UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JUDY ROMERO, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 1:03-CV-01367-MAC |
| | § | |
| vs. | § | |
| | § | |
| WYETH LLC, | § | Honorable Marcia A. Crone |
| | § | |
| Defendant. | § | |

**WYETH'S MOTION TO EXCLUDE THE TESTIMONY OF**
**RANDALL PATTEN, M.D. AND BRIEF IN SUPPORT**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendant Wyeth LLC f/k/a Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. ("Wyeth") files this Motion to Exclude the Testimony of Randall Patten, M.D. and Brief in Support, and would respectfully show the Court as follows:

## TABLE OF CONTENTS


**I. INTRODUCTION AND BACKGROUND** .......... 1

A. The Science Behind Breast Density .......... 1

B. Plaintiff's Medical Background .......... 2

C. Dr. Patten's Qualifications and Opinions .......... 3

**II. STANDARD OF REVIEW** .......... 5

**III. ARGUMENT AND AUTHORITIES** .......... 8

A. Dr. Patten is Unqualified to Render his Causation Opinions .......... 8

B. Dr. Patten's Causation Opinions are Unreliable and Should be Excluded. .......... 10

1. Dr. Patten's Opinion Testimony Directly Conflicts with the Only Relevant Studies .......... 10

2. Dr. Patten Applies a Different Methodology in the Courtroom Than He Does in His Medical Practice. .......... 13

C. Dr. Patten's Causation Opinions Conflict with the Facts of this Case .......... 14

**IV. CONCLUSION** .......... 17

## TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE**

*In re Air Crash Disaster at New Orleans, La.*,
795 F.2d 1230, 1234 (5th Cir. 1986) ....................7, 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)....................1, 5, 6, 7, 10, 11, 12, 13

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
43 F.3d 1311, 1317 (9th Cir. 1995) ....................7

*Elshotz v. Taser International Inc.*,
No. 4:05-CV-487-Y, 2007 WL 2781664, at *2-3 (N.D. Tex. Sept. 25, 2007)................6, 7

*General Electric Co. v. Joiner*,
522 U.S. 136, 146 (1997)....................7

*Guy v. Crown Equipment Corp.*,
394 F.3d 320, 325 (5th Cir. 2004) ....................6

*Johnson v. Manitowoc Boom Trucks, Inc.*,
484 F.3d 426, 435 (6th Cir. 2007) ....................7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................5, 13

*Mathis v. Exxon Corp.*,
302 F.3d 448, 459-60 (5th Cir. 2002) ....................5

*Moore v. Ashland Chemical Inc.*,
151 F.3d 269, 278 (5th Cir. 1998) ....................7

*Paz v. Brush Engineered Materials, Inc.*,
555 F.3d 383, 388 (5th Cir. 2009) ....................15

*Vargas v. Lee*,
317 F.3d 498, 500 (5th Cir. 2003) ....................6

**FEDERAL STATUTES AND RULES**

FEDERAL RULE OF EVIDENCE 702 ....................1, 5, 6, 10, 12, 13, 14

The Court should exclude Dr. Patten's opinions under Rule 702 and *Daubert* because they are not the product of reliable principles or methods, they conflict with the facts of this case, and he is unqualified to render them.

## I. INTRODUCTION AND BACKGROUND

### A. The Science Behind Breast Density.

A woman's breast is generally composed of fat, fibrous tissue (called stroma), and glandular tissue (lobules and ducts).[1] A mammogram is a low-dose x-ray administered while the breast is compressed between two plates.[2] Compressing the breast between two plates permits the mammogram to be taken at several different angles.[3] Still, because a mammogram is a two-dimensional picture of a three-dimensional object, its ability to detect all breast abnormalities is somewhat limited.[4] One of these limitations is the detection of breast density.[5]

Stroma and glandular tissue have a higher water content than fat, and therefore block a greater percentage of an x-rays than fat.[6] Thus, on a mammogram, fat in a breast appears dark, while stroma, lobules, and ducts appear white.[7] Breast density refers to the percentage of white to dark on a mammogram: the more white that appears, the higher the patient's breast density.[8]

To create a uniform system to characterize mammograms, the American College of

---

1 **Exhibit 15 –** Patten Report at 5; **Exhibit 6 –** Affidavit of Susan P. Weinstein, M.D., *Mill v. Wyeth Pharmaceuticals*, Inc., No. 3631 (Pa. Ct. Comm. Pleas) (Sept. 13, 2007) ("Weinstein Affidavit") at ¶ 7.

