UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JUDY ROMERO, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 1:03-CV-01367-MAC |
| | § | |
| vs. | § | |
| | § | |
| WYETH LLC, | § | Honorable Marcia A. Crone |
| | § | |
| Defendant. | § | |

**WYETH'S MOTION TO EXCLUDE THE TESTIMONY OF DRS. AUSTIN AND TILLEY AND BRIEF IN SUPPORT**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Wyeth LLC f/k/a Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. ("Wyeth") files this Motion to Exclude the Testimony of Drs. Austin and Tilley and Brief in Support, and would respectfully show the Court as follows:

## TABLE OF CONTENTS


I. BACKGROUND AND THE OPINIONS AT ISSUE ........ 1

II. THE LEGAL STANDARD ........ 3

III. OPINION TESTIMONY REGARDING SAFER ALTERNATIVE DESIGN IS UNRELIABLE AND THE COURT SHOULD EXCLUDE IT. ........ 4

A. The Opinions of Drs. Austin and Tilley are Irrelevant for Purposes of Rule 702. ........ 8

1. Failure to Consider *All* the Risks and Benefits ........ 8

2. Failure to Identify an Alternative Design for Prempro ........ 10

B. The Opinions of Drs. Austin and Tilley are Based on Insufficient and Unreliable Scientific Evidence. ........ 15

1. The Espié Study ........ 16

2. The Fournier Study ........ 16

3. The clinical trial evidence contradicts Drs. Austin and Tilley's conclusion. ........ 18

4. The monkey study is unreliable. ........ 20

IV. CONCLUSION ........ 22

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Allison v. McGhan Medical Corp.*,
184 F.3d 1300 (11th Cir. 1999) .................................................. 20

*Bielskis v. Louisville Ladder, Inc.*,
— F.3d —, 2011 WL 5829771 (7th Cir. 2011) .................................. 10

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .................................................. *passim*

*Elshotz v. Taser International Inc.*,
No. 4:05-CV-487-Y, 2007 WL 2781664 (N.D. Tex. Sept. 25, 2007) .................. 13

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997) .................................................. 4, 16

*Housing Works, Inc. v. Turner*,
362 F. Supp. 2d 434 (S.D.N.Y. 2005) .................................................. 18

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .................................................. 3, 18

*Mathis v. Exxon Corp.*,
302 F.3d 448 (5th Cir. 2002) .................................................. 4

*Moore v. Ashland Chemical Inc.*,
151 F.3d 269 (5th Cir. 1998) .................................................. 4

*In re Paoli R.R. Yard PCB Litigation*,
35 F.3d 717 (3d Cir. 1994) .................................................. 20

*Pritchard v. Dow Argo Scis.*,
705 F. Supp. 2d 471 (W.D. Pa. 2010) .................................................. 16

*In re: Rezulin*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005) .................................................. 18

*Robinson v. Crown Equipment Corp.*,
No. 2:02-CV-84, 2006 WL 897669 (E.D. Ark. Mar. 30, 2006) .................................. 10

*Theriot v. Danek Med., Inc.*,
168 F.3d 253, 255 (5th Cir. 1999) .................................................. 13

*Torkie-Tork v. Wyeth*,
739 F. Supp. 2d 895 (E.D. Va. 2010) .................................................. 13

*Watkins v. Telsmith, Inc.*,
121 F.3d 984, 992 (5th Cir. 1997) .......... 10

*Wells v. SmithKline Beecham Corp.*,
601 F.3d 375 (5th Cir. 2010) .......... 16

*Zaremba v. Gen. Motors Corp.*,
360 F.3d 355 (2d. Cir. 2004) .......... 8

**STATE CASES**

*Caterpillar, Inc. v. Shears*,
911 S.W.2d 379 (Tex. 1995) .......... 13

*Damian v. Bell Helicopter Textron, Inc.*,
— S.W.3d —, 2011 WL 3836464 (Tex. App.—Ft. Worth 2011, no pet. h.) .......... 13

*Gen. Motors Corp. v. Sanchez*,
997 S.W.2d 584 (Tex. 1999)) .......... 8

**FEDERAL RULES**

Fed. R. Evid. 702 .......... *passim*

Fed. R. Evid. 703 .......... 3

## I. BACKGROUND AND THE OPINIONS AT ISSUE

This case arises out of Plaintiff Judy Romero's use of Premphase and Prempro, prescription hormone therapy ("HT") medications used for the treatment of menopausal symptoms. Each of these medications was approved by the U.S. Food & Drug Administration ("FDA") as safe and effective at the time that Ms. Romero took them, and are still on the market today. Ms. Romero has designated Donald Austin, M.D. and Wayne Tilley, Ph.D. to testify as expert witnesses regarding safer alternative design. United States Magistrate Judge Zack Hawthorn previously found Drs. Austin's and Tilley's safer alternative design opinions to be inadmissible, and this Court should do the same.[1]

First, Dr. Tilley is expected to testify that medroxyprogesterone acetate ("MPA") "in combination hormone replacement therapy (cHRT) contributes to the development of breast cancer" and that OMP is a safer alternative to the use of MPA.[2] The majority of his report discusses the former proposition;[3] he dedicates only a single page to discussion of "alternatives to MPA," and only one paragraph to a comparison of OMP and MPA.[4] Dr. Tilley's report talks generally about the differences between OMP and "synthetic progestins," a group which he acknowledges includes many progestins in addition to MPA.[5] He also acknowledges that there is variation in the breast cancer risk among the different synthetic progestins: "Other synthetic progestins used in Europe have, like MPA, been associated with increased breast cancer risk in observational and randomized controlled trials comparing HRT with cHRT . . . but ***the extent of the risk increase varies among***

---

1 **Exhibit 6 -** Order Granting in Part and Denying in Part Defendants' Motion to Exclude the Testimony of Drs. Tilley and Austin, *Lea v. Wyeth LLC et al.*, Cause No. 1:03-cv-01339-mac, Dkt. No. 130 ("*Lea* Order").

2 **Exhibit 1 -** Expert Report, Stephen N. Birrell M.D., Ph.D. and Wayne D Tilley, Ph.D., Apr. 1, 2008 ("Tilley Report") at 1. The Steering Committee never produced Dr. Birrell for deposition, and he is not named as an expert in this case.

3 *See id*. at 1–19.

4 *See id*. at 20–21.

