UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JUDY ROMERO, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 1:03-CV-01367-MAC |
| | § | |
| vs. | § | |
| | § | |
| WYETH LLC, | § | Honorable Marcia A. Crone |
| | § | |
| Defendant. | § | |

**WYETH'S MOTION TO EXCLUDE THE TESTIMONY OF DRS. PARISIAN, BLUME, AND PATSNER AND BRIEF IN SUPPORT**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendant Wyeth LLC f/k/a Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. ("Wyeth") files this Motion to Exclude the Testimony of Drs. Parisian, Blume, and Patsner and Brief in Support, and would respectfully show the Court as follows:

# TABLE OF CONTENTS


**I. SUMMARY OF THE ARGUMENT** ....................1

**II. BACKGROUND AND STATEMENT OF FACTS**....................3

A. Background Facts Related to Premphase and Prempro ....................3

B. Background Facts Related to Ms. Romero ....................5

**III. LEGAL STANDARDS** ....................6

**IV. ARGUMENT AND AUTHORITIES**....................7

A. The Court Should Exclude the Regulatory Experts' "Failure-to-Test" Opinions Because They are Not Tied to Any Objective Standard ....................8

1. The Experts Cite to No Objective Standard Requiring Wyeth to Test....................8

2. Dr. Patsner Has No Reliable Basis for His Opinion Listing Tests Wyeth "Could" Have Performed ....................15

B. The Court Should Exclude Drs. Parisian, Blume, and Patsner's Testimony Regarding Wyeth's Intent, Motive, and Knowledge ....................17

C. The Court Should Exclude Dr. Patsner's Labeling Opinion Because it is Nothing More Than Another "Bottom Line" Opinion, Unsupported by Any Methodology ....................20

D. The Court Should Exclude Dr. Patsner's Marketing Opinion ....................23

**V. CONCLUSION** ....................23

# TABLE OF AUTHORITIES

FEDERAL CASES PAGE

*In re Air Crash Disaster at New Orleans, La.*,
795 F.2d 1230 (5th Cir. 1986) ....................18

*In re Baycol Products Liability Litigation*,
532 F. Supp. 2d 1029 (D. Minn. 2007)....................12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)....................2, 6, 7, 8, 11, 19

*Elshotz v. Taser International Inc.*,
No. 4:05-CV-487-Y, 2007 WL 2781664 (N.D. Tex. Sept. 25, 2007) ....................7

*In re Fosamax Products Liability Litigation*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009)....................18

*In re Gadolinium-Based Contrast Agents Products Liability Litigation*,
No. 1:08 GD 50000, 2010 WL 1796334 (N.D. Ohio May 4, 2010)....................18

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997)....................7

*Gerace v. United States.*,
No. 5:03-CV-166, 2006 WL 2376696 (N.D.N.Y. Aug. 10, 2006) ....................12

*Harnett v. Ulett*,
466 F.2d 113 (8th Cir. 1972) ....................12

*Knight v. Kirby Inland Marine Inc.*,
482 F.3d 347 (5th Cir. 2007) ....................6, 7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................6

*Mathis v. Exxon Corp.*,
302 F.3d 448 (5th Cir. 2002) ....................7

*Minasian v. Standard Chartered Bank, PLC*,
109 F.3d 1212 (7th Cir. 1997) ....................20, 22

*Moore v. Ashland Chemical Inc.*,
151 F.3d 269(5th Cir. 1998) ....................7

**PAGE**

*Oakberg v. Zimmer, Inc.*,
211 F. App‘x 578 (9th Cir. 2006) ....................................................................................18

*Reece v. Astrazeneca Pharmaceuticals, LP*,
500 F. Supp. 2d 736 (S.D. Ohio 2007) ..............................................................................18

*In re Rezulin Products Liability Litigation*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................................................12

*Scroggin v. Wyeth*,
554 F. Supp. 2d 871 (E.D. Ark. 2008),
*aff'd in pertinent part, rev'd in part on other grounds*,
586 F.3d 547 (8th Cir. 2009) ......................................................................3, 13, 18, 19, 20

*In re Trasylol Products Liability Litigation*,
709 F. Supp. 2d 1323 (S.D. Fla. 2010) ..........................................................................8, 19

*United States v. Lester*,
234 F. Supp. 2d 595 (E.D. Va. 2002) ................................................................................22

*In re Viagra Products Liability Litigation*,
658 F. Supp. 2d 950 (D. Minn. 2009)................................................................................18

**FEDERAL STATUTES AND RULES**

21 U.S.C. § 355 (2006)........................................................................................................9, 10

21 C.F.R. § 314.126 (2010) .......................................................................................................9

FEDERAL RULE OF EVIDENCE 702 ..................................................................2, 6, 8, 11, 19, 20

FEDERAL RULE OF EVIDENCE 702 adv. cmtee. notes (2000)..................................................11

## I. SUMMARY OF THE ARGUMENT

Plaintiff Judy Romero has designated Drs. Suzanne Parisian,[1] Cheryl Blume,[2] and Bruce Patsner[3] (collectively, "the Experts") to testify to their personal opinions that Wyeth failed to properly test its hormone therapy ("HT") medications and, based on their review of selected Wyeth documents, that Wyeth somehow acted with improper intent, motive, or knowledge about whether HT can cause breast cancer. The Court should exclude the testimony of Drs. Parisian and Blume for the same reasons that it did so in *Lea v. Wyeth*.[4] The Court should also now exclude the testimony of Dr. Patsner, for he offers the same failure-to-test testimony based on the same flawed methodology. Insofar as he also plans to testify that Wyeth's labeling was inadequate in light of the scientific studies at the time, that testimony should also be excluded because he did not employ even the most basic and necessary methodology for reaching that opinion. Finally, the Court should prohibit Dr. Patsner from rendering any opinion that Wyeth improperly marketed its HT medications because he is unqualified to render any opinions about pharmaceutical marketing.

In *Lea*, this Court closely analyzed Drs. Parisian and Blume's[5] proposed expert testimony

---

[1] Dr. Parisian worked for the FDA's Center for Devices and Radiological Health for four years in the early 1990s. *See* **Exhibit 1** - Report of Dr. Parisian (July 2, 2007) ("Parisian Report") at 1-2.

[2] Dr. Blume has a doctorate pharmacology and is president of a consulting company specializing in pharmaceutical registration and development issues. *See* **Exhibit 2** - Report of Dr. Blume (Dec. 15, 2006).

