**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **JUDY ROMERO** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:03-cv-1367** |
| | § | |
| **WYETH PHARMACEUTICALS, INC.,** | § | |
| **and WYETH, INC.,** | § | **Judge Marcia A. Crone** |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S OPPOSITION TO WYETH'S MOTION TO EXCLUDE THE TESTIMONY OF DRS. ELIZABETH NAFTALIS AND JAMES WALDRON**

This Court has already heard and ruled on the issues raised in defendants' motion in another Hormone Replacement Therapy case just over five months ago in the *Lea* case, and there is no reason for this Court to rule any differently in the instant case.[1] Not surprisingly, defendants make no mention that ruling in their motion, nor do they make any attempt to distinguish Ms. Romero's case from Ms. Lea's. This Court, like other courts across the country, has found differential diagnosis to be a reliable methodology, stating that "the specific causation testimony of Drs. Naftalis and Waldron is reliable and admissible."[2] In addition, this Court also found Drs. Naftalis and Waldron to be qualified and their testimony to be relevant.[3] Furthermore, the issues raised in defendants' motion are the same as what defendants have consistently filed in trial-set cases since 2006, to no avail. Defendants' pretrial challenges to almost a dozen different cancer physician experts – who all used the same methodology of differential diagnosis as plaintiff's experts here – have all been denied. Indeed, defendants have challenged every case

---

[1] Ex. 1 - Order Denying Defendants' Motion to Exclude the Specific Causation Testimony of Drs. Naftalis and Waldron, *Lea v. Wyeth, et al.*, 9/16/11.
[2] *Id.* At 8.
[3] *Id.* At 8.

specific expert designated by the plaintiff, including Dr. Naftalis and Dr. Waldron, over two dozen times and lost each and every challenge in both state and federal court.[4] Three appellate courts have reviewed the plaintiffs' scientific evidence and affirmed jury verdicts: the United States Court of Appeals for the Eighth Circuit,[5] the Nevada Supreme Court[6] and the Pennsylvania Superior Court.[7] When Wyeth appealed the Eighth Circuit decision in *Scroggin*, specifically as to the *Daubert* ruling admitting Dr. Naftalis' causation testimony, the U.S. Supreme Court declined to take the case. This left intact the Eighth Circuit's strong approval of plaintiffs' expert's testimony and methodology.[8]

---

[4] **MDL Federal Court Orders**: Ex. 2 - Order denying expert challenges in *Reeves v. Wyeth*, 8/21/06; Ex. 3 - Order denying Wyeth's challenges in *Rush v. Wyeth*, 9/13/06; Ex. 4 - Order denying expert challenges in *Scroggin v. Wyeth*, 11/15/07; Ex. 5 - Order denying expert challenges in *Hill v. Wyeth*, 8/7/08; Ex. 6 - Order denying expert challenges in *LaFerrara v. Wyeth*, 6/30/10; Ex. 7 - Order denying Wyeth's Motion to Reconsider in *LaFerrara v. Wyeth*, 7/9/10; Ex. 8 - Order denying Wyeth's challenges in *Wilson v. Wyeth*, 9/17/10; Ex. 9 - Order denying expert challenges in *Curtis v. Wyeth*, 1/19/11. **Federal Courts**: Virginia: Ex. 10 - Transcript of order denying Wyeth's challenges to plaintiff's oncology expert in *Torkie-Tork v. Wyeth*, 11/15/10; Ex. 11 - Transcript of order denying Wyeth's challenges to plaintiff's pathology expert, Dr. Michaels in *Torkie-Tork v. Wyeth*, 11/23/10; Puerto Rico: Ex. 12 - Order denying expert challenges in *Rivera-Adams v. Wyeth*, 12/3/10; Florida: Ex. 13 - Order denying expert challenges in *Hansen v. Wyeth*, 6/24/11; West Virginia: Ex. 14 - Order denying expert challenges in *Hines v. Wyeth*, 7/8/11. **State Court Orders**: Texas: Ex. 15 - Order denying expert challenges in *Choueifati v. Wyeth*, 2/17/11. Pennsylvania: Ex. 16 - Order denying expert challenges in *Nelson v. Wyeth*, 8/16/06; Ex. 17 - Order denying Wyeth's challenges to plaintiff's pathology experts in *Nelson v. Wyeth*, 8/16/06; Ex. 18 - Order denying expert challenges in *Simon v. Wyeth*, 4/16/07; Ex. 19 - Order denying expert challenges in *Barton v. Wyeth*, 9/8/09; Ex. 20 - Orders denying Wyeth's challenges to plaintiff's experts in *Kendall v. Wyeth*, 10/15/09; Ex. 21 - Order denying expert challenges in *Singleton v. Wyeth*, 1/20/10. Florida: Ex. 22 - Order denying expert challenges in *Esposito v. Wyeth*, 4/14/10; Nevada: Ex. 23 - Order denying expert challenges in *McCreary v. Wyeth*, 9/27/06; Ex. 24 – Transcript of order denying Wyeth's challenges to plaintiff's expert in *Woods / Woodhouse v. Wyeth*, 6/12/08.

[5] *Scroggin v. Wyeth*, 586 F.3d 547, 566-67 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 3467 (June 21, 2010).

[6] *Wyeth v. Rowatt*, 244 P.3d 765 (Nev. 2010), *cert denied* (June 17, 2011).

[7] *Daniel v. Wyeth Pharmaceuticals, Inc.*, 15 A.3d 909 (Pa. Super. 2011).

[8] *Scroggin* at 566-67.

In the hormone therapy litigation nationwide, there have been multiple full *Daubert* hearings and at least six *Frye* hearings challenging plaintiff's methodology. Dr. Naftalis testified live in four of those proceedings. Defendants have cross-examined Dr. Naftalis at trial nine times and deposed her dozens of times. Despite all those transcripts, their motion offers nothing new and makes the same arguments that have been rejected by the federal MDL court eight times, by five federal judges in Virginia, Puerto Rico, Florida and West Virginia and over a dozen state judges– including Texas - to consider the motion. Dr. Naftalis' testimony has been approved by every presiding court.

It is generally accepted in the medical community that combination hormone therapy (E+P) can cause breast cancer in women. Reliable scientific evidence confirms that E+P can promote the growth and development of hormone dependent breast cancer. After all, hormone receptor positive tumors are fueled by hormones. This is true whether the hormone dependent cancer is occult, *in situ*, or invasive. Defendants' own experts and scientists admit that E+P causes breast cancer to grow and to become "bigger" and "worse."[9] Tellingly, defendants do not cite to any literature that suggests otherwise. Instead defendants assert three specific issues.

First, defendants tepidly claim that E+P does not cause *in situ* cancer generally. This might be interesting if defendants did not also claim in every other case– with the same vehemence – that E+P does not cause any kind of cancer: occult, *in situ*, or invasive. However, epidemiological studies confirm that E+P causes breast cancer generally and DCIS specifically. This Court has previously found that "such challenges go to the weight of the experts' testimony rather than to its admissibility."

---

[9] Ex. 25 - Deposition of Dr. Copeland in *Cross v. Wyeth*, 3/4/11 at p. 75:23 (with qualifications from Deposition of Dr. Copeland in *Hansen v. Wyeth*, 2/15/11); Ex. 26 - Testimony of Dr. James Pickar - PX 20260C.

