**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **JUDY ROMERO** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:03-cv-1367** |
| | § | |
| **WYETH PHARMACEUTICALS, INC., and WYETH, INC.,** | § | |
| | § | **Judge Marcia A. Crone** |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DRS. DONALD AUSTIN AND WAYNE TILLEY**

Defendant has filed a *Daubert* motion to bar the expert opinions of Dr. Austin and Dr. Tilley on the issue of safer alternative designs because Defendant contends that these experts failed to consider all risks and benefits, failed to identify an alternative design, and based their opinions on unreliable scientific evidence. Among Defendant's arguments is the contention that neither Dr. Tilley nor Dr. Austin should be allowed to testify that oral micronized progesterone ("OMP") is a safe alternative to medroxyprogesterone acetate ("MPA"), a component of Prempro and Provera.

Defendants' motion fails for four reasons. First, Dr. Austin and Dr. Tilley are highly qualified experts. Dr. Austin is a Ph.D. epidemiologist with a Masters Degree in microbiology, and decades of experience analyzing cancer data, specifically cancer data related to Hormone Replacement Therapy ("E+MPA"), and has published on this topic in peer-reviewed literature.[1] His expert epidemiological opinions on the breast cancer risk of E+MPA have been admitted by

[1] Ex. 1 – Curriculum vitae of Donald Austin.

federal and state courts all across the country including the MDL court repeatedly.[2] In fact, defendants' challenges to Dr. Austin were so routinely denied that defendants stopped filing motions to exclude Dr. Austin's testimony in most jurisdictions. Dr. Austin has testified in virtually every trial to date from federal courts in Arkansas and Puerto Rico to state courts in Pennsylvania and Nevada.

Dr. Tilley is also a well qualified expert. He is a Ph.D. microbiologist and has published over 100 peer reviewed papers related to the mechanism of cancer. He has won numerous international awards for his cancer research. He is head of the Dame Roma Mutual Cancer Research Laboratories in Australia and has focused his research on hormonal mechanisms and the development and treatment of breast and prostate cancer.[3]

Second, peer reviewed literature is a hallmark of reliability when considering an expert opinion. The analytical epidemiological and biomolecular methodology applied by Drs. Austin and Tilley, as well as their conclusions, are grounded in the peer reviewed scientific literature. Also, both Dr. Austin and Dr. Tilley have published peer reviewed studies on the relationship between hormones and cancer.

Third, an expert offering an opinion on a safer alternative design is not required to analyze every possible risk and benefit of the designs being compared. The expert may use other forms of reliable scientific evidence to arrive at an opinion as to which design is safer.

---

[2] **MDL Orders**: Ex. 2 - Order denying Wyeth's challenges to Dr. Austin in *Reeves v. Wyeth*, 8/21/06; Ex. 3- Order denying Wyeth's challenges to Dr. Austin in *Scroggin v. Wyeth*, 11/15/07. **New Jersey**: Ex. 4 - Order denying Wyeth's challenges to Dr. Austin in *Deutsch v. Wyeth*, 6/19/07 (Order and Memo). **Pennsylvania**: Ex. 5- Order denying Wyeth's challenges to Dr. Austin in *Nelson v. Wyeth*, 8/30/06; Ex. 6- Order denying Wyeth's challenges to Dr. Austin in *Barton v. Wyeth*, 9/8/09. **Nevada:** Ex. 7- Order denying Wyeth's challenges to Dr. Austin in *McCreeary v. Wyeth*, 9/27/06.

[3] Ex. 8 - Curriculum vitae of Dr. Wayne Tilley.

Fourth, an expert's proposed alternative design is not required to be physically identical to the defective design, as the Defendant proposes when asserting the safer alternative design must be a "single pill taken daily."

For these reasons, the expert opinions of Dr. Austin and Dr. Tilley are relevant, reliable, and admissible, and defendants' motion be denied.

## I. FACTUAL BACKGROUND

Dr. Austin's report in this case is based fundamentally on the epidemiology of hormone drugs – both of MPA (which is used in Prempro and Provera – both drugs ingested by plaintiff), and of OMP, a safe alternative to MPA. In his report, Dr. Austin evaluates four types of peer reviewed studies on these drugs relevant to his opinions: 1) human observational studies, 2) human clinical trials, 3) controlled animal experiments, 4) in vitro studies on human cells.

In each instance, he analyzes relevant scientific literature and shows how it supports his conclusion that MPA (which is included in Prempro and Provera) causes a serious breast cancer risk to menopausal women and OMP does not.

In addition to the peer reviewed literature showing that OMP is a safe alternative to the MPA used in Prempro and Provera, the record contains *admissions against interest* from defendants' own executives showing the same understanding. In 1992, when Wyeth was researching OMP and planning to market OMP, it admitted the safety advantages of OMP over MPA. In a research proposal reviewed and written by James Pickar at Wyeth, Wyeth stated "natural progesterone [OMP] may have *less impact on the breast and risk of breast cancer.*"[4]

---

[4] Ex. 9 - WHERS 171-00971-972, Pickar Project 17B Estradiol Progesterone SR (11/9/92).

Similarly, Pfizer,[5] a manufacturer of MPA (under the brand name Provera), has recognized in its internal post-WHI discussions that there are safer alternatives to MPA:

> This leaves MPA as the "key causative factor." … It was openly expressed that the scientific community will not support the use of MPA in the treatment of postmenopausal women when other progestins are available.[6]

It is important to note that Dr. Austin's expert opinion regarding MPA and OMP is supported by a series of human observational studies performed in different countries,[7] as well as human clinical studies, and animal toxicological studies. Because defendants' challenges to Dr. Austin have been so routinely denied, defendants stopped filing motions to exclude Dr. Austin's testimony in most jurisdictions. Like Dr. Austin, Dr. Tilley has evaluated different types of studies in support of his conclusion that OMP is a safe alternative to MPA, including observational studies, ecological studies, and biomolecular studies.[8]

As a result of their independent analyses of MPA and OMP, both Dr. Austin and Dr. Tilley concluded that OMP is a safer alternative to MPA. Specifically, Dr. Austin, relying primarily on the science of epidemiology testified:

> A. I take the position that there is evidence that MPA does increase the risk of breast cancer. There is no such evidence for micronized progesterone.[9]

And Dr. Tilley, relying primarily on his cancer mechanism studies, concluded in his report:

---

5 Pfizer refers to Defendants Pfizer, Inc., Pharmacia & Upjohn Company LLC, and Pharmacia Corporation LLC.

6 Ex. 10 - PX 10663 at 004 (Hormone Replacement Therapy Meeting Minutes (9/24/02, 9/27/02) Engels-D 0000966-73).

7 Ex. 11 - Donald Austin 2007 Updated Causality Report (8/30/2007) at §III.

8 Ex. 12 - Report - *cHRT and Breast Cancer*, Steven Birrell (M.D., Ph.D.) and Wayne D. Tilley, Ph.D. (March 2008) at 1, 7, 11, 13.

