# EXHIBIT 25

# Reference Manual on Scientific Evidence

*Second Edition*

Federal Judicial Center 2000

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

Case 1:03-cv-01367-MAC Document 100-27 Filed 03/09/12 Page 3 of 14 PageID #: 6561



# I. Introduction

Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations. The purpose of epidemiology is to better understand disease causation and to prevent disease in groups of individuals. Epidemiology assumes that disease is not distributed randomly in a group of individuals and that identifiable subgroups, including those exposed to certain agents, are at increased risk of contracting particular diseases.[1]

Judges and juries increasingly are presented with epidemiologic evidence as the basis of an expert's opinion on causation.[2] In the courtroom, epidemiologic research findings[3] are offered to establish or dispute whether exposure to an agent[4] caused a harmful effect or disease.[5] Epidemiologic evidence identifies

1. Although epidemiologists may conduct studies of beneficial agents that prevent or cure disease or other medical conditions, this reference guide refers exclusively to outcomes as diseases, because they are the relevant outcomes in most judicial proceedings in which epidemiology is involved.

2. Epidemiologic studies have been well received by courts trying mass tort suits. Well-conducted studies are uniformly admitted. 2 Modern Scientific Evidence: The Law and Science of Expert Testimony § 28-1.1, at 302–03 (David L. Faigman et al. eds., 1997) [hereinafter Modern Scientific Evidence]. It is important to note that often the expert testifying before the court is not the scientist who conducted the study or series of studies. *See, e.g.*, DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 953 (3d Cir. 1990) (pediatric pharmacologist expert's credentials sufficient pursuant to Fed. R. Evid. 702 to interpret epidemiologic studies and render an opinion based thereon); *cf.* Landrigan v. Celotex Corp., 605 A.2d 1079, 1088 (N.J. 1992) (epidemiologist permitted to testify to both general causation and specific causation); Loudermill v. Dow Chem. Co., 863 F.2d 566, 569 (8th Cir. 1988) (toxicologist permitted to testify that chemical caused decedent's death).

3. An epidemiologic study, which often is published in a medical journal or other scientific journal, is hearsay. An epidemiologic study that is performed by the government, such as one performed by the Centers for Disease Control (CDC), may be admissible based on the hearsay exception for government records contained in Fed. R. Evid. 803(8)(C). *See* Ellis v. International Playtex, Inc., 745 F.2d 292, 300–01 (4th Cir. 1984); Kehm v. Procter & Gamble Co., 580 F. Supp. 890, 899 (N.D. Iowa 1982), *aff'd sub nom.* Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613 (8th Cir. 1983). A study that is not conducted by the government might qualify for the learned treatise exception to the hearsay rule, Fed. R. Evid. 803(18), or possibly the catchall exceptions, Fed. R. Evid. 803(24) & 804(5). *See Ellis*, 745 F.2d at 305, 306 & n.18.

In any case, an epidemiologic study might be part of the basis of an expert's opinion and need not be independently admissible pursuant to Fed. R. Evid. 703. *See In re* "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1240 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988); *cf.* Grassis v. Johns-Manville Corp., 591 A.2d 671, 676 (N.J. Super. Ct. App. Div. 1991) (epidemiologic study offered in evidence to support expert's opinion under New Jersey evidentiary rule equivalent to Fed. R. Evid. 703).

4. We use *agent* to refer to any substance external to the human body that potentially causes disease or other health effects. Thus, drugs, devices, chemicals, radiation, and minerals (e.g., asbestos) are all agents whose toxicity an epidemiologist might explore. A single agent or a number of independent agents may cause disease, or the combined presence of two or more agents may be necessary for the development of the disease. Epidemiologists also conduct studies of individual characteristics, such as blood pressure and diet, which might pose risks, but those studies are rarely of interest in judicial proceedings. Epidemiologists may also conduct studies of drugs and other pharmaceutical products to assess their efficacy and safety.

5. DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945–48, 953–59 (3d Cir. 1990) (litigation

suffered from breast cancer consumed more dietary fat than those who have not suffered from the disease. This assumption may not be true. Nevertheless, the study is useful in that it identifies an area for further research: the fat intake of individuals who have breast cancer as compared with the fat intake of those who do not. Researchers who identify a difference in disease or death in a demographic study may follow up with a study based on gathering data about individuals.

