# EXHIBIT 45

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

**THE NATIONAL ACADEMIES PRESS 500 Fifth Street, N.W. Washington, DC 20001**

The Federal Judicial Center contributed to this publication in furtherance of the Center's statutory mission to develop and conduct educational programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

The development of the third edition of the *Reference Manual on Scientific Evidence* was supported by Contract No. B5727.R02 between the National Academy of Sciences and the Carnegie Corporation of New York and a grant from the Starr Foundation. The views expressed in this publication are those of the authors and do not necessarily reflect those of the National Academies or the organizations that provided support for the project.

International Standard Book Number-13: 978-0-309-21421-6
International Standard Book Number-10: 0-309-21421-1

Library of Congress Cataloging-in-Publication Data

Reference manual on scientific evidence. — 3rd ed.
p. cm.
Includes bibliographical references and index.
ISBN-13: 978-0-309-21421-6 (pbk.)
ISBN-10: 0-309-21421-1 (pbk.)
1. Evidence, Expert—United States. I. Federal Judicial Center.
KF8961.R44 2011
347.73′67—dc23
2011031458

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

Copyright 2011 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

# THE FEDERAL JUDICIAL CENTER

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States, with the mission to "further the development and adoption of improved judicial administration in the courts of the United States." By statute, the Chief Justice of the United States chairs the Federal Judicial Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The Center undertakes empirical and exploratory research on federal judicial processes, court management, and sentencing and its consequences, often at the request of the Judicial Conference and its committees, the courts themselves, or other groups in the federal system. In addition to orientation and continuing education programs for judges and court staff on law and case management, the Center produces publications, videos, and online resources. The Center provides leadership and management education for judges and court employees, and other training as needed. Center research informs many of its educational efforts. The Center also produces resources and materials on the history of the federal courts, and it develops resources to assist in fostering effective judicial administration in other countries.

Since its founding, the Center has had nine directors. Judge Barbara J. Rothstein became director of the Federal Judicial Center in 2003

**www.fjc.gov**

# THE NATIONAL ACADEMIES

*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

## *Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence*

*Co-Chairs:*

**JEROME P. KASSIRER** (IOM), Distinguished Professor, Tufts University School of Medicine

**GLADYS KESSLER**, Judge, U.S. District Court for the District of Columbia

*Members:*

**MING W. CHIN**, Associate Justice, The Supreme Court of California

**PAULINE NEWMAN**, Judge, U.S. Court of Appeals for the Federal Circuit

**KATHLEEN MCDONALD O'MALLEY**, Judge, U.S. Court of Appeals for the Federal Circuit

**JED S. RAKOFF**, Judge, U.S. District Court, Southern District of New York

**CHANNING R. ROBERTSON,** Ruth G. and William K. Bowes Professor, School of Engineering, and Professor, Department of Chemical Engineering, Stanford University

**JOSEPH V. RODRICKS,** Principal, Environ

**ALLEN WILCOX,** Senior Investigator, Institute of Environmental Health Sciences

**SANDY L. ZABELL,** Professor of Statistics and Mathematics, Weinberg College of Arts and Sciences, Northwestern University

*Consultant to the Committee:*

**JOE S. CECIL,** Project Director, Program on Scientific and Technical Evidence, Division of Research, Federal Judicial Center

*Staff:*

**ANNE-MARIE MAZZA,** Director

**STEVEN KENDALL,** Associate Program Officer

**GURUPRASAD MADHAVAN,** Program Officer (until November 2010)

## *Board of the Federal Judicial Center*

The Chief Justice of the United States, *Chair*
Judge Susan H. Black, U.S. Court of Appeals for the Eleventh Circuit
Magistrate Judge John Michael Facciola, U.S. District Court for the District of Columbia
Judge James B. Haines, U.S. Bankruptcy Court for the District of Maine
Chief Judge James F. Holderman, U.S. District Court for the Northern District of Illinois
Judge Edward C. Prado, U.S. Court of Appeals for the Fifth Circuit
Chief Judge Loretta A. Preska, U.S. District Court for the Southern District of New York
Chief Judge Kathryn H. Vratil, U.S. District Court for the District of Kansas
James C. Duff, Director of the Administrative Office of the U.S. Courts

