# EXHIBIT 1

**UNITED STATES DISTRICT COURT** **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| JEAN LEA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:03-CV-1339 |
| | § | |
| WYETH LLC, PHARMACIA & UPJOHN COMPANY, LLC, and PHARMACIA CORPORATION, | § § § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Pending before the court is Defendants Wyeth LLC ("Wyeth"), Pharmacia & Upjohn Company, LLC ("Upjohn"), and Pharmacia Corporation's ("Pharmacia") (collectively, "Defendants") Motion for Summary Judgment (#73), wherein Defendants argue they are entitled to judgment as a matter of law as to Plaintiff Jean Lea's ("Lea") claims. Having considered the pending motion, the submissions of the parties, and the applicable law, the court is of the opinion that Defendants' motion should be granted in part and denied in part.

I. <u>Background</u>

The above-styled action arises from Lea's use of hormone replacement therapy ("HRT") in the 1990s, which she alleges led to her developing ductal carcinoma in situ ("DCIS")[1] breast cancer in 1999.

---

[1] DCIS is a group of malignant epithelial cells confined to an individual's lactiferous duct. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 265, 266 (28th ed. 1994).

A. HRT and its Possible Link to Breast Cancer

HRT is used in the treatment of menopausal symptoms, including hot flashes, chills, headaches, irritability, and vaginal atrophy. This action concerns three types of HRT—Premarin[2], Provera, and Prempro—all of which were purportedly ingested by Lea. Wyeth manufactures Premarin, an estrogen drug, and Prempro, a combination estrogen and progestin ("E+P") pill. Upjohn manufactures Provera, a progestin medication.

During the 1990s, the National Institute of Health conducted a clinical trial and observational study to evaluate the effect of E+P on certain medical conditions, including heart disease, hip fractures, and breast and colon cancer. This study, known as the Women's Health Initiative ("WHI"), examined more than 160,000 postmenopausal women, who were randomly assigned to ingest HRT or a placebo. In 2002, the WHI was terminated due to a high occurrence of breast cancer among participants consuming HRT, and the preliminary study results were published in the July 2002 edition of the *Journal of the American Medical Association* ("JAMA"). Numerous other media reports followed, including two more JAMA articles in May and June of 2003. Both prior to and following the release of the WHI's results, multiple other studies reported a potential connection between HRT use and the development of breast cancer.

B. Lea's Use of HRT and her Breast Cancer Diagnosis

Lea, who is 82-years-old and suffers from dementia, first experienced menopausal symptoms in her 50s and began using HRT in 1993. In April 1996, Lea visited her physician, Dr. James Kirby ("Kirby"), who prescribed a combination of Premarin and Provera to relieve Lea's

---

[2] Though Premarin is one of the medications at issue in this lawsuit, the parties mention the drug only in passing. Accordingly, it will not be addressed in detail in this memorandum and order.

symptoms.[3] Lea took the two drugs until February 1997, when Kirby switched her prescription to Prempro. Lea continued to ingest Prempro until her breast cancer diagnosis in December 1999, when she ceased using HRT completely. Lea's cancer tested hormone receptor positive, meaning the use of hormones may have spurred the growth of her tumor.

Prior to prescribing HRT to Lea, Kirby discussed the pros and cons of the medication with her, including a probable small increased risk of breast cancer associated with long-term use. In addition, all HRT labels during the relevant time period contained warnings (which Lea now asserts were inadequate) of a potential breast cancer risk. Specifically, from 1995 to 2002, the Prempro label stated:

> Some studies have reported a moderately increased risk of breast cancer (relative risk 1.3 to 2.0) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of 10 years. The majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy. The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen/progestin has been reported. Other studies have not shown this relationship. In a one-year clinical trial of Prempro, Premphase, and Premarin alone, 5 new cases of breast cancer were detected among 1,377 women who received the combination treatments, while no new cases were detected among 347 women who received Premarin alone. The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population.

The Provera label similarly contained the following warning:

> Beagle dogs treated with medroxyprogesterone acetate [the chemical name for Provera] developed mammary nodules, some of which were malignant. Although nodules occasionally appeared in control animals, they were intermittent in nature, whereas the nodules in the drug-treated animals were larger, more numerous, persistent, and there were some breast malignancies with metastasis. The significance with respect to humans has not been established.

---

[3] Prior to visiting Kirby, Lea was prescribed these medications by another doctor.

The label also contained a contraindication against the use of progestin in women with "known or suspected malignancy of [the] breast" and acknowledged that "[t]here are possible additional risks which may be associated with the inclusion of progestin in estrogen replacement regimen," although it did not identify breast cancer as one of those risks. Nonetheless, Lea, having been informed of these risks, continued to use HRT. Kirby now acknowledges that, knowing more about the risks associated with HRT, he would not have prescribed the same dose or duration of combination hormone therapy for Lea and would have provided her with more definite warnings regarding the risks of the drugs.[4]

Lea filed this lawsuit on September 2, 2003, in the 260th Judicial District of Orange County, Texas. Defendants subsequently removed the case to this court. Thereafter, on August 23, 2004, the action was transferred to the United States Judicial Panel on Multidistrict Litigation ("JPML") in the United States District Court for the Eastern District of Arkansas. The JPML remanded this case in April 2010. On June 18, 2010, Lea filed an Amended Complaint asserting the following claims: fraud and misrepresentation; negligence; gross negligence; negligence *per se*; strict product liability (failure to warn and defective product); breach of express and implied warranty; negligent misrepresentation; assault and battery; and deceptive trade practices.[5] Lea also seeks exemplary and punitive damages.

Essentially, Lea contends that Defendants marketed their products as safe despite knowing that the medications' promoted benefits did not outweigh their risks. She likewise asserts that

[4] Defendants take issue with Kirby's affidavit testimony. Their objection will be addressed *infra*.

[5] In her response to Defendants' motion, Lea expressly abandons her manufacturing defect, express warranty, negligence *per se*, and assault and battery claims.

Defendants took steps to conceal the risk of breast cancer associated with their drugs, including misrepresenting study results to prescribing doctors, waging a public relations campaign against researchers' findings, and instructing their sales representatives not to disclose negative cancer-risk data to physicians.

Defendants filed the instant motion on July 1, 2011, arguing that they are entitled to summary judgment on Lea's failure to warn, design and manufacturing defect, fraud, misrepresentation, breach of warranty, deceptive trade practices, negligence *per se*, and assault and battery claims on numerous grounds. Lea counters that the record evidence is sufficient to create a genuine issue of material fact as to each of her remaining causes of action.

## II. Analysis

### A. Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). Where a defendant moves for summary judgment on the basis of an affirmative defense and, thus, bears the ultimate burden of persuasion, "evidence must be adduced supporting each element of the defense and

demonstrating the lack of any genuine issue of material fact with regard thereto.” *Terrebone Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002); *see Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir.), *cert. denied*, 522 U.S. 915 (1997); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). To warrant judgment in its favor, the movant “‘“must establish beyond peradventure *all* of the essential elements of the defense.”’” *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (emphasis in original) (quoting *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot*, 780 F.2d at 1194)); *accord Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010).

“A fact is material only if its resolution would affect the outcome of the action . . . .” *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009); *accord Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001). “Factual disputes that are irrelevant or unnecessary will not be counted.” *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). “An issue is ‘*genuine*’ if it is real and substantial, as opposed to merely formal, pretended, or a sham.” *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original). Thus, a genuine issue of material fact exists “if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.” *Anderson*, 477 U.S. at 248; *accord Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010); *Wiley*, 585 F.3d at 210; *EMCASCO Ins. Co. v. Am. Int’l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454. The moving parties, however, need not negate the elements of the nonmovant’s case. *See Bayle*, 615 F.3d at 355; *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536,

Case 1:03-cv-01367-MAC Document 110-3 Filed 03/16/12 Page 8 of 45 PageID #: 8322

540 (5th Cir. 2005) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 339 (5th Cir. 2004).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Bayle*, 615 F.3d at 355; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see Riverwood Int'l Corp. v. Emp'rs Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009); *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Estate of Smith*, 391 F.3d at 624; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in her favor. *Groh v. Ramirez*, 540 U.S. 551, 562 (2004) (citing *Anderson*, 477 U.S. at 255); *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park*, LLC, 578 F.3d 255, 258 (5th Cir. 2009); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004); *Martin*, 353 F.3d at 412.

