# EXHIBIT 4

# Expert Report of

# Suzanne Parisian, M.D.

## I. QUALIFICATIONS

1. Since August 1995, I have been President and founder of MD Assist, Inc., a regulatory and medical consulting firm specializing in matters involving the United States Food and Drug Administration's regulation of products. I received my Medical Degree (M.D.) from the University of South Florida in 1978 and have been Board Certification in Anatomic and Clinical Pathology since 1989. I have been a general practitioner and President of Mountain Emergency Physicians. I received a Masters in Biology from the University of Central Florida. I am the author of FDA Inside and Out, a text about FDA, and will be a Clinical Lecturer at University of Arizona Medical School, Phoenix Campus beginning in August 2007.

2. From 1991 to 1995, I served as a Commissioned Officer in the United States Public Health Service and achieved the rank of Lt. Commander. During the time period, I was primarily assigned to the Center for Devices and Radiological Health ("CDRH") at the Food and Drug Administration ("FDA"). Concurrently, I was also assigned clinical responsibilities at the Armed Forces Institute of Pathology ("AFIP"), Office of the Medical Examiner for the Armed Forces, Washington, D.C.

3. From 1991 to 1993, I was an FDA Medical Officer in the Office of Health Affairs (OHA), a staff office within the Center for Devices and Radiological Health (CDRH), FDA. In OHA, I provided regulatory support to both FDA's Office of Compliance and Office of Device Evaluation. My responsibilities in OHA included health hazard and health risk assessment, Safety Alerts and physician and layperson communications, review of adverse event reports and

medical literature and review of product labeling, promotions, advertising, and corporate records as to compliance with the Food, Drug and Cosmetic Act. I was responsible for the review of mandatory adverse event reports submitted by manufacturers, as well as the review of voluntary reports submitted by health care providers, patients and others. I presided over 162 health risk assessments convened to advise FDA on overall health risk issues for the public and made recommendations to FDA regarding the subsequent regulatory actions, which should be undertaken by FDA, health care providers, users groups and manufacturers to help protect the public's welfare. My assignment at OHA specifically included identification of safety issues. I participated in mandatory recalls and participated in an administrative hearing as FDA's expert witness.

4. As an example of a drug safety problem I helped identify and manage for FDA, I became directly involved in 1992 with an issue involving reports of adverse event reports and deaths for drugs and devices and in the medical literature in patients taking ACE Inhibitor (ACEI) drugs for blood pressure regulation. ACEI had been drugs approved by FDA for marketing in the 1980s. When a patient took ACEI and then had blood exposed to specific membrane surface during hemodialysis or LDL apheresis, a sudden life-threatening reaction was precipitated. As FDA's medical officer, I performed a health risk assessment per 21 CFR part 7, made a clinical recommendation that health care providers be quickly informed by FDA with a safety alert describing symptoms and risks as the emergency treatment that was necessary. No other medical officer was assigned by FDA in the work-up or handling of this safety issue. Working with an FDA epidemiologist, I designed the epidemiologic study, issued the epidemiologic study along with the safety alert sent to health care providers and analyzed the returned response data to determine the extent of the risk, the pharmacological mechanism and

labeling warnings for the drugs and devices. I helped draft the current drug warning for all class ACEI labeling about risk of membrane surface exposure and anaphylactoid reaction. This drug warning was subsequently negotiated by CDER with pharmaceutical industries for inclusion in all ACE I drug labeling.

5. From March 1993 to December 1993, I was a Medical Office in the Office of Device Evaluation (ODE), Division of Reproductive Abdominal, Ear, Nose and Throat, and Radiology (DRAERD), FDA and January 1994 through June 1995, I was one of two Chief Medical Officers in ODE. ODE, in contrast to OHA, is primarily responsible for premarketing evaluation of new product applications and clinical trials to support safety and effectiveness to begin legal marketing within the United States. In ODE, I participated in the review of proposed clinical trial, pre-marketing applications, including review of animal toxicology and biocompatibility data, as well as had the assigned responsibility of training new medical officers and scientific reviewers in application, clinical trial and labeling evaluation. I was the primary reviewing medical officer in charge of several premarketing approval applications required to adhere to CDER's Drug Guidance for LDL Lowering drugs. I provided the Agency's presentation at the FDA Advisory Panel composed of outside experts drawn from both CDRH and CDER (Center for Drug Evaluation and Research). I was a primary author for FDA's guidance for Hemodialyzer Reuse labeling. I consulted as a medical officer on INDs for combination products for drugs and biologics. While in ODE, I conducted an additional 100 health risk assessments and was required to train medical officers as to methods for heath risk assessment, health hazard evaluation, annual report review, adverse event, labeling and promotion review.

6. I was an initial instructor in FDA's Staff College for training FDA reviewers in the design and evaluation of clinical data in investigational and premarketing applications. I had primary responsibility for review of marketing applications, labeling and was required to teach medical officers the process for evaluation and review as required by the Food, Drug and Cosmetic Act for support of product marketing decisions. I was charged with training medical officers on the process of health risk assessment and health evaluation per 21 CFR Part 7.

7. Regarding post market surveillance of marketed products, I participated with FDA's District Offices, Office of General Counsel, and the Office of Compliance in the review of manufacturing records, labeling, product complaints and adverse event reports obtained by FDA. I was the primary clinician involved in several of FDA's Major Corporate-Wide Actions for which I received various citations and honors for my services for FDA. My awards have included Department of Health and Human Services and the Food and Drug Administration Employee of the Month.

8. I was sent by the FDA to serve as an official Agency representative at medical meetings and seminars to help identify and monitor conduct of manufacturers for potential deviations from regulations governing promotional activities. At those interactions, I was required to provide official guidance as to the FDA's interpretation of Food and Drug Laws as they pertain to all medical products and the roles of manufacturers and health care providers.

9. While at FDA, I helped draft agency documents, guidance regarding requirements for obtaining FDA's marketing approval, FDA Safety Alerts, provided FDA's comments for voluntary warnings and physician and user notifications, and voluntary industry standards. I was an FDA liaison with the National Institutes of Health (NIH) for issues involving ENT, Renal, Respiratory, Women's Health, and Alternative Medicine. I was required to provide

support to Health Care Financing Agency (HCFA now CMS) regarding FDA's approval of products and issues involving hemodialysis. I was assigned responsibility for product adverse event reporting to the Department of Defense (DOD) and Veterans Administration.

10. One of my assigned responsibilities at FDA, based on my clinical training and experience, was to review facts contained in product marketing applications, clinical trials, medical literature, reports of post marketing experience, and available manufacturing documents gathered by FDA or provided to FDA by the manufacturer or other regulatory agencies, and then to use those facts 1) to make a clinical determination to a reasonable degree of medical certainty for FDA per the FDCA and 2) recommend the next courses of action available to FDA to protect the public health. I was also required by FDA to advise and train other FDA employees regarding the review of facts of a case or issue, the requirements of the Food, Drug and Cosmetic Act, and the method for making a determination to a reasonable degree of medical certainty the clinical impact of the agency's actions for the public. This was a process I was trained in and required to perform for FDA. The FDA health risk assessment process is further described in 21 CFR §7. During my tenure at the FDA, I reviewed hundreds of marketing applications for safety and efficacy as well as proposed draft labeling. In this capacity, I worked with industry scientists and academic clinical investigators for evaluation, marketing and labeling review of new products. I organized national conferences with industry and physicians to discuss and obtain expert consensus regarding the development of new products and labeling as well as evaluating existing products on the market for safety and efficacy.

11. At the Armed Forces Institute of Pathology (AFIP), Office of the Medical Examiner, I was required, again based on my clinical training and experience in pathology, to take all available facts surrounding a patient's death and any involved adverse events and make a

final determination: 1) to a reasonable degree of medical certainty, as to the cause of death, and 2) to recommend the next steps that should be taken by the military or another agency of the federal government. In that capacity as a Medical Examiner, I provided support to the various legal staff of the armed services, as well as the FBI and CIA. While a medical examiner at the AFIP, I determined that a cause of civilian patient deaths at a military hospital, to a reasonable degree of medical certainty appeared to be associated with an unanticipated drug/device effect. I reported my findings as a MedWatch report to the FDA. Therefore, as an AFIP Medical Examiner, I was able to trigger the FDA to investigate a major drug regulatory safety problem which resulted in the protection of public health.

12. After leaving FDA, and founding MD Assist, Inc., I have continued to provide information to individuals, manufactures, and organizations about FDA's requirements, Adverse Event Reporting, labeling and promotion of FDA-regulated products. I have been involved with products available as INDs, NDAs, IDEs, BLAs, PMAs, and 510(k) s for devices, biologics and drugs. I was requested by FDA to participate in a 1997 panel of experts convened by FDA to comment on changes proposed in the requirements for medical device labeling. I continue to consult for manufacturers, lecture at conferences and seminars regarding FDA. I have been involved in premarket clearance, clinical trial design, product labeling, Corrective and Preventive Action (CAPA), Quality Systems and post market surveillance.

13. I have attached a list of my last 4 years of deposition and court testimony Appendix 2. A copy of my most recent Curriculum Vitae is attached as Appendix 1. I receive $350/hr for study and $475/hr for deposition and trial testimony.

## II. EXECUTIVE SUMMARY

### A. Role of the FDA – (See Appendix 3 for a more detailed discussion)

14. The United States Congress mandated that the Federal Food and Drug Administration (FDA) be the federal government agency to have oversight of the marketing of new drugs in the United States. The authority of the FDA comes from the Federal Food and Drug Act of 1938 ("FDCA" or "the Act") and subsequent amendments. The Act provides a minimal standard of conduct to allow a manufacturer to legally sell human drugs in the United States. After 1938 all new drugs were to be approved for U.S. marketing based on FDA's review and approval of premarketing applications with safety and manufacturing data. The Kefauver-Harris Amendment of 1962 changed the role of the FDA, all "new" drug applications were reviewed by FDA for support of substantial evidence of safety and effectiveness prior to marketing. To address drugs already on the market prior to 1962, the amendment contained a "grandfather" clause. Premarin, conjugated equine estrogen (CEE) on the market since 1942 and Provera (Medroxyprogesterone acetate, or MPA) on the market since 1959 are examples of grandfathered drugs. Grandfathered drugs could remain on the market until had FDA its completed public retrospective, Drug Efficacy Study Implementation ("DESI"), review of the supporting literature to make a determination of the allowable efficacy claims for categories of grandfathered drugs.

15. After 1962, drug labeling was also standardized into a uniform format that could be understood by health care providers with sections for the intended use, adequate indications and instructions for use, animal and human data, contraindications, warnings, precautions, and adverse events. All grandfathered drug labels were to include the DESI established efficacy indications.

16. FDA was not required by Congress to create new drugs, write drug labeling or conduct clinical trials. FDA's role is to protect public safety, accordingly FDA was to monitor

drug safety reports for trends and safety signals. FDA could utilize public advisory meetings with outside experts to obtain nonbinding opinions and recommendations.

17. Because Premarin and Provera were "grandfathered" drugs and were on the market long before the 1962 Amendments neither required rigorous clinical studies to support both efficacy and safety. The FDA was not given a means to force Wyeth to conduct clinical trials for efficacy of its purported heart benefits from the estrogen/MPA combination. FDA could not force Wyeth to conduct safety studies investigating the risk of breast cancer (Appendix 3 at ¶ 15). The greatest leverage that FDA has to compel the sponsor of an already approved drug to voluntarily update product labeling or commitment to conducting safety studies is if the drug sponsor has a reason to come to FDA to request approval of a new combination, claims or indications. For new drugs and new drug combinations approved after 1962, such as Prempro, the FDA can seek commitments from a drug company to conduct post-approval studies called phase 4 studies. However, FDA has not been given the authority to enforce that these post approval commitments are actually completed (Appendix 3 at ¶ 26). Drug manufacturers and FDA are aware that postmarketing safety studies and pharmacovigilance is needed for each drug during its lifecycle. For new drugs now approved with NDA, there is no way that the small clinical studies required to obtain NDA approval will be able to detect rarer but serious outcomes which can occur with a drug with wider use. The short-term clinical studies for marketing approval would not be able to detect association of a drug with a distant event such as cancer. That is why drug manufacturers, not FDA, must have monitoring procedures in place to identify rare events and to update product warnings and labels (Appendix 3 at ¶ 32).

18. FDA's reviewers examine data that is provided to them by competing drug manufacturers with dispassion. FDA negotiates the contents of drug label with each

manufacturer. As discussed at great length in the Institute of Medicine's (IOM) **The Future of Drug Safety, Promoting and Protecting the Health of the Public,** 2007, FDA was not given authority to require a company to perform safety studies for an already marketed drug. Because of limited agency resources and authority, FDA attempts to compel voluntary actions from manufacturers for updating product labeling, conducting post-approval studies, warning physicians and patients and withdrawing unsafe drugs from the market.

19. The FDA does not conduct preclinical or clinical studies for the drugs it regulates. The FDA lacks the resources to monitor each manufacturer to make sure it is properly studying and monitoring its own drugs (Appendix 3 at ¶157). The entire drug safety surveillance system depends on trust. The FDA must rely on the ethical behavior of drug manufacturers to conduct necessary post-marketing studies and monitoring (Appendix 3 at ¶¶ 27, 28).

20. The FDCA establishes a minimum standard of care for drug manufacturers. This need for monitoring is especially true for grandfathered drugs when it attempts to expand its indications and marketing claims. In the case of grandfathered estrogens, Wyeth is marketing a known human carcinogen. Wyeth began to promote long-term use of Premarin without adequate studies, monitoring or warnings. When there was a growing appreciation of an association of long-term Premarin with uterine cancer by physicians, Wyeth began to promote the long-term combined use of Premarin with another human carcinogen, MPA. Wyeth began combination promotion, again without having completed adequate studies, provided adequate warnings to patients or physicians, and without having instituted procedures for patient safety monitoring. Wyeth promoted the continuous use of combination Premarin/MPA hormone therapy to millions of healthy women for the rest of their lives (Appendix 3 at ¶153). When a new combination drug regimen consists of two known human carcinogens, safety outcome monitoring and investigating

the potential cancer risk in the target users is of utmost importance. All drug manufacturers are required to have written standard operating procedures (SOP) in place to enable them to monitor the safety and performance of its drugs once on the market (Appendix 3 at ¶153).

21. Although the Federal Trade Commission (FTC) regulates most product advertising, an interagency agreement gives the FDA authority to regulate prescription drug advertising. Prescription drug labeling is broadly construed to include not just television, radio and print advertisements, but also websites and advertising conducted by sales representatives through computer programs, fax machines or electronic bulletin boards (Appendix 3 at ¶34). Beginning in the 1980s, drug companies launched large direct-to-consumer (DTC) advertising campaigns for prescription drugs in the print media. In 1997, drug companies were permitted to air DTC advertisements on the television and radio. FDA regulations require that all advertisements must contain only truthful and scientifically supported statements in fact. Furthermore, there can be no omission of fact material to determining the consequences that can occur from customary and usual use. FDA regulations require advertisements to be fairly balanced (Appendix 3, at ¶34). If any statement of fact or any omission is misleading on a material issue, the drug is deemed misbranded in violation of FDA regulations (Appendix 3, at ¶36).

**B. Role of the Pharmaceutical Manufacturer-(See Appendix 3 for a more detailed discussion)**

22. Sponsors of any FDA-regulated product, whether foods, drugs, biologics, cosmetics, devices, or veterinary products, are required to ensure that the products sold in the United States are safe with adequate and truthful labeling. It is the drug manufacturer (sponsor),

not the FDA, which is responsible for ensuring its own compliance with the applicable sections of the Act, the safety and effectiveness of its drug product and adequacy and truthfulness of its marketing. It is the drug sponsor, not FDA, who is responsible for adequate drug testing, development, and monitoring, and providing warnings. If a drug sponsor desires to improve the safety and effectiveness of its drug and marketing to ensure its own compliance with the Act and patient safety, the drug sponsor has been given the ability by the Act to add or strengthen its warnings or otherwise change its label or marketing without FDA's prior approval. The drug manufacturer, not the FDA, is responsible for drafting the language of its drug labeling and to make sure that it is not misleading (Appendix 3 ¶40).

23. FDA regulations require the drug manufacturer to revise its label to include a new or stronger warning as soon as there is reasonable evidence of an association of a serious hazard with the drug. A causal relationship need not have been proved (Appendix 3 ¶ 37). Failure to update the warning section with new information on adverse effects will cause the drug to be misbranded (Appendix 3 ¶ 36). Furthermore, the FDA both permits and encourages drug manufacturers to update their drugs' labels without waiting for FDA's approval of specific language. This provision for the eventual filing of a NDA supplement notifying FDA of the changes that have been made and the reasons is known as "Changes Being Effected" (Appendix 3 ¶ 40).

24. A drug sponsor, not the FDA, is responsible for its own behavior, performance of its product, contents, adequacy and truthfulness of its label and promotions. A drug sponsor is to monitor drug performance and to investigate with standard case-control, observational or epidemiological studies to update drug label warnings to ensure its drug remains safe and effective.

25. A responsible pharmaceutical manufacturer will promote its drug's use by fair and balanced marketing and not disregard the requirements of the Act. A responsible drug sponsor does not promote its drug for new off-label/unapproved use, particularly when there is data that suggests that use is not safe or effective. A responsible manufacturer does not provide physicians and patients with false and misleading labeling through use of public relations agencies, 3rd parties, reimbursed advocates. A responsible manufacturer upon becoming aware that its product is being used in combination with another drug would update its label, warnings and instructions to ensure compliance with the Act and to protect patients (See Appendix 4).

**III. OPINIONS: (See Appendix 4- History of Wyeth, Medroxyprogesterone Acetate (MPA), and Prempro)**

26. The following opinions are rendered to a reasonable degree of medical and professional certainty, based on my training and education and following my review of the documentation. The materials I have reviewed and relied upon to formulate my opinions have included an external hard drive of Wyeth's production documents, expert reports of Dr. Blume, Dr. Gueriguian, Dr. Stolley, Dr. Allen, Dr. Jolson, and Dr. Rarick. I have also done my own search of relevant information in the FDA's and National Medical Library's databases.

**OPINION #1**

27. Wyeth breached its duty as a responsible pharmaceutical manufacturer under the Food Drug and Cosmetic Act when it began to market Premarin, Premarin plus MPA to physicians and women as suitable to be used by a woman for the rest of her life without having done appropriate testing, monitoring, or obtaining FDA's approval for a new product indication.

28. Premarin, as a 1942 grandfathered drug was found effective for short term treatment of symptoms of menopause. In the DESI (Appendix 3 ¶8) process for determination of

effectiveness of estrogens, including Premarin, and progestins, including Provera, after 1962, the FDA was not requested to consider effectiveness of combination use of short-term or long-term estrogen plus progestin for treatment of menopausal women. Without adequate investigation, patient monitoring or FDA's approval, Wyeth began to promote a *known human carcinogen,* Premarin, to physicians for prescription to patients as if it could be reasonably intended for prolonged treatment of "estrogen deficiency disease". Wyeth's marketing misled both physicians and women that Premarin and later Premarin/MPA had been found to be safe for this new indication.

29. By 1975, physicians, not Wyeth, associated prolonged Premarin use with increased risk of uterine cancer. Without adequate investigation, monitoring or FDA's approval, Wyeth promoted prolonged Premarin plus prolonged progestin, medroxyprogesterone acetate (MPA), *another human carcinogen*, tow women and physicians as a safe combination hormone therapy. MPA had not been approved by FDA as effective for any menopause indication when it began to be promoted as "the other half" of combination hormone therapy. The intended use for combination hormone therapy was expanded by Wyeth from treating symptoms of menopause, to increasing a women's expectations they would gain benefits for prolonged therapy, "Total Health", with a reduction of cancer risk. As a result of Wyeth's marketing, by 1997 the Premarin Family of drugs were the most prescribed drugs in the United States and taken by over 9 million women (SOLOJ025-000287).

30. Besides the medical literature, FDA's, NCI's, and physicians' concerns, Wyeth's own Prempro pivotal clinical trial and HOPE trial had clustering of breast cancer in women receiving continuous combination therapy at 1-year analyses and at even the lowest dose. Taken together, these were safety signals that should have alerted Wyeth of a potential association of

continuous combination therapy with breast cancer and its need to investigate and monitor women's safety. Wyeth's strategy however, did not include monitoring and addressing the safety of women and preventing breast cancer with appropriate studies or warnings (SOLOJ025-000286-355). Rather, Wyeth elected to use public relations and a two tier policy based on "dismiss/distract" to "managing the breast cancer issue" (*See citations below for Dismiss/Distract). Despite breast cancer warning signals for continuous combination therapy, Wyeth persisted in promoting the long-term benefits of continuous daily use of Prempro.

> **(Refer to APPENDIX 4, See Section IV**. **Wyeth's Marketing to Women Prolonged Use –** (MDL04782-00016708-15;,BURRG002-000050;ROSSC001-000773;SOLOJ027-046965-711;LAWT021-009874;FISHG004-001352;PARKA008-000257;W-MDL04782-00015373;W-MDL04782-00015317;W-MDL04782-00015353;W-MDL-04782-00016708-15BURRG002-000049;RYANJ002-00495;CONTA003-00676;SOLOJ025-000286-355) ***Feminine Forever***- BURRGOO2-000049-51;CONTA003-000676,RYANJ002-000495); ***Good Housekeeping's Guide to Women's Health***- (PANAA027-000800); ***Silent Passages*** (SOLOJ025-000306); **Seasons Magazine**-PANAA036-001540;HENRL008-000280;DUROJ046-010953;W-MDL04782-00036168;PANAA016-000465;W-MDL04782-00002391;CONNS008-000980;PANAA021-000192) **Health Word** (PANAA016-000938;PANAA016-000922;PANAA016-000914;PANAA016-00930;PANAA016-000938;PANAA016-000946;PANAA016-001028); **Body of Evidence** –(STRIS001-000034;FARAN015-000894;HENRL002-000657;HENRL005-01388;HENRL005-001314;HENRL011-000502);***Keeping a Balanced Perspective on Breast Cancer Risk*- March 2002**- (W-HUSKA01-00001019);**Annual Menopause Report** (SOLOJ025-000307); **Marketing Research**-(HENRL026-001723;HENRLO26-001732, EXHIBIT 7787, P 1-9);**Hospital based Medical Education Seminars on ERT for Consumers** (SOLOJ025-000309) **See Appendix 4. Section V. Wyeth's Marketing to Physicians Strategy-** (SOLOJ027-046965-108), National Hormone Councils (See Appendix 4)(CONNS014-001645);**Annual Estrogen Deficiency Symposium**- (YAVUE010-000664; DEYMI020-001070); **Plan of Action** (DUROJ037-000183;CONKJ008-000129;HENRL025-001651);**Monographs**- (CONKJ012-000765);**Continuing Medical Education**-(SOLOJO23-000870) "**Dismiss/Distract"- Negative Spin**-(W-MDL04782-0051980-1;PICKJ007-001349;VICTJ001-002141;CONJK018-056069;SOLOJ022-001019;SOLOJ022-001373-4;SOLOJ022-001040-2;W-MDL04782-0016708;W-MDL04782-00051980-1;W-MDL04782-00051891; CONTA025-024637;CONKJ012-000765;DUROJ017-000004;W-MDL527-00039573;W-MDL527-00038714; W-MDL04782-00051891; **Ghost Writers**- (CONTA025-03053-9;DWRITE 003353;MRTN010-010296-7;DWRITE 066935; SOLOJ027-048916-7;DWRITE 067253; M4188) R. Hoover, et al. (**Menopausal estrogen and breast cancer**, *NEJM*, 1976;295:401-5 (See Appendix 4), W-MDL04782-00029002; Dr. R.Ross-1980 (**A Case**

**Control Study of Menopausal Estrogen Therapy and Breast Cancer**, *JAMA* (DELCA008-000627;W-MDL04782-0032315;W-MDL04782-00032331;W-MDL04782-0032274);**Third party and Physician Advocate Groups-** (SOLOJ025-000313)
**Sales representative downplay breast cancer risk-** (W-HUSKA01-00001306)
**CME- Myths and Misperception of Breast Cancer and HRT**- (SOLOJ023-000870)
**Wyeth's Breast Cancer Task Force**-(PICKJ007-001349
**Wyeth Suitable for Prolonged Use-**(W-MDL04782-000292330,W-MDL-04782-00051890-10; W-MDL04782-00060132; W-MDLl04782-00059871;W-MDL04782-00051980-1; FISHG001-000388; FISHG001-000403;LAWT021-009874; SOLOJ025-000286-355)
**Wyeth lack of Safety and Effectiveness**- W-IND-00000404,W-MDL04782-00060132;W-MDL04782-00060105-7; VICTJ005-001704;VICTJ001-001843; W-MDL04782-00009303;GPIL008-002293;GPIL008-002282;GOLDG001-001435;LEVIG002-005601;W-MDL04782-00057786
**Wyeth carcinogenicity study-MPA**- (FISG001-000355-58;FISHG001-000201-14;FISHG001-000358FISHG001-000331-333;FISHG001-000359-61;GISHG001-000273-76;FISHG001-000323;FISHG001-000273-6;FISHG001-000323;FISHG001-000275FISHG001-000341FISHG001-000258-61;FISHG001-0002000;FISHG-001-000216;FISHG001-000341;W-MDL04782-00032460
**FDA- Lack of Safety and Effectiveness** (W-MDL04782-00059954; FISHG001-000387;W-MDL527-00035136;W-MDL303-00081735;FISHG001-000353;CONNS022-000503;FISHG001-000402;FISHG001-00410-13;W-MDL303-00082105; PANAA026-001571;PANAA034-001426;CONNS014-001103;W-MDL303-00085228
**FDA Medical Officer Reviews Prempro**- See Appendix 4
**Provera marketing for use with Premarin**- NDA-PRO 0029068;
**See Appendix 4 Sections Premarin and Prempro NDA Medical Officer Reviews-** Dr. Golden's and Dr. T. van der Vlugt (Exhibit 8413, page 0012-3), Exhibit 8413, p 0015) and (ROSSC012-001502-3, Exhibit #7773, pg 6-7 .
**Canada Lack of Safety and Effectiveness**- (NORMJ006-000610;ROSSC012-001506
**Premarin prolonged market success**- (CONNS013-000683; WEBEM015-001201
**Most women take 8 years, 25%>11 years** (W-MDL527-00048274)

**OPINION #2**

31. Wyeth's promotion of prolonged Premarin use was associated in the mid 1970s with an increased risk of uterine (endometrial) cancer, a risk identified by physicians and not by Wyeth. The association of prolonged Premarin and increased risk of uterine cancer was determined for FDA, NIH and physicians using case-control and other standard observational studies. The association with uterine cancer resulted in a black box warning in the label. When the medical literature , the NCI, NIH, FDA, and physicians began to discuss an association

between breast cancer and use of combination hormone therapy, a responsible United States pharmaceutical manufacturer should have voluntarily conducted case-control studies and other observational studies to investigate the risk and update product warnings. Also, Wyeth had made a phase 4 commitment to FDA in 1995 to investigate breast cancer risk by a study after approval of Prempro. If those types of studies had been voluntarily done by Wyeth when it first promoted combination Premarin/MPA therapy, they would have been able to confirm the association of invasive breast cancer for patients receiving daily Prempro long before the halting of the WHI by the NIH. Wyeth however, failed to behave as a responsible drug manufacturer, caused an unnecessary and unreasonably dangerous delay in identification of association of breast cancer risk with continuous combination Premarin/MPA, and produced needless suffering for women and their families. After the association of increased risk of breast cancer was made for continuous Prempro in the WHI, FDA required Wyeth to update its product labeling and add a black box warning.

**Early Breast Cancer Safety Signals-** R. Hoover, et al. (**Menopausal estrogen and breast cancer,** *NEJM*, 1976;295:401-5, W-MDL04782-00029002; Dr. Ross 1980 (**A Case Control Study of Menopausal Estrogen Therapy and Breast Cancer**, *JAMA* (DELCA008-000627;W-MDL04782-0032315;W-MDL04782-00032331;W-MDL04782-0032274); K Hunt et al. (**Long-term surveillance of mortality and cancer incidence in women receiving hormone replacement therapy**. *Br J Obstet Gynaecol* 1987;94:620-635); L. Bergvkist, et. al. (**The risk of breast cancer after estrogen and estrogen-progestin replacement**, *NEJM* 1989;321;296-7;CONNS005-000346) ; **Mammary tumor in male rats- estrogen/progestin arm only-** See Appendix 4 M.R. Riviere, et al, *Societe de Biologie*, Nov 18, 1961, 2101-04
R.Ross, M. Pike et al (**Effect of hormone replacement therapy on breast cancer risk: estrogen versus estrogen plus progestin**, *Journ NCI*, 92(4):328-32; February 16, 2000)**, Re: Effect of Hormone Replacement Therapy on Breast Cancer Risk: Estrogen versus Estrogen plus Progestin**, D. Archer, T. Bush, and L. Nachtigall, Vol. 92, No. 23, December 6, 2000, pp:1950-1951), R. Ross and M. Pike response *Journ NCI* Vol. 92, No. 23, December 6, 2000, pp:1951-1952- See Appendix 4
B.de Lignieres, F. de Vathaire, S. Fournier, et al. (**Combined hormone replacement therapy and risk of breast cancer in a French cohort study of 3175 women**. *Climacteric* 5: 332-340, 2002)

G. Greendale, et al.( **Postmenopausal hormone therapy and change in mammographic density** *Journ NCI*. 95(1): 30-7, January 1, 2003)
R. Chlebowski et al. (**Influence of Estrogen Plus Progestin on Breast Cancer and Mammography in Healthy Postmenopausal Women The Woman's Health Initiative Randomized Trial**, JAMA June 25, 2003- Vol. 289,No.24, pp3254-3304)
S. Missmer et al. (**Endogenous Estrogen, Androgen, and Progesterone Concentrations and Breast Cancer Risk Among Postmenopausal Women**, *Journ NCI*, Vol 96, No.24, pp1856-65) Dec 15, 2004)
A. Fournier, et al. (**Breast cancer risk in relation to different types of hormone replacement therapy in the E3N-EPIC cohort**. Int J Cancer: 114,:448-454, 2005)
According to C. Crandall, et al (**Positive associations between mammographic breast density and bone mineral density in the Postmenopausal Estrogen/Progestin Interventions Study** *Breast Cancer Research* 7:R922-R928, 2005),
A.McTiernan, *et al.* ( **Estrogen-Plus-Progestin Use and Mammographic Density in Postmenopausal Women: Women's Health Initiative Randomized Trial**, *Journ NCI*, 97(4): 1366-1376. September 21, 2005)
A. Kavanagh, et al (**Hormone replacement therapy, percent mammographic density, and sensitivity of mammography** *Cancer Epidemiol Biomarkers Prev* 14(5): 1060-4, 2005)
M. Pike (**The role of mammographic density in evaluating changes in the breast cancer risk.** *Gynecological Endocrinology*, 21 (Suppl 1):1-5, July 2005)
K. Crouchley, et al (**Hormone Replacement therapy and mammographic screening outcomes in Western Australia** *Journ Medical Screening* 13(2):93-97, 2006)
A. Chiarell, et al. **(Influence of patterns of hormone replacement therapy use and mammographic density on breast cancer detection** *Cancer Epidemiol Biomarkers Prev* 15(10):1856-62, 2006)
A. Fournier, et al. (**Unequal risks for breast cancer associated with different hormone replacement therapies: results from the E3N cohort study**. *Breast Cancer Res Treat* January 2007)
**Dr. B Hulka- case-control study request to Wyeth, Chairperson 1990 FDA Advisory Panel** (W-MDL04782-00032472-3;W-MDL04782-00032460-2; VICTJ005-001705;VICTJ005-001701-2;CONNS017-000032-35)
**Endometrial cancer association with prolonged estrogen**-(VICTJ005-001658-65;W-MDL-015-01287;W-MDL04782-00016708;W-MDL04782-00051891;W-MDL04782-00027344;W-MDL04782-00051891
**Sales Representatives downplay breast cancer risk**- (W-HUSKA01-00001306
**Breast Cancer with hormone therapy**- EDWARDS-A0000366; (W-MDL04782-00059874-6; **Wyeth's Breast Cancer Task Force**-(PICKJ007-001349)
**ACOG and Breast Cancer with combination therapy**-(PICKJ004-000667)
**Mammary nodules**- (FISHG001-000393)
**Breast Pain**-(ROSSC012-001538)
**Wyeth Breast Cancer "Dismiss/Distract"- Myths and Misperception of Breast Cancer and HRT**- (SOLOJ023-000870); **Dear Dr**. (PANAA025-001943,PANAA010-000988
**Wyeth need for study**-W-MDL04782-00057786; W-MDL04782-00029233;W-MDL04782-00032460; W-MDL04782-00033664

**Wyeth "company policy" no funding for breast cancer studies**- (PANAA027-000562;PANAA027-000561
**Public Citizen**- W-MDL04782-00063068;W-MDL04782-00063066
**Dr. Golden, FDA Medical Reviewer presents her safety concerns**-1993 (CONNS001-001434)

**OPINION #3**

32. Nothing in the Food Drug and Cosmetic Act would have prohibited Wyeth from voluntarily conducting post-approval safety studies, including case-control and other observational studies, to determine if combination Premarin plus MPA and continuous Prempro were associated with an increased risk of breast cancer prior to the halt of the WHI by NIH in May 2002. Nothing in the Food Drug and Cosmetic Act would have prevented Wyeth from voluntarily improving its own product label and warnings for physicians and women regarding the possible risk of breast cancer with continuous combination hormone therapy to ensure its own compliance with the Act and to protect public safety.

**Dr. Golden, FDA Medical Reviewer presents safety concerns**-1993 (CONNS001-001434
**Wyeth's discontinued studies**-(W-MDL04782-00058976;W-MDL04782-00058978;W-MDL04782-00058980;W-IND-00003859;W-IND-00009083;W-MDL303-00083690;W-IND-00006856;W-MDL303-00008975
**Prempro Pivotal Trial Breast Cancer Safety Signal**- Clustering in combination treatment arms (ROSSC012-001562,W-MDL303-0083746; ROSSC012-001551;
**HOPE (Health Osteoporosis Progestin/Estrogen ) Study- Breast cancer signal-clustering low dose combination**- See Appendix 4- a Prempro phase 4 commitment study
**FDA requested Phase 4 post-approval study for determination of breast cancer risk-** (W-MDL527-00035129;W-MDL303-00084699)
**Dr. Rarick, FDA and phase 4 commitment-breast cancer risk - WHI and WISDOM-** (W-MDL303-00084714)
**Dr. Allen and FDA's Breast Cancer Warning** (ROSSC001-000368;ROSSC001-000367;ROSSC001-000349-50)
**Wyeth's Response to FDA's Cancer Risk label** (ROSSC001-000356-366; ROSSC001-000338;ROSSC001-000336; BURKM015-000087-89))
**Women discontinue hormones due to "fear of breast cancer"**- (EDWARDS-100000373,Exhibit10665, page 29; STRIS017-000076-99)

**Wyeth's company policy-"no funding of breast cancer studies"**- (PANAA027-000562;PANAA027-000561;PICKJ011-003007)
**Wyeth's experts- need to study CHT for increased breast cancer risk**- (YAVUE010-000664)
**Cancer Fear**-(BURRG002-000049;CONTA003-000676;RYANJ002-0004950)
**Steroidal Estrogen- Carcinogen, Report of NTP**-(FISHG001-000510573
See Appendix 4- **PEPI** (Postmenopausal Estrogen/Progestin Intervention) Trial
See Appendix 4 **HERS** (Heart Estrogen/Progestin Replacement) Trial
See Appendix 4 **HOPE** (Health Osteoporosis Progestin and Estrogen) Study
See Appendix 4 **WHI** (Women's Health Initiative)

**OPINION #4**

33. Wyeth failed to investigate and market alternative drugs that it knew would be safer for women. Furthermore, Wyeth's stranglehold of the United States postmenopausal market over the past 60 years, with its relationships with opinion leaders, third-party organizations, advocates, public relations firms, residents, medical schools, National Hormone Council, Symposiums, Continuing Medical Education , Speakers Bureau, ghost writers, and sales representatives have all helped delay completion of valid scientific research regarding treatment of women around menopause and development of safer alternative products.

34. As Wyeth was aware, since 1942 menopausal women in the United States have been prescribed Premarin, a conjugated equine estrogen (CEE) derived from pregnant mare's urine, a xenoestrogen, developed by Wyeth for its potent "estrogen-like" properties. CEE is a complex mixture of at least 10 compounds derived from a pregnant horse and formed into a tablet. When Premarin was first approved by FDA in 1942, Wyeth elected not to listen to FDA's request that Premarin be labeled so that women would know the source of Premarin came from horse urine. Despite over 60 years of sales, the active ingredients of Premarin have not been fully characterized by Wyeth.

35. As part of combination hormone therapy, and without FDA's approval, United States women began to be prescribed Premarin along with a progestin, medroxyprogesterone acetate (MPA, Provera, Cycrin). MPA is a synthetic steroidal compound, 80-120 times more potent than natural human progesterone. MPA has diverse steroid properties, and can produce progesterone-like effects. CEE plus MPA are taken each daily by women as Prempro.

36. Neither Premarin nor MPA structurally resemble natural human hormones and are not called "bioidentical". Bioidentical estrogen contains the three main naturally occurring human estrogens from the ovary: estradiol, estrone and estriol. An example of a bioidentical estrogen is 17-Beta estradiol. An example of a bioidentical progesterone is oral micronized progesterone (Prometrium, or MP). In bioidentical hormone replacement therapy (BHRT), the estrogen is often delivered not orally but rather via topical administration of a cream or gel solution on the skin, eliminating the first pass liver effects for a tablet. While chemically identical to hormones found in the body, they are not able to exactly replicate the body's normal delivery system for hormones or are they able to be made available in the exact same amounts. The human body contains over 25 different types of estrogen, and estradiol, estrone and estriol are the three most common types.

37. In Europe, as early as the 1980s other hormone products besides Premarina or Provera (MPA, Cycrin), including bioidentical hormones were being investigated and prescribed to menopausal women. The PEPI Trial (See Appendix 4) used a Premarin + micronized progesterone (MP) (cyclic) treatment arm and two Premarin +MPA (cyclic and continuous) treatment arms. All treatment of Premarin with either MP or MPA reduced endometrial hyperplasia, however, the Premarin +cyclic MP produced the most favorable effect on serum lipid and HDL-C, a benefit not seen with either of the two Premarin +MPA treatment arms. As

Wyeth was aware, the two Premarin+ MPA arms eliminated the serum lipid advantages of Premarin, a finding which directly impacted on potential cardiac effects of a combination therapy with either MPA or MP.

38. Beginning in 1990, Wyeth's management endorsed the start of Project 810A to develop a bioidentical "17-Beta estradiol/natural progesterone SR (sustained release) combination hormone pill". This was a new combination therapy which was not to be based on Premarin. (CONNS020-000401) Since natural progesterone NDA had not yet been approved, Wyeth's plan was to submit an IND in January 1992. However, Wyeth ran into problems with development of a SR progesterone pill in animal studies.

39. On January 23, 1995, David Colasante wrote a "Rush Memo" to distribution regarding the WHI Update, "PEPI Influence"(PICKJ021-002474-5). Originally the plan for PEPI had been that all women were to receive unopposed Premarin and have rigorous monitoring, but it was learned that the dropout rate for patients from endometrial hyperplasia was high enough to hurt the outcome of the trial. Dr. Loretta Finnegan (WHI Director) requested the unopposed Premarin, non-hysterectomized treatment group be discontinued. As a result and in keeping with Wyeth's future opportunities for marketing combination Prempro and Premphase, Wyeth agreed to provide the WHI with its Cycrin (MPA) for use as its combination hormone therapy. Dr. Finnegan's communication referred to a consensus toward continued utilization of MPA as the progesterone of choice for the WHI. However, the "*dissension still exists*" and was voiced most prominently by Dr. Elizabeth Barrett-Connor for inclusion of combination with MP as in PEPI. The memo continued:

> You are aware that PEPI results confirmed existing data as to the beneficial effects of Premarin on lipid levels, including LDL and HDL. It was also apparent that much of the beneficial effect on HDL was eliminated by MPA co-administration but <u>not</u> by oral micronized progesterone. This has resulted in

> debate over the continued utilization of MPA in WHI. Dr. Jacques Rossouw has asked me to provide support for the continued use of MPA. I am aware that Schering-Plough is supplying further data on micronized progesterone (and presumably an offer to supply the drug). **It is essential that the current disposition of the Premarin/MPA combination tablet in WHI not change**. A proposed support document is attached for your immediate review…We must assume that even though logistical and cost implications are overwhelmingly in our favor, the dissenting voices will, at least, fall back to a scenario where micronized progesterone treatment is proposed for a subgroup. This would affect the statistical power of the trial and cast unnecessary doubt on our combination product.

40. In 1995, Schering-Plough attempted to acquire a co-promotion partner for Canada. Wyeth was selected as an appropriate partner in that it was the current market leader with Premarin. The Prometrium monograph had referenced MP use along with 0.625 mg CEE. The plan was for Schering-Plough to promote combination use of Prometrium with Premarin and Wyeth would promote Prometrium and Premarin each separately. "Wyeth was to be allowed to continue its current promotion with <u>Upjohn's MPA</u> as well as to continue development of its own MPA formats" (DUROJ0039-001922-3). There was a handwritten note that reminding that Prometrium was "not approved to be used as a combination product" (DUROH039-001924).

41. Executive Summary 1995-1997, indicated that the combination of Premarin plus Prometrium – first as a two tablets in 1995 and then as single combination tablet in 1996 – would make Wyeth less vulnerable to generics, and helped minimize the "erosion curve of Premarin franchise". The memo ended, "…there is currently little consensus among physicians regarding the best estrogen-progestin (HRT) regimen to use when treating non-hysterectomized women".

> **Threats**: Negative media coverage (e.g ERT and breast cancer)
>
> **Strategic Recommendation**: Efforts to specifically expand the HRT segment have been limited due to lack of clinical data and appropriate product labeling supporting efficacy and safety of HRT regimens (DUROJ039-001945-53).

**Goal: Market Expansion**- Long term- Develop Premarin/Prometrium HRT Product and position as new and improved vs. Prempro and Premphase. It would have **superior lipid profile**. (DUROJ039-02038)

42. Wyeth abandoned the MP projects of 1991 and later in 1995 apparently to avoid the cost and scrutiny of doing the studies necessary to get Prometrium approved and then approved as a combination drug. Instead, Wyeth invested its time and resources into a strategy of "defending" MPA and resisting efforts to include micronized progesterone (MP) as a subgroup of the WHI study.

**Mr. Whitehead studies**- (CONTA012-001691;W-MDL04782-00059906-922W-MDL04782-00059895-7;W-MDL04782-00059904-5)
**Marketing Division**- (W-MDL04782-00059871
**Project 713B**- Not to start from scratch-(FISHG001-000074; CONTA012-001691
**Project 810A**-(PANAA038-000032-3;CONNS020-000401;PANAA038-000032-3
**Wyeth and acquisition of Prometrium-** (DUROJ039-002000;2DUROJ039-002021-2; DUROJ039-002024; DUROJ039-002026;DUROJ0039-001922-3;DUROJ039-001945-53;DUROJ039-02038)
**See Appendix 4 Micronized Progesterone-NDA 19-781**
**Marketing against Competitors**-(CONTA012-001554-5;CONTA012-001534-52)
**Effects of MPA**- See appendix 4
MF McCarty (**Androgenic progestins amplify the breast cancer risk associated with hormone replacement therapy by boosting IG-I activity**, *Medical Hypothesis* 56(2):213-216; R. Ross et al (**Effect of hormone replacement therapy on breast cancer risk: estrogen versus estrogen plus progestin**, *Journ NCI*, 92(4):328-32; February 16, **Re: Effect of Hormone Replacement Therapy on Breast Cancer Risk: Estrogen versus Estrogen plus Progestin**, D. Archer, T. Bush, and L. Nachtigall, Vol. 92, No. 23, December 6, 2000, pp:1950-1951

**OPINION #5**

43. <u>Despite Wyeth's being aware of safer alternatives and at least the difference in serum lipids with MP in PEPI (See Opinion #4) , Wyeth continued to market Premarin, Premarin/MPA and Prempro as suitable for continuous use without providing adequate warnings to physicians and women about the risks and without truthful, fair and balanced marketing</u> (Appendix 3 ¶32).

**Prolonged Use –** (MDL04782-00016708-15;,BURRG002-000050;ROSSC001-000773;SOLOJ027-046965-711;LAWT021-009874;FISHG004-001352;PARKA008-000257;W-MDL04782-00015373;W-MDL04782-00015317;W-MDL04782-00015353;W-MDL-04782-00016708-15BURRG002-000049;RYANJ002-00495;CONTA003-00676;SOLOJ025-000286-355) ***Feminine Forever***- BURRGOO2-000049-51;CONTA003-000676,RYANJ002-000495); ***Good Housekeeping's Guide to Women's Health***- (PANAA027-000800); ***Silent Passages*** (SOLOJ025-000306); **Seasons Magazine**-PANAA036-001540;HENRL008-000280;DUROJ046-010953;W-MDL04782-00036168;PANAA016-000465;W-MDL04782-00002391;CONNS008-000980;PANAA021-000192) **Health Word** (PANAA016-000938;PANAA016-000922;PANAA016-000914;PANAA016-00930;PANAA016-000938;PANAA016-000946;PANAA016-001028); **Body of Evidence** –(STRIS001-000034;FARAN015-000894;HENRL002-000657;HENRL005-01388;HENRL005-001314;HENRL011-000502);***Keeping a Balanced Perspective on Breast Cancer Risk*- March 2002**- (W-HUSKA01-00001019);**Annual Menopause Report** (SOLOJ025-000307); **Marketing Research**-(HENRL026-001723;HENRLO26-001732, EXHIBIT 7787, P 1-9);**Hospital based Medical Education Seminars on ERT for Consumers** (SOLOJ025-000309)
**See Appendix 4. Section V. Wyeth's Marketing to Physicians**
**Strategy-** (SOLOJ027-046965-108), National Hormone Councils (See Appendix 4)(CONNS014-001645);**Annual Estrogen Deficiency Symposium**- (YAVUE010-000664; DEYMI020-001070); **Plan of Action** (DUROJ037-000183;CONKJ008-000129;HENRL025-001651);**Monographs**- (CONKJ012-000765);**Continuing Medical Education**-(SOLOJO23-000870) **Dismiss/Distance- Negative Spin**-(W-MDL04782-0051980-1;PICKJ007-001349;VICTJ001-002141;CONJK018-056069;SOLOJ022-001019;SOLOJ022-001373-4;SOLOJ022-001040-2;W-MDL04782-0016708;W-MDL04782-00051980-1;W-MDL04782-00051891; CONTA025-024637;CONKJ012-000765;DUROJ017-000004;W-MDL527-00039573;W-MDL527-00038714; W-MDL04782-00051891; R. Hoover, et al. (**Menopausal estrogen and breast cancer**, *NEJM*, 1976;295:401-5 (See Appendix 4), W-MDL04782-00029002; Dr. R.Ross-1980 (**A Case Control Study of Menopausal Estrogen Therapy and Breast Cancer**, *JAMA* (DELCA008-000627;W-MDL04782-0032315;W-MDL04782-00032331;W-MDL04782-0032274);**Third party and Physician Advocate Groups-** (SOLOJ025-000313)
**Sales representative downplay breast cancer risk**- (W-HUSKA01-00001306)
**CME- Myths and Misperception of Breast Cancer and HRT**- (SOLOJ023-000870)
**Wyeth's Breast Cancer Task Force**-(PICKJ007-001349
**Wyeth Suitable for Prolonged Use-**(W-MDL04782-000292330,W-MDL-04782-00051890-10; W-MDL04782-00060132; W-MDLl04782-00059871;W-MDL04782-00051980-1; FISHG001-000388; FISHG001-000403;LAWT021-009874; SOLOJ025-000286-355)
**Wyeth lack of Safety and Effectiveness-** (W-IND-00000404,W-MDL04782-00060132;W-MDL04782-00060105-7; VICTJ005-001704;VICTJ001-001843; W-MDL04782-00009303;GPIL008-002293;GPIL008-002282;GOLDG001-001435;LEVIG002-005601;W-MDL04782-00057786)
**Wyeth carcinogenicity study-MPA**- (FISG001-000355-58;FISHG001-000201-14;FISHG001-000358FISHG001-000331-333;FISHG001-000359-61;GISHG001-000273-76;FISHG001-000323;FISHG001-000273-6;FISHG001-000323;FISHG001-

000275FISHG001-000341FISHG001-000258-61;FISHG001-0002000;FISHG-001-000216;FISHG001-000341;W-MDL04782-00032460)
**FDA- Lack of Safety and Effectiveness** (W-MDL04782-00059954; FISHG001-000387;W-MDL527-00035136;W-MDL303-00081735;FISHG001-000353;CONNS022-000503;FISHG001-000402;FISHG001-00410-13;W-MDL303-00082105; PANAA026-001571;PANAA034-001426;CONNS014-001103;W-MDL303-00085228)
**FDA Medical Officer Reviews Prempro**- See Appendix 4
**Provera marketing for use with Premarin**- (NDA-PRO 0029068);
**See Appendix 4 Sections Premarin and Prempro NDA Medical Officer Reviews-** Dr. Golden's and Dr. T. van der Vlugt (Exhibit 8413, page 0012-3), Exhibit 8413, p 0015) and (ROSSC012-001502-3, Exhibit #7773, pg 6-7) .
**Canada Lack of Safety and Effectiveness**- (NORMJ006-000610;ROSSC012-001506)
**Premarin prolonged market success**- (CONNS013-000683; WEBEM015-001201)
**Most women take 8 years, 25%>11 years** (W-MDL527-00048274)
**Ghost Writers**- (CONTA025-03053-9;DWRITE 003353;MRTN010-010296-7;DWRITE 066935; SOLOJ027-048916-7;DWRITE 067253; M4188)

**OPINION #6**

44. Wyeth failed to behave as a responsible United States manufacturer when it engaged in marketing violations for Premarin and Prempro. Instead of monitoring and investigating safety signals in the medical literature and clinical trials, Wyeth chose to allot its resources and funding to public relations agencies, influencing medical associations, residents, medical centers, hiring technical writing groups, engaging ghost writers, and acquiring its own medical advocates and speakers to facilitate Wyeth's two step "Dismiss and Distract" policy rather than employ a "Patient Safety First" policy.

**"Dismiss/Distract"- HERS**-(CONTA025-024637;CONKJ012-000765;DUROJ017-000004;PICKJ020-001968,KBIL5-01558;KET-001561;LUDMG003-000423;CONSG001-002027;CONKJ003-000150-1, **HERS fracture**- CONKJ024-001753;CONSG007-000075;CONSG007-000113;CONSG007-000045;CONSG001-000435;CONSG007-000079)
**Strategy-** (SOLOJ027-046965-108), **National Hormone Council (NHC)** (See Appendix 4 for description of NHC)(CONNS014-001645);**Annual Estrogen Deficiency Symposium**- (YAVUE010-000664; DEYMI020-001070); **Plan of Action** (DUROJ037-000183;CONKJ008-000129;HENRL025-001651);**Monographs**- (CONKJ012-000765);**Dear Dr. Letter**- (CONNSO14-001645;PANAA025-001866)**Continuing Medical Education (CME)**-(SOLOJO23-000870), **Journals, Medical Articles, Presentations, Technical Writers**- (CONTA025-027130;DUROJ046-018053;DUROL046-018067;CONTA025-020958;DWRITE-065923;DWRITE-

065952;CONTA013-000914CHOOM001-002318;CONTA023-006750;PICKJ023-002677;DUROJ023-001712;STRIS016-047973;CONTA025-017717;SENDM009-000252;CONTA013-000420;CONTA025-019619;SENDM009-000225;DEMAE023-000059;DUROK023-0016889;CONTAO25-022310;CONTA025-019892;PICKJ007-001296;PICKJ007-001310;PICKJ007-001311;PICKJ007-001287;DUROJ046-010671; W-MDL04782-0051980-1;PICKJ007-001349;VICTJ001-002141;CONJK018-056069;SOLOJ022-001019;SOLOJ022-001373-4;SOLOJ022-001040-2;W-MDL04782-0016708;W-MDL04782-00051980-1)
**Endometrial cancer strategy**- W-MDL04782-00051891; CONTA025-024637;CONKJ012-000765;DUROJ017-000004;W-MDL527-00039573;W-MDL527-00038714; PANAA031-000708;CONJKO18-05069;w-mdl04782-0064632;W-MDL04782-00064631;W-MDL04782-00064632;DEYM101-000790) **Wyeth's Breast Cancer Task Force**-(PICKJ007-001349; **Wyeth use of Third-Party**-(CONNS005-000121;JANECO10-000163
**Wyeth Suitable for Prolonged Use-**(W-MDL04782-000292330,W-MDL-04782-00051890-10; W-MDL04782-00060132; W-MDLl04782-00059871;W-MDL04782-00051980-1; FISHG001-000388; FISHG001-000403)
**Health benefits**- (CHOOM018-000033; CONNSO14-001645)
**Sales Representatives, Scripts and White Papers**- (STRIS004-000183; DUROJ017-001087;CONTA004-00008; (W-MDL04782-00051980-1); W-HUSKA01-00001306)
**Speakers Program-**CONNS003-000235;SOLOJ023-000870;CONTA004-000008;
**Advocate/spokesperson**-(DUROJ037-000183;HENRL025-001651) **$1Million in Advocate Fees**-(CONKJ008-000129)
**CME-Myths and Misperception of Breast Cancer and HRT**- (SOLOJ023-000870)
**Strategic Publications Committee**- (DWRITE 066935;DWRITE 003353;DWRITE 066449;MARTN010-010296;SOLOJ027-048916;DWRITE 067253;DWRITE 066322)
**Training of Medical Students and Residents**-(CONNS005-000969;DUROJ023-000528) **Ghost Writers**- (CONTA025-03053-9;DWRITE 003353;MRTN010-010296-7;DWRITE 066935; SOLOJ027-048916-7;DWRITE 067253; M4188)

**OPINION #7**

45. Wyeth falsely skewed the apparent medical risks versus benefits paradigm for its estrogen/MPA products by informing the medical community that the risks of breast cancer and endometrial cancer posed by combination hormone therapy were minimal to nonexistent and acceptable, in terms of the numerous purported, but unproven, long term health benefits.

46. (SOLOJ025-000286-355, Exhibit 7182) On March 10, 1998 Jamie Durocher gave a slide presentation entitled: **The U.S. Market: A Case Study in the Success of Changing the HRT Paradigm.** Durocher, Group Product Director Women's Healthcare, walked through

Wyeth's history of marketing strategy and tactics. From the 1980s through the 1990s, Wyeth's efforts had focused on expanding the potential long-term health benefits, eradicating uterine cancer risk to tip the scales to make breast cancer risk appear low and acceptable. Wyeth did not investigate or warn about cancer risk or protect women but instead "managed issues of endometrial and breast cancer". Physicians and women were told of new potential health benefits for prolonged combination therapy that included osteoporosis/prevention of fracture, cardiovascular disease, Alzheimer's disease, colon cancer, and macular degeneration. The advertising message of the 1990s: 1) Branded materials: reinforce indications and promote brand loyalty; 2) Unbranded materials: educate and differentiate (Consequences of estrogen loss; "Benefits Outweigh the Risks", promote intervention. Wyeth's sales representatives would be encouraged to move seamlessly from unbranded materials to branded materials in promoting the use of both Premarin and combination therapy. Wyeth facilitated market penetration with investing in development of relationships with third-party groups and physician advocates- NAMs, NOF, SAWHR, AMWA, ACOG, ASRM. The methods for market penetration for physicians in the 1990s included physician detailing with a message that Premarin contained a Unique Combination of 10 components and "Nothing Else is PREMARIN". Wyeth would develop working alignments with third party associations that were designed to influence the medical community's beliefs that estrogen/MPA had a low association with breast cancer and the association with uterine cancer had been virtually eliminated.

47. Wyeth had a Strategic Publications Development Committee and a Publications Management Group whose goal was to facilitate publications in the literature of Wyeth's messages. Wyeth utilized Design Write and ghost writers to create articles for Wyeth's chosen topics, write manuscripts under Wyeth's oversight and approval and identify appropriate authors

to submit them for publication. The selected "authors" would submit the Wyeth manuscriptsfor publication without providing disclosure of Wyeth's involvement in the process (See discussion in Appendix 4).

48. An October 30, 2002 (DWRITE 071150) cover letter from Dr. Eden submitting a Wyeth commissioned manuscript was addressed to Dr. Kim, editor *American Journal of Obstetrics and Gynecology*. Dr. Eden's letter makes no reference to Wyeth's involvement in any stage of the project. From the Wyeth internal documents, Wyeth had selected the paper's title, "**Breast Cancer and Progestins**", outlined the points and opinions to be covered, approved the final manuscript. DesignWrite commissioned the ghost writer to fulfill Wyeth's assigned writing project. Wyeth had designed, edited and approved the manuscript and eventually had the draft manuscript sent to Dr. Eden for his input. Dr. John Eden was the sole identified author for **Breast Cancer and Progestins**, published in the *Am J Obstet Gynecol* 2003:188:1123-31 (M4188). The intent of Wyeth's paper was to have a respected physician cast doubts on the association of breast cancer with estrogen/MPA hormone therapy. There was no disclosure for readers of the *American Journal of Obstetrics and Gynecology* of Wyeth's involvement and design control over the contents and opinions expressed in the final published article.

**Durocher Presentation-** (SOLOJ025-000286-355, Exhibit 7182)
**Sales Representatives, Scripts and White Papers**- (STRIS004-000183; DUROJ017-001087;CONTA 004-00008; W-MDL04782-00051980-1; W-HUSKA01-00001306)
**Speakers Program-**CONNS003-000235;SOLOJ023-000870;CONTA004-000008;
**Advocate/spokesperson**-(DUROJ037-000183;HENRL025-001651) **$1Million in Advocate Fees**-(CONKJ008-000129)
**CME-Myths and Misperception of Breast Cancer and HRT**- (SOLOJ023-000870)
**Strategic Publications Committee**- (DWRITE 066935;DWRITE 003353;DWRITE 066449;MARTN010-010296;SOLOJ027-048916;DWRITE 067253;DWRITE 066322)
**Endometrial cancer spin**- W-MDL04782-00051891; CONTA025-024637;CONKJ012-000765;DUROJ017-000004;W-MDL527-00039573;W-MDL527-00038714; PANAA031-000708;CONJKO18-05069;w-mdl04782-0064632;W-MDL04782-00064631;W-MDL04782-00064632;DEYM101-000790) **Wyeth's Breast Cancer Task Force**-(PICKJ007-001349; **Wyeth use of Third-Party**-(CONNS005-

000121;JANECO10-000163) **Ghost Writers**- (CONTA025-03053-9;DWRITE 003353;MRTN010-010296-7;DWRITE 066935; SOLOJ027-048916-7;DWRITE 067253; M4188, DWRITE 071149-50)

**OPINION #8**

49. Wyeth failed to behave as a responsible pharmaceutical manufacturer when it promoted Premarin and Premarin/MPA and Prempro using false, misleading and unsupported claims despite the opinions of its own scientists and experts, warnings from FDA and requirements of the Act. These false and misleading claims included unsubstantiated health benefits claims for cardiac protection, retention of cognitive function, including reduction of Alzheimer's disease, maintenance of hair, and improved emotional stability.

**Marketing Division**-(W-MDL04782-00059871)
**Wyeth Cardiac Benefit**-(DUROJ017-001087,W-HUSAK01-0000681;SOLOJ023-000519;W-HUSAK01-00001021;SOLOGJ023-000976;LUDGMOO2-001711;VICTJ001-001064;GOLDG001-001435;LEVIG002-005601;CONNSO14-001645;DEYM003-000013;PANAA025-001866;DUROJ034-000439;W-MDL04782-00094080;CONNS014-000949;CONNS014-000210;W-HUSKA02-0000094;CONKJ012-000765;DUROJ007-000004;KBIL5-01558;KET-001561;LUDMG003-000423;CONT007-000688)
**Third-Party Cardiac benefit**-(CONNS005-000121;JANECO10-000163;PANAA027-000892)
**Alzheimer's disease/cognitive benefit**-(CONKJ012-000765; CONKJ012-000765;DUROJ007-000004)
**Lack of Cardiac Benefit**- (OLIVS014-001896; VICTJ001-002141;BURKM029-024148;GOLDG001-0014535;LEVYIG002-005601;PANAA026-001571;PANAA034-001426;W-MDL04782-00009302;GPIL008-002293;CONNS014-001103L;W-MDL303-00085228; ROSSC012-001505)
**HERS** (Heart Estrogen/Progestin Replacement Study)-Lack of cardiac benefit- See Appendix 4,(VICTJ001-001843;PICKJ020-001968, W-MDL303-00085228;CONSG001-002027;CONKJ003-000150-1;CONSG018-032099;BURKM015-00097,W-MDL527-00040231;HOLSN006-000162;ROSSC001-000368)
**HERS and fracture rate-(** CONKJ024-001753;CONSG007-000075;CONSG007-000113;CONSG007-000045;CONSG001-000435;CONSG007-000079)
**WHI** (Women's Health Initiative)-Lack of cardiac benefit- See Appendix 4
**WHI re-analysis** *JAMA* 2007 - See Appendix 4
**WHI-CACS**- *NEJM* 2007- See Appendix 4
**ERA (Estrogen Replacement and Atherosclerosis)Trial**- *Amer Heart J* 2007- See Appendix 4,( ROSSC012-001505)

**Coronary Drug Project Discontinuation of 2.5mg/d Estrogen Group-**1973 (See Appendix 4, Section VI)
**FDA Warnings about Marketing**- (W-MDL04782-00027339;PANAA034-001426;PANAA014-001130;W-MDL303-00081836;ROSSC005-000271;ROSSC005-000092)
**Scientific need for cardiovascular study**- (W-MDL04782-00030693;W-MDL04782-00009303;GPIL008-002293;GPIL008-002282)
**FDA- Need for Cardiac study**-(W-MDL303-00081735;W-MDL04782-00095313)
**Wyeth's denial to fund cardiac endpoints Million Women's Study**- (PICKJ009-001232,DEMAE007-002954)
**Ghost Writers**- (CONTA025-03053-9;DWRITE 003353;MRTN010-010296-7;DWRITE 066935; SOLOJ027-048916-7;DWRITE 067253; M4188)

**OPINION #9**

50. Wyeth failed in its responsibilities as a United States pharmaceutical manufacturer, when it disregarded both the Food Drug and Cosmetic Act and the warnings of FDA, and over-promoted the effectiveness of Premarin and Premarin/MPA and Prempro to physicians and women for prevention of osteoporosis. Wyeth ignored the FDA's approval and availability of other drugs for treatment and prevention of osteoporosis in women at increased risk. Wyeth aggressively marketed lifetime compliance to women for taking Premarin and Premarin/MPA and Prempo by scare marketing tactics including pictures of women sitting in wheelchairs, drawings of women with crooked spines and humped backs, and without providing adequate safety and efficacy information. Wyeth's marketing failed to indicate that its hormone therapy was to be prescribed after other approved products were found not acceptable for women. Also, physicians and women were not informed that Premarin and Prempro are not effective for prevention of osteoporosis in all postmenopausal women. In contrast, after WHI, physicians and women are now being informed to use the smallest dose of hormone therapy for the shortest acceptable period of time for treatment of symptoms of menopause and, in terms of

prevention of osteoporosis, that there are alternative products available that have been approved for treatment and prevention of osteoporosis in women at increased risk.

**Wyeth Promotion of Osteoporosis-easiest return on investment ("ROI")-** (SOLOJO10-000819)
**Wyeth to establish safety and effectiveness for osteoporosis**- (W-MDL04782-00059959-66)
**Wyeth promoting long-term effectiveness**-( CONKJ012-000765;DUROJ007-000004)
**FDA not safe and effective** –(W-MDL04782-00128935)
**FDA warnings for overpromotion**-(ROSSC005-000271;ROSSC005-000162;ROSSC005-000092;CONNS005-000046;CONNS005-000023;HOLSN006-000703)
**Does not "restore" bone**- (CONKJ012-000729;PANAA030-001175;W-HUSKA02-00001911;VICTJ001-001155;W-ADSBRO-001142;HOLSN004-000403;W-IND-0003867)
**Post-WHI Use alternative therapy for women of serious risk**- (PARKA008-000257)
**HERS fracture rate, no benefit and Dr. Cauley**-(CONKJ024-001753;CONSG007-000075;CONSG007-000113;CONSG007-000045;CONSG001-000435;CONSG007-000079)
**Wyeth aware not effective for all women**- (CONNSG007-000075;W-MDL04782-00059960)
**Lower dose**-(STRIS017-000076-99)

51. I reserve the right to amend my opinions pending any future discovery.

Suzanne Parisian, M.D.

prevention of osteoporosis, that there are alternative products available that have been approved for treatment and prevention of osteoporosis in women at increased risk.

**Wyeth Promotion of Osteoporosis-easiest return on investment ("ROI")**-(SOLOJO10-000819)
**Wyeth to establish safety and effectiveness for osteoporosis**- (W-MDL04782-00059959-66)
**Wyeth promoting long-term effectiveness**-( CONKJ012-000765;DUROJ007-000004)
**FDA not safe and effective** –(W-MDL04782-00128935)
**FDA warnings for overpromotion**-(ROSSC005-000271;ROSSC005-000162;ROSSC005-000092;CONNS005-000046;CONNS005-000023;HOLSN006-000703)
**Does not "restore" bone**- (CONKJ012-000729;PANAA030-001175;W-HUSKA02-00001911;VICTJ001-001155;W-ADSBRO-001142;HOLSN004-000403;W-IND-0003867)
**Post-WHI Use alternative therapy for women of serious risk**- (PARKA008-000257)
**HERS fracture rate, no benefit and Dr. Cauley**-(CONKJ024-001753;CONSG007-000075;CONSG007-000113;CONSG007-000045;CONSG001-000435;CONSG007-000079)
**Wyeth aware not effective for all women**- (CONNSG007-000075;W-MDL04782-00059960)
**Lower dose**-(STRIS017-000076-99)

51. I reserve the right to amend my opinions pending any future discovery.

Suzanne Parisian

Suzanne Parisian, M.D.

7/2/2007

# APPENDIX 3

## II. Food & Drug Administration (" FDA") & Human Prescription Drugs

1. The United States Congress mandated that the Federal Food and Drug Administration (FDA) be the federal agency charged to oversee public health and welfare for medical and therapeutic products including drugs, biologics products, and medical devices per the legal authority given to it through the Federal Food and Drug Act (FDCA) and subsequent amendments.

2. Between 1938 and 1962, FDA approved new drug applications as "safe", based on general support of safety and with limited amount of documentation required for a sponsor to support "safety". However, FDA received a new mandate from Congress on the wake of the thalidomide scare and subsequent public outcry by the passage of the Kefauver-Harris Drug Amendment of 1962. The amendment required that FDA ensure that all new drugs post 1962 were approved for United States marketing with scientific support for safety and efficacy. The amendment required that the sponsor provided scientific support of safety and efficacy in the form of a new drug application (NDA) (21 CFR part 314) published 1985.

### A. Kefauver-Harris Amendment and Drug Efficacy Study Implementation (DESI) Process

3. Significantly, the Kefauver-Harris Amendment contained a "grandfather" clause for products already on the market prior to 1962 – the date the Amendment became law. The grandfather clause provided that drugs commercially marketed prior to October 9, 1962 and after June 25, 1938, which would include both Premarin (Wyeth) and Provera (Upjohn), deemed safe and were not considered new drugs under the new Amendment provided that the products had not significantly changed in labeling or formulation and could support efficacy. As a

grandfathered drug, neither Premarin (approved 1942) nor Provera (approved 1959) were ever required to satisfy the current regulatory safety and efficacy standards traditionally thought as applicable to current pharmaceuticals. After 1962, both drug groups were required to pass a public Drug Efficacy Study Implementation ("DESI") review using the medical literature for ranking and support of efficacy for specific intended uses (described further below).

4. For grandfathered products, in lieu of the sponsor having to submit a completely New Drug Application (NDA) with new clinical trials to FDA for support of "efficacy", FDA created an alternative review process allowing a sponsor to support efficacy while remaining on the market. The process was called the "DESI" process. To facilitate the retrospective review process of thousands of marketed drugs, FDA utilized outside consultation with the National Academy of Sciences- National Research Council ("NAS-NRC"). A formal contract was made with the NAS-NRC for FDA to fund its role in the DESI project. FDA projected that the entire DESI process would take 2 years to complete, which proved to be an overly optimistic estimate.

5. Meanwhile, prior to DESI, FDA requested that drug sponsors begin to "voluntarily" make appropriate changes to the labeling and promotions of pre-1962 grandfathered drugs to expedite the updating process. Manufacturers were to begin voluntarily changing labeling and removing unsupportable indications and promotional claims from grandfathered safe drugs they did not intend to pursue as effective by DESI. During this same period, FDA also initiated the administrative actions it would be necessary for it to use to require manufacturers to make mandatory product and labeling changes based on DESI and FDA's final findings of efficacy. FDA was also to remove all grandfathered drugs from the market that were not found to be effective for an indication.

6. The NAS-NRC conducted a review of the groups of types of drugs already on the market prior to 1962 and submitted its group recommendations to FDA. The NAS-NRC organized and appointed 30 panels of experts, examined the medical literature and supporting data provided by the sponsors for approximately 4000 grandfathered safe prescription drug formulations.

7. The FDA established an internal review process of the received NAS-NRC recommendations. The reports from the NAS-NRC and other available data for the prescription drugs were internally reviewed by FDA's scientists in the Office of Drug Research and Review and FDA's final findings were reported to a DESI PMS Project Manager of the DESI Project. The results and recommendations of FDA were periodically published in a Federal Register as "Implementation Notices".

8. The FDA was required by Congress to take final action on all DESI-reviewed drugs based on its findings from the DESI Review. FDA was to withdraw all groups of grandfathered "safe" products from the market if "efficacy" for an indication could not be supported. The FDA was also, at some point, to also notify generic drug manufacturers of the outcome for a brandname or pioneer drug. If DESI supported efficacy for a grandfathered pioneer drug, the generic drug manufacturers were not required to duplicate the process. The fate of the generic drug version from DESI was to be the same as the grandfathered pioneer drug.

9. The DESI Review recommendation process for generics were codified in the 1984 Amendments to the Act. All prescription drug labeling was to be revised by a sponsor within 90 days of the publication in the Federal Register of the conclusions of the FDA or by May 15, 1972 unless the product was specifically exempted ( 21 CFR 201.200). In 40 FR 13998, March 27, 1975, the following was published regarding the requirements of each drug

sponsor to fully disclose to physicians in labeling and advertising the efficacy findings of the DESI review:

> **Sec. 201.200 Disclosure of drug efficacy study evaluations in labeling and advertising.**
>
> (1)(1) The National Academy of Sciences-National Research Council, Drug Efficacy Study Group, has completed an exhaustive review of labeling claims made for drugs marketed under new-drug and antibiotic drug procedures between 1938 and 1962. The results are compiled in "**Drug Efficacy Study, A Report to the Commissioner of Food and Drugs from the National Academy of Sciences** (1969)." As the report notes, this review has made " an audit of the state of the art of drug usage that has been uniquely extensive in scope and uniquely intensive in time" and is applicable to more than 80 percent of the currently marketed drugs. The report further notes that the quality of the labeling claims, is poor. Labeling and other promotional claims have been evaluated as "effective," "ineffective," "probably effective," "possibly effective," "ineffective," "ineffective as a fixed combination," and "effective but," and a report for each drug in the study has been submitted to the Commissioner.
>
> (2) The Food and Drug Administration is processing the reports, seeking voluntary Action on the part of the drug manufacturers and distributors in the elimination or modification of unsupported promotional claims, and is initiating administrative actions as necessary to require product and labeling changes.
>
> (3) Delays have been encountered in bringing to the attention of the prescribers of prescription items the conclusions of the expert panels that reviewed the promotional claims.
>
> (b) The Commissioner of the Food and Drugs concluded that:
>
> (1) The failure to disclose in the labeling of a drug and in other promotional material the conclusions of the Academy experts that a claim is "ineffective," "possibly effective," "probably effective," or "ineffective as a fixed combination," while labeling and promotional material bearing any such claim are being used, is a failure to disclose facts that are material in light of the representations made and causes the drug to be misbranded.
>
> (2) The Academy classification of a drug as other than "effective" for a claim for which such drug is recommended establishes that there is a material weight of opinion among qualified experts contrary to the representation made or suggested in the labeling, and failure to reveal this fact causes such labeling to be misleading.
>
> (c ) Therefore, after publication in the Federal Register of a Drug Efficacy Study Implementation notice on a prescription drug, unless exempted or

otherwise provided for in the notice, all package labeling (other than the immediate container or carton label, unless such labeling contains information required by 201.100( c)(1) in lieu of a package insert), promotional labeling, and advertisements shall include, as part of the information for practitioners under which a drug can be safely and effectively used, an appropriate qualification of all claims evaluated as other than "effective" by a panel of the National Academy of Sciences—National Research Council, Drug Efficacy Study Group, if such claims continue to be included in the indications section of the portion of the advertisement containing the information required in brief summary by 202.1(e)(1) of this chapter. When, however, the Food and Drug Administration classification of such claim is "effective" (for example, on the basis of revision of the language of the claim or submission or existence of adequate data), such qualification is not necessary. When the Food and Drug Administration classification of the claim, as stated in the implementation notice, differs from that of the Academy but is other than "effective," the qualifying statement shall refer to this classification in lieu of the Academy's classification.

(e)(1) In drug labeling the box statement may entirely replace the indications section…..
Final classification of the less-than-effective indications requires further investigation..

(f)(2) Less-than effective indication(s) in the promotional message of an advertisement which is a single package or less shall be keyed to the boxed statement by asterisk, by an appropriate statement, or by other suitable means providing adequate emphasis on the boxed statement. On each page where less-than-effective indications(s) appear the …. The asterisk shall refer to a notation on the bottom of the page which shall state," This drug has been evaluated as probably effective (or possibly effective whichever is appropriate) for this indication" and "See Brief Summary" or "See Prescribing Information," the latter legend to be used only if the advertisement carries the required information for professional use as set forth in 201.100 ( c)(1).

(g) The Commissioner may find circumstances are such that , while the elimination of claims evaluated as other than effective will generally eliminate the need for disclosure about such claims, there will be instances in which the change in the prescribing or promotional profile of the drug is so substantial as to require a disclosure of the reason for the change so that the purchaser or prescriber is not misled by being left unaware through the sponsor's silence that a basic change has taken place. The Food and Drug Administration will identify these situations in direct correspondence with the drug promoters, after which the failure to make the disclosure will be regarded as misleading and appropriate action will be taken.

10. In a decision handed down in July 29, 1975, the U.S. District Court held that a drug declared to be a "new drug" could not be marketed in the U.S. unless it was covered by an "approved" new drug application per 21 U.S.C. § 321(p)(1970).[1] The presence of a filed NDA submission with FDA was not adequate for drug marketing. The same held true for identical or similar drug products, thus sponsors were required to obtain an "approval of a completed drug application" from FDA as the only acceptable basis to start US marketing. In the Federal Register dated September 23, 1976, Congress announced the availability of a guideline for already marketed drugs which had not yet received an approved NDA or ANDA ("Abbreviated new Drug Application") and the steps required to continue US marketing.

11. The DESI review process had required industry and the FDA to review any sources, including the published medical literature, for support of substantial evidence of "efficacy" for an intended use for a group of drugs. The DESI review did not require manufacturers perform clinical trials using pre-Amendments drugs to scientifically support efficacy.

12. The "paper NDA" was an attempt by FDA to continue a similar process using already available medical literature rather than sponsors having to conduct pre-clinical and clinical testing to support safety and efficacy of marketing similar or identical drugs. At its inception, the paper NDA process did not appear to require as much FDA time and work to market similar products for the same indication. FDA and industry sought a quicker or more streamlined method, expanding upon the DESI Review policies to provide for development and marketing of similar drugs. The result was FDA's short-lived "paper NDA" policy, an attempt to bridge between the "old drug" DESI, the public "generally recognized as safe and effective"

[1] Hoffmann-LaRoche, Inc. v Caspar W. Weinberger, Sec. of Health, Education & Welfare, et al. U.S. District Court for District of Columbia, July 29, 1975.

(GRASE) approach used for retrospective review of over-the-counter drugs and the published medical literature.

13. The use of the paper NDA permitted competing companies marketing already approved post-1962 drugs to be approved by FDA based on submission of publicly available reports of "well-controlled studies" which could support a drug's safety and efficacy. However, as found out by Wyeth, adequate well-controlled studies necessary for FDA's approval under the Act were found by industry not to be generally available within the published medical literature. Use of the paper NDA could prove to be just as slow and time consuming a process for drug sponsors as obtaining FDA's approval of a traditional NDA by conductance of a clinical protocol designed to be able to support FDA approval. FDA's official reliance on a "paper NDA" policy was challenged by industry with the court upholding the challenge in 1975.[2]

**B. The Investigational New Drug Application (IND) (21 CFR Part 312)**

14. The Investigational New Drug (IND) regulations were published in 1987, 52 FR 8831, long after the commercial marketing launch of Premarin (*1942) and Provera (*1959). 21 CFR 312 defined for industry the procedures and requirements for a pharmaceutical firm to use in order to submit an investigational protocol to FDA to request to begin to study using an investigational new drug in humans or to make changes in terms of intended efficacy claims. The IND process also maintained a new accountability for investigational drugs or an approved drug but investigated for a new investigational use in the United States. The IND process also helped ensure oversight and safety of subjects enrolled in a clinical investigation and adherence of investigators to a clinical protocol.

[2] Hoffmann-LaRoche, Inc. v Caspar W. Weinberger, Sec. of Health, Education & Welfare, et al. U.S. District Court for District of Columbia, July 29, 1975.

15. The FDA first approves the IND exemption request before a sponsor can let its investigators begin using a new drug for investigation in humans. The IND process is an exemption that allows transportation in interstate commerce of a new drug and or drug for new indications which have not yet been demonstrated as safe and effective. The IND exemption will exempt the investigational drug from adulteration and misbranding under the Act. The IND was the mechanism from Congress to allow ethical clinical investigation of safety and efficacy of potential new drugs in humans. The FDA's approval of an IND protocol helps assure the quality of the data generated by a study and safety and ethical treatment of subjects volunteering to participate in a clinical drug investigation.

16. As described in 21 CFR 312.22 published in 1987, **Phase 1** trials are closely monitored studies which have been designed to determine the metabolism and pharmacologic actions of the drug when used in humans, they often use normal volunteers, the possible side effects which may be associated with increasing doses, and if possible to obtain early evidence of effectiveness. Phase 1 trials range from 20 to 80 subjects depending on the drug.

17. During **phase 2 studies**, the sponsor begins to conduct "controlled clinical studies" designed specifically to help evaluate safety but now include effectiveness of the drug for a particular indication in patients with a disease or condition under study using specified endpoints. Phase 2 trials are usually on a small group of patients, usually no more than several hundred.

18. The **Phase 3 studies** are "expanded controlled and uncontrolled" clinical trials which are performed as primary support for effectiveness of the drug and which will be included in marketing applications to support product approval. Phase 3 studies are intended to gather additional information, substantial evidence, needed to help FDA evaluate the overall benefit-

risk relationship of the drug and provide a basis for proposed physician labeling. Phase 3 trials can range from several hundred subjects to several thousand.

19. The Phase 4 studies (21 CFR 312.85) are study commitments made by a sponsor to be conducted after NDA approval. Concurrent with new drug marketing approval, FDA may seek an agreement from the sponsor that it will conduct certain postmarketing (phase 4) studies to delineate additional information about the drug's risks, benefits, and optimal use. These studies could include, but would not be limited to, studying different doses or schedules of administration than were used in phase 2 studies, use of the drug in other patient populations or other stages of the disease, or use of the drug over a longer period of time. FDA has not been given the authority or legal mechanism under the Act to compel that sponsors perform Phase 4 study commitments. Phase 4 studies are usually not the types of study that would be used by a company to support new efficacy claims for expansion of marketing but rather would be used to update warnings, risks and instruction for use.

20. For post 1962 "new" drugs, the Act and IND regulations require FDA to monitor ongoing clinical studies conducted by sponsors and submitted in marketing applications. However, FDA has limited resources for active monitoring. It would be virtually impossible for the FDA to reach out to all clinical investigational sites or facilities with INDs and monitor ongoing clinical investigations. The responsibility for monitoring the conduct of clinical investigators at each investigational site and the safety of the subjects enrolled and fulfillment of endpoints in clinical trials rests under the Act with the clinical trial sponsor and its appointed monitors, such as Drug Safety Monitoring Board (DSMB), Contract Research Organizations (CRO). For each IND clinical trial and every subject enrolled there is to be written documentation of first obtaining signed voluntary informed consent ( 21 CFR part 50). There is

also to be documented oversight by an Institutional Review Board. (IRB) (21 CFR part 56) or a comparable regulatory body (*when outside the U.S.). The monitoring of clinical investigation quality and patient safety is critical to the general mission of the FDA to ensure the quality of the scientific evaluation of drugs as to safety and effectiveness (21 CFR 312.22(a)). The FDA's ability to evaluate the data from clinical studies provided in marketing submission information is directly dependent on a firm's truthful, timely and balanced compliance with the regulations and its candid disclosure to FDA of all relevant safety and performance information.

21. Section 21 CFR 312.33 requires a new drug sponsor to file annual reports within 60 days of the IND anniversary date. The annual report is to provide FDA with a summary of the previous year's progress with the product. The report is to include a summary of both clinical and nonclinical data for the IND and new drug. 21 CFR 312.32 also requires the sponsor to file IND Safety Reports with FDA and review of safety information:

> (b) *Review of safety information.* The sponsor shall promptly review all information relevant to the safety of the drug obtained or otherwise received by the sponsor from any source, foreign or domestic, including information derived from any clinical or epidemiological investigations, animal investigations, commercial marketing experience, reports in the scientific literature, and unpublished scientific papers, as well as reports from foreign regulatory authorities that have not already been previously reported to the agency by the sponsor.

22. As a medical review officer for the FDA, faced with the review of many new product applications, it was necessary to assume, until proven otherwise, that each sponsor would behave ethically, be concerned about marketing a safe and effective product and protection of patients, and voluntarily provide the Agency with truthful and accurate product information. The medical review of clinical data for support of valid scientific evidence of safety and efficacy in marketing applications is identical for drugs, devices and biologics. The

review process has been designed to analyze the data provided as to substantial evidence of safety and efficacy. The FDA review process has not been designed to detect fraud, falsification of data or omissions of important patient safety information.

**C. The New Drug Application (NDA) (21 CFR Part 314)**

23. After a sponsor's completing its planned INDs, designed to specifically support safety and effectiveness of a new drug for a new indication (or indications) and/or specific new intended patient population, a sponsor submits an NDA to the FDA to request approval for commercial marketing. The INDs information are summarized in the NDA for FDA. It is the responsibility of the sponsor of an NDA to provide FDA with all relevant safety information and to highlight for FDA any additional safety or efficacy concerns remaining for the drug.

24. Upon receipt of the NDA, if filed by FDA, the FDA distributes and assigns the NDA to appropriate Division Director or Drug Evaluation Office Director in CDER who in turn assign the NDA application components to reviewers under a designated team leader. The team leader can refer specific sections to other specialized reviewers of CDER or utilize review skills from other Centers of FDA. The NDA review includes the information as provided by the sponsor. The reviewer documents his findings and opinions by generating an official written report with recommendations to be included in the official FDA review record. Medical officers may change, but the written record is to remain with the marketing application and to be used by the next reviewer. The supervisors from the Director of the Division up to the Commissioner of the FDA have the authority to accept or reject each reviewer's findings and recommendations regarding the NDA. At the conclusion of the new drug review process, the NDA application will be approved, not approved, or the sponsor will be sent an "approvable" letter. If the NDA is not approved, the sponsor receives a not-approvable letter which identifies the remaining

deficiencies which if addressed may be able to make the application "approvable". The sponsor can under some circumstances correct the deficiencies and resubmit additional information to the NDA to address FDA's remaining deficiencies and request reconsideration for approval. The "approvable" letter specifies the remaining conditions which must be met by the sponsor to make the product approvable.

25. The FDA utilizes Panels of Advisory Committees drawn from outside independent experts to assess information provided to FDA by the manufacturer in the NDA application and provide recommendations to the FDA. The Advisory Panel may also be used by FDA to make public suggestions to FDA regarding the types of guidance which should be given to industry for marketing applications and/or safety issues. The Advisory Panel members present nonbinding recommendations to the FDA. The Advisory Panel can also make recommendations for product labeling issues and possible post marketing concerns which can be addressed by post approval studies.

26. The FDA approves or disapproves a NDA for marketing based on its evaluation of risk versus benefit from the data obtained by the clinical trials in the NDA. Both industry and the FDA recognize the pre-marketing clinical trials are not able to identify and predict all the potential risks that may occur with a drug following wider commercial use, thus highlighting the need for appropriate phase 4 clinical trials and postmarketing surveillance by the sponsor.

27. It is the sponsor's obligation – not the FDA's – to complete postmarketing phase 4 commitments, provide FDA and physicians with adequate and truthful postmarketing reports (21 CFR 314.81), monitor performance (pharmacovigilance) and update product inserts and promotions.

**D. Prescription Drug Labeling**

28. Once a new NDA is approved, the FDA and the sponsor negotiate the language of the draft product launch labeling. The sponsor begins the process with creation of its proposed draft labeling. The proposed launch labeling for a new drug (NDA) will reflect the clinical trial data as well as any other reported human performance data. The sponsor, not the FDA, is responsible for compliance with adequacy of label requirements under the Act and for the adequacy of the contents of labels, labeling and promotions. Under 21 CFR 314.170, all new drugs, including those the FDA has approved under section 505 of the Act are subject to adulteration and misbranding provisions in sections 501, 502, and 503. The FDA regulates approved new drugs by regulations through informal rulemaking under sections 501, 502, and 503 of the Act.

29. As a general rule of thumb, the Federal Trade Commission (FTC) regulates advertising to consumers under authority from the Federal Trade Commission Act of September 26, 1914, while the FDA regulates labeling under the authority of the Federal Food, Drug and Cosmetic Act. There is a Memorandum of Understanding (MOU) between FDA and FTC, that FTC regulates ads for foods, over-the-counter (OTC) drugs, non-restricted devices, cosmetics and dietary supplements. The FDA will regulate advertisements for prescription drugs and restricted medical devices.

30. 21 CFR 201.1(1) states that advertisements subject to Section 502(n) of the Food, Drug and Cosmetic Act include advertisements published in journals, magazines, other periodicals, and newspapers, and broadcast through media such as radio, television, and telephone communications systems. FDA also regulates advertising conducted by sales representatives, on computer programs, through fax machines or on electronic bulletin boards.

31. Under 21 CFR 202.1(e), "All advertisements for any prescription drug…shall present a true statement of information in a brief summary relating to side effects, contraindications…and effectiveness….side effects, contraindications include side effects, warnings, precautions, and contraindications, and include any such information under such headings as cautions, special considerations, important motes, etc…" The regulations do not distinguish between a brief summary intended for a professional versus a brief summary intended for a consumer. Historically, the approved physician labeling has been reprinted as the source of the brief summary. When broadcasting of drug information began in 1997, the brief summary began to be viewed as one means for adequate provision of information. FDA issued a guidance for the brief summary draft in February 2004. In terms of DTC ads, the use of a physician label's brief summary has been considered as acceptable but not preferred. The brief summary was to inform its intended audience of the most serious and most common risks. Sources of product-specific health information for patients have included the healthcare provider, the patient package insert, advertising, brief summary, internet and other sources. Drug advertising have included general disease awareness information, reminder labeling and product claims.

32. Per FDA's regulations from the late 1960's, after passage of the 1962 amendments to the Act, advertisements were not to be false or misleading; must present "fair balance" between both the benefits and the risks information; must disclose "material" facts in light of the claim being made about a product. As has been interpreted by DDMAC at FDA after 1962, Congress had intended that the promotional messages for prescription drugs provide the patient and health care provider the complete story for a drug in terms of safety and efficacy and risks and benefits. Up through the 1980s, consumer communications for prescription drugs

continued to be primarily through a "learned intermediary". In the 1980s the risks of marketing prescription drugs directly to consumers (DTC) began to surface. From 1983-1985, FDA placed a voluntary moratorium on DTC marketing for the pharmaceutical industry. In 1985, FDA lifted its voluntary marketing moratorium, hoping that the regulations would now provide "sufficient safeguards to protect consumers." In the 1990s' print ads for prescription drugs to consumers began to proliferate. In the mid 1990's, DTC was expanded with broadcast ads. FDA conducted surveys to examine the impact of DTC advertising on the doctor-patient relationship and prescription of drugs. There were two consumer surveys (1999 and 2002) and one physician survey (2002). In September 2003, there was a public meeting held by FDA on its DTC research. In February 2004, FDA issued 3 draft guidances for industry. By November 2004, there was a final report on FDA's conclusions from its DTC research with a DTC Meeting held November 2005.

33. In terms of FDA's recent enforcement actions, FDA was averaging 4-5 warning letters annually issued to drug sponsors to stop and correct misleading promotional activities. In 2005, FDA sent out 15 Warning Letters for promotion violations. In the 15 Warning Letters sent in 2005 for violation of promotional activities, 82% were inadequate risk information, 43% misleading effectiveness claims, and 43% misleading comparative claims. (* Taken from Thomas Abrams, DDMAC, FDA, January 30, 2006 presentation titled: **FDA Update on Advertising and Promotion of Prescription Dru**gs; K. Aikin, DDMAC, FDA Society of Women's Health Research, October 25, 2005, **Direct-to-Consumer Advertising of Prescription Drugs: looking Back, Looking Forward**)

34. Since the promulgation of the requirements set forth in Federal Register (41 FR 6908) on **February 13, 1976**, misleading statements in drug labeling are described as:

**Sec. 201.6 Drugs; misleading statements**.
a) Among representations in the labeling of a drug which render such drug misbranded is a false or misleading representation with respect to another drug or a device or a food or cosmetic.

35. Under the definitions of the Act drug and device labeling and label are defined as follows:

SEC. 201**.** [21 U.S.C. 321] For the purposes of this Act—

(k) The term "**label**" means a display of written, printed, or graphic matter upon the immediate container of any article;

m) The term "**labeling**" means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.

(n) If an article is alleged to be **misbranded** because the **labeling** or **advertising** is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.

36. Since 1979 (44 FR 37462 ) and through the most recent format changes for prescription drug labeling, FDA's general format for prescription drug labeling applicable to Premarin could be found in 21 CFR 201. 57 (*See 21 CFR 201.56,and 201.80). According to 21 CFR 201.57(e), the FDA drug regulations regarding labeling stated that a "W**arning**" section of a drug label shall describe serious adverse events and potential safety hazards and actions, limitations imposed by them and steps that should be taken when they occur. This section required that "the labeling shall be revised to include a warning **as soon as there is reasonable**

**evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved**." Further, in promulgating this regulation, FDA stated:

> [L]abeling regulations do not prohibit a manufacturer...from warning health care professionals whenever possibly harmful adverse effects associated with the drug are discovered. The addition to labeling and advertising of additional warnings... is not prohibited by these regulations. 44 Fed. Reg. 37434.

37. The FDA may require that special problems with a drug, particularly those that may lead to death or serious injury, be prominently displayed in a **box at the outset of a package insert**. This "black box" warning contains information that is ordinarily based on clinical data, but serious animal toxicity risks may also be the basis of a boxed warning in the absence of clinical data. The frequency of these serious adverse reactions and, if known, the approximate mortality and morbidity rates for patients sustaining the reaction, which are important to safe and effective use of the drug, shall be expressed as provided under the "**Adverse Reactions**" section of the labeling.

38. In contrast to "Warnings," (21 CFR 201.57(f)), the "**Precaution**" section in a drug label was to contain the following subsections as appropriate for a drug:

> (1) *General*. This subsection of the labeling shall contain information regarding any special care to be exercised by the practitioner for safe and effective use of the drug, e.g., precautions not required under any other specific section or subsection of the labeling.
>
> (2) *Information for patients*. This subsection of the labeling shall contain information to be given to patients for safe and effective use of the drug, e.g., precautions concerning driving or the concomitant use of other substances that may have harmful additive effects.

39. In light of safety or efficacy issues relating to a drug, or if a sponsor desires to improve the overall safety and effectiveness of a drug label to protect public health or comply

with the Act, the drug's sponsor may add to or strengthen its warnings or otherwise change its label without the FDA's prior approval through a process discussed in **(21 CFR 314.70(c)(6)(iii)(A-D):**

> (6) The agency may designate a category of changes for the purpose of providing that, in the case of a change in such category, the holder of an approved application may commence distribution of the drug product involved upon receipt by the agency of a supplement for the change. These changes include, but are not limited to:
>
> iii) Changes in the labeling to accomplish any of the following:
>
> (A) To add or strengthen a contraindication, warning, precaution, or adverse reaction;
>
> (C) To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;
>
> (D) To delete false, misleading, or unsupported indications for use or claims for effectiveness; ….

40. This section permits important labeling changes affecting public health and safety to be swiftly implemented by a manufacturer avoiding the delay a requirement for FDA's prior approval of a supplement would involve.

41. Only a few prescription drugs, including estrogens, require direct to patient warnings (21 CFR Section 310). For women, the requirements for a Patient Warning Insert is a recognition that estrogen drugs are lifestyle choice drugs, with the woman participating with her physicians in the final decision making as to whether or not to use these drugs in terms of risks versus benefits.

42. The role of the FDA is to enforce regulations that govern the actions of pharmaceutical companies. The resources provided to the FDA, to accomplish this task, are

limited. Drug companies know the limitations of the FDA. Drug companies cannot rely upon, and certainly cannot minimize their own responsibility and capacity to ensure the safety of the public from the dangers of the drugs it makes and profits from. Sponsors of FDA-regulated products are required to ensure product safety and provide adequate and truthful labeling. It would be illogical that the Act and FDA's regulations would not allow a process whereby the NDA sponsor can immediately improve product labeling, protect public health and ensure its own full compliance with the Act.

43. Information placed in the "Contraindication Section" of a label describes those situations in which the drug should not be used because the risk clearly outweighs any possible benefit. Known hazards and not theoretical possibilities are to be listed, e.g., if hypersensitivity to the drug has not been demonstrated, it should not be listed as a contraindication. If no contraindications are known, this section of the labeling shall state, "None known." (21 CFR 201.57(d).)

44. The regulations require that the frequency of serious adverse events and other pertinent information "shall" be provided under the "adverse reaction" section of the label (21 CFR 201.57(g)). This section of the label "shall list the adverse reactions that occur with the drugs in the same pharmacologically active and chemically related class."

45. A drug's sponsor, not the FDA, is responsible for the content of both product labeling and a product's label. The sponsor, not the FDA, prepares the draft original label after NDA or supplemental NDA ("sNDA") approval, and it is the sponsor that is required to draft all additional or supplemental labels including any revised warnings sections. The regulations expressly state that labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not be

proved (21 CFR 201.57(e)). "**Reasonable association**" can be provided by evidence of a variety of sources including:

a) *in vivo* and *in vitro* evidence collected during the preclinical period;
b) well documented single case report;
c) a case series;
d) adverse event analysis;
e) epidemiological studies (including observational studies); and
f) clinical trials.

**Standards of Care**

46. The Federal Food and Drug Act ("FDCA") provides a minimal standard to allow a new drug product or a drug product with a new claim to legally enter the United States market. The FDCA prohibits any manufacturer of any FDA-regulated product, whether food, cosmetic, biologic, drug or device to sell a product in the United States in violation of the Act (21 USC Sec. 301[331]). For drugs, biologics, and devices, Congress required premarketing approval, and that a product be manufactured according to current industry Good Manufacturing Practices (GMP) to ensure it sells safe and effective products which are adequately and truthfully labeled and truthfully promoted. All United States pharmaceutical companies are required to have in place written standard operating procedures ("SOP") for it to continuously monitor the performance of its manufacturing facilities, product quality and performance of its drugs in order to remain in full compliance with the Act. The manufacturer's obligations under the Act, to both FDA and the public, are continuing in nature, and encompass both the pre-approval and post-approval stages of the drug's lifecycle.

47. The responsibility for the adequacy of testing and development of a new drug, design of product insert, advertising and promotions to physicians has rested with the NDA sponsor and not with the FDA. The FDA issues nonbinding Guidances to industry to help it utilize methods that can support safety and efficacy for a new indication as required by the Act.

FDA has made a commitment to the pharmaceutical industry with the introduction of Prescription Drug User Fees in 1992 of streamlining FDA's review process and requirements to help bring new products to the market in a timely manner. FDA's guidances are nonbinding, with. FDA suggesting and making comments based on best current science. Ultimately responsibility for compliance with the Act and substantial evidence of support of safety and efficacy, adequacy of labeling and product performance for a drug lifecycle rests with the manufacturer and not FDA.

48. The FDA was not intended by Congress as an agency that engages in independent development of new drugs. FDA is not to compete with the pharmaceutical industry. The FDA does not design clinical and pre-clinical studies for sponsors to support NDA approval. FDA does not tell a drug sponsor when it should file an IND, NDA or sNDA (Supplemental New Drug Application). It is the drug's sponsor or its United States agent that remains responsible for performing these functions in order to market a drug and comply with the Act.

49. After the Kefauver-Harris Amendment to the Act, approval of an original NDA must be supported through the use of well-designed human clinical investigations ( March 1987, 52 FR 8831). A new drug application (NDA) was to contain the required elements described by the Agency 21 USC Sec 505 [355], and 21 CFR part 314. In addition, the FDA was empowered by Congress with a pharmacovigilance role after new drug approval to help ensure continued safety and efficacy of a new drug and protection of the public when a drug was used for treatment of commercial patient populations.( 21 USC Sec 505(k) [355], 21 CFR 314.80 published 1985, 50FR21238). The FDA was required to monitor product inserts, labeling and promotion of approved new drug applications to help ensure the sponsor's compliance with the

Act and the safety of the public. ( 21 USC Sec 301[331], Sec. 501[351], Sec. 502[352] and 21 CFR 201,202, and 203).

50. As discussed at great length in the Institute of Medicine's (IOM) **The Future of Drug Safety, Promoting and Protecting the Health of the Public,** 2007, commissioned by the FDA, the FDA after initial drug launch does not have ability to compel mandatory drug labeling changes, rather FDA pursues a course of voluntary negotiation of drug label changes which, in the case of VIOXX, potentially can take a long time to complete for an already marketed drug and may be inadequate to fully protect public health. Also, FDA, as again evidenced by VIOXX, did not have the ability to require manufacturers to conduct post-approval safety studies. As supported by the IOM, it remains the ultimate responsibility of a United States pharmaceutical company to ensure that the drugs it manufactures, markets in the United States and profits from remain safe and effective for the intended patient population and indication, adequately labeled, and truthfully marketed.

# APPENDIX 4

# UNDERLYING FACTS AND DATA IN SUPPORT OF OPINIONS

## I. History of Wyeth, Medroxyprogesterone Acetate ("MPA") and Prempro

### A. Wyeth's Premarin- Development of Conjugated Equine Estrogen ("CEE")

1. Physicians in the United States were relatively unconcerned about the treatment options available to women with symptoms of menopause until the end of the nineteenth century, when the first monograph on menopause was published by A.F. Currier in 1897. Beginning in the twentieth century, women were living longer and became more active participants in medical care, menopause became considered an important change in a woman's lifecycle. With new recognition of menopause and menopause symptoms, came encouragement from pharmaceutical firms to prescribe drugs, such as sedatives, to help her cope with symptoms.

2. Menopause symptoms are often transitory, moderate to mild in nature, not life-threatening, and primarily impact on a woman's quality of life. Therefore, unlike the treatment of a true "disease", a decision to electively treat, or not treat symptoms, and how long to treat rests primarily with a woman.

3. Sex hormones were initially discovered in Germany over 100 years ago by Arnold Adolph Berthold (1803-1861), a physiologist, zoologist and a pioneer in the new field of endocrinology. He had been investigating the role of the gonads in development of animal secondary sexual characteristics and identified that sex organs acted as endocrine glands.

4. It had been known since 1869 when surgeons began to remove the ovaries of women with breast cancer that hormones, even the patient's own natural hormones, were able to

speed up the growth of breast cancer. The birth of medical endocrinology began when methods were developed to obtain and manufacturer exogenous hormones that could be administered to humans.

5. In the early 1920's, Dr. Edgar Allen and Dr. Edward Doisy isolated the steroid hormone estrogen from pig ovaries. In 1923 Allen and Doisy published a rat vaginal smear procedure to help investigate the periodic estrous cycles of rats and mice through monitoring cyclic changes in vaginal epithelium. Injections of extracts obtained from an ovarian follicle could alter vaginal epithelial smear findings. In 1924 Ayerst, Mckenna and Harrison, Ltd., ("Wyeth") organized in Montreal Canada. In 1929, Butenandt in Germany isolated estrone from human pregnancy urine, followed in 1930 in the U.S. by Dr. Doisy and in Holland, Dr. Laquer. Also in 1930, in England, Dr. Marrian isolated estriol and in the U.S. Dr. Doisy isolated estradiol from pig ovaries.

6. It had been known since 1932 that male mice would develop breast cancer when given injections of estrogen. Sex hormones were known to be able to produce cancer in certain susceptible animals.

7. A pre-menopausal woman normally is known to produce estrogen during the first two weeks of each new menstrual cycle, and estrogen along with the hormone progesterone during the next two weeks of her cycle. The cyclic progression of changes in natural hormones pre-menopause produce the cyclic changes of the lining of a uterus (endometrium) preparing the uterus and endometrium for implantation and development of a fertilized egg. If a pre-menopausal woman does not conceive, the two hormone levels drop, triggering the start of menses and shedding of her uterus lining.

8. In the 1930's Dr. Collip, McGill University, Canada, obtained a potent estrogenic fraction from human placenta, which he called "Emmenin". The biological activity of Emmenin was decreased when it was given orally. The early estrogens such as Emmenin were given to a woman to help treat symptoms of dysmenorrhea, amenorrhea and menopause. Emmenin was considered to have low estrogenic activity and was costly due to its limited supply. In the early 1930's, Wyeth in cooperation with Dr. Collip and McGill University marketed Emmenin without conducting any clinical trials. The single most important active ingredient of Emmenin was estriol glycuronide, a compound that had been first isolated by Dr.Marrian in England just before he joined the staff at the University of Toronto, Canada. In 1931, shipments of Emmenin were initially denied entry into the United States by U.S. Customs since there was "no such thing as an orally active estrogen", but by 1933, Emmenin was being marketed in the United States. During 1937 and1938, Emmenin was well-received by physicians for treatment of patients and sales increased. It quickly became apparent to Wyeth that the human placenta, was not going to be an adequate source of raw materials and attention was turned to use of late human pregnancy urine. (* History of Premarin- BURRG002-00055-72; History of Premarin October 31, 1994 BURRG002-000049-53).

9. In 1930, Dr. Benhard Zondek, a German Obstetrician and Gynecologist, inventor of the first reliable pregnancy test, the Aschheim-Zondek test, made a survey of the urine of animals in the Berlin Zoo which resulted in his discovery that urine obtained from the equine family (horse, zebras, male and female) contained estrogen and the amount was markedly increased in pregnant mares' urine ("P.M.U."). In 1934 Dr. Beall and Dr. Marrian published a method for large scale preparation of estrone from PMU. In 1938 Dr. Schacter and Dr. Marrian isolated estrone sulfate as the potassium salt from PMU.

10. In 1939 Diethystilbesterol (DES), a synthetic estrogen, unrelated in structure to natural estrogen, came to the market as a new cheap endocrine hormone entity for physicians to use and sales of Emmenin fell 10% in both the US and Canada. Diethylstilbesterol (DES) had been first synthesized by Sir Charles Dodd in England in 1938 and became the first synthetic estrogen hormone sold in the United States that was easy to make and active orally.

**[* DES – The First Identified Hormone "Carcinogen"**

11. DES is a synthetic estrogenic compound capable of producing estrogen-like effects "similar to", but "not identical to", a woman's own natural estrogen. It has a history that is applicable to the general class of estrogen drugs and helps supply a piece of FDA's regulatory history with estrogens. Shortly after DES was first synthesized in the 1930s, it was shown in laboratory animals to be a potent carcinogen that produced tumors which tended to concentrate in estrogen-sensitive tissues. Empirically, and with no scientific data or clinical testing to support its new use, in 1948 DES began to be used by physicians to treat women during first trimester of pregnancy as treatment for a theoretical hormone deficiency to help prevent spontaneous abortion. This unproven new hormone regimen unfortunately became a standard of medical care.

12. Starting in 1969 and through 1971 Massachusetts General Hospital (MGH) began to report cases of clear-cell adenocarcinoma diagnosed in the vagina and cervix in young women. A case control study was published in the NEJM by Dr. Arthur Herbst linking a woman's prenatal exposure from her mother to DES. He also provided his findings and raw data sheets directly to FDA in April 1971. Not through the actions of the FDA to protect the public, but rather as a result of the actions of New York State, there was a Congressional hearing chaired by Congressman L.H. Fountain November 1971 (Fountain Hearing). It was also

discovered that after the publication of the NEJM article, the FDA had taken no formal steps to warn physicians of the risks of DES or limit the use of DES as an ineffective and dangerous drug during pregnancy. FDA took no action until November 10, 1971 the day prior to the opening of the Fountain Hearing. On March 1972 at one of the Fountain Hearings, FDA, when questioned, admitted that it had made no formal evaluations of the DES issue.

13. In 1967, the FDA's DESI review process had identified DES as "possibly effective" for threatened abortion, but requiring more data. FDA admitted at the Fountain Hearing, it had taken no action to obtain additional data from the drug sponsor to support of deny effectiveness of DES for threatened abortion. As a result of the Fountain Hearings, DES was identified as the first hormone estrogen product to be classified as a human carcinogen.

14. It became clear to Wyeth after the introduction of synthetic DES, that in order to be competitive in the estrogen market, it need an estrogen product with even more hormone potency than Emmenin. A project was begun at Wyeth to attempt to manufacture a new "High Potency Emmenin" using PMU (pregnant mares' urine). The Board of Management's minutes in the year 1941, reportedly reflect references to a need for adequate clinical trials prior to introducing its new product. At an early stage it was decided by Wyeth to make the new product from PMU and that the new investigational tablets needed to be labeled as "Special Emmenin Tablets" when used in small human clinical trials to compare the potency of Emmenin to "Special Emmenin". It was reported as recognized early that there was a considerable difference in potency between Emmenin from placentas and PMU's "Special Emmenin".

15. In 1941, Premarin first began to be marketed in Canada. In 1942 Wyeth submitted its NDA to FDA for launching of marketing in the United States Premarin tablets,

1.25mg (*label potency is expressed as the amount of sodium estrone sulfate). In 1943, Ayerst was purchased by American Home Products.

**2. FDA's Approval of Premarin's NDA# 4-782**

16. The PMU product sold by Wyeth was first called Premarin when sold in Canada. Premarin is a "conjugated equine estrogen" ("CEE"), not a human estrogen, but which can produce "estrogen-like" effects when given to a human. In contrast to Premarin, the human female's ovary naturally produces estradiol, a biologically active estrogen, as well as weaker estrogens estrone and estriol. Pursuant to the Federal Food, Drug and Cosmetic Act (FDCA) of 1938, Wyeth submitted NDA #4-782 in March 1942 requesting to market Premarin Tablets derived from PMU to treat a woman's menopausal symptoms.

17. Wyeth's Premarin NDA notified FDA that Wyeth intended to begin its marketing of Premarin on May 1942 based on FDA's satisfactory review of submitted safety and manufacturing data. (BURRG002-000055; BURRG002-000049; CONTA003-000676). The Premarin tablets were made at Arner Company, Inc., and according to the NDA, the recipe for 25, 000 Premarin tablets was: 2 ½ lbs dessicated extract of pregnant mare's urine; 1 lb corn starch; 1 lb 4ozs cane sugar; 9 lbs lactose, starch; talc; acacia mucilage and 3 certified colors (W-MDL4782-00014936).

18. Prior to receiving NDA approval, Hunter Kennedy, M.D., FDA wrote to Dr. A. Stanley Cook, Director of Research and Control, Ayerst, McKenna & Harrison (aka "Wyeth"). FDA notified Wyeth that it had received additional information for the NDA on April 27 from the American Drug Manufacturers Association. The Agency letter continues that Section 301(1) prohibits the use in labeling or in any advertising to the effect that the application for the drug is

found "effective" under Section 505. FDA wrote (W-MDL04782-00014963) regarding its label recommendations for Premarin:

> In order that the declaration of the active ingredient be fully informative, in our opinion, you should clearly define the source of the natural estrogenic-substance, namely pregnant mare's urine.
>
> In order that the label comply with section 502(f)(2) of the Act it should bear a warning statement which clearly indications that this is a potent drug and serious consequences can result if used other than under the constant medical supervision.

19. Wyeth's response to FDA's labeling request provides information about Wyeth's planned marketing of Premarin to physicians and its willingness to comply with FDA's request for labeling changes and new warnings. Wyeth sent a May 16, 1942 letter to Mr. Carson Frailey, Executive VP, American Drug Manufacturers Association (ADMA). (W-MDL04782-00014968-69), a pharmaceutical trade association, along with its final drug labels for ADMA to provide to FDA (Underlining added for emphasis.):

> You will note that we have not conformed with all the suggestions contained in Dr. Kennedy's letter of May 8th. In his letter he expressed the opinion that we should mention the source material, pregnant mares' urine, on the label. He brought up this point during my last conversation with him in Washington and I rebutted with the argument that in our opinion inclusion of this term on the label may mislead physicians as to the nature of the product. The very large number of brands of "estrogenic substances" which, as you know, may be considered for practical purposes as slightly impure estrone, are all described as pregnant mares' urine estrogens. Our product "Premarin", while it is derived from pregnant mares' urine likewise, contains these estrogens in the form of their sulfates. They are thus chemically distinct from the pregnant mares' urine estrogens sold under the name of "estrogenic substances" and this general difference is reflected in their physiological activity, the conjugated estrogens being much more active by mouth.
>
> Further, I pointed out to Dr. Kennedy that we have the word "equine" on our label, and in our descriptive literature we state prominently in the opening paragraph that the product is made from the urine of pregnant mares. Dr. Kennedy agreed that there was a real basis for our contention but apparently his own opinion was unchanged.

> If my understanding is correct, there is no compulsion attached to this particular suggestion of the Food and Drug Administration, and we are at liberty to accept or reject it as we wish, provided that we are satisfied that our label is not misleading and that we accept responsibility for this.
>
> In connection with the warning statement, the terminology used in Dr. Kennedy's letter is the same as the suggested warning statement for stilbesterol. We have used a shorter statement which we feel conveys the same idea.
>
> In transmitting this material to the Food and Drug Administration, if you could informally ascertain whether or not they have deep-rooted objections to the course we have followed, we would appreciate it very much.

20. As stated in the FDA's letter above, FDA recommended before Premarin's NDA approval that Wyeth include information for the user about the active ingredients of PMU on the label. Even prior to the initial NDA approval and launch of marketing, Wyeth began to choose to ignore FDA's labeling recommendations, as it stated, assuming its own full responsibility for the contents of its labeling. (W-MDL04782-00014935- Ex. 0002; W-MDL04782-00014963- Ex. 0003; W-MDL04782-00014967- Ex. 0004).

21. Wyeth continued to represent to women and physicians that its estrogen was "obtained exclusively from natural sources" as were other sources of estrogen that were available. However, Wyeth avoided indicating clearly to women that Premarin was "equine estrogen" from PMU and not a human estrogen. (CONNS003-000069- Ex 0238). Even in 1942, Wyeth fully understood the limitations of FDA's authority under the Federal Food Drug and Cosmetic Act ("FDCA").

22. Wyeth aggressively met the challenge of promoting both Emmenin and Premarin, as new and potent endocrine drugs, to physicians. Wyeth began by publishing comprehensive brochures on Emmenin and later on Premarin providing its version of what it called termed as scientific background and disease education , as well as results of its own clinical investigations.

These types of basic science disease education brochures used by Wyeth were classified as "unbranded" materials ( HENRL005-000603) therefore not as clearly regulated by FDA under the Act as "branded" information intended for drug promotion and advertising. However, according to the Federal Trade Commission (FTC), all advertising, whether "branded" or "unbranded" must be truthful.

23. One of the earliest brochures for Premarin was issued May 1942 along with drug launch and without supplying physicians with clinical references. The brochure was reissued September 1942 with clinical references. An advertising piece was issued December 1942 directing attention to the fact that both Emmenin and Premarin were supplied with the approval, not of the FDA, but with the approval of the Research Institute of Endocrinology ("REI"), McGill University and under the direction of Dr. J. B. Collip. The first Wyeth sponsored clinical reference for use of Premarin' was a paper by Goodall produced in December 1942. As more clinical references became available to Wyeth for Premarin it issued new brochures.

24. Education of its salesmen so that they could make a "proper presentation" to the physician has been an essential part of Premarin programs. This was accomplished in part by inclusion in the monthly Salesman Bulletin information on estrogens prepared by the Medical Director, Dr. Murray Scott. Throughout the history of Premarin, there has been a continuing series of clinical investigation for support of "efficacy" for new marketing claims. According to Wyeth's 1994 history (BURRG002-000050), in the 1950s it instituted a "massive program" to educate physicians and patients about menopause, vasomotor symptoms, atrophic vaginitis and the use of Premarin. The result was that estrogen replacement therapy (ERT) surged with about 12% of all menopausal women using ERT. Premarin grew 170% from 1963 to 1966, becoming

the #1 prescribed drug in the United States. Premarin 1.25 mg was the most prescribed dose, with Premarin 2.5 mg (available since 1947) the second most-prescribed.

25. However, in the late 1960's, competing estrogen products also began to enter the United States market to compete with Premarin, for example, "esterified" estrogens (Estratab) by Reid Carnick and Ogen, a "semisynthetic" estrogen by Abbott. In the early 1970's generic conjugated estrogens made from 3 identified estrogen components of Premarin began to proliferate as Premarin use continued to grow. To help counter the generic competition, Premarin began to be promoted for osteoporosis.

3. **FDA and DESI Review of Premarin** (* Also see discussion of "DES" and DESI above)

26. In 1972, FDA announced that the DESI review, based on review of published literature found certain estrogens, including Premarin Tablets as "effective" for relief of number of symptomatic indications and "probably effective" in selected cases of osteoporosis (DESI 1543;37FR 14826-8, July 25, 1972). The effective indications included menopausal symptoms, senile vaginitis, dysfunctional uterine bleeding, hypogenitalism, and functional amenorrhea. In that same submission, FDA also requested submission of abbreviated new drug applications (ANDAs) for sales of generic conjugated estrogens.

27. A follow-up notice (DESI 1543; 41 FR 43114, September 29, 1976) defined the conditions for marketing estrogens for their effective indications, reclassified all less than effective indications as "lacking substantial evidence of effectiveness" and published labeling requirements for the effective indications (as amended October 29, 1976; 41 FR 47573-8): moderate to severe vasomotor symptoms (There is no evidence that estrogens are effective for nervous system symptoms or depression which might occur during menopause and they should

not be used to treat these conditions.), female hypogonadism, female castration, primary ovarian failure, atropic vaginitis, kraurosis vulvae, postpartum breast engorgement, and prostatic carcinoma-palliative therapy of advanced disease, breast cancer (for palliation only) in appropriately selected women and men with metastatic disease ( ROSSC012-001501). The notice specifically exempted Premarin Tablets labeled for osteoporosis from reclassification as "lacking substantial evidence of effectiveness", stating that only Ayerst Laboratories had submitted data to support upgrading the indication to "effective" but that Ayerst's submission was found not to provide substantial evidence of Premarin's effectiveness. A future notice would specifically explain this conclusion. This action allowed Premarin Tablets to carry the "probably effective" indications for osteoporosis.

28. In 1986, based on the recommendations of two advisory committees (Endocrine and metabolism February 18, 1977; Obstetrics and Gynecology, July 28, 1977) and additional published literature, including clinical dose-ranging data using bone mineral density endpoints (Lindsay, 1984; Genant, 1982), non-contraceptive estrogens were all reclassified as "effective" for the treatment of osteoporosis, including Premarin Tablets (DESI 1543; 51FR 12568, April 11, 1986).

29. On September 29, 1976, Federal Register notice 41FR 43108 instituted so-called "class labeling" for estrogen products. In 1990, formal guidelines were revoked for estrogen drug product professional and patient labeling, and replaced by informal labeling guidances (55 FR 18761, May 4, 1990). The availability of the most recently revised labeling Guidance for Estrogen Drug Products Physician labeling and Package Insert (1992) was announced on June 28, 1994 (59 FR 33300)(*Used by Wyeth for submission of Prempro NDA in 1994- See below)).

30. From the DESI and FDA's documentation, and unlike the NDA's eventually approved for later marketing approval of synthetic conjugated estrogens (SCE-A and SCE-B), Wyeth was required at no time to provide FDA with what we currently consider clinical trials to support safety and efficacy for start of new drug marketing. Wyeth's Premarin claims have been derived from a DESI process for substantial evidence of "effectiveness", FDA's reviews of medical literature for estrogen, and two FDA advisory committee's recommendations for osteoporosis.

**4. PREMARIN - Generics and Synthetic Conjugated Estrogens**

31. As a "pregnant horse urine", Premarin is known to contain at least ten different horse estrogen components. Estrone and equilin, both in the sulfate form, have been identified as two major components. It is known that there are additional estrogens present in smaller amounts. How all these various horse estrogens contribute to the drug's overall effectiveness and activity has not been definitely determined by Wyeth. This lack of adequate characterization of Premarin's activity by Wyeth has proved to be a useful marketing advantage for Wyeth reducing the likelihood of a generic CEE interfering with sales of Premarin. The delay in characterizing by Wyeth dramatically has affected sales and profitability of Premarin (W-MDL04782-00082752). Wyeth developed no valid scientific evidence showing that any of the unique Premarin components from horse urine possess a unique therapeutic activity in humans (RYANJ002-000495; DEYMI020-000195; CONNS001-000654; BURRG002-000049; PANAA019-000676;SINAM002-001012).

32. The sales of Premarin by Wyeth has been designed to develop brand loyalty among physicians and patients since there is no generic bioequivalent for Premarin. Wyeth informs health care providers that they should entrust their patients' care to Premarin because

there are "no branded or generic equivalents", "no other product is therapeutically bioequivalent". (W-HUSAK02-0000095). At one time, Wyeth calculated that FDA approval of a bioequivalent generic for Premarin would potentially cost Wyeth at least 79% of its Premarin sales (PANAA001-000816).

33. In 1970, the United States Pharmacopeia (USP) published a monograph of compendia standards for Conjugated Equine Estrogens ("CEE" and Premarin), describing USP conjugated estrogen as containing estrone sulfate and sodium equilin sulfate. Little scientific data was available when the USP first monograph was published about the actual composition of Premarin or pharmacological activity of all of its components.

34. According to FDA, (FDA Backgrounder on Conjugated Estrogens, FDA's website), "the scientific belief at the time was that all estrogens had similar pharmacological activity and therefore, the pharmacologic activity of an estrogen preparation could be described in terms of its "total estrogenic potency". FDA indicated that" the effects of different estrogens in a mixture were believed to be additive and the identity of any particular estrogen contributing to the estrogenic potency was not considered crucial". FDA continued that :"Furthermore, based on the results of early studies, including Premarin, the effects of estrogen on bone mineral density (BMD) appeared to have a steep dose-response relationship, and that a 0.625mg dose of Premarin appeared to be near the top of the dose response curve."

35. The FDA's Backgrounder continued "although FDA's Scientific Advisory Committee failed to provide definitive advice on the issue of Premarin's active ingredients, FDA continued to support the position that the ingredients sodium estrone sulfate and sodium equilin sulfate were the sole active ingredients in Premarin".

36. FDA wrote regarding its internal deliberations of the requirements for a generic CEE that:

> Over the past several years, emerging scientific evidence demonstrates that , for a number of reasons (e.g., variable pharmacokinetics, tissue metabolism, and tissue-specific receptor factors) all estrogens do not uniformly exert their effects on different target tissues. One estrogen can be more active than another in a specific tissue or organ, such as breast, uterus, or bone. This finding leads to the conclusion that the active ingredients in Premarin cannot be defined solely in terms of overall estrogenic potency in any single system, but must be defined based upon their contribution to particular estrogenic effects.
>
> Compositional analysis of Premarin using modern analytical techniques demonstrates that it consists of a mixture of a substantial number of compounds with potential pharmacologic activity. In fact, the steroidal content of Premarin has not been completely defined. Undoubtedly, many of the compounds present in Premarin do not provide a clinically meaningful contribution to the therapeutic effects of the drug and are best thought of as impurities. However, the clinical tests, on which the findings of the safety and efficacy of Premarin were based, were performed on the entire mixture, not on individual components. A basic understanding of Premarin's chemical composition must be achieved as a first step in adequately characterizing the product, unless a complete understanding of which components provide a clinically meaningful contribution to the therapeutic effect of the product is achieved by clinical trials alone.
>
> New clinical studies emphasize the importance of adequately characterizing Premarin…
>
> Highly illustrative of the need for further characterization of Premarin are the recent findings regarding the estrogen compound delta (8,9) dehydroestrone sulfate (DHES) This compound w as first detected in Premarin in 1975, represents only a small percentage (4.4%) of the estrogenic compound present in the product. Recent pharmacokinetic studies demonstrate that, after single or repeated oral dosing of Premarin in women, the plasma concentration of the metabolite of DHES is approximately 34% of the combined concentration of the metabolites of the active ingredients estrone and equilin or 26% of the metabolites from the three estrogens.

37. In 1991 FDA removed all generic conjugated equine estrogen (CEE) from the market until a sponsor could successfully demonstrate bioequivalence to Premarin. In 1995, Wyeth successfully petitioned the FDA to require the presence of delta 8,9-dehydoestrone (DHS)

in any generic version of Premarin. This component, DHS, had been first identified in 1975 and represented a small portion of the eventual active estrogenic metabolite in pharmacokinetic studies with Premarin. Wyeth obtained the United States Patent for synthetic delta 8,9-dehydroestrone. The requirements for the presence of DHS in a generic bioequivalent along with patent exclusivity effectively blocked competitors from producing a synthetic version of Premarin. In 1997, FDA refused to approve abbreviated new drug applications (ANDA) for Duramed and Barr Laboratories for generic synthetic versions of Premarin. The FDA's rationale was that a synthetic generic version of Premarin could not be approved by FDA because the "exact chemical composition" of Premarin can't be fully identified.

38. Because the road to bioequivalent generic competition was blocked, Duramed chose to pursue obtaining FDA's approval of a New Drug Application (#20-992, approved March 24, 1999). Duramed's synthetic drug which it called Cenestin is a mixture of nine synthetically derived estrogenic compounds (*DHS was absent) produced from soy and yam plant sources. Cenestin is not considered a conjugated estrogen by USP's compendial standard. It is called a "Synthetic Conjugated Estrogen-A" by FDA. The composition of Cenestin is similar to Premarin, but it is not considered a "substitute" for Premarin. The Synthetic Conjugated Estrogen- A ("SCE-A") category was created by FDA to distinguish Premarin from any other branded future conjugated estrogen product that may be approved by NDA.

39. FDA approved the Duramed NDA on the basis of a single 3-month double blind placebo-controlled safety and efficacy study involving 117 healthy menopausal women, 70 receiving active drug. The study evaluated the efficacy of Cenestin for short-term management of moderate to severe vasomotor symptoms associated with menopause. There is no data for Cenestin in the NDA to support claims of thinning and atrophy of the vaginal epithelium or

prevention of osteoporosis, nor were there any long-term studies performed. Cenestin had no studies about changes in serum cholesterol and prevention of coronary artery disease. In its approval of the NDA, the FDA limited Cenestin to marketing for only the indications with data in the NDA from its own clinical trial. At time of approval, Cenestin was indicated only for short-term management of vasomotor symptoms of menopause.

40. Barr's "SCE-B", Enjuvia,(NDA #021-443) was acquired from Endeavor Pharmaceuticals and is now being distributed by Duramed. It is the second synthetic conjugated estrogen product available in the US, approved May 2004. It is referred to as a Synthetic Conjugated Estrogen-B (SCE-B) by FDA. Enjuvia is also plant derived, but unlike Cenestin, contains 10 estrogenic components, including DHS. As with Cenestin, Enjuvia was approved as indicated for the treatment of moderate-to-severe vasomotor symptoms associated with menopause. Enjuvia was approved in four strengths and using a clinical trial involving 281 naturally or surgically postmenopausal women, treated over 12 weeks assigned to 4 treatment arms.

**E.COMBINED Hormone Therapy- Estrogen/Progesterogen**

41. The term "progesterone" refers to a single molecular structure identical to the progesterone molecule produced by the human body. The term "progesterogen" is a category of hormone molecules (both natural and synthetic) with biological activity like progesterone. The term "progestin" refers generally to a "synthetic progesterogen". An example of synthetic MPA is Upjohn's ( aka"Pfizer") drug Provera which is a progestin.

**1. Combination Estrogen and Progestins- "Birth Control Pills"**

42. In the 1930s and 1940s, an organic chemist, Russell Marker, teaching at Pennsylvania State College became interested in the chemistry of steroids. His research led him

to believe that certain plants derived from the sarsaparilla family may be a potential source of natural steroids. On a trip to the jungles of Mexico, he determined that a certain yam plant from the sarsaparilla family would be a good source of progesterone. In 1944, with friends he began a small company called Syntex that made progesterone for treatment of menstrual symptoms. A Syntex chemist subsequently identified a way to produce a progesterone that would be active orally. By 1951, Syntex had patented the first orally active progestin, norethindrone. Searle also applied at the same time for a very similar progesterone patent.

43. In the 1940's hundreds of studies had been already been published associating estrogen with risk of cancer. That cancer risk motivated Gregory Pincus and Min Chueh Chang, Worcester Foundation for Experimental Biology, Shrewsbury, MA, to begin to examine the other known ovarian hormone, progesterone, to look for a birth control product that did not use estrogen. In 1951 with a small grant from the Margaret Sanger Research Bureau and Planned Parenthood Federation of America, Pincus and Chang confirmed earlier research that progesterone could be used to inhibit ovulation, and in 1953 funding was increased and work expanded.

44. In order to prove the safety of "the birth control pill", human trials were started using infertility patients. The pills in 1953 were of progesterone only and by 1954 three different types of progestins, using progestin from the Searle and Syntex patents and later switching to only Searles' progestin. The first US volunteers were medical students and a group of chronic mental patients living in a hospital near Worchester.

45. Puerto Rico was used as the site for the clinical trial in 1956. Some of the women experienced side effects from "the pill" (Enovid) and Pincus was told that Enovid produced 100% protection against pregnancy but caused too many side reactions to be acceptable to

women. Pincus considered the reported side effects as psychosomatic. The trial was expanded to Haiti, Mexico and later Los Angeles.

46. It was eventually identified that the progestin being used in the pill was not pure but actually contained estrogen as a contaminant. When the estrogen was completely removed from the pill, patients began to complain of break through bleeding and ovulation did not appear to be completely suppressed. Therefore, despite the original intention to avoid any use of estrogen in a birth control pill due to risks including cancer, estrogen was returned back to "the pill" to be used in combination with progestin. The correct dosages for both hormones necessary for contraception protection were not scientifically determined by a limited clinical trial but empirically selected. By the time Searle's Enovid product was patented and the Puerto Rico trial underway, the pill was now a "combination birth control pill" of estrogen and progestin.

47. In May 1960, FDA approved Enovid as the first birth control pill. By 1963, there was a Senate investigation of FDA's approval of Enovid due to concerns about safety. It was made public at the hearing that FDA had approved Enovid as a birth control pill for women based only on data from a total of 132 women taking the pill continuously for one year or longer. During that clinical trial, three young women had died, none of which were autopsied to obtain a definitive cause of death. A major concern for the safety of continued use of the birth control pills by women were that the long-term side effects from both the estrogen and progestin were unknown. It would eventually become discovered after millions of women had taken Enovid, that the estrogen dose used in the pill was ten times higher than the dose necessary for contraception.

48. In 1962, when the pill had been on the United States market for little over a year, Searle already had received reports of 132 women with blood clots and 11 deaths. There were

discussions that the government should remove the drug from the market for safety concerns. At this time, Searle elected to convene the first conference to discuss the safety of combination birth control pills. Dr. Michael DeBakey, a heart surgeon was chairman of the conference held at the American Medical Association in Chicago. Dr. DeBakey personally acknowledged that he did not believe the adverse event being reported were associated with risks of Enovid and he wanted to propose a resolution to that effect. One physician, Dr. Stanford Wessler spoke against the resolution pointing out there were still insufficient statistics available to make a final determination as to etiology. An alternative resolution was proposed and passed that there was a need for continuing study on the issue of safety and birth control pills.

49. On November 19, 1970, Upjohn (*See discussion of Provera and Depo-Provera below) wrote to physicians to announce the discontinuation of its birth control pill Provest. The decision to discontinue Provest was based on the appearance of "mammary nodules" in beagle dogs exposed to multiples of the human dose of the progestational component (MPA) over a prolonged period of time. (NDA-PRO 0001475) Regarding the Provest discontinuation based on dog mammary nodules, Dr. Varley of Upjohn wrote to physicians:

> All available clinical data suggest no reason to predict human extrapolation of this finding nor is there any way of disproving that this can occur in the human. Inasmuch as other contraceptive alternatives are available it was felt unnecessary for healthy women to take such drugs prophylactically for prolonged periods of time.
>
> Provera and Depo-Provera, on the other hand, are indicated as therapeutic agents for specific gynecologic disorders. In this instance the therapeutic benefits, in our opinion, far outweigh any possible inferred risk.
>
> It is the opinion of The Upjohn Company that the continued use of Provera and Depo-Provera, based on your medical judgment, poses no unwise risk in this regard to you or your patients.

50. In 1973, there was a launch of progestin-only pills ("POP") also referred to as "mini-pills". The progestin only pill contained synthetic progestogens and included: Micronor (NDA #016954 approved 1/2/1973 as a 28 day pill with 0.35mg norethindrone acetate (NETA)); Nor-QD( NDA #017060 approved 1/2/1973 as a 28 day with 0.35mg NETA; and Overette (NDA #017031 approved for Wyeth 10/23/1973 containing 0.075mg dl norgestrel - now discontinued). The use of progestin- only birth control pills was considered less reliable than either combination or sequential (* eventually discontinued) birth control pills but were viewed as a way to reduce a patient's risks from exposure to estrogen. The POP is taken every day on a continuing basis and at approximately the same time of day. The POP can produce changes in cervical mucus to help reduce the entry of sperm into the uterus for fertilization. In some women, but not in all women, the POP prevents ovulation.

**2. PROGESTIN "Medroxyprogesterone acetate (MPA)"- Upjohn's Provera & Wyeth's Cycrin**

51. George Spero of Kalamazoo, MI assigned US Patent 3,147,290 6α-17α,21-dihydroxy-4-pregnen-3,20-dione and 21-acetate patented September 1, 1964 to Upjohn Company. The original Upjohn (Pfizer) patent application for this group of related synthetic steroid compounds was a continuation of an application filed in November 23, 1956 and a division of an application filed February 19, 1958. The new products were reported to have utility as oral and parenteral progestational agents. The US Patent application stated that:

> Owing to their progesterone-like effects, the compounds of this invention find application in "cyclic" therapy, where estrogenic and progestational hormones are supplied together or in succession so as to favor re-establishment of normal endometrium-ovary-anterior pituitary relationships in cases of menstrual disturbances.

52. The United States trademark for the name Provera was first used in United States commerce April 2, 1958 by Upjohn Company. The US Trademark for injectable MPA "Depo-Provera" was first used commercially by Upjohn August 23, 1960. The original NDA #11-839 sponsored by the Upjohn Company ("Pfizer") to market an oral MPA was approved by FDA based on support for safety on July 3, 1959 based on a satisfactory safety review. As with Premarin and estrogens. Provera (MPA) was reviewed for substantial evidence of "effectiveness" by later DESI review.

53. The Brook Lodge Symposium: **Progesterone**, was published by Brook Lodge Press, Guest Editor Allan C. Barnes, MD, copyright 1961, The Upjohn Company, Kalamazoo, MI. It was submitted by Upjohn as substantial evidence of effectiveness to DESI. The symposium text contains 9 major sections each dealing with a role of progesterone/progestins during pregnancy or to help identify pregnancy. It also had other sections: Hyperplasia and Carcinoma In Situ of the Endometrium, The Effect of 6α-methyl-17α-acetoxyprogesterone on the Endometrium; The parenteral effectiveness of 6-methyl-17α-OH- progesterone acetate Under Varying Dosages of Estrogenic Priming of the Endometrium in Surgical Castrates; and 6-methyl 17-acetoxy-progesterone Injectable: Clinical Experience.

54. Pfizer ("Upjohn") first submitted a communication to FDA September 29, 1966 requesting to amend its February 1, 1966 NDA #11-839/S-001. A later Pfizer communication to FDA October 25, 1967 was made to request to amend the drug indication for use in <u>conjunction with estrogens in cyclic replacement therapy</u>. FDA indicated that the supplement would be approvable when a final determination had been made regarding substantial evidence of effectiveness for the purposes claimed in Provera's labeling.

55. FDA was currently in the early stages of making arrangements with the NAS-NRC for DESI process to assist FDA in evaluating the evidence of the drug's effectiveness. Therefore, at the time in 1967, FDA was withholding approvals of supplemental NDAs pending receipt of the report by the NAS-NRC. In the interim, the changes being proposed by Pfizer would be permitted by FDA without approval. Once the report from the NAS/NRC became available, the labeling would be revised or changes made in marketing to be incompliance with DESI and FDA's findings.(NDA-PRO 0023985).

56. At the Medical College of Georgia, Drs. Barfield and Greenblatt re-examined their experience with injectable Depo-Provera. The parenteral form of MPA was used since the oral effects of Provera were reduced by liver metabolism and the effects could not be sustained as long within the body as the injectable form. The authors indicated that injection of Depo-Provera had a prolonged effect as a progestational agent and could raise the basal temperature in an anovulatory patient for as long as 4 to 6 weeks. With prolonged use it eventually caused atrophy of the endometrial gland and marked decidua-like changes in the stroma. Ultimately both the gland and the decidua-like effects were lost and true atrophy of the endometrium occurred. The study suggested that Depo-Provera injection was clinically useful in the management of endometriosis and could postponement of menstruation.

57. Dr. Kistner, Harvard Medical School and Free Hospital for Women, Brookline, MA discussed the association between the reporting of endometrial hyperplasia and subsequent carcinoma in situ (CIS). The relationship between the two conditions in females had been appreciated since 1904. He stated that:

> A fair summation of the data seems to be that "in predisposed individuals, the unopposed action of estrogenic substances for considerable periods of time will result in endometrial adenomatous hyperplasia, carcinoma in situ, and, eventually, carcinoma."

> …Another method of prophylaxis may be available in the use of certain newer progestins. Studies of LH excretion in patients with endometrial carcinoma have shown a diminution following administration of 17-alpha-hydroxyprogeterone caproate. Moreover, endometrial hyperplasia of varying degrees has been reversed by ovarian wedge resection….presumably by the subsequent cyclic Action of endogenous progesterone.
>
> The conclusion may be drawn that, in anovulatory patients with endometrial hyperplasia, persistently elevated LH levels may be lowered by the action of endogenous or exogenous progesterone. Hyperplastic endometrial patterns are then reversible either because of the direct Action of progesterone (or progesterone-like substances) on the glands or by their subsequent cyclic desquamation.

58. Patients in his subsequent case study had a retrospective review of their uterine curettages as well as another prospective study of patients. Four women were given 1) Enovid (combination birth control pill); or 2) Delalutin intramuscularly twice per week; or 3) Depo-Provera 100mg intramuscularly once per week prior to either surgery or curettage. The females all had varying etiologies of endometrial hyperplasia and carcinoma in situ. The only woman who received Depo-Provera was postmenopausal, post mastectomy and had received a variety of other continuous steroidal estrogen agents. The author wrote that:

> Although the specific morphologic changes preceding carcinoma of the endometrium are not adequately documented, some suggestive evidence has been advanced by Hertig and Sommers to indicate that adenomatous (atypical) hyperplasia precedes carcinoma. This study was based on a retrospective examination of prior curettings in women known to have endometrial cancer. However, several prospective experiments have been carried out which support the premise that **adenomatous hyperplasia does not always proceed relentlessly toward unequivocal carcinoma** and it is, at present, **impossible to predict which hyperplasia will, and which will not, develop a malignant potential**.
>
> Gusberg classified "atypical" hyperplasia as being histologically identical with adenomatous hyperplasia, carcinoma in situ and Stage 0 cancer. He followed 64 patients having this entity for five years and subsequently found <u>invasive cancer in three</u> (4.6%). Gusberg concluded that adenomatous hyperplasia may be present in the same endometrium with adenocarcinoma or it might be a cancer precursor….

> Wellenbach and Rakoff demonstrated in **oophorectomized hamsters** that induced endometrial hyperplasia underwent rapid regression when progesterone was given. They showed further that if progesterone was administered with estrogen, hyperplastic endometrial changes were virtually prevented. The newer progestins have been shown by us and others to produce specific and dramatic changes on the morphology of endometrial glands in adult, normally ovulating females. Following the initial secretory effect the gland lumina gradually become narrower and the epithelial cells assume a cuboidal appearance. If the progestin is continued, and ovulation prevented, the glands diminish in size, the lining cells become flattened and show no mitotic Activity. Thus a state of glandular "regression" is produced. (emphasis added)

59. The author concluded that an approach using progestins in patients with endometrial hyperplasia was not to be viewed as a cure or a definitive therapy for patients in either the premenopausal or menopausal age groups. In young females every effort should still be made to secure ovulation so that a woman's own endogenous progesterone could be utilized.

60. The Brook Lodge Symposium contained no section specifically addressing the use of either Depo-Provera or Provera for treatment of menopause symptoms. It contained no section discussing the use of "combined estrogen-progesterone replacement therapy" for treatment of menopause symptoms, acute or chronic. There was no discussion of any well-controlled study regarding scientific support for a reduction in cancer risk from estrogen due to the use of progesterone.

61. By 1975, a basic pharmacology text such as Chapter 68 **Estrogens and Progestins** authors F. Murad and A. Gilman, (**The Pharmacological Basis of Therapeutics**, 5th Edition, Editors L. Goodman and A. Gilman, p1423-1449) the authors listed the current pharmaceutical utility of use of "progestins" in the United States:

> **Therapeutic Uses**
> *Contraception…*
> *Functional Uterine Bleeding…*
> *Dysmenorrhea …*

*Premenstrual Tension…*
*Endometriosis…*
*Threatened Habitual Abortion…*
*Evaluation of Ovarian Functions and Diagnosis of Pregnancy…*
*Suppression of Post-Partum Lactation…*
*Endometrial Carcinoma…*

62. In 1975, the DESI and pharmacotherapy discussions of use of MPA was not of its use for treatment of symptoms of menopausal women but rather for its use in premenopausal women as a long-term injectable form of birth control drug. Also, as had occurred with the synthetic estrogen DES (above) in 1948, MPA began being administered to pregnant women for prevention of threatened habitual abortion by treatment of her "progesterone deficiency".

63. As supported by the Brook Lodge Symposium: Progesterone (NDA-PRO 0055839), ("Pfizer") and the DESI review by NAS-NRC, Pfizer in 1961 should have been well aware of the increased potency of synthetic MPA when compared to natural progesterone. In fact in 1961, the potency of MPA was listed as 4 times the potency of 17α-ethinyl-19-nortestosterone…., 24 times the potency of 17α-ethinyl-testosterone, 28 the potency of 17α-acetoxyprogesterone and **80-120** times the potency of chemically pure, orally administered progesterone. Therefore, it was a foreseeable risk to a responsible pharmaceutical manufacturer promoting long-term benefits of MPA that there would be new risks associated with MPA that were outside the risks and effects of natural progesterone.

64. As had occurred with estrogens such as Premarin, the progestin Provera ( MPA) was determined by DESI and FDA's review of the literature to be effective for certain limited indications, basically two- secondary amenorrhea and abnormal uterine bleeding, in the absence of pathology such as fibroids or uterine cancer. As a result of DESI and FDA's determination of efficacy, all subsequent generic synthetic MPAs, including Wyeth's Cycrin would be indicated

for the same indications as the name brand pioneer drug Provera. On July 27, 1972,37 FR 15033, (DESI- #11839), FDA published its conclusions for MPA's efficacy. Pfizer had not request DESI and FDA consideration of Provera's efficacy for treatment of menopause symptoms or for combined use with cyclic estrogen therapy, the indication it had requested earlier in October 25, 1967.

**DESI Panel on Drugs Used in Disturbances of the Reproductive System**

**1. Secondary amenorrhea**
EVALUTION: Effective
Comments: This preparation is useful for the induction of bleeding in patients with primary and secondary amenorrhea when the uterus is estrogen primed. The Panel emphasizes that this therapy does not induce ovulation.
DOCUMENTATION:
1. Brook Lodge Symposium: Progesterone. Brook Lodge Press, Augusta, MI, 1961, pp 1-220.
**2. Functional uterine bleeding.**
EVALUTION: Effective
COMMENTS: Numerous methods of designating the indication for abnormal uterine bleeding are employed, and generally the Panel believes then to be insufficiently precise. Until the terminology is standardized or clarified, a more appropriate statement would be that progesterone therapy is effective for abnormal uterine bleeding due to hormonal imbalance in the absence of organic pathology, such as submucous fibroids or uterine cancer.
DOCUMENTATION:
1. Brook Lodge Symposium: Progesterone. Brook Lodge Press, Augusta, MI, 1961, pp 1-220.
2. Eichner, E. Clinical uses of a 17α-hydroxy-6a-methylprogesterone acetate in gynecologic and obstetric patients. Amer J. Obstet Gynec. 86: 171-176, 1963.
3. Greenblatt, R.B., and W.E. Barfield. The progestational Activity of 6-methyl-17-acetoxyprogesterone. Southern Med. J. 52:345-351.
**3. Infertility**
EVALUATION: Possibly effective.
COMMENTS: An inadequate luteal phase can be a factor in infertility; however, the usefulness of this preparation has not been established by sound therapeutic trials and this indication should be considered inappropriate unless the manufacturer can supply adequate proof of efficacy in this situation.
DOCUMENTATION: None available.
**4. Habitual and threatened abortion**
EVALUATION: Probably effective
**5. Premenstrual tension and dysmenorrhea**
EVALUTATION: possibly effective

Documentation: None available
**6. Pregnancy test**
Evaluation: Effective

65. In a follow-up by the FDA to DESI, the agency wrote in October 1973, that based on "new concerns" about **prenatal safety** , use of any progesterone/progestins in the prenatal period could no longer be recommended. The agency's actions significantly reduced the pre-menopausal pregnancy indications for progestins. Also as with DES, in 1977, labeling directed to the patient was required for all prescription estrogen and progestational drug products for human use. Guideline for professional and patient labeling were published (42 FR 37636 through 37648, July 22, 1977) and later revised (54 1243, January 12, 1989). As with synthetic estrogen DES and its cancer risks, progestin in IARC Monographs in 1987 was being identified as having a potential cancer risk for humans.

66. Unlike Premarin, there are generic versions of MPA available, including the generic used by Wyeth. For example, USL Pharma had ANDA #088-484 approved for marketing of generic 10mg MPA in July 26, 1984. Wyeth marketed a 10mg MPA under ANDA, # 089-386 approved September 9, 1987. Wyeth's Cycrin (MPA) ANDAs were approved as #081-239 (2.5mg) and #081-240 (5mg) on October 30, 1992, and marketed as generic versions of Upjohn's Provera Tablets. All of the Cycrin produced under those ANDA's have been discontinued.

67. Until FDA's approval of an NDA for combination hormone therapy for postmenopausal women (Prempro), FDA had not approved any progestins product, including Provera and Cycrin for an indicated use in postmenopausal women (ROSSC012-001502).

68. After the endometrial cancer concerns began to be published by physicians in the medical literature in the 1975 describing an association of increased reporting of endometrial

cancer in postmenopausal women taking prolonged unopposed estrogen administration, including Wyeth's Premarin, physicians began to be encouraged to prescribe a combination of estrogen plus progestin as a combination hormone therapy (CHT).

69. A responsible manufacturer, either Wyeth or Pfizer, at a minimum, before promoting an FDA unapproved use of a product to physicians and women should have examined the published literature or conducted animal studies before starting to promote prolonged use of estrogen or progestin to postmenopausal women. A responsible manufacturer, either Wyeth or Pfizer, should have been concerned about patient safety should have monitored the safety of women receiving prolonged unopposed estrogen, Provera or estrogen/progestin.

70. In 1961, an animal study showed that mammary tumors could be produced in male rats receiving combination hormone therapy with combination estrogen and progesterone. (M.R. Riviere, et al. **Appearance of mammary tumors in the male rat subjected to a combination treatment of estrogen and progesterone**. *Societe De* Biologie,Nov 18, 1961; 2102-04). The study showed that it was the combined action of estrogen and progestin together that was responsible for mammary tumors in male rats. The tumors were not produced in the estrogen-only animals or in the progesterone-only animals. The male rats are an animal model used to simulate menopausal females. The study should have provided an early safety signal to either Wyeth and Pfizer regarding the "synergistic effect" produced by combination estrogen/progesterone on breast tissue.

71. In Contraceptive Technology Update. 1983, Mar; 4(3):25-7 (ChemIDplus, CAS Registry Number 71-58-9 http://toxnet.nlm.nig.gov/cgi-bin/sis/download.txt), the author wrote about the "unknown risks", including cancer, associated with the injectable form of MPA, Provera (*Depo-Provera). The injectable MPA was known to be more potent in a woman's body

than oral medroxyprogesterone acetate (MPA). In 2003, the authors A. Schindler, C. Campagnoli, et al. (**Classification and pharmacology of progestins,** *Maturitas* 46S1 (2003) S7-S16) provided the following excerpted table regarding the physiological activity of MPA when compared to natural progesterone. The authors also wrote regarding the activity of different forms of progestins and lack of benefits:

> Recent prospective randomized studies on hormone replacement (HRT), among others the HERS I and II as well as the WHI and MWS have raised great concern regarding the role of progestins for the cardiovascular and venous system and breast cancer in the climacteric and postmenopausal woman. Neither secondary nor primary prevention of cardiovascular events seems to be accomplished and the rate of invasive breast cancer seems even to be raised. This could be related to the specific progestins used in HRT in these studies. Since there is a large body of data, partially conflicting, on the various progestins it appears mandatory to scrutinize the progestins in clinical use.
>
> Basically all progestins do have only one effect in common, the progestogenic effects on the estrogen-primed endometrium of the rabbit, but there are large differences between progestins in the multitude of biological effects elicited. In practice, clinically used synthetic progestins have been selected on other effects, e.g. activity after oral administration and favourable bio-availability or inhibition of ovulation, but not on pregnancy maintaining capacity, a very important biological role of progesterone.
>
> Besides natural progesterone, produced and secreted normally in the human female by the corpus luteum, the placenta and in small quantities by the adrenal cortex, there is a broad spectrum of steroids with progesterone-like actions, derived from different parent compounds.
>
> Depending on the route of administration, oral or parenteral (vaginal, intramuscular, transdermal), progestins can manifest different effects that are due to differences in metabolism. For progesterone this has been demonstrated experimentally. Orally administered progesterone, even in micronized form, shows a wide variation of absorption and bioavailability in the individual person. After oral administration, synthetic progestins are in general rapidly absorbed and reach a maximum serum concentrations within 2-5 h, they have a longer half-life than progesterone and display stable plasma levels on long-term use. Many of them are metabolized in the liver and excreted via the urine.
>
> Biological effects at the cellular level are mediated by intracellular steroid receptors. The ability of any progestin to bind to the progesterone receptor varies between different compounds and by this, the biological effect of the progestin is

influenced. Very little knowledge is available on binding to the newest class of progesterone receptors, receptors located on the membrane of many different cells.

**(Excerpted) Table 6. Relative Binding Affinities of progesterone and synthetic progestins to steroid receptors and serum binding proteins.**(S15)

| Progestin | PR | AR | ER | GR | MR | SHBG | CBG |
|---|---|---|---|---|---|---|---|
| **Progesterone** | 50 | 0 | 0 | 10 | 100 | 0 | 36 |
| **MPA** | 115 | 5 | 0 | 29 | 160 | 0 | 0 |

(*PR- Progesterone Receptor, AR: androgen receptor; ER estrogen receptor; GR: glucocorticoid receptor; MR: mineralocorticoid receptor; SHGB: sex-hormone binding globulin; CBG: corticosteroid-binding globulin.)

72. Concerns about cancer risk, particularly breast cancer risk, as with estrogen, were also raised for MPA by FDA when Pfizer proposed its use as a depo injectable contraceptive for premenopausal females. During Pfizer's animal studies for the Depo-Provera contraception NDA there had been production of mammary nodules in the beagles. As a result, as discussed above by Dr. Varley, Pfizer (Upjohn) removed Provest, its own MPA-containing birth control pill from the market as a result of the animal study and the long-term use of women (NDA-PRO 0001475). Yet, both Pfizer and Wyeth began to actively promote the unapproved prolonged use of Premarin along with Provera ( MPA and later Cycrin) to physicians and women for CHT. This unapproved promotion of MPA to prolong the combined use of estrogen and progestin, "the other part of estrogen therapy for menopausal women" began by both companies without adequate safety studies, clinical trials or a processes set in place to monitor the safety of women and despite the expressed safety concerns from FDA.

73. Concern for cancer risk of MPA was raised when Wyeth proposed the chronic use of MPA. FDA required a 2 year rat carcinogenicity study for MPA. There was no "2-year rat carcinogenicity" study done for the chronic combination of Premarin and MPA.

74. In a July 2001 slide presentation to the JAALA (Japan, Asia, Latin and South America, and Australia) Medical Marketing Meeting (Edwards-A 0000345-414) by Pfizer following its February 2000 launch of its new one pill combination hormone product FEMHRT (1 mg norethindrone acetate (NETA) and 5 mcg ethinyl estadiol), approved following a clinical trial with combination 3-week dosing, the **"#1 Reason Women Resist using HRT is fear of Breast Cancer".** (Edwards-A 0000373, Exhibit 10665 page 0029) In terms of safety and tolerability – FEMHRT's breast pain was 8.1% compared to Prempro 33%, FEMHRT's headache 18.2% and Prempro's 36% - source from the product insets (Edwards-A 00000371; Exhibit 10665, page 027). (* FEMHRT- NDA #02-1065, and NDA #02-1102 approved October 15, 1999 in the United States for Warner Chilcot)

75. There had been scientific information available which a responsible hormone manufacturer should have considered as to the potential health effects of prolonged use of MPA as a component of CHT. As discussed by the outside consultants for Wyeth in their analyses of the Wyeth's 2 year rat carcinogenicity study with MPA (See below), there were other potential significant "non-progesterone-like effects" produced by long-term use of a synthetic hormone like MPA in humans.

76. Wyeth had only to look at patients, male and female, who were receiving high doses of MPA as an empirical cancer chemotherapy agent for a model of the potential steroid effects of MPA. There is both human and animal data attesting to the variety of physiological hormonal effects produced by MPA outside those being promoted by Pfizer or Wyeth for

postmenopausal women as a hormone regimen. The following are examples of "other steroid effects" which are relatable to use of MPA, also seen in the 2 year chronic rat carcinogenicity study, that would have been knowable to both Pfizer and Wyeth before beginning to aggressively market Provera and generic MPA to women and physicians as suitable for prolonged CHT.

77. In L Hellman, et al (**The effect of medroxyprogesterone acetate on the pituitary-adrenal axis.** *J. Clin Endocrinology Metab*. 42(5):912-7, May 1976) twelve cancer patients and one patient with diabetes mellitus were treated with MPA by intramuscular injection in a total weekly dose of 400,700 or 1200mg. MPA reduced plasma cortisol concentration by 76% in the morning hours and 75% in the evening hours. Low plasma ACTH values continued during MPA treatment and blunted the body's ability to respond to maximal ACTH stimulation. MPA produced cortisol-like effects and suppressed adrenal function probably as a result of negative feedback action on the brain's hypothalamus or pituitary. The evidence demonstrated that MPA had corticosteroid properties.

78. P.Cancannon, *et al*. (**Growth Hormone, prolactin, and cortisol in dogs developing mammary nodules and an acromegaly-like appearance during treatment with medroxyprogesterone acetate.** *Endocrinology*. 106(4):1173-7 April 1980.) Concentrations of growth hormone (GH), prolactin (PRI) cortisol, progesterone, and MPA were determined in the serum of beagle females at 17 months after implanting either MPA or progesterone implants. None of the serum parameters were changed in the implanted progesterone dogs. However, in the MPA implanted group, the dogs developed findings of acromegaly-like changes (enlargement of skull and bones) and large mammary nodules as a result of MPA-induced elevations of GH (growth hormone). The results did not eliminate the possibility that MPA had

been able to suppress serum cortisol production and that there was a direct action of MPA on the mammary glands which had created the formation of mammary nodules. This animal model using MPA-treated dogs provided a unique animal model which could be used for studying the effects of chronic elevation of GH levels as a result of MPA and for testing compounds such as MPA as to the ability to alter (raise or lower) GH.

79. In D. Leis, *et al*. (**The influence of high doses of oral medroxyprogesterone acetate on glucose tolerance, serum insulin levels and adrenal response to ACTH. A study of 17 patients under treatment for endometrial cancer**. *Arch Gynecol*. 230(1):9-13, 1980.), is a report of seventeen women aged 55 to 76 years who had all been treated for endometrial cancer by surgery, radiotherapy or a combination of both. The women were each given 300mg of MPA orally. Before treatment and again at the 3rd week, an oral glucose tolerance test (with measurement of insulin levels) was obtained and an ACTH-stimulation test was done. All blood glucose levels tended to remain elevated following MPA therapy and serum insulin levels were significantly increased 3 hours after a glucose load. The rise in serum cortisol at 30 minutes after ACTH-stimulation was blunted and significantly reduced with use of MPA therapy. High dose oral MPA appeared to produce a glucocorticoid-like steroid action for the women.

80. KJ Malik, *et al*. (**Cushing's Syndrome and hypothalamic-pituitary axis suppression induced by medroxyprogesterone acetate**. *Ann Clin Biochem*. 33(Pt3):187-9, May 1996) discussed a patient referral with overt features of Cushing's Syndrome but with low plasma cortisol and adrenocorticotrophic hormone (ACTH) concentrations, but who was also taking MPA. Because of the unusual findings, the authors studied the effects of oral MPA therapy on a patient's adrenal axis. Eleven women (ages 54-82) were enrolled to receive 200-400mg/day MPA in a study. Of the 11 women, four (36%) developed subnormal (low) plasma

cortisol response and two (18%) borderline plasma cortical responses. The authors concluded that administration of MPA frequently was able to suppress the adrenal axis in patients. Patients taking MPA should be routinely monitored for evidence of adrenal suppression before MPA therapy is stopped.

## 2. COMBINATION HORMONE THERAPY with Premarin/"Progestin"

### A. Premarin and Risk of Endometrial Cancer

81. In the 1970's it was found by physicians that women receiving prolonged unopposed estrogen, as was being promoted by Wyeth, had an increased risk of endometrial cancer. In 1973, there was advertising by Wyeth: "Why Stop Estrogen Replacement Therapy After the Hot Flushes Have Subsided…When the Deficiency is Still There?" (WMDL04782-00016708). Wyeth did not warn patients of the potential cancer risks of prolonged estrogen use in its labeling and promotions to women and physicians.

82. November 20, 1975 Ayerst International had internal correspondence regarding recent lay press publicity concerning the possible increased incidence of cancer of the endometrium with long term estrogen use. The information appeared to have originated from the University of Washington and the Kaiser Permanent Medical Center (Los Angeles, CA) and was to be published in the New England Journal of Medicine in December 1975. Similar data had been reported from the California Tumor Board and the Connecticut Tumor Registry. The articles report conjugated estrogen as the prime estrogen therapy involved, which is understandable since 70% of estrogens used in the US were Premarin Tablets (W-MDL04782-00051980-1).

83. The Wyeth memo continued to indicate that it been informed by an unnamed source that much of the information is "inconclusive and that one of the studies poorly

designed". Other physicians contacted by Wyeth, according to the memo, thought the increase in endometrial cancer is "grossly misleading" and, in fact, "not the case". Regarding the long-term use of estrogen, Dr. Acken (*Obset. Gynel* 34:46, July 1969) reported on a study of 479 patients who received continuous or cyclic estrogen for 2 years to 11 years. The author concluded "no demonstrable increase in breast or endometrial carcinoma observed". Of the patients treated with Premarin, 210 had intact uteri and "only 5 cases" of endometrial cancer occurred. He surveyed 197 patients not treated with estrogens and found 15 cancers. A prominent physician at Harvard University was interviewed concerning the publicity and said that many cases listed as cancer are only hyperplasia. If the subject is brought up, the following points should be made(W-MDL04782-00051980-1):

> 1) It is two medical groups in the Western United States;
> 2) other medical opinions expressed by the lay press and in physician interviews indicate disagreement with those conclusions that have been highlighted in the lay press;
> 3) the only prospective evidence (data by Acken and Gordon) indicates there is no connection between long term administration of estrogen and the incidence of cancer of the endometrium;
> 4) the position of Ayerst regarding Premarin therapy ahs in no way changed.
>
> We continue to recommend cyclic Premarin therapy or cyclic therapy associated with a progestational agent (ex. Colpro), using the lowest dose of Premarin which provides the desired therapeutic response. As you know, this dosage regimen has been advocated by Ayrest since the introduction of Premarin to avoid continuous, unopposed estrogen stimulation of endometrial and breast tissue. (W-MDL04782-00051980-1).

84. A Wyeth internal memo dated December 22, 1975 from N.J. Thomas to Mr. H.K. Roberts (W-MDL04782-00051891), upon learning of Dr. Austin's San Francisco study with an increased reported of endometrial cancer, attributed the increase to an association with more women in that area having physical examines. Therefore, there was not a greater occurrence of cancer with Premarin but rather a greater opportunity to detect more cancers of the endometrium. Wyeth had not studied the risks for women associated with prolonged Premarin use. In

disregard for its responsibilities as a pharmaceutical manufacturer, Wyeth had not conducted animal or human studies or put in place procedures to monitor women's outcomes to determine if prolonged use of Premarin was safe at any dosage.

85. In 1975, in two separate case studies by physicians, and not WYETH, (**Association of exogenous estrogen and endometrial cancer**, Smith, Prentice, Donovan, Thompson, Herrmann, *NEJM*; and **Increased risk of endometrial cancer among users of conjugated estrogens**, Ziel and Finkle, *NEJM*) showed a 5 to 14 fold increase in the number of cases of endometrial cancer amongst estrogen users. At a subsequent FDA Obstetrics and Gynecology Advisory Committee , December 16, 1975 (W-MDL04782-00027344), data was presented by Dr. Finkle, Kaiser Permanente Medical Group, Los Angeles, CA for the period 1970-1974, with the risk of endometrial cancer, determined by medical records and pathology report, showing a 7.6 fold risk ratio following exposure to conjugated estrogens. The risk of endometrial cancer was shown to increase with the length of estrogen exposure. At the same time, the FDA had to deal with another estrogen's cancer risks, DES. FDA began to view all estrogens as a class of drugs that required additional warning of the potential risks for women.

86. An August 24, 1977 Ayerst Laboratories memo from Dr. Tornai sent to Dr. Brice was written regarding the increasing practice of sequential progestin administration with estrogen replacement. He indicated that" many practicing gynecologists are introducing sequential progestins with estrogen replacement regimens in postmenopausal women. Dr. Tornai's search of the literature had concluded that the number of published, well-designed studies regarding sequential progestin use with estrogen was "small or practically nonexistent". He also noted that "he had been trying to collect the different theories about sequential progestin with estrogen to construct a position about it for the future" (W-MDL-15-01287).

87. Based on class safety issues, FDA required a new black box warning to be placed on all estrogen products, including Premarin. FDA mandated that a Patient Information Insert clearly explaining the increased cancer risk in terms of benefits, be provided to each patient receiving an estrogen prescription.

88. T.J.A. Key and M.C. Pike (**The dose-effect relationship between 'unopposed' oestrogens and endometrial mitotic rate: Its central role in explaining and predicting endometrial cancer risk,** *Br. J Cancer* (1988", 57,205-212) (VICTJ005-001658-65), the authors wrote that there are lifelong effects produced for a woman from even a short exposure to exogenous hormones. In particular, 5 years of use of combination-type oral contraceptives (OC) is likely to reduce her lifetime risk of endometrial cancer by 60%; whereas 5 years use of unopposed estrogen replacement therapy (ERT) is likely to increase her subsequent lifetime risk of endometrial cancer by at least 90%; and even 5 years of 'adequately' opposed therapy (estrogen/progestin) is still likely to increase her subsequent lifetime risk of endometrial cancer by at least 50%. The authors proposed that use of combination oral contraceptives by young women protects them from endometrial cancer. Whereas, use of either estrogens or estrogens/progestins in a postmenopausal woman causes lifelong "increased risk" of endometrial cancer. From the age-incidence curve of endometrial cancer, estrogen replacement therapy plus cyclic progestogen for even 14 days per month was still associated with a significantly increased risk of endometrial cancer, and that hormonal factors affecting cell-division rates will produce a lifelong impact on a woman's endometrial cancer risk.

89. The interaction of estrogen and progesterone on a female's uterus had been known since 1904, with use of that effect in the design of combination estrogen/progestin birth control pills since the 1960s. The role of progestins for reducing risk of endometrial hyperplasia

and possible risk of cancer prompted an ACOG recommendation (*not an FDA recommendation) for the use of progestins along with estrogen in women with an intact uterus. (FISHG001-000387). Dr. Wilson (See discussion below) had based his own observations in his popular best seller, sponsored by Wyeth, called *Feminine Forever* in 1966 on the benefits of using combination birth control pills to treat the hormone deficiency of menopause. Therefore, it would not have been unreasonable for Wyeth and Pfizer to encourage Obstetricians and Gynecologist to consider the same use of combination estrogen/progestins in menopausal women. What was unreasonable was that both firms were encouraging physicians to prescribed chronic estrogen/progestin to asymptomatic postmenopausal women without any data for that indication or FDA's approval.

90. By 1976, doctors were being encouraged by Wyeth's marketing and the medical literature to prescribe long-term Premarin opposed by long-term "progestin" (continuous or sequential) to help counter the risks of endometrial cancer.(W-MDL04782-000292330) As indicated by Pfizer's presentation in July 2001 (Edwards-A 0000366), the most common reason why women discontinue hormone therapy is "spotting and bleeding". That was also a true statement in 1976. Combination of estrogen plus progestin helped reduce spotting/ bleeding, improving an asymptomatic woman's willingness to remain on prolonged hormone therapy.

91. In 1978, Wyeth submitted a labeling supplement to FDA to provide for the concomitant use of Premarin and MPA tablets in its review of the medical literature suggesting that the addition of MPA attenuated the incidence of endometrial hyperplasia. This was reviewed with the Fertility and Maternal Health Drugs Advisory Committee later that year which concluded that there was inadequate evidence to establish the health benefit of the addition of progestin and recommended that further studies be conducted (FISHG001-000387).

92. In February 1979, Dr. Barbara Hulka (W-MDL04782-00032472-3) (*See FDA's 1990 Advisory Panel Meeting below), an MD and epidemiologist, wrote to Dr. George Brice of Wyeth to request to perform a retrospective epidemiologic study for Wyeth to determine the possible association between exogenous estrogen and breast cancer. She had become concerned that as "more studies proliferate", and the status of investigators becomes hinged on the production and promotion of "positive findings", the chances of publications appearing with positive results was going to increase. She wrote regarding the type of study she was proposing:

> First, since we really want to do a sound scientific inquiry, I believe this would be very difficult to achieve through the case-control design. The reason being that if estrogen has anything to do with the subsequent development of breast cancer, the latent period is likely to be very long (measurable in decades, not years) and the reliability of patient recall and medical records, which have not been previously identified through a systematic strategy, is just not likely to be adequate.
>
> My second argument against a case-control study is the limited scope of what can be learned. Any epidemiologic study is going to be expensive (as you well know), so why not get as much information of if it as possible. A case-control study will only tell us about the possible relationship between breast cancer and estrogen. Whereas, it seems to me the more important questions relate to the use of estrogen itself, including the possible relationship to breast cancer, but also its potential benefits.

93. After discussions with Dr. Brice in August, she was now proposing to do a retrospective cohort study using women from clinical practices in North Carolina. Medical records were to be identified for female patients age 40-59 during the years 1960-1969. She had been against the use of a case-control study because of unreliability of patient recall, inadequacy of medical records, limited scope of what can be learned of potential benefits of estrogen.

94. Her study involved 500 histologically confirmed breast cancer cases admitted to Duke University Hospital and two community hospitals, Durham County General and Cabarrus memorial Hospital between August 1, 1976 and December 15, 1978. The analysis was

performed on 280 primary cases, 554 hospital controls and 1548 community controls. 83 cases were excluded as recurrent cancers. The study looked at estrogen use only. 80(26.8%) of the 280 women with breast cancer were pre-menopausal. There were hospital and community controls identified. There had been a statistically significant increased risk (RR =2.38) of breast cancer identified in estrogen user women who had undergone a natural menopause. For the "Premarin" users, she calculated the relative risk (0.82) of developing breast cancer was significantly lower than that of the "non-Premarin" users. There was also an increased risk of breast cancer identified for "black women" receiving estrogen that was not seen with white women. She did not find an increased risk of breast cancer for users of Premarin. But, it was not clear to the author of Wyeth's memo how Dr. Hulka was able to determine what estrogen was used in her retrospective review. A more intensive review of the data was to be postponed until after the next meeting with Dr. Hulka.

95. However, in May 5, 1981, according to an Ayerst memo from Dr. TY Lee, et al to Dr. Brice, Dr. Hulka was now proposing to perform a case-control study (W-MDL04782-00032460-2). Dr. Hulka in January 1980 had wanted Wyeth to fund a case-control study in North Carolina originally planned to evaluate the differences between pre- and post-menopause breast cancers. The study had been started and a full report was to be available in one year. The Premarin Review Committee agreed to the proposal largely because the data had already been collected and the results would be available quickly, fully recognizing the potential limitations and inadequacies of the study design. A preliminary report was sent to Dr. Brice in December 1980.

96. According to the 1981 Wyeth memo, in general Dr. Hulka's estrogen users had "not experienced a higher risk of breast cancer nor were they protected from breast cancer".

However, the statistically significant increase in breast cancer in the natural postmenopausal estrogen users (RR=2) warranted further investigation and reflected the findings of Dr. Ross (*See below).

97. A Prem-Pak Meeting September 21, 1981 included the discussion of a report of the literature to determine if there was adequate data to support concomitant use of estrogen and progestin in therapy. Dr. Leibowitz performed a literature search. Dr. Perdue stated that evidence is required documenting that eliminating estrogen therapy while giving progestin shows a return of symptoms and shows worsening of osteoporosis. Prem-Pak is to be indicated for short-term use in patients with endometrial hyperplasia resulting from exogenous estrogen stimulation, when discontinuation of estrogen is undesirable (e.g. severe symptomatology or ongoing treatment of osteoporosis.) The absence of organic pathology must be established prior to treatment with Prem-Pak (W-MDL04782-00060132)

98. On March 30, 1982, Wyeth Marketing defined the major strategy for Prem-Pak to protect against possible inroads in PREMARIN sales that may occur if a competitor such as Upjohn introduces an estrogen/Provera combination package. The objective was to begin marketing Prem-Pak as quickly as possible, to preclude Upjohn from getting a major share of the combination product market. The Prem-Pak regimen was to contain Premarin and "Aygestin". Medical was to draft a protocol for the required clinical study if PremPak was to be marketed for concomitant usage for cyclic shedding. The protocol was to address safety and efficacy with periodic endometrial sampling and blood sampling to assess carbohydrate, lipid metabolism and clotting factors. (W-MDL04782-00060105-7)

99. According to a report of a meeting held on December 9, 1982 between Wyeth and Mr. Malcolm Whitehead at King's College Hospital, written by Dr. Kapadia, Ayerst U.K.,

(W-MDL-04782-00059898-903), in 1982 Wyeth had consider use of one of three commonly available progestins: 1) dl Norgestrel; 2) MPA; or 3) Norethisterone acetate (NETA). Dl Norgestrel (commonly used in Europe) was not favored due to concerns about the need for twice daily dosing. NETA (the most commonly progestin being used in Europe(CONTA012-001691) was less favored due to reports of breakthrough bleeding and risks of poor asymptomatic patient compliance. Regarding MPA, Mr. Whitehead learned that Ayerst Domestic had planned to initiate clinical trials using Premarin and 10 mg MPA as a "sequential regimen" for the initial 10-12 days in a menopausal woman's cycle. Mr. Whitehead did subsequent work at King's College Hospital with MPA which showed that 5mg MPA was capable of suppression of endometrial DNA activity.

100. Wyeth became aware from the meeting that the King's unit had already been asked by Upjohn, to assess its Provera from the point of view of its effects on psychological and biochemical parameters when taken as long term therapy along with estrogen as combination hormone therapy. Upjohn's particular reference for use of Provera was in the menopausal market and in fact, the Unit had agreed to collaborate with Upjohn on the assessment project.

101. Wyeth anticipated that by 1985, MPA (*generic) would become available to Ayerst Domestic. It would , therefore, "seem reasonable for them" to choose to work with MPA in the evaluation of the new formulation.

102. As of the 1983 report, Mr. Whitehead's Unit in England was to evaluate 0.625mg Premarin daily plus 0.35 (or even 0.1 to 0.2 mg) NET twice daily for Wyeth, with a reduction in dose based on evidence of total suppression of endometrial DNA. The other treatment arm of women were to receive Premarin once a day plus 2.5mg MPA <u>twice daily</u>.

103. The <u>Conclusion</u> as written by Dr. Kapadia's report:

> The development of such a regimen represents an important advance in ORT, particularly when one bears in mind that, with continuing develop of medical research, we may within the next few years, be able to determine and give prophylactic treatment for osteoporosis, thus avoiding its consequences which can justifiably be described as colossal in terms of morbidity, mortality and a drain on Health Service resources.
>
> I feel that the question of "Which Progestogen" to use in the continuous combined regimen should be resolved by Ayerst International, in conjunction with Dr. G. Brice, Medical Director of Ayerst Domestic, but it should be borne in mind that we must await the results of the proposed pilot regimens of Premarin with MPA and NET (await Protocol from Malcolm Whitehead for further elucidation). However, such a formulation may, at some time, be acceptable to the Food and Drug Administration Authority and is would, perhaps, be important to balance our commitment in favour of Medroxyprogesterone Acetate.

104. King's College Hospital, Denmark Hill, London, England, has a protocol titled:

**Continuous Premarin/Progestin Study Phase I:-Effects on Bleeding Patterns, and the Endometrial, Physical and Psychological Status of Postmenopausal Women-** Menopause Clinics , dated January 28, 1983 (W-MDL04782-00059906-922), the protocol began with the following INTRODUCTION (*Underlining added for emphasis):

> Although a sequential combined regimen consisting of continuous natural Premarin with the addition of 12 days of progestin per month is extremely effective in controlling symptoms, is well tolerated in healthy patients and successfully prevents endometrial abnormalities it does, however, cause a withdrawal bleed in the majority of women. Bleeding is accepted by 90% of our patients as the price they must pay for relief of their climacteric symptoms but other groups of women, who have only minimal or no climacteric symptoms, are likely to tolerate bleeding less readily. These include women with genital atrophy and, more importantly, women who need to take Premarin for many years as prophylaxis against osteoporosis. The bone-sparing effects of oestrogens are increasingly being recognized as their major long-term beneficial action.
>
> Our clinical experience in the Menopause Clinics at King's Hospital and the Chelsea Hospital for Women is that not all patients experience a withdrawal bleed and that the duration and extent of the bleed appear to depend upon the ratio of oestrogen to progestin. We have observed that bleeding diminishes or occasionally ceases when the progestin dose is increased; when the duration of progestin administration is lengthened and when the oestrogen dose is decreased. Thus, it seems possible that manipulation of the Premarin/progestin ratio might reduce the incidence of bleeding and that continuous combined therapy might

achieve a stable but relatively atrophic endometrium similar to that obtained with continuous oral contraception.

The daily addition to the Premarin therapy of a dosage of progestin adequate to suppress DNA synthesis and receptor formation within the endometrium would, we believe, inhibit cell proliferation. The risk of endometrial abnormalities would be minimized and if no endometrial tissue is formed, none can be shed. Thus, vaginal bleeding would not occur. Unfortunately, progestins may cause certain side-effects which include adverse changes in the physical and psychological status and the progestin component of oral contraceptive therapies has been linked to an increase in the risk of arterial thrombo-embolic disease. It has been suggested that the latter effect is mediated through suppression of HDL-cholesterol.

Our published data clearly show that reductions in the dosages of certain progestins are not associated with any loss of beneficial endometrial effect. However, these reductions are likely to minimize the potential adverse effects of progestins because these appear to be dose-dependent. Therefore, we propose that a phase I study should be undertaken to evaluate these small dosages of progestins, when added to the Premarin therapy every day, in terms of their effects on vaginal bleeding patterns, endometrial responses and the physical and psychological status of postmenopausal women. If continuous combined therapies were shown to be beneficial on these parameters than a second study (Phase II), to determine their effects on lipids, carbohydrate metabolism and bone mineral content, should be undertaken.

105. Regarding the selection of the progestins to be used in the King's College Hospital clinical protocol, the author indicated that the progestins had been determined at the December 9, 1982 meeting (See above report) held between Ayerst U.K and the Menopause Unit The test progestins selected were 0.7mg NETA and 5 mg MPA. The author then goes on to discuss 4 reasons why dl norgestrel was not selected. Reason #4 was that there had been access to data from a "very reputable unit" clearly showing that dl norgestrel was not "bone-sparing".

106. February 6, 1983 letter from Mr. Whitehead to Dr. A. Kapadia, Medical Director Ayerst Laboratories, Ltd, U.K.(W-MDL04782-00059895-7) there must have been a time when dl norgestrel was considered for the combination. The letter contains the following lines about the final protocol for the continuous/combined study since the December 9, 1982 meeting- "The

most obvious alteration is the change to medroxyprogesterone acetate from dl norgestrel. We were delighted to get your agreement on this because we have been unhappy about using dl norgestrel for some time." Mr. Whitehead mentioned that he had independently taken the liberty of sending copies of the protocol to Dr.s George Brice, Arthuro Roberts and Henry Purdue since all had expressed an interest to him about his study and asked to be kept informed. He also requested that Dr. Kapadia send them copies of the December 9, 1982 meeting report since he thought the report explained the rationale for the selection of the Premarin/progestin regimens.

107. An Ayerst Laboratories memo from George Brice, MD to Dr. A. Roberts reviewing a January 21, 1983 memo received from Dr. Kapadia expressing his concerns. His initial concern was that Mr. Whitehead was recommending the progestogens be given twice a day in the UK studies. Dr. Brice wrote:

> I am unaware of any previous b.i.d. dosing. Apparently, this is due to irregular bleeding reported in 25% of patients receiving 1mg Norethindrone Acetate and experiencing "a withdrawal bleed" because of the very short half-life….It seems to me that this might represent a less physiologic plan than the cyclic/sequential regimen used by Gambrell, Hammond and many of the U.S. investigators. Certainly, there has been reason for concern regarding safety of the OC in women over 40.
>
> As you know, we are beginning a large multi-center trial very soon to hopefully answer the safety question of combined-sequential Premarin (1/25mg x 21 days) and Provera (10mg x 10 days) in postmenopausal patients.
>
> I would even be concerned about efficacy. For example, we have good data on the prevention of bone resorption with Premarin (0.625mg or more) but- what effect might the continuous and combined use of progestogen have.
>
> I can understand the concern of withdrawal bleeding in a woman with minimal climacteric symptoms but I am more concerned about the possible problems of safety and efficacy in a relatively untested hormonal regimen.

108. February 28th, 1983 letter (W-MDL04782-00059904-5) from Mr. Whitehead to Dr. Brice. With CCs to Drs. Perdue, Roberts and Kapadia, regarding the combined

Premarin/progestin regimen. Mr. Whitehead still maintained that the appropriate progestin dose should be given twice daily. From his own research, the breakthrough bleeding that women experienced on a combination protocol was due to acute progestin withdrawal which produced shedding of the endometrium and bleeding. He proposed three options for this problem to Dr. Brice. First, they could increase the progestin dose. Mr. Whitehead believed this was "unacceptable" due to the increased risks of adverse events metabolically and psychologically for menopausal women. Second, they could alter the particle size to modify the plasma profile, an option he would continue to study. His third proposal, which he called the "most practical and sensible" was to administer progestin twice a day. He had initially proposed a lower dose of Premarin to be given twice a day but that had been rejected by Dr. Kapadia. While he understood Dr. Brice's concerns with twice a day dosing of progestin, from his own clinical experience he considered the concern unfounded. Mr. Whitehead concluded with the following recommendation for Dr. Brice :

> …we discussed the British Congress of Obstetrics and Gynaecology in Birmingham this July. We at King's think it is important that some data on the effects of exogenous oestrogens on breast cancer risk be presented at the Congress. There are no large scale studies which address this issue in the U.K. but Don Gambrell from Georgia and Kirby Bland from Louisville have excellent data on this point. I have no doubt that their most up to date results should be presented in Birmingham this Summer.

109. A March 16, 1983 memo of a telephone conversation with Mr. Whitehead (W-MDL04782-00059890-92) discussed the role of receptor testing in studying the effects of estrogens and progestogens on the endometrium. Wyeth presented the background information on the planned 1.25 (Premarin)/10mg (MPA) Pre-Pak protocol. Wyeth also explained the goals with respect to development of a subsequent 6.25 Premarin /(XX )* redacted mg progesterone

protocols. Mr. Whitehead also indicated that there were U.S. researchers who were capable of performing receptor testing.

110. A December, 1983 Ayerst Laboratories memo from Dr. Perdue to Dr. Mullane regarding his comments on the PREM-PAK Protocol for Study on Effects on Bone Loss (Protocol 83-14MD) (W-MDL04782-00059954):

> …I suggest that the medroxyprogesterone acetate be given on days 12 through 21 as described in alternative "c" in the section of the protocol on study design. If the study is intended for division into two clusters to represent two adequate and well-controlled studies, the protocol should describe how this will be done. As designed, the study addresses primarily the efficacy of PREM-PAK and its components for retarding post-menopausal bone loss. Depending in part on the outcome of the FDA's Advisory Committee meeting in February 1984, we may need to have data on a "0.625mg PREM-PAK" like those we are collecting in the currently ongoing study (82-28MD) on a "1.25mg PREM-PAK".

111. Wyeth recognized internally that "before the use of combined therapy becomes established, the risks of the various progestins must be adequately evaluated"(W-IND-00000404). In March 1983, Wyeth submitted an IND (21,696) to FDA requesting to conduct a clinical study (1.25mg Premarin for 21 days/10mg MPA for 10 days) to collect endometrial biopsy data for support of concomitant use of the drugs. Inadequate enrollment (investigator and patient) eventually led to the premature termination of the study. (FISG001-000387) . Between 1982 and 1992, the use of MPA in the United States increased almost 5-fold (CONTA012-001690).

112. A November 9, 1983 Wyeth Protocol Outline- "Prem-Pak: Osteoporosis- Efficacy of Prem-Pak in Reducing Bone Loss in Postmenopausal Women" was designed as a 2 year study to determine if Prem-Pak would retard, prevent, or substantially reduce, the rate of bone loss in postmenopausal women. (W-MDL04782-00059959-66). The protocol was projected for 240 health Caucasian or Oriental women, 45-57 years of age, one to 5 years from normal

menopause, all within 20% of ideal body weight, with a normal mammogram at 12 study centers. Women were to be assigned to either treatment with 0.625mg Premarin/10 mg MPA daily or placebo daily group. Patients were to visit the clinic every 3 months for two years, for a total of 10 visit. All enrolled patients were to receive a mammogram at visit 1, visit 6 ( 12 months), and visit 10 (24 months).

113. However, sparked by Wyeth's Marketing Division and despite internal concerns about risks for women, Wyeth requested approval from FDA of a combination package, Prem-Pak (0.625mg Premarin/10mg MPA), based on literature without clinical studies establishing the risks of the progestin selected, the risks of the selected progestin when combined with Premarin, or the optimal dosing of the two drugs when used together as a combination. Wyeth submitted medical literature to FDA supporting a new CHT indication and its proposed marketing claims and reduction of endometrial hyperplasia.

114. (W-MDL-04782-00059871). Internally, in a September 22, 1983 memo to Mr. A Somin from Dr. Henry Perdue, it states that the "The cornerstone of the planning for this program as now formulated was that the understanding that the "Marketing Division" was not particularly concerned about the exact labeling or indications so long as Wyeth was permitted by FDA to market a product in a single package of Premarin and a progestin for cyclic use". "This understanding led to the design of the current program as a minimal cost, shortest time, route to FDA approval for a PREM-PAK" product.

115. Wyeth had become concerned when Dr. Sobel (Director, Division of Metabolic and Endocrine Drug Products, FDA) at one of Wyeth's meeting with FDA had indicated to Wyeth he would prefer to wait to make comments on the proposed draft Prem-Pak labeling until after he saw the results of the studies. Wyeth had concerns that FDA might take a position that

the Prem-Pak was a combination drug product and that the effects of the combination of the two drugs together should be greater than each product alone. If FDA would require additional support of the combined action of the drugs in women, "it would very costly, would take many years, and might in the end prove not successful". In fact, Wyeth had concerns that "the results of the studies that would be needed could turn out to be embarrassing." "To avoid this issue, we have taken the position that the progestin is used to prevent or minimize a potential adverse effect of Premarin (endometrial hyperplasia) and, thereby, to enhance the safety of Premarin".

116. The same Wyeth memo continues:

> If the Marketing Division now feels that PREM-PAK cannot be marketed successfully without labeling explicitly stating that it is effective in preventing or retarding loss of bone mass (osteoporosis), or in preventing vasomotor symptoms of the menopause, or in preventing or treating any of the other conditions for which PREMARIN is currently indicated, the entire program should be re-evaluated. (W-MDL-04782-00059871).

117. FDA's response to Wyeth's early request for a combination hormone indication for postmenopausal women was <u>denied.</u> FDA told Wyeth it needed to do clinical studies to obtain data to demonstrate the safety of a combination regimen.

118. The February 9-10, 1984 Fertility and Maternal Health Advisory Committee Meeting attended by Wyeth was summarized in a memo from Dr. Morrison to Mr. Rapoza, February 15, 1984 (W-MDL04782-00059874-6). The two major topics discussed by FDA were: 1) a recent paper reporting an association of oral contraceptives with an increased risk of breast cancer (Pike et al, *Lancet*, October 22, 1983, p.926); and 2) estrogen/progestin use in post-menopausal women.

> <u>Breast Cancer</u>
> None of the presentations made at this meeting supported the Pike data. The paper was repeatedly described either as flawed, faulty, meaningless or fallacious. Pike did not attempt to justify his data. His presentation was solely a hypothesis

that breast cancer had a hormonal relationship. He presented his data to suggest that the responsible hormone was progesterone.

Epidemiological data presented by Shapiro (Boston University) and Webster (CDC) indicated that there was no evidence of an association of breast cancer with OC use. Literature reviews by Stadel (NIH), Piper (FDA), and data presented by Gambrell (University of Georgia), Anderson (University of Edinburgh, Scotland), Kay (Royal Coll. Genl Pract. Manchester, England), and Goldzieher (Baylor University) all indicated that there was no evidence that either OCs or progestins were associated with an increased risk of breast cancer.

The Advisory committee concluded that there was no association of OCs with breast cancer and recommended that the package insert contain such a statement.

Estrogen/Progestin Use in Post Menopausal Women

Dr. Sobel (FDA) stated that it is well known that concomitant use of a progestin (P) with estrogen (E) will reduce endometrial hyperplasia, but there is no evidence that P with E will not increase adverse reactions. He said that one explanation why E in post menopausal women produces a decrease in cardiovascular effects whereas OC use in young women increases them may be related to the type of estrogen used, but another explanation may be that the problem is related to the P in the OC. He suggested that if post menopausal women now get P with their E, they would become subject to the same increase in cardiovascular effects seen in younger women taking OCs.

Dr. Gambrell (University of Georgia) read a statement from ACOG which stated that P with E may reduce endometrial carcinoma.

Dr. Gambrell then reviewed his own Wilford Hall data which showed a significant decrease in endometrial cancer in patients on P and E compared to no treatment or to E alone. Through the years, the length of progestin therapy has increased from 5 to 7 days with a corresponding decrease in the incidence of endometrial cancer in the E+P group. Gambrell now recommends 13 days of P treatment which he claims will reduce the incidence to zero. He indicated that Whitehead in England has reached a similar conclusion.

Sidney Wolfe (HRG) distributed a copy of recent letter to Mark Novich, Acting FDA Commissioner about a recent Upjohn ad. He stated that the ad recommended concomitant P+E in ERT which was in violation of the approved labeling for Provera.

> Note: Following the meeting I asked Dr. Sobel if the Division or Agency had reached a decision on the Provera ad. Dr. Sobel informed me that they “want to pull it”. This recommendation has been made to the Commissioner’s Office and they are awaiting a response.

Committee Discussion

Dr. Andrews recommended that the package insert include a statement that the use of P decreases the risk of endometrial carcinoma but that long term cardiovascular risks are unknown. Dr. Sobel reminded the Committee that the addition of a new indication requires double blind studies which have not been conducted.(*Underlining added for emphasis)

> In answer to FDA's question: "Does the committee believe that labeling for progestins and estrogens should reflect the uncertainties regarding the use of progestins in estrogen replacement therapy? The Committee said "No".

119. Wyeth filed another marketing application for CHT using "P&P" (*Premarin & Provera) in April 30, 1985 to the Bureau of Human Prescription Drugs, Ontario Canada requesting a CHT indication. (NORMJ006-000610). The application was for a sequential regimen of 25 days of Premarin with MPA on days 15 through 25 of each month. The intended use was to oppose estrogen and reduce the risk of endometrial hyperplasia in "susceptible women". According to FDA's Medical Reviewer for Prempro in 1994, this application was denied "due to lack of sufficient safety and efficacy data". (ROSSC012-001506)

120. Once again Wyeth applied for a CHT approval- as a Premphase submission, February 1, 1985 (W-MDL527-00035133). Despite Wyeth's filing as a supplement to Premarin's NDA submission, FDA assigned a new NDA number to the product. FDA considered Premphase for CHT as a new drug submission.

121. FDA would go on to deny Wyeth's NDA application based on a lack of support from the medical literature, again stating that it felt that clinical data with Premphase was necessary before FDA could approve a CHT regimen (W-MDL527-00035136).

122. Wyeth Premarin Advocate Meeting, July 17, 1989, (GPIL009-001533-4, Exhibit 1567))from Suzanne Joyner to Dr. T. Christie about the Premarin Advocate meeting held in

Estoril, Portugal. There was a discussion of the addition of progestogens to estrogens as a combination therapy, the "most controversial" subject at the meeting, with a prejudice against 19 nortestosterone derivative based on oral contraceptive experience. "There was a general concern that the addition of progesteogen to hormone replacement therapy will negatively impact the cardioprotective benefits. Dr. Lindsay indicated that he was going to stay away from the use of birth control pills in menopausal women- it was thought he was referring to Dr. Pike's data. Dr. Pike took his "usual position" that addition of progestogen to HRT doubles the risk of breast cancer. There was a note that Wyeth executives had decided this would be the "last meeting sponsored by Wyeth that Dr. Pike would be invited to attend".

123. As discussed above, Wyeth had already been considering the use of various other alternative progestins available in for a combination regimens (CHT). Wyeth eventually selected the use of medroxyprogesterone acetate (MPA) as the "logical choice" since it was already approved by FDA and Wyeth would not have to "start from scratch" (FISHG001-000074). Development of a combination Premarin/MPA product was referred to as "Project 713B." According to a Wyeth report on Progestins and Hormone Replacement Therapy by D. Archer (CONTA012-001691) oral micronized progesterone had been considered by Wyeth for combination therapy. However, since micronized progesterone (MP) is prepared in an oil base that does not mix well with powders, its use in a single table combination product was not practical.

124. Beginning in 1990, Wyeth management had endorsed a project "**Project 810A**" to develop a new combination hormone product that did not contain Premarin. Wyeth was pursuing a slow release "17 beta estradiol/ natural progesterone product" for once daily dosing (CONNS020-000401) and had intended to submit an IND to FDA in January 1992. However,

the use of progesterone as spheroids as had been done with a propanolol pulse dose did not produce satisfactory plasma levels in monkey studies. Problems with the design of the combination product had slowed down the proposed timeline for a submission. Wyeth also was exploring a monkey study involving suspension of progesterone incorporating bile salts. (PANAA038-000032-3)

125. Wyeth elected to dismiss FDA's safety concerns about potential risks of combining progestin and estrogens in postmenopausal women. In 1988, FDA had expressed its strong concerns about the use of combination therapy, including progestin's, would have cardiac impacts (W-MDL303-00081735). The agency had indicated, as in the 1984 Advisory Meeting above, that it would not approve a specific fixed dosage regimen of estrogen/progestins for menopausal women without strong data that could support the safety and effectiveness of the particular proposed regimen.

126. Wyeth listened to FDA's concerns, but it did not conduct an appropriate large scale, long-term study to support safety and effectiveness of combination therapy. The studies that Wyeth did attempt to conduct with CHT had protocol and enrollment problems, with Wyeth having to end up discontinuing several of them, returning back to the paper NDA submissions (W-MDL04782-00058976;W-MDL04782-00058978;W-MDL04782-00058980;W-IND-00003859; W-IND-00009083;W-MDL303-00083690;W-IND-00006856;W-MDL303-00008975).

127. In 1988, Wyeth had numerous teleconferences and meetings with FDA regarding the appropriate design of the clinical study for NDA# 20-303. The agreed-upon design involved four combination hormone regimes with Premarin and MPA (2.5mg, 5.0mg, and 10,0mg) as well as a Premarin-alone + placebo group. Additionally FDA allowed letting Wyeth pursue retaining

all the indications for Premarin including osteoporosis since the combination only involved the addition of a progestin. Wyeth's NDA submission had the following statement to FDA regarding the use of combination therapy as a new continuous drug therapy rather than a cyclic drug therapy for women: (FISHG001-000388) :

> It was for this reason, as well as the fact that both Premarin and MPA are currently available and widely used by prescribing physicians, that agreement was reached that an evaluation of breast cancer risk would not be a subject of evaluation in this program.
>
> **Dosing**
>
> Wyeth-Ayerst and FDA also recognized the impracticality of conducting clinical studies with all conceivable doses and regimes of Premarin and MPA. Consequently, the 0.625mg dose of Premarin was selected, in part, because it was the most commonly used dose and also because this dose had been recognized as the optimal dose for prevention of postmenopausal bone loss. Additionally, a reduction in the dose of Premarin could unfavorably impact the lipid and bleeding profiles. Regarding the dosing regimen, continuous dosing with Premarin was selected to minimize bleeding and to facilitate compliance.
>
> During our April 24, 1992 and June 23, 1992 pre-NDA meetings, concern was expressed regarding the use of continuous ERT in our clinical study, particularly with respect to chronic use such as prevention of osteoporosis. Dr. Linda Golden indicated that it was her understanding that both the Lindsay and Genant studies demonstrated that the 21-day regimen of Premarin 0.625mg was the lowest effective dose for protection against bone loss. In follow-up of these discussions, we subsequently confirmed that the Lindsay and Genant studies utilized continuous dosing of Premarin and that the lower continuous doses that were studied were not effective. A recent study by Castelo-Branco also demonstrated a greater increase in bone mineral content with continuous administration of Premarin (0.625mg) versus cyclic (25 days).
>
> Regarding the question whether the addition of MPA would allow for a reduction of the dose of Premarin, Gallagher et al reported that even with the addition of 10mgMPA for 23 days per cycle to a 0.3mg dose of Premarin also given for 23 days, the effect on total body mass is not as great as that seen with 0.6mg of Premarin given alone for 23 days. Since the regimens proposed for approval contain less than 10mg of PMA, it is not anticipated that MPA would contribute significantly to Premarin's effect on bone. Additionally, any reduction in the dose of Premarin may affect its beneficial lipoprotein and carbohydrate profiles, as well as bleeding profile.

128. The February 1, 1990 FDA Advisory Panel Meeting for Fertility and Maternal Health Drug Products Advisory Group was chaired by Dr. Barbara Hulka. Dr. Hulka an epidemiologist and a physician, had already been involved with a Wyeth study to look at a population for risk of breast cancer and its association with hormone replacement therapy. (* See above). She informed Wyeth that she would clarify at the beginning of the Advisory meeting based on the benefits of hormone therapy, that it was her opinion that the focus of the meeting was not to determine whether or not HRT should be used or to discuss the risk versus benefits.

129. From Wyeth's documentation for the Advisory panel meeting, the panel had been charged by FDA with determining whether or not there was a possible association between breast cancer and HRT (VICTJ005-001700).

130. In a memo to distribution from J. Victoria, dated January 25, 1990, on Wednesday, January 24, 1990, Dr. Stephen Sasson and Mr. Victoria had spoken with Dr. Hulka to confirm that she had received the materials that they had sent on HRT products. Dr. Hulka indicated that the Committee would discuss the Agency's questions at the meeting, but that the focus of the committee review was on cancer issues and not necessarily risk versus benefit. Mr. Victoria indicated that if the committee were to discuss cancer issues without any consideration to the associated benefits of the HRT therapy, then the message would be picked up by the lay press at the meeting and would be solely negative and not reflective of the true situation. Dr. Hulka acknowledged this and promised to lead off the discussion on February 1 with an overview of the benefits of HRT therapy to put the cancer risk into perspective. She added that she would also preface the Committee discussion of the question at the end of the day with similar information (VICTJ005-001705).

131. Comments were recorded and summarized by Mr. Victoria for the file (VICTJ005-001701-2):

> At the panel meeting, Dr. Golden FDA Medical Officer introduced the topic to the committee. She presented evidence which demonstrated the correlation between endogenous estrogen and breast cancer as well as animal evidence suggesting that exogenous estrogens as well as progestogens can produce breast cancer. The Warnings and Precaution Section of the Premarin labeling as it related to endometrial and breast cancer had not been reviewed since 1942. Dr. Golden showed a draft revision to the labeling however, it was noted that she was not working from the current Premarin labeling. Dr. Diane Kennedy (FDA epidemiologist) presented data on the extent of use of HRT.
>
> Dr. Benjamin Hankey (NCI) showed data which indicated that the incidence of breast cancer has been accelerating since 1980. …the number of mammography machines and the number of tests performed has increased dramatically over the same time period.
>
> Dr. Robert Hoover (NCI) presented the Bergkvist paper. There was some discussion and concern with respect to the interpretation of the results because of the small number and applicability to US population since estradiol and not CEE predominate in Sweden. Dr. Hoover indicated that he did not believe there was an applicable difference between estrogens.
>
> Dr. Janet Daling (Fred Hutchinson Cancer Research Center) presented an epidemiological and statistical review of evidence linking HRT to breast cancer. She noted that 18% studies were taking a progestogen as well…
>
> Dr. Barnett Zumoff (Beth Israel Medical Center) reviewed animal evidence suggesting that estrogens have a "promoting effect" for cancer. He pointed out that Premarin was unnatural in that the sulfate conjugates are not normally found in women. He indicated that there is some evidence suggesting that breast cancer is clinically more benign in women who have taken ERT.
>
> Dr. Hulka emphasized that the risk, if any, was "slight".
>
> The committee felt that there was inadequate data to make a distinction between different estrogens or if the addition of a progestogen would alter the risk of breast cancer. However the committee believed that the concomitant use of progestogen will decrease the risk of endometrial cancer. (VICTJ005-001701-2)

132. Regarding the outcome of the Panel meeting for Wyeth, Mr. Fred Hassan sent a February 2, 1990 internal memo regarding the advisory committee meeting. "I want to

personally congratulate you for your contribution to our success at the February 1 Advisory Committee Meeting on Premarin. Our goal was to ensure that this meeting was a "non-event" and that's exactly what happened….we must be more and more to the providers of new credible medical and scientific information concerning HRT…Eventually the various questions that the Advisory committee could not answer conclusively will be answered, and it is our responsibility and very much to our benefit for Wyeth-Ayerst to provide the studies, information, and insights to ensure that the answers will be accurate and balance (VICTJ005-001704).

133. July 1991, Wyeth began with negotiations with Schering Plough to acquire Prometrium and Estrogel for sale in the United States. (DUROJ039-002021) July 3, 1991 Wyeth memo from A.P. Baker to D. Hertel, indicated that Dr. David Poorvin of Schering Plough informed them that as a result of re-assessment of their strategic objective they are were seeking outlicensing two hormone replacement products they had in development- Estrogel (estadiol gel) and Prometrium (oral micronized progesterone) (DUROJ039-02022) . As of October 14, 1991, Schering Plough informed Wyeth that for commercial reasons it had wanted to stop development of the two products and was seeking a sublicensee. Wyeth's commercial/research people had expressed an interest in the products and asked for further details. Schering –Plough has a 15 year confidentiality agreement with the licensors of Prometrium and Estrogel. Mr. Baker asked for permission to sign the 15 year confidentiality agreement. (DUROJ039-002024). Mr. Baker was not able to sign a 15 year confidentiality agreement, since American Home Products would not let him accept anything over five years. (DUROJ039-002026). Wyeth would need to do studies to complete the NDA for secondary amenorrhea. The sustained release form of micronized progestin being developed at Rouses

Point, is a novel potentially patentable form. It is however at least 3-5 years from market. A micronized progestin may offer fewer side effects (DUROJ039-002000).

134. The American College of Obstetricians and Gynecologists (ACOG) Technical Bulletin No. 158- August 1991, "Carcinoma of the Breast" (PICKJ004-000667):

> Most studies report that estrogen replacement of less than 10 years' duration is not associated with an increased risk of breast cancer. Because the effect of progestins administration with estrogen on breast cancer is unknown, the addition of a progestational agent for protection against breast cancer is not recommended.

135. For the Prempro IND (21,696), FDA requested by letter of June 7, 1989 that Wyeth perform a two year rat MPA carcinogenicity study in 100 female rats in each dosing group for support of its NDA for long-term combination MPA therapy. During a meeting of September 1, 1989, the protocol was discussed. According to the minutes of the meeting (FISHG001-000353), Dr. Jordan of FDA explained that although MPA had been approved and prescribed for many years, a two-year carcinogenicity study would be required since Wyeth proposed to seek approval for chronic administration of MPA. The initial proposed Wyeth dosing FDA considered was too low. FDA anticipated that there would be mammary, pituitary and hepatic tumors produced with the level of progestin exposure proposed to be used in the rats. Wyeth submitted a November 28, 1989 rat pharmacokinetic study to FDA to determine the appropriate dose of MPA for the 2 year study. As a result of the DESI process and grandfathering, Upjohn had not been required to perform a long-term carcinogenicity study for Provera despite all the years of marketing in the United States. As of 1992, MPA was being marketed for short term use as Provera, Cycrin (Wyeth) and Curretab and AMEN (by Reid-Ravell and Carnick, respectively) and not indicated for any intended use in postmenopausal women.

136. MPA laboratory studies had shown that when MPA was given subcutaneously it was 75 times more potent than natural progesterone, when given orally 333 times more active. As of the June 23, 1992 preliminary toxicology report (FISG001-000355-58) - Observed treatment related effects of MPA seen in the rats at termination at the end of 2 years were significantly lower adrenal gland weights, significantly lower pituitary weights, and increased weight gain in the treated arms when compared to the control. The heart, kidneys and brains were increased in weight and when examined microscopically there were changes of chronic progressive nephropathy, cardiomyopathy and polyarteritis. “A correlation existed between early body weight gains and increased incidence and severity of chronic progressive nephropathy and cardiomyopathy”(FISHG001-000355) . The predominant “unexpected” (FISHG001-000356) change that occurred involved the “pancreas”. The pancreas had islet cell hyperplasia, benign islet cell adenomas, and islet cell carcinomas (adenocarcinoma with and without metastases). The changes in the pancreas appeared to be related to the MPA dose. (FISHG001-000201-14; FISHG001-000358).

137. Wyeth consulted with Dr. Lawrence Demers, Professor of Pathology and Medicine, Penn State, who responded by a letter dated June 26, 1992 (FISHG001-000331-333). MPA in man by radiolabeling is known to be distributed to the adrenal gland, GI tract, kidney, lung, testes and brain. Therefore, the animal organ effects produced from 2 year exposure were consistent with known effects from chronic administration of MPA. MPA can produce progestational effects and it can produce glucocorticoid effects. MPA has been shown to decrease estrogen, progesterone, and prolactin receptor levels in target organs and to be able to produce a decrease in size of the ovaries, adrenals, uterus, and pituitary with a decrease in hormone receptor levels. Several studies in both animals and humans have shown that MPA can

reduce pituitary function. The kidney changes and cardiomyopathy were related to both the glucocorticoid and mineralcorticoid properties from cumulative exposure to MPA. Water and salt retention occurred as a consequence of the mineralocorticoid effects of MPA on the kidneys and the resulting plasma volume expansion. The associated weight gain in the rats was the result of "fluid retention" that then leads to increased heart work and increased heart weight. Dr. Demers was discussing the "mechanism that chronic MPA administration" which produces changes from fluid retention by the kidneys, fluid overload, pulmonary hypertension, increased work on the heart, cardiomyopathy and cardiac failure. All of the described findings in the rat are consistent with the known effects in animals and humans with high dose and chronic MPA use regimens.

138. Charles Capen, DVM, Ph.D wrote to Wyeth on August 3, 1992" Most of the lesions observed and described in your report are to be expected following the chronic administration of a potent steroid with progestational and cortisol-like activity at high doses." "There was a statistically significant increase in islet cell neoplasms (adenomas and cancer) in the pancreas of the rats administered MPA at 1,000 and 5,000 mcg/kg (approximately 20 and 100X the human dose). The majority of the lesions were benign…A logical hypothesis…chronic administration of MPA resulted in a perturbation of glucose homeostasis leading to sustained stimulation of pancreatic beta cells in response to hyperglycemia….Although the blood glucose concentration was in the normal range throughout most of the two-year experiment, pancreatic beta cells appeared to be chronically stimulated by the high doses of MPA leading to the increased incidence of proliferating lesions derived from islet cells. In summary, Dr. Capen opined that the most significant lesions in the female rats appeared related to hormonal imbalances resulting from chronic stimulation or suppression of different populations of target

cells.(FISG001-000359-60). Dr. Capen proposed a further rat study to investigate the mechanism of the changes, a proposal rejected by Wyeth's Safety Committee (FISHG001-000361).

139. FDA was sent a 10 day Interim Safety report on the unexpected occurrence of pancreas tumors, including invasive cancer, in the in a two year rat carcinogenicity study (FISHG001-000273-76) on August 5, 1992 (FISHG001-000323). Wyeth indicated that the increased incidence of pancreatic lesions could perhaps involve the cortisol-like effects of MPA. Cortisol can increase serum glucose levels with down-regulation of insulin receptors on target cells. MPA was known to increase blood glucose in the dog. No trend had been noted in the serum glucose of the rats with pancreatic cell lesions, but serum glucose had not been measured until 6 weeks into the study. Changes in serum glucose could have occurred before 6 weeks. Plasma insulin had not been measured in the study. The other findings Wyeth categorized as expected. The administration of MPA to rats had induced atrophy of the adrenal cortex, ovaries, uterus by acting on the pituitary gland and/or hypothalamus reduce the production of gonadotrophin and adrenocorticotrophin. Decreased serum prolactin concentration in the MPA fed rats may explain the decreased incidence of mammary tumors in the rats. A correlation existed between early body weight gain and increased incidence of CPN and cardiomyopathy in rats. A significant increase in group mean body weight occurred during the first year of MPA . A significant-drug related decrease in mean adrenal, ovarian, uterine and pituitary gland weights were observed in the two highest drug groups.

140. The opinions of the outside experts consulted by Wyeth as summarized in its August 5, 1992 communication to FDA included (FISHG001-000275):

> The rats in the mid and high dosage groups developed pancreatic islet cell lesions because of continuous exposure to the drug at doses approximately 10 and 50 time greater than the AUC values for women receiving a 10 mg oral dose.
>
> The endocrine system of rats is more sensitive to hormones than that of women…Therefore the results obtained from rats involving endocrine changes are difficult to extrapolate to humans.
>
> When MPA is combined with estrogen (the Wyeth-Ayerst product will consist of MPA plus Premarin), more progesterone receptors are produced and more receptors are available to bind MPA. In the absence of estrogen less progesterone receptors are available to bind MPA leaving more free to bind glucocorticoid receptors.
>
> It is our opinion that the administration of MPA will not result in the pancreatic islet cell hyperplasia and neoplasia in women similar to that observed in rats. Although hyperglycemia and hyperinsulinemia have been reported in humans given MPA after an extensive literature search no evidence has been found to indicate that MPA causes pancreatic tumors in humans.

141. An August 25, 1992 internal correspondence from Mr. Krieg to Dr. Wetzel/Dr. M. Hite (FISHG001-000341) (*Underlining added for emphasis):

> As I stated in our discussions on August 20th regarding the pancreatic lesions in the MPA rat carcinogenicity study, I believe that strong consideration should be given to employing a European based expert to assist us in minimizing any further complications arising from this finding. After giving this matter further thought and discussing it with colleagues in Europe, it is the recommendation of International Regulatory Affairs that we approach Dr. Francis Roe of Wimbledon Common, London. According to Dr. Sanford, he is very knowledgeable on hormonal issues in rats. We consider Dr. Roe to be the preferred choice to others being considered…
>
> It is critical that we secure an esteemed European expert to buy into our explanation for this finding or perhaps jointly developing an alternate one. Regardless of how this finding is explained, it will be necessary to address it in the preclinical report. In addition, the clinical expert report will need to be integrated with the preclinical expert report so that it is clear that drug-related pancreatic complications in humans are not an issue. Since we are targeted to complete the dossier for Europe by December, these issues need to be addressed right away.

142. Mr. Krieg wrote to Dr. Fisher September 21, 1992, "Since this lesion does not appear to be an issue in humans, we need to place it in proper perspective in our clinical expert report in order to help carry us over this hurdle in the registration process."(FISHG001-000256). In **File Note- from the meeting held on September 14, 1992 with "Dr. Roe and Dr. Prentice" to discuss the MPA two-year rat carcinogenicity study** (FISHG001-000258-261), Dr Roe emphasized that Wyeth needed "much more data on the effects of MPA" on hormones in rats, and on "hormones in women when given MPA long-term". On questioning, he advised that minimally Wyeth needed to obtain data on prolactin, growth hormone and insulin levels. He also suggested that the clinical Expert Report address specifically the effects of the Premarin/MPA combination on the pancreas, blood glucose and insulin.

143. Dr. Roe wrote to Dr. Jon Wetzel, Director, Drug Safety Evaluation , Wyeth Ayerst Research (FISHG001-0002000) on October 9, 1992 (*Underlining added for emphasis):

> When we met in Slough, I drew attention to the data which my colleague, Dr. A.J.Cohen and I have been much involved concerning the relationship between exposure to various neuroleptic antidopaminergic drugs and increased incidence of pancreatic islet-cell tumors. I have not discussed these data in the enclosed draft opinion because I find it difficult and complicated to see how to relate them to the problem with MPA. Antidopaminergic neuroleptic drugs increase both prolactin and islet cell tumors whereas MPA reduces prolactin and increases islet cell tumors. I suspect the link is that both MPA and the neuroleptics increase growth hormone levels.

144. Dr. Roe suggested (FISHG001-000216) two relevant issues with the rats in terms of islet cell tumors- 1) over nutrition- rats were allowed to feed ad lib, and 2) increased body weight. Dr. Roe concludes with:

> We doubt whether humans exposed to MPA at clinically recommended levels would be at increased risk of pancreatic islet-cell neoplasia, even it exposure continued over a prolonged periods. However, it should be prudent to collect and analyze data relevant to blood glucose, serum insulin and serum growth hormone levels from women receiving MPA over prolonged periods.

145. In December 1992, Wyeth submitted its NDA submission (NDA #20-303) requesting to FDA to reconsider its request to market CHT, Prem-Pak (0.625mg) and MPA (2.5 and 5.0mg) (continuous combined regimen (Regimens "A" and "B") daily Premarin and Cycrin) and Premphase- Continuous sequential regimen (Regimen "C") daily Premarin with MPA days 15-28 of each 28 day cycle (ROSSC012-001497-576). According to Wyeth, the clinical study used over 1700 postmenopausal women. All endometrial biopsies were read by a single pathologist, Dr. J.D. Woodruff, Johns Hopkins University. Women assigned to the continuous combined regimens had significantly more amenorrhea than the women taking the sequential regimens. The incidence of amenorrhea was highest in the Premarin 0.625mg/5.0mg MPA continuous combined regimen than the Premarin 0.625 mg / 2.5mg MPA continuous. As expected the continuous regimens had more reports of spotting than the sequentials. The 0.625/5mg had less spotting than the 0.625mg/2.5mg MPA. The study appeared to demonstrate the effectiveness of continuous therapy for reduction of endometrial hyperplasia. Regarding the preclinical conditions including the 2 year rat carcinogenicity study, Wyeth wrote to FDA:

> Several meeting and teleconferences were held with FDA in 1988 and 1989 to define any additional preclinical studies that would be necessary to support this application. It was concluded that a two-year rat carcinogenicity study with oral MPA would be required and the doses were selected with FDA based in toxicokinetic and dose-range finding studies. The results of this study are providing herewith. An IND Safety Report was filed on August 5, 1992 when we unexpectedly found an apparent dose-related increase in the incidence of pancreatic islet cell hyperplasia and neoplasia in this two-year at study. <u>We believe this finding to be unique to rats given the sensitivity of their endocrine system to hormone imbalances.</u> A discussion of these findings are presented in the Application Summary contained in this volume as well as in the Preclinical Section. (FISHG001-000391).

146. Wyeth did not provide a full description of the endocrine implications of the rat findings for postmenopausal women as described to it by its own consultants or the concern

about fluid accumulation, kidney changes, cardiomyopathy, need to monitor women's glucose levels. (*See discussion of rat study above by Wyeth). As the August 25, 1992 internal correspondence from Mr. Krieg to Dr. Wetzel/Dr. M. Hite (FISHG001-000341) had said regarding the rat study, strong consideration should be given to employing a European based expert to assist us in "minimizing" any further complications arising from this finding The potential significance of the 2 year carcinogenicity rat MPA study for women was downplayed to FDA and the concerns expressed by the consultants are not echoed in the Medical Officer's review.

147. The FDA found this NDA as not fileable (CONNSO22-000503). FDA sent Wyeth a nonfileable letter dated February 19, 1993 saying the application was not sufficiently complete for a substantive review (21 CFR314.101)(FISHG001-000402). Specifically FDA had referred to three points pertaining to human pharmacokinetics and bioavailability as deficiencies which prevented filing. Additionally FDA had noted that insufficient information was provided to support a claim for either prevention of osteoporosis or treatment of atrophic urethritis and that the indications would be unacceptable for filing even with a resolution of the above-mentioned deficiencies. FDA also wanted additional information regarding bioavailability/drug-drug interaction study (No. 713B-103) prior to approval as well as information on the metabolism and protein binding for Premarin and MPA. March 11, 1993 Wyeth responded to FDA (FISHG001-000403):

> As you are aware, Wyeth-Ayerst undertook an extensive clinical program to establish the benefits to women of taking a progestin with estrogen replacement therapy. Wyeth-Ayerst and the Division had extensive communications during 1988 which included a number of meetings regarding the preclinical and clinical development of this combination product so that an approvable application would be filed. We are optimistic that we will be able to work together to resolve these issues in an expeditions manner. The important information contained in this

> application is relevant to women's health and should be made available in labeling to allow for more informed benefit/risk judgments regarding combination hormone replacement therapy.

148. Regarding FDA's comments about the prevention of osteoporosis (FISHG001-00410-13), Wyeth wrote addressing FDA's concerns about its proposed use of "continuous administration" of 0.625 mg Premarin and MPA versus "cyclic administration" for osteoporosis prevention. FDA specifically had concerns that continuous Premarin would increase the risks of both breast cancer and endometrial cancer for postmenopausal women:

> In 1988 Wyeth-Ayerst had a number of teleconferences and meeting with FDA regarding the appropriate design of the clinical study…These discussions reaffirmed the agreement that the currently approved indications for Premarin alone, including osteoporosis, would be applicable to the combination, since it was recognized that the addition of a progestin would not attenuate Premarin's beneficial effects on bone mass. Premarin, at a dose of 0.625mg/day, was selected for the study, in part because it was the most commonly used dose, and also because this dose is recognized as the optimal dose for prevention of postmenopausal bone loss. Additionally, a reduction in the dose of Premarin could unfavorably impact on the lipid and bleeding profiles. Wyeth-Ayerst and FDA recognized the impracticality of conducting clinical studies with all conceivable doses and regimens of Premarin and MPA. The regimen proposed by Wyeth-Ayerst and agreed to by FDA, was continuous daily dosing of Premarin. The dose regimen was felt to provide, within reasonable bounds, a sufficiently close approximation of the minimum effective dose while ensuring adequate therapy.
> …Nevertheless, the Agency expressed concern on June 23, 1992 meeting, that a continuous rather than a cyclic dosage regimen of 0.625mg of Premarin had been studied. The FDA agreed, however, to consider Wyeth-Ayerst's position supporting an osteoporosis indication in the NDA and we appreciate the opportunity to discuss this information with you.
>
> The studies of Lindsay et al and Genant et al in which Premarin was administered daily in a continuous regimen demonstrated the minimum effective dose to be 0.625mg…
> Premarin is indicated for osteoporosis in a daily dosage of 0.625mg. Although Premarin labeling states that administration should be cyclic, data currently suggests that approximately 57% of estrogen/progestin users take the estrogen component for 25 days of each cycle and approximately 26% take it continuously.
>
> Although Premarin labeling provides an example of a cyclic regimen (three weeks on and one week off), the labeling does not require that this specific example be

the cyclic regimen actually employed, nor is it current clinical practice to administer Premarin in this manner.

FDA has expressed concern that a continuous regimen of Premarin, as opposed to a cyclic regimen, may increase the risk of breast and endometrial cancer. As regards the relative risk of breast cancer, it is speculative that a dose-response relationship exists within the dose range of Premarin 0.625mg to 1.25mg. In fact, such relationship is not supported by the data of Colditz et al. The data from the Nurses' Health study indicates that the age adjusted relative risk (RR) of breast cancer among current users of conjugated estrogens compared to never users is as follows:

| | |
|---|---|
| 0.3mg | RR=1.55(95% CI, 1.0-205) |
| 0.625mg | RR=1.42 (95% CI, 1.0-1.9) |
| 1.25mg | RR=1.48 (95% CI, 1.0-2.2) |

The authors concluded that they were unable to detect "an association between the dosage of conjugated estrogen and risk" within this dosage range. They additionally pointed out that these findings were consistent with reports of other investigators. More specifically, Brinton et al in 1981 and 1986, in case control studies, compared the relative risk of breast cancer for every day and cyclic estrogen use. In the 1981 report, it was noted that cyclic administration was generally three weeks on and one week off. The results in the report, adjusted for age, were for everyday use, a relative risk of 1.32 and for cyclic administration, a relative risk of 1.26. These two estimates were not significantly different. Results in 1986 indicated that for every day use the RR=1.17 (95% CI, 0.9-1.4); for cyclic RR= 1.0 (95% CI, 0.8-1.2). Again, no significant differences between these regimens were seen.

Regarding endometrial cancer …FDA indicated in 1991 that it was awaiting adequate data showing clear cut endometrial protection with any progestin in any dosage regimen. Data submitted in this NDA clearly demonstrate that specific regimens of medroxyprogesterone acetate, when added to continuous daily doses of Premarin 0.625mg, significantly reduces the incidence of endometrial hyperplasia.

Wyeth-Ayerst has previously indicated its willingness to conduct an additional program to further define the minimal effective dose of the Premarin/MPA combination regimen and we would welcome the opportunity to discuss an appropriate trial design which is outlined in attachment (Tab 3). However, we do not feel that the completion of such a trial should be considered a prerequisite to NDA filing or approval, but instead, be a condition of approval as was the position of the Agency in the medical review of the supplemental applications to ANDA 84-499 and 84-500 for Estrace (estradiol) Tablets providing for an indication of prevention of osteoporosis

149. FDA once again informed Wyeth that it had provided them with insufficient data to conclusively demonstrate any specific progestin drug administered in a specific CHT regimen could reduce the incidence of endometrial hyperplasia (W-MDL303-00082105).

150. December 16, 1992 Internal Correspondence U.S. Regulatory Affairs from Stephen Sasson, Ph.D. to Dr. Robert Levy regarding Premarin/MPA labeling (FISHG001-000393):

> During the sign-off of the Application Summary for the Premarin/MPA NDA which contains the draft labeling, Dr. Fisher requested additional, and appropriate, change to the presentation of toxicology information in the labeling. Information on mammary nodules in the beagle dog studies was included in the Warnings Section, per progestogen class labeling. Accordingly, this is where we added the results of the two-year rat study.
>
> The reason FDA put the dog data in this section rather than under "Mutagenesis and Carcinogenesis" is because they felt that the data had direct human implications. Recent data suggest that there is little or no relationship between the dog data and humans and therefore it would be more appropriate to move the information to the Mutagenesis and Carcinogenesis Section. We also moved the rodent data to this section. Drs. Fisher and Wetzel also took the opportunity to expand upon the information presented

151. On December 30, 1993, Wyeth resubmitted its application with FDA to market a 2-pill combination package it would call Prempro which would eventually be approved in December 1994. According to FDA's Medical Officer Review, Dr. Golden, there were two trials- Reviewer Trial #1 (Wyeth Protocol #713B-300, 301) and Reviewer's trial #2 (Wyeth Protocol 84-915-MD, 84-930-MD, 82-028-MD, and 84-903-MD).

152. The Medical Officer, Dr. Golden, DMEDP, referenced the pharmacology review of the animal toxicology. MPA was reported as "*carcinogenic by the oral route*" in <u>rats in a 2-year oral carcinogenicity study (</u>See discussion of Wyeth's 2 year rat study above) with Cycrin MPA (*Underlining added for emphasis):

> Treated rats developed islet cell hyperplasia, adenomas, and carcinomas in a dose-dependent manner, some with liver metastases, at doses approximately 25 times the human dose of 10mg/d. Immunohistochemical studies of the proliferative pancreatic islets showed staining similar to normal islets, primarily for insulin with some variable staining for glucagon and somatostatin. Plasma glucose levels were decreased in the rates treated with MPA but circulating insulin levels were not determined. The sponsor"believe[s] this finding to be unique to rats given the sensitivity of their endocrine system to hormone imbalance" (NDA vol. 1.1, p 264). They suggest that the pancreatic tumors were due to high MPA levels cross-reacting with glucocorticoid receptors to provoke hyperglycemia, which overstimulated the pancreatic islets to overgrow and transform. If this hypothesis is potentially applicable to human physiology, <u>it emphasizes the importance of minimizing MPA dosage levels to maximize the safety of chronic administration to women</u>. However, this reviewer is aware of no conclusive clinical evidence linking glucose intolerance or insulin deficiency diabetes mellitus as a risk factor to the development of islet cell tumors or pancreatic carcinoma in humans.

153. Wyeth conducted a pivotal clinical study for Prempro's **NDA #20-303** ( Note: *This NDA is no longer on FDA's website history of Prempro). The pivotal study included: n=289 Prempro (0.625mg/2.5mg), n= 283 Premarin (0.625mg). Dr. Golden, Medical Reviewer DMEDP, indicated that in the 1980's an inverse relationship was suggested between concomitant progestin use and ERT and the risk of endometrial hyperplasia (MM Gelfand, 1989) The strength of this association appeared more dependent upon the monthly duration of progestin exposure than upon progestin dosage, with at least 10 days of treatment per month correlated with optimal endometrial outcomes. In the 1990's, observational data have begun to emerge reporting a reduction in endometrial cancer risk with HRT (Pearson, 1989; Voigt, 1991), but the optimal progestin, its dosage, and regimen that would maximize this benefit while minimizing attendant risks remained to be determined. The DMEDP Medical Officer wrote the following regarding her concerns about the safety of continuous combination therapy for women:

> Meanwhile, emerging reports in the 1980's suggested a direct relationship between ERT and increased risk of breast cancer (Hoover, 1976; Brinton, 1986), especially in long term users. Meta analyses of these observational finding failed to settle the controversy over this question (Dupont, 1991; Steinberg, 1991;

Sillero-Arenas, 1992; Grady, 1992; Colditz, 1993), while observational data on prolonged estrogen usage continued to accrue (Yang, 1992; Risch, 1994). Because of the relative recency of HRT usage in the US, most published relative risk (RR) estimates of breast cancer and menopausal hormone use have continued to apply primarily to ERT usage, reporting overall RR's of 1.2 to 1.5 for usage of 3-5 years, and RR estimates of up to 2.0 for very prolonged usage (10-15 years or more).

In contrast to the protective effects of added progestins on the endometrium, recently reported RR estimates for HRT and breast cancer suggest that concomitant progestins do not reduce and may exacerbate the risk of breast cancer associated with ERT (Bergkvist, *NEJM* 1989; Ewertz, 1988; Colditz, 1992; Colditz, 1993) without necessarily increasing breast cancer mortality (Bergkvist, *Am J Epidem* 1989, Yuen, 1993). Breast cancer is a major public health problem in the United States; the average American woman currently faces an approximately 1 in 10 total lifetime risk of developing breast cancer, with the vast majority of cases occurring after menopause. Thus, in the postmenopausal population, even small increments in the relative risk of breast cancer have great public significance. Because of the long latency between exposure to promotional agents and detection of clinical tumors, however, prospective studies may take many years to conduct and require extremely large sample sizes to ensure statistically meaningful treatment group comparisons. Since many more years are needed before the relationship to HRT and breast cancer can be definitely determined, the public health impact on this safety concern increases with the growing popularity of HRT usage by a rapidly expanding population of perimenopausal "baby boom" women. As such, the true effect of HRT on breast cancer incidence and mortality must be considered the single most important safety issue concerning this class of drugs.

Although recent observational data strongly suggest that ERT reduces cardiovascular (especially coronary heart disease) morbidity and mortality (Bush, 1987; Stampfer, 1991), obvious selection bias permeates this literature, with treated women consistently slimmer, healthier, and less likely to have diabetes mellitus than untreated women. Unbiased data on the cardiovascular effects of ERT and HRT are expected to become available within the next 5-15 years from the ongoing NIH- sponsored Randomized Clinical Trial of the Women's Health Initiative (WHI/RCT: a primary/secondary prevention trial, see section 6.2 below) and the Wyeth-Ayerst –sponsored Heart and Estrogen Replacement Study (HERS: a secondary prevention trial, see section 6.2 below). Although the WHI/RCT is adequately designed to definitely answer the ERT/HRT cardiovascular question, it is doubtful that even the WHI/RCT has sufficient statistical power to clearly define the relationship between HRT and breast cancer. (ROSSC012-001502-3, Exhibit #7773, page 0006-7)

154. Of the INDs described as ongoing, there was an ERA (Estrogen Replacement and Atherosclerosis ) trial which is investigator-sponsored (David M. Herrington), a NIH-funded, 3-year, 3-center, randomized, placebo-controlled, secondary prevention trial of Premarin and Premarin/Cycrin on atherosclerosis progression in postmenopausal women with angiographically documented coronary atherosclerosis that was just beginning to recruit patients in 1994. (ROSSC012-001505). Dr. Herrington is located at Wake Forest University School of Medicine. [* J. Yeboah, D. Herrington, et al. **Effects of estrogen replacement with an without medroxyprogesterone acetate on brachial flow –mediated vasodilator responses in postmenopausal women with coronary artery disease** , *Am Heart J* 2007;153:439-44)- The ERA trial randomized 309 postmenopausal women with established coronary atherosclerosis (mean 65.8 years) to three treatment arms: unopposed estrogen (Premarin 0.625mg), estrogen/MPA (2.5mg) or placebo. After an average of 3.2 years of treatment with unopposed estrogen or estrogen/progestin there were no significant improvements in endothelial vasodilation compared with placebo. This apparent <u>absence of an effect</u> on brachial artery endothelial function in older postmenopausal women with established coronary artery disease may help explain the <u>lack of benefit of estrogen for secondary prevention</u> for coronary heart disease. ]

155. The NDA compared the occurrence of reports of endometrial hyperplasia between the treatment arms after 12 months. 1724 women were enrolled into 5 treatment arm, with 363 dropping out of the study (21%). A percentage of drop outs were women who had endometrial hyperplasia and could not continue. The study was overwhelmingly Caucasian, with a low percentage of women with baseline cardiovascular risk since women with risks had been excluded. A subpopulation of 525 women (approximately 100 per arm) were enrolled as the

Special Safety Study Subpopulation, with 436 completing, and 89 drop outs. The most commonly reported treatment-emergent drug-related study event was breast pain reported in approximately one third of subjects in each of the four treatment arms. (ROSSC012-001538). Headache was the most common Premarin alone group reported in 20% of subjects in group E, and the second most common event in the combination groups. Endometrial hyperplasia, not endometrial cancer, was used as a surrogate marker to support a claim of possible reduction of risk of endometrial cancer. Even in the relatively small patient numbers (~1000) and over a short time period, 1 year, a total of 13 cancers and 3 class IV Pap smears were reported. The key safety concerns for the study were cardiovascular changes and breast cancer.

156. Six women were identified with breast cancers, 5 localized and 1 node-positive were identified in 3 combination regimens (ROSSC012-001552): Group A(0.625CEE/2.5mg), Group B (0.625mgCEE/5.0mgMPA), and Group C ( 0.625mgCEE/placebo days 1-14, 0.625mgCEE/5.0mg MPA days 15-28) . Although the finding was not statistically significant, the clustering in the combination groups, especially in the continuous treatment regimen, raised the FDA Medical Officer Reviewer's concern- "it raises concern that concomitant progestin may exacerbate the increment in breast cancer risk that has been repeatedly observed with prolonged unopposed estrogen treatment". The reviewer continued, this concern should be addressed post-approval by the sponsor by conducting a comprehensive Phase 4 investigation of breast cancer risk in users and non-users of the approved NDA regimens. It is essential that this phase 4 study be designed with adequate statistical power to rule out relative risks close to 1.0 in the comparison of unopposed Premarin and Premarin/MPA-treated women, and ideally should be powered to evaluate the differences between Premarin/MPA groups by treatment regimen.

157. Wyeth's pivotal study to support marketing of Prempro provided Wyeth with a clear safety signal about the increased risk of breast cancer with continuous Premarin and MPA therapy. The reviewer also wanted the information from the pivotal trial about the breast cancer to be in the WARNINGS of Prempro labeling as it appeared in the 1996 Prempro labeling (ROSSC012-001562).

158. Dr. Golden also requested that the reference to RD Gambrell et al: (**Reduced incidence of endometrial cancer among postmenopausal women treated with progestogens**. *J. Am Geriatr Soc* 1979; 27:389-394 be deleted from the Premarin/Prempro product insert as confounding (ROSSC012-001569).

159. Among the other cancers developed in the trial, there was one patient with ovarian cancer (Group B (0.625mgCEE/5.0mgMPA)), and one patient with colon cancer- Group D (0.625mgCEE/placebo days 1-14, 0.625mg CEE/10mg MPA days 15-18) and of the class IV Pap smears, they were identified in Group A (CHT), Group D(CHT) and Group E (unopposed estrogen 0.625mg CEE). Of the other cancers, 1 patient with lung cancer, 1 patient with malignant melanoma and one patient with non-melanoma skin cancer all occurred in Group A. Overall, Group A had the widest involvement with reports of malignancy and it was the regimen approved by FDA as Prempro for combination hormone therapy (0.625mg plus 2.5mg MPA daily) (W-MDL303-0083746).

160. In the NDA overview of *10. Overview of Safety*,(W-MDL303-00083745) regarding the occurrence and risk of breast cancer from combination therapy, Wyeth wrote (page) (* Note Wyeth provided a Consultation Review from Dr. Stadel for review and analysis of noteworthy clinical events):

> Breast cancer developed in 5 subjects during study drug treatment, with all cases occurring in the combination treatment groups (4 of 5 in the continuous regimens

A and B). Although there were no statistically significant differences in breast cancer incidence between treatment groups, the clustering of cases in the Premarin/MPA groups , (especially in the continuous treatment regimen) raises concern that concomitant progestin may exacerbate the increment in breast cancer risk that has repeatedly been observed with prolonged unopposed estrogen treatment. This concern should be addressed post-approval by the sponsor, by conducting a comprehensive Phase IV investigation of breast cancer risk in users and non-users of the approved NDA regimens. It is essential that this Phase IV study be designed with adequate statistical power to rule out relative risks close to 1.0 in the comparison of unopposed Premarin and Premarin/MPA-treated women, and ideally should be powered to evaluate differences between Premarin/MPA groups by treatment regimen.

161. A "Reviewer's Trial #2" was also submitted by Wyeth. According to Dr. Golden, this constituted a series of small, ancillary, double-blind, randomized prospective trials conducted by Ayerst in the early 1980's. The objective was to demonstrate the safety and effectiveness of MPA in reducing the incidence of endometrial hyperplasia associated with unopposed Premarin. Due to recruitment difficulties, they were terminated by administrative decision by Wyeth in 1988. Since insufficient data were obtained to reach any conclusions regarding efficacy of the studies regimens, the efficacy data were not evaluated.

162. In terms of efficacy (ROSSC012-001551) and the primary efficacy variable, the pivotal trial provided compelling evidence that concomitant MPA reduces the risk of endometrial hyperplasia induced by treatment with unopposed Premarin from a 1-year with an incidence of 8% (20% when focal hyperplasia is included) to 1% or less, with $p<0.001$ for all between-group comparisons of combination therapy to unopposed Premarin. This effect is statistically highly significant, clinically very significant, and similar in magnitude for the lower and higher MPA doses and for the sequential and continuous MPA regimens administered with 0.625 mg daily Premarin. However, the development of a case of endometrial carcinoma and 5 cases of endometrial hyperplasia within 12 months of

combination drug therapy clearly indicates that no concomitant estrogen/progestin regimen can completely eliminate the risk of endometrial cancer. Therefore, prescribers and users of combined Premarin/MPA treatments must still be warned that unexplained uterine bleeding must be worked-up to rule out cancer. Bone mass density endpoints were not evaluated in the trial, one cannot conclude that the efficacy of combination Premarin and MPA is the same as Premarin alone. For preserving bone mass density and preventing osteoporotic fracture.

163. Because the low dose MPA regimens A and C are just as effective as the high dose MPA regimens (B and D), there is no justification for approval of the proposed high dose MPA regimen B. Although the incidence of irregular bleeding was lower in group B (13% of cycles) than in group A (22% of cycles), this statistically significant difference is not clinically significant.

164. Based on the data, FDA approved 2 tablet Prempro (0.625mg+ 2.5mg MPA daily) but Wyeth was required to commit to conducting two post-approval safety studies. One phase 4 study was to investigate the lowest dose combination of CEE/MPA needed in Prempro for prevention of postmenopausal osteoporosis. The second phase 4 study commitment made to FDA by Wyeth was to investigate the breast cancer risk in users and non-users of Prempro.

165. At the time of NDA approval, MPA was the first progestin to be approved for use with postmenopausal women for any indication, and the combination Premarin/MPA was the first hormone regimen approved by FDA to be intended for continuous daily use.

166. The results of the clinical trial had demonstrated that concomitant MPA could reduce the risk of endometrial hyperplasia induced by unopposed Premarin from a 1-year incidence of 8% (20% with focal hyperplasia) to 1% or less. The reduction was similar in

magnitude for the lower and higher dose of MPA including both sequential (5.0mg/ for 14 days/cycle) and continuous (2.5 mg/day) combined regimens. However, users and prescribers still need to be made aware that endometrial cancer still occurred in the trial in women on combination therapy, therefore combination therapy did not eliminate the risk of endometrial cancer.

167. Dr. Golden wrote regarding the risk of breast cancer, that because emerging epidemiologic data increasingly suggests that concomitant progestin therapy may exacerbate the increased risk of breast cancer risk associated with long-term unopposed ERT, it is essential that the doses of both estrogen and progestin HRT components be reduced to the lowest effective dose for their respective indications. All studied regimens included the current lowest Premarin dose (0.625mg) previously shown to preserve bone mineral density and prevent osteoporosis. Given that the 1-year efficacy results for regimen A and B were indistinguishable, and that group B contains twice as much MPA, there is no justification to approve group B.

168. Since the pivotal trial did not evaluate bone density endpoints, it is not certain that the combination therapy will share the same osteoporosis effects as Premarin. If so the lowest effective Premarin dose to prevent osteoporosis may be reduced by concomitant MPA with significant improvement in the safety profile.

169. Because American women will be extensively exposed to these drugs, even subtle reduction in chronic dosage regimens may translate into a large risk reduction in terms of long-term consequences from estrogen treatment. To address the deficiency of the study regarding osteoporosis, the sponsor has submitted an draft protocol to IND #21,696 for its phase 4 study of bone density and endometrial effects of low dosages of Premarin (0.3mg, 0.45mg, and 0.635mg) with and without low dosage of concomitant MPA (1.25mg and 2.5mg).

170. The study population of the pivotal study had been healthy, 97% Caucasian, non-obese, non-diabetic, a highly selected population of postmenopausal women at generally low risk for cardiovascular disease and higher than average risk for osteoporosis. Thus the reassuring profile from the pivotal study cannot be extrapolated to the higher risk populations of diverse racial and or demographic compositions.

171. The breast cancer developed within 1 year following normal baseline exams and mammograms in five subjects during the study treatment, with all cases occurring in the combination treatment groups (4 of 5 in the continuous regimens of group A and B). Although no statistically significant differences in breast cancer incidence was detected between the treatment groups, the clustering of cases in the Premarin/MPA groups (* especially in the continuous treatment regimen) raises concern that concomitant progestin may exacerbate the increased breast cancer risk reported with unopposed prolonged estrogen treatment. This concern should be addressed by Wyeth post-approval,, by conducting a comprehensive Phase 4 investigation of breast cancer risk in users and non-users of the NDA regimens. It is essential that this phase 4 commitment be designed with adequate statistical power.

172. At time of approval of the 2 pill Prempro (NDA# 20-303), Wyeth had not yet made a single tablet form of Prempro, but was using selling Prempro as a convenience blister package with .625mg Premarin + 2.5mg MPA(Cycrin). After NDA approval, Wyeth moved to market a single combination pill with a Premarin core and layer of MPA which it called Prempro (CONTA003-000847), and approved for marketing as NDA #20-257. The pharmacokinetic information for the single pill Prempro of NDA#20-257 was not repeated and was referenced from the 2 pill data of NDA #20-303.

173. Two pill Prempro (NDA #20-303) (Premarin and Cycrin) was approved by FDA for use as CHT and with the essentially the same indications as Premarin. Under Warnings, *Endometrial Cancer*, there was a brief discussion of the Prempro clinical trial, indicating that "endometrial hyperplasia" is a possible precursor of endometrial cancer.

174. There is an October 23, 1995 Wyeth Ayerst memo regarding a plan for an internal meeting to meet on November 1, 1995 to prepare for a November 3, 1995 FDA meeting to discuss PREMPRO's phase 4 breast cancer study.(W-MDL527-00035129). Wyeth ultimately did not perform a phase 4 breast cancer study but rather chose to wait for the results of the Women's Health Initiative (WHI)(See discussion below) to provide FDA with breast cancer risk information for Prempro.

175. The single tablet's Prempro, along with Premphase, NDA#20-527 were approved November 17, 1995 with the following intended use:

> treatment of moderate to severe vasomotor symptoms associated with menopause, treatment of vulvar and vaginal atrophy, and prevention of osteoporosis in women with an intact uterus.

176. Wyeth prepared a comparison memo of the differences between two-pill Prempro and one pill Prempro labeling. A new WARNING was added regarding the incidence of **breast cancer observed** in the PEPI trial. Under "PRECAUTIONS" a reference to HDL/Total cholesterol was deleted and potential risks of added progestins was now characterized as "less favorable effects" on lipid metabolism versus "adverse effects". A paragraph regarding carcinogenesis of estrogens in animal studies was included since it was inadvertently omitted from the two-tablet PREMPRO labeling. The language was now consistent with Premarin's labeling. Pancreatitis was added to the list of adverse reactions to be consistent with Premarin's labeling. Text and a new graphic were added regarding the

incidence of amenorrhea. According to Wyeth's memo, " this accomplishment will allow a more thorough discussion of amenorrhea in promotional materials and also negates the need for the $110,000 user fee FDA requested for reviewing this text and data for incorporation into the two-tablet PREMPRO labeling"(W-MDL527-00035055).

177. At some point after approval of NDA #20-3003 and prior to approval #20-527 S006, the review of Wyeth's Prempro marketing application was changed to a joint FDA Drug Product Review Division review. DMEDP would now perform the "efficacy review" and the Division of Reproductive and Urological Drug Products (DRUDP) would be responsible for the "safety review". Combination therapy with (0.625mg + 5.0mg MPA) had not been approved for Prempro due to FDA's medical officer's safety concerns about increased continuous dosing of MPA and Premarin and the risks of increased MPA were not necessary or warranted in order to address endometrial hyperplasia, therefore it was not recommended for approval. On April 1995 (W-HUSKAK01-00000373) Premphase was approved by FDA.

178. Wyeth presented the CHT data to both physicians and patients as if endometrial hyperplasia had a known direct correlation with endometrial cancer risk. FDA had described endometrial hyperplasia as a "possible" precursor of endometrial cancer not as a "known precursor" of endometrial cancer risk. In reality, CHT had been associated with a doubling of the risk of endometrial cancer when compared to no hormone treatment (Endometrial Carcinoma Risks among Menopausal Estrogen Plus Progestin and Unopposed Estrogen in a Cohort of Postmenopausal Women, Lacey et al).

179. There is a January 23, 1995 Wyeth Rush memo from David Colasante to distribution regarding the Women's Health Initiative (WHI) Update, "PEPI Influence"(PICKJ021-002474-5). Originally the plan for PEPI had been to include only women

receiving unopposed Premarin with rigorous monitoring, but it was learned that the dropout from hyperplasia would deplete the unopposed hormone group to insignificance by the trial's end. Dr. Loretta Finnegan (WHI Director) had requested the unopposed, nonhysterectomized group be discontinued. As a result, in keeping with Premarin and Wyeth's position on HRT, the new market opportunities of Prempro and Premphase, Wyeth would provide Cycrin. Dr. Finnegan's communication referred to a consensus toward continued utilization of MPA as the progesterone of choice for the WHI. However, the "*dissension still exists*" and is voiced most prominently by Dr. Elizabeth Barrett-Connor. The memo continued:

> You are aware that PEPI results confirmed existing data as to the beneficial effects of Premarin on lipid levels, including LDL and HDL. It was also apparent that much of the beneficial effect on HDL was eliminated by MPA coadministration but not by oral micronized progesterone. This has resulted in debate over the continued utilization of MPA in WHI. Dr. Jacques Rossouw has asked me to provide support for the continued use of MPA. I am aware that Schering-Plough is supplying further data on micronized progesterone (and presumably an offer to supply the drug). **It is essential that the current disposition of the Premarin/MPA combination tablet in WHI not change**. A proposed support document is attached for your immediate review…We must assume that even though logistical and cost implications are overwhelmingly in our favor, the dissenting voices will, at least, fall back to a scenario where micronized progesterone treatment is proposed for a subgroup. This would affect the statistical power of the trial and cast unnecessary doubt on our combination product.

180. By May 3, 1995 Wyeth was once again looking to Schering-Plough for Prometrium. Wyeth was negotiating co-promotion with Schering Plough for Prometrium (micronized progesterone MP)). Schering-Plough had required a co-promotion partner for

Canada. Wyeth was selected as the most appropriate partner in that it was the market leader with Premarin and the Prometrium monograph references use of 0.625 mg CEE. The plan was for Schering-Plough to promote Prometrium and Premarin together and Wyeth to promote Prometrium and Premarin. This would give the possibility of developing a combination sample and commercial package with a unique copyrightable approach which would further protect from anticipated generic entry of Premarin. "Wyeth was to be allowed to continue current promotion with Upjohn's MPA as well as continue development of its won MPA formats" (DUROJ0039-001922-3). There is a handwritten note that Prometrium was not approved to be used as a combination product (DUROH039-001924).

181. An Executive Summary 1995-1997, indicated that the combination – first as a two tablet 1995 and then as single tablet 1996 – made Wyeth less vulnerable to generics, and helped minimize the erosion curve of Premarin franchise. "There is currently little consensus among physicians regarding the best estrogen-progestin (HRT) regimen to use when treatment nonhysterectomized women. At present, only 40% of nonhysterectomized women take HRT have been prescribed a continuous combined estrogen/progestin regimen. Conversely, remaining patients are either on cyclic regimen or taking unopposed estrogen.

> **Threats**: Negative media coverage (e.g ERT and breast cancer)
> **Strategic Recommendation**: Efforts to specifically expand the HRT segment have been limited due to lack of clinical data and appropriate product labeling supporting efficacy and safety of HRT regimens.(DUROJ039-001945-53).
>
> **Goal: Market Expansion**- Long term- Develop Premarin/Prometrium HRT Product and position as **new and improved vs Prempro and Premphase**. It would have **superior lipid profile**. (DUROJ039-02038)

182. On January 9, 1997 Wyeth submitted a supplement S006 to **NDA# 20-527** for a higher dose of Prempro. The original clinical submission for Prempro, including the safety data had already been reviewed in NDA #20-303 and therefore it was not re-reviewed by Theresa van

der Vlugt, Medical Officer, DRUDP. The purpose of the current supplement was to provide a continuous combined regimen of 0.625mg Premarin and 5 mg MPA in Prempro Tablets that had not been approved by the medical officer with the prior submission of NDA 20-257 in 1995. The new dose was intended for women with bleeding or spotting is problematic on the 0.625mgCEE/2.5mg MPA dose. The supporting pharmacokinetic and clinical information to support the proposed regimen was included in NDA #20-303 approved December 31, 1994. In support of approval of the new dose for Prempro, Wyeth provided the following documents: Recommendations of Wyeth's Expert Consultants on the Premarin 0.625mg/MPA 5mg 28-Day Continuous Combined Regimen; Market research on the use of 5mg Progestin with 0.625mg Estrogen as continuous combined HRT regimen; and proposed draft labeling. FDA had not originally approved the dose based on the efficacy in terms of treating vasomotor symptoms and endometrial hyperplasia and the unknown potential increased safety risks of 5mg MPA with continuous dosing did not appear to be justified.

183. At a September 15, 1997 Prempro's labeling meeting, attendees included Dr. Heidi Jolson, Deputy Director, DRUDP, Dr. T. van der Vlugt, Medical Officer (Exhibit 8413 page 0012-3), Meeting Minutes June 24, 1997 5 month status meeting. Discussion Points- Medical-

> ▲the Dosage and Administration section of the label should have stronger wording to indicate that the 5mg dose of MPA should never be the primary regimen of choice for HRT
> ▲the evaluation of irregular vaginal bleeding should be discussed in the label
> ▲the original Prempro label for 2.5mg dose of MPH has more appropriate wording than this proposed label
> ▲the data from breast cancer studies is conflicting; the continuous 5.0mg MPA dose remains under review and appears to not increase the incidence of breast cancer(Exhibit 8413 page 0015).

184. Dr. Heidi Jolson was the Group Leader for the NDA efficacy supplement. She dismissed the concerns expressed by the prior medical officer for use of an increased MPA dose without a demonstration of additional efficacy. Her memo of January 8, 1997 recommends approval of the higher dose of MPA and stated:

> I concur with the recommendation of the primary medical officer that this supplemental application be approved. Although only a small difference in amenorrhea rates between Prempro dosage groups was demonstrated, this small difference may be clinically important for those women requiring HRT and in whom bleeding is problematic. Further, extensive post-marketing experience with these products suggests that there are no safety issues with the 5 mg dose of MPA that would offset the potential benefit of better compliance with HRT.
>
> This new tablet strength should be approved for use in all three of Prempro's current indications (including osteoporosis) between a previously reviewed drug interaction study demonstrated that 5mg of MPA does not have a clinically important effect on the pharmacokinetics of Premarin
> There are no outstanding regulatory issues (Exhibit 8412 page 0002-3).

185. On September 25, 1997, greater than 2 years after Prempro approval, Wyeth wrote a letter to Lisa Rarick, MD, Director of Reproductive and Urologic Drug Products, FDA, regarding its phase 4 commitment for Prempro and Premphase to "conduct a comprehensive investigation of breast cancer risk in users and nonusers" of NDA regimens at an "<u>appropriate and reasonable cost</u>." Wyeth referenced its own August 24, 1995 submission to FDA which provided a draft protocol synopsis for a phase 4 breast cancer investigation to obtain agency's review and comment, and a November 3, 1995 meeting between FDA and Wyeth to discuss several issues impacting the phase 4 trial and the feasibility of conducting a meaningful phase 4 trial.

186. Dr. Rarick was told that currently two large placebo-controlled clinical trials and one observational study (WHI) were already underway to evaluate the effects of ERT and HRT.

Breast cancer is one of the endpoints being evaluated in one of these studies, WHI. The second study was Medical Research Council's Women's International Study on Long-Duration Oestrogen after Menopause (WISDOM). Wyeth had committed to support both WHI and WISDOM trials by providing the active drug and placebos. WHI is anticipated to be done in 2005, WISDOM in 2011.

187. In contrast, Wyeth's proposed phase 4 study had been intended to enroll 500 cases and 1,000 controls for a period of 5 to 10 years. Initiation of the safety study was to occur in 2003 or 2004 to allow for sufficient penetration of PREMPRO and PREMPHASE into the market. Wyeth's phase 4 was to have 80% power to identify a statistical significance at the p=.05 level, relative risk of 2.0 for PREMPRO or PREMPHASE compared to Premarin.

188. The recent publication of the Nurses' Health Study reports observations of 121,700 nurses from 1976 through 1992, specifically focusing on breast cancer. In 727,550 woman-years of follow-up postmenopausal women, 1,935 cases of invasive breast cancer were identified. The RR for nonusers was 1.32 (CI: 1.14-1.54) among current users of estrogen alone and 1.41 (CI:1.15-1.74) among current users of estrogen plus progestin. Even in a study of this magnitude, the relative risks did not differ significantly from each other. Wyeth stated that is unlikely, therefore, that the study proposed by Wyeth will provide definitive information regarding the risk of breast cancer.

189. The point of the letter to Dr. Rarick was that Wyeth proposed to substitute the WHI for its phase 4 commitment regarding identification of the risk of breast cancer from estrogen/progestin use. Wyeth claimed that the WHI data, when pooled with data from WISDOM, should be able to detect more meaningful differences in breast cancer risks. Wyeth stated that its proposed phase 4 study would not be able to add meaningful information regarding

breast cancer risk. "Therefore, because of Wyeth's "contractual obligations" to WHI and WISDOM, it believed that its phase 4 commitment has been met through its continued support of these studies.

190. On November 6, 1997, Ms. Diane Moore, CSO, Division of Reproductive and Urologic Drug Products called to say that "it looks like" FDA would accept Wyeth's proposal to use the WHI and WISDOM as its phase 4 commitment for investigation of breast cancer risk (W-MDL303-00084699). November 24, 1997, Dr. Rarick wrote to Ms. Barton of Wyeth, "We further refer to your December 30, 1994 agreement to conduct a comprehensive investigation of breast cancer risks in users and non-users of the NDA regimens at appropriate and reasonable cost". The FDA had reviewed Wyeth's September 25, 1997 proposal and concluded to support that these prospective studies will fulfill the phase 4 commitment and that the previously discussed case-control study is not necessary (W-MDL303-00084714).

191. In Wyeth's files is a an article by H. Genant, et al., for the Estrab Osteoporosis Study Group, (**Low-Dose Esterified (Solvay) Estrogen Therapy Effects on Bone, Plasma Estradiol Concentrations, Endometrium and Lipid levels** *Arch Intern Med* 1997; 157:2609-2615). The article began that prospective studies have shown that doses of 0.625mg/d CEE or higher are needed to produce a significant increase in bone mineral density of the lumbar spine. The authors determined that esterified estrogens at a doses of 0.3 to 1.25mg/d administered unopposed by progestin, produced a continuum of positive changes on bones and lipids in a 24 month, prospective, randomized, placebo-controlled, double-blind study in 406 women, 278 without a hysterectomy, to determine the effect of the continuous administration of 3 doses. The 0.3mg/d dose related in positive bone and lipid changes without inducing endometrial hyperplasia. The authors began, "…the possible increased risk of breast cancer with prolonged

estrogen use and the relationship of lumbar BMD to breast cancer have led to alterations in the manner in which estrogens are administered and to the search for the lowest effective dose of estrogen…Because of the possible confounding effect of progestins on bone, only unopposed esterified estrogens were used in this study**.”**

192. On January 9, 1998, NDA 20-527/S-006 was approved for "Prempro 5" a single tablet with (0.625mg/5.0mgMPA). The manufacturer of Provera, Pfizer obtained FDA's approval of NDA 11-839/S-068 on August 4, 1998 for Provera to be used as combination therapy with 0.625mg conjugated estrogens (Premarin) (and not "all" estrogens) for reduction of endometrial hyperplasia for 12 to 14 consecutive days each month either beginning the 1st day of the cycle or the 16th day of the cycle. Pfizer's approval was based on submission of Wyeth's published study ("paper NDA") for combination therapy.

193. There was a March 10, 1998 presentation by Jamie Durocher, **The US Market: A Case Study in the Success of Changing the HRT Paradigm,** Group Product Director Women's Healthcare (SOLOJ025-000286-355, Exhibit 7182). In term of key dates of Premarin she lists May 8, 1942- Approval; Osteoporosis indication 1988; FDA's decision against generics May 5, 1997. The "Paradigm Shift"- input in 1940-1970's was Vasomotor symptoms" and by 1980s and beyond: "eyesight, colon cancer, Alzheimer's, cardiovascular disease, osteoporosis, and vasomotor". How did Wyeth get there?- "By capitalizing on social trends, meeting the challenges for women, drove "New Science" and used communications to change physician's and women's perceptions". In 1988, Ob/Gyns accounted for 42% of prescription market, primary care physicians (PCP) 50%, "Other" 8%. By 1997, the "Other" prescribers expanded to 14%, PCP- 51% and Ob Gyn 35%. The Marketing Strategy of the 1980's was to move from

treatment to "prevention". By the 1990s the strategy had evolved from prevention to "Total Health".

194. The presentation had the strategy used in the 1990s regarding Wyeth's "management of two issues"- "Breast Cancer, Endometrial cancer". On a slide there is a visual regarding a balance scale and primary care physicians (PCPs) in terms of their process of making risks versus benefits considerations. In the 1980s, the balance scale was tipped by the heavy load of risks of "breast/endometrial cancer", overloading the lighter vasomotor symptoms benefit (SOLOJ025-0003000). For PCPs, the risks of Premarin outweighed the small benefit. The balance scale for the 1990's as being promoted by Wyeth, the lighter plate was the "risks plate" containing only the risk of "breast cancer". The benefits plate for a PCP would include benefits of vasomotor symptoms, osteoporosis, cardiovascular, CNS/Alzheimer's colon cancer, macular degeneration and osteoarthritis appears. The overloaded benefits plate overwhelmed the breast cancer risk, thus now apparently justifying the PCP's prescription of continued hormone therapy (SOLOJ025-000301). The impression to be made to the PCP by the 1990s is the risk versus benefits paradigm has been totally shifted so that the "benefits" far outweigh the risk of breast cancer. According to Wyeth's promotions, the balance has been tipped now that Wyeth has removed the "endometrial cancer" risk from the paradigm. The risk of breast cancer alone is acceptable with all the other potential health benefits of HRT.

195. Market penetration strategies of the 1980s was for Wyeth to develop relationships with thought leaders, third parties, lead by example- provide science education and service. Market penetration strategies of the 1990's included a differentiation of the product from other estrogens as well as SERMs. Product development strategies included new potential indications-

osteoporosis/prevention of fracture, cardiovascular disease, Alzheimer's, colon cancer, macular degeneration.

196. In the 1980s, under its public relations strategy, Wyeth leveraged Gail Sheehy's Book ***Silent Passages***- Wyeth worked closely with the author to provide her with research and information about the Premarin brand, capitalized on her book tour by providing reports with Premarin specific information, and conducted aggressive media outreach program. Wyeth launched Annual Menopause Report to "own the issue", attitudes and behavior, women and the workplace, HRT and sexuality. Wyeth supported "*Acceptance*" of therapy by women with complete media campaigns, press kits. Wyeth drove "*Intervention*" via hospital-based medical education seminars for consumers on ERT, capitalized on baby boomers and physicians and utilized sales force to promote the campaign. Wyeth encouraged "*Persistence*" by educating consumers about short and long-term effects of menopause. Wyeth created an "Understanding Menopause Campaign" video and slide presentation developed with help of AMWA, BPW. The 1980s tactics were marketing direct to consumer and by physician detailing. The messages were that: 1) osteoporosis is a disease linked to menopause; 2) treatment provides symptom relief and disease prevention; 3) benefits outweigh the risks. By the 1990s tactics for marketing were direct to consumer, physician detailing and through the use of provider materials. The messages provided for the 1990s were: 1) branded promotions: reinforce indications; promote brand loyalty; 2) unbranded promotions/materials: educate and differentiate (Consequences of estrogen loss, benefits outweigh the risks; promote intervention). Market penetration was to occur with Wyeth's investment in relationships with third-party advocate groups: NAMS, NOF, SAWHR, AMWA, ACOG, ASRM. The market penetration of the 1990s included tactics with physician

detailing. Wyeth's messages were: Premarin contains a unique combination of 10 components and "Nothing Else is PREMARIN".

197. Recognizing the need for ongoing research, Wyeth donated its own products to be used in PEPI, WHI, WHI-MS, WISDOM and HERS. In terms of product development in the 1990s, Wyeth's tactic included physician detailing for the Prempro launch. The messages for Prempro: 1) standardization of HRT regimen, 2) single tablet convenience and 3) proven endometrial protection. The KEYS to SUCCESS- grow the market, acceptance, issues management intervention persistence, increase share- product differentiation and product development.

198. Wyeth managed to defer its 1994 phase 4 commitment made to FDA to obtain breast cancer risk information until the WHI study. The phase 4 minimal dosing safety study for osteoporosis Wyeth utilized a subpopulation analysis from Wyeth's phase 3 efficacy study, Health, Osteoporosis, Progestin and Estrogen Study (HOPE). According to FDA the HOPE study for osteoporosis prevention claims was designed in accordance with the March 20, 1995 HRT Guidance and the November 19, 1997 Committee for Proprietary Medicinal Products (CPMP), "Points to Consider on Hormone Replacement Therapy (CPMP/EXP/021/97) publication. The original protocol for the phase 4 study was submitted to FDA January 13, 1994 and finalized July 18, 1995, and amended February 23, 1999. The 1999 amendment allowed the interim data from HOPE to be submitted to the National Institutes of Health (NIH) to review the outcomes of subjects assigned to treatment arms after August 23, 1995 through July 31, 1998.

199. The trial length, use of washout periods, inclusion criteria, measurements of hot flushes and endometrial hyperplasia endpoints were conducted as recommended in these documents. HOPE (See additional discussion of HOPE below) was designed by Wyeth to be a

2-year, phase 3 efficacy study (0713D2-30-US) conducted at 57 study sites and included 8 treatment groups: three treatment groups of CE alone (0.3mg, 0.45mg, and 0.625mg); four treatment groups of combination CE/MPA (0.3CE/1.5mg MPA, 0.45mgCE/1.5mg MPA, 0.45mgCE/2.5mg MPA, and 0.625mg/2.5mg MPA); and a placebo (*332 patients). Wyeth postulated that lower dose 1.5mg MPA dose may also "provide additional benefit to CEE in the prevention of osteoporosis as well as provide less attenuation of the positive lipid effects of lower dose of CEE". The 1.5mgMPA was selected by Wyeth because it was postulated that a lower dose may be sufficient to oppose a lower dose of CEE for the prevention of endometrial hyperplasia. Wyeth's Study 0713D2-309-US was designed as a efficacy prospective, double-blind, placebo/active drug-controlled clinical trial, randomizing 2,805 postmenopausal women (40 and 65 years of age) for 2-year duration of treatment. There was to be a smaller subpopulation of women followed through the 2-years as the metabolic/osteoporosis portion of the study. Built into HOPE was a subpopulation to address FDA's request for a phase 4 commitment to examine minimal dosing safety.

200. As a result of Wyeth's HOPE study, after 1 year, Wyeth submitted NDA # 20-**527/S-017** requesting FDA's approval of two combined (0.45mg/1.5mgMPA and 0.3mg/1.5mgMPA) lower doses for Prempro on June 15, 2000. Wyeth received an approvable letter for "Prempro 0.45mgCE/1.5mgMPA" on April 13, 2001 with a request from FDA that good manufacturing practice (GMP) deficiencies identified during inspection of Wyeth's Guayama, Puerto Rico manufacturing facility be addressed before NDA supplement approval. However, Wyeth was not permitted to market its lower dose Prempro until 2003. On January 31, 2003 the Divisions (DRUDP and DMEDP) were notified by FDA's Office of Compliance that the Puerto Rico manufacturing establishment was now considered as compliant with GMP.

FDA's Daniel Shames, MD, Director, DRUDP issued a supplement approval letter for **NDA #20-257/S017** on **March 12, 2003** for the legal start of marketing low dose (0.45mg/1.5mg) Prempro as a continuous combined regimen for treatment of moderate to severe vasomotor symptoms associated with menopause and treatment of moderate to severe symptoms of vulvar and vaginal atrophy associated with menopause. On June 4, 2003, David Orloff, MD, Director of DMEDP sent Wyeth an approval letter for **NDA #21-396**, a marketing application for low dose Prempro submitted September 24, 2001 and HOPE data for efficacy. Wyeth had provided FDA with a December 3, 2002 submission that completed Wyeth's response to FDA's July 25, 2002 action letter. **NDA #21-396** was a NDA for efficacy approved by FDA's DMEDP for the use of Prempro/Premphase (0.45ml/1.5mg and 0.3mg/1.5mg) for prevention of postmenopausal osteoporosis. **NDA#21-417**, submitted December 17, 2001 and approved July 16, 2003, was for Wyeth to market Premarin 0.3mg and 0.45mg for the prevention of postmenopausal osteoporosis.

201. Overall, the lower dose 0.45mg/1.5mg Prempro was found to be just as effective at relieving moderate-to-severe vasomotor symptoms and vulvar and vaginal atrophy in generally healthy postmenopausal women between 40 to 65 years of age as higher dose Prempro combination therapy. The data presented by Wyeth to FDA as support for NDA 20-527/S017 was 1-year interim analysis of an ongoing 24-month, phase 3 Health and Osteoporosis Progestin and Estrogen (HOPE) study. DRUDP's reviewers had been responsible for the review of 1-year (13 cycle) HOPE data. In HOPE, a total of almost 2700 were treated women contributed data for analysis at 1-year, and approximately 749 (28%) by 2-year were evaluable to comprise the metabolic/osteoporosis "substudy" group. Wyeth's analysis provided to FDA indicated that no endometrial cancers had occurred in year 1 however, an FDA medical reviewer identified two

"endometrial malignancies" within the discussion within the submission. Subject 30924-0011(0.3mg CEE-only), and Subject 30912-0049 (0.45mg CEE/1.5mg MPA), both thought to have cancer by the Medical Reviewer listed by Wyeth as having "endometrial hyperplasia". Wyeth originally identified 32 cases of endometrial hyperplasia across the 8 treatment arms, however, the reviewer identified 30 with endometrial hyperplasia and 2 with cancer. Of the remaining 30 endometrial hyperplasia, 29 (97%) occurred in the estrogen-only arm, and one case (3%) of endometrial hyperplasia occurred in the lowest minimal dose CE/MPA combination group (0.3mg/1.5mg MPA).

202. Seven of the 8 reported breast cancers during the HOPE substudy occurred during the treatment period, and one case was diagnosed 12 months after completion of the study. For the 2 –year (26 cycle) of HOPE, FDA relied on DMEDP reviewers. One CE only (0.625mg) patient was reported as having breast cancer. The placebo treatment group (332 patients) reported one case of breast cancer. The remaining six cases of breast cancer were all reported in CE/MPA combination treatment groups- one in 0.625CE/2.5mgMPA (Prempro), one in 0.45mgCE/1.5mgMPA (minimal dose) and "four clustered in the 0.3mg/1.5mgMPA"(lowest of the two minimal doses) treatment group (*Five of the 8 cancers (63%) occurred in the new "low dose groups"). Two additional breast cancers were reported in a 4-month safety update, but the drug being taken was still blinded for FDA due to the ongoing metabolic/osteoporosis study. (* According to Theresa Kehoe, MD, Medical Reviewer DMEDP, Summary of NDA# 21-417, Wyeth had 2-year HOPE data for support of NDA #21-417 to support a claim of efficacy for continuous "Premarin" at doses 0.625 mg, 0.45mg and 0.3mg for prevention of osteoporosis. On page 31 of 36, dated 10/10/02, she states that a total of **13 cases** of breast cancer occurred in HOPE's subjects. Two cases in the placebo group and 11 in the active treatment arms. Dr.

Kehoe also indicated about the clinical investigators (page 36 of 36- APPENDIX- "Two principal investigators and one sub-investigator received substantial financial benefits from Wyeth-Ayerst. Because of the double-blind randomized nature of the study, these potential conflicts of interest were less likely to affect the outcome of the study. ")

In contrast to prior opinions of FDA's Medical Reviewer regarding Prempro (NDA #20-303, 21-527) there was no concern about potential clustering of breast cancer with continuous use of MPA and Premarin by women for the rest of their lives. A prior FDA Medical Officer's concern over pivotal study for # 20-303 had triggered FDA's post approval commitment from Wyeth for two phase 4 commitments. Now with HOPE and its finding of 6 of 8 (75%) breast cancers, clustered in the combination therapy groups, including low dose combinations, and NDA 21-417 reviewed post WHI, with 11 of 13 cancers in the continuous combination arms, FDA's Medical Officer had no concerns. After WHI, physicians were being informed to use the lowest dose for the shortest amount of time, FDA was aware that as of 2003, there were now lower dose options available.

203. In the Wyeth documents is an undated draft letter to be sent to Dr. Rarick at FDA regarding FDA's approval of S-015 and FDA requesting Wyeth to update Prempro/Premarin labeling with HERS data. The purpose of the letter was to request that "all manufacturers of combination estrogen/progestin products (HRT)" be required to update their package inserts with the results of HERS study. Wyeth requested that package inserts for Activella, Prefest, *fem*HRT, Provera and Prometrium all be updated **immediately.** Furthermore, Wyeth requested that FDA require the HERS information be included in product labeling for investigational hormone products (CONSG007- 000117-8).

204. On January 11, 2000 Wyeth submitted a Changes Being Effected (CBE) Special Supplement for NDA #4-782 to inform FDA that it was strengthening Premarin labeling information regarding risks of thromboembolism in the WARNINGS and PRECAUTIONS label and under the RISKS of ESTROGEN section of the patient labeling (ROSSC001-000328).

205. May 1, 2000 Wyeth wrote to Dr. Allen of FDA with a Special Supplement- CBE for changes in its label for WARNINGS- Induction of Malignant Neoplasms- breast cancer subsection. Wyeth felt that its changes for the label were consistent with the Agency's 1999 Draft Labeling Guidance for Non-Contraceptive Estrogen Drug Products (ROSSC001-000371-373).

206. There is a July 13, 2000 Wyeth internal memo recording a July 12, 2000 phone conversation with Ms. Diane Moore, DRUDP, FDA initiated by Wyeth to determine if she could provide any additional information about a letter to industry that currently was being drafted at FDA regarding estrogen class labeling revisions to the Breast Cancer Warning and Cardiovascular Risk subsections. The Agency had stated that it intended to publish the Final Labeling Guidance for Estrogen Drug Products with proposed class labeling for breast cancer and HERS. The physician insert- BREAST CANCER WARNING as proposed by FDA was to contain:

> *The addition of progestin to estrogen may increase the risk for breast cancer over that noted for non-hormone users more significantly (by about 24-40%), although this is based solely on epidemiological studies and definitive conclusions await prospective controlled clinical trials.(ROSSC001-000367).*

207. Patient Labeling: RISKS OF ESTROGENS:

> *Cancer of the breast*
> *Studies examining the risk of breast cancer among women using estrogen alone and combined estrogen progestin therapy have suggested a modest increase in breast cancer risk for users…*(ROSSC001-000368).

208. In addition Ms. Moore reiterated that as a result of HERS – Wyeth's funded study the label would be changed to state:

> PRECAUTIONS- Cardiovascular Risk
> *The effects of estrogen replacement therapy on cardiovascular disease have not been fully studies. The Heart and Estrogen/Progestin Replacement Study (HERS) a controlled clinical trial of secondary prevention in 2763 postmenopausal women with documented coronary heart disease, demonstrated no benefit. During an average follow-up of 4.1 years, treatment with estrogen/progestin did not reduce the overall rate of recurrent coronary heart disease events…There were more CHD events in the hormone group than in the placebo group in year 1 and fewer events in years 3 through 5.*

209. Wyeth told Ms Moore that it was in the process of finalizing a labeling supplement for the WHI and a Changes being Effected (CBE) Supplement was being submitted by it for HERS. On August 10, 2000 Wyeth received its official letter from FDA with the labeling changes that had been provided to it by Ms. Moore. The Agency's letter was sent from Dr. Susan Allen, M.D., M.P.H., Director, DRUDP, FDA (ROSSC001-000349-50).

210. In Wyeth's August 11, 2000 CBE S-112 Wyeth proposed to use its own two alternative breast cancer statements for labeling. Wyeth wrote:

> Wyeth-Ayerst "strongly objects" to the Agency's proposed draft labeling. Primarily, we believe that breast cancer risk assessments in estrogen labeling must be a clear description of the relative risk and also include absolute risk information. Relative risk information, particularly when expressed as percentages, is easily misinterpreted and appears to exaggerate the risk of what is already an exceptionally emotional issue for women. Recent market research has underscored our belief that risk expressed solely as percentages is misunderstood by patients who are not aware that this risk is relative. For example, when users and nonusers of HRT were asked to interpret 24-40% increased risk, they often construed this to mean an absolute risk of 4 in 10. Even if understood by most physicians, the information is frequently reported in the lay media and this subject to gross misunderstanding by patients. Our proposed wording puts this information into perspective by including both relative and absolute risk assessments (with baseline risk information), thereby providing healthcare professionals and consumers more comprehensive information to individualize assessment…

> Furthermore, we believe that the labeling proposed by the Agency may overemphasize the risk attributed to the progestin in HRT. The FDA relies on two recent epidemiological studies…Both these studies, as outlined in a previous correspondence from Wyeth-Ayerst, have limitations of small HRT sample sizes. This degree of emphasis on the increased risk attributable to progestin use based upon only two recent epidemiological studies, with this limitation, is not justifiable, especially given the number of earlier case-control and cohort studies that have shown inconsistent and conflicting results. (ROSSC001-000338; see also ROSSC001-000356-366))

211. On September 29, 2000, Wyeth again wrote to Dr. Allen. Wyeth requested that Dr. Allen and FDA suspend its 90-day implementation date regarding requested changes to WARNINGS and PRECAUTIONS for breast cancer risk and cardiovascular effects for approved estrogens and estrogen/progestin products. Wyeth requested suspension of the mandatory date so that there could be a meeting with FDA to discuss "our very serious concerns with the Agency's proposal". (ROSSC001-000336). On October 16, 2000, Ms. Moore called Wyeth back to tell them known that its request for a meeting with FDA about the labeling changes had been denied. The Agency was not willing to grant the request for suspension of the 90-day implementation of the labeling changes. She also indicated that the Agency planned to publish for comment the proposed breast cancer and HERS labeling. She then turned to a discussion of Wyeth's pending supplements (S-105, S011) requesting to incorporate osteoporosis data from the PEPI trial in the Premarin and Prempro package insert. She said a teleconference was needed to discuss the proposed labeling. The medical reviewers wanted to only display the intent to treat population in the tables providing the mean percentage in bone mineral density at 36 months (ROSSC001-000334).

212. On November 7, 2000 Mr. Donald O. Beers, Esq, Arnold and Porter, representing Wyeth, Pfizer and Pharmacia, wrote to Dr. Allen regarding her August 10, 2000 FDA letter and follow-up telephone calls. Dr. Allen had requested labeling changes be implemented within 90

days of all estrogen replacement and estrogen/progestin combination hormonal replacement therapy products(BURKM015-000087-89; Exhibit 10425). Mr. Beers wrote that regarding the oversight of labeling:

> As you know, under the New Drug Application review system, applicants propose labeling, which FDA reviews. Thus, as a practical matter, changes in labeling generally result from a negotiation process that recognizes and respects the different expertise and perspectives of the applicants and the agency. It is not consistent with the law for the FDA simply to dictate proposed language for an applicant's labeling without providing a meaningful opportunity for dialogue between the applicant and the agency.
>
> We recognize that the situation is necessarily somewhat different when, as here, class labeling is involved. In such circumstances, however, the applicant continues to have a contribution to make to the process and, as FDA has recognized in other contexts, a right to have its views considered. Thus, FDA generally has addressed potential changes in class labeling for hormonal drug products in guidances for industry. FDA has, in conformance with requirements of the Food and Drug Administration Modernization Act of 1997, committed itself to following "Good Guidance Practices". Those practices require that, for guidance that involves "complex scientific issues," FDA seek comment from interested parties before implementing the guidance. See generally 65 Fed. Reg. 7321 (Feb 14, 2000)(proposed regulations codifying current FDA practice). Compare 21 U.S.C. §371(h)(1)( c ) (statutory requirement). While the information addressed in your August 10 letter is important, FDA has itself taken some time to review it and to suggest class labeling addressing it. Thus, we do not believe the agency can justify a conclusion that prior input from the affected applicants is not feasible or appropriate (the only basis under FDA policy and the statute to deny public participation prior to finalization of FDA's position… We only ask that , consistent with FDA's policy and the statutory procedure, a process be adopted that will permit a meaningful dialogue concerning the proposed label changes so that the best language may be adopted.

213. The Prempro package insert in 2002 did not have the FDA's initial requested breast cancer warning with 24-40% data as recommended by Dr. Allen. Also, the HERS data in PRECAUTIONS – Cardiovascular Risk has been buried much further down within the labeling section where it was less likely to be read and appreciated by physicians.

214. According to a presentation by Pfizer for FEMHRT,(combination hormone therapy pill containing 1mg norethindrone acetate and 5 mcg ethinyl estradiol) launched February 2000, at a July 2001 JAALA Marketing Meeting (Edwards-A0000345-414) the hormone replace therapy market had become crowded. The combined combination hormone therapy market (CCHT) consisted of Prempro, FEMHRT, Ortho-Prefest, Activella, Premphase, Combipatch, and Estratest. Approved drugs intended for treatment of osteoporosis included Fosamax, Actonel, Evista, Crinone. The progestins market included Prometrium, Provera, Amen, Cycrin, Aygetin, and Progest. The oral estrogens market included Premarin, Estratab, Estrace, Ogen, Ortho Est, Cenestin, and Tri Est. Estrogen patches included Vivelle, Estraderm, Climara, and Alora. Among the nutraceuticals were Promensil, black cohash, soy and Don Quai. The JAALA countries included Japan, Asia, Latin America, South America and Australia. Of the potential risks and problems with hormone therapy- **#1 Breast cancer**, #2 endometrial cancer, #3 venous thrombosis (blood clots) and #4 compliance.(Edwards-A 0000403). There are multiple HRT regimens and delivery systems in 2001:

> **pulsed or cyclophasic**- estrogen continuous and progestins at 2 day intervals on and off;
> **cyclic combined**- estrogen and progestins continuous, and no progestins day 1-6;
> **cyclic-** estrogen days 1-30 with progestins days 1-12;
> **cyclic (old)** estrogen continuous day 21and progestins day 9-21;
> **continuous combined**- estrogen and progestin daily(women with an intact uterus)
> **estrogen alone**- daily (hysterectomized women).

215. According to the Pfizer presentation, the #1 Reason Women Discontinue HRT is Spotting/Bleeding" (Edwards-A0000366). **The #1 Reason Resist Using HRT- Fear of <u>Breast Cancer</u>** (Edwards-A0000373)

216. Wyeth also submitted NDA# 21-396 in September 2001 for FDA's approval of the same lower dose 0.45mg CEE/1.5mg MPA and 0.3mg CE/1.5mg MPA CHT but for the

indication of "prevention of postmenopausal osteoporosis". The NDA for the lower dosage strengths was approved by FDA on June 4, 2003 (*after the release of WHI in July 2002). The application review was stopped in July 2002 when the manufacturing facility had deficiencies in GMP as well as clinical deficiencies. Wyeth addressed some of the deficiencies in its December 2002 complete response to the action letter.

217. FDA's reviewer indicated that at the time of the low dose submission, there were 5 doses of CEE (Premarin) approved by FDA: 0.3mg, 0.625mg, 0.9mg, 1.25mg, and 2.5 mg. The 0.625mg dose of CEE is currently recommended dose for prevention of postmenopausal osteoporosis (PMO). The other approved indications for CEE included vasomotor symptoms (0.625mg), vaginal atrophy (0.3 to 1.25mg or more), hypogonadism (0.3 to 0.625mg), treatment of breast cancer (10mg TID), and advanced androgen-sensitive prostate cancer (1.25mg to 2.5mg).

218. Regarding the HOPE results, the phase 3 efficacy study for NDA #20-396, which was totally funded and managed by Wyeth, Wyeth was unable to provide FDA with fracture rate information since it had not designed HOPE to collect fracture rate data. In terms of FDA's obtaining additional safety information from HOPE post WHI, when Wyeth was pushed by FDA to provide additional safety information, Wyeth contended that could be no meaningful safety data obtained in HOPE to respond to WHI and FDA's concerns.

219. FDA's reviewer of NDA#21-396 noted that in year 2003 the labeling revised post WHI for these products as well as other estrogen/ progestin products now recommended to physicians the use of low doses of hormones for a duration sufficient to accomplish treatment goals. Additionally, the drug labeling counseled that when the combination product was used solely for the prevention of post menopausal osteoporosis (as opposed to for symptomatic relief

of symptoms of hypoestrogenism) other therapeutic options (nonHRT) should be considered. Therefore, to FDA the new lower dose CEE/MPA Prempro options of NDA #20-396 provided a new lower dose alternative for women and physicians.

220. There had been nothing which would have prevented Wyeth at any time from investigating by animal and human studies optimal dosing for Premarin and later combination hormone therapy. Lower doses of Premarin and MPA could have been investigated by Wyeth in the early 1980s and when Wyeth first began to try to obtain approval of a combination hormone therapy.

## II. A MICRONIZED "PROGESTERONE" NDA

221. Unlike Provera, grandfathered as effective for certain limited indications by DESI review, Wyeth would have been aware that eventually FDA approved a New Drug Application (NDA) #19-781 for Schering Corporation allowing the launch of a micronized oral natural progesterone, Prometrium, in the United States. Wyeth had selected MPA in Prempro, since MPA was already approved by FDA and it avoided having to start "from scratch" in obtaining FDA's approval of a combination Premarin progestin drug. Also, since MP is prepared in an oil base that does not mix well with powders, its use in a single tablet combination product like Prempro had proved not to be practical (CONTA012-001691) (RD Langer. **Micronized progesterone: a new therapeutic option.** *Int J Fertil* 1999;44:67-73). Wyeth attempted to acquire Prometrium in 1991 and again in 1995. At one time in 1995, Wyeth had envisioned a new combination Premarin/Prometrium product, to be marketed as an improvement over Prempro with an improved lipid profile.

222. Prometrium was initially approved by FDA as a "short-term treatment" for secondary amenorrhea in premenopausal females. Prometrium had been many years in-house

under review by FDA. At time of NDA approval there was a phase 4 commitment from Schering to conduct additional clinical studies for support of treatment of menopause symptoms.

223. The original NDA for progesterone was submitted September 30, 1987 by Besins Pharmaceuticals and resubmitted March 17, 1989 by LaSalle Laboratories, US affiliate of Besins-Iscovesco Pharmaceuticals, Inc. (Besins Pharmaceuticals was dissolved September 26, 1988.) Transfer of ownership of the NDA was made to Schering Corporation on July 1, 1990. Schering Corporation was sent a "not approvable letter" from FDA on August 17, 1990. Subsequently, concurrence was reached between FDA and Schering Corp as to the methods to take to address the deficiencies in the NDA . Schering Corp would conduct two pharmacokinetic studies in male volunteers and additional clinical trials to support indications. An additional clinical trial was to address effectiveness of Prometrium on inducing endometrial secretory transformation in postmenopausal women with proliferative endometrium induced by estrogen priming.

224. Prometrium Oral capsule, 100mg was approved May 14, 1998 and a 200mg capsule October 14, 1999. At the time of approval, there was no other oral progesterone drug product approved for the United States. According to the NDA's Medical Review officer, MPA was currently the most commonly prescribed synthetic oral progestational drug. Unlike the grandfathering history of Provera, Schering Corp. had been required to provide FDA with a clinical study with three years of patient data supporting approval of an intended use for treatment of postmenopausal females as part of combination hormone therapy.

225. Schering Corp's U.S.P. progesterone was micronized for oral administration and synthesized from starting material obtained from a yam plant source. Unlike MPA, chemically the micronized progesterone was identical (* bioidentical) to natural human progesterone of from

the ovary. The serum progesterone concentrations produced from Prometrium appeared linear and dose proportional following multiple doses over the range of 100mg/day to 300mg/day in postmenopausal women and men. As with Provera and CHT, Prometrium was eventually approved by FDA indicated for use in prevention of endometrial hyperplasia in non-hysterectomized postmenopausal women receiving conjugated estrogen tablets.

226. At the time of Prometrium's 1998 approval by FDA, the medical officer wrote the following regarding clinical use of oral progesterone (*Underlining added for emphasis.):

> In addition to the clinical data submitted by the applicant, there is a significant amount of medical literature on the clinical use of oral progesterone which was reviewed as background material. The following citations represent the current most relevant publications. The sponsor has not made any claims based on these references.
>
> The Writing Group for the PEPI Trial JAMA 273:199, 1995
> The Writing Group for the PEPI Trial JAMA 275:370, 1996
> JT Hargrove, et al. Obstet Gynecol 73:606, 1989
> WS Maxson and JT Hargrove Fertil Steril 44:662, 1985
> JT Hargrove,et al. Am J Obstet Gynecol 161: 948, 1989
> JA Simon, et al Fertil Steril 60:26, 1993
> P Affinito, et al Maturitas 20: 191, 1995….
>
> **Relevant human experience**
> Some of the recently published articles (English only) containing the largest clinical experience with oral micronized progesterone are as follows:
> MM Shangold, et al. *Fertil Steril* 56:1040, 1991
> A. Dupont, et al. *Maturitas* 13: 297, 1991
> DL Moyer, et al. *Fertil Steril* 59:992, 1993
> The Writing Group for the PEPI Trial *JAMA* 273:199, 1995
> The Writing Group for the PEPI Trial *JAMA* 275:370, 1996
>
> These articles represent experience with over 600 women treated with 100-300mg or oral micronized progesterone from one month to five years for the indications of secondary amenorrhea.
>
> **Foreign marketing experience**
> Micronized progesterone as Utrogestan was first marketed in 1980 by Basins-Iscovesco Pharmaceuticals, Inc. Since that time it has been marketed in 26 countries for various indications including menstrual irregularities related to anovulation and dysovulation, luteal insufficiency, and postmenopausal hormone

replacement therapy. The range of dosing for these indications is between 200-300mg/day. It has been recommended that these daily doses be administered as a single dose, as well as divided doses. In Belgium, Luxembourg, France, Greece, Portugal, and Switzerland one of its indications is for menstrual irregularities (anovulation/dysovulation) which is probably similar to a secondary amenorrhea indication. The sponsor estimates that approximately ( XX ) units (1 unit= 30 capsules) have been sold worldwide between 1980 and 1995.

**Regulatory history and other relevant background information**

The Medical Officer review dated November 20, 1987 stated that Utrogestan is not covered by the DESI regulations and that none of the submitted clinical studies supported the efficacy of the proposed doses of Utrogestan for the claimed indications. It was recommended that the NDA not be filed.

In January 22, 1988 meeting with Besins Pharmaceutical representatives, the sponsor indicated they thought Utrogestan could be approved as a "paper NDA". The FDA responded that in meeting 3 years previously with the sponsor the need for clinical trials had been indicated. The need for bioavailability studies and to determine the effective dose for their proposed indication was also discussed. The need for the sponsor to address possible toxicity of progesterone administered orally was discussed since the first pass effect in the liver and possible lipid changes would be different from the IM route of administration. The need to perform clinical studies using the proposed dose in the proposed population was again stressed. Finally, it was suggested that the sponsor seek outside consultation on designing their clinical studies…

February 13, 1990 the FDA met with LaSalle Laboratories to review their response to the deficiencies identified 1-22-90. The FDA proposed discussing this drug at the upcoming Advisory Panel Committee meeting, but the sponsor declined. Agreed upon conclusions were as follows: 1) LaSalle would provide literature documentation that 80% reduction of withdrawal bleeding was as good as or better than efficacy of other progestins; 2) Class labeling will not be used. The only indications will be the treatment of secondary amenorrhea, and the efficacy rate for the induction of withdrawal bleeding will be stated as will be the extent of secretory changes; 3) The labeling will state that there is no evidence establishing the efficacy of this product for endometrial protection in a postmenopausal population; 4) The FDA recommended a cautionary statement be included that there is no (or insufficient) evidence regarding the safety of long-term use of this drug; 5) The labeling section describing the mode of action will be modified accordingly establishing the efficacy of this product.

227. From the available documentation for the NDA, the reviewing FDA officers continued to recommend "against approval" of micronized progesterone in 1996 despite the

submission of Schering Corporation. There is a FDA Group Leader Memorandum dated February 6, 1997, regarding the Agency's final decision to proceed with approval of the Prometrium marketing application.

> The deficiency was discussed with the sponsor in a meeting on December 4, 1996. <u>In subsequent internal discussions, consensus was reached that this application is approvable in light of the following considerations:</u>
>
> 1) The effectiveness of progestins for this indication is well established;
> 2) It is reasonable to expect that the safety profile on the 400mg daily dose will be similar in post-menopausal and pre-menopausal women;
> 3) The 400mg dose should be at least equally efficacious as the 300mg dose at inducing withdrawal bleeding in premenopausal women;
> 4) The sponsor has addressed the deficiencies in the August 17, 1990 not approvable letter in a manner consistent with the division's guidance at that time;
> 5) The sponsor has committed to conducting a phase IV study; and
> 6) Until the phase IV study has been completed and reviewed, only the 400mg doses would be recommended in the package insert because of safety concerns that the 300 mg dose does not induce sufficient endometrium transformation.
>
> Because of the need for extensive revision to the proposed package insert (REDACTED) an approvable letter will be issued.

228. As indicated in the medical officer's review above, bioidentical hormones for natural progesterone had been successfully used outside the United States. The medical officer cited several articles felt to be relevant to his review of micronized progesterone by an author J.T. Hargrove (Vanderbilt University Medical Center). One of the documents cited above is JT Hargrove, WS Maxson, AC Wentz, and LS Burnett (**Menopausal hormone replacement therapy with continuous daily oral micronized estradiol and progesterone** *Obstete Gynecol*. 73(4):606-12 April 1989) which examined the safety and efficacy of the use of a daily combination of micronized estradiol (E2) (0.7-1.05mg) and progesterone (200-300mg) in a population of ten menopausal women with moderate to severe vasomotor symptoms and/or vaginal atrophy over a 12 month study interval. For comparison, five similar women were

placed on conjugated estrogens, 0.625mg daily, and medroxyprogesterone acetate (MPA), 10mg daily, for the first 10 days of each calendar month for 12 months. In the E2 and progesterone group, the endometrial histology became completely quiescent and there was no uterine bleeding after 6 months. Four of five women on conjugated estrogens (CEE) and MPA continued to have regular withdrawal bleeding throughout the study. The study demonstrated to the authors that the daily administration of a combination of micronized E2 and progesterone resulted in symptomatic improvement, minimal side effects, an improved lipid profile, and amenorrhea without the endometrial proliferation or hyperplasia seen in menopausal women with CHT with MPA.

229. Also appearing on the FDA medical officer's list was JT Hargrove WS Maxson, AC Wentz, (**Absorption of oral progesterone is influenced by vehicle and particle size**. *Am J Obstet Gynecol* 161(4):948-51 October 1989), a study which examined reports that micronized progesterone enhanced absorption and increased serum and tissue levels of progesterone. "Contrary to traditional teaching, these data showed that significant serum progesterone levels can be achieved by oral administration". Absorption could be significantly improved by the physical characteristics of progesterone and the vehicle used for oral administration.

230. Another JT Hargrove article which was not included on the medical officer's list of relevant documents was JT Hargrove, E Eisenberg (**Menopause.** *Med Clin North Am* 79(6):1337-56 November 1995.). The abstract had the following statement regarding the authors' experiences with use of natural sex steroids:

> The use of naturally occurring sex steroids in humans represents faithful replacement of the steroids lost at ovarian failure. By using timed measurements of the replaced steroids to ensure attainment of premenopausal levels of the deficient hormones, the adequacy of an individual's therapy can be monitored. This method of hormone replacement has evolved over more than 10 years. It is inexpensive, gives good relief of symptoms, and is well tolerated. The

> endometrium is protected, and uterine bleeding is extremely infrequent. Patient compliance is excellent, and the positive effects of this hormone treatment encourage most patients to want long-term therapy.

231. Unlike treatment of menopause symptoms outside the United States, within the USA physicians, even after approval of Prometrium, continued to remain brand loyal Provera, MPA and Prempro for long-term treatment of postmenopausal women. The trend for continuing to use synthetic progestins including MPA had begun in the 1960s with successful launch of the first oral contraceptives.

232. As with other grandfathered "safe" products, FDA's regulatory oversight of marketing was reduced. Grandfathering of a drug serves to increase the responsibilities placed on a grandfathered drug sponsor for policing its own drug's performance and labeling and conduct in terms of compliance with the Food Drug and Cosmetic Act and patient safety.

233. Also like Wyeth and Premarin (discussed further below), Upjohn's Provera had a long history of being promoted off-label to physicians for use along with estrogen in hormone therapy as CHT. An early example of such promotion is NDA-PRO 0029068. Though undated, this promotional material contains a reference dated 1966. This pre-DESI promotion clearly advocated the use of Provera to oppose estrogen's effects, and promoted the use of both hormones long-term. It reads, in relevant part:

> **The benefits**
> Cyclic therapy with Provera helps modify the effects (irregular bleeding) of continuous estrogen replacement.
>
> **Estrogen**- manage the symptoms- If you choose long-term estrogen treatment for your patients, then in addition to helping provide symptomatic relief….
>
> **PROVERA**- to manage the estrogen-
> ■ Periodic menses helps shed hyperplastic endometrium

■Estrogen/progesterone therapy may be maintained throughout the post-menopausal years to facilitate periodic shedding and generation of healthy, uterine tissue.

234. As discussed above, a synthetic MPA was eventually used by Wyeth in its Prempro, ignoring the bioidentical form of natural progesterone approved after Prempro in the United States in 1998. However, the investigational natural progesterone product had been used in a combination hormone therapy arm in the PEPI trial (Postmenopausal Estrogen/Progestin Interventions Study) published in JAMA 1995 and 1996. Micronized progesterone, Prometrium, is chemically identical (*or bioidentical) to progesterone of human ovarian origin. In 1991 and 1995, Wyeth had pursued obtaining a licensing agreement for micronized progesterone for use in the United States as CHT. However, Wyeth's pursuit of Prometrium (*initially called Utrogestan) was abandoned by Wyeth. Therefore, Wyeth pursued the use of grandfathered MPA for its combination drug.

235. As indicated by FDA's Medical Officer's reviews, bioidentical hormones for natural progesterone had already been widely available outside the United States. The medical officer cited several articles which he felt were relevant to the Agency's review of micronized progesterone. The articles included JT Hargrove, WS Maxson, AC Wentz, and LS Burnett (**Menopausal hormone replacement therapy with continuous daily oral micronized estradiol and progesterone** *Obstete Gynecol*. 73(4):606-12 April 1989); JT Hargrove WS Maxson, AC Wentz, (**Absorption of oral progesterone is influenced by vehicle and particle size**. *Am J Obstet Gynecol* 161(4):948-51 October 1989); JT Hargrove, E Eisenberg (**Menopause.** *Med Clin North Am* 79(6):1337-56 November 1995.) The authors' experiences with use of natural sex steroids represented a more faithful replacement of the human steroids

lost during ovarian failure. By using timed measurements of the replaced steroids to ensure attainment of premenopausal levels of the deficient hormones, the adequacy of an individual's therapy could be monitored. This method of hormone replacement had evolved over more than 10 years. It was inexpensive, gave good relief of symptoms, and was reported as well tolerated. As with progesterone, the endometrium could be protected, and uterine break-through bleeding reduced.

236. All progestins, synthetic or natural, have in common the so-called "progestogenic effect" i.e. characteristic change produced in an estrogen-primed endometrium. The final progestogenic or progestational activity of any substance will depend on the route it is administered and the timing of dosing. The hormone dose required can vary widely between the type of products administered and is expressed by the differences in the dose required for production of endometrial transformation, or the "transformation dose". The transformation oral dose for endometrium is clinically dependent on whether the compound is taken orally, transdermally, injected and as a sequential or continuous dosing. Table 4 is a comparison of the differences in the transformation dose required for oral micronized progesterone compared to oral MPA.

**(Excerpt) Table 4 Progesterone dose (per oral) from <u>transformation</u> of the <u>endometrium</u> depending on sequential or continuous (S14) (*** A. Schindler, C. Campagnoli, et al. (**Classification and pharmacology of progestins,** *Maturitas* 46S1 (2003) S7-S16))

| Progestins | Sequential | Continuous |
|---|---|---|
| **Progesterone micronized** | 200-300 | 100 |
| **MPA** | 5-10 | 2.5 |

237. The FDA's Medical Review for Prometrium in several instances referenced publication of the Writing Group of PEPI (Postmenopausal Estrogen/Progestin Interventions Study) in JAMA 1995 and 1996 as medical literature felt to be relevant to FDA's current consideration of approval of micronized progesterone. The same articles would have been available to Wyeth in terms of identification of the risks of using MPA versus progesterone as part of long-term combined hormone replacement (CHT) therapy. In fact, Wyeth participated in the PEPI trial so there is no way they would not have been aware of the investigational Prometrium treatment arm.

## III. Clinical Trials

### A. PEPI (Postmenopausal Estrogen/Progestin Intervention Study)

238. In September 1983, a NIH sponsored workshop had the preliminary discussion of the need to conduct a large government study to investigate the effects of estrogens on cardiovascular disease (CVD). In 1986, another NIH working group considered feasibility of conducting a study to assess the effects of HRT on prevention of CVD and fractures in postmenopausal women. The NIH working group was not sure what drugs should be tested and at what dosing. Wyeth had previously experienced difficulties with its own volunteer enrollment and participation in its Premarin + MPA study conducted under IND 21-696. Therefore, the NIH working group recommended that a small scale, pilot study be conducted to first help determine the specific drugs and their associated dose(s) and dosing regimens to be used in a large scale, multi-center trail. The smaller scale, pilot study was known as the Postmenopausal Estrogen/Progestin Intervention (PEPI) study and recruitment began in 1989. Wyeth supported PEPI by allowing NIH to cross reference the Premarin NDA and by donating study drug (i.e. Premarin and placebo).

239. PEPI was designed to determine the effects of postmenopausal hormone therapy and CHT on women's cardiovascular risk factors and bone mineral density (BMD). PEPI was a **3 year** multi-center randomized double-blinded, placebo-controlled trial. Patients were randomized into one of five 28-day treatment arms: 1) placebo; 2) estrogen-only (0.625mg/d of conjugated equine estrogens (CEE) Premarin); 3) CEE plus 10 mg/d MPA for the first 12 days (cyclic); 4) CEE plus 2.5 mg/d MPA daily (continuous); 5) CEE plus 200mg/d of micronized progesterone (MP) for the first 12 days (cyclic). The daily dose of CEE enhanced the development of endometrial hyperplasia. Combining CEE with cyclic or continuous MPA or cyclic MP appeared to protect the endometrium from hyperplastic changes. PEPI had not been designed to investigate the risk of breast cancer with CHT.

240. PEPI enrolled 875 menopausal women, aged 45 to 64 years at seven clinical centers between the years 1989 and 1991. Menopause was defined as the last menses having occurred at least 12 months before enrollment. Women with any major contraindication for the use of combined estrogen and progestin treatment (for example breast cancer), or any other cancer other than basal cell skin cancer within the previous years, were excluded. Women who were using menopausal hormone therapy at the time of recruitment could enroll in the trial if they stopped hormone therapy for at least 2 months before the first screening visit. As part of the PEPI study, all enrolled women had a baseline mammogram.

241. F. Connor-Barrett, et al. (**Postmenopausal hormone use following a 3-year randomized clinical trial.** *J Women's Health Gend Based Med*. 2000, Jul-Aug; 9(6):633-43) ascertained hormone therapy use 1-4 years after the trial in 775 (90%) of the originally enrolled women. Among women assigned to placebo during PEPI, post-PEPI hormone use was significantly less common in women who had been adherent to placebo during PEPI, older, or

non-Caucasian ethnicity. Hormone use was positively associated with hysterectomy. Among women assigned to the active regimen during PEPI, post-PEPI hormone use was significantly more common in women who had used hormones prior to PEPI and in women adherent to hormones during PEPI. Older age, les education, and being non-Caucasian predicted less hormone use. Post- PEPI hormone use was highest in San Diego, CA and lowest in Iowa City. The main predictors of post-PEPI hormone use were associated with the same predictors of hormone use for the general United States population: education, ethnicity, geographical region, hysterectomy, and prior use/adherence.

242. D. Altkorn and T. Vokes (**Treatment of Postmenopausal Osteoporosis**, *JAMA*, March 21, 2001, Vol.285, No.11:1415-1418) looked at the PEPI results to determine for effects on bone mineral density (BMD). As the authors began, "large randomized trials examining the effect of HRT on fractures have not been done primarily because estrogen received approval by FDA for osteoporosis without such clinical trials". As has already been discussed above, the DESI process, and not a requirement for clinical trial data and substantial evidence, allowed Premarin to begin to claim of efficacy for osteoporosis in postmenopausal women. There have been observation studies supporting postmenopausal estrogen use with an association for reduction in nonspinal fractures. Using the PEPI results, CEE increased BMD by about 6% in the spine and 2.8% in the hip after 3 years. The addition of progestins, regardless of the regimen (cyclic or continuous) did not alter the effects of estrogen. The trial did not show a reduction in fractures.

243. The authors also wrote that approximately 10% to 20% of women will continue to lose bone density while receiving HRT alone and will need additional therapy.

**B. HOPE (Health Osteoporosis Progestin and Estrogen Study)**

244. As discussed above, HOPE was used by Wyeth as its phase 4 study to FDA for Prempro to identify the lowest dose of CEE + MPA that would obtain protection against additional loss of bone mass density (BMD). R. Lindsay, et al (**Effect of lower doses of conjugated equine estrogens with and without medroxyprogesterone acetate on bone in early postmenopausal women**, *JAMA* 2002;287: 2668-2676) wrote about the HOPE study. The use of lower dosing of CEE as combination therapy had been proposed to enhance the initiation and long-term continuation of HRT. A small number of low-dose estrogen formulations had already been approved for use in the United States for preventing menopause symptoms or osteoporosis: oral conjugate equine estrogens (CEEs) or esterified estrogens at 0.3mg/d; oral micronized estradiol at 0.5 mg/d; and transdermal 17B-estradiol at 0.025mg/d. As an example of the types of discussions about low-dose estrogens, HK Genant, et al (**Low-dose esterified estrogen therapy: effects on bone, plasma estradiol concentrations, endometrium, and lipid levels.** *Arch Intern Med*. 1997;157:2609-2615) demonstrated that esterified estrogens at 0.3mg/d for 24 months, combined with a calcium supplement, had increased BMD compared to baseline and placebo.

245. As discussed above for Prempro, a two year randomized, double-blind, placebo-controlled substudy of the Women's Health, Osteoporosis, Progestin, Estrogen trial, was conducted at 19 US centers between August 1995 and October 2000. According to the authors a total of 822 healthy post-menopausal women aged 40 to 65 years, 4 years from their last menstrual cycle, were enrolled. All patients also received 600 mg/d of elemental calcium. Patients were randomly assigned to 8 treatment /placebo arms to receive 1) CEE 0.625mg or 2) CEE 0.625mg and MPA 25.5; 3) CEEs 0.45mg; 4) CEEs 0.45mg and MPA 2.5mg; 5) CEEs

0.45mg and MPA 1.5 mg; 6) CEEs 0.3mg; 7) CEEs 0.3mg and MPA 1.5; or 8) placebo for 2 years.

246. By 24 months, all women assigned to an active treatment group had significant gains from baseline in spine and hip BMD compared to the placebo group. For women treated with CEE-only, the gains in spine BMD for the group taking 0.625mg CEE were significantly higher than those of the group taking CEEs 0.3mg (P=.02), but not the group treated with CEE 0.45mg/d (P=.48). Therefore before the release of the WHI data in July 2002, Wyeth from the study it funded and managed would have been aware that low dose CEE (0.45 and .03mg) with or without the use of low dose 1.5mg MPA prevented the loss of spine and hip BMD and reduced bone turnover in this postmenopausal population.

**C. HERS (Heart Estrogen/Progestin Replacement Study)**

247. HERS was a secondary coronary heart disease (CHD) prevention study among postmenopausal women with known coronary artery disease and was supported by a grant from Wyeth. Stroke and transient ischemia attack (TIA) were prespecified secondary outcomes. Between February 1993 and October 1994, postmenopausal women (n=2763) were enrolled and randomly assigned to one of two treatment arms. All women received conjugated estrogen (CEE) (0.625mg Premarin) plus either 1) 2.5mg MPA daily (continuous)) as CHT or 2) placebo. There was a mean follow-up of 4.1 years. A limitation to HERS is that it was restricted to only postmenopausal women with CHD, all women received Premarin, and it is not generalizable to other groups of women.

248. Patient baseline data were collected during screening and at the randomization visits. Participants were monitored by a phone interview 3 times per year and were seen in the clinic annually for a physical exam and evaluation of interval events. HERS participants on

average were 67 years of age, white, married and with a high likelihood of using aspirin and being hypertensive. Wyeth had represented on several occasions that the HERS study would ultimately confirm the cardiac benefits of CHT.

249. On July 29, 1998, was the publication of HERS data. Wyeth had proposed to FDA that it might be able to use the results of HERS to support a Premarin cardiovascular claim submission (W-MDL04782-00095313). HERS showed no cardiac benefits for CHT when compared to placebo. In fact, patients' receiving CHT had a statistically significant increase risk in cardiovascular events during the first year (VICTJ001-001843).

250. On September 1998, a month after publication of HERS data, Wyeth sponsored and funded the Duke University Monograph. Dr. Charles Hammond, a Wyeth consultant, helped create the monograph and later would co-chair Wyeth's Hormone Council (CONTA025-024637). The Duke Monograph was designed as continuing medical education (CME) review for physicians of hormone therapy which encouraged the use of Wyeth's product for CHT. The Duke monograph represented that CHT's benefits went beyond symptom relief, particularly for long-term health implications including osteoporosis and cardiovascular disease, Alzheimer's Disease and cancer. (CONKJ012-000765; DUROJ007-000004). The document reassured physicians that estrogen and CHT reduced cardiac mortality by 50%. The Duke Monograph omitted a mention of the unfavorable HERS CHT data.

251. Wyeth actually continued the HERS study for 2.7 more years of follow-up (HERS II) After a total of six years of CHT there was still no measurable cardiac benefit (CONSG018-032099). After HERS, Wyeth had several communications with FDA and DDMAC about whether Wyeth could continue to include any serum lipid impact statements in Prempro promotional materials. (W-MDL527-00039573;W-MDL527-00038714).

252. On September 22, 1999 Wyeth filed its new proposed labeling language for Prempro/Premphase for CHT referencing the HERS data (BURKM015-000097). Wyeth requested FDA's input into its HERS labeling. After further discussions, Wyeth and FDA finalized the HERS language for the new label during January 2000 (W-MDL527-00040231; HOLSN006-000162). The initial publication of HERS had first been July 29, 1998 and the updated Prempro and Premphase labeling including the HERS and lack of cardiac protective effect was in Wyeth's' product insert in the 2001 PDR.

253. C.Torgerson and S. Bell-Syer,(**Hormone Replacement Therapy and Prevention of Nonvertebral Fractures A meta-analysis of randomized trials**, *JAMA*, June 13, 2001, Vol. 285, No. 22:2891-97), in a study supported by Wyeth as well as other manufacturers of HRT, began that the HERS study, the largest HRT trial to date, had produced no evidence of an anti-fracture effect of HRT. "This lack of substantial and consistent anti-fracture efficacy data on HRT from randomized trials has led the US Food and Drug Administration to withdraw conjugated equine estrogen as an approved treatment for osteoporosis."

**D. Woman's Health Initiative (WHI)**

254. The Women's Health Initiative Clinical Trial of Estrogen and Progestin (WHI) included a randomized controlled trial of 16,608 nonhysterectomized postmenopausal women, age range 50 to 79 years enrolled from 1993 to 1998 into a set of clinical trials (trials of low-fat dietary pattern, calcium and vitamin D supplementation, and 2 trials of postmenopausal hormone use), and an observational study at 40 clinical centers in the United States. The WHI clinical trial was designed during 1991-1992 using the accumulated evidence available at that time. The WHI was intended to be the first randomized trial to directly assess whether estrogen plus progestin had a favorable or unfavorable effect on CHD incidence and on overall risks and

benefits in predominantly healthy women. Combined estrogen plus progestin was provided in one table- Prempro. After the publication of the PEPI data and the effects of unopposed estrogen on the uterus, 331 women previously randomized to receive unopposed estrogen still having a uterus, were unblinded and reassigned to receive Prempro.

255. The primary outcome for the WHI trial of estrogen plus progestin was designated as coronary heart disease (CHD). A potential for a cardioprotective effect was based on supportive data in the medical literature regarding lipid levels in intermediate outcomes trials, trials in nonhuman primates, and a large body of observational studies that suggested a 40% to 50% reduction in risk among users of either estrogen alone or, less frequently, combined estrogen and progestin. Hip fracture was designated as a secondary outcome, supported also by observational studies as well as clinical trials showing a positive benefit for bone mineral density (BMD). Invasive breast cancer was designated as a primary adverse outcome based on observational data. Additional clinical outcomes selected as secondary outcomes that may plausibly be affected by HRT included other cardiovascular diseases; endometrial, colorectal, and other cancers; and other fractures. A global index was defined as the earliest occurrence of CHD, invasive breast cancer, stroke, pulmonary embolism, endometrial cancer, colorectal cancer, hip fracture, or death due to other causes.

256. Procedures for monitoring the trial involved semiannual comparisons of the Prempro and placebo groups. Study participants were contacted by phone 6 weeks after randomization to assess symptoms and reinforce adherence. Follow-up of clinical events occurred every 6 months, with annual clinic visits required. The study protocol required annual mammograms and clinical breast examination. Electrocardiograms were collected at baseline

and at follow-up years 3 and 6. Only 7.7% of participating women reported having had any prior cardiovascular disease. The planned duration for the WHI was 8.5 years.

257. The Prempro arm of the WHI was prematurely terminated due to detection of an increased health risk in terms of health benefits in the women receiving Prempro (CEE plus MPA) daily when compared to the placebo. Formal monitoring of the WHI results began in 1997. Late in 1999, with 5 interim analyses completed, the Data and Safety Monitoring Board (DSMB) observed small but consistent early adverse effects in cardiovascular outcomes and in the global index. None of the disease specific boundaries had been crossed. In the spring of 2000 and again in the spring of 2001, at the direction of the DSMB, hormone trial participants were given information indicating a detected increase in myocardial infarction (MI), stroke, pulmonary embolism (PE)/deep venous thrombosis (DVT) had been observed and that the trial would continue because the balance of risks and benefits remained uncertain. In reviewing the data for the 10th interim analyses on May 31, 2002, the DSMB found that the adverse effects in cardiovascular disease persisted, although the results were still within the monitoring boundaries. However, the design-specified weighted log-rank test statistic for breast cancer (z=-3.19) crossed the designated boundary (z=-2.32) and the global index was supportive of a finding of overall harm (z=-1.62). On the basis of this data, the DSMB concluded that the evidence for breast cancer harm, along with the evidence for some increase in CHD, stroke, PE outweighed the evidence of benefit for fractures and possible benefit for colon cancer over the average 5.2 year follow-up. The WHI results indicated that continuous Prempro (CHT) should not be initiated or continued for primary prevention of CHD.

258. The original population size calculations had been based on the estimated influence of estrogen plus progestin on heart disease. Measurements of chronic disease were to

include coronary heart disease (CHD), stroke, colorectal cancer, endometrial cancer, pulmonary embolus, hip fracture and death due to other causes as well as invasive breast cancer.

259. The rise in Premarin and Prempro sales were abruptly halted July 2002 with release of the preliminary results by the NIH. The arm of menopausal women receiving continuous Prempro (CEE + MPA) had an unacceptable outcome. The WHI study, with the primary outcome measure of incidence of coronary heart disease (OLIVS014-001896), was able to reconfirm what other earlier studies had shown about the effects and risks of CHT. There was an increased incidence of breast cancer identified in women taking Prempro as continuous CHT and there was no support for cardiac protective benefit. The WHI Prempro subjects in 5.2 years had developed more breast cancers, the cancers were larger at time of initial detection and the cancers were identified at more advanced stages than cancers in other treatment arms.

260. According to the WHI, the hazard ratios (HR) of Prempro (n=8506) to placebo (n=8102) when the study was prematurely terminated were: 1.29 (adjusted 95% CI 0.85-1.97) for CHD, 1.18 (adjusted 95% CI 0.47-2.98) for CHD death, 1.32 (adjusted 95% CI 0.82-2.13) for nonfatal MI; 1.41 (adjusted 95% CI 0.86-2.31) for stroke, 1.20 (adjusted 95% CI 0.32-4.49) for fatal stroke, 1.50 (adjusted 95% CI 0.83-2.70) nonfatal stroke; venous thromboembolic disease 2.11(adjusted 95% CI 1.26-3.55); 2.07 (adjusted 95% CI 1.14-3.74)DVT, 2.13 (adjusted 95% CI 0.99-4.56)PE; 1.22(adjusted 95% CI 1.00-1.49) total cardiovascular disease; 1.26 ((adjusted 95% CI 0.83-1.92) invasive breast cancer. Analyses that censored a women's event history after becoming non-adherent (using <80% of or stopping study drugs) produced the largest changes to estimated effects sizes. This approach increased HRs to 1.51 for CHD, 1.49 for breast cancer, 1.67 for stroke and 3.29 for VTE. The increased risks for CHD and invasive breast cancer was present across racial/ethnic and age strata and was not influenced by antecedent risk status or

prior disease. Hence the WHI results are generally applicable to healthy women in the age range.

261. The WHI was the first randomized controlled trial to confirm that combined hormone therapy with CEE and MPA increases the risk of breast cancer. According to the Writing Group of the Women Health Initiative Investigators (**Risks and Benefits of Estrogen Plus Progestin in Healthy Postmenopausal Women Principal Results from the Women's Health Initiative** *JAMA*, July 17, 2001, Vol 288. No.3 (321-333), the 26% excess breast cancers was consistent with estimates from pooled epidemiological data which reported a 15% increase in breast cancer for estrogen plus progestin use for less than 5 years and a 53% increase in breast cancer for use for more than 5 years. (**Collaborative group on Hormonal Factors in Breast Cancer. Breast cancer and hormone replacement therapy: collaborative reanalysis of data from 51 epidemiological studies of 52,705 women with breast cancer and 108,411 women without breast cancer**. *Lancet*. 1997;350:1047-1059). The WHI results were not designed to address other treatment of menopause including transdermal estradiol and progesterone which more closely mimic normal physiology.

262. FDA's *Consumer Magazine* in March 1997 wrote about the "anticipated results" of the WHI:

> …Until recently, there were few studies on menopause. One of the largest and potentially most fruitful is the Women's Health Initiative, sponsored by the National Institutes of Health, which will study 164,500 women of various racial and ethnic backgrounds across the United States. The scientific investigation, which will not be completed until 2005, is expected to find out whether a low-fat diet, hormone replacement therapy, calcium, and vitamin D might prevent heart disease, breast and colorectal cancers, bone fractures , and memory loss.
>
> As many as 15 to 25 percent of postmenopausal American women take hormone replacement therapy, according to an article in the January 1995 issue of the Journal of Obstetrics and Gynecology by Diane Wysowski, Ph.D., of the Food and Drug Administration, and colleagues.

> Nearly all the studies on heart disease and cognitive function have been retrospective or "look back" studies. The Women's Health Initiative Study will be prospective, that is, future-oriented…Researchers will select a group of generally healthy women to treat and observe for a number of years to see if, and at what rate, they develop symptoms. …Retrospective studies depend on information sometimes clouded by time and memory loss, and women selected by their doctors from hormone replacement therapy have usually been healthier than the women not so prescribed.
>
> "The other important difference about the Women's Health Initiative is that it included a clinical trial of estrogen" says Jacques Rossouw, the lead project officer for the study. "Participants will have an equal chance of being on either estrogen or a placebo, and any differences in their health at the study's end can be ascribed to the estrogen".

263. The release of the WHI data significantly decreased (50%) the sales of Wyeth's Premarin products. Wyeth's Premarin family of drugs still exceeds annual sales of one billion dollars (DEYMI202-000083). Six million women in the United States currently receive Prempro or Premarin tablets (CONNS013-000683). This number has fallen from the fourteen million using the products prior to the release of the WHI study (WEBEM015-001202). Wyeth reports that women generally receive its products for approximately 8 years, although one-fourth of users have taken estrogen therapy for more than 11 years (WMDL527-00048274).

264. Despite both Premarin and MPA's, and later combination Prempro extensive use by women and long histories of aggressive marketing by Wyeth as well as Pfizer, the products' safety had not been adequately studied by Wyeth in either premarket or postmarket well-controlled randomized clinical trials or observational studies. With over 60 years of use and profits in the United States with Premarin and 50 years of use of MPA by both Wyeth and Pfizer, Wyeth had not conducted adequate safety studies for Premarin, combination therapy (CHT) with MPA and Prempro (approved December of 1994) (Prempro 2.5), and later Premphase (0.625 mg CEE + 5 mg of MPA) (Prempro 5).

265. Wyeth failed to conduct adequate dosing studies before it combined two grandfathered products into a single a fixed dose combination as Prempro. Not until the 2002 publication of a government sponsored WHI trial, were women and physicians provided true benefit versus risk information about the negative health effects of extended combination use of Prempro.

**IV. <u>Wyeth's Marketing to Women of Prolonged Premarin/Prempro</u>**

266. Wyeth devised more creative ways to promote chronic use of Premarin. Wyeth developed large, well-planned educational campaigns, publications for both health care providers and women on topics surrounding "estrogen deficiency", menopause, and treatment of symptoms of menopause (BURRG002-000050). Selling hormone therapy just to relieve transient symptoms of menopause, the approved indications from FDA and DESI, would create only limited profits (ROSSC001-000773). Wyeth was aware that "most women have only mild menopausal symptoms or none at all" (ROSSC005-000034). Use of hormones for long-term health prevention would expand the market and create larger and sustainable profits for shareholders. A 9/25/2002 Wyeth marketing slide presentation was titled "2002 Beyond $2 BILLION" (SOLOJ027-046965-7111). The Wyeth Mission:

> We bring to the world pharmaceutical healthcare products that improve lives and deliver outstanding value to our customers and shareholders. (FISHG004-001352)

267. Wyeth has told women that menopause cause "the virtual total shutdown of estrogen and progesterone production" which leads to significant medical problems (LAWT021-009874; PARKA008-000257). All Wyeth's discussions point a woman towards the benefits of long-term use of Premarin.

268. Beginning in the 1950's menopause was transitioned from a normal physiologic change to a "disease" caused by a "hormone deficiency". Wyeth's 1960's advertising

promotions for Premarin -"Start her on it. Keep her on it" (W-MDL04782-00015373; W-MDL04782-00015317; W-MDL04782-00015353; W-MDL04782-00016708). Wyeth's 1973 advertising:

> Why stop estrogen replacement therapy after the hot flushes have subsided- When the deficiency is still there? Once the classic menopausal symptoms of hot flushes, sweats, and estrogen-related emotional distress have been brought under control, the need for continuing estrogen replacement does not end.
>
> For, as natural production further diminishes in the postmenopausal years, many more deficiency-related disorders may result-especially atrophy of urogenital tissue and degeneration of bones
> * Conjugated Estrogen Tablets have been evaluated as "probably" effective for postmenopausal osteoporosis. (W-MDL04782-00016708-15)

269. Wyeth began actively promoting HRT ("hormone replacement therapy") drugs for <u>long-term prevention</u> and protection of women for diverse chronic conditions including osteoporosis, cardiovascular disease, and cognitive decline. The promotions were begun without the benefits of adequate scientific support or FDA's approval.

***"Feminine Forever"***

270. Dr. Robert Wilson, *Feminine Forever*, was the author of a book first published in 1966, a longtime best seller, also published in *Look Magazine*. Wyeth was directly involved in the writing, promotion and sales of his book (BURRG002-000049). Dr. Wilson claimed, based on his personal opinions and observations, that estrogen therapy for women at menopause corrected hypertension, osteoporosis, arthritis, emotional disturbances, feelings of worthlessness and any other negative event he could attribute to menopause. His opinions proved to be lucrative, incorrect and popular. His book sales soared in spite of FDA's indications that his opinions were incorrect and unsubstantiated by science. *Feminine Forever* increased Premarin sales as physicians and women treated symptoms of aging with estrogen. (RYANJ002-000495; CONTA003-00676; BURRG002-000049).

271. Wyeth not only supported the writing of the book by Dr. Wilson, but Wyeth bought up large numbers of copies of the book to provide them to physicians and to help ensure the book remained a popular best-seller (CONTA003-000676, RYANJ002-000495, BURRG002-000049 to 51.) The Wilson book provided "pseudo-scientific" information to women and physicians regarding a woman's "need" for hormone "replacement" even before she reached menopause. In Chapter 5- *Menopause-The Loss of Womanhood and the Loss of Good Health*, Dr. Wilson discussed his personal philosophy about why he treated patients for menopause symptoms:

> The transformation, within a few years, of a formerly pleasant, energetic woman into a dull-minded but sharp-tongued caricature of her former self is one of the saddest of human spectacles. The suffering is not hers alone- it involves her entire family, her business associates, her neighborhood storekeepers, and all others with whom she comes into contact. Multiplied by millions, she is a focus of bitterness and discontent in the whole fabric of our civilization. And the supreme tragedy is that, in the light of present medical possibilities, all this is unnecessary.

272. Chapter 6-*Feminine Once More and Forever*- Case 4- "with estrogen and progestin supplied in the form of tablets, your menstrual cycles can go on indefinitely beyond the time when ovulation ceases". Chapter 9- *Birth Control Pills and Menopause Prevention*- "

> The principle of "the pill" is to create essentially similar hormonal conditions to those normally preventing ovulation during pregnancy. This hormonal situation makes the pituitary gland act as if the woman were really pregnant; no more chemical signals are sent to the ovaries; no more eggs are sent down to the uterus. Hence the woman cannot conceive.
>
> The pill accomplishes this by providing ample amounts of synthetic progestin (an analog of progesterone). Putting both estrogen and progestin in a single package greatly simplifies the routine both for fertility control and for menopause prevention. The mounting evidence suggests that some types of birth-control pills presently available offer a cancer-preventive effect similar to that already discussed in connection with sequential type (separate estrogen and progestin tablets) of hormone therapy for menopausal symptoms. In my opinion, no moral or religious problem of any sort is involved when a physician prescribes birth control pills as treatment for menopausal symptoms…Taken simply as a therapeutic prescription, estrogenic birth control pills bestow triple benefits: 1)

> …relive estrogen deficiency and the associated menopausal symptoms; 2) assure regularity…3) provide probable protection against breast and genital cancers thanks to keeping the women estrogen-rich.

273. In *Feminine Forever* Chapter 9 Pocketbook Edition published 1968, but not the second printing hardcopy, there appeared the following final disclaimer about FDA's lack of approval of birth control pills for use as a treatment of menopause symptoms as being recommended by Dr. Wilson:

> At the present time the Federal Food and Drug Administration has not approved the use of birth control pills for the treatment of menopause. (November 1967)

274. As has already been discussed above, birth control pills prevent pregnancy by mimicking the condition of pregnancy by administration of extraneous hormones, an intentional pseudo-pregnancy state. As a result, the uterus lining (endometrium) is not shed and menstruation is reduced or does not occur. Dr. Wilson went one step further and proposed the off-label or unapproved use of combination birth control pills to treat a woman's symptoms of menopause.

275. In April 1995, Wyeth actively worked with writers and editors of reference books to ensure that books continued to contain Wyeth's message about the benefits of hormone replacement therapy (HRT). For example, the *Good Housekeeping Guide to Women's Health*, Wyeth contributed the book's entire chapter on menopause. The book misleadingly and incorrectly promoted hormone therapy to women as capable of preventing memory loss, depression, Alzheimer's disease, and would "cut in half the risk of heart disease" (PANAA027-000800). The book failed to tell women that the chapter had come from Wyeth the maker of Premarin, the number one selling replacement estrogen in the United States.

**Seasons Magazine**

276. In June 1992 Wyeth launched a direct to woman promotional magazine called "Seasons Magazine". It was designed to increase a woman's awareness of her symptoms of menopause and increase her willingness to comply with a hormone therapy regimen (PANAA036-001540; HENRL008-000280; DUROJ046-010953; W-MDL04782-00036168). The magazine became the fourth most "read on a regular basis" magazine in the United States (PANAA016-000465).

277. When FDA reviewed the first proposed issue of Seasons, FDA informed Wyeth that FDA considered the magazine a Wyeth's promotional material and subject to FDA's review. As a promotional product, Wyeth could not promote unapproved uses of Premarin in the magazine since it would be viewed as misbranding and in violation of the Act by FDA.

278. Wyeth was informed by FDA that it could not create promotional materials which falsely implied to women that a document had been sent directly to them from their physician, pharmacist or other health care provider. There needed to be a clear statement from it came from Wyeth and it was for promotion. The FDA called the concept of Seasons Magazine "an insidious marketing ploy masquerading as concern for women" (W-MDL04782-00002391).

279. Wyeth informed the FDA that "Seasons Magazine" was not intended as a promotional or a marketing tool, because "Seasons" was only sent to patients who already were taking Premarin. Therefore, it should not be considered by FDA as a sales tool (ROSSC005-000160). Wyeth was able to convince FDA to allow "Seasons" publication and distribution to occur without FDA's review oversight (CONNS008-000980). "Seasons" has been used by Wyeth as a primary selling tool with a "strong impact on the market" which helped "increase sales" and "expand enrollment" (PANAA021-000192).

**Health Words**

280. In 1992, Wyeth began a program called "Health Words" which, like Seasons Magazine, provided directed information to a woman about menopause, estrogen replacement and combination replacement therapy. Wyeth had Health Words sent directly to women from hospitals and healthcare facilities. Wyeth's name does not appear until page 3 and in small font. It would not be obvious to the reader that this document was intended as Wyeth's promotional material.

281. Wyeth in its marketing to women represented that "HRT provides long-term benefit: protection against heart attacks and strokes due to atherosclerosis, the No. 1 killer of women after age 50" and "HRT protects against heart disease which develops from a loss of estrogen" (PANAA016-000938; PANAA016-000922; PANAA016-000914; PANAA016-000930;PANAA016-000938;PANAA016-000946). Wyeth mixed together terms and statements about ERT, HRT and CHT. Wyeth viewed a major advantage of products like Health Words over traditional "direct-to-consumer" (DTC) marketing was its lack of FDA oversight. (PANAA016-001028)

**Wyeth's "Body of Evidence" Campaign**

282. This campaign emphasized the long term risks associated with "estrogen deficiency" at menopause which could be treated or prevented by use of hormone therapy (STRIS001-000034). The campaign encouraged women to take hormone therapy for the rest of their lives in order to continue to reap the long-term health benefits. The benefits of hormone therapy for her included prevention of heart disease and Alzheimer's disease. There was an ad campaign which included TV advertising followed by use of unbranded educational print advertising as well as Premarin branded ads. Wyeth spent more than $22 million in the first year (1998) (FARAN015-000894; HENRL002-000657). In November 1998, Wyeth spent $2.3

million for TV ads running over three weeks (HENRL005-01388). Sales representatives were to take this opportunity to make sure that physicians and staff knew about the screening of the ads and had been prepared to talk to women about the health risks of menopause and its associated estrogen loss (HENRL005-001314). Wyeth used the Body of Evidence campaign to help promote the prevention of cognitive function decline (HENRL011-000502).

***Keeping a Balanced Perspective on Breast Cancer Risk- March 2002***

283. In March 2002, Wyeth created direct-to-patient material entitled "*Keeping a balanced perspective on breast cancer risk* (W-HUSAK01-00001019). The document represented to women that the "increased risk remains small for most women and is often outweighed by the benefits of therapy". Despite interactions with FDA to the contrary, Wyeth continued to promote to women that benefits of hormone therapy included a woman's reduced "risk of developing cardiovascular disease".

**Marketing Research- Consumer Awareness & Usage Study**

284. There was a study made to determine women's "Total Awareness of Lauren Hutton Ad (HENRL026-001723). The survey included magazine and television ads broken down by quarter used and awareness by non-users and nonhysterectomized HRT users. Women were asked about their "feeling towards HRT" based on Lauren Hutton ad awareness. The women were then questioned without additional aids about "perceived benefits /risks" of HRT. Regarding the perceived risks- non-users- 25% were aware of the risk of breast cancer, 8% were not aware, in contrast 59% of current users were aware and 38% were not aware. In terms of cardiovascular risks-stroke/blood clots/heart disease 14% of non-users were aware, 6% unaware, for current users 8% aware and 0% unaware. Perceived long-term benefits of HRT for non-users- #1prevention of osteoporosis, #2 relief of symptoms of hot flashes/night sweats. The

perceived long-term benefits of HRT for users: #1 prevention of osteoporosis, #2 cardiovascular protection, and #3 helps her feel better emotionally. Attitudes of non-users- bone loss which lends itself to osteoporosis begins at menopause (40-55%), HRT can prevent osteoporosis in menopause (60-73%), HRT increases quality of life (46-65%), benefits of HRT outweigh risks (45-53%), ERT brands are the same (42-57%), calcium is probably enough to prevent osteoporosis (44-57%). Attitudes of current users- woman's risk for heart disease increases with onset of menopause (73-87%), HRT has been shown to cause cancer (44-60%); HRT brands are pretty much the same(27-55%), diet and exercise are enough to prevent osteoporosis or bone loss(18-39%), low-moderate response (35-22%) that HRT is effective treatment for effects of Alzheimer's Disease. (HENRL026-001732, Exhibit 7787, p 1-9)

**V. <u>Wyeth's Marketing to Health Care Providers of Premarin/Prempro</u>**

285. Wyeth has developed an elaborate support network for successfully marketing Premarin in the United States. It has organized relationships with clinical investigators, key epidemiologists, consultants, advocates, medical centers, and opinion leaders. Wyeth has not just cultivated loyalty of physicians, but the loyalty of other health care providers involved in the care of menopausal women. Wyeth has positioned itself to offer continuing medical education (CME), grand rounds for physicians, office and operating room supplies of patient materials and has established an active and aggressive sales force. (See SOLOJ027-046965-108). There is no harm in the activities above, if the product as being promoted has been proven by Wyeth to be safe and effective for its new indication and use. As a grandfathered drug, a greater burden for ensuring safety and effectiveness of patients rested with Wyeth.

286. Wyeth created a National Hormone Council (NHC) which has Working Groups in: Skin/Sexuality, Cascade/Cognition, Osteopenia, Cardiovascular and Breast Health. Members

of the NHC as independent from Wyeth would not have complete access to all Wyeth's policies and procedures used for testing, marketing and regulatory oversight of Premarin. The National Hormone Council (NHC) holds regular New Science Meetings (10 per year) and has Distinguished Professors. The New Science meeting convenes 75-100 key opinion leaders from around the country for two 2 day-meetings of scientific presentations, discussion and development of medical education materials. The Distinguished Professors are physicians and scientists from the Leadership Board and Working Groups that can visit and share "new science" at the top 150 academic medical centers in the country. The members of the Working Groups are to produce primary papers, secondary papers, speakers' bureau, produce representative tools, educational materials and congresses, with an objective is to drive opinions among leaders in academic medicine. The Working Groups have members present at Health, Hormones, Happiness Series; Reflections in Women's Health; Resident Education; and other ERT Initiatives.

287. The NHC council members, assisted by Wyeth, publish abstracts, posters, review articles, editorials, convention symposia, supplements and monographs. The NHC members participate in Gyn Consult Series, Gyn Lunch & Learns, Speaker Training and Peer Selling. The NHC has an Independent Group of HRT upper Advocates that include board members from professional societies such as ACOG, ASRM, NAMS. The objective of the NHC is to establish and maintain strong relationships with physicians able to positively influence sales.

288. There are 125 CME programs offered over 12 months, 90-120 minutes long with a Q& A for 20-35 participants. Wyeth holds one-day programs for nurse practitioners (NP) as well as physician assistants (PA). It works with the primary care physician (PCP) residents at

Eastern Virginia Medical School in the Women's Health Care Curriculum to ensure that 10 PCP residents each year will learn the appropriate way to care for menopausal women. The NHC produces "Proceedings in Menopause".

289. Wyeth participates in on-line CME Medical Education as well as Medscape (Health care provider's #1 website), MedicaLogic- Logician digital health record, World Medical Leaders faculty- CME. It also maintains a Key Opinion Leader Web-Site. Wyeth offers residency training with promotional programs, resident tracking, Premarin Resident Dinner Meetings, Premarin CD-ROMs for residents, Art and Science of Hysterectomy Video/DVD. The purpose of the residency education programs is to establish and reinforce physician loyalty.

290. Wyeth makes an effort to contribute to the growing body of published medical literature surrounding menopause to ensure it is all supportive of a concept that menopause is an "estrogen deficiency disease" for women. Ultimately the cause of all symptoms of a woman's aging is attributable back to her natural loss of estrogen. Many normal age-related conditions, occurring in both males and females, including heart disease, depression, hypertension, hair changes, bone loss, are attributed by Wyeth as occurring in women as a direct response to estrogen loss. Women without any menopausal symptoms were encouraged by physicians to be stated on estrogen replacement just for the "potential of long term health benefits" (CONNS014-001645).

**Wyeth's Annual Symposium of Estrogen Deficiency- Physician Education**

291. Wyeth funds an Annual Symposium which uses invited exerts to discuss the medical consequences of "estrogen depletion". Wyeth publishes a summary of the presentations for dissemination to physicians. In 1989, Wyeth began to claim at the symposium that use of

Premarin would improve memory (YAVUE010-000664). Wyeth has regularly included discussion of the cognitive benefits of Premarin on the symposium's agenda.

292. In 1993, Wyeth's annual symposium summary included a strong promotional message to physicians that hormone use in postmenopausal women provided "primary protection against the development of coronary artery disease (CAD)". In 1993, physicians were told by Wyeth that estrogen replacement could prevent or delay the onset of dementia (DEYMI020-001070).

**Wyeth's Plan of Action (POA)**

293. In Wyeth's 1996 Plan of Action (POA), new hormone use growth was to be achieved through targeting physicians to begin new women on hormone therapy. By 1997 Wyeth's POA advocated creating new promotional pieces that a physician could use to encourage "patient acceptance of HRT." Wyeth recognized that "patients counseled by physicians with printed materials were more likely to start and stay with HRT." Wyeth created full promotional plans intended for patients that were "very aggressive in tone to motivate both a physician and new patient to initiate therapy". Wyeth's promotions focused on the many "health benefits" of hormone therapy (CHOOM018-000033).

**Sales Representatives**

294. Wyeth trains its sales representatives to "educate" physicians using Wyeth's unbranded educational messages and then smoothly "transitioning" into the Premarin specific branded messages (STRIS004-000183).

295. In 2001, Wyeth created scripts for its sales representatives intended to educate physicians. The scripts included representations that estrogen therapy prevented or delayed "the

onset of memory loss and cognitive decline", potentially reducing the risk of Alzheimer's disease (DUROJ017-001087).

**Speakers Program**

296. In 1998, Wyeth organized speakers programs to promote the use of hormone therapy drugs for prevention of Alzheimer's disease (CONNS003-000235; SOLOJ023-000870).

297. In 2002, Wyeth's public relations agency examined the success of Wyeth's seminar and symposium campaigns with physicians. Wyeth's funded seminars are designed to use well-respected physicians, opinion leaders as its speakers to help disseminate Wyeth's benefits messages in programs which appeared to be organized by a reputable third party group such as Duke University. Wyeth would then print the symposium presentations for wider dissemination to physicians who had not been invited to participate in the seminar. The White Papers of the Wyeth funded symposiums were distributed to sales representative to provide to prescribing physicians (CONTA004-000008). The Wyeth documents consistently continue to support HRT's cardiac and cognitive benefits (W-HUSAK01-00000681).

298. Wyeth contracted with physicians to be its advocate or spokesman both in professional writings and professional forums with oral presentations. (DUROJ037-000183). In 2001, Wyeth paid more than $1million in advocate fees (CONKJ008-000129). Wyeth would track the success of each of its advocates (HENRL025-001651).

**Monographs**

299. Wyeth funded Duke University to create a monograph intended for physicians. The document was to represent that estrogen therapy reduces a woman's risk for Alzheimer's Disease, "slows the progression of Alzheimer's, "delays brain aging" and may also improve mood, quality and minimize depression at this time of life (CONKJ012-000765).

**Wyeth Sponsored Continuing Medical Education (CME) for Health Care Providers**

300. Tuesday May 12, 1998, Fairmont Hotel, New Orleans, LA a CME Symposium **Myths and Misperceptions Breast Cancer and HRT.** Sponsored and accredited by the Dannemiller Memorial Education Foundation. "This program is made possible by an unrestricted educational grant provided by Wyeth-Ayerst Laboratories". "This is not an ACOG sponsored or endorsed event" (SOLOJ023-000870).

**Wyeth's Traditional Response to Negative Media for Hormone Therapy**

301. Wyeth repeatedly used its own medical consultants to respond to negative publicity about hormone replacement therapy. The Wyeth spin plan was usually to discredit the validity of the data as" inconclusive", the study methodology as "poorly designed" or flawed. Wyeth obtained the services of its epidemiologists, opinion leaders or advocates to publicly refute the quality of the findings and provide support for Wyeth. Sometimes, clinical investigators who reported adverse findings in the literature were approached by Wyeth with funding for special projects. What Wyeth's internal documents do not show in response to negative publicity is any expression of concern about patient safety and plans for adequate testing, monitoring or research to determine if the reported risk is correct and update label warnings and promotions. The following are examples of Wyeth's usual spin control methods:

302. November 20, 1975 Ayerst International internal correspondence discussed recent lay press publicity concerning a possible increased incidence of endometrial cancer being associated with long term estrogen use, a currently unapproved indication being promoted by Wyeth for Premarin. The information, referred to as "originating from the West coast", (University of Washington and the Kaiser Permanent Medical Center (Los Angeles, CA)) was going to be published in the New England Journal of Medicine ("NEJM") December 1975.

Similar cancer risk data had also been reported from California Tumor Board and Connecticut Tumor Registry. The articles would report conjugated estrogen (Premarin) as the prime estrogen therapy involved. Wyeth's experts informed it that much information is "inconclusive" and for one, the studies "poorly designed". Other physicians reportedly contacted by Wyeth opined that the increase in endometrial cancer is "grossly misleading" and, in fact, "not the case".

303. Wyeth tells its field representatives that regarding long-term use of estrogen, Dr. Acken (*Obset. Gynel* 34:46, July 1969) in 1969 had reported that in his study of 479 patients who had received continuous or cyclic estrogen for 2 years to 11 years, the author concluded "no demonstrable increase in breast or endometrial carcinoma observed". Of the patients he treated with Premarin, 210 had intact uteri and "only 5 cases" of endometrial cancer occurred. He surveyed 197 patients not treated with estrogens and found 15 cancers.

304. A "prominent physician" at Harvard University was interviewed concerning the publicity and he reportedly said that many cases listed as cancer are only hyperplasia.

305. Wyeth told its agents that if the subject of endometrial cancer with prolonged estrogen use is brought up, the following points should be made:

> 1) It is two medical groups in the Western United States;
> 2) Other medical opinions expressed by the lay press and in physician interviews indicate disagreement with the conclusions highlighted in the lay press;
> 3) The only "prospective evidence" (data by Acken and Gordon) indicates there is no connection between long term administration of estrogen and the incidence of cancer of the endometrium;
> 4) The position of Ayerst regarding Premarin therapy has in no way changed.
>
> We continue to recommend cyclic Premarin therapy or cyclic therapy associated with a progestational agent (ex. Colpro), using the lowest dose of Premarin which provides the desired therapeutic response. As you know, this dosage regimen has been advocated by Ayrest since the introduction of Premarin to avoid continuous, unopposed estrogen stimulation of endometrial and breast tissue. (W-MDL04782-00051980-1)

306. Wyeth did not tell its sales representatives to stop promoting the unapproved use of unopposed estrogen for long-term therapy or unapproved combination therapy.

307. A July 1995 letter was sent by Dr. Trudy Bush, an epidemiologist, to *Modern Maturity* objecting to an article it had published critical to use of hormone replacement therapy. Dr. Bush wrote that postmenopausal estrogen therapy provided "strong protective effects" on heart disease and she requested that her letter be published. Dr. Bush however failed to identify to the editors her financial and professional ties to Wyeth and that Wyeth had been sent a draft copy of her letter. (PANAA031-000708).

308. <u>Wyeth's Breast Cancer Task Force meeting</u>- January 31, 1996 (PICKJ007-001349)

Action steps

Visit Cummings
Assess feasibility of re-analyzing Dupont
Convert updated Dupont into whitepaper
"Tap" advocates as potential speakers for media-
Dupont, Bush, Nachtigall, Ravnikar.

"Tap" 3rd party sources for support
ACOG, NIH, AMWA, NOF

Satellite symposium at Amsterdam ("bundle of benefits" to provide balance)
Investigate use of a "coalition of women "

<u>Advocate Interaction</u>
-Mailing to VIPP list
-Teleconference with "top tier" physicians

<u>Field Force communication- need timeline by next meeting</u>
-Analysis of data (Cummings)
-Message points
-Backgrounder on breast cancer
    -Sales training primer re putting breast cancer into perspective
    -Dupont whitepaper
    -Women's Health Digest article on breast cancer

(Consider video with workbook)
-guidelines from ACOG
-NIH position paper
-NEJM editorial

Potential key message points
-Shift attention to other cancers (colon cancer)
-"This is just one more paper (WHI doing definite prospective trial)
-Highlight flaws in Cumming's methodology
-Re-analyze data to contemporary doses
-Emphasize results from PEPI

309. In July 2001, Wyeth began to anticipate a "significant communications challenge" after multiple studies were published in reputable journals showing a relationship between HRT and <u>increased risk of cardiovascular disease</u>. Wyeth had concerns "that the message conveyed to the general public could be that there is a growing body of evidence revealing an increased risk of CVD in women who use HRT" (VICTJ001-002141). By July 2001, the Women's Health Initiative (WHI) had begun to release preliminary cardiac data showing an initial increase in the numbers of heart attacks and strokes with Prempro. Wyeth created a Justification Document which provided various explanations for the cardiac findings seen in the WHI. Wyeth also wanted to ensure that the negative cardiac findings would result in changes to the entire class labeling (BURKM029-024148).

310. By 2002, physicians had begun questioning the cardiac benefits of HRT. Wyeth conducted a national survey of primary care physicians which showed that primary care physicians no longer believed in the cardiac benefits of HRT and did not view menopause as a disease that needed to be treated with hormones. Without a specific cardiac benefit derived from the use of hormones, the osteoporosis prevention indication could be better managed by use of approved "nonHRT" drugs not carrying the same health risks. Wyeth decided to increase its

"education" to help change primary care physicians' perceptions of the issues. (CONJK018-056069).

**Journals**

311. During May, 2002, Wyeth forced a meeting to occur between Wyeth and the editors of JAMA to discuss the journal's "editorial bias", which, according to Wyeth, "tended to focus on the negative effects of ERT/HRT therapy". Wyeth's advertising support of JAMA was considered its "good leverage" to force the JAMA meeting (CONTA025-027130). Wyeth anticipated that JAMA's publisher and vice president of publishing could "work behind the scenes to make sure that the meeting happened."(CONTA025-027130; DUROJ046-018053; DUROL046-018067).

**Medical Articles, Presentations and Creating "Advocates"**

312. Wyeth used unidentified ghost writers to publish science articles about hormone therapy credited articles, editorial and letters to the editors without revealing that the comments were crafted by Wyeth. Wyeth paid Design Write, Parthenon and OCC of North America, Inc. to write for them (CONTA025-020958; DWrite-065923; DWrite 065952; CONTA013-000914). Wyeth had its own publication strategy plan. That plan included Wyeth selecting the title, obtaining a ghost writer, approving the manuscript, locating a suitable author to submit the project to a journal without mention of Wyeth's involvement in the project (CHOOM001-002318;CONTA023-006750;PICKJ023-002677;DUROJ023-001712;STRIS016-047973;CONTA025-017717;SENDM009-000252;CONTA013-000420;CONTA025-019619;SENDM009-000225;DEMAE023-000059;DUROJ023-001689). Wyeth required that at least one positive piece about hormone therapy be published each month (CONTA025-022310; CONTA025-019892).

313. Wyeth contracted with Toltzis Communications to have an article written on "Breast Cancer and Hormone Replacement Therapy". Toltzis Communications researched the issue and wrote the article. Dr. Freitas, a Brazilian physician, was then asked to place his name on the article as the primary author. A third party was given the responsibility of getting the article published (PICKJ007-001296; PICKJ007-001310;PICKJ007-001311;PICKJ007-001287).

314. Physicians send their draft manuscripts to Wyeth for editing and comment to make sure that what they are saying is consistent with Wyeth's views. The assistance of Wyeth in the finalizing of the articles by its own consultants is not identified (DUROJ046-010671).

**Strategic Publications Committee**

315. Wyeth had a Strategic Publications Committee which included members of Wyeth's regulatory and marketing divisions, not Wyeth's scientists, researchers or physicians, as well as members of Design Write, a technical writers group. The published articles did not cite or reference Wyeth's input into the articles (DWRITE 066935,DWRITE 003353; DWRITE 066449;MARTN010-010296;SOLOJ027-048916;DWRITE 067253;DWRITE 066322).

316. The Publications Management Group had a goal to facilitate publications in the medical literature. At a meeting of June 15, 2000,(CONTA025-030538-9) the attendees were, from Wyeth- Jamie Durocher, Mark Barbee, Steve Strickland, Stephanie Brown and Alice Conti and from DesignWrite, Karen Mittleman and Kathy Ohleth. The June 2000 actions steps for the committee included helping a paper from Lila Nachtigall be submitted and published in *The Female Patient*. Wyeth would contact H. Fillit and send him a proposed outline for the "**Prevention of Alzheimer's disease**" paper, which was to include a discussion of potential markers (MMSE scores) for prevention of "AD". In other papers there was to be discussion of cardiovascular markers that should take into consideration labeling changes. Paul Ridker, an

expert in C-reactive protein was suggested as a possible author. John Eden was suggested as an author of a breast cancer paper questioning the role of progestins as a causative factor. Paganini-Hill's *Leisure World* review was to include fracture data, cognition, diabetes and possibly define the use of low-dose hormones in this population. Eskin's data would be limited to only 1 paper, since this is not a priority at the moment. Rosen was suggested as author of the "**BoneMarkers for Osteoporosis Fracture**" paper. Wyeth would need to contact him to determine his interest. The "Quality of Life" review paper was a priority.

317. A July 27, 2000 meeting of the Strategic Publications Development Meeting (DWRITE 066935) began with updates of the Telluride meeting: 1) Low-dose review paper (MS#10) authors(s)?, 2) Koh contacted for Healthy Endothelium paper (MS #20). Other topics discussed included Breast Cancer in Perspective (MS#6)- Lila submitted to *The Female Patient*; Low-dose roundtable (MS#11); J. Eden had agreed to author the **Breast Cancer and Progestins** paper (MS#16); galley proofs were reviewed for Lori Mosca's paper (SERMs#4) **The role of HRT in the Prevention of Postmenopausal Heart Disease**", with publication in August.; macular degeneration and HRT paper (BB#2) was resubmitted; Raymond Ke had made minor changes to the **HRT and immune function paper** (BB#4)- with journal selection still needed; and Cefalu's paper on **Diabetes and HRT** (BB#1) had been reformatted *for Journal of Women's Health*.

318. A pre August 2000 "Project Assignment Form"(DWRITE 003353) was sent to Caron Pruiett for a project called #8231: Manuscript on "Breast Cancer and Progestins" intended for submission to *Women's Health in Primary Care*. The description of the project was for an 8-10 page manuscript (not including references) based on the approved outline. The general points to be covered included the current literature indicating a role of progestins in breast cancer

among postmenopausal women; mechanisms how progestins may influence breast cell development; and why progestins may not be responsible for the incidence of breast cancer in hormone replacement (HRT) users. DesignWrite would provide all the reference materials…If additional reference materials needed to be ordered, they were to be requested from DesignWrite. At the completion of the project, all materials were to be returned to DesignWrite. Work on the project is to begin on August 23, 2000, the date an outline should be received by DesignWrite is September 6, 2000. The first full draft of the manuscript is to available be 4 weeks from the date of the approved outline. Revisions will need to be made within 24 hours Failure to meet deadlines may result in financial penalties.

319. There was a July 23, 2001 (MARTN10-010296-7) meeting with the general comment that "papers in development should be sensitive to current platform/messages". "The acute effects of estrogen loss including cognitive changes, sexuality, skin, osteopenia, and sleep disturbances should be the focus; however, there is still a need to manage CVD and breast cancer ("BC") issues". Strategic Development Grid Update-

►BC Message
●Fiorica's "Mammographic Density and HRT" (BC#5)- **Action item: DW** will contact author regarding update of paper with information from Bermuda and Breast Health Expert Forum. DW will send paper to author for final review once updated.
●Eden's "Do Progestins Have a Role in Breast Cancer?"- Concern raised about message with respect to pipeline products. Need to reiterate primary role of progestin in HRT for endometrial safety. **Action item: DW** will update outline with new information and will bring to next meeting for internal reviews.

►CVD Message
●Sperof''s "The Impact of Progestins n the Cardiovascualr Effects…" (CVD#3)- **Action Item: DW** will update outline with new data (including new Speroff article) and will contact author regarding incorporation of message from Clarkson in Bermuda. Outline will be circulated next meeting for internal review.
●Rackley's "Relevance of Clinical Markers for CVD Outcomes" (CVD#7)- Paper is a priority. **Action item: DW** will update paper with new information on CRP and Koh's NEJM article and will contact author.

●**Action item**: DW will add Koh's NEJM review paper and Rosano's CRP paper to grid.
●Duke CV group's, "Current Issues in Cardiovascular Health in Women" (CVD #8)- M. Flather's European approach has been incorporated in outline given to Karas 7/1/01. **Action item: DW** will F/U with D. Karas, then W. Post.

320. A meeting of August 14, 2001(SOLOJ027-048916-7) informed the attendees that 2 papers on the workload of papers/outlines (CVD #9, OP #3) and 2 papers that were submitted for final review to journals (BC#7, CNS#4) were disseminated. Based on the workload of papers/outlines that required timely review, Alice Conti suggested that the responsibility for the reviews be split between marketing and medical teams. On the strategic publications development grid were papers dealing with **Mammographic Density and HRT,** J. Fiorica (BC#5) a paper to be reviewed by Jamie Durocher prior to sending it to the author. **Do progestins have a role in breast cancer**- J. Eden (BC#6)- the outline to be reviewed by Mark Barbee prior to sending it to the author. **The Impact of Progestins on the Cardiovascular Effects of HRT in Postemenopausal Women,** L. Speroff (CVD #3)- the outline was to be reviewed by Mark Barbee prior to sending it to the author; Liselott Silvhed will give to "MJ" for her review since it focuses on progestins. **The Role of HRT in the Prevention of Alzheimer's Disease**, H. Fillit (CNS #3), had the paper submitted to *Arch Intern Med*. Alice is to review any changes that need to be made in it when reviewer's comments are received. For the grid update, **HRT and Breast Cancer: A Qualitative Review**. T Bush , M. Whiteman, J. Flaws (BC#3) – "DW" will contact journal to check on publication date. **The Impact of Progestins on the Cardiovascular Effects of HRT in Postmenopausal Women,** L. Speroff (CVD #3), the journal selected should target primary care physicians. DW will discuss journal with author once outline is sent. **Prevention of Heart Disease in Women: Is Postmenopausal Estrogen Therapy Warranted? Point-Counterpoint "The HERS Trial Does Not Confute a**

**Cardioprotective Effect of Hormone Replacement Therapy**," I. Thorneycroft (CVD#9), *Menopause Management* 2001; July/August: 16-28- DW will check to see if it is a peer-reviewed for determination of FDAMA or MAIL distribution. **The Role of Estrogens in the Management of Postmenopausal Bone Loss**, J.C. Gallagher (OP#2), *Rheumatic Disease Clinics of North America* 2001; 27:143-162- Mark will follow up with Barbara Alonzo to see if distribution can be by WLF; DW will send Mark final published paper. Ideas for new paper included Harry Burke (Georgetown)- Absolute vs Relative Risk, suggested that the paper include the value of epidemiological studies.

321. In a January 2002,(DWRITE 067253-4), there is a table of Strategic Publications Development Committee with 10 action descriptions, person assigned responsibility, proposed completion date and comments. There is a second sheet for strategic publication plan tracking report of papers in progress. The only paper listed is BC#6, **Progestins and Breast Cancer**, author J. Eden to be published in *Archives of Internal Medicine*. The submission target date was February 2002. According to the summary, the outline had been provided to the client (Wyeth) for review on August 14, 2001. An outline was sent to the author (J. Eden) August 24, 2001, with feedback received September 27, 2001. The manuscript was sent back to the author for review November 5, 2001, with author sending revisions December 12, 1001. The revised paper was sent to the author on February 11, 2002, and paper manuscript was sent to the author for submission February 21, 2001 which was submitted to the journal March 4, 2002.

323. February 20, 2002 (DWRITE 071149, there is a manuscript cover letter sent from John Eden, MD to the editor of *Archives of Internal Medicine* accompanying his submission of a manuscript "**Progestins and Breast Cancer**". There is no disclosure of involvement of Wyeth with the creation and writing of the document. There is a second October

30, 2002 (DWRITE 071150) cover letter for the same manuscript addressed to Dr. Kim, editor of the *American Journal of Obstetrics and Gynecology*. Still there is no reference to involvement of Wyeth in the design andr writing of the manuscript. To Dr. Kim, Dr. Eden writes that he was thankful for the constructive criticism he had received from the journal, namely for him to take into account the recent report of the WHI (JAMA 2002 Jul 17; 288:321-22) and 2) to move the preclinical information before the discussion of clinical and epidemiological data. In response, he also addressed the WHI trial in the abstract and in detail on page 10 and in the conclusion on page 15. He had also revised the discussion of the nested, case-controlled study in Australia (page 11), of which he had been one of the authors, published in Medical Journal of Australia.

324. The preselected title of the paper by Wyeth, "**Breast Cancer and Progestins**", was eventually published with John Eden, M.D. as the sole identified author, in the *Am J Obstet Gynecol* 2003:188:1123-31 (M4188). The intent of Wyeth's paper was to have a physician cast doubt on the association of breast cancer and estrogen/MPA hormone therapy. DesignWrite had commissioned the writing of the paper by a ghost writer as designed, edited and approved by Wyeth and eventually sent the draft manuscript to Dr. Eden for his input. In turn, Dr. Eden submitted the paper for publication as if he were the sole author, in a journal widely read by Ob/Gyns. There was no disclosure of Wyeth's involvement by Dr. Eden in the design, contents and approval of the contents of the final published article.

**Training of Medical Students and Residents**

325. In 1992, Wyeth analyzed the cost and possibilities of promoting the use of hormone therapy to medical students and residents. It provided textbooks written by Wyeth consultants to primary care residents, purchased exclusive rights to books echoing support of Wyeth's messages and provided textbook programs for training of Ob/Gyns and primary care

residents. Wyeth created computer based programs to help them learn the diagnosis and treatment of postmenopausal women. Wyeth implemented a Medical Review Board Course designed for third year residents. Wyeth tried to establish resident research programs to help educate residents about Wyeth's drugs. All these activities are totally unrestricted or unmonitored by FDA. (CONNS005-000969)

326. In addition, Wyeth helped fund medical schools and teaching facilities with an expectation of loyalty to Wyeth and its products. Wyeth believed that in exchange for its funding, a medical school or teaching hospital owed Wyeth to be an advocate for the use of its products (DUROJ023-000528).

**Planning for New Competitive Challenges**

327. In the third quarter of 1999 a new single tablet hormone replacement product was anticipated to be launched by Novo Nordisk called Activella approved November 1998. The NDA had been approved for moderate to severe menopausal symptoms and vaginal atrophy. Activella has estradiol- the estrogen most similar to naturally circulating estrogen, therefore it also required the lowest effective dose of estrogen. In terms of potential strengths of Activelle marketing: it has been extensively used in Europe, was a non horse product, had the lowest effective single table dose of HRT; widely recognized use of NETA as contraceptive; potential for increased compliance when compared to Prempro; 90% amenorrhea after 1 year; 40% of women experience no bleeding at one year; data is available for women 1-3 years after last menses. Activelle has better bleeding profile than Prempro, therefore was completely countering Prempro 5mg. The marketing "weaknesses" of Activelle (*According to Wyeth)- Novo-Nordisk had minimal corporate presence in US among Ob/Gyns and PCPs; no announced US marketing partner; potential androgenic side effects; less favorable lipid effect (LDL) compared to MPA;

will launch in US with vasomotor symptom data only; no comparative trial with Prempro; limited data for endometrial hyperplasia. Activelle has not been approved with an osteoporosis indication.

328. Activelle contained 17-beta estradiol and norethindrone acetate (NETA) and was intended to be used as a continuous combined regimen that would directly compete with Prempro.(CONTA012-001554-5; CONTA012-001534-52). After marketing research among physicians in June 1999, the message designed for Wyeth- Prempro provides effective management of all the short term effects of menopause; effective for the long term sequelae of menopause; the "Premarin heritage"; the proven safety profile and "new science".

## VI. Wyeth's Marketing of Prolonged Use of Two Carcinogens

329. An example of Wyeth's marketing to women in 1973:

> Why stop estrogen replacement therapy after the hot flushed have subsided- when the deficiency is still there? The postmenopausal years: A time of continuing and often increasing estrogen need- Estrogen replacement past the menopause: Long-term benefits throughout the later years" – PREMARIN- Natural estrogen therapy: Long-term benefits throughout the later years (W-MDL04782-00016708-15).

330. Wyeth had not investigated the safety of long term unopposed "continuous" estrogen use before recommending it to be used by postmenopausal women, nowhere in Wyeth's marketing is that risk message adequately conveyed to women or physicians for Premarin. When Wyeth first learned of the articles from the West coast physicians reporting endometrial cancer associated with prolonged estrogen use of Premarin (See above Opinion #2), internally, instead of being concerned about safety, Wyeth told its sales force how to deny the reports, discredit the studies and the authors. An internal Wyeth document credits increased risk with Premarin to a corresponding increase in regional physical examinations increasing the opportunity to detect endometrial cancer, not the actual cancer risk (W-MDL04782-00051891).

331. Further, with Wyeth's later pursuit of a combination hormone regimen (CHT), Wyeth still has not conducted adequate animal, human or observational studies, it had failed to monitor safety, update product labeling, alter product dosing to the lowest minimal doses of Premarin and MPA necessary, or warn physicians and women about the potential risks. Wyeth selects MPA because it is expedient way to block completion from Upjohn with Provera.

332. As a class, estrogens are used by a woman for elective indication, grandfathered as safe but known to be a human carcinogen. Women should be able to decide for themselves with truthful and accurate information if the "benefits" of estrogen are commensurate with the "risks".

333. As has been discussed, Premarin was found to have substantial evidence of efficacy effective by DESI and FDA for "short term" relief of transitory symptoms of menopause with administration by cyclic dosing. DESI had not reviewed claims for long-term efficacy. Until the Prempro NDA, Premarin was not approved by FDA for long-term or a continuous dosing regimen. Prempro, Premarin or MPA have all been found to be effective for prevention of cardiovascular disease or cognitive function.

334. After the FDA's 1975 Advisory Panel meeting and discussion of the risks of Premarin for endometrial cancer, Wyeth promptly sent out a letter to doctors and pharmacists which "minimized the endometrial cancer risk" (W-MDL04782-0064632; W-MDL04782-00064631). Wyeth stated that "it would be simplistic indeed to attribute an apparent increase in the diagnosis of endometrial carcinoma solely to estrogen therapy."(W-MDL04782-00064632;DEYM101-000790). The letter continues (*Underlining for emphasis):

> The labeling of PREMARIN recommends cyclic administration- a three week regimen with a one week reset period- to avoid prolonged stimulation of the endometrium. The lowest maintenance dosage needed to control the menopausal symptoms should be employed. …With these and other standard measures, any

> potential risk attendant to the use of PREMARIN will be minimized, and women may continue to receive the proven benefits of estrogen replacement therapy.

335. As a result, the FDA strongly reprimanded Wyeth's conduct and its physician communication. FDA considered Wyeth's Dear Doctor letter to be a "misrepresentation of the scientific data", "warped in tone" and drafted with the intent to 'obfuscate the issues'.(W-MDL04782-00027339). The FDA noted that it was disappointed with Wyeth's "passive attitude" regarding the seriousness of the issue since Wyeth had not promptly voluntarily updated Premarin's warnings with the new risks of conducted studies on the issue.

336. As a result of the safety actions implemented by FDA (and not Wyeth) and the resulting negative publicity, including an FDA Advisory Panel meeting, Premarin sales dropped over fifty percent over the late 1970s (DEYMI202-000082). The actions caused Premarin sales to "plummet" and estrogen use in general to "decline dramatically and immediately" in the United States (BURRG002-000049; CONTA003-000676). With the stigma of endometrial cancer attached to Premarin, physicians were "afraid to prescribe it" and "many patients took themselves off Premarin"(RYANJ002-0004950)

337. By 1975 based on safety, FDA had a class "black box warning" required on all estrogens warning of the risks of endometrial cancer, a Patient Package Insert warning of the cancer risks to patients.

338. In T.J. Key and M.C. Pike, (**The dose-effect relationship between 'unopposed'oestrogens and endometrial mitotic rate: Its central role in explaining and predicting endometrial cancer risk.** *Br J Cancer*, 1988, 57, 205-212), (also totally discounting the methodology shortcomings of Gambrell(1986)), the authors wrote that:

> Detailed analysis of the age-incidence curve for endometrial cancer in the light of this hypothesis suggests that there will be lifelong effects of even short duration use of exogenous hormones. In particular, 5 years of combination-type oral

> contraceptive use is likely to reduce a woman's lifetime risk of endometrial cancer by some 60%; whereas 5 years of unopposed osetrogen replacement therapy is likely to increase her subsequent lifetime risk by a t least 90%; and even 5 years of 'adequately' opposed therapy is likely to increase subsequent lifetime risk by at least 50%.

339. Wyeth was aware that there was a "marketing need" to have its own FDA approved combination therapy package to market to women. The combination approval process began as a series of unsuccessful attempts with FDA to obtain approval to market a combination Premarin/progestin hormone therapy regimen (CHT).

340. Wyeth almost arbitrarily selected medroxyprogesterone acetate (Provera) as the progestin component for other progestins available due to immediate availability. MPA was approved by FDA, it was going to be available in generic form and MPA appeared to present the least amount of work and expense for Wyeth to obtain approval. MPA had never been approved for an indication for postmenopausal women, despite having been marketed for that indication by Upjohn since the 1960's. Due to clustering of breast cancer in Wyeth's combination treatment arm, FDA approved only the lower MPA containing Prempro (2.5mg) with two phase 4 commitments for Wyeth. The first phase 4 commitment was the post-market investigation of the safety for users of continuous administration of Premarin plus MPA (Cycrin). The second phase 4 study commitment was to investigate the minimum dose of Premarin and MPA required as a continuous combination therapy to prevent bone loss and reduce endometrial hyperplasia. Prior to this approval of 2-pill Prempro, MPA had never been approved by FDA for any menopausal indication. Wyeth's 2 year rat study demonstrated that oral MPA, as with estrogens, when used alone was a human carcinogen (See below).

341. December 13-14 2000, **Steroidal Estrogen**, Report on Carcinogens Background Document Steroidal Estrogens, Meeting of the NTP Board of Scientific Counselors, Report on Carcinogens Subcommittee (FISHG001-000510573), page 9, **Introduction** begins:

> "Conjugated estrogens were listed in the Fourth Annual Report on Carcinogens (RoC)(1985) as *known to be human carcinogens*….In 1987, the International Agency for Research on Cancer (IARC) identified steroidal estrogens as carcinogenic to humans (Group I), based on sufficient evidence of carcinogenicity in humans (IARC 1979). Also in 1987, and again in 1999, the IARC identified postmenopausal estrogen therapy as carcinogenic to humans (Group I), based on sufficient evidence of carcinogenicity in humans (IARC 1979, 1999). These IARC listings are based on a consistent, strongly positive association between exposure to a number of steroidal estrogenic substances and increased risks of endometrial and breast cancer in women.

342. In 2007, Conjugated Estrogenic Substances, Premarin, according to National Library of Medicine's TOXNET (excerpted), risks which were available to Wyeth in 1973 and 1977 :

> Case-control studies have reported association between use of Premarin and endometrial cancer. The relative risk was estimated to be increased 7.6 times in one study and 5.6 times in another. Risk increased with dose and duration of exposure and therefore seemed to result from the drug rather than the underlying condition. The source of this information was the American Medical Association; AMA Department of Drugs, AMA Drug Evaluations. 3rd ed. Littleton. MA: PSG Publishing Company, Inc. **1977**, p 547.
>
> A follow-up survey of 908 women who had received Premarin for menopausal symptoms revealed 9 cases of ovarian cancer. The source was R. Hoover , et al, in (**Exogenous estrogen & endometrial carcinoma: Case control & incidence study**; *Am J Obstet Gynecol* 127: 572-580 (1977). Women should be examined <u>for breast and genital carcinoma</u> before estrogen therapy is instituted and periodically during administration; estrogen should be withdrawn if evidence of carcinoma is found or suspected. The source again the American Medical Association; AMA Department of Drugs, AMA Drug Evaluations. 3rd ed. Littleton, MA: PSG Publishing Co., Inc. **1977**, p 547)
>
> Strongly indicate lack of therapeutic efficacy of 2.5 mg/day mixed conjugated equine estrogen regimen & suspected possible adverse effects, the source J Samler et al. (**Coronary Drug Project: Findings leading to discontinuation of 2.5 mg/day estrogen group**; *J Amer Med Assoc* 226: 652-657 (**1973**)).

343. For the Prempro IND (21,696), FDA requested on June 7, 1989 that Wyeth perform a two year rat carcinogenicity study in female rats for support of its NDA as a combination Premarin/MPA therapy. The chronic rat study showed that MPA was carcinogenic. Upjohn, the sponsor of Provera, had not been required to perform a carcinogenicity study despite all the years of marketing in the United States. The predominant "unexpected"(FISHG001-000356) changes from the 2 year rat study involved the "pancreas". The pancreas had islet cell hyperplasia, benign islet cell adenomas, and islet cell carcinomas( adenocarcinoma with and without metastases). The changes in the pancreas appeared to be related to MPA dose. (FISHG001-000201-14; FISHG001-000358).

344. An August 25, 1992 internal correspondence from Mr. Krieg to Dr. Wetzel/Dr. M. Hite (FISHG001-000341) (*Underlining added for emphasis):

> As I stated in our discussions on August 20th regarding the pancreatic lesions in the MPA rat carcinogenicity study, I believe that strong consideration should be given to employing a European based expert to assist us in minimizing any further complications arising from this finding.
>
> It is critical that we secure an esteemed European expert to buy into our explanation for this finding or perhaps jointly developing an alternate one. Regardless of how this finding is explained, it will be necessary to address it in the preclinical report.

345. The FDA found this NDA initially as not fileable (CONNSO22-000503). FDA sent Wyeth a nonfileable letter dated February 19, 1993 saying the application was not sufficiently complete for a substantive review (21 CFR314.101)(FISHG001-000402

346. (FISHG001-00410-13), Wyeth wrote to FDA addressing FDA's concerns about "continuous administration" of 0.625 mg Premarin and MPA versus cyclic administration for osteoporosis prevention. FDA specifically had concerns that the new use of continuous

Premarin (*not cyclic) would increase the risks of both breast cancer and endometrial cancer for postmenopausal women:

> FDA has expressed concern that a continuous regimen of Premarin, as opposed to a cyclic regimen, may increase the risk of breast and endometrial cancer. As regards the relative risk of breast cancer, it is speculative that a dose-response relationship exists within the dose range of Premarin 0.625mg to 1.25mg. In fact, such relationship is not supported by the data of Colditz et al. The data from the Nurses' Health study indicates that the age adjusted relative risk (RR) of breast cancer among current users of conjugated estrogens compared to never users is as follows:
>
> 0.3mg RR=1.55(95% CI, 1.0-205)
> 0.625mg RR=1.42 (95% CI, 1.0-1.9)
> 1.25mg RR=1.48 (95% CI, 1.0-2.2)
>
> The authors concluded that they were unable to detect "an association between the dosage of conjugated estrogen and risk" within this dosage range. They additionally pointed out that these findings were consistent with reports of other investigators. More specifically, Brinton et al in 1981 and 1986, in case control studies, compared the relative risk of breast cancer for every day and cyclic estrogen use. In the 1981 report, it was noted that cyclic administration was generally three weeks on and one week off. The results in the report, adjusted for age, were for everyday use, a relative risk of 1.32 and for cyclic administration, a relative risk of 1.26. These two estimates were not significantly different. Results in 1986 indicated that for every day use the RR=1.17 (95% CI, 0.9-1.4); for cyclic RR= 1.0 (95% CI, 0.8-1.2). Again, no significant differences between these regimens were seen.

347. Therefore, Wyeth as a responsible manufacturer of hormone products should have been aware in the 1970s of the risks of cancer with prolonged Premarin exposure. Yet it took no steps to investigate the risk, to monitor patient outcomes, to adequately warn physicians and patients about the risks of cancer from prolonged elective use of Premarin. Wyeth instead persisted to promote long-term use of Premarin as safe and effective.

348. Wyeth promoted a combination of Premarin with MPA for continuous use by women as a combination regimen without having obtained adequate safety data. While attempting to reduce the risks of one pre-cancerous condition, namely endometrial hyperplasia,

Wyeth did not consider the other cancers that could be induced by combination of Premarin plus MPA.

349. Daily combination Prempro was approved by FDA for use as a daily regimen of Premarin plus MPA. Wyeth retained all the Premarin indications for Prempro. However, even in a 1-year pivotal clinical trial with thin, healthy Caucasian women, Prempro did not eliminate endometrial cancer and there was a clustering of breast cancer, a safety signal available in 1993 detected in the continuous combination treatment groups. The same clustering of invasive cancer was later seen in the combination therapy Prempro groups in the Women's Health Initiative (WHI) July 2002.

## VII. Wyeth's Marketing of Cardiac Prevention Benefits

**Cardiac Benefits**

350. In 1998, Wyeth provided physicians with promotional cardiac information representing that "hormone replacement therapy, defined as estrogen alone or estrogen and progesterone, had been identified as the most significant factor reducing the risk of CVD for postmenopausal women" (SOLOJ023-000519). Wyeth assured doctors that "for the vast majority of postmenopausal women, these cardioprotective benefits, in addition to the reduced risk of osteoporosis related to estrogen use, far outweighed the potential risks." Wyeth encouraged health care providers to "facilitate a greater awareness of the risks associated with cardiovascular disease in women and to proactively assist women to reduce their risks through lifestyle changes as well as through hormone replacement therapy" (W-HUSAK01-00001021; SOLOJ023-000976).

351. By the late 1990s, Wyeth's cardiac prevention campaign had become so successful, despite a lack of scientific support or FDA's approval, that 70% of physicians

reported that it was the "cardiac benefits" of combination hormone replacement therapy which was the major reason patients agreed to therapy (LUDGM002-001711). This belief in the cardiac benefits of hormones was despite FDA's having repeatedly informed Wyeth that it could not make unsupported cardiac benefit claims to physicians or women.

352. In April 2001, Wyeth surveyed physicians to assess the reasons why patients and physicians would use estrogen and CHT. The survey had 26% of physicians prescribing CHT for the cardiovascular protection; 67% estrogen therapy for its potential cardiovascular benefits; 48% for Alzheimer 's disease protection effects (VICTJ001-001064).

353. Wyeth began promoting the cardiac benefits of hormone therapy without scientific evidence to support the claims and against the opinions of its own in-house scientists and consultants. There had been no cardiac benefits substantiated by randomized, well-controlled for prolonged use of Premarin or Prempro.

354. According to Wyeth's promotions, Prempro, was falsely marketed as reducing the risks of endometrial cancer to almost non-existent, so that a woman could safely continue on prolonged CHT for "cardiac benefits". The cardiac benefits were made to appear commensurate with potential risks for CHT to a woman in Wyeth's marketing. The success of the Wyeth's promotions was predicated on Wyeth not addressing the "other" risks of CHT including breast cancer.

355. Wyeth was reprimanded repeatedly by its own in-house scientists, FDA and outside experts that there was no scientific basis supporting claims of cardiac benefit. To make those claims, a clinical study needed to be designed and conducted to investigate the true cardiac impact of estrogen and progestins for women.

365. Instead of performing the necessary clinical studies, Wyeth instead disregarded the requirements of the FDA and the Food Drug and Cosmetic Act and its own experts and promote cardiac benefits directly to physicians and patients at every available opportunity. Wyeth repeatedly violated even its own internal promotional standard operating policies (SOP) continuing to promote cardiac benefits of hormone drugs for postmenopausal women. (GOLDG001-001435;LEVIG002-005601). It eventually took the public release of the WHI study, a randomized government study, not a Wyeth study, using more than 16,000 women to show physicians and patients scientifically that there was a "lack" of cardiac benefit from Prempro. In 2007, reports have once again begun to surface in the medical literature purporting the cardiac benefits of Prempro that have not been supported by well-controlled clinical trials.

366. In 2002 and 2003, the WHI confirmed that "estrogen plus progestin does not confer cardiac protection and may increase the risk of coronary heart disease (CHD) among generally healthy postmenopausal women, especially during the first year of use. Combined hormone therapy (CHT) should not be prescribed for prevention of cardiovascular heart disease" (Estrogen Plus Progestin and the Risk of Coronary Heart Disease" Manson, et al; NEJM: Vol 349:6).

**The Persistence of Cardiac Benefit Claims**

367. The body of knowledge confirming a "lack of cardiac benefit" for CHT had actually been available to Wyeth much earlier than WHI. In 1973, the Coronary Drug Project ("CDP") was halted prematurely because there was " no evidence of a positive cardiac effect" from use of a conjugated estrogen. The CDP was a study done using a population of 8,000 men aged 30 to 64 years of age who had all recovered from one or more myocardial infarctions. This was a well-controlled study, capable of providing Wyeth with a clear safety signal that long-term

use of conjugated estrogen produced potential cardiac injury and not benefit. (**The Coronary Drug Project Findings Leading to Discontinuation of the 2.5-mg/day Estrogen Group**" **The Coronary Drug Project Research Group**. JAMA, Nov 1973: Vol. 226, No.6). Despite the CDP's findings, and expert opinions since 1989, no further studies to investigate the cardiovascular risks of conjugated estrogens or Prempro were undertaken by Wyeth.

368. In September 1983, ten years after the CDP, the National Heart, Lung, and Blood Institute (NHLBI), National Institutes of Health (NIH) held a public conference regarding estrogen use and cardiovascular effects/benefits. According to Dr. Henry Perdue, Wyeth, the overall consensus was that" a large long-term study should be conducted to look at the effects on morbidity and mortality associated with estrogen use" ( W-MDL04782-00030693). The data presented at the conference suggested that any positive effects gained by use of estrogens on lipids, glucose tolerance, carbohydrate metabolism and blood pressure usually were reversed by addition of "progestins". Wyeth acknowledge at the meeting that any cardiovascular study done would need to have three arms: estrogen-only, combination estrogen/MPA (CHT) and placebo ((W-MDL04782-00009303; GPIL008-002293;GPIL008-002282). Wyeth attended the conference, heard all the safety concerns about the use of estrogen and CHT and lack of cardiac benefits, yet took no steps to explore the safety or update its promotions.

369. Overlooking the NIH's recommendations in 1983 and that it had gathered no data, in 1989, Wyeth sought FDA's approval of a new efficacy claim for "cardiovascular benefits" associated with combination therapy (CHT). The submission was filed not with clinical trial data but with a literature review. The supplement was denied by FDA based on "inadequate data for supporting the safety of the new cardioprotective claim". (PANAA026-001571; PANAA034-001426).

370. In 1985, Wyeth complained to FDA about the violative conduct of other manufacturers. For example, Wyeth complained to FDA that Abbott had inappropriately promoted its hormone drug Ogen, (estropipate), as having a positive lipid effects, falsely implying cardiac benefits. Wyeth was aware that FDA subsequently identified Abbott's cardiac benefit representations as false, misleading and prohibited by the Act. (W-MDL04782-00009302; GPIL008-002293).

371. In 1987, Wyeth reimbursed a physician at the University of Chicago to promote the cardiac benefits of estrogen in a letter sent to physicians. Dr. Barnes encouraged physicians to prescribe estrogen therapy to all postmenopausal women "even those who do not present with the troublesome symptoms of menopause". Dr. Barnes assured doctors that "by warding off cardiovascular disease and the consequences of osteoporotic bone loss, ERT can have a very significant impact on the postmenopausal health of women and on the quality of their lives." (CONNSO14-001645).

372. During 1988, Wyeth met with FDA about obtaining approval of its CHT regimen. At that meeting, Dr. Bennett, FDA, expressed his concerns about the effect of addition of progestin to the overall cardiovascular effects of estrogen therapy. Dr. Bennett put Wyeth on notice that there was a need for a CHT study concerning cardiac effects. (W-MDL303-00081735).

373. June 29, 1989 there is a Wyeth internal memo from J. Victoria to Mr. Cavanaugh regarding Wyeth's future plans to trigger an FDA regulatory action against Mead Johnson for its Estrace promotions. He indicated that prior to consideration of a regulatory action, he "would suggest a thorough clinical review of the points relative to its effect on renin

substrate, blood pressure, and lipids and lipoproteins; the stated and/or implied clinical significance of these issues; and a review of the basis for the substantiation of these points."

374. Referring to Ms. Daira's memo, Mr. Victoria wrote that "We have more to lose if our ability to discuss cardiovascular issues is limited than we have to gain by stopping the use of this particular Estrace promotion piece." He also wrote that Mr. Leone had recently indicated on numerous occasions that the promotion of the cardiovascular effects of Premarin were of critical importance to Wyeth-Ayerst and that our approaches to date, while acceptable, do indeed push the edge of the envelope. "By raising questions regarding the Estrace promotion with FDA, we are likely, in his opinion, to heighten FDA's scrutiny of Wyeth's Premarin promotional pieces".

375. In 1990, Wyeth was told by FDA that it had significant concerns about CHT in that progestin may negate the beneficial cardiovascular effects of estrogen. Further, without definitive clinical studies, the FDA could not approve CHT. The FDA's Director of Compliance strongly admonished Wyeth that "to provide combination packaging would represent promotion of an unapproved combination and that would be clearly actionable by the FDA". (PANAA034-001426). Despite these types of negative interactions with FDA about unapproved promotion of unapproved CHT for cardiac benefits, Wyeth continued to represent to both patients and physicians that there were proven cardiac benefits from prolonged hormone therapy (DEYM003-000013).

376. In April 1991, Wyeth mailed a Dear Doctor letter to physicians discussing a published article by Dr. Steinberg et al. The letter minimized the author's concerns about the risks of breast cancer while emphasizing estrogen therapy's unproven and unapproved cardiac benefits. Wyeth noted the "importance of putting the relationship of benefit to risk in

perspective" and represented that Premarin possessed long-term health benefits which included lowering the risk of cardiovascular disease." (PANAA025-001866).

377. In 1991, Wyeth once again reported violative conduct to FDA by another hormone manufacturer, Ciba-Geigy. Ciba-Geigy had sponsored a dinner meeting entitled "Cardiovascular benefits of estrogen replacement therapy". Wyeth objected to Ciba-Geigy's off-label and "unbranded" promotion of cardiac benefits. Mr. Ken Feather of FDA's DDMAC told Wyeth that this type of conduct was of particular concern to FDA and "was clearly a problem to the Division" (PANAA034-001796, W-MDL04782-00050226).

378. During 1992, FDA informed Wyeth that it could not represent that hormone therapy drugs conveyed cardiac benefits to patients. The FDA refused Wyeth's request to modify labeling to add Premarin's beneficial cardiac effects to either the "Clinical Pharmacology" or "Other Health Benefits" sections. Instead FDA expressed concerns that Wyeth would make such a request to promote cardiovascular benefit of Premarin when such changes could lead to inappropriate and/or misleading promotion. The FDA indicated that it would be agreeable to consider a request from Wyeth to include changes in the Warnings or Precautions section of the insert. The FDA confirmed that the reason for the current recommendation was to prevent Wyeth from promoting Premarin for what FDA considered as a "yet to be proven" benefit. (PANAA014-001130; W-MDL303-00081836).

379. On March 1992, Wyeth arranged for a third party group, the American Heart Association (AHA) to release Wyeth's advertisements under the organization's name. The advertisements represented that hormone therapy drugs provided a cardiac benefit. Rubin Ehrenthal had created a complete advertising campaign for cardiac benefits of hormone for use by the AHA using one of Wyeth's job identifiers. (CONNS005-000121). Wyeth had an overall

strategy to" identify educational opportunities within medical associations to further enhance Wyeth's business objectives." (JANECO10-000163).

380. On April 1992, FDA's DDMAC reprimanded Wyeth for using promotional materials which discussed changes in serum cholesterol levels after menopause since the information misleadingly implied that estrogen treated serum cholesterol changes and there was cardiovascular benefit from use of Premarin (ROSSC005-000271). June 1992, FDA once again reprimanded Wyeth for using promotional materials representing Premarin as effective for lowering serum cholesterol. Wyeth reportedly agreed at that meeting to cease and desist making those types of misleading and false cardiac promotions (ROSSC005-000092).

381. However, after the meeting with FDA in 1992, Wyeth continued to disseminate direct-to-patient pamphlets informing women that estrogen loss at menopause caused detrimental changes in serum cholesterol but that use of Premarin increased the good cholesterol and lowered the bad cholesterol, preventing cardiac risk.

382. In 1994, Wyeth met confidentially with Dr. Max Borten, a physician and attorney, based at Harvard, to develop a plan for establishing hormone therapy as a "standard of care" for preventative cardiac treatment. Wyeth thought that by establishing a medical standard of care for the heart would pressure physicians to prescribe hormone therapy for cardiac prevention in order to avoid legal liability (PANNAA027-000892).

383. In December 1996, Dr. Beral asked Wyeth to fund an extension to the Million Women's study to include cardiac endpoints (PICKJ009-001232). Wyeth had concerns about funding the study since it was also petitioning FDA for a new cardiovascular claim in its labeling for Premarin (DEMAE007-002954). Wyeth's concern was that negative results from such a study would directly impact on the FDA's application decision. Therefore, Wyeth declined an

opportunity to obtain cardiovascular endpoint data from a large study in 1996, which could have easily provided it with cardiac benefit/risk information.

384. In 1997, Wyeth requested again that the FDA permit it to add new cardiac prevention language to its Premarin label. (DUROJ034-000439; W-MDL04782-00094080;CONNS014-000949;CONNS014-000210). FDA rejected the request in 1998 on the basis that "many of the cardiovascular claims in the submission appear to be unsupportable." The FDA further informed Wyeth that for approval of such cardiac prevention indications, Wyeth would need to conduct either two adequate and well-controlled clinical studies or a multi-year, very large-scale, multi-center mortality trial. (W-MDL04782-00095313). FDA issued a non-approvable letter (CONNS014-001103). Despite FDA's failure to approve the new cardiac prevention claims, promotional materials from Wyeth continued to claim unproven, unsupported unapproved cardiac benefits.

385. In 1998, Wyeth distributed a patient information booklet, "*Discover more about menopause and estrogen replacement therapy*" which contained the same 1992 prohibited and unsupported cardiac benefit representations (W-HUSKA02-0000094).

**Wyeth and Reporting of HERS (Heart Estrogen/Progestin Replacement Study)**

386. In July 29, 1998, there was the publication of HERS ( Heart Estrogen/progestin Replacement Study) data. Wyeth had been the sole drug sponsor for HERS (CONNS016-000199). Wyeth had represented on several occasions that the HERS study would "ultimately confirm the <u>cardiac benefits of CHT"</u>. While the study was ongoing, Wyeth represented that "evaluation of the effects of ERT/HRT on the incidence of cardiovascular events awaits the outcome of large, long-term, randomized, controlled, clinical trials such Heart Estrogen/progestin Replacement Study (HERS) and the Women's Health Initiative (WHI) (W-

HUSAK01-0000786). Wyeth also proposed that FDA might be able to use the results of HERS to support a Premarin cardiovascular submission (W-MDL04782-00095313).

387. Contrary to Wyeth's expectations, HERS showed no cardiac benefits for CHT when compared to placebo. In fact, patients' receiving CHT had a statistically significant increase in cardiovascular events during the first year (VICTJ001-001843). As a result of the negative results, Wyeth created a HERS public relations team to respond to the study's unfavorable results (PICKJ020-001968). The team's objective was to "protect the benefit of primary CVD prevention for Premarin" and to ensure that key organizations such as the AHA and ACOG would still support primary CVD prevention benefits for estrogen in official statements.

388. September 1998, a month after publication of HERS data, Wyeth sponsored and funded the Duke University Monograph. Dr. Charles Hammond, a Wyeth consultant, helped create the monograph, and later would co-chair Wyeth's National Hormone Council (NHC) (CONTA025-024637). The Duke Monograph was designed to resemble a physician's continuing medical education (CME) review of hormone therapy but which encouraged the use of Wyeth's product for CHT. The Duke monograph represented that CHT's benefits went beyond symptom relief, particularly for long-term health implications including osteoporosis and cardiovascular disease, Alzheimer's Disease and cancer. (CONKJ012-000765; DUROJ007-000004). The document reassured physicians that estrogen and CHT reduced cardiac mortality by 50%. The Duke Monograph represented the "significant long-term benefit" for cardiovascular disease and even confers "a protective effect on women with established coronary artery disease (CAD)." The Duke Monograph omitted any mention of the unfavorable HERS data.

389. Wyeth's publicity spin was to repeatedly contradict the HERS findings. It claimed that HERS showed "promising results" was a "heartening result" and confirmed that "therapy can be given long-term" (K-Bi15-01558; KET-001561). After Wyeth's publicity spin for HERS, a survey of physicians showed that overall, the perception about the HERS study was largely that it had been positive, and the physicians surveyed concluded that HRT had been shown to provide cardiovascular benefit in HERS. For 51% of physicians surveyed, HRT had thought to be shown to be good for the heart in HERS. (LUDMG003-000423). FDA's analysis of HERS data, confirmed that the HERS study showed no cardiac benefits (W-MDL303-00085228). However, Wyeth took steps to intentionally downplay and minimize the HERS data in various ways. (CONSG001-002027;CONKJ003-000150-1).

390. Wyeth actually continued the HERS study for 2.7 more years of follow-up (HERS II) After a total of six years of CHT there still was no measurable cardiac benefit for volunteers (CONSG018-032099).

391. July 1999, Wyeth sought advice from the Klemtner Advertising agency on methods for circumventing the FDA's directive to stop cardiac promotion of hormone therapy drugs ( CONTA007-000688). The documentation with Klemtner demonstrates that Wyeth carried out a campaign of continuing to promote unsupported cardiac and cognitive benefits by using unbranded advertising pieces and linking those materials with branded pieces.

392. On September 22, 1999 Wyeth filed new proposed labeling language for Prempro/Premphase which referenced the HERS study (BURKM015-000097). Wyeth requested FDA's input into the HERS labeling. After further discussions, Wyeth and FDA finalized the HERS language for the label in January 2000 (W-MDL527-00040231; HOLSN006-000162). The publication of HERS had been July 29, 1998. The updated Prempro and Premphase labeling

with HERS information was published by Wyeth in the 2001 PDR. The HERS data was important in that it provided new scientific information about the cardiac risks and lack of cardiac benefits of CHT. HERS contradicted all of Wyeth's public statements and prior unapproved promotions about cardiac benefits. FDA proposed labeling for HERs, which was modified by Wyeth, and went through a series of negotiations.

393. There is a July 13, 2000 Wyeth internal memo of a July 12, 2000 phone conversation between Ms. Diane Moore, DRUDP, FDA and Wyeth to determine if she could provide any additional information about the Agency's letter to industry about estrogen class labeling revisions to the Breast Cancer Warning and Cardiovascular Risk subsection ROSSC001-000368). Ms. Moore reiterated that as a result of HERS – Wyeth's funded study the following statement was to be added to the labeling:

> PRECAUTIONS- Cardiovascular Risk
> *The effects of estrogen replacement therapy on cardiovascular disease have not been fully studies. The Heart and Estrogen/Progestin Replacement Study (HERS) a controlled clinical trial of secondary prevention in 2763 postmenopausal women with documented coronary heart disease, demonstrated no benefit. During an average follow-up of 4.1 years, treatment with estrogen/progestin did not reduce the overall rate of recurrent coronary heart disease events…There were more CHD events in the hormone group than in the placebo group in year 1 and fewer events in years 3 through 5.*

394. The HERS labeling proposed above by FDA was subsequently modified into a cumbersome and wordy paragraph that buries the lack of cardiovascular effect further down in the text. The HERS precaution in the product insert is hard for a physician to identify that there was no cardiac benefit shown by HERS and there is no anticipated effect. Wyeth demanded that all other combination hormone manufactures be required by FDA to add the same class HERS statement to its labeling.

**Wyeth and the Women's Health Initiative (WHI) and 2007**

395. The Prempro arm of the WHI was halted in 2002 due to unacceptable risks and no support of cardiac benefits. Wyeth, in April 2007 has continued to promote to physicians and women that there had been short-term cardiovascular benefits identified for Prempro suggesting a cardiac benefits. On Wyeth's website, Wyeth describes the re-analysis of pooled data from both WHI arms that were published, not indicating the journal reference. There was a re-analysis published in JAMA April 2007 as well as NEJM June 2007 . The website article does not provide the complete reference of the article in April 2007. Wyeth states that its pooled analysis showed no apparent increase in coronary heart disease (CHD) for women who begin hormone therapy close to menopause. The Wyeth article is titled:"**New analysis of data from WHI provides reassurance with respect to coronary heart disease for newly menopausal women considering hormone therapy**". The title implies to a physician or patient that there is reassuring new information about use of hormones and cardiac benefits since WHI.

396. Reading Wyeth's own release, it reports a statistically "nonsignificant" trend towards a reduction in coronary heart disease (CHD) among hormone therapy users within 10 years of menopause. The study reports a statistically significant reduction in total mortality among only women aged 50-59 in the group receiving hormone therapy when compared to the placebo group with a "nonsignificant" trend for increasing risk across other age groups. Additionally, as consistent with previous findings, there was an increase risk of stroke for women taking hormone therapy confirmed.

397. According to Joseph Camardo, M.D., Senior Vice President of Global Medical Affairs for Wyeth Pharmaceuticals (*Underlining added for emphasis):

> These pooled findings with respect to coronary heart disease may be reassuring to newly menopausal women. Hormone therapy remains a good health care choice for the appropriate woman seeking the relief of moderate to severe menopausal symptoms, including hot flashes, night sweats and vaginal atrophy and the

prevention of postmenopausal osteoporosis. Hormone therapy should not be used for prevention of cardiovascular disease.

**Wyeth and the Journal of the American Medical Association – 2007**

398. The article which may be referenced by Wyeth (above), but not specifically cited may be J. Rossouw, et al. (**Postmenopausal hormone therapy and risk of cardiovascular disease by age and years since menopause**. JAMA April 4, 2007, Vol 297 No. 13:1465-1477). This was Wyeth's source of "reassuring cardiac news". The study was done as a continuation of the analysis of the WHI data to explore whether effects of hormone therapy (Premarin) on risk of cardiovascular diseases varied according to patient age or years since start of menopause. The conclusion was that women who began hormone therapy close to start of menopause tended to have reduced CHD risk compared to women beginning hormone therapy distant to start of menopause, but the trend was not statistically significant. The article goes on to say that although not statistically significant, the secondary analyses suggests that the effect of hormones on CHD may be modified by year since menopause and by the presence of vasomotor symptoms, with the highest risks seen in women 20 or more years since menopause ( or aged >70 years). The authors noted that there had not been adequate statistical power to assess the outcome in women aged 50 to 54 years or women with less than 5 years since start of menopause.

399. Regarding the treatment arms of the WHI, as previously reported "CEE-only" appeared to be associated with a lower risk of CHD than the combination of CEE+ MPA (Prempro). Estrogen appeared to potentially play dual and opposing actions. CEE was able to retard the earlier stages of atherosclerosis through beneficial effects on endothelial function, and blood lipids, but could trigger acute events in the presence of advanced lesions by procoagulant and inflammatory mechanisms. The current WHI findings were consistent with an overall

neutral effect of estrogen therapy in women when taken soon after menopause (*who are likely to have developed fewer complicated lesions), unfavorable effects of CHD risk with hormone therapy were seen only in later years. The article also continued (*Underlining added for emphasis.):

> For CEE+ MPA, the risk of breast cancer also needs to be considered…By contrast, the increasing absolute risks of CHD in older women or women more distant from menopause (most marked in women aged >70 years or >20 years past menopause), together with their increased risks of stroke, breast cancer, and venous thromboembolism, would in general contraindicate the use of hormones for disease prevention in there groups.

400. J. Manson, et al.(**Estrogen Therapy and Coronary-Artery Calcification**, *NEJM* June 21, 2007; 356:2591-602) used an ancillary study of the WHI trial of continuous daily conjugated equine estrogens (Premarin) compared to placebo in a population of women with hysterectomies. The authors performed computed tomography of the heart in 1064 women aged 50 to 59 years at randomization. Imaging was conducted at 28 of 40 centers after a mean of 7.4 years of treatment and 1.3 years after the trial was completed (8.7 years after randomization). Coronary- artery calcium scores were measured at a central reading center without knowledge of randomization. Among women 50 to 59 years old at enrollment, the calcified-plaque burden in the coronary arteries after trial completion was lower in women assigned to estrogen (Premarin) than those assigned to placebo. However, estrogen has complex biologic effects and may influence the risk of cardiovascular events and other outcomes through multiple pathways (*Underlining added for emphasis).

> The WHI trial of Premarin alone was originally scheduled to continue until close-out visits between October 2004 and March 2005. However, the NIH stopped the trial approximately 1 year early, owing to an increased risk of stroke in the absence of apparent benefit for the risk of CHD. Study participants were informed of this decision on March 1, 2004. Were instructed to discontinue the study medication and were informed of their group assignments.

> Although the evidence suggested a reduced risk of CHD among the women aged 50 to 59 years, who were receiving Premarin, the statistical power of the study was inadequate to provide conclusive results. Therefore, an explanatory ancillary substudy (WHI-CACS) was proposed to provide mechanistic information. WHI-CACS was restricted only to women aged 50 to 59 years. An average of 8.7 years after randomization, women receiving estrogen had a lower prevalence and quantity of coronary-artery calcium than those receiving placebo. The findings, in conjunction with the suggestion of a reduced risk of clinical coronary events among women related with Premarin in this age group, are consistent with previous evidence from laboratory, animal and observational studies.
>
> The new findings from WHI-CACS indicate that estrogen therapy initiated in women at 50 to 59 years of age is related to a reduced plaque burden in the coronary arteries and a reduced prevalence of subclinical coronary artery disease, providing support for the hypothesis that estrogen therapy may have cardioprotective effects in younger women. Although the WHI trial of Premarin suggested that younger women, but not older women, may have a reduced risk of myocardial infarction and coronary revascularization when using estrogen, statistical tests for an interaction according to age were nonsignificant (range of P values, 0.07 to 0.09) Estrogen has complex biologic effects that may vary according to the underlying state of the vasculature and other tissues. Conclusive answers, however, can be derived only from large-scale trials involving sufficient numbers of clinical events among women in early menopause.
> However, the possibility of a favorable effect of estrogen on atherosclerosis in younger women requires confirmation in future studies, and other risks and benefits of treatment with estrogen initiated at a younger age will, with prolonged use, persist at older ages. Additional research on various formulations and regimens of hormone therapy will also be important. In the meantime, hormone therapy should not be initiated (or continued) for the express purpose of preventing cardiovascular disease in either younger or older postmenopausal women. The current recommendations from many organizations that hormone therapy be limited to treatment of moderate-to-severe menopausal symptoms, with the lowest effective dose used for the shortest duration necessary, remain appropriate.

**Estrogen Replacement and Atherosclerosis (ERA) Trial**

401. J. Yeboah, D. Herrington, et al. **Effects of estrogen replacement with an without medroxyprogesterone acetate on brachial flow –mediated vasodilator responses in postmenopausal women with coronary artery disease**, *Am Heart J* 2007;153:439-44)- The ERA trial randomized 309 postmenopausal women, referenced in NDA #20-303 by the FDA's

reviewing Medical Officer (ROSSC012-001505) , was designed to investigate women with established coronary atherosclerosis (mean 65.8 years) to three treatment arms: unopposed estrogen (Premarin 0.625mg), estrogen/MPA (Premarin/Cycrin 2.5mg) or placebo. After an average of 3.2 years of treatment with unopposed estrogen or estrogen/progestin there was no significant improvements in endothelial vasodilation compared with placebo. This apparent absence of an effect on brachial artery endothelial function in older postmenopausal women with established coronary artery disease may help explain the lack of benefit of estrogen for secondary prevention for coronary heart disease.

**VIII. Wyeth's Marketing of Osteoporosis Benefits**

402. Wyeth actively promoted ERT and CHT's osteoporosis benefits long after there were safer alternative drugs available, including Fosamax which Wyeth co-marketed. It promoted osteoporosis prevention across the board for all women, even when she was not at increased risk. Wyeth , by DESI, probably effective for prevention of osteoporosis, had not performed adequate animal of human testing to support the safety of this claim actively promoting Premarin for "all" postmenopausal women as a prevention for osteoporosis. Wyeth also had failed to perform dosing studies when marketing Premarin along or Prempro in combination with MPA to determine the lowest effective fixed dose combination of Premarin and MPA.

403. In 2000, FDA refused to approve Premarin for the indication of "treatment" of osteoporosis because Wyeth had not been provided "convincing evidence" from "one of more adequate and well-controlled trials that the drug significantly reduced the risk of osteoporotic fracture" (W-MDL04782-00128935).

404. The FDA repeatedly cautioned Wyeth not to over-promote the osteoporosis benefits of hormone replacement therapy or to use scare advertising ( such as women sitting in wheelchairs) to frighten women to take hormone therapy for prevention of osteoporosis. (ROSSC005-000271;ROSSC005-000162;ROSSC005-000092; CONNS005-000046;CONNS005-000023). FDA required that Wyeth promote the drugs only as one "part of an overall program for prevention of osteoporosis and not as a panacea" and admonished Wyeth to "not over promise the potential benefits". (HOLSN006-000703).

405. In contrast to FDA, Wyeth told its sales representatives that they needed to "push the osteoporosis story" because that was Wyeth's easiest "ROI" (Return- On-Investment) (SOLOJ010-000819).

406. Wyeth had originally received its osteoporosis indication by DESI review and not by premarket double-blind randomized controlled human clinical trials. Wyeth would have been aware that it had not obtained adequate scientific data to support the benefits for osteoporosis to justify long-term Premarin/Prempro use. Wyeth did not inform physicians or patients that there was not sufficient data to support the safety or effectiveness of Premarin for prevention and treatment of osteoporosis. Wyeth delayed in informing physicians that there was data from HERS which did not support that CHT had reduced hip fractures A claim of osteoporosis prevention for a hormone therapy such as Premarin is achieved only through use of the drug by a woman for the rest of her life (LAWT021-009874). Wyeth's promotion of this benefit ensured extended use of the Premarin/ Prempro by women. As Wyeth would have been aware, there were no residual bone mass density (BMD) benefits associated with its hormone therapy. Premarin helps maintain bone mass density but is not able to restore bone that is already lost (SONKJ012-000729; PANAA030-001175; W-HUSAK02-00001911; VICTJ001-

001155;W-ADSBRO-001142;HOLSN004-000403). Wyeth's hormone therapy drugs were not approved by FDA as a "treatment" for osteoporosis (W-IND-00003867).

407. From the HERS study, Dr. Cauley had determined that "four years of combination therapy use had not reduced the overall incidence of fractures"(SONKJ024-001753). Wyeth tried to suppress Dr. Cauley's findings because her conclusions, in Wyeth's opinion were "too strong". (CONSG007-000075; CONSG007-000113; CONSG007-000045; CONSG001-000435). (J. Cauley, DrPH, et al. **Effects of Hormone replacement Therapy on Clinical Fractures and Height Loss: The Heart and Estrogen/Progestin Replacement Study** (HERS)- a study funded by Wyeth). A handwritten note on the proposed manuscript written from Robert Levy to Kathy Shields- "Not worth much, my concerns is that this paper will be quoted for years without the caveats found in the discussion." (CONSG007-000079)

408. For women who are overweight, hormone therapy did not significantly reduce the incidence of fractures or the rate of height loss (CONSG007-000075). Wyeth would exclude women from its clinical trials for osteoporosis if women were greater than 20% greater than ideal body weight. (W-MDL04782-00059960).

409. It was not until after the WHI that Wyeth began to more appropriately describe the limitations of its hormone's osteoporosis benefits. In 2003, Wyeth acknowledged that when hormone therapy was "used in women without menopausal symptoms for the prevention of osteoporosis, these drugs should be used only in women at significant risk of osteoporosis and only after alternative therapies had been carefully considered" (PARKA008-000257).

410. Wyeth undated slide presentation (STRIS017-000076-99) Rationale for Lowering HRT Doses: **Demographic change**, current use of ERT/HRT, impact of media

coverage, importance of physician recommendation, opportunities for lower-dose HRT. **The reasons to stop HRT** - Breakthrough bleeding/spotting (22%), side effects (17%), fear of cancer (14%), weight gain (9%), and breast tenderness (8%) Yankelovich 2000. For hysterectomized women, the length of HRT is 13.8 years, for non-hysterectomized women 7.8 years. Between January 1999 and September 2000, over 21, 000 articles addressed menopause. **54% unbranded**, 8% Wyeth branded, 6% other Rx brand, 4% SERMs and 27% alternative medicine. In the US toady, the most commonly prescribed HRT (estrogen plus progestin) regimen for women with an intact uterus is 0.625mg/d CEE with 2.5mg/d MPA. **The emerging trend-** is a growing interest among healthcare providers and consumers for lower dose options. Evidence is accumulating that lower estrogen doses may provide similar benefits with reduced side effects, thus extending the benefits for women. Clinical trials of the impact of lower progestin doses in combination with lower estrogens are needed. **The potential benefits of lower-dose HRT**- comparable efficacy with fewer side effects, greater acceptance by women, improved continuance to achieve long-term health benefits.

## IX. Wyeth's Disregard of Signals of Breast Cancer

411. In a July 2001 Pfizer slide presentation at the JAALA Medical Marketing Meeting (Edwards-A 0000345-414) for its combination hormone product FEMHRT (1 mg norethindrone acetate (NETA) and 5 mcg ethinyl estadiol), approved by FDA with daily 3 week dosing, the **"#1 Reason Women Resist using HRT is fear of Breast Cancer".** (Edwards-A 0000373, Exhibit 10665 page 0029). If Pfizer knew this, so should Wyeth.

412. The presentation continued, in terms of safety and tolerability – FEMHRT breast pain was 8.1% compared to Prempro 33%, headache 18.2% FEMHRT and 36% Prempro -

source from the product insets (Edwards-A 00000371; Exhibit 10665, page 027). Prempro, with MPA had greater breast pain than FemHrt.

413. Despite there being safety signals suggesting a risk of breast cancer with combination estrogen/progestin therapy which actually goes back to a French male rat study in 1961 (**Appearance of mammary tumors in male rat subjected to a combination treatment of estrogen and progesterone**. Riviere M.R., Chouroulinkov I, Guerin M. *Societe de Biologie*, Nov. 18, 1961; 2101-04), Wyeth ignored the signals and did not conduct safety studies to investigate the risk of breast cancer in users of combination hormone therapy even before selecting MPA. Wyeth did not monitor the outcomes of 60 years of women taking Premarin, the 12 years of women taking Prempro as combination therapy. In the rat study, only the combination arm developed mammary tumors.

414. The first human signal of breast cancer risk with estrogen therapy occurred in 1976 with (R. Hoover, et al **Menopausal estrogens and breast cancer**. *NEJM* 1976;295:401-5) The study showed an estimated relative risk of 2.5 for women taking estrogens for 15 years or more. Dr. Hoover wrote that the study gave "cause for great concern" and indicated that "there may be a problem that certainly needs more intensive study" (W-MDL04782-00029002) In April 1976, before the publication of the negative Hoover data for estrogen, Wyeth had already investigated methods to control the negative publicity. In Wyeth's prepared press release, released one day after the Hoover article, Wyeth represented that the company had "supported and encouraged studies of estrogens for more than 35 years and is continuing to do so," while attempting to minimize the breast cancer risk to physicians which Hoover associated estrogen therapy ( W-MDL04782-00029027)

415. In March 1976, Wyeth internally admitted that at the time the company should place an "even higher priority" on understanding the breast cancer risk rather than on quantifying the endometrial cancer risk" "We need to know all there is to know, both good and bad". Wyeth considered at the time sponsoring a retrospective study on breast cancer (W-MDL04782-00057786). In June 1976, Wyeth's scientists reviewed the medical knowledge of an association between estrogens with or without progestins and breast cancer. The scientists wrote that "in view of the widespread use of estrogens with or without progestins, there is valid concern as to whether or not the use of exogenous estrogen leads to an increase in the incidence of breast cancer". The document goes on to discuss the importance of positive estrogen and progesterone receptive tumors and confirms that the presence of both estrogen and progesterone receptors in a tumor indicates that a tumor does responds to estrogen." The document indicates the need for additional studies to be done to determine the possible "role of progesterone in the etiology of breast cancer". The Wyeth scientists concluded that although estrogens may not trigger a breast cancer, hormone drugs are "capable of accelerating growth of previously established tumors." This document should have triggered a responsible manufacturer to begin to perform additional investigation as to the role of hormones for risk of breast cancer before recommending prolonged unopposed and combination hormone therapy. (W-MDL04782-00029233).

416. In February 1979, Dr. Barbara Hulka (W-MDL04782-00032472-3), a physicians and epidemiologist, wrote to Dr. George Brice of Wyeth to request to perform a retrospective epidemiologic study for Wyeth to determine the possible association between exogenous estrogen and breast cancer. She had become concerned that as "more studies proliferate, and the status of investigators becomes hinged on the production and promotion of

"positive findings", the greater the chance of publications appearing with positive results. After discussions with Dr. Brice in August, she proposed a retrospective cohort study using women from clinical practices in North Carolina. Medical records were to be search for female patients age 40-59 during the years 1960-1969. She was against the use of a case-control study because of unreliability of patient recall, inadequacy of medical records, limited scope of what can be learned of potential benefits of estrogen.

417. Her study involved 500 histologically confirmed breast cancer cases admitted to Duke University Hospital and two community hospitals, Durham County General and Cabarrus memorial Hospital between August 1, 1976 and December 15, 1978. The analysis was performed on 280 primary cases, 554 hospital controls and 1548 community controls. 83 cases were excluded as recurrent cancer patients. The study looked at estrogen use only patients. 80(26.8%) of the 280 women with breast cancer were "pre-menopausal". There were suitable hospital and community controls identified. There had been a statistically significant increased risk (RR =2.38) of breast cancer identified amongst estrogen users who had undergone a natural menopause. There was also an increased risk of breast cancer identified for "black women" receiving estrogen that was not seen with white women. She reported that she did not find an increased risk of breast cancer for users of Premarin. But, it was not clear to the members of Wyeth how Dr. Hulka was able to determine the estrogen that was used. A more intensive review of the data was to be postponed until after the next meeting with Dr. Hulka.

418. In May 5, 1981, according to an Ayerst memo from Dr. TY Lee, et al to Dr. Brice, she proposed a new case-control study (W-MDL04782-00032460-2 planned to evaluate the differences between pre- and post-menopause breast cancers.

[*Dr. Hulka would be the Chairperson for FDA's Fertility and Maternal Health Drug Advisory Committee during February 1990. That meeting was called by FDA to discuss breast and endometrial cancer associated with hormone replacement therapy. (CONNS017-000032-35) It is not clear whether Dr. Hulka disclosed her previous ties with Wyeth at the FDA Advisory Panel meeting and prior study involving breast cancer in women taking Premarin.]

419. In April of 1980, Dr. Ross et. Al. (A **Case Control Study of Menopausal Estrogen Therapy and Breast Cancer,** *JAMA* (DELCA008-000627) showed a relative risk of 2.5 in nonhysterectomized women after 3 years of estrogen use. Dr. Ross's data showed that the risk of developing breast cancer increased both with estrogen dose and duration. Wyeth met with Dr. MacMahon to identify weaknesses in the Dr. Ross study. Dr. MacMahon called it a "good paper" without any "serious flaws" and which agreed with other reports as well as his own research (W-MDL04782-0032315; W-MDL04782-00032331) Wyeth responded by preparing a public relations statement to minimize the impact of the Ross report. Wyeth's media statement directed at physicians, minimized the breast cancer risk of hormone therapy. Wyeth also did not initiate studies to address the report (W-MDL04782-0032274).

420. Wyeth's scientists reviewed the available medical literature for an association between estrogen and breast cancer. Their review confirmed that 16 out of 26 articles cited showed a relative risk higher than 1.3. Wyeth did not include its own identified literature breast cancer risk information in either the Premarin or Prempro labeling and instead elected to use statistics which underreported the risk (W-MDL04782-00032460).

421. In 1983 Dr. Sidney Wolfe filed a Citizen's Petition which put Wyeth on notice that Wyeth needed to provide stronger and more definitive warnings for physicians and women in its Premarin labeling regarding the increased breast cancer risk of estrogen and estrogen plus

progestin therapy. Dr. Wolfe testified that there was no proof that the therapy was either safe or effective and called for a Black Box warning on Premarin as to breast cancer risk demonstrated in multiple studies. Dr. Wolfe demanded warnings that would inform a woman to "only use menopausal estrogens when absolutely necessary" and "at the lowest dose for short periods of times". Dr. Wolfe concluded that many of the several million women currently using Premarin would not continue if they were adequately informed of the increased risk of breast cancer" (W-MDL04782-00063068; W-MDL04782-00063066).

422. In 1985 Wyeth's sales representatives used promotional pieces with physicians intended to downplay and minimize breast cancer risk. Such a piece compared the lives that have been saved by estrogen therapy in terms of the women who had died from breast cancer. Doctors were told that estrogen therapy provided "two benefits versus a risk" since per 100,000 women between the age of 20-75, only 18 would die from breast cancer but 53 lives would be saved by avoiding osteoporotic fractures and 5,250 lives would be saved by avoiding heart disease" (W-HUSAK01-00001306). In 1987, estrogen got listed by the IARC as a human carcinogen. This action by an international safety group should have triggered a full analysis of the drug's potential for causing cancer in women. In 1987, Dr. Hunt published a study which showed a breast cancer relative risk of 4.8 for women who took estrogen for 31 months of more (Hunt K, et al. **Long-term surveillance of mortality and cancer incidence in women receiving hormone replacement therapy**. *Br J Obstet Gynaecol* 1987;94:620-635) This information also did not appear in the Premarin or Prempro labels.

423. In January 1988, Dr. Budoff approached Wyeth about funding a retrospective study in her combination therapy patient population. All of Dr. Budoff's nonhysterectomized patients had a least one uterine biopsy as well as annual mammograms. Dr. Budoff felt that the

study she proposed would "greatly improve the present fund of knowledge, including factors such as prevalence of breast cancer and uterine cancer and hyperplasia" occurring in combination hormone therapy users, (PICKJ011-003007) Dr. Budoff was proposing an easy, cost-effective method for Wyeth to assess breast cancer risk for a population of patients with combination hormone therapy. The study was not appear to have been funded.

424. At Wyeth's Annual Symposium in 1989, Wyeth was informed by its own invited experts that "additional studies were needed to determine whether the risk of breast cancer was altered in women receiving combined estrogen/progestin therapy since exposure to a progestin in the presence of estrogen "might enhance the risk".(YAVUE010-000664).

425. In 1989, when the Bergkvist article (Bergkvist L, et al. **The risk of breast cancer after estrogen and estrogen-progestin replacement,** *NEJM*1989;321;296-7) was published in New England Journal of Medicine., by August 1989, Wyeth should have been aware that women receiving combination (estrogen/MPA) therapy had an increased risk for cancer. Dr. Bergkvist concluded that "estrogens seem to be associated with a slightly increased risk of breast cancer, which is not prevented and may be increased by addition of progestins". At that time, Wyeth publicly committed to conducting "further research in the field to reach a complete understanding of the risk –benefit" of hormone therapy drugs (W-MDL04782-00033664) Despite Wyeth's scientific commitment, Wyeth instructed its sales representatives to "under no circumstances initiate discussions with physicians about this study" and, if asked about the study, "to minimize the results reminding the physician that the study was conducted in Sweden" and "may not accurately reflect the medical environment in the U.S." (CONNS005-000346).

426. In 1990, FDA held an Advisory Committee, Chaired by Dr. Hulka, that confirmed that there was evidence of a breast cancer risk but that more studies were required (VICTJ005-001700). Dr. Hoover (NCI) stated there was no "appreciable difference between estrogens", which the committee members agreed with. Dr. Zumoff discussed the "promoting effect" of estrogens on breast cancer. After the meeting, Wyeth sent out a Dear Doctor letter downplaying the Advisory Committee's conclusions (PANAA025-001943). At an annual meeting sponsored by Wyeth in Italy for "estrogen depletion", physicians were encouraged to prescribe combination therapy because the addition of progestin "decreased the risk of breast cancer" (PANAA010-000988).

427. In 1993, an FDA Medical Officer, Dr. Linda Golden presented at the ACOG meeting her concerns about the risk/benefit ratio of prolonged estrogen therapy with respect to breast cancer. Dr. Golden noted that "most breast cancer studies were epidemiologic studies not based on randomized groups" and that "adequate and well-controlled placebo randomized studies" were needed (CONNS001-001434). In 1993, Wyeth was approached by the Eastern Cooperative Oncology Group (ECOG) requesting funding for a breast cancer study. Wyeth rejected the request because of Wyeth's "company policy" was not to fund studies involving breast cancer (PANAA027-000562; PANAA027-000561)

428. In Wyeth's 1-year pivotal trial for approval of 2-pill Prempro, there was a safety signal of breast cancer clustered in the combination therapy arms. FDA approved the NDA for Prempro but only with two phase 4 commitments for safety studies. Wyeth was to determine the risk of breast cancer with CHT. Wyeth was also to determine as a phase 4 study the minimal effective dose of Premarin and MPA for daily continuous dose therapy. Wyeth after 60 years of selling Premarin had not attempted to identify a minimal effective dose to improve safety.

429. In Wyeth's HOPE (Health Osteoporosis Progestin Estrogen) study for support of a lower dose combination of Premarin/MPA therapy for control of vaginal symptoms and later for prevention of osteoporosis, again there appeared a safety signal with breast cancer clustered in the combination therapy arms.

430. Wyeth repeatedly utilized its "Dismiss/Distract" policy to handle negative information about the use of Premarin or Prempro, including for breast cancer risks. (SOLOJ002-001019, SOLOJ022-001373-4; SOLOJ022-0010140-42) involves a Breast Cancer Working Group held March 27, 1996, and an abstract by SR Cummings et al Bone Mineral Density Predicts the Risk of Breast Cancer in Older Women. The Study of Osteoporotic Fractures reported:

> In summary, our prospective study is the first to report an association between BMD and breast cancer linking two of the most common and important conditions affecting a woman's health. Identifying a common denominator for these conditions should substantially improve our understanding of their etiology and prevention. Our findings suggest that the risk of breast cancer associated with hormone replacement therapy may have been substantially underestimated since osteoporosis is a primary indication for its use (SOLOJ022-001373-4).

431. The Breast Cancer Working group goal was to "Balance anticipated negative coverage by casting doubt on validity and value of study, emphasizing its aberrant results relative to other ERT/breast cancer results. The strategy- Two-track was to ensure Wyeth responds appropriately to the Cummings study:

> *Track One*
>
> Dismissive Strategy- Downplay value of the study by dismissing its contribution to the literature (based on a small number of cases, wide confidence interval), and simultaneously suggesting it may be inappropriately creating a public health scare. Utilize third-parties as much as possible to distance W-A from the study, which is not Premarin-specific. **Note:** Release and timing of individual communications documents to be determined as situation unfolds.
>
> *Track Two- To be implemented in the event competition raises the ante*

Head to Head Strategy- Should Merck negatively merchandize this study to advance the Fosamax agenda, move to aggressively defend ERT's role in osteoporosis therapy while communicating the competition's intention to confuse women by manipulating statistics, In this case W-A generates communication directly, augmented by third-parties
Tactical Recommendations

*For both strategies*

Part I: Benefit/Risk Information Session for Press- Functions as tactical centerpiece of either strategy.

Two-part discussion for the media

Part I: Benefits and Risks of HRT
Topics and suggested experts*:
-Benefits
Cardiovascular disease (T. Bush)
Osteoporosis (R. Linday)
Alzheimer's disease/other CNS functions (S. Shumaker/S. Birge)
Vasomotor Symptoms (W. Utian)
-Risks
Breast Cancer (L. Speroff or (~~N. Davidson~~)/ Dawn N. Willis
-Uterine Cancer (H. Judd)

Part II: Responsible Report on Women's Health Issues
-Leading opinion leader emphasizes overall importance of media providing comprehensive coverage of benefit and risk issue (President of the European Menopause Society)

*Tract One Tactics (Dismissive strategy)*
●Select third-party group statements , specifically ACOG, AMWA, NAMS, WHI
●Appropriate third-party spokespeople, Trudy Bsh, Leon Speroff
●Voice mail scripts for W-A sales resps
●Press background materials
-graphs of breast cancer studies
Breast cancer data white paper
*Women's Health Digest* report, :Demystifying the Hormone/Breast Cancer Connection"
W-A international brochure

*Tract Two Tactics (Head to Head Strategy)*
●Third party statements provided proactively
●Letter to science/medical/trade journalists "setting the record straight for estrogen"

●Letter to doctors
●Letter for dissemination at meeting
●Q&A
●Coordinate press outreach through B-M/New York

Next Steps
●W-A to contact third party organizations
●B-M to begin media coordination efforts with European colleague

432. In the Wyeth documentation is a handwritten note, “Breast CA Present”,

Cummings- NIH Study, 10year, 65+ prospective.

MD’s BCA Flash cards
BCA Patient Aids
MD Letter in Can!

433. In large letters is written “**Dismiss/Distract**”(SOLOJ0022-001019)

## X. Wyeth’s Disregard for Effects of MPA on the Breast

434. MF McCarty (**Androgenic progestins amplify the breast cancer risk associated with hormone replacement therapy by boosting IGF-I activity**, *Medical Hypotheses* 56(2):213-216, 2001) wrote:

> Recent epidemiology indicates that unopposed oral estrogen replacement therapy has a surprisingly small impact on breast cancer-little if any in overweight women- whereas combined regimens featuring synthetic progestins are attended by a much larger increase in risk. These findings may reflect the fact that oral estrogen acts on the liver to down-regulate systemic IGF-I activity, whereas concurrent administration of androgens-including androgenic progestins often used in replacement therapy-abrogates this effect. Increased systemic IGF-I activity has been linked to increased risk of breast cancer risk, and may be largely responsible for the greater incidence of breast cancer in overweight postmenopausal women-who thus should have the most gain from suppression of UGF-1 activity by oral estrogen…Fortunately, natural progesterone-now available in micronized oral preparations-does not oppose the hepatic effects of oral estrogen, and moreover may be preferable to androgenic progestins with respect to vascular function.

435. In 2000 R. Ross, et al. (**Effect of hormone replacement therapy on breast cancer risk: estrogen versus estrogen plus progestin**, *Journ NCI*, 92(4):328-32, February 16, 2000) before the publication of the WHI and consistent with the French 1961 male rat findings, wrote their conclusions that the data reviewed showed that addition of progestin to HRT markedly enhanced the risk of breast cancer relative to use of estrogen alone. The authors felt the findings had important implications for the risk-benefit equation of HRT in women using CHT. The article began:

> Hormone replacement therapy (HRT) given as unopposed estrogen replacement therapy (ERT) gained widespread popularity in the United States in the 1960s and 1970s. Recent prescribing practices have favored combination HRT (CHRT), i.e. adding a progestin to estrogen for the entire monthly cycle (continuous combined replacement therapy [CCRT]) or a part of the cycle (sequential estrogen plus progestin therapy [SEPRT]). Few data exist on the association between CHRT and breast cancer risk. We determined the effects of CHRT on a woman's risk of developing breast cancer in a population-based, case-control study. The results of the study- HRT was associated with a 10% higher breast cancer risk for each 5 years of use (OR=1.10; 95% CI=1.02-1.18). Risk was substantially higher for CHRT use (OR=1.24; 95%=1.07-1.45) than for ERT use (OR=1.06; 95% CI=0.97-1.15). Risk estimates were higher for SEPRT (OR=1.38; 95% CI=1.13-1.68) than for CCRT (OR=1.09; 95% CI=0.88-1.35), but this difference was not statistically significant. This study provides strong evidence that the addition of progestin to HRT enhances markedly the risk of breast cancer relative to estrogen alone.

435. The response to the Ross article was by Wyeth "advocates" David Archer. Trudy Bush, and Lila Nachtigall, without any indication that they routinely are funded by Wyeth as primary speakers, investigators and authors. They respond by reminding the reader that the use of hormone therapy provides a "host of benefits". Moreover any small increase risk in breast cancer for women with HRT is balanced by the fact that if a cancer is found, it is a "favorable histology". The reply to the R. Ross article was **Re: Effect of Hormone Replacement Therapy on Breast Cancer Risk: Estrogen versus Estrogen plus Progestin**, D. Archer, T. Bush, and L. Nachtigall, *Journ NCI*, Vol. 92, No. 23, December 6, 2000, pp: 1950-1951

437. Dr. Ross and M. Pike respond *Journ NCI*, Vol. 92, No. 23, December 6, 2000, pp: 1951-1952- "The rather intransigent attitude of Dr. Archer and colleagues regarding their patients is especially unfortunate. To choose not to inform patients of the mounting and now considerable evidence that CHRT causes a large increase in breast cancer risk…is a real disservice…Instead of bickering that followed the early studies proving that ERT causes endometrial cancer, we should be addressing the considerable challenge of how to administer progestins to the endometrium without increasing breast cancer risk above that of ERT, so as to maximize the benefit to risk equation for CHRT."

438. B.de Lignieres, F. de Vathaire, S. Fournier, et al. (**Combined hormone replacement therapy and risk of breast cancer in a French cohort study of 3175 women**. *Climacteric* 5: 332-340, 2002) speculated that Wyeth's two recent randomized trials, the Heart and Estrogen/progestin Replacement Study (HERS) and the Women's Health Initiative (WHI), the larger study concluded that the continuous use, with a duration of 5 or more years, of an oral combination of conjugated equine estrogens (CEE) and MPA increased the risk of breast cancer. The authors wrote that "this conclusion may not apply to women taking other estrogen and progestogen formulations because differences in routes of administration, doses and sequences of HRT may variously alter the risk." In France, the most widely prescribed HRT for the unselected majority of postmenopausal women combines transdermal estradiol with oral progesterone or closely related progestins.

439. The authors continued that , in terms of the surgical biopsies of the breasts performed in postmenopausal women, the breast epithelial cell mitotic activity increases during treatment with oral CEE, and even more so during HRT combining oral CEE and MPA. Some

of the epidemiological surveys and the largest randomized trial suggests that this HRT regimen is not optimal for breast tissues and should be stopped.

440. In the cohort of 3175 women, mean age 50 years (range 20-59 years), 105 women developed breast cancer, 43 were classified as HRT non-users and 62 as HRT users. In the French cohort, 83% of the combined HRT were receiving mostly or exclusively a transdermal estradiol gel formulation, and the progestin was oral micronized progesterone in 58%, while MPA users were less than 3%. The results of the present study did not show an increase in breast cancer risk.

441. G. Greendale, et al.( **Postmenopausal hormone therapy and change in mammographic density** *Journ NCI*. 95(1): 30-7, January 1, 2003) discussed the use of standard classification systems and computer analysis of mammograms to review baseline mammograms obtained from the PEPI study for changes in density, from treatment arms CEE+MPA-cyclic, CEE+MPA-continuous, and CEE-MP. The absolute mean changes in mammographic density over 12 months were 4.76% (95% CI=3.29% to 6.23%), 4.58% (95% CI =3.19% to 5.97%), and 3.08% ((95% CI=1.65 to 4.51%). The authors used the Breast Imaging Reporting and Data System (BI-RADS) classification system in the United States, dividing the mammograms into four categories on increasing breast density: grade 1, entirely fatty breast; grade 2, breast containing scattered fibroglandular tissue; grade 3, heterogeneously dense breast; and grade 4, extremely dense breast. Besides BI-RADS the study used a computer associated determination of breast density. The greatest change percent breast density were in both combinations using CEE plus MPA. The CEE+MPA(cyclic) (0.625 CEE + 10mg MPA for days 1-12) had greater % change of breast density over 12 months than the CEE+MPA (continuous) (0.625 mg CEE+ 2.5 mg MPA). CEE+MP (micronized progesterone) had less change in density than either MPA

arm, but had more increased breast density change than either the estrogen-only or placebo arms. The authors pointed out that that the link between change in breast density resulting from hormone use and change in breast cancer risk remains uncertain.

442. The WHI had randomized nonhysterectomized women to received estrogen plus progestin (a single daily tablet containing conjugated equine estrogen (0.625mg) and MPA(2.5mg) as Prempro, (Wyeth Ayerst)) or an identical appearing placebo tablet. In R. Chlebowski et al. (**Influence of Estrogen Plus Progestin on Breast Cancer and Mammography in Healthy Postmenopausal Women The Woman's Health Initiative Randomized Trial**, JAMA June 25, 2003- Vol. 289,No.24, pp3254-3304) its conclusion was that:

> Relatively short-term combined estrogen plus progestin use increases incident breast cancers, which are diagnosed at a more advanced stage compared with placebo use, and also substantially increases the percentage of women with abnormal mammograms. These results suggest estrogen plus progestin may stimulate breast cancer growth and hinder breast cancer diagnosis.

443. The data suggested that women reporting prior menopausal hormone use may have had higher Hazard Ratios (HR) for breast cancer associated with estrogen plus progestin use than those who never used menopausal hormones (among never users, 141 vs 121; HR, 1.09; for women with <5years of prior use, 37 vs 21; HR, 1.70; and women with >5years of prior use, 21 vs 8; HR, 2.27) but the trend with duration of use was not statistically significant (weighted p=.15).

444. Invasive breast cancer associated with estrogen plus progestin (CHT) use were of a larger size (mean [SD], 1.7cm[1.1] vs 1.5 cm[0.9] respectively; P=.04), more likely to be lymph node positive 925.9% vs 15.8%; respectively; P=.03), and were diagnosed at a significantly more advanced stage when compared with breast cancer occurring in women taking

only placebo. The distribution of estrogen receptor-positive and progesterone-receptor positive cancers did not differ significantly between the two arms (CHT vs placebo). The number of deaths from invasive breast cancer were the same for both groups- 4 women each.

445. After the first year, the percentage of abnormal mammograms was substantially higher in the CHT arm compared to placebo. (716[9.4%] of 7656 vs 398 [5.4%] of 7310 women with abnormal mammograms). The frequency of abnormal mammograms was higher in women aged 50 to 59 years in the CHT group after 1 year as well (8.8% vs 5.9%, respectively; P<.001). In each year thereafter, the percentage of women with abnormal mammograms was significantly higher in the CHT group vs the placebo group. In total, 31.5% of women in the CHT arm had a least 1 abnormal mammogram vs. 21.2% of women in the placebo group (P<.001). The absolute increased risk of abnormal mammogram with CHT was about 4% per year in women. It was noted that CHT use increased mammographic breast density vs estrogen alone (hysterectomized patients) or placebo.

446. For the WHI, the relatively early development (<5 years) of breast cancers in the CHT group was an unexpected finding. Most recent reviews of observational studies for CHT had suggested a detectable breast cancer risk would not be identified as be increased until after longer (>5years) menopausal hormonal use. The discrepancy in the findings was speculated as the result of CHT being able to hinder mammographic identification of breast cancers. The estrogen only (CEE) arm of the WHI did not show the same increased risk for breast cancer as CHT. Regarding warnings for physicians and patients, the WHI authors concluded that:

> … the increased frequency of abnormal mammograms requiring medical evaluation and increased breast cancer risk should be added to the already known risks of short-term duration of menopausal hormone use.

447. S. Missmer et al. (**Endogenous Estrogen, Androgen, and Progesterone Concentrations and Breast Cancer Risk Among Postmenopausal Women**, *Journ NCI,* Vol 96, No.24, pp1856-65) Dec 15, 2004) began the article's discussion with "Epidemiologic data now provide strong evidence for an influence of plasma steroid hormones on the risk of breast cancer in postmenopausal women- a long proposed, but previously poorly supported, hypothesis." The authors continued regarding the risks of hormone therapy to women:

> In addition, our findings suggest that higher concentrations of endogenous steroids-both estrogens and androgens- are primarily associated with an increased risk of ER+/PR+ breast cancers. We have recently reported that both <u>body mass index and current postmenopausal hormone use</u> are preferentially associated with an increased risk of ER+/PR+ tumors in this cohort. The association with an increased risk of ER+/PR+ tumors and higher levels of endogenous steroid hormones is biological feasible because the presence of ERs and PRs in cancer cells is considered to provide a growth advantage…
>
> ER overexpression has been associated with mammary tumors in animal models, and selective estrogens receptor modulators, such as tamoxifen, block ER activation in the breast, suggesting <u>ER-mediated regulation for gene expression</u> plays a biologically important role in normal and malignant cells.
>
> To our knowledge, our study was the first to investigate whether progesterone levels were associated with breast cancer risk in postmenopausal women, and we observed no statistically significant association. Interestingly, we observed that case subjects with <u>PR+ tumors were statistically significantly more strongly affected by all circulating steroid hormones, except for progesterone</u>.
>
> ….Given the lack of association that we observed with <u>naturally circulating</u> progesterone and the relatively <u>strong associations observed with synthetic progestin exposure, it may be that synthetic progestins have a more dramatic or metabolically different effect on breast tissue proliferation.</u>

448. A. Fournier, et al. (**Breast cancer risk in relation to different types of hormone replacement therapy in the E3N-EPIC cohort**. <u>Int J Cancer</u>: 114,:448-454, 2005) described E3N a French prospective study investigating cancer risk factors in 98,997 women all belonging to MGEN, a health insurance scheme covering primarily teachers.. Part of the E3N cohort is also included in the European Prospective Investigation into Cancer and Nutrition

(EPIC). The women complete health questionnaires every 24 months. The study shows an increased risk of breast cancer associated with HRT use. The authors indicated an association between HRT use and breast cancer risk that most likely varies with the type of progestogen product used. There is little or no increase in breast cancer risk with estrogens used alone or combined with micronized progesterone over short periods. The increase in risk reached significance when estrogens were combined with synthetic progestins and was significantly greater than when combined with micronized progesterone. Overall, the relative risk did not vary according to the route of administration of estrogen. Even short durations of exposure were associated with significantly increased risks when estrogens were combined with synthetic progestins:<2years; and 2-4 years for transdermal/percutanous estrogens; 2-4 years for oral estrogens.

449. According to C. Crandall, et al (**Positive associations between mammographic breast density and bone mineral density in the Postmenopausal Estrogen/Progestin Interventions Study** *Breast Cancer Research* 7:R922-R928, 2005), the PEPI-MDS (PEPI Mammographic Density Study) was a substudy of 594 women who had been enrolled in PEPI, mean age 56 years, average time since menopause 5.6 years. PEPI-MDS obtained the pre-randomization conventional mammograms and all subsequent mammograms performed between 1989 and 1994 for the original PEPI study to quantify mammographic breast density. Breast density was defined as the percentage of the breast composed of dense tissue. The conventional mammograms were converted into digitized mammograms for software quantification of MDS. A yellow tint was applied by radiologist to all areas of digitized mammograms considered as “dense”. The software calculated the ratio of dense tinted area to the area of the breast.

450. Mammographic breast density has been considered a strong independent risk factor for breast cancer. PEPI had found that mammographic density was increased only in the arm with administration of combined estrogen and progestin (CHT), not in the estrogen alone or placebo arms. The relative risk (RR) of breast cancer increased by between 1.5% and 2% for each 1% increment of endogenous breast density. Even though breast density is a strong risk factor for breast cancer, the determinants for breast density are still poorly understood. The authors concluded that mammographic breast density was not associated with bone mineral density (BMD) in recent users of postmenopausal hormone therapy. This finding is consistent with there being a residual CHT effect on mammographic density.

451. A. McTiernan, *et al.* ( **Estrogen-Plus-Progestin Use and Mammographic Density in Postmenopausal Women: Women's Health Initiative Randomized Trial**, *Journ NCI*, 97(4): 1366-1376. September 21, 2005) wrote:

> Mammographic density refers to the relative proportion of white-appearing areas (presumptive connective and epithelial tissues) to dark-appearing areas (presumptive fatty tissue) in a mammogram. Increased density reduces the sensitivity of screening mammography. Women with the highest level of mammographic density have a four to five to six times higher risk of developing breast cancer than women with the lowest levels. Recent data indicate the risks of both estrogen receptor-positive and –negative breast cancer are higher in women with moderate to high mammographic density than in women with low mammographic density.
>
> Mammographic density declines after menopause, suggesting a hormonal etiology to breast density. Observational studies have reported higher mean density levels among current users of menopausal hormone therapy than among nonusers. A small number of clinical trials conducted primarily in non-Hispanic white women have reported a change toward increased density after initiation of various menopausal hormone regimens.
>
> *Results*: Mean mammographic percent density increased by 6.0% at year 1, compared with baseline, in the estrogen-plus-progestin group but decreased by 0.9% in the placebo group (difference=5.7%, 95% CI=4.3% to 7.3%;P<.001). These effects were consistent across racial/ethnic groups but were higher among women aged 70-79 years in the estrogen-plus-progestin group(mean increase at

year 1=11.6%) than in the placebo group (mean decrease at year 1=0.1%) (difference of the means =11.7%, 95% CI=8.2% to 15.4%; P<.001, comparing across age groups). At year 1, women who were adherent to treatment in the estrogen-plus-progestin group had a mean increase in density of 7.7% (95% CI=5.9% to 9.5%), and women in the placebo group had a mean decrease in breast density of 1.1% (95% CI=0.3% to 1.9%). Use of estrogen plus progestin was associated with an increased risk of having an abnormal mammogram at year 1 (relative risk=3.9, 95% CI=1.5 to 10.2; P=.003), compared to placebo, that was not explained by an increase in density. *Conclusions*: Use of up to 2 years of estrogen plus progestin was associated with increases in mammographic density.

452. A. Kavanagh, et al (**Hormone replacement therapy, percent mammographic density, and sensitivity of mammography** *Cancer Epidemiol Biomarkers Prev* 14(5): 1060-4, 2005) concluded that mammographic density only partly explains the effect of HRT on reduction of mammography sensitivity for postmenopausal women. In the 371 HRT users in the study (24% of sample) had the same sensitivity on mammography as the nonusers, then an additional 76 cancers would have been detected at screening. Adjusting for mammographic density modestly attenuated the effect of HRT, however, there still remained a strong, statistically significant residual effect of current HRT use on having a false-negative mammogram. HRT may be associated with production of subtle breast tissue changes, such as edema or vascular dilation which could potentially obscure tumors without causing an increase in measurable density. Using contrast-enhanced MRI has shown parenchymal enhancements during the secretory, menstrual and proliferative phases of the menstrual cycle breast, with strongest changes produced in the progestrogenic phases. As >80% of Australians use oral progesterone either sequentially or continually, mostly in conjunction with oral estrogen, this added weight to the plausibility of the explanation.

453. M. Pike (**The role of mammographic density in evaluating changes in the breast cancer risk.** *Gynecological Endocrinology*, 21 (Suppl 1):1-5, July 2005) wrote regarding the biology of breast cancer risk that the risk (incidence) of colorectal cancer and other non-

hormone dependent cancers of women increases steadily in a log-log linear fashion with increasing age. The risk of breast cancer does not increase in this fashion, after about age 50 years, breast cancer risk increases at a much slower rate. This slowing of the rate of increase has a large effect on risk. In discussing the findings of the WHI, the author wrote:

> These results were predicted more than 15 years ago based on the epidemiology of breast cancer and the relationship of ovarian hormone levels to breast cell proliferation. Despite being supported by the findings from an epidemiological study from Scandinavia published in 1992, and case reports of sharp increases in breast mammographic densities, the prediction was weakened by its theoretical nature and had little effect on prescribing habits or the search to bind alternative ways of delivering progestogen to the endometrium while minimizing progestogen exposure to the breast. It is proposed that increased mammographic breast density be used as a marker for investigation of increased breast cancer risk associated with estrogen-progestogen use.

454. K. Crouchley, et al (**Hormone Replacement therapy and mammographic screening outcomes in Western Australia** *Journ Medical Screening* 13(2):93-97, 2006) using a cohort of 113,310 women who had 119,296 screening episodes between January 1998 and December 1999. BreastScreen Western Australia (BSWA) is a free, population-based, mammographic screening service that targets women aged 50-69 years of age. The study's findings of reduced screening sensitivity is in agreement with previous research. In addition the authors found that the risk of having a false-negative screening episode was maintained after controlling for potential confounders and tumor characteristics.

455. A. Chiarell, et al. **(Influence of patterns of hormone replacement therapy use and mammographic density on breast cancer detection** *Cancer Epidemiol Biomarkers Prev* 15(10):1856-62, 2006) in a Canadian study with the Ontario Breast Screening Program (OBSP) of 431,480 women screened from 1994 through 2002, indicated that several studies have shown that current use of hormone replacement therapy (HRT) substantially lowered the sensitivity of screening compared with nonuse by 7% to 25% and resulted in a significant increase in interval

cancers. In recent studies, the increase in mammographic density associated with HRT use was more common in women taking combined estrogen and progesterone preparations compared to estrogen alone. Women with extremely dense beasts were found to have a 6-to9-fold increased risk of an interval cancer. In the OBSP population, there were 4,478 women with invasive breast cancer, 616 women were identified as interval cancers (cancer was not detected at time of screening). Although based on a small number of cases, the risk for true-interval cancers among women taking cyclical-combination HRT was significantly greater compared to the never user (OR, 5.04; 95% CI, 1.65-15.38). After adjusting for mammographic density, women taking estrogen alone had an almost 2-fold increased risk of being diagnosed with a true-interval cancer, whereas women taking combined HRT had a 2-fold increased risk of being diagnosed with a true-interval cancer or a 3-fold increased risk for a missed-interval cancer, compared with never users.

456. A. Fournier, et al. (**Unequal risks for breast cancer associated with different hormone replacement therapies: results from the E3N cohort study**. *Breast Cancer Res Trea*t January 2007) at the conclusion of the French cohort which utilized self-reporting by periodic questionnaire of women enrolled in the MGEN health insurance plan. The relative risk for MPA plus estrogen was 1.48 (1.02-2.16). In this population, only 1.3% used CEE. And there were 29 invasive breast cancers associated with estrogen combined with MPA. Overall, the highest risk for invasive breast cancer was CHT with a progestogen, with increasing risk with increasing time of use. The authors found that the risk of invasive breast cancer was significantly lower with estrogen-progestogen HRTs containing progesterone or dyhydrogesterone than with HRTs containing other progestagens. As to the types of CHT and role of MPA, the authors wrote that:

Recently, Wood et al. compared the effects of estradiol given with either medroxyprogesterone acetate or micronized progesterone on risk biomarkers for breast cancer in a postmenopausal primate model. In this randomized crossover trial, they found that, compared to placebo, estradiol + medroxyprogesterone acetate resulted in significantly greater proliferation (as measured by Ki67 expression) in lobular and ductal breast epithelium, while estradiol + micronized progesterone did not. This result supports our findings suggesting that, when combined with an estrogen, progesterone may have a safer risk profile in the breast compared with some other progestagens.

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 2 | 2/1/1942 | W-MDL04782-00014935 | W-MDL04782-00014940 | NEW DRUG APPLICATION "PREMARIN TABLETS" | | | |
| 3 | 5/7/1942 | W-MDL04782-00014963 | W-MDL04782-00014964 | FDA letter to Ayerst | | | |
| 4 | 5/16/1942 | W-MDL04782-00014968 | W-MDL04782-00014969 | Ayerst letter to American Drug Manufacturers Association | | | |
| 6 | 12/1/1972 | W-MDL04782-00015373 | W-MDL04782-00015375 | LIFE BEGINS AT FORTY | | | |
| 11 | 7/1/1973 | W-MDL04782-00015317 | W-MDL04782-00015325 | AT HER AGE ARE TRANQUILIZERS REALLY ENOUGH? | | | |
| 13 | 2/1/1973 | W-MDL04782-00015353 | W-MDL04782-00015363 | THERE"S A VOID IN THE LIFE OF MANY MIDDLE-AGED WOMEN. | | | |
| 14 | 00/00/1940 | BURRG002-000055 | BURRG002-000072 | Premarin | | | |
| 17 | 12/1/1973 | W-MDL04782-00016708 | W-MDL04782-00016715 | WHY STOP ESTROGEN REPLACEMENT THERAPY AFTER THE HOT FLUSHES HAVE SUBSIDED. WHEN THE DEFICIENCY IS STILL THERE? | | | |
| 20 | 2/27/1975 | W-MDL04782-00082752 | W-MDL04782-00082755 | Commentary | | | |
| 21 | 12/16/1975 | W-MDL04782-00027344 | W-MDL04782-00027513 | TRANSCRIPT OF PROCEEDINGS. OBSTETRICS AND GYNECOLOGY ADVISORY COMMITTEE | | | |
| 22 | 12/1/1975 | W-MDL04782-00064632 | W-MDL04782-00064633 | Dear Doctor Letter from Dr. Jewell; Depo: Robert Essner 6/29/06 EX 008: Dear Doctor Letter | | | |
| 24 | 1/12/1976 | W-MDL04782-00027339 | W-MDL04782-00027342 | MEMORANDUM OF CONFERENCE. Between: Ayerst Laboratories Mr. Charles Hagen, General Counsel Mr. M. Silverstein, Counsel Dr. J. B. Jewell, Executive Vice Pres. Medical Affairs Dr. G. J. Carallito, Executive Vice Pres. for Scientific Affairs Dr. Henry Perd; Depo: Robert Essner 6/29/06 EX 009: Memo of Conference; DEPO: Andrew Panagy 7/13/06 EX 004: Memo | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 28 | 6/14/1976 | W-MDL04782-00029233 | W-MDL04782-00029236 | Estrogens and Breast Cancer.; Depo: Constantine, Ginger 11/1/2005 EX 005: Estrogens and Breast Cancer.; Depo: Deitch, Marc 10/27/2005 EX 030: Estrogens and Breast Cancer.; Depo: Jane, Carol 7/14/2005 EX 007: Estrogens and Breast Cancer. | | | |
| 30 | 7/16/1976 | W-MDL04782-00029230 | W-MDL04782-00029231 | Estrogens and Mammary Cancer. | | | |
| 31 | 7/30/1976 | W-MDL04782-00029002 | W-MDL04782-00029002 | Letter from Robert Hoover, M.D. to George Brice, M.D., Director of Medical Affairs, Ayerst; Depo: Constantine, Ginger 11/1/2005 EX 003 | | | |
| 35 | 8/19/1976 | W-MDL04782-00029027 | W-MDL04782-00029032 | Statement of Ayerst Laboratories Regarding the Article "Menopausal Estrogen and Breast Cancer" in the 08191976, Issue of The New England Journal of Medicine | | | |
| 39 | 4/11/1985 | SONKJ012-000729 | SONKJ012-000766 | Report RA-85-03. Summary of Major for Activities Related to the Osteoporosis Indication for Estrogens | | | |
| 46 | 2/22/1979 | W-MDL04782-00032472 | W-MDL04782-00032473 | Letter from Barbara Hulka, M.D. to George Brice, M.D., Director of Medical Affairs, Ayerst | | | |
| 54 | 3/10/1980 | W-MDL04782-00032315 | W-MDL04782-00032316 | Consultation with Dr. Brian Macmahon Harvard School of Public Health | | | |
| 55 | 3/17/1980 | W-MDL04782-00032331 | W-MDL04782-00032333 | PREMARIN (R). Meeting with Dr. Brian Macmahon, School of Public Health, Harvard University, on the paper by Ross et al. | | | |
| 56 | 3/26/1980 | W-MDL04782-00032274 | W-MDL04782-00032275 | Public Relations Plan relating to the JAMA publication of Ross / Mack report on breast cancer and estrogen | | | |
| 58 | 4/25/1980 | DELCA008-000627 | DELCA008-000631 | A Case-Control Study of Menopausal Estrogen Therapy and Breast Cancer; Depo: DelConte, Anthony 6/20/06 EX 029: Case-Control Study of Menopausal ET and Breast Cancer | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 60 | 5/5/1981 | W-MDL04782-00032460 | W-MDL04782-00032462 | Estrogens and Breast Cancer Comments on Dr. Hulka's Preliminary Report; Depo: Dey, Michael 6/26/06 EX 029: Memo; Depo: Justin Victoria 6/30/06 EX 003: Internal Memo | | | |
| 66 | 3/9/1993 | W-IND-00000404 | W-IND-00000845 | Premarin IND 21-696, Book 2 | | | |
| 67 | 5/2/1983 | W-MDL04782-00058976 | W-MDL04782-00058977 | Premarin. Protocol Synopsis. Evaluation of Safety and Efficacy of Fixed Doses of Premarin and Medroxyprogesterone Acetate. Protocol No. 82-28-MD | | | |
| 68 | 9/15/1983 | W-MDL04782-00030691 | W-MDL04782-00030693 | Estrogens Workshop Sponsored by the NHLBI-NIH, 09131983 - 09141983.; Depo: Dey, Michael 6/26/06 EX 030: Memo | | | |
| 69 | 9/22/1983 | W-MDL04782-00059871 | W-MDL04782-00059872 | PREM-PAK. Desired Labeling and Indications. | | | |
| 70 | 12/8/1983 | W-MDL04782-00063068 | W-MDL04782-00063083 | CITIZEN"S PETITION | | | |
| 71 | 12/20/1983 | W-MDL04782-00063066 | W-MDL04782-00063067 | Citizen Petition by HRG (Estrogens Class Labeling) | | | |
| 73 | 2/7/1984 | W-MDL04782-00058978 | W-MDL04782-00058978 | Premarin + Medroxyprogesterone. Protocol Synopsis. Evaluation of Estrogen and Progesterone Receptors, DNA-Thymidine Uptake Labelling, and Estradiol Dehydrogenase in Patients Receiving Fixed Doses of Premarin and Medroxyprogesterone. Protocol No. 83-13-MD | | | |
| 76 | 5/21/1984 | W-MDL04782-00058980 | W-MDL04782-00058981 | Premarin. Protocol Synopsis. Evaluation of Efficacy of Fixed Doses of Premarin and Medroxyprogesterone Acetate. Protocol No. 84-912-MD | | | |
| 82 | 4/30/1985 | NORMJ006-000610 | NORMJ006-000610 | New Drug Submission P & P (Conjugated Estrogen Tablets & Medroxyprogesterone Acetate Tablets) | | | |
| 83 | 5/2/1985 | W-MDL527-00035136 | W-MDL527-00035137 | FDA Contact Report (NDA 20-527) | | | |
| 84 | 6/27/1985 | W-MDL04782-00009302 | W-MDL04782-00009302 | OGEN Promotion | | | |
| 85 | 6/28/1985 | W-IND-00003859 | W-IND-00004310 | Premarin IND 21-696, Amendment #7 | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 86 | 8/28/1985 | GPIL008-002282 | GPIL008-002286 | FDA letter to Abbott Laboratories regarding Ogen advertising and promotional materials | | | |
| 87 | 9/20/1985 | GPIL008-002293 | GPIL008-002295 | General Discussion - Ogen Advertising Follow-Up Notice of Violation NOV Letter 8/28/85 | | | |
| 89 | 00/00/1986 | W-HUSAK01-00001306 | W-HUSAK01-00001306 | Information for Patient "Two Benefits vs. a Risk of Estrogen Replacement Therapy" | | | |
| 98 | 10/00/1987 | CONNS014-001645 | CONNS014-001646 | Regarding effects of estrogen on the cardiovascular system; Depo: Robert Essner 6/29/06 EX 011; Depo: Jeanne Durocher 6/30/06 EX040 | | | |
| 102 | 8/7/1992 | W-MDL303-00081735 | W-MDL303-00081738 | FDA meeting minutes (NDA 20-303) | | | |
| 104 | 05/00/1988 | W-IND-00009083 | W-IND-00009110 | Premarin IND 21-696 Progress Report | | | |
| 108 | 12/28/1988 | W-IND-00006856 | W-IND-00006862 | Letter to FDA from Justin Victoria | | | |
| 111 | 03/00/1990 | YAVUE010-000664 | YAVUE010-000737 | Long-Term Effects of Estrogen Deprivation Proceedings of the Third Annual Symposium on the Long-Term Effects of Estrogen Deprivation | | | |
| 114 | 8/4/1989 | CONNS005-000346 | CONNS005-000346 | The New England Journal of Medicine Article Entitled: "The Risk of Breast Cancer after Estrogen and Estrogen-Progestin Replacement" | | | |
| 121 | 00/00/1990 | RYANJ002-000495 | RYANJ002-000523 | One of a Kind Premarin (Conjugated Estrogens Tablets, U.S.P.); Depo: Ryan, John 6/14/2005 EX 012 | | | |
| 122 | 00/00/1990 | PANAA030-001175 | PANAA030-001176 | Ideal Duration of ERT | | | |
| 130 | 1/25/1990 | VICTJ005-001705 | VICTJ005-001706 | FDA Advisory Committee HRT and Cancer; Depo: Deitch, Marc 10/26/2005 EX 009: FDA Advisory Committee HRT and Cancer | | | |
| 135 | 2/15/1990 | VICTJ005-001700 | VICTJ005-001703 | Fertility and Maternal Health Advisory Committee Meeting February 1, 1990; Depo: Justin Victoria 6/30/06 EX 005: Internal Memo | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 136 | 2/21/1990 | PANAA026-001571 | PANAA026-001572 | Premarin Cardiovascular Indication; Depo: Deitch, Marc 10/26/2005 EX 014: Premarin Cardiovascular Indication | | | |
| 140 | 6/6/1990 | PANAA010-000988 | PANAA010-001102 | The Fourth Annual Symposium on the Long Term Effects of Estrogen Deprivation June 4, 5, 6, 1990 San Dominico Palace Sicily, Italy Proceedings Session II ERT Risks: Metabolic and Neoplastic | | | |
| 144 | 8/22/1990 | PANAA034-001426 | PANAA034-001427 | Estrogen/Progestin Packaging; Depo: DelConte, Anthony 1/19/2006 EX 010; Depo: Pickar, James 9/20/2005 EX 019; Depo: Justin Victoria 6/30/06 EX 017: Internal Correspondence | | | |
| 150 | 01/00/1991 | DEYMI003-000013 | DEYMI003-000025 | What Every Women Should Know About Estrogen; Depo: Dey, Michael 11/4/2005 EX 016: What Every Women Should Know About Estrogen | | | |
| 152 | 1/10/1991 | DEYMI020-000790 | DEYMI020-000790 | Dose Relationship of Endometrial Cancer | | | |
| 154 | 2/25/1991 | W-MDL04782-00002391 | W-MDL04782-00002393 | FDA letter to Joseph Morrison, Wyeth-Ayerst; Depo: Deitch, Marc 10/27/2005 EX 021; Depo: Robert Essner 6/29/06 EX 014: Letter; DEPO: Andrew Panagy 7/13/06 EX 017: Letter | | | |
| 160 | 4/30/1991 | PANAA025-001866 | PANAA025-001867 | Dear Doctor Letter signed by Marc Deitch, M.D.; Depo: Deitch, Marc 10/27/2005 EX 029 | | | |
| 161 | 1/1/1991 | W-MDL04782-00036168 | W-MDL04782-00036185 | Seasons. Volume 1, Issue 1 | | | |
| 162 | 6/11/1991 | DEYMI020-000195 | DEYMI020-000271 | 5th Annual Symposium on the Long-Term Effects of Estrogen Deprivation; Depo: Dey, Michael 11/4/2005 EX 011 | | | |
| 168 | 7/16/1991 | PANAA034-001796 | PANAA034-001796 | Premarin CBL Program; Depo: Deitch, Marc 10/26/2005 EX 013; Depo: Robert Essner 6/29/06 EX 016: Premarin CBL Program | | | |
| 169 | 6/4/1991 | W-MDL04782-00050226 | W-MDL04782-00050226 | MEDICAL LECTURE SERIES DINNER MEETING | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 171 | 8/1/1991 | SINAM002-001012 | SINAM002-001017 | History of Premarin and Generic Conjugated Estrogens | | | |
| 184 | 1/23/1992 | PANAA014-001130 | PANAA014-001130 | Premarin Cardiovascular Labeling; Depo: Deitch, Marc 10/26/2005 EX 015; Depo: Robert Essner 6/29/06 EX 017: Premarin/CV Labeling; Depo: Justin Victoria 6/30/06 EX 016: Internal Correspondence | | | |
| 190 | 3/24/1992 | CONNS005-000121 | CONNS005-000126 | "Don't Know" -Menopause | | | |
| 191 | 3/24/1992 | HOLSN006-000703 | HOLSN006-000704 | FDA Meeting to Discuss DTC Promotion for Estrogen Product for Osteoporosis | | | |
| 192 | 4/20/1992 | ROSSC005-000271 | ROSSC005-000272 | Premarin | | | |
| 194 | 4/26/1992 | W-MDL303-00081836 | W-MDL303-00081836 | Premarin/Cardiovascular Labeling (NDA 20-303) | | | |
| 197 | 6/3/1992 | ROSSC005-000160 | ROSSC005-000161 | NDA 4-782; Depo: Deitch, Marc 10/27/2005 EX 024: NDA 4-782 | | | |
| 198 | 6/3/1992 | CONNS008-000980 | CONNS008-000982 | Premarin Seasons Magazine; Depo: Deitch, Marc 10/27/2005 EX 025: Premarin Seasons Magazine | | | |
| 199 | 6/8/1992 | ROSSC005-000162 | ROSSC005-000166 | Wyeth-Ayerst letter to FDA | | | |
| 202 | 6/29/1992 | CONNS005-000969 | CONNS005-000970 | Tactical Plans | | | |
| 205 | 7/21/1992 | ROSSC005-000092 | ROSSC005-000092 | NDA 4-782; Depo: Jane, Carol 7/14/2005 EX 016: NDA 4-782 | | | |
| 209 | 8/6/1992 | CONNS005-000046 | CONNS005-000047 | Premarin Help-Seeking Video | | | |
| 222 | 10/14/1992 | FISHG001-000201 | FISHG001-000214 | Medroxyprogesterone Acetate (MPA) : Interpretation of Studies in Laboratory Animals; Depo: Fisher, Gerald 11/22/2004 EX 137: Medroxyprogesterone Acetate (MPA) : Interpretation of Studies in Laboratory Animals | | | |
| 223 | 10/20/1992 | CONNS016-000199 | CONNS016-000201 | Heart and Estrogen-Progestin Replacement Study (HERS) Fact Sheet | | | |
| 226 | 11/17/1992 | CONNS005-000023 | CONNS005-000024 | Premarin Promotional Items PRM: 314 and PRM: 315 | | | |
| 227 | 12/22/1992 | W-MDL303-00008975 | W-MDL303-00009394 | New Drug Application (NDA 20-303); Volume 1.40 of 1.174 | | | |
| 231 | 2/24/1993 | W-MDL303-00082105 | W-MDL303-00082110 | Refusal to File Response (NDA 20-303) | | | |
| 238 | 5/12/1993 | CONNS003-000069 | CONNS003-000069 | OGEN Promotion | | | |
| 239 | 5/25/1993 | CONNS001-001434 | CONNS001-001436 | Trip Report | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 242 | 07/00/1993 | PANAA016-000938 | PANAA016-000945 | Health Words for Women what Every Woman Should Know about Estrogen and Breast Cancer | | | |
| 245 | 7/27/1993 | DEYMI020-001070 | DEYMI020-001143 | The Long-Term Effects of Estrogen Deprivation Seventh Annual Symposium | | | |
| 251 | 12/8/1993 | PANAA027-000562 | PANAA027-000562 | ECOG Breast Cancer Trial | | | |
| 252 | 12/30/1993 | CONNS022-000503 | CONNS022-000503 | Premarin/MPA NDA Amendment | | | |
| 253 | 11/00/1993 | PANAA016-000465 | PANAA016-000487 | Women's Health Moves to the Forefront | | | |
| 259 | 01/00/1994 | PANAA016-001028 | PANAA016-001029 | Healthwords for Women Executive Briefing Document | | | |
| 262 | 00/00/1994 | W-HUSAK02-00001911 | W-HUSAK02-00001940 | Manual "Osteoporosis - The Only Cure Is Prevention" | | | |
| 265 | 2/9/1994 | PANAA027-000561 | PANAA027-000561 | ECOG Breast Cancer Study | | | |
| 268 | 00/00/1994 | PANAA021-000192 | PANAA021-000195 | Wyeth District Manager's Leader's Guide POA 2 1994; Depo: Deitch, Marc 10/27/2005 EX 026: Wyeth District Manager's Leader's Guide POA 2 1994 | | | |
| 269 | 4/26/1994 | ROSSC005-000034 | ROSSC005-000038 | NDA 04-782 Premarin | | | |
| 279 | 10/31/1994 | BURRG002-000049 | BURRG002-000053 | History of Premarin; Depo: Robert Essner 6/29/06 EX 004; DEPO: Jean Meaney 7/11/06 EX 013 | | | |
| 288 | 2/16/1995 | W-MDL303-00083690 | W-MDL303-00083805 | Premarin/MPA Separate Tablets; Medical Officer's Review (NDA 20 303) | | | |
| 293 | 00/00/1995 | CONTA003-000676 | CONTA003-000725 | Estrogen Replacement Therapy (ERT) Hormone Replacement Therapy (HRT) | | | |
| 294 | 00/00/1995 | CONTA003-000847 | CONTA003-000903 | Marketing Strategy and Selling Issues | | | |
| 297 | 1/19/1995 | PANAA027-000892 | PANAA027-000892 | Letter from Max Borten, M.D., Harvard Medical School to Murry Greene, Wyeth | | | |
| 306 | 04/00/1995 | W-HUSAK01-00000373 | W-HUSAK01-00000382 | Powerpoint slides "Premphase: To Bleed or Not To Bleed" | | | |
| 307 | 4/26/1995 | PANAA027-000800 | PANAA027-000801 | The Good Housekeeping Guide to Women's Health | | | |
| 308 | 5/4/1995 | PANAA019-000679 | PANAA019-000684 | Overview: Premarin and Women's Health | | | |
| 321 | 7/18/1995 | PANAA031-000708 | PANAA031-000709 | Letter from Trudy Bush, M.D. to Editor, Modern Maturity | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 341 | 1/31/1996 | PICKJ007-001349 | PICKJ007-001349 | Breast Cancer Task Force Meeting 1/31/96; Depo: Pickar, James 9/20/2005 EX 073: Breast Cancer Task Force Meeting 1/31/96 | | | |
| 342 | 02/00/1996 | HENRL008-000280 | HENRL008-000299 | Seasons; Depo: Henry, Lesa 2/9/2005 EX 008: Seasons; Depo: Sinapi 8/29/2005 EX 022: Seasons | | | |
| 343 | 2/29/1996 | FISHG001-000074 | FISHG001-000096 | Premarin Line Extension Strategy; Depo: Fisher, Gerald 11/22/2004 EX 130: Premarin Line Extension Strategy | | | |
| 345 | 3/27/1996 | SOLOJ022-001040 | SOLOJ022-001042 | Cummings Study: Revised Strategic Recommendations; Depo: Mahady, Joseph 11/17/2005 EX 017: Cummings Study: Revised Strategic Recommendations | | | |
| 346 | 4/23/1996 | SOLOJ022-001373 | SOLOJ022-001374 | Bone Mineral Density Predicts the Risk of Breast Cancer in Older Women. The Study of Osteoporotic Fractures.; Depo: Zucal, Vincent 7/28/2005 EX 003: Bone Mineral Density Predicts the Risk of Breast Cancer in Older Women. The Study of Osteoporotic Fractures. | | | |
| 349 | 4/28/1996 | SOLOJ022-001019 | SOLOJ022-001019 | Breast CA | | | |
| 350 | 5/10/1996 | CONNS014-000210 | CONNS014-000211 | Premarin Labeling | | | |
| 351 | 6/26/1996 | DUROJ023-000528 | DUROJ023-000528 | Parkland PHS Issue -Reply | | | |
| 355 | 1/1/1996 | PICKJ007-001296 | PICKJ007-001306 | Breast Cancer and Hormone Replacement Therapy: A Medical Judgement | | | |
| 356 | 8/22/1996 | PICKJ007-001310 | PICKJ007-001310 | Toltzis Communications Inc.Proposal 90072WAI | | | |
| 357 | 8/27/1996 | PICKJ007-001311 | PICKJ007-001311 | Purchase Order Attachment. Prepare Manuscript Breast Cancer & HRT | | | |
| 358 | 9/9/1996 | PICKJ007-001287 | PICKJ007-001287 | Request from Dr. Freitas, Brazil for support from Wyeth to attend Menopause Congress | | | |
| 360 | 12/3/1996 | PICKJ009-001232 | PICKJ009-001233 | Breast Cancer and Hormone Replacement Therapy | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 361 | 12/20/1996 | STRIS004-000183 | STRIS004-000184 | Business Brief - December; Depo: Strickland 9/8/2005 EX 005: Business Brief - December; Depo: Robert Essner 6/29/06 EX 021: Memo; DEPO: Nick Marmontello 7/28/06 EX 008: Letter | | | |
| 365 | 01/00/1997 | CHOOM018-000033 | CHOOM018-000043 | Growth through InterventionPOA I 1997; Depo: Robert Essner 6/29/06 EX 019 | | | |
| 378 | 07/00/1997 | STRIS001-000034 | STRIS001-000045 | For Four Decades, Her Body Supplied All the Estrogen She Needed.; Depo: Jane, Carol 7/14/2005 EX 017: For Four Decades, Her Body Supplied All the Estrogen She Needed.; Depo: Sorrentino, Matthew 5/3/2006 EX 006: For Four Decades, Her Body Supplied All the Estrogen She Needed.; Depo: Strickland 9/8/2005 EX 004: For Four Decades, Her Body Supplied All the Estrogen She Needed. | | | |
| 386 | 11/12/1997 | W-MDL303-00084714 | W-MDL303-00084714 | Correspondence re: NDA and investigation of breast cancer risk (NDA 20-303) | | | |
| 391 | 00/00/1997 | LUDMG002-001711 | LUDMG002-001731 | Executive Summary; Depo: Ludmerer, Gail 5/25/2005 EX 007: Executive Summary | | | |
| 393 | 00/00/1998 | ROSSC001-000773 | ROSSC001-000790 | Wyeth-Ayerst Comments to 1998 Draft Guidance Entitled "Labeling Guidance for Non-Contraceptive Estrogen Drug Products-Physician and Patient Labeling" | | | |
| 395 | 1/13/1998 | W-MDL04782-00094080 | W-MDL04782-00094081 | FDA Contact; Depo: Robert Essner 6/29/06 EX 023: Memo | | | |
| 397 | 02/00/1998 | W-HUSAK01-00001021 | W-HUSAK01-00001028 | Clinical Courier "Cardiovascular Disease in Women" | | | |
| 400 | 2/17/1998 | CONNS003-000235 | CONNS003-000238 | Evista (Raloxifene HCl) | | | |
| 404 | 3/3/1998 | CONNS014-000949 | CONNS014-000950 | Contact Report Premarin NDA 04-782 | | | |
| 406 | 4/30/1998 | W-MDL04782-00095313 | W-MDL04782-00095314 | FDA Contact Report | | | |
| 408 | 5/12/1998 | SOLOJ023-000870 | SOLOJ023-000892 | Myths and Misperceptions Breast Cancer and HRT | | | |
| 412 | 00/00/1998 | SOLOJ023-000976 | SOLOJ023-000984 | Cardiovascular Disease in Women | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 417 | 8/12/1998 | VICTJ001-001843 | VICTJ001-001848 | Meeting Report FDA/Wyeth Ayerst Meeting on the Heart and Estrogen / Progestin Replacement Study (HERS) | | | |
| 418 | 8/14/1998 | CONNS014-001103 | CONNS014-001103 | Premarin-NDA No. 04-782/S-106 "Other Health Benefits- 'Cardiovascular'" "Not Approvable" | | | |
| 422 | 09/00/1998 | CONKJ012-000765 | CONKJ012-000818 | Therapeutic Options for Menopausal Health Monograph | | | |
| 428 | 09/00/1998 | W-HUSAK02-00000076 | W-HUSAK02-00000094 | Patient booklet "Discover more about menopause and estrogen replacement therapy" | | | |
| 435 | 10/15/1998 | LUDMG003-000423 | LUDMG003-000426 | Summary of HERS Data - Impact on Physicians; Depo: Ludmerer, Gail 5/25/2005 EX 003: Summary of HERS Data - Impact on Physicians | | | |
| 439 | 11/10/1998 | FARAN015-000894 | FARAN015-000894 | Revised Final Year 1998 Flowcharts | | | |
| 440 | 11/11/1998 | HENRL002-000657 | HENRL002-000657 | Premarin DTC Print for February; Depo: Weber, Margaret 6/21/06 EX 053: Internal correspondence | | | |
| 446 | 11/13/1998 | HENRL005-001388 | HENRL005-001388 | Wyeth-Ayerst HRT Unbranded TV Schedule-Rev 1 | | | |
| 457 | 11/13/1998 | JANEC010-000163 | JANEC010-000166 | Office Of Global Business Affairs – 1999 Business Plan | | | |
| 461 | 00/00/1999 | HENRL005-000603 | HENRL005-000617 | The Role of the Consumer; Depo: Henry, Lesa 2/9/2005 EX 007: The Role of the Consumer | | | |
| 462 | 01/00/1999 | W-HUSAK01-00000786 | W-HUSAK01-00000819 | Cardiovascular Disease/Lipids Backgrounder | | | |
| 472 | 2/25/1999 | CONSG001-002027 | CONSG001-002046 | Tuning in on Hers: An Engineering Perspective | | | |
| 473 | 4/5/1999 | PICKJ020-001968 | PICKJ020-001969 | HERS Resources | | | |
| 475 | 5/7/1999 | PICKJ023-002677 | PICKJ023-002680 | Post-HERS Publication Strategy; Depo: Pickar, James 9/20/2005 EX 099: Post-HERS Publication Strategy | | | |
| 477 | 7/12/1999 | CONTA007-000688 | CONTA007-000716 | Wyeth-Ayerst Women's Health Care: 2000 Tactical Development for Menopausal Health | | | |
| 500 | 1/6/2000 | CONSG007-000045 | CONSG007-000046 | HERS Fracture Paper | | | |
| 502 | 01/00/2000 | CONSG007-000075 | CONSG007-000078 | Fracture paper comments | | | |
| 503 | 01/00/2000 | CONSG007-000113 | CONSG007-000114 | Comments on fracture paper | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 505 | 1/11/2000 | ROSSC001-000328 | ROSSC001-000330 | Premarin (Conjugated Estrogens Tablets, USP) NDA No. 04-782 Special Supplement - Changes Being Effected | | | |
| 507 | 1/18/2000 | DUROJ023-001712 | DUROJ023-001712 | Strategic Publications Development Meeting Meeting Recap; Depo: Cobb , Pamela 11/17/2005 EX 026; Depo: Mittleman, Karen 5/3/2006 EX 128, 278 | | | |
| 530 | 03/00/2000 | W-HUSAK01-00001019 | W-HUSAK01-00001020 | Keeping a balanced perspective on breast cancer risk - leave behind detail piece | | | |
| 531 | 3/20/2000 | CONSG001-000435 | CONSG001-000435 | Fracture Paper | | | |
| 536 | 04/00/2000 | VICTJ001-001155 | VICTJ001-001188 | Best Clinical Practices Chapter 13 from the International Position Paper on Women's Health and menopause: A Comprehensive Approach | | | |
| 542 | 05/00/2000 | W-HUSAK01-00000681 | W-HUSAK01-00000688 | Symposium Highlights - Hormone Replacement Therapy in the Cardiovascular System | | | |
| 544 | 06/00/2000 | HENRL011-000502 | HENRL011-000509 | Consequence of Menopause Lecture Guide | | | |
| 546 | 1/9/2001 | DEMAE023-000059 | DEMAE023-000061 | List of studies being funded by Wyeth | | | |
| 555 | 7/6/2000 | W-MDL04782-00128935 | W-MDL04782-00128937 | Inadequacy Letter | | | |
| 561 | 8/10/2000 | ROSSC001-000349 | ROSSC001-000350 | NDA 4-782 | | | |
| 563 | 8/16/2000 | W-MDL303-00085228 | W-MDL303-00085229 | Request for labeling change (NDA 20-303) | | | |
| 565 | 9/29/2000 | ROSSC001-000337 | ROSSC001-000339 | NDA No. 04-782 Premarin (Conjugated Estrogens Tablets, USP) NDA No. 10-402 Premarin Intravenous (Conjugated Estrogens, USP) for Injection NDA No. 10-971 PMB (Conjugated Estrogens / Meprobamate) Tablets NDA No. 11-074 Premarin H-C (Conjugated Estrogens / H | | | |
| 566 | 10/17/2000 | ROSSC001-000334 | ROSSC001-000335 | FDA Telephone Contact. Premarin NDA 04-782 Prempro NDA 20-527 | | | |
| 568 | 10/26/2000 | CHOOM001-002318 | CHOOM001-002323 | Wyeth publication plan; Depo: Speroff, Leon 6/30/2005 EX 007 | | | |
| 574 | 12/00/2000 | W-ADSBRO-001142 | W-ADSBRO-001155 | Physician advertisement "Her Questions, Your Answers" | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 580 | 12/27/2000 | HOLSN004-000403 | HOLSN004-000416 | What every Woman should Know about Estrogen/Hormone Replacement Therapy (ERT/HRT) | | | |
| 583 | 00/00/2001 | PANAA001-000816 | PANAA001-000842 | Premarin Family Forecast 2001-2012 | | | |
| 585 | 2/7/2001 | CONTA023-006750 | CONTA023-006762 | Powerpoint slides on Publication Planning and Management; Alice Perrone 8/30/06 DEPO EX 014: PPT presentation | | | |
| 598 | 1/27/2001 | W-HUSAK02-00000095 | W-HUSAK02-00000107 | Dear Doctor Letter signed by Margaret Weber, M.D. | | | |
| 599 | 11/16/1998 | STRIS017-000076 | STRIS017-000099 | Powerpoint slides "Rationale for Lowering HRT Doses" | | | |
| 600 | 2/1/2001 | DUROJ017-001087 | DUROJ017-001092 | Deskside Briefing Media Response Fact Sheet | | | |
| 603 | 5/9/2001 | STRIS016-047973 | STRIS016-047978 | AHP Authorization Request for Pre-Launch and Launch activities for Premia .45/1.5 mg | | | |
| 612 | 00/00/1999 | VICTJ001-001064 | VICTJ001-001065 | MD/Patient Learnings | | | |
| 625 | 7/2/2001 | VICTJ001-002141 | VICTJ001-002143 | Hormone Replacement Therapy and Cardiovascular Disease Media Plan | | | |
| 627 | 7/16/2001 | BURKM029-024148 | BURKM029-024149 | Justification Document, label revision WHI; Depo: Olivier, Sophie 9/14/2005 EX 007 | | | |
| 662 | 6/14/2002 | DUROJ046-010953 | DUROJ046-010956 | 2002 Estimated Budget for Seasons | | | |
| 681 | 2/7/2002 | CONKJ003-000150 | CONKJ003-000150 | email re HERS; Depo: Poussot, Bernard 5/31/06 EX 022: Email from Petkus | | | |
| 683 | 2/7/2002 | CONKJ003-000151 | CONKJ003-000151 | Response to editorial in USA Today | | | |
| 697 | 4/3/2002 | CONKJ018-056069 | CONKJ018-056074 | Business Unit Name; Depo: DelConte, Anthony 1/19/2006 EX 006: Business Unit Name | | | |
| 705 | 4/11/2002 | CONTA004-000008 | CONTA004-000011 | Hormone Symposium | | | |
| 708 | 4/23/2002 | CONTA025-027130 | CONTA025-027130 | Re: NEJM, JAMA, Lancet - former editors - follow-up | | | |
| 712 | 5/1/2002 | DUROJ046-018053 | DUROJ046-018053 | JAMA - request to meet with editor | | | |
| 713 | 5/1/2002 | DUROJ046-018067 | DUROJ046-018067 | 24-Apr-02 | | | |
| 719 | 5/20/2002 | CONTA025-017717 | CONTA025-017722 | Adis Manuscript Template | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 722 | 5/21/2002 | SENDM009-000252 | SENDM009-000258 | Communication Messages: Premarin / Trimegestone Combination; Depo: Cobb , Pamela 11/17/2005 EX 003: Communication Messages: Premarin / Trimegestone Combination; Depo: Weber, Margaret 6/21/2005 EX 035: Communication Messages: Premarin / Trimegestone Combination | | | |
| 724 | 11/16/1998 | CONSG018-032099 | CONSG018-032134 | Powerpoint slides "Scientific Update: What's New?" | | | |
| 738 | 6/27/2002 | CONTA013-000420 | CONTA013-000433 | Minutes From the Menopausal Health Publication Management Meeting June 27, 2002; Depo: Xue, Songlin 6/9/06 EX 058: Menopausal Health Publication Management Meeting Minutes | | | |
| 741 | 7/1/2002 | CONTA025-019619 | CONTA025-019619 | FW: 3rd Annual Conference Session | | | |
| 746 | 7/15/1997 | FISHG004-001350 | FISHG004-001373 | American Home Products Corporation | | | |
| 753 | 7/1/2002 | OLIVS014-001893 | OLIVS014-001902 | Overall WHI design Review HRT trial; Depo: Olivier, Sophie 9/14/2005 EX 020: Overall WHI design Review HRT trial | | | |
| 758 | 7/18/2002 | DUROJ046-010671 | DUROJ046-010671 | Hi Jamie; Depo: Speroff, Leon 6/30/2005 EX 059 | | | |
| 786 | 9/3/2002 | SENDM009-000225 | SENDM009-000235 | Preclinical and Clinical Experience with Trimegestone a Novel New Progestin; Depo: Cobb , Pamela 11/17/2005 EX 015; Depo: Weber, Margaret 6/21/2005 EX 026 | | | |
| 824 | 1/2/2003 | PARKA008-000257 | PARKA008-000303 | Premarin Family U.S. Marketing Plan Women's Health Care Marketing Plan | | | |
| 839 | 5/12/2003 | LEVIG002-005601 | LEVIG002-005602 | Business Unit Name | | | |
| 858 | 5/3/2004 | DEYMI202-000082 | DEYMI202-000083 | Handwritten letter on Robert Becker stationery | | | |
| 900 | 10/09/0000 | SOLOJ023-000519 | SOLOJ023-000522 | Proposed Satellite Symposia and Plenary Sessions Educational Activities with Clinical Couriers and Check Studies 1998 Budget Summary | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 910 | 3/10/1998 | SOLOJ025-000286 | SOLOJ025-000355 | The US Market: A Case Study in the Success of Changing the HRT Paradigm; Depo: Solomon, Jeffrey 1/26/2006 EX 007: The US Market: A Case Study in the Success of Changing the HRT Paradigm; Depo: Strickland 9/8/2005 EX 003: The US Market: A Case Study in the Success of Changing the HRT Paradigm | | | |
| 922 | 12/1/1975 | W-MDL04782-00064631 | W-MDL04782-00064631 | Letter from Ayerst to pharmacists | | | |
| 923 | 8/26/1998 | W-MDL527-00039573 | W-MDL527-00039577 | Correspondence re: launch materials for EZ Dial Dispenser (NDA 20-527) | | | |
| 929 | 9/22/1999 | BURKM015-000097 | BURKM015-000102 | Prempro/Premphase (Conjugated Estrogens/Medroxyprogesterone Acetate Tablets) NDA No. 20-527 Special Supplement - Changes being Effected | | | |
| 930 | 10/21/1999 | W-MDL527-00040231 | W-MDL527-00040233 | FDA Contact Report (NDA 20-527) | | | |
| 931 | 1/6/2000 | HOLSN006-000162 | HOLSN006-000163 | Labeling. Prempro Physician Labeling (6096-01 issued January 6, 2000) | | | |
| 935 | 1/22/1988 | PICKJ011-003007 | PICKJ011-003008 | Letter from Penny Budoff, M.D. to James Pickar, M.D. | | | |
| 936 | 6/8/2002 | CONTA025-020958 | CONTA025-020959 | re: GBT and Publication planning; Depo: Mittleman, Karen 5/2/2006 EX 013: re: GBT and Publication planning; Jeannemarie Durocher 8/2/06 DEPO EX 067: Email | | | |
| 937 | 3/15/1997 | DWRITE 065923 | DWRITE 064941 | Premarin Publication Program; Depo: Sendi, Mary 5/19/06 EX 004: Premarin Publication Program; Depo: Weber, Margaret 6/21/06 EX 055: Premarin Publication program; Jeannemarie Durocher 8/2/06 DEPO EX 073: Premarin Publication Program | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 938 | 11/20/1998 | DWRITE 065952 | | Design Write 1998 proposal; Depo: Weber, Margaret 6/21/06 EX 056: Premarin Family Study Management Plan; Depo: Sendi, Mary 5/19/06 EX 005: Premarin Family of Products Study Management Plan; Depo: Cobb, Pamela 6/23/06 EX 006: Dwrite proposal; Jeannemarie Durocher 8/2/06 DEPO EX 071: Study Management Plan | | | |
| 940 | 10/26/2000 | HENRL025-001651 | HENRL025-001653 | Premarin Family State of the Business Meeting Outline | | | |
| 942 | 11/6/2001 | DUROJ023-001689 | DUROJ023-001696 | Estrogens and the Skin Draft Outline Author and Target Journal TBD | | | |
| 945 | 00/00/1998 | DUROJ037-000183 | DUROJ037-000227 | ERT/HRT Franchise Three Year Strategic Plan 1996 - 1998 | | | |
| 949 | 00/00/2000 | DUROJ007-000004 | DUROJ007-000148 | Volume 3 Slide Kit & Lecture Guide | | | |
| 954 | 5/13/2002 | CONTA025-022310 | CONTA025-022311 | Menopausal Health Pub Mgt Agenda | | | |
| 955 | 11/15/2001 | CONTA025-024637 | CONTA025-024638 | update on National Hormone Council; Depo: Lynch, Rosie 5/4/2006 EX 035: update on National Hormone Council | | | |
| 956 | 6/25/2002 | CONTA025-019892 | CONTA025-019893 | Potential Slides to Describe and Emphasize the Importance | | | |
| 1280 | 2/2/1990 | CONNS017-000032 | CONNS017-000035 | Summary Minutes | | | |
| 1329 | 00/00/0000 | CONTA013-000914 | CONTA013-000915 | Womens HOPE Clinical Trial Publications: Initial 2nd Year Papers | | | |
| 1495 | 2/2/1990 | VICTJ005-001704 | VICTJ005-001704 | 2/1 Advisory Committee Meeting; Depo: DelConte, Anthony 1/19/2006 EX 002; Fred Hassan 12/16/06 DEPO EX 010: Memo | | | |
| 1567 | 7/17/1989 | GPIL009-001533 | GPIL009-001534 | Premarin Advocate Meeting | | | |
| 1573 | 1/23/1995 | PICKJ021-002474 | PICKJ021-002475 | Womens Health Initiative (WHI) Update PEPI Influence | | | |
| 1592 | 2/28/1996 | DEMAE007-002654 | DEMAE007-002654 | Third Party Support for WHI | | | |
| 1655 | 2/15/1984 | W-MDL04782-00059874 | W-MDL04782-00059876 | FDA Fertility and Maternal Health Advisory Committee Memo | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 3591 | 10/14/1992 | FISHG001-000201 | FISHG001-000220 | Depo: Fisher, Gerald 11/22/2004 EX 137: Medroxyprogesterone Acetate (MPA) : Interpretation of Studies in Laboratory Animals | | | |
| 3592 | 9/21/1992 | FISHG001-000256 | FISHG001-000257 | Depo: Fisher, Gerald 11/22/2004 EX 138: Premarin MPA | | | |
| 3594 | 00/00/0000 | FISHG001-000273 | FISHG001-000276 | Depo: Fisher, Gerald 11/22/2004 EX 140: Medroxyprogesterone Acetate Occurrence of Pancreatic Hyperplasia and Neoplasia in Rats | | | |
| 3595 | 8/25/1992 | FISHG001-000341 | FISHG001-000341 | Depo: Fisher, Gerald 11/22/2004 EX 142: Premarin/MPA | | | |
| 3956 | 00/00/0000 | SOLOJ010-000819 | SOLOJ010-000825 | Depo: Henry, Lesa 2/9/2005 EX 014: Product Strategy Input Template. Product: Premarin Family | | | |
| 5177 | 5/14/1992 | PANAA036-001536 | PANAA036-001559 | Depo: Ryan, John 6/14/2005 EX 011: Seasons Subscribers Tracking; Fred Hassan 12/16/06 DEPO EX 013 | | | |
| 5785 | 11/19/1970 | NDA-PRO-0001475 | NDA-PRO-0001475 | Dear Doctor Letter from Upjohn | | | |
| 5959 | 5/16/1942 | W-MDL04782-00014967 | W-MDL04782-00014969 | Letter to Mr. Carson Frailey @ American Drug Manufacturers Association; Depo: Robert Essner 6/29/06 EX 003: Letter | | | |
| 5974 | 12/1/1973 | W-MDL04782-00016708 | W-MDL04782-00016708 | WHY STOP ESTROGEN REPLACEMENT THERAPY AFTER THE HOT FLUSHES HAVE SUBSIDED. WHEN THE DEFICIENCY IS STILL THERE? | | | |
| 7098 | 7/12/2001 | W-MDL527-00048273 | W-MDL527-00048281 | Depo: Robert Essner 6/29/06 EX 036: ACOG Newsletter; Depo: Jeanne Durocher 6/30/06 EX039: transmittal of Advertisements and Promotional Labeling for Drugs and Biologics for Human Use | | | |
| 7182 | 00/00/0000 | SOLOJ025-000286 | SOLOJ025-000355 | Depo: Jeanne Durocher 6/30/06 EX046: The US Market: A Case Study in the Success of Changing the HRT Paradigm | | | |
| 0022C | 8/4/1989 | W-MDL04782-00033664 | W-MDL04782-00033664 | Wyeth Dear Doctor Letter signed by Joel Lippman, M.D. | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 0022D | 12/3/1990 | PANAA025-001943 | PANAA025-001945 | Wyeth Dear Doctor Letter signed by Marc Deitch, M.D. | | | |
| 0022E | 3/18/1993 | CONNS001-000654 | CONNS001-000656 | Dear Doctor letter – signed by Rofsky | | | |
| 0192A | 00/00/1995 | GOLDG001-001435 | GOLDG001-001436 | Field Sales Promotional Policy 511 | | | |
| 0242B | 10/00/1992 | PANAA016-000922 | PANAA016-000929 | Health Words for Women Mammograms: The Very Best Defense Against Breast Cancer | | | |
| 0242C | 01/00/1992 | PANAA016-000914 | PANAA016-000921 | Health Words for Women "Brittle Bones - How to Avoid Bad Breaks as you Get Older | | | |
| 0242D | 04/00/1993 | PANAA016-000930 | PANAA016-000937 | Health Words for Women Bothered by Mood Swings? They're Often Preventable | | | |
| 0242F | 10/00/1993 | PANAA016-000946 | PANAA016-000953 | Health Words for Women the Truth about Ovarian Cancer | | | |
| 0950B | 7/27/2000 | DWRITE 066935 | | Strategic Publications Development Meeting | | | |
| 0950C | 08/00/2000 | DWRITE 003353 | | Project Assignment Form | | | |
| 0950D | 10/3/2000 | DWRITE 066449 | | Payment to Pruiett | | | |
| 0950E | 8/13/2001 | MARTN010-010296 | MARTN010-010297 | Strategic Publications Development Meeting | | | |
| 0950F | 8/20/2001 | SOLOJ027-048916 | SOLOJ027-048917 | Strategic Publications Development Meeting | | | |
| 0950G | 1/28/2002 | DWRITE 067253 | | Strategic Publications Development Committee: | | | |
| 0950H | 3/4/2002 | DWRITE 066322 | | Strategic Publication Plan Tracking Report | | | |
| 1659A | 00/00/0000 | ROSSC001-000356 | ROSSC001-000366 | FDA proposed labeling for breast cancer | | | |
| 10126 | 00/00/1961 | NDA-PRO 0023643 | NDA-PRO 0023755 | Brook Lodge Symposium: Progesterone, 1961 | | | |
| 10133 | 00/00/0000 | NDA-PRO 0029068 | NDA-PRO 0029068 | Promotional material: the benefits | | | |
| 10425 | 11/7/2000 | BURKM015-000087 | BURKM015-000089 | Arnold & Porter letter to FDA | | | |
| M0002 | 6/25/2003 | | | | Chlebowski, RT, Hendrix, SL, Langer, RD, Stefanick, ML, Gass, ML, Lane, DS, Rodabough, RJ, Gilligan, MA, Cyr, MG, Thomson, CA, Khandekar, J, Petrovitch, H, McTiernan, A, WHI Investigators | Influence of estrogen plus progestin on breast cancer and mammography in healthy postmenopausal women: the Women's Health Initiative Randomized Trial. | JAMA 2003;289:3243-53 289(24):3243-53. |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| M0022 | 10/11/1997 | | | | Collaborative Group on Hormonal Factors in Breast Cancer (Beral), | Breast cancer and hormone replacement therapy: collaborative reanalysis of data from 51 epidemiological studies of 52,705 women with breast cancer and 108,411 women without breast cancer. Collaborative Group on Hormonal Factors in Breast Cancer. . | Lancet. 1997 Oct 11;350(9084):1047-59 |
| M0030 | 7/17/2002 | | | | Writing Group WHI, Writing Groups for the Women's Health Initiative Investigators | Risks and benefits of estrogen plus progestin in healthy postmenopausal women: principal results From the Women's Health Initiative randomized controlled trial. | JAMA. 2002 Jul 17 288(3):321-33. |
| M0098 | 2/16/2000 | | | | Ross, RK, Paganini-Hill, A, Wan, PC, Pike, MC, | Effect of hormone replacement therapy on breast cancer risk: Estrogen versus estrogen plus progestin. | J Natl Cancer Inst 2000;92:328-332 |
| M0210 | 1/1/2002 | | | | de Lignieres, B, Vathaire, F, Fournier, S, Urbinelli, R, Allaert, F, Le, M Kuttenn, F | Combined hormone replacement therapy and risk of breast cancer in a french cohort study of 3175 women. | Climacteric 2002;5:332-40 |
| M0539 | 1/1/1961 | | | | Riviere, M Chouroulinkovi, I, Guerin, M | [Appearance of mammary tumors in the male rat subjected to combined estrogen and progesterone treatment] French article. | C R Seances Soc Biol Fil 1961;155:2102-4 |
| M0600 | 8/3/1989 | | | | Bergkvist, L, Adami, HO, Persson, I, Hoover, R, Schairer, C | The risk of breast cancer after estrogen and estrogen-progestin replacement. | N Engl J Med. 1989 Aug 3;321(5):293-7 |
| M1200 | 11/5/1973 | | | | Coronary Drug Project Research Group | The Coronary Drug Project: findings leading to discontinuation of the 2.5-mg/day estrogen group. | J Am Med Assoc. 1973 November 5;226(6):652-7 |
| M1401 | 1/1/2003 | | | | Greendale, GA, Reboussin, BA, Slone, S, Wasilauskas, C, Pike, MC, Ursin, G | Postmenopausal hormone therapy and change in mammographic density. | J Natl Cancer Inst. 2003 Jan 1;95(1):30-7 |
| M1423 | 2/1/2001 | | | | McCarty, MF | Androgenic progestins amplify the breast cancer risk associated with hormone replacement therapy by boosting IGF-I activity. | Med Hypotheses. 2001 Feb;56(2):213-6 |
| M1977 | 8/19/1976 | | | | Hoover R, Gray LA Sr, Cole P, MacMahon B, | Menopausal estrogens and breast cancer. | N Engl J Med. 1976 Aug 19;295(8):401-5 |
| M2046 | 12/4/1975 | | | | Smith DC, Prentice R, Thompson DJ, Herrmann WL, | Association of exogenous estrogen and endometrial carcinoma. | N Engl J Med. 1975 Dec 4;293(23):1164-7 |
| M2068 | 12/4/1975 | | | | Ziel HK, Finkle WD, | Increased risk of endometrial carcinoma among users of conjugated estrogens. | N Engl J Med. 1975 Dec 4;293(23):1167-70 |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| M2099 | 4/10/2005 | | | | Fournier A, Berrino F, Riboli E, Avenel V, Clavel-Chapelon F., , | Breast cancer risk in relation to different types of hormone replacement therapy in the E3N-EPIC cohort. | Int J Cancer. 2005 Apr 10;114(3):448-54 |
| M2343 | 7/1/1987 | | | | Hunt K, Vessey M McPherson K, Coleman M. | Long-term surveillance of mortality and cancer incidence in women receiving hormone replacement therapy. | Br J Obstet Gynaecol. 1987 Jul;94(7):620-35. |
| M2518 | 5/1/2005 | | | | Kavanagh AM Cawson J, Byrnes GB, Giles GG, Marr G, Tong B, Gertig DM Hopper JL. | Hormone replacement therapy, percent mammographic density, and sensitivity of mammography. | Cancer Epidemiol Biomarkers Prev. 2005 May;14(5):1060-4. |
| M2826 | 12/15/2004 | | | | Missmer SA, Eliassen AH, Barbieri RL, Hankinson SE. | Endogenous estrogen, androgen, and progesterone concentrations and breast cancer risk among postmenopausal women. | J Natl Cancer Inst. 2004 Dec 15;96(24):1856-65. |
| M3476 | 9/21/2005 | | | | McTiernan A, Martin CF, Peck JD, Aragaki AK, Chlebowski RT, Pisano ED, Wang CY, Brunner RL, Johnson KC, Manson JE, Lewis CE, Kotchen JM Hulka BS; Women's Health Initiative Mammogram Density Study Investigators. | Estrogen-plus-progestin use and mammographic density in postmenopausal women: women's health initiative randomized trial. | J Natl Cancer Inst. 2005 Sep 21;97(18):1366-76. |
| M3482 | 7/1/2005 | | | | Pike MC. | The role of mammographic density in evaluating changes in breast cancer risk | Gynecol Endocrinol. 2005 Jul;21 Suppl 1:1-5 |
| M4100 | 1/1/1996 | | | | Williams CL, Stancel GM | Chapter 57: Estrogens and Progestins | IN: Goodman and Gilman's The Pharmacological Basis of Therapeutics, 9th ed., 1996 McGraw-Hill:1411-1440 |
| MA2347 | 09/00/1979 | | | | Gambrell RD, Massey FM Casaneda TA, Ugenas AJ, Ricci CA | Reduced incidence of endometrial cancer among postmenopausal women treated with progestogens | J Am Geriatr Soc 1979 Sep;27(9):389-94 |
| MA3451 | 7/1/2006 | | | | Crouchley K, Wylie E, Khong E | Hormone replacement therapy and mammographic screening outcomes in Western Australia. | J Med Screen 2006;13(2):93-7 |
| MA4001 | 10/1/2006 | | | | Chiarelli AM Kirsh VA, Klar NS, Shumak R, Jong R, Fishell E, Yaffe MJ, Boyd NF. | Influence of patterns of hormone replacement therapy use and mammographic density on breast cancer detection. | Cancer Epidemiol Biomarkers Prev. 2006 Oct;15(10):1856-62. |
| MA4120 | 12/10/2003 | | | | Schindler A, Campagnoli C, Drukmann R, Huber J, Pasqualini J, Schweppe KW, Thijssen JH | Classification and pharmacology of progestins | Maturitas 46 Suppl 1:7-16 |
| 651 | 10/17/2001 | LAWT021-009874 | LAWT021-009918 | Affiliate Brand Plan | | | |
| 7717 | 00/00/0000 | DUROJ039-001922 | | | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| M4736 | 4/4/2007 | | | | Rossouw JE, Prentice RL t, Manson JE , Wu L P, Barad d, Barnabei VM , Ko M , LaCroix AZ, Margolis KL, Stefanick ML | Postmenopausal hormone therapy and risk of cardiovascular disease by age and years since menopause | JAMA 297(13):1465-77 |
| MA4260 | 4/1/1989 | | | | Hargrove JT, Maxson WS, Wentz AC, Burnett LS | Menopausal hormone replacement therapy with continuous daily oral micronized estradiol and progesterone. | Obstet Gynecol 73(4):606-12. |
| 7773 | 12/29/1994 | ROSSC012-001497 | ROSSC012-001587 | Medical Officer's Review of Original and Resubmitted NDA Submissions | | | |
| 8412 | 1/8/1997 | N/A | | FDA/CDER Prempro NDA 20-527/S-006 - Administrative Documents | | | |
| 8413 | 2/25/1997 | | | FDA/CDER Prempro NDA 20-527/S-006 - Administrative Documents 2 | | | |
| 10665 | 7/18/2001 | EDWARDS-A 0000345 | EDWARDS-A 0000414 | JALA presentation : FEMhrt First | | | |
| 8054 | 12/22/1975 | W-MDL04782-00051891 | W-MDL04782-00051892 | PREMARIN Letter Thomas,Norman J - Ayerst Lab Roberts,HK | | | |
| 8055 | 11/20/1975 | W-MDL04782-00051979 | W-MDL04782-00051981 | Memo re: Recent Lay Press Publicity Concerning the Possible Increased Incidence of Cancer of the Endometrium With Long Term Estrogen Therapy Bustamante,Robert - Ayerst Intl | | | |
| 7778 | 9/20/1990 | CONNS020-000401 | CONNS020-000401 | 17 Beta Estradiol/Slow Release Natural Progesterone | | | |
| 7787 | 1/28/2002 | HENRL026-001723 | HENRL026-001731 | Working With Global | | | |
| 7788 | 10/9/1991 | PANAA038-000032 | PANAA038-000033 | 17 Beta-Estradiol/Progesterone (Project 810A) Project Team Review Meetings of September 4, 1991 & October 3,1991 | | | |
| 7791 | 8/29/2001 | SOLOJ027-046965 | SOLOJ027-047117 | HRT Satisfaction Campaign | | | |
| 7802 | 3/21/9999 | W-MDL04782-00060105 | W-MDL04782-00060107 | MINUTES OF THE PREM-PAK MEETING | | | |
| 7803 | 6/7/9999 | W-MDL04782-00060132 | W-MDL04782-00060132 | Prem-Pak Minutes of 09181981 Meeting | | | |
| 7804 | 4/25/2000 | BURKM010-000720 | BURKM010-000722 | FDA Backgrounder on Conjugated Estrogens | | | |
| 7805 | 00/00/0000 | CONKJ008-000129 | CONKJ008-000144 | Visiting Speakers Bureau Premarin Reports | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 7806 | 12/07/0000 | CONSG007-000079 | CONSG007-000104 | Effects of Hormone Replacement Therapy on Clinical Fractures and Height Loss: The Heart and Estrogen/Progestin Replacement Study (HERS) | | | |
| 7807 | 00/00/0000 | CONSG007-000117 | CONSG007-000118 | NDA 20-527 Prempro/Premphase (Conjugated Estrogens/Medroxyprogesterone Acetate Tablets) | | | |
| 7808 | 00/00/0000 | CONTA012-001534 | CONTA012-001552 | Prempro/Premphase Planning for New Competitive Challenges | | | |
| 7809 | 7/30/1999 | CONTA012-001554 | CONTA012-001555 | Final Report of Findings: Prempro/Activelle War Games | | | |
| 7810 | 00/00/0000 | CONTA012-001686 | CONTA012-001722 | Progestins and Hormone Replacement Therapy | | | |
| 7811 | 7/31/1997 | DUROJ034-000439 | DUROJ034-000441 | NDA No. 04-782 Premarin Tablets | | | |
| 7812 | 00/00/1997 | DUROJ039-001945 | DUROJ039-001954 | Premarin Franchise Three Year Strategic Plan | | | |
| 7813 | 00/00/0000 | DUROJ039-002000 | DUROJ039-002000 | Schering's Prometrium | | | |
| 7814 | 7/12/1991 | DUROJ039-002021 | DUROJ039-002021 | Hormone Replacement Products (Schering-Plough) | | | |
| 7815 | 7/3/1991 | DUROJ039-002022 | DUROJ039-002022 | Hormone Replacement Products (Schering-Plough) | | | |
| 7816 | 10/14/1991 | DUROJ039-002024 | DUROJ039-002024 | Terms of Secrecy Agreement (Schering Plough) | | | |
| 7817 | 8/26/1991 | DUROJ039-002026 | DUROJ039-002026 | | | | |
| 7818 | 06/15/0000 | DUROJ039-002032 | DUROJ039-002038 | Why AN Alliance | | | |
| 7819 | 00/00/0000 | FISHG001-000037 | FISHG001-000048 | Determination of Progestational Activity in PCUD HPLC Fractions by in Vitro Measurement of Alkaline Phosphatase Activity in T 47 D Human Breast Cancer Cell Line | | | |
| 7820 | 10/9/1992 | FISHG001-000200 | FISHG001-000200 | | | | |
| 7821 | 9/17/1992 | FISHG001-000258 | FISHG001-000261 | From the Meeting Held on the 14 September 1992 with Dr Roe and Dr Prentice to Discuss the MPA Two-Year Rat Carcinogenicity Study | | | |
| 7822 | 6/26/1992 | FISHG001-000331 | FISHG001-000332 | | | | |
| 7823 | 00/00/0000 | FISHG001-000333 | FISHG001-000334 | | | | |
| 7824 | 9/1/1989 | FISHG001-000353 | FISHG001-000354 | Premarin/MPA Two-Year Rat Carcinogenicity Study Minutes of FDA Meeting of September 1, 1989 | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 7825 | 6/23/1992 | FISHG001-000355 | FISHG001-000357 | Preliminary Toxicologic and Histologic Findings in MPA Two Year Oral (Diet) Toxicity Study in Rat (Illegible-11,236) | | | |
| 7826 | 6/23/1992 | FISHG001-000358 | FISHG001-000358 | Table 1 Preliminary Incidence Summary with (%) of Microscopic Observations AK-11, 236 (Protocol 89094) | | | |
| 7827 | 12/22/1992 | FISHG001-000387 | FISHG001-000392 | Conjugated Estrogens and Medroxyprogesterone Acetate NDA No. 20-303 | | | |
| 7828 | 12/16/1992 | FISHG001-000393 | FISHG001-000393 | Premarin/MPA Labeling | | | |
| 7829 | 3/11/1993 | FISHG001-000402 | FISHG001-000417 | Conjugated Estrogens and Medroxyprogesterone Acetate NDA No. 20-303 | | | |
| 7830 | 12/14/2000 | FISHG001-000510 | FISHG001-000573 | Report on Carcinogens Background Document for Steroidal Estrogens | | | |
| 7831 | 11/11/1998 | HENRL005-001314 | HENRL005-001314 | New Unbranded Direct-to-Consumer (DTC) Advertising Campaign Video Tapes | | | |
| 7832 | 5/4/1995 | PANAA019-000679 | PANAA019-000684 | Overview: Premarin and Women's Health | | | |
| 7833 | 00/00/0000 | PICKJ004-000667 | PICKJ004-000667 | OBJECTIVE INDEX UNAVAILABLE | | | |
| 7834 | 9/29/2000 | ROSSC001-000336 | ROSSC001-000336 | NDA No. 04-782 Premarin (Conjugated Estrogens Tablets, USP) NDA No. 10-402 Premarin Intravenous (Conjugated Estrogens, USP) for Injection NDA No. 10-971 PMB (Conjugated Estrogens / Meprobamate) Tablets NDA No. 11-074 Premarin H-C (Conjugated Estrogens / Hydrocortisone) Vaginal Cream NDA No. 20-126 Premarin (Conjugated Estrogens) Vaginal Cream NDA No. 20-303 Prempro / Premphase (Conjugated Estrogens / Medroxyprogesterone Acetate Tablets) NDA No. 20-527 Prempro / Premphase (Conjugated Estrogens / Medroxyprogesterone Acetate Tablets) | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 7835 | 7/13/2000 | ROSSC001-000367 | ROSSC001-000368 | FDA Telephone Contact. Premarin (Conjugated Estrogens Tablets, USP) | | | |
| 7836 | 5/1/2000 | ROSSC001-000371 | ROSSC001-000373 | Premarin (Conjugated Estrogens Tablets, USP) NDA No. 04-782 Special Supplement - Changes Being Effected | | | |
| 7837 | 11/12/1998 | SONKJ024-001753 | SONKJ024-001753 | HERS Poster Presentation | | | |
| 7838 | 00/00/1988 | VICTJ005-001658 | VICTJ005-001665 | The Dose-Effect Relationship between 'Unopposed' Oestrogens and Endometrial Mitotic Rate: Its Central Role in Explaining and Predicting Endometrial Cancer Risk | | | |
| 7839 | 3/1/9999 | W-MDL04782-00009303 | W-MDL04782-00009305 | Endocrinologic and Metabolic Drugs Advisory Committee Meeting 06241985 | | | |
| 7840 | 7/23/9999 | W-MDL04782-00059890 | W-MDL04782-00059892 | Telephone Conversation with Dr. Whitehead, 04161983 | | | |
| 7841 | 4/14/9999 | W-MDL04782-00059895 | W-MDL04782-00059897 | | | | |
| 7842 | 1/8/9999 | W-MDL04782-00059898 | W-MDL04782-00059903 | REPORT ON MEETING WITH MR. MALCOLM WHITEHEAD ON 12091982 | | | |
| 7843 | 4/26/9999 | W-MDL04782-00059904 | W-MDL04782-00059905 | | | | |
| 7844 | 1/16/9999 | W-MDL04782-00059906 | W-MDL04782-00059922 | CONTINUOUS PREMARIN / PROGESTIN STUDY PHASE I: - EFFECTS ON BLEEDING PATTERNS, AND THE ENDOMETRIAL, PHYSICAL AND PSYCHOLOGICAL STATUS OF POSTMENOPAUSAL WOMEN. MENOPAUSE CLINICS | | | |
| 7845 | 12/30/9999 | W-MDL04782-00059954 | W-MDL04782-00059954 | PREM-PAK Protocol for Study on Effects on Bone Loss ( Protocol 83-14 MD) | | | |
| 7846 | 9/24/9999 | W-MDL04782-00059959 | W-MDL04782-00059966 | Protocol Outline Prem-Pak: Osteoporosis - Efficacy of Prem-Pak in Reducing Bone Loss in Postmenopausal Women | | | |
| 7847 | 11/6/1997 | W-MDL303-00084698 | W-MDL303-00084699 | Prempro/Premphase FDA Contact - Phase IV Commitment Breast Cancer Study (NDA 20-303) | | | |
| 7848 | 11/21/1995 | W-MDL527-00035054 | W-MDL527-00035074 | Prempro Labeling (NDA 20-527) | | | |
| 7849 | 10/23/1995 | W-MDL527-00035128 | W-MDL527-00035129 | FDA Breast Cancer Study (NDA 20-527) | | | |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| 7850 | 6/26/1998 | W-MDL527-00038634 | W-MDL527-00039022 | Proposed launch materials (NDA 20-527) | | | |
| 7851 | 00/00/0000 | WEBEM015-001202 | WEBEM015-001204 | OBJECTIVE INDEX UNAVAILABLE | | | |
| M1786 | 5/22/2002 | | | | Lindsay, R, Gallagher, JC, Kleerekoper, M, Pickar, JH | Effect of lower doses of conjugated equine estrogens with and without medroxyprogesterone acetate on bone in early postmenopausal women. | JAMA. 2002 May 22-29;287(20):2668-76 |
| M3174 | 12/6/2000 | | | | Archer DF, Bush T, Nachtigall LE. | Re: effect of hormone replacement therapy on breast cancer risk: estrogen versus estrogen plus progestin. | J Natl Cancer Inst. 2000 Dec 6;92(23):1950-2. |
| M4004 | 9/22/2005 | | | | Crandall C, Palla S, Reboussin BA, Ursin G, Greendale GA. | Positive association between mammographic breast density and bone mineral density in the Postmenopausal Estrogen/Progestin Interventions Study. | Breast Cancer Res. 2005 Sep 22;7(6):R922-R928 |
| M4541 | 3/15/1977 | | | | McDonald TW, Annegers JF, O'Fallon WM, Dockerty MB, Malkasian GD Jr, Kurland LT. | Exogenous estrogen and endometrial carcinoma: case-control and incidence study. | Am J Obstet Gynecol. 1977 Mar 15;127(6):572-80. |
| M4722 | 2/27/2007 | | | | Fournier A, Berrino F, Clavel-Chapelon F. | Unequal risks for breast cancer associated with different hormone replacement therapies: results from the E3N cohort study. | Breast Cancer Res Treat. 2007 Feb 27; [Epub ahead of print] |
| M4757 | 5/1/2007 | | | | Blumenfeld Z, Boulman N, Leiba R, Siegler E, Shachar S, Linn R, Levy Y. | High C-reactive protein levels are associated with oral hormonal menopausal therapy but not with intrauterine levonorgestrel and transdermal estradiol. | Scand J Clin Lab Invest. 2007;67(3):257-63. |
| M4758 | 3/1/2007 | | | | Yeboah J, Reboussin DM, Waters D, Kowalchuk G, Herrington DM. | Effects of estrogen replacement with and without medroxyprogesterone acetate on brachial flow-mediated vasodilator responses in postmenopausal women with coronary artery disease. | Am Heart J. 2007 Mar;153(3):439-44. |
| M4759 | 3/21/2001 | | | | Altkorn D , Vokes T | Treatment of postmenopausal osteoporosis. | JAMA. 2001 Mar 21;285(11):1415-8. |
| M4760 | 6/21/2007 | | | | Manson JE, Allison MA, Rossouw JE, Carr JJ, Langer RD, Hsia J, Kuller LH, Cochrane BB, Hunt JR, Ludlam SE, Pettinger MB, Gass M, Margolis KL, Nathan L, Ockene JK, Prentice RL, Robbins J, Stefanick ML; WHI and WHI-CACS Investigators. | Estrogen therapy and coronary-artery calcification. | N Engl J Med. 2007 Jun 21;356(25):2591-602. |

| PX EX_NO (File Name) | DOCDATE | BEGBATES | ENDBATES | DESCRIPTION | AUTHOR | TITLE | CITATION |
|---|---|---|---|---|---|---|---|
| M4761 | 12/8/1997 | | | | Genant HK, Lucas J, Weiss S, Akin M, Emkey R, McNaney-Flint H, Downs R, Mortola J, Watts N, Yang HM, Banav N, Brennan JJ, Nolan JC. | Low-dose esterified estrogen therapy: effects on bone, plasma estradiol concentrations, endometrium, and lipid levels. Estratab/Osteoporosis Study Group. | Arch Intern Med. 1997 Dec 8 22;157(22):2609-15. |
| M4762 | 1/1/1980 | | | | Leis D, Bottermann P, Ermler R, Henderkott U, Gluck H. | The influence of high doses of oral medroxyprogesterone acetate on glucose tolerance, serum insulin levels and adrenal response to ACTH. A study of 17 patients under treatment for endometrial cancer. | Arch Gynecol. 1980;230(1):9 13. |
| M4763 | 5/1/1996 | | | | Malik KJ, Wakelin K, Dean S, Cove DH, Wood PJ. | Cushing's syndrome and hypothalamic-pituitary adrenal axis suppression induced by medroxyprogesterone acetate. | Ann Clin Biochem. 1996 May;33 ( Pt 3):187-9. |
| M4764 | 6/13/2001 | | | | Torgerson DJ, Bell-Syer SE. | Hormone replacement therapy and prevention of nonvertebral fractures: a meta-analysis of randomized trials. | JAMA. 2001 Jun 13;285(22):2891-7. Review. |
| M4765 | 3/1/1983 | | | | N/A | FDA Board Investigates Depo-Provera Safety | Contracept Technol Update 1983 Mar; 4(3):25-27 |
| MA2067 | 00/00/2000 | | | | Barrett-Connor E | Postmenopausal Hormone Use Following a 3-year Randomized Clinical Trial | J Women's Health Gend Based Med 2000;9(6):633-643 |
| MA4260 | 4/1/1989 | | | | Hargrove JT, Maxson WS, Wentz AC, Burnett LS | Menopausal hormone replacement therapy with continuous daily oral micronized estradiol and progesterone. | Obstet Gynecol 73(4):606-12. |
| MA4392 | 5/3/2007 | | | | Jemal A, Ward E, Thun MJ | Recent trends in breast cancer incidence rates by age and tumor characteristics among U.S. women. | Breast Cancer Res 2007 May 3;9(3):R28 |