# EXHIBIT 5

*Summary of Testimony by*

**Cheryl D. Blume, Ph.D.**

*President of*
*Pharmaceutical Development Group, Inc.*

## I. Introduction and Background

My name is Cheryl D. Blume, Ph.D. I am the President of Pharmaceutical Development Group, Inc., a consulting firm specializing in pharmaceutical development and registration activities, located in Tampa, Florida. As described in the Curriculum Vitae attached as Exhibit 1, my background includes holding several executive positions in pharmaceutical companies over a period of 20 years, including Vice President of Scientific Affairs for Mylan Laboratories, Inc. and Executive Vice President and Chief Operations Officer for Somerset Pharmaceuticals, Inc. I also was a member of the Board of Directors of Somerset.

I was responsible for overseeing preclinical and clinical (Phases I – IV) programs associated with pharmaceutical product development and the securing of premarketing approvals for over 100 new prescription pharmaceutical drugs from the U.S. Food and Drug Administration (FDA). These products include both new (brand name) and generic drug products. These responsibilities included the design, execution and interpretation of pivotal preclinical and clinical trials.

My duties included direction of all phases of interactions with the FDA relating to the prosecution of New Drug Applications (NDAs), Abbreviated New Drug Application (ANDAs) Supplements to New Drug Applications (sNDAs), drafting labeling and other aspects of the approval procedures. I have been centrally involved in supervising the collection and evaluation of post marketing adverse medical events, the design and implementation of studies to assess post-marketing signals, and the preparation and dissemination of updated product information to health care providers and patients.

I have been asked by counsel to evaluate address the scientific and regulatory actions taken by Wyeth in the development, post-launch evaluations and marketing of various estrogen

containing products, including Premarin® (NDA #4-782), Premarin/Cycrin (NDA #20-303), Prempro/Premphase (NDA #20-527) and others. The scientific opinions set forth in this report are true to a reasonable degree of scientific certainty based on the data and information provided to date.

I hereby reserve the right to supplement this report if additional information is provided. To date, I have been provided with extensive documentation including a hard drive of documents, CDs of documents, copies of all corporate representative depositions and Call Note listings. I have considered the materials listed in Exhibit 2 as well as many documents viewed on the hard drive. I charge hourly rates of $300 per hour for document review and report preparation and $350 per hour for deposition and trial testimony. A list of all cases in which I have written an Expert Report or provided deposition or trial testimony is included in Exhibit 3.

## II. Safety and Regulatory Overview

The Federal Food, Drug, and Cosmetic Act requires that pharmaceutical manufacturers comply with specific regulatory requirements when developing and marketing drug products. The Code of Federal Regulations (CFR) is a compilation of the regulations published in the Federal Register by the executive departments and agencies of the Federal Government. The CFR is divided into 50 titles that represent broad areas subject to Federal regulation; FDA regulations are published under Title 21. To assist pharmaceutical manufacturers in complying with these procedures and regulations, the FDA has issued a large number of general and specific Guidances. FDA Guidance documents represent the Agency's current thinking on a particular subject, and describe the minimum requirements for the registration and marketing of new drug products in the United States.

Before a new drug product can be marketed in the United States, a pharmaceutical manufacturer must independently conduct a wide variety of preclinical (animal) and clinical studies to support the pre-marketing application (NDA). These include studies designed to assess the clinical safety and efficacy of the drug in the patient populations for whom the drug will be prescribed. Sponsors often additionally examine specific patient populations to determine if the proposed drug may have selective safety concerns in these patients.

The FDA does not and cannot independently guarantee the safety of any pharmaceutical product. Rather, a primary mission of the FDA, as described in the Federal Food, Drug, and Cosmetic Act, is to promote the public health by promptly and efficiently reviewing clinical research and taking appropriate and timely action on the marketing of regulated products. Seen in this light, the FDA is heavily committed to pre-approval risk assessment. Risk assessment is an essential role of FDA because, although drugs are required to be safe, safety does not imply zero risk. A product is considered to be safe if the clinical significance and probability of its beneficial effects outweigh the likelihood and medical importance of its harmful or undesirable effects. It follows that a marketed drug is considered to be safe if it has a favorable risk-to-benefit ratio.

In order to assess pre-marketing risk, the FDA relies upon the manufacturer of a new drug product to conduct the appropriate preclinical studies and clinical trials. The manufacturer controls all of the critical elements relating to these trials, supplies the funding for the clinical trials, and provides the medications that are used. The drug manufacturer also selects and monitors the clinical investigators who conduct the trials. All clinical trial data are submitted directly to the manufacturer. In a similar manner, the required preclinical trials are also conducted and controlled by the manufacturer. When completed, the preclinical and clinical trial

data are compiled and reported to the FDA by the manufacturer. The FDA relies on the manufacturer to present a scientifically fair and balanced view of the drug sought to be approved, in much the same way that the IRS relies on taxpayers to present an honest and open report of their income to the government.

Based on the information provided by the pharmaceutical manufacturer, the FDA then reviews the submitted preclinical and clinical data to determine if the proposed drug product is safe and effective. As part of the NDA approval process, the FDA evaluates the professional labeling ("package insert or label") to be provided with the new drug product. This labeling is developed based on the information provided by the sponsor and should be designed to convey all necessary prescribing and safety-related information. It is not uncommon for professional labeling to also include safety-related information for products with similar chemical compositions.

It must be stressed that the FDA does not maintain its own preclinical and clinical testing laboratories, and does not conduct government-sponsored studies to independently evaluate drug products or verify preclinical or clinical data. Rather, the Food, Drug, and Cosmetic Act gives FDA the responsibility to review clinical and preclinical research. Thus, the FDA relies upon the sponsors to conduct the proper preclinical and clinical studies and to report the results accurately and completely. If the reports submitted by the sponsors were incomplete or inaccurate, the validity of an FDA approval, predicated upon such reported data, would be jeopardized.

An FDA approval also does not guarantee that a drug product will be safe for all time and for all purposes. A number of drugs have been approved by the FDA and then later withdrawn from the market because of emergent adverse medical events. The FDA therefore has a very

important responsibility for monitoring adverse events after a new drug product has been launched. This is usually referred to as risk assessment.

To assist the FDA with post-marketing risk assessment, pharmaceutical manufacturers are required to establish a system for pharmacovigilance activities. Manufacturers must collect, collate and evaluate information about suspected adverse reactions, both here in the United States and worldwide. All relevant information, including reports and analyses of updated safety-related information, must be shared with FDA. These safety data are derived from a variety of sources including the manufacturer's internal studies and reports, spontaneous domestic and international adverse event reports, ongoing U.S. and foreign trials, the clinical and preclinical literature and other available databases. Manufacturers are also required to track and report safety-related information for products with similar molecular structures, pharmacologic activities, and clinical uses.

Surveillance is critically important for the development of a safety database for the drug product. Experience has taught that pre-marketing clinical trial data provide only initial and preliminary safety information for a new drug product. Frequently, critical safety concerns are not observed until after an approved product has been commercially launched. There are several reasons for the delayed appearance of adverse medical events. One reason is that a relatively small number of patients (usually only up to a few thousand) are actually exposed to a new drug before it is approved. As such, only the most frequently occurring adverse events will be observed. Following approval, a much larger population uses the drug and the less frequent adverse events will then be evidenced.

A second reason contributing to the delayed appearance of certain adverse medical events relates to the patients chosen for clinical trials. In general, with the exception of the disorder for

which the drug is being studied, relatively healthy patients are enrolled in investigational drug trials. Moreover, most clinical trials will discontinue a patient if the precursor signals to an adverse experience are suspected. However, once a drug product is approved, it will be given to patients with additional illnesses and to patients receiving multiple other drug products. Not surprisingly, these additional circumstances will often lead to the appearance of new adverse events, increases in the frequency of previously observed events and the emergence of new drug interactions.

A third reason for the delayed appearance of post-marketing adverse events is the time required for certain events to emerge. Many drug related events, including certain cancers or other delayed responses, may not be seen until several years of exposure to the offending agent has occurred.

Because the post marketing surveillance system provides safety data concerning real patients in a real world setting, it is a vital and integral component of the FDA's efforts to ensure the continued safety of marketed drug products. It is for this reason that the FDA relies on safety surveillance to track adverse drug experiences from the launch of a new drug product and throughout its entire marketing lifespan. Unfortunately, the surveillance system captures only a fraction (approximately 1-10%) of the actual number of adverse event. It is therefore imperative that manufacturers closely monitor all available data, conscientiously review published literature, conduct necessary follow-up studies and fully explore all potential adverse events.

Several factors contribute to the low percentage of significant adverse medical events actually reported to the FDA and to other authorities. A major factor is that many health care providers do not associate a patient's complaints or symptoms with a drug-related adverse event. Often times the new event is simply considered a component of the patient's medical condition

or an unrelated concomitant illness. This is particularly likely to occur if representatives of the drug manufacturer fail to share all available label information with prescribers or make untrue or scientifically unbalanced presentations to prescribers. It is therefore critically important that drug manufacturers fully alert prescribers to potential adverse events and safety concerns with their products in all promotional materials. After all, physicians and other prescribers rely on drug company representatives to provide them with drug-related information (Conklin Deposition, 230-240).

Another factor contributing to the low reporting rate of adverse events is that many health care providers are simply unaware of the various programs developed to receive this information. Pharmaceutical organizations should assist FDA with their ongoing efforts to promote this important exchange of information. Finally, the great majority of adverse event reports are sent to and reviewed by the manufacturer of the drug product, who is then required to submit data relevant to these reports to the FDA. If a manufacturer inaccurately, incompletely, or inarticulately submits adverse event reports and subsequent analyses, the FDA may not fully appreciate an emerging or changing safety profile associated with a drug product. Obviously, if information concerning a particular adverse event is not reported to FDA or it is reported in a way that is misleading or inaccurate, FDA will not be able to make timely and appropriate regulatory decisions.

FDA's post-marketing surveillance requirement is in place to detect new safety signals associated with the use of a drug product, signals that may not have been detected in the pre-marketing clinical trials. The system also detects increases in the frequency or severity of previously identified events. If there is a reasonable association between the event and the drug product, additional or intensified labeling warnings relating to the newly identified event can be

enacted. Once a signal is detected, the specific adverse events should be fully and quickly evaluated to determine if a new patient safety risk has been identified. The sponsor is then required to review this information with the FDA to determine if additional scientific studies and regulatory actions are needed to address safety concerns. If the manufacturer and/or the FDA consider the new signal sufficiently serious, the drug product may be restricted to certain patients or even withdrawn from the U.S. marketplace.

Importantly, the duty to detect and promptly act upon “signals” in post marketing surveillance is that of the manufacturer. The manufacturer must promptly alert physicians, patients and the FDA when a potential danger exists. Although FDA may also receive reports of Adverse Drug Events (ADE), the FDA does not have the resources to properly evaluate and act upon reports concerning thousands of marketed products. The first line of defense falls to the manufacturer of the product, and if the manufacturer fails in its duty, serious injury or death may occur. There is no magic number for the number of events needed to precipitate immediate action by the NDA holder. It does not have to include an explosion of events. There are examples of labeling changes and Dear Health Care Professional letters issued based upon the manufacturer’s receipt of only two or three events.

The obligation to report all safety related information includes serious ADEs occurring outside the country. Manufacturers also have an obligation to report any international labeling changes to the FDA. The reporting of worldwide events is critically important because most safety issues are not dependent on national or regional related parameters. Foreign regulatory authorities must also be informed if FDA effects labeling changes or if new adverse event information has been identified in the United States.

Pharmaceutical manufacturers are required to continually amend their package inserts, professional labeling and promotional materials in response to new safety information. Such safety information includes new ADEs or changes in the severity or frequency of previously identified events. These data may be derived from post marketing reports, reports from clinical trials, ongoing studies or the clinical literature. Product information and labeling must be immediately modified and disseminated when serious clinical events are reported. All efforts must then be taken to ensure that the necessary information is expeditiously conveyed to health care professionals and consumers.

It cannot be stressed strongly enough that it is the pharmaceutical manufacturer who bears the obligation and responsibility to assure the safety of its marketed pharmaceutical products. The FDA does not have the authority, mission or resources to independently seek out and identify all safety issues involving all marketed drugs products. FDA resource limitations are well known, and dictate very limited post-marketing safety assessments. In fact, prominent drug safety issues involving recently withdrawn products have recently called into question the capability and credibility of FDA's drug safety program, and have caused the Agency to seek a significant increase in budgeted resources for the Office of Drug Safety (ODS). The FDA has publicly stated that budget increases are necessary to enhance the Agency's surveillance capability and to counter the perception that FDA is unable to ensure the safety of marketed drugs. Unfortunately, until this funding occurs, the responsibility for safety monitoring of drug products continues to fall squarely on the NDA sponsors.

**III. Regulatory Process for Labeling, Labeling Changes, and the Dissemination of New Safety Information.**

As a part of the NDA review process, the initial labeling for an approved drug product, sometimes referred to as the "launch label," is reviewed and accepted by the FDA. Without FDA approval of the launch label, the product cannot be marketed. Changes to the label of an approved drug product fall under the manufacturer's responsibility for product maintenance. As was clearly evidenced with the recent Congressional Hearings associated with the Vioxx withdrawal, FDA is not empowered to force manufacturers to update their package insert with new safety data, following product launch. In fact, FDA asked Congress for the authority to dictate such label changes in March 2005.

Labeling changes are made subject to notification of the FDA, and fall into three categories: minor labeling changes that require notification of the Agency only in an annual report, moderate changes that require notification in a Changes Being Effected (CBE) Supplement, and major changes that require the submission of a Prior Approval Supplement for a new indication.

Changes that add or strengthen labeling for contraindications, warnings, precautions, and adverse events require FDA notification via a CBE Supplement. Because such changes involve important safety issues, the FDA requires that such labeling changes be implemented promptly and without the attendant delay associated with FDA's approval of a supplement.

The Code of Federal Regulations explicitly provides for the holder of an approved application to continue to distribute product following receipt by the FDA of a "Changes Being Effected" Supplement that adds or strengthens the product labeling with respect to a

contraindication, warning, precaution, or adverse reaction. This has also been spelled out very clearly in an FDA regulatory Guidance.

However, in spite of these explicit provisions, manufacturers often either neglect the addition of new safety information or orchestrate extended negotiations with the FDA concerning proposed safety-related changes to delay changes to product labeling. For example, as described below Wyeth delayed the implementation of HERS labeling for many months by engaging in extended negotiations with the FDA.

When a manufacturer does change a product label to provide enhanced safety information, the revised labeling information must be disseminated to healthcare professionals and consumers. This process is covered by the Code of Federal Regulations and by FDA Standard Operating Procedures.

A major tool for the dissemination of safety information is the "Dear Doctor" or "Dear Healthcare Professional Letter." Such correspondence is mailed by a manufacturer and/or distributor to physicians and/or other health care professionals to convey important information about a drug product. These letters can be required or requested by FDA or may be initiated by the manufacturer. If the FDA so chooses, the FDA may also initiate and send a "Dear Healthcare Professional" letter. Most "Dear Healthcare Professional" letters disseminate information concerning a significant hazard to health, to announce changes in package labeling, or to correct drug advertising or labeling. Other methods to disseminate new information include FDA Talk Papers, Press Releases, Public Health Advisories, informational mailings, literature notices, website updates, newspaper, radio and television updates and many others.

A few prescription drug products that are used on an outpatient basis without frequent supervision by a health professional, require direct to patient warnings. For drugs in this

category, the FDA requires the distribution of FDA-approved patient information with every prescription and refill. This requirement has been written into the Code of Federal Regulations. Oral contraceptives and noncontraceptive estrogen drug products are among the medicines that fall into this category. The specific requirements for patient package inserts for oral contraceptives and noncontraceptive estrogen products have also been written into the Code of Federal Regulations, and FDA Guidances have been developed to guide manufacturers in preparing labeling for both categories of these products. Pharmaceutical manufacturers are also obligated to promptly provide all available safety information to patients and most develop effective procedures to implement dissemination of this information.

## IV. Hormone Therapy Drugs

Physicians in the United States were relatively unconcerned with treatment options for the clinical symptoms of menopause through the end of the nineteenth century. The first monograph on menopause was not even published, by A. F. Currier, until 1897. Similarly, little attention had been directed to drug products designed to address menopausal symptoms. Beginning in the twentieth century, however, menopause was considered an important milestone in a woman's life and the medical community recognized the need for drug products, additional to the traditional sedative therapies, to assist with the menopause experience.

In the 1920s and 1930s, scientists had discovered that the urine from pregnant women were estrogenic in nature and the specific hormones, estrone and estriol, were isolated. This was followed by the use of these hormones in dysmenorrhea, amenorrhea, and as menopause replacement therapy. The early estrogen supplies were obtained from human placentas. Wyeth

marketed these extracts in oral and other forms. However, it soon became apparent that alternative sources would be necessary because of low activities, high costs and extremely small supplies. After extensive experimentation, Wyeth identified pregnant mare urine to be a more potent, less costly and more commercially available source for estrogen to be used as menopause replacement therapy.

Pursuant to the provisions of the original Food, Drug and Cosmetic Act of 1938, Wyeth submitted NDA #4-782 in March 1942, for the use of Premarin Tablets, containing pregnant mare urine extracts, for the treatment of menopausal symptoms. The NDA became effective in May 1942, based upon satisfactory manufacturing and safety reviews by FDA. In 1972 and 1986, the DESI Reviews found Premarin to be effective for the menopause-related indications discussed in the following section of this report.

In concert with the development of Premarin, Wyeth also orchestrated campaigns to establish intended purposes for the drug product. The company conducted extensive educational campaigns directed toward both physicians and patients on the topics of menopause, atrophic vaginitis, and vasomotor symptoms (BURRG002-000050). Wyeth also set out to create a menopause marketplace in the press and in magazines and books (see below the details regarding *Feminine Forever*). As such, during the 1950s, menopause became a medical condition ("medicalized") and for which estrogen therapy was the cure.

Researchers, often sponsored by Wyeth, also contributed to the available materials relating to estrogen replacement therapies. In fact, the "estrogen deficiency disease" attributed menopause to be the cause of several normal age related events including heart disease, depression, hypertension, hair changes and alcoholism. Women, without any menopausal symptoms, were also encouraged to use estrogens for long term benefits (CONNS014-001645).

One of the most egregious proponents of estrogen therapy use was Robert Wilson, M.D., the author of *Feminine Forever (1966).* He claimed that estrogen therapy would correct the hypertension, osteoporosis, arthritis, emotional disturbances, feelings of worthlessness and other events associated with the menopause. Unfortunately, his claims were echoed in the lay press and other media and his book sales skyrocketed, even though the FDA had decried his data and indicated that these opinions were unsubstantiated. Premarin sales surged and it became the most frequently prescribed drug in the U.S. Wyeth not only supported the writing of Dr. Wilson's book, the company also bought huge supplies of this publication to provide to physicians and to ensure the book's continued best-seller status (CONTA003-000676, RYANJ002-000495, BURRG002-000049 at 51).

However, in 1975, separate studies (Ziel and Finkle, Smith et al, etc.) showed a 5 to 14 fold increase in the number of cases of endometrial cancer in estrogen users. The FDA also held an Advisory Committee on this issue on December 16, 1975 (W-MDL04782-00027344). The FDA attached a Black Box Warning on all estrogen products, including Premarin, and mandated that a Patient Information Insert, explaining the increased cancer risk, be included each time that a patient received an estrogen prescription. As a result of these actions, Premarin sales dropped over fifty percent in the late 1970s (DEYMI202-000082).

