# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JUDY ROMERO, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | 1:03-cv-001367 |
| vs. | § | |
| | § | |
| WYETH, LLC, | § | |
| | § | |
| Defendant. | § | |

—— —— ——

WEDNESDAY, APRIL 27, 2011

—— —— ——

Videotaped oral deposition of RADHA J. LAL, M.D., held at the MCM Elegante Hotel, 2355 Interstate 10 South, Beaumont, Texas, at 10:01 a.m., on the above date, before Michael E. Miller, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public.

—— —— ——

GOLKOW TECHNOLOGIES, INC.
877.370.3377 | fax 917.591.5672
deps@golkow.com

A P P E A R A N C E S:

AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC
BY: DANIEL J. THORNBURGH, ESQUIRE
dthornburgh@awkolaw.com
17 East Main Street
Suite 200
Pensacola, Florida 32501
(850) 916-7450
Counsel for Plaintiffs

SNELL & WILMER, LLP
BY: BRYON J. BENEVENTO, ESQUIRE
bbenevento@swlaw.com
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
(801) 257-1900
Counsel for Defendant Wyeth, Inc., et al.

HENDERSON, BLOCK & ELMORE, PLLC
BY: DEBBIE L. ELMORE, ESQUIRE
delmore@hbelaw.com
5020 Montrose Boulevard
Suite 300
Houston, Texas 77006
(713) 275-4050
Counsel for The Witness

VIDEOGRAPHER:
DOUG OVERSTREET,
Golkow Technologies, Inc.

———



INDEX


| | |
|---|---|
| APPEARANCES | 2 |
| PROCEEDINGS | 4 |
| EXAMINATION OF RADHA J. LAL, M.D.: | |
| BY MR. BENEVENTO | 6 |
| BY MR. THORNBURGH | 155 |
| BY MR. BENEVENTO | 273 |
| BY MR. THORNBURGH | 299 |
| BY MR. BENEVENTO | 300 |
| CERTIFICATE | 301 |
| ACKNOWLEDGMENT OF DEPONENT | 302 |
| ERRATA | 303 |
| LAWYER'S NOTES | 304 |


———



DEPOSITION EXHIBITS
RADHA J. LAL, M.D.
Wednesday, April 27, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Lal-1 | Curriculum Vitae | 17 |
| Lal-2 | Medical Records, LAL-001 - LAL-048 | 76 |
| Lal-3 | Brochure: Hormone Replacement Therapy and Your Health | 97 |
| Lal-4 | 2007 Label for Prempro/Premphase | 218 |
| Lal-5 | 1996 Label for Premphase | 237 |

———



PROCEEDINGS

(April 27, 2011 at 10:01 a.m.)

THE VIDEOGRAPHER: Stand by. Okay. We're now on the record. My name is Doug Overstreet. I'm the videographer. Today's date is April 27th, 2011. It's 10:01 a.m., beginning of Tape 1.

This video deposition is being held in Beaumont, Texas in the matter of Judy Romero vs. Wyeth, LLC for the U.S. District Court before the Eastern District of Texas, Beaumont Division. The deponent is Radha Lal.

THE WITNESS: Yes, sir.

THE VIDEOGRAPHER: Will counsel please identify themselves for the record.

MR. BENEVENTO: Bryon Benevento on behalf of the defendants.

MR. THORNBURGH: Dan Thornburgh on behalf of the plaintiff, Judy Romero.

MS. ELMORE: Debbie Elmore on

Page 6

behalf of the witness, Dr. Lal.
THE VIDEOGRAPHER: The court reporter today is Mike Miller. He will now swear in the witness.
RADHA J. LAL, M.D.,
having been duly sworn,
testified as follows:
EXAMINATION
BY MR. BENEVENTO:
Q. Hi, Doctor. My name is Bryon Benevento. I had a chance to meet with you briefly as you came in today. I appreciate your time and appearing here for this deposition.
It is not a marathon, so if you need a break during the deposition, just let us know, okay?
A. All right. Thank you.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. Okay. It will follow the same kinds of process and procedure. I'll ask you some questions. I will try to be clear in my

Page 7

questions.
A. Okay.
Q. If I'm not, just tell me you don't understand, and I'll try to restate it for you, okay?
A. All right.
Q. I will do my very best to let you finish your answer before I start my next question; but I have to tell you, sometimes I'm impulsive --
A. Oh.
Q. -- and I will start my next question. And just let me know that you haven't finished, and I'll let you finish your answer, okay?
A. All right.
Q. The court reporter is here, and he has a hard time taking the statements down that are being made if we're both talking at the same time or if the lawyers are talking at the same time. So, again, I'll try to wait to have you finish, and if you'll do the same for my question, that would be helpful for the record, okay?

Page 8

A. Okay.
Q. Do you have any questions before we get started?
A. No, sir.
Q. Okay. And you understand that we're here to talk about your care and treatment of Judy Romero?
A. Yes.
Q. And you understand that you are not named as a party to this litigation?
A. Yes.
Q. In other words, no one is claiming you've done anything wrong at all. Do you understand that?
A. Yes, sir.
Q. Okay. You understand that Ms. Romero has brought a lawsuit against my clients for the sale and use of hormone therapy medication that doesn't have anything to do with you. Do you understand that?
A. Yes, sir.
Q. Okay. Have you had an opportunity to speak to anybody that represents Ms. Romero --

Page 9

A. No.
Q. -- her lawyers or her experts or anybody like that?
A. No, sir.
Q. Have you been provided with any information outside of your own chart that provides the care and treatment you gave to Ms. Romero from anybody else?
MS. ELMORE: Object to form, to the extent it asks for -- any communications between you and I are privileged.
THE WITNESS: Okay.
BY MR. BENEVENTO:
Q. And what I'm asking is for information like pathology reports, supplemental proceedings, expert reports, things like that, that would help you understand what has occurred to Ms. Romero since she's no longer in your medical care.
A. No.
Q. Have you received any of that information?
A. No, I have not.

MS. ELMORE: Same objection.
You may answer.
BY MR. BENEVENTO:
Q. Well, have you been provided with any information by lawyers?
A. No, not --
MS. ELMORE: Same objection.
You may answer.
THE WITNESS: Okay.
BY MR. BENEVENTO:
Q. You have not been provided with any information from lawyers; is that correct?
A. Except for in discussion with my own lawyer.
Q. Right. And I'm not asking for discussion. I'm asking: Has anybody given you any materials, any documents, any pathology reports, any expert reports, any depositions, any studies, anything like that?
MS. ELMORE: Other than me, her attorney.
MR. BENEVENTO: It's not limited to attorneys.



BY MR. BENEVENTO:
Q. It's: Has anybody given you any information that you've used to prepare for this deposition?
A. None except my attorney. I've discussed with her, and that's the only thing.
Q. Right. And this question doesn't talk -- and I apologize. I'm not being very clear. I'm sorry. I'm not asking you about communications, discussions that you've had with your lawyer.
A. Uh-huh.
Q. I'm asking now: Has anybody, including your lawyer, given you anything to review, other than your chart?
MS. ELMORE: Object to form. To the extent you and I have had discussions or exchanged any information, that's privileged.
MR. BENEVENTO: Are you instructing her not to answer?
MS. ELMORE: To the extent it asks for communications between she



and I.
MR. BENEVENTO: I didn't say "communications." Let me try one more time.
BY MR. BENEVENTO:
Q. Has any lawyer given you anything, other than your chart, to prepare for your deposition today?
A. She asked me to review the PDR content of, you know, those --
MS. ELMORE: I'm going to object to form and instruct her not to answer about communications between she and I.
MR. BENEVENTO: Okay.
BY MR. BENEVENTO:
Q. And, again, I'm not asking you about what you discussed with your lawyer, okay?
I'm simply asking you whether you received any materials to prepare for your deposition today.
MR. THORNBURGH: But certain materials may be protected by the



attorney-client privilege, and she's asserted her objection. I don't think it would be appropriate for her to answer a question that requires her to divulge that information.
MR. BENEVENTO: It's a yes-or-no. And so I haven't asked her what that material is or what the nature of the material is, so I think these are all premature.
I'm trying to find out, establishment, what this witness has looked at; and I think I'm entitled to that. And if we're not, we'll just suspend the deposition and come back.
MS. ELMORE: I'm not trying to get crossways with you at all. I think you're asking her if she's received any of the other materials about Ms. Romero, pathology, other medical records; but I'm not sure. I can't tell what you're asking for here.
To the extent that I have met

with Dr. Lal, that her attorneys have met with her and had discussions, that is privileged, and I'm instructing her not to answer to the extent that divulges our communications.
BY MR. BENEVENTO:
Q. And, again, ma'am, I am not asking you -- just so we're clear for the third time, I am not asking you what your lawyer told you and what you told your lawyer. I'm not asking that at all, okay?
I'm simply asking you: Has anybody given you any materials, hard materials to read in preparation for this deposition that pertains to Ms. Romero?
MS. ELMORE: That pertains to Ms. Romero.
A. No, not about Ms. Romero.
BY MR. BENEVENTO:
Q. Okay. Thank you.
Has anybody given you any studies to review that pertain to hormone therapy?
A. We -- my attorney advised me --



MS. ELMORE: Just a moment. Again -- and I think it's a matter of semantics. To the extent that she's about to answer you with privileged attorney communications, I think your question is calling for that; and I'm going to instruct her not to answer to the extent it divulges any attorney-client information.
BY MR. BENEVENTO:
Q. Have you read any studies to prepare for your deposition today?
A. I've reviewed the PDR content of it and from --
MS. ELMORE: Dr. Lal, listen to his question. Have you reviewed any studies to prepare for your deposition today?
A. Studies on what?
BY MR. BENEVENTO:
Q. Studies on anything.
A. Not necessarily, no.
Q. Okay. You've referenced a few times a PDR. And for the jury, that's the



Physician's Desk Reference; is that correct?
A. Yes, sir.
Q. Okay. And what PDR did you look at? What was -- what were the particular medications or drugs that you were looking at?
A. I reviewed again on the prescription that I gave, to see what it says.
Q. Prescription for whom?
A. To Ms. Romero, long time ago.
Q. Okay. And we'll get to that in a moment. I believe that's Premphase.
A. Right.
Q. Did you review any other Physician's Desk References for any other drugs?
A. No.
Q. Okay. Your lawyer's been kind enough to provide me with your CV, and if you could just help me understand a couple of things.
It looks like you went to medical school in India?



A. Yes, sir.
Q. Okay. What was the name of that school?
A. It's Madurai Medical College, and it is from University of Madras. Madras now has changed its name as Chennai; but those days, it was Madras.
Q. Okay. And that -- and you graduated in 1968?
A. Yes, sir (inaudible) --
(Clarification requested by the reporter.)
A. Yes, sir.
BY MR. BENEVENTO:
Q. Okay. I think your attorney was kind enough to put another copy of that. And since you have that in front of you, why don't we mark that as Exhibit 1, okay?
A. Okay.
Q. Would that be all right?
(Whereupon, Deposition Exhibit Lal-1, Curriculum Vitae, was marked for identification.)
BY MR. BENEVENTO:

Page 18

Q. So I've marked your CV, or curriculum vitae, as Exhibit 1. And we were referencing under "Education"; is that correct?
A. Yes.
Q. All right. And then it looks like you did your internship and senior house surgeon -- where was that performed at?
A. It was Government Rajaji Hospital. That is the hospital that is along -- that is provided from the medical school.
Q. Okay.
A. Different -- it's together. They're a medical school, attached one.
Q. And then that was in India as well?
A. Yes, same town.
Q. At this particular time, in 1969-1970, had you decided to specialize in obstetrics and gynecology?
A. Yes, sir. I always, from the time I went to medical school.
Q. Okay. That was what you wanted

Page 19

to do?
A. Yes. My parents also expected me to do that.
Q. And then it looks like you completed -- you have, "Completed DGO," which is the diploma of obstetrics and gynecology, in 1972. Was that, again, in India?
A. Yes, sir.
Q. All right. And then you moved to the United States sometime in 1973?
A. Yes.
Q. Has that -- has your work -- well, has your work in the United States all been here in the greater Beaumont area?
A. I did my residency in Michigan, four years OB/GYN residency.
Q. In the state of Michigan?
A. Yes.
Q. And that's -- do you remember what college -- or what institution or facility that was at?
A. That was as I wrote, William Beaumont Hospital.
Q. Okay. So the Beaumont

Page 20

hospital's actually in the state of Michigan?
A. Yes.
Q. And then you moved to Beaumont, Texas?
A. Yes. It was a coincidence.
Q. Oh that's interesting. I was confused when I saw "Beaumont Hospital," that that might be here.
A. No.
Q. All right. So you did four years of work in Michigan, specializing in OB/GYN residency; and then you came here to Beaumont, Texas?
A. Yes, sir.
Q. And you've had a private practice here since that time?
A. Yes.
Q. So for approximately 30, 35 years?
A. Yes, 33 years.
Q. And I understand you're about to retire?
A. Yes. I decided that from last year, but it extended through June.

Page 21

Q. Congratulations.
A. Thanks.
Q. When you are working here in the greater Beaumont area for your patients, do you have any hospital privileges at any of the facilities here?
A. Yes, we have to have it. I used to work in three different hospitals then. St. Elizabeth's is my primary hospital; and then they had Baptist Hospital; and then they had another one, Beaumont Medical/Surgical Hospital.
Now, the Baptist and Beaumont Medical/Surgical merged together and bought out by Hermann. Right now, I have been practicing only in St. Elizabeth's.
Q. Okay. Do you hold any teaching positions with any institutions, whether they be hospitals or educational?
A. No. When Beaumont -- St. Elizabeth's, for some time, had a family practice residency rotating through them; not anymore. During that time, we used to just discuss with their family practice residents.

Page 22

Q. And when you practiced -- you're still practicing. I apologize.
A. Yes.
Q. But you're about to retire.
A. Yes.
Q. During the time that you have practiced in Beaumont, have you been on your own as your -- as your own physician, or are you with a group of other physicians?
A. I always had been solo practitioner, but for convenience, I had call shares with other doctors. I used to have one other doctor to share calls with me, alternate weekend or something like that, especially when my children were growing up and I needed to pay some attention to the family.
Q. And was that person that you would share calls with -- has that been the same person for the 30, 35 years, or has that changed?
A. No. It was Dr. Calle first, who is my subordinate in William Beaumont Hospital during my training. That's the one

Page 23

who asked me to come to Beaumont. That's how I found about it.
And then when he quit practicing, then it was Dr. Free. He was by himself, so it was convenient for call share for us.
And when he stopped practicing, then I had Dr. Smith, Roger Smith.
Q. Okay. Thank you.
Your practice as an OB/GYN here, I assume that it has a great number of women that are entering the menopause phase or are in postmenopause stage. Would that be fair?
A. Right now, that is fair. But in the beginning of my practice, I had lots of patients of all age groups, because I was practicing OB also; so many of the childbearing age group women were my primary practice. And their parents -- or some menopausal-age patients were there.
But now, my patients have grown up with me, and I have more of those perimenopausal age group patients.

Page 24

Q. So when you first started, you had a good mix of ages of women?
A. All women.
Q. And as you progressed through your career --
A. Yeah.
Q. -- those patients have continued to follow -- or most of those patients have continued to follow you --
A. Yeah.
Q. -- and they become older as well?
A. Yes.
Q. Okay. Can you give me a sense today of what the mix would be of how -- percentage-wise, how many women are menopausal versus non, just a rough guess?
A. Are you asking now, or in the past?
Q. Yes, today.
A. Today, I have -- more than 60% are menopausal and perimenopausal patients.
Q. Okay. And how do you define "perimenopausal"?

Page 25

A. In general, the ACOG defines -- most of the obstetricians and gynecologists define menopause as age -- menopausal age to be around 50, 52. Actually, at one place I had heard that 52.8 is the American age group that is going to menopause, on an average.
And so anywhere from, say, 43, 45 to 55, I would consider them to be perimenopausal, and they may have problems related to that, so...
Q. And if a patient is perimenopausal, does that mean that they're not having their regular cycles?
MR. THORNBURGH: Objection.
MS. ELMORE: You may answer.
THE WITNESS: Okay.
A. They may have regular cycles. They may have associated menopausal symptoms, physically, emotionally. So there are multiple reasons that we call it perimenopausal.
BY MR. BENEVENTO:
Q. If a patient is perimenopausal, does that mean that their body is no longer

Page 26

producing natural estrogen?
A. They do -- menopausal and postmenopausal, they don't produce as much. But perimenopausal, yes, they produce, but it may be at a variable degree.
Q. And you mentioned ACOG. That's the American College of Obstetrics and Gynecology?
A. Yes, sir.
Q. Are you a member of that group?
A. Yes, sir, always have been.
Q. Always have been.
Do you attend their -- have you attended their meetings on a regular basis?
A. Not every meeting, but some, I have attended. But I regularly attend the Texas branch of ACOG, which happens once a year in different cities in Texas. That, I regularly attend.
Q. I apologize.
Do you receive their publications and materials that they disseminate?
A. Yes, sir.

Page 27

Q. Do you find any of them particularly helpful?
A. I go through them quickly and see whatever is helpful. Most of them are helpful.
Q. And I understand sometimes they publish guidelines for various courses of treatment. Do you read those guidelines?
A. Yes, sir.
Q. Do you deviate or vary from those guidelines?
MS. ELMORE: Object to form.
You may answer.
THE WITNESS: Excuse me?
MS. ELMORE: You may answer.
A. Do I deviate from the guidelines?
BY MR. BENEVENTO:
Q. If you receive an ACOG guideline that says --
A. Yeah.
Q. -- "Do XYZ," do you always do that, or do you use your own --
A. Most of the time, yes.

Page 28

Occasionally, when the patient presents and things like that, I might have deviated; but I tried to stay within their limits.
Q. Are you a member of the North American Menopause Society?
A. No, sir.
Q. Are you a member of any other organization, other than ACOG?
A. Just Texas Medical Association and Jefferson County. And I used to be temporarily with other associations, but not all the time, you know.
Several other associations, there are so many of them, and each one of them have -- you have to have membership payments and all that, so I have not been regularly associated with them. Here and there, I have -- over the years, I have been with other associations.
Q. Okay. How do you keep abreast of the current medical information that pertains to obstetrics and gynecology?
A. I attend the meetings, ACOG meetings and other OB/GYN meetings held

Page 29

and -- and nowadays, mostly within the state. I used to go out of state, but now I try to stay within the -- within Texas.
Q. Is that part of the continuing medical education --
A. Yes. Yes.
Q. -- requirements?
MS. ELMORE: Let him finish his question.
A. Yes. And, also, even if I have more number of credit hours that is required for the CME, I still attend for my own interest.
BY MR. BENEVENTO:
Q. Are the -- do you keep a list over the years of the various courses that you go to in order to satisfy your requirements?
A. Yes. Main ones, I keep, and so every time we have reappointments with the hospitals, we have to provide our CME credit to verify that we are attending and keeping up with the present things.
Q. Do you recall attending any

Page 30

continuing medical education programs in the past 15 years that spent a significant time dealing with hormone therapy?
A. Yes, several of them I have attended.
Q. Okay. Can you tell me what you remember about those and where they were and what was discussed?
A. As I said before, Texas ACOG meeting every year, I attend. Those are held in Austin, Houston, Dallas, Fort Worth or Corpus Christi, San Antonio; any of these big cities. So every year I attend that.
And then there are several meetings like that only a corporation gives free meetings also, periodically in Houston area. I have attended several of them.
Women's health meetings happen every now and then. If it is a one-day conference covering on OB/GYN topics on Fridays, I try to attend them.
It gives me casual knowledge of the present things, because the speakers are well versed and mostly authorities on the

Page 31

subjects. And, also, I'll have a trip out of Beaumont and come to Houston, attend that, and then I spend the weekend in Houston.
Q. Do you recall any of those seminars that you've attended that focused on hormone therapy?
A. Yes. Many of them, yeah.
Q. Do you know which ones did, you know, whether it was the one that you went to in -- or Houston or San Antonio, a particular year or a particular speaker or particular paper?
A. I am -- I know the one that -- very impressive one is -- I forget the name. The lady that -- she works for A&M, and -- gosh, I even went and talked to her, because I appreciated how wonderful speaker she was on birth control pills.
And she was an authority or an activist in teen pregnancy prevention, and I thought she was doing such a favor for this country and, you know, educating teenagers and preventing teen pregnancy and the complications that arise from that. So I

Page 32

really enjoyed her talk.
Q. Okay. And my question was not very well phrased.
What I was particularly interested in is whether you can recall attending any conferences or presentations where hormone replacement therapy was discussed.
A. Yes. Almost all the women's health topics will have menopause, hormone replacement therapy, osteoporosis and all these commonest topics in them.
Every year I have attended several of them, even the primary conference, which is a common conference for all the specialties that happen in Brown Center in Houston. Every year I try to attend that, because they do have OB/GYN topics.
And, also, I like to attend the other related ones, like cardiovascular disease and lipid therapy and all such things, diabetes. My husband is diabetic, and -- you know.
And now that I have more

Page 33

patients in the menopausal age group, they're all having such problems too, and I feel like if I'm a good doctor, I have to check on their whole system and refer to them appropriately after diagnosing it, just instead of just doing my part of it, gynecology part.
So I -- out of my own interest, I attend those meetings too.
Q. Do you recall any particular speaker, like you did with the --
A. Yeah.
Q. -- the teen pregnancy lecture, do you recall any particular speaker that has stuck out in your mind over the last 15 years or so on hormone replacement therapy that you found to be enlightening or informational?
A. No, because -- maybe because I attend so many of those, and so I can find out from my office and from the notes that I bring. But I can't recall anybody in particular.
Q. Okay. Is there -- are there any publications that you receive on a

Page 34

regular basis that you use to assist you in keeping abreast of obstetrics and gynecology issues?
A. I get Green Journal. That is from the OB/GYN membership, ACOG membership. I used to have a Gray Journal, but I stopped getting them.
Q. Do you know how long ago you stopped receiving the Gray Journal?
A. When I stopped OB practice, and that was like 10, 12 years ago.
Q. Okay. So you stopped delivering babies --
A. Yes.
Q. -- about 12 years ago?
A. Approximately. My husband got extremely sick with his health problems, and so I had to tend to him also.
Q. So for the past 12 years, your practice has been focused --
A. On gynecology.
Q. -- primarily on gynecology?
A. Yes, sir.
Q. Okay.

Page 35

THE WITNESS: I'm sorry.
MS. ELMORE: That's okay.
You're doing fine.
BY MR. BENEVENTO:
Q. Do you read the New England Journal of Medicine?
A. Not really. Sometimes they mention it there in the meetings, and so I don't get that journal.
Q. So if I understand you correctly, if you attend a conference and someone mentions there's an article that deals with an area of your interest and it's been published in the American -- in the New England Journal of Medicine, you may then read it?
A. I might have. I cannot recall.
Q. Okay. But is it something that you try to pull up on a regular basis through MEDLINE searches or other kinds of computer searches?
A. No, sir.
Q. All right. So you have the ACOG materials that are being sent to you.

Page 36

You go to these various presentations on a regular basis.
Is there any other source of information that you rely upon to keep you abreast of obstetrics and gynecology information?
A. I cannot recall right now what else.
Q. Okay. And let me just back up a little bit and ask you to help me understand what are menopausal symptoms.
A. First of all, menopause and the public, they -- they find out it is menopause because -- the cessation of menstruation. And many of them have symptoms related to the lack of estrogen, hot flashes, the vasomotor symptoms.
And then longer menopause, they will have atrophic changes in the vagina and other mucosal area, like the urethra; and some of them suffer much more with anxiety, depression and such things.
And then longstanding menopause without being treated, their bones get into

Page 37

trouble, and they can get into osteopenia or osteoporosis and so symptoms related to that can be appearing; and there are multiple symptoms, signs.
Q. Can some of those symptoms be severe enough in a patient that they're life-disturbing or life-changing?
A. Yes.
Q. How so?
A. The vasomotor symptoms are really, really bothering lots of people; and many of the women come to me first with that symptoms, hot flashes and sweaty and unable to sleep at night, having to change their night clothes two times at night and such.
And they -- another thing that brings them to me is -- like me being a lady physician, even other patients change to me to discuss certain sexual deficiencies, loss of libido and their husbands getting upset and she lost interest in sex and dry vagina, burning sensation and such things, and, you know, feeling like crying and depression.
And many times it could be

Page 38

associated with, also, the life changes in their own family. Children might have gone out of -- you know, for college. Empty nest syndrome and whatnot.
But -- and these are the main symptoms they bring us.
Q. And how do you go about treating those symptoms?
A. It depends. I discuss with them what can be done to alleviate the symptoms.
You know, if they can do lifestyle changes, exercise, changing their attitude and diverting their attention to other things, such emotional changes; and then if they are extremely severe, then treatment by hormone therapy, which is the reason for -- you know, lack of estrogen is causing all these problems, so I might discuss that, and the pros and cons about the hormones.
Q. Okay. And when you would discuss -- let's assume for the sake of argument that the patient is presenting with

Page 39

hot flashes and night sweats and telling you they're life-disturbing to her, and you would discuss hormone therapy. What would you tell her, and has that changed?
So let's first start with:
What would you tell her today?
MR. THORNBURGH: Objection, form.
MS. ELMORE: You can --
MR. THORNBURGH: If you understood the question, you can answer.
BY MR. BENEVENTO:
Q. Did you understand my question?
A. What would I tell them if they are suffering from all these vasomotor symptoms?
Q. Yes. When you're discussing hormone therapy with a patient today --
A. Right.
Q. -- what would you tell them?
You indicated that you would discuss hormone therapy pros and cons?
A. Yes.