2 **Exhibit 6 –** Weinstein Affidavit at ¶ 5.

3 *Id.*

4 *Id.* at ¶ 6.

5 **Exhibit 15 –** Patten Report at 5-6.

6 **Exhibit 15 –** Patten Report at 5-6; **Exhibit 6 –** Weinstein Affidavit at ¶ 7.

7 **Exhibit 15 –** Patten Report at 5-6; **Exhibit 6 –** Weinstein Affidavit at ¶ 7.

8 **Exhibit 15 –** Patten Report at 5-6; **Exhibit 6 –** Weinstein Affidavit at ¶ 7.

Radiology established four breast imaging categories for the reporting of breast density.[9] This system, called the Breast Imaging Reporting and Data System (BI-RADS), categorizes breast density as follows:

- Almost entirely fat: < 25% of the breast volume dense
- Scattered fibroglandular densities: 25-50% dense
- Heterogeneously dense: 50-75% dense
- Extremely dense: > 75% dense.[10]

The BI-RADS categorizations proceed only in quartiles, and radiologists do not regularly opine that a patient's breast density is a specific percentage but instead use the four categories.[11]

**B. Plaintiff's Medical Background.**

Ms. Romero began experiencing menopausal symptoms, including irregular periods and hot flashes, in 1996 at the age of 48.[12] On December 31, 1996, Ms. Romero began taking Premphase to address these symptoms.[13] Ms. Romero continued taking Premphase until February 22, 2000 when she switched to Prempro.[14] After her February 27, 2001 mammogram revealed an area of calcifications in the left breast and a questionable mass in her right breast, Ms. Romero stopped taking Prempro and was diagnosed with high grade ductal carcinoma in the left breast.[15] She received radiation treatment to the left breast and she began taking Tamoxifen, an estrogen blocker.[16]

---

9 **Exhibit 15 –** Patten Report at 6; **Exhibit 6 –** Weinstein Affidavit at ¶ 8.

10 **Exhibit 15 –** Patten Report at 6; **Exhibit 6 –** Weinstein Affidavit at ¶ 8.

11 **Exhibit 8 –** Oral Deposition of Randall Patten, M.D., *Zahn v. Wyeth Pharms., Inc.* (Jan. 17, 2011) ("Patten *Zahn* Dep.") at 44:12-48:23; *see also* **Exhibit 15 –** Patten Report at 6.

12 **Exhibit 18 –** JRomero-O&GA-Houston-000178 to -179; JRomero-SHE-MD-000035; **Exhibit 19** - Oral Deposition of Judy Romero (May 22, 2009) ("Romero Dep.") at 184:24-185:11, 185:20-186:14, 222:12-223:9.

13 **Exhibit 18 –** JRomero-O&GA-Houston-000179; **Exhibit 19** - Romero Dep. at 159:13-16.

14 **Exhibit 18 –** JRomero-O&GA-Houston-000022.

15 **Exhibit 18 –** JRomero-KETomm000031to -32; JRomero-KETomm-000057 to -58; JRomero-WHT-000020 to -21.

16 **Exhibit 18 –** JRomero-KETomm000016, JRomero-KETomm000046 to -48; JRomero-TexasOnc-000039 to -40.

The first record of Ms. Romero having a mammogram is in July 1988.[17] She had at least two more mammograms prior to taking HT medication: one on August 11, 1993, and another on June 27, 1996.[18] After 1996, Ms. Romero had at least one mammogram every year continuing through to the present.[19] The films for Ms. Romero's mammograms from the middle years (June 1996 through March 2002) were available for Dr. Patten to review; the films from the early and later years (1988, 1993, and March 2003 to the present) were not, although the mammography reports dictated by the interpreting radiologist were available to Dr. Patten.[20]

To reach his opinions in this case, Dr. Patten read each of the 7 mammograms that were available. According to Dr. Patten, Ms. Romero's breasts were 80% dense on each of her mammograms between 1996 and 2002.[21] This would place Ms. Romero's breast density in BI-RADS category 4, the densest category, for each of these mammograms.[22] Each of the mammography reports for Ms. Romero's annual mammograms from 2003 to 2010 also characterize her breast density as either "dense" or "very dense."[23]

### C. Dr. Patten's Qualifications and Opinions.

Dr. Patten is a diagnostic radiologist who now primarily analyzes mammograms and testifies for plaintiffs in HT cases.[24] Before 2010, Dr. Patten testified for HT plaintiffs solely regarding the films and what they show about breast density; starting last year, however, Dr.