5 *Id*. at 20.

***the different synthetic steroids***."[6] Other than in his introductory summary of opinions, Dr. Tilley directly compares OMP to MPA once – a comparison based on a small, brief study of monkeys.[7] His opinion that E + OMP is a safer alternative to E + MPA rests almost entirely on two French observational studies – the "2007 Espié study," including roughly 6,700 women, and the "2005 Fournier study," including approximately 55,000 women – in both of which less than 2% of the women used Premarin (or some other form of conjugated equine estrogen).[8] His claim, based on these two French observational studies, is that "cHRT with OMP does not increase the risk of breast cancer, whereas the use of synthetic progestins do."[9]

Dr. Austin is expected to 1) explain that estrogen plus progestogen in the form of MPA causes a significant increase in breast cancer; and 2) testify that OMP, a natural human progesterone, is a safe alternative to the synthetic hormone. In his expert report, Dr. Austin spoke even less assuredly about the relative risks of E + OMP and E + MPA than Dr. Tilley did. In a half-page-long section entitled "Comparisons to other CHRTs," Dr. Austin notes only that evidence from the same French observational studies "***suggests*** that micronized progesterone and dydrogesterone combined with estrogen ***may*** carry no elevated risk of breast cancer."[10] In addition,

---

6 *Id*. (emphasis added) (footnote omitted).

7 *Id*. (citing Charles E. Wood et al., *Effects of Estradiol with Micronized Progesterone or Medroxyprogesterone Acetate on Risk Markers for Breast Cancers in Postmenopausal Monkeys*, 101 Breast Cancer Res. Treat. 125 (2007)).

8 *See* **Exhibit 3** - Marc Espié et al., *Breast Cancer Incidence and Hormone Replacement Therapy: Results from the MISSION Study, Prospective Phase*, 23 GYNECOLOGICAL ENDOCRINOLOGY 391, 391-92 (2007); **Exhibit 4** - Agnés Fournier et al., *Breast Cancer Risk in Relation to Different Types of Hormone Replacement Therapy in the E3N-EPIC cohort*, 114 INT'L J. CANCER 448, 452 (2005) ("Fournier 2005").

9 **Exhibit 1** - Tilley Rep. at 20 (citing both the Espié and Fournier 2005 studies).

10 *See* **Exhibit 5** - August 2007 Updated Causality Report of Donald F. Austin, MD, MPH at 25 ("Austin Rep.") (emphasis added).

Dr Austin admits that the evidence regarding E + OMP and any comparison to E + MPA is weak and limited.[11]

## II. THE LEGAL STANDARD

Rules 702 and 703 of the Federal Rules of Evidence, as interpreted in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of an expert witness's testimony. In evaluating the admissibility of expert testimony, the key factors are reliability and relevance. *Daubert*, 509 U.S. at 589. The reliability requirement ensures that expert testimony is "supported by appropriate validation" and "establishes a standard of evidentiary reliability." *Id.* at 590. The Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The reliability prong requires an expert's opinions to be based on more than "subjective belief or unsupported speculation." *Id.* at 590.

Courts apply five factors to determine reliability: (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593–94. To determine reliability, the expert must provide details regarding the methodology he used and tests he conducted to reach those

---

[11] *See id.* (emphasis added) ("Available evidence implicates MPA as an independent cause of breast cancer, although the variability in observed risk estimates and a lack of statistical test for heterogeneity between relative risk estimates ***make a definite assertion of independent cause difficult at this time***.") ("***While the current evidence is limited***, existing research results are that CHRT containing micronized progesterone or dydrogesterone has no elevated risk, in contrast to CHRT containing MPA.") ("Additional investigation into breast cancer incidence among users of CHRT containing micronized progesterone or dydrogesterone is necessary but with the available evidence, a prudent clinician would not choose to prescribe CHRT containing MPA . . . .").

opinions. *E.g., Elshotz v. Taser Int'l Inc.*, No. 4:05-CV-487-Y, 2007 WL 2781664, at *2-3 (N.D. Tex. Sept. 25, 2007) (Means, J.) ("This Court simply cannot determine whether an expert's opinions are reliable when he fails to provide any details regarding the methodology he used to conduct the tests that give rise to those opinions.").

Under *Daubert*, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (internal quotation marks and citation omitted). There must be an analytical connection between the facts of the case and the opinion offered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore*, 151 F.3d at 276. This "fit" between the facts and the expert's conclusions is not present when there is "too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146. In other words, there must be a demonstrable connection between the facts and the opinions, and the expert's reasoning and methodology must be properly applied to the facts. *Daubert*, 509 U.S. at 592-93. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

The party offering the expert testimony has the burden to establish that it is admissible under Rule 702 and *Daubert*. *E.g., Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

## III. OPINION TESTIMONY REGARDING SAFER ALTERNATIVE DESIGN IS UNRELIABLE AND THE COURT SHOULD EXCLUDE IT.

No one – including Drs. Austin and Tilley – takes the position outside the courtroom that Premarin + OMP is safer than Prempro (or other forms of HT).

- FDA does not: It requires all hormone therapy drugs, whatever the estrogen and progestin components, to carry the same breast cancer warning. FDA's position is that it "***does not have evidence*** that 'bioidentical hormones' are safer or more

effective than other hormone products. FDA believes that the benefits and risks are likely to be the same."[12]

- Solvay, the manufacturer of the only FDA-approved OMP product in the United States, does not: Even apart from the labeling, it does not claim that OMP is safer than MPA. The Prometrium patient brochure states, "There is ***no evidence*** that structurally identical hormones are safer or more effective than other types of hormone therapy."[13]

- IARC (the International Agency for Cancer Research) does not: It says that "[***t***]***he data are insufficient*** to determine whether the [breast cancer] risk differs by estrogen type, dose, or route of administration ***or the progestogen type*** . . . or regimen (continuous versus cyclic) progestogen."[14]

- The North American Menopause Society does not: In its 2010 position statement on hormone therapy, it says, "Early data from a large observational trial suggests that EPT with micronized progesterone may not be associated with an increased risk of breast cancer if used for up to five years, ***but these findings should not be overemphasized and require confirmation***."[15]

- The International Menopause Society does not: It says, like IARC, that "[t]here are ***insufficient data*** to evaluate the possible differences in the incidence of breast cancer using different types and routes of estrogen, ***natural progesterone*** and progestagens, and androgyne administration."[16]

- The Institute of Medicine ("IOM") of the National Academy of Sciences does not: In a report describing the results of an independent study commissioned by the Susan G. Komen Foundation for the Cure, IOM stated: "A criticism of the combination hormone therapy products that are prescribed most often and used in clinical trials of menopausal hormone therapy is that they are synthetic. The concern is that they therefore may be associated with risk not present for products that are considered more 'natural,' often referred to as bioidentical hormones. . . . ***[T]here is little to***

---

12 **Exhibit 11** - Deposition of Peter H. Gann, M.D., Sc.D. (Oct. 28, 2011) Ex. 38 (Menopause and Hormones information For Women from FDA website).