[3] Dr. Patsner is an OB/GYN who worked for the FDA's Center for Drug Evaluation and Research for approximately three years. **Exhibit 3** - Report of Dr. Patsner (Mar. 13, 2011) ("Patsner Report") at 3-5. He is also a lawyer. *Id.*

[4] **Exhibit 4** - Order Granting in Part and Denying in Part Defendants' Motion to Exclude the Testimony of Drs. Parisian, Blume, and Austin, *Lea v. Wyeth LLC et al.*, No. 1:03-cv-01339-mac, slip op. at 1 (E.D. Tex. Oct. 6, 2011) ("*Lea* Order").

[5] Drs. Blume and Parisian's expert reports are identical to their expert reports in the Lea case. *See* **Exhibits 1 and 2**. The Plaintiff in the Lea case did not designate Dr. Patsner as an expert witness; thus, his testimony was not previously before the Court. As shown below though,

and found that the majority of it was inadmissible under *Daubert* and Rule 702. Following this close analysis, the Court excluded each of the opinions listed above and permitted Drs. Parisian and Blume to testify only regarding three narrow categories: whether Wyeth's labeling was inaccurate in light want Wyeth actually knew at the time; what tests Wyeth could have (that is, was capable of) performing; and the general regulatory requirements governing pharmaceutical manufacturers.[6] The Court held that the remainder of Drs. Parisian and Blume's testimony was inadmissible for several reasons: it was "unsupported by sufficient analysis to be admissible . . . is irrelevant" and "[n]either expert is qualified to offer their opinions . . . ."[7] Drs. Parisian and Blume have not changed their testimony or their analysis in this case; therefore, their opinions should be excluded here for the same reasons.

After this Court's order in *Lea*, Judge Means of the Northern District of Texas also considered the admissibility of Drs. Blume and Parisian's testimony and, like this Court, found much of their testimony inadmissible.[8] After evaluating their reports and analyzing other courts' orders excluding some or all of their testimony, the *Allen* court reached the same conclusion that this Court did in *Lea*: that Drs. Parisian and Blume's opinions were not supported by sufficient analysis to be admissible.[9] Specifically, the court held that "[n]either Parisian not Blume cite to any specific statute, regulation, custom, or practice that supports their 'failure-to-test opinions.' Nor do they demonstrate how their extensive experience led to their conclusions, why that experience is a sufficient basis for their opinions, nor how that experience is reliably applied to

---

Dr. Patsner's opinions are no different than Drs. Parisian and Blume's, and should likewise be excluded.

6 **Exhibit 4 –** *Lea* Order at 13-14.

7 **Exhibit 4 –** *Lea* Order at 9-10, 14.

8 **Exhibit 5** - Order Partially Granting Motion to Exclude Certain Testimony, *Allen v. Wyeth*, No. 4:04-CV-507-Y, slip op. at 4 (N.D. Tex. Jan. 12, 2012) (Means, J.) ("*Allen* Order"). Plaintiff in the *Allen* case did not designate Dr. Patsner as an expert witness either.

the facts of this case."[10]

The MDL court, on no fewer than four occasions,[11] other HT transferor courts in Florida and West Virginia,[12] and a Florida state court,[13] have each also excluded some or all of Drs. Parisian and Blume's testimony for these same reasons: Because at bottom, their failure to test opinions and opinions regarding Wyeth's intent, motive, and knowledge are nothing more than their personal opinions, unsupported by any expert analysis. This Court should do the same and exclude these categories of testimony, whether offered by Dr. Parisian, Blume, or Patsner.

## II. BACKGROUND AND STATEMENT OF FACTS

This case arises out of Plaintiff's use of Premphase and Prempro, prescription HT medications that the Food and Drug Administration ("FDA") has approved as safe and effective, both at the time Ms. Romero took them and today.

### A. Background Facts Related to Premphase and Prempro.

Prempro is a HT medication that is a combination of conjugated equine estrogen (CEE) and medroxyprogesterone acetate (progestin) (MPA). Premphase is similar to Prempro and

---

9 **Exhibit 5 –** *Allen* Order at 4.

10 *Id.*

11 **Exhibit 6 –** Order, *Wilson v. Wyeth* (E.D. Ark. Sept 16, 2010) ("*Wilson* Order") at 4 (emphasis in italics added), *aff'd*, **Exhibit 7 –** Order, *Wilson v. Wyeth* (E.D. Ark. Sept. 23, 2010) at 1; *see also* **Exhibit 8 –** Order, *LaFerrara v. Wyeth* (E.D. Ark. June 29, 2010) ("*LaFerrara* Order") at 4; **Exhibit 9 –** Order, *Curtis v. Wyeth* (E.D. Ark. Sept. 16, 2010) ("*Curtis* Order") at 4; *Scroggin v. Wyeth*, 554 F. Supp. 2d 871, 886–87 (E.D. Ark. 2008), *aff'd in pertinent part, rev'd in part on other grounds*, 586 F.3d 547 (8th Cir. 2009).

12 **Exhibit 10 –** Order on Motion to Exclude the Testimony of Drs. Suzanne Parisian and Donald Austin, *Kaufman v. Pfizer Pharms., Inc.*, No. 1:02-CV-22692, slip op. at 17 n. 8 (S.D. Fla. Aug. 3, 2011) ("*Kaufman* Order"); **Exhibit 11 –** Order on Motion to Reconsider, *Kaufman v. Pfizer Pharms., Inc.*, No. 1:02-CV-22692, slip op. at 4 (S.D. Fla. Aug. 10, 2011) ("*Kaufman* Reconsideration Order"); **Exhibit 12 -** Memorandum Opinion and Order, *Hines v. Wyeth*, No. 2:04-CV-0690, slip op at 12 (S.D. W. Va. July 8, 2011) ("*Hines* Order").

13 **Exhibit 13 –** Order Granting Defs.' Mot. in Limine to Bar the "Reasonable Company" Testimony of Drs. Cheryl Blume, Suzanne Parisian, and Donald Austin, and Dr. Blume's Labeling Opinions, *Esposito v. Wyeth, Inc.*, No. 05-1606-CI-13, slip op. at 2 (Fla. Cir. Ct. Pinellas Co. Apr. 14, 2010) ("*Esposito* Order").

differs only in that it allows the patient to take CEE and MPA sequentially – that is, the patient takes a pill containing only CEE for the first half of the month, and a different pill with a combination of CEE and MPA for the second half of the month.[14] The FDA approved Prempro as safe and effective in 1994 and again in 1998. It is still on the market today.