Second, defendants assert that the opinions of Drs. Naftalis and Waldron are invalid because they used the methodology of differential diagnosis. Again, this Court has already spoken to this issue, finding that "Drs. Naftalis's and Waldron's application of differential diagnosis to Plaintiff's case is reliable."[10] Defendants claim that differential diagnosis is inappropriate in this context because we do not know all of the causes of breast cancer. But plaintiff is not arguing "cause" in the sense that defendants or its experts are. Plaintiff does not contend that hormone therapy "initiated" the first bad cell that ultimately became cancerous. Plaintiff admits that no one knows what caused that first abnormality. Rather, plaintiff argues that hormone therapy "promoted" and/or "aggravated" the development of Mrs. Romero's hormone dependent breast cancer. Thus, E+P promoted the development and growth of a hormone dependent malignancy in a woman who did not have sufficient natural hormones to fuel such growth.

Judy Romero suffered from classic signs of hormone deficiency, including severe hot flashes and menopausal bleeding. She was what Wyeth termed "hormone-deficient" in its marketing materials and the exact type of women for whom defendants promoted E+P.[11] Plaintiff was thus prescribed E+P to treat those symptoms and she ingested defendants' hormone drugs for over four years, using two forms of combination hormone therapy, Premphase and Prempro.

Hormone therapy provided the fuel that enabled the plaintiff's breast abnormalities to grow and become a clinical tumor requiring treatment. Judy Romero did not have breast cancer

---

10 Ex. 1 - Order Denying Defendants' Motion to Exclude the Specific Causation Testimony of Drs. Naftalis and Waldron, *Lea v. Wyeth, et al.*, 9/16/11, at 7.

11 Ex. 27 - PX 19 at p. 3 (The most common conditions related to continued estrogen deficiency center around atrophy of the urogenital tissues).

before she started E+P in 1996.[12] For over four years, every day, defendants' drugs swamped her breast tissue with 18 times the typical post-menopausal level of hormones.[13] In February of 2001, plaintiff's mammogram revealed a mass in her right breast. A subsequent biopsy and pathologic examination revealed fibrocystic changes in the right breast and high grade ductal carcinoma in the left breast.[14] She endured biopsies of both breasts, and underwent surgery to remove the cancerous portion of her left breast in March of 2001.[15] Postoperatively, Judy Romero underwent radiation therapy to her left breast and was placed on Tamoxifen.[16]

Thus, in performing their differential diagnosis, plaintiff's experts first determined whether her cancer was hormone receptor positive meaning that it required hormones for fuel. Plaintiff's experts then asked the important question for their differential diagnosis: What provided the hormones necessary to fuel the development and growth of this cancer? One source of hormones was Judy Romero's own body. The other source of hormones was the E+P pills plaintiff took every day for years. Plaintiff's experts thus assessed Judy Romero's natural hormone production after menopause and determined that she had low natural hormones in light of her symptoms. Thus, by the process of elimination, the most probable explanation for the growth of the plaintiff's abnormalities into a clinical cancer is E+P. This is precisely the differential diagnosis methodology that the Eighth Circuit found valid in *Scroggin v. Wyeth*, and

---

12 Ex. 28 - Romero mammogram report from 6/27/96.

13 Ex. 29 - Chatterton, *Comparison of Hormone Levels in Nipple Aspirate Fluid of Pre- and Postmenopausal Women: Effect of Oral Contraceptives and Hormone Replacement*, J. Clin. Endocrinology & Metabolism 90(3):1686-1691 (2005) – PX ML 2488 at p. 5 (E+P users had 18 times higher levels of estradiol in the nipple aspirate or breast tissue fluid when compared to non-E+P user postmenopausal women and 2.5 times higher levels of estradiol in serum or blood).

14 Ex. 30 - Expert report of Dr. Naftalis for Judy Romero at p. 6.

15 Ex. 30 - Expert report of Dr. Naftalis for Judy Romero at p. 6.

16 Ex. 30 - Expert report of Dr. Naftalis for Judy Romero at p. 6.

which this Court adopted in its prior ruling in the *Lea* case. As the Eighth Circuit wrote regarding Dr. Naftalis' testimony about the cause of Donna Scroggin's breast cancer:

> Knowing that Scroggin's breast cancer was hormone dependent, Dr. Naftalis' differential diagnosis sought to determine the cause of Scroggin's breast cancer by ruling out the two possible sources of these hormones: (1) Scroggin produced the hormones herself, or (2) they came from the hormone replacement therapy she had taken for the past eleven years.
>
> *  *  *
>
> We find unpersuasive the contention that Dr. Naftalis' testimony should not have been admitted because Scroggin has some breast cancer risk factors and a family history of breast cancer. Dr. Naftalis sufficiently established that hormones were necessary to the development of Scroggin's tumors and conducted her differential diagnosis from this starting point.
>
> *  *  *
>
> Thus, Dr. Naftalis ruled out the other possible cause of Scroggin's breast cancer [endogenous hormones], and her expert testimony was properly admitted.[17]

Since the breast cancer at issue was hormone dependent, the Eight Circuit found Dr. Naftalis' exclusion of alternate explanations until E+P was all that remained as the potential cause, to be an appropriate use of differential diagnosis.[18]

Additionally, defendants claim that plaintiff's experts inappropriately applied differential diagnosis in this case because they failed to fully evaluate plaintiff's other risk factors. As a starting point, this argument lacks credibility since plaintiff's experts assessed plaintiff's entire medical picture in detail. Dr. Naftalis dedicated six pages of her expert report to an evaluation of Ms. Romero's risk factors. But more importantly, not a single other risk factor provides a current source of hormones necessary to fuel the growth and development of Ms. Romero's cancer. While the other risk factors may explain why Ms. Romero had hormone dependent abnormalities in her breast when she entered menopause, or why she was particularly susceptible to E+P's effect, they cannot answer the key causation question here.

---

17 *Scroggin*, 586 F.2d at 566-67.
18 *Id.*

## I. STANDARD OF REVIEW

Under *Daubert*,[19] expert testimony is admissible if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable.[20] The proponent need only establish these admissibility requirements "by a preponderance of the evidence."[21] The purpose of a *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[22]

Accordingly, under Rule 702, the trial court must act as a "gatekeeper" to determine the qualifications of an expert and whether the expert's opinions are admissible.[23] As enunciated by the Fifth Circuit, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[24] As *Daubert* itself recognized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky, but admissible evidence."[25] Moreover, "the rejection of expert testimony is the exception rather than the rule."[26] The district court's

---

19 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

20 *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir.1997).

21 *United States v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003).

22 *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir.1999) (citing *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 1176 (1999)).

23 *Id.* at 589.

24 *United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir.1996); ); *see also Dearmond v. Wal-Mart Louisiana LL*, 335 Fed. Appx. 442, 445-446 (5th Cir. 2009

25 *Daubert*, 509 U.S. at 596. *See also U.S. v. Ashlock*, 2003 WL 297339, at *1 (N.D. Tex. Feb. 7, 2003) (quoting *Daubert*, 509 U.S. at 596)). *See also Varco LP v. Bohnsack*, CIV. A. H-08-1481, 2010 WL 2900316 (S.D. Tex. July 20, 2010) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir.2002)).

26 *Dentler v. Monumental Life Ins. Co.*, 2007 WL 4241665, at *3 (S.D. Tex. Nov. 29, 2007) (citing Fed. R. Evid. 702 advisory committee's notes (2000)).

inquiry into the admissibility of expert testimony is a flexible one.[27] The court must focus on the methodology used by the expert, not on the conclusions reached.[28] And the opinions offered by the expert need not be irrefutable or indisputably correct.[29]

## II. ARGUMENT AND AUTHORITY

Breast cancer originates from abnormal cells in the breast. When those abnormalities become malignant, they are categorized as either *in situ* (meaning that the cancer has not yet grown into or invaded other tissues of the breast)[30] or invasive (where the tumor has already invaded its surroundings). An *in situ* cancer in the ducts of the breast is called ductal carcinoma *in situ*, or DCIS. This is the subtype of cancer that Ms. Romero developed.