9 Ex. 13 - Deposition of Dr. Donald Austin, 10/31/07 at 21:24-22:3.

> Oral micronized progesterone (OMP) is a progestin in current clinical use that is structurally and functionally bio-identical to natural progesterone. Unlike MPA, OMP does not disrupt normal steroid hormone interactions in the breast, but effectively opposes the action of estrogen on the endometrium. As such, OMP is a safer alternative to the use of MPA in systemically-administered cHRT.[10]

Put simply, one of the bases for Dr. Austin's and Dr. Tilley's opinions that OMP is a safer alternative than MPA is the evidence that the two components are structurally and functionally the same, and the known difference between the OMP and MPA is the risk of breast cancer. Dr. Austin's opinion that estrogen plus MPA is a known cause of breast cancer is now supported by the International Agency for Research on Cancer,[11] by textbooks,[12] and in many published peer-reviewed articles and studies, *e.g.* the Million Women Study and the WHI Randomized Clinical Trial and Observational Study.[13]

The OMP product has been available for at least two decades as a formulated product from pharmacies and, since 1998 as a commercial product under the brand name "Prometrium" in the U.S.[14] Thus, OMP was an available safer substitute for the MPA in defendants' products during the years plaintiff ingested MPA.

Today, there is only one long-term randomized trial being conducted to evaluate the

---

[10] Ex. 12 - Tilley Report at 1.

[11] Ex. 14 - IARC Monograph No. 2, *Combined Estrogen-Progestin Menopausal Therapy*, 3d draft rev. 3 at p. 2.

[12] *E.g.*, Ex. 15 - Schottenfeld and Fraumeni (eds.), *Cancer Epidemiology and Prevention* at 470-473.

[13] There can be no dispute that E+MPA causes breast cancer. For a more thorough review of the scientific literature regarding E+MPA and breast cancer, *see* Doc. No. 63 in *Lea v. Wyeth*, Plaintiff's Daubert Motion, 7/1/11, pp 16-27, which is hereby incorporated into this response. *See also* Ex. 16 - MacMahon, *Epidemiology and the causes of breast cancer* (2006) (Dr. MacMahon stating that E+P is one of the three known causes of breast cancer).

[14] Ex. 17 - See Parisian Report July 2007 at ¶37; Ex. 18 - Deposition of Dr. Suzanne Parisian, 12/20/07 at 171:17-172:2.

safety of E+MPA using Premarin, Wyeth's main E drug, called the KEEP study. But, the KEEP study investigators refused to use MPA in their study. Instead, the KEEP study participants take E or Premarin with OMP instead of MPA.[15]

## II. STANDARD OF REVIEW

Expert opinion testimony is proper where the expert is shown to be qualified and has specialized knowledge that will assist the trier of fact, so long as the testimony is based on sufficient facts and data and the product of reliable principles and methods, and the witness has applied those principles and methods to the facts. *See* Fed. R. Evid. 702.

Many factors bear on the inquiry into the reliability of scientific and other expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993); *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 (5th Cir. 2000). In *Daubert*, the Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community. *Id.* at 593-94; *see also Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc). In the later case of *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the Daubert analysis is a "flexible" one. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). In *Kumho*, the Court explained "the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his

[15] KEEPS, www.keepstudy.org.

testimony." *Id.* A court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

The Fifth Circuit has ruled that a proponent of an expert opinion need not prove that the expert's opinions and conclusions are correct, but merely that the expert's testimony is reliable. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The proponent need only show this reliability "by a preponderance of the evidence." *Id.*

The court's gatekeeper role does not replace the traditional adversary system and jury's crucial role in that system. *See Daubert*, 509 U.S. at 596. As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must rule "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir.1996) (*quoting Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.*

Fifth Circuit courts have recognized the Second Circuit's admonition "not to push *Daubert* too far." *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1245 (M.D. La. 1996) (*citing McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir.1995)).

> Trial judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert*. [Defendant], however, would

> elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul — separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.

*McCullock*, 61 F.3d at 1045 (affirming admission of a consulting engineer's testimony).

## III. ARGUMENT

### A. Texas Law Allows for a Design Defect Claim

Defendants challenge the legal support for design defect in Texas in another brief, Defendants' Memorandum in Support of Motion for Summary Judgment.[16] This is *not* a *Daubert* argument and Plaintiff's Response to Defendants' Motion for Summary Judgment on the issue of defective design is incorporated by reference as set forth fully herein. Texas law allows defective design claims, even in the prescription drug context.

### B. Dr. Austin's Opinions on Safer Alternative Designs are Based on Sufficient Reliable Scientific Evidence.

As numerous courts have found, Dr. Austin is eminently qualified to give an epidemiology opinion. Just last fall, a federal court district judge denied a similar motion, clearing the way for Dr. Austin to testify on defective design.[17]

In the New Jersey HRT litigation, Judge Garruto admitted Dr. Austin's opinion and made these findings:

> Dr. Austin opines that hormone therapy acts as a promoter of breast cancer, insofar as it promotes initiated cells to become cancerous. *His opinion is based on the generally accepted knowledge in the scientific literature* that unopposed estrogen stimulates the growth of hormone-receptive endometrial tissue, and that both estrogen and progestins stimulate cell growth in hormone-receptive breast tissue. His opinion is further confirmed by the significant decline in breast cancer

---

16 *See* Doc No. 90.