Another epidemiologic approach is to compare disease rates over time and focus on disease rates before and after a point in time when some event of interest took place.[31] For example, thalidomide's teratogenicity (capacity to cause birth defects) was discovered after Dr. Widukind Lenz found a dramatic increase in the incidence of limb reduction birth defects in Germany beginning in 1960. Yet other than with such powerful agents as thalidomide, which increased the incidence of limb reduction defects by several orders of magnitude, these secular-trend studies (also known as time-line studies) are less reliable and less able to detect modest causal effects than the observational studies described above. Other factors that affect the measurement or existence of the disease, such as improved diagnostic techniques and changes in lifestyle or age demographics, may change over time. If those factors can be identified and measured, it may be possible to control for them with statistical methods. Of course, unknown factors cannot be controlled for in these or any other kind of epidemiologic studies.

## C. *Epidemiologic and Toxicologic Studies*

In addition to observational epidemiology, toxicology models based on animal studies (in vivo) may be used to determine toxicity in humans.[32] Animal studies have a number of advantages. They can be conducted as true experiments, and researchers control all aspects of the animals' lives. Thus, they can avoid the problem of confounding,[33] which epidemiology often confronts. Exposure can be carefully controlled and measured. Refusals to participate in a study are not an issue, and loss to follow-up very often is minimal. Ethical limitations are diminished, and animals can be sacrificed and their tissues examined, which may improve the accuracy of disease assessment. Animal studies often provide useful

31. In *Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1152–53 (10th Cir. 1990), the defendant introduced evidence showing total sales of Bendectin and the incidence of birth defects during the 1970–1984 period. In 1983, Bendectin was removed from the market, but the rate of birth defects did not change. The Tenth Circuit affirmed the lower court's ruling that the time-line data were admissible and that the defendant's expert witnesses could rely on them in rendering their opinions.

32. For an in-depth discussion of toxicology, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, in this manual.

33. *See infra* § IV.C.

information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies.

Animal studies have two significant disadvantages, however. First, animal study results must be extrapolated to another species—human beings—and differences in absorption, metabolism, and other factors may result in interspecies variation in responses. For example, one powerful human teratogen, thalidomide, does not cause birth defects in most rodent species.[34] Similarly, some known teratogens in animals are not believed to be human teratogens. In general, it is often difficult to confirm that an agent known to be toxic in animals is safe for human beings.[35] The second difficulty with inferring human causation from animal studies is that the high doses customarily used in animal studies require consideration of the dose–response relationship and whether a threshold no-effect dose exists.[36] Those matters are almost always fraught with considerable, and currently unresolvable, uncertainty.[37]

Toxicologists also use in vitro methods, in which human or animal tissue or cells are grown in laboratories and exposed to certain substances. The problem with this approach is also extrapolation—whether one can generalize the findings from the artificial setting of tissues in laboratories to whole human beings.[38]

Often toxicologic studies are the only or best available evidence of toxicity. Epidemiologic studies are difficult, time-consuming, and expensive, and consequently they do not exist for a large array of environmental agents. Where both animal toxicology and epidemiologic studies are available, no universal rules exist for how to interpret or reconcile them.[39] Careful assessment of the meth-

34. Phillip Knightley et al., Suffer the Children: The Story of Thalidomide 271–72 (1979).

35. *See* Ian C.T. Nisbet & Nathan J. Karch, Chemical Hazards to Human Reproduction 98–106 (1983); International Agency for Research on Cancer (IARC), Interpretation of Negative Epidemiological Evidence for Carcinogenicity (N.J. Wald & R. Doll eds., 1985).

36. *See infra* § V.C & note 119.

37. *See* General Elec. Co. v. Joiner, 522 U.S. 136, 143–45 (1997) (holding that the district court did not abuse its discretion in excluding expert testimony on causation based on expert's failure to explain how animal studies supported expert's opinion that agent caused disease in humans).

38. For a further discussion of these issues, see Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology § III.A, in this manual.