## *Committee on Science, Technology, and Law*
## *National Research Council*

**DAVID KORN** (*Co-Chair*), Professor of Pathology, Harvard Medical School, and formerly, Inaugural Vice Provost for Research, Harvard University

**RICHARD A. MESERVE** (*Co-Chair*), President, Carnegie Institution for Science, and Senior of Counsel, Covington & Burling LLP

**FREDERICK R. ANDERSON, JR.,** Partner, McKenna, Long & Aldridge LLP

**ARTHUR I. BIENENSTOCK,** Special Assistant to the President for Federal Research Policy, and Director, Wallenberg Research Link, Stanford University

**BARBARA E. BIERER,** Professor of Medicine, Harvard Medical School, and Senior Vice President, Research, Brigham and Women's Hospital

**ELIZABETH H. BLACKBURN,** Morris Herzstein Professor of Biology and Physiology, University of California, San Francisco

**JOHN BURRIS,** President, Burroughs Wellcome Fund

**ARTURO CASADEVALL,** Leo and Julia Forchheimer Professor of Microbiology and Immunology; Chair, Department of Biology and Immunology; and Professor of Medicine, Albert Einstein College of Medicine

**JOE S. CECIL,** Project Director, Program on Scientific and Technical Evidence, Division of Research, Federal Judicial Center

**ROCHELLE COOPER DREYFUSS,** Pauline Newman Professor of Law and Director, Engelberg Center on Innovation Law and Policy, New York University School of Law

**DREW ENDY,** Assistant Professor, Bioengineering, Stanford University, and President, The BioBricks Foundation

**PAUL G. FALKOWSKI,** Board of Governors Professor in Geological and Marine Science, Department of Earth and Planetary Science, Rutgers, The State University of New Jersey

**MARCUS FELDMAN,** Burnet C. and Mildred Wohlford Professor of Biological Sciences, Stanford University

**ALICE P. GAST,** President, Lehigh University

**JASON GRUMET,** President, Bipartisan Policy Center

**BENJAMIN W. HEINEMAN, JR.,** Senior Fellow, Harvard Law School and Harvard Kennedy School of Government

**D. BROCK HORNBY,** U.S. District Judge for the District of Maine

**ALAN B. MORRISON,** Lerner Family Associate Dean for Public Interest and Public Service, George Washington University Law School

**PRABHU PINGALI,** Deputy Director of Agricultural Development, Global Development Program, Bill and Melinda Gates Foundation

**HARRIET RABB,** Vice President and General Counsel, Rockefeller University
**BARBARA JACOBS ROTHSTEIN,** Director, The Federal Judicial Center
**DAVID S. TATEL,** Judge, U.S. Court of Appeals for the District of Columbia Circuit
**SOPHIE VANDEBROEK**, Chief Technology Officer and President, Xerox Innovation Group, Xerox Corporation

*Staff*

**ANNE-MARIE MAZZA,** Director
**STEVEN KENDALL,** Associate Program Officer

# II. What Different Kinds of Epidemiologic Studies Exist?

## *A. Experimental and Observational Studies of Suspected Toxic Agents*

To determine whether an agent is related to the risk of developing a certain disease or an adverse health outcome, we might ideally want to conduct an experimental study in which the subjects would be randomly assigned to one of two groups: one group exposed to the agent of interest and the other not exposed. After a period of time, the study participants in both groups would be evaluated for the development of the disease. This type of study, called a randomized trial, clinical trial, or true experiment, is considered the gold standard for determining the relationship of an agent to a health outcome or adverse side effect. Such a study design is often used to evaluate new drugs or medical treatments and is the best way to ensure that any observed difference in outcome between the two groups is likely to be the result of exposure to the drug or medical treatment.