Nevertheless, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008)

(citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992)). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Eastman Kodak Co.*, 504 U.S. at 468-69; *accord Shelter Mut. Ins. Co. v. Simmons*, 543 F. Supp. 2d 582, 584-85 (S.D. Miss.), *aff'd*, 293 F. App'x 273 (5th Cir. 2008). The nonmovant's burden is not satisfied by "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,'" by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)); *accord Thibodeaux v. Vamos Oil & Gas Co.*, 487 F.3d 288, 294-95 (5th Cir. 2007); *Warfield*, 436 F.3d at 557; *Boudreaux*, 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541; *accord RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002); *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 332 (5th Cir. 2004).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

B. Defendants' Motion to Strike Kirby's Affidavit

As a threshold matter, Defendants move to strike Kirby's affidavit—which was signed three days after his deposition, but purportedly not provided to Defendants until recently—arguing that it is a "sham" document that contradicts his deposition testimony without explanation or excuse. Lea responds that Kirby's affidavit does not contradict his deposition testimony and, therefore, is competent summary judgment evidence.

The points of contention between the parties are Kirby's seemingly contradictory statements regarding (1) his reliance on promotional information provided by Defendants when prescribing HRT to Lea and (2) his understanding of the risk of breast cancer associated with HRT. Defendants point to several statements in Kirby's deposition testimony where he acknowledges that he did not rely on information directly from drug manufacturers when making prescribing decisions, that he threw away pharmaceutical companies' promotional materials, and that he was aware of the risk of breast cancer accompanying HRT. In contrast, Kirby's affidavit states that his knowledge of the risks and benefits of HRT was derived from, *inter alia*, information from pharmaceutical sales representatives and materials produced by Defendants, such

as Dear Doctor letters.[6] It further states that Kirby was "not able to fully appreciate the breast cancer risk associated with [HRT]" before the findings of the WHI study were released in 2002.

It is well settled that the United States Court of Appeals for Fifth Circuit "does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citing *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir.), *cert. denied*, 506 U.S. 845 (1992); *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984)); *accord McArdle v. Dell Prods., L.P.*, 293 F. App'x 331, 335 (5th Cir. 2008); *see Copeland v. Wasserstein Perella & Co.*, 278 F.3d 472, 482 n.21 (5th Cir. 2002); *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000), *cert. denied*, 531 U.S. 1073 (2001); *Crowe v. Henry*, 115 F.3d 294, 298 n.4 (5th Cir. 1997). An examination of Kirby's affidavit and deposition testimony reveals such impermissible contradiction regarding his reliance on Defendants' promotional materials. For example, Kirby definitively states throughout his deposition that he routinely disregarded Defendants' marketing materials and did not base his prescribing decisions on information distributed by drug manufacturers. His affidavit, however, reflects that his understanding of the risks and benefits of HRT originates from "sales representatives that visit me or materials left with me by such sales representatives [and] Dear Doctor or Dear Healthcare Professional letters." Further, Lea offers no justification for Kirby's altered testimony. This is precisely the type of unexplained, contradictory statement rejected by the Fifth Circuit in the context of summary judgment proceedings. *See Bouvier v. Northrup Grumman Ship Sys., Inc.*,

[6] A Dear Doctor letter is correspondence mailed by a drug manufacturer to physicians and other health care professionals to convey important information about a medication.

350 F. App'x 917, 920 (5th Cir. 2009) (affirming district court's exclusion of plaintiff's sworn statement, which was inconsistent with her prior deposition testimony); *Pazarin v. Armes*, 512 F. Supp. 2d 861, 870 (W.D. Tex. 2007) (striking plaintiff's affidavit where she provided no explanation for its contradictory statements). Moreover, on September 16, 2011, United States Magistrate Judge Zack Hawthorn excluded the testimony of Lea's marketing practices experts on the ground that Kirby's deposition testimony established that he did not consider Defendants' marking materials and that his affidavit testimony on this topic contained "conclusory generalizations" insufficient to show reliance. Therefore, the portion of Kirby's affidavit that refers to his reliance on Defendants' direct marketing practices is stricken from the record. Nonetheless, the court will consider those portions of Kirby's affidavit that are not inconsistent with his deposition testimony and otherwise constitute competent summary judgment evidence.

C. Failure to Warn

Defendants assert that they are entitled to judgment as a matter of law on Lea's failure to warn claim on the ground that Lea has not overcome the statutory presumption that the warnings accompanying their drugs were adequate. Lea contends that the record evidence supports two exceptions to Texas's statutory presumption against failure to warn claims; namely, that Defendants withheld material information from the FDA and that they promoted their drugs for unapproved uses.

"The existence of a duty to warn of dangers or instruct on the safe use of a product is a question of law." *Woods v. Phillips Petroleum Co.*, 119 S.W.3d 870, 873 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A manufacturer must warn consumers if it knows or should know of potential harm to a user. *Id.* Harms of which a manufacturer should know include those that

are "reasonably foreseeable or scientifically discoverable at the time the product is sold." *Id.* (citing *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1088 (5th Cir. 1973)). Moreover, a manufacturer also has a duty to instruct its users on the safe use of its product, which means that it must "not only keep abreast of scientific knowledge, discoveries, and advances, but, more importantly, test and inspect its product." *Id.* (citing *Borel*, 493 F.2d at 1089-90). Liability for failure to warn is imposed where a manufacturer does not exercise reasonable care in discovering and warning of a given danger. *Id.* at 873 n.6. "In any failure to warn case, the plaintiff must show both that the warning was defective and that it was the producing cause of [her] injury." *Wyeth-Ayerst Labs. Co. v. Medrano*, 28 S.W.3d 87, 94 (Tex. App.—Texarkana 2000, no pet.).

Texas law, however, contains a statutory presumption that a drug manufacturer is not liable for failure to warn if the "warnings or information that accompanied the product in its distribution were those approved by the [FDA] . . . ." TEX. CIV. PRAC. & REM. CODE § 82.007(a)(1); *Ebel v. Eli Lilly & Co.*, 536 F. Supp. 2d 767, 774 (S.D. Tex. 2008), *aff'd*, 321 F. App'x 350 (5th Cir. 2009). This presumption may be rebutted by evidence that: (1) "the defendant . . . withheld from or misrepresented to the [FDA] required information that was material and relevant to the performance of the product and was causally related to the claimant's injury" (the "fraud on the FDA" exception) or (2) "the defendant recommended, promoted, or advertised the pharmaceutical product for an indication not approved" by the FDA, and the claimant used the product as recommended, promoted, or advertised, resulting in his injury (the "overpromotion" exception). TEX. CIV. PRAC. & REM. CODE § 82.007(b)(1), (3).

Here, it is undisputed that the FDA approved the Premarin, Provera, and Prempro warnings. Consequently, Lea must present some evidence that one of the aforementioned exemptions applies to preclude summary judgment on this issue. *See Ackermann v. Wyeth Pharms.*, 471 F. Supp. 2d 739, 749 (E.D. Tex. 2006), *aff'd*, 526 F.3d 203 (5th Cir. 2008) ("In the context of a summary judgment, the party against whom a statutory presumption applies must produce evidence sufficient for the case to proceed to trial."); *Temple Indep. Sch. Dist. v. English*, 896 S.W.2d 167, 169 (Tex. 1995) ("A presumption is simply a rule of law requiring the trier of fact to reach a particular conclusion in the absence of evidence to the contrary."); *Balawajder v. Tex. Dep't of Crim. Justice Inst. Div.*, 217 S.W.3d 20, 27 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (stating that a claimant must produce evidence sufficient to "neutralize the effect of the [statutory] presumption" to survive summary judgment").[7]

1. Fraud on the FDA Exception

Pursuant to § 82.007(b)(1), a plaintiff may rebut Texas's statutory presumption with evidence that:

> [T]he defendant, before or after pre-market approval or licensing of the product, withheld from or misrepresented to the [FDA] required information that was material or relevant to the performance of the product and was causally related to the claimant's injury.

TEX. CIV. PRAC. & REM. CODE § 82.007(b)(1). Defendants contend that this exception is inapplicable for two reasons.[8] First, Defendants claim that Lea has failed to present any evidence

[7] Defendants argue that the plain language of § 82.007(b) requires the claimant to "establish" one of the statutory exceptions. As noted above, however, this assertion is controverted by case law and, further, is inconsistent with the legal standard for summary judgment. FED. R. CIV. P. 56(a).