Premarin sales rebounded in the early 1980s when it was believed that the development of endometrial cancer with estrogens could be reduced with the concomitant use of a cyclic progestin (CONNS017-000113).

In September of 1983, the National Heart, Lung, and Blood Institute of the National Institutes of Health held a conference regarding estrogen use and cardiovascular effects/benefits.

Dr. Henry Perdue of Wyeth reported that the overall consensus of the conference attendees was to conduct large, long-term study looking at the effect on morbidity and mortality associated with estrogen use (W-MDL04782-00030693). Unfortunately, Wyeth never conducted an appropriate study to address this critical safety concern. As discussed in the following sections, if a study design similar to that employed by WHI had been initiated in 1983, the cardiovascular and breast cancer risks identified in 2002 by the WHI study, would have been known in the late 1980s. It would not have been unreasonable for Wyeth to conduct such a clinical outcomes study. By the mid 1980s, large clinical outcome studies had been conducted for other products including statins and another grandfathered drug, aspirin.

Unfortunately, the cardiovascular and breast cancer risks were not discovered and revealed by Wyeth at this time. By the early 1990s, Premarin was again the top U.S. product. In 1994 and 1995, Wyeth amplified its Premarin family with the approval of fixed combination products, Prempro and Premphase, and its U.S. sales continued to rise.

When Wyeth combined estrogen and medroxyprogesterone acetate into Prempro and Premphase, they merged two known carcinogens into one drug. As mentioned earlier, by the mid-1970s, Wyeth was aware that Premarin caused endometrial carcinoma (WHO International Agency for Research on Cancer, http://www- cie.iarc.fr/htdocs/monographs/suppl7/ oestrogenreplacement.html). MPA was classified as a class 2B animal carcinogen in 1987 (WHO International Agency for Research on Cancer, http://www-cie.iarc.fr /htdocs/monographs/suppl7/progestins.html). Progesterones are known carcinogens (WHO International Agency for Research on Cancer, http://www-cie.iarc.fr/htdocs/monographs/ vol06/progesterone.html). In the face of a combination product which involved two known

carcinogens, a prudent company would have done intensive studies to fully understand the cancer effect of combination therapy.

The rise in Premarin and Prempro sales were halted in July, 2002 by the dissemination of the preliminary results from the NIH sponsored study called the Women's Health Initiative Clinical Trial of Estrogen and Progestin (WHI). This study confirmed multiple earlier studies and showed that there was an increase in the incidence of breast cancer in women taking estrogen and progestin. Because these breast cancer risks outweighed any benefits of the trial, the WHI trial was prematurely halted. Not only did the WHI participants receiving estrogen and progestin develop more breast cancer, their cancers were larger and at a more advanced stage than those in the other treatment groups.

Interestingly, the primary outcome measure of the WHI study was the incidence of coronary heart disease (OLIVS014-001896). Therefore, the WHI study was designed and powered to detect cardiovascular benefits and not quantify specific risks of breast cancer events. However, the WHI results found increased risk of both breast cancer and cardiovascular events in the combined regimen group within a few years of treatment.

WHI participants receiving estrogen and progestin suffered significant increases in coronary heart disease (heart attack, ischemic stroke, blood clots, venous thrombosis, pulmonary emboli, etc.) These results also confirm earlier studies which demonstrated increased cardiovascular risks in patients receiving the combination therapy. It was later shown (Shumaker et al., 2004) that the older participants receiving estrogen and progestin also had twice the rate of dementia and there were no evidence of prevention in cognitive decline.

Not surprisingly, the WHI data significantly decreased (50%) sales of the Wyeth products, although the Premarin family still exceeds annual sales of one billion dollars

(DEYMI202-000083). However, this single independent publication was able to overturn decades of medical practice in the treatment of menopause.

The history of hormone replacement therapy violates the concept of evidence-based medicine, a concept in which Wyeth's top employees placed great value (PARKA002-001210). If Wyeth had initiated the necessary study in 1983, proper evidence related to ET and HRT risk would have been available by the late 1980s. Had this occurred, millions of women could have avoided the fate of being diagnosed with HRT-related breast cancer or coronary heart disease. Instead, nearly two decades passed between the time a trial was needed (1983), and the date the WHI was discontinued (2002).

## V. Regulatory Overview of Hormone Replacement Therapies

Six million women in the United States currently take either Prempro or Premarin tablets (CONNS013-000683). This number has fallen from the fourteen million women using these products prior to the release of the results from the WHI study (WEBEM015-001202). Wyeth reported that women generally receive these products for approximately 8 years, although one-fourth of users have taken estrogen therapy for more than 11 years. (WMDL527-00048274).

Despite this extensive use, these products have not been well studied by Wyeth in either premarketing or postmarketing randomized clinical trials. In fact, the New Drug Applications associated with these products contain extremely modest databases for clinical trial data. This paucity of data results from the regulatory status afforded to Premarin in 1942 and the failure of Wyeth to conduct critical safety evaluations over the next 60 years.

In fact, as described below, only one controlled clinical trial was conducted by Wyeth and even this limited trial yielded a significant safety signal.

Premarin was approved by FDA in 1942, according to the mandates of the original Food, Drug and Cosmetic Act (1938) which required only safety assessments. The FDA noted (Federal Register 62(152):42562-42575) that the 1942 approval was based on Chemistry, Manufacturing and Controls information, acceptable at the time, and a showing that the product was safe for its intended use in the treatment of menopausal symptoms. The original NDA did not include data from well-controlled trials designed to address safety and efficacy. Data from early trials have also not been referenced by the FDA in the various Premarin/DESI reviews issued after its release and have not been described in the literature.

Premarin is known as a "pre-62" or "grandfathered" drug. In 1962, the Federal Food, Drug and Cosmetic Act was amended with the Drugs Amendments of 1962 (Public Law 87-781). Following this, all new drugs must be shown by adequate studies to be both safe and effective before they can be marketed. This legislation was also applied retroactively to all drugs approved as safe from 1938 to 1962 (referred to as pre-62 drugs). These pre-62 drugs were permitted to remain on the market while evidence of their effectiveness was reviewed. The Drug Efficacy Study Implementation (DESI) program was established to review the effectiveness of drugs approved between 1938 and 1962.

In 1972, FDA announced that the DESI review found Premarin to be effective for relief of menopausal symptoms, senile vaginitis, dysfunctional uterine bleeding, hypogenitalism, and functional amenorrhea (Federal Register 37(143):14826). This determination was made based on studies published in the literature. The 1972 DESI report also classified the indication of osteoporosis as "probably effective."

In 1975, another DESI report reclassified all indications that were previously classified as "less than effective" as "lacking substantial evidence of effectiveness." For Premarin, these indications included moderate to severe vasomotor symptoms, female hypogonadism, female castration, primary ovarian failure, atropic vaginitis, kraurosis vulvae, postpartum breast engorgement, and prostatic carcinoma (ROSSC012-001501).

In 1986, again based on literature reports, Premarin was reclassified as "effective" for the treatment of osteoporosis. Based on FDA's DESI announcements, it appears that all of the DESI indications were obtained from the literature and were not based on long term controlled clinical trials.

Wyeth tried on multiple occasions to gain NDA approval for combination therapy with Premarin and MPA based solely on data gathered from the literature. In 1978, a supplement for combination therapy was submitted for reduction of endometrial hyperplasia. However, this was denied by the FDA due to insufficient evidence and lack of clinical data. Wyeth again attempted to secure approval for this use in 1986 based on literature findings (WMDL303-00083703). Once again, FDA deemed the NDA non-approvable due to insufficient evidence. In early 1989, Wyeth sought approval for cardiovascular benefits associated with combination therapy, based on literature analyses. However, this supplement was also denied due to inadequate data (PANAA026-001571; PANAA034-001426).

In late 1983, Wyeth also overlooked the National Institute of Health's suggestion to conduct a long-term study for the effects of estrogens on cardiovascular morbidity and mortality (W-MDL04782-00030693). At this Advisory Committee Meeting, Wyeth concluded that further clinical trials should be conducted. However, no clinical trials were conducted to address the

effects of estrogens until 1998 and 2002 when HERS and WHI confirmed cardiovascular risks respectively.

There were no pivotal randomized clinical studies supporting Wyeth's products until the mid 1990's, and even then only one clinical trial was conducted. In 1994, Wyeth received NDA approval for combination therapy with estrogen and MPA based on the data generated in a trial designed to compare frequencies of endometrial hyperplasia in post menopausal women receiving conjugated estrogens or the combination of conjugated estrogens and MPA. Notwithstanding the relatively small patient numbers receiving combination therapy (~1000), a breast cancer signal was observed when 6 women were found to develop breast cancer on study (WMDL303-0083746).

Based on this data, the FDA asked Wyeth to commit to conduct a Phase IV study to specifically evaluate breast cancer risks with the combination therapy. Wyeth never conducted this evaluation and instead waited for WHI to finally reconfirm (in 2002) the breast cancer signal that had been noted almost a decade earlier with Prempro therapy.

Over the years, the literature has included several observational studies with combined estrogen and progesterone use, but these data do not establish the safety of Premarin and Prempro. These studies are, at best, inconclusive regarding long-term safety, especially with respect to cardiovascular and breast cancer risks. By their own admission, Wyeth acknowledged that the issues could not be resolved with these literature reports (WMDL303-00083703).

It appears that Wyeth received a free pass for many years with respect to Premarin and Prempro for both cardiovascular and breast cancer risks. Premarin was marketed with little or no controlled clinical study data. One pivotal study supported Prempro efficacy, but it also demonstrated increased breast cancer events. Efforts were never expended by Wyeth to address

these concerns. It was not until the 2002 publication of the government sponsored WHI trial data that women were provided true benefit risk information.

## VI. WYETH FAILED TO ADEQUATELY ASSESS BREAST CANCER RISKS ASSOCIATED WITH HORMONE REPLACEMENT THERAPY

Based on information provided in the literature, foreign databases, clinical studies, cancer registries and FDA records, there were ample signals available to Wyeth demonstrating a breast cancer risk with its hormone therapy drugs but Wyeth chose to not conduct adequate studies to define this risk. Without such safety data, the Wyeth sales remained high. This section summarizes the events that would have prompted any reasonable drug company to perform a definitive study examining the breast cancer-related risks associated with Premarin and Prempro.

The role of estrogens in the development and progression of breast cancer has been hypothesized for more than 100 years (Beatson, 1896). Results from both clinical (Dao, 1972) as well as nonclinical studies (Mobbs, 1969) have suggested that endocrine ablation could lead to disease remission. Data with a synthetic estrogen compound, (diethylstilbestrol) used to prevent miscarriage, also showed elevated cancer rates in the offspring of exposed mothers (National Cancer Institute Website; www.cancer.gov). Despite this, early studies (based on a small number of cases) indicated that there was no significant increase in the relative risk of breast cancer associated with the use of estrogens (Burch et al., 1974; Boston Collaborative Drug Surveillance Program, 1974).

One of the earlier studies linking estrogen use to an increased incidence of breast cancer was published in the New England Journal of Medicine in 1976 (Hoover et al., 1976). The relative risk of breast cancer in patients taking conjugated estrogens increased with follow-up

duration; after 15 years, the relative risk was 2.0. This study also found that the risk of breast cancer for women diagnosed after they started taking estrogen was 7 times greater than that of the general population. Wyeth responded to these data by attacking the design of the Hoover study (W-MDL04782-0029027). This became a pattern for Wyeth, if a study's data was not favorable; Wyeth's response was to either ignore the data or to point out weaknesses in the study.

Internal Wyeth documents confirm that the company was aware of the possible estrogen-breast cancer link in the mid-1970's. Indeed, the author of the NEJM paper noted above (Robert Hoover, MD, National Cancer Institute) stated in a July 1976 letter to the Director of Medical Affairs at Ayerst (George Brice, MD) that he had previously indicated the potential risk of breast cancer associated with the use of menopausal estrogens (Kennedy Subcommittee). In light of these findings he expressed "grave concern" and stated that more intensive study would be required to determine the risks of breast cancer associated with estrogen use [W-MDL04782-00029002]. Internal Wyeth memoranda indicated that while estrogens do not appear to increase breast cancer incidence, they do appear to maintain the growth of pre-existing and metastatic tumors in hormone-dependent cases and that the role of the endocrine system in the etiology of breast cancer "…remains to be clarified." (W-MDL04782-00029233-36).

A case control study examining the effect of menopausal estrogen therapy on the incidence of breast cancer demonstrated that the relative risk for a total cumulative dose of 1500 mg was estimated to be 2.5 (Ross et al., 1980). Wyeth- again mounted a public relations campaign to counter adverse publicity associated with this publication (W-MDL04782-00032274). This included a summary of studies examining the risk of breast cancer associated

with estrogen therapy, a number of which noted an elevated relative risk for breast cancer (W-MDL04782-00032463).

Another study in the American Journal of Epidemiology (Jick et al., 1980) found that women with natural menopause who took estrogens were 3.4 times more likely to develop breast cancer in comparison to women not using these drugs or who had a surgical menopause (W-MDL04782-00063068-83). An FDA Public Citizen's Petition (December 8, 1983) references a study from Cancer (Brinton et al., 1981) that found an increased risk of breast cancer with increasing duration of estrogen use in oophorectomized women: there was a 38% increase of breast cancer in women using estrogen for less than 5 years; a 55% increase in women using estrogen for 5-9 years and a 70% increase in women using estrogen greater than 10 years. An increased risk for benign breast disease was also observed in patients using Premarin in a 1984 study (Trapido et al., 1984).

A nearly two-fold increase in the incidence of breast cancer in Swedish women using unopposed estrogen for 9 years (compared to non estrogen users) was reported in 1989 in the New England Journal of Medicine (Bergkvist et al., 1989). In women taking a combination of estrogen and progestin, the increase was approximately 4-fold. Internal Wyeth documents demonstrate that the company did not intend to clarify the breast cancer risks associated with estrogen therapy (CONNS005-000346). A 1992 follow-up study performed by the same group reported that the elevated breast cancer risk associated with unopposed estrogen persisted and that the risk associated with combination therapy had increased (Persson et al., 1992). These results were preceded by a declaration from the International Agency for Research on Cancer (IARC) in 1987 stating that sufficient evidence existed to declare estrogenic agents carcinogenic. This was based upon elevated rates of endometrial cancer observed in a number of studies

(Buring et al., 1986; Ewertz et al., 1984; Henderson et al., 1983). Combination (estrogen-progestin) therapy was declared possibly carcinogenic in 1999 by the IARC.

On February 1, 1990 the FDA Fertility and Maternal Health Advisory Committee met to determine the possible association of breast and endometrial cancer with Hormone Replacement Therapy (HRT). A number of presenters noted the relationship between estrogen therapy and breast cancer. Sidney Wolfe, MD indicated that animal studies and epidemiological data demonstrate a relationship between estrogen therapy duration and breast cancer and he complained about the misleading product labeling. An FDA Medical Reviewer (Linda Golden, MD), presented evidence demonstrating a correlation between endogenous estrogen and breast cancer including animal study data suggesting that exogenous estrogens as well as progestogens can produce breast cancer. Janet Daling, MD (Fred Hutchinson Cancer Research Center) presented both an epidemiological and statistical analysis linking HRT to breast cancer. She noted that 18% of those studied included a progestagen as part of their therapy. The committee agreed to include the following statement in the labeling: “while the evidence is not conclusive, some studies report an increased risk of breast cancer with long-term use of ERT. Other studies have not shown this relationship.” In addition, the committee indicated that there was insufficient data to distinguish between different estrogens, or if the addition of a progestagen alters the risk of breast cancer. Internal Wyeth correspondence noted that the meeting was favorable and that the meeting was “relatively benign” and “received no media attention.” (CONNS017-000113-116).

A significant increase in the incidence of breast cancer in postmenopausal women taking estrogen was noted in a November 1990 JAMA publication (Colditz et al., 1990). In response to this publication, Wyeth circulated a Dear Doctor Letter highlighting an FDA review which stated

that an elevated risk of breast cancer associated with estrogen use had not been proven (PANAA025-001943). Further evidence of elevated breast cancer risks associated with estrogen therapy come from a meta-analysis of clinical studies (Steinberg et al., 1991). Here, the authors described an elevated risk of breast cancer after 5 years of therapy and they estimated that hormone use caused about 4700 cases of breast cancer and 1500 deaths each year in the United States. Current users of hormone replacement therapy were also found to have an elevated breast cancer risk of up to 40% (Colditz et al., 1992; 1993).

At a June 1991 FDA Advisory Committee Meeting Ron Krauss (USC School of Medicine) discussed the Ron Ross Breast Cancer Data. This data suggested that combination estrogen plus progestin exhibited a higher relative risk of breast cancer than unopposed estrogen. Internal Wyeth correspondence (Daira Hertel, August 19, 1991) noted that the company should develop a strategy on how to address this data from a sales force/public relations perspective (PANNA025-001812). The risk of breast cancer in patients receiving estrogen or combined hormonal replacement was also discussed at a meeting of the Royal Society of Medicine Anglo-American Conference on HRT and Breast Cancer Risk, held in September 1991. Although it was noted that Premarin therapy appeared to have a lower risk of breast cancer compared to other compounds (estradiol, progestins), the risk of breast cancer in patients receiving opposed (estrogen plus progestin) therapy was still an "area of concern". Wyeth took no steps to convey these worrisome and important data to doctors and patients. Internal Wyeth correspondence (September 30, 1991; M Deitch, MD) reviewed the data presented at this meeting (W-MCL004-01712-0171, Wyeth Vice President, Deitch to Wyeth President, Hassan). This internal correspondence also contains a quote from Ron Ross, MD, (USC) noting that there is "…no question in my mind that estrogen plays a role in the development of breast cancer…" (W-

MCL004-01712-0171). Dr. Ross believed that is was biologically plausible that HRT could cause breast cancer and increase the risk for adverse cardiovascular events. Despite this, Dr. Deitch noted that the author would let Wyeth "control the press".

Dr. Andrew Glass from the Center for Health Research in Oregon and Dr. Robert Hoover from the NCI published a study in 1990 based on the incidence of breast cancer in patients listed in the Kaiser Permanente Cancer Registry from 1972-1989. This study reported a statistically significant increase in estrogen receptor-positive (ER+) breast cancers, concluding that hormonal factors may be responsible for the increased incidence of breast cancer in postmenopausal women. Wyeth should have done a case control study to confirm this signal but nothing was done in response to this published study.

In 1992, a meta-analysis performed to determine the potential risk of breast cancer associated with estrogen therapy showed that long term therapy was associated with an increased risk of up to 30% (Henrich et al., 1992).

Wyeth Power Point presentation references study results in Lancet (Collaborative Group on Hormonal Factors in Breast Cancer, 1997) indicating an increased incidence of breast cancer in women taking either unopposed estrogen or estrogen/progestin therapy in increasing doses or duration (SONKJ030-001294). An increased incidence of breast cancer for both past/current use of unopposed estrogen or estrogen/progestin combination therapy with short-term (less than 5 years) or long-term (greater than 5 years) duration of use was confirmed in a case-control study published in Clinical Epidemiology (Henrich, 1998; PICKJ006-000930). Other studies demonstrated an increase in breast cancer incidence in women undergoing unopposed estrogen or unopposed estrogen or estrogen/progestin combination therapy combination therapy with increased duration of use (Magnusson et al., 1999; PICKJ006-000931) or an increase in breast

cancer risk in women using the estrogen/progestin combination therapy with increasing duration (Persson et al., 1999; PICKJ006-000928).