Page 40

Q. I'm just trying to figure out what that meant.
A. Yeah. I would tell them that, you know, there are hormone therapies still in existence, but we don't prescribe as much as we used to several years, a decade ago or so, and things have changed a little bit.
And the dosage regimen also has changed drastically because of some side-effects that are related to that.
I discuss with them the side-effects, and then also how WHI also -- you know, many patients are even knowledgeable about such things, through the journals and this and that. And so if they are -- if this is going to make their life better, I still prescribe them and follow them up.
Also, have them sign a consent form saying that -- you know, that these things could happen, side-effects, and then you're aware of it and we are giving the treatment because right at this point, between you and me, for your symptoms, if I

Page 41

feel that your benefit is outweighing the risk, then we'll put you on this medication, but you have to be followed regularly.
Q. Okay. And let's turn the clock back in time for a moment, and let's say that you're counseling a patient that presents to you sometime in the 1980s and early 1990s with hot flashes and night sweats that they're describing as life-altering for them.
Would you have discussed hormone therapy with them as well?
MR. THORNBURGH: Objection, form.
A. I always told them that this is available, but everything has little side-effects, so if you want to take it. And I'm from India, and this might not be relevant to this: And many of my family members and my friends --
MS. ELMORE: Dr. Lal, if it's not relevant, it's not answering his question, then --
THE WITNESS: Then I don't --
MS. ELMORE: No, you just need

Page 42

to answer his question.
BY MR. BENEVENTO:
Q. Well, my -- if your experiences help you in treating your patients, then I'd like to know what your experiences are, because that could result in how you care for your patients. So I didn't -- I didn't want you to stop your answer. I'm interested in understanding your background.
THE WITNESS: I can answer?
MS. ELMORE: Yes. Yes.
A. Like I treat my patients deep from my heart for their well-being, period, because my parents wanted me to be an OB/GYN from childhood, because they thought -- this might be out of the way.
They thought childbirth is the most painful thing in life, and if somebody could help with the childbirth, they will be worshipped, and that's the best thing that one can do.
And so I was one of six children, and they always wanted me to, and I went to medical school. And they wanted me

Page 43

to become an OB/GYN and be very compassionate in treating the women.
So I always tell the patients some of the experiences that I have from India, and I tell them that -- not that women all over the world take hormones, necessarily. They think if the good Lord thinks that ovaries should stay forever, he would have kept it there, and so whatever is natural is what the life should be.
But that is my personal feeling, that -- but if one is suffering from a lot of complications from menopausal symptoms, then they have to be helped also. So I was a little bit a conservative person always, before prescribing a lot of doses of hormones. But if they need it, I gave them.
BY MR. BENEVENTO:
Q. Okay. Thank you. I really did appreciate that.
MS. ELMORE: Are you okay?
THE WITNESS: Yes.
MS. ELMORE: Okay.
THE WITNESS: I'm --

Page 44

MS. ELMORE: Would you like to take a little break? Are you okay?
THE WITNESS: Not necessarily.
MS. ELMORE: All right.
THE WITNESS: I'm just thinking why and how I became an OB/GYN.
MR. BENEVENTO: It was moving to me as well, and I appreciate that. Thank you. Unfortunately, my story about becoming a lawyer isn't nearly as moving or altruistic.
THE WITNESS: Yeah.
BY MR. BENEVENTO:
Q. I want to, if I can, talk to you about your practice in the mid to late '80s and early '90s. And the reason I'm focusing on that is because Ms. Romero came and saw you sometime in the mid '90s, and so I'm trying to figure out what your normal practice was before she came to you and how you would treat women that were presenting with complaints that were menopausal-related.
If I understand you correctly, you -- based upon your background and

Page 45

experience, you would treat people conservatively and not use drugs, necessarily, as the first solution to a problem. Would that be fair?
A. Yes.
Q. Okay. And you would counsel them on diet and exercise and other ways to perhaps help them?
A. Yes.
Q. All right. If the patient said, "I appreciate that, Doctor. However, these really are symptoms that are bothering to me, and I would like to know what else I can do in addition to that," you would discuss hormone therapy with them, correct?
A. Yes.
Q. All right. And you indicated that there were certain pros and cons that you would discuss with them. Can you tell me what that would be?
A. Yeah.
MR. THORNBURGH: Objection, form.
THE WITNESS: I can answer or

not?
MS. ELMORE: What time frame are you talking about?
MR. BENEVENTO: The mid to --
MS. ELMORE: Okay.
MR. BENEVENTO: The mid to late '80s and early '90s.
MR. THORNBURGH: Objection, form.
MS. ELMORE: You can answer.
A. Yes, I always discuss with them it's something that's happening naturally and if you can live with that, that is one good thing. If you cannot and if the symptoms are bothering you a whole lot, then there are solutions available.
Just for like anything in the world, if there's a benefit, there might be also risk, and so -- whether it be aspirin or driving a car or whatever, and so -- and these hormones will help alleviate your symptoms, but you don't want to be on it for a very long time. You need to be followed regularly and see how you do.



BY MR. BENEVENTO:
Q. Okay. So you would be telling them that, that with the benefit of perhaps having their symptoms relieved, there comes with it certain risks?
A. Right.
Q. And you need to observe and follow them --
A. Yes.
Q. -- to make sure that those risks are addressed, if they arise?
A. Yes.
Q. Would that be fair?
A. And be followed, yes.
Q. Okay. What were you observing them for?
MR. THORNBURGH: Objection, form.
A. They have to come regularly every year for follow-up visits, and they have to get their checkups, Pap smear, physical examination, breast examination and all these things, and blood work as necessary, and then titrated with the dosage



accordingly.
BY MR. BENEVENTO:
Q. Okay. Did you prescribe hormone therapy, hormone replacement therapy, for your patients in the late '80s and early '90s?
A. Yes, I did.
Q. Was there a particular form of therapy that you would prescribe over others?
A. If they needed hormones --
MS. ELMORE: Object to form. You may answer.
THE WITNESS: What was the question, again?
BY MR. BENEVENTO:
Q. I'm just trying to figure out what forms of hormone therapy you were prescribing in the early '90s. Apparently, I'm not doing a very good job. I'm drawing some objections.
So all I'm asking is: What kinds of therapies were available that you were prescribing?
MS. ELMORE: Throughout those



years, Bryon?
MR. BENEVENTO: Yes, ma'am, before 1995. I'm trying to figure out what she was doing before 1995 as it relates to --
MS. ELMORE: Okay.
MR. BENEVENTO: -- prescribing and counseling women that are presenting with menopausal-related symptoms.
MS. ELMORE: Okay. Thank you. Go ahead.
A. In -- you know, in those days, I was one of the only female physicians in the area for some time, OB/GYN, and so I had a lot of reference from -- from private family practice, internists, such if they found tumors or female problems in menopausal age group women for surgery and all that.
So if I did surgery, and then I had given them estrogen therapy, Premarin was one of the commonest ones that was used in those days.
So estrogen therapy after

hysterectomies, BSO -- "BSO" being bilateral salpingo-oophorectomy, I had given them and followed them yearly to titrate the dosage and such.
BY MR. BENEVENTO:
Q. So let me just stop you there to make sure I understood what you said.
If you were prescribing an estrogen therapy for them, you would use -- generally use Premarin?
A. Yes, that was the most popular one.
Q. Okay. And that was for a woman that did not have a uterus?
A. Yes.
Q. Okay. And you indicated that you would start with the lowest dosage. Did I get that right?
A. But in those '80s and all that, 1.25 milligram was commonly used, and all the women were almost aware of that yellow tablet. I think it was yellow, oval-shaped.
It was quite popular to use that, and so I have used the 1.25. But now,



I use -- if I have to use, I use much lower dosage than that.
But especially if they had surgery, immediately thereafter they have abrupt fall of those hormones, so they get helped immediately with the higher dosage; and I would give them for three months supply, and then have them come back to the office to reevaluate and then see if I have to continue with that or lower the dosage and they can tolerate and all that.
Q. But your goal was always to start with the lowest dosage, if you could do that --
MR. THORNBURGH: Objection, form.
BY MR. BENEVENTO:
Q. -- is that correct?
A. It depends. Birth control pills, I start always with the lowest dose. The hormone replacement, I had to give what I think that they will be needing at that time.
Even if there's a lower dose than what I prescribe is available, if I feel



that this patient's symptoms are extremely severe and they will be helped with this much dosage, then I give that.
Q. Okay. So it's an individual assessment --
A. Yes, sir.
Q. -- that you make of it.
And if you believe that they need a higher dosage, you give it; and if you believe they don't, then you start with the lowest dosage --
A. Yes.
Q. -- would that be fair?
A. Yes.
Q. Okay. And that's been your practice from day one, hasn't it?
MR. THORNBURGH: Objection, form.
A. Yes. Mostly, that's how I do.
MR. THORNBURGH: Up until the present or --
BY MR. BENEVENTO:
Q. It's always been true, hasn't it, ma'am, that you've always started with



the lowest dosage that was possible to meet the symptoms and if you felt like you needed higher dosage to address the symptoms, you would give a higher dosage?
MR. THORNBURGH: Objection.
A. I would -- I was telling that birth control pills, I would start with the low dosage, but other medications, I would give what I feel that -- depending on her symptoms, if she needs some mediocre dose or whatever dose I'm going to give her, if this will be good for her, then I will give that, even if there's a lower than that dose that's available.
But if she was referred to me for that severe symptoms or if she was complaining of these severe symptoms, sometimes I have had husbands calling me with the wife's complaints and do something like that; and so in such patients, if I feel like they would be better off with the dosage that I give, I assess my own way to individualize the treatment for each patient.
BY MR. BENEVENTO:

Q. Okay. Fair enough. And that's what I was trying to say. You would assess the woman's condition, and if you believed a higher dosage was necessary, you would give her a higher dosage?
MR. THORNBURGH: Objection to form.
MR. BENEVENTO: What's the objection? What's wrong with the question?
MR. THORNBURGH: I can't tell what period of time you're talking about here, Bryon.
BY MR. BENEVENTO:
Q. Has that changed at all, what I just said? In any -- in your 35 years of practice --
MR. THORNBURGH: She testified earlier.
MR. BENEVENTO: I'm not asking you, sir.
BY MR. BENEVENTO:
Q. I'm asking you, ma'am: Has your practice changed in 35 years as it



relates to what I just said, that you would assess the woman's condition and you would prescribe the dose that you thought was necessary to address those symptoms?
A. Yes and no. Yes, in the sense I individualize each patient and see what is best for her. No, is like from that WHI and then the ACOG notes and TMLT informations and all these things.
And then now almost all of us have tried to go the least effective dose of hormones for any treatment with the shortest period of time that is necessary and advise them about all the ill effects and the reason why we are trying to be conservative on these things.
Q. Okay. So if I understand what you said, after WHI -- and for the jury, that's the Women's Heath Initiative?
A. Right.
Q. And that came out sometime in the mid 2002?
A. In the early 2000s, uh-huh. Yeah.



Q. Correct. Sometime in 2002?
A. Yeah.
Q. Are you saying that after that happened, the way that you prescribed, as it pertains to dosage, changed?
A. Yes. For example, like before, for postmenopausal estrogen therapy on posthysterectomy patients, it would be -- as I said, we used to easily give 1.25 milligram. I haven't prescribed that in a long time.
We start them out with a 0.625, and then even that we will follow -- next year, I would try to reduce it to 0.45 and such.
So it has changed the way I practice.
Q. So if I understand you correctly, for Premarin, which is --
A. For example, yes.
Q. -- which is just an estrogen-based hormone replacement therapy --
A. Yes.
Q. -- you would start them at a



lower dose now than you would before the WHI --
A. Yeah.
Q. -- study?
A. Yes, sir.
Q. And have you changed that at all based upon any additional information that has been published through the WHI that deals with Premarin alone?
MR. THORNBURGH: Objection, asked and answered.
BY MR. BENEVENTO:
Q. Are you aware of any additional information after 2002 with the Women's Health Initiative that discuss the effects of Premarin?
MR. THORNBURGH: Objection.
MR. BENEVENTO: What's the objection?
A. I don't recall.
MR. BENEVENTO: I really -- I really want to know what you're doing here. You're interrupting the deposition with these objections, and

Page 58

what is -- what's wrong with the question?
MR. THORNBURGH: Bryon, I have a right to object to the form of the -- I mean, if you have a problem, then --
MR. BENEVENTO: I have a problem. You're interrupting the deposition. If the form of my question is wrong, tell me what's wrong.
MR. THORNBURGH: Because I don't know if you're talking about Premarin.
MR. BENEVENTO: I said "Premarin." The question was "Premarin."
MR. THORNBURGH: I don't know if you're talking about HT. I don't know if you're talking about, you know -- you know, estrogen only. I don't know what you're talking about.
MR. BENEVENTO: Premarin is estrogen only.

Page 59

MR. THORNBURGH: All right. Well, I don't know if you're talking about Premarin only.
MR. BENEVENTO: Let me go back, ma'am.
MR. THORNBURGH: Premarin is contained in other conjugated estrogens --
BY MR. BENEVENTO:
Q. Ma'am, I was talking about --
MR. THORNBURGH: -- combined with other progestins.
BY MR. BENEVENTO:
Q. Have you read anything --
MR. BENEVENTO: Thank you. I appreciate that.
BY MR. BENEVENTO:
Q. Have you read anything since 2002 that dealt with the Women's Heath Initiative addressing the effects of Premarin only?
A. I can't recall.
Q. Okay. So you're not aware of whether they published anything in 2004 or

Page 60

later that said Premarin by itself has not been linked to any increased risk of breast cancer?
A. Since then, there have been other products in the market that -- estrogen products had been there. And, also, there have been people who -- the animal rights group and such women who have not wanted Premarin, have asked for other estrogen products, and, you know, you're aware that other plant products have been available in the market.
And so things are -- the number of prescriptions that we give for Premarin when -- used to be in olden days have reduced for multiple reasons.
Q. Okay. And what I was trying to focus on --
MS. ELMORE: Listen to his -- listen to his question. I think you're trying to give more information than he's asking for, and he has to go about it in a methodical way, so you're doing fine.

Page 61

But go ahead, Bryon.
MR. BENEVENTO: Yeah, and I'm sure it's my -- the way that I'm communicating with you, and I apologize for that.
BY MR. BENEVENTO:
Q. What I was trying to figure out -- it sounds like to me that you were aware of the Women's Health Initiative study in 2002 that addressed hormone therapy, correct?
A. Uh-huh. Yes.
Q. Okay. And what I was trying to figure out is whether you have followed the literature coming from the Women's Heath Initiative about follow-ups from that study from 2002 until today.
A. Whenever I get information, I read about it, but I cannot recall exactly what the follow-up was.
Q. Okay. And that's what led to these series of questions. I was wondering if you had followed any of the Women's Health Initiative reports after 2002 dealing with

just Premarin alone and whether it has any increased risk of breast cancer.
A. I cannot recall.
Q. Okay. Fair enough.
But now I want to bring you back in time, if I can, back to before 1995. You're prescribing, I believe you said, Premphase?
A. I have, uh-huh.
Q. Okay. And why would you prescribe Premphase?
A. Well, in this particular woman, or in general?
Q. Well, let me ask this question: Do you recall Judy Romero?
A. Yes. Not her face, but I -- when I look at the chart, I can see what she was. I don't -- I cannot recognize if I see her now.
Q. Right. And the reason I ask that is, based upon the number of depositions and communications I've had with doctors, when you ask them about a particular patient five, ten, 15 years ago and whether they



remember a particular conversation, they look and me and they say, "Are you kidding? No, I don't. I only know what's in the records."
A. Right.
Q. And so do you -- so the question I have is: Do you recall Judy Romero and the conversations you had with her?
A. Whatever I have in the chart, yes.
Q. Okay. So you don't have a specific recollection today of saying, "Oh, yeah, I remember her coming into my office and sitting down with her and we talked about a subject"? Would that be fair? Do you remember to that level of detail?
MR. THORNBURGH: Objection.
A. I can't remember minor details on that.
BY MR. BENEVENTO:
Q. Okay. Tell --
A. But I remember the name -- if I'm going out of the conversation. When first they asked for the chart, Judy Romero,



and we did not have it, and my office manager said we don't have the chart; but I remembered the name, so we kept looking. They gave different names on her, and we could not. And I remembered the name of this patient.
Q. Okay.
A. And so...
Q. So you remember Judy Romero's name?
A. The name.
Q. Right.
A. But I cannot recall how she looked or anything.
Q. Right. And could you recall any particular visit that you had with her, when she'd walk in, what she said, what you said, anything like that, beyond what your medical records would say?
A. Not particularly.
Q. Right. And that's why I'm trying to figure out what your course of conduct or pattern was back then, because it's highly likely that you would have tried



to follow the same kinds of things that you've done in the past?
A. Right.
Q. So what I'm trying to figure out is that in the mid '90s when you saw Ms. Romero, what was your standard course of pattern or conduct or practice when you would prescribe Premphase?
A. This particular patient had irregular bleeding. She was perimenopausal, looking at the chart; and she came in to me for that complaint. And was referred by her daughter and some friend that were my patients.
And so -- and she had -- according to my chart, she had not had a checkup for over three years. She had gone to my friend, Dr. Black, three years ago.
So I did the whole physical examination. And since her problem was a heavy flow with clots and irregular periods and all these things, I looked -- checked her thoroughly and then did the lab work, Pap smear, breast examination, mammogram and all

Page 66

these things, and had her come back for follow-up, and advised what we need to do because of her irregular bleeding and periods. And I wanted -- I suggest to her to have an endometrial biopsy.

So looking at the chart, I can remember that then she did not want to do it right away and waited for like six months or something, and came back -- or when he called, she said that she's not ready and all these things.

Q. Okay. And I will get to that visit that you're referring to. I'm just trying to figure out right now: If a patient presented in this time frame, in 1995, with menopausal-related symptoms, what would lead you to prescribe Premphase, and why would you do that?

A. If I suspect that there is a problem with the hormones, and after I exclude that there's no endometrial hyperplasia or cancer or anything like that that is causing all of these -- her complaints, then I -- and she was not ready

Page 67

for definitive surgery, like hysterectomy also, so I had to help her out for her menopausal symptoms.

At the same time, not to create a major risk on this particular patient, I was thinking endometrial cancer or hyperplasia or cancer would be a problem if I give her just estrogen, then she will have a post reaction of that.

So she needed the help for her symptoms, and at the same time, wash out the endometrial lining by giving the progesterone, adding the progesterone, so she will not develop hyperplasia or cancer in the endometrium.

Q. Okay. So you were prescribing the estrogen part of the Premphase to address the menopausal symptoms --

A. And --

Q. -- and the progestin side to protect her uterus?

A. Yes.

Q. Okay. And if she didn't have a uterus, if she had a hysterectomy, then you

Page 68

would have just prescribed the estrogen side?

A. Absolutely.

Q. Okay. Thank you.

In your experience, did you find that that form of treatment of Premphase for a woman with a uterus was effective in resolving their hot flashes?

A. Yes.

Q. Do you know of any other treatment in 1995 that could address the symptoms for hot flashes and night sweats?

MS. ELMORE: Excuse me. I'm sorry. It's '96. I don't know if it makes any difference to you.

MR. BENEVENTO: Fine. '96.

BY MR. BENEVENTO:

Q. Does it make a difference between '95 and 96?

A. It does not matter, not much.

Q. Okay.

A. Yeah, there are other products. Prempro -- Prempro was also available then, and that I would have probably switched her after -- that one has a lesser amount of

Page 69

progesterone, but same amount of estrogen.

But mainly at that point, why I gave her Premphase was the uterine complaints and irregular bleeding. And my main concern was for her not to develop the endometrial hyperplasia, so I wanted to give her enough progesterone to wash it off.

And had she been coming to me for regular follow-up, I'm sure I would have reevaluated her hormone medicine and changed it and treated her as necessary.

Q. Okay. In 1995 and 1996, isn't it true that it was well known in the OB/GYN community that there was a small risk of breast cancer associated with hormone therapy?

MR. THORNBURGH: Objection.

MS. ELMORE: Object to form.

You may answer.

A. Yes, there are a certain amount of risks. Along with that, breast cancer risk is also mentioned.

BY MR. BENEVENTO:

Q. And that's one of the reasons

Page 70

you would want to follow her closely with mammograms and self-breast exams and annual exams as well, correct?
A. Yes, sir. Yes, sir.
Q. Okay. Thank you.
When you would meet with your patients to talk to them about hormone therapies, such as Premphase, would you discuss with them those potential risks?
A. Yes, I do.
Q. Okay. Well, did you, back in the -- in '95 and '96?
A. All these. All these dates.
Q. Okay. Thank you.
A. Actually, I gave this patient just one sample only for one cycle, and then asked her how she felt. And when she called back that it was better, and then we called for her six months' supply.
Q. Okay.
A. So we didn't -- I didn't write a prescription for a year at the first visit.
Q. You started off with a dosage, and then -- to see how she reacted to that

Page 71

and whether it helped?
A. Yes.
Q. And then you would follow up with her as needed?
A. Yes.
Q. Okay. Very well. Thank you.
When you would sit down with a patient for the first time that was considering hormone replacement therapy in the mid '90s, '95 and '96, would you actually provide them with any information about the particular drug, like Premphase or Prempro?
And what I mean by that, ma'am, is: Would you give them a brochure or would you sit down with them and cover the PDR, the Physician's Desk Reference information?
A. I would -- many times, we have pamphlets from these medications, along with the sample, or in my front desk. Most of the prescriptions that I give, we have the pamphlets related to that.
And I briefly explain what is in there, because each one may have small letters, four, five, eight pages of it, and

Page 72

patients may not be reading all of it. So I would just highlight certain important things.
Q. And do you recall what you would highlight for them?
A. Mainly just -- sometimes it may have irregular spotting and complications, which will indicate uterine problems; and breast examination; and nausea, vomiting, the small gastrointestinal symptoms and such.
So I always tell them that it is extremely important that they call us or -- if there's any problem, or come for follow-up visits.
Q. Okay. But you would -- it's fair to say you would not sit down with them and go over the PDR line by line and say, "Okay. Here's a risk, here's a benefit, here's a contraindication, here's a symptom," those kinds of things?
A. No, not necessarily.
Q. All right. What --
A. I might have done for some extreme patients, one or two that will be

Page 73

demanding such things, because there may not be time to sit down with the PDR and explain to each patient individually.
Q. Do you -- I apologize.
Do you recall, when Ms. Romero came to you, whether she asked you about hormone therapy or whether you were the one that first talked about that?
A. I cannot recall.
Q. Okay. Some patients, I think from your previous testimony, actually knew a lot about hormone therapy before they came to you?
A. Yes. Yes.
Q. Do you recall whether she was one of those types of patients?
A. I cannot recall. I know many of the teenagers that come to me come with the name brand of birth control pills they want and all that. But I cannot recall if Ms. Romero asked for anything in particular.
Q. Okay. I want to make sure I cover a couple things. And I apologize, I'm skipping around a bit.