---

17 **Exhibit 15** – Patten Report at 2.

18 **Exhibit 15** – Patten Report at 2; **Exhibit 18** – JRomero-SHE-MD-000140.

19 **Exhibit 15** – Patten Report at 2.

20 **Exhibit 15** – Patten Report at 2.

21 **Exhibit 15** – Patten Report at 3-4.

22 **Exhibit 17** – Oral Deposition of Randall M. Patten, M.D. (May 24, 2011) ("Patten Dep.") at 33:11-22.

23 **Exhibit 18** – JRomero-SMcKenney 000087-88, 91; JRomero-TRobinson-000012, 12; JRomero-O&GA-Houston-000039, 207, 261; JRomero-ThBrCtr-000002; **Exhibit 17** – Patten Dep. at 34:1-35:5.

24 **Exhibit 15** – Patten Report at 1-2; **Exhibit 16** – Dr. Patten's Testimonial History. Dr. Patten reads between 4,000 and 5,000 mammograms per year. **Exhibit 15** – Patten Report at 2.

Patten also began to testify that HT ***causes*** increased breast density, which increases a patient's susceptibility to breast cancer.[25] But before he began offering this causation testimony, Dr. Patten admitted, in two other HT cases, that he is unqualified to offer an opinion on the causes of breast cancer:

> Q: And you're not qualified to give an opinion on the cause of a breast cancer, is that fair?
>
> A: That would be better left to a cell biologist or an oncologist, not me.[26]
>
> * * * * * * *
>
> Q: Over the course of your clinical radiology practice, have you undertaken to determine what was the cause of a woman's breast cancer?
>
> A: Certainly theorized, but haven't listed a particular causative agent in any report that I've ever generated for an women's mammography report.
>
> Q: ***You've never done that, right?***
>
> A: ***Correct***.[27]

Dr. Patten so testified in his deposition in this case, explaining that opining as to whether HT caused Ms. Romero's breast cancer was "not [his] role" and that "there are others who are much more qualified to render that opinion than [he is]."[28] In spite of these admissions, Dr. Patten opines that HT caused Ms. Romero's breasts to remain dense, increasing her risk of breast

---

[25] *Compare* **Exhibit 12** – Report of Randall M. Patten, M.D., P.S., *Barton v. Wyeth* (June 2009) (containing no general causation opinions), and **Exhibit 13** – Report of Randall M. Patten, M.D., P.S., *Buxton v. Wyeth* (November 2009) (same), *with* **Exhibit 15** – Patten Report at 10 (giving general causation opinions).

[26] **Exhibit 7** – Oral Deposition of Randall Patten, M.D., *Esposito v. Wyeth, Inc.* (Nov. 21, 2009) ("Patten *Esposito* Dep.") at 201:10-15.

[27] **Exhibit 9** – Oral Deposition of Randall Patten, M.D., *Cross v. Wyeth, Inc.* (Jan. 17, 2011) ("Patten *Cross* Dep.") at 44:12-19 (emphasis added).

[28] **Exhibit 16** – Patten Dep. at 79:23-80:6.

cancer:

- "[R]eports of Ms. Romero's prememopausal breast density suggest that her parenchymal tissue was dense";

- Plaintiff's "perimenopausal mammographic breast density placed her at relatively increased risk for breast cancer. This risk appears to be further increased in women with dense breasts who take [HT medication]";

- That Plaintiff's "mammographic breast density remained extremely dense during the time that she was taking Premphase and Prempro . . . [which] suggests that her breast tissue reacted to and was influenced by the presence of exogenous hormones"; and

- "Had [Plaintiff] not taken [HT medication], it is likely that her breast tissue would have undergone gradual and natural fatty involution during menopause, thereby reducing her risk of breast cancer."[29]

Despite Plaintiff's arguments to the contrary, these opinions are precisely the type that Dr. Patten admitted he was unqualified to give: opinions regarding the cause of a particular woman's breast cancer. The Court should exclude his opinions under Rule 702 and *Daubert* on the grounds that they are unreliable, they are not based on sufficient facts or data, and Dr. Patten is unqualified to render them.

## II. STANDARD OF REVIEW

Rules 702 and 703 of the Federal Rules of Evidence, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of an expert witness's testimony. The party offering the expert testimony has the burden to establish that it is admissible under Rule 702 and *Daubert*. *E.g.*, *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002). "*Kumho Tire* clarified that the Rule 702/*Daubert* analysis applies to all proposed expert testimony, including nonscientific 'technical analysis' and other 'specialized knowledge'". *Guy v. Crown Equipment Corp.*, 394

[29] **Exhibit 15** – Patten Report at 10.