13 **Exhibit 12** - Deposition of Peter H. Gann, M.D., Sc.D. (Oct. 28, 2011) Ex. 39 (Prometrium patient brochure titled "Take comfort in your protection"—"A closer look at progesterone").

14 **Exhibit 13** - *Combined Estrogen-Progestogen Menopausal Therapy*, 100A IARC MONOGRAPHS 263, 276.

15 **Exhibit 14** - Deposition of Donald F. Austin, M.D., M.P.H. (Nov. 7, 2011) Ex. 21 (*Estrogen and progestin use in postmenopausal women: 2010 position statement of The North American Menopause Society*, 17(2) MENOPAUSE: THE J. OF THE N. AM. MENOPAUSE SOCIETY 242 (2010)).

16 **Exhibit 15 –** Deposition of Donald F. Austin, M.D., M.P.H. (Nov. 7, 2011) Ex. 22 (Pines et al., *IMS Updated Recommendations on postmenopausal hormone therapy*, 10 CLIMACTERIC 181 (2007)).

***suggest that the use of bioidentical hormones would be a safe alternative to other forms of hormone therapy."***[17]

- The Endocrine Society ("TES") does not: In its position statement TES stated: "'Bioidentical hormones,' particularly estrogen and progesterone, have been promoted as safer and more effective alternatives to more traditional hormone therapies, often by people outside of the medical community. ***In fact, little or no scientific and medical evidence exists to support such claims about 'bioidentical hormones.'"***[18]

- The National Toxicology Program ("NTP") prepared a 2011 report that was issued by the U.S. Department of Health and Human Services. The report, known as the *Report on Carcinogens* ("RoC"), is a Congressionally-mandated document, published every two years, which lists all substances "known to be carcinogens or [ ] reasonably be anticipated to be carcinogens." According to the RoC, "Progesterone is *reasonably anticipated to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in experimental animals."[19] Thus, the RoC confirms what other organizations have already said: the data are insufficient to conclude that OMP is safer.

- The American Cancer Society does not: "The word 'bio-identical' is sometimes used by sellers to describe hormones that contain estrogens or progestins with the same chemical structure as those found naturally in people. Marketers may describe bio-identical hormones as more 'natural,' and buyers often think that they are safer than the more traditional drugs used to control menopause symptoms. But anything that contains estrogens or progestins must be prescribed, just as other hormone drugs are, ***and should be assumed to have the same health risks as any other type of hormone therapy***."[20]

It is these organizations that have a duty (or assume the responsibility on behalf of their physician-members) to summarize the scientific data about hormone therapy drugs and to provide guidance about using the drugs, and, as Dr. Austin conceded, ***none*** have stated that OMP is safer

---

17 **Exhibit 30 –** Breast Cancer and the Environment: A Life Course Approach at p. 6-11 ("IOM Report") (excerpts only).

18 **Exhibit 31** - The Endocrine Society, "Position Statement: Bioidentical Hormones, October 2006," *available at* http://www.menopause.org/bioidenticalHT_Endosoc.pdf (last accessed Feb. 22, 2012).

19 **Exhibit 32** - Report on Carcinogens (Twelfth Edition, 2011) at p. 362, *available at*, http://ntp.niehs.nih.gov/ntp/roc/twelfth/roc12.pdf (last accessed Feb. 22, 2012).

20 **Exhibit 17** - American Cancer Society, "Menopause, symptoms, and hormone therapy: Types of hormone therapy," *available at* http://www.cancer.org/Cancer/CancerCauses/OtherCarcinogens/MedicalTreatments/menopausal-hormone-replacement-therapy-and-cancer-risk (last accessed Feb. 22, 2012).

than MPA.[21] As explained below, even the authors of the studies on which Drs. Austin and Tilley rely do not consider their findings established; the authors describe the findings as preliminary and in need of confirmation. Here, as has been true of other *Daubert* issues, Ms. Romero's experts propose to advance a scientific proposition in the courtroom that they have never presented to their peers, either in scientific meetings or in publications.

Although the data do not support the proposition that Premarin + OMP is safer than Prempro as to breast cancer risk (as FDA, IARC, NAMS, IMS, et al. recognize), the Court need never consider the reliability of the data. That is so because the proposed testimony of Drs. Austin and Tilley fails to meet the threshold test of relevance under Rule 702. The law requires an "all-things-considered" analysis before a reliable opinion can be given that the alternative design is superior to the original design – in this case that Premarin + OMP is superior to Prempro in terms of risk and benefit. Drs. Austin and Tilley, however, do not base their opinions on an analysis of all the risks and benefits of Premarin + OMP compared to all the risks and benefits of Prempro; they considered only the risk of breast cancer. Their opinions about the defectiveness of Prempro will not therefore "assist the trier of fact . . . to determine a fact in issue,"[22] because they do not address the relevant question, which must consider all the risks and benefits.

The proposed testimony of Drs. Austin and Tilley is also irrelevant as a threshold matter because, while opining that OMP is safer than MPA, they have not identified a specific alternative ***design*** for Prempro that incorporates OMP. They refer to designs that could be "explored," but Drs. Austin and Tilley have not explored them and cannot say they are superior, or even feasible. Even had they done so, the alternatives that Drs. Austin and Tilley mention are not Prempro differently designed, but different products. Prempro, after all, is a single pill taken daily. None of the

---

21 **Exhibit 16 –** Excerpts from the Deposition of Donald F. Austin, M.D., M.P.H. (Nov. 7, 2011) at 99 ("Austin Nov. 7 Dep.").