In the 1990s, the National Institutes of Health ("NIH") (with Wyeth's support) undertook a massive randomized clinical trial called the Women's Health Initiative ("WHI") to evaluate the risks and benefits of numerous women-specific medications and treatments, including Prempro. This study was one of the largest randomized clinical trials ever done to study the health of post-menopausal women.[15] The Prempro portion of the study evaluated more than 16,000 women for more than five years, with approximately half receiving Prempro and the other half receiving a placebo.[16] The medical and scientific communities recognized this large, randomized, controlled clinical trial as the "gold standard" of medical evidence and as providing the best data regarding the benefits and risks of Prempro in post-menopausal women.[17]

The WHI investigators reported that women taking Prempro every day for approximately five years had a slightly higher risk of being diagnosed with breast cancer compared to women

---

14 **Exhibit 19** - Premphase Labeling at 2 (Nov. 15, 1995). Like Prempro, Premphase was also approved by the FDA in 1994. *Id.*

15 *The Women's Health Initiative Participant Website: About WHI*, WHI.org, http://www.whi.org/about/whi.php (last visited Feb. 9, 2012).

16 **Exhibit 14 –** *Chlebowski et al.*, *Influence of Estrogen Plus Progestin on Breast Cancer and Mammography in Healthy Postmenopausal Women*, 289 J. AM. MED. ASS'N 3243, 3244 (2003) ("Chlebowski 2003").

17 The WHI results were important because the medical community considers clinical trials to be the most reliable form of scientific evidence, and far superior to observational studies. Green et al., *Reference Guide on Epidemiology*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 338 (2d ed. 2000) ("Reference Manual"); **Exhibit 15 –** *Hulley et al.*, DESIGNING CLINICAL RESEARCH 157–58, 195 (3d ed. 2007); **Exhibit 16** – Piantadosi et al., *Larger Lessons from Women's Health Initiative*, 14 EPIDEMIOLOGY 6, 6-7 (2003); **Exhibit 17** – Herrington & Howard, *From Presumed Benefit to Potential Harm – Hormone Therapy and Heart Disease*, 349 N. ENGL. J. MED. 519, 519 (2003).

taking placebo pills.[18] They also reported that Prempro conferred no increased risk of breast cancer if taken by post-menopausal women for less than five years.[19] In fact, more than 97% of women who took Prempro in the study did not develop breast cancer.[20] The study also showed that women taking Prempro did not have an increased risk of being diagnosed with Plaintiff's type of tumor (estrogen receptor positive or ER+).[21]

**B. Background Facts Related to Ms. Romero.**

Ms. Romero began experiencing menopausal symptoms, including irregular periods and hot flashes, in 1996 at the age of 48.[22] On December 31, 1996, Ms. Romero began taking Premphase to address these symptoms.[23] Ms. Romero continued taking Premphase until February 22, 2000 when she switched to Prempro.[24]

After her February 27, 2001 mammogram revealed an area of calcifications in the left breast and a questionable mass in her right breast, Ms. Romero was diagnosed with high grade ductal carcinoma in the left breast.[25] She received radiation treatment to the left breast and she began taking Tamoxifen, an estrogen blocker.[26]

---

[18] WHI reported a relative risk of 1.24 (or 24%) for breast cancer in women taking Prempro. **Exhibit 14 –** Chlebowski 2003 at 3243; **Exhibit 18 –** FDA Approved Prempro Labeling, Feb. 2010 ("Prempro Labeling") at 5.

[19] *See* **Exhibit 14 –** Chlebowski 2003 at 3248, tbl.2.

[20] *See* **Exhibit 14 –** Chlebowski 2003 at 3243. 2.3 percent of women taking Prempro developed invasive breast cancer, compared to 1.9 percent of women taking placebo. *Id.* at 3250, tbl.4.

[21] *See* **Exhibit 14 –** Chlebowski 2003 at 3248, 3250.

[22] **Exhibit 27** - JRomero-O&GA-Houston-000178 to -179; JRomero-SHE-MD=000035; **Exhibit 28** - Oral Deposition of Judy Romero (May 22, 2009) at 184:24-185:11, 185:20-186:14, 222:12-223:9 ("Romero Dep.").

[23] **Exhibit 27** - JRomero-O&GA-Houston-000179; **Exhibit 28** - Romero Dep. at 159:13-16.

[24] **Exhibit 27** - JRomero-O&GA-Houston-000022.

[25] **Exhibit 27** - JRomero-KETomm000031to -32, JRomero-KETomm-000057 to -58, Romero, Judy_0013, JRomero-WHT-000020 to -21.

[26] **Exhibit 27** - JRomero-KETomm000016, JRomero-KETomm000046 to -48; JRomero-TexasOnc-000039 to -40.

Ms. Romero did not recall seeing any marketing materials for HT before or during the time she took Premphase and Prempro.[27] She took Premphase and Prempro only because her physician recommended them and to alleviate her menopausal symptoms.[28] Both of her prescribing physicians testified that they did not rely on any marketing materials in deciding whether to prescribe Prempro and Premphase for Ms. Romero.[29]

## III. THE LEGAL STANDARD

Rules 702 and 703 of the Federal Rules of Evidence, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of an expert witness's testimony. Rule 702 expressly imposes three requirements that must be met before expert testimony may be admitted: It must be "based upon sufficient facts or data"; be "the product of reliable principles and methods"; and the witness must have "applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702.

This requirement of reliable principles and methods ensures that expert testimony is "supported by appropriate validation" and "establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590. The Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93.

"District courts have an important role as gatekeepers in determining whether to admit expert testimony [and] must carefully analyze the studies on which experts rely for their opinions before admitting their testimony." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th

---

27 **Exhibit 28** - Romero Dep. at 233:12-236:4, 247:19-248:13, 250:2-7, 252:20-253:4.
28 *Id.* at 234:12-16, 235:17-236:4, 236:19-22, 239:1-5, 252:13-253:4.

Cir. 2007). To permit a determination of whether her opinions are reliable, the expert must provide details regarding the methodology she used and the tests she conducted to reach those opinions. *E.g.*, *Elshotz v. Taser Int'l Inc.*, No. 4:05-CV-487-Y, 2007 WL 2781664, at *2-3 (N.D. Tex. Sept. 25, 2007) (Means, J.).

Under *Daubert*, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (en banc) (internal quotation marks and citation omitted). There must be an analytical connection between the facts of the case and the opinion offered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore*, 151 F.3d at 276. There is no "fit" between the facts and the expert's conclusions when there is "too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146. In other words, there must be a demonstrable connection between the facts and the opinions, and the expert's reasoning and methodology must be properly applied to the facts. *Daubert*, 509 U.S. at 592-93. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

The party offering the expert testimony has the burden to establish that it is admissible under Rule 702 and *Daubert*. *E.g.*, *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

## IV. ARGUMENT AND AUTHORITIES

Drs. Parisian, Blume, and Patsner should not be permitted to testify that Wyeth did not test its HT medications as a "reasonable" pharmaceutical company would have. These opinions are not based on an objective standard of care, such as the requirements imposed by statutes,

---

[29] **Exhibit 29** - Oral Deposition of Radha J. Lal, M.D. (Apr. 27, 2011) ("Lal Dep.") at 153:17-24; **Exhibit 30** - Oral Deposition of Eberhard C. Lotze, M.D. (Apr. 16, 2011) ("Lotze Dep.")