When a breast cancer is diagnosed, it is tested to see if it is positive for hormone receptors (estrogen or progesterone: ER+ and /or PR+). When diagnosed, hormone dependent cancers are treated with (and respond to) anti-estrogen therapies because, as multiple published articles confirm, hormone dependent cancers grow when exposed to hormones and shrink or regress when deprived of hormones.[31] For causation purposes, it thus does not matter whether a

---

27 *Id.*

28 *Id.*

29 *Daubert*, 509 U.S. at 596.

30 Even defendants acknowledge that an *in situ* cancer is a very early cancer that has not spread to nearby tissue. Ex. 31 - Pfizer Oncology website, "Understanding Cancer: Test, Terms, and Tumor Markers," at p.8.

31 Ex. 32 - Berry and Ravdin, *Breast Cancer Trends: A Marriage between Clinical Trial Evidence and Epidemiology*, JNCI, Vol. 99, Issue 15 (2007)- PX ML 4775 (E+P is the fuel that is promoting the growth and without this fuel, the growth may slow or stop entirely or the tumors may even regress); Ex. 33 - Prasad, *Short-Term Biologic Response to Withdrawal of Hormone Replacement Therapy in Patients with Invasive Breast Carcinoma*, Cancer, 98(2), p. 2539 (2003) - PX ML 1085 (marked reduction in proliferation or growth rate of cancer following Prempro cessation); Ex. 34 - Harvey, *Short-term Cessation of Hormone Replacement Therapy and Improvement of Mammographic Specificity*, *Journal of National Cancer Institute*, Vol. 89, No. 21 (1997) – PX ML 0275; Ex. 35 - Jena, *Complete Resolution of Metastatic Breast Cancer by Withdrawal of Hormone Replacement Therapy*, Clinical Oncology, Vol. 13: 200-201 (2001)- PX ML 6008; Ex. 36 -Harvey, *Marked Regression of a Nonpalpable Breast Cancer after Cessation*

woman's breast cancer is occult, *in situ* or invasive when found. What matters is that Ms. Romero's cancer was hormone dependent, meaning that it required hormones to grow and develop.[32]

The biological characteristics of DCIS are essentially the same as invasive ductal cancers. DCIS is merely a middle step on the progression of cancer between atypical hyperplasia and invasive cancer. As one leading textbook on breast cancer explains, "DCIS, in many respects, should be regarded as a carcinoma of the ductal system for it possesses all of the molecular and biological abnormalities as frankly invasive carcinoma."[33] And defendants' experts' agree. Dr. Acs, one of defendants' pathology experts, explains that the only difference between an atypical hyperplasia and a clinical cancer such as DCIS is the size of the abnormality:

> If you compare atypical ductal hyperplasia to low grade DCIS, the way the cells look and the molecular changes they have are very similar or identical. **We separate them out arbitrarily based on size criteria**.[34]

---

*of Hormone Replacement Therapy*, AJR, Vol. 167:394-5 (1996)- PX ML 2238; Ex. 37 - Farhat, *Changes in Invasive Breast Cancer and Ductal Carcinoma In Situ Rates in Relation to the Decline in Hormone Therapy Use*, J. of Clinical Oncology, 28 (2010) at p. 7, PX ML 6102 (Withdrawal of HT may halt the progression of pre-existing tumors or even cause them to regress completely); Ex. 38 - Sloan Kettering website by Dr. Clifford Hudis – PX 8078 (Hormones fuel cancers and without this fuel "they might immediately stop growing and shrink").

[32] Ex. 39 - Chen and Colditz, *Risk factors and hormone-receptor status: epidemiology, risk-prediction models and treatment implications for breast cancer*, Nature Clinical Practice: Oncology, Vol. 4, No. 7, 415-23 (2007) – PX ML 4820; Ex. 40 - Oncolink (the presence of estrogen and progesterone receptors means that the cancer requires estrogen for its growth)- PX 8426B; Ex. 41 - National Cancer Institute Website (cancers with these hormone receptors need hormones to grow) - PX 8426A; Ex. 42 - Wyeth's website - PX 10555, p. 4 (This type of cancer requires estrogen to grow).

[33] Ex. 43 - Povoski, *In Situ Carcinomas of the Breast: Ductal Carcinoma in Situ and Lobular Carcinoma in Situ*, Sect. IV – Pathology of Malignant Lesions, in THE BREAST, 4TH EDITION, BLAND AND COPELAND, EDS. 2009

[34] Ex. 44 -Deposition testimony of Dr. Geza Acs, 9/27/10 at p. 12:24-13:12.

Thus, what turns a hyperplasia into a full-blown cancer is solely size and growth. Dr. Palazzo, another one of defendants' pathology experts, agrees that DCIS is a "pre-invasive stage" and "a precursor of a step before invasive cancer."[35] A recent peer-reviewed, published paper concludes that risk factors for DCIS and invasive cancer are similar, "suggesting a common etiology."[36] These *in situ* tumors develop the same way as invasive ductal tumors. DCIS is just one step away in cancer progression from an invasive tumor. It is nonsensical to suggest that E+P causes invasive breast cancer but not the smaller cancer of DCIS.

### A. <u>Epidemiological Studies Confirm that E+P Causes Breast Cancer, Including *In Situ* Cancer</u>

There is overwhelming evidence that E+P causes breast cancer and that the mechanism of causation is promotion. Nearly four dozen epidemiological studies establish a greater than 2.0 relative risk of breast cancer in E+P users.[37] Plus, epidemiological data shows that adding E+P causes breast cancer to grow and removing it causes breast cancer to stop growing, shrink and regress.[38]

As to epidemiological support for E+P use and DCIS specifically, plaintiff's general causation expert, Dr. Austin, has thoroughly detailed that issue.[39] Defendants do not challenge Dr. Austin's general causation opinions in this case. Plaintiff's case specific experts rely upon many of the same studies as Dr. Austin in forming their opinions[40] including the Million Women's Study. This study, conducted by the British government, showed a statistically

---

35 Ex. 45 - Deposition of Dr. Juan Palazzo, *Lea v. Wyeth* (May 27, 2011), at 43:10-14.

36 Ex. 46 - Kerlikowski - PX ML 5656.

37 *See* Plaintiff's *Daubert* Motion to Exclude Testimony of Drs. Chodosh and Ling, and Incorporated *Daubert* Motion to Exclude the Opinions of Any Wyeth Expert that Hormone Therapy Does Not Cause Breast Cancer Generally, *Lea v. Wyeth* (July 1, 2011), Doc. 63, which is incorporated into this response as if copied verbatim.