17 Ex 19 - Order, *Torkie-Tork v. Wyeth, et al.*, Eastern District of Virginia (10/4/10).

> incidences in conjunction with the sudden drop-off in hormone therapy prescriptions.[18]

Judge Robert Perry, a Nevada state district judge also denied Defendants' challenges to the reliability of Dr. Austin's opinions in a hormone therapy case and wrote: "The Court finds that the testimony of Dr. Donald Austin … is based on a wealth of knowledge and experience, and is the product of the application of generally accepted methods."[19]

Dr. Austin's opinion that E+MPA causes or contributes to breast cancer in menopausal women is supported by international cancer authorities, textbooks, and peer reviewed studies. *See* Section I, *supra*. Other studies focusing on estrogen receptor positive, progesterone receptor positive (ER+, PR+) breast cancer in menopausal women show even higher risk levels.[20]

Dr. Austin relies on numerous epidemiological studies and toxicology studies from around the world to show that OMP does *not* cause or contribute to breast cancer. These studies, which appear in the peer reviewed published literature and are set forth in Dr. Austin's opinion, support this conclusion. One of Fournier's studies concluded:

> Compared with postmenopausal hormone therapy (HT) never-use, ever-use of estrogen+progesterone *was not significantly associated with the risk of any breast cancer subtype*, but increasing duration of estrogen+progesterone was associated with increasing risks of lobular and estrogen receptor-positive/progesterone receptor-negative.[21]

---

[18] Ex. 4 - Order, *Deutsch v. Wyeth, et al.*, Superior Court of New Jersey (June 19, 2007).

[19] Ex. 7 - Order, *McCreary v. Wyeth, et al.*, Second Judicial District Court of State of Nevada (September 27, 2006).

[20] Ex. 20 - Li *et al*., *Relationship Between Long Durations and Different Regimens of Hormone Therapy and Risk of Breast Cancer*, JAMA, Vol. 289, No. 24, pgs. 3254-62 (June 25, 2003); Ex. 21 - Setiawan *et al*., *Breast Cancer Risk Factors Defined by Estrogen and Progesterone Receptor Status,* Am. J. Epidemiol., Vol. 169, No. 10, pgs. 1251-9, March 24, 2009.

[21] Ex. 22 - Fournier *et al.*, *supra*.

This finding is thoroughly supported by recent findings in peer reviewed journals.[22] These findings are consistent with statements by Wyeth medical specialists. *See supra* at p. 3.

Defendants are yet again engaging in an attack on the factual basis for an opinion, a tactic rejected by the Eighth Circuit. *Scroggin*, 586 F.3d at 566, n.12 ("the factual basis of an expert opinion is assessed by the jury"). Defendants' motion is based entirely on issues that go to the weight of Dr. Austin's opinions and not whether his opinions are reliable and admissible.

Defendants attack Dr. Austin's reliance on the Fournier Study because it (1) does not compare OMP directly to MPA, (2) compares synthetic progestins as a group against OMP and (3) the 2008 follow-up did not show a "statistically significant difference." All of these issues are matters that should be addressed in cross-examination and do not impact whether Dr. Austin's opinion is admissible. See *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996) (reversing and remanding; "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. . . . the district court applied too stringent a reliability test"). The Circuit Court noted, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* at 1077.

Dr. Austin reaches his opinions using the science of epidemiology which is recognized to contribute highly relevant data to causation determinations.[23] Dr. Austin's analysis of multiple types of studies that evaluate the cancer causing effect of E+MPA (human observational studies,

---

[22] *See* Ex. 23 - Gadducci (2009); Ex. 24 - Mueck (2009).

[23] *See* Ex. 25 - *Reference Manual on Scientific Evidence* at 469, Figure 1, "Determining External Causation" (identifying epidemiological data as important to causal reasoning).

human clinical trial, controlled animal experiments, *in vitro* studies on cells) combine to form the "diverse types of information" appropriate for determining causation.[24]

Federal courts in Texas have approved of the types of studies utilized by Dr. Austin in reaching his opinions in this case. See *Lofton v. McNeil Consumer & Specialty Pharmaceuticals*, 2008 WL 4878066 at *4 (N.D. Tex. July 25, 2008) (denying motion to exclude and declining to apply *Havner* test for doubled risk, ruling that standard applies to legal sufficiency of causation evidence and not to procedural question of admissibility).

Courts in other circuits have also addressed the role of epidemiological evidence in the context of challenges to expert testimony admissibility. See *Golbetti v. Sandoz Pharmaceuticals, Corp.*, 111 F. Supp. 2d 1174, 2000 U.S. Dist. LEXIS 19322 (N.D. Ala. 2000) (finding expert testimony admissible where expert relied on a variety of sources); *Brasher v. Sandoz Pharmaceuticals, Corp.*, 160 F. Supp. 2d 1291 (N.D. Ala. 2001) (rejecting Daubert challenge).

> There can be little question that scientists routinely use animal studies, case reports, and pharmacological comparisons of similar classes of drugs to infer conclusions, which are expressed in peer-reviewed journals and textbooks. Unquestionably, epidemiological studies provide the best proof of the general association of a particular substance with particular effects, but it is not the only scientific basis on which those effects can be predicted. In science, as in life, where there is smoke, fire can be inferred, subject to debate and further testing.

*Brasher*, 160 F. Supp. 2d at 1296.

Dr. Austin's epidemiological and toxicological opinions readily meet the standards set forth by the *Reference Manual on Scientific Evidence*, as well as *Daubert*, as numerous courts have already found. For these reasons, defendants' motion should be denied.

**C. Dr. Tilley's Expert Opinion is Based on Reliable, Peer Reviewed Studies on the Mechanism of Hormones and Cancer, Scientific Information Highly Relevant to Causation.**

---

[24] Ex. 25 - *Reference Manual on Scientific Evidence* at 468.