39. *See* IARC, *supra* note 35 (identifying a number of substances and comparing animal toxicology evidence with epidemiologic evidence).

A number of courts have grappled with the role of animal studies in proving causation in a toxic substance case. One line of cases takes a very dim view of their probative value. For example, in *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 313 (5th Cir. 1989), *cert. denied*, 494 U.S. 1046 (1990), the court noted the "very limited usefulness of animal studies when confronted with questions of toxicity." A similar view is reflected in *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 830 (D.C. Cir. 1988), *cert. denied*, 493 U.S. 882 (1989); *Bell v. Swift Adhesives, Inc.*, 804 F. Supp. 1577, 1579–80 (S.D. Ga. 1992); and *Cadarian v. Merrell Dow Pharmaceuticals, Inc.*, 745 F. Supp. 409, 412 (E.D. Mich. 1989). Other courts have been more amenable to the use of animal toxicology in proving causation.

odological validity and power[40] of the epidemiologic evidence must be undertaken, and the quality of the toxicologic studies and the questions of interspecies extrapolation and dose–response relationship must be considered.[41]

Thus, in *Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087, 1094 (D. Md. 1986), *aff'd sub nom.* Wheelahan v. G.D. Searle & Co., 814 F.2d 655 (4th Cir. 1987), the court observed: "There is a range of scientific methods for investigating questions of causation—for example, toxicology and animal studies, clinical research, and epidemiology—which all have distinct advantages and disadvantages." *See also* Villari v. Terminix Int'l, Inc., 692 F. Supp. 568, 571 (E.D. Pa. 1988); Peterson v. Sealed Air Corp., Nos. 86-C3498, 88-C9859 Consol., 1991 U.S. Dist. LEXIS 5333, at *27–*29 (N.D. Ill. Apr. 23, 1991); *cf. In re* Paoli R.R. Yard PCB Litig., 916 F.2d 829, 853–54 (3d Cir. 1990) (questioning the exclusion of animal studies by the lower court), *cert. denied*, 499 U.S. 961 (1991). The Third Circuit in a subsequent opinion in *Paoli* observed:

> [I]n order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves. Thus, the requirement of reliability, or "good grounds," extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.

*In re* Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995); *see also* Cavallo v. Star Enter., 892 F. Supp. 756, 761–63 (E.D. Va. 1995) (courts must examine each of the steps that lead to an expert's opinion), *aff'd in part and rev'd in part*, 100 F.3d 1150 (4th Cir. 1996), *cert. denied*, 522 U.S. 1044 (1998).

One explanation for these conflicting lines of cases may be that when there is a substantial body of epidemiologic evidence that addresses the causal issue, animal toxicology has much less probative value. That was the case, for example, in the Bendectin cases of *Richardson*, *Brock*, and *Turpin*. Where epidemiologic evidence is not available, animal toxicology may be thought to play a more prominent role in resolving a causal dispute. *See* Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation*, 86 Nw. U. L. Rev. 643, 680–82 (1992) (arguing that plaintiffs should be required to prove causation by a preponderance of the available evidence); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1359 (6th Cir.), *cert. denied*, 506 U.S. 826 (1992); *In re* Paoli R.R. Yard PCB Litig., No. 86-2229, 1992 U.S. Dist. LEXIS 16287, at *16 (E.D. Pa. Oct. 21, 1992). For another explanation of these cases, see Gerald W. Boston, *A Mass-Exposure Model of Toxic Causation: The Control of Scientific Proof and the Regulatory Experience*, 18 Colum. J. Envtl. L. 181 (1993) (arguing that epidemiologic evidence should be required in mass-exposure cases but not in isolated-exposure cases). *See also* IARC, *supra* note 35; Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology § I.F, in this manual. The Supreme Court, in *General Electric Co. v. Joiner*, 522 U.S. 136, 144–45 (1997), suggested that there is not a categorical rule for toxicologic studies, observing, "[W]hether animal studies can ever be a proper foundation for an expert's opinion [is] not the issue. . . . The [animal] studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them."

40. *See infra* § IV.A.3.