Randomization minimizes the likelihood that there are differences in relevant characteristics between those exposed to the agent and those not exposed. Researchers conducting clinical trials attempt to use study designs that are placebo controlled, which means that the group not receiving the active agent or treatment is given an inactive ingredient that appears similar to the active agent under study. They also use double blinding where possible, which means that neither the participants nor those conducting the study know which group is receiving the agent or treatment and which group is given the placebo. However, ethical and practical constraints limit the use of such experimental methodologies to assess the value of agents that are thought to be beneficial to human beings.[14]

When an agent's effects are suspected to be harmful, researchers cannot knowingly expose people to the agent.[15] Instead epidemiologic studies typically

14. Although experimental human studies cannot intentionally expose subjects to toxins, they can provide evidence that a new drug or other beneficial intervention also has adverse effects. *See In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2007) (the court relied on a clinical study of Celebrex that revealed increased cardiovascular risk to conclude that the plaintiff's experts' testimony on causation was admissible); McDarby v. Merck & Co., 949 A.2d 223 (N.J. Super. Ct. App. Div. 2008) (explaining how clinical trials of Vioxx revealed an association with heart disease).

15. Experimental studies in which human beings are exposed to agents known or thought to be toxic are ethically proscribed. *See* Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 992 (8th Cir. 2001); Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291, 1297 (N.D. Ala. 2001). Experimental studies can be used where the agent under investigation is believed to be beneficial, as is the case in the development and testing of new pharmaceutical drugs. *See, e.g.,* McDarby v. Merck & Co., 949 A.2d 223, 270 (N.J. Super. Ct. App. Div. 2008) (an expert witness relied on a clinical trial of a new drug to find the adjusted risk for the plaintiff); *see also* Gordon H. Guyatt, *Using Randomized Trials in*

"observe"[16] a group of individuals who have been exposed to an agent of interest, such as cigarette smoke or an industrial chemical and compare them with another group of individuals who have not been exposed. Thus, the investigator identifies a group of subjects who have been exposed[17] and compares their rate of disease or death with that of an unexposed group. In contrast to clinical studies in which potential risk factors can be controlled, epidemiologic investigations generally focus on individuals living in the community, for whom characteristics other than the one of interest, such as diet, exercise, exposure to other environmental agents, and genetic background, may distort a study's results. Because these characteristics cannot be controlled directly by the investigator, the investigator addresses their possible role in the relationship being studied by considering them in the design of the study and in the analysis and interpretation of the study results (see *infra* Section IV).[18] We emphasize that the Achilles' heel of observational studies is the possibility of differences in the two populations being studied with regard to risk factors other than exposure to the agent.[19] By contrast, experimental studies, in which subjects are randomized, generally avoid this problem.

## B. Types of Observational Study Design

Several different types of observational epidemiologic studies can be conducted.[20] Study designs may be chosen because of suitability for investigating the question of interest, timing constraints, resource limitations, or other considerations.

Most observational studies collect data about both exposure and health outcome in every individual in the study. The two main types of observational studies are cohort studies and case-control studies. A third type of observational study is a cross-sectional study, although cross-sectional studies are rarely useful in identifying toxic agents.[21] A final type of observational study, one in which data about

*Pharmacoepidemiology, in* Drug Epidemiology and Post-Marketing Surveillance 59 (Brian L. Strom & Giampaolo Velo eds., 1992). Experimental studies also may be conducted that entail the discontinuation of exposure to a harmful agent, such as studies in which smokers are randomly assigned to a variety of smoking cessation programs or have no cessation.

16. Classifying these studies as observational in contrast to randomized trials can be misleading to those who are unfamiliar with the area, because subjects in a randomized trial are observed as well. Nevertheless, the use of the term "observational studies" to distinguish them from experimental studies is widely employed.