[8] Defendants also summarily aver that Lea cannot rely on this exception because she did not plead fraud with specificity. Defendants, however, overlook the fact that Lea's complaint alleges myriad fraudulent representations and omissions on their part, including that their warning labels during the

that they withheld information from the FDA. Second, Defendants contend that this exception is preempted by federal law. Both contentions are without merit.

a. Adequacy of Lea's Evidence

Lea has presented sufficient evidence to raise a fact issue regarding whether Defendants withheld material information from the FDA. Federal regulations currently—and during the time in question—require drug manufacturers to revise their labeling "to include a warning as soon as there is reasonable evidence of an association of serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.80(e). Moreover, according to one of Lea's experts, Dr. Cheryl D. Blume ("Blume"), once a drug is approved by the FDA, manufacturers must "collect, collate, and evaluate information about suspected adverse reactions" to their products and share that information with the agency. This process is known as pharmacovigilance and, according to Blume, it is vital to the "FDA's efforts to ensure the continued safety of marketed drug products." A drug manufacturer's duty to detect and promptly alert physicians and the FDA when a potential danger exists is particularly critical, Blume opines, because the agency does not have the resources "to properly evaluate and act upon reports concerning thousands of

relevant time frame represented HRT as a "safe and beneficial medication" despite the fact that HRT purportedly "provide[s] little or no short or long term benefits while exposing the users to significant risk of developing serious medical conditions, including [breast cancer]." In any event, at this stage of the proceeding, Lea has proffered evidence of fraud on the part of Defendants, which will be discussed below, as this is the relevant consideration when considering summary judgment. *See Martin v. Sullivan*, No. 1:06-CV-906, 2011 WL 754886, at *2 (E.D. Cal. Feb. 24, 2011) (distinguishing between a plaintiff's burden at the pleading and summary judgment stage); *Jarbo v. Cnty. of Orange*, No. SA-CV-05-202, 2010 WL 3584440, at *15 (C.D. Cal. Aug. 30, 2010) (rejecting defendant's pleading deficiency argument at summary judgment and reasoning that, while the complaint lacked the pertinent allegations and would have been dismissed pursuant to a 12(b)(6) motion, plaintiff had now come forth with competent evidence supporting his claim); *Lillibridge Health Care Servs. Inc. v. Hunton Brady Architects, P.A.*, No. 6:08-CV-1028, 2010 WL 1417193, at *5 (M.D. Fla. Apr. 7, 2010) (declining to grant summary judgment on the basis of an alleged pleading deficiency).

marketed products." Nevertheless, an examination of the record suggests that Defendants, despite the aforementioned duties, took steps to withhold negative risk data from the public and the FDA.

For example, Defendants were aware of numerous studies evincing a potential connection between HRT and breast cancer. One such study (the "Bergkvist study"), released in 1989 by Dr. Leif Bergkvist, reported a 4.4 relative risk for women who used HRT combination therapy for more than six years. Following the publication of the Bergkvist study, Wyeth issued a memorandum to its sales representatives dictating that "[u]nder no circumstances should you initiate discussions concerning this study. . . . As a representative of Wyeth-Ayerst Laboratories, you should continue to present the benefits of estrogen replacement therapy and discuss pertinent information about conjugated estrogens." Similarly, one of Wyeth's consultants, Dr. Trudy Bush, informed the company in 1994 that a National Cancer Institute study found an increased risk of breast cancer in women on any HRT dose.[9]

These findings called into question the adequacy of Wyeth's labeling, which warns of a possible breast cancer risk only in women on high doses or on long-term, low doses of HRT. Rather than approaching the FDA about this highly relevant risk information as required by federal regulations and its duty of pharmacovigilance, the record reflects that Wyeth sought to discount and minimize the effect of researchers' findings. Specifically, following the release of adverse reports, the company formed public relations committees, directed its sales representatives not to initiate discussions of the findings with prescribing physicians, and mailed Dear Doctor letters aimed at minimizing study results. One such example of Wyeth's attempts to divert attention from

[9] The evidentiary record contains numerous studies and reports with similar results, although only these two are mentioned here.

adverse data is a 1997 company internal memorandum which acknowledges that "a number of national stories have appeared . . . concerning possible links between HRT and breast cancer" but encourages employees not to "raise these articles with your doctors unless they mention them" and, if mentioned, to "highlight that these reports say nothing new . . . and that the long term benefits of HRT still by far outweigh the risks."

Importantly, despite Wyeth's knowledge of a possible connection between E+P use and breast cancer, Prempro's label was not revised to reflect this risk until 2003, when the FDA required Wyeth to include a boxed warning incorporating the WHI's findings. This fact, coupled with the numerous medical studies reporting a link between HRT and breast cancer, is arguably sufficient to rebut the statutory presumption set forth in § 82.007.

As for Upjohn, the FDA questioned the company several times about data suggesting that the addition of progestin to an estrogen-only regimen did nothing to decrease a patient's risk of developing breast cancer. Nevertheless, despite its knowledge of numerous studies noting a risk of human breast cancer associated with E+P use, Upjohn's label proclaimed that the significance of the cancer risk "with respect to humans has not been established." Viewing the evidence in the light most favorable to Lea, these facts, in combination with the research studies contained in the record, raise an issue as to whether Upjohn should have approached the FDA about these adverse findings and revised its label accordingly. Thus, Lea has proffered substantial evidence to rebut the statutory presumption of non-liability as to Upjohn.

Defendants also assert that the information allegedly withheld was not material as required by statute. This contention is belied by the record evidence. First, the serious nature of the risk at issue in and of itself reflects the materiality of the information withheld. Moreover, certain

memoranda exhibit that the FDA "ha[d] repeatedly expressed the opinion that further clinical trials are required to demonstrate the long-term effects of progestin and appropriate doses when administered to oppose the effects of estrogen." In light of the FDA's concern about E+P's side effects, it follows that such breast cancer risk information likely would have been viewed as material by the agency. Thus, Defendants' assertion that the information allegedly withheld was immaterial is unavailing.

The court notes that the evidence discussed above regarding fraud on the FDA is contradicted by the testimony of Lea's own expert, Dr. Suzanne Parisian ("Parisian"), who has stated in other HRT/breast cancer proceedings that she does not believe that Defendants withheld any scientific information from the agency. Nonetheless, viewing the entirety of the record in the light most favorable to Lea, as the court must at this juncture, Lea's proffered evidence arguably rebuts the presumption of § 82.007(a). Accordingly, summary judgment is not warranted.

b. Federal Preemption

Regarding preemption, Defendants do not articulate why the fraud on the FDA exception is preempted by federal law. Nonetheless, it appears that they are basing their argument for preemption on the theory that § 82.007's fraud on the FDA exception interferes with the enforcement of the FDA's power to investigate fraud, rendering it impossible for a private party to comply with both state and federal law requirements. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-51 (2001). In *Buckman*, the United States Supreme Court held that state law fraud on the FDA claims were preempted by federal law. The Court stated that the "federal statutory scheme amply empowers the FDA to punish and deter fraud against the

Case 1:03-cv-01367-MAC Document 110-3 Filed 03/16/12 Page 19 of 45 PageID #: 8333

Administration," striking a balance of statutory objectives that "can be skewed by allowing fraud on the FDA claims under state tort law." 531 U.S. at 348.

Here, however, Lea is not asserting a fraud on the FDA *claim*; rather, she is asserting a common law, state tort claim for failure to warn. *See Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 94 (2d Cir. 2006) (holding *Buckman* inapplicable to traditional state tort law claims); *Ackermann*, 471 F. Supp. 2d at 749-50 (distinguishing between a fraud on the FDA claim and the exception contained in § 82.007(b)(1) and finding that the statutory exception was not preempted); *but see Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 966 (6th Cir. 2004) (stating that the distinction between fraud on the FDA claims and exceptions is usually immaterial); *Lofton v. McNeil Consumer & Specialty Pharm.*, 682 F. Supp. 2d 662, 675 (N.D. Tex. 2010) (same). This distinction is significant, however, because rather than basing her claim on Defendants' purported fraud on the FDA, Lea is asserting that Defendants knew or should have known of the breast cancer risk purportedly associated with HRT and warned their consumers accordingly. Thus, Lea's evidence of fraud is submitted to rebut the statutory presumption against liability and is not the crux of her failure to warn claim. *See Buckman*, 531 U.S. at 352 (distinguishing claims based on a "fraud-on-the-agency" theory from those based on "traditional state tort law principles," which are not preempted); *Hughes v. Boston Sci. Corp.*, 631 F.3d 762, 775 (5th Cir. 2011) (declining to apply *Buckman* preemption where plaintiffs did not attempt to assert "a freestanding federal cause of action based on violation of the FDA's regulations," but rather pleaded violation of a state tort duty). As the *Ackermann* court stated, "[t]he language of § 82.007(a) creates nothing more than a presumption which the defendant is free to raise. It does not create a cause of action where none existed before. If [a] plaintiff comes forward with evidence that the FDA

was somehow misled, [she] has merely rebutted a presumption that the manufacturer is not liable." 471 F. Supp. 2d at 749; *c.f. Wyeth v. Rowatt*, 244 P.3d 765, 781 (Nev. 2010) (opining that if a drug maker knows or should know of increased dangers not already identified on the medication's label, "compliance with the FDA's minimal standard may not satisfy its duty to warn.").