In a November 1999 letter to the editor (Lippert and Mueck, 1999, Canadian Medical Association Journal) Dr. Theodor Lippert discusses the uncertainty surrounding the number of active estrogenic components in Premarin. He also notes that estrogen metabolites can have a number of different effects (Lippert et al., 1999) and that some are thought to increase the risk of breast cancer (Fishman et al., 1995). Internal Wyeth documents (January 13, 2000) confirm Wyeth's concern with the opinions expressed by Dr. Lippert (VICTJ002-000315) and discussed possible ways to counteract such opinions. Wyeth decided it was better to let "… sleeping dogs lie." (FISHG002-000003). This document also provides a recommendation that Wyeth not discuss the composition of conjugated equine estrogens or their metabolism and that their response should focus on the overall effect of estrogen replacement therapy on the incidence and mortality associated with breast cancer (FISHG002-000003).

The breast cancer risk associated with hormone replacement therapy was also noted by the FDA in their 1994 review of the Prempro New Drug Application (NDA). The Medical Officer's review noted 6 cases of breast cancer, all in patients receiving combination therapy (W-MDL303-00083745). This prompted the concern that "concomitant progestin may exacerbate the increased breast cancer risk reported with prolonged unopposed estrogen treatment." The FDA also asked Wyeth to perform a post-approval investigation of the risk of developing breast cancer in estrogen users and non-users (PICKJ007-000280; W-MDL303-00081186; W-MDL303-00081420). While the Medical Officer noted that breast cancer was the single biggest risk associated with the use of estrogen, the FDA pointed out that the WHI trial would not answer the question of whether breast cancer risk was elevated by estrogen. Unfortunately,

Wyeth chose not to perform such a study, deciding instead to wait until the results of the Women's Health Initiative study became available (FISHG001-000078; W-MDL303-00084714).

The results of the PEPI trial, published in 1995, showed that 8 women developed breast cancer during the 3-year follow-up to the study (Miller et al., 1995). Wyeth attempted to mitigate this data by stating that a 50% reduction in cardiac deaths outweighed any possible increased risk of breast cancer. This statement was made despite the lack of an indication for reduction in cardiovascular events. Long-term hormone users (>10 years) were also found to have an increased mortality from breast cancer (Grodstein et al., 1997). Another clinical study published in JAMA (Chen et al., 2002) noted an increase in breast cancer incidence in women using unopposed estrogen or estrogen/progestin combination therapy with increased duration of use. The study showed a greater increase of incidence in breast cancer with long-term estrogen use in comparison to estrogen/progestin use (PICKJ006-000934).

Results of the WHI Study were published in 2002 in JAMA. These results confirmed that the detrimental effects of combination therapy outweighed any potential benefits. Extrapolation of these data over a 1 year period revealed that 100 additional serious adverse events among 10,000 (1 in 100) women using the estrogen/progestin combination therapy would be expected. Viewed in light of the millions of women receiving this therapy, which was promoted by Wyeth for long-term use, the public health risk was deemed substantial (Roussow et al., 2002). Taken together with additional studies demonstrating an increased risk of breast cancer associated with longer term therapy, the WHI results further confirm the unnecessary risks to which these patients were exposed.

Worldwide medical literature, FDA correspondence and internal Wyeth documents provide insight into the increased breast cancer risk associated with estrogen replacement

therapy, a risk that has been apparent since the mid-1970's. As the evidence demonstrating this increased breast cancer risk continued to mount, Wyeth continually denied any association between breast cancer and estrogen therapy or simply stepped up their public relations effort in an attempt to portray hormone replacement therapy in a more favorable light to physician's and their patients. A reasonable pharmaceutical company would have conducted a definitive study examining the breast cancer risk associated with hormone replacement and provided these results in the product labeling. This should certainly have been undertaken prior to FDA approval of Prempro in 1994. As additional evidence mounted, Wyeth chose to forego conducting this critical study and instead chose to wait on results from the WHI study. This delay likely resulted in thousands of excess cases of breast cancer among women taking hormone replacement therapy. It is interesting to note that the foreign product labeling was amplified to reflect increasing evidence of an association between estrogen use and breast cancer, years before the United States labeling was amplified to reflect a similar risk.

## VII. WYETH FAILED TO ADEQUATELY ASSESS CARDIO-VASCULAR RISKS ASSOCIATED WITH HORMONE REPLACEMENT THERAPY

For two decades, Wyeth misrepresented and minimized the cardiovascular effects of its hormone replacement therapy drugs. As noted below, Wyeth's actions were accomplished by acts of omission and commission.

Multiple sources (medical literature, FDA correspondence, internal Wyeth documents) demonstrate that Wyeth overstated the benefits of estrogen therapy for the prevention and treatment of coronary heart disease events for many years. In addition, Wyeth downplayed any negative study results demonstrating either no beneficial effects or an increased risk for coronary heart disease (CHD) events associated with various estrogen or estrogen/progestin replacement

therapies. Notwithstanding the initiation of large clinical outcome studies by other manufacturers, in the 1970s and 1980s, with low-dose aspirin, pravastatin, simvastatin and other products, Wyeth postponed the performance of a definitive study examining the effects of estrogen therapy on CHD events. Wyeth instead focused marketing efforts only on positive observational studies in an attempt to prove cardiovascular benefits.

In September, 1983 (W-MDL04782-00030691), Wyeth was placed on notice that recent epidemiologic studies had not confirmed positive cardiovascular benefits. Wyeth should have immediately initiated a trial to investigate this issue more thoroughly. Had the proper trial been conducted, Wyeth would have appreciated the adverse cardiovascular events associated with estrogen therapy in post-menopausal women long before the HERS and WHI data was generated.

Wyeth also delayed dissemination of scientifically balanced product labeling designed to fully describe cardiovascular consequences associated with estrogen use**.** A responsible drug company would have changed the product labeling and instructed detail representatives to provide physicians with accurate study results as they became available. Certainly, by the time the HERS data were published in 1998, corrected labeling was required. After all, HERS demonstrated a greater than 50% increase in the risk for coronary heart disease events during the first year of estrogen plus progestin therapy. Wyeth did not revise their product labeling describing the HERS results for another two years (2001 Physicians Desk Reference).

Following publication of the WHI study, which confirmed the potential negative effects of hormone replacement therapy observed in the HERS study, Wyeth continued to evade the negative results, instead focusing on benefits observed in less rigorous trials. Wyeth's delay in incorporating these changes into the product labeling contributed to the ongoing deception that

Wyeth had practiced since the initial study which found increased rates of pulmonary emboli and thrombophlebitis in subjects receiving estrogen.

The Coronary Drug Project was the first clinical trial designed to test the long-term efficacy of estrogen in reducing coronary events (Wilkins et al., 1973). After an average of 56 months of follow-up, conjugated estrogen therapy produced no therapeutic benefit in regards to the primary end point (total mortality) in men. In addition, a higher rate of pulmonary emboli and thrombophlebitis in subjects receiving conjugated estrogens necessitated the discontinuation of this study. Adverse cardiovascular effects of estrogen were also demonstrated in a 1976 study (Dr. John Laragh). He described a marked elevation of renin production in patients receiving estrogens (as contraceptive therapy) accompanied in some cases by clinically serious elevations in blood pressure. Around this time a smaller, double-blind prospective study (Nachtigall et al., 1979) revealed no difference in the incidence of myocardial infarction in postmenopausal women undergoing unopposed estrogen therapy compared to placebo.

Following these studies, a considerable amount of time elapsed before the performance of a large scale trial examining coronary heart disease endpoints in patients taking estrogens. The Postmenopausal Estrogen/ Progestin Interventions (PEPI trial) lasted 3 years and included 875 women within 10 years of menopause (Miller et al., 1995). The PEPI trial showed that unopposed estrogen or estrogen/progestin combination therapy improved lipoprotein levels. Unopposed estrogen causes the greatest increase in HDL-C levels but the elevated rate of endometrial hyperplasia limits its use to women without a uterus. In women with a uterus, estrogen with cyclic medroxyprogesterone exhibits the greatest effect on HDL-C with no excess risk of endometrial hyperplasia. Although this trial was not designed to study disease outcomes,

there was a higher incidence of cardiovascular and thrombotic events among women receiving hormone therapy compared to the placebo group (PEPI trial, 1995).

Despite the lack of controlled clinical trials examining the effect of estrogens on coronary heart disease, some observational studies suggested that postmenopausal unopposed estrogen therapy reduced the risk of cardiovascular disease (Pfeffer et al., 1978; Ross et al., 1981; Stampfer et al., 1985; Stampfer et al., 1991). Observational studies utilize a cohort of disease-free individuals with a factor of interest (hormone use) as well as a group not displaying that factor (non users of hormone). The study then observes these groups over time to determine the frequency of development of disease. At this same time, some studies demonstrated an increased risk of adverse cardiovascular events associated with estrogen therapy (Jick et al., 1978; Adam et al., 1981; La Vecchia et al., 1987).

Wyeth focused on only those observational studies providing support for its position, and in May 1990 filed a supplemental NDA to gain an indication of cardioprotection in postmenopausal women for Premarin (W-MDL04782-00045227-28). The FDA rejected this application due to the lack of controlled data. Additional Wyeth internal correspondence (August 22, 1990) notes that the FDA remains unconvinced regarding the overall safety and effectiveness of an estrogen/progestin regimen. In particular, the FDA expressed concern that the progestin component may override the beneficial cardiovascular effects of Premarin (unopposed estrogen) and that the lack of clinical data from well-controlled studies evaluating the risk/benefit ratio of combination estrogen/progestin will preclude the approval of a combination therapy regimen (PANAA034-001426-1427). Wyeth had previously submitted a New Drug Application (NDA) for combination therapy which was rejected by the FDA due to a lack of well-controlled clinical studies. This internal correspondence also notes that an FDA

official "admonished" the Wyeth employee (Justin Victoria) for proposing the marketing of combination therapy prior to submitting a full NDA.

Although several observational studies demonstrated a cardioprotective effect of estrogen, Wyeth internal correspondence recording the results of an NIH Estrogen Workshop held on September 13-14, 1983 notes that other epidemiological studies have not confirmed beneficial effects observed in the Lipids Research Clinics Program. Perhaps noting the serious consequences that negative results from a properly-controlled, double-blind trial would bring about, Dr. Henry Perdue (Wyeth Laboratories) stated that the future of hormone replacement therapy could be impacted by such a controlled study, and suggested that the company monitor plans for the study and assert the necessary influence to ensure that the study was properly designed, conducted and evaluated (W-MDL04782-00030691-93).

In addition, a number of reports suggested that a large part of this reduced risk associated with cardiovascular endpoints resulted from hormone use by women with reduced risk for cardiovascular disease (Stampfer et al., 1991; Posthuma et al., 1994; Pettiti et al., 1986). Women taking hormone replacement therapy tended to have healthier lifestyles, were wealthier, more educated and exhibited fewer cardiovascular risk factors (Iribarren et al., 1997). Thus, the need existed for a randomized, controlled trial to demonstrate the cardioprotective effect of estrogens (Manson et al., 1994; Matthews et al., 1996). Despite this fact, Wyeth delayed conducting a definitive study, ignored results contradictory to its marketing plan including a 1985 follow-up study demonstrating a 50% increase in cardiovascular morbidity in patients taking estrogens (Wilson et al., 1985), and instead focused on observational data.

In the 1990's, results from controlled clinical trials examining the effects of hormone replacement on cardiovascular endpoints began to appear. These often contradictory results

should have alerted Wyeth to inform physicians and their patients not only of the potential beneficial effects, but also of the potential adverse cardiovascular events. The Nurses Health Study (Stampfer et al., 1985; Grodstein et al., 1997) demonstrated a reduction in mortality due to coronary disease and for mortality attributed to any cause in postmenopausal women currently taking hormone therapy. Women exhibiting risk factors for coronary heart disease had the greatest reduction in risk while very little effect was observed in women at low risk for CHD. Increasing duration of use did not provide additional benefit.

The Heart and Estrogen/Progestin Replacement Study (HERS) was the first large trial designed to examine whether estrogen plus progestin therapy reduced the risk for coronary heart disease events in postmenopausal women with established coronary disease. Wyeth agreed to fund this study after the NIH declined. The study began in 1993 and closed in July 1998.

After 4 years of follow-up, results from HERS showed no difference in the primary outcome (nonfatal myocardial infarction and CHD death combined) between active and placebo groups (Hulley et al., 1998). In addition, during the first year of therapy there was a 52% excess risk of CHD events in the active treatment group. From years 3 to 5, a decreased risk was apparent in subjects treated with estrogen plus progestin. Follow-up HERS data (Grady et al., 2002) demonstrated that the decreased rates of coronary heart disease events in the estrogen/progestin group in the final years of the initial HERS study did not persist during additional years of follow-up. Therefore, it was concluded that postmenopausal hormone therapy should not be utilized to reduce risks for CHD events in women with pre-existing CHD. Additional HERS study results showed that the estrogen/progestin combination did not reduce coronary or peripheral arterial events (Hsia et al., 2000) and did not modify the risk for stroke (Simon et al., 2001). Data from the Women’s Estrogen for Stroke Trial (WEST) indicated that

unopposed estrogen therapy actually increased the risk of experiencing a fatal stroke (Viscoli et al., 2001).

Despite the publication of these numerous studies detailing adverse CHD events associated with estrogen therapy, Wyeth delayed the inclusion of these data into the package inserts for Premarin and Prempro. Instead, Wyeth chose to explain away these data by noting limitations of the trial (CONSG001-002027; CONKJ003-000150), even as other authors concluded that HERS subjects were similar to a representative sample of US women with coronary disease (Herrington et al., 1998). Extensive analysis of subgroups in HERS subjects was also performed in an attempt to explain why no overall effect on the primary outcome was observed (Furberg et al., 2002). These tests failed to reveal any explanation for the observed result, demonstrating that the opposed estrogen therapy produced no beneficial response in these women.

Thus, the results from two large scale clinical trials (Coronary Drug Project, HERS) demonstrated either harmful or no beneficial effects of unopposed or opposed estrogenic therapy. Based on these results Wyeth should have amended their product labeling to reflect the possible risks associated with the use of these products (Premarin and Prempro) and performed additional controlled clinical trials examining cardiovascular endpoints. This became more apparent following the publication of additional secondary prevention trials examining the effect of estrogens (opposed and unopposed) on cardiovascular endpoints (Herrington et al., 2000; Angerer et al., 2001; Cherry et al., 2002; Waters et al., 2002). Results from these studies corroborated the Coronary Drug Project and HERS results, finding either no benefit or increased risk associated with estrogen therapy.

Instead of designing and funding a clinical trial to examine the necessary endpoints, Wyeth instead mounted an aggressive media blitz to "…craft and deliver messages that are perceived as focusing on the patient …." (CONKJ003-000150; PICKJ020-001968). They were particularly concerned with the impact of the HERS study results on physicians, especially as it pertained to cardiovascular disease. Internal Wyeth correspondence notes that physician perception of the HERS Study was generally favorable, with 51% of physicians recalling benefits of HRT, particularly with respect to cardiovascular effects; however, 25% of physicians polled had a negative opinion of the HERS data. Interestingly, while about 50% of the physicians polled expressed less favorable feelings for secondary prevention of cardiovascular disease, only 21% of physicians indicated that they would decrease their prescribing of Prempro for patients with prior cardiovascular disease. The most common reason for not altering their Prempro prescribing habits was the belief that additional research was needed on the topic (LUDMG003-000423-426). Thus, despite a previous acknowledgment that the responsible course of action would be to perform clinical studies and provide information to physicians/patients to ensure that answers on Hormone Replacement Therapy will be accurate and balanced (VICT005-001704), Wyeth chose to evade the negative results.

The Women's Health Initiative study began in 1992, involving 16,608 patients and was designed to evaluate primary prevention of coronary heart disease. Wyeth provided the study medication for this trial. An early excess risk of heart attack and stroke was apparent after the first 2 years of follow-up (and again 1-2 years later) in women taking opposed or unopposed estrogen (Lenfant, 2000). The combined estrogen-progestin arm of the study was stopped early because of excess invasive breast cancer risk after an average of 5.2 years. Excess risk for CHD became apparent almost immediately after starting therapy. Data from the estrogen/progestin

arm of the WHI Study published in JAMA (Rossouw et al., 2002) showed that there were 7 more cases of CHD per 10,000 women using combination therapy. Final results from the WHI (mean follow-up of 5.2 years) indicate that an estrogen/progestin combination therapy does not confer cardiac protection and may actually increase the incidence of CHD in generally healthy women during the first year after the initiation of hormone therapy (Manson et al., 2003).

Additional trials provided support for results observed in HERS and WHI. A pooled analysis of 22 short term primary prevention (3 months to 3 years duration) clinical trials (total patients, 4124) showed a relative risk of 1.39 for cardiovascular events (Hemminki and McPherson, 1997). These results provided additional evidence that Wyeth should have amended their product labeling to reflect the increased risk for cardiovascular events associated with estrogen therapy.

Despite contradictory findings apparent in the literature regarding the cardiovascular effects of various estrogen or estrogen/progestin replacement therapies, Wyeth focused solely on those findings beneficial to their products. This included the presentation of observational study results as solid evidence that hormone replacement could reduce cardiovascular risk factors. In addition, Wyeth chose to either ignore negative study results, demonstrating increased cardiovascular risk or attempted to explain away the findings by noting supposed limitations of the study, such as advanced subject age or the inappropriate comparison of different hormone therapies. Finally, Wyeth failed to conduct a definitive study to quantify cardiovascular risks when placed on notice of the need for such a study in 1983. This course of action served to deceive millions of women taking these products and likely resulted in numerous adverse cardiovascular events which may have been prevented if appropriate warnings were available to both physicians and their patients.

## VIII. WYETH'S PRESENTATION OF RISKS AND BENEFITS

Wyeth consistently misrepresented the risks and benefits of its hormone therapy drugs to prescribers and post-menopausal women. In addition, Wyeth sought to delay FDA actions concerning decisions about its drugs especially when such actions would have negatively impacted risk-benefit assessments and the marketing of these products. Because there has been little but bad news in the last two decades for these drugs, Wyeth repeatedly tried to delay the dissemination of the bad news and then contested the scientific value of such bad news when the data were released.

### THE ASSOCIATION BETWEEN ENDOMETRIAL CANCER AND PREMARIN

Beginning in the mid-1970s, Wyeth worked hard to put the right spin on the association between Premarin and endometrial cancer. This effort really started with the December 1975 publication of NEJM articles revealing a 4.5 – 13-fold increase in endometrial cancer in women using HRT (Ziel and Finkle, N Engl J Med 1975; 293:1167-70; Smith et al., N Engl J Med 1975; 293:1164-70) The FDA immediately convened an Advisory Committee meeting, on December 16 and 17, to review the risk. Almost simultaneously, Wyeth issued a "Dear Doctor" letter in which they claimed that the published studies had weaknesses and had failed to establish a link between estrogen use and endometrial cancer. The letter noted that Premarin should be prescribed for cyclical administration (to avoid prolonged stimulation of the endometrium) and that the lowest maintenance dose needed to control the menopausal symptoms should be employed (W-MDL04782-00064632).