Page 74

Do you have any experience in the design of clinical trials for drugs?
A. No, sir.
Q. Okay. Have you ever been involved in the design of a clinical trial approved by an institution?
A. No.
Q. And I take it from that you are not comfortable about rendering opinions on how pharmaceutical companies should manufacture their drugs?
A. No.
Q. Or how they should test their drugs?
A. No.
Q. Or how --
A. I'm not -- I'm not involved in any of those.
Q. Okay. Thank you.
Have you ever heard someone suggest in your profession that the fact that a woman is menopausal means that they're at a lower risk for breast cancer?
A. I cannot recall anything like

Page 75

that.
Q. Have you ever told one of your patients that is presenting with menopausal symptoms that they're at a lower risk of developing breast cancer?
A. No, sir.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Did you ever tell Ms. Romero that she was at a lower risk of having breast cancer because she was presenting with menopausal symptoms?
A. No.
Q. Let's, if I can, turn to your medical records. And your counsel was kind enough to send me a copy of those a few days ago, and so I've taken the liberty of actually making a copy. I see that you have your chart in front of you.
A. Yes, I have my own original chart.
Q. Mine has a number on the bottom that I could reference, but it seems like you --

Page 76

A. Yeah, I have them down here. I can look in that copy too.
Q. Would you feel more comfortable doing that, or do you want to look at your original chart?
A. I'm more familiar with my original, but whatever you want me to do.
Q. Okay. Well, let's do this. If it's okay with the other attorneys, let me mark your records as Exhibit 2, and I'll just reference those. And if you need to --
A. Okay.
Q. -- then compare them to your original chart because you're more comfortable with that, then please feel free to do so. Is that okay?
A. Yes.
MS. ELMORE: You're going to mark this set?
MR. BENEVENTO: Yes, ma'am.
MS. ELMORE: Okay. That's great.
(Whereupon, Deposition Exhibit Lal-2, Medical Records, LAL-001 -

Page 77

LAL-048, was marked for identification.)
BY MR. BENEVENTO:
Q. Doctor, I've marked as Deposition Exhibit 2 the copies of your chart, and they're numbered 1 through...
A. Where are the numbers? Where's the number?
Q. 49. 1 through 49, so there's 49 pages.
MS. ELMORE: The numbers? For the most part, the bottom right.
THE WITNESS: Okay. Yeah, I see it.
MR. BENEVENTO: Do you need another copy, Dan?
MR. THORNBURGH: Hold on. Let me just make sure I've got it.
MR. BENEVENTO: Are you okay?
MR. THORNBURGH: Yeah, I'm just checking.
MR. BENEVENTO: May I continue?
MR. THORNBURGH: Yes.
BY MR. BENEVENTO:

Page 78

Q. If I can have you, Doctor, turn to page 2, that seems to me to be the first page where we actually have some notations about your care and treatment of Ms. Romero. The first page seems to be an insurance form and some information about that.
But the page 2 seems to be your history and physical of Ms. Romero, correct?
A. Yes, sir.
Q. And based upon this document, which is number 2 of Exhibit 2, it's dated June 11, 1996?
A. Yes, sir.
Q. Do you believe that, looking at this document, that would be the first time you ever saw Ms. Romero?
A. Yes, sir.
Q. And it indicates that she's 47 years of age, so that would be a little early for menopause, but not outside of the realm, correct?
A. Yes.
Q. All right. And the chief complaint is to "check up and Pap," so to do

Page 79

an examination and a Pap smear, correct?
A. Yes.
Q. All right. And then what's the next complaint there that you wrote?
A. "Irregular periods for the last year and heavy flow with clots, hot flashes."
Q. Okay. And based upon that complaint, were you able to, at that time, determine whether she was menopausal?
A. No.
Q. Okay.
A. That's why I called it perimenopausal.
Q. Okay. And that -- what does that suggest to you, as it relates to her estrogen levels?
A. It's erratic.
Q. Does that mean that her ovaries are still producing some level of estrogen?
A. Yes.
Q. All right. That her body isn't estrogen-free?
A. It is not estrogen-free.
Q. Okay. And then you have,

Page 80

"Onset of Present Illness," you have, "Last Pap, three years ago, Dr. Black"?
A. Yes.
Q. All right. And then what's the next line? I'm sorry.
A. She's not on any medications.
Q. All right. And she does not smoke?
A. Yes.
Q. And her last mammogram was three years ago?
A. At St. Elizabeth's.
Q. Right. So that's kind of the history you were obtaining from her?
A. Yes, sir.
Q. Very well. Thank you.
And then you've got a section here for menstrual history, correct?
A. Yes.
Q. And you have she first started at 15 years of age?
A. Uh-huh.
Q. And that her intervals were 28 days?

Page 81

A. Yes.
Q. Five to six days is the duration of the --
A. Flow, menstrual flow.
Q. Thank you.
And then you have, "Last year, irregular periods, has skipped two months, heavy flow and clots"?
A. Yes.
Q. And from that, you did a Pap smear and -- well, strike that.
What was your course of action or treatment for Ms. Romero?
A. A routine examination first, after all the full history-taking. So a routine examination will involve checking the whole body and then including breast examination and pelvic examination.
So with the pelvic examination, Pap smear-taking is part of it, so I did the Pap smear also.
Q. Okay. And then you sent that away for results?
A. Yes, sir.

Page 82

Q. All right. And then you -- it appears that you have taken a past history of her where she's a had a hernia surgery, tubal ligation, and is that "positive for hepatitis B"?
A. She's a -- patient history, hepatitis B. She wasn't sure, so I just named that.
Q. Is there any significance to that, hepatitis B?
A. She wasn't sure, so I did not pay too much attention to that.
Q. All right. The complaints that she was raising did not lead you to conclude hepatitis B?
A. No, not at all.
Q. Okay. Thank you.
Then you have a family history, mother with high blood pressure?
A. Yes.
Q. Is that maternal grandfather died of a heart attack?
A. Yes.
Q. Maternal grandmother died of

Page 83

lung --
A. Cancer.
Q. -- cancer.
And then you've got, "Paternal grandmother, diabetic, died"?
A. Yes.
Q. Any other medical history she shared with you?
A. That's about it.
Q. Okay. And it would be your practice to write those down, if there was additional significant medical history she shared?
A. Definitely.
Q. Okay. Very well. Thank you.
The next page, which is page 3 to Exhibit 2, is a continuation of that examination?
A. Yes.
Q. All right. The impressions, if I can have you go down to the -- near the bottom of the document, the impressions, what have you noted there?
A. I've put menorrhagia, which is

Page 84

the heavy flow, irregular flow; and then I put, "Suggest examine under anesthesia" -- EUA is examine under anesthesia, "and D&C," dilatation and curettage, "after reports."
Q. Okay. So you may have wanted her to have a D&C, if the reports demonstrated a need?
A. Yes.
Q. Is that what that notation means?
A. Yeah.
Q. Okay.
A. I said this to her from the beginning, but I ordered lab work, blood work and pelvic ultrasound and a mammogram.
Q. All right.
A. After that, that's why I put, "Examine under anesthesia and D&C after reports." I'm supposed to wait for the Pap smear report, blood work and pelvic ultrasound and mammogram.
Q. Okay. And then if you turn the page, I've got page 4 of Exhibit 2, which appears to be some progress notes?

Page 85

A. Uh-huh.
Q. All right. The next one is 6/20/96?
A. Uh-huh. Yeah.
Q. And I didn't see any -- is there anything there that's significant to you?
A. She complains of discomfort in the left arm, and that's from where the blood was drawn. And she said this area is still bruised, and so I checked her arm and it was okay.
Sometimes, when drawing blood, if they don't have good veins, then it could extravasate from here, and she was reassured she was fine.
Q. Okay. The next notation is about eight days later, is that correct, June 28 of '96?
A. Yes, sir.
Q. And that's -- I think you're starting to get back some of the results from the examinations?
A. And they were -- ultrasound and

mammogram were negative.
Q. Okay. And negative for what?
A. That means they're normal.
Q. Okay. And then the next notation is 7/3/96?
A. Uh-huh.
Q. And that's where it indicates that the, "Patient wants to wait on surgery. Will call when ready."
Had you, at that particular time, decided from the reports that you had received that she needed to have the D&C?
A. Yes. Still, she needs it because, even though her uterus and her cervix were normal, we have to evaluate where the irregular bleeding and heavy flow is coming from.
Q. Okay. And were you going to perform the surgery?
A. Yes.
Q. Okay. And did you actually perform the surgery at some point?
A. Yes.
Q. All right. How long ago -- or



how -- in the time sequence, when did you perform the surgery?
A. I think six months later. It's December, she came back. December 12th, she again had similar complaints: spotting, irregular spotting on those days; and then hot flashes and discomfort. So at that time, she was ready to have the D&C to check it out.
Q. Right. And then the notation under that is, "Patient had been advised D&C because of heavy flow and clots"?
A. And clots, yeah.
Q. Okay.
A. And plus spotting off and on, so...
Q. And then you have a notation at the bottom of page 4 to Exhibit 2, "perimenopausal bleeding"?
A. Uh-huh.
Q. And what's the word under that?
A. "Discussed."
I always briefly discuss what we do with this surgery procedure. If they



don't understand, I have a model in my -- on my desk, and I show with the model what is involved, how we do it.
Q. Okay.
THE VIDEOGRAPHER: Four minutes.
MR. BENEVENTO: Thank you.
BY MR. BENEVENTO:
Q. If you could turn the page to page 5, again it appears to be continued progress notes; is that correct?
A. Yes.
Q. All right. And there's 12/17/96. Is that an assessment of, again, the D&C?
A. Yes. That was done; and then pathology report, I just pulled out the important thing. It showed benign fibroglandular polyp.
Q. What does that mean?
A. That might have caused her irregular bleeding. A polyp is an aggregation of gland and stromal tissue of the endometrium. When there is increased



level of these, they form -- they aggregate and form a polyp. A polyp is like a blob of tissue, soft tissue, that could cause increased surface area and bleed.
Q. Okay. And sometimes those can be malignant?
A. They can turn into malignancies.
Q. Okay. And this one was not?
A. No, it was not.
MR. BENEVENTO: Okay. Thank you. Why don't we stop and let the videographer change the tape and take a short break. Would that be okay with you?
THE WITNESS: Yes, sir.
MR. BENEVENTO: Thank you.
THE VIDEOGRAPHER: Okay. We're off the record at 11:20, end of Tape 1.
(Recess taken, 11:20 a.m. to 11:28 a.m.)
THE VIDEOGRAPHER: Stand by. Okay. We're on the record, 11:28,

Page 90

beginning of Tape 2.
BY MR. BENEVENTO:
Q. Doctor, when we were just about to take our break, we were on page 5 of Exhibit 2. If I could go back to there. Are you there?
A. Yes, sir.
Q. Thank you.
It looks like the -- once you determined that the D&C -- the results from the D&C were benign, it appears the next visit is December 31, 1996?
A. Yes.
Q. Okay. And she's presenting at this particular time, again complaining of hot flashes and menopausal symptoms; is that correct?
A. Yes, sir.
Q. All right. The sentence right above that, can you read that for me, please?
A. Yeah. "Pathology report explained, benign."
Q. So you were able to go through the reports with her?

Page 91

A. Yes, sir.
Q. Thank you.
Do you remember whether she had any questions or concerns in that discussion?
A. No. She, again, complained of hot flashes and symptoms.
Q. Okay. So she's been -- if I'm reading the records correctly, she's been complaining about the hot flashes and menopausal symptoms now for about six months?
A. Yes.
Q. Okay. And it's at this particular time that you decided to try Prempro -- Premphase, correct?
A. Yes, sir.
Q. All right. And that's the notation down below, "Premphase, 0.625"?
A. Premarin and progesterone .5 milligram. This, we explain to the patient also. And then I was telling what it has, you know, four weeks of that and then two weeks, that progesterone.
Q. So they would take the Premarin for four weeks, and then the final two weeks

Page 92

they would also take the progestin?
A. Yes.
Q. Okay. And that's kind of the cycle of treatment for this particular --
A. Yeah, I think they had like a birth control pill -- it had a package, a long package with the Premarin alone, and then -- for the first two weeks, and then third and fourth week, both together, Premarin and progesterone together.
Q. And when you prescribed this for her, did you provide her with some additional information on how to take the drug?
A. Many times we may have had samples in our cabinet, and so I'm thinking that I must have given her one course of the sample, and then have her try it. And then when she called back, then we call for the six cycles afterwards.
Q. So for the six months that she was under your care and she was complaining, or at least reporting about complaints dealing with hot flashes and menopausal

Page 93

symptoms, you waited until this period of time to actually prescribe hormone replacement therapy?
A. Yes.
Q. Okay. Why is that?
A. I wanted to make sure that everything else is fine and no endometrial hyperplasia, no breast problems, no abnormal Pap smear or -- blood work is decent and all that.
Q. Okay. Do you know whether, during the six months, you were advising her to try to do other things, such as diet or exercise or herbal medications or anything to address her hot flashes?
A. Maybe I might have told her until I verify all these things, I cannot prescribe her immediately.
Q. Okay. And the reason I'm trying to figure this out is I'm trying to figure out whether, when she showed up in December of '96, again complaining of hot flashes, whether this was something where she was saying to you, "It's not going away. No

Page 94

matter what I try" --
A. Right.
Q. -- "I'm having these problems," or whether it was simply you needed to get the work done necessary to make sure that you had a full assessment of her health?
A. Yeah, it's both. If it was a temporary thing, by then it might have gone away. And if it continues severely in that she needs to be treated, I have to make sure that she's not any contraindication for this treatment.
Q. Did you consider any other hormone replacement therapy other than Premphase at this time, December of '96?
A. On this patient, no.
Q. Okay. Were you prescribing any other hormone replacement therapy in December of '96 for patients complaining of similar menopausal symptoms?
A. This and Prempro were -- that I can think of now, other than plain estrogen. For combination, I only remember this.
Q. And then the next notation

Page 95

down, January 24, 1997, is you fulfilled -- or you filled --
A. Yeah, the first time, we only gave the sample, so like three weeks, four -- three weeks later, she called. She wanted the medication because -- so that's the first prescription that we called in Eckerd's.
Q. Now, this is going to be a hard question, because I'm testing your memory, and I apologize for having you go back: But in December of 1996, when you would have first given Ms. Romero Premphase, do you know whether you actually went through the product label with her?
A. I cannot recall.
Q. Okay. And do you know whether you actually would have pulled your PDR, your Physician's Desk Reference, and opened it up to Premphase and covered those with her?
A. No, I cannot remember. I don't think I would have opened the PDR.
Q. And that was going to be my follow-up question: Was it your course of practice, what you normally would do when you

Page 96

prescribed Premphase in 1996 time period, that you knew enough about that particular drug not to consult the PDR?
A. No, I had -- along with the samples, the drug reps bring the pamphlets. I think I had in my office next to the samples the booklets that said everything about it.
Q. Okay. What booklets would they be?
A. The ones produced by the -- I mean, given by the drug company.
Q. Can you describe them for me? Were they multiple pages?
A. Yes.
Q. Were they bound?
A. No, it wasn't. I have it. Do you want me to show that? I have one of those. I pulled it out from my closet. I don't -- I'm closing down, so some of these were lying in a storage kind of area.
MR. BENEVENTO: Okay. Yeah, I would prefer that you pull it out, if you believe that you would have given

Page 97

it to Ms. Romero.
MS. ELMORE: Let me see it. Is this something you think you gave to Ms. Romero?
THE WITNESS: I might have, because --
MS. ELMORE: Can we take a break?
MR. BENEVENTO: Sure. Absolutely.
THE VIDEOGRAPHER: We're off the record at 11:36.
(Recess taken, 11:36 a.m. to 12:36 p.m.)
(Whereupon, Deposition Exhibit Lal-3, Brochure: Hormone Replacement Therapy and Your Health, was marked for identification.)
THE VIDEOGRAPHER: Stand by. We're on the record 12:36, beginning of -- still Tape 2.
BY MR. BENEVENTO:
Q. Okay. Thank you.
Doctor, I appreciate having an

opportunity to meet with you again after lunch.
Before we took our break, you indicated that there was some pamphlets that you had available in your office and that you would give to patients, and you were -- and you gave us a copy of that.
I placed that in front of you as Exhibit 3; is that correct?
A. Yes, sir.
Q. Okay. If you'd turn to the very back, it has a print date of March of 1995.
A. Yes.
Q. Okay. The medical records state that you prescribed Premphase for Ms. Romero in December 31, '96; and I believe you described that that was a sample, and then you prescribed a six-month regimen for her in January of '97, correct?
A. Yes.
Q. Do you know whether this particular pamphlet that's been marked as Exhibit 3 was in your office a year later,



sometime in 1996, late '96 and early '97?
A. Yes. I only recently removed them, in the last ten years or something. It's in the cabinet on the other side.
Q. Well, the last -- I'm sorry, I'm not following. You would have recently removed them in the last seven years?
A. Something like that. I cannot remember exactly when.
Q. Okay. Well, were -- so you think you would have removed these particular pamphlets sometime in 2001-2002?
A. Probably.
Q. Okay. Do you know whether you actually gave Exhibit 3, or a copy of Exhibit 3, to Ms. Romero?
A. I really cannot recall for sure, but most of the time -- and these pamphlets are right next to the samples, so I would imagine if I gave her a sample, I might have given her a pamphlet.
But I cannot recall for 100% sure.
Q. So it's fair to say these were



available, but you don't know whether she got one?
A. Yes.
Q. That's true?
A. Yes.
Q. Okay. Was it your practice that when you did prescribe Premphase, you would always give the booklet to the patient?
A. Mostly, yes. Any hormone therapy, when I prescribed, I give them a pamphlet.
Q. You do?
A. Yes.
Q. Okay. And on this note of 12/31/96, it doesn't indicate whether you gave her any material. Would you make a notation in your medical records as to whether you gave the patient the material?
A. No, sir.
Q. Okay. And then do you know whether she actually came in on January 24, 1997, to get her Premphase, or was that a phone conference?
A. This one must have been a phone



call to Eckerd Drugs, so she must have asked us over the phone.
Q. So it's -- based upon this record, would it be fair to say that you believe you gave her a sample in December of '96, and then she would have called about a month later and asked for a six-month prescription?
A. Yes.
Q. All right. If someone calls in and asks for a prescription, do you send a copy of the pamphlet in the mail to them?
A. No.
Q. Okay. And is it your practice, when you do give these pamphlets, to walk them through the pamphlet to make sure that they understand what's contained in it?
A. In general, I just tell them what is in the pamphlet, and then for them to read it.
Q. Okay. And what do you tell them is in the pamphlet?
A. All the dosage regimen, how to take it and what are the side-effects and how

Page 102

long -- and how you should have follow-up, everything.
Q. Okay. So you would help explain the course of treatment with the patient and also have the brochure available for their reading?
A. Yes.
Q. All right. Well, let's look at Exhibit 3 in a little more detail, then, okay?
If you turn to the third page, which I have -- yes, you're correct.
A. This one?
Q. Yes. Uh-huh.
It starts with, "It's been said that in life."
You see that?
A. Yes.
Q. The last paragraph of that page says, "This brochure has been created to help you, together with your healthcare provider, make that important decision. Be sure to ask any questions you may still have so that you fully understand your options."

Page 103

Did you also reiterate that with the patients, that if they had any questions about any of the hormone therapy regimen, dosage, side-effects, warnings, they should talk to you about it?
A. Yes.
Q. You were not giving this pamphlet to them in lieu of --
A. No.
Q. -- or not to -- or to encourage them not to talk to you about those questions?
A. No.
Q. Okay.
A. Anytime they have problem or questions, they can call my office.
Q. Okay. Do you know whether Ms. Romero asked you any particular questions about hormone replacement therapy, such as Premphase, in December or January?
A. I do not recall anything.
Q. Okay. The next page is "Understanding Menopause."
Do you see that?

Page 104

A. Yes.
Q. One of the things that is on there says -- it's in the last sentence of the -- last two sentences of the first paragraph, "After menopause, your ovaries produce little or no estrogen and your periods stop completely. Additionally, you cannot become pregnant."
Is it true that after menopause, the ovaries can still produce estrogen through the life of a woman?
MR. THORNBURGH: Objection.
A. Very unlikely.
BY MR. BENEVENTO:
Q. So do you believe that at some point in a woman's life, the ovaries stop producing any estrogen?
A. Yes.
Q. When does that happen, generally?
A. In general, the menopause is -- is assumed when the periods stop, which means there are not enough of estrogen. And then there may be very little estrogen still

Page 105

producing for some time and taper off and completely be absolved.
Q. Right. And that's what I'm trying to figure out: Is it your experience that at some point in a woman's life, the ovaries taper to the point where they produce no estrogen? And if so, when is that?
A. I cannot pinpoint that. Maybe several -- a few months later or several years later.
Q. Okay. So it's highly variable for a woman?
A. Variable, yes.
Q. Do we know when Ms. Romero's ovaries, if ever, stopped producing estrogen?
A. I don't know.
Q. We don't know?
A. Huh-uh.
Q. Well, she came to see you when she was 47 years of age. You put her on Premphase when she was 48 years of age.
Do you know whether, by 48, her ovaries had stopped producing all estrogen?
A. I don't know.

Q. Okay. She was diagnosed with DCIS breast cancer in the left breast, a ductal carcinoma in situ, in February of 2001.
Do you know whether her ovaries had stopped producing any estrogen by February of 2001?
A. I don't know.
Q. Okay. The next statement I wanted to ask you about is on the next column, still that same page, that says, "These symptoms may continue from several months to several years and, for most women, will eventually go away.
"Other problems related to estrogen loss may not be felt at first, and these problems do not go away. They can last for years and have serious complications."
Would you agree with that statement? Has that been your experience in the care and treatment of your patients?
A. Which line is this that you're referring to?
Q. I'm sorry. I apologize.



I'm still on the same page.
A. Okay.
Q. Okay. And if you go to the next column over, the first -- the first paragraph talks about these symptoms are common --
A. Yes.
Q. -- most women have them, and the symptoms they're talking about, hot flashes, night sweats, sexual intercourse may also be painful. Those are the things that you talked to me a little earlier today --
A. Yes.
Q. -- that are symptoms of menopause, correct?
A. Yes.
Q. All right. And then it carries over, and it talks about those kinds of symptoms, the hot flashes, night sweats, sexual intercourse may be painful, et cetera -- it says that, "These symptoms may continue for several months" --
You'd agree with that, right?
A. Yes.



Q. -- "to several years"?
A. Yes.
Q. Okay. "And, for most women, they will eventually go away."
Do you agree with that?
A. At the variable time. It may or may not go away.
Q. Okay. And then it says, "Other problems related to estrogen loss may not be felt at first, and these problems do not go away. They can last for years and have serious complications."
Would you agree with that statement?
A. Yes.
Q. Okay. Turning to the next page over, on this page, there's a paragraph that starts with, "Estrogen replacement therapy is clinically proven to help prevent osteoporosis."
Do you agree with that statement?
A. Yes.
Q. Okay. Did you prescribe, and



do you prescribe, estrogen replacement therapy for osteoporosis?
A. No.
Q. Okay. For Ms. Romero, we know that you did not do that, correct?
A. No, I did not.
Q. All right. You prescribed Premphase for Ms. Romero to treat her hot flashes and her night sweats, correct?
A. Yes.
Q. All right. Did you prescribe Premphase for any cardiovascular or heart disease issues?
A. No.
Q. Did you prescribe it for any dementia or mental issues?
A. No.
Q. All right. It was solely for her menopause symptoms, correct?
A. Yes, sir.
Q. Thank you.
If you'll turn the page, please, to the title where it says, "Estrogen Replacement Therapy." The second paragraph

Page 110

says, "The estrogen that your body has stopped producing after menopause can be replaced by taking estrogen tablets. This is the most widely used form of estrogen replacement therapy.

"Estrogen replacement therapy has helped millions of women relief -- relieve the symptoms of menopause and prevent osteoporosis."

Do you agree with that statement?

A. Yes.

Q. And isn't it true that that was the therapy you were using in the mid '90s to assist women?

A. Yes.

Q. All right. The next paragraph down says, "The Most Prescribed Estrogen Product."

Do you know whether Premarin was the most prescribed estrogen replacement therapy?

A. It was.

Q. Okay. And then it says that

Page 111

it's the most extensively researched estrogen-replacement product in America.

Do you know whether that's a true statement or not?

A. I think it is true.

Q. You think it's true?

A. Uh-huh.

Q. Why do you think that's true?

A. That was the mostly available. Most of the patients were already on it, and many of the journals and things discussed that.

Q. And so in your conferences that you would attend, you would hear this kind of information from your colleagues and presenters?

A. Yes.

Q. All right. The next one says, "Wyeth Laboratories has been making Premarin for more than 50 years. Very few pharmaceutical products can match the experience."

Do you agree with that statement?

Page 112

A. Probably.

Q. It -- certainly within your experience and your practice that was true, correct?

A. Yes.

Q. All right.

A. I, myself, took Premarin.

Q. How long did you take Premarin?

A. A few years.

Q. Okay. Did you have any side-effects from it?

A. No.

Q. Did it seem to help you?

A. Yes.

Q. Okay. Then it says, "Proven to Relieve Symptoms of Menopause."

Now I'm on the next page over. Do you see that?

A. Yes.

Q. It says, "Premarin has been proven to relieve moderate to severe hot flashes."

Has that been your experience?

A. Yes.

Page 113

Q. And what I mean by "your experience," your experience --

A. With the patients.

Q. -- as a physician, helping patients.

A. Yes.

Q. And "vaginal dryness in most women"?

A. Yes.

Q. Has that been your experience as well?

A. Yes.

Q. Okay. "Because Premarin relieves night sweats, it may help relieve the irritability that comes from the lack of sleep resulting from these symptoms."

Would you agree with that statement?