F.3d 320, 325 (5th Cir. 2004).

Rule 702 expressly imposes three requirements that expert testimony must meet before it is admissible. The testimony must be "based upon sufficient facts or data." It must be "the product of reliable principles and methods." And the witness must have "applied the principles and methods reliably to the facts of the case."

The reliability requirements ensure that expert testimony is "supported by appropriate validation" and "establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590. The Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. An expert's opinions must be based on more than "subjective belief or unsupported speculation." *Id.* at 590.

"In *Daubert*, the Supreme Court set forth an illustrative, non-exhaustive list of factors that may be considered by the district court when determining whether the expert testimony is sufficiently reliable. These factors include whether the theory or technique that forms the basis of the expert's testimony: (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error and standards controlling its operation; and (4) is generally accepted within the relevant scientific or technical community." *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003). To permit a determination of whether his or her opinions are reliable, an expert must provide details regarding the methodology he used and tests he conducted to reach those opinions. *See*, *e.g.*, *Elshotz v. Taser Int'l Inc.*, No. 4:05-CV-487-Y, 2007 WL 2781664, at *2-3 (N.D. Tex. Sept. 25, 2007) (Means, J.) ("This Court simply cannot determine whether an expert's opinions are reliable when he fails to provide any details regarding the methodology he used to conduct the tests that give rise to those opinions.").

Under *Daubert*, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (en banc) (internal quotation marks and citation omitted). There must be an analytical connection between the facts of the case and the opinion offered. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore*, 151 F.3d at 276. This "fit" between the facts and the expert's conclusions is not present when there is "too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146. In other words, there must be a demonstrable connection between the facts and the opinions, and the expert's reasoning and methodology must be properly applied to the facts. *See Daubert*, 509 U.S. at 592-93. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

Finally, "[o]ne very significant fact" to be considered when assessing the reliability and admissibility of expert testimony "is whether the expert[] [is] proposing to testify about matters growing naturally and directly out of research [he] ha[s] conducted independent of the litigation, or whether [he] ha[s] developed [his] opinions expressly for purposes of testifying." *Daubert v. Merrill Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*). When a proposed expert, such as Dr. Patten, "is a 'quintessential expert for hire,' then it seems well within a trial judge's discretion to apply the *Daubert* factors with greater rigor." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007); *see also In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1234 (5th Cir. 1986) ("[T]he professional expert is now commonplace. That a person spends substantially all of his time consulting with attorneys and testifying is not a disqualification. But experts whose opinions are available to the highest bidder

have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that he is an 'expert.'").

## III. ARGUMENT AND AUTHORITIES

### A. Dr. Patten is Unqualified to Render his Causation Opinions.

In his deposition, Dr. Patten professed not to be offering an opinion about the cause of Ms. Romero's breast cancer.[30] But he nevertheless offers the opinions that Plaintiff's "mammographic breast density remained extremely dense during the time that she was taking Premphase and Prempro . . . [which] suggests that her breast tissue reacted to and was influenced by the presence of exogenous hormones" and that "Had [Plaintiff] not taken [HT medication], it is likely that her breast tissue would have undergone gradual and natural fatty involution during menopause, thereby reducing her risk of breast cancer."[31] These are in fact opinions regarding causation.

The difficulty is that Dr. Patten has admitted in prior HT cases that he is not qualified to offer an opinion regarding breast cancer causation:

> Q. And you're not qualified to give an opinion on the cause of a breast cancer, is that fair?
>
> A. ***That would be better left to a cell biologist or an oncologist, not me***.[32]
>
> * * *
>
> Q. Over the course of your clinical radiology practice, have you undertaken to determine what was the cause of a woman's breast cancer?
>
> A. Certainly theorized, but haven't listed a particular causative

---

30 **Exhibit 17 –** Patten Dep. at 79:23-80:6.

31 **Exhibit 15 –** Patten Report at 10.

32 **Exhibit 7 –** Patten *Esposito* Dep. at 201:10-15 (emphasis added).

agent in any report that I've ever generated for a woman's mammography report.