22 FED. R. EVID. 702.

alternatives described by Drs. Austin and Tilley is a single pill. Where, as here, plaintiffs take the position that a product is defective because there is a safer, alternative design, the law requires that the alternative constitute a modification of the same fundamental design. A convertible is not defective because it is not an SUV; they are different products as a matter of law, not alternative designs of the same product. Because the same is true for the alternatives that Drs. Austin and Tilley suggest might be explored, their analysis is off-track and irrelevant from the start.

We elaborate these two points below: (1) Drs. Austin and Tilley offer opinions that, for purposes of Rule 702, are irrelevant; and (2) Drs. Austin and Tilley rely on scientific data that is preliminary and unreliable.

### A. The Opinions of Drs. Austin and Tilley are Irrelevant for Purposes of Rule 702.

The opinions of Drs. Austin and Tilley are "irrelevant" for purposes of Rule 702 because they will not "assist the trier of fact to understand the evidence or to determine a fact in issue." That is true because the opinions fail to incorporate two necessary elements. One could also say that the opinions are "unreliable" for that reason. Whether the label is irrelevance or unreliability, however, the Court should exclude the testimony of Drs. Austin and Tilley because: (1) they did not consider all the risks and benefits of Prempro and Premarin + OMP in comparing those alternatives and (2) they have not identified and proposed a true alternative design for Prempro.

#### 1. Failure to Consider *All* the Risks and Benefits

In any design-defect claim based on the existence of an alternative design, the alternative design obviously must prevent the injury suffered by the plaintiff (or, at least, substantially reduce the risk of that injury).[23] Thus, here, any proposed alternative design must prevent breast cancer

[23] *See, e.g.*, *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359 (2d Cir. 2004) ("[T]o provide relevant testimony, [the expert] must . . . establish that his hypothetical design would have resulted in greater safety in the . . . accident at issue."); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999) ("An alternative design must substantially reduce the risk of injury and be both economically and technologically feasible.").

(or, at least, substantially reduce the risk). An alternative design cannot be considered safer, however, simply because it is safer in terms of one potential risk. It is truly safer only if, taking into account all the potential risks and benefits, and weighing the relative importance of each, its "package" of risks and benefits is superior to that of the original design. Thus, here, if Premarin + OMP is less effective than Prempro in treating menopausal symptoms, preventing osteoporosis and/or preventing fractures, or if it presents a higher risk of serious disease other than breast cancer, then it would not be a safer or superior alternative to Prempro.

The burden is on Ms. Romero to show that Premarin + OMP is safer ***overall***. But the two experts are frank that they did not conduct an ***overall*** analysis; they did not consider any risks and benefits other than breast cancer. Dr. Austin testified:

> Q. You've not considered whether CEE plus OMP is a safer design than CEE plus MPA when you consider all safety and efficacy end points including the effects on colorectal cancer, on osteoporosis, hip fractures and cardiovascular risk. Correct?
>
> * * *
>
> A. ***I have considered breast cancer risk period***.[24]

Dr. Tilley testified likewise:

> Q. Do you have an opinion as to the overall risk/benefit profile of oral micronized progesterone?
>
> * * *
>
> A. I have looked at some of the studies. I'm familiar—not in detail, but am familiar of studies that actually refer to other effects than on breast cancer. ***But the primary issue that I am concerned with here is a combination that is superior and safer . . . in terms of breast cancer risk***, and that there are no other documented significant risks that would actually dissuade women from taking that.[25]
>
> * * *
>
> Q. So maybe we can short-circuit some of this and just agree your focus has been with regard to breast cancer risk profile. You have not focused in

---

[24] **Exhibit 16** - Austin Nov. 7 Dep. at 112 (emphasis added); *see also id.* at 99–100 ("I have only considered the risk of breast cancer.").

[25] **Exhibit 18** - Deposition of Wayne D. Tilley, Ph.D. (Nov. 10, 2011) at 84–85 ("Tilley Nov. 10 Dep.") (emphasis added).

any particular depth on the other risks or benefits of oral micronized progesterone as they compare to MPA; is that fair to say?

A . . . . I'm not aware of—***I've not investigated in any details other studies or looked at cardiovascular profiles***.

Q. Or other endpoints such as color cancer, osteoporosis, cognition, overall mortality, any of those other endpoints, you haven't investigated in any particular depth in preparation for this expert report deposition?

A. ***No***.[26]

Because the relevant legal question is whether Premarin + OMP is superior to Prempro and safer overall, and because Drs. Austin and Tilley have not addressed that question, the opinion that they do offer – that Premarin + OMP is safer as to the breast cancer risk – is irrelevant.[27]

### 2. Failure to Identify an Alternative Design for Prempro

Where, as here, plaintiffs contend that Prempro is defectively designed because there is a safer alternative, Ms. Romero must say what it is, and her experts must show that reliable scientific evidence supports that choice.[28] Only Dr. Tilley's expert report mentions alternative designs (in one paragraph of his 30-page report),[29] and his deposition makes clear that he is only speculating

---

26 *Id*. at 90–91 (emphasis added). Although neither expert considered other risks and benefits in their analysis, both conceded that there is a group of women who cannot use OMP because they are allergic to peanut oil. *See id*. at 165; **Exhibit 16** - Austin Nov. 7 Dep. at 89–90.

27 In theory, their narrow opinion might be relevant if plaintiffs had named another expert who would complete the analysis by addressing the other risks and benefits. But there is no such other expert.

28 *See, e.g., Bielskis v. Louisville Ladder, Inc.*, — F.3d —, 2011 WL 5829771, at *6 (7th Cir. 2011) (rejecting an expert's argument that "[it] is the principles that [are] required, not the exact implementation," and that his design alternative therefore did not need to be tested, used in the marketplace, or be generally accepted by the industry, because "the principles" alone, without more, did not constitute testimony based on "sufficient facts or data" and did not assure the court that the proposed alternative was "the product of reliable principles and methods"); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997) ("[T]he proper methodology for proposing alternative designs includes more than just conceptualizing possibilities."); *Robinson v. Crown Equipment Corp.*, No. 2:02-CV-84, 2006 WL 897669, at *3 (E.D. Ark. Mar. 30, 2006) (Wilson, J.) ("In short, an expert's alternative design theory will not be allowed under *Daubert* or Fed. R. Evid. 702 if it amounts to speculation and untried concepts. While the design does not have to be personally tested by the expert, it must have been produced and put to practical use in the industry.").