FDA regulations, or industry custom and practice. They are instead based only on the Experts' subjective beliefs about what Wyeth should have done, are wholly untethered from an objective standard, and are nothing more than credentialed witnesses' *ipse dixit*. Such opinions are by their nature not reliable and therefore not admissible under Rule 702 or *Daubert*. Moreover, the Experts cannot read, comment on, and narrate general "bad company" documents. Their subjective interpretations of Wyeth's documents is not expert testimony, but "advoca[cy], presented with the trappings of an expert." *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1351 (S.D. Fla. 2010). Dr. Patsner's opinions regarding the accuracy of statements on the Premphase and Prempro labeling lacks any supporting methodology. Finally, Dr. Patsner is wholly unqualified to offer any opinions regarding Wyeth's marketing, and such opinions would be irrelevant anyway. These two opinions are nothing more than "bottom line" opinions that have no place in this Court. This Court should therefore exclude each of these opinions.

### A. The Court Should Exclude the Regulatory Experts' "Failure-to-Test" Opinions Because They are Not Tied to Any Objective Standard.

#### 1. The Experts Cite to No Objective Standard Requiring Wyeth to Test.

Rule 702 and *Daubert* require that an expert's methodology be verifiable. That means that the Experts cannot simply testify that, in their personal opinion, Wyeth failed to act as reasonable pharmaceutical company would when it came to testing its HT products. Rather, they must tie their opinion to a verifiable, objective standard – such as a standard established by FDA regulations, industry codes and guidelines, or industry custom and practice – and show how Wyeth failed to meet that objective standard. No such objective standard exists, however, and the Experts' opinions reflect nothing more than their own personal beliefs, devoid of any scientific, regulatory, or industry expertise. This Court excluded Drs. Parisian and Blume's

---

at 108:6-12, 114:22-115:4, 118:3-8, 246:11-19, 257:12-258:1.

"failure-to-test" opinions in *Lea* for this very reason; it should do so again here and exclude Dr. Patsner's indistinguishable opinion.

In the *Lea* case, this Court, after reviewing Drs. Parisian's and Blume's expert reports – the same reports they produced in this case – concluded that both expert's opinions about the testing a "reasonable pharmaceutical company" would have undertaken were "unsupported by sufficient analysis to be admissible."[30] This lack of analysis rendered Drs. Parisian and Blume's opinions inadmissible and this Court therefore excluded their opinions about (1) what a reasonable pharmaceutical manufacturer would have done; (2) what Wyeth should have done or known; and (3) that Wyeth breached the standard of care in any way.[31]

Drs. Parisian, Blume, and Patsner's opinions do not rely on any FDA regulations; in fact, there is no FDA testing regulation that provides an objective standard for the testing opinions they seek to give. In fact, when the FDA approved Prempro – first in 1994[32] and again in 1995 and 1998[33] – it statutorily found that Prempro had been subjected to "adequate tests by all methods reasonably applicable" and that the its application for approval was supported by "adequate and well-controlled studies." 21 U.S.C. § 355(d) (2006) (identifying conditions precedent to FDA approval); 21 C.F.R. § 314.126 (2010) ("Reports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs.").

Dr. Patsner testified at times during his deposition that his opinion is, in fact, based on

---

30 **Exhibit 4** – *Lea* Order at 9.

31 *Id.* at 10.

32 **Exhibit 20** – 1994 FDA Medical Officer's Review 6–7 (discussing more than a dozen studies that evaluated the breast cancer risk).

33 **Exhibit 21** – 1998 FDA Medical Officer's Review 9–10 ("The impact of exogenous hormones on the risk of breast cancer has been the focus of considerable interest in recent

"the statute which governs approval of a new drug."[34] In this testimony, Dr. Patsner has identified Section 355(d) and the labeling regulations as the source of a duty to test while simultaneously acknowledging that they impose no duty to test.[35] As the FDA explicitly found when it approved Prempro in 1994, 1995, and 1998, Defendants met both the statutory testing standard, and no other statute or regulation establishes any duty to test.

Without an official regulatory standard to rely upon, the Experts would have to rely on another objective standard, such as industry codes and guidelines. Again, no such objective standard exists. Dr. Parisian typically makes passing reference to her reliance on industry codes, guidelines, and internal company standards, but she never actually identifies, much less describes, any particular standard on which she purports to rely. Nor have HT plaintiffs identified an industry code concerning testing. Instead, plaintiffs usually refer to the PhRMA Code, which actually governs *marketing practices* and does not provide an objective basis for concluding that Wyeth's *testing* was unreasonable.[36] The PhRMA Code is silent on the subject of pharmaceutical testing and therefore provides no objective standard upon which the Experts can base their opinions. The absence of any specific code, guideline, or internal standard governing testing forecloses this as a basis for the experts' opinions.

In the absence of written standards, an expert can rely on industry "custom and practice,"

---

years. There have been many cohort and case-controlled studies of women using HRT and these have yielded inconsistent findings.").

34 **Exhibit 23** – Oral Deposition of Bruce Patnser, M.D., J.D. (July 12, 2011) ("Patsner Dep.") at 471.

35 *Id*. at 477-80.

36 **Exhibit 22** – PhRMA Code. The only reference to testing in the entire code arises in the context of ensuring that post-marketing studies and surveillance studies - should not be conducted simply as a means to promote a product and influence physicians, with little or no scientific or educational basis." *Id.* at 4. The MDL court barred plaintiff from using the PhRMA Code, finding that it "would likely cause confusion, undue prejudice, and delay" and

*if there is one*. But as the Advisory Committee noted when it amended Rule 702, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"[37] But Dr. Parisian is unable to identify specific experiences – e.g., what specific companies did with specific drugs to conduct testing above and beyond that required by FDA – that define an industry custom and practice. Neither can Drs. Blume and Patsner.[38] Dr. Patsner admitted that he "ha[s]n't seen that many companies interact with the [FDA], so I don't have a lot to compare it to."[39] *Daubert* and Rule 702 require more from an expert than vague assertions of "personal experience."

Dr. Parisian has conceded that she relies solely on her own personal beliefs, not industry custom and practice, to determine what testing Wyeth should have done. As Dr. Parisian testified, determining how much testing a prescription drug should undergo is "a subjective judgment that each company has to make on its own."[40] Or put more bluntly, "It's not a written-down standard. It's just a code of ethics in terms of not hurting people with — it's bad business to hurt people."[41] These concessions that there is no industry custom and practice eliminate the last possible objective basis for her opinions (or Drs. Blume and Patsner's identical opinions).