38 Ex. 30 - Expert report of Dr. Naftalis in *Romero v. Wyeth* at p. 20.

39 Ex. 47 - Expert report of Dr. Austin, 2/8/11.

40 Ex. 30 - Expert report of Dr. Naftalis in *Romero v. Wyeth* at p. 37-39.

significant increased risk for the development of *in situ* cancers in E+P users.[41] Similarly, in 2008, Dr. Brinton and colleagues reported on the National Institutes of Health AARP cohort containing over 125,000 postmenopausal women and over 670,000 person-years of risk. They examined separately *in situ* and invasive cases and found that for *in situ* cancers, women using E+P had a significantly elevated relative risk of 1.94 (1.51-2.48). For women who were currently using the drug at the time of diagnosis (such as Mrs. Romero), the relative risk rose to 2.04 (1.59-2.65).[42] This one study alone should end the *Daubert* inquiry. But an additional six published articles similarly found an increased risk of *in situ* cancer with E+P.[43] As the *Marshall* article concludes, "women who reported currently taking E+P had higher rates of invasive and *in situ* cancers."[44]

---

41 Ex. 48 - Reeves et al for the Million Women Study Collaborators, *Hormonal therapy for menopause and breast-cancer risk by histological type: a cohort study and meta-analysis, Lancet Oncol*, Vol. 7, p. 910(2006) – PX ML 4580 at p. 1 (Relative risk of lobular *in situ* cancer was 2.82 and ductal *in situ* was 1.56 (both statistically significant)).

42 Ex. 49 - Brinton, *Menopausal hormone therapy and breast cancer risk in the NIH-AARP Diet and Health Study cohort*. Cancer Epidemiol Biomarkers Prev, Vol. 17(11):3150-60 (2008), PX ML 5211.

43 Ex. 50 - Marshall, *Recent Breast Cancer Incidence Trends According to Hormone Therapy use: The California Teacher's Study Cohort*, Breast Cancer Research, Vol. 12: R4 (2010) – PX ML 5358; Ex. 51 - Kerlikowske K, *Prognostic characteristics of breast cancer among postmenopausal hormone users in a screened population*, J Clin Oncol 21 :4314-4321 (2003) – PX ML 1099 at p. 5 (Increased risk of DCIS in E+P users = 1.39); Ex. 52 - Manjer, *Increased Incidence of Small and Well-Differentiated Breast Tumors in Post-Menopausal Women following Hormone Replacement Therapy*, Int. J. of Cancer, Vol. 92, 919-922 (2001) – PX ML 1241 at p. 3 (The incidence of cancer *in situ* among users of HRT was increased (1.4 RR)); Ex. 53 – DX 8473 - Trentham-Deitz, *Risk factors for carcinoma in situ of the breast*, Cancer Epidemiol Biomarkers Prev, Vol. 9:697-703 (2000) (Statistically significant increased risk from use of postmenopausal hormone therapy for invasive and *in situ* cancers). Ex. 54 - Colditz, *The Use of Estrogens and Progestins and the Risk of Breast Cancer in Postmenopausal Women*, NEJM, Vol. 332, No. 24 (1995) – PX ML 3 at p. 4 (Current use of hormones was somewhat more strongly associated with in situ disease (age-adjusted relative risk, 1.95); Ex. 55 - Schairer, *Menopausal Estrogen and Estrogen-Progestins Replacement Therapy and Risk of Breast Cancer*, Cancer Causes Control, Vol, 5: 491-500 (1994) – PX ML 671 at p. 1-2 (In combination users, increased risk of *in situ* breast cancer was 2.3 (CI = 1.3-3.9). There was a stronger association with duration of use for in situ than invasive cancer).

44 Ex. 50 - Marshall, *Recent Breast Cancer Incidence Trends According to Hormone Therapy use: The California Teacher's Study Cohort*, Breast Cancer Research, Vol. 12: R4 (2010) – PX ML 5358.

In addition, the recently published *Farhat* study confirms that when E+P use plummeted after the publication of the WHI study, DCIS rates fell in lock-step with that drop in drug use. As Dr. Farhat explained, this study showed "a significant decline in DCIS rates in relation to the decrease in HT use in a population undergoing regular mammography screening."[45]

In their motion, defendants cites to the WHI study as the sole rebuttal to this evidence. But, as Dr. Donald Austin explains, such reliance is misplaced. First, the WHI was a randomized clinical trial which means that it was designed to identify risks but is not well suited for quantifying the magnitude of such risks.[46] Second there was a high drop-out rate (40%) as well as a significant cross-over rate of 10% (where placebo users started taking drug but were still counted as placebo patients in the study) leading to an almost 50% contamination in the data.[47] Third, and what defendants did not mention, the WHI study showed an increase in DCIS cases, just not enough to be statistically significant. When the WHI investigators separately analyzed *in situ* cases in E+P users they found an elevated mean hazard ratio.[48]

**B. <u>Drs. Naftalis' and Waldron's Use of Differential Diagnosis Is a Reliable Methodology for Determining that E+P Caused Plaintiff's Breast Cancer.</u>**

---

45 Ex. 37 - Farhat, *Changes in Invasive Breast Cancer and Ductal Carcinoma In Situ Rates in Relation to the Decline in Hormone Therapy Use*, J. of Clinical Oncology, 28(35): 5140-5146 (2010) – PX ML 6102 at p. 1 and 6 (Results: DCIS rates significantly decreased in women age 50 to 69 years after 2002 while rates of DCIS in women younger than 49 remained stable).

46 Ex. 47 - Expert report of Dr. Austin, 2/8/11 at p. 2-4.

47 Ex. 47 - Expert report of Dr. Austin, 2/8/11 at p. 3; Ex. 56 - Santen, Colditz, *Postmenopausal Hormone Therapy: An Endocrine Society Scientific Statement*, J. of Clinical Endo & Met, 95, Supplement 1:S1-S66 (2010) – PX ML 6016B at S 4.

48 Ex. 57 - Chlebowski, *Influence of estrogen plus progestin on breast cancer and mammography in healthy postmenopausal women: the Women's Health Initiative Randomized Trial*. JAMA, Vol. 289**:** 3243–3253 (2003), PX ML 2.

First, defendants do not, nor can they, argue that Drs. Naftalis and Waldron are unqualified to render their opinions in this case, as noted by this Court in the *Lea* case.[49] However, as background to this motion, plaintiff includes a brief summary of their credentials and qualifications.

**Dr. Elizabeth Naftalis**: Dr. Naftalis is an academic and clinical surgeon and oncologist[50] with a concentration in breast oncology.[51] She was certified by the American Board of Surgery in 1992 and is a member of the American College of Surgeons, the American Society of Breast Disease, The Society of Surgical Oncology and the American Society of Breast Surgeons. Until August 2004, she was an Assistant Professor in the Department of Surgery, Division of Surgical Oncology at University of Texas Southwestern ("UT SW") where she taught medical students, residents and breast fellows in addition to maintaining her clinical practice.[52] At UT SW, she was named Director of Operations at the Surgical Breast Clinic, Director of the Komen/UT Southwestern Breast Fellowship, Medical Director of the Volunteer, and the Solomon Breast Chair. Dr. Naftalis' clinical practice involved conducting over 2,000 breast evaluations per year, providing surgical evaluation to approximately 100 breast cancer patients annually, and giving follow-up and treatment to her breast cancer patients. She has also been actively involved as investigator and researcher on various topics in breast cancer research including one clinical project for the Department of Defense.[53] In this latter study, completed in 1998, she was an active participant in the ACOSOG (American College of Surgeons Oncology

---

[49] Ex. 1 - Order Denying Defendants' Motion to Exclude the Specific Causation Testimony of Drs. Naftalis and Waldron, *Lea v. Wyeth, et al.*, 9/16/11, at 8.

[50] Dr. Naftalis is temporarily not practicing medicine while she spends a few years at home as a full-time parent.

[51] Ex. 58 - Curriculum vitae of Dr. Naftalis.