Dr. Tilley is a world renowned expert in research on hormonal mechanisms and the development of breast cancer – the exact subject of his expert report in this case. Furthermore, he has published his work in this area in the peer reviewed literature over the last two decades in over 100 peer reviewed papers. Peer review is a hallmark of reliability of scientific opinion. *See Daubert v. Merrell Dow Pharma. Co.*, 509 U.S. 579 (1993).

Dr. Tilley's key scientific opinions in this case as they relate to the defective design of the MPA used in Prempro and Provera are:

> cHRT that contains MPA contributes to the development of breast cancer in women by disrupting the normal steroid hormone interactions required for a balance of growth within breast tissue.
>
> * * *
>
> Oral micronized progesterone (OMP) is a progestin in current clinical use that is structurally and functionally bio-identical to natural progesterone. Unlike MPA, OMP does not disrupt normal steroid hormone interactions in the breast, but effectively opposes the action of estrogen on the endometrium. As such, OMP is a safer alternative to the use of MPA in systemically-administered cHRT.[25]

These opinions are based on a foundation of epidemiological evidence that MPA used in combination hormone therapy causes or contributes to breast cancer and OMP does not.[26] The mechanistic research and opinions expressed by Dr. Tilley support *biological plausibility* for the cancer causing activity of MPA used in Prempro and Provera.

Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology to provide a judgment about the plausibility that an agent causes a disease.[27] "[W]hen biological plausibility exists; it lends credence to an inference of

---

25 Ex. 12 - Tilley Report (March 2008) at 1.

26 *See* Ex. 12 - Tilley Report at 6-21.

27 Ex. 25 - *Reference Manual on Scientific Evidence*, at 388.

causality."[28] Biological plausibility is one of the standard criteria used in the scientific community to infer causation. Evidence of biological plausibility is commonly based on animal and *in vitro* studies.[29]

Dr. Tilley's opinions essentially relate to the interaction between the estrogen receptor (ER) and the androgen receptor (AR), the effect of MPA as a disruptor of the normal signaling of the AR, and the implications of those interactions as they relate to the risk and development of breast cancer. Dr. Tilley's scientific research of mechanism and biological plausibility of hormonal related cancer are the kinds of scientific evidence courts routinely approve as support for expert causation opinions. *See Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434, 449 (W.D. Pa. 2003) (biological and pathological mechanisms are a valid type of scientific evidence of toxic causation); *Smith v. Wyeth-Ayerst Laboratories, Co.*, 278 F. Supp. 2d 684, 704-05 (W.D.N.C. 2003) (testimony regarding possible biological mechanism of action by which defendant's drug caused the injury in question was admissible); *Bowers*, 905 F. Supp. 2d at 1011 (testimony based upon biological plausibility was admissible). Like Dr. Austin, Dr. Tilley relies on a multitude of studies from different disciplines to support his mechanism causation opinion. He explains his rationale for how these studies relate to each other to prove causation and he relies on his own laboratory research and publications in support of his conclusions.

Therefore, Dr. Tilley demonstrates numerous reasons why his scientific opinion is reliable. Much of the work supporting his opinion is his own peer-reviewed, published science. He also relies on peer-reviewed articles produced by others. *See Kitzmiller v. Dover Area School*

---

[28] Ex. 25 - *Reference Manual*, *supra,* at 378.

[29] Ex. 25 - *Reference Manual*, *supra,* at 345-349.

*District*, 400 F. Supp. 2d 707, 744-45 (M.D. Penn. 2005) (recognizing peer review as important indicia of reliability). Defendants' motion to bar Dr. Tilley's opinions should be denied.[30]

**D. Defendants Misstate the Factual and Legal Requirements for a Design Defect Claim.**

**1. Plaintiffs Need Not Prove that E+OMP provides a superior "package of benefits" to E+MPA that are unrelated to plaintiffs' breast cancer.**

A major flaw in Wyeth's attack on plaintiffs' design defect claim is its assertion that plaintiffs must prove not only that OMP reduces the risk of the breast cancer injury suffered by plaintiffs, but that OMP is superior to MPA in all other respects. None of the cases cited by defendants imposes such an unattainable standard.

Under Texas' law of design defect, a "safer alternative design" is one that is economically feasible and that probably "would have prevented or significantly reduced the risk *of the claimant's personal injury*, property damage, or death without substantially impairing the product's utility." *Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d 124 (Tex. App. 2011) (emphasis added).[31]

The inquiry of the safer alternative design analysis focuses on the avoidance of the type of harm suffered by the plaintiff – not some other potential injury – so long as it is economically feasible to adopt the alternative design. No case holds that plaintiffs must produce conclusive evidence of the alternative design's comparative superiority for *each* feature, whether it is

[30] A district court in West Virginia recently granted a motion to exclude the expert opinions of Drs. Tilley and Austin on the issue of OMP being a safer alternative to MPA. *Hines v. Wyeth*, Case 2:04-cv-00690 (S.D. W.Va. 2011). However, this ruling was based on an incorrect interpretation of *Wells v. SmithKline*, 601 F.3d 375 (5th Cir. 2010). The district court cited *Wells* as holding that experts' methods may be deemed unreliable where the expert placed "undue emphasis on statistically insignificant data." *Hines* at 16. This is incorrect. The *Wells* opinion dealt with a case where the expert cited no statistically significant epidemiological evidence, relying instead on case studies and a science poster. In fact, the *Wells* court stated "we do not suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions." *Wells* at 379-81.

[31] *Id.*

relevant or not. Likewise, no case holds that the evidence supporting the alternative design must be established by more than a preponderance of the evidence. In essence, defendants have concocted an onerous legal standard that no court has ever adopted – and one that no plaintiff could ever meet.

There is no dispute that OMP and MPA are both equally effective for their purpose, *i.e.*, to protect the endometrium from estrogen-induced hyperplasia and cancer. Indeed, the FDA has approved both drugs for combination use with CEE for this very purpose. Even if plaintiffs were legally required to furnish proof that OMP is superior overall to MPA in hormone replacement therapy, ample evidence exists from several clinical studies that OMP is more beneficial and has a better risk/benefit profile than MPA on a number of parameters.