41. *See* Ellen F. Heineman & Shelia Hoar Zahm, *The Role of Epidemiology in Hazard Evaluation*, 9 Toxic Substances J. 255, 258–62 (1989).

# III. How Should Results of an Epidemiologic Study Be Interpreted?

Epidemiologists are ultimately interested in whether a causal relationship exists between an agent and a disease. However, the first question an epidemiologist addresses is whether an association exists between exposure to the agent and disease. An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance.[42] Although a causal relationship is one possible explanation for an observed association between an exposure and a disease, an association does not necessarily mean that there is a cause–effect relationship. Interpreting the meaning of an observed association is discussed below.

This section begins by describing the ways of expressing the existence and strength of an association between exposure and disease. It reviews ways in which an incorrect result can be produced because of the sampling methods used in all observational epidemiologic studies and then examines statistical methods for evaluating whether an association is real or due to sampling error.

The strength of an association between exposure and disease can be stated as a relative risk, an odds ratio, or an attributable risk (often abbreviated as "RR," "OR," and "AR," respectively). Each of these measurements of association examines the degree to which the risk of disease increases when individuals are exposed to an agent.

## *A. Relative Risk*

A commonly used approach for expressing the association between an agent and disease is relative risk (RR). It is defined as the ratio of the incidence rate (often referred to as incidence) of disease in exposed individuals to the incidence rate in unexposed individuals:

$$\text{Relative Risk (RR)} = \frac{\text{Incidence rate in the exposed}}{\text{Incidence rate in the unexposed}}$$

The incidence rate of disease reflects the number of cases of disease that develop during a specified period of time divided by the number of persons in the cohort under study.[43] Thus, the incidence rate expresses the risk that a

42. A negative association implies that the agent has a protective or curative effect. Because the concern in toxic substances litigation is whether an agent caused disease, this reference guide focuses on positive associations.

43. Epidemiologists also use the concept of prevalence, which measures the existence of disease in a population at a given point in time, regardless of when the disease developed. Prevalence is expressed as the proportion of the population with the disease at the chosen time. *See* Gordis, *supra* note 26, at 32–34.

member of the population will develop the disease within a specified period of time.

For example, a researcher studies 100 individuals who are exposed to an agent and 200 who are not exposed. After one year, 40 of the exposed individuals are diagnosed as having a disease, and 20 of the unexposed individuals also are diagnosed as having the disease. The relative risk of contracting the disease is calculated as follows:

- The incidence rate of disease in the exposed individuals is 40 cases per year per 100 persons (40/100), or 0.4.
- The incidence rate of disease in the unexposed individuals is 20 cases per year per 200 persons (20/200), or 0.1.
- The relative risk is calculated as the incidence rate in the exposed group (0.4) divided by the incidence rate in the unexposed group (0.1), or 4.0.

A relative risk of 4.0 indicates that the risk of disease in the exposed group is four times as high as the risk of disease in the unexposed group.[44]

In general, the relative risk can be interpreted as follows:

- If the relative risk equals 1.0, the risk in exposed individuals is the same as the risk in unexposed individuals. There is no association between exposure to the agent and disease.
- If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals. There is a positive association between exposure to the agent and the disease, which could be causal.
- If the relative risk is less than 1.0, the risk in exposed individuals is less than the risk in unexposed individuals. There is a negative association, which could reflect a protective or curative effect of the agent on risk of disease. For example, immunizations lower the risk of disease. The results suggest that immunization is associated with a decrease in disease and may have a protective effect on the risk of disease.

Although relative risk is a straightforward concept, care must be taken in interpreting it. Researchers should scrutinize their results for error. Error in the design of a study could yield an incorrect relative risk. Sources of bias and confounding should be examined.[45] Whenever an association is uncovered, further analysis should be conducted to determine if the association is real or due to an error or bias. Similarly, a study that does not find an association between an agent and disease may be erroneous because of bias or random error.

44. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990); Gaul v. United States, 582 F. Supp. 1122, 1125 n.9 (D. Del. 1984).
45. *See infra* § IV.B–C.

for inferring causation from an association apply to the available evidence. These guidelines consist of several key inquiries that assist researchers in making a judgment about causation.[110] Most researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn.[111]

The factors that guide epidemiologists in making judgments about causation are

1. temporal relationship;
2. strength of the association;
3. dose–response relationship;
4. replication of the findings;
5. biological plausibility (coherence with existing knowledge);
6. consideration of alternative explanations;
7. cessation of exposure;
8. specificity of the association; and
9. consistency with other knowledge.

There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines. One or more factors may be absent even when a true causal relationship exists. Similarly, the existence of some factors does not ensure that a causal relationship exists. Drawing causal inferences after finding an association and considering these factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship, and vice-versa. While the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using scientific methodology.

110. *See* Mervyn Susser, Causal Thinking in the Health Sciences: Concepts and Strategies in Epidemiology (1973); *In re* Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1128–30 (2d Cir. 1995) (discussing lower courts' use of factors to decide whether an inference of causation is justified when an association exists).

111. Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 n.12 (Fla. Dist. Ct. App. 1998) ("Almost all genres of research articles in the medical and behavioral sciences conclude their discussion with qualifying statements such as 'there is still much to be learned.' This is not, as might be assumed, an expression of ignorance, but rather an expression that all scientific fields are open-ended and can progress from their present state . . . ."); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 App. B. at 1446–51 (D. Or. 1996) (report of Merwyn R. Greenlick, court-appointed epidemiologist). In *Cadarian v. Merrell Dow Pharmaceuticals, Inc.*, 745 F. Supp. 409 (E.D. Mich. 1989), the court refused to permit an expert to rely on a study that the authors had concluded should not be used to support an inference of causation in the absence of independent confirmatory studies. The court did not address the question whether the degree of certainty used by epidemiologists before making a conclusion of cause was consistent with the legal standard. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 957 (3d Cir. 1990) (standard of proof for scientific community is not necessarily appropriate standard for expert opinion in civil litigation); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745 (11th Cir.), *cert. denied*, 479 U.S. 950 (1986).

generally should yield similar results. While inconsistent results do not rule out a causal nexus, any inconsistencies signal a need to explore whether different results can be reconciled with causality.

### *E. Is the Association Biologically Plausible (Consistent with Existing Knowledge)?*[122]

Biological plausibility is not an easy criterion to use and depends upon existing knowledge about the mechanisms by which the disease develops. When biological plausibility exists, it lends credence to an inference of causality. For example, the conclusion that high cholesterol is a cause of coronary heart disease is plausible because cholesterol is found in atherosclerotic plaques. However, observations have been made in epidemiologic studies that were not biologically plausible at the time but subsequently were shown to be correct. When an observation is inconsistent with current biological knowledge, it should not be discarded, but the observation should be confirmed before significance is attached to it. The saliency of this factor varies depending on the extent of scientific knowledge about the cellular and subcellular mechanisms through which the disease process works. The mechanisms of some diseases are understood better than the mechanisms of others.

### *F. Have Alternative Explanations Been Considered?*

The importance of considering the possibility of bias and confounding and ruling out the possibilities was discussed above.[123]

### *G. What Is the Effect of Ceasing Exposure?*

If an agent is a cause of a disease one would expect that cessation of exposure to that agent ordinarily would reduce the risk of the disease. This has been the case, for example, with cigarette smoking and lung cancer. In many situations, however, relevant data are simply not available regarding the possible effects of ending the exposure. But when such data are available and eliminating exposure reduces the incidence of disease, this factor strongly supports a causal relationship.

ing a study on Bendectin insufficient to support an expert's opinion, because "the study's authors themselves concluded that the results could not be interpreted without independent confirmatory evidence").

122. A number of courts have adverted to this criterion in the course of their discussions of causation in toxic substances cases. *E.g.*, Cook v. United States, 545 F. Supp. 306, 314–15 (N.D. Cal. 1982) (discussing biological implausibility of a two-peak increase of disease when plotted against time); Landrigan v. Celotex Corp., 605 A.2d 1079, 1085–86 (N.J. 1992) (discussing the existence vel non of biological plausibility). *See also* Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology § III.E, in this manual.