17. The subjects may have voluntarily exposed themselves to the agent of interest, as is the case, for example, for those who smoke cigarettes, or subjects may have been exposed involuntarily or even without knowledge to an agent, such as in the case of employees who are exposed to chemical fumes at work.

18. *See* David A. Freedman, *Oasis or Mirage?* 21 Chance 59, 59–61 (Mar. 2008).

19. Both experimental and observational studies are subject to random error. See *infra* Section IV.A.

20. Other epidemiologic studies collect data about the group as a whole, rather than about each individual in the group. These group studies are discussed *infra* Section II.B.4.

21. See *infra* Section II.B.3.

individuals are not gathered, but rather population data about exposure and disease are used, is an ecological study.[22]

The difference between cohort studies and case-control studies is that cohort studies measure and compare the incidence of disease in the exposed and unexposed ("control") groups, while case-control studies measure and compare the frequency of exposure in the group with the disease (the "cases") and the group without the disease (the "controls"). In a case-control study, the rates of exposure in the cases and the rates in the controls are compared, and the odds of having the disease when exposed to a suspected agent can be compared with the odds when not exposed. The critical difference between cohort studies and case-control studies is that cohort studies begin with exposed people and unexposed people, while case-control studies begin with individuals who are selected based on whether they have the disease or do not have the disease and their exposure to the agent in question is measured. The goal of both types of studies is to determine if there is an association between exposure to an agent and a disease and the strength (magnitude) of that association.

### *1. Cohort studies*

In cohort studies,[23] researchers define a study population without regard to the participants' disease status. The cohort may be defined in the present and followed forward into the future (prospectively) or it may be constructed retrospectively as of sometime in the past and followed over historical time toward the present. In either case, the researchers classify the study participants into groups based on whether they were exposed to the agent of interest (see Figure 1).[24] In a prospective study, the exposed and unexposed groups are followed for a specified length of time, and the proportions of individuals in each group who develop the disease of interest are compared. In a retrospective study, the researcher will determine the proportion of individuals in the exposed group who developed the disease from available records or evidence and compare that proportion with the proportion of another group that was not exposed.[25] Thus, as illustrated in Table 1,

22. For thumbnail sketches on all types of epidemiologic study designs, see Brian L. Strom, *Study Designs Available for Pharmacoepidemiology Studies, in* Pharmacoepidemiology 17, 21–26 (Brian L. Strom ed., 4th ed. 2005).

23. Cohort studies also are referred to as prospective studies and followup studies.

24. In some studies, there may be several groups, each with a different magnitude of exposure to the agent being studied. Thus, a study of cigarette smokers might include heavy smokers (>3 packs a day), moderate smokers (1 to 2 packs a day), and light smokers (<1 pack a day). *See, e.g.,* Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment,* 316 New Eng. J. Med. 1044 (1987).

25. Sometimes in retrospective cohort studies the researcher gathers historical data about exposure and disease outcome of a cohort. Harold A. Kahn, An Introduction to Epidemiologic Methods 39–41 (1983). Irving Selikoff, in his seminal study of asbestotic disease in insulation workers, included several hundred workers who had died before he began the study. Selikoff was able to obtain information about exposure from union records and information about disease from hospital and autopsy

the number in the reference population that would be expected if the reference population had the age distribution of the population of interest.

This ratio is called the standardized mortality ratio (SMR). When the outcome of interest is disease rather than death, it is called the standardized morbidity ratio.[65] If the ratio equals 1.0, the observed number of deaths equals the expected number of deaths, and the mortality rate of the population of interest is no different from that of the reference population. If the SMR is greater than 1.0, the population of interest has a higher mortality risk than that of the reference population, and if the SMR is less than 1.0, the population of interest has a lower mortality rate than that of the reference population.