Moreover, the Supreme Court's subsequent holding in *Wyeth v. Levine* appears to foreclose Defendants' preemption argument, and other courts have favorably cited *Levine* in rejecting preemption in the HRT/breast cancer context. *See* ___ U.S. ___, ___, 129 S. Ct. 1187, 1198-99 (2009) (holding that state law failure to warn claims are not preempted where there is no evidence the FDA would not have approved a change in a drug's labeling to address a new risk); *see also In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 563 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 3467 (2010) (finding defendants' preemption argument to be foreclosed by *Levine*); *Brockert v. Wyeth Pharms., Inc.*, 287 S.W.3d 760, 768 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that plaintiff's failure to warn claims were not preempted by federal law); *accord Pustejovsky v. Wyeth, Inc.*, 4:07-CV-103-Y, 2009 WL 3336032, at *1 n.4 (N.D. Tex. Sept. 4, 2009), *aff'd*, 623 F.3d 271 (5th Cir. 2010) (not addressing HRT/breast cancer litigation). Therefore, Lea's failure to warn claim is not preempted by federal law.

2. <u>Overpromotion Exception</u>

The overpromotion exception to § 82.007(a) applies where: (1) the defendant recommended, promoted, or advertised a medication for an indication not approved by the FDA; (2) the product was used as recommended, promoted, or advertised; and (3) the claimant's injury was causally related to the use of the product. TEX. CIV. PRAC. & REM. CODE § 82.007(b)(3). To rely on this exception, Lea must present some evidence that Defendants promoted off-label uses

of their drugs and that her physician was influenced by that marketing scheme. *See Ebel*, 536 F. Supp. 2d at 777; *In re Norplant Contraceptive Prods. Liab. Litig.*, No. MDL 1038, 1997 WL 81092, at *1 (E.D. Tex. Feb. 21, 1997).

Even assuming that Defendants marketed their products for off-label uses, the record is devoid of evidence that Kirby was influenced by that promotion when prescribing HRT to Lea. Kirby states no less than four times in his deposition that he did not believe HRT medications had any other proven benefits beyond relief of menopausal symptoms. For example, when asked if he prescribed hormone therapy for Lea "for any perceived cardiovascular benefit or cognitive benefit," Kirby responded that he "never claimed those benefits to Mrs. Lea or prescribed them to anybody telling them that this is [a] definite benefit." Similarly, when asked if he made a practice of prescribing "menopausal hormones for other potential benefits, like cardiovascular benefits," Kirby replied that he did not and later opined that he did not "think there is proof of [such a benefit]" associated with HRT. In any event, there is no evidence that any purported off-label benefits prompted Kirby to prescribe HRT to Lea or to any other patient. Thus, Lea cannot rely on the overpromotion exception as a matter of law. *See* TEX. CIV. PRAC. & REM. CODE § 82.007(b)(3); *accord In re Norplant Contraceptive Prod. Liab. Litig.*, 1997 WL 81092, at *1.

3. Lea's Evidence of Inadequate Warning

In the alternative, Defendants aver that Lea's failure to warn claim fails because she cannot prove that their HRT testing was inadequate. Specifically, Defendants contend that Lea's failure to warn claim is premised on the theory that Defendants' testing of HRT was insufficient. Therefore, according to Defendants, summary judgment is proper because Lea is unable to show that they failed to test their products as a reasonable drug manufacturer would have. Lea responds

that her failure to warn claim is based not only on a theory of inadequate testing but also on the premise that Defendants' labels were inadequate in light of the information available to them at the time. Both of these theories are pleaded in Lea's Amended Complaint.

On October 6, 2011, Judge Hawthorn determined that certain topics on which Lea's regulatory experts planned to testify were inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Nonetheless, Judge Hawthorn ruled other testimony, including the experts' opinions "that Defendants' warnings were inadequate based on what Defendant[s] actually knew of the science of hormone replacement therapy at the time," admissible, and Lea may rely on this evidence in opposition to summary judgment. Specifically, the record contains testimony from Parisian and Blume that Defendants' labeling inadequately warned of the breast cancer risk associated with E+P use for less than ten years based on the information known by Defendants during the relevant period. Moreover, the evidence of research findings discussed above is probative of whether Defendants' warnings were adequate in light of the information known at the time.

Furthermore, while Judge Hawthorn excluded any testimony pertaining to what Defendants *should* have done in regard to testing their products, he permitted Lea's experts to proffer an opinion as to what Defendants *could* have done to discover more about the science of HRT and its associated risks. In that vein, Blume and Parisian both opined that Defendants could have conducted a large clinical trial to reveal such a correlation. Also present in the record is testimony from several senior Wyeth doctors and research advisors acknowledging that the company did not conduct its own internal, independent studies to identify a possible link between HRT and the development of breast cancer. For example, Dr. Harold Marder, Wyeth's former senior vice

president and global medical director and head of Global Medical Affairs for the company, stated that he is unaware of any internal study conducted to determine whether E+P causes cancer. Likewise, Dr. Pamela Cobb, who served as Wyeth's director of global medical affairs for women's health from 2000-2003, confirmed that Wyeth has never performed a long-term clinical trial to determine the cancer risk associated with HRT use. Finally, Dr. Rodney F. Carlson, Upjohn's director of U.S. Medical Affairs, testified that Upjohn did not conduct its own epidemiological study on the relationship of postmenopausal progestins and breast cancer. These statements, coupled with the research studies referenced above, are sufficient to raise a fact issue as to the adequacy of Defendants' warnings.

D. Design Defect

Defendants next argue that Lea's design and manufacturing claims are legally infirm under the Second and Third Restatement of Torts. Lea responds that she is pursuing only a design, not a manufacturing, defect claim and has provided evidence regarding a safer alternative design to Prempro.[10] "A design defect renders a product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use." *Brockert*, 287 S.W.3d at 769 (citing *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999)). To recover on a design defect claim in Texas, a plaintiff must show: (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was the producing cause of the injury for which the plaintiff seeks recovery. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009) (citing TEX. CIV. PRAC. & REM. CODE § 82.005);

[10] Given that Lea is not pursuing a manufacturing defect claim, the court will confine its discussion to the issue of design defect.

Case 1:03-cv-01367-MAC Document 110-3 Filed 03/16/12 Page 24 of 45 PageID #: 8338

*Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 255-56 (Tex. 1999). "The focus on a design defect claim . . . is whether there was a reasonable alternative design that, at a reasonable cost, would have reduced a foreseeable risk of harm." *Timpte*, 286 S.W.3d at 314. Absent evidence of a safer alternative, a product is not unreasonably dangerous as a matter of law. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995). Nevertheless, the reasonableness of an alternative design is generally a question of fact for the jury. *See Timpte*, 286 S.W.3d at 311; *accord Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895, 900 (E.D. Va. 2010).

1. Restatement (Third) of Torts: Products Liability

Defendants point to § 6(c) of the Restatement (Third) of Torts: Products Liability to support their contention that they are entitled to summary judgment on Lea's design defect claim. Section 6(c) states:

> A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 6(c) (1998). Defendants concede, however, that Texas has not adopted § 6(c), and this standard is not binding. The court's research has failed to unearth any Texas or Fifth Circuit authority applying the standard articulated in § 6(c) in the context of a design defect claim. Thus, in the absence of controlling law, the court declines to rely on § 6(c) as a basis for summary judgment in this case. *See Chesson v. Hall*, No. H-01-315, 2005 WL 2045570, at *38 (S.D. Tex. Aug. 25, 2005) (refusing to grant summary judgment in the absence of binding precedent).

2. Restatement (Second) of Torts

Alternatively, Defendants maintain Lea's design defect claim fails under comment k to § 402A of the Restatement (Second) of Torts, which has been adopted by the Texas Supreme Court. *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997). Comment k states:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. [This] is true of many . . . drugs, vaccines, and the like, many of which for this reason cannot legally be sold except to physicians, or under the prescription of a physician. . . . The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

RESTATEMENT (SECOND) OF TORTS § 402A cmt. k (1965).