The FDA responded in two ways. First, on January 8, 1976, the FDA announced that it would release new labels for estrogen products used to treat menopausal and postmenopausal women, and that the labels would "emphasize the newly reported increased risk of cancer of the uterus associated with prolonged use of estrogen products…" The FDA also reprimanded Wyeth on the grounds that the "Dear Doctor" letter misrepresented the scientific data and was intended to obscure the issue rather than highlight the risks (W-MDL04782-00082569). The FDA minutes of a January meeting between Wyeth and FDA (W-MDL04782-00027339) bluntly stated that Wyeth's "…letter is warped in tone and is intended to obfuscate the issues rather than to highlight new information related to risk. This letter is borderline in terms of violating the Food, Drug and Cosmetic Act."

As a direct result, Premarin sales plummeted in late 1970s, recovering only when new studies demonstrated that the risk of endometrial carcinoma in nonhysterectomized women could be reduced by the addition of cyclic progestin to ERT.

The association between estrogen use and endometrial cancer was a clear postmarketing safety surveillance signal. At that point, any reasonable drug company would have investigated all other potential cancer targets associated with hormone therapy.

**THE ASSOCIATION BETWEEN BREAST CANCER AND PREMARIN/ PREMPRO**

Among the first major papers to draw attention to the association between Premarin and breast cancer was Hoover et al. (N Engl J Med 1976; 295:401-5), which occurred within a few months of the endometrial cancer events. The authors reported that patients using estrogen replacement therapy had twice the incidence of breast cancer after 15 years of therapy in comparison to women who had never used it. Wyeth responded to Hoover's publication

dismissively, stating "We do not believe that this study provides support for concluding that an association exists between the use of estrogens and an increased risk of breast cancer." (W-MDL04782-00029027) In a manner reminiscent of the December 1975 "Dear Doctor" letter on endometrial cancer, Wyeth focused on weaknesses in the Hoover study and identified several published reports that did not support an association between estrogen use and an increased risk of breast cancer.

In the months prior to this publication, Wyeth scientists confirmed that the company should place an "even higher priority" on understanding the risk of breast cancer than quantifying the endometrial cancer risk. "We need to know all there is to know, both good and bad" about the issue, they concluded and suggested a retrospective study be undertaken. (W-MDL0478-00051786). In June of 1976, the same company scientists conducted a review of the medical knowledge of an association and found that "although estrogens may not bring about breast cancer, they are capable of accelerating growth of previously established breast tumors." (W-MDL04782-00029233)

The medical literature of the 1980s and 1990s includes a number of studies that suggested an association between estrogens and breast cancer, as well as a few that did not. This was an open and unanswered issue. For example, in April 1980, Ross et al. (JAMA 1980(Apr); 243:1635-9) published a case-controlled study of menopausal estrogen therapy and breast cancer and concluded that the risk ratio for a total cumulative dose in excess of 1500 mg was estimated to be 2.5 in women with intact ovaries. Wyeth first consulted with Dr. Brian MacMahon to see if there were design flaws in the study but Dr. MacMahon confirmed that it was a "good paper." Dr. MacMahon also informed Wyeth that more studies showing a significantly increased risk of breast cancer in postmenopausal estrogen users were expected and that "in 6 months, when all

the data is out, (Wyeth) may be faced with some serious decisions." (W-MDL04782-00032331). Disregarding Dr. MacMahon's concerns, Wyeth again mounted a public relations campaign to counter the adverse publicity that would accompany Ross's publication. (W-MDL04782-00032274).

In 1989, Bergkvist et al. (N Engl J Med 1989; 321:293-7) reported an increase in breast cancer incidence of nearly two-fold in Swedish women who had used estrogen-only hormonal treatments for nine years compared to women who did not use hormones. The increased incidence was approximately four-fold for women taking a combination of estrogen and progesterone. Wyeth avoided the issue, instructed representatives not to discuss the study, and reminded its staff that a study conducted in Sweden may not accurately reflect the medical conditions in the US. (CONNS005-000346).

In November 1990, Colditz et al. (JAMA 1990 (Nov); 264:2648-53) published a prospective study on the risk of breast cancer in postmenopausal women taking estrogen replacement therapy. This study reported an elevated risk of breast cancer (RR 1.36) among current users, but not among previous users. Wyeth's responsive "Dear Doctor" letter emphasized an FDA review that determined that the evidence for an association between ERT and breast cancer was not conclusive in the overall population and did not necessitate any change in the use of ERT (PANAA025-001943).

The FDA's 1990 Guidance for Estrogen Drug Products Physician Labeling proposed the following breast cancer warning:

> "While the majority of studies have not shown an increased risk of breast cancer in women who have ever used estrogen replacement therapy, some have reported a moderately increased risk (relative risks of 1.3—2.0) in those taking higher

doses or those taking lower doses for prolonged periods of time, especially in excess of 10 years. Other studies have not shown this relationship."

This was the first time that a Relative Risk figure for breast cancer appeared in the proposed Guidances. However, neither this Relative Risk figure, nor any other risk statistics were included in the Physician Labeling for Premarin until 2000 (9 years later) (VICTJ005-001620 and 2000 label).

In 1990, Dr. Andrew Glass and Dr. Robert Hoover published a study based on the breast cancer incidences of patients at the Kaiser Permanente Cancer Registry. Their findings suggested an increase in positive estrogen receptor breast cancers with hormonal factors.

We also know that had Wyeth or Pfizer been watching for signals of new increases in hormonally sensitive breast cancer in the SEER cancer registry, which Wyeth frequently used for defensive purposes, they would have seen a signal in increasing invasive lobular breast cancers, solely in older women, starting in the early 1980's. (Surveillance, Epidemiology, and End Results: Incidence and mortality data, 1973-77. NCI Mongr 57, NIH Publ No.81-2330, 1981.; Surveillance, Epidemiology, and End Results (SEER) program of the National Cancer Institute. Website URL: http//seer.cancer.gov/about/.) It would have taken only three or four years to do relatively inexpensive case control studies to confirm if this signal were real.

In 1991, Steinberg et al. (JAMA 1991; 265:1985-90) performed a meta-analysis of published clinical studies and found that an increased risk of breast cancer did not begin until after five years of HRT. The authors estimated that every year in the United States, hormone use could add about 4700 preventable cases of breast cancer, and nearly 1500 deaths.

Studies published in 1992 and 1993 by Colditz et al. suggested an increased breast cancer risk (33-40%) for current users of HRT (Colditz et al. Cancer Causes and Control 1992; 3:433-9; Colditz et al. Am J Obstet Gynecol 1993; 168:1473-80).

In December 1992, Grady et al. published a review of hormone therapy in postmenopausal women (Ann Intern Med 1992 (Dec); 117:1016-37). They reported that long-term estrogen therapy appeared to be associated with a small increase in risk for breast cancer.

Despite this extensive breast cancer risk background for Premarin, Prempro was approved by the FDA at the end of 1994. The risk of breast cancer in the clinical study that served as the basis for the approval, was noted by the Medical Officer in her Review. The Review noted that breast cancer developed within one year following normal baseline exams and mammograms in five subjects during study drug treatment, with all of the cases occurring in the combination treatment groups (4 of 5 in the continuous treatment regimens) (W-MDL303-00083745). The Medical Officer stated that this "raises a concern that concomitant progestin may exacerbate the increased breast cancer risk reported with prolonged unopposed estrogen treatment." The Medical Officer's report went on to state that "the true effect of (HRT) on breast cancer incidence and mortality must be considered the single most important safety issue concerning this class of drugs. (W-MDL303-0008396) As a result of these findings, the FDA conditioned their approval of Prempro upon Wyeth agreeing to conduct a post-approval comprehensive investigation of breast cancer risk in users and non-users, most likely as a case-control epidemiologic study (PICKJ007-000280, W-MDL303-00081186, and W-MDL303-00081420).

Wyeth never conducted this requested breast cancer risk study. Wyeth sought (and received) an exemption from this commitment because of the Women's Health Initiative study

(FISHG001-000078, W-MDL303-00084714). This is in line with Wyeth's company policy of reluctance to fund or conduct breast cancer studies involving its hormone therapy drugs. In 1993, the Eastern Cooperative Oncology Group (ECOG) requested that Wyeth provide drug for a study of HRT in women post-breast cancer, taking tamoxifen. In a memo to David Dodd, Carrie Smith Cox stated that ECOG's request had been rejected per company policy "as is customary apparently for studies involving breast cancer" (PANAA027-000561). This hesitation to conduct appropriate safety studies is seen repeatedly in Wyeth's documents (OLIVS019-024695).

The labeling information related to breast cancer for Wyeth's hormone therapy drugs was designed to downplay the risks rather than educate prescribers and patients. This labeling also permitted a forum for Wyeth to minimize the risk in promotional pieces. For example, Wyeth repeatedly used only one sentence from the labeling when discussing breast cancer risks in promotional pieces (W-HUSAK02-00000094 ; PANAA016-000938 ) . The chosen sentence was "The majority of studies, however, have not shown an association with the usual doses used for estrogen replacement therapy."

## THE ASSOCIATION BETWEEN CARDIOVASCULAR DISEASE AND PREMARIN/PREMPRO

The association between cardiovascular disease and Premarin/Prempro makes for an interesting story, in part because Wyeth first tried to establish the prevention of cardiovascular disease as an indication for Premarin/Prempro before learning that ERT/HRT actually increases the risk of cardiovascular disease. Notwithstanding this growing body of information, Wyeth repeatedly denied negative data and promoted the cardiac benefits of estrogen use.

The story begins with the Nurses' Health Study, which reported in 1985 that, among the 32,300 study participants, there was a 50% reduction in coronary disease among hormone users in comparison to those who never used hormone therapy (Stampfer et al. N Engl J Med 1985; 313:1044-9). Mostly ignored and in the same issue of NEJM was a report from the investigators of the Framingham Heart Study to the effect that estrogen users had two times the rate of strokes and blood clots and a 50% higher incidence of coronary risk (Wilson et al. N Engl J Med 1985; 313;1038-43).

On a number of occasions, Wyeth sought permission from the FDA to either promote a cardiac benefit or to include cardiac benefit information in the Premarin label. Each time the FDA denied Wyeth's requests. In June 1990, based solely on observational studies, Wyeth sought approval from the FDA for a heart disease prevention indication for Premarin; FDA did not approve the application. Extremely telling is the fact that Wyeth's proposed indication explicitly limited itself to "hysterectomized" women, and admits "the effects of progestin on the beneficial cardiovascular properties of estrogen replacement therapy are unknown". (WMDL04782-00045322) An FDA official later stated that the submitted studies did not constitute randomized, prospective clinical trials (Senate Labor and Human Resources/Aging Subcommittee Hearing, FDC Report, Pink Sheet, April 29, 1991).

In 1992, Wyeth requested permission to add cardiac benefit language to the Premarin label. The FDA refused this request and instead required the cardiac information be placed into the precautions section of the Premarin label to prevent Wyeth from promoting a cardiac benefit which was "yet to be proven" (PANAA014-001130; W-MDL303-00081836).

In May 1994, Potshuma et al. suggested that the evidence for a cardioprotective effect of HRT in postmenopausal women may have been biased (BMJ 1994 (May); 308:1268-9). They

reviewed the follow-up studies reported in three meta-analyses to determine the effects of estrogen therapy on cancer and cardiovascular disease. They found that relative risk (RR) for total cancer was less than 1, and those studies that showed the largest reduction in cardiovascular disease also showed the largest reduction in cancer. They suggested that their findings may have been due to a healthy cohort effect, and that the unintended selection of relatively healthy women for estrogen therapy may have influenced the reported beneficial effect.

On January 18, 1995, Miller et al. published the results of the PEPI Trial (JAMA 1995 Jan 18; 273(3):199-208). The PEPI Trial studied the effects of estrogen and estrogen/progestin on heart disease risk factors in postmenopausal women. The authors reported that estrogen alone or in combination with a progestin improved lipoprotein levels (decreased LDL, increased HDL) and lowered fibrinogen levels. Unopposed estrogen caused the greatest increase in HDL, but a high rate of endometrial hyperplasia was seen to restrict the use of this regimen to women without a uterus. In women with a uterus, the authors suggested that estrogen/progestin combinations had the most favorable effect on HDL with no excess risk of endometrial hyperplasia. These data provided a basis for Wyeth to make lipid-lowering claims for both Premarin and Prempro.

In May 1995, Sturgeon et al. published an article concerning evidence for a “healthy estrogen user survivor effect” (Epidemiology 1995(May); 6:227-31). Dr. Sturgeon found a lower all-cause mortality rate among women who took estrogens, particularly current users, than among women who never took them. Additional analyses showed that women who had recently stopped taking estrogens had a higher all-cause mortality rate, and higher mortality rates from circulatory disease and cancer. They concluded that the most reasonable explanation was that women stop taking estrogens when they develop symptoms of serious illness, and that

nonexperimental studies are susceptible to overestimating the benefits of menopausal estrogen use due to this "healthy estrogen user survival effect." Then, in 1996, articles published in Lancet indicated that healthy women between the ages of 45 and 65 who were treated with estrogen or estrogen/progestin regimens had a two- to fourfold increase in potentially fatal emboli in the legs and lungs (Daly et al., Lancet 1996; 348:977-80; Jick et al., Lancet 1996; 348:981-3; Grodstein et al., Lancet 1996; 348:983-87).

In 1998, FDA again refused to permit cardiac benefit language to appear in the Premarin label. (CONNS014-001103; W-MDL04782-00094080; DUROJ034-000439; CONNS014-000949; CONNS014-000210) The FDA told Wyeth that "many of the cardiovascular claims made in the Premarin submission appear to be unsupportable". Wyeth was also told that to get approval for such labeling language, Wyeth would have to conduct either two adequate and well-controlled clinical studies or a multi-year, large-scale, multi-center mortality trial. (W-MDL04782-00095313)

In order to pursue a heart disease claim, Wyeth sponsored a randomized controlled trial, the Heart and Estrogen/Progestin Replacement Study (HERS). On August 19, 1998, Hulley et al. published the results of the HERS study, a randomized trial of estrogen plus progestin for secondary prevention of coronary heart disease in postmenopausal women (JAMA. 1998(Aug19); 280:605-13). Unexpectedly, the authors reported that, during an average follow-up of 4.1 years, treatment with Prempro did not reduce the overall rate of coronary heart disease (CHD) events in postmenopausal women with established coronary disease. 172 women in the hormone group and 176 women in the placebo group died from an MI or CHD death (RR, 0.99; 95% CI, 0.80-1.22). The lack of an overall effect occurred despite a net 11% lower low-density lipoprotein cholesterol level and 10% higher high-density lipoprotein cholesterol level in the

hormone group compared with the placebo group (each P<.001). The major finding was no overall cardiovascular benefit and a pattern of early increase in risk of CHD events. The findings implied that lower lipoprotein levels associated with estrogen-progestin treatment did not translate into a beneficial cardiac effect.

Instead of strengthening the safety-related aspects of its product labeling, Wyeth began a campaign to camouflage the issue and delay the implementation of any labeling revisions that might cause a loss of its market share. A few weeks prior to the publication of the HERS data, on July 29, 1998, in preparation for a meeting with the FDA to discuss the preliminary HERS data, Wyeth sent its "background data package" to the FDA for review (IND 21,696; Serial no. 182). The meeting took place on August 12, 1998. At the meeting, the FDA indicated that they did not at that time have any immediate recommendations for revised labeling based on the HERS results. Wyeth sent a copy of the HERS paper to the FDA the next day.

On August 26, 1998, Wyeth requested a meeting with FDA's Division of Drug Marketing Advertising and Communications (DDMAC) concerning proposed promotional materials for Prempro and Premphase (W-MDL527-00039572). The meeting request concerned DDMAC's objection to a proposed promotional claim regarding increased HDL and decreased LDL. DDMAC had argued that the promotional claim emphasized a benefit due to Premarin in materials that concerned Prempro and Premphase. DDMAC suggested that claims in Prempro/Premphase materials be specific to the condition of added progestins. Wyeth stated that they believed they should be permitted to promote the claim as written, based on text in the approved Prempro/Premphase labeling and because the lipid effect of Prempro/Premphase is based primarily on its conjugated estrogen content. A meeting was scheduled for November 23, 1998.

On November 19, 1998, DDMAC contacted Wyeth to request a detailed agenda for the November 23 meeting, to include new items concerning the HERS data in regards to promotion and the use of the lipid lowering claim in ads for the Premarin family of products (W-MDL-527-00039696). Wyeth had not expected to have to address the HERS data with DDMAC. In response, Wyeth cancelled the November 23 meeting.

On December 1, 1998, Joseph Sonk (Wyeth U.S. Regulatory Affairs) advised Norman Drezin of DDMAC that Wyeth intended to promote the lipid lowering benefits of Prempro/Premphase in the same context as it appears in the current labeling. Sonk noted that the claim was based on a clinical trial in a low risk Caucasian population, that the HERS study population was older and at higher cardiovascular risk, and that it would therefore be possible to separate the populations in any promotional claim. Sonk further stated that it was Wyeth's position that "no Prempro/Premphase labeling changes are needed based on the results of the HERS study" (W-MDL527-00039708).

On December 11, 1998, Wyeth again requested a meeting with DDMAC to discuss lipid claims as related to the promotion of Prempro/Premphase and to request clarification of DDMAC's issues about promotional statements concerning the "Premarin family" of products (W-MDL527-00039716). On January 4, 1999, citing Wyeth's failure to address "new information available and known to it regarding the effect of Prempro and/or Premphase on the lipid profile", DDMAC declined to schedule a meeting (W-MDL527-00039729). It is interesting to note that in 1999, 68% of prescriptions written for the Premarin family drugs were written for the off-label indication of decreased risk of cardiovascular disease (Pink Sheet, July 15, 2002).

On February 3, 1999, Wyeth provided DDMAC with a revised lipid lowering promotional claim for Prempro/Premphase and advised DDMAC that the Premarin Family promotional campaign had been stopped. Wyeth requested a meeting to obtain DDMAC concurrence on the appropriate wording for the revised claim and to define and describe the "Premarin Family" advertising concept (W-MDL527-00039756). DDMAC agreed to a meeting, which took place on February 22, 1999. At the February 22 meeting, Wyeth committed to the submission of labeling reflecting the results of the HERS study in approximately six months time.

In the FDA version of the February 22 meeting minutes, provided to Wyeth on March 31, 1999, the Agency noted that the HERS data raised concerns about claims regarding beneficial lipid changes that have been incorporated into promotional materials for Prempro and Premphase. FDA also noted that the HERS study failed to demonstrate that lipid changes, described in the Prempro/Premphase labeling, were clinically meaningful regarding cardiovascular events. FDA also stated that Wyeth's proposed HERS language did not identify Prempro as the drug that failed to show a benefit in the overall rate of CHD events, whereas positive lipid claims were clearly attributed to Prempro/Premphase, that these are not lipid lowering drugs and should not be so presented, and that no promotional materials should claim lipid or cardio benefits. In subsequent correspondence, Wyeth advised the FDA that it did not agree with several points in DDMAC's version of the February meeting minutes (W-MDL527-00039902) but FDA reconfirmed its version of the minutes (W-MDL527-00039928).

On April 1, 1999, Wyeth submitted revised lipid-lowering information to DDMAC (W-MDL-00039855). The first feedback from the Agency came via an FDA telephone contact in

which Lisa Stockbridge informed Jennifer Phillips that Dr. Temple "didn't like it" (W-MDL-00039887).

On September 22, 1999, Wyeth submitted a CBE (NDA 20-527, S-015) for Prempro/Premphase incorporating language regarding the HERS study in the Precautions and Patient Information sections of the labeling. Wyeth indicated that it was prepared to use the new labeling in 30 days, but requested FDA input and stated that the labeling would not be implemented until the submission had been discussed with the FDA and concurrence had been obtained.