A. Yes.

Q. All right. Going further down, under "Proven to Prevent Osteoporosis," the last paragraph there says, "Together with calcium, a proper diet and weight-bearing exercise, Premarin can help -- I'm sorry,

Page 114

Premarin can play an important role in keeping your bones strong."
Do you agree with that statement?
A. Yes.
Q. Okay. Now, did you treat Ms. Romero for osteoporosis?
A. No.
Q. There was some medical records that we reviewed yesterday with Dr. Lotze that suggested that she did have osteoporosis, or at least was diagnosed with that sometime in the late '90s, early 2000s. Are you aware of that at all?
A. Not at all.
Q. Did she ever discuss with you any issues pertaining to bone loss or pain from bones or fractures, weaknesses in the bone structure?
A. No.
Q. All right. I'd like you now to turn to the page where it says, "Hormone Replacement Therapy: The proven benefits of Premarin with the addition and protection of

Page 115

a progestin."
I'm not going to go through the first one there because I think you've already talked about that, which is you prescribed the progestin to protect the uterus, the estrogen to address the menopausal symptoms, right?
A. Yes.
Q. Okay. I do want to turn to the next column over there, where it says, "HRT is Not for Every Woman."
A. What page?
MS. ELMORE: (Indicating).
A. Oh.
BY MR. BENEVENTO:
Q. Are you with me?
A. Yes.
Q. All right. It starts with, "Some women should not take HRT."
A. Uh-huh.
Q. "Make sure your doctor or your healthcare provider is aware of your personal and family health history. Your personal history can -- your personal history should

Page 116

include any instances of breast cancer."
Do you know why that's added?
MR. THORNBURGH: Objection.
A. Risk for that, small risk for -- by taking these things for prolonged, extended period of time.
BY MR. BENEVENTO:
Q. Breast cancer being a risk?
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Is that what you said, ma'am?
A. Possibly.
Q. Okay. Yeah, it's a possible risk for taking hormone replacement therapy?
MR. THORNBURGH: You don't have to speculate about the meaning of why --
MR. BENEVENTO: I'm not -- that is not a proper objection.
A. And some studies have shown a little increase, some have not shown any increase with estrogen alone and all that, so...
BY MR. BENEVENTO:

Page 117

Q. Right. And you and I talked earlier this morning that you would still discuss the risk of breast cancer for women --
A. Yes.
Q. -- when you were talking about hormone therapy, right?
A. Yes, at least as tenderness and heaviness and all these things also are part of breast problems.
Q. Right. But that's one of the side-effects, and I'll get to that section in a minute. I just want to make sure that the record is clear before Mr. Thornburgh asks you questions.
It's your testimony, under oath, that you would discuss with women, in the mid '90s, that breast cancer -- there's a risk, albeit small, for breast cancer with hormone replacement therapy?
MR. THORNBURGH: Objection, that's not what she testified to.
MR. BENEVENTO: I'm not asking you, sir. I'm asking the witness.

Page 118

BY MR. BENEVENTO:
Q. Is that true, ma'am?
MR. THORNBURGH: Objection, vague and ambiguous.
A. I give the generalized side-effects to watch the breast and irregular bleeding and all these things. And I'm not sure if I told them that it increases breast cancer or anything.
BY MR. BENEVENTO:
Q. Okay. Well, the next sentence says -- if we move down, the next paragraph says, "It is also important for all women to have a regular breast examination by a doctor or healthcare provider."
You agree with that, correct?
A. Yes.
Q. And that's something you told Ms. Romero?
A. Yes.
Q. Okay. And then it says, "Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens. Some studies have reported that

Page 119

breast cancer developed more often in women who used estrogen for long periods of time or who used higher doses for shorter periods of time -- for shorter time periods.
"The effects of added progestins on the risk of breast cancer are unknown. Some studies have reported a moderately increased risk in those taking combination estrogen-progestin therapy, even higher than the possible risk of taking estrogens alone. Keep in mind, however, that other studies have not shown this relationship."
Is that the type of information you would share with your patients in the mid '90s?
A. Yes.
Q. Okay.
A. If I gave the pamphlet, and I would have read that and given the same information.
Q. Did you take it upon yourself in the mid '90s to try to determine what the "some studies" was referencing?

Page 120

A. Excuse me?
Q. Yeah. This particular paragraph says, "Some studies have reported that breast cancer developed more often in women," and I'm just asking you: Did you try to figure out what those studies were, the Nurse Study, the collaborative study, the Swedish cohort study, any of those?
MR. THORNBURGH: Objection.
A. I have gone through or listened to some of the studies, but I can't remember which studies -- which one it said.
BY MR. BENEVENTO:
Q. In the mid '90s, when you looked at this particular pamphlet -- I believe it's March of '95, is when it was printed.
A. Right. Yeah.
Q. Did you look at that paragraph and say, "I wonder what studies they're referencing? I should go look at them"?
A. I can't remember.
Q. Okay. It's certainly true that you would not tell a woman she's not at risk

Page 121

of breast cancer from taking hormone therapy?
A. No.
Q. Or that hormone therapy has a reduced risk of breast cancer?
A. No.
Q. Okay. And then it says, "It is recommended that you have a baseline mammogram taken before the age of 40."
You agree with that, correct?
A. Yes.
Q. And that's something you recommended -- well, Ms. Romero was already 47, but you wanted her to have a mammogram, and you had her have that --
A. Yes.
Q. -- as one of your first courses of treatment?
A. Yes, sir.
Q. And then it says, "Women between the ages of 40 and 49 should have mammograms every one or two years. Women over 50 should have a mammogram each year, even if they have no symptoms of breast disease," correct?

Page 122

A. Yes.
Q. And you agree with that as well?
A. Yes. I do every year after 40.
Q. Okay. And when you put women on hormone replacement therapy, such as Premphase, do you pay particular attention to self-breast exams and mammograms?
MR. THORNBURGH: Objection, form.
A. Yes.
BY MR. BENEVENTO:
Q. And why do you do that?
A. I have a -- I teach them even, most of the patients -- I have a model given by the Ortho Pharmaceuticals that has a breast, its consistency, and then there are lumps, cysts and hard lumps, so if they don't know how to.
And I had pamphlets that, you know, can follow on the -- in the shower, that they can see how they check the breast, circular and circular, and then nipple and areolar area. And if they're not sure -- and

Page 123

I demonstrate it to them.
And then if they're not sure, I have that model for them to feel and recognize the lump or cyst or such things.
Q. Okay.
A. I have those in the office.
Q. Thank you.
If you turn to page 14 of this document, it's entitled, "What to expect from therapy."
MR. THORNBURGH: I'm sorry, was that page 14?
MR. BENEVENTO: 1-4, yes, 14.
MR. THORNBURGH: My page is...
MR. BENEVENTO: Are you there? Is it okay if I proceed?
MR. THORNBURGH: Yes.
MR. BENEVENTO: Thank you.
BY MR. BENEVENTO:
Q. It says, "From the Start." It says, "You should experience relief from hot flashes and night sweats almost immediately. Relief from vaginal dryness may take somewhat longer."

Page 124

That was true for Ms. Romero, wasn't it?
A. Yes.
Q. She complained of the hot flashes, et cetera. In December -- on December 13, '96, you prescribed Premphase, and she called less than a month later and wanted a prescription?
A. Yes.
Q. Did you take it from her request of the prescription that it was actually addressing her menopausal symptoms?
A. Yes.
Q. That it was working as intended?
A. Yes.
Q. All right. And then we go down to where it says, "Side-Effects. The three most common side-effects are breast tenderness, headache and abdominal pain."
Do you know whether she actually complained of abdominal pain?
A. Let me see. I can't remember.
(Witness reviews document.)

Page 125

A. If they do -- sometimes they have pain for minor, other reasons and...
BY MR. BENEVENTO:
Q. Well, I'll just represent to you that the first time that Dr. Lotze saw Ms. Romero was in 1998.
A. Okay.
Q. And she presented, I believe February of '98, with a complaint of lower abdominal pain.
A. Uh-huh.
Q. Did she ever complain to you, in your 18 months of care and treatment of her, of lower abdominal pain?
A. I cannot remember unless it's in the chart. Usually whatever they complain with, I put in the chart.
Q. Okay. Well, if I flip through your chart, I think the next set of progress notes that I could find are number 7, Exhibit 2, Bates number 7. It starts with the date July 14, 1997.
A. Yes.
Q. Okay. So she would have been

Page 126

on Premphase for about seven months at this time, correct?
A. Uh-huh. Yes.
Q. And she's coming back for a checkup?
A. Uh-huh.
Q. Is that correct?
A. Yes.
Q. All right. You list the meds as Premphase, correct?
A. Uh-huh.
Q. And you say there's a complaint of vaginal discharge, clear and yellow?
A. Uh-huh.
Q. Last mammogram, '96?
A. Yeah.
Q. And then can you read your notes there underneath that?
A. Yeah. "Head and neck normal. Breasts, no discrete lumps. Lobular (lumpy) feeling in the right breast, upper outer quadrant. No axillary lymphadenopathy."
Q. I'm sorry, the large lobular lump, that was in the right breast?

Page 127

A. Yeah.
Q. Okay. And did that cause you any concern?
A. No. Sometimes if they're on hormones, you know, they feel a lumpy breast. But I already have ordered a mammogram following that, and that was negative.
Q. Okay. And, I'm sorry, what was the last sentence of that notation?
A. "No axillary lymphadenopathy."
Q. What does that mean?
A. Axillary lymph nodes. Sometimes if they have inflammatory breast or even a cancerous mass or anything like that, lymph nodes will be one of the first things that we would feel.
Q. Okay. And --
A. Axillary lymph nodes are the draining areas for the breast.
Q. And then your note just continues with your results of your exam, the pelvic exam, et cetera, correct?
A. Yeah. Yes, sir.
Q. All right. Nothing abnormal

Page 128

there?
A. No.
Q. All right. And then you continue with Premphase for -- is that 12 more months?
A. Yes, 12 cycles. Yes.
Q. Okay. So 12 more months of Premphase?
A. Yes.
Q. So she would have been then prescribed, if she took that for the full 12 months, 18 months under your care?
A. If she would have taken that. And if she had any problem during that period of time, if she were under my care, she would have come back for a checkup.
Q. Okay.
A. I think there might be a place where she left and asked for the record release and --
Q. Record release?
A. Yeah. It must be -- this is 7/14, I saw her.
Q. Okay. And we'll get to that.

Page 129

A. Okay.
Q. I just wanted to conclude the visit of July 14, 1997. Nothing else that was noted that was abnormal for her or a different course of treatment, other than continuing with Premphase?
A. Yeah. Yeah, I don't think.
Q. Is there a reason why, at this particular point, you didn't have her convert to Prempro?
A. She was comfortable with that, so I continued with that.
Q. And were you comfortable with the dosage?
A. Yes.
Q. Okay. Was there any other hormone therapy that you considered, rather than Premphase, in July of '97?
A. Not unless she had problems or if she had completely attained menopause or -- since she didn't have any problem, I continued with the same one.
Q. Okay. What would happen if a patient presented to you with lower abdominal

Page 130

pain, which is a known side-effect of Premphase?
A. What would I have --
Q. What would you do? Let's assume Ms. Romero comes to you in July of '97 and says, "Doctor, I've been taking Premphase, and I'm having lower abdominal pain."
MS. ELMORE: Object to form.
Go ahead.
A. I would have examined, and then probably ordered an ultrasound to check on the pelvic organs. And if it continued with the negative pelvic organ findings, I would have asked -- referred her to a GI person to further investigate the colon problems or any bowel problems and such.
BY MR. BENEVENTO:
Q. If the side-effects that are reported for Premphase actually present to a patient, do you take them off of Premphase?
A. If it is a major side-effect. I haven't -- I don't recall any patient that has complained to me of serious abdominal

Page 131

pain --
Q. Okay.
A. -- as a side-effect.
Q. You're aware that Ms. Romero sought the care of Dr. Lotze in Houston, are you not?
A. Only when we got the request for the records. That was in -- that was May 14th, '98.
Q. Okay. Did you have any discussions with Dr. Lotze at any time?
A. No.
Q. So you haven't had any discussions with him about that transition of the care to -- of Ms. Romero or what's happened to her since she's left your care?
A. No.
Q. All right. The next notation on 007 to Exhibit 2 is dated July 16, 1997. Do you see that?
A. Yes.
Q. And I think that you're just recording some of the results from the exams --

Page 132

A. Right.
Q. -- that you ordered two days earlier?
A. Yes, sir.
Q. You note that she has a high cholesterol level?
A. Yes.
Q. And you order a low cholesterol diet --
A. And exercise, yes.
Q. -- and exercise.
Do you know whether she followed the recommendation?
A. We expect them to. Whether she did or not, I cannot tell.
Q. All right. And if you turn the page, now we're on page 008 to Exhibit 2, there appears to be a notation of August 6, 1997, "Mammogram negative"?
A. Yes.
Q. And was that a separate visit or just -- or just, at that point --
A. No, it was just phone notification. Patient notified.

Page 133

Q. All right.
A. Mammogram report comes to my office, and then I check it out, and then we call her to tell that it is negative.
Q. Is that the last time you saw --
A. Yes, sir.
Q. -- Ms. Romero, would have been July of '98 -- '7?
A. Yes.
Q. Then you said in your report -- or in your chart, you have an indication that there was a record release request?
A. Yeah, we got that letter from them, record request.
Q. Okay. You've handed me a document that is signed by Judy Romero on or about May 14, 1998, asking you to release your records to Dr. Lotze in Houston, correct?
A. Yeah, and I -- we made a note here (indicating), and the chart goes to the inactive section.
Q. Okay. And did you receive any

Page 134

further communication from Ms. Romero after July of '97?
A. No.
Q. Do you have any idea what -- what happened to her care and treatment under Dr. Lotze or anybody else?
A. No.
Q. Okay.
A. Later on, I heard that she had breast cancer, because when they requested the charts and we were looking for the charts.
Q. Okay. And did you do anything with that information, meaning did you try to reach out to Ms. Romero or anybody else to offer assistance or answer questions?
A. No.
MS. ELMORE: Object to form. Go ahead.
A. I only got the legal notice for record release --
BY MR. BENEVENTO:
Q. Okay.
A. -- so I didn't ask anyone

Page 135

anything.
Q. All right. Now, if I can go back to Exhibit 3 -- and let me close the loop on this for a second.
Do you know what caused Ms. Romero's breast cancer?
A. I don't know.
MR. THORNBURGH: Objection. You're not an expert. You're not an oncologist. You're not here to give expert testimony.
A. I don't know. That's...
BY MR. BENEVENTO:
Q. If she would have asked you to opine on what caused her breast cancer, could you have done that for her?
MR. THORNBURGH: Same objection.
A. I don't know, sir.
BY MR. BENEVENTO:
Q. Have you ever been asked to answer a patient's question about the cause of their breast cancer?
MR. THORNBURGH: Same

Page 136

objection.
A. No.
BY MR. BENEVENTO:
Q. Have any of your patients developed breast cancer under your care?
A. I have seen patients that had breast cancer, but not necessarily from under my care of hormone therapy.
Q. Okay. Have you told any patient that you believe their breast cancer is a result of their hormone therapy?
MR. THORNBURGH: Same objection.
A. I don't think so. I don't know.
BY MR. BENEVENTO:
Q. I'm just asking you if you have done it.
A. All right.
Q. I'm not asking you to opine on anything. I'm not asking you to be an expert. I'm not asking you to do anything --
MR. THORNBURGH: She's here to testify about the care and treatment

Page 137

of Ms. Romero, not about other patients that she treats.
MR. BENEVENTO: I'm not done with my question, and that's not a proper objection.
BY MR. BENEVENTO:
Q. I'm simply asking you: In the course of your care and treatment of patients that have had breast cancer, have you ever told them what caused their breast cancer?
MR. THORNBURGH: Same objection.
A. No.
BY MR. BENEVENTO:
Q. Has any patient ever asked you what they think -- what you think caused their breast cancer?
MR. THORNBURGH: Same objection, asked and answered.
A. If they asked, I'd say I don't know.
BY MR. BENEVENTO:
Q. Okay. The Physician's Desk Reference for 1996 on Premphase, I think

Page 138

we've asked this -- I've asked this question of you a few times. I just want to make sure that I have a clear understanding.
You would not have pulled the Physician's Desk Reference in 1996 and shown that to Ms. Romero, correct?
A. I don't think so.
Q. And you would not have pulled the Physician's Desk Reference in 1996 to refresh yourself of any of the information contained in them before you prescribed Premphase to Ms. Romero?
A. I can't recall. I don't think so.
Q. Okay. So it would be unfair for someone to say the label is reassuring to you, correct?
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. If someone showed you this and said, "Read through this, and doesn't it reassure you of all of the benefits of Prempro or Premphase," that would -- that's not something you would do, right?

Page 139

MR. THORNBURGH: Objection.
A. I'm not expert, so I cannot get reassured that something causes or does not cause any cancer.
BY MR. BENEVENTO:
Q. Okay. Did you ever look at the Nurses Health Study?
A. No.
Q. Okay. Did you ever try to look at the literature that was available in 1996 to determine what was being reported by others studying hormone replacement therapy?
A. I can't recall.
Q. So it would be fair to say that your information about hormone replacement therapy was what you've previously discussed from your colleagues, from your seminars, from your experience, from the pamphlet that we have here.
Is there anything else that would be in the body of information for hormone --
A. ACOG pamphlets and ACOG notes, sometimes Green Journals.

Page 140

Q. Okay. Have you found Premphase to be effective over the years for relief of menopausal symptoms?
A. Yes.
Q. I think we've already covered those, so I won't be repetitive.
That was true for Ms. Romero?
A. Yes.
Q. Okay. Do you know whether Premphase or Prempro were ever recalled from the market by the FDA?
MR. THORNBURGH: Objection.
A. I don't remember.
BY MR. BENEVENTO:
Q. And if I understand your testimony correctly, you still prescribe, for those patients who want it, Prempro and Premphase?
A. Not those. I haven't been prescribing for a while.
Q. I'm sorry?
A. I have not been prescribing Premphase and Prempro in quite a while.
Q. Okay. After the world

Page 141

health -- the Women's Heath Initiative in 2002, did you ever prescribe Prempro again?
A. No, but I have prescribed Premarin.
Q. Premarin. Okay.
And have you ever prescribed Premphase after the women's health -- or the women's initiative study of 2002?
A. I don't think so.
Q. Okay.
A. I don't recall, but I doubt if I prescribed after that.
Q. Okay. So if you -- would you have any reason to challenge your prescription record if there's records that show that in 2004, '5 and '6, you were prescribing Prempro and Premphase? Or do you have a recollection that you never did that, or is it just that you prescribed less?
MR. THORNBURGH: Objection.
A. I cannot remember.
BY MR. BENEVENTO:
Q. Okay. So it's possible that you would have prescribed Prempro or

Page 142

Premphase for patients after 2002?
MR. THORNBURGH: Objection, asked and answered.
A. I can't remember that either.
BY MR. BENEVENTO:
Q. Okay. Don't know, one way or the other; is that fair?
A. Yes.
Q. Okay. You would rely on the records to help you with that?
A. Yes.
Q. Okay. Did you make a conscious decision after 2002 that if any woman asked for hormone replacement therapy, you would not prescribe Premphase?
A. That, even, I can't remember.
Q. Okay.
A. I had made my combination pill prescription much, much lesser.
Q. Why is that?
A. Because of the dosage regimen and hard to follow up on these patients, who are perimenopausal. If they had a hysterectomy and ovaries removed, I felt more

Page 143

comfortable to prescribe the hormone replacement.
Q. Okay. So if they didn't have a uterus, you were okay -- you felt a little more comfortable prescribing Premarin to them?
A. Yes.
Q. You would still follow up, though, with your breast cancer examination --
A. Yes.
Q. -- and mammograms, et cetera, correct?
A. Yes.
Q. Would you agree that most women who get breast cancer have never taken hormone therapy?
MR. THORNBURGH: Objection.
A. It has to be phrased differently. I would say all the breast cancer patients are not hormone-takers.
BY MR. BENEVENTO:
Q. Have you done any research to understand whether there's a link between

Page 144

hormone replacement therapy, like Premphase or Prempro, and ductal carcinoma in situ?
A. I have not done any research.
Q. When you read the world -- did you read the Women's Heath Initiative study?
A. Yes.
Q. Did you read the abstract or the full study?
A. I think it was the full study --
Q. Okay. Did you note in that study that the increased risk of breast cancer was not for ductal carcinoma in situ?
MR. THORNBURGH: Objection.
A. I don't remember what the --
BY MR. BENEVENTO:
Q. Do you remember that the only association for increased risk of breast cancer was for invasive breast cancer?
MR. THORNBURGH: Objection.
A. I can't remember.
BY MR. BENEVENTO:
Q. Okay. When the Women's Health Initiative study was released in the summer

Page 145

of 2002, what kind of impact did it have on your practice?
A. Quite a few patients even dropped taking the hormone therapy. There was a tremendous down in the prescriptions for any kind of hormone therapy.
There were lots of patients who were taking estrogen alone or combinations. They did not want to take any, and there was a gross diminution in the prescriptions.
Q. Did some of the women decide to stop taking hormone therapy without consulting with you?
A. Yes.
Q. Okay. Did that result in you reducing the number of prescriptions you were writing?
A. Yes.
Q. Do you believe that the publicity surrounding the world -- or the Women's Health Initiative study was fair? Do you think they were fairly reporting what was going on, the media and what was being televised?

MR. THORNBURGH: Objection to form.
A. The media is good because it approaches lots of women, public, to be aware of any problem that there could be. So what was your question?
BY MR. BENEVENTO:
Q. Sure.
A. I don't know if I answered it.
Q. Yeah. Do you think that the media coverage that was being given -- I assume your patients are hearing it from somewhere, rather than just pulling the WHI study and reading it themselves.
A. Right.
Q. They're hearing it on TV or --
A. They're on journals and just -- the women's journals and lots of them.
Q. Right. Do you believe that the way that that was being reported by the media, how the media was reporting the results of the WHI study, was fair?
MS. ELMORE: Object to form. Go ahead.



A. I cannot really give an opinion on that. All I can say is that it brought more awareness in the women, and if somebody still needed for their symptoms, they were coming to a physician to ask for it.
BY MR. BENEVENTO:
Q. What type of hormone therapy do you currently prescribe for women that complain of postmenopausal-related symptoms with a uterus?
A. I'm extremely hesitant to give them combination pills. But if it is perimenopausal, I have given them the lowest dose of -- like birth control pills, like Mircette and all that, temporarily, and followed them very closely.
If they had other problems associated with that, I encouraged them to have hysterectomy done, and then given just estrogen alone.
Q. When you would speak about the pros and cons of Premphase and Prempro to your patients, would you tell them anything about the possible benefits of cardiovascular



disease prevention?
MR. THORNBURGH: Objection.
A. I don't touch those.
BY MR. BENEVENTO:
Q. Okay. Would you tell them about the possible benefits of reducing dementia or other mental illness?
MR. THORNBURGH: Objection.
A. No. I -- in general, I tell them that there are some side good effects also, but I don't think I mentioned individually.
BY MR. BENEVENTO:
Q. And at least as it relates to Ms. Romero, you didn't prescribe for any purpose other than menopausal symptoms?
A. No.
Q. No, I'm correct?
A. Yes. No.
Q. Do you know the details of the WHI study as it relates to subgroups or the amounts of cohort studies or anything like that that went into the WHI?
And if I asked you specific



statistics, subgroups, different kinds of cancers, would you be able to help me with any of that?
A. No.
Q. Do you know if there were any other gynecologists in the greater Beaumont area that still prescribed hormone replacement therapy after the WHI study was released in 2002?
MR. THORNBURGH: Objection, no need to speculate.
A. Yeah, I don't know. I'm sure there must be, but I don't know. I have not asked them.
BY MR. BENEVENTO:
Q. Okay. Well, I just was wondering if you've had discussions with your colleagues in the general area, asked them about what they were doing for their menopausal patients?
A. No, I don't remember.
Q. It would be fair to say that you don't know what Ms. Romero would have done if the WHI results would have been

Page 150

released in 2006, rather than -- I'm sorry, 1996, rather than 2002, correct?
A. I don't know what would go into her mind.
Q. Right. I mean, it would be speculation as it relates to what she would do --
A. Yeah.
Q. -- whether she would take hormone replacements or not, correct?
A. Yeah.
MR. BENEVENTO: I apologize. I'm getting blind in my old age.
BY MR. BENEVENTO:
Q. We've talked about Exhibit 3, which was provided to you by Wyeth sales representatives, correct?
A. Uh-huh.
Q. Yes?
A. Yes. Yes.
Q. Was there any other marketing material that Wyeth provided you for Premphase or Prempro?
A. I don't remember. This one was

Page 151

there, and I brought it.
Q. There were sales representatives from Wyeth that would come to your office from time to time?
A. There used to be.
Q. Okay. Do you know any of their names?
A. There was one, Mr. Bush. I remember his name because we always joked him "George Bush." And he lived in the -- close by, in the Silsbee area or so.
Q. Did he ever provide you any financial incentives to prescribe Premphase or Prempro?
MR. THORNBURGH: Objection.
A. No, sir.
BY MR. BENEVENTO:
Q. Did he ever ask you to prescribe Premphase or Prempro in a circumstance you felt uncomfortable?
A. No.
Q. Did he ever -- did you feel like his visits were inappropriate, that he was providing you information you didn't

Page 152

want, or being pushy in any way?
A. No, I think he was doing his duty --
Q. Okay.
A. -- to call on the doctors.
Q. Would you receive visits from other pharmaceutical representatives, other than Wyeth, from time to time?
A. Receive what?
Q. Do other sales representatives visit your office?
A. Yes.
Q. Not just Wyeth sales representatives?
A. No. All the companies do.
Q. Okay. And they help by providing you with samples, correct?
A. Yeah. Yeah. Patient samples and pamphlets.
Q. Okay. And answer questions for you?
A. Yes.
Q. Have you ever had a question of any of the Wyeth sales representatives about

Page 153

Premphase or Prempro?
A. I haven't seen them in a long time.
Q. Okay. I'm challenging your memory again, but when -- before WHI came out, do you recall whether any of them gave you any information that you thought was helpful?
A. I cannot remember that far.
Q. Okay. Do you recall you asking them any questions about, you know, when you should give -- when you should prescribe Premphase or Prempro or what the risks and benefits are, anything like that, that you can recall asking of them?
A. No.
Q. Would you make your decision to prescribe Premphase or Prempro to a patient based upon your own judgment, or based upon what the sales representatives told you?
MS. ELMORE: Object to form.
MR. THORNBURGH: Objection.
MS. ELMORE: Go ahead.
A. My judgment.