Q. You've never done that, right?

A. Right.[33]

Dr. Patten testified similarly in his deposition in this case, explaining that opining as to whether HT caused Ms. Romero's breast cancer was "not [his] role" and that "there are others who are much more qualified to render that opinion than [he is]."[34]

There is nothing unique about the size, shape, or location of a breast cancer that would allow Dr. Patten, as a radiologist, to determine whether the cancer was caused by the use of HT medication.[35] In one of the first cases remanded from the MDL to proceed to trial, the court recognized that Dr. Patten was unqualified to offer opinions about causation and barred him from doing so:

> He admitted in his deposition that he is not the right person to give such an opinion. And plaintiff says he is not the best expert for it but he is a sufficiently qualified expert. . . . As to the general causation opinion, this general causation opinion is not reliable and in any event it is cumulative as the plaintiff points out there are more qualified experts on causation and it does seem cumulative to allow this witness to offer an opinion in which he himself is not competent.[36]

Nothing has changed regarding Dr. Patten's qualifications: He remains unqualified to testify regarding causation and should not be permitted to do so.

**B. Dr. Patten's Causation Opinions are Unreliable and Should be Excluded.**

Dr. Patten's opinions are at odds with the relevant science. Specifically, Dr. Patten's opinions are unreliable because (1) the only available scientific studies on the connection

33 **Exhibit 9** –Patten *Cross* Dep. at 44:12-19 (App. 67).

34 **Exhibit 16** – Patten Dep. at 79:23-80:6.

35 **Exhibit 10** – Oral Deposition of Randall Patten, M.D., *Torkie-Tork v. Wyeth* (July 13, 2010) at 60:16-22, 61:12-15.

36 **Exhibit 11** – Hearing Transcript, *Torkie-Tork v. Wyeth* (Nov. 15, 2010) at 101-103.

between HT, breast density, and breast cancer have determined that "the effects of [HT] on mammographic density, and on breast cancer, are separate and not related causally;"[37] and (2) by specifying the breast density indicated by each of Ms. Romero's mammograms to a specific percentage, Dr. Patten employs a method in the courtroom that is not generally accepted in the radiology field and that he himself does not utilize in his own practice. This renders Dr. Patten's opinions inadmissible under *Daubert* and Rule 702.

#### 1. Dr. Patten's Opinion Testimony Directly Conflicts with the Only Relevant Studies.

Dr. Patten opines that HT medication increased Ms. Romero's breast density, which increased her risk of developing breast cancer.[38] This opinion therefore relies on two important premises: (1) that HT medication is capable of increasing a patient's breast density, and did so in Ms. Romero's case; and (2) that HT-induced breast density is capable of causing breast cancer, and did so in Ms. Romero's case. Although some scientific studies support the first premise, there is no such support for the second premise; in fact, the most recent scientific studies directly refute it.

Some studies indicate that a woman's "native" breast density – her breast density before menopause and before taking HT medication – is a risk factor for developing breast cancer, but there is not a scientific consensus on the issue.[39] Dr. Patten himself testified that he is not sure whether native breast density is a risk factor for breast cancer or a marker for increased risk.[40] He has never researched the issue, and testified that he simply does not know which it is, even

---

37 **Exhibit 1 –** Boyd, Norman et al., *Mammographic Density as a Surrogate Marker for the Effects of Hormone Therapy on Risk of Breast Cancer*, 15 CANCER EPIDEMIOL. BIOMARKERS PREV. 961, 965 (May 2006) ("Boyd 2006").

38 **Exhibit 15 –** Patten Report at 10.

39 **Exhibit 15 –** Patten Report at 10; **Exhibit 16 –** Patten Dep. at 49:4-22.

40 **Exhibit 17 –** Patten Dep. at 49:4-22.

though this would seemingly be an important issue in forming his opinions.[41]

Some studies also suggest that HT increases a woman's breast density.[42] According to Dr. Patten, an HT-induced increase in breast density must also be a risk factor for developing breast cancer (even though he isn't sure that breast density is a risk factor for breast cancer).[43] The most recent scientific studies have rejected this premise, however.[44]

In the principal study on the issue, Dr. Norman Boyd concluded that, although there is some correlation between HT-induced increases in breast density and the risk of breast cancer, "the effects of hormone therapy on mammographic density, and on breast cancer risk, are separate and not related causally."[45] Dr. Boyd explained that there is no causal relationship between the two because

> ***The present results suggest that the pathways that are responsible for the increase in mammographic density following exposure to exogenous hormones, and those that increase risk of breast cancer in those taking hormone therapy, are not the same.*** . . . [HT] seems to have a relatively short-term effect on breast cancer risk, which is greatest in those taking hormones currently or recently, and disappears 5 years after cessation of use. . . . The increase in density that is associated with use of hormones may be due to an increase in the numbers of these cells, and although this may increase risk over the long term, it is unlikely to have any influence on risk in the short term.[46]

Two subsequent studies confirmed this conclusion.[47]

---

41 *Id*. at 49:4-50:7.