29 **Exhibit 1** - Tilley Report at 20.

about possibilities. This extended excerpt from his deposition demonstrates that the alternative designs he mentions are back-of-the-envelope notions, at best:

A. . . . I am still of that view that ***there are other options that could be explored*** that would actually potentially reduce . . . the risk of breast cancer. In particular, the vaginal, maybe even a dermal delivery system. . . .

Q. Have you undertaken to fully evaluate the risk/benefit profile of estrogen combined with levonorgestrel-releasing intrauterine device?[30]

A. I have not gone into the detailed profiles of that, but what I've said to you is that the principle is that such approaches with appropriate progestins have the potential to markedly reduce the risk as opposed to giving it systemically. . . . ***I've not made specific recommendations that that is what you should do*** in the context of those. . . .

Q. With regard to the levonorgstrel-releasing intrauterine device, do you know whether such a device has been approved for use in the United States by the Food and Drug Administration?

A. I'm not sure whether I commented on that, but I cannot recall absolutely that. But I don't know if I made a comment on that. [31]

* * *

Q. So do you know whether or not levonorgestrel-releasing intrauterine device has ever been tested in postmenopausal women?

A. I thought I actually saw something to that effect. . . . ***We were speculating in that report that there are options*** and there are options that the pharmaceutical companies could have ***explored***. . . . [T]his is something that could have and probably should have been ***explored*** by the pharmaceutical companies. . . .[32]

* * *

Q. Do you know whether or not it's possible to combine oral micronized progesterone with estrogen in a single pill?

A. ***I'm not qualified to give you a definitive answer on that***, but I would presume . . . that would be feasible . . . .

Q. Are you an expert on pharmacology?

A. . . . I'm not going to advise on formulations, no. . . .

Q. Are you an expert in the design of pharmaceutical delivery systems?

A. . . . ***I'm not going to advise a company on how to actually come up with a best formulation for progesterone with equine estrogens***. . . .[33]

In short (although Dr. Tilley's answers are rarely short), he does not offer a "recommendation" for an alternative design. He has only "speculat[ed]" about "options" that others might be interested in

---

[30] *See id*. at 21 ("A levonorgestrel-releasing intrauterine device is one such system.").

[31] **Exhibit 18 -** Tilley Nov. 10 Dep. at 68–69 (emphasis added).

[32] *Id*. at 70–71 (emphasis added).

[33] *Id*. at 85–87 (emphasis added).

"explor[ing]." His expert report says that these "options" are "scientifically intuitive," not that they are tested or proven.[34] For himself, he lacks the expertise to say whether a feasible alternative design of the kind required by law – i.e., a single pill – exists.

Dr. Austin said nothing about design alternatives in his supplemental expert report, but, when asked in his deposition to identify "the design alternative that is safer than Prempro," he testified, "I think there are a number of them."[35] It quickly became clear, however, that Dr. Austin meant only that OMP (and possibly other progestins) are safer than MPA (in his view); he did not have an opinion about an alternative ***design*** that would combine Premarin and OMP. Asked whether Premarin could be taken with OMP in one pill, he answered, "***I don't know*** if it could or not. I don't know if you can put conjugated equine estrogens in the same vehicle that you have oral micronized progesterone. ***I don't know***, and ***I don't know*** that they have tried. Maybe they have."[36] Nor does he know what the dosage of OMP would be in this alternative (if it were feasible), nor what the dosing regimen would be.[37] That is, four years after he was first asked and testified that he did not know, Dr. Austin ***still*** does not know.[38]

In any event, the design alternatives that Dr. Tilley mentions off-handedly in his report are not legally cognizable alternatives. In the eyes of the law, they are different products, not Prempro designed in an alternative way. In addition, as noted in the testimony quoted above, Dr. Tilley does

---

[34] *See* **Exhibit 1** - Tilley Report at 21.

[35] **Exhibit 16** - Austin Nov. 7 Dep. at 109. Even as to other progestins, however, Dr. Austin testified that "it's not been my assignment to figure out what . . . progestational agents could be used." *Id*. at 110.

[36] *Id.* (emphasis added).

[37] *Id.*

[38] **Exhibit 26** - Excerpts from the Oral Deposition of Dr. Donald F. Austin, M.D., M.P.H. (October 31, 2007) ("2007 Austin Dep.") at 34–36, 39–40.

not consider himself "qualified to give . . . a definitive answer" as to whether it is even possible to combine Premarin and OMP in a single pill.[39] In fact, Wyeth tried and failed.[40]

The alternatives he proposes – a Premarin pill taken with (1) a levonorgestrel-containing intrauterine device, (2) a vaginally delivered progesterone-containing gel, or (3) an OMP pill taken 10 days every 3-4 months – are different products. The classic example in the case law illustrating the difference between an alternative design of the same product and a different product involves a convertible (e.g., a Volkswagen Beetle with a soft top). Arguably, a convertible is unreasonably dangerous in a side collision, given the risk of rollover, and, arguably, a sedan would be safer. The law recognizes, however, that the two are different products because they satisfy different consumer needs.[41] *A fortiori* Dr. Tilley's three options constitute different products. None is a single pill (like Prempro). Each is ***two*** products: (1) a Premarin pill ***plus*** an IUD; (2) a Premarin pill ***plus*** a vaginal gel; or (3) a Premarin pill taken daily ***plus*** an OMP pill taken 10 days out of every 90 or 120 days. Moreover, the nature of the second product adds an important level of difference that calls into question whether women willing to use Prempro would also be willing to use the alternative.

---

39 **Exhibit 18** - Tilley Nov. 10 Dep. at 85.

40 **Exhibit 19** - Supplemental Report of Dr. Rogerio A. Lobo, M.D. (Nov. 5, 2007), at 5 ("The absorption issues related to MP make creating a delivery system for a combination product very complex. Estrogens are delivered in a pictogram range and MP in a nanogram range and they have different rates of dissolution and absorption."); **Exhibit 20** - Expert Report of Barbara S. Levy, M.D., P.S. at 7–8 ("It is still not practical to deliver any form of estrogen with sufficient doses of MP in one pill.").