Dr. Patsner, to his credit, was unabashedly candid that his testing opinions were his own personal beliefs and were in no way tied to FDA regulations or any other objective standard:

---

that the plaintiff "failed to show how it would be admissible as a standard of care under Arkansas law." **Exhibit 6** – *Wilson* Order at 5.

37 FED. R. EVID. 702 advisory committee's note to the 2000 amendments.

38 **Exhibit 2** – Blume Report at 8-9; **Exhibit 3** – Patsner Report at 6-7; **Exhibit 23** – Patsner Dep. at 117:21-118:6, 240:23-242:2.

39 **Exhibit 23** – Patsner Dep. at 670:19-22; *see also* at 670:23-671:12.

40 **Exhibit 24** – Oral Deposition of Dr. Suzanne Parisian at 571:15–572:18 (July 20, 2007).

Q: [Discussing a company's obligation to test] Is that your personal opinion?

A: Yes, it is.

. . .

Q: Right. Is that opinion in any way tethered to an FDA standard?

A: No. ***Why should it be?***[42]

Courts routinely reject subjective expert opinions such as these. *See, e.g.*, *Harnett v. Ulett*, 466 F.2d 113, 118 (8th Cir. 1972) (excluding opinion of ethics expert that "was the expression of a personal opinion rather than that of an expert."); *In re Baycol Prods. Liab. Litig.*, 532 F. Supp. 2d 1029, 1053 (D. Minn. 2007); *Gerace v. United States.*, No. 5:03-CV-166, 2006 WL 2376696, at *26 (N.D.N.Y. Aug. 10, 2006); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004).

Numerous other transferor courts have excluded Drs. Parisian and Blume's "failure-to-test" opinion for the same reason this Court did in *Lea*. For example, after this court's opinion in *Lea*, Judge Means of the Northern District of Texas conducted a "careful review" of Drs. Parisian and Blume's expert reports and also excluded their opinions regarding Wyeth's alleged failure to test and their alleged intent, motive, or knowledge.[43] The court agreed with the MDL court's opinions and those of two other transferor courts that "[n]either Parisian nor Blume cite to any specific statute, regulation, custom, or practice that supports their 'failure-to-test' opinions. Nor do they demonstrate how their extensive experience led to their conclusions, why that experience is a sufficient basis for their opinions, nor how that experience is reliably applied

---

[41] *Id.* at 572:11-18.

[42] **Exhibit 23 –** Patsner Dep. at 241:18-242:2 (emphasis added).

[43] **Exhibit 5 –** *Allen* Order at 3-4.

to the facts of this case."[44] The Court therefore excluded their "failure to test" opinion testimony.

The MDL court has also excluded this very same subjective opinion testimony in no fewer than four cases.[45] As the Court wrote in *Wilson v. Wyeth*, Drs. Parisian and Blume's assertions that Wyeth failed to act "reasonably" in testing Prempro were "not expert in nature because Plaintiff is unable to point to the existence of a reasonable standard of care or a custom and practice established by either industry or governmental standards regarding Defendants' duty to test,"[46] in spite of ample opportunity to do so:

> Plaintiff's counsel admitted the standard ***could be different in every circumstance*** — and therein lies the rub — ***there is no set standard.*** Drs. Parisian, Blume, and Austin[47] cannot be qualified as experts simply to testify what they believe Defendants could have done versus what they should have done.[48]

The Court reiterated that the experts' opinions were "too subjective and not expert in nature": "Because Plaintiff cannot show some independent objective validation, Drs. Parisian, Blume, and Austin . . . simply would be providing their own subjective beliefs about what could have

---

44 **Exhibit 5 –** *Allen* Order at 4. Although the court did not preclude Drs. Blume and Parisian from testifying entirely, Judge Means concluded his order with the stern warning to plaintiff to "be vigilant, however, to ensure that any testimony elicited from these experts . . . does not bleed over into testimony regarding Defendants' alleged failure to test and monitor its [HT medication] or its intent, motive, or knowledge." *Id.* at 5.

45 *Scroggin v. Wyeth*, 554 F. Supp. 2d at 886–87 (striking Dr. Parisian's punitive damages testimony and holding that it "did *not* 'give the jury the tools they need to look at [various documents] to understand them in the context of a regulatory background,'" and was "devoid of any testimony that Wyeth's actions violated FDA regulations or any other defined standard."); **Exhibit 6 –** *Wilson* Order at 4, *aff'd*, **Exhibit 7 –** Order, *Wilson v. Wyeth* (E.D. Ark. Sept. 23, 2010) at 1; **Exhibit 8 –***LaFerrara* Order at 4; **Exhibit 9 –** *Curtis* Order at 4.

46 **Exhibit 6 –** *Wilson* Order at 4, *aff'd*, **Exhibit 7 –** Order, *Wilson v. Wyeth* at 1.

47 Plaintiff has designated Dr. Austin as an expert witness in this case, but on the issue of general causation. Dr. Patsner's regulatory opinions are in lockstep with Drs. Parisian and Blume's though, and should be excluded for all the same reasons. *See* **Exhibit 23 –** Patsner Report at 2-3, 10.

48 **Exhibit 6 –** *Wilson* Order at 6.

been done."[49]

Several additional transferor courts have also excluded opinions offered by HT plaintiff's regulatory experts. These decisions reflect the kind of careful review that a number of courts have conducted upon remand of cases from the MDL proceedings.[50] In *Kaufman*, Judge Ungaro scoured Dr. Parisian's voluminous expert reports (as well as an outline of her opinions that the plaintiff filed at the court's direction), and, like the MDL court, could find no reliance by Dr. Parisian on any objective standard to formulate her opinions.[51] Although the plaintiff there had argued that Dr. Parisian relied on her experience, FDA Guidance notices, and the PhRMA Code, the Court concluded that neither Dr. Parisian's voluminous report nor her subsequent submission (for Judge Ungaro gave the plaintiff a further opportunity to clarify her opinion) indicated that she had relied on anything other than her own personal opinions. Thus, the court excluded Dr. Parisian's opinions entirely.[52]

Judge Copenhaver reached the same conclusion in *Hines v. Wyeth* after thoroughly reviewing Dr. Parisian's expert report, writing that the court could not "find that the proposed expert testimony is anything more than a personal belief or opinion. . . . ***nowhere in [Dr. Parisian's] expert report does she explain the basis for [her failure to test] conclusions***.[53] As a

[49] *Id*. The MDL court's decision in *Wilson* came on the heels of similar rulings excluding these opinions in the *Curtis* and *LaFerrara* cases. **Exhibit 8 –** *LaFerrara* Order at 4-7; **Exhibit 9** – *Curtis* Order at 4.