[52] Ex. 59 - Trial transcript of Dr. Elizabeth Naftalis in *Singleton v. Wyeth*, 2/1/10AM at p. 42:19-52:19.

[53] *Id*. at p. 50.

Group) Z10 and Z11 National Surgical Adjuvant Breast Project P1 clinical research trials on Tamoxifen breast cancer prevention.[54] She has authored a number of articles on breast cancer and breast cancer research.[55]

**Dr. James Waldron**: Dr. Waldron is a pathologist who earned both his Ph.D. and M.D. degrees in pathology from Vanderbilt University. He served as assistant professor at the Yale School of Medicine for eight years. He then moved to Little Rock, Arkansas to assist in opening a cancer center. Beginning in 1989, he was a professor of pathology at the University of Arkansas Medical School in Little Rock. Dr. Waldron has been board certified in pathology for 33 years. He has been the recipient of numerous awards, fellowships and research grants from varied cancer organizations, including the American Cancer Society and the National Institutes of Health. He has published extensively on pathology in peer-reviewed journals.[56]

**Reliable Methodology Used:** Both sides agree that the original "cause" of breast cancer, meaning what brought about the initial abnormality, cannot normally be determined. Plaintiff does not contend that E+P "initiates" the abnormality in that first cell. Indeed, a woman's breast may contain many "initiated" abnormalities that do not develop into clinically significant cancers.[57] But we do know that hormones are needed to fuel an abnormal cell or benign lesion to develop and grow into a cancer if the cancer is hormone dependent. We also know that women like Ms. Romero, who suffered from menopausal symptoms, do not produce sufficient natural hormones to fuel such a tumor. Thus, by the process of elimination, the sole explanation for the growth of the bad cell into a cancerous tumor is the use of E+P.

---

54 *Id*. at p. 50.
55 *Id*. at p. 49-50.
56 Ex. 60 - Curriculum Vitae of Dr. Waldron.
57 Ex. 30 - Expert report of Dr. Naftalis at p. 18-19.

This is precisely the methodology that this Court has previously found to be reliable, and which the Eighth Circuit approved in *Scroggin*, 586 F.2d at 566-67.[58] The Fifth Circuit has likewise found that a differential diagnosis is a reliable methodology that meets the standards of Federal Rule of Evidence 702 and *Daubert*.[59] A differential diagnosis is:

> a routine diagnostic method used in internal medicine whereby a treating physician formulates a hypothesis as to likely causes of a patient's presented symptoms and eliminates unlikely causes by a deductive process of elimination. *See, e.g., Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604-05 & n. 24 (Tex. App. -Houston [1st Dist.] 2002, pet. denied) (en banc) ("[Differential diagnosis] is a clinical process whereby a doctor determines which of several potential diseases or injuries is causing the patient's symptoms by ruling out possible causes-by comparing the patient's symptoms to symptoms associated with known diseases, conducting physical examinations, collecting data on the patient's history and illness, and analyzing that data-until a final diagnosis for proper treatment is reached.").[60]

Likewise, the Southern District of Texas has found differential diagnosis to be an objective and reliable method for determining causation, not only in the *Lea* case, but also elsewhere.[61] The plaintiffs in the *Simpson* case brought a claim against a veterinary clinic for negligently causing severe and debilitating injury to a racehorse's legs. The defendant argued that plaintiff's expert's causation opinion was unreliable because the expert failed to consider and exclude other possible causes of the horse's injury and failed to provide an objective and reliable basis for his opinion. This Court disagreed and correctly held that an expert is required to have "considered and excluded other possible causes of the injury. However, '[t]his does *not* necessitate an exhaustive search that forces an expert to disprove or discredit every possible

58 Ex. 1 - Order Denying Defendants' Motion to Exclude the Specific Causation Testimony of Drs. Naftalis and Waldron, *Lea v. Wyeth, et al.*, 9/16/11, at 8.

59 *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) (finding that expert's differential diagnosis was a reliable method under *Daubert*).

60 *Transcontinental Ins. Co. v. Crump*, No. 09-0005, 2010 WL 3365339, at *3 (Tex. Aug. 27, 2010).

61 *Simpson v. Baronne Veterinary Clinic, Inc.*, 2011 WL 1100263, 4 (S.D.Tex. 2011).

cause other than the one espoused by him as long as his opinion does not simply pick the cause that is most advantageous to one party's claim while ignoring other relevant evidence."[62]

Other federal courts following the *Daubert* standard concur.[63] "The overwhelming majority of the courts of appeals" concur.[64] Differential diagnosis is an admissible methodology for determining the cause of a cancer and courts have routinely approved differential diagnosis as a way to determine the cause of cancer in individual cases, including breast cancer.[65]

**Differential Diagnosis Routinely Used**: Defendants' motion reads as though Drs. Naftalis and Waldron stand alone in their use of differential diagnosis to ascertain the likely cause of breast cancer. But contrary to defendants' assertion, their own experts use a virtually identical method to assess causation in these cases. For example, Wyeth's expert, Dr. Alison Laidley, uses a methodology she calls "comprehensive assessment"[66] to evaluate whether an individual women's breast cancer was caused by ionizing radiation. Similarly, Dr. Edward Copeland, another Wyeth expert, reviews these cases by first reading the woman's medical records, data, biological markers and hormone receptor status. He then considers all of her other

---

62 *Simpson*, 2011 WL 1100263 at 4 (citing *McNabney v. Lab Corp. of Am.*, 153 Fed. Appx. 293, 295 (5th Cir. 2005).

63 *See, e.g.*, *Westbury v. Gislaved Gummi AB*, 178 F.3d 257, 262-63 (4th Cir. 1999) (differential diagnosis "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results."); *see also Glaser v. Thompson Med. Co.*, 32 F.3d 969, 978 (6th Cir. 1994) (differential diagnosis is "a standard diagnostic tool used by medical professionals to diagnose the most likely cause or causes of illness, injury and disease"); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154-55 (3d Cir. 1999) ("differential diagnosis consists of a testable hypothesis, has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context").

64 *Westbury*, 178 F.3d at 263 (multiple citations omitted).

65 *Beck v. Koppers, Inc.*, 2006 WL 270260, at *10-11 (N.D. Miss. Feb. 2, 2006); *see also In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 917 (C.D. Cal. 2004) (expert did not rule out other causes of breast cancer but proved them less likely). *See also*, *Wicker v. Consolidated Rail Corp.*, 371 F. Supp. 2d 702, 728-29 (W.D. Pa. 2005) (toxic chemicals and lung cancer); *Hall v. Babcok & Wilcox Co.*, 69 F. Supp. 2d 716, 721 (W.D. Pa. 1999) (nuclear radiation and various cancers).

66 Ex. 61 - Deposition of Dr. Alison Laidley in *Zahn v. Wyeth* (Feb. 24, 2011) at p. 42:8-11; Ex. 62 - Deposition of Dr. Alison Laidley, *Lea v. Wyeth* (June 17, 2011) at p. 75:4-24.

risk factors and uses deductive reasoning to come to a conclusion.[67] It is irrelevant that Dr. Copeland comes to a different conclusion[68] because *Daubert* is about methodology, not conclusions. No matter what one calls it, defendants' experts employ very similar methodology to plaintiff's experts here.