**Cardiovascular Profile**: Dr. Robert Langer, Wyeth's own longtime litigation expert, has written, "Other progestogens may be better than MPA."[32] Dr. Langer believes that OMP in hormone replacement therapy has a better cardiovascular safety profile than MPA:

> The [PEPI] trial demonstrated that MPA mitigates estrogen's beneficial effects on lipids while micronized progesterone does not. Furthermore, well-designed animal studies show that MPA blocks estrogen's effect on blood flow and coronary atheroma while progesterone does not.[33]

In a separate paper, Dr. Langer heralded both *in vitro* and monkey studies (the same model Wyeth claims is unreliable to study breast cancer risks) as providing strong corroborating

---

[32] Ex. 26 - A4968, R. Langer, *The More Things Change – CHD and the Latest WHI Report,* Heart Disease, SRM (Nov. 2007) at 9.

[33] *Id.*

evidence that progesterone, unlike MPA, has an added protective effect on the cardiovascular system.[34]

Indeed, the PEPI randomized study compared the cardiovascular effects on Premarin alone, Premarin+MPA and Premarin+OMP. It concluded that OMP is as safe for the endometrium as MPA. In addition – unlike MPA – OMP "preserve[s] the bulk of estrogen's favorable effects on risk factors including HDL-C."[35] The investigators noted that their results were consistent with earlier clinical trials showing that E+OMP had superior effects on lipids than synthetic progestins.[36] A more recent study also suggests that OMP reduces systolic and diastolic responses to stress compared to MPA.[37]

**Sleep Disturbances**: Randomized clinical trials demonstrate that CEE+OMP is superior to CEE+MPA in treating sleep disturbances, and it produces a better quality of sleep. Thus, the

---

[34] Ex. 27 - M0389, R. Langer, *Hormone Replacement and the Prevention of Cardiovascular Disease*, 89 (12A) AM. J. CARDIOLOGY 36E, at 43E-44E (2002).

[35] Ex. 28 - M0444, The Writing Group for the PEPI Trial, *Effects of Estrogen or Estrogen/Progestin Regimens on Heart Disease Risk Factors in Postmenopausal Women: The postmenopausal Estrogen/Progestin Interventions (PEPI) Trial*, 273(3) J. AM. MED. ASS'N 199 (1995).

[36] *Id.* at 205. *See also* Ex. 29 - M4621, S. Moorjani et al., *Changes in Plasma Lipoprotein and Apolipoprotein Composition in Relation to Oral Versus Percutaneous Administration of Estrogen Alone or in Cyclic Association with Utrogestan in Menopausal Women*, 73(2) J. Clinical Endocrinology & Metabolism 373 (1991) (Premarin+OMP had more desirable effects than Premarin alone on plasma lipoproteins).

[37] Ex. 30 - MA4324, K. Matthews, et al., *Influence of hormone therapy on the cardiovascular responses to stress of postmenopausal women*, 69 BIOLOGICAL PSYCHOLOGY 39 (2005).

choice of progesterone over synthetic progestins "is crucial for the ultimate action of HRT on sleep disturbances."[38]

**Bleeding and Breast Tenderness**: Studies also show that women who use CEE+MPA have more vaginal bleeding and breast tenderness than women who use CEE+OMP.[39] "The lesser side effects of the micronized progesterone-containing regimen suggest that some women may prefer it to an MPA-containing regimen."[40]

**Bone Fractures**: The PEPI study found that, among women who adhered to HRT, all of the regimens increased bone mineral density, and none of them differed significantly from the others.[41] In other words, "[n]either MPA nor progesterone added to estrogen alters the beneficial effect of estrogen in preventing loss of bone density, but evidence suggests MPA negates more of the beneficial effects of estrogen on the cardiovascular system than micronized progesterone."[42]

---

38 Ex. 31 - M4602, M. Gambacciani, et al., *Effects of low-dose, continuous combined hormone replacement therapy on sleep in symptomatic postmenopausal women,* 50 MATURITAS 91, 94-95 (2005).

39 Ex. 32 - MA4319, J. Cummings and L. Brizendine, *Comparison of physical and emotional side effects of progesterone or medroxyprogesterone in early postmenopausal women,* 9(4) MENOPAUSE 253 (2002).

40 *Id.* at 253.

41 Ex. 33 - M1806, Writing Group for the PEPI Trial, *Effects of Hormone Therapy on Bone Mineral Density,* 276(17) J. AM. MED. ASS'N 1392 (Nov. 6, 1996).

42 Ex. 34 - M0174, D. Grady, V. Ernster, *Hormone Replacement Therapy and Endometrial Cancer: Are Current Regimens Safe?* 89(15) J. NAT'L CANCER INST. 1088, 1089 (Aug. 6, 1997).

**Endometrial Protection**: The PEPI study found OMP was as safe as MPA in opposing the proliferative effects of estrogen on the endometrium.[43] This is consistent with other laboratory studies comparing OMP to other orally administered progestagens.[44] Furthermore, the FDA approved Prometrium (OMP) as safe and effective for opposing estrogen in hormone replacement therapy. Protecting the endometrium is the only reason for combining E+P.

In summary, there is overwhelming consensus that OMP is not only safer for the breast, but it is a *better* overall choice to oppose estrogen than MPA.[45]

**2. Substituting OMP for MPA in hormone therapy does not make it a "different product."**

Defendants also contend that OMP is not a valid alternative to MPA because it undermines the function of HRT and transforms it into an entirely "different product." They analogize the substitution of OMP for MPA to redesigning a Volkswagen Beetle convertible as a sedan. Because sedans satisfy different consumer needs, they are considered to be different products from convertibles and thus improper as alternative designs. Def. Br. at 13.