123. *See supra* § IV.B–C.

lung cancer is attributable to cigarettes). Synonymous terms include attributable fraction, attributable risk, and etiologic fraction. See attributable risk.

**attributable risk.** The proportion of disease in exposed individuals that can be attributed to exposure to an agent, as distinguished from the proportion of disease attributed to all other causes.

**background risk of disease.** Background risk of disease (or background rate of disease) is the rate of disease in a population that has no known exposures to an alleged risk factor for the disease. For example, the background risk for all birth defects is 3%–5% of live births.

**beta error.** Also called type II error and false negative error, beta error occurs when a researcher fails to reject a null hypothesis when it is incorrect (i.e., when there is an association). This can occur when no statistically significant difference is detected between the control group and the exposed group, but a difference does exist.

**bias.** Any effect at any stage of investigation or inference tending to produce results that depart systematically from the true values. In epidemiology, the term bias does not necessarily carry an imputation of prejudice or other subjective factor, such as the experimenter's desire for a particular outcome. This differs from conventional usage, in which bias refers to a partisan point of view.

**biological marker.** A physiological change in tissue or body fluids that occurs as a result of an exposure to an agent and that can be detected in the laboratory. Biological markers are only available for a small number of chemicals.

**biological plausibility.** Consideration of existing knowledge about human biology and disease pathology to provide a judgment about the plausibility that an agent causes a disease.

**case-comparison study.** See case-control study.

**case-control study.** Also, case-comparison study, case history study, case referent study, retrospective study. A study that starts with the identification of persons with a disease (or other outcome variable) and a suitable control (comparison, reference) group of persons without the disease. Such a study is often referred to as retrospective because it starts after the onset of disease and looks back to the postulated causal factors.

**case group.** A group of individuals who have been exposed to the disease, intervention, procedure, or other variable whose influence is being studied.

**causation.** Causation, as we use the term, denotes an event, condition, characteristic, or agent's being a necessary element of a set of other events that can produce an outcome, such as a disease. Other sets of events may also cause the disease. For example, smoking is a necessary element of a set of events

useful estimate on which policy making can be based. In recent years, codification of the methodology used to assess risk has increased confidence that the process can be reasonably free of bias; however, significant controversy remains, particularly when actual data are limited and generally conservative default assumptions are used.[34]

While risk assessment information about a chemical can be somewhat useful in a toxic tort case, at least in terms of setting reasonable boundaries as to the likelihood of causation, the impetus for the development of risk assessment has been the regulatory process, which has different goals.[35] Because of their use of appropriately prudent assumptions in areas of uncertainty and their use of default assumptions when there are limited data, risk assessments intentionally encompass the upper range of possible risks.

## *F. Toxicology and Epidemiology*

Epidemiology is the study of the incidence and distribution of disease in human populations. Clearly, both epidemiology and toxicology have much to offer in elucidating the causal relationship between chemical exposure and disease.[36] These sciences often go hand in hand in assessments of the risks of chemical exposure, without artificial distinctions being drawn between them. However, although courts generally rule epidemiological expert opinion admissible, admissibility of toxicological expert opinion has been more controversial because of uncertain-

34. An example of conservative default assumptions can be found in Superfund risk assessment. The EPA has determined that Superfund sites should be cleaned up to reduce cancer risk from 1 in 10,000 to 1 in 1,000,000. A number of assumptions can go into this calculation, including conservative assumptions about intake, exposure frequency and duration, and cancer-potency factors for the chemicals at the site. *See, e.g.*, Robert H. Harris & David E. Burmaster, *Restoring Science to Superfund Risk Assessment*, 6 Toxics L. Rep. (BNA) 1318 (Mar. 25, 1992).