Thus, age adjustment provides a way to compare populations while in effect holding age constant. Adjustment is used not only for comparing mortality rates in different populations but also for comparing rates in different groups of subjects selected for study in epidemiologic investigations. Although this discussion has focused on adjusting for age, it is also possible to adjust for any number of other variables, such as gender, race, occupation, and socioeconomic status. It is also possible to adjust for several factors simultaneously.[66]

# IV. What Sources of Error Might Have Produced a False Result?

Incorrect study results occur in a variety of ways. A study may find a positive association (relative risk greater than 1.0) when there is no true association. Or a study may erroneously result in finding that that there is no association when in reality there is. A study may also find an association when one truly exists, but the association found may be greater or less than the real association.

Three general categories of phenomena can result in an association found in a study to be erroneous: chance, bias, and confounding. Before any inferences about causation are drawn from a study, the possibility of these phenomena must be examined.[67]

65. *See* Taylor v. Airco, Inc., 494 F. Supp. 2d 21, 25 n.4 (D. Mass. 2007) (explaining SMR and its relationship with relative risk). For an example of adjustment used to calculate an SMR for workers exposed to benzene, see Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment,* 316 New Eng. J. Med. 1044 (1987).

66. For further elaboration on adjustment, see Gordis, *supra* note 32, at 73–78; Philip Cole, *Causality in Epidemiology, Health Policy, and Law,* 27 Envtl. L. Rep. 10,279, 10,281 (1997).

67. *See* Cole, *supra* note 65, at 10,285. In *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 955 (3d Cir. 1990), the court recognized and discussed random sampling error. It then went on to refer to other errors (e.g., systematic bias) that create as much or more error in the outcome of a study. For a similar description of error in study procedure and random sampling, see David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section IV, in this manual.

The findings of a study may be the result of chance (or random error). In designing a study, the size of the sample can be increased to reduce (but not eliminate) the likelihood of random error. Once a study has been completed, statistical methods (discussed in Section IV.A) permit an assessment of the extent to which the results of a study may be due to random error.

The two main techniques for assessing random error are statistical significance and confidence intervals. A study that is statistically significant has results that are unlikely to be the result of random error, although any criterion for "significance" is somewhat arbitrary. A confidence interval provides both the relative risk (or other risk measure) found in the study and a range (interval) within which the risk likely would fall if the study were repeated numerous times. These two techniques (which are closely related) are explained in Section IV.A.

We should emphasize a matter that those unfamiliar with statistical methodology frequently find confusing: That a study's results are statistically significant says nothing about the importance of the magnitude of any association (i.e., the relative risk or odds ratio) found in a study or about the biological or clinical importance of the finding.[68] "Significant," as used with the adjective "statistically," does not mean important. A study may find a statistically significant relationship that is quite modest—perhaps it increases the risk only by 5%, which is equivalent to a relative risk of 1.05.[69] An association may be quite large—the exposed cohort might be 10 times more likely to develop disease than the control group—but the association is not statistically significant because of the potential for random error given a small sample size. In short, *statistical significance is not about the size of the risk found in a study*.

Bias (or systematic error) also can produce error in the outcome of a study. Epidemiologists attempt to minimize bias through their study design, including data collection protocols. Study designs are developed before they begin gathering data. However, even the best designed and conducted studies have biases, which may be subtle. Consequently, after data collection is completed, analytical tools are often used to evaluate potential sources of bias. Sometimes, after bias is identified, the epidemiologist can determine whether the bias would tend to inflate or dilute any association that may exist. Identification of the bias may permit the

68. *See* Modern Scientific Evidence, *supra* note 2, § 6.36 at 358 ("Statisticians distinguish between 'statistical' and 'practical' significance. . . ."); Cole, *supra* note 65, at 10,282. Understandably, some courts have been confused about the relationship between statistical significance and the magnitude of the association. *See* Hyman & Armstrong, P.S.C. v. Gunderson, 279 S.W.3d 93, 102 (Ky. 2008) (describing a small increased risk as being considered statistically insignificant and a somewhat larger risk as being considered statistically significant.); *In re* Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 634–35 (S.D.N.Y. 2008) (confusing the magnitude of the effect with whether the effect was statistically significant); *In re* Joint E. & S. Dist. Asbestos Litig., 827 F. Supp. 1014, 1041 (S.D.N.Y. 1993) (concluding that any relative risk less than 1.50 is statistically insignificant), *rev'd on other grounds,* 52 F.3d 1124 (2d Cir. 1995).