The parties dispute whether comment k is universally applicable to all prescription drugs. Defendants contend that it is, citing *Hackett v. G.D. Searle & Co.* 246 F. Supp. 2d 591, 595 (W.D. Tex. 2002) ("Defendants can only be held strictly liable if the drug was not properly prepared or marketed or accompanied by proper warnings."); *see also Tatum v. Schering Corp.*, 795 F.2d 925, 926 (11th Cir. 1986) ("Because ethical drugs are considered unavoidably unsafe products, they are defective only when not accompanied by an adequate warning."). Lea avers that a majority of courts employ a case-by-case approach in determining which products fall within comment k's protection. *See Hill v. Searle Labs., a Div. of Searle Pharms., Inc.*, 884 F.2d 1064, 1069 (8th Cir. 1989) ("The drafters of comment k did not intend to grant all manufacturers of prescription drugs a blanket exception to strict liability."); *Weiss v. Fujisawa Pharm. Co.*, No. 5:05-527-JMH, 2006 WL 3533072, at *3 (E.D. Ky. Dec. 7, 2006) ("The court agrees with the

majority position that the case-by-case analysis is better supported by the language of comment k."); *Freeman v. Hoffman-La Roche, Inc.*, 260 Neb. 552, 560 (Neb. 2000) ("The majority of jurisdictions that have adopted comment k apply it on a case-by-case basis, believing that societal interests in ensuring the marketing and development of prescription drugs will be adequately served without the need to resort to a rule of blanket immunity."). In any event, the court need not decide the applicability of comment k because, even under the more stringent interpretation, Lea's evidence raises a fact issue as to the sufficiency of the warnings utilized by Defendants.

The Texas state and federal case law concerning the application of comment k is sparse. Nonetheless, even courts that have suggested that comment k precludes the assertion of a design defect claim in the prescription drug context have tempered that notion with a recognition of the fact that sufficient warnings must accompany the product. *See Hackett*, 246 F. Supp. 2d at 595 ("The Court thus holds that under Texas law and comment k of the Restatement, Defendants can only be held strictly liable if the drug was not . . . accompanied by proper warnings."); *Holland v. Hoffman-La Roche, Inc.*, No. 3:06-CV-1298-BD, 2007 WL 4042757, at *3 (N.D. Tex. Nov. 15, 2007) (same); *c.f. Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1274 (5th Cir. 1974) ("[A]n unavoidably unsafe product is neither defective nor unreasonably dangerous if . . . accompanied by proper directions and warning"); *Centocor, Inc. v. Hamilton*, 310 S.W.3d 476, 515-16 (Tex. App.—Corpus Christi 2010, pet. granted) (rejecting defendant's assertion that, under comment k, no liability could be imposed for a medication that "could not possibly be made entirely safe" and reasoning that the Restatement's solution to an unavoidable unsafe product is an adequate warning). Indeed, the express language of comment k repeatedly emphasizes the necessity of appropriate warnings in the context of "unavoidably unsafe products," such as prescription

medications. *See* RESTATEMENT (SECOND) OF TORTS § 402A cmt. k ("Such a product, properly prepared, and accompanied by proper directions and warning, is not defective nor is it *unreasonably* dangerous. . . . The seller of such products, again with the qualification that they are properly prepared and marketed, and that proper warning is given, where the situation calls for it, is not to be held strictly liable. . . .).

In the case at bar, the record contains evidence calling into question the adequacy of the warnings accompanying Defendants' products. Specifically, Blume and Parisian both opine that the warnings included on Defendants' labels were inadequate in light of the science available at the relevant time. *See Blackmon v. Am. Home Prods. Corp.*, 328 F. Supp. 2d 659, 664 (S.D. Tex. 2004) (noting that comment k rejects design defect claims if a product includes a sufficient warning). Hence, comment k does not bar Lea's design defect claim, and the adequacy of Defendants' warnings is a question of fact for the jury.[11] *See McNeil v. Wyeth*, 462 F.3d 364, 368 (5th Cir. 2006) ("Texas law generally holds that the adequacy of a product's warning is a question of fact to be determined by the jury); *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 592 (Tex. 1986) (recognizing that the sufficiency of a warning is a question of fact to be determined by the jury).

3. Evidence of Safer Alternative Design

Defendants also move for summary judgment on the ground that Lea cannot demonstrate the existence of a safer alternative to E+P. In response, Lea proposes two safer alternative

[11] Additionally, the court was unable to locate any Texas state case holding that comment k precludes design defect claims in the prescription drug context. To the contrary, courts have considered the merits of a plaintiff's claim even where the defendant asserted comment k's applicability. *See, e.g., Merck & Co., Inc. v. Garza*, 277 S.W.3d 430 (Tex. App.—San Antonio 2008), *rev'd on other grounds*, 54 Tex. Sup. Ct. J. 1697 (2011); *Brockert*, 287 S.W.3d at 769.

designs: (1) a low-dose form of Prempro and (2) substitution of an oral micronized progesterone ("OMP"), a non-synthetic or "natural" progestin drug, for the P component.

On September 26, 2011, the parties filed an agreed stipulation as to the scope of testimony to be elicited from Parisian and Blume. They expressly agree that Parisian and Blume may offer opinions regarding the "risks and benefits of Prempro, whether the drug was unreasonably dangerous (*i.e.*, defect design) and available safer alternatives." *See* Docket No. 133. Further, the record contains testimony from Parisian and Blume pertaining to the recommended use of a lower dose of E+P for a shorter duration as well as testimony from Parisian regarding the availability of low-dose Prempro. In addition, testimony from Dr. Graham Colditz suggests that higher doses of E+P elevate the risk of breast cancer. Finally, Defendants' post-WHI label warns women to use a low dose of E+P for the shortest possible duration. Viewed in the light most favorable to Lea, this evidence is sufficient to defeat summary judgment as to her design defect claim. *See Torkie-Tork*, 739 F. Supp. 2d at 900 (denying summary judgment on design defect claim where plaintiff proffered evidence of low-dose Prempro as a safer alternative to E+P).

Regarding Lea's second proposed alternative design, Judge Hawthorn issued an order on September 16, 2011, excluding proffered testimony from Drs. Wayne Tilley ("Tilley") and Donald Austin ("Austin") advocating OMP as a safer alternative, reasoning that the studies upon which the experts base their opinions are unreliable. Judge Hawthorn found that the 2007 Espié, 2005 Fournier, and 2002 Ligniéres studies render Tilley's and Austin's proffered testimony unreliable because the studies yielded statistically insignificant results. Further, the Wood monkey study was deemed unreliable because Tilley did not extrapolate its findings to demonstrate comparable effects in humans. Although an order excluding similar testimony from other experts

has not been entered, the court finds Judge Hawthorn's order persuasive. Thus, to the extent other experts, including Parisian and Blume, rely on these same studies, their testimony advocating OMP as a safer alternative is similarly inadmissible.

E. Fraud and Misrepresentation

Defendants also maintain that Lea's fraud and misrepresentation claims fail as a matter of law. Specifically, Defendants assert that: (1) Lea's fraud claim is not pleaded with the requisite specificity; (2) there is no evidence Defendants made an intentionally false statement to Lea or Kirby (her prescribing physician); (3) no evidence exists that either Lea or Kirby relied on any alleged misrepresentation by Defendants; and (4) even if there is evidence of reliance, the learned intermediary doctrine bars Lea's claim. Defendants likewise attack Lea's negligent misrepresentation claim on the ground that she lacks evidence of a false statement and/or reliance. Lea counters that Defendants made—and she and Kirby relied on—false representations regarding the breast cancer risk associated with HRT. She also contends that Defendants omitted material facts about the danger of the drugs, which gives rise to a claim for fraud under Texas law.

1. Fraud

In Texas, fraud may consist of an affirmative misrepresentation or, in certain circumstances, the concealment or non-disclosure of a material fact. *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied). To recover for fraud in the context of a positive representation, Lea must establish that:

(1) the defendant made a material representation concerning an existing fact;

(2) the representation was false when it was made;

(3) the speaker knew the misrepresentation was false, or made it recklessly without knowledge of its truth and as a positive assertion;

Case 1:03-cv-01367-MAC Document 110-3 Filed 03/16/12 Page 30 of 45 PageID #: 8344

(4) the speaker made the misrepresentation with the intent that it should be acted upon;

(5) the plaintiff acted with justifiable reliance on the misrepresentation; and

(6) the plaintiff suffered injury as a result.