Teleconferences between FDA and Wyeth were held on October 21, 1999 and on November 16, 1999. At the latter meeting, an agreement was reached on the proposed HERS language. A revised supplement was subsequently submitted, and was approved by the FDA on January 6, 2000. The HERS language was designed to appear in the PRECAUTIONS section:

> "In the Heart and Estrogen/progestin Replacement Study (HERS), 2763 postmenopausal women with documented coronary heart disease (CHD) who were taking their usual cardiac medications were randomized to Prempro 0.625mg/2.5mg or placebo. Documented CHD was defined as the presence of one or more of the following: previous myocardial infarction, previous percutaneous mechanical revascularization, previous coronary artery bypass graft surgery, or angiographic evidence of greater than 50% occlusion of one or more major arteries. During an average follow-up of 4.1 years, treatment with Prempro did not reduce the overall rate of recurrent coronary heart disease events, defined as CHD death or nonfatal myocardial infarctions, in this predominantly elderly population (average age 66.7 years) with established coronary disease. There

were more CHD events in the hormone group than in the placebo group in year 1 and fewer events in years 3 through 5."

It took a year and a half to negotiate the HERS study label language. From a legal and regulatory perspective, Wyeth had a duty to make appropriate label changes upon receipt of the relevant data.

On August 10, 2000, DRUDP (Division of Reproductive and Urologic Drug Products) advised Wyeth that, having conducted an extensive review of the HERS study, FDA was issuing class labeling language to update information concerning the risk of breast cancer and cardiovascular effects (W-MDL527-00040692). FDA stated that the changes would be applicable to all approved ERT and HRT products, not just Wyeth's products. The FDA's new breast cancer warning included revised relative risk information, but this time the relative risk figures were targeted at concominant progestin's propensity to exacerbate the breast cancer risk beyond that previously recognized with estrogen. Furthermore, based on the importance of this information, FDA noted that "to assure that this safety information is included in your label, these changes must be implemented within 90 days of this letter or at the next printing."

On September 29, 2000, Wyeth formally objected to the FDA proposed draft labeling, asked for suspension of 90-day implementation deadline, and requested a meeting (MDL303-00040692). FDA rejected both requests (MDL303-00040888), but (FDA's Diane Moore) stated that an additional request for a delay could be submitted if Wyeth felt that the labeling changes were too unwieldy to implement within the 90 day time period. Not surprisingly, on October 31, 2000, Wyeth requested such a delay. Wyeth and Pfizer were so threatened by this new class labeling implicating both estrogen and Progestin, that on November 7, 2000 they had their

attorneys at Arnold & Porter write a letter to the FDA reminding them that labeling changes were a negotiation and requesting additional time and a meeting.

On November 29, 2000, FDA issued an approvable letter for Wyeth's supplemental application S-011 (Prevention of Postmenopausal Osteoporosis, based on the PEPI study), and in the process inserted the class breast cancer warning into the approved language for the labeling (MDL527-00040999). Wyeth responded on December 6, 2000 by notifying the FDA of its intent to amend its labeling supplement, S-011 (MDL527-00041033).

On January 19, 2001, Wyeth submitted a CBE30 regarding the class breast cancer warning. This was basically a counter-proposal to the FDA language, and suggested a meeting to discuss the proposed revision (MDL527-00041120). The FDA acknowledged receipt of the supplement and agreed to respond, but rejected the request for the meeting (MDL527-00041289). The FDA approved the proposed labeling changes on February 22, 2001, but made some of its own changes (MDL527-00041401). Still not satisfied with the outcome, on March 1, 2001, Wyeth notified FDA of intent to amend the labeling (MDL527-00041502).

The HERS data was a blow to Wyeth. However, Wyeth refused to accept the significance of this data and consistently minimized the study results. For example, in October of 1998, Wyeth conducted a survey to evaluate the impact of the HERS data on physicians (LUDMG003-000423). This survey reported that physician awareness of the HERS trial was high, but that "overall, perceptions about the HERS study were largely positive, as more physicians concluded that HRT provided cardiovascular benefits than that HRT is associated with cardiovascular risk." The survey showed that the "HERS clinical trial seemed to have minimal impact on physicians perceptions about HRT and their expected prescribing of Prempro and virtually no impact about MPA or their relationship between HRT and breast cancer." Thus

Wyeth continued its efforts to promote all the long term benefits of HRT, including cardiovascular benefits and to provide physicians with tools to help them counsel and reassure patients who express concern, and to minimize any negative impact of the HERS data and associated publicity on the Premarin franchise.

An internal Wyeth document dated April 5, 1999 (PICKJ020-001968) concerned the establishment of a cross-functional team to communicate the HERS message. This document confirms that the new team's objectives were to protect the benefit of primary CVD prevention for Premarin, explore all plausible explanations for the HERS study result, defend MPA from being cast as the villain, and minimize any legitimization of other estrogen/progestin combinations. It also stated that Wyeth would seek to retain the primary CVD prevention benefit for estrogen in the official statements of key organizations such as AHA.

A draft of a Post-HERS Publication Strategy dated May 7, 1999 (PICKJ023-002677) stated that the "results of the HERS study should not be extrapolated to women outside of this population, for example, women outside of the age range or women without established CHD… Most importantly, HERS results cannot be extrapolated to the average postmenopausal woman who takes HRT for primary CHD prevention. Furthermore, it is imperative to note that HERS was not designed for adequate statistical power to investigate outcomes other than prevention of recurrent CHD events in women of the specified cohort." Thus, the study was deemed to be flawed and/or limited in scope, and the risks it identified did not apply to most of the target population.

Evidence that biased promotion continued is contained in a July 2000 letter written by Charles Payne, Wyeth's Territory Manager for Alabama and Georgia, and addressed to the Office of Ethics and Business Conduct at American Home Products (Wyeth) (CORRA001-

000125). In this letter, Mr. Payne stated that he had been "instructed with written presentations from company management to promote to physicians out of labeling indications such as but not limited to Alzheimer's disease, the reduction of cardiovascular disease, and vanity issues with Premarin and Prempro. Since many recent studies have shown increased incidences of breast cancer, heart attack and little effect on Alzheimer's disease…the liability for Wyeth could make the Redux lawsuits pale in comparison…" He closed by stating that the "desire for increased sales has overruled our company's ethical responsibility to promote our products safely."

As late as February 2002, Doug Petkus proposed a proactive strategy to explain the HERS study and "what it truly represents" (CONKJ003-000150). Petkus proposed an aggressive media outreach to explain HERS and its rationale. On March 26, 2002, John Kreutzer wrote a memo in which he indicated that education would be the key to addressing the attitudes of primary care physicians concerning HRT – attitudes such as the lack of long term CV benefit in the use of HRT and the fear of women of an increased risk of breast cancer if they take HRT (CONKJ018-056069).

The campaign to sell Premarin and Prempro included extending the duration of treatment as well as increasing the number of patients on therapy. Wyeth even noted in a Dear Doctor letter that women tended to stay on HRT for a considerable period of time, an average of 7.8 years with one quarter of the group on therapy for more than 11 years (W-MDL527-00048274). An undated and unsigned memo (PANAA030-001175) suggested that some experts "recommend that ERT be continued for at least 10 to 15 years or until approximately age 70, while others recommend therapy for life."

**WHI STUDY AND AFTERMATH**

On July 3, 2002, Wyeth informed the FDA that the WHI study was being discontinued due to concerns regarding breast cancer and cardiovascular disease (MDL527-00044575). A "Dear Healthcare Professional" Letter was issued in July of 2002 concerning the stoppage of the WHI study.

Two weeks later, Rossouw et al published the preliminary results of the WHI study, "Risks and benefits of estrogen plus progestin in healthy postmenopausal women: principal results from the Women's Health Initiative randomized controlled trial" (JAMA. 2002 Jul 17; 288(3):321-33). As noted above, the WHI study was stopped early because the test statistic for invasive breast cancer exceeded the stopping boundary for this adverse effect and the global index statistic supported risks exceeding benefits. The publication included data on the major clinical outcomes through April 30, 2002. The absolute excess risks per 10,000 person-years attributable to estrogen plus progestin were 7 more CHD events, 8 more strokes, 8 more pulmonary embolisms, and 8 more invasive breast cancers, while absolute risk reductions per 10,000 person-years were 6 fewer colorectal cancers and 5 fewer hip fractures. It was concluded that overall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2-year follow-up among healthy postmenopausal US women.

On August 28, 2002, Wyeth issued a "Dear Doctor" letter together with revised labels for Prempro, Premphase and Premarin. The letter stated that the revisions reflected new data, primarily from the WHI study, and that Prempro, Premphase and Premarin were not indicated and should not be used to prevent coronary heart disease. "The product indications remain the same. However, because of the potential increased risks of cardiovascular events, breast cancer and venous thromboembolic events... the use of postmenopausal estrogen/progestin therapy, including Prempro and Premphase, should be limited to the shortest duration consistent with

treatment goals and risks for the individual woman, and should be periodically reevaluated. When used solely for the prevention of postmenopausal osteoporosis, alternative treatments should be carefully considered."

Notwithstanding the gravity of the WHI findings, Wyeth continued to apply the most positive spin to the issues. Internal documents suggested an ongoing attempt to "place those results in context" (DEYMI012-000104) and to motivate the sales force (PARKA002-001209). In addition, a fax sent from Wyeth-Public Affairs under the heading of an organization called "Cancer Risk Assessment" suggested that the interpretation of the WHI study was "out of proportion to the study's findings and does not hold up under careful scrutiny" (RHUDM002-000095).

A post-WHI document entitled "Menopausal Hormone Therapy: Wyeth Perspective post WHI" stressed that the absolute risk of events was low, that there were no differences in mortality between placebo and HRT groups, that the absolute risk of CHD was low in early menopausal women, that the absolute risk of venous thromboembolic disease was low in early menopausal women, and that there was no evidence of increased mortality for breast cancer due to ERT or HRT. It also stated that, due to the design of the study, an overall risk/benefit profile could not be based on WHI alone, but acknowledged that HRT is not indicated and should not be used for the prevention or treatment of CHD (DEYMI206-001901).

In summary, these data and information confirm that Wyeth minimized the cardiovascular risks associated with its hormone therapy products for many years. In doing so, prescribers and their patients were unable to make fully informed benefit-risk assessments for their best treatment options.

## IX. Inadequacy of the Premarin and Prempro Labeling

From at least 1975 to 2002, Wyeth failed to adequately warn prescribing doctors, practitioners and patients that the harms of Premarin and MPA outweighed the benefits for many, if not most, women (See labels for hormone therapy drugs in PDRs). Wyeth knew that "most women have only mild menopausal symptoms or none at all" (see, e.g. W-LABELS-000246; ROSSC005-000034; DELCA009-000251). Wyeth also knew women needing these therapies only did so for a short period of time (see e.g., W-LABELS- 000246 – Ex. 953; DELCA009-000257; SOLOJ011-000514; PANAA025-000820). Finally, Wyeth was aware that those women who were being prescribed these drugs for osteoporosis would be exposed to the greatest breast cancer risk because of the long-term exposure.

Despite all these facts, Wyeth promoted Premarin and Prempro to considerably more women than needed the drug and for considerably longer use than necessary. As outlined in this report, data and information linking estrogen and/or estrogen/progestin use with endometrial cancer, breast cancer and cardiovascular events were either known or knowable to Wyeth years before inclusion of these events in the U.S. labeling. The Code of Federal Regulations (21CFR201.57) requires that "The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug…" Doctors and patients were denied this information because Wyeth, through both its actions and failure to act, delayed disclosure of these issues.

In 1975, FDA reprimanded Wyeth for minimizing risks related to uterine cancer (WMDL04782-00064632) and forced the company to implement Black Box labeling changes

describing the estrogen related increases in endometrial carcinoma events reported in multiple literature articles (W-MDL04782-00027339, W-MDL04782-00064632).

With respect to the association between estrogen use and breast cancer, the initial literature reports followed the noted endometrial reports by just a few months (Hoover et al, N Engl J Med 1976; 295(8): 401-405). Rather than immediately start a randomized clinical trial to investigate this adverse effect, Wyeth instead criticized the study and downplayed its importance (W-MDL04782-00029027). The association between breast cancer and estrogen use in menopausal women was confirmed by numerous studies following this 1976 report. A Black Box warning relating this risk for combination hormone therapy was not provided to physicians and patients until after the publication of the WHI results.

In addition, the breast cancer warning that did appear in the Prempro label provided only an estrogen therapy relative risk statistic, the statistic was inaccurate and did not include the true risk range (W-MDL04782-00032463), did not include risk statistics for combination therapy and misrepresented Wyeth's data from the Prempro pivotal trial. Further, Wyeth consistently emphasized only the one minimizing and reassuring statement from the label: "the majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy." The Prempro label did not include important risk information such as the increase in a woman's risk level if she is lean (SOLOJ022-001373), overweight or had a family history of breast cancer (STEPW014-008246). The Prempro label also did not include a warning that use of combination therapy could cause pre-existing breast abnormalities or dormant masses to grow or develop into cancer (DELCA030-001209; W-MDL04782-00029233; VICTJ005-001581; W-HUSAK01-00001219; W-HUSAK01-00000838) and that combination therapy could cause hormone receptor positive tumors as well as rare cancer tumors (such as lobular or tubular)

(CONJ003-000161; W-HUSAK01-00001082; DEYMI015-000278; PANAA010-000988; W-MDL04782-00029233; DEYMI020-001070; PICKJ007-001296;) Lastly, the Prempro label did not warn women that combination therapy could aggravate or escalate the growth of breast cancer after a short period of exposure to the drugs and that even short term use carried significant risk. The label also did not warn that a woman's risk increased with duration of use and that long-term use carried with it excess risk (OLIVS014-001893; BURKM014-001858). While the Prempro label encouraged regular mammograms, Wyeth never told physicians to remove a woman from the combination therapy if her mammograms showed increased breast density when exposed to these drugs.

The following chronology examines multiple labeling events for Premarin and Prempro over the ten year period beginning in 1995. This period was chosen to allow comparisons between Premarin and Prempro (which was not approved until December 2004). Specific attention is directed to the adequacy of the information relating to breast cancer and the cardiac effect of hormone therapy drugs, as provided in the Contraindications, Warnings, Precautions, and Adverse Event sections. Labeling refers to the prescribed package inserts and patient inserts as well as Wyeth's promotional pieces and advertising materials.

The adequacy and currency of the data provided in these materials are reviewed pursuant to the information available in the literature, publicly available U.S. and international databases as well as Wyeth's internal documents. Relevant international regulatory information is also included.

**Prempro Launch Label**

The initial Prempro label in the 1996 PDR included a BOXED WARNING that estrogens had been reported to increase the risk of endometrial carcinoma in postmenopausal women (referring to unopposed estrogens given without progestin), and a WARNING about the possible induction of malignant neoplasms, specifically breast cancer and endometrial cancer. Concerning the Warning for breast cancer, this warning was tempered by language to the effect that the majority of studies had not shown an association and that. The labeling noted that in the one study, (which was the only pivotal NDA trial) that did show an association, the overall incidence of breast cancer in the clinical trial did not exceed that expected in the general population.

For cardiovascular events, there was a CONTRAINDICATION for use in patients with active or a past history of thrombophlebitis, thromboembolic disorders, and stroke, and WARNINGS for an increased risk of cardiovascular disease, elevated blood pressure, and thromboembolic disorders with large estrogen doses.

The PRECAUTIONS section noted the following "endorsement" relating to estrogens and cardiovascular risk:

> "Cardiovascular risk. A causal relationship between estrogen replacement therapy and reduction of cardiovascular disease in postmenopausal women has not been proven. Furthermore, the effect of added progestins on this putative benefit is not yet known.
>
> "In recent years many published studies have suggested that there may be a cause-effect relationship between postmenopausal oral estrogen replacement therapy

without added progestins and a decrease in cardiovascular disease in women. Although most of the observational studies which assessed the statistical association have reported a 20% to 50% reduction in coronary heart disease risk and associated mortality in estrogen takers, the following should be considered when interpreting these reports.

"Because only one of these studies was randomized and it was too small to yield statistically significant results, all relevant studies were subject to selection bias. Thus, the apparently reduced risk of coronary artery disease cannot be attributed with certainty to estrogen replacement therapy. It may instead have been caused by life-style and medical characteristics of the women studied with the result that healthier women were selected for estrogen therapy. In general, treated women were of higher socioeconomic and educational status, more slender, more physically active, more likely to have undergone surgical menopause, and less likely to have diabetes than the untreated women. Although some studies attempted to control for these selection factors, it is common for properly designed randomized trials to fail to confirm results suggested by less rigorous study designs. Thus, ongoing and future large-scale randomized trials may fail to confirm this apparent benefit."

Wyeth used this Cardiovascular Risk Precaution to promote a cardiac benefit with these drugs. The corresponding patient label included no cardiovascular warning or discussion of cardiovascular risks. There was a BOXED WARNING to the effect that estrogens increase the risk of cancer of the uterus in women who have had their menopause ("change of life"), together

with the clarification that this finding refers to estrogens given without progestin. The RISKS of cancer of the uterus and cancer of the breast were mentioned.

The corresponding Premarin label published in the 1996 PDR included the BOXED WARNING about the increased risk of endometrial cancer, a CONTRAINDICATION for use in patients with active thrombophlebitis or thromboembolic disorders, a muted WARNING on the induction of breast cancer and a WARNING for a "theoretical cardiovascular risk caused by high estrogen doses." However, the Premarin label does not include the "cardiovascular precaution" noted with the Prempro label. The patient label included essentially the same warning relating to breast cancer.

A review of the literature indicated several relevant articles were published in adequate time to meet the 1996 PDR printing schedule. However, it appears that only selected data were included. For example, on January 18, 1995, Miller et al. published the results of the PEPI Trial (JAMA 1995 Jan 18; 273(3):199-208). The PEPI Trial studied the effects of estrogen and estrogen/progestin on heart disease risk factors in postmenopausal women. The authors reported that estrogen alone or in combination with a progestin improved lipoprotein levels (decreased LDL, increased HDL) and lowered fibrinogen levels. Unopposed estrogen caused the greatest increase in HDL, but a high rate of endometrial hyperplasia was seen to restrict the use of this regimen to women without a uterus. In women with a uterus, the authors suggested that estrogen/progestin combinations had the most favorable effect on HDL with no excess risk of endometrial hyperplasia. The PEPI study thus provided a basis for Wyeth to make lipid-lowering claims in these inserts.

However, in May 1995, Sturgeon et al. published an article concerning evidence for a "healthy estrogen user survivor effect" (Epidemiology 1995(May); 6:227-31). They found a

lower all-cause mortality rate among women who took estrogens, particularly current users, than among women who never took them. Additional analyses showed that women who had recently stopped taking estrogens had a higher all-cause mortality rate, and higher mortality rates from circulatory disease and cancer. They concluded that the most reasonable explanation was that women stop taking estrogens when they develop symptoms of serious illness, and that nonexperimental studies are susceptible to overestimating the benefits of menopausal estrogen use due to this “healthy estrogen user survival effect.”

In 1996, articles published in Lancet indicated that healthy women between the ages of 45 and 65 who were treated with estrogen or estrogen/progestin regimens had a two- to fourfold increase in potentially fatal emboli in the legs and lungs (Daly et al., Lancet 1996; 348:977-80; Jick et al., Lancet 1996; 348:981-3; Grodstein et al., Lancet 1996; 348:983-87).