Page 154

BY MR. BENEVENTO:
Q. Okay. And I've asked this before. I just want to make sure, because I'm sure Mr. Thornburgh has other documents. But can you recall ever receiving any documents from Wyeth other than Exhibit 3?
A. I cannot recall.
MR. BENEVENTO: Thank you for your time, ma'am.
THE WITNESS: All right. Thank you.
MS. ELMORE: Would you like to take a quick break, or would you care for some water?
THE WITNESS: I'll take some water.
MR. THORNBURGH: Okay. We can take a real quick break.
THE VIDEOGRAPHER: Off the record, 1:26, end of Tape 2.
(Recess taken, 1:26 p.m. to 1:39 p.m.)
THE VIDEOGRAPHER: Stand by. Okay. We're on the record at 1:39,

Page 155

beginning of Tape 3.
EXAMINATION
BY MR. THORNBURGH:
Q. Doctor, thanks for your patience in staying through lunch. And I will try to get through my outline and cut some corners and try to get you out of here as soon as I can, okay?
A. Thanks.
Q. I want to go back a little bit to prior to 1996 and talk to you a little bit about sources of information you had available to you about hormone replacement therapy information, okay?
A. Uh-huh.
Q. I think earlier you testified that colleagues were a source of information for you --
A. Sometimes.
Q. -- is that correct?
A. Uh-huh.
Q. And seminars?
A. Yes.
Q. And those seminars were -- is

Page 156

it my understanding that those were either CME lectures that were put on by ACOG or other -- other folks --
A. Yes.
Q. -- other programs?
And that would include the Texas ACOG?
A. Yes.
Q. And was there a county ACOG as well?
A. There's a Jefferson County Medical Society, but theirs are not necessarily specialty conferences.
Q. So they couldn't necessarily be talking about gynecological issues?
A. No.
Q. Okay. There may be a random --
A. Right.
Q. Okay. You indicated that part of the information would come from the pamphlet that you -- that has been marked as Exhibit 3?
A. Yes.
Q. And the Green Journal, which is

Page 157

an ACOG journal; is that correct?
A. Yes.
Q. The Gray Journal, you said that you stopped receiving that publication -- when did you stop receiving that publication?
A. Several years ago. I don't know pinpointing.
Q. Before or after 1996?
A. I cannot remember.
Q. Okay. Prior to ending that publication, would that have been a source of information for you about the drug -- or the hormone replacement therapy drugs?
A. Yeah, one of the sources.
Q. Published medical articles?
A. Have I?
Q. No. Would published medical articles from medical journals also be a source of information for you?
A. Yes.
Q. What about "Dear Doctor" letters? Do you know what a "Dear Doctor" letter is?
A. I only get those when some

warning signals come in or some drugs are withdrawn.
Q. Okay. And do you read those when you -- when they come through and there's some sort of new label change or warning?
A. Yes, most of the time.
Q. What about medical conventions and booths at conventions, would that be a source of information for you about hormone replacement therapy prior to 1996?
A. Yes. Yes. Always, when we go for the medical conferences, then there's the pharmaceutical booths that we attend also.
Q. Sales representatives would be a source of information for you, prior to 1996, about hormone replacement therapy?
A. Yes.
Q. Including Premphase and Prempro?
A. Yeah, in general, they do that.
Q. And do you recall Wyeth sales representatives would come and detail you?
A. That's the one that I said



Mr. Bush.
Q. Was Mr. Bush a Wyeth sales representative?
A. I'm thinking he's Wyeth.
Q. What about bulletins, position statements and patient education information provided by medical associations such as ACOG, which you've mentioned, and/or NAMS, would that be information that you would rely upon for information about hormone replacement therapy, including Premphase, prior to 1996?
A. In general, those are the sources, yes.
Q. Any textbooks or reference materials that you would rely upon -- or relied upon prior -- 1996 or prior, related to Premphase?
A. No.
Q. What about Novak's on Gynecology?
A. I had my own Novak Gynecology, but that was all getting older, so...
Q. Did you -- when did you have



the Novak's on Gynecology book?
A. Very long time ago.
Q. In the '60s, '70s, '80s?
A. '70s.
Q. '70s?
And would that have been a source of information for you about hormone replacement therapy or estrogen replacement therapy?
A. Yes, generalized information. They don't talk about particular medications.
Q. And what about articles in newspapers or ads on television, would that be another source of information that you would have --
A. If I happened to see them, yes.
Q. Now, I understand -- we understand that this pamphlet was left behind by a sales representative. Do you know if that sales representative that left this behind was Mr. Bush?
A. I can't remember.
Q. Did the -- when the sales representative left these pamphlets behind



with you, would he sit down -- he or she sit down with you and go through the entire pamphlet with you, so that you had read it with the sales representatives, or was there a situation where they would basically leave the pamphlets --
A. Yeah.
Q. -- with the samples that they left behind as well?
A. Many times they'll come and discuss, and then they will leave the samples and the books, booklets.
Q. Do you --
A. They don't go over the line by line with us.
Q. Was it your experience that they would go over the benefits of the drug mostly, rather than the risks associated with the drug?
A. Both.
Q. And I guess I should clarify that: They'd go over the side-effects?
A. Yes. If they don't, I ask them.

Q. Okay. What is a side-effect?
A. What is?
Q. Just in general -- not what are the side-effects of hormone replacement therapy, but what is your understanding of a side-effect?
A. Yeah. Something that the patient would stay compliant and -- and major side-effects that could make them sick or discontinue therapy, so...
Q. Is it important for you that pharmaceutical companies lay out the major side-effects --
A. Yes.
Q. -- for you so that you understand what those side-effects are?
A. Yes.
Q. And so you've -- is it true, then, that you relied on these sources of information to get sort of a global understanding or full picture of hormone replacement therapy in 1996 and before?
A. Yes. I know decent amount of information.



Q. All right. You get a lot of information and you've got to filter that information, but these -- all of these sources were sources that you would have relied upon to get that full picture of the drug Premphase?
A. Yes.
Q. Do you trust that drug companies provide accurate information about the risks and benefits of drugs?
A. Most of the time, yes.
Q. Do you hope that they provide you with accurate and complete information about drugs that they're prescribing -- that they're marketing?
A. I hope so.
Q. You trust that drug companies would not hide bad data from you, right?
A. Yes.
Q. You trust that drug companies do not exaggerate benefits?
A. Yes.
Q. You trust that drug companies do not minimize or downplay risks?



A. Yes.
Q. It would be inappropriate for a drug company, wouldn't it, to not give you accurate information?
A. Yes.
MR. BENEVENTO: Objection, lacks foundation, calls for speculation.
BY MR. THORNBURGH:
Q. And that would be inappropriate because it would be impossible for you to relay accurate information to your patients, right?
MR. BENEVENTO: Same objection, also speculation, misstates her testimony.
MR. THORNBURGH: If you can answer the question?
A. Yes, we would hope that they give the right information.
BY MR. THORNBURGH:
Q. Right. I mean, you want full disclosure from them --
A. Yes.



Q. -- so you can share that important information with your patients?
A. Yes, sir.
Q. Doctor, what is the Physician's Desk Reference?
A. Something that we depend on to check on the drugs. And it is redone every year, so the latest informations are added on that.
Q. If you were going to prescribe a product for the first time, would that be a source of information that you would look to before you prescribed it?
A. Yeah. If I have any questions or doubts, I will definitely look over it.
Q. And would you -- when you prescribed Premphase, the first Premphase patient of yours, would that have been a source of information that you would have looked to?
A. It could have been.
Q. Now, I understand and appreciate that defense counsel asked -- that you testified, in response to defense

Page 166

counsel's answer [sic], that you did not prescribe hormone replacement therapy to Ms. Romero for cardiac or mental benefits.
A. Yes.
Q. But what was your understanding of the cardiac benefits and mental benefits prior to 1996, related to hormone replacement therapy?
MR. BENEVENTO: Objection, lacks foundation, calls for speculation, irrelevant, asked and answered, waste of time.
MS. ELMORE: You can answer.
A. It's variable sources. Some go in favor and some, the other way around, so I never brought that subject into discussion.
BY MR. THORNBURGH:
Q. Did you consider the cardiac benefit as part of your entire risk-benefit assessment of the drug?
And I don't mean whether or not you spoke to Ms. Romero about it or whether or not that was a condition, but was that information that you had that became part of

Page 167

your entire risk-benefit assessment of the drug?
MR. BENEVENTO: Object to the form, lacks foundation, conclusory.
A. That was not one of my major discussion, benefit or risk.
BY MR. THORNBURGH:
Q. Right. And I'm not asking you if it was a discussion that you would have. But was that something that you had in your mind prior to 1996, that these hormone replacement therapies had a cardiac benefit?
MR. BENEVENTO: Same objections.
A. I've heard that -- I mean, I've read some places that they say they have benefits. At the same time, I have seen and read journals where they say that they raise blood pressure and opposite effects of it.
BY MR. THORNBURGH:
Q. Right.
A. And some of them improve the lipids. Like HDL and all have improved with some of the hormonal therapy, like estrogen

Page 168

and all that. But I would have never prescribed anything for that effect.
Q. Right. So that wouldn't have been the sole reason for your prescription, but would that have been one of the reasons for --
A. No, not at all.
MR. BENEVENTO: Object.
BY MR. THORNBURGH:
Q. Doctor, if a patient came to you and had complaints of hot flashes, severe enough where they were keeping her up at night, and you ordered an FSH test -- and can you explain to the jury what an FSH test is?
A. It's a follicle stimulating hormone, but these are extremely expensive hormone evaluation tests; and in general, it is not necessary to prove.
Only if you are in doubt if some patient is menopausal or not, then I could -- and on special situations, I might order that test, if their values are sky-high, the FSH, LH, and that's a little proof that she might be menopausal.

Page 169

Q. Okay. Okay. I want you to just focus on my question, okay? I don't -- you don't -- just --
A. I'm getting --
Q. I just want to know what is an FSH test? It's the follicular stimulating --
A. Follicle stimulating hormone.
Q. Hormone. Okay.
And what does that test -- what is the purpose of that test? Not how you used it in your practice, but what's the purpose of an FSH test?
A. To check if it is elevated or normal.
Q. Okay. And if the FSH is elevated, what does that mean?
A. Extremely high elevated -- these tests have a wide variation in their numbers to be normal. So if this test is very, very high, then that indicates that she's menopausal, there's not enough estrogen effect.
Q. Okay. Assume with me that a patient comes in, she's complaining of

Page 170

menopause symptoms, including -- including hot flashes, and you ordered an FSH and it showed that it was in the menopause -- postmenopausal range.
A. Uh-huh.
Q. Would it be fair to say that that patient had -- was in a postmenopausal stage?
MR. BENEVENTO: Object to the form, lacks foundation, calls for speculation, incomplete hypothetical.
A. I wouldn't order the FSH test for the complaints of --
BY MR. THORNBURGH:
Q. I'm not asking you if you would have ordered it.
I'm asking you: If somebody came in and they had an FSH done and it showed that it was within the postmenopausal range, and the patient had menopausal symptoms --
A. Yes.
Q. -- would it be fair to say -- or to diagnose her as postmenopausal?

Page 171

MR. BENEVENTO: Same objections. Also violating your own rule that you're not supposed to talk to this doctor about something that they didn't care or treat for Ms. Romero.
MR. THORNBURGH: I'm not asking her about breast cancer diagnosis. I'm asking her about FSH, which gynecologists perform all the time.
MR. BENEVENTO: Same objections.
A. Okay. Postmenopausal, I wouldn't diagnose postmenopausal if she's still menstruating and having irregular periods and she has hot flashes. Just based on a chemical test alone, we cannot prove a diagnosis.
BY MR. THORNBURGH:
Q. What if she stops menstruating?
MR. BENEVENTO: Same objections.
A. I might think that she's menopausal.

Page 172

BY MR. THORNBURGH:
Q. And menopausal -- a postmenopausal -- a woman who is postmenopausal means that she has little or no production of natural estrogen in her body, correct?
A. Yes. Less -- less production of estrogen, because there are other sources that would produce estrogen other than ovaries.
Q. Okay. Ms. Romero was a thin woman, correct?
A. Yes.
Q. And we know that because --
A. Her weight --
Q. -- your medical records demonstrate that she was less than a BMI of 24?
A. I saw the weight of 2 -- 130 and some pounds, so she's average size.
Q. Individuals that are heavier may have -- their own fat may produce --
A. Yes.
Q. -- estrogen, not the same level

Page 173

that your hormones would produce?
A. Yes.
Q. A lower-level of estrogen production --
A. Yes.
Q. -- if you -- in individuals that are overweight?
A. Yes. And adrenals can also produce a little bit.
Q. And when a woman is perimenopausal, she's producing less and less of the hormone estrogen, correct?
A. Yes.
Q. And is it your belief that when you prescribed hormone replacement therapy to Ms. Romero, that she was hormone-deficient?
A. Yes, there's an indication to that.
Q. And the hormone replacement therapy worked?
A. Yes.
Q. By replacing the deficient estrogen, natural estrogen, with synthetic exogenous hormone replacement therapy,

Page 174

Premphase?
MR. BENEVENTO: Objection, assumes facts not in evidence, lacks foundation, misstates science.
BY MR. THORNBURGH:
Q. That's the purpose of hormone replacement therapy, to replace the natural hormones that are depleted from a woman's body after menopause or during the perimenopausal state, correct?
A. Yes.
Q. So if the side-effect of that drug is that they have -- they can deal better with their vasomotor symptoms, like hot flashes, it means that they're getting appropriate levels of exogenous estrogen to control those symptoms?
A. Yes.
Q. Okay. Doctor, if you can turn with me to Exhibit 3.
A. Yeah.
Q. And turn to -- well, let's just go to the first page -- well, your -- yeah, the first page there.

Page 175

A. Yes.
Q. The last paragraph, "This brochure has been created to help you" --
And that's the patient, correct?
A. Yes.
Q. When they're saying "help you," they're talking about the patient, right?
A. The patient, yes.
Q. So Wyeth intended to provide this to the patient?
MR. BENEVENTO: Object to foundation.
A. -- "to help you, together with your healthcare provider, make the important decision."
BY MR. THORNBURGH:
Q. So it was the intent of Wyeth to have this material provided directly to the patient?
MR. BENEVENTO: Objection, calls for speculation, lacks foundation as to what Wyeth intended or didn't intend.

Page 176

MR. THORNBURGH: You can answer the question.
MR. BENEVENTO: If you can. You don't have to answer, if you don't have an answer.
THE WITNESS: Oh.
A. Sometimes it's hard to explain the whole thing to the patient --
BY MR. THORNBURGH:
Q. That's -- just listen to my question, okay?
This was intended to be provided directly to the patient?
A. Yes.
Q. Okay. If you turn to the next page?
MS. ELMORE: I don't think this is in order. Just a moment. Let me look.
MR. THORNBURGH: Okay. And I should say -- I should identify the page number, but it's difficult for me to read the page numbers. I don't think there is a page number on these

Page 177

first few pages. It looks like it would be one, two, three, the table of contents, right?
BY MR. THORNBURGH:
Q. Do you see any subtitle or title in this table of contents that says, "Warning, Breast Cancer"?
MR. BENEVENTO: Objection, document speaks for itself.
BY MR. THORNBURGH:
Q. Doctor?
A. Just for breast cancer, no.
Q. Right. And do you see -- okay.
So if you go down here, do you see any section that says "Warning"?
MR. BENEVENTO: Objection, document speaks for itself, argumentative.
A. I would imagine "Side-Effects" are the warnings.
BY MR. THORNBURGH:
Q. Okay. So that's a good point. So you would imagine the "Side-Effects" are the warnings, so why don't we turn to the

Page 178

"Side-Effects" section of this pamphlet, okay?
A. Uh-huh.
Q. So if you turn to page --
MR. THORNBURGH: My page is cut off. You got a page number?
MS. ELMORE: Which section are you referring to?
MR. THORNBURGH: I want to go to "Side-Effects" subsection.
MR. BENEVENTO: Which one? There's three.
THE WITNESS: There are side-effects of Premphase --
MS. ELMORE: What do you expect --
MR. THORNBURGH: Well, I mean, we're talking about Premphase here, right?
THE WITNESS: Yeah. 21, page 21.
MR. THORNBURGH: Okay. So I want to go to -- I'm sorry. I'll be clear, clearer.

Page 179

BY MR. THORNBURGH:
Q. Premphase, which is what you prescribed to Ms. Romero, correct?
A. Yes.
Q. Okay. And then go to "Side-Effects" section under the "Premphase" portion of this document.
A. Uh-huh.
Q. It's going to be page 14.
A. No. 21, I thought.
Q. 21?
A. 21. 21 is for Premphase.
Q. Okay. You're right.
Okay. So you just testified that you would expect the warnings to be under the "Side-Effects" section of this pamphlet, correct?
MR. BENEVENTO: Objection, misstates her testimony, document speaks for itself, argumentative.
BY MR. THORNBURGH:
Q. I mean, that's what you testified to just a minute ago?
MR. BENEVENTO: Same

Page 180

objections.
BY MR. THORNBURGH:
Q. Warnings --
MR. THORNBURGH: One moment here. Let me straighten up my...
BY MR. THORNBURGH:
Q. So you would expect to find the breast cancer -- there was a breast cancer warning, you'd expect to find it under "Side-Effects," right?
MR. BENEVENTO: Objection, misstates her testimony.
A. Yes.
BY MR. THORNBURGH:
Q. Okay. So can you read the "Side-Effects" section on page 21, please?
A. Yeah. "The three most common side-effects are breast tenderness, headache and abdominal pain. Rarely, however, there are -- these are serious enough to cause women to stop therapy.
"If you experience breast or nipple tenderness or soreness or are concerned about the side-effects, speak with

Page 181

your doctor or healthcare provider so that he or she can advise you."
Q. Does it say anything in that about breast cancer?
MR. BENEVENTO: Objection, document speaks for itself, argumentive, misleading.
A. Not breast cancer, but breast tenderness and --
BY MR. THORNBURGH:
Q. Okay. My question is: Does it say anything in there about breast cancer?
MR. BENEVENTO: Same objections.
A. No.
BY MR. THORNBURGH:
Q. Okay. Let's go to the same section, but for Prempro, "Side-Effects." Okay.
Can you read -- on page 14 of Exhibit 3, can you read --
A. "The three most common side-effects are breast tenderness, headache and abdominal pain. Rarely, however, are

Page 182

these serious enough to cause women to stop therapy.
"If you experience breast or nipple tenderness or soreness or are concerned about side-effects, speak with your doctor or healthcare provider so that he or she can advise you."
Q. Does that say anything about hormone replacement therapy causing breast cancer?
MR. BENEVENTO: Same objections.
A. Here, it does not.
BY MR. THORNBURGH:
Q. After the WHI, did you consider breast cancer to be a side-effect of hormone replacement therapy?
MS. ELMORE: Object to form. Go ahead.
MR. BENEVENTO: Also lacks foundation.
A. I went over in general about all the side-effects with patients, and I prescribed much lesser than before.

Page 183

BY MR. THORNBURGH:
Q. Right. And that's not my question.
My question is: Was it your understanding -- and I apologize, I asked -- I talk fast, and I don't speak clearly, okay, so I will try to be better at that, okay?
Was it your understanding after the WHI that a side-effect of Premphase and Prempro was breast cancer?
MR. BENEVENTO: Objection to the form, lacks foundation.
MS. ELMORE: You can answer.
MR. BENEVENTO: To the extent you have medical understanding, you can answer.
BY MR. THORNBURGH:
Q. You're prescribing -- I mean, you're a doctor that --
A. Yes. WHI, I think, they noticed a little bit of higher incidence, just a tiny bit of higher incidence on certain type of combination pills.
Q. 24% increased risk, correct?

Page 184

MR. BENEVENTO: Object to the form, misleading.
A. I don't remember the exact percentage.
BY MR. THORNBURGH:
Q. So you consider, then, a 24% increased risk of breast cancer to be a side-effect of hormone replacement therapy after the WHI was released?
MR. BENEVENTO: Object to the form, lacks foundation, compound, speculative, misleading.
MS. ELMORE: You can answer.
A. I'm not sure if -- yes, it is a little increase, but I don't know if it is 24%. 24% of what? 100 people taking, 24 of them will get breast cancer? No.
BY MR. THORNBURGH:
Q. Okay. Yeah. I mean, that wasn't entirely my question. My question was -- let me ask it a different way.
Do you understand that when the label was changed in 2007, that Wyeth put down breast cancer as a side-effect in their

Page 185

label?
MR. BENEVENTO: Object to the form.
A. I think they put that black box or red box or something. They changed some of them.
BY MR. THORNBURGH:
Q. The black box, and also under the "Side-Effects" section, they put breast cancer?
MR. BENEVENTO: Object to the form, misleading, lacks foundation.
BY MR. THORNBURGH:
Q. Do you understand that --
A. Yes.
Q. -- to be the case?
A. Uh-huh.
Q. Let's turn to page 11.
Did you have a chance to review this pamphlet during the break?
A. I just rapidly went through it, not line by line.
Q. Actually, let's -- let's go, actually, back to the "Table of Contents"

Page 186

section. All right.
Now, the first section is "Understanding Menopause," right?
A. Uh-huh.
Q. "Symptoms of menopause," "Menopause and osteoporosis," "Are you at risk?"
A. (Nods head.)
Q. So the first section is about the benefits of using hormone replacement therapy?
MR. BENEVENTO: Object to the form, misstates the document.
BY MR. THORNBURGH:
Q. Is that your understanding, that hormone replacement therapy, Premphase, benefitted by preventing osteoporosis?
A. It does benefit some.
Q. All right. And the next section says, "Estrogen Replacement Therapy"?
A. Uh-huh.
Q. Then it says, "The most prescribed estrogen product," "Proven to relieve symptoms of menopause," "Proven to

Page 187

prevent osteoporosis," right?
A. Yes.
Q. That's -- so these first two sections are talking about benefits, not risks, right?
A. Right.
Q. Okay. Let's turn to page 11.
So the first mention of any breast -- of breast cancer doesn't occur in this pamphlet until page 11, correct?
MR. BENEVENTO: Object to the form, document speaks for itself, argumentative.
A. Okay. Where does it say --
BY MR. THORNBURGH:
Q. Yeah. So the first mention of breast cancer is on page 11 of this document, correct? There are ten other pages prior to this document -- prior to this page, right?
MR. BENEVENTO: Same objections.
A. Okay.
BY MR. THORNBURGH:
Q. Right?