42 **Exhibit 15 –** Patten Report at 8-9.

43 **Exhibit 15 –** Patten Report at 9-10; **Exhibit 17 –** Patten Dep. at 49:4-50:7.

44 **Exhibit 1 –** Boyd 2006 at 964-65; **Exhibit 2 –** Becker, Susan & Kaaks, Rudolf, *Exogenous and Endogenous Hormones, Mammographic Density and Breast Cancer Risk: Can Mammographic Density be Considered an Intermediate Marker of Risk?*, 181 RECENT RESULTS IN CANCER RESEARCH 135, 149-50 (2009) ("Becker 2009"); **Exhibit 3 –** Martin, Lisa et al., *Hormone Therapy, Mammographic Density, and Breast Cancer Risk*, 64 MATURITAS 20, 24-25 (Sept. 2009) ("Martin 2009").

45 **Exhibit 1 –** Boyd 2006 at 965.

46 **Exhibit 1 –** Boyd 2006 at 965 (emphasis added).

47 **Exhibit 2 –** Becker 2009 at 150 ("In summary, although there are some intriguing parallel

Dr. Patten has not accounted for these studies in reaching his opinions. When confronted with Dr. Boyd's study in a deposition in another case, Dr. Patten admitted that it was contrary to his opinions, and that he was not aware of studies on the specific issue of the relationship between HT-induced increases in breast density and breast cancer risk.[48] Instead, he made clear that he was relying on the general studies determining that *natural* breast density is a risk factor for breast cancer.[49]

Dr. Boyd and his co-authors, confirmed by two other articles, disproved a key premise of Dr. Patten's opinions in this case, and Dr. Patten has cited to no specific studies rebutting those studies or supporting his opinions. The fact that science has rejected his theory developed during litigation renders it inadmissible under *Daubert* and Rule 702.[50]

---

findings relating [HT], tamoxifen, or endogenous hormones (PRL) to both increased mammographic density and increased breast cancer risk, there are also major discrepant observations regarding the role of sex hormones in the regulation of mammographic density. It is therefore impossible, at present, to propose mammographic density measures as an intermediate measure of risk, integrating the effects of exogenous and/or endogenous hormones on breast tumor development."); **Exhibit 3 –** Martin 2009 at 25 ("To date, however, none of the hormones that influence breast cancer risk have been shown to do so through their associations with [breast density].").

48 **Exhibit 7 –** Patten *Esposito* Dep. at 141:2-143:19.

49 **Exhibit 7 –** Patten *Esposito* Dep. at 143:7-19.

50 In other HT cases, other plaintiffs have cited to a letter to the editor written by Drs. Ursin and Pike four months after Dr. Boyd's article was published as rebutting the article's conclusions. **Exhibit 4 –** Drs. Giske Ursin & Malcolm Pike, *Letter to the Editor: Mammographic Density, Hormone Therapy, and the Risk of Breast Cancer*, 15 CANCER EPIDEMIOL. BIOMARKERS PREV. 9 (Sept. 2006) (App. 37). A letter to the editor that is more than five years old is not a scientific study however, and the failure of either Dr. Ursin or Dr. Pike to ever publish an article rebutting Dr. Boyd's conclusions with the results of a study indicates that Dr. Boyd's results were more reliable than they initially thought.

### 2. Dr. Patten Applies a Different Methodology in the Courtroom Than He Does in His Medical Practice.

Finally, the Court should exclude Dr. Patten's opinions because he adheres to a different methodology as an expert witness than he does in his medical practice. Rule 702 and *Daubert* require an expert witness to "[e]mploy in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Dr. Patten's use of a different methodology in this case therefore requires that the Court exclude his opinions.

Specifically, Dr. Patten, for each of the mammograms that were available for him to read, assigned a specific percentage to Ms. Romero's breast density.[51] For example, Dr. Patten opined that the mammograms Ms. Romero had between 1996 to 2002 reflected 80% density.[52] The BI-RADS classification system, which was developed by the American College of Radiology and which Dr. Patten uses in his private practice, classifies breast density only by quartile into four categories: (1) Almost entirely fat (<25% dense); (2) Scattered fibroglandular densities (25% – 49% dense); (3) Heterogeneously dense (50% –75% dense); and (4) Extremely dense (>75% dense).[53]

Dr. Patten's assignment of specific percentages to the density reflected in the mammograms he read contradicts both the only recognized manner of classifying breast density in his profession, as established by the American College of Radiology, and the method he himself utilizes in private practice. Dr. Patten's opinions must be excluded.