41 *See, e.g., Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895, 900 (E.D. Va. 2010) (remanded from MDL-1507) ("[A]n alternative design must not be an altogether essentially different product."); *Theriot v. Danek Med., Inc.*, 168 F.3d 253, 255 (5th Cir. 1999) (rejecting claim that "other products that do not use pedicle screws should be considered as alternative designs" for pedicle screws); *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 385 (Tex. 1995) ("A motorcycle could be made safer by adding two additional wheels and a cab, but then it is no longer a motorcycle. A convertible can be made safer by fully enclosing the cab, but then it is just an ordinary car."); *Damian v. Bell Helicopter Textron, Inc.*, — S.W.3d —, 2011 WL 3836464, at *23 n.26 (Tex. App.—Ft. Worth 2011, no pet. h.) ("Appellants cannot successfully prove the existence of a safer alternative design by offering evidence that [defendant] should have built an entirely different product.").

Taking a single pill every day is easy to do and easy to remember. But it is doubtful that many women would even be willing to use an IUD. As for a vaginal gel, many women are sure to believe that using it is too much bother, and, therefore, to reject that option entirely or to be inconsistent in using it.[42] Taking a second pill is not bothersome, but there are predictable problems of compliance. For that reason, Dr. Tilley conducted a recent trial involving testosterone plus aromatase inhibitor with a single-delivery system, because "there is definitely the potential . . . an individual may or may not take both drugs . . . . so it does help to ensure compliance of taking both drugs" to use one pill.[43] Indeed, that is one reason why Wyeth introduced Prempro; with it, a woman could take one pill each day rather than two.

There is another important "difference." Not only are Dr. Tilley's three alternatives really different products, not different designs, but two of the three alternatives are products that do not contain OMP. Ms. Romero's claim is that OMP is safer than MPA. But levonorgestrel (for the levonorgestrel-containing IUD) is a synthetic progestin. And, although Dr. Tilley refers to a vaginal gel containing progesterone, a gel is not "oral" or "micronized." It is only OMP that has been

---

42 Regarding a levonorgestrel-containing IUD and a progesterone-containing gel, Dr. Tilley cannot be sure that they are as safe as an OMP pill. He is simply guessing:

Q. Isn't it true that route of administration can change risks and benefits of a medication?

A. That is fair statement.

Q. And so studies of an oral medication can't necessarily be extrapolated to a transdermal delivery of the same medication. Correct?

A. You need to look at the biokinetics of the individual compounds . . . .

Q. *But without doing the study comparing the two things . . . , you can't make definitive conclusions or extrapolations from data generated by oral delivery of a medication to other routes of administration; is that fair to say*?

A. *You can only make certain assumptions*. Ultimately, you have to definitively test the particular route of administration.

**Exhibit 18** - Tilley Nov. 10 Dep. at 169–70 (emphasis added). But he has not done that.

43 *Id.* at 88. The problem of compliance is even greater when, as Dr. Tilley proposes here, the second pill is not taken on the same schedule as the first. Premarin is taken daily, but Dr. Tilley suggests that the OMP pill might be taken 10 days in every 90-120 days.

studied for breast cancer risk.[44] Thus, Dr. Tilley's two product alternatives are not true alternatives at all.

**B. The Opinions of Drs. Austin and Tilley are Based on Insufficient and Unreliable Scientific Evidence.**

United States Magistrate Judge Zack Hawthorn previously found that Drs. Austin and Tilley's "excessive reliance on [certain] studies renders the proffered testimony unreliable because the studies yielded statistically insignificant results."[45] The same analysis applies to their opinions in this case, and therefore, the opinions should be excluded.

Dr. Tilley does not rely on any human study that compares the breast cancer risk of OMP and MPA head-to-head. He relies instead on two studies – the Espié study and 2005 Fournier study – that compare OMP and synthetic progestins generally, a group among which Dr. Tilley admits the "extent of the risk increase varies" from progestin to progestin.[46] Tellingly, the authors of these studies did not reach the conclusions drawn by Drs. Tilley and Austin and, in one case, explicitly rejected them.

---

44 Dr. Tilley did not know whether Crinone (an FDA-approved vaginal gel containing progesterone) has been studied for breast cancer risk or been approved for use in hormone replacement therapy. *Id.* at 163. It has not.

45 **Exhibit 6** - *Lea* Order at 10.

46 **Exhibit 1** - Tilley Report at 20. Dr. Tilley testified that the two French studies are the only ones of which he knows that look at the breast cancer risk associated with OMP:

Q: Can you point to me any other studies, other than the two European studies, that evaluate breast cancer risk with estrogen plus micronized progesterone?

A: They're the key studies, yes.

Q: But can you cite me any other studies, other than those two European studies?

A: There's nothing else that I can cite to you at this point in time, no.

**Exhibit 10** - Excerpts from the Oral Deposition of Dr. Wayne Tilley (June 19, 2009) at 509–10.

### 1. The Espié Study

Citing the 2007 Espié study, Dr. Tilley says that "cHRT with OMP does not increase the risk of breast cancer, whereas the use of synthetic progestins do."[47] The Espié study, however, does not compare OMP and MPA directly; it compares OMP and a group of different drugs. As the *Hines* Court stated, "Insofar as Drs. Austin and Tilley rely upon studies that do not directly compare E+OMP with E+MPA . . . in opining that E+OMP poses less breast cancer risks than E+MPA, there is 'too great an analytical gap' between the experts' opinions and the data presented."[48] Moreover, the authors explicitly reject even Dr. Tilley's more general conclusion:

> When the incidence of breast cancer was compared in patients who received different types of HRT, the incidence was .28% for [estrogen] alone, 0.40% for [estrogen] + natural progesterone, and 0.94% for [estrogen] + synthetic progestin; **there was no statistically significant difference between the groups**.[49]
>
> Reliance on the Espié study is therefore doubly unreliable: first, because the authors do not draw the "more probable than not" conclusion offered by Drs. Tilley and Austin and, second, because the findings are not statistically significant. Like the *Hines* and MDL Courts, this Court should reject expert opinions that place "undue emphasis" on statistically insignificant data.[50]

### 2. The Fournier Study

Like the Espié study, the 2005 Fournier study does not compare OMP with MPA directly. The study reports that the risk of breast cancer was "significantly greater" for HT containing "synthetic progestins" ***taken as a group*** compared to HT containing OMP.[51] The study does not break out the different synthetic progestins and compare the breast cancer risk of OMP with each of

---

47 **Exhibit 1** - Tilley Report at 20.

48 **Exhibit 23** - *Hines* Order at 17.