[50] **Exhibit 10 –** *Kaufman* Order at 17 n.8; **Exhibit 11 –** *Kaufman* Reconsideration Order at 4; **Exhibit 12 –** *Hines* Order at 12.

[51] **Exhibit 10 –** *Kaufman* Order at 11-17.

[52] **Exhibit 10 –** *Kaufman* Order at 17 n.8. In a ruling on the plaintiff's motion to reconsider less than a week later, the court reiterated the bases for excluding Dr. Parisian's testimony, concluding that "although the excerpts of testimony to which Plaintiff cites contain some semblance of opinions, they contain no indication of what methodology Dr. Parisian used to formulate her opinions." **Exhibit 11 –** *Kaufman* Reconsideration Order at 5.

[53] **Exhibit 12 –** *Hines* Order at 12 (emphasis added).

result, Judge Copenhaver excluded Dr. Parisian's opinion testimony.[54]

Because the Experts can point to no "independent objective validation" – and have conceded that no such standard exists – this Court should again exclude Plaintiff's experts "reasonable company" testing opinions, whether offered by Drs. Parisian, Blume, or Patsner.

**2. Dr. Patsner Has No Reliable Basis for His Opinion Listing Tests Wyeth "Could" Have Performed.**

Dr. Patsner opines in his expert report that "[t]here are a number of ways to evaluate the breast cancer risk of a drug and these methods were available and feasible for Wyeth to have done so from 1985 on,"[55] and he lists randomized clinical trials, database studies, cohort studies, and case-controlled studies, among others. Although this Court permitted Drs. Parisian and Blume to testify in *Lea* about what Wyeth could have done,[56] the Court should refuse to permit Dr. Patsner to offer such similar testimony because he offers no reliable methodology for opining what Wyeth could have done.

The FDA Medical Officer's 1994[57] and 1998[58] reviews, prepared in connection with the approvals of Prempro, referenced cohort studies, case-controlled studies, and meta-analyses, so there is no reason to believe that one more of these studies would have "answered" the breast cancer question. In his deposition, Dr. Patsner asserted that a randomized clinical trial, not

---

54 *Id*. at 18; *see also* **Exhibit 13 –** *Esposito* Order at 3 ("The jury function is usurped when an expert is unnecessarily permitted to explain what is reasonable or unreasonable. . . . [The experts'] personal conclusions about the reasonableness or unreasonableness of the Defendants' conduct will not be permitted.").

55 **Exhibit 3 –** Patsner Report at 6.

56 **Exhibit 4 –** *Lea* Order at 11.

57 **Exhibit 20 –** 1994 FDA Medical Officer's Review 6–7 (discussing more than a dozen studies that evaluated the breast cancer risk).

58 **Exhibit 21 –** 1998 FDA Medical Officer's Review 9–10 ("The impact of exogenous hormones on the risk of breast cancer has been the focus of considerable interest in recent years. There have been many cohort and case-controlled studies of women using HRT and these have yielded inconsistent findings.").

another observational study, was the kind of study that would have "answered" the question:

> Q: So I guess my question then is . . . ***what basis do you have for saying that a Wyeth study somehow would have revealed the true safety and efficacy of E plus P when all these other studies supposedly didn't***?
>
> A: . . . . ***A randomized prospective controlled trial would have settled the issue***, because . . . it would have eliminated all of the biases, been adequately powered . . .
>
> Q: Just so I understand then, ***you're not going to come in then . . . and offer the opinion at trial that if only Wyeth had done an observational study, whether it be case control, cohort, questionnaire, whatever, that somehow that would have answered the breast cancer question when all of these other observational studies that had been done by other people didn't answer it***?
>
> A: . . . . I think ***the answer to your question is no***, I'm not going to do it . . . .[59]

As all the experts have testified since the first trial in the HT litigation however, one cannot ethically conduct a randomized controlled trial in order to experiment on the participants by giving them a drug to see if it harms them or how quickly or severely it harms them.[60] A randomized controlled trial is only ethical when there is substantial scientific evidence to support the belief that the drug may confer a yet-to-be confirmed *benefit*.

Realizing this error, Dr. Patsner quickly changed course and testified that, in fact, an observational study could have "answer[ed] the breast cancer question":

> A: I am not saying that the only way Wyeth could have defined the safety risk was by doing a study like WHI. . . . They could have done a sufficiently powered, adequately designed observational study that ***might*** have still answered the question. What I am saying is that they had to adequately test to answer that safety question. And ***I don't care how they did it as long as they did it adequately***.[61]

This testimony demonstrates that Dr. Patsner really has no reliable basis to opine that another study of any kind could have "answer[ed] the breast cancer question," only that it ***might***

---

59 **Exhibit 23 –** Patsner Dep. at 495-97 (emphasis added).

60 **Exhibit 25 –** Oral Deposition of Dr. Donald Austin (March 13, 2007) at 121.

61 **Exhibit 23 –** Patsner Dep. at 499–500 (emphasis added).

have done so. Moreover, Dr. Patsner's opinion clearly demonstrates hindsight bias: WHI has convinced Dr. Patsner that there was some unspecified test out there that Wyeth could have done earlier and did not do. But hindsight bias is not a reliable method to reach an expert opinion, and Dr. Patsner's inability to even articulate what type of test Wyeth could have performed sooner demonstrates that his opinion was not reached through a reliable methodology.

### B. The Court Should Exclude Drs. Parisian, Blume, and Patsner's Testimony Regarding Wyeth's Intent, Motive, and Knowledge.

The Court should not only exclude the Experts' "reasonable company" testing opinions, but it should also bar them from testifying about Wyeth's intent, motive, or knowledge. Each purports to offer, based on a review of Wyeth's documents, various unsupported, speculative opinions about Wyeth's intent, motive, and knowledge about causation. As discussed above, many courts – including this Court – have already held that these opinions are not the proper subject of expert testimony and have repeatedly excluded such testimony on that basis, particularly Dr. Parisian's testimony.[62] This Court should likewise exclude her testimony, as well as the indistinguishable testimony of Drs. Blume and Patsner.[63]

Judges in other coordinated product liability cases have frequently excluded testimony regarding the manufacturer's intent and motives that is similar to Drs. Parisian, Blume, and Patsner's proposed testimony in this case. Stripped of their purported "expertise" about what a "reasonable" pharmaceutical company should have done to test Prempro, their testimony amounts to little more than reading portions of documents and offering personal commentary. There is nothing reliable about such advocacy-based opinions, and such testimony will not assist

---

[62] *E.g.*, **Exhibit 4** – *Lea* Order at 14; **Exhibit 5** – *Allen* Order at 4-5; **Exhibit 11** – *Kaufman* Reconsideration Order at 4; **Exhibit 12** – *Hines* Order at 12.