Furthermore, Dr. Naftalis testified that she regularly employed the methodology she uses here in her private practice. She learned the technique in medical school,[69] as did Wyeth's expert Dr. Laidley.[70] Dr. Naftalis testified that differential diagnosis is important to a practitioner to determine the appropriate course of treatment and prevention.[71] For instance, a tumor initiated by genetics might require more aggressive surgery than a tumor caused by something else.[72] A tumor caused by alcohol or another drug warrants counseling about stopping alcohol use or use of the other drug.[73] A tumor caused by E+P would be treated by cessation of E+P and administration of an estrogen blocker.[74] A tumor initiated by radiation would be treated by breast conservation rather than chemotherapy or radiation.[75] Plus, it is

67 Ex. 63 - Deposition of Dr. Edward Copeland, 2/15/11 at p. 83:23-86:24.

68 Ex. 63 - Deposition of Dr. Edward Copeland, 2/15/11 at p. 56:8-10.

69 Ex. 64 - Naftalis Trial Testimony in *Scroggin v. Wyeth*, 2/11/08 at 961:7-962:18 Ex. 65 - Deposition of Dr. Naftalis (7/10/07) at p. 79:3-81:8.

70 Ex. 61 - Laidley *Zahn* Dep. at 63:23-24; 64:1-24 ("[w]ell, a differential diagnosis, we take a patient -- is a process of the presenting symptoms of a -- that a patient has, the signs that we can come up with on clinical examination, taking into consideration her testing that we do, and we come up with a list of possible diagnoses that could go along with that constellation of symptoms, signs, and the resulting tests.")

71 Ex. 65 at 74:16-75:23; Ex. 64 at 961:7-21, 962:12-963:14.

72 Ex. 65 at 57:18-58:16.

73 Ex. 64 at 962:12-963:14.

74 Ex. 65 at 59:8-16; Ex. 66 - Deposition Testimony of Sami Diab, *Tamatsu v. Wyeth*, 8/13/10 at 65-67.

75 Ex. 65 at 59:17-22; Ex. 64 at 963:7-19.

ridiculous to claim that Dr. Naftalis' opinions are litigation driven. She has been an outspoken critic of E+P and its risk of breast cancer since long before her involvement in this litigation.[76]

Dr. Waldron testified that he regularly attends Tumor Boards and provides expert opinions during the meetings. At a Tumor Board, the specific facts of a patient's cancer are discussed. The physicians then examine the epidemiological data behind particular causative mechanisms. They then engage in a process of differential diagnosis to rule out alternative causes and reach conclusions about the likely cause of the cancer. Dr. Waldron testified that this is a common practice among physicians treating breast cancer. He testified that differential diagnosis to ascertain the cause of a woman's breast cancer is a generally accepted practice.[77]

**Use of Differential Diagnosis is Published:** Defendants assert that this methodology has never been published. That takes some courage since Wyeth itself chose to never publish a single one of its dozens of causal assessments or to publicly disclose its internal protocol for such an evaluation. Instead Wyeth kept these documents hidden from physicians and patients. But even worse, Wyeth well knows that one of its own experts and consultants, Dr. Leon Speroff, has published a causality assessment of an individual women's breast cancer and found E+P to be the possible cause.[78] And just last year, Dr. Naftalis herself published the use of differential

---

[76] Ex. 67 - PX 20949A-C.

[77] Ex. 68 - Affidavit of James Waldron, M.D. at 1-2.

[78] Ex. 69 - Simon & Speroff, *Reduced vaginal bleeding in postmenopausal women who receive combined norethindrone acetate and low-dose ethinyl estradiol therapy versus conjugated equine estrogens and medroxyprogesterone acetate therapy*, Am. J. Obstet. Gynecol, Vol. 188:92-9 (2003) - PX ML 6075 at p. 5 (One patient in E+P study group "experienced a serious adverse event that the investigator judged to be possible related to the study treatment. This adverse event was breast cancer.").

diagnosis to evaluate an individual woman's breast cancer as a poster presentation at the Annual American Society of Breast Disease meeting.[79]

**Differential Diagnosis Appropriately Applied in this Case:** Tumors that are hormone receptor positive, like the one from which plaintiff suffered, must have hormones to grow. An appropriate differential diagnosis would thus only assess the possible sources of hormones for fuel. After all, the issue here is what promoted an abnormality into a malignancy, not what initiated the abnormality. There can be more than one proximate cause of an injury.[80] Drs. Naftalis and Waldron thus employed this analysis:

1. **Plaintiff's breast cancer was hormone receptor-positive**: Pathology testing revealed that plaintiff's tumor was estrogen receptor-positive.[81]

2. **Plaintiff's hormone receptor-positive tumor depended upon hormones for its growth**: A hormone-positive tumor requires hormones to fuel its growth.[82] As Dr. Graham Colditz, a world-renowned breast cancer researcher has testified, the presence of hormone receptors establishes that hormones are responsible for the cell's growth.[83] According to the National Cancer Institute, positive hormone receptors mean that the cancer "needs hormones to grow."[84] And outside of the courtroom, Wyeth agrees. On its website, Wyeth confirms that hormones are "required" for growth of hormone receptor positive cancers.[85] And Wyeth's head

---

[79] Ex. 58 - Curriculum Vitae of Dr. Elizabeth Naftalis at p. 10 (Naftalis, Elizabeth. Methodology for Determining the Causes of Breast Cancer in an Individual Woman. 35th Annual Meeting of the ASBD, Dallas, Texas, March 24-26, 2011).

[80] *Lee Lewis Const. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001).

[81] Ex. 70 - Expert report of Dr. James Waldron.

[82] Ex. 30 - Expert Report of Dr. Elizabeth Naftalis at p. 20-21.

[83] Ex. 71 - Deposition of Graham Colditz, 12/18/06 at 174:11-175:4.

[84] Ex. 41 - PX 8426A (www.cancer.gov/cancertopics/wyntk/breast/page8; *What you need to know about Breast Cancer)*.

[85] Ex. 42 - PX 10555 at p. 4.

of Research and Development, Dr. James Pickar, admits that Prempro makes cancer cells grow bigger and become "worse."[86]

Defendants' experts and the medical facilities that employ those experts agree. Dr. Edward Copeland, defendants' oncology expert in this case, agrees that hormone receptor positive breast cancers "will grow" in the presence of hormones.[87] He also agrees that "inhibiting the action of estrogen in a woman's body reduces her risk of developing breast cancer."[88] And that a hormone receptor positive cancer "can regress in the absence of E+P."[89]

Dr. Robert Weinberg, a distinguished cancer biologist, who was Dr. Chodosh's mentor, wrote in his textbook, "*The Biology of Cancer*," that estrogen is "critically important" to the development of an ER-positive ("estrogen receptor-positive) tumor."[90] Dr. Klimberg, the director of the breast center at University of Arkansas Medical Center, has confirmed that hormone receptor-positive tumors must have hormones to grow.[91] No matter what the risk factors, a hormone receptor-positive tumor requires a current supply of hormones to develop into a malignancy.[92] As explained by Dr. Naftalis, "[h]ormones necessary to fuel the growth of these tumors must come from endogenous source or from a drug therapy (exogenous source). If she is hormone deficient, then it must come from the drugs.[93]

3. **Plaintiff was hormone-deficient and thus not producing sufficient natural hormones to fuel the growth of her cancer**: While all women experience a substantial decline

---

86 Ex. 72 - Pickar Trial Testimony, *Henry / Buxton v. Wyeth*, at p. 5-7; 44:7-45:3.

87 Ex. 25 - Deposition of Dr. Edward Copeland, 3/4/11 at p. 67.

88 Ex. 63 - Deposition of Dr. Edward Copeland in *Hansen v. Wyeth*, 2/15/11 at p. 61: 22-63:2.

89 Ex. 63 - Deposition of Dr. Edward Copeland in *Hansen v. Wyeth*, 2/15/11 at p. 32:4-10.

90 Ex. 73 - PX 8080 - Weinberg, *The Biology of Cancer*; Ex. 74 - Trial testimony of Dr. Lewis Chodosh in *Daniel v. Wyeth*, 1/19/07 at p. 8:15-20.