This analogy is nonsensical. No one disputes that the estrogen in HRT is the ingredient that relieves symptoms of estrogen deficiency. But estrogen is prescribed together with a progestogen to protect the endometrial lining of the uterus from the proliferative effect of estrogen alone, which can cause endometrial cancer. Substituting OMP for MPA as the progestogen component does not change HRT into a different product. Both regimens have the

---

43 Ex. 28 - PEPI (1995) at 207.

44 Ex. 32 - Cummings & Brizendine (2002) at 254.

45 Estrogen by itself and with progestins has also been shown to reduce risk of colorectal cancer. Ex. 35 - M0155, I. Csizmadi, et al., The effects of transdermal an oral oestrogen replacement therapy on colorectal cancer risk in postmenopausal women, 90 BRIT. J. CANCER 76 (2004). Ex. 36 - M0165, R. Chlebowski., et al., Estrogen plus Progestin and Colorectal Cancer in Postmenopausal Women, 350(10) NEW ENG. J. MED. 991 (Mar. 4, 2004).

same function – to treat menopause symptoms. Indeed, both OMP and MPA are FDA approved for the same indication, *i.e.*, "for use in the prevention of endometrial hyperplasia in non-hysterectomized postmenopausal women who are receiving conjugated estrogen tablets [Premarin], as well as for treatment of secondary amenorrhea."[46] These regimens both combine E+P. But, unlike MPA with estrogen, OMP with estrogen does not increase breast cancer risk.

In *Sprague v. Upjohn*, the court granted Upjohn's motion to dismiss on the grounds that the prescription drug Halcion contains only one active ingredient, whose molecule was incapable of being modified or redesigned to make it safer.[47] However, the court went out of its way to distinguish the case from a decision from the First Circuit involving oral contraceptives,[48] "where a design defect claim was brought based upon an allegation that another formulation of the oral contraceptive at issue, i.e. one with less estrogen, would have been equally effective but safer." *Id.* at *1. Halcion, on the other hand, "is created from a single active ingredient and only has one possible formulation." *Id.* HRT is a combination of two active ingredients, E+P. Plaintiffs allege that another formulation of the P in E+P is equally effective, but safer. It is hard to fathom a more classic example of a safer alternative product design.

Wyeth's reliance on the pedicle screw cases is also misplaced. *See* Def. Br. at 13, fn. 41, citing *Theriot v. Danek Med., Inc.*, 168 F.3d 253, 255 (5th Cir. 1999). Those decisions held that alternative products that did not contain pedicle screws did not constitute alternative designs because such products are entirely different. The pedicle screw analogy would only make sense

---

46 Ex. 37 - Prometrium advertisement.

47 *Sprague v. Upjohn*, No. 91-40035-NMG, 1995 WL 376934 (D. Mass. May 10, 1994).

48 *Citing Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 655 (1st Cir. 1981).

if plaintiffs alleged that acupuncture or a soy-based diet were a safer alternative. In contrast, a different formulation of E+P makes HRT safer, not different.

It is pure speculation for Wyeth to assume – arrogantly – that women won't take a safer, two-part HRT regimen. Women and their prescribers can capably decide whether they prefer the convenience of a single pill at the expense of taking a drug that is carcinogenic, versus choosing to take two pills to avoid the risk of breast cancer. What makes Prempro so dangerous is that it combines a flawed combination of medications into a single pill. Prometrium is approved for combination use with Premarin. It is also the progestogen of choice in Europe precisely because it is safer than synthetic progestins like MPA. So, defendants cannot credibly argue that no safer alternative to Prempro exists.

Wyeth goes so far as to cite the decision in *Torkie-Tork* to suggest that OMP is not a legally cognizable substitute for MPA as a safer alternative design. Def. Br. at 13, fn 41 (citing *Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895, 900 (E.D. Va. 2010). But in fact, the *Torkie-Tork* court rejected Wyeth's identical argument, holding that the evidence created a genuine issue of fact, and it was up to the jury to decide whether OMP was a safer feasible alternative to the synthetic progestin in Prempro. *Id.* at 900-901. The court in *Hines* also found Wyeth's reasoning unpersuasive. *Hines v. Wyeth*, No. No. 2:04-0690, 2011 WL 1990496, slip op. at *9 (May 23, 2011). "The plaintiff in this case has presented evidence regarding the comparability of OMP and synthetic progestin in treating menopausal symptoms. Defendants dispute this evidence. Thus, whether OMP was a reasonable alternative to synthetic progestin is a question for the

jury." *Id.* Likewise, the court in *Choueifati* denied Wyeth's motion for summary judgment on plaintiff's similar design defect claim.[49]

The facts before this Court are no less in dispute than they were in *Torkie-Tork*, *Hines* or *Choueifati.* It is undeniable that OMP has long existed as an alternative progestogen in the real world of medicine, and women take it with Premarin or estradiol because it is safer than Prempro to treat their menopausal symptoms. The jury should decide whether OMP is a safer alternative.

### 3. Plaintiffs' Experts Have Identified OMP as an Alternative Design to MPA in Hormone Replacement Therapy.

Related to its contention that only a single-pill formula will suffice as a legally cognizable safer alternative to Prempro, Wyeth glibly accuses Dr. Austin of "guessing." Def. Br. at 14, fn 42. It contends that plaintiffs' experts have not identified a safer alternative therapy for Prempro. Def. Br. at 12. It is clear that Wyeth did not read the experts' reports, which are devoted entirely to the analysis of the relative safety of OMP to MPA as the progestogen component of E+P. Dr. Austin stated both in his 2007 and 2011 reports that CEE+OMP is a safer form of HRT than CEE+MPA:

> In my last report, I suggested that it would not be prudent to elect CEE+MPA over CEE+OMP since it is so overwhelmingly clear that the former is a potent cause of breast cancer while in spite of some rather well done studies, no such effect has been found for OMP. I now make that conclusion stronger.[50]

And Dr. Tilley's latest report prominently states that "MPA should no longer be prescribed for use in systemically-administered cHRT because its disease-promoting risks outweigh its therapeutic effects."[51] Dr. Tilley's report continues:

---

[49] Ex. 38 - Order, *Choueifati v. Wyeth*, Cause No. 2003-49357A (Dist. Ct. Harris Cnty., 151st Jud. Dist. Apr. 12, 2011).

[50] Ex. 39 - Austin Report at 25 (Sept. 27, 2011).

[51] Ex. 40 - Tilley Report at 1, ¶ 3 (Oct. 17, 2011).