35. *See, e.g.*, Ellen Relkin, *Use of Governmental and Industrial Standards of Exposure and Toxicological Data in Toxic Tort Litigation*, *reprinted in* Proving Causation of Disease: Update 1996, at 199 (New Jersey Inst. for Continuing Legal Educ. 1996); Steven Shavell, *Liability for Harm Versus Regulation of Safety*, 13 J. Legal Stud. 357 (1984). Risk assessment has been heavily criticized on a number of grounds. The major argument of industry has been that it is overly conservative and thus greatly overstates the actual risk. The rationale for conservatism is in part the prudent public health approach of "above all, do no harm." The conservative approach is also used, especially in regard to cancer risk, because it is sometimes more feasible to extrapolate to a plausible upper boundary for a risk estimate than it is to estimate a point of maximum likelihood. For a sample of the debate over risk assessment, see Bruce N. Ames & Lois S. Gold, *Too Many Rodent Carcinogens: Mitogenesis Increases Mutagenesis*, 249 Science 970 (1990); Jean Marx, *Animal Carcinogen Testing Challenged*, 250 Science 743 (1990); Philip H. Abelson, *Incorporation of a New Science into Risk Assessment*, 250 Science 1497 (1990); Frederica P. Perera, *Letter to the Editor: Carcinogens and Human Health, Part 1*, 250 Science 1644 (1990); Bruce N. Ames & Lois S. Gold, *Response*, 250 Science 1645 (1990); David P. Rall, *Letter to the Editor: Carcinogens and Human Health, Part 2*, 251 Science 10 (1991); Bruce N. Ames & Lois S. Gold, *Response*, 251 Science 12 (1991); John C. Bailar III et al., *One-Hit Models of Carcinogenesis: Conservative or Not?*, 8 Risk Analysis 485 (1988).

36. *See* Michael D. Green et al., Reference Guide on Epidemiology § V, in this manual

consider measures such as smoking cessation, dietary modification, medications, and even angioplasty or surgery if the level of occlusion proves to be substantial and a likely explanation for the pain.

As the process of refinement of diagnostic hypotheses unfolds, the consideration of several causal models may be necessary, because consistency of the model with observed findings does not necessarily prove that a model is correct. In the example above, another model that would explain the findings is exposure to high levels of carbon monoxide from a faulty furnace at home, producing a blood carboxyhemoglobin level of 18% (the normal for a nonsmoker is less than 1%) and reducing the blood's oxygen-carrying capacity. In conjunction with only mild coronary artery obstruction by plaque, this exposure then leads to inadequate oxygen delivery to the heart muscle and chest pain. The model combines general causation models for coronary artery disease with information on the levels of carbon monoxide and coronary artery obstruction specific to this patient. Thus, the physician applies general medical knowledge about the relationship of various factors to symptoms and then refines the appropriate causal model in accordance with the specific patient's condition. Although carbon monoxide intoxication can cause chest pain that is due to inadequate oxygen delivery to the heart, it requires a blood carboxyhemoglobin level of at least 5% to 10%, and its impact is enhanced by the presence of underlying mechanical obstruction of the coronary arteries. Hence, the physician must usually consider and assess alternative and more specific causal models before accepting a particular model as the preferred explanation. Like the probabilistic reasoning described above, this kind of reasoning is rarely made explicit.

## *E. Evaluation of External Causation*

For the physician, both causal and probabilistic reasoning are the basis for establishing external causation, which is the relationship between environmental factors (work, chemical exposures, lifestyle, medications) and illness, as well as for making the more common analysis of internal causation as discussed earlier in section IV.B. The physician may be asked to determine external causation by the patient or a third party, such as a lawyer, insurance company, or governmental agency. A key element of determining causation is gaining access to all information available about the patient's condition.

Figure 1 provides examples of the diverse types of information that may be available for review in determining external causation. In any given case, much of the listed information is normally not available.[111] Determining external causation also generally occurs in a stepwise fashion. In the first step the physician

111. For a somewhat different illustration of the interaction of such factors, see Cullen et al., *supra* note 19, at 230 fig.18-2.

Figure 1. Determining External Causation




must establish the characteristics of the medical condition. Second, he or she carefully defines the nature and amount of the environmental exposure. The third step is to demonstrate that the medical and scientific literature provides evidence that in some circumstances the exposure under consideration can cause the outcome under consideration. This step is synonymous with establishment of general causation. As part of this step, the clinician attempts to establish the relationship between dose and response, including whether thresholds exist, ultimately defining the clinical toxicology of the exposure. The fourth step is to