69. In general, small effects that are statistically significant require larger sample sizes. When effects are larger, generally fewer subjects are required to produce statistically significant findings.

any study whose *p*-value is not less than the level chosen for statistical significance should be rejected as inadequate to disprove the null hypothesis. Others are critical of using strict significance testing, which rejects all studies with an observed *p*-value below that specified level. Epidemiologists have become increasingly sophisticated in addressing the issue of random error and examining the data from a study to ascertain what information they may provide about the relationship between an agent and a disease, without the necessity of rejecting all studies that are not statistically significant.[86] Meta-analysis, as well, a method for pooling the results of multiple studies, sometimes can ameliorate concerns about random error.[87]

Calculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiologic study.[88]

2d 1071, 1103 (D. Colo. 2006) ("The statistical significance or insignificance of Dr. Clapp's results may affect the weight given to his testimony, but does not determine its admissibility under Rule 702."); *In re* Ephedra Prods. Liab. Litig., 393 F. Supp. 2d 181, 186 (S.D.N.Y. 2005) ("[T]he absence of epidemiologic studies establishing an increased risk from ephedra of sufficient statistical significance to meet scientific standards of causality does not mean that the causality opinions of the PCC's experts must be excluded entirely.").

Although the trial court had relied in part on the absence of statistically significant epidemiologic studies, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), did not explicitly address the matter. The Court did, however, refer to "the known or potential rate of error" in identifying factors relevant to the scientific validity of an expert's methodology. *Id*. at 594. The Court did not address any specific rate of error, although two cases that it cited affirmed the admissibility of voice spectrograph results that the courts reported were subject to a 2%–6% chance of error owing to either false matches or false eliminations. One commentator has concluded, "*Daubert* did not set a threshold level of statistical significance either for admissibility or for sufficiency of scientific evidence." *Developments in the Law, supra* note 79, at 1535–36, 1540–46. The Supreme Court in *General Electric Co. v. Joiner,* 522 U.S. 136, 145–47 (1997), adverted to the lack of statistical significance in one study relied on by an expert as a ground for ruling that the district court had not abused its discretion in excluding the expert's testimony.

In *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309 (2011), the Supreme Court was confronted with a question somewhat different from the relationship between statistically significant study results and causation. *Matrixx* was a securities fraud case in which the defendant argued that unless adverse event reports from use of a drug are statistically significant, the information about them is not material, as a matter of law (materiality is required as an element of a fraud claim). Defendant's claim was premised on the idea that only statistically significant results can be a basis for an inference of causation. The Court, unanimously, rejected that claim, citing cases in which courts had permitted expert witnesses to testify to toxic causation in the absence of any statistically significant studies.

For a hypercritical assessment of statistical significance testing that nevertheless identifies much inappropriate overreliance on it, see Stephen T. Ziliak & Deidre N. McCloskey, The Cult of Statistical Significance (2008).

86. *See* Sanders, *supra* note 13, at 342 (describing the improved handling and reporting of statistical analysis in studies of Bendectin after 1980).

87. *See infra* Section VI.