*See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009); *Malacara v. Garber*, 353 F.3d 393, 404-05 (5th Cir. 2003); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 322 (5th Cir. 2002); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir.), *cert. denied*, 522 U.S. 966 (1997); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001). "The first requirement of this test can be met if the defendant concealed or failed to disclose a material fact when a duty to disclose existed." *United Teacher Assoc. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005); *see also Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (stating that "fraud by non-disclosure is simply a subcategory of fraud"). In the case at bar, Defendants had a duty to disclose that the risk of developing breast cancer as a result of ingesting HRT exceeded that reported on their warning labels. *See* 21 C.F.R. § 201.80(e) (requiring drug manufacturers to revise their labeling in response to evidence of a significant hazard associated with their products); *see also* Docket No. 69, exhibit 7 (Blume opining that a drug manufacturer's duty of pharmacovigilance mandates that it alert physicians and the FDA of a potential danger). "Fraud is never presumed, and it is plaintiff's burden to allege and prove actionable fraud." *William B. Roberts, Inc. v. McDrilling Co.*, 579 S.W.2d 335, 339 (Tex. Civ. App.—Corpus Christi 1979, no writ). In the instant case, Defendants aver that Lea lacks evidence of a false statement of material fact, intent, and/or reliance.

a. Lea's Evidence of a False Statement

Defendants first maintain that Lea's fraud claim is legally infirm because she failed to identify a specific false statement in her Amended Complaint. Defendants' briefing on this issue is confined to attacking her complaint on Rule 9(b) grounds. This argument is unavailing at this juncture of the proceeding. *See Jarbo*, 2010 WL 3584440, at *15 (reasoning that pleading failure is irrelevant at the summary judgment stage); *Lillibridge Health Care Servs., Inc.*, 2010 WL 1417193, at *5 ("Summary judgment is not the appropriate time to raise pleading issues."). In any event, contrary to Defendants' contention, Lea's complaint is replete with ostensibly false statements and/or nondisclosures on the part of Defendants, including that "HRT drugs were safe, effective, could be safely used at prescribed doses, and could be safely prescribed for long-term use" and that "HRT drugs were safe, fit, and effective for human consumption."

b. Lea's Evidence of Intent

Defendants next contend that Lea lacks evidence of intent. To prevail on a common law fraud claim, the plaintiff must show that the defendant had an intent to mislead. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Stanfield v. O'Boyle*, 462 S.W.2d 270, 272 (Tex. 1971)); *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994); *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 302 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "[A] statement is not fraudulent unless the maker knew it was false when he made it or made it recklessly without knowledge of the truth." *Prudential Ins. Co. of Am. v. Jefferson Assoc., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied*, 498 U.S. 1048

(1991); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977)); *Ritchey v. Pinnell*, 324 S.W.3d 815, 820 n.8 (Tex. App.—Texarkana 2010, no pet.).

According to Defendants, none of the evidence in this case reveals any knowledge on their part that their products were unsafe or ineffective. Defendants, however, miss the forest for the trees. Lea's evidence, when viewed collectively, creates a fact issue regarding Wyeth's intent. Lea points to several internal Wyeth documents generated following the release of unfavorable research studies that suggest the company intentionally misled the public regarding the breast cancer risk associated with its products. For example, several memoranda highlight the company's goal to "undermine/cast doubt on [the] validity of [the] data" and communicate that there was "no definitive answer regarding [HRT's] impact on breast cancer." Lea has also submitted a letter from Wyeth to its sales representatives that acknowledges recent negative media reports discussing a link between HRT and breast cancer and directs representatives not to "raise these articles with your doctors unless they mention them to you."

Moreover, summary judgment is "generally inappropriate where inferences parties seek to draw deal with questions of motive and intent." *Williams v. Upjohn Co.*, 153 F.R.D. 110, 116 (S.D. Tex. 1994); *see also Thompson v. Cont'l Airlines*, 18 S.W.3d 701, 704 (Tex. App.—San Antonio 2000, no pet.). Accordingly, there exists a genuine issue of material fact as to Wyeth's intent, and summary judgment on this ground is not warranted.

Lea's evidence of Upjohn's intent, however, is lacking. In her response to Defendants' argument on this point, Lea confines her briefing entirely to the record evidence pertaining to Wyeth and does not mention or cite any evidence to raise a fact issue as to Upjohn's intent. This court is "not like [a] pig[], hunting for truffles buried in briefs," and will not scour the record to

unearth evidence that it is Lea's burden to highlight to the court. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also Eyikogbe v. Tex. State Dep't of Highways & Public Transp.*, 990 F.2d 1252, 1252 (5th Cir. 1993). Thus, summary judgment in favor of Upjohn is appropriate on Lea's fraud claim.

c. The Learned Intermediary Doctrine and Lea's Evidence of Reliance

Furthermore, to recover on a fraudulent representation claim, "a plaintiff's reliance on 'the defendant's fraudulent conduct must be justifiable as well as actual.'" *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1050 (5th Cir.), *cert. denied*, 506 U.S. 822 (1992) (quotation omitted); *see Lewis v. Bank of Am. NA*, 343 F.3d 540, 546-47 (5th Cir. 2003), *cert. denied*, 540 U.S. 1213 (2004); *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 906 (5th Cir. 2002), *cert. denied*, 538 U.S. 1034 (2003); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 762 F. Supp. 2d 942, 967 (S.D. Tex. 2010); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 797 (Tex. 2002) (citations omitted). Justifiable reliance consists of two elements: (1) the plaintiff must in fact rely on the information; and (2) the reliance must be reasonable. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 501-02 (5th Cir. 2000); *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir.), *cert. denied*, 519 U.S. 869 (1996); *Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 526 (5th Cir. 1987). The reasonableness of the plaintiff's reliance is assessed in view of the "'individual['s] characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud.'" *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 356 (5th Cir. 1996), *cert. denied*, 519 U.S. 1078 (1997) (quotation omitted); *accord Brittan Commc'ns Int'l Corp.*, 313 F.3d at 906 (citations omitted); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913,

Case 1:03-cv-01367-MAC Document 110-3 Filed 03/16/12 Page 34 of 45 PageID #: 8348

923 (Tex. 2010); *Smith v. Harrison Cnty.*, 824 S.W.2d 788, 793 (Tex. App.—Texarkana 1992, no writ). Moreover, "the reasonableness of a person's reliance on a particular representation is to be determined by the nature of the representation and the circumstances surrounding the making of the representation." *Smith*, 824 S.W.2d at 793; *see Bykowicz*, 950 F.2d at 1050-51; *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). There can be no justifiable reliance where the representations were such that "''any person of normal intelligence, experience, and education would recognize [them] at once as preposterous . . . or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery.''" *Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1186 (5th Cir. 1993) (quotation omitted); *see also Grant Thornton LLP*, 314 S.W.3d at 923 (citing *Lewis*, 343 F.3d at 546). "Put another way, there must be a reasonable relation between the contents of the defendant's misrepresentation and the action the plaintiff took in reliance." *Geosearch, Inc.*, 819 F.2d at 526.

In a products liability action such as the case at bar, however, the salient issue is not Lea's reliance on Wyeth's statements but her physician's. This is because where, as here, the crux of a plaintiff's suit is based on a failure to warn, the learned intermediary doctrine applies to strict liability, negligence, misrepresentation, and breach of warranty claims. *Ebel*, 536 F. Supp. 2d at 773. The learned intermediary doctrine is a products liability defense that limits a drug manufacturer's duty to warn to only "an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use." *Reyes*, 498 F.2d at 1276; *accord*

*Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 207 (5th Cir. 2008) (*Ackermann II*). The Texas Supreme Court has explained the reasoning behind the doctrine:

> In some situations, courts have recognized that a warning to an intermediary fulfills a supplier's duty to warn ultimate consumers. For example, when a drug manufacturer properly warns a prescribing physician of the dangerous propensities of its product, the manufacturer is excused from warning each patient who receives the drug. The doctor stands as a learned intermediary between the manufacturer and the ultimate consumer.

*Alm*, 717 S.W.2d at 591-92; *see also Ackermann II*, 526 F.3d at 207. Therefore, to survive summary judgment based on the learned intermediary doctrine, a plaintiff must produce evidence that (1) a product's warning was inadequate and (2) an adequate warning would have resulted in a physician not using or prescribing the product. *Ebel*, 536 F. Supp. 2d at 778; *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 823 (E.D. Tex. 2002).

In the instant case, there is sufficient evidence, previously discussed, to raise a fact issue as to whether Defendants' warnings to its prescribing physicians were adequate.[12] Furthermore, Kirby stated in his affidavit that had he known of the "risks and lack of benefit of [HRT] as determined by the WHI study, [he] would not have prescribed combination hormone therapy for [Lea] in the same dose and duration."[13] *See McNeil*, 462 F.3d at 372 (reversing summary

---

[12] To the extent Lea's reliance is relevant, Lea has produced evidence of that, as well. Kirby testified that he advised Lea of the risks and benefits of HRT consistent with its labeling. After communicating the risks and benefits, Kirby permitted his patient to make the "ultimate decision" whether to ingest the medication. It reasonably follows, therefore, that Lea relied upon the statements contained in Wyeth's labeling to determine whether to take HRT.