The Prempro label in the 1997 PDR added the breast cancer incidence data from the PEPI trial, further diminishing the impact of this Warning. Interestingly, another breast cancer signal was reported on June 19, 1997, although these data were not included. Grodstein et al. published a paper entitled “Postmenopausal Hormone Therapy and Mortality” (N Engl J Med 1997 Jun 19; 336(25):1769-75.). After adjustment for confounding variables, the authors reported that current hormone users had a lower risk of death (relative risk, 0.63; 95 percent confidence interval, 0.56 to 0.70) than subjects who had never taken hormones. However, the apparent benefit decreased with long-term use (relative risk, 0.80; 0.67 to 0.96, after 10 or more years) because of an increase in mortality from breast cancer among long-term hormone users.

The Prempro label prepared in 1997 and included in the 1998 PDR included a revision to the WARNINGS. The previous warnings for cardiovascular disease and thromboembolic disorders were replaced by a single warning for Thromboembolic Disorders and Other Vascular

Problems. A warning for thromboembolic disorders and other vascular problems was also added to the Premarin label in 1998.

There were no changes to the U.S. breast cancer warnings in 1998. However, a Swedish package insert for Premelle, dated 08/04/1998, warned that treatment with estrogens for more than 5 years could lead to breast cancer (BURKM029-032804). It also stated: “For women between 50 and 70 years of age, this means that of 1000 women in the general population, 45 will normally develop breast cancer. When estrogen therapy is used for 5 years, 2 extra cases in every 1000 women will be discovered in this age group. When estrogen therapy is used for 10 and 15 years, 6 and 12 extra cases respectively in every 1000 women will be discovered in this age group.” These statements provided stronger and more specific warnings than in the corresponding United States labeling. Comparable wording did not appear in the United States label until August 2002.

On August 19, 1998, Hulley et al. published the results of the Heart and Estrogen/Progestin Replacement Study (HERS) Study, a randomized trial of estrogen plus progestin for secondary prevention of coronary heart disease in postmenopausal women (JAMA. 1998(Aug19); 280:605-13). This was the study that Wyeth had initiated in 1991 to pursue a heart disease claim. Unexpectedly, the authors reported that, during an average follow-up of 4.1 years, treatment with Prempro did not reduce the overall rate of coronary heart disease (CHD) events in postmenopausal women with established coronary disease. In fact, 172 women in the hormone group and 176 women in the placebo group died from an MI or CHD death (RR, 0.99; 95% CI, 0.80-1.22). The lack of an overall effect occurred despite a net 11% lower low-density lipoprotein cholesterol level and 10% higher high-density lipoprotein cholesterol level in the

hormone group compared with the placebo group (each P<.001). The major finding was no overall cardiovascular benefit and a pattern of early increase in risk of CHD events.

The HERS study was intended to demonstrate that lower lipoprotein levels would have a beneficial cardiac effect. However, the actual findings of the study implied that the lower lipoprotein levels associated with treatment did not translate to a beneficial cardiac effect.

The results of the HERS study, especially the pattern of an early increase in risk for CHD events, might have focused Wyeth's attention on patient safety and on product labeling. Rather, it appeared to focus the company's attention on protecting its market franchise and a very startling regulatory scenario was orchestrated. Instead of strengthening the safety-related aspects of its product labeling, Wyeth began a campaign that seemed to be designed to avoid the issue and delay the implementation of any labeling revisions that might cause a loss of its market share. To a very large extent, this campaign involved successful efforts to manipulate the FDA.

A few weeks prior to the publication of the HERS data, on July 29, 1998, in preparation for a meeting with the FDA to discuss the preliminary HERS data, Wyeth sent its "background data package" to the FDA (IND 21,696; Serial no. 182). The meeting took place on August 12, 1998. At the meeting, the FDA indicated that they did not at that time have any immediate recommendations for revised labeling based on the HERS results. Wyeth sent a copy of the HERS paper to the FDA the next day.

On August 26, 1998, Wyeth requested a meeting with FDA's Division of Drug Marketing Advertising and Communications (DDMAC) concerning proposed promotional materials for Prempro and Premphase (W-MDL527-00039572). The meeting request concerned DDMAC's objection to a proposed promotional claim regarding increased HDL and decreased LDL. DDMAC had argued that the promotional claim emphasized a benefit due to Premarin in

materials that concerned Prempro and Premphase. DDMAC suggested that claims in Prempro/Premphase materials be specific to the condition of added progestins. Wyeth stated that they believed they should be permitted to promote the claim as written, based on text in the approved Prempro/Premphase labeling and because the lipid effect of Prempro/Premphase is based primarily on its conjugated estrogen content. A meeting was scheduled for November 23, 1998.

In communications dated prior to November 23, it is very evident that Wyeth had decided to defend its Premarin/Prempro franchise. Indicative of this is an internal Wyeth letter (LUDMG003-000423), dated October 15, 1998, from P Johansen (Wyeth Market Planning) to H. Hunter, J. Durocher and G. Burr. The topic was a "Summary of HERS data - impact on physicians." Mr. Johansen reported that physician awareness of the HERS trial was high, and that "Overall, perceptions about the HERS study were largely positive, as more physicians concluded that HRT provided cardiovascular benefits than that HRT is associated with cardiovascular risk." He stated that the "HERS clinical trial seemed to have minimal impact on physicians perceptions about HRT and their expected prescribing of Prempro and virtually no impact about MPA or their relationship between HRT and breast cancer." He indicated that Wyeth planned to continue its efforts to promote all the long term benefits of HRT, including cardiovascular benefits for healthy postmenopausal women and to provide physicians with tools to help them counsel and reassure patients who express concern, and to minimize any negative impact of the HERS data and associated publicity on the Premarin franchise.

On November 19, 1998, DDMAC contacted Wyeth to request a detailed agenda for the November 23 meeting, to include new items concerning the HERS data in regards to promotion and the use of the lipid lowering claim in ads for the Premarin family of products (W-MDL-527-

00039696). Wyeth had not expected to have to address the HERS data with DDMAC. In response, Wyeth cancelled the November 23 meeting.

On December 1, 1998, Joseph Sonk (Wyeth U.S. Regulatory Affairs) advised Norman Drezin of DDMAC that Wyeth intended to promote the lipid lowering benefits of Prempro/Premphase in the same context as it appears in the current labeling. Sonk noted that the claim was based on a clinical trial in a low risk Caucasian population, that the HERS study population was older and at higher cardiovascular risk, and that it would therefore possible to separate the populations in any promotional claim. Sonk further stated that it was Wyeth's position that "no Prempro/Premphase labeling changes are needed based on the results of the HERS study" (W-MDL527-00039708).

In December 1998, Sourander et al. published a study (Lancet 1998(Dec); 352:1965-9) in which they reported that current ERT was associated with decreased cardiovascular mortality, no increase in the incidence of breast cancer, and an increase in the incidence of endometrial cancer (RR 5.06).

On December 11, 1998, Wyeth again requested a meeting with DDMAC to discuss lipid claims as related to the promotion of Prempro/Premphase and to request clarification of DDMAC's issues about promotional statements concerning the "Premarin family" of products (W-MDL527-00039716). On January 4, 1999, citing Wyeth's failure to address "new information available and known to it regarding the effect of Prempro and/or Premphase on the lipid profile", DDMAC declined to schedule a meeting (W-MDL527-00039729).

The Prempro label that was published in the 1999 PDR did not reflect any of the HERS study data. This label included one unrelated change. The BOXED WARNING on endometrial cancer was deleted from both the physician label and from the patient label, presumably because

the induction of endometrial carcinoma is considered to be primarily an effect of unopposed estrogen (Premarin).

On February 3, 1999, Wyeth contacted DDMAC to provide a revised lipid lowering promotional claim for Prempro/Premphase, to advise DDMAC that the Premarin Family promotional campaign had been stopped, and to request a meeting to obtain DDMAC concurrence on the appropriate wording for the revised claim and to define and describe the "Premarin Family" advertising concept (W-MDL527-00039756). DDMAC agreed to a meeting, which took place on February 22, 1999. At the February 22 meeting, Wyeth committed to the submission of labeling reflecting the results of the HERS study in approximately six months time.

In the FDA version of the February 22 meeting minutes, provided to Wyeth on March 31, 1999, the Agency noted that the HERS data raised concerns about claims regarding beneficial lipid changes that have been incorporated into promotional materials for Prempro and Premphase. FDA also noted that the HERS study failed to demonstrate that lipid changes, described in the Prempro/Premphase labeling, were clinically meaningful regarding cardiovascular events. FDA also stated that Wyeth's proposed HERS language did not identify Prempro as the drug that failed to show a benefit in the overall rate of CHD events, whereas positive lipid claims were clearly attributed to Prempro/Premphase, that these are not lipid lowering drugs and should not be so presented, and that no promotional materials should claim lipid or cardio benefits.

On February 25, 1999, in an interesting internal Wyeth communication, David Colasante told Philip de Vane that appropriate analysis of the HERS data in fact demonstrated significant

cardiovascular protection (CONSG001-002027). He did not, in this memo, elaborate on the particulars.

On April 1, 1999, Wyeth submitted revised lipid-lowering information to DDMAC (W-MDL-00039855). The first feedback from the Agency came via an FDA telephone contact in which Lisa Stockbridge informed Jennifer Phillips that Dr. Temple "didn't like it" (W-MDL-00039887). In subsequent correspondence, Wyeth advised the FDA that it did not agree with several points in DDMAC's version of the February meeting minutes (W-MDL527-00039902); the FDA reconfirmed its version of the minutes (W-MDL527-00039928).

An internal Wyeth document dated April 5, 1999 (PICKJ020-001968) concerned the establishment of a cross-functional team to communicate the HERS message. It stated that the objectives of the new team would be to protect the benefit of primary CVD prevention for Premarin, explore all plausible explanations for the HERS study result, defend MPA from being cast as the villain, and minimize any legitimization of other estrogen/progestin combinations. It also stated that Wyeth would seek to retain the primary CVD prevention benefit for estrogen in the official statements of key organizations such as AHA.

In June 1999, Gapstur et al. published the results of the Iowa Women's Health Study (JAMA 1999(Jun); 281:2091-7). They reported that the duration of "ever HRT use" was associated with a risk of invasive carcinoma "with a favorable histology," with an RR of 1.81 for those who had used HRT for five years or less versus an RR of 2.65 for those who used HRT for more than 5 years.

Persson et al. reported on a study of more than 11,000 Swedish women who took HRT (Cancer Causes Control 1999; 10:253-60). They found that, compared to women who had taken

HRT for one year or less, the RR for developing breast cancer was 1.4 for HRT use of 1-6 years and 1.7 for use of more than 6 years.

On September 22, 1999, Wyeth submitted a CBE (NDA 20-527, S-015) for Prempro/Premphase incorporating language regarding the HERS study in the Precautions and Patient Information sections of the labeling. Wyeth indicated that they were prepared to use the new labeling in 30 days, but requested FDA input and stated that the labeling would not be implemented until the submission had been discussed with the FDA and concurrence had been obtained.

Teleconferences between FDA and Wyeth were held on October 21, 1999 and on November 16, 1999. At the latter meeting, agreement was reached on the proposed HERS language. A revised supplement was subsequently submitted, and was approved by the FDA on January 6, 2000. The HERS language appeared in the PRECAUTIONS section:

> In the Heart and Estrogen/progestin Replacement Study (HERS), 2763 postmenopausal women with documented coronary heart disease (CHD) who were taking their usual cardiac medications were randomized to Prempro 0.625mg/2.5mg or placebo. Documented CHD was defined as the presence of one or more of the following: previous myocardial infarction, previous percutaneous mechanical revascularization, previous coronary artery bypass graft surgery, or angiographic evidence of greater than 50% occlusion of one or more major arteries. During an average follow-up of 4.1 years, treatment with Prempro did not reduce the overall rate of recurrent coronary heart disease events, defined as CHD death or nonfatal myocardial infarctions, in this predominantly elderly

population (average age 66.7 years) with established coronary disease. There were more CHD events in the hormone group than in the placebo group in year 1 and fewer events in years 3 through 5.

The Prempro label that was published in the 2000 PDR still did not differ significantly from the previous versions. A label revision was issued on January 6, 2000, which was, of course, too late for inclusion in the 2001 PDR, which had already been published. This label revision is important because it included the new PRECAUTION based on the HERS data. This information was delayed to the 2001 PDR. Even with the inclusion of the HERS precaution, the previous "Cardiovascular Risk Precaution" (the one that reads more like a cardiovascular benefit claim) was retained. Thus, the HERS addition was quite modest in scope and successfully buried among the Precautions.

The Premarin label published in the 2000 and 2001 editions of the PDR included a revision to the warning on the induction of breast cancer. While continuing to state that the majority of studies had not shown an increased risk of breast cancer, the insert reported that some studies had reported a "moderately increased risk (relative risks of 1.3 to 2.0) in those women taking higher doses or those taking lower doses for prolonged periods of time, especially in excess of 10 years. Other studies have not shown this relationship." Also included was a statement concerning the number of breast cancer cases observed in the PEPI trial of 875 women (including one in the placebo group and one in the Premarin group). However, the PEPI study was too small to provide meaningful data on the risk of breast cancer induction. Therefore, it is clear that this information was added to obscure and provide deniability for any risk.

There was no mention of the HERS study in the 2000 or 2001 Premarin labels, but there was an astonishing addition to the PRECAUTIONS. This was the addition to the Premarin label of the previously-noted "Cardiovascular Risk Precaution" that had been part of the Prempro label since launch:

> "Cardiovascular risk. A causal relationship between estrogen replacement therapy and reduction of cardiovascular disease in postmenopausal women has not been proven. Furthermore, the effect of added progestins on this putative benefit is not yet known.
>
> "In recent years many published studies have suggested that there may be a cause-effect relationship between postmenopausal oral estrogen replacement therapy without added progestins and a decrease in cardiovascular disease in women. Although most of the observational studies which assessed the statistical association have reported a 20% to 50% reduction in coronary heart disease risk and associated mortality in estrogen takers, the following should be considered when interpreting these reports.
>
> "Because only one of these studies was randomized and it was too small to yield statistically significant results, all relevant studies were subject to selection bias. Thus, the apparently reduced risk of coronary artery disease cannot be attributed with certainty to estrogen replacement therapy. It may instead have been caused by life-style and medical characteristics of the women studied with the result that healthier women were selected for estrogen therapy. In general, treated women

were of higher socioeconomic and educational status, more slender, more physically active, more likely to have undergone surgical menopause, and less likely to have diabetes than the untreated women. Although some studies attempted to control for these selection factors, it is common for properly designed randomized trials to fail to confirm results suggested by less rigorous study designs. Thus, ongoing and future large-scale randomized trials may fail to confirm this apparent benefit."

It should be noted that this "Cardiovascular Risk Precaution" was added to the Premarin label AFTER the HERS study was published.

The publication date for the HERS study was July 29, 1998. The labeling change that incorporated the HERS language into the Prempro label (and deleted the "Cardiovascular Risk Precaution") was dated January 6, 2000. The labeling changed that ADDED the "Cardiovascular Risk Precaution" to the Premarin label was written sometime in 1999, and it was still there in the version of the label published in the 2001 PDR (date of revision, April 17, 2000). And so, the Wyeth evasion continued.

On August 10, 2000, DRUDP (Division of Reproductive and Urologic Drug Products) advised Wyeth that, having conducted an extensive review of the HERS study, FDA was issuing class labeling language to update information concerning the risk of breast cancer and cardiovascular effects (W-MDL527-00040692). FDA stated that the changes would be applicable to all approved ERT and HRT products, not just Wyeth's products.

On September 29, 2000, Wyeth formally objected to the FDA proposed draft labeling, asked for suspension of 90-day implementation deadline, and requested a meeting (MDL303-

00040692). FDA rejected both requests (MDL303-00040888), but (FDA's Diane Moore) stated that an additional request for a delay could be submitted if Wyeth felt that the labeling changes were too unwieldy to implement within the 90 day time period. It should come as no surprise that, on October 31, 2000, Wyeth requested such a delay.

On October 31, 2000, Hsia et al. published additional data from the HERS study (Circulation. 2000 Oct 31;102(18):2228-32). They reported that treatment with oral conjugated estrogen plus medroxyprogesterone acetate was not associated with a significant reduction in the incidence of peripheral arterial events in postmenopausal women with preexisting CHD. During a mean of 4.1 years of follow-up, 311 peripheral arterial events were reported in 213 women, an annual incidence of 2.9%. The number of women who had peripheral arterial events was 99 among those assigned to active estrogen/progestin and 114 among those assigned to placebo, a nonsignificant difference (relative hazard 0.87, 95% CI 0.66 to 1.14).

On November 29, 2000, FDA issued an approvable letter for Wyeth's supplemental application S-011 (Prevention of Postmenopausal Osteoporosis, based on the PEPI study), and in the process inserted the class breast cancer warning into the approved language for the labeling (MDL527-00040999). Wyeth responded on December 6, 2000 by notifying the FDA of its intent to amend its labeling supplement, S-011 (MDL527-00041033).

On January 19, 2001, Wyeth submitted a CBE30 regarding the class breast cancer warning. This was basically a counter-proposal to the FDA language, and suggested a meeting to discuss the proposed revision (MDL527-00041120). The FDA acknowledged receipt of the supplement and agreed to respond, but rejected the request for the meeting (MDL527-00041289). The FDA approved the proposed labeling changes on February 22, 2001, but made

some of its own changes (MDL527-00041401). Still not satisfied with the outcome, on March 1, 2001, Wyeth notified FDA of intent to amend the labeling (MDL527-00041502).

In February 2001, Simon et al. published another paper on data from the HERS study, Postmenopausal hormone therapy and risk of stroke (Circulation 2001 Feb 6;103(5):638-42). They reported that hormone therapy with estrogen and progestin had no significant effect on the risk for stroke among postmenopausal women with coronary disease. A total of 149 women (5%) had 1 or more strokes, 85% of which were ischemic, resulting in 26 deaths. Hormone therapy was not significantly associated with risk of nonfatal stroke (relative hazard [RH] 1.18; 95% CI 0.83 to 1.66), fatal stroke (RH 1.61; 95% CI 0.73 to 3.55), or transient ischemic attack (RH 0.90; 95% CI 0.57 to 1.42).

In June 2001, Utian published data from the HOPE trial, entitled "Relief of vasomotor symptoms and vaginal atrophy with lower doses of conjugated equine estrogens and medroxyprogesterone acetate" (Fertil Steril. 2001(Jun); 75(6):1065-79). The HOPE trial demonstrated the efficacy of lower doses of conjugated equine estrogen combined with medroxyprogesterone acetate in the treatment of vasomotor symptoms and vaginal atrophy. In the efficacy-evaluable population, the reduction in vasomotor symptoms was similar with CEE of 0.625 mg/d and MPA of 2.5 mg/d (the most commonly prescribed doses) and all lower combination doses. It was concluded that lower doses of CEE plus MPA relieve vasomotor symptoms and vaginal atrophy as effectively as commonly prescribed doses.

The next Prempro/Premphase label was written in 2001 and published in the 2002 PDR. The physician label included a revised cardiovascular warning (a discussion of thromboembolic disorders and other vascular problems became a discussion of thromboembolic disorders,

including venous thromboembolism, cardiovascular disease). The patient label did not include important changes.

The Premarin label published in the 2002 PDR included a breast cancer warning with wording similar to that of the 1998 Swedish Premelle label. "In terms of absolute breast cancer risk, approximately 45 in every 1000 women between 50 to 70 years of age (who never used ERT/HRT) will be diagnosed with breast cancer. It is estimated that among women in this age group who used ERT/HRT for 5 years, there would be 2 additional cases of breast cancer diagnosed, and for those who used ERT/HRT for 10-15 years, there would be 6 to 12 additional cases diagnosed." This wording was still absent from the 2002 Prempro label.