Page 188

A. You have read it, so yes.
MR. BENEVENTO: You want to count up the number of sentences as well?
BY MR. THORNBURGH:
Q. Let's go ahead and read the first sentence under the second paragraph, starting with, "It is also important."
MR. BENEVENTO: Objection, asked and answered, already covered --
A. "It is also important for all women to have a regular breast examination by a doctor or healthcare provider."
BY MR. THORNBURGH:
Q. Okay. Stop right there. The first sentence, okay?
So the first sentence says, "It is also important for all women to have a regular breast examination by a doctor or healthcare provider."
It doesn't say it is important for women on hormone replacement therapy to have a regular breast examination by a doctor or healthcare provider. It's just saying

Page 189

"all women," right?
A. Yes.
MR. BENEVENTO: Object to the question, lacks foundation, argumentative, taken out of context, misleading.
You can laugh, but you're taking it out of context.
MR. THORNBURGH: How am I taking it out of context?
MR. BENEVENTO: Because it says --
MR. THORNBURGH: "It is also important for all women" -- how am I taking -- I'm taking the word "all" -- by emphasizing the word "all," out of context?
MR. BENEVENTO: No, you're picking a sentence out of a paragraph and isolating it as --
MR. THORNBURGH: We're going to talk about every sentence. We're going to talk about every sentence so that we can put it all in context --

Page 190

MR. BENEVENTO: I already did.
MR. THORNBURGH: -- at the end of the day.
MR. BENEVENTO: I already did.
MR. THORNBURGH: Oh, okay. Well, it's my turn. I have a chance -- I have an opportunity, so I'd appreciate it if you'd respect that and have some professionalism.
MR. BENEVENTO: I am. I respect it, and I have professionalism. I think your questions are inappropriate. They've been asked and answered --
MR. THORNBURGH: You don't like them because they hurt your client.
MR. BENEVENTO: That's not appropriate --
MR. THORNBURGH: Your client killed thousands of women.
MR. BENEVENTO: Move to strike, inappropriate.
MR. THORNBURGH: Let me ask the questions, then.

Page 191

MR. BENEVENTO: I'm not stopping you.
MR. THORNBURGH: So you want to argue about what your company did to my client and to thousands of other women in this country? Then we'll go ahead and argue right now.
MR. BENEVENTO: I'm stating my objections, as I'm allowed to do under the Rules. You're behaving completely inappropriately.
MR. THORNBURGH: You can object.
MR. BENEVENTO: I think you're behaving inappropriately.
MS. ELMORE: Let's move forward.
BY MR. THORNBURGH:
Q. "It is also important for all women to have a regular breast examination by a doctor or healthcare provider."
Did I read that correctly?
A. Yes.
Q. As an obstetrician and

Page 192

gynecologist, is it -- was it your understanding that women -- all women over the age of 40 should have breast examinations?
A. Yes.
Q. And there's no indication from this first sentence that women who are using hormone replacement therapy or Premphase need to be -- need to have extra breast examinations or that this breast examination indication was just for hormone replacement therapy patients, correct?
MR. BENEVENTO: Object to the form, lacks foundation, calls for speculation.
A. I would imagine that all women should have a breast examination --
BY MR. THORNBURGH:
Q. Right.
A. -- which includes those who are on hormone therapy or those who are not. Everybody needs a breast examination, annual.
Q. Right. Right.
And the next sentence says,

Page 193

"Most studies have not shown a high risk of breast cancer in women who have ever used estrogen."
That's the first sentence after -- I mean, that's the first sentence that talks about breast cancer in this entire pamphlet, right?
A. Uh-huh.
MR. BENEVENTO: Same objections.
BY MR. THORNBURGH:
Q. And it says, "Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens."
Did I read that accurately?
A. Yes.
Q. And this is talking about estrogens, right?
A. Yes.
Q. It's not talking about Premphase or Prempro?
A. Yes.
Q. Next sentence, "Most studies have reported that breast cancer developed

Page 194

more often in women who used estrogens for long periods of time or who used high doses for shorter periods of time," right?
A. Uh-huh.
Q. Did I read that accurately?
MR. BENEVENTO: No, but the record will speak for itself.
A. Some of the sentence.
BY MR. THORNBURGH:
Q. Okay. And this sentence is talking about that some studies have reported breast cancer in women who used estrogen, right?
MR. BENEVENTO: Document speaks for itself, argumentative, misstates --
BY MR. THORNBURGH:
Q. It's talking about long periods of time and high doses, correct?
MR. BENEVENTO: Same objections.
BY MR. THORNBURGH:
Q. You didn't prescribe this to Ms. Romero for a long period of time or with

Page 195

a high dose, did you?
MR. BENEVENTO: Objection, assumes facts not in evidence.
A. No.
MR. BENEVENTO: She left the care after 18 months, misleading.
BY MR. THORNBURGH:
Q. "The effects of added progestins on the risk of breast cancer are unknown," right? So there's -- it's unknown whether or not these combination estrogen and progestins cause breast cancer?
MR. BENEVENTO: Object to the form.
BY MR. THORNBURGH:
Q. And that most studies that were conducted with estrogen-only drugs didn't show a risk?
A. Uh-huh.
MR. BENEVENTO: I'm not sure there's a question there, but we'll keep plowing through it.
BY MR. THORNBURGH:
Q. Right? Is that your

Page 196

understanding of what we've read so far?
A. Yeah --
Q. That the risk may be increased for long duration and higher doses, right?
A. Yes.
Q. It's not talking about the .625 and 5-milligram dose that you prescribed of Premphase, right?
MR. BENEVENTO: Object to the form.
A. Yes.
BY MR. THORNBURGH:
Q. And the 6 -- the .625 and 5-milligram dose of Premphase that you prescribed to Ms. Provera was the lowest dose available --
MR. BENEVENTO: Ms. Romero, not "Provera."
BY MR. THORNBURGH:
Q. -- Ms. Romero -- is the longest dose -- is the lowest dose available at the time of Premphase; isn't that correct?
A. Premphase, yeah, that is the dose -- is the only dose.

Page 197

Q. So the effect -- so the effects of added progestins on the risk of breast cancer are unknown.
Next sentence, "Some studies have reported a moderately increased risk in those taking combination estrogen-progestin therapy, even higher than the possible risk of taking progestin alone."
But read that in conjunction with the next sentence. Can you read that for me?
MR. BENEVENTO: Oh. We're going to read it all now in context?
BY MR. THORNBURGH:
Q. Can you read that for me?
A. "Keep in mind, however, that the other studies have not shown this relationship."
Q. Doesn't this -- doesn't this section of this pamphlet actually reassure you that there's -- for short-term use, low-dose, there's no real risk of breast cancer?
MR. BENEVENTO: Object to the

Page 198

form, lacks foundation, misstates the document, misstates her prior testimony.
BY MR. THORNBURGH:
Q. I mean, "Keep in mind, however, the other -- the other studies have not shown this relationship."
MR. BENEVENTO: Now we have two questions and one statement.
BY MR. THORNBURGH:
Q. Am I reading that correctly?
MR. BENEVENTO: Same objections.
BY MR. THORNBURGH:
Q. Am I reading that right?
A. You're reading right, uh-huh.
Q. So this says the risk for Premphase is really unknown, the studies go both ways, and it provides no real or definitive evidence of breast cancer with use of -- with Premphase, right?
MR. BENEVENTO: Same objection, lacks foundation, document speaks for itself.

Page 199

BY MR. THORNBURGH:
Q. Would that be your interpretation of that section that I just read?
MR. BENEVENTO: Misstates her testimony.
A. Yeah, there's a slightly increased risk than just estrogen alone, is my understanding.
BY MR. THORNBURGH:
Q. So some studies have found that, right?
A. Uh-huh.
Q. "But keep in mind, however, the other studies have not shown that relationship."
MR. BENEVENTO: Objection, asked and answered --
BY MR. THORNBURGH:
Q. So there's no definitive --
MR. BENEVENTO: -- argumentative.
BY MR. THORNBURGH:
Q. There's no definitive warning

Page 200

there about breast cancer, is there?
MR. BENEVENTO: Same objections, argumentative. You've got the testimony, and you're just trying to twist her again.
BY MR. THORNBURGH:
Q. There's no definitive warning there, is there? It's saying that they go both ways?
MR. BENEVENTO: Argumentative, same objections, lacks foundation, document speaks for itself.
A. Yeah.
BY MR. THORNBURGH:
Q. That the risk of added progestin is unknown, isn't that what that says?
A. Yes. Yes, sir.
Q. And that there have been studies, but they go both ways?
MR. BENEVENTO: Same objections.
BY MR. THORNBURGH:
Q. Am I misleading you?

Page 201

A. No, you're -- it's right.
Q. Is that your understanding of the warning?
A. Uh-huh.
Q. Is that your understanding of the risks back in 1996, when you prescribed Premphase to Ms. Romero?
A. Yes.
MR. BENEVENTO: Asked and answered, misstates her prior testimony.
BY MR. THORNBURGH:
Q. I want you to turn with me to page 14 real quick.
A. Okay.
Q. It says, "You should experience relief from hot flashes and night sweats almost immediately."
Did I read that correctly?
And that indicates that Premphase and Prempro are effective, correct?
A. Uh-huh.
Q. I want you to turn to page 16, "How long to use Prempro."

Page 202

Can you read the -- why don't you start with the second paragraph, starting with, "Once you begin therapy"?
A. "Once you begin therapy, the short-term symptoms of menopause may rapidly disappear. But they may return if you stop taking Prempro abruptly."
Q. So does that indicate to you that women should stay on the drug, rather than suffer an abrupt return of vasomotor symptoms?
MR. BENEVENTO: Object to the form, lacks foundation, calls for speculation. Never prescribed Prempro to Ms. Romero.
BY MR. THORNBURGH:
Q. Well, Prempro and Premphase are contained -- the information is under the same label, and they contain the same active ingredients of estrogen, conjugated estrogen and medroxyprogesterone acetate, right?
MR. BENEVENTO: Objection, argumentative.
A. Yes.

Page 203

BY MR. THORNBURGH:
Q. So, "Once you begin therapy, short-term symptoms of menopause may rapidly disappear. But they may return if you stop taking Prempro abruptly. Bone" --
Can you read the next paragraph for me?
A. "Bone protection continues only as long as you take Prempro.
Q. Stop there for me, okay?
The bone protection continues only as long as you're on Prempro, right?
A. Uh-huh.
Q. Is that right?
A. Yes.
Q. So the longer you stay on Prempro, the more your bones will be protected?
MR. BENEVENTO: Object to the form.
BY MR. THORNBURGH:
Q. Is that what it's saying? Is that your understanding of that sentence?
MR. BENEVENTO: Object to the

Page 204

form, document speaks for itself, taken out of context, misleading.
BY MR. THORNBURGH:
Q. If you can answer that question?
A. Yeah, we can imagine like that.
Q. Read the next sentence for me.
A. "If Prempro is prescribed for osteoporosis prevention, you should follow your healthcare provider's recommendation about length of treatment. Prempro is generally recommended for an extended period to help prevent bone loss, so follow your healthcare provider's recommendations carefully."
Q. And read the last sentence for me.
A. "Remember, hot flashes and night sweats may be the reason you started with Prempro, but prevention of osteoporosis may be the reason you continue."
Q. Stop there for me. Okay.
So what does that sentence mean to you, as a physician prescribing Premphase

Page 205

and Prempro to patients?
A. I think in olden days, lots of patients continued for a longer time. Even the plain estrogen also, they continued for a very long time.
Q. And why is this telling you that -- and telling patients directly that these menopausal women should stay on Prempro and Premphase for long periods of time?
MR. BENEVENTO: Object to the form, lacks foundation.
BY MR. THORNBURGH:
Q. Is that your understanding of -- is that consistent with your understanding of the duration that a woman could stay on Premphase and Prempro prior to 1996 --
MR. BENEVENTO: Lacks foundation, calls for speculation --
BY MR. THORNBURGH:
Q. -- in 1996?
MR. BENEVENTO: -- document speaks for itself.
A. It is returning there, but if

Page 206

patients are coming for regular visits, it's also doctor's discussion with the patients to -- whether or not to continue, and then we can discontinue, ask them to discontinue.
BY MR. THORNBURGH:
Q. Right. And this is provided to patients, right?
A. This is provided to patients.
Q. So a patient -- presumably, a patient who reads this --
MR. BENEVENTO: Will follow the recommended provider --
BY MR. THORNBURGH:
Q. -- will follow the recommendation that, "If I'm going to prevent bone loss, I'm going to stay on Premphase and Premphase for -- Prempro for a long period of time"?
A. They --
MR. BENEVENTO: Objection, argumentive, taking the document out of context, misstates her testimony.
A. They cannot get the prescription until they come back to the

Page 207

doctor for their yearly visit. So a doctor's responsibility is also there --
BY MR. THORNBURGH:
Q. All right.
A. -- whether or not to give it to patients.
Q. All right. So if a woman wasn't receiving -- wasn't having any significant side-effects or didn't know she was having side-effects in 1996 --
A. Uh-huh.
Q. -- and she was a woman who was postmenopausal, she was at a greater risk of osteoporosis, right?
So it might prevent her from having bone loss if we keep her on Premphase or Prempro for long durations of time?
MR. BENEVENTO: Object to the form, lacks foundation, improper hypothetical.
BY MR. THORNBURGH:
Q. Was that -- was that consistent with your understanding of the -- how long a patient could use Prempro or Premphase?

Page 208

A. No. Essentially, like --
Q. Prior to 1996?
A. -- I speak for the physicians --
MR. BENEVENTO: Can you let her answer the question?
MR. THORNBURGH: I just want to make sure we understand -- that we were talking about the same time frame.
BY MR. THORNBURGH:
Q. So prior to 1996.
A. Okay. It's even then, like we insisted patients to come for yearly checkup, and the prescriptions were only given for one year.
Q. All right.
A. And when they come back, they're totally examined, Pap smear and mammogram and all these things.
And it was -- even though it's a side benefit for osteoporosis prevention, it was not essentially a primary drug given to prevent osteoporosis. There are other

Page 209

medications available for osteoporosis prevention.
Q. But is it your understanding from reading this, though, that the longer you keep a woman on it, the longer osteoporosis prevention she gets?
A. Osteoporosis prevention.
MR. BENEVENTO: Objection to the document --
A. Mainly --
(Simultaneous discussion interrupted by the reporter.)
MR. BENEVENTO: Object to the form, lacks foundation, calls for speculation, misstates her testimony.
THE REPORTER: And the answer again, please?
MR. THORNBURGH: Okay. Do you want me to ask you the question again?
THE WITNESS: Yes, sir.
MR. THORNBURGH: Okay.
BY MR. THORNBURGH:
Q. Your understanding when you read this document, okay, that's titled "How

Page 210

long to use Prempro," the longer a woman stayed on Prempro or Premphase, as the case may be, the longer osteoporosis prevention she receives?
A. Your question is: Is it true or not? Is that the --
Q. Is that your understanding? Is that consistent with your understanding of this document?
A. Yeah, but my understanding is not going to be 100% depending on this pamphlet.
Q. But this is one of the sources --
A. It's one of the sources.
MR. BENEVENTO: Can you let her finish, even if you don't like her answer?
MR. THORNBURGH: I do like her answer.
BY MR. THORNBURGH:
Q. This is one of the sources of information you have?
A. This is one of the sources, but

Page 211

there are other guidelines given by ACOG and places where we respect more. So we also depend on that.
Q. All right. So you would like at ACOG and some other sources to determine how long a woman should stay on --
A. Yes.
Q. -- Premphase or Prempro?
A. Yes.
Q. Okay. There was no -- on Exhibit 3, there's no black-box warning, is there?
MR. BENEVENTO: Objection, document speaks for itself.
BY MR. THORNBURGH:
Q. Can you -- just so the jury --
A. Yes, no black box.
Q. So the jury understands, what is a black-box warning?
A. They're very important warnings, a high-level warning on the black box.
Q. Warnings about significant risks?

Page 212

A. Yes.
Q. That patients and physicians should be aware about?
A. Yes.
Q. Important information -- did you find -- do you find black-box warnings to be important information for you in determining whether or not to prescribe a drug to a particular patient?
A. Yes.
Q. There's no black-box warning on this pamphlet, right?
MR. BENEVENTO: Objection, asked and answered, misstates testimony.
A. In 1995, yes.
BY MR. THORNBURGH:
Q. There wasn't in 1995?
A. Yeah, this is in 1995.
Q. And a sales rep didn't come in between 1995 and 1996 and say, "Hey, I want you to add a black-box warning to that pamphlet I gave you, because it causes breast cancer," right?

Page 213

MR. BENEVENTO: Object to the form.
BY MR. THORNBURGH:
Q. That didn't happen, right?
MS. ELMORE: You may answer.
THE WITNESS: I don't know how to answer this question.
BY MR. THORNBURGH:
Q. That was kind of a funny question, but it didn't happen, right?
A. This is the only pamphlet that I had in those days.
Q. And from 1995 to 1996, sales reps didn't come in and say, "Hey, there's a risk of breast cancer that is a serious risk that your patients should be aware about that wasn't included on that pamphlet that we provided you in 1995" --
MR. BENEVENTO: Object to the form.
BY MR. THORNBURGH:
Q. -- right?
A. No.
Q. There's no warning on here that

Page 214

the risk of developing breast cancer can occur even after just a year or two on E+P, is there?
MR. BENEVENTO: Object to the form, misstates the document, document speaks for itself, argumentative.
MS. ELMORE: You may answer. Do you remember the question?
A. Is there a warning like that?
BY MR. THORNBURGH:
Q. Is there warning contained in this pamphlet that says that breast cancer can occur even after a patient is on E+P for one or two years?
MR. BENEVENTO: Same objections.
A. I don't think it was in this one --
BY MR. THORNBURGH:
Q. Okay.
A. -- there.
Q. There's no warning in this pamphlet that the risk increases -- the breast cancer risk increases each year that

Page 215

the patient stays on these drugs, is there?
MR. BENEVENTO: Same objections.
A. No.
BY MR. THORNBURGH:
Q. Is there a warning in this pamphlet that a thin or lean-build woman is at an even increased risk of developing breast cancer from using hormone replacement therapy?
A. Not in this pamphlet.
Q. Is there a warning in this pamphlet that breast cancers in women who use E+P, estrogen-plus MPA, medroxyprogesterone, or progestin, are larger and at a more advanced stage when found than cancers in women who did not use E+P?
MR. BENEVENTO: Object to the form, compound, vague, lacks foundation, document speaks for itself.
THE WITNESS: Say that again. I did not hear you.
BY MR. THORNBURGH:

Page 216

Q. Is there a warning in this pamphlet, that was one of the sources of information that you relied upon, that breast cancers in women who use E+P, Premphase --
A. Right.
Q. -- are larger and at a more advanced stage when found than cancer in women who do not use E+P?
MR. BENEVENTO: Same objections.
A. There's no warning in here.
BY MR. THORNBURGH:
Q. No warning that risks of taking E+P outweigh its benefits --
MR. BENEVENTO: Same objection.
BY MR. THORNBURGH:
Q. -- in this pamphlet, correct?
A. Not in this pamphlet.
Q. You would expect that in 1995, when Wyeth produced and published and provided you with this pamphlet, that had they had that information, they would have passed it on to you so you could share that information with your patient, correct?

Page 217

MR. BENEVENTO: Objection, lacks foundation, calls for speculation --
A. Yeah, patients would be -- if they read it and they would be more aware of it.
BY MR. THORNBURGH:
Q. It's important for patients to be able to make informed decisions, in your opinion?
A. Yes.
Q. That's why, when we were talking about the WHI earlier and you asked -- were asked a question about the media coverage and whether or not that media coverage was fair, that media coverage was important, wasn't it?
A. Yeah.
MS. ELMORE: Object to form. You may answer.
A. I think media coverage is good.
BY MR. THORNBURGH:
Q. Why do you think the media coverage about WHI was good?

Page 218

A. So it can reach more women. They watch TV more than they see their doctors and take their advice.
MS. ELMORE: Are you doing all right?
THE WITNESS: Yeah.
MS. ELMORE: Okay. Speak up when you're ready for a break.
THE WITNESS: I'm going to stay until we finish and then go home.
(Interruption by the reporter.)
MR. THORNBURGH: I'll mark this as Exhibit 4, the 2007 Physician's Desk Reference.
(Whereupon, Deposition Exhibit Lal-4, 2007 Label for Prempro/Premphase, was marked for identification.)
MR. BENEVENTO: Thank you.
BY MR. THORNBURGH:
Q. Earlier you described for the jury what a black-box warning is. Do you remember that?
A. Yes.

Page 219

Q. And this is the -- I've handed you the -- can you identify what I've handed you?
A. Uh-huh.
Q. What is that, that I've handed you? If you look at the front page --
A. Yeah, PDR.
Q. -- it's the PDR, the Physician's Desk Reference --
A. Uh-huh.
Q. -- 2007 --
A. Right.
Q. -- is that right?
And is there a black box contained on this Physician's Desk Reference?
A. There's the "Cardiovascular and Other Risks" in the black -- in the box.
Q. Okay. So there is a black box?
A. Is this the black box?
Q. So there is a black box on the 2007 label, right?
A. Yes. Yeah.
Q. And this label is for Premphase and Prempro?

Page 220

A. Yeah, Premphase. Yeah, for both.
Q. And earlier you testified that the only available Premphase tablet or dosage in 2006 was the 0.625 and the -- of the estrogen --
A. Right.
Q. -- and the 5 milligrams of the progestin; is that correct?
A. Uh-huh.
MS. ELMORE: Yes?
A. Yes.
BY MR. THORNBURGH:
Q. And can you -- so you've identified that there is a black-box warning.
Can you read the first sentence in the black-box warning?
A. "Cardiovascular and Other Risks. Estrogen and progestins should not be used for the prevention of cardiovascular disease or dementia. (See Clinical Studies and Warnings, cardiovascular disorders and dementia.)
"The estrogen-plus-progestin

Page 221

substudy of the Women's Health Initiative reported increased risk of myocardial infarction, stroke, invasive breast cancer, pulmonary emboli and deep vein thrombosis in postmenopausal women (50 to 79 years of age) during 5.6 years of treatment with conjugated estrogen" -- that is, 0.625 milligram -- "combined with medroxyprogesterone acetate (2.5 milligram) per day relative to placebo."
Q. So they found an increased risk in postmenopausal women of breast cancer who used for 5.6 years --
A. Uh-huh.
Q. -- as treatment with conjugated estrogen of .625 and combined with medroxyprogesterone acetate, MPA, of 2.5, correct?
A. Yes.
Q. And that's a lower dose than what you had available to prescribe to Ms. Romero in 1996, right?
A. Yeah, that one is Prempro. You asked Premphase, if it has lower dose. Premphase is .5 -- .625 milligram and

5 milligram progesterone.
Q. Right. Right. But I think my point was that they found this increased risk --
A. Uh-huh.
Q. -- in people who had estrogen of .625 --
A. Yes.
Q. -- and MPA of 2.5 --
A. Yes.
Q. -- right?
A. Yes.
Q. And that's a lower dose -- that 2.5 MPA is a lower dose than you had available to you --
A. Right.
Q. -- in 1996, when you prescribed Premarin -- or Premphase, I'm sorry --
A. Yes.
MS. ELMORE: Let him finish.
A. Premphase.
BY MR. THORNBURGH:
Q. Premphase to Ms. Romero, right?
A. Yes.



Q. So the increased risk was there even in a lower dose?
MR. BENEVENTO: Objection, lacks foundation, calls for speculation.
A. Yes.
BY MR. THORNBURGH:
Q. Okay. If you go to the last sentence, can you read the last sentence of the black-box warning for us, please?
A. "Because of these risks, estrogens with or without progestins should be prescribed at the lowest effective doses and for the shortest duration, consistent with treatment goals and risks for the individual woman."
Q. So now there's a warning in the black box that says women should only be prescribed E+P for the -- at the lowest duration -- at the lowest dose and the lowest -- shortest duration, correct?
A. Yes.
MR. BENEVENTO: Objection, document speaks for itself.



BY MR. THORNBURGH:
Q. And that pamphlet didn't say that -- didn't provide that warning -- Exhibit 3 didn't provide that warning to you in 1995 or 1996, right?
MR. BENEVENTO: Object to the form.
A. Yes.
BY MR. THORNBURGH:
Q. Turn to page 4 -- 3459 -- actually, strike that, page 3460. Do you find that? It's on the top left-hand corner.
A. Uh-huh.
Q. Do you see -- are you on page 3460?
A. Yes, sir.
Q. Okay. And if you go down to --
Actually, if you don't mind, I'm sorry, if you just back up one page to 3459.
A. Okay.
Q. Are you there?
A. Uh-huh.
Q. And do you see the bold,



capital letters word, "Warnings"? Do you see "Warnings"? It's in bold and capitalized.
A. Yes.
Q. There wasn't anything in the hormone replacement therapy pamphlet that you had that was -- said "Warnings" and was bold and capitalized, was there?
MR. BENEVENTO: Object to the form --
A. No.
MR. BENEVENTO: -- document speaks for itself, argumentive.
BY MR. THORNBURGH:
Q. Okay. If you turn to the next page, under the "Warnings" section, there's a number 2; and what does number 2 say on page 3460 of the pamphlet -- I mean, of the PDR?
A. "Malignant neoplasms."
Q. Okay.
A. "Breast cancer."
Q. So breast cancer is the first malignant neoplasm that pulls up under Section 2 of the "Warnings" section, right?