---

[51] **Exhibit 15** – Patten Report at 3-4.
[52] *Id*.
[53] **Exhibit 15** – Patten Report at 6; **Exhibit 9** – Patten *Cross* Dep. at 51:16-53:10.

### C. Dr. Patten's Causation Opinions Conflict with the Facts of this Case.

Dr. Patten seeks to testify that "[h]ad [Plaintiff] not taken [HT medication], it is likely that her breast tissue would have undergone gradual and natural fatty involution during menopause, thereby reducing her risk of breast cancer."[54] This opinion is not "based upon sufficient facts or data" as required by Rule 702, and the Court should therefore exclude it.

In Dr. Patten's opinion (in this and every other HT case in which he has recently testified), HT medication prevents the natural decrease in breast density that the average woman going through menopause generally experiences.[55] Thus, according to Dr. Patten, HT medication causes a woman to have breasts that are denser than she ordinarily would.[56] This conclusion suffers from two flaws: first, it conflicts with the science Dr. Patten relies on; and second, it contradicts Ms. Romero's mammograms.

First, Dr. Patten's conclusions, as applied to Ms. Romero, contradict the studies that he relies upon. In his report, Dr. Patten cites to a study by Professors Sterns and Zee as support for his opinion that Ms. Romero's breast density should have declined at the time she was taking Premphase and Prempro.[57] According to this study, 38% of women who do not take HT medication experience a decrease in breast density before age 55.[58] Thus, according to this study, the majority of women – the remaining 62% – experience ***no decrease in breast densit***y before the age of 55.[59] Ms. Romero was 48 years old when she began taking Premphase in 1996

---

54 **Exhibit 15** – Patten Report at 9-10.
55 **Exhibit 15** – Patten Report at 9-10.
56 *Id.*; **Exhibit 17** – Patten Dep. at 58:2-59:8.
57 **Exhibit 15** – Patten Report at 8 (citing **Exhibit 5** – Sterns, Ernest, & Zee, Benny, *Mammographic Density Changes in Perimenopausal and Postmenopausal Women: Is the Effect of Hormone Replacement Therapy Predictable?,* 59 BREAST CANCER RES. & TRTMT. 125, 130 (2000)).
58 *Id.*; **Exhibit 17** – Patten Dep. at 80:7-81:7.
59 **Exhibit 15** – Patten Report at 8; **Exhibit 17** – Patten Dep. at 80:7-81:7.

and was 52 when she stopped taking Prempro in 2001.[60] According to Dr. Patten's own statistics, Ms. Romero's breast density was not expected to decrease for the ages that she took HT medication – the breast density of 62% of the women in her age group (below 55) did not decrease in Dr. Patten's study.[61] Dr. Patten's opinions are therefore unreliable in light of the studies he purports to rely on.

Second, Dr. Patten's opinions contradict the facts of this case. Mammographic records – either mammogram films or mammography reports – exist from before Ms. Romero began taking HT medication through the present.[62] Ms. Romero had dense breasts before starting Premphase in 1996, the entire time she took Premphase and Prempro from 1996 until February 2001, and for the decade after she stopped taking HT medication.[63] Thus, Ms. Romero's breast density remained high for many years when, according to Dr. Patten, it should have decreased. This conflict between Dr. Patten's opinion – that, absent HT medication, Plaintiff's breast density would naturally decrease – and the facts of this case – Ms. Romero's actual mammographic record showed no decrease in breast density in ten years of mammograms after she stopped taking HT medication – renders Dr. Patten's opinions unreliable and inadmissible. *See Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where an expert's opinion is based on insufficient information, the analysis is unreliable.").

When confronted with this conflict during his deposition, Dr. Patten at first denied that there was a conflict and testified that perhaps the mammography reports from 2003-2010 were

---

[60] **Exhibit 20** – Plaintiff's MDL Fact Sheet (May 22, 2010) ("Plaintiff Fact Sheet") at 6.

[61] **Exhibit 15** – Patten Report at 8; **Exhibit 17** – Patten Dep. at 80:7-81:7.

[62] **Exhibit 15** – Patten Report at 2-4.