49 **Exhibit 3** - Espié, et al., supra note 8 at 394 (emphasis added).

50 **Exhibit 23** - *Hine*s Order at 16–17; *see also* **Exhibit 21** - Premarin Order at 8 (each citing *Wells v. SmithKline Beecham Corp*., 601 F.3d 375, 380 & n. 23 (5th Cir. 2010); *Pritchard v. Dow Argo Scis*., 705 F. Supp. 2d 471, 489–90 (W.D. Pa. 2010); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145–47 (1997)).

51 **Exhibit 4** - Fournier 2005, supra note 8 at 451 (comparing the relative risks of "estrogens combined with [MPA]" with those of "estrogens combined with synthetic progestins").

them. Yet Dr. Tilley concedes that the breast cancer risk varies from progestin to progestin within that group.[52] The authors of the Fournier study do not treat their findings as conclusive evidence that OMP is safer, but report them as preliminary in nature. They acknowledge that their results are "new" and that they are contradicted by the "only epidemiological study comparing the impact of progesterone and synthetic progestins."[53] In conclusion, they go further and say that the finding as to OMP requires "further investigation."[54] The tentative nature of this data is enough, standing alone, to warrant exclusion of testimony that OMP is a safer alternative.

The 2005 Fournier study, however, does not stand alone, for the authors conducted "further investigation," although the Court would not learn that from reading Dr. Tilley's expert report. In a larger, "follow-up" observational study published in 2008 (the "2008 Fournier study"), the authors performed a head-to-head comparison of OMP and MPA.[55] The data from that follow-up study shows that, for women who used OMP, as compared to women who used MPA, there is ***no statistically significant difference***.[56] Dr. Austin admits this fact:

> Q: Will you look at Table 2 of [the later Fournier study], please. Do you see the relative risk for estrogen combined with progesterone in Table 2 of Exhibit 22?
> A: I do, yes
>
> * * *
>
> Q: Do you see the relative risk for estrogen combined with medroxyprogesterone acetate?
> A: I do.

---

52 **Exhibit 1** - Tilley Rep. at 20.

53 **Exhibit 4** - Fournier 2005, supra note 8 at 452.

54 *Id*. at 448.

55 **Exhibit 24** - Agnés Fournier et al., *Unequal Risks for Breast Cancer Associated with Different Hormone Replacement Therapies: Results from the E3N Cohort Study*, 107 BREAST CANCER RES. TREAT. 103 (2008) ("Fournier 2008").

56 *Id*. at Table 2 (showing the relative risk of MPA given with oral estrogen and a relative risk of OMP given with transdermal/percutaneous estrogen). Note that the authors implicitly endorse such a comparison across different administrations of estrogen. *Id.* at 106–07 ("[T]he route of administration of the estrogen did not have a statistically significant effect on the association between HRT use and breast cancer.").

* * *

Q: Are those two specific relative risks statistically different from one another?

A: ***Statistically they're not different from each other.***[57]

Thus, as the *Hines* Court concluded, the later Fournier study "actually undermines the opinions of Drs. Tilley and Austin."[58] It is hard to avoid the impression that Dr. Tilley sought to suppress this evidence, which supplants and contradicts the data on which he relies; he certainly failed to account for it.[59] But, of course, there is no way to account for it, except by conceding that his own evidence demonstrates that OMP is not a safer alternative.

### 3. The clinical trial evidence contradicts Drs. Austin and Tilley's conclusion.

The MDL Court said in its Premarin Order that "observational studies are more susceptible to bias and other confounding factors, and so are less reliable than clinical studies, which are often referred to as the 'gold standard.'"[60] In that Order, the Court excluded expert testimony that relied solely upon observational studies when the WHI trial contradicted those results.[61] As the United States Supreme Court has held under *Daubert*, an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Therefore, an expert's opinion which ignores well-recognized studies must be excluded. *See, e.g.*, *In re: Rezulin*, 369 F. Supp. 2d 398, 411–25 (S.D.N.Y. 2005) (excluding expert testimony where expert relied on tangentially relevant studies and ignored relevant, contradictory studies); *Housing Works, Inc. v. Turner*, 362 F. Supp. 2d 434,

---

57 **Exhibit 25** - Excerpts from the Oral Deposition of Dr. Donald F. Austin, M.D., M.P.H. (March 12, 2009) ("2009 Austin Dep.") at 198 (emphasis added).

58 **Exhibit 23** - *Hines* Order at 13.

59 *See* **Exhibit 21** - Premarin Order at 7–8, 10 (excluding expert opinion in part because of selective presentation of data).

60 *Id*. at 5.

61 *See id*. at 5–8.

447–48 (S.D.N.Y. 2005) (excluding illogical expert report that failed to address facts that would, by common sense, dictate different conclusions from those reached by the expert).

By relying only on observational findings and disregarding clinical trial results, Drs. Tilley and Austin have not based their opinions upon recognized standards of epidemiology. Drs. Tilley and Austin completely ignore the only large-scale randomized clinical trial ever completed comparing OMP and MPA,[62] the PEPI trial.[63] They ignore it, although the WHI investigators relied on its findings in choosing MPA as their progestin to study[64] and although the 2005 Fournier study mentions it by name.[65] The PEPI clinical trial found that E + MPA led to fewer cases of breast cancer than did E + OMP.[66]

Thus, not just once did Dr. Tilley overlook, or disregard, contrary evidence. He did it with the 2008 Fournier study and again with the PEPI trial. By disregarding evidence contrary to his conclusions Dr. Tilley has identified himself as an advocate. He is not a scientist who is doing the same kind of careful analysis of the scientific record inside the courtroom as he does outside the courtroom, and therefore, his opinions should be excluded.

---

62 Dr. Austin acknowledges that the 1995 PEPI study is the only “randomized controlled double blind clinical trial.” **Exhibit 26** - Excerpts from the Oral Deposition of Dr. Donald F. Austin, M.D., M.P.H. (October 31, 2007) at 24; *see also* **Exhibit 4** - Fournier 2005, supra note 8 at 452 (noting that the 1995 PEPI trial is the only epidemiological study comparing the effects of OMP and MPA on the breast).

63 **Exhibit 27** - *Effects of Estrogen or Estrogen/Progestin Regimens on Heart Disease Risk Factors in Postmenopausal Women*, 273 J. AM. MED. ASS’N 199 (1995) (“PEPI trial”).