[63] **Exhibit 2** – Blume Report at 12-102 (summarizing history of HT medication and Defendants' marketing); **Exhibit 3** – Patsner Report at 4-10 (same).

the jury. "[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986). And as numerous courts have held – in other cases involving Drs. Parisian and Blume, in fact – jurors are capable of reading documents and drawing their own conclusions. *See, e.g.*, *In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, No. 1:08 GD 50000, 2010 WL 1796334, at *13 (N.D. Ohio May 4, 2010); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d at 1351 (excluding testimony by Dr. Parisian); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 964-65 (D. Minn. 2009) (excluding testimony by Dr. Blume); *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *Reece v. Astrazeneca Pharm., LP*, 500 F. Supp. 2d 736, 745-46 (S.D. Ohio 2007) (excluding testimony by Dr. Parisian); *accord Oakberg v. Zimmer, Inc.*, 211 F. App'x 578, 580 (9th Cir. 2006) (excluding testimony by Dr. Parisian). Excluding the Experts' testimony in regarding Wyeth's alleged intent, motives, or knowledge is appropriate because Drs. Parisian, Blume, and Patsner serve as nothing more than conduits to introduce general "bad company" documents, functioning as advocates in the guise of purportedly neutral experts.

The MDL court struck Dr. Parisian's punitive damages testimony in its entirety following the punitive damages phase in *Scroggin v. Wyeth*, finding that her "testimony was hardly expert in nature" and "merely paid lip service" to testifying from an expert standpoint. 554 F. Supp. 2d at 887, *aff'd in relevant part*, 586 F.3d at 571. Insofar as Dr. Parisian purported to tie her opinions to the record evidence, the court explained, she simply read the jury documents and added one-sided commentary regurgitating the plaintiff's theories:

> ***Dr. Parisian's testimony tracked Plaintiff's legal arguments, and there was very little significant analysis***. . . . When Dr. Parisian actually elaborated on documents, her testimony did no more than counsel for plaintiff did in argument, *i.e.*, propound a particular interpretation of defendant's conduct. Having an expert

> witness simply summarize a document (which is just as easily summarized by a jury) with a tilt favoring a litigant, without more, does not amount to expert testimony. ***Because Dr. Parisian's testimony — or reading — invaded areas that required no expert assistance, it was inappropriate "expert" testimony.***

*Id.* (emphases added) (brackets, internal quotations and footnote omitted). In short, "Dr. Parisian testified as to the bottom line without any explanation, failed to provide [any] expert analysis, . . . testified in areas beyond her expertise, and invaded areas that required no expert testimony." 554 F. Supp. 2d at 887. Such testimony is also improper under *Daubert* and Rule 702 because it is unhelpful to the jury; as the MDL court noted, "jurors are capable of reading documents." *Id.* at 886.

This Court and other HT transferor courts have been similarly critical of Dr. Parisian's opinions. This Court, in *Lea*, recognized that Drs. Parisian and Blume are unqualified to offer opinions regarding Wyeth's intent and motive for the simple reason that their "backgrounds do not provide them with knowledge of Defendants' state of mind or intent."[64] Similarly, when the *Kaufman* court denied the plaintiff's motion to reconsider the order excluding Dr. Parisian's testimony in its entirety, the court offered a direct and pointed critique of Dr. Parisian's opinions: "Dr. Parisian's mere summarization of documents authored by others and her conclusions as to what Wyeth knew or should have known, or did or failed to do at the time . . . is not expert opinion – ***it is advocacy***."[65]

Dr. Patsner's opinions are no different. In fact, he candidly described himself as "a ***blank slate*** on this litigation before I met with the [plaintiff's] attorneys for the first time."[66] He never

---

[64] **Exhibit 4 –** *Lea* Order at 14.

[65] **Exhibit 11 –** *Kaufman* Reconsideration Order at 4; *see also* **Exhibit 12 –** *Hines* Order at 12 ("Put simply, the proposed expert testimony . . . at times, merely regurgitates factual information that is better presented directly to the jury than through the testimony of an expert witness.").

[66] **Exhibit 23 –** Patsner Dep. at 24:18-25:6 (emphasis added).

expressed any of these opinions regarding Prempro or Wyeth's conduct while he worked at the FDA prior to this litigation, even though he was "fairly heavily involved in regulating" this set of products while at the FDA.[67] Plaintiff's counsel's recurring arguments throughout this case, first advanced by Drs. Parisian and Blume, have now been written on Dr. Patsner's "blank slate" and are being impermissibly offered as his expert opinions.

Accordingly, notwithstanding any expertise in general FDA matters, the Court should preclude all testimony regarding Wyeth's alleged intent, motive, or knowledge from Drs. Parisian, Blume, and Patsner because it is unreliable and will not assist the trier of fact. The Court should heed the MDL court's pointed warning in *Scroggin* that "Dr. Parisian's . . . testimony reveals 'how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis. An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Scroggin*, 554 F. Supp. 2d at 887 (quoting *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997)).

**C. The Court Should Exclude Dr. Patsner's Labeling Opinion Because it is Nothing More Than Another "Bottom Line" Opinion, Unsupported by Any Methodology.**

"An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Minasian*, 109 F.3d at 1216. Dr. Patsner, in contrast to Drs. Parisian and Blume, also opines that Premarin and Prempro's labeling was inaccurate and misleading in light of the science known at the time, even though the FDA approved that labeling several times.[68] When scrutinized, it becomes apparent that this opinion is just another of Dr. Patsner's personal views, unsupported by a reliable methodology or even by facts – that is, it is nothing more than a forbidden bottom line, presented without analysis.

---

[67] *Id*. at 24:7-25:6.

To reach this opinion, Dr. Patsner was required to rely on a reliable methodology, which must rest on a systematic compilation, review and analysis of what the scientific literature and studies performed at the time reported. Dr. Patsner's report, rather than containing such an evaluation, cites to eight medical articles, six of which post-date WHI and the allegedly misleading labeling.[69] Of the two studies from the time of the allegedly misleading labeling, one did not analyze Premphase or Prempro, and the other reported a relative risk of 1.35 for use lasting five years or longer, thus confirming the labeling's accuracy.

The FDA requires that the labeling fairly summarize all the scientific data. Three times the FDA reviewed the Prempro label, and three times the FDA approved it. In approving Prempro in 1994, the FDA Medical Officer discussed 13 breast cancer studies, one of which was a meta-analysis that combined the results of 31 studies.[70] Then, in 1998, a different FDA Medical Officer summarized the science on breast cancer in detail, reviewed the label, but suggested no changes to the breast cancer warning.[71] Given the volume of data at the time, reference to a single contrary study or handful of studies would not constitute a reliable basis for concluding that the summary of the data in the labeling was inaccurate.