91 Ex. 75 - Trial Transcript, *Reeves v. Wyeth*, 8/29/06 and 8/30/06 at 1729:18-21.

92 Ex. 75 - Trial Transcript, *Reeves v. Wyeth*, 8/29/06 at 1511:25-1512:7.

93 *Id*. at 32.

in hormone production during menopause, the majority of women continue to produce significant levels of natural ("endogenous") hormones. These women produce enough of their own estrogen to fuel the growth of a hormone-dependent cancer and do not suffer severe menopausal symptoms. Wyeth's own statistics confirm that only a minority of women, 17.5%, become hormone deficient and develop significant symptoms.[94] This minority of post-menopausal women are like Judy Romero and no longer produce sufficient natural hormones to fuel the growth of hormone-dependent cancer after menopause.

Multiple published articles establish that women develop menopausal symptoms due to low natural hormones and these hormones create a marked reduction in breast cancer risk.[95] Dr.

---

94 Ex. 76 - PX 1206 (Symptoms occurred in 17.5% of women in the 50-59 year old range).

95 Ex. 30 - Naftalis expert report at p. 10-14; Ex. 77 - Wyeth's sale training manual, redacted - PX 293B at pp. 5-6 (symptoms of menopause are caused by the reduction in estrogen levels); Ex. 78 - Thurston, *Gains in body fat and vasomotor symptom reporting over the menopausal transition: The study of women's health across the nation* (SWAN), Am. J. Epidemiol, Vol. 170(6):766-74 (2009) – PX ML 6010 (Women with hot flashes had significantly higher FSH and significantly lower estrogen levels compared to women without hot flashes); Ex. 79 - Gast, *Vasomotor symptoms, estradiol levels and cardiovascular risk profile in women*, Maturitas, Vol. 66(3):285-90 (2010)- PX ML 6077 (Estradiol levels were significantly lower in the women with symptoms of hot flashes and night sweats as compared to asymptomatic women); Ex. 80 - Mortimer, *Tamoxifen, Hot Flashes & Recurrence in Breast Cancer*, WHEL study, Breast Cancer Res Treat, Vol. 108, 421-426 (2008) – PX ML 6001 at p. 1 (Women who reported hot flashes at baseline were less likely to develop recurrent breast cancer than those who did not report hot flashes); Ex. 81 - Yasui, *Serum estrogen level after hormone replacement therapy and body mass index in postmenopausal and bilaterally ovariectomized women,* Maturitas, Vol. 50:19-29 (2005) – PX ML 3567 at p. 2 (Low endogenous estradiol levels in post-menopausal women were related to appearance of hot flush and osteoporosis. The relative risk for breast cancer in women with high endogenous estradiol levels was higher than that in women with low estradiol levels); Ex. 82 - National Cancer Institute website -PX 8426C at p. 3 **(**A number of studies suggest that endogenous estrogen levels are higher in women who develop breast cancer than in women who do not); Ex. 83 - Cuzick, *Treatment-emergent endocrine symptoms and the risk of breast cancer recurrence: a retrospective analysis of the ATAC trial*, The Lancet, Vol. 9, Issue 12 (2008) – PX ML 6000 at p. 5 (There is an inverse association between the occurrence of vasomotor symptoms and the rate of recurrence of breast cancer); Ex. 84 - Hankinson, *Endogenous estrogen, testosterone and progesterone levels in relation to breast cancer risk*, J. of Steroid Biochemistry & Molecular Biology, (2007), PX ML 4697 at p. 1 (Confirms a strong positive association between breast cancer risk and circulating levels of

Naftalis' expert report cites to dozens of articles over the five detailed pages on this issue alone.[96] Wyeth's own literature and experts agree.[97]

And the Eighth Circuit has affirmed that reliance by experts on this issue as appropriate:

> Dr. Naftalis was able to testify that Scroggin's breast cancer would not have developed without hormone replacement therapy because Scroggin's body was not producing sufficient amounts of hormones to allow hormone-receptor-positive tumors to develop. Thus, Dr. Naftalis ruled out the other possible cause of Scroggin's breast cancer, and her expert testimony was properly admitted.[98]

Low levels of natural estrogen results in a very low incidence of breast cancer, particularly hormone receptor-positive cancer. For example, removal of a woman's ovaries, the body's primary source for estrogen, causes "breast cancer risk to plummet."[99] Premature menopause brought on by the side-effects of chemotherapy for Hodgkin's lymphoma results in a 90 percent reduction in breast cancer risk.[100] Studies on estrogen-blocking drugs, like Tamoxifen and Raloxifene, provide compelling proof that hormone-positive tumors do not grow

---

natural estrogen. Women with high natural hormone levels have a 2-3 fold higher risk of breast cancer than women with low levels); Ex. 85 - Adly, *Serum concentrations of estrogens, sex hormone-binding globulin, and androgens and risk of breast cancer in postmenopausal women*, Int. J of Cancer, Vol. 119: 2402-2407 (2006) – PX MA 3937 at p. 5 (Confirmed that higher serum levels of natural estrogen are associated with increased risk of postmenopausal breast cancer).

[96] *See* generally, Ex. 86 - Naftalis expert report in *Scharff v. Wyeth* at p. 9-14.

[97] Ex. 87 - PX 497 at p. 2 – Wyeth marketing document (estrogen loss can result in many different effects including menopausal symptoms, such as hot flashes and night sweats); Ex. 88 - PX 378 (menopause and its associated estrogen loss can lead to potentially serious medical conditions including hot flashes); Ex. 89 - PX 20258C - Testimony of Dr. Robert Langer, Wyeth's expert at p. 61-64; Ex. 90 - PX 20258A - Testimony of Dr. Creasman, Wyeth's expert at p. 208-209.

[98] *Scroggin*, 586 F.3d at 566, 567.

[99] Ex. 73 - PX 8080 - Weinberg, *The Biology of Cancer*; Ex. 91 - Expert report of Dr. Wertheimer in *Torkie-Tork v. Wyeth* at p. 5.

[100] Ex. 73 - PX 8080 - Weinberg Textbook.

or survive without hormones.[101] The National Cancer Institute's Tamoxifen study showed that blocking hormones in a woman's body reduces the occurrence of estrogen receptor-positive tumors by 69 percent. Even more significantly, estrogen-blocking drugs decrease the incidence of breast cancer among women known to have abnormal breast cells (women with a history of atypical hyperplasia) by a staggering 86 percent.[102] The *Journal of the American Medical Association* reported that a study involving administration of Raloxifene, an estrogen-blocker, reduced the incidence of estrogen receptor-positive breast cancer by 81 percent in women with the highest levels of estrogen and had no discernable effect on women with undetectable estrogen levels (as these women were already at such a low risk of breast cancer).[103] Both the ATAC and WHEL studies documented a 50 percent decreased in breast cancer incidence among women experiencing hot flashes after the administration of estrogen-blocking drugs.[104]

### C. Drs. Naftalis and Waldron Appropriately Evaluated Plaintiff's Other Risk Factors

First of all, this Court has previously held that the issue of whether plaintiff's experts adequately address other potential causes of Ms. Romero's breast cnacer goes to the weight, not the admissibility of their testimony. However, plaintiff's experts specifically excluded alternate factors of hormone production and isolated E+P as the most probable cause of the growth of

---

101 Ex. 92 - Fisher, *Tamoxifen for Prevention of Breast Cancer: Report of the National Surgical Adjuvant Breast and Bowel Project P-1 Study*, J. of National Cancer Inst., Vol 90., No. 18, (1998) – PX ML 3867; Ex. 93 - Cummings, *Serum Estradiol Level and Risk of Breast Cancer During Treatment With Raloxifene*, JAMA, Vol. 287, No. 2, (2002) – PX ML 2849.