> Multiple lines of scientific evidence converge to support the conclusion that OMP does not increase the risk of breast cancer beyond that of the estrogen it is used to "oppose," and does notdiminish any cardiovascular benefits of estrogen, while MPA doesboth. **As such, OMP is a substantially safer alternative to theuse of MPA** in systemically-administered cHRT.[52]

It is disingenuous for Wyeth to attack Dr. Tilley for his laudable efforts to develop safer forms of HRT. Indeed, Wyeth and Pfizer have always been in a superior position than outside scientists to develop a safer drug than Prempro. Wyeth had the option of acquiring the marketing rights for Prometrium during the 1990s, and Wyeth pursued it. When that effort failed, Wyeth doubled down on its investment in Prempro and waged an anti-Prometrium marketing campaign to ensure that OMP did not make inroads on its Prempro profit franchise. Wyeth should not now be allowed to fabricate a "single-pill" design defect defense in this litigation to bar scientists from testifying that there are safer forms of HRT.

Although they have described other available types of HRT besides Prempro, plaintiffs' experts endorse CEE+OMP as a safer alternative design. OMP (marketed under the brand name Prometrium) is an FDA-approved alternative to MPA and is widely prescribed to women who want to avoid the breast cancer risk posed by CEE+MPA in either single-pill (Prempro) or two-pill (Premarin + Provera) form. There is no truth to defendants' assertion that the opinions by plaintiffs' experts are "irrelevant" simply because the safer design that is widely used comes in two pills, not one.

### E. The Opinions of Drs. Tilley and Austin Are Based on a Reliable Methodology and Are Admissible under Fed. R. Evid. 702.

Much new and important new data has accumulated since Drs. Austin and Tilley submitted their original reports on OMP versus MPA back in 2007. The experts address these studies in their most recent reports. Wyeth avoids discussion of the experts' current reports. Instead, Wyeth quotes selectively from the report Dr. Austin wrote more than *four years ago,* to

---

52 *Id.* at 1-2, ¶ 4 (emphasis added).

imply that the evidence upon which he relies merely "suggests" E+OMP does not cause breast cancer. Wyeth maintains that the evidence is no stronger now than it was then because there are no "head to head" randomized clinical studies comparing breast cancer risk in women taking CEE+OMP to women taking CEE+MPA. This is a dangerous argument; it invites the Court to go out on a limb and foreclose opinions based on evidence that the scientific community itself finds sufficient and reliable.

Wyeth also asks the Court to abuse its discretion by assessing the independent validity of each of the studies in isolation, rather than reviewing the evidence as a whole. *See W.R. Grace*, 504 F.3d at 765 (court abused its discretion by conducting a document-by-document Rule 702 analysis that deconstructed the experts' testimony in a manner not contemplated by Rule 702); *Milward*, 639 F.3d at 23 (district court erred in excluding expert's testimony by "treat[ing] the separate evidentiary components of [the expert's] analysis atomistically, as though his ultimate opinion was *independently* supported by each."). It is a well established scientific principle that reaching an inference on causation requires an assessment of all relevant evidence. Charles Hennekens' textbook on medical epidemiology instructs:

> [O]ur primary objective in epidemiology is to judge whether an association between exposure and disease is, in fact, causal. To do this is neither simple nor straightforward and requires a judgment based on the **totality of the evidence**, of which the result of anysingle study is only one component. * * * **Judging whether theassociation is causal extends beyond the validity of the results of any single study and includes consideration of other epidemiologic data as well as the biologic credibility of the hypothesis.**[53]

Rule 702 never intended for courts to impose a higher or different standard on experts in the courtroom than scientists and physicians employ in their everyday practice.

[53] Ex. 41 - Charles H. Hennekens, M.D., Dr. PH, Julie E. Buring, Sc.D., EPIDEMIOLOGY IN MEDICINE, *Ch. 3, Statistical Association and Cause-Effect Relationships* (Little Brown & Co., 1987) at 30.

**F. Several Courts Have Denied Defendants' Motions to Exclude Drs. Tilley and Austin.**

Wyeth misrepresents the scoreboard of district court opinions on the admissibility of Dr. Austin's and Dr. Tilley's opinions that OMP is safer than MPA. It relies heavily on the decision of the court in *Hines v. Wyeth* (Def. Br. at 19 n. 48) and the "me-too" opinion by a court in *Lea v. Wyeth* (Def. Br. at 19 n. 49), which parroted *Hines.* Absent from Wyeth's brief is any mention of the decisions from four other courts, which denied Wyeth's virtually identical motions.

In *Vance v. Rite Aid et al.,*[54] the court rejected defendants' similar attacks on Dr. Tilley, noting that his opinions provide a biologically plausible explanation for how MPA combined with estrogen (E) promotes breast cancer. The court found Dr. Tilley's research on the effect of MPA on estrogen and androgen receptors was particularly reliable because no scientists have criticized his study. Moreover, "Dr. Tilley's 2007 article that most closely tracks his opinions in this case already has been cited by at least nineteen other published articles – in other words, other scientists have relied on it."[55] The *Vance* court was also unpersuaded by Wyeth's contention that animal studies are irrelevant and that scientists may not rely on them.[56]

Similarly, a district court judge from the Northern District of Alabama denied Wyeth's motion to exclude Drs. Tilley and Austin, finding that their opinions were reliably grounded in empirical data. *Loewen et al. v. Wyeth, Inc.*, 2011 WL 6942887, slip op. at *3 (N.D. Ala. Nov. 14, 2011). The court pointed out that unanimity of evidence is not required for an expert's opinion: "If the standard for admissibility for these theories were something approaching objective scientific proof, as defendants suggest it should be, perhaps no expert whose testimony has been offered would be permitted to testify." *Id.* In addition, two other courts denied

---

[54] Ex. 42 - Order Denying Wyeth's and Barr's *Daubert/Wilt* Motions to Exclude the Opinions of Dr. Wayne Tilley, *Vance v. Rite Aid, et al*., Case No. 06-C-351P (Logan Cnty Cir. Ct., W. Va. Aug. 13, 2010).

[55] *Id.* at 2.