88. Kenneth Rothman, Professor of Public Health at Boston University and Adjunct Professor of Epidemiology at the Harvard School of Public Health, is one of the leaders in advocating the use of confidence intervals and rejecting strict significance testing. In *DeLuca*, 911 F.2d at 947, the Third Circuit discussed Rothman's views on the appropriate level of alpha and the use of con-

to determine whether that association reflects a true causal relationship.[141] These guidelines consist of several key inquiries that assist researchers in making a judgment about causation.[142] Generally, researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn.[143]

The factors that guide epidemiologists in making judgments about causation (and there is no threshold number that must exist) are[144]

141. In a number of cases, experts attempted to use these guidelines to support the existence of causation in the absence of any epidemiologic studies finding an association. *See, e.g.,* Rains v. PPG Indus., Inc., 361 F. Supp. 2d 829, 836–37 (S.D. Ill. 2004) (explaining Hill criteria and proceeding to apply them even though there was no epidemiologic study that found an association); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 460–61 (W.D. Pa. 2003). There may be some logic to that effort, but it does not reflect accepted epidemiologic methodology. *See In re* Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 187–88 (S.D.N.Y. 2009); Dunn v. Sandoz Pharms. Corp., 275 F. Supp. 2d 672, 678–79 (M.D.N.C. 2003) ("The greater weight of authority supports Sandoz' assertion that [use of] the Bradford Hill criteria is a method for determining whether the results of an epidemiologic study can be said to demonstrate causation and not a method for testing an unproven hypothesis."); *Soldo*, 244 F. Supp. 2d at 514 (the Hill criteria "were developed as a mean[s] of interpreting an established association based on a body of epidemiologic research for the purpose of trying to judge whether the observed association reflects a causal relation between an exposure and disease." (quoting report of court-appointed expert)).

142. *See* Mervyn Susser, Causal Thinking in the Health Sciences: Concepts and Strategies in Epidemiology (1973); Gannon v. United States, 571 F. Supp. 2d 615, 624 (E.D. Pa. 2007) (quoting expert who testified that the Hill criteria are "'well-recognized' and widely used in the science community to assess general causation"); Chapin v. A & L Parts, Inc., 732 N.W.2d 578, 584 (Mich. Ct. App. 2007) (expert testified that Hill criteria are the most well-utilized method for determining if an association is causal).

143. Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 n.12 (Fla. Dist. Ct. App. 1998) ("Almost all genres of research articles in the medical and behavioral sciences conclude their discussion with qualifying statements such as 'there is still much to be learned.' This is not, as might be assumed, an expression of ignorance, but rather an expression that all scientific fields are open-ended and can progress from their present state. . . ."); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 app. B. at 1446–51 (D. Or. 1996) (report of Merwyn R. Greenlick, court-appointed epidemiologist). In *Cadarian v. Merrell Dow Pharmaceuticals, Inc.,* 745 F. Supp. 409 (E.D. Mich. 1989), the court refused to permit an expert to rely on a study that the authors had concluded should not be used to support an inference of causation in the absence of independent confirmatory studies. The court did not address the question whether the degree of certainty used by epidemiologists before making a conclusion of cause was consistent with the legal standard. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 957 (3d Cir. 1990) (standard of proof for scientific community is not necessarily appropriate standard for expert opinion in civil litigation); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745 (11th Cir. 1986).

144. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) ("Defendants cite no authority, scientific or legal, that compliance with all, or even one, of these factors is required. . . . The scientific consensus is, in fact, to the contrary. It identifies Defendants' list of factors as some of the nine factors or lenses that guide epidemiologists in making judgments about causation. . . . These factors are not tests for determining the reliability of any study or the causal inferences drawn from it.").

1. Temporal relationship,
2. Strength of the association,
3. Dose–response relationship,
4. Replication of the findings,
5. Biological plausibility (coherence with existing knowledge),
6. Consideration of alternative explanations,
7. Cessation of exposure,
8. Specificity of the association, and
9. Consistency with other knowledge.

There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines.[145] One or more factors may be absent even when a true causal relationship exists.[146] Similarly, the existence of some factors does not ensure that a causal relationship exists. Drawing causal inferences after finding an association and considering these factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship, and vice versa. Although the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using an objective or algorithmic methodology.