[13] As a matter of clarification, the court distinguishes between Kirby's statements regarding his reliance on Defendants' promotional marketing materials, which were stricken *supra*, and his testimony regarding the significance of Defendants' representations in their warning labels, which is competent summary judgment evidence. Specifically, Kirby stated at deposition that he occasionally consulted the Physician's Desk Reference, which contains drug warnings and contraindications, in regard to his prescribing decisions. Further, Kirby asserted reliance on conversations with colleagues; medical articles, some of which may have been ghost written by Wyeth; continuing education lectures; and medical

judgment where learned intermediary's testimony suggested he may not have prescribed drug to plaintiff had there been a stronger warning label and opining that "[w]arning . . . of a much lower risk than the actual risk could render the warning not just misleading, but ineffective"). Kirby also testified at deposition that his prescribing practices for HRT changed significantly after the WHI, as he was able to appreciate more fully the breast cancer risk associated with Defendants' products. *See Mauldin v. Upjohn Co.*, 697 F.2d 644, 647 (5th Cir. 1983) (finding that whether physician would have prescribed medication but for inadequate warning to be an issue for the jury where the doctor testified that he would have advised plaintiff differently of risks if manufacturer's warning had been more detailed) (applying Louisiana law); *In re Prempro Prods. Liab. Litig.*, No. 4:03-CV-1507-WRW, 2006 WL 1897267, at *2 (E.D. Ark. July 11, 2006) (finding a fact issue regarding whether physician would have prescribed HRT in the same manner where doctor testified that his prescribing practices had changed as a result of fully understanding the breast cancer risk). Accordingly, the court concludes that Lea's fraud claim as its pertains to Wyeth is not barred as a matter of law.

2. <u>Negligent Misrepresentation</u>

In addition to her intentional fraud claim, Lea asserts a negligent misrepresentation cause of action. Defendants contend that summary judgment is appropriate on the issue of negligent misrepresentation because Lea lacks evidence of a false representation and/or reliance. Lea

---

bulletins. Given the aforementioned evidence that Defendants often misrepresented the significance of the breast cancer risk associated with their products to the medical community, it follows that even Kirby's reliance on outside sources of information may have been colored by Defendants' public relations campaign. Regardless, Kirby also testified that he trusts drug manufacturers, including Defendants, to provide accurate information regarding the risks and benefits associated with their products, and his affidavit states that "he relies upon such information in forming my assessments of drugs as well as during my discussions with patients about drugs." Accordingly, Kirby's testimony regarding his reliance on Defendants' warning labels is probative of the issues in this case.

responds that the evidence supports her contention that Defendants failed to exercise reasonable care in their decisions to omit information from their labeling, giving rise to her claim.

Under Texas law, to recover for negligent misrepresentation, the plaintiff must establish that:

(1) a representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest;

(2) the defendant supplied "false information" for the guidance of others in their business;

(3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and

(4) the plaintiff suffered pecuniary loss by justifiably relying on the representation.

*See Gen. Elec. Capital Corp. v. Posey*, 415 F.3d 391, 396-96 (5th Cir. 2005); *First Nat'l Bank of Durant v. Trans Terra Corp.*, 142 F.3d 802, 809 (5th Cir. 1999) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)); *Clardy Mfg. Co.*, 88 F.3d at 356; *Nazareth Int'l, Inc. v. J.C. Penny Co., Inc.*, 287 S.W.3d 452, 459 (Tex. App.—Dallas 2009, pet. denied); *Jeffries v. Pat A. Madison, Inc.*, 269 S.W.3d 689, 691 (Tex. App.—Eastland 2008, no pet.).

As with fraud, to prevail on a claim for negligent misrepresentation, the plaintiff must prove "justifiable reliance" on the misrepresentation. *See Posey*, 415 F.3d at 396; *Clardy Mfg. Co.*, 88 F.3d at 358; *Scottish Heritable Trust, PLC*, 81 F.3d at 615; *Geosearch, Inc.*, 819 F.2d at 526; *Grant Thornton LLP*, 314 S.W.3d at 923. To determine whether a plaintiff's reliance is justifiable, "courts inquire whether—given a . . . plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part." *Clardy Mfg. Co.*, 88 F.3d at 360; *see Scottish Heritable Trust*, 81 F.3d at 615; *Beijing Metals & Minerals Import/Export*

*Corp.*, 993 F.2d at 1186; *Grant Thornton LLP*, 314 S.W.3d at 923. Moreover, if a party is sophisticated and experienced, "that may be evidence that he did not rely on the seller's representations but on his own expertise. The degree of sophistication is evidence for the trier of fact to consider in deciding the issue of reasonable or justifiable reliance." *Lutheran Bhd. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 308 (Tex. App.—Texarkana), *vacated on other grounds*, 840 S.W.2d 384 (Tex. 1992).

The same allegedly false representations that support Lea's intentional fraud claim are also applicable in the negligent misrepresentation context; namely, Defendants' statements regarding the risk/benefit analysis of HRT. Furthermore, the evidence of reliance discussed above is equally apropos here. Indeed, Kirby acknowledged that he relied upon Defendants' warnings when advising his patients, including Lea, about HRT use. Moreover, the evidence reveals that Kirby's subsequently acquired heightened understanding of the breast cancer risk accompanying HRT altered his prescribing practices. *See McNeil*, 462 F.3d at 372; *Mauldin*, 697 F.2d at 647.[14] In fact, the record indicates that after the results of the WHI were announced, the number of his prescriptions for HRT declined precipitously. Although Kirby is a sophisticated physician experienced in prescribing medication, his testimony, viewed in the light most favorable to Lea, precludes summary judgment on the issue of negligent misrepresentation.

---

[14] Furthermore, as to Lea's reliance, she was a woman in her 50s at the time of her ingestion of HRT and was not sufficiently well-versed in medical matters or sophisticated enough to render her reliance unjustifiable. *See Hannon, Inc. v. Scott*, No. 02-10-00012-CV, 2011 WL 1833106, at *8 (Tex. App.—Fort Worth May 12, 2011, pet. denied) (considering plaintiff's individual abilities and characteristics when determining whether his reliance on statement was justifiable); *1001 McKinney Ltd.*, 193 S.W.3d at 30 (reasoning that jury should determine whether plaintiff's reliance was justified where evidence suggested a difference in the parties' sophistication).

F. Breach of Warranty

Lea originally asserted a breach of express warranty and a breach of implied warranty claim, and Defendants move for summary judgment on both theories of liability. In Lea's response to the instant motion, however, she withdraws her express warranty claim. Thus, this claim is dismissed, and the court need not reach the issue of express warranty. As to Lea's implied warranty claim, Defendants argue that they are entitled to judgment as a matter of law on two grounds: (1) Lea did not provide them with pre-suit notice of the claim and (2) there is no evidence of a product defect, a fundamental prerequisite for a breach of implied warranty action.

Implied warranties are derived primarily from statute, although some have their origin at common law. *See Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 666 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Canfield v. Bank One, Tex., N.A.*, 51 S.W.3d 828, 839 (Tex. App.—Texarkana 2001, pet. denied). Implied warranty claims arise by operation of law for any sale of goods in Texas. *See Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 353 (Tex. 1987) (citing *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex. 1984); *Humber v. Morton*, 426 S.W.2d 554, 556 (Tex. 1968)); *Canfield*, 51 S.W.3d at 839. Here, Lea asserts a claim for breach of the implied warranty of merchantability, which requires that goods "are fit for the ordinary purposes" for which they are used. *See* TEX. BUS. & COMM. CODE § 2.314. To prevail on an action for breach of the implied warranty of merchantability, a plaintiff must show: (1) the defendant sold or leased a product to the plaintiff; (2) the product was unmerchantable; (3) the plaintiff notified the defendant of the breach; and (4) the plaintiff suffered injury. *Helen of Troy, L.P. v. Zotos Corp.*, 511 F. Supp.

2d 703, 724 (W.D. Tex. 2006); *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003, no pet.).

As noted above, notice is a required element of an implied warranty of merchantability claim. *Helen of Troy, L.P.*, 511 F. Supp. 2d at 724; *Polaris Indus., Inc.*, 199 S.W.3d at 336. Here, Lea does not attempt to refute Defendants' assertion that she failed to provide pre-suit notice of her implied warranty claim. Consequently, Lea has failed to present "specific facts in support of allegations essential to [her] claim and on which [she bears] the burden of proof at trial." *Silva v. Chertoff*, 512 F. Supp. 2d 792, 802 (W.D. Tex. 2007); *accord Celotex*, 477 U.S. at 317. Accordingly, summary judgment in favor of Defendants is warranted as to Lea's implied warranty claim.