Finally, a precaution based on the HERS study was added. This was almost three years after the publication of the HERS data. Most amazingly, the "cardiovascular benefit claim" was still there, with one change: the first paragraph was underlined!

> "A causal relationship between estrogen replacement therapy and reduction of cardiovascular disease in postmenopausal women has not been proven. Furthermore, the effect of added progestins on this putative benefit is not yet known."

A January 10, 2002 label revision deleted the "cardiovascular benefit claim" from the PRECAUTIONS section of the Premarin labeling.

In June 2002, the FDA responded to various Wyeth labeling supplements and CBEs with an approvable letter (MDL527-00044496). This approvable letter again included labeling changes inserted by the FDA.

In July 2002, two additional HERS study articles were published. Grady et al. (JAMA 2002; 288:49-57) reported on the cardiovascular disease outcomes in the study based on an average follow-up of 6.8 years. They found that lower rates of CHD among women in the hormone group in the final years of HERS did not persist during additional years of follow-up, and concluded that hormone therapy did not reduce the risk of cardiovascular events in women with CHD. Hulley et al. (JAMA 2002; 288:58-66) reported that treatment for 6.8 years with estrogen plus progestin in older women with coronary disease increased the rates of venous thromboembolism and biliary tract surgery.

On July 3, 2002, Wyeth informed the FDA that the WHI study was being discontinued due to concerns regarding breast cancer and cardiovascular disease (MDL527-00044575). A "Dear Healthcare Professional" Letter was issued concerning the stoppage of the WHI study. It was dated July 2002.

Two weeks later, Rossouw et al published the preliminary results of the WHI study, "Risks and benefits of estrogen plus progestin in healthy postmenopausal women: principal results from the Women's Health Initiative randomized controlled trial" (JAMA. 2002 Jul 17; 288(3):321-33). As noted above, the WHI study was stopped early because the test statistic for invasive breast cancer exceeded the stopping boundary for this adverse effect and the global index statistic supported risks exceeding benefits. The publication included data on the major clinical outcomes through April 30, 2002. The absolute excess risks per 10,000 person-years attributable to estrogen plus progestin were 7 more CHD events, 8 more strokes, 8 more pulmonary embolisms, and 8 more invasive breast cancers, while absolute risk reductions per 10,000 person-years were 6 fewer colorectal cancers and 5 fewer hip fractures. It was concluded

that overall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2-year follow-up among healthy postmenopausal US women.

A Prempro/Premphase labeling change dated 08/20/2002 (FDA website) included data from the WHI studies. There was also a bolded WARNING based on the discontinued WHI study.

> WARNING: In a subset of the Women's Health Initiative study, Prempro was reported to increase the risks of cardiovascular events, breast cancer and venous thromboembolic events (see CLINICAL PHARMACOLOGY, Clinical Studies). Therefore, the use of postmenopausal estrogen/progestin therapy, including Prempro and Premphase, should be limited to the shortest duration consistent with treatment goals and risks for the individual woman, and should be periodically reevaluated. When used solely for the prevention of postmenopausal osteoporosis, alternative treatments should be carefully considered.

WHI-related data were extensively worked into a heavily-revised section on WARNINGS. This included both cardiovascular data (coronary heart disease and stroke, venous thromboembolism) and breast cancer data (showing a 26% increase in invasive breast cancer after an average of 5.2 years of treatment). In addition to the inclusion of the WHI data, the malignant neoplasm section was heavily revised to include new breast cancer data (primarily a reanalysis of data from 51 epidemiological studies showing an increase in the incidence of breast cancer in women currently or recently using estrogen and/or estrogen/progestin, i.e., the warning and language used in the 1998 Swedish Premelle label had finally made it into the Prempro

label), including a suggestion that the addition of progestins increases the risk of breast cancer compared to the use of estrogens alone.

In the patient labeling, the WARNING statement added: The use of Prempro or Premphase may increase your risk of getting breast cancer, blood clots, heart attacks and strokes. Prempro and Premphase should be used only as long as needed. Periodically, you and your healthcare provider should discuss whether you still need treatment. Prempro and Premphase should not be used to prevent heart disease.

The August 20, 2002, revision of the Premarin also addresses the WHI data. The revised label stated that “Premarin alone or in combination with a progestin is not indicated and should not be used to prevent coronary heart disease.” It included a WARNING comparable to the Prempro warning: “Because of the potential increased risks of cardiovascular events, breast cancer and venous thromboembolic events, use of Premarin alone or in combination with a progestin should be limited to the shortest duration consistent with treatment goals and risks for the individual woman, and should be periodically reevaluated. When used solely for the prevention of postmenopausal osteoporosis, alternative treatments should be carefully considered.”

On August 28, 2002, Wyeth issued a “Dear Doctor” letter together with revised labels for Prempro, Premphase and Premarin. The letter stated that the revisions reflected new data, primarily from the WHI study, and that Prempro, Premphase and Premarin are not indicated and should not be used to prevent coronary heart disease. "The product indications remain the same. However, because of the potential increased risks of cardiovascular events, breast cancer and venous thromboembolic events, use of Prempro, Premphase, and Premarin should be limited to the shortest duration consistent with treatment goals and risks for the individual woman, and

should be periodically reevaluated. When used solely for the prevention of postmenopausal osteoporosis, alternative treatments should be carefully considered" (W-DDL00000103).

The 'speed' of Wyeth's response to the adverse data from the WHI study is astonishing when seen in the light of the "duck and delay" tactics they had previously used to try to maintain their Premarin/Prempro market franchise, tactics seen most notably and most obviously in their prolonged and annoying response to the HERS study. But the response to the WHI study was by no means an immediate response. Nearly two months elapsed from the stoppage of the WHI study to the announcement of the label revision and the issuance of the "Dear Doctor" letter. Furthermore, if it Wendy Stephenson's deposition testimony has merit (March 10, 2005; see p 302, lines 14-23: "…most of the things in the WHI study, with the exception of the heart disease, most of the other outcomes that were studied in that trial were already suspected to be associated with hormone therapy."), then there was no reason why significant label changes could not have been initiated prior to the WHI study stoppage.

In the aftermath of the WHI stoppage, internal Wyeth documents suggested an ongoing attempt to "place those results in context" (DEYMI012-000104) and to motivate the sales force (PARKA002-001209). In addition, a fax sent from Wyeth-Public Affairs under the heading of an organization called "Cancer Risk Assessment" suggested that the interpretation of the WHI study was "out of proportion to the study's findings and does not hold up under careful scrutiny" (RHUDM002-000095). That sounds familiar.

Three months later, Wyeth issued new labeling changes dated 01/03/2003 (FDA website) for Prempro and Premarin. This new label for Prempro included the following BLACK BOX WARNING:

Estrogens and progestins should not be used for the prevention of cardiovascular disease.

> The Women's Health Initiative (WHI) reported increased risks of myocardial infarction, stroke, invasive breast cancer, pulmonary emboli and deep vein thrombosis in postmenopausal women during 5 years of treatment with conjugated equine estrogens (0.625 mg) combined with medroxyprogesterone (2.5 mg) relative to placebo (see CLINICAL PHARMACOLOGY, Clinical Studies). Other doses of conjugated estrogens and medroxyprogesterone acetate, and other combinations of estrogens and progestins were not studied in the WHI and, in the absence of comparable data, these risks should be assumed to be similar. Because of these risks, estrogens and progestins should be prescribed at the lowest effective doses and for the shortest duration consistent with treatment goals and risks for the individual woman.

The boxed warning, above, replaced a similar statement that had been placed in the (unboxed) Warnings section of the previous version of the label. The cardiovascular warnings in the new label were similar to those in the previous version. In the oncology section, the specific numbers concerning the number of additional breast cancer cases to be anticipated in women receiving HRT were removed, along with the warning concerning ovarian cancer.

The patient information section included the following as a boxed statement: “Do not use estrogens and progestins to prevent heart disease, heart attacks, or strokes. Using estrogens and progestins may increase your chances of getting heart attacks, strokes, breast cancer, or blood clots. You and your healthcare provider should talk regularly about whether you still need treatment with Prempro or Premphase.”

The above labeling changes were announced via a "Dear Health Care Professional" letter dated January 6, 2003.

Label changes were announced in a "Dear Health Care Professional" letter dated May 28, 2003 (ZUCAV008-029599). This letter announced the publication of preliminary Women's Health Initiative Memory Study (WHIMS) data in the May 28 issue of the Journal of the American Medical Association (Rapp et al., JAMA 2003(May 28); 289:2727-9). The WHIMS study was officially sanctioned by the General Council of the Women's Health Initiative and was supported financially by Wyeth (although Wyeth did not directly monitor the study [STRIS002-000075]). The WHIMS authors reported an increased risk of developing clinically meaningful cognitive decline in women taking combined estrogen plus progestin therapy compared to women taking placebo (RR 2.05, 45 versus 22 cases per 10,000 women per year). The announced label change was the addition of a dementia statement to the WARNINGS.

Comprehensive reports were published by the WHI study group in June and August of 2003. Chlebowski et al. (JAMA 2003(Jun); 289:3243-53) reported that relatively short term combined estrogen plus progestin use increases incident breast cancers, which are diagnosed at a more advanced stage compared with placebo use, and increases the percentage of women with abnormal mammograms. The authors suggested that estrogen plus progestin may stimulate breast cancer growth and hinder breast cancer diagnosis. Manson et al. (N Engl J Med 2003(Aug); 349:523-34) concluded that estrogen plus progestin does not confer cardiac protection and may increase the risk of CHD among generally healthy postmenopausal women, especially during the first year after the initiation of hormone use.

In August 2003, Beral et al. published the results of the Million Women Study (Lancet. 2003(Aug 9); 362(9382):419-27). They reported that current users of HRT at recruitment were

more likely than never users to develop breast cancer (RR 1.66) and die from it (RR 1.22). Past users of HRT were, however, not at an increased risk of incident or fatal disease (RR 1.01 and 1.05, respectively). Incidence was significantly increased for current users of preparations containing estrogen only (RR 1.30), estrogen-progestagen (RR 2.00), and tibolone (RR 1.45), but the magnitude of the associated risk was substantially greater for estrogen-progestagen than for other types of HRT ($p<0.0001$). In current users of HRT the risk of breast cancer increased with increasing total duration of use. Ten years' use of HRT was estimated to result in 5 additional breast cancers per 1000 users of estrogen-only preparations and 19 additional cancers per 1000 users of estrogen-progestagen combinations. Use of HRT by women aged 50-64 years in the UK over the past decade was estimated to have resulted in an estimated 20,000 extra breast cancers, 15,000 of which were associated with estrogen-progestagen. The authors concluded that current use of HRT is associated with an increased risk of incidence and or fatal breast cancer, and that the risk is substantially greater for estrogen-progestagen combinations than for other types of HRT.

In April 2004, Anderson et al. (JAMA 2004(Apr); 291:1701-12) reported data from the estrogen-alone portion of the trial, which had continued until February 2004. The authors reported that estrogen use increased the risk of stroke, decreased the risk of hip fracture, and did not affect CHD incidence in postmenopausal women with prior hysterectomy over an average of 6.8 years. A possible reduction in the incidence of breast cancer was noted. The authors concluded that treatment offered no overall benefit.

In label revisions implemented in 2004, strengthened dementia statements, based on the WHIMS study, were added to the BLACK BOX WARNING for both products.

> The Women's Health Initiative Memory Study (WHIMS), a substudy of WHI, reported increased risk of developing probable dementia in postmenopausal women 65 years of age or older during 4 years of treatment with conjugated estrogens plus medroxyprogesterone acetate relative to placebo. It is unknown whether this finding applies to younger postmenopausal women or to women taking estrogen alone therapy. (See CLINICAL PHARMACOLOGY, Clinical Studies.)

In June 2004, Shumaker et al published the results of the WHIMS Study (Women's Health Initiative Memory Study) (JAMA. 2004 Jun 23;291(24):2947-58.) They reported that estrogen therapy alone did not reduce dementia or MCI incidence and increased the risk for both end points combined. Pooling data for estrogen alone and estrogen plus progestin resulted in increased risks for both end points. They concluded that the use of hormone therapy to prevent dementia or cognitive decline in women 65 years of age or older is not recommended.

In label revisions implemented in 2005, a statement was added to the BLACK BOX WARNING for both products. This statement extended the WHI findings.

> The WHI study reported increased risks of stroke and deep vein thrombosis in postmenopausal women (50 to 79 years of age) during 6.8 years of treatment with conjugated estrogens (0.625 mg) relative to placebo (See CLINICAL PHARMACOLOGY, Clinical Studies and WARNINGS, Cardiovascular disorders.)

The current Premarin and Prempro labels finally provide adequate information concerning the risks associated with Premarin and Prempro and Premphase treatment. If Wyeth had conducted the appropriate studies, this information would have been provided to physicians more than a decade earlier. In addition, the process by which these labels evolved was protracted and intentional. For years, Wyeth disseminated information that obscured and hid the issues.

Wyeth failed to reveal the morbidity and mortality risks associated with its hormone therapy drugs. For example, the authors of the WHI study calculated that the absolute excess risks per 10,000 person-years attributable to estrogen plus progestin were 7 more CHD events, 8 more strokes, 8 more pulmonary embolisms, and 8 more invasive breast cancers, while absolute risk reductions per 10,000 person-years were 6 fewer colorectal cancers and 5 fewer hip fractures. The authors of the Million Women Study estimated that 10 years' use of HRT would result in 5 additional breast cancers per 1000 users of estrogen-only preparations and 19 additional cancers per 1000 users of estrogen-progestagen combinations. They further estimated that use of HRT by women aged 50-64 years in the UK over the preceding decade had resulted in an estimated 20,000 extra breast cancers, 15,000 of which were associated with estrogen-progestagen combination therapy. By easy mathematical translation to this country, the Million Women Study shows that there were likely more than 100,000 unnecessary breast cancers associated with hormone therapy use.

## X. WYETH'S MARKETING OF HORMONAL REPLACEMENT THERAPIES

Over the past sixty years, Wyeth has created, manipulated and perpetuated an unprecedented pharmaceutical marketplace phenomenon. Their activities captured extraordinary corporate sales and effected unremitting control over any competitor attempting to participate in this U.S. market. As noted earlier in this report, Wyeth has exploded U.S. revenues of ET and HRT to over two billion dollars in annual sales and has secured the top spot for pharmaceutical sales on many occasions. The Wyeth-manufactured products, including Premarin, Prempro and Premphase, continue to represent over ninety percent of these sales each year. Even more remarkable than the sales dollars is the fact that Wyeth has engineered these sales with very little (and many times, no) corroborating quality based clinical data. Wyeth, instead, has relied upon the uniquely orchestrated marketing ploys discussed in this section to deflect the absence of efficacy data and to camouflage problematic safety data. It is extremely unlikely that such a scenario could ever happen again in the United States.

According to the FDA-approved labeling, these products are indicated for a specific population of post-menopausal women and for specific periods of use. However, Wyeth has exploded this marketplace by convincing prescribers and patients that these therapies will benefit all women (nearing or at menopause) for a wide variety of unproven uses, and, once started, should be continued forever. Wyeth has employed a variety of techniques, outside of FDA's direct control, to accomplish these amplified uses. These include dissemination of biased and scientifically unbalanced promotional tools, the employment of paid "scientific" advocates (including professional individuals, universities, associations, etc.) to promote their products using direct and more subtle means, participation in the creation of biased "scientific literature", encouragement of off-label uses by their field representatives and usage of inappropriate

materials designed for the intended patient populations. These activities clearly show that Wyeth abandoned the standards of care imposed upon pharmaceutical manufacturers when promoting their products. (21 CFR 202.1 (e) (3); 21CFR 202.1 (e) (4); 21CFR 202.1 (k) (2); 21CFR314.126; FDA Guidances).

Wyeth has created many new uses for HRT, albeit without the benefit of supporting scientific data. These new uses include women who did not qualify for HRT use, women who were prescribed HRT for benefits for which there were no controlled clinical data or regulatory approvals and women who were prescribed HRT for extended durations of use including treatment for decades and decades.

With respect to asymptomatic women, Wyeth associated with physicians who advocated the use of HRT in women without vasomotor or menopausal symptoms. For example, in 1987, Dr. Randall Barnes (CONNS014-001645) of the University of Chicago wrote a "Dear Doctor" letter on Wyeth's behalf to encourage his fellow physicians to prescribe estrogen therapy to patients who did not yet present menopausal symptoms. His letter also promoted that HRT could ward off cardiovascular disease. In 1997 Drs. C. A. Johnson (University of Kansas Medical Center) and J. M. Sullivan (University of Tennessee College of Medicine) noted "Prescribing prophylactic hormonal therapy can help prevent cardiovascular disease and/or osteoporosis in women who are asymptomatic for menopause" in a program funded by Wyeth (SOLUJ023-000996).

Another method employed by Wyeth to explode the marketplace was the promotion of uses for which there were no labeled indications. These include the treatment and/or prevention of anxiety, depression, chronic back pain, skin atrophy, atherosclerosis, Alzheimer's disease, macular degeneration, stroke, and colon cancer (CONKJ012-000765; DUROJ037-000183;

WMDL04782-00015343). Beneficial effects were also promoted with regard to the cardiovascular system, brain, skin tissue, circulatory system, breast, nervous system, digestive system, sleep improvement, and dental health (STRIS001-000034; ROSSC005-0271). These uses have never been approved. In fact, the most recent Prempro label (6/30/05), included on the FDA website, confirms that the only indicated uses remained the same and include: (for women with a uterus), treatment of mild to moderate vaso-motor symptoms, vulvar and vaginal atrophy associated with menopause and the prevention of post-menopausal osteoporosis (only for women at significant risk or as second line therapy). Several promotional efforts are noted in the following paragraphs to illustrate Wyeth's efforts to expand these indications.

A series of advertisements in the 1970s promoted Premarin as being superior to tranquilizers for the relief of estrogen related emotional symptoms (W-MDL04782-00015317, W-MDL04782-00015353) including anxiety and depression (W-MDL04782-00015343) although no psychiatric indications were approved. There were advertisements for the treatment of chronic back pain and osteoporosis (W-MDL04782-00015353, W-MDL04782-00016840) which had not been found to be effective at this time.

In 1994, Wyeth distributed a brochure (Brochure PRM: 344) that implied Premarin was effective in treating skin atrophy and atherosclerosis. (DDMAC later addressed the content of this brochure on April 14th, 1994 in a letter explaining that these were not indicated uses and that the promotional materials would need to be revised) (ROSSC005-000271).

Wyeth clearly did not intend for their estrogen-containing products to be used only according to the approved insert. In a 1997 brochure (STRIS001-000034) targeted to health care providers, a chart was included for the physician to "help the patient understand that estrogen not only affects her reproductive organs, but affects all areas of her body." "You may want to use

this chart to demonstrate to patients the length of time they will spend postmenopausal. Placing them at risk for potentially serious medical conditions."

Wyeth's 1995-1997 Strategic Plan included the goals known as the **"**Phase IV initiative" (DUROJ042-000781). As noted, "the goal in recent years has been to identify and disseminate information which highlights additional health benefits for Premarin users beyond traditional menopause symptom therapy and osteoporosis. In fact, women may initially consider long term HRT to prevent osteoporosis, however other benefits associated with therapy should be considered." Wyeth's "plans over the next three years include an intense effort to prove the benefits of Premarin in the prevention and treatment of Alzheimer's disease…We will continue to expand our programs supporting cardiovascular and osteoporosis, to support long term compliance…New areas of investigation include the prevention of macular degeneration, reduction of colon cancer, benefits to the urinary tract, sleep improvement, dental benefit, reduction in risk of stroke, and many others."

In September 1998, a Wyeth sponsored Continuing Medical Education (CONKJ012-000765) publication contained several HRT benefits for which there were no approved indications. These included the prevention of cardiovascular disease and Alzheimer's disease, reduction of tooth loss, protection against colon cancer, and prevention of age related macular degeneration. Despite multiple FDA admonitions over several years, Wyeth clearly engaged in a strategy of attempting to expand the definition of indicated menopausal symptoms through the over-promotion of off label benefits (WMDL04782-00042950; WMDL527-00039730).

Wyeth's unprecedented enlargement of the marketplace was not confined to the promotion of unapproved benefits or the promotion of HRT to women who had not been proven to benefit from its use. Wyeth also engaged in a sustained effort to keep women on HRT as long

as possible, even including the rest of their lives. (DUROJ042-00781, PANAA017-000480, SOLOJ010-000819). For example, the promotion of long term use was clearly addressed in a Wyeth strategic plan (DUROJ037-000183). The plan highlighted: "Cessation of Symptoms May Lead to Discontinuation" The articulated strategy was noted to "Provide patients with positive reinforcement relative to staying on medication. Convince patients that the benefits of routine adherence to therapy outweigh the potential risks. Educate patients about the need to take their HRT medication every day and long term." (DUROJ037-000183). This strategy evidently must have worked. Wyeth has noted (W-MDL527-00048274) "… a survey of current users indicated their average time on HRT is 7.8 years and one quarter of the group has been on therapy for more than 11 years…"

A series of 1970s promotional brochures ask the physician to "Start her on, keep her on…Premarin" (W-MDL04782-0015373, W-MDL04782-00015343). Another states "The subsiding of symptoms such as hot flushes and sweats doesn't signal the end of estrogen deficiency and its potential manifestations". (W-MDL04782-00016840). Yet another asks "Why Stop Estrogen Replacement Therapy after the Hot Flushes Have Subsided…When the Deficiency is still There?" (W-MDL04872-00016708).

In the early 1990s, Wyeth prepared a standard corporate response letter to address inquiries with regard to the ideal duration of HRT. Their response stated, in part, that "some experts recommend that ERT be continued for at least 10 to 15 years or until approximately age 70, while others recommend therapy for life" and that "Additional data has shown that once estrogen is discontinued, bone loss occurs". (PANAA030-001175).

Wyeth (RYANJ002-000499) instructed detail representatives in the early 1990s that women could now realistically expect to live with a deficit of estrogen for an average of 30 years

past menopause. The resulting estrogen deficit placed women at risk for a "wide spectrum of disturbances relating to estrogen deficiency". The package further instructs the representative to "gain agreement that estrogen-deficiency symptoms related to menopause demand treatment: present the unique benefits of Premarin and clearly position it as the best possible choice for ERT". This had the dual effect of promoting long term risk as well as the supposed risks associated with abstaining from HRT

In April 1993, Wyeth conducted a survey of "Seasons" magazine subscribers to determine their perceptions of Premarin. One of the questions was whether or not the patients thought that Premarin was safe for long-term use. The number of subscribers responding affirmatively rose from 63.64% in August 1992 to 82.1% in April 1993. Clearly the marketing objectives of the publication were met. The response was summed up by a Wyeth employee in a handwritten note on the last page of the document: "+27% vs. prev. period +42% vs year ago Our highest ever! Great news for a slow month/time of year".

In 1997, a brochure was produced entitled "For Four Decades, Her Body Supplied All the Estrogen She Needed…How Much does she Know about the Consequences of the Next Four?" (STRIS001-000034). In this brochure, physicians were encouraged to "explain menopause as a continuum with different conditions arising with its progression. This can be useful in supporting why treatment can last throughout the rest of a woman's life".

A brochure entitled Premarin Compliance Program: Physician and Staff Guide (version 7 approved December 27th, 2000) (HOLSN004-000392) provides an example of Wyeth's "through the physician" method of over-promotion to patients. The package contained a 5 phase program to increase patient compliance and to encourage long term use of Premarin. Included were patient questionnaires, physician and staff posters, exam room posters, patient information tear

sheets, comprehensive patient brochures (answers the question "why I should take HRT long term), plan of action (contract to take HRT), a patient diary and 7 follow-up letters. The package included the statement "Estrogen/hormone replacement therapy (HRT) has long term benefits. Some benefits are very well documented, and others are still under investigation."

In April 2002, Wyeth's document noting "Celebrating 60 Years of Trust and Innovation" (: W-ADSBRO-000175) contained testimonials such as "…the past 45 of my 83 years I've taken estrogen daily." and "Age 79 on therapy for 25 years".

After WHI, Wyeth changed its promotional paradigm. By 2002, Wyeth was communicating a message of restraint with regard to duration of use. Health care providers were being advised to limit HRT to limited duration since HRT should not be considered a "lifelong commitment" (W-DDL-00000103; Exh. 322K, W-DDL-00000113; Exh. 322L; DEYMI206-002257; Exh. 390, DEYMI206-001901; Exh. 392, DEYMI206-004012; Exh. 468). As noted earlier in this report, Wyeth should have conducted a WHI type of trial in the mid 1980's. If this had occurred, Wyeth would never have promoted the long term use of HRT and millions of women would have been protected from accumulating breast cancer and cardiovascular risks.

How did Wyeth build this huge marketplace for HRT? The records indicate that Wyeth has employed a variety of techniques, outside of FDA's direct control, to effect the amplified uses of HRT. These included dissemination of biased and scientifically unbalanced promotional tools, the employment of paid "scientific" advocates (including professional individuals, universities, associations, etc.) to promote their products using direct and more subtle means, participation in the creation of biased "scientific literature", and the encouragement of off-label uses by their field representatives. More information relating to these tools is provided in the following sections.

**USE OF UNBRANDED ADVERTISING**

As part of its marketing plan, Wyeth employed substantial amounts of unbranded advertising relating to menopause and HRT and targeted to both patients and health care providers (DUROJ044-003012, DUROJ046-010953). Such promotion was a unique benefit to Wyeth since they controlled over 90% of the HRT market. In fact, one Wyeth employee who was charged with market planning wrote with regard to unbranded advertising on February 4, 1998: "Because we are the HRT market, we have a unique opportunity to benefit the brand by through unbranded messages." (HENRL005-000603)

The 1997 brochure entitled "For Four Decades, Her Body Supplied All The Estrogen She Needed…How Much does she Know about the Consequences of the Next Four?" also included various off label benefits and encouraged the long term use of HRT (STRIS001-000034). Targeted to health care providers, this brochure included a chart for the physician to "help the patient understand that estrogen not only affects her reproductive organs, but affects all areas of her body," including brain, skin, circulatory system, breast, nervous system, digestive system and bladder. Instructions at the bottom of the packet state: "Summarize this message for patients by reinforcing that, because of the changes brought about during menopause, there may be risk in not treating the potentially serious medical conditions associated with menopause with preventive care."

In 2000 Wyeth published an unbranded advertisement brochure (HENRL003-000493, HENRL003-000575) entitled Menopause & Hormone Replacement: A Helpful Guide When Talking to Your Doctor. The brochure claimed that "Taking hormone replacement therapy (HRT) can relieve bothersome symptoms of menopause and, at the same time, protect your body

from silent threats like osteoporosis and heart disease." and "HRT dramatically reduces a woman's risk of heart attacks and stroke according to the American Heart Association." The brochure also reported as much as a 50% decrease in heart disease risk in women taking estrogen therapy and that "researchers are exploring a possible link between loss of estrogen and the risk of Alzheimer's disease."

Other examples of unbranded materials are provided in this report. Wyeth clearly enjoyed a win/win situation with their unbranded advertisements and educational campaigns. After all, Wyeth had created a long-term disease state with menopause and then controlled the lion's share of the HRT market intended to address this disease. Because of their control of the HRT market, all benefits of the unbranded promotional efforts (which is not regulated by FDA) would accrue primarily to Wyeth.

**ADVOCATES**

A pivotal element of Wyeth's strategic plan was the development of "advocates" (DUROJ037-000183**)**. Advocates were generally well credentialed medical professionals, associations, and opinion leaders who could be depended upon to present information favorable to HRT and Wyeth. Advocates received honoraria or grant awards in appreciation of their support of Wyeth's HRT marketing goals. For example, in 1987, as mentioned earlier, Dr. Randall Barnes of the University of Chicago wrote a "Dear Doctor" letter on Wyeth's behalf to encourage his fellow physicians to prescribe estrogen therapy to patients who did not yet present menopausal symptoms. His letter also promoted a supposed cardiovascular benefit (CONNS014-001645). His recommended therapeutic courses were inappropriate, and inconsistent with the usage and indications in the label at the time.

In late 1998, Wyeth hired Dr. Leon Speroff, of the Oregon Health Services University, to endorse the benefits of estrogen for cardiovascular health at a symposium for the American Society for Reproductive Medicine (SOLOJ023-000705). In his presentation, he downplayed the relative risk of heart disease associated with estrogen therapy and manipulated the risk benefit ratio, even though the significant clinical data were available to signal an association between HRT use and various cardiac adverse events.

Wyeth's association with advocates was also meant to orchestrate the dissemination of their HRT message on a national scale. For example, the National Committee for Quality Assurance (NCQA) Health Plan Employer Data and Information Set (HEDIS) helps to ensure standardized measures of performance among managed health care plans (http://www.ncqa.org/programs/hedis). As such, HEDIS exerts influence over the standard of care rendered by managed care physicians. Wyeth planned to "leverage HEDIS to drive the establishment of a standard of care" and then to "expand the 'standard' to all health care provider organizations." The plan included using the Jacobs Institute and the American College of Obstetricians & Gynecologists (ACOG) to assist in the implementation of the standard (DUROJ044-000143). The Jacobs Institute "Guidelines for Counseling Women on the Management of Menopause" dated February 2000 explains the HEDIS "management of menopause measure" and includes a checklist of topics for members of health care provider organizations to cover in counseling. Included in the checklist is coronary heart disease, with HRT listed as one of the treatment options.

In early 2001, Wyeth invited their advocates to publicly address prospective prescribers at over 900 events. That year, Wyeth granted honoraria totaling over $1 million. (CONKJ008-000129). Wyeth employed a scoring convention to rate their speakers on criteria such as the

impact on the audience, whether the speaker would be used again, and whether the product message was delivered effectively (CONKJ008-000129). According to a Wyeth meeting agenda, advocates were expected to "go on the attack" in public forums (HENRL025-001651).

Wyeth advocate, Susan Wysocki, President and CEO of the National Association of Nurse Practitioners in Women's Health, issued a statement to the National Institutes of Health to comment on the cessation of WHI. She urged them to keep the results in proper perspective and explained that the findings of the study were mischaracterized. (http://www.npwh.org/NIH-wysocki-statement.htm) She expressed concern that "countless women took themselves off HRT" and that WHI news coverage "scared women out of their well being". Interestingly, Wysocki was "supported" by Wyeth in the delivery of continuing education. (CONKJ017-066312) This kind of public statement was typical of Wyeth's tactic of using advocates in an attempt to neutralize unfavorable press.

Advocates could also be third party institutional organizations such as the American Heart Association. Wyeth's marketing and advertising pieces clearly showed that AHA supported the mythical cardiovascular benefit. (CONNS005-000121) A promotional pamphlet for women titled "Menopause & Hormone Replacement Therapy" stated in part that "according to AHA studies have shown that there is a 50% lowered risk of cardiovascular disease in women taking estrogen" (HENRL003-000493). AHA received $1.5 million from Wyeth (HENRL025-000457).

**CME AND GRANTS**

Another staple of Wyeth's unbranded promotion was the funding and development of continuing medical education **(**DUROJ044-003012, DUROJ046-010953). Duke, a long term

Wyeth advocate, created an activity entitled "Therapeutic Options for Menopausal Health, September 1998" as a monograph designed to facilitate continuing medical education for physicians (CONKJ012-000765). This document stresses long term benefits of HRT on cardiovascular disease. The date of this document (September 1998) is interesting because it immediately follows the publication of the problematic cardiovascular data from the HERS study (Hulley et al., 1998), which, interestingly, the monograph fails to cite. The funding source of the monograph was noted as an "unrestricted educational grant from Wyeth Ayerst Laboratories." Charles Hammond, MD, the author, reports a possible conflict of interest because of his affiliation with Wyeth. Besides lacking the HERS data, the monograph itself promotes HRT benefits for which there was no indication contained in this document including prevention of cardiovascular disease and Alzheimer's disease, reduction of tooth loss, protection against colon cancer, and prevention of age related macular degeneration. In fact, the publication states that even women at a high risk for breast cancer should consider initiation of HRT therapy if the benefits are considered significant enough (CONKJ012-000765). In addition to using the Duke monograph for promotion through CME, Wyeth's detail representatives were given the document for use when calling on physicians. (CONKJ012-000759; Exh. 802, Detail Notes; Exh. 2000). Because of its timing, funding, and off-label promotion, the monograph became a promotional weapon to combat the negative impacts of the HERS findings.

**POLLUTED LITERATURE**

As part of their ongoing strategy of neutralizing unfavorable clinical trial results or other adverse literature reports, Wyeth utilized a number of clinicians and researchers to author polluted and biased reports in the literature. These literature reports were designed to both

discredit the design of any study which resulted in negative findings and to then place the problematic data in the proper perspective relative to all the other data more favorable to Wyeth.

Wyeth's Strategic Publication Plan Tracking Report makes it clear that they effected a systematic practice of populating the scientific literature. (DUROJ046-013418). As noted earlier, Dr. Leon Speroff, Professor of Obstetrics and Gynecology at Oregon Health Sciences University, provides an illustrative example following publication of the HERS data (Maturitas; The European Menopause Journal, 1998). Dr. Speroff explained that HERS results which demonstrated an increased incidence in adverse cardiovascular events in the first year, were surprising and contrary to the vast majority of observational studies. He noted that this increase was "…difficult to understand" and raised questions about whether the study was sufficiently powered. He also tried to convince readers that the HERS study "did not yield … definitive results." However, HERS was designed and funded by Wyeth to specifically determine whether combination therapy would reduce coronary heart disease events. Apparently, a definitive result would only have been reached if a positive benefit of cardiovascular events had been observed.

As noted elsewhere in this report, Wyeth also relied upon Dr. Charles Hammond (Duke) as an HRT advocate. In fact, Dr. Hammond summarized a series of presentations in September 2000 in the American Journal of Managed Care. Notwithstanding, rapidly escalating sources of cardiovascular and breast cancer risk data, Dr. Hammond extolled the benefits of HRT for a variety of unproved indications (including cardiovascular events) and diluted breast cancer concerns.

Wyeth's unbalanced approach to populating the literature is particularly troubling given the health care community's reliance upon its unbiased integrity in making prescribing decisions.

**CALL NOTES**

One of the techniques employed by Wyeth to explode the marketplace was to amplify the uses of HRT and the encouragement of off-label uses by their field representatives. Wyeth's detail representatives were trained to minimize safety concerns associated with HRT and to present off label benefits. (SOLOJ010-000824; STRIS002-000403) A review of call notes dating from 1995-2002 indicates that this training was well worth the effort. In almost every state in the nation, multiple representatives initiated contact with physicians and promoted off label uses including, but not limited to cardiovascular and cognitive benefits.

Wyeth's directives to its detail representatives had some effect. In July of 2000, a Wyeth sales representative wrote to the internal Office of Ethics and Business Conduct that he was instructed from management to promote products using "out of label indications" such as, but not limited to, "Alzheimer's disease, the reduction of cardiovascular disease, and vanity issues with both Premarin and Prempro". The employee had multiple concerns. First, "many recent studies have shown increased incidences of breast cancer, heart attack and little effect on Alzheimer's disease, and many physicians may have been influenced by representatives when detailing out of labeling to prescribe Premarin or Prempro…". Second, his concern was that this "could make the Redux lawsuits pale in comparison should upcoming studies show continued problems or should patients be prescribed these products for their out of labeling indications and experience any medical problems". His third concern was that Wyeth was sacrificing women's health for profits. The representative was accused by his management of being negative and insubordinate as a result of his views and statements (CORRA001-000125).

**WYETH'S STANDARD FOR ITS COMPETITORS**

As noted at the beginning of this section, Wyeth exerted unremitting control over its competitors. While Wyeth routinely abrogated the standards of care with respect to promotion of unapproved cardiovascular and other benefits, Wyeth routinely reported to FDA these same promotional activities when committed by their competitors. Wyeth reported competitors' advertising campaigns on several occasions and. clearly held their competitors to a higher regulatory standard of promotional practices than applied internally.

For example, beginning in 1990, and continuing thereafter Wyeth notified FDA that Ciba-Geigy was engaging in unbranded promotion of supposed cardiovascular benefits of HRT. (CONNS009-00315) FDA made it clear to Wyeth that promotions such as these were of "particular concern." FDA's response to the Ciba-Geigy material should have served as a standard for Wyeth's behavior. Unfortunately, this was not the case.

In 1994, Wyeth notified FDA that Solvay was engaging in a false and misleading promotion of Estratab by advertising a supposed cardiovascular benefit. Wyeth's letter stated in part "the promotion of products for unapproved uses is a potential hazard to the health of millions of women." (CONNS001-001319)

In 1997, Wyeth notified FDA that the campaign to promote Ogen included the claim of a cardiovascular benefit (CONNS003-000002). Wyeth was concerned that this off label promotion might create the perception that Ogen was actually safe and effective for use as a cardiovascular therapeutic option. Wyeth's letter stated in part "We trust that you will realize that the public deserve (id.) more accurate and complete information and will take the necessary steps to correct this situation immediately by stopping circulation of this pamphlet". (CONNS003-000002).

In 2002 Wyeth notified FDA that Women First Healthcare, Inc. was engaging in false and misleading promotion of Esclim and Ortho-Est. (KUSIV009-009208). The claims included the prevention of the progression of atherosclerosis, reduction of the risk of Alzheimer's and increased life expectancy. Wyeth objected to this advice because it raised a "major public health concern". In addition, Wyeth alleged non-disclosure of the corporate interest of an advocate, misrepresentation of Women First as providing a service to the public by offering guidance on the proper use of hormone therapy, misrepresentation of promotional statements as medical advice and offering medical advice in conflict with the label. Wyeth clearly understood the inappropriateness of off-label promotions. Unfortunately, their concerns with corrective actions to these promotions only extended to their competitors.

In summary, Wyeth engaged in a marketing strategy for HRT conceived around unlabeled indications, use in populations that would not benefit from the drug as indicated and for a duration of use that was not supported by well controlled clinical trials. In executing its strategy, Wyeth avoided FDA scrutiny by cloaking HRT promotion in ostensibly credible medium such as disease awareness communications, individual and institutional advocates, continuing medical education and scientific literature. Wyeth exercised these promotional tactics knowing FDA was opposed to them. Further, Wyeth held its competitors to the standards it should have observed itself by making a practice of notifying FDA anytime they learned of a competitor engaging in similarly inappropriate promotions.

I reserve the right to amend my opinion if/when additional information becomes available.

I hold all of the opinions expressed within this report to be true within reasonable scientific and regulatory certainty.

Cheryl Blume

Cheryl D. Blume, Ph. D.

02-15-06

Date