Page 226

A. Uh-huh. Yes.
Q. Okay. And can you read the first sentence?
A. "In some studies, the use of estrogens and progestins by postmenopausal women has been reported to increase the risk of breast cancer."
Q. Is that a pretty definitive warning to you? If you'd like, you can look back at the Exhibit 3, the pamphlet, and compare them, if you'd like to.
The 2007 warning starts out with, "In some studies, the use of estrogens and progestins by postmenopausal women have been reported to increase the risk of breast cancer."
Did I read that accurately?
A. Yes.
Q. Turn back to the pamphlet, Exhibit 3, that Wyeth provided to you in 1995.
A. Uh-huh.
Q. And page -- page 11, the first sentence is -- the first sentence I want you

Page 227

to read is, "Most studies" -- or focus on right now is, "Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens."
So that's the -- that's the first sentence that talks about the risk of breast cancer, and it says, "Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens."
And did I read that sentence accurately?
And that's the sentence that's contained in the Exhibit 3 pamphlet that was provided to you by a Wyeth sales representative --
A. Right.
Q. -- in 1995, correct?
MR. BENEVENTO: Object to the form, lacks foundation, calls for speculation.
BY MR. THORNBURGH:
Q. Look at the first sentence in the 2007 label.
A. Yeah.

Page 228

Q. It says, under the "Breast Cancer" section --
A. Uh-huh.
Q. -- "In some studies, the use of estrogens and progestins by postmenopausal women have been reported to increase the risk of breast cancer."
That's a different warning, isn't it?
A. Yes.
Q. You find that warning to be more definitive about the risk of breast cancer associated with the use of E+P replacement therapies?
A. Yes.
Q. And then the next sentence says, "The most important randomized clinical trial providing information about the issue is the Women's Health Initiative," right?
A. Yes.
Q. And it goes on to say, "Observational studies have also reported an increased risk of breast cancer for estrogen-plus-progestin combination therapy

Page 229

and a smaller increased risk for estrogen-alone therapy after several years of use."
A. Uh-huh.
Q. This is talking about an increased risk that's directly associated with the use of E+P drugs, right?
A. Uh-huh. Yes.
Q. And that warning is different than the warning that you had available to you in 1995 in the pamphlet that was provided to you by a Wyeth sales representative, correct?
MR. BENEVENTO: Object to the form.
A. Yes.
BY MR. THORNBURGH:
Q. Do you find that warning to be more definitive about the risk?
A. Yeah. No, this one...
Q. And if you go down to the -- one sentence down that starts out with, "In these studies."
You see that?

A. Yes.
Q. Okay. Can you read that sentence for me?
A. "In these studies, the risk of breast cancer was greater and became apparent earlier with estrogen-plus-progestin combination therapy, as compared to the estrogen-alone therapy."
Q. Was that warning in this pamphlet?
MR. BENEVENTO: Objection, document speaks for itself.
A. No.
BY MR. THORNBURGH:
Q. It's a more definitive warning about the risk of breast cancer associated with E+P therapies; is that correct?
A. Yes. Yes.
Q. And that's the therapy that you prescribed to Ms. Romero in 1996?
A. Yes.
Q. Do you wish you had that information available to you in 1996, when you prescribed Premphase to Ms. Romero?



MR. BENEVENTO: Object to the form, lacks foundation, calls for speculation.
A. Yes.
MS. ELMORE: We've been operating under the assumption that one objection by anyone is good for everyone, right? We've all been doing that?
MR. THORNBURGH: That's fine. That's fine. It would be a mess if we were all objecting.
MS. ELMORE: Thank you.
MR. THORNBURGH: Okay.
BY MR. THORNBURGH:
Q. That new information that was in the 2007 label that you just looked at?
A. Uh-huh.
Q. If you had that information available to you in 1996, when Ms. Romero came in to you to talk to you about her symptoms, would that information have been important to you in forming your decision about whether or not to prescribe or to offer



to Ms. Romero Premphase?
A. Yes.
MR. BENEVENTO: Objection, lacks foundation, calls for speculation.
BY MR. THORNBURGH:
Q. Why would that information have been important to you?
MR. BENEVENTO: Same objections.
A. So I could have -- when she came back, I could have gone for -- asked if she could do without it, or if she continued to have problems, maybe if she would have elected to have a hysterectomy, and --
BY MR. THORNBURGH:
Q. Would you -- I'm sorry. Go ahead. I thought you were done. Go ahead.
A. And that way, we don't have to use progestin therapy along with estrogen.
Q. So you would have recommended to her, if I understand your testimony correctly, that she should discontinue using Premphase --



A. Yes.
Q. -- in light of that information?
A. Yes.
Q. And I think you testified earlier that even if individuals decided that they wanted to stay on Prempro, that you would have required them to sign a consent form?
A. Yes.
Q. And what was contained in that consent form?
A. The risks -- mostly all the risks that are involved, including nausea, vomiting, irregular bleeding, possibly breast cancer, effects on the cardiovascular system, dementia, whatever.
Q. So was it your opinion that your consent form relayed, essentially, the information or the relevant, important information to your patient that you learned from the WHI?
A. Yes.
Q. And was it your experience that

often when a -- let me ask you.
If you provided that to women, what was the majority -- did the majority of the women decide to sign the consent form and stay on Prempro, or would they decide not to stay on it?
MS. ELMORE: Object to form.
MR. THORNBURGH: If you recall or can answer the question.
A. I have a consent form which is open for all the hormone therapy, including birth control pills.
BY MR. THORNBURGH:
Q. Okay.
A. So like people who are supposed to be on birth control pills and -- they sign it, but since it is not a major-major problem, if they are young and healthy and they need the contraceptive effect of it, so --
Q. It's a hard --
A. -- this group is different.
Q. Right.
A. And those who want to be on



estrogen replacement therapy alone, which is what is now -- I don't have that many -- or I don't remember any that I'm giving combination therapy. So for estrogen replacement therapy, I still get them to sign all these side-effects.
And if their -- if their benefits are going to be so overwhelmingly high, then they can go ahead and sign and continue estrogen therapy for the following year.
Q. So the -- so most of the individuals that you were treating post WHI, when you developed this consent form, were hormone therapy patients, not necessarily E+P patients?
A. Yes.
Q. So if I'm understanding your testimony correctly, it was difficult for you to answer that question that I asked because the majority of the women you were treating were just taking contraceptives or estrogen only? Did I understand that correctly?
A. Contraceptive pills? That



has -- that -- and then hormone replacement, most of the time it is estrogen only.
Q. Only?
A. Estrogen replacement therapy.
Q. And this warning that was in the -- or this discussion about breast cancer in the pamphlet that was provided to you in 1995 and 1996, is that -- to your understanding, was that similar to the warning that you remember in the PDR, the Physician's Desk Reference, in 1996 or prior?
A. I think it was similar. I cannot remember now.
THE VIDEOGRAPHER: Five minutes.
MR. THORNBURGH: That's all I need, five minutes. Oh, that's my highlighted copy. All right. There you go.
BY MR. THORNBURGH:
Q. There's the 1996 label that I've handed you for Premphase; is that correct?
A. This is for Premphase? Yeah.



Q. Okay. And if you go to page 2, you'll see "Premphase"; is that right?
A. Uh-huh.
Q. Okay. And there's a black box there?
A. Yeah.
Q. Do you see that?
A. Yes.
Q. And take a minute, if you want to, to look at that black box --
A. Okay.
Q. -- and tell me if there's any risk included in that black box about breast cancer.
MS. ELMORE: Take your time and read through.
(Witness reviews document.)
MR. THORNBURGH: I'm sorry.
(Whereupon, Deposition Exhibit Lal-5, 1996 Label for Premphase, was marked for identification.)
A. No.
BY MR. THORNBURGH:
Q. You don't see a --

Page 238

A. No.
Q. -- anything in the black box about breast cancer risk, right?
A. No.
Q. And this is 1996. This is the information that was available to you at the time that you prescribed Premphase to --
A. Yes.
Q. -- Ms. Romero, correct?
And if you turn to the "Warnings" section and read the first -- see number 1 there, "Induction of malignant neoplasms"?
A. Uh-huh.
Q. If you want to read the next sentence after that?
A. "Breast cancer. Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of ten years."
Q. Okay. So that -- this label is

Page 239

actually different than the information that was provided to you and which you relied upon in 1995 and '6 in the pamphlet, correct?
MR. BENEVENTO: Object to the form, misstates her testimony, lacks foundation, document speaks for itself.
BY MR. THORNBURGH:
Q. Is that correct? I mean, do you see a difference there? If we turn to page 11 of Exhibit 3?
A. Uh-huh.
MS. ELMORE: You want her to compare these?
MR. THORNBURGH: Yeah.
A. It also says, "The majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy."
BY MR. THORNBURGH:
Q. Right. It's a slight difference, but I think the slight difference is important, okay?
A. Uh-huh. Uh-huh.

Page 240

MR. BENEVENTO: Move to strike the colloquy and argument.
BY MR. THORNBURGH:
Q. So if you look at -- if you look at the Exhibit 3, the pamphlet, and it says -- the first part that it starts talking about breast cancer, it says, "Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens," right?
A. Yes.
Q. So that's the first sentence in that section about breast cancer, and this one starts -- and the label, starts out with, "Some studies have reported a moderately increased risk of breast cancer in those women on estrogen therapy replacement taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of ten years," right?
Did I read that right?
A. Yes. Yes.
Q. So there's a difference there, right?

Page 241

MR. BENEVENTO: Objection, document speaks for itself, taking out of context, not having her read the whole thing --
BY MR. THORNBURGH:
Q. Do you recognize that to be a difference?
MR. BENEVENTO: -- incomplete comparison.
BY MR. THORNBURGH:
Q. "Most studies have not shown a risk," versus, "Some studies have reported a moderately increased risk"?
A. Yes.
Q. Okay. And -- but in the -- in the 1996 label, that moderately increased risk was only associated with estrogen replacement therapy for -- in women taking estrogen replacement therapy at higher doses, or in those taking lower doses for prolonged periods of time, time especially in excess of ten years, right?
A. Yes.
MR. BENEVENTO: Object to form.

BY MR. THORNBURGH:
Q. It's talking about estrogen only there, and it's talking about increased risk with higher doses and for prolonged periods of time, right?
A. Yes.
MR. BENEVENTO: Object to the form, misstates the document.
BY MR. THORNBURGH:
Q. And in 1996, you were prescribing to Ms. Romero the lowest dose available of Premphase; isn't that -- or is that true or not?
A. That's the only dose available in Premphase, yes.
Q. Okay. And you didn't prescribe it for a prolonged period of time, ten years?
A. I did not.
THE VIDEOGRAPHER: One minute.
MR. THORNBURGH: All right.
BY MR. THORNBURGH:
Q. The next sentence says, "The majority of studies, however, have not shown an association in women who have ever used



estrogen replacement therapy."
So it's basically saying -- tell me what that means to you. I mean, the majority of women, however -- "of studies, however, have not shown an association in women who have ever used estrogen replacement therapy."
A. Just some studies showed there is increased risk. Most of the studies, majority of the studies, did not show any association with increased risk.
Q. Okay. And was that your understanding in 1996 of the risk associated with hormone replacement therapy?
A. Yes.
Q. Okay. And was -- is that sentence reassuring to you, that -- the fact that most studies have not shown an increased risk?
MR. BENEVENTO: Object to the form, lacks foundation, misstates her testimony.
Go ahead.
A. I cannot say that it is



reassuring, but I prescribed for the need of it and under close observation and for a short period of time.
MR. THORNBURGH: All right. Let's go off the record a moment to change the tape.
THE VIDEOGRAPHER: Going off the record at 3:00 o'clock, end of Tape 3.
(Recess taken, 3:00 p.m. to 3:05 p.m.)
THE VIDEOGRAPHER: Stand by. Okay. We're on the record, 3:05, beginning of Tape 4.
BY MR. THORNBURGH:
Q. Okay. Doctor, before we went off the record, you read the sentence that said, "The majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy."
And the first sentence and second sentence there that you read are talking about E+P only, right -- I'm sorry, are not talking about E+P?



A. No.
MR. BENEVENTO: Object to the form.
A. Estrogen.
BY MR. THORNBURGH:
Q. Estrogen only, right?
MR. BENEVENTO: Objection to the question, misstates the document.
BY MR. THORNBURGH:
Q. And it says that the risk is only for long-term use or high dose, right?
A. Yes.
Q. And you testified that you prescribed Premphase at the recommended dose of E+P, which was the lowest dose available?
A. Yes.
Q. And you did not prescribe to Ms. Romero E+P for more than ten years, right?
A. No. She was only one year under my care.
Q. So these two sentences don't warn that there's a risk for regular dose Premphase for less than ten years?

Page 246

MR. BENEVENTO: Object to the form, the document speaks for itself, lacks foundation, argumentative.
A. Say that again.
BY MR. THORNBURGH:
Q. These two sentences don't warn that there's a risk of breast cancer for regular dose Premphase for less than ten years?
MR. BENEVENTO: Same objections.
A. No.
BY MR. THORNBURGH:
Q. Okay. The next sentence, "The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen-progestin therapy has been reported. Other studies have not shown this relationship."
Did I read that correctly?
A. Yes.
Q. Okay. It's a little bit different than what you had in your pamphlet

Page 247

that was provided to you by Wyeth in 1995, which you had available to you and your patients in 1996, right?
MR. BENEVENTO: Same objection, misstates the document, mischaracterizes them.
A. Yes.
BY MR. THORNBURGH:
Q. And particularly with respect to the last two sentences there, it says, "The effect of added progestins on the breast of breast cancer -- on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen-progestin therapy has been reported, period. Other studies have not shown this relationship."
If you go back to the pamphlet, Exhibit 3, they add, "Keep in mind, however, that other studies have not shown this relationship."
A. Uh-huh.
Q. It's a difference in language they use in the pamphlet and then in the

Page 248

label, right?
MR. BENEVENTO: Object to the form, documents speak for themselves, misleading.
BY MR. THORNBURGH:
Q. Would you agree with that?
A. Yes.
Q. But this sentence says that the risk is unknown and the studies go both ways, right?
A. Yes.
Q. It doesn't provide a real or definitive evidence of a risk of breast cancer in users of Premphase?
MR. BENEVENTO: Object to the form, misstates testimony, misstates the document.
BY MR. THORNBURGH:
Q. Would you agree -- would you agree with that?
A. Yes.
Q. And the final paragraph here, you can -- if you can, go ahead and read it for the jurors.

Page 249

MS. ELMORE: Beginning with?
BY MR. THORNBURGH:
Q. Beginning with, "In a one-year clinical trial of Prempro."
A. "In a one-year clinical trial of Prempro/Premphase and Premarin alone, five new cases of breast cancer were detected among 1,377 women who received the combination treatments, while no new cases were detected among 347 women who received Premarin alone.
"The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population."
Q. Is it reassuring to know that the overall incident rate of breast cancer in this study did not exceed that of the general population?
MR. BENEVENTO: Objection, asked and answered, lacks foundation, calls for speculation.
A. I don't know what to answer to that. It's not really reassuring.

Page 250

BY MR. THORNBURGH:
Q. Right. Is it reassuring to you, though, that the overall incidence of breast cancer in the clinical trial did not exceed that expected in the general population?
MR. BENEVENTO: Same objection, also argumentative.
BY MR. THORNBURGH:
Q. What does that -- what does that mean, that the overall incidence of breast cancer did not exceed that expected in the general population?
MR. BENEVENTO: Objection, lacks foundation, calls for speculation.
MR. THORNBURGH: Maybe I can ask it in a different way.
BY MR. THORNBURGH:
Q. This sentence -- does this sentence reassure that even in Wyeth's study, no greater risk of breast cancer was found than that in the background rate?
MR. BENEVENTO: Objection,

Page 251

asked and answered three times now.
A. I think that's what it means.
BY MR. THORNBURGH:
Q. Does that comfort you?
MR. BENEVENTO: Same objections.
BY MR. THORNBURGH:
Q. I mean, the fact that there was no difference in the clinical trial of the breast cancer incidence rate than that in the background rate of the general population? I mean --
A. Yeah, it means there's no risk, practically, right? It means that there's no risk, according to this.
Q. Okay. In the 1996 label, there was no black-box warning, right --
MR. BENEVENTO: Objection, asked and answered --
BY MR. THORNBURGH:
Q. -- about breast cancer?
MR. BENEVENTO: -- document speaks for itself.
BY MR. THORNBURGH:

Page 252

Q. There's no warning that the risk increases each year that the patient stays on these drugs?
MR. BENEVENTO: Same objections. This is ridiculous.
BY MR. THORNBURGH:
Q. I asked you a question earlier about Premphase -- about the pamphlet. Would your testimony be the same about the 1996 label?
A. Is that the same question repeated before?
Q. Yeah, I'm repeating the same question.
A. Yeah.
Q. But instead of talking about the pamphlet, I'm talking about the 1996.
Would you say that your opinion -- your testimony about the label and the pamphlet were similar or identical?
MR. BENEVENTO: Object to the form.
BY MR. THORNBURGH:
Q. So that I don't have to go

Page 253

back through -- I can, if you want -- and create additional questions.
A. No, don't, please.
Q. I want you to give an accurate testimony here, so --
A. Same as whatever I have answered before.
Q. If you had the information that was available to you from the WHI, the Women's Health Initiative, would that have influenced your decision to prescribe Premphase to Ms. Romero?
MR. BENEVENTO: Objection, lacks foundation, calls for speculation, asked and answered.
A. Yes and no. Even if I started her in the beginning for her complaints, I would have followed up on her and go on to titrate the treatment differently.
BY MR. THORNBURGH:
Q. And would you have recommended that she try alternatives --
A. Yes.
Q. -- and not take Premphase?

Page 254

A. Yes.
Q. Would you have allowed the patient to make the ultimate decision of whether or not to go on Premphase in light of the WHI information that you learned?
A. I would have given the information to the patient, but I would have also recommended what I feel about it and see that she could take alternate treatment.
Q. Okay. And if a woman decided to go on hormone replacement therapy despite your recommendations against it, would you have changed the dosage that you would have prescribed?
A. Yes.
MS. ELMORE: Object to form. Go ahead.
BY MR. THORNBURGH:
Q. Would you have prescribed it for a shorter period of time?
A. Yes.
Q. And that would have been the case for Ms. Romero?
A. Yes. I don't know if she

Page 255

continued after that prescription ended. That, I don't know what happened. She was under my care exactly for one year.
Q. Right. And I'm just talking about your care of Ms. Romero.
A. Right.
Q. So your recommendations, you would have recommended to Ms. Romero not to go on Premphase in 1996, had you known the WHI information?
A. Yes.
MR. BENEVENTO: Objection, lacks foundation, calls for speculation.
BY MR. THORNBURGH:
Q. Okay. I'm going to try to wrap up really quick. I just want to go to the -- to your chart, which has been marked as Exhibit 2, I believe.
A. Okay.
Q. I just have a couple questions from the chart I want to ask to try to get a better understanding of her medical condition at the time that she first saw you, okay?

Page 256

A. Okay.
Q. Was Ms. Romero a smoker?
A. She's not.
Q. And you described her as thin?
A. Yes.
Q. And I believe when she first came in to see you, your record reflects that she was about 128 pounds -- yeah, pounds --
A. Yeah.
Q. -- and about 5-5?
A. 5-1/2".
Q. 5-5-1/2?
A. Inches.
Q. Okay. And she came in -- she had a tubal ligation?
A. Yes.
Q. What's a tubal ligation?
A. She -- a contraceptive, permanent contraceptive method.
Q. Is that a surgical procedure on the fallopian tubes?
A. Yes. Yes.
Q. Is there a risk of disrupting estrogen -- natural estrogen production when

Page 257

a tubal ligation or a surgical procedure is performed on the fallopian tubes?
A. Should not necessarily disturb.
Q. Is there a risk that a procedure, a tubal ligation, can disrupt the natural production of hormones in a woman's body?
A. It should not, unless there's blood supply compromised to the ovaries. Tubes are different, and ovaries different, and this is laparoscopic tubal ligation.
Q. Okay. So the likelihood is -- there's not a great likelihood, but I'm trying to figure out if it does carry a risk if there's a complication or something?
A. I would say no.
Q. Okay. If you turn to LA -- the LAL-025?
A. Yes.
Q. LAL-025.
MS. ELMORE: What is it?
MR. THORNBURGH: I'm sorry, it's from the --
THE WITNESS: This one?

Page 258

MR. THORNBURGH: Yeah. Right, the 025.
(Witness reviews document.)
THE WITNESS: Page 25?
MR. THORNBURGH: Right.
THE WITNESS: Okay. Okay.
BY MR. THORNBURGH:
Q. You see that there?
And so she -- is it correct that she had a surgical procedure to her fallopian tubes?
A. Not with me. I did a D&C.
Q. Right. But is it your understanding at the time that she came in to you, before you prescribed Premphase --
A. Uh-huh.
Q. -- that she'd already undergone a tubal ligation?
A. Yes.
Q. And you described that as a surgical procedure to the fallopian tubes?
A. Yes.
Q. Okay. And if you look at page 25 of your medical chart, at the very

Page 259

bottom, it's the third-to-last box on the page. Do you see that?
A. Uh-huh.
Q. It says, "All fallopian tube"?
A. Uh-huh.
Q. Okay. So this -- according to this document, which I believe is -- this is a document that you would have had Ms. Romero sign before the D&C?
MR. BENEVENTO: I'm sorry, is yours checked and initialed that that's what she had? Do you have a different document?
BY MR. THORNBURGH:
Q. But is it --
MR. BENEVENTO: I'm sorry, I'm just trying to --
MR. THORNBURGH: No. No, I don't have a different document. She just testified that she had --
THE WITNESS: This is a surgical -- routine surgical consent form.
BY MR. THORNBURGH:

Page 260

Q. And you just testified, right, that she had a fallopian tube surgery procedure, right, called a tubal ligation, right?
A. Okay.
Q. Are you guys on a different page than I am or something?
A. No, --
Q. Yeah. So if you go to the -- three boxes up, she had a tubal -- she had a surgical procedure to her fallopian tube, right?
A. Uh-huh. Yes.
Q. What you called a tubal ligation?
A. Right.
Q. And she had that performed prior to her use of hormone replacement therapy, right?
A. Yes.
Q. Okay. And if you look at the five risks that they list there, and the last risk that could be associated with a fallopian tube surgical procedure is, "A loss

Page 261

of ovarian functions or hormone production from ovaries."
Did I read that correctly?
A. Yes, you did, but what was it for? "All fallopian tube and ovarian surgery, with or without hysterectomy, including removal and lysis of adhesions."
So this could mean for the ovarian surgery. It says "all fallopian tube and ovarian surgery."
Q. Right.
A. So this loss of ovarian hormones -- functions and hormone production from the ovary is for the ovarian surgery, which she did not have.
Q. Right. But this is talking about fallopian tube or ovarian surgery, with or without --
A. And ovarian surgery.
Q. -- and ovarian surgery, with or without --
A. Yes.
Q. -- hysterectomy, right?
A. Uh-huh.

Page 262

Q. Okay. And according to this -- I'm not trying to test you on your -- what your knowledge is.
A. Uh-huh.
Q. I'm just trying to understand for my own purpose --
A. Yeah.
Q. -- whether or not a fallopian tube procedure, surgical procedure --
A. Uh-huh. Yeah.
Q. -- could result in a loss of ovarian function or hormone production.
MR. BENEVENTO: And she's answered that question three times, and it was no.
A. It should not -- it should not --
MR. THORNBURGH: I don't think it was -- I don't think it was -- I'm going to object and move to strike your testimony. That's not -- from what I understand, that's not what she said, and so I'm trying to understand the question -- the answer, okay?

Page 263

MS. ELMORE: Explain, Dr. Lal.
BY MR. THORNBURGH:
Q. Take your time.
A. Okay. Tubal ligation is only tying the tube or clipping the tube or so. And tubes have nothing to do with the ovarian functions. Tubes are hanging like that. Ovaries are here. So, actually, tubal ligations should not interfere with the ovarian function.
But this sentence that is given here is for a generalized fallopian tube and ovarian surgery, both together. Sometimes we remove unilateral or bilateral salpingo-oophorectomy for multiple reasons, then "salping," which is tube, and ovary.
If both of them are removed, then ovarian function is going to be diminished, right, absent.
Q. Okay.
A. So this whole box is for the one above that says, "All fallopian tube and ovarian surgery, with or without hysterectomy."

Page 264

Q. Okay.
A. Even if this fallopian tube and ovary, one side is removed, with the uterus intact, that may interfere with ovarian function, which is hormone production.
Q. Okay.
A. But tubal ligation is only for the tube, so tube has nothing to do with this. It's only a carrier of the ovum and things like that. It's a passage --
Q. Okay. Okay.
A. -- and the --
Q. So you think that this loss of ovarian function or hormone production from ovaries only relates to a removal of the --
A. Ovary.
Q. -- ovaries through hysterectomy or partial removal?
A. Yeah. Ovaries by itself, sometimes we do. Sometimes with the hysterectomy, we remove the ovaries.
Q. Okay. Thank you. Thank you very much for your clarification.
I wanted to draw your attention

Page 265

to -- and, again, I'm just trying to make sure I understand all the facts of my client's medical condition --
A. Sure.
Q. -- while she went to see you, or after she came to see you.
There was a -- look at LAL-29, so page 29 of your chart.
A. Okay.
Q. Okay. The third-to-last sentence -- wait, I'm sorry.
First off, so the jury understands what we're talking about here, this is a surgical report?
A. Yes.
Q. Okay. And what procedure was performed?
A. It's a dilatation and curettage, what we call D&C.
Q. Okay. And what is -- it's a D&C, and --
A. Yeah.
Q. What --
A. First is "Examined under

anesthesia," so patient is under general anesthesia in the lithotomy position, and then we dilate the cervix. The cervix is the lower portion of the uterus. So we dilate the cervix, and then introduce a curette inside the uterus and scrape the tissues all around.
Q. Okay. And what's a curetting?
A. That is the curetting.
Q. Curetting?
A. "Curette" means -- it's a metal instrument with a little spoonlike at the end, a tiny one --
Q. Okay. So --
A. -- and we scrape the tissue. That's curetting.
Q. Okay. So you would look at the tissue, and that would be the vaginal tissue that lines the --
A. No, it's the endometrium. It's the lining of the uterus. I wish I brought my model. The uterus is like that, soft, like a mushroom, bigger, imagine like that (indicating).



Q. Uh-huh.
A. And then it's -- the shape. And lower one-third is the cervix, upper two-thirds is the body of the uterus.
So the cervix is -- under normal circumstances, it's closed with a little hole in that. It can open up to let the baby out, you know, but normally it's closed.
So we put these dilators in the cervix and open it up so it can let this curette go in comfortably.
Q. Okay.
A. And it's very painful, so we do it under anesthesia.
Q. Okay.
A. And then this curette is nothing but a long-stemmed metal, stainless steel thing with a tiny little spoonlike at the end, tiny. And then you introduce that inside the uterus. If this is the uterus, we scrape the tissue from the inside wall.
Q. Okay.
A. Inside wall is called the



endometrium. That is the place where it can -- I was looking for hyperplasia or a precancerous condition or endometrial cancer before I could put her on hormone.
Q. Okay.
A. So that was -- the scrapings were removed and sent.
Q. Okay. So if the endometrium is atrophic, can that be an indication of a lack of estrogen?
A. Yes.
Q. Okay. And was it your finding, during this procedure, that her endometrium was atrophic?
A. Let me see. At the same time -- you know, I cannot depend on just from what I feel. The pathology also said it had a fibroglandular polyp at the same time. So it can be atrophic in some place, and it can be growing something that is harmful in another place.
That is why we do -- I prefer to do a menopausal or perimenopausal women, this D&C, under anesthesia, even though it



can be done in the office as an endometrial biopsy. But it's a very painful procedure, one thing. Another thing, we cannot really scrape all around.
Q. Okay. So -- so just to make sure I'm clear, an atrophic endometrium could be a symptom of menopause?
A. Possibly.
Q. Okay.
A. Less estrogen production. Does not mean completely no estrogen.
Q. Fair enough. But it's an indication?
A. Close to menopause, yeah.
Q. And another procedure that I just -- I don't know what this means, and I just want to make sure I understand everything here. In June 27th of 1996, you did the pelvic ultrasound?
MS. ELMORE: What page are you on?
MR. THORNBURGH: I'm sorry, page 35.
THE WITNESS: Okay.

Page 270

BY MR. THORNBURGH:
Q. Okay. And, again, I have no idea, just a poor country boy, so I want to try to understand what this means, okay?
A. Uh-huh.
Q. There is no fluid in the cul de sac. What's the cul de sac?
A. It's a -- there's a peritoneal covering. It's a silkish, thin layer of membranous layer, and it covers the uterus. If I had this -- can I draw something and show you?
Q. Sure, by all means. Here, I've got a piece of paper.
A. I can do that drawing here. Okay. Uterus is like that. I was trying to explain this is the uterus. And this portion, the lower one-third, is cervix, okay? It's uterus.
And if you look at in a profile, the uterus is situated -- this is a profile, bellybutton, and then pubic bone.
In the profile, if you see, here is the pubic bone, okay? Right behind

Page 271

is the bladder, okay? This is the bladder. And then the uterus is situated there. And then behind is bowels, rectum and anal canal, that comes like that.
So there's a peritoneal lining inside the -- there's first skin layer and then fat layer and then fascia layer, and then the innermost layer is the peritoneal layer, which is a very silkish layer, okay?
And it covers the bladder there, and then comes in and covers the uterus, its anterior wall, and then posterior wall, the backside of the uterus covers, and then goes like that to cover around the bowels, and then goes there to the spine.
So this layer is -- there's a free layer, this one, like a sack.
Q. Okay.
A. Between the bowels and the uterus, there's a little pouch there. The pouch is formed by this peritoneal lining, that -- after covering the bladder and the uterus, and it forms the pouch here and then goes to cover the bowels and then attaches to

Page 272

the sacrum.
Q. Okay. I think I --
A. And that is called cul de sac.
Q. Cul de sac is that sac in between the uterus and the bowel?
A. Yes. Yes.
Q. Is there any significance why there was no fluid in the cul de sac?
A. Yes, very important. We always look for blood in the cul de sac. Whenever there's a tubal pregnancy, for example, it ruptures or leaks, then whatever fluid that comes out here, it's like a little -- like a pouch, and so that will contain all the spilled things.
Q. So you want it to be empty?
A. Yes.
Q. You --
A. And there may be a little bit of peritoneal fluid; that's normal. But it should be empty.
MS. ELMORE: Okay.
MR. THORNBURGH: All right. I think I am done, but if you just won't

Page 273

mind giving me one second here.
(Pause.)
MR. THORNBURGH: I'm through.
MS. ELMORE: Thank you.
MR. BENEVENTO: A couple quick follow-ups.
EXAMINATION
BY MR. BENEVENTO:
Q. Exhibit 3, which is the brochure, Mr. Thornburgh asked you a number of questions about warnings and durations, et cetera. The first thing I want to make sure is that I understood your testimony correctly.
Exhibit 3 is not the only information that you utilize in giving information to your patients about hormone replacement therapy; is that correct?
A. Yes.
Q. Okay. And you use additional information to assist you in assessing the patient, correct?
A. Yes.
Q. And prescribing the treatment?

Page 274

A. Yes.
Q. And follow-up of the patient?
A. Yes.
Q. Okay. Next, the fact that the discussion about breast cancer is found on page 11, rather than page 15 or 21 under "Side-Effects," is that of any consequence to you in how you advise your patients?
MS. ELMORE: Do you need to refer to it? Do you recall?
THE WITNESS: Yeah, I didn't see it. In this one or --
MR. BENEVENTO: Yes.
THE WITNESS: Exhibit 3?
BY MR. BENEVENTO:
Q. Mr. Thornburgh made much about the fact that under "Side-Effects," there's no discussion of breast cancer, and they're found later in the pamphlet, and the discussion of breast cancer is on page 11.
And I'm just trying to figure out, in your mind, whether that's important to you, that it's on page 11, rather than page 15 or 21?

Page 275

A. It should be there, but it doesn't matter if it's front or back or...
Q. As long as it's in there?
A. Yes.
Q. Okay. And the -- he made much of the fact of going through and talking about that the discussion of breast cancer on page 11 of Exhibit 3 is not identical to the discussion of breast cancer on Exhibit 5, which is the PDR of 2006.
First question: Did you discuss with Ms. Romero the Exhibit 5, the PDR of 1996?
MR. THORNBURGH: Objection.
A. I do not open up the PDR and go line by line with the patients.
BY MR. BENEVENTO:
Q. Right. Right. That's what I thought. I just wanted to make sure.
A. Yeah.
Q. The Exhibit 3 says that, "Some studies have reported a moderately increased risk in those taking combination estrogen-progestin therapy, even higher than

Page 276

the possible risk of taking estrogens alone."
That's information that you knew before you prescribed Premphase to Ms. Romero, correct?
MR. THORNBURGH: Objection.
A. Yes.
BY MR. BENEVENTO:
Q. Okay. It says, also, in Exhibit 11 that, "The effect of added progestins on the risk of breast cancer are unknown," correct?
A. Yes.
Q. And that's information you had when you prescribed Premphase to Ms. Romero, correct?
A. Yes.
Q. Okay. Going to Exhibit 5, which is the PDR for Premphase and Prempro, one thing that Mr. Thornburgh did not cover with you, if you turn to page 5 of that label -- of that information?
MR. THORNBURGH: Page 5, I'm sorry, of the PDR?
MR. BENEVENTO: Exhibit 5, the

Page 277

PDR, 1996, page 5, top column, first paragraph.
BY MR. BENEVENTO:
Q. It says, "While the effects of added progestins on the risk of breast cancer are also unknown, available epidemiologic evidence suggests that progestins do not reduce, and may enhance the moderately increased breast cancer risk that has been reported with prolonged estrogen replacement therapy."
Did I read that correctly?
A. Uh-huh.
Q. And that's information that you knew about when you prescribed Premphase to Ms. Romero, correct?
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Yes, ma'am?
A. I knew that there is some risk, but I had to prescribe to the patient for what she needs at that time.
Q. Understood. I just didn't want the jury to be misled to think --

MR. THORNBURGH: Objection. Come on.
BY MR. BENEVENTO:
Q. -- that there was any --
MR. THORNBURGH: Come on. Bryon, come on, man.
MS. ELMORE: That's not a question to you.
MR. THORNBURGH: That's totally inappropriate and unprofessional --
MR. BENEVENTO: Like your question --
(Simultaneous discussion interrupted by the reporter.)
MR. BENEVENTO: I'm not speaking.
MR. THORNBURGH: Come on, Bryon. I think you owe me an apology.
MR. BENEVENTO: No, sir.
BY MR. BENEVENTO:
Q. If you turn to Exhibit --
MR. THORNBURGH: Unprofessional, man. I would never say that you were misrepresenting



facts to a jury. I would never do that. Your client does it --
MS. ELMORE: Y'all are disturbing the witness, so --
MR. BENEVENTO: I didn't mean to disturb the witness.
MS. ELMORE: -- let's bring it down.
MR. BENEVENTO: Ma'am, did I disturb you? If I did, I apologize to you. I didn't mean to disturb you. I just want to understand --
THE WITNESS: It's all being recorded, so we have to -- all of us should behave civil.
MR. BENEVENTO: Yes, that is true. That's very true. Thank you.
BY MR. BENEVENTO:
Q. If you go to Exhibit 2, which is your medical records --
MS. ELMORE: Okay.
A. Okay.
BY MR. BENEVENTO:
Q. -- Mr. Thornburgh asked you a



bunch of questions about tubal ligation and whether Ms. Romero's estrogen level could have been affected by that.
I think your answer was, it's not generally accepted that tubal ligation alone would affect the estrogen level of a woman, correct?
A. Correct.
Q. Okay. Did you find any estrogen deficiency in Ms. Romero as a result of this tubal ligation?
A. No.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Okay. Going to page 35, which was the Outpatient Diagnostic Center, June 27, 1996, it's the pelvic ultrasound, correct?
A. Yes, sir. Yes.
Q. The findings were that the ovaries have a normal size and configuration, there's no cystic or solid lesions on them?
A. Right.
Q. And that they gave the



dimensions of them, correct?
A. Right.
Q. Which, to you, says what?
A. Normal size.
Q. Okay. And that would also mean, would it not, that they would be producing estrogen?
MR. THORNBURGH: Objection.
A. Generally, yes. Sometimes they could stay and shrivel and not function also.
BY MR. BENEVENTO:
Q. Mr. Thornburgh asked you a series of questions about if you knew in 1996 what you knew in 2002, would your advice have been any different to Ms. Romero. Do you recall those questions?
If you knew in 1996 what the world -- what the Women's Health Initiative reported in 2002, you would have counseled Ms. Romero differently?
A. I might have.
Q. Right. Do we know how Ms. Romero would have reacted to that counseling?

Page 282

A. Maybe when we explain all the side-effects completely and they get scared and they might have agreed to alternative treatment.
Q. Might have.
A. Might have.
Q. And she might have decided that these symptoms --
A. Taken it as -- if she cannot stand it and so she may want some relief. Yes, it can happen.
Q. So it would be purely a guess?
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Would that be fair, ma'am?
A. Fair, depending on patient, her needs.
Q. Mr. Thornburgh asked you a series of questions about the duration of Prempro. Did you ever prescribe Prempro to Ms. Romero?
A. No.
Q. Okay. He asked you whether you ever prescribed Prempro or Premphase to

Page 283

Ms. Romero for a period of ten years. Was she under your care for ten years?
A. One year only she was under my care.
Q. Okay. And then she chose to leave and seek other care?
A. Yes. She was -- she moved away to Houston.
Q. The pamphlet, which is Exhibit 3, when it talks about duration, if you turn to page 16 of Exhibit 3?
A. Yes.
Q. It also says, does it not, ma'am, that you should follow your healthcare provider's recommendation about the length of treatment, does it not?
A. Which --
MS. ELMORE: You want to point her to it?
MR. BENEVENTO: Yes. I'm sorry. Yes.
BY MR. BENEVENTO:
Q. It's page 16.
A. Yes.

Page 284

Q. Second -- I'm sorry, third full paragraph says, "If Prempro is prescribed for osteoporosis prevention, you should follow your healthcare provider's recommendation about length of treatment.
"Prempro is generally recommended for an extended period to help prevent bone loss, so follow your healthcare provider's recommendations carefully."
A. Right.
Q. And you agree with that, correct?
A. Yes.
Q. And that would mean that you would prescribe to a patient like Ms. Romero on a yearly basis after assessing her conditions?
A. Yes.
Q. Not that the patient gets to say, "I don't want to come in and see you, so please write the prescription for me"?
A. No.
Q. Mr. Thornburgh asked you whether Exhibit 3 was prepared solely for

Page 285

patients. Can I have you turn to --
MR. THORNBURGH: Objection, that's not what I asked.
MR. BENEVENTO: Okay. Well, the record will speak for what it is.
MR. THORNBURGH: It sure will.
BY MR. BENEVENTO:
Q. The page here that we start with, if you turn to the first page after you get through the table of contents, where he was reading for you?
A. Okay. Yes.
Q. Okay. It says, "This brochure has been created to help you" -- and that would be the patient, right?
MS. ELMORE: Are you at the last paragraph?
MR. BENEVENTO: Yes. Uh-huh. Yes. I'm just following up on Mr. Thornburgh's questions about this pamphlet.
A. Yeah, it's to the patient.
BY MR. BENEVENTO:
Q. It says, "This pamphlet was

Page 286

created for you" -- that would be the patient, right?
A. Yes.
Q. And what's the rest say, "together with your healthcare provider" --
A. Yes.
Q. -- right?
This pamphlet was also prepared to help you, was it not?
A. For her to make decision with the healthcare provider.
Q. Right. It's a symbiotic relationship. You and her will help make decisions about her healthcare?
A. Right. Right. Right.
Q. Mr. Bush ever influence you to prescribe Prempro or Premphase to a patient that you did not feel that it should have been prescribed to?
A. No.
Q. You would agree with me, would you not, that what we know today is more thorough about hormone replacement therapy than what we knew ten years ago?

Page 287

A. Yeah, we know more now than before.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Okay. And if we didn't know something, we can't report it, correct? You wouldn't want people to report information that's not accurate. I think that was what Mr. Thornburgh asked you, correct?
MR. THORNBURGH: Objection to form.
A. Yes. Now we know more details than what we knew before.
BY MR. BENEVENTO:
Q. Right. Be hard to put into a warning something that we didn't know?
A. Yes.
Q. Okay. Now, there were studies that were available in 1996 that showed an increased risk of breast cancer. That's the -- it says it here in the pamphlet and it says it in the 1996 PDR, that there's some studies, and that there are other studies that go the other way, correct?

Page 288

MR. THORNBURGH: Objection.
A. Yes.
BY MR. BENEVENTO:
Q. Did I fairly say that?
MR. THORNBURGH: Objection.
A. Yes.
BY MR. BENEVENTO:
Q. Thank you.
MR. THORNBURGH: Misstated the record.
BY MR. BENEVENTO:
Q. Did I misstate the record?
A. I don't know.
MR. THORNBURGH: Ten years. Wrong.
MS. ELMORE: Don't --
MR. THORNBURGH: High dose, ten years.
BY MR. BENEVENTO:
Q. I just want to know. He's sitting here impugning my character again.
I just want to know from you: Did I say something that you think was inaccurate?

Page 289

A. No.
Q. Thank you.
The New England Journal of Medicine published an article on June 15, 1995, where it was authored by Graham Colditz. Did you read that article?
A. I don't remember.
Q. Okay. It has results that there's an increased risk of breast cancer for HRT --
MR. THORNBURGH: Are you going to provide a copy to counsel here?
MR. BENEVENTO: No. I'm just asking -- I'm trying to establish the foundation, and if she doesn't have the foundation, I can't introduce it into evidence.
MR. THORNBURGH: I don't -- I can't -- I don't know what is being said is what's -- you're reading off the document or not.
MR. BENEVENTO: Okay. So far, all I've identified is the document, but if you think I'm

Page 290

misrepresenting --
MR. THORNBURGH: If you're going to ask questions about the document, I think it's fair that both the doctor have a copy, I have a copy and the doctor's counsel has a copy.
MR. BENEVENTO: I'm happy to do that. I was trying to follow the rules of evidence and establish whether there was appropriate foundation to ask questions. But if you want me to go ahead and do it that way, I'd be happy to.
MR. THORNBURGH: Thank you.
MR. BENEVENTO: Sure.
MS. ELMORE: I think if you show it to her, she can at least state that she doesn't recall it.
MR. BENEVENTO: That's what I'm trying to do. I'm just trying to honestly establish foundation under the rules of evidence.
MS. ELMORE: That's fine.
BY MR. BENEVENTO:

Page 291

Q. I only have two, but I just wanted you to see that, and so that to see if you ever have seen that particular article published in the New England Journal of Medicine in June of 1995.
A. We used to have a journal club in those days and discuss some of the things, but I cannot remember now if this particular label, we talked about this.
Q. Okay. Do you know whether this was a study that was being referenced in Exhibit 3 and Exhibit 5 about some studies reporting an increased risk of breast cancer?
MR. THORNBURGH: Objection, don't speculate. He's asking you to speculate. Don't do it.
BY MR. BENEVENTO:
Q. Do you know?
A. What is the question, again?
Q. The question was a simple one: Exhibit 3, which was the brochure, says there were some studies that showed an increased risk, correct?
A. Uh-huh.

Page 292

Q. And Exhibit 5 was the PDR for Prempro and Premphase in 1996 that showed some studies had an increased risk.
And all I'm asking is whether you know whether this was one of the studies that was being referenced in those two exhibits, Exhibit 3 and Exhibit 5?
MR. THORNBURGH: Same objection.
BY MR. BENEVENTO:
Q. I'm just asking if you know.
MS. ELMORE: If you know.
A. I don't know.
BY MR. BENEVENTO:
Q. Thank you.
Do you know whether there was any additional studies that was considered when Exhibit 3 and Exhibit 5 were prepared?
A. Additional studies?
Q. Yeah. Additional studies that were considered when Exhibit 3 were prepared and Exhibit 5 were prepared?
A. I don't know.
MR. THORNBURGH: Objection to

Page 293

form.
BY MR. BENEVENTO:
Q. I'm just trying to figure out what you knew about -- when it says some studies say this, and some studies say that --
A. Yes.
Q. -- do you know what studies they're talking about?
A. No.
Q. Did you read any of the underlying studies to try to determine where that went?
MR. THORNBURGH: Asked and answered.
A. No.
BY MR. BENEVENTO:
Q. Okay. But that's --
MS. ELMORE: You don't recall?
THE WITNESS: I don't recall on this.
BY MR. BENEVENTO:
Q. But that would be information that is available to you, if you wanted to

Page 294

look for it, correct?
MR. THORNBURGH: Objection.
A. Might be.
BY MR. BENEVENTO:
Q. I mean, you could have asked Mr. Bush, if you wanted to --
A. I'm sorry, he's been long gone.
Q. Sure.
A. And he had some cancer, and it's a bad thing.
Q. Understood. I just want to --
A. I only knew him for that period of time. That's it.
Q. I appreciate that.
I just want to make sure that there's no misconception on the part of the jury.
When this pamphlet was provided to you by a sales representative with certain samples of the product, were you precluded from asking him any questions about the information contained in the pamphlet?
MS. ELMORE: Object to form.
Go ahead.

Page 295

A. Whatever information they give to us is what they had known, they knew, and --
BY MR. BENEVENTO:
Q. Understood.
Did you ever ask Mr. Bush or whoever the sales representative was for Wyeth in 1995 and 1996 what the "some studies" were? Identify them or anything like that?
A. No, I didn't ask that question.
Q. Okay. If the risk is unknown -- in other words, if the risk of breast cancer is unknown -- is that a reassuring thing for you?
A. Not really, because we don't know either way, if there's a high risk or low risk.
Q. Mr. Thornburgh showed you Exhibit 5 and asked you about the "Warnings" section. Can you pull that out for me?
He asked you to go ahead and read various sentences under the warnings. Do you recall that?

Page 296

A. Uh-huh.
Q. The first warning is breast cancer; is that correct?
MR. THORNBURGH: I don't think that's actually...
MR. BENEVENTO: I get that wrong too?
MS. ELMORE: Where are you?
MR. BENEVENTO: I'm on the PDR --
MR. THORNBURGH: 2007 or 2006?
MR. BENEVENTO: Yeah.
THE WITNESS: No, this is '96.
MR. BENEVENTO: Yes, that's what I want.
THE WITNESS: Oh.
BY MR. BENEVENTO:
Q. I want Exhibit 5, which is the PDR for 1996 Prempro and Premphase --
A. Uh-huh. Okay.
Q. -- under the "Warnings" section, where Mr. Thornburgh asked you to read. Do you see that?
A. Yes.

Page 297

Q. Okay. And the first warning is for induction of malignant neoplasms, correct?
A. Yes.
Q. Okay. And what -- and is it breast cancer?
A. Yes.
Q. Okay. So the very first thing is breast cancer?
A. Uh-huh.
Q. And under that is the title. Can you read that to the jury?
A. "Induction of malignant neoplasm, breast cancer."
Q. No, the title of the warning. It says, "All" --
A. "All warnings below pertain to the use of this combination product."
Q. And when you --
MR. THORNBURGH: Hold on a second. I asked you if you were looking at the 2007 label. You said yes. You're actually looking at the '96 label?

MR. BENEVENTO: I apologize if I said that. I thought I made myself really clear that I was looking at the 1996 PDR, Exhibit 5.
MR. THORNBURGH: No. You said 2007 when I asked you, so it wasn't that clear.
MS. ELMORE: No, '96.
BY MR. BENEVENTO:
Q. Are you with me, ma'am?
A. Yes.
Q. Okay. Thank you.
And it says -- it pertains to the combination product. What did you understand the combination product to be?
A. Estrogen and progesterone.
Q. Both?
A. Yes.
Q. Not just estrogen?
A. Yes.
Q. Okay. And so the warnings that followed were to apply to the combination product, right?
MR. THORNBURGH: Object.



Objection, asking to speculate.
A. Yes.
BY MR. BENEVENTO:
Q. Thank you.
Well, I'm not asking you to speculate. Is that how you understood the document?
A. Yes.
Q. Thank you.
MR. BENEVENTO: That's all I have. Thank you.
THE WITNESS: Thank you.
MR. THORNBURGH: I may have just a couple of quick ones. I don't have --
MS. ELMORE: There are two questions there.
EXAMINATION
BY MR. THORNBURGH:
Q. Have I been polite to you today?
A. Have you been what?
Q. Polite to you?
A. Yes.



Q. Did you think at any point that I was trying to mislead you?
A. No.
MR. THORNBURGH: That's all I have.
MR. BENEVENTO: Same with me.
EXAMINATION
BY MR. BENEVENTO:
Q. Have I been polite?
A. Yes.
Q. Have I been respectful?
A. Very.
Q. Have I tried to mislead you?
A. No.
MR. BENEVENTO: Thank you.
THE VIDEOGRAPHER: Okay. We're off the record at 3:52, end of deposition, end of Tape 3.
(Proceedings adjourned at 3:52 p.m.)
— — — — — —



CERTIFICATE

I, MICHAEL E. MILLER, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, RADHA J. LAL, M.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

MICHAEL E. MILLER,
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified LiveNote Reporter
Notary Public in and for the State of Texas
My Commission Expires: 7/9/2012
Dated: May 9, 2011