[63] **Exhibit 15** – Patten Report at 3-4; **Exhibit 17** – Patten Dep. at 29:3-8, 29:19-21; **Exhibit 18** – JRomero-SMcKenney 000087-88, 91; JRomero-TRobinson-000012, 12; JRomero-O&GA-Houston-000039, 207, 261; JRomero-ThBrCtr-000002.

inaccurate.[64] But Dr. Patten has testified in other cases that it is a reliable methodology to rely on the characterization of a patient's breast density in the mammography reports dictated by another radiologist when the original film is not available.[65] Dr. Patten cannot rely on mammography reports dictated by other radiologists when they fit his opinion but attempt to discredit them when they do not support his opinions.

When pressed, Dr. Patten admitted that Plaintiff's consistently high breast density for the decade after she stopped taking HT medication "would not particularly support the fact that that [breast density] was a hormonally related effect."[66] That puts it mildly. The fact that Ms. Romero's breast density remained constant from before she started taking HT until the present day, more than a decade after she stopped taking HT and a decade after Dr. Patten's opinions anticipate that her breast density will begin to decrease renders his opinions factually unsupported and unreliable.

Dr. Patten also opines that the fact that Ms. Romero's breast density was consistently dense for the four years that she took Premphase and Prempro "suggests that her breast tissue reacted to and was influenced by the presence of exogenous hormones."[67] This opinion is also factually unsupported and unreliable for similar reasons: Ms. Romero's consistently high breast density for more than a decade after she ceased taking exogenous hormones in any way conclusively establishes that her breast tissue is not influenced by exogenous hormones.

Dr. Patten's exogenous hormones opinion is also not reliable because he admitted that the

---

64 **Exhibit 17 –** Patten Dep. at 56:9-57:1.

65 **Exhibit 14 –** Oral Deposition of Randall M. Patten, M.D., *Ashlock v. Wyeth* (Nov. 21, 2011) at 45:17-46:12 ("And literature would suggest that most radiologists are very much in agreement, radiologists are going to agree with one another as far as putting them -- putting a particular mammogram in a particular ACR density category.").

66 **Exhibit 17 –** Patten Dep. at 57:2-16.

67 **Exhibit 15 –** Patten Report at 10.

issue of what hormones affect Ms. Romero's breast density is far beyond his field of expertise:

> Q: So you would not be able to rule out the fact that the breast itself may produce enough estrogen to maintain its own density?
>
> MR. BESS: Object to form.
>
> THE WITNESS: ***That is far away from my field as a radiologist*** --
>
> Q: (By Ms. Cochran) Okay.
>
> A: -- so no, I would not be able to answer that question. ***I wouldn't have the slightest clue as to how to answer for that -- answer that question***.

It is impossible to reconcile Dr. Patten's opinion regarding the effect of ***exogenous*** estrogen on Ms. Romero's breast tissue (and the implicit assertion that he is qualified to render that opinion) with his testimony that he is utterly unqualified to testify about the effect of ***endogenous*** estrogen (that is, estrogen the body produces) on Ms. Romero's breast tissue.

The Court should therefore exclude Dr. Patten's opinion testimony regarding the effect of HT medication on Plaintiff's breast density and breast tissue.

## IV. CONCLUSION

Defendant Wyeth LLC f/k/a Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. therefore respectfully requests that the Court exclude Dr. Patten's opinion testimony in its entirety. Wyeth requests all other relief to which it has shown itself justly entitled.

Dated: February 24, 2012

Respectfully Submitted,

By: /s/ *Gregory S. Meece w/ permission JHM*
Gregory S. Meece, *Attorney-in-Charge*
Texas State Bar No. 13898350
Gregory.Meece@tklaw.com

**THOMPSON & KNIGHT LLP**
333 Clay Street, Suite 1500
Houston, Texas 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

— ***AND*** —

John H. Martin
Texas State Bar No. 13086500
John.Martin@tklaw.com
Janelle L. Davis
Texas State Bar No. 24059655
Janelle.Davis@tklaw.com

**THOMPSON & KNIGHT LLP**
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF CONFERENCE

Counsel has complied with the meet and confer requirement in Local Rule CV-7(h). This motion is opposed. On February 17th and 20th, counsel for Plaintiff, Bryan Aylstock, and counsel for Defendant, Janelle L. Davis, conducted the conferences required by this rule. Despite a good faith effort by both sides, an agreement could not be reached and the discussions have conclusively ended in an impasse, leaving an open issue for the court to resolve.

*/s/ Janelle L. Davis*
Janelle L. Davis

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 24th day of February, 2012 a true and correct copy of the foregoing was filed with the Court and served via electronic notification on all counsel of record.

*/s/ Janelle L. Davis*
Janelle L. Davis

064500 000019 DALLAS 2839314.2