64 **Exhibit 28** - WHI HRT Ad-Hoc Working Group, Proposed Modifications to the Hormone Replacement Therapy Protocol, Jan. 10, 1995, at 2–3.

65 *See* **Exhibit 4** - Fournier 2005, supra note 8 at 452.

66 **Exhibit 27** - PEPI trial at Table 4 (including data demonstrating that patients who received E+ MPA contracted more breast cancers than patients who received E + OMP). The numbers are admittedly small, but the facts remain that the “best” evidence (because PEPI is a clinical trial) finds that OMP is not safer, and the second-best evidence (from the observational studies) finds that there is no statistically significant difference between OMP and MPA.

**4. The monkey study is unreliable.**

Dr. Tilley relies on only one ***head-to-head*** comparison between OMP and MPA: the Wood monkey study comparing OMP and MPA in twenty-six postmenopausal monkeys over the course of two months.[67] That study says simply that "[l]imited observational data show [OMP has] potentially favorable effects . . . on breast cancer risk relative to synthetic progestins."[68] It goes on to note that "the direct effects of [OMP] in the breast are currently unknown." [69]

Dr. Tilley's reliance on this one animal study further demonstrates the experimental and unreliable nature of his opinion. As the MDL Court has recognized, "Federal Courts have consistently cautioned against extrapolation of human effects from animal studies," and where an expert opinion relies heavily on animal studies, that opinion is unreliable unless the "expert [is] prepared to explain how such studies can be reliably extrapolated to prove comparable effects in humans."[70] In excluding Dr. Tilley's testimony, the *Hines* Court concluded, "Dr. Tilley only summarizes the findings of the Wood monkey study; he gives no explanation of why the study can be reliably extrapolated to humans."[71] For further comparison, in the Premarin Order, the MDL Court excluded the expert opinion of Dr. Marcelo Aldaz in part because he relied on a "significant number" of animal studies without "explain[ing] how these studies could be reliably extrapolated to predict the effects . . . in humans."[72] In contrast to Dr. Aldaz, Dr. Tilley can cite to only ***one*** animal

---

67 *See* **Exhibit 1** - Tilley Rep. at 20 ("In support of the clinical impression that OMP is a more favourable progestin supplement than MPA, experiments on post-menopausal monkeys (in which menopause is induced by ovariectomy) show that estrogen in the presence of MPA, but not OMP, stimulates breast epithelial cell proliferation." (citing only the Wood Monkey Study)).

68 **Exhibit 2** - Wood, *supra* note 7 at 126.

69 *Id.*

70 *See* **Exhibit 21** - Premarin Order at 11 (citing *Gen. Elec. Co. v. Joine*r, 522 U.S. 136, 144 (1997); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1313–14 (11th Cir. 1999); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994)); *see also* **Exhibit 23** - *Hines* Order at 17–18.

71 **Exhibit 23** - *Hines* Order at 18.

72 **Exhibit 21** - Premarin Order at 11–12.

study (that looked at only 26 monkeys) to support his opinion. Much like Dr. Aldaz, Dr. Tilley has made no attempt, in either his expert report or deposition testimony, to explain why that one monkey study can be used to predict the effects of OMP and MPA in humans. Both comparisons argue in favor of excluding Dr. Tilley's opinion.

There is compelling evidence from professional reports, from Dr. Austin, and from the authors of the Wood monkey study itself that it should not be so relied upon as an accurate predictor of the comparative effects of OMP and MPA in humans. First, the authors of an Institute of Medicine Report concluded that the "low spontaneous rate of mammary tumors in primates . . . seriously limits the usefulness of the monkey as a model for studying sex steroid hormones and mammary cancer."[73] Second, Dr. Austin himself has on two occasions cautioned against relying too heavily on animal studies, including monkey studies.[74] Finally, the authors of the Wood monkey study themselves caution that "[f]urther studies are needed to confirm" their finding, an understandable concession given both the small sample size (26 monkeys) and short time frame (2 months) of their study.[75] This Court should not admit an expert opinion comparing OMP and MPA – such as Dr. Tilley's – based solely on a two month study of twenty-six women, let alone twenty-six monkeys.

---

[73] **Exhibit 29** - Diana B. Petitti, Animal Models of Sex Steroid Hormone and Mammary Cancer: Lessons for Understanding Studies in Humans, in ORAL CONTRACEPTIVES & BREAST CANCER 152 (Institute of Medicine, 1991).

[74] Dr. Austin has testified that "the risk of breast cancer that we should be concerned about is the risk in humans, not the risk in rats or mice or dogs, and the best information comes from humans." **Exhibit 26** - 2007 Austin Dep. at 54:15-18; *see also* **Exhibit 25** - 2009 Austin Dep. at 31:20-32:6.

[75] **Exhibit 2** - Wood, *supra* note 7 at 125–26, 133.

## IV. CONCLUSION

Based on the foregoing, Wyeth respectfully requests that the Court exclude the safer alternative design testimony of Drs. Austin and Tilley. Wyeth requests all other relief to which it has shown itself justly entitled.

Dated: February 24, 2012

Respectfully Submitted,

By: /s/ *Gregory S. Meece w/ permission JHM*
Gregory S. Meece, *Attorney-in-Charge*
Texas State Bar No. 13898350
Gregory.Meece@tklaw.com

**THOMPSON & KNIGHT LLP**
333 Clay Street, Suite 1500
Houston, Texas 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

***— AND —***

John H. Martin
Texas State Bar No. 13086500
John.Martin@tklaw.com
Janelle L. Davis
Texas State Bar No. 24059655
Janelle.Davis@tklaw.com

**THOMPSON & KNIGHT LLP**
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF CONFERENCE

Counsel has complied with the meet and confer requirement in Local Rule CV-7(h). This motion is opposed. On February 17th and 20th, counsel for Plaintiff, Bryan Aylstock, and counsel for Defendant, Janelle L. Davis, conducted the conferences required by this rule. Despite a good faith effort by both sides, an agreement could not be reached and the discussions have conclusively ended in an impasse, leaving an open issue for the court to resolve.

*/s/ Janelle L. Davis*
Janelle L. Davis

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February, 2012 a true and correct copy of the foregoing was filed with the Court and served via electronic notification on all counsel of record.

*/s/ Janelle L. Davis*
Janelle L. Davis

064500 000019 DALLAS 2839355.1