Dr. Patsner's deposition testimony establishes that he did not conduct such an exhaustive review of the relevant scientific tests. In fact, he was unable to identify ***even one*** study that contradicted the statements in the labeling. Instead, he speculated that, if someone were to perform one, surely he'd find a study that showed the labeling was inaccurate: "I can't name the

---

68 **Exhibit 3** – Patsner Report at 9.

69 *Id*.

70 **Exhibit 20** – 1994 FDA Medical Officer's Review 13-55.

71 **Exhibit 21** – 1998 Medical Officer's Review 9–10 ("The impact of exogenous hormones on the risk of breast cancer has been the focus of considerable interest in recent years. There have been many cohort and case-controlled studies of women using HRT and these have yielded inconsistent findings.").

exact document, but ***if we put a binder together with all the literature in the world on estrogen and breast cancer and we start going through them***, I will find studies that show that women who were taking estrogen for less than ten years had a higher – had a greater chance of getting breast cancer than 1.0."[72]

Dr. Patsner did not assemble this binder of studies before rendering his opinions though. In fact, he applied no methodology whatsoever to reach his opinions regarding the allegedly inadequate warning. "[A]n expert's report that does nothing to substantiate [its] opinion is worthless, and therefore inadmissible." *Minasian*, 109 F.3d at 1216; *see also United States v. Lester*, 234 F. Supp. 2d 595, 600 (E.D. Va. 2002) ("[Plaintiff's expert] was required to 'show his work,' so to speak, and he did not.").

When questioned about FDA's published guidelines (i.e., "guidances") for the labeling of hormone therapy drugs, he agreed that FDA issued updated guidances in 2003, 2004 and 2005 and that "none of them say that combination hormone therapy causes breast cancer."[73] He further agreed that "even today" the approved labeling "does not say cause"[74] and that "[i]t's not a regulatory violation in the sense that there's a requirement they use the word 'cause' and [Wyeth] elected not to."[75] And he agreed that the guidances are rightly considered a "safe harbor," such that "as a drug company, if you follow those recommendations, . . . you're in a regulatory safe harbor from a labeling standpoint."[76]

Similar to his other opinions, Dr. Patsner made no attempt to substantiate any of the inaccuracies he contends were present in the labeling, nor does he contend they are inadequate

---

72 **Exhibit 23** – Patsner Dep. at 306:23-308:23.
73 *Id*. at 396-97.
74 *Id*. at 397.
75 *Id*. at 404.
76 *Id*. at 396.

according to any objective standard. He cannot do so because the labeling accurately reported the state of the science at the time and was not inadequate under any objective standard. Again, we are left with Dr. Patsner's personal, unexplained belief that the labeling was somehow inadequate. The Court should therefore also exclude Dr. Patsner's inaccurate labeling opinion.

### D. The Court Should Exclude Dr. Patsner's Marketing Opinion.

Lastly, Dr. Patsner also claims expertise in "marketing or representations made by drug companies about prescription drugs, direct to consumer advertising and promotion of off-label uses of drugs and physicians [sic]."[77] But his expert report fails to show any basis for this claim. He has been a practicing physician, a law student and lecturer, and a medical officer at the FDA, but if he has any experience in regulating pharmaceutical marketing, his report and curriculum vitae do not say what it is. Insofar as he offers the opinion that "Wyeth promoted E+P for off-label and unproven benefits," his report merely cites a handful of documents provided him by plaintiffs' counsel and offers a series of bottom-line judgments. Plaintiff has not established (1) that Dr. Patsner is qualified to opine on marketing; (2) that his marketing opinions are the result of a reliable methodology or are tied to an objective standard, rather than his personal beliefs; or (3) that expert testimony regarding marketing is relevant or necessary to this case.[78] The Court should therefore exclude Dr. Patsner's marketing opinions too.

## V. CONCLUSION

Defendant Wyeth LLC f/k/a Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. therefore

---

77 **Exhibit 3** – Patsner Report at 2.

78 In fact, as argued more thoroughly in *Defendants' Motion to Exclude the Testimony of Drs. Hollon and Fugh-Berman and Brief in Support* (filed contemporaneously herewith), expert testimony regarding marketing is not relevant to this case because there is no evidence that either Ms. Romero or any of her prescribing physicians relied on Wyeth's marketing when deciding how best to treat her menopausal symptoms. **Exhibit 29** - Lal Dep. at 153:17-24; **Exhibit 30** –Lotze Dep. at 108:6-12, 114:22-115:4, 118:3-8, 246:11-19, 257:12-258:1.

respectfully request that the Court exclude Drs. Parisian, Blume, and Patsner's opinion testimony regarding (1) what Wyeth should have known or done; (2) what a reasonable pharmaceutical company would have done; (3) whether Wyeth breached any standard of care; and (4) Wyeth's alleged intent, motives, or knowledge. Wyeth further requests that the Court exclude Dr. Patsner's opinion testimony as to what Wyeth could have done, the adequacy of the Prempro and Premphase labeling, and Wyeth's marketing practices. Wyeth requests all other relief to which it has shown itself justly entitled.

Dated: February 24, 2012

Respectfully Submitted,

By: *<u>/s/ Gregory S. Meece w/ permission JHM</u>*

Gregory S. Meece, *Attorney-in-Charge*
Texas State Bar No. 13898350
Gregory.Meece@tklaw.com

**THOMPSON & KNIGHT LLP**
333 Clay Street, Suite 1500
Houston, Texas 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

**— *AND* —**

John H. Martin
Texas State Bar No. 13086500
John.Martin@tklaw.com
Janelle L. Davis
Texas State Bar No. 24059655
Janelle.Davis@tklaw.com

**THOMPSON & KNIGHT LLP**
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF CONFERENCE**

Counsel has complied with the meet and confer requirement in Local Rule CV-7(h). This motion is opposed. On February 17th and 20th, counsel for Plaintiff, Bryan Aylstock, and counsel for Defendant, Janelle L. Davis, conducted the conferences required by this rule. Despite a good faith effort by both sides, an agreement could not be reached and the discussions have conclusively ended in an impasse, leaving an open issue for the court to resolve.

*/s/ Janelle L. Davis*
Janelle L. Davis

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of February, 2012 a true and correct copy of the foregoing was filed with the Court and served via electronic notification on all counsel of record.

*/s/ Janelle L. Davis*
Janelle L. Davis

064500 000019 DALLAS 2838850.1