102 Ex. 92 - Fisher - PX M3867.

103 Ex. 93 - Cummings - PX ML 2849.

104 Ex. 83 - Cuzick, *Treatment-emergent endocrine symptoms and the risk of breast cancer recurrence: a retrospective analysis of the ATAC trial*, The Lancet, Vol. 9, Issue 12 (2008) – PX ML 6000; Ex. 80 - Mortimer, *Tamoxifen, Hot Flashes & Recurrence in Breast Cancer*, WHEL study, Breast Cancer Res Treat, Vol. 108, 421-426 (2008) – PX ML 6001 at p. 1 (Hot flashes were a stronger predictor of breast cancer. Women who reported hot flashes at baseline were less likely to develop recurrent breast cancer than those who did not report hot flashes (12.9% vs. 21%, P = 0.01)).

plaintiff's breast cancer. [105] While plaintiff's experts evaluated all of her risk factors, none of them can answer the preliminary question: What current source of hormones is fueling the development of this cancer? As even the Eighth Circuit acknowledges:

> We find unpersuasive the contention that Dr. Naftalis' testimony should not have been admitted because Scroggin has some breast cancer risk factors and a family history of breast cancer. Dr. Naftalis sufficiently established that hormones were necessary to the development of Scroggin's tumors and conducted her differential diagnosis from this starting point.[106]

Defendants complain that plaintiff's experts did not rule out her natural breast density as a risk factor.[107] But, this argument fails for three reasons. First, the presence of breast density does not provide a current source of hormones to fuel a cancer. As Dr. Naftalis explains, dense breasts simply create more cells susceptible to the effects of E+P.[108] While breast density may be a risk factor for breast cancer, there is no scientific evidence that breast density, unlike E+P, is a "promoter" of hormone dependent breast cancer. Second, women who have dense breasts and take E+P are at a particularly increased risk of developing breast cancer from the drug.[109] In a recent study, researchers found a 4-fold increased risk for E+P users who had dense breasts.[110] For that reason, expert radiologists recommend that E+P be contraindicated for use in women with dense breast.[111] Plaintiff's natural breast density made her particularly susceptible to E+P's

---

105 Ex. 30 - Expert report of Dr. Naftalis in *Romero v. Wyeth* at p. 28-42.

106 *Scroggin v. Wyeth*, 586 F.2d at 566-67 (8th Cir. 2009).

107 Defendants' Motion at p. 18.

108 Ex. 30 - Expert report of Dr. Naftalis in *Romero v. Wyeth* at p. 21, 30, and 34.

109 Ex. 46 - Kerlikowske, *Breast Cancer Risk by Breast Density, Menopause and Postmenopausal Hormone Therapy Use,* J. of Clinical Oncology, (July 19, 2010) - PX ML 5656 at p. 1 (Breast cancer risk was high among women with greater density, particularly estrogen plus progestin users. For E+P users aged 55 to 59 years, 5-year risk was 4.2 (95% CI, 3.7% to 4.6%).

110 *Id.* at p. 1.

111 Ex. 94 - PX 10079 - Yaffe, *Is mammographic density, as currently measured, a robust surrogate marker for breast cancer?* Gynecological Epidemiology, Vol. 21 (Supp 1): 17-21

carcinogenic effects. Third, plaintiff's breast density increased because of her exposure to E+P[112] and without it, her breast density should have naturally gone down, thus reducing her breast cancer risk.[113] E+P both increased her natural breast density (and thus her risk) and stopped the natural reduction of density and risk expected as women age.

Defendants' arguments about plaintiff's other risk factors are similarly red herrings. Ms. Romero has no relevant family history of breast cancer. As far as other risk factors, importantly, Dr. Naftalis deals with each of these issues specifically – and in detail – in her expert report.[114]

## III. CONCLUSION

For the reasons stated above, plaintiff respectfully asks the Court to deny Defendants' motion to exclude the general causation testimony of Drs. Naftalis and Waldron. At most, Defendants' criticisms go to the weight Drs. Naftalis and Waldron's testimony and are best addressed by vigorous cross-examination.

Dated this 9th day of March, 2012.

Respectfully Submitted,

/s/ Bryan F. Aylstock
Bryan F. Aylstock
Daniel J. Thornburgh
Nathan C. Bess
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
(850) 202-1010
baylstock@awkolaw.com
dthornburgh@awkolaw.com
nbess@awkolaw.com

---

(2005) at p 3 (Expert panel felt that E+P should be contraindicated for women with high breast density).

112 Ex. 28 - Romero Mammogram report, 8/5/97 (Revealed dense fibrocystic changes).

113 Ex. 30 - Expert report of Dr. Naftalis in *Romero v. Wyeth* at p. 36.

114 Ex. 30 - Expert report of Dr. Naftalis in *Romero v. Wyeth* at p. 30-41.

Zoe B. Littlepage
Natasha D. Hanberry
LITTLEPAGE BOOTH
2043A W. Main St.
Houston, TX 77098
(713) 529-8000 – Telephone
(713) 529-8044 – Facsimile
zoe@littlepagebooth.com
natasha@littlepagebooth.com
**Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 9th day of March, 2012, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, and notification was sent to the parties below:

Laura E. De Santos
Gordon & Rees
1900 West Loop South, Suite 1000
Houston, TX 77027
713-961-3366
Fax: 713-961-3938
ldesantos@gordonrees.com

Michael Klatt
Gordon & Rees LLP
816 Congress Avenue, Suite 1510
Austin, TX 78701
512-391-0197
Fax: 512-391-0183
mklatt@gordonrees.com

Bryon J Benevento
Snell & Wilmer LLP
15 West South Temple, 1200
Salt Lake City, UT 84101
801/257-1902
18012571800 (fax)
bbenevento@swlaw.com

Kathy Ann Cochran
Wilson Smith Cochran & Dickerson
1215 4th Avenue
Suite 1700
Seattle, WA 98161
206/623-4100
206/623-9273 (fax)
cochran@wscd.com

Janelle Lauren Davis
John Martin
Thompson & Knight - Dallas
1722 Routh Street, Ste. 1500
Dallas, TX 75201-2533
214-969-1677
214-999-1657 (fax)
janelle.davis@tklaw.com
John.martin@tklaw.com

Gregory S Meece
Thompson & Knight
333 Clay St., Suite 3300
Houston, TX 77002
713/654-8111
17136541871 (fax)
gregory.meece@tklaw.com

Caryl Lyn Pruitt
Mitchell Williams Selig Gates & Woodyard
425 W Capitol Ave., Suite 1800
Little Rock, AR 72201-3525
501/688-8869
501/688-8807 (fax)
lpruitt@mwlaw.com

Jay Joseph Schuttert
Snell & Wilmer LLP - Las Vegas
3883 Howard Hughes Pkwy, Suite 1100
Las Vegas, NV 89169
702/784-5200
702/784-5252 (fax)
jschuttert@swlaw.com

/s/ Bryan F. Aylstock
Bryan F. Aylstock