[56] *Id.* at 3.

defendants' similar motions to bar plaintiffs' experts from testifying that OMP is a safer alternative to MPA.[57]

Although the majority of courts have held that plaintiffs' evidence of design defect admissible, Wyeth wants the Court to ignore those decisions and adopt the *Hines* order. As explained above, however, that court's analysis was demonstrably flawed and based on unscientific, erroneous assumptions.[58]

### G. Head-to-Head Human Randomized Clinical Trials on Women Are Not a Prerequisite to the Admissibility of Expert Testimony that OMP is Safer for the Breast than MPA.

Wyeth's main contention is that the existence of a safer feasible alternative design can only be proven by evidence in the form of at least one head-to-head clinical trial randomly exposing postmenopausal women to either CEE+MPA or CEE+OMP, and comparing the two groups to see if one HRT regimen causes more breast cancers (and to a "statistically significant" degree) than the other. While such head-to-head comparison would be ideal, they are not always possible. As Dr. Austin has explained, "There is no equivalence trial for the effect of E+MPA vs. E+OMP on breast cancer risk, and there is unlikely to ever be any, since that study could certainly not obtain ethics review approval."[59] Nor are such studies necessary. There is already overwhelming evidence that E+MPA causes breast cancer, as explained above. Numerous other well-designed studies have provided reliable, convergent and consistent evidence that E+OMP

---

57 *Torkie-Tork*, 739 F. Supp. 2d at 901 (allowing Dr. Austin to testify that OMP was a safer alternative to MPA); Ex. 43 - Orders in *Meisenzahl v. Wyeth et al.*, Cause No. 22042-09651 (22d Jud. Cir., Mo. Cir. Ct. Oct. 13, 2011 and Oct. 31, 2011).

58 *Supra* at fn. 30.

59 Ex. 39 - Austin 2011 Report at 12.

carries a much lower risk of breast cancer than does E+MPA.[60] Given the strong evidence on both sides of the equation, there is no need to perform head-to-head studies (which cannot ethically be done, anyway).

Rules 702 and 703 contemplate that expert testimony is reliable, and therefore admissible, if it rests on the type of data "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." FED. R. EVID. 703. *See also United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007) (a study's failure to establish causation goes to the weight it should be accorded, but does not bar it from informing an expert's opinion).

Defendants' demand for head-to-head clinical trial evidence is hypocritical. Indeed, Wyeth itself is directly to blame for this missing data. Initially, the WHI investigators planned to include a CEE+OMP as an additional study drug regimen in the randomized trial. But Wyeth wielded its considerable influence to make sure that didn't happen.[61] Wyeth thus stifled a unique opportunity to compare the two drug combinations directly in a head-to-head clinical study. There will be no further opportunities for such research because of ethics constraints.[62] The only two ongoing randomized clinical trials on HRT of which plaintiffs are aware (KEEPS and ELITE) are using Prometrium, not MPA, as the progestogen component.

---

[60] Ex. 40 - Tilley 2011 Report at 14.

[61] Ex. 44 - PX1573, David Colasante, MD's Memorandum of January 23, 1995 Re: Women's Health Initiative (WHI) Update: PEPI Influence (Bates No. PICKJ021-002474).

[62] *See* Ex. 45 - REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3d Ed. (Federal Judicial Center 2011) at 555-56: Ethical and practical constraints limit the use of prospective randomized clinical trials "to assess the value of agents thought to be beneficial to human beings. When an agent's effects are suspected to be harmful, researchers cannot knowingly expose people to the agent." Instead, researchers use observational studies to measure harmful outcomes.

## IV. CONCLUSION

For all the reasons above, plaintiff respectfully requests that defendants' motion to exclude the safer alternative design opinions of Drs. Tilley and Austin be denied.

Dated this 9th day of March, 2012.

Respectfully Submitted,

/s/ Bryan F. Aylstock
Bryan F. Aylstock
Daniel J. Thornburgh
Nathan C. Bess
Debra Renee Baggett
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
(850) 202-1010
baylstock@awkolaw.com
dthornburgh@awkolaw.com
nbess@awkolaw.com
rbaggett@awkolaw.com

Zoe B. Littlepage
Natasha D. Hanberry
LITTLEPAGE BOOTH
2043A W. Main St.
Houston, TX 77098
(713) 529-8000 – Telephone
(713) 529-8044 – Facsimile
zoe@littlepagebooth.com
natasha@littlepagebooth.com
**Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 9th day of March, 2012, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, and notification was sent to the parties below:


Laura E. De Santos
Gordon & Rees
1900 West Loop South, Suite 1000
Houston, TX 77027
713-961-3366
Fax: 713-961-3938
ldesantos@gordonrees.com

Michael Klatt
Gordon & Rees LLP
816 Congress Avenue, Suite 1510
Austin, TX 78701
512-391-0197
Fax: 512-391-0183
mklatt@gordonrees.com

Bryon J Benevento
Snell & Wilmer LLP
15 West South Temple, 1200
Salt Lake City, UT 84101
801/257-1902
18012571800 (fax)
bbenevento@swlaw.com

Kathy Ann Cochran
Wilson Smith Cochran & Dickerson
1215 4th Avenue
Suite 1700
Seattle, WA 98161
206/623-4100
206/623-9273 (fax)
cochran@wscd.com

Janelle Lauren Davis
John Martin
Thompson & Knight - Dallas
1722 Routh Street, Ste. 1500
Dallas, TX 75201-2533
214-969-1677
214-999-1657 (fax)
janelle.davis@tklaw.com
John.martin@tklaw.com

Gregory S Meece
Thompson & Knight
333 Clay St., Suite 3300
Houston, TX 77002
713/654-8111
17136541871 (fax)
gregory.meece@tklaw.com

Caryl Lyn Pruitt
Mitchell Williams Selig Gates & Woodyard
425 W Capitol Ave., Suite 1800
Little Rock, AR 72201-3525
501/688-8869
501/688-8807 (fax)
lpruitt@mwlaw.com

Jay Joseph Schuttert
Snell & Wilmer LLP - Las Vegas
3883 Howard Hughes Pkwy, Suite 1100
Las Vegas, NV 89169
702/784-5200
702/784-5252 (fax)
jschuttert@swlaw.com


/s/ Bryan F. Aylstock
Bryan F. Aylstock