These guidelines reflect criteria proposed by the U.S. Surgeon General in 1964[147] in assessing the relationship between smoking and lung cancer and expanded upon by Sir Austin Bradford Hill in 1965[148] and are often referred to as the Hill criteria or Hill factors.

145. *See* Douglas L. Weed, *Epidemiologic Evidence and Causal Inference,* 14 Hematology/Oncology Clinics N. Am. 797 (2000).

146. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) (rejecting argument that plaintiff failed to provide sufficient evidence of causation based on failing to meet four of the Hill factors).

147. Public Health Serv., U.S. Dep't of Health, Educ., & Welfare, Smoking and Health: Report of the Advisory Committee to the Surgeon General (1964); *see also* Centers for Disease Control and Prevention, U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking: A Report of the Surgeon General (2004).

148. *See* Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc. Royal Soc'y Med. 295 (1965) (Hill acknowledged that his factors could only serve to assist in the inferential process: "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non.*"). For discussion of these criteria and their respective strengths in informing a causal inference, see Gordis, *supra* note 32, at 236–39; David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology 263–66 (3d ed. 1994); Weed, *supra* note 144.

## *B. Purpose of the Reference Guide on Toxicology*

This reference guide focuses on the scientific issues that arise most frequently in toxic tort cases. Where it is appropriate, the guide explores the use of regulatory data and how the courts treat such data. It also provides an overview of the basic principles and methodologies of toxicology and offers a scientific context for proffered expert opinion based on toxicological data.[14] The reference guide describes research methods in toxicology and the relationship between toxicology and epidemiology, and it provides model questions for evaluating the admissibility and strength of an expert's opinion. Following each question is an explanation of the type of toxicological data or information that is offered in response to the question, as well as a discussion of its significance.

## *C. Toxicological Study Design*

Toxicological studies usually involve exposing laboratory animals (in vivo research) or cells or tissues (in vitro research) to chemical or physical agents, monitoring the outcomes (such as cellular abnormalities, tissue damage, organ toxicity, or tumor formation), and comparing the outcomes with those for unexposed control groups. As explained below,[15] the extent to which animal and cell experiments accurately predict human responses to chemical exposures is subject to debate.[16] However, because it is often unethical to experiment on humans by exposing them to known doses of chemical agents, animal toxicological evidence often provides the best scientific information about the risk of disease from a chemical exposure.[17]

In contrast to their exposure to drugs, only rarely are humans exposed to environmental chemicals in a manner that permits a quantitative determination of adverse outcomes.[18] This area of toxicological study may consist of individual or multiple case reports, or even experimental studies in which individuals or groups of individuals have been exposed to a chemical under circumstances that permit analysis of dose–response relationships, mechanisms of action, or other aspects of

14. The use of toxicological evidence in regulatory decisionmaking is discussed in Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 3, at 13–14; Barbara D. Beck et al., *The Use of Toxicology in the Regulatory Process, in* Principles and Methods of Toxicology, *supra* note 2, at 45–102. For a more general discussion of issues that arise in considering expert testimony, *see* Margaret A. Berger, The Admissibility of Expert Testimony, Section IV, in this manual.

15. *See infra* Section I.D.

16. The controversy over the use of toxicological evidence in tort cases is described in Bernard D. Goldstein, *Toxic Torts: The Devil Is in the Dose*, 16 J.L. & Pol'y 551 (2008); Joseph V. Rodricks, *Evaluating Disease Causation in Humans Exposed to Toxic Substances*, 14 J.L. & Pol'y 39 (2006); Silbergeld, *supra* note 4, at 378.

17. *See, e.g.,* Office of Tech. Assessment, U.S. Congress, Reproductive Health Hazards in the Workplace 8 (1985).

18. However, it is from drug studies in which multiple animal species are compared directly with humans that many of the principles of toxicology have been developed.