G. Deceptive Trade Practices Act ("DTPA")

The Texas DTPA provides: "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful . . ." TEX. BUS. & COM. CODE ANN. § 17.46(a). Defendants move for judgment as a matter of law on Lea's DTPA claim, arguing that there is no evidence that they made a false representation or that Lea relied on any such representation. Additionally, Defendants maintain that summary judgment is proper because the DTPA excludes causes of action for bodily injury or the infliction of mental anguish, subject to two exceptions inapplicable here. Lea counters that she has adduced sufficient evidence regarding an alleged DTPA violation to preclude judgment as a matter of law. The court has already highlighted evidence of false statements and reliance in previous sections and need not revisit that analysis here. Suffice it to say, the same fact issues similarly prevent summary judgment on this cause of action.

Defendants' remaining argument pertains to § 17.49(e) of the Act, which provides that, subject to certain exceptions, the DTPA is inapplicable to "a cause of action for bodily injury or death or for the infliction of mental anguish." TEX. BUS. & COM. CODE ANN. § 17.49(e). One of the aforementioned exceptions, however, permits the recovery of economic damages where the plaintiff is pursing a DTPA claim for unconscionable conduct. *Id.* § 17.50(a)(3). Lea's Amended Complaint includes allegations of unconscionable conduct on the part of Defendants.

An examination of Lea's Amended Complaint reveals that, while she asserts non-economic damages as to her other causes of action, she limits the damages pertaining to her DTPA claim to "economic damages, including but not limited to, reimbursement for prescription costs, cost of medical testing, [and] medical expenses incurred to date and necessary in the future." She further seeks mental anguish damages, damages for unjust enrichment, and attorneys' fees and costs.

Under the Act, economic damages are defined as "compensatory damages for pecuniary loss, including costs of repair and replacement," but do not include "exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society." *Id.* § 17.45(11). This definition appears to include reimbursement for medical expenses. *See Akin v. Bally Total Fitness Corp.*, No. 10-05-280-CV, 2007 WL 475406, at *4 (Tex. App.—Waco Feb. 14, 2007, pet. denied) (reversing trial court's grant of summary judgment pursuant to § 17.49(e) where plaintiff in bodily injury suit alleged damages resulting from unconscionable action); *accord* Richard M. Alderman, *Texas Deceptive Trade Practices Act*, 15 J. CONSUMER & COM. L. 2, 4 (2011) ("[A] consumer may recover any economic damages arising out of an incident involving a personal injury, such as hospital bills or lost income."). Moreover, in the non-DTPA context, Texas law recognizes

medical costs as a form of economic damages. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 763 (Tex. 2003) ("Traditionally, economic damages are those that compensate an injured party for lost wages, lost earning capacity, and medical expenses."); *Didur-Jones v. Family Dollar, Inc.*, No. 2-09-069-CV, 2009 WL 3937477, at *2 (Tex. App.—Fort Worth Nov. 19, 2009, pet. denied) (characterizing medical bills as economic damages). Finally, under the DTPA, a plaintiff may recover damages for mental anguish where the fact finder determines that the defendant acted knowingly or intentionally. *Id.* § 17.50(b)(1). Accordingly, as all of the DTPA damages sought by Lea are permitted by statute, Defendants are not entitled to summary judgment on this basis. *See* TEX. BUS. & COM. CODE §§ 17.50(b)(4), (d) (authorizing damages to "restore to any party to the suit any money . . . which may have been acquired in violation of" the Act and an award of attorneys' fees and costs, respectively).

H. Negligence *Per Se* and Assault and Battery

Defendants also move for summary judgment on Lea's negligence *per se* and assault and battery causes of action. Lea's response brief, however, expressly abandons these claims and, therefore, they are dismissed. Accordingly, the court need not address these issues.

I. Lea's Evidence Against Upjohn

Upjohn contends that it should be dismissed from this action because Lea has failed to proffer evidence that she took Upjohn's brand of Provera or any product manufactured by the company. Lea responds that the record evidence is sufficient to create a fact issue regarding her use of Provera. The court agrees.

"A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury." *Gaulding v. Celotex Corp.*,

772 S.W.2d 66, 68 (Tex. 1989); *see In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990); *Rodrigues v. Gen. Elec. Corp.*, 204 F. Supp. 2d 975, 976 (E.D. Tex. 2001); *Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 477 n.3 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Here, Lea has presented some evidence that she ingested an Upjohn product, including medical records indicating that Kirby prescribed Provera, not a generic, and an affidavit from her daughter, Brette Lea ("Brette"), stating that she recalls Lea taking a hexagon-shaped pill[15] she believed to be Provera.[16]

Defendants argue that the court should disregard this evidence, contending that Lea could have taken a generic medication not manufacturer by Upjohn. Indeed, Kirby acknowledged at deposition that he was not opposed to a patient filling a Provera prescription with a generic, and Lea stated in her own deposition that she did not remember taking Provera. Nonetheless, the court is not convinced this entitles Upjohn to judgment as a matter of law. Texas law permits, rather than requires, a pharmacist to dispense a generic equivalent under certain circumstances. 22 TEX. ADMIN. CODE § 309.3. Furthermore, Kirby's medical records explicitly reflect that he prescribed Provera to Lea rather than designating a generic equivalent. *Compare Michael v. Wyeth, LLC*, No. 2:04-0435, 2011 WL 2011485, at *4-5 (S.D.W.V. May 23, 2011) (denying summary judgment

---

[15] Provera is dispensed as a hexagon-shaped pill.

[16] Defendants argue that the court should not consider Brette's affidavit because she was not identified as a fact witness on Lea's "fact sheet." The court disagrees. The JPML court required each *plaintiff*, not plaintiff's counsel, to complete a "fact sheet" identifying all persons who possessed information regarding her illness. Lea listed two physicians and her husband. It is reasonable to assume that Lea, who suffers from dementia, may not have recalled that her daughter had knowledge of relevant information. Further, Lea, who presumably is unsophisticated when it comes to legal matters, may not have appreciated the need to list Brette on her "fact sheet." In any event, there is no indication that the JPML court intended that an individual's exclusion from the"fact sheet" would disqualify him or her as a witness. Accordingly, the court will consider Brette's affidavit.

where pharmacist had discretion over whether to dispense generic under state statute, and there was no testimony from prescribing physician that "Provera" notations in his records actually referred to the generic form of the drug) *with Zandi v. Wyeth*, No. A08-1455, 2009 WL 2151141, at *3-4 (Minn. App. July 21, 2009) (holding defendant was entitled to judgment as a matter of law where state statute required physician to fill prescriptions with generics unless specifically directed otherwise and doctor acknowledged that the word "Provera" was intended to reference the generic equivalent). In short, the mere *possibility* that Lea consumed a generic form of Provera is insufficient to warrant summary judgment in favor of Upjohn, particularly where Lea has presented evidence, including her medical records and Brette's affidavit, from which it can be inferred that she ingested the name drug. Under the circumstances, any suggestion that Lea ingested a generic form of Provera is mere speculation on the part of Upjohn. In any event, Lea's evidence is sufficient to raise a fact issue for determination by the jury.

J. Lea's Claims Against Pfizer, Inc. ("Pfizer")

Finally, Defendants asserts that Pfizer is entitled to summary judgment because it did not manufacture Prempro or Premarin during the relevant time frame and did not assume liability for the drugs when it became the parent company of the original manufacturers. Pfizer, however, was dismissed as a party to this action pursuant to the parties' joint stipulation, filed August 11, 2011. Therefore, this portion of Defendants' motion is denied as moot.

III. Conclusion

Consistent with the foregoing analysis, the court finds existing fact issues in the record preclude summary judgment on the majority of Lea's claims. Lea's evidence of intentional fraud against Upjohn, however, is lacking, and summary judgment is GRANTED as to that cause of

action. Likewise, summary judgment is GRANTED on Lea's implied warranty of merchantability claim. Defendants' motion is DENIED as to its remaining grounds for judgment as a matter of law. Additionally, Lea's breach of express warranty, manufacturing defect, negligence *per se*, and assault and battery claims are dismissed pursuant to her express abandonment of these causes of action in her response to Defendants' motion. Lea's fraud (as to Wyeth), negligent misrepresentation, negligence, gross negligence, failure to warn, design defect, and DTPA causes of action remain pending.

SIGNED at Beaumont, Texas, this 28th day of October, 2011.

Marcia A. Crone

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE