# EXHIBIT 14

page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION
- - -

CONNIE BARTON, : APRIL TERM, 2004
Plaintiff :
vs. :
WYETH PHARMACEUTICALS, :
et al :
Defendants : NO. 006301
- - -

Friday, October 16, 2009
Afternoon Session
- - -
Courtroom 633, City Hall
Philadelphia, Pennsylvania
- - -

BEFORE: THE HONORABLE NORMAN ACKERMAN, J., and a Jury
- - -

REPORTED BY: Danielle O'Connor, RPR, CRR

♀page 2

APPEARANCES:

ZOE LITTLEPAGE, ESQUIRE
RAINEY C. BOOTH, ESQUIRE
Littlepage Booth
2043A W. Main Street
Houston, TX 77098
-and-
ESTHER BEREZOFSKY, ESQUIRE
SAMUEL ABLOESER, ESQUIRE
KEVIN HAVERTY, ESQUIRE
Williams Cuker Berezofsky
One Penn Center at Suburban Station
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA 19103
Counsel For the Plaintiff

GEORGE E. McDAVID, ESQUIRE
SHANA E. RUSSO, ESQUIRE
ReedSmith, LLP
136 Main Street, Suite 250
Princeton, NJ 08540
-and-
LAUREN HANDLER, ESQUIRE
SPRING POTOCZAK, ESQUIRE
Porzio, Bromberg & Newman, PC
100 Southgate Building
Morristown, NJ 07960
Counsel For the Defendants, Wyeth

♀page 3

INDEX

PLAINTIFF'S EVIDENCE

| WITNESS | DR | CR | RDR | RCR |
|---|---|---|---|---|

- - -

DEFENDANTS' EVIDENCE

| WITNESS | DR | CR | RDR | RCR |
|---|---|---|---|---|

Michael Dey 4 99 -- --

♀page 4

- - -

(Whereupon, the jury entered the courtroom at 1:35 p.m.)

- - -

THE COURT: Defense, call your next witness, please.

MS. HANDLER: Yes, Your Honor.

Defense calls Dr. Michael Dey.

- - -

... MICHAEL DEY, having been duly sworn/affirmed, was examined and testified as follows:

- - -

THE COURT CRIER: State your full name, spell your first and last name.

THE WITNESS: Michael Steven Dey, M-I-C-H-A-E-L; last name is Dey, D-E-Y.

THE COURT: All right.

- - -

DIRECT EXAMINATION

- - -

BY MS. HANDLER:

Q. Good afternoon, Dr. Dey.

A. Good afternoon.

Q. The jury has seen you on videotape, but in

♀page 5

person, would you introduce yourself, please.

A. Good afternoon. I'm Mike Dey.

Q. You're employed at Wyeth?

A. Yes, I am.

Q. What's your current title?

A. President of Scientific Affairs For Women's Healthcare.

Q. How long have you held that title?

A. About two and a half years.

Q. Before that, what was your title?

A. I was President of Women's Healthcare.

Q. What was your responsibilities as President of Women's Healthcare?

A. I had financial responsibility for the performance of the products that we sold in women's health, including oral contraceptives and menopausal products.

Q. What are your current responsibilities as President of Wyeth Women's Healthcare Scientific Affairs?

A. Separate from this litigation, it is focused on representing the company in scientific meetings and also trying to deal with a couple of product-related issues that we have in development.

Q. Let's let the jury get a little bit of your

♀page 6

background. Tell them about your education.

A. I have a bachelor's in biology with a minor in chemistry. I have a master's in pharmacology and toxicology, and Ph.D. in pharmacology and toxicology.

Q. Explain what pharmacology and toxicology is.

A. They're related fields, which is why they're given together. Pharmacology is the study of drugs, and toxicology is the study of adverse effects of drugs.
Q. Between your undergraduate degree and master's, did you work?
A. Yes.
Q. Where do you work?
A. Worked at a hospital, Swedish hospital, in Seattle in Department of Nuclear Medicine.
Q. What did you do in that department?
A. We made drugs to identify and treat cancer.
Q. When did you begin working at Wyeth?
A. February of 1984.
Q. And have you worked there until now?
A. Yes.
Q. Let's get a little background as to when you were born and where.
A. I was born December 3, 1950, in Stuttgart,

♀page 7

Germany.
Q. And how did that come about?
A. Both of my parents were in the service. My father was riding around in tanks and my mother was a generalized nurse. I was born over there and we moved back to the states in Omaha, Nebraska.
Q. Are you living in the Philadelphia area now?
A. Yes. I've been down here about 15 years, longer actually than I've lived anywhere.
Q. And you said you started at Wyeth, I guess it was called Ayerst at the time, in 1984; is that right?
A. That's correct.
Q. Tell the jury what your first job title was.
A. I was group leader in pharmaceutical research and services.
Q. And what kind of work did you do?
A. We were trying to identify what the release rate of a drug needed to be from a dosage form; that is, when you took a tablet or capsule, how fast it should release in your stomach to get blood levels that would be safe and effective.
Q. Did you study the drug, Premarin, in that position?
A. Yes, I did.

♀page 8

Q. Tell the jury, just bring them through from being a bench scientist to where you are today in terms of your work history at Wyeth.
A. I -- the responsibilities I had at Wyeth evolved over time. I focused a lot of my initial work on pharmacokinetics, which is what I was just describing, and then we moved from that to analytical work, where we were measuring drugs in the plasma and serum of patients. And I did that for about ten years. And I was involved in Premarin, studying the components of Premarin, what they did as individuals, and then what they did as a mixture.
I had a pretty successful career, and they asked me if I would consider moving down and

working on the business side. I did that, and I worked for seven years running a generic division of the company, and I moved from there after seven years doing that to women's healthcare where I was for about seven years.
Q. Did you have some understanding as to why you, who was the science person, would be tapped to be working the business side?
A. The company -- the majority of people in the company and business and research area have a
♀page 9

science background, so the company really focuses on science. That's where we make our living. And so I think they recognized that I had done a reasonable job as a scientist and gave me the opportunity to step over to the business side.
Q. Can you tell the jury a little something about Wyeth? I mean, they've heard a lot about promotional marketing during the trial.
Tell the jury something about your experience in terms of Wyeth's commitment to science.
A. Well, as I said, the company is -- is focused on science. If we don't do good science, then we don't develop good medicines. If we don't develop good medicines, then we don't stay in business. So it's a pretty logical flow. And so we spend a lot of our efforts trying to develop the company as a science-based company and to continue to focus on those areas.
Q. Over the past decade or so, how many people would you say you worked with at Wyeth?
A. There are about 5,000, five to six thousand people in research that I've worked with.
Q. That's worldwide or company wide?
A. Company wide in the pharmaceutical piece.
♀page 10

Q. And in terms of the women's healthcare portion itself in research and development, is there such a group?
A. Yes.
Q. How many scientists work in that group?
A. There were about 250 dedicated people in women's health research, and then there's probably at least that many more that were part-time and directly involved with women's health.
Q. Your experience with Wyeth is it the marketing side or science side that run the company?
A. Clearly, the science side.
Q. How does Wyeth manifest that?
A. We hire and train very good people. We start with bright people, and then you train them and you educate them and give them opportunities to work with cutting edge people in their fields.
So as part of what we do, we give these new and experienced scientists opportunities to expand their careers by publishing and spending times in the field with other academics and other people in the industry.
Q. The jury has heard about an estrogen conference that Wyeth sponsors.

Have you attended that conference?

♀page 11

A. Yes, many times.
Q. Over the years, how many times have you been there, would you say?
A. Well, it started in 1987, and I've been involved -- it was an annual meeting, so I've been there all of two times, maybe three I've missed.
Q. What was the thinking behind the company holding this annual meeting? What does Wyeth do? Why do they do it?
A. The meeting was designed to get the top experts in the field of menopausal health together to talk about what they were doing so we could begin to stay cutting age. So much of what we do is, in fact, related to the science. If we're behind the eight ball on the science, then we're behind our competition. And so much of what we do is to stride -- try to stay as current and as active in this field as we can.
So we would bring together leading experts from all fields of medicine and science, whether it's obstetrics and gynecology, whether it's psychiatry, whether it's internal medicine, whether it's osteoporosis, cardiovascular disease, and these -- these experts would tell us the kind of work that they were doing, which would enable us to

♀page 12

understand where the science and the medicine is going. It would enable us to look at our own work and decide whether that was an important area for us to get involved with, whether, in fact, we would collaborate with these individuals.
And, frankly, the experts loved it, because they got to see other areas of science medicine that they didn't normally deal with. And it would allow them to collaborate with each other. So we'd have psychiatrists collaborating with people in internal medicine, and it was a great -- it was a great meeting.
Q. Just explain something that seems unclear.
Wyeth is the company that's making the hormone therapy drug, but you're talking about meeting with a lot of experts and outside people who are studying the drug; did I understand that correctly?
A. Yes. When they were studying the drug, they were studying our drug, they were studying other drugs, but they had some interest in menopausal health, some interest in women's health.
Q. And what type of institutions did the people come from who attended the meeting?
A. Well, they came from all over the world. They

♀page 13

came from the government side, so we had people from the National Institutes of Health or National Institutes of Environmental Health and Safety. They came from the American Cancer Society. They came from University of Pennsylvania. They came from John Hopkins. They came from Harvard, Yale,

University of San Francisco. They came from Australia, Europe, Germany, the UK, literally experts from all over the world.
Q. Is this an opportunity for Wyeth to hear from people whose opinions they agree with?
A. No, no. The value of this was that we heard all of the trends in medicine and we would -- we would bring in people that were doing things, frankly, that sometimes were not necessarily things we wanted to hear, but it was the cutting edge information. It was the kind of science that we needed to pay attention to.
Q. And if anyone's been left with an impression that this annual conference was a closed-door invitation only meeting, so that what was talked about in the meeting would be a secret from the rest of the world, would that be an appropriate impression?
A. No. The meeting was by invitation only,

♀page 14

because we could only manage so many people. But we had hundreds of physicians that came to this meeting over the years. Anywhere from about probably 30 to 70 physicians or clinicians would come to the meeting based on what the subjects were, and there was a group of experts that would work on the agendas and invite the individuals. But it rotated every year, but it was not the same group of people. It was by no means closed door.
Q. Were there original papers or original research that would be presented at the meeting?
A. Yes. Much of the research that we were looking at, as I mention, was cutting edge research. So it was information that wasn't necessarily published. Some of it had been submitted to journals and would not get published. Others were information that had just -- it was very early on and it had not yet even been submitted to a journal and others had just been published.
Q. Let's talk about another impression that may be left from hearing about the meeting.
Was it a meeting where Wyeth would present its message and what it wanted people to think about hormone therapy so that this group of top-notch experts would go out and spread Wyeth's

♀page 15

word to the rest of the country?
A. No. We didn't generally present; very infrequently would Wyeth present. Maybe once every other year or something we'd have a presentation. But, generally, this is a meeting where we were there to listen and then to discuss with people and listen to the discussions between them as experts.
Q. And did those who presented their own research at the meeting, did they at times go on and publish the research?
A. Almost universally.
Q. Do you know how many times that occurred?
A. Well, generally, I think -- I would guess that 99.9 percent of the time the papers were published. If we look at the field of cancer, specifically

breast cancer, I think there were at least 40 different presentations over the years on breast cancer, and I think all of those were published.
Q. Let me change the subject.
I want to ask you something about publications and Wyeth's involvement with publications. And we're going to start talking about something the jury has heard about already.
It's at Tab 6 in your notebook. It's Plaintiff's Exhibit 954. Just to orient the jury.
♀page 16

This is an e-mail from an N. Cooper at DesignWrite to Alice Conti.
Are you familiar with this e-mail?
A. Yes, I am.
Q. I think what the jury heard is that you had given a mandate to the publications committee at the company to increase the number of positive-related publications, and it goes on to say, Ms. Cooper goes on to say that "this is necessary to challenge the media's recent focus on HERS trial and negative information on HRT."
Did I read that right?
A. Yes, you did.
Q. Let's start, what's the date of the e-mail?
A. It's dated May 13th, 2002.
Q. And the jury's heard something about ghost writing and articles by Dr. Nachtigall and Dr. Eden.
Are you familiar with that issue?
A. Yes.
Q. Does this memo and your request about publications have anything to do with that?
A. No, absolutely not.
Q. This was years after that?
A. Yes.
Q. Let me ask this: What was it you were asking
♀page 17

to have published, No. 1? And what did it have to do with -- maybe we should start with why first.
Why were you talking about the media's recent focus on the HERS trial and negative information? What was happening and what was in your mind that led you to talk to someone about doing publications?
A. At the time that this was going on, the results of HERS, which was a clinical trial that Wyeth had sponsored looking at cardiovascular disease, which was a potential new indication, the results of that study came out, and it was not what anybody expected. It's not what we expected. It's not what, I think, the physicians, the researchers expected, and it was on a new indication.
Q. I'm going to interrupt you for a minute.
The new indication would be some kind of cardio --
A. Cardiovascular disease indication.
Q. And HERS didn't support that?
A. Right. The trial was in women that already had evidence of cardiovascular disease. They either already had a heart attack or some sort of angioplasty -- they had some sort of cardiovascular

treatment where they open up the arteries, so on.

♀page 18

And so these were what we would have termed a "secondary prevention study." These were ill patients. These were not healthy young women in their 50s. They tended to be older and ill.

So that was a potential indication that we were looking, and we actually expected, honestly, for it to work, so did everybody else. It didn't work. It surprised us.

And that's what the media were focused on, the lay media, the scientific community, and there was so much focus on that, that people were forgetting the primary indication of the drug. And so what we were -- what I was trying to get our folks to focus on is, they're going to talk about that. We need to get back to what is our drug for, who does it treat, what are the benefits, what are the risks, and let's focus on that. And so I set the standard of one article a month and, frankly, that number was pulled out of thin air. I was just trying to give them something to aspire to.

Q. Where was it you were asking them to -- what data were you asking them to publish about?

A. I was asking them to go back in our own studies. We had done a number of studies in-house. We had a database that I wanted them to go back and

♀page 19

look at, what we call data mining, go in and look at other things in the study, not just open studies but closed studies, see if there was anything new or useful to be published that wasn't the primary purpose of the study.

Q. Did it ever come to fruition?

A. No. Shows you how much influence I have, I guess.

Q. This was from somebody from DesignWrite.

Explain to the jury who DesignWrite is and what they did for Wyeth.

A. DesignWrite was an outside party that we had hired to help write manuscripts for us. They were medical writers, which is why we hired them. This meeting that I had called to talk about this -- actually, I sent it to my staff. I didn't invite DesignWrite. DesignWrite was at the meeting, though. So DesignWrite was there, I think, to facilitate the writing of these manuscripts for us.

Q. If the scientists at Wyeth did a study and wanted to publish on the study, did the scientists sit down at a computer and write out the results and create a transcript.

A. Sometimes they did. But, frankly, their focus, they were busy enough that if we relied on

♀page 20

our own people to write our manuscripts, we'd never get anything out. So we used DesignWrite as writers, as editorial people, clerical people, to help us put out these manuscripts.

Q. Let's now talk about what else DesignWrite did in earlier days.

First of all, the jury's heard the term "ghost writing." Just so we're all taking about the same thing, tell the jury what your definition of ghost writing is.
A. Well, my definition of ghost writing is, it's somebody else writing an article where the person whose names on it as the author has nothing to do with the article at all. So whether it's a book or an ad or a speech or anything like that, those things where the person really has -- has no influence -- the author has no influence of what's really being written.
Q. And the jury's heard two examples of this, one involving a Dr. Lila Nachtigall, who published a paper, and another, Dr. John Eden, who published a paper.
Have you read both of those papers?
A. Yes.
Q. And have you had an opportunity, because of

♀page 21

the litigation, to review the DesignWrite documents that track the evolution of the preparation and publication of those papers?
A. Yes.
Q. And based on your definition of ghost writing, in terms of what you and what Wyeth thought, did you consider those papers ghost written?
A. Absolutely not.
Q. Explain to the jury why you did not.
A. Because in all the papers that DesignWrite did for us, these two in particular, DesignWrite would pull together an outline or a draft of this, but in these situations, that would then be sent onto the author and the author would have a major review and critique and rewrite of the documents. And that's true in both of these cases, as well.
Q. Were these original research papers or review papers or something else?
A. No. These were review articles.
Q. What was the significance of that, if anything?
A. Well, review articles are designed to take the existing literature, and it's especially in areas where there's an awful lot being done, and there wasn't in a couple of areas, as it evolves -- as the

♀page 22

science evolves, and to try to consolidate that, to summarize that.
So, for example, a review article may reference a hundred different original articles and say this person found this, and this person found this, and this person found this, and this is the trend that we're seeing, and each one of those points is then referenced in the bibliography.
It is designed as a summary so somebody can review the literature without reading a hundred articles. If they want to go back to the original article, they're free to. That's the important aspect. Review articles are not designed to be the final word. If people want to -- they're not designed to substitute for the original work.

They're designed, frankly, to summarize it. And they're viewed as a valuable tool.
Q. I think the jury heard DesignWrite's work with authors started maybe in '96 or so.
Did you look to see or ask people to look to see, I should say, from '96 to 2006, how many scientific articles in total were published on the subject of hormone therapy?
A. Yes.
Q. And in the literature generally, about how

♀page 23

many were there in that ten-year period?
A. In that ten-year period, there were probably 4,000.
Q. And how many articles, to your knowledge, did DesignWrite, at Wyeth's request, have any hand in?
A. Well, DesignWrite wrote around 50. The ones that were related to generally in that -- generally in that ten-year period, there were probably thirteen to fourteen hundred that were specifically on hormone therapy.
Q. Thirteen hundred in the published literature, and how many from DesignWrite?
A. About 50.
Q. Now, generally, did the authors who were asked to work with DesignWrite on these published articles, were they experts in the field, on the subject matter in the paper?
A. Yes.
Q. Was that true for Dr. Eden and Dr. Nachtigall?
A. Yes.
Q. Let's talk about Dr. Eden's article in particular. And if you turn to Tab 10, and you had said you got and looked at documents concerning the interaction between DesignWrite and Dr. Eden with regard to his article; is that correct?

♀page 24

A. Yes.
Q. So we look at Tab 10, this is DX8847, and I just want you to give the jury a sense of what was happening and maybe if you could start on the first page.
That's a series of e-mails; is that right?
A. Yes.
Q. Between Dr. John Eden and a Karen Mittleman --
A. Yes.
Q. -- Ph.D.? Who is Dr. Mittleman?
A. Karen Mittleman was one of the authors or the writers for DesignWrite, the medical writers. She had a degree in science.
Q. If you can start on the first page of 8847, the bottom e-mail, you know how e-mails are printed out, it's all going to be working in reverse order.
It's an e-mail from whom to whom and on what date?
A. It's an e-mail from Dr. Mittleman to Dr. Eden.
Q. What date?
A. And the date is August 24th, 2001.
Q. And if you can just look at the highlighted area so we can move through it quickly.

What is Dr. Mittleman saying to Dr.

♀page 25

Eden?
A. It says, "if you could review the outline at your convenience and get back to me with your comments/suggestions for proceeding with the development of the manuscript, that would be great."
Q. The e-mail above is what date and from whom to whom?
A. The e-mail above is from August 24th, 2001, in response, and it's from Dr. Eden back to Dr. Mittleman.
Q. And what is he saying?
A. It says, Karen, I will give the paper my full attention on my return.
Q. And the next excerpt is another e-mail from Dr. Mittleman to Dr. Eden; is that right?
A. Yes, dated February 11th, 2002.
Q. This is several months later. What is Dr. Mittleman saying to Dr. Eden?
A. "Dear Dr. Eden: Attached is a revised review paper 'Progestins and Breast Cancer' based on your comments and suggestions. We have bolded the changes we made to the initial draft for easier review."
Q. And if you go two pages later at the bottom e-mail, again, this is from Dr. Eden to Dr.

♀page 26

Mittleman, and now we're in October, October 14th, 2002, what is he saying to her?
A. He says, "Dear Karen, the paper has been accepted by the American Journal of Obstetrics and Gynecology, which is great news, but I have got some suggested changes. I am snowed under at the moment, so I would be grateful if you or your staff could make these changes for me."
Q. Then what does he go on to say?
A. He goes on and says, I think we should change page 6, the paragraph that starts, data from randomized control trials could be changed to say something like, data from randomized control trials examining breast cancers --
Q. I don't want to take up the time to read it all. In this e-mail, he's giving changes?
A. Yes, goes on to page 7, so on.
Q. And the page after that is an e-mail from a Fiona Herr to Steven Parker, October 16th, 2002, copied to Dr. Mittleman.
Do you know who those people are?
A. I believe Dr. Herr was the -- one of the senior writers at DesignWrite.
Q. What is being told about Dr. Eden's manuscript at this point?

♀page 27

A. It says, "I added two sections, according to Dr. Eden's e-mail. I have highlighted the areas that were changed, approximately pages 7 through 10 on the attached."
Q. And then if you go back in the article in the exhibit again, back to the two pages, there's again

an e-mail to Dr. Eden, October 18th, 2002; is that right?
A. Yes.
Q. And what's happening there with regard to this article?
A. It says, "Dear Dr. Eden: I noticed that the reviewers strongly recommend placing the preclinical information on pages 11 through 14 before the clinical and epidemiologic discussions on page 5 to make the paper 'flow' better. We will go ahead and make this change for the revision unless you prefer that we didn't."
Q. What's the next paragraph?
A. The next paragraph also says, "also, we feel it would strengthen the paper if the WHI were briefly addressed in the abstract and conclusion as well as in the body of the text."
Q. Keep reading.
A. If you agree, we will add just a sentence to

♀page 28

the abstract and conclusion based on the material you gave us in your last e-mail. We will then send the paper to you for a final review.
Q. And on the immediately preceding page, there's an e-mail from Dr. Eden back saying he agrees with all the comments and telling Mr. Parker to make the changes?
A. Yes. It says, "please add acknowledgement for yours and Karen's help. I think that we should make the point that in my study of HRT after breast cancer (page 11), the subjects were given 50 milligrams MPA or 5 milligrams of Norethindrone (i.e. higher dose of progestin than usual, with their estrogen, in attempt to elicit an anti-estrogen effect on the breast. As far as I am aware, we are the only group in the world who have tried this approach. I think we should state the regimen used in the other study on page 11 (reference 93) as a contrast to our work."
Q. This, again, is Dr. Eden asking DesignWrite to make changes that he wanted made in this transcript?
A. That's correct.
Q. Did Dr. Eden's article end up being published?
A. Yes, it did.
Q. Was it published in a peer-reviewed journal?

♀page 29

A. Yes, it was.
Q. What does the fact that his article was published in a peer-reviewed journal tell you about the scientific accuracy of the article, if anything?
A. Well, peer review means that it is reviewed and evaluated by peers in the field, his colleagues, experts in the field, that the journal selects. So the journal is selecting them, and they review it for accuracy and scientific merit.
Q. And from your review of these various papers between DesignWrite and authors, and I'm not saying it happened in every case, but generally was there this back and forth between the author and DesignWrite?
A. Yes.

Q. Now, I notice that Dr. Eden in his last e-mail says being about -- says, "please add an acknowledgement for yours and Karen's help." What do you understand that to mean?
A. He was acknowledging at the end of the paper that they had contributed to writing the paper.
Q. Means that would be something written in the paper?
A. Yes.
Q. With these various articles that DesignWrite
♀page 30

was involved in, whose decision was it to acknowledge the assistance in writing that the author was to receive?
A. It was the authors', Dr. Eden's or Dr. Nachtigall's.
Q. Is the idea of having assistance writing a medical or scientific journal, is that something that's unusual or is that something peculiar to Wyeth's having DesignWrite work with these authors in this fashion?
A. No. Common in the industry, common in the pharmaceutical industry, common in the healthcare business. Frankly, it's common here, you know, in the courts. You know, we do that all the time. Universities do it. When I was in graduate school, it was done with various labs and graduate students.
Q. Let's -- we were talking about acknowledgements, so let's move on about this.
Did Wyeth ever have a policy that dealt with publications and presentations? And by that, I mean a written policy?
A. Yes.
Q. And could you turn to Tab 8 in your notebook. This is Wyeth Defense Exhibit 4086. I see this is something called Policy 513.
♀page 31

Is this a policy you were referring to?
A. Yes.
Q. And tell the jury when it was issued and what its effective date is.
A. The issue date was May 4th, 2006, with an effective date of August 4th, 2006.
Q. So this was after Dr. Eden's article?
A. Yes.
Q. And tell the jury what led to the -- to the preparation of this policy.
MS. LITTLEPAGE: Objection; relevance because of the date.
MS. HANDLER: I'd like to be heard on that based on the claims being made in the case.
THE COURT: What was the date, Doctor?
MS. LITTLEPAGE: 2006.
MS. HANDLER: Goes to the punitive damage claim, Your Honor.
THE COURT: Overruled.
BY MS. HANDLER:
Q. Tell the jury the policy that you put into place and why.

A. The policy that we put into place was
♀page 32

specifically about external publications and presentations, and it specified what we required in terms of disclosure in terms of our involvement, whether we had a medical writer, a system, whether we had supported the study.
In all of the prior work that had been done, any financial disclosure for research was always disclosed, but in this case, what had happened was we allowed the authors to decide who they acknowledged, who they wanted to add for authorship, who they acknowledged at the end of the paper, and it was being inconsistently applied. And we said, look, this is -- we need to change this. We need to have a uniform policy.
Q. What was the new uniform policy with respect to acknowledgments?
A. Well, the acknowledgments, specifically, it says that, "the Acknowledgments section of a publication should list, with their permission, all those people who make significant contributions to the project but do not meet all of the criteria for authorship as defined above. It should also be used to acknowledge the project's funding and Wyeth's involvement in the analyses of the data or presentation of the publication.
♀page 33

Q. Let's change subjects. I want to talk to you a little bit about the sales force.
THE COURT: About what?
MS. HANDLER: The sales force.
BY MS. HANDLER:
Q. Wyeth has sales representatives that talk to doctors?
A. Yes, we do.
Q. How many people do you have?
A. About 5,000.
Q. And what about women's healthcare?
A. We had about a thousand.
Q. And what, basically, is the job of a sales representative?
A. The job of the sales representative is to provide the physician with information about our products, what's in the label in terms of the risks and the benefits. They also provide a service, and we provide samples --
Q. Why do you provide samples?
A. Because, oftentimes, it's a good way for a physician to be able to get a patient to start our medicine. Most of the times -- I shouldn't say most of the times. A lot of times when a prescription is written, it's never filled. The patient, whether
♀page 34

it's monetary or they just don't want to take the drug, don't. By giving samples, it gets the patient started on it. It's also helpful for people who can't afford the medicines.
Q. And you said that the sales representatives talk to the doctors about the risks and benefits.

Don't the doctors know about the drug? Why do you need a sales rep to talk to them about it?
A. Well, it evolves over time. When the drug is first introduced, part of the sales representative's job is to make sure that the doctor understands if it's a new drug, what's the drug, what's it used for, what are the benefits, what are the risks?
As new information comes out, it's important that they get that new information, whether it's new indications, new benefits, or new risks. There's also, frankly, from the business side of it, we want to be front and center in the doctors' minds.
If they have a patient coming in for a particular illness, that when the physician decides that the patient would benefit from the medicine, that we're the drug that they think of, not our competition.

♀page 35

Q. How do you decide who to hire as a sales rep?
A. Well, we try to hire good people; I mean, that's the fundamental. A minimum requirement is a bachelor's degree. Then they go through a training program, and we test them and, you know, we train and test and train and test and train...
Q. Are they trained not to promote for off-label benefits?
A. Yes.
Q. Off-label benefit meaning something that the drug has not been approved -- is not an approved indication by the Food and Drug Administration?
A. Yes.
Q. Now, in a company as large as Wyeth, do you have sales representatives or people who manage the sales representatives who don't live up to your expectations as to what they're supposed to do?
A. Unfortunately, yes.
Q. Does the company have a Code of Conduct?
A. Yes, we do.
Q. How long has Wyeth had a Code of Conduct?
A. As long as I can remember. I signed it when I first joined the company.
Q. You said you signed it when you first joined the company. What do you mean, you signed it?

♀page 36

A. It's a requirement for employment. Every employee in the company must sign the Code of Conduct, and it must be signed every three years.
Q. Signed to indicate that they've received it, read it, and understand the rules?
A. Yes.
Q. We've brought in one, for example, and that's at Tab 12 DX247. What is that?
A. That's a copy of the Code of Conduct for what was American Corporation -- American Home Products Corporation.
Q. And this particular one is dated, looks like, January 1, 1999?
A. Yes.
Q. Does it have particular rules with regard --

turn to the Table of Contents, which is at page 4 of the document, bottom right-hand side.
Tell the jury the topics that are covered in Wyeth's Code of Conduct.
A. Basically, they fall into three umbrellas; compliance with the law, compliance with business ethics, policy and the commitment to integrity and professionalism.
Q. And were these covered in the earlier versions of the Code of Conduct, as well?
♀page 37

A. Yes.
Q. Specifically, with respect to promotion of products, can you tell the jury what the Code of Conduct requires with respect to promotion of the products?
A. That they promote them within label.
Q. And was that also in earlier versions of the Code of Conduct?
A. Yes, it was.
Q. What's the purpose of this Code of Conduct?
A. The purpose is to make sure that employees recognize that we are in a heavily regulated industry, that we must do the right thing, that there are standards that this company stands for and standards that we all must comply to and comply with.
Q. Does Wyeth tell the employees, is there anything in the Code of Conduct that tells an employee what to do if they are asked to or if they know of a violation?
A. Yes. We have an Office of Compliance where employees are specifically instructed to contact should they know of a violation in any of the practices, whether it's people on the manufacturing line or sales force or marketing or anywhere.
♀page 38

Q. The jury has heard about a document, which is at Tab 9 of your notebook. It's Plaintiff's Exhibit 557, and if I can remind them, it is a letter from a sales representative, Charles Payne, dated July 18, 2000.
Are you familiar with that letter?
A. Yes, I am.
Q. This is a sales representative who was complaining that he was being told by -- he was being instructed to promote to physicians outside of the labeling; is that right?
A. Yes, that's correct.
Q. Are you familiar with what happened after Mr. Payne sent his letter?
A. Yes, I am.
Q. Tell the jury what happened after Mr. Payne sent his letter.
A. The Office of Compliance at the company did a rather elaborate investigation involving senior attorneys in the company, senior compliance officers. They went down and investigated this complaint, which was down in the south, and as a result of that, took corrective action against a number of people.

Q. And what was the corrective action?

♀page 39

A. All of the people were reprimanded; one of them left the company and two others were removed from a management job and demoted.
Q. Was any additional training given as a result of this?
A. Yes.
Q. What was that?
A. The company felt at the time that we needed to retrain the entire sales force. So we began first with the managers, bringing them in, telling them what the issue was, reminding them of what the rules were. The Office of Compliance, together with the attorneys and the marketing and sales management team, put together a training program to train the managers first, and then when we had the managers trained, we trained the sales reps, all 5,000 of them.
Q. If you would turn to Tab 15 in your notebook -- let me ask you this: Not just because of what happened with Mr. Payne's complaint, but, generally, in your view, do you and do Wyeth senior management take the issue of compliance seriously?
A. Absolutely.
Q. And who is Joe Mahady?
A. Joe Mahady was my boss. He was the President

♀page 40

of Pharmaceutical Business for North America.
Q. What is at Tab 15; this is DX0564?
A. It's a letter from Joe Mahady to the field sales and marketing organization.
Q. And what is Mr. Mahady telling the field sales marketing organization?
A. Can I quote him? It says, "while the competition is quite fierce and our expectations high, I must remind you that we all hold a special responsibility based on the nature of the products that we sell and the patients who take them. I direct you to maintain the highest standards of compliance with respect to issues of product safety, medical education, use of approved materials, and our promotion practices with physicians.
Q. Based on your experience in all the years you've been with Wyeth, was Mr. Mahady's admonition to the people in the company, was that something new or was it a reiteration of the company's feelings beforehand?
A. It was a reiteration of the company's feelings. I mean, I had told my staff at meetings that I had with the sales organization that, you know, we aspired to be the best company in the industry, but, more importantly, for the sales

♀page 41

representatives that are out there, I reminded them that the patients sitting on the other side of that desk from that physician could have been their sister, their mother, their daughter, their wife, and that it was really important that that physician have all of the information to guide that patient in

making that decision whether the medicine was right for them. And in the end, ultimately, if we did what was right for the women, we did what was right for the business.
Q. Why do you say -- what do you mean?
A. If the drug works and the patient feels better, the physician feels confident in the medicine, and the drug will sell itself. This is -- you know, people, I think, believe that the marketing and sales organization drives sales of products.
What drives the sale of a product is how well it works. If it doesn't work, nobody is going to use it.
Q. Have you had an opportunity to get a sense of how -- well, let me ask a different question.
Are OB/GYNs the main group of doctors who prescribe your drugs in terms of hormone therapy drugs?

♀page 42

A. Primarily, yes.
Q. Did they ever have an opportunity to rank the sales force in terms of how the sales force is interacting with them?
A. Yes. There's a third party group that every year surveys physicians.
Q. What's that third party group?
A. Called Verispan.
Q. What do they do?
A. They take the various specialties in our case, OB/GYNs, could be psychiatrists or internists, and they ask them a series of questions about the sales representatives that call on them and ask them to rank them according to what they've experienced.
Q. And based on what criteria?
A. Product knowledge, the integrity of the rep, the accuracy of the information, and the overall value that they bring to their office or their practice.
Q. Can you turn to Tab 16 and tell the jury what Defense Exhibit 4010 is.
A. This is a copy of the Verispan results from 2004 and 2005 -- 2003 and 2004, sorry.
Q. If you keep going, you'll see other dates, I think.

♀page 43

A. Yes, 2003-2004, 2002-2003, 2001-2002, '99 to 2000, '97-'98, '98-99, 95-'96, '96-'97, '93-'94, '94-'95.
Q. So it goes from 1993 to 2004?
A. Yes.
Q. And how many different companies and sales forces are ranked by Verispan during that time period?
A. Verispan ranks on an annual basis 60 companies.
Q. And how have the OB/GYNs ranked Wyeth's sales force over the years?
A. Number 1.
Q. Between 1995 -- in particular, in 2002, how did Verispan rank the sales force?

A. Number 1.
Q. And what about after the WHI came out, if you look at the results of 2003 and 2004, how did the OB/GYNs rank the Wyeth sales force?
A. Number 1.
Q. What did that tell you, as the president of this company, about generally how the sales force was performing its job?
A. Well, this, to us, was a sign that all of the effort that we were putting in on the sales force to



make them the best sales force was working, that, in fact, they were representing the company in a way that we had wanted them to, that they had high integrity, they provided value to the physicians. They weren't wasting their time. They had excellent product knowledge. This is sort of the culmination of all the training and all the work that we put into the sales organization.
Q. Does it mean nobody ever did anything wrong?
A. No, no.
Q. As president of the company, did you think that the sales force would have gotten those kinds of rankings after WHI if in the years before the sales force had been minimizing the breast cancer risk and misleading doctors about the benefits of the product?
A. No. If we had been doing either of those, they would have thrown us out on our ear.
Q. I want to change the subject about issues of studying the drug, okay.
The jury has heard about a request that was made to Wyeth -- let me direct you to Tab 3 in your binder.
These are Plaintiff's Exhibits 251 and 265, and just to orient everybody, this has to do



with a request that came to Wyeth from the Eastern Cooperative Oncology Group; is that right?
A. Which tab are we at?
Q. Tab 3.
A. Sorry. Yes.
Q. And the jury has heard about these. First of all, the first -- Exhibit 251 -- both exhibits, 251 and 265, are to David Dodd from Carrie Smith Cox. Who is David Dodd?
A. David Dodd was -- I don't know whether he was a vice president, but he was one of the members of marketing at the time.
Q. Who is Carrie Smith Cox?
A. Carrie Smith Cox was the brand manager that was responsible for Premarin and the Premarin family.
Q. And these documents, the jury's heard, show that this Eastern Cooperative Oncology Group was asking Wyeth to provide Premarin so that it could do a study of women who had previously had breast cancer; is that right?
A. That's correct.
Q. And it's been suggested that what these memos show is that Wyeth had a company policy not to

support or conduct breast cancer studies. Are you
♀page 46

aware of that?
A. Yes.
Q. Is that a fair statement?
A. Absolutely not.
Q. Why not?
A. Because we had been conducting breast cancer studies for years and continued to.
Q. Then why would the company not agree to provide Premarin for this particular study?
A. This was reviewed by the medical department, and there was a specific -- there is a specific indication -- contraindication in the label that says this should not be given to women who have a prior history of breast cancer. For us to give this would have been absolutely inconsistent with the label and wrong.
Q. Why was somebody in marketing talking about doing a study at all?
A. Because I think marketing would have -- would have liked to do the study. I think they thought that it was an important study to do. But the medical people, the people -- the science people said we can't do this.
Q. Well, you're familiar with FDA advisory committees, aren't you?
♀page 47

A. Yes.
Q. And the jury's heard about a particular FDA advisory committee that talked about some advantages to studying Premarin or studying estrogen therapy in women who already had breast cancer.
Are you familiar with that advisory committee?
A. Yes.
Q. Can you tell the jury why in light of that advisory committee discussion Wyeth would still not agree to do a study of hormone therapy in women with breast cancer?
A. An advisory committee is not the FDA, first of all. It's a group of experts brought in to give guidance to the FDA. In this case, they thought that it would be good to do a study of women who had a prior -- prior breast cancer.
Because these women suffered tremendously from hot flushes and night sweats, they were losing bone, and so they thought that we should try to address this issue of, does the breast cancer get worse if we give it to these women, is there anything we can do? That was their motivation.
Q. The advisory committee?
A. The advisory committee.
♀page 48

Q. What did Wyeth do when they learned that was the advisory committee's statement?
A. We went to the FDA and the FDA said, Well, we're not going to change the contraindication.
Q. What did that mean?
A. That means that, do not use in this population

was going to stay in the label.
Q. And if that contraindication stayed in the label, where did that leave Wyeth in terms of doing this study?
A. We wouldn't do it. It was medically unethical.
Q. Now, at this time of these memos, December '93, February '94, that it's being suggested that the company has a policy against studies of breast cancer, was the company doing anything to study breast cancer?
A. Yes, yes.
Q. Tell the jury what was going on in that time frame.
A. We had just completed a breast cancer study. This is -- these are epidemiologic studies, so we go back in time, observational studies. We look at patients taking the drug and look at the incidence of breast cancer. We had just completed one with

♀page 49

Dr. Graham Colditz that started in '91 and published in '93. We had been doing breast cancer studies with these products since the '70s.
We did a study in 1971 with Burch and Byrd out of Vanderbilt. We did another one, 1973, with Burch and Byrd out of Vanderbilt, another one in 1977, Burch and Byrd out of Vanderbilt.
We allowed Lila Nachtigall, provided placebo for her study. We started our own study on a combination product in 1983. We supported another study by Barbara Hulka, and I believe it was published in 1984, another study by Dr. Horowitz in 1986.
So we had continuously studied this issue of breast cancer. There was another study by Dr. Lavecchia in 1986. This was '82, '84, and '86.
Q. And in the immediate time frame, '93, '94, had the HERS study been ongoing?
A. Yes.
Q. Was that looking at breast cancer?
A. Yes. Right. The HERS study started looking around 1992. The WHI, we had signed a contract with the Women's Health -- National Institutes of Health to support the Women's Health Initiative. That was 1992.

♀page 50

We had signed an agreement with the Nurses' Health Study, the Harvard group, to provide them funding to support their breast cancer studies in '93. So there were a number of studies going on.
Q. In light of all those studies that had been done over the years, would you say that Wyeth had a policy not to study breast cancer?
A. Absolutely not.
Q. Do you know how many scientific articles about studies on Prempro and its components, CEE and MPA, have been published in the medical literature, round number?
A. Probably around 4,000.
Q. And --
A. That's against a backdrop of about 60,000

articles on hormone therapy generally.
Q. And how many studies -- I know you've listed a number of them. How many studies on Prempro or its components have been supported or conducted by Wyeth itself?
A. About 180.
Q. How many women were involved in those studies?
A. About 180,000.
Q. Has FDA ever taken a position on whether your hormone therapy is well-studied or not well-studied?

♀page 51

A. They have taken a position that it is probably the most actively studied or extensively researched product in the United States.
Q. Can you turn to Tab 5 in your notebook? This is Plaintiff's Exhibit 304.
Turning to page 4 of 8 -- first of all, can you tell the jury what that document is?
A. This is a letter from the Food and Drug Administration to Ms. Barton at -- Ms. Joan Barton at Wyeth.
Q. What's the subject matter of it?
A. The subject matter has to do with -- it's a response to our -- Wyeth's submission on the proposed launch materials for Prempro.
Q. And so this was a division of the FDA who was commenting on the launch materials for the Prempro -- what are launch materials?
A. It was a division of advertising, marketing and advertising, at the FDA that were reviewing the materials that would be handed out to the sales force to use when they called on the doctors, and materials that would go into journals, medical journals, talking about the drug.
Q. And this is talking about a statement that Wyeth had in the proposed materials about Premarin;

♀page 52

is that right?
A. Yes, that's correct.
Q. And it said Premarin is the No. 1 prescription medication in America today; is that right?
A. Yes.
Q. What did the FDA tell you to change that to?
A. Their comment was DDMAC suggests -- this is the division of advertising -- suggests revising the research statement to the "most extensively researched product in the United States."
Q. On that subject, let's talk about another FDA -- well, it may be the same, but FDA advisory committee.
There was one in 1990 that was looking at hormone therapy and breast cancer; is that right?
A. Yes.
MS. HANDLER: If I can hand up a second binder, Your Honor?
THE COURT: Proceed.
BY MS. HANDLER:
Q. I'll ask you, when everyone's ready, to turn to Tab 32, because I'm going to ask you about that document in a minute.
Are you familiar with that document,

Plaintiff's Exhibit 133, Dr. Dey?

♀page 53

A. Yes, I am.
Q. And it's dated February 2, 1990. It is from Fred Hassan to a number of people, and you're copied on it; is that right?
A. Yes.
Q. Who was Fred Hassan?
A. He was the president of Wyeth-Ayerst at the time.
Q. You mentioned a bunch of people who were presidents.
Did this change over the years, or are there multiple people with that title?
A. It's done both. Fred Hassan was the president of the entire company, so he had responsibility for all of the commercial business on a global basis.
Q. All right.
So Mr. Hassan -- the jury's already heard this -- Mr. Hassan is sending this memo to a group of people and says, "I want to personally congratulate you for your contribution to our success at the February 1 Advisory Committee Meeting on Premarin. Our goal was to ensure that this meeting was a 'non-event,' and that's exactly what happened."
I want to ask you to put that in

♀page 54

context. What was the advisory committee?
A. The advisory committee was pulled together by the FDA to discuss the role or the relationship of the use of estrogens and estrogens plus progestins and endometrial cancer and breast cancer.
Q. Did Wyeth participate in the advisory committee in any way?
A. Yes. I don't remember whether we had a speaking role, but we certainly provided them information about the research that had been done on breast cancer.
Q. You received this memo from Mr. Hassan?
A. Yes.
Q. And what did you understand that first paragraph to mean when we talked about it being "non-event"?
A. What he was referring to, whenever we get into discussions about breast cancer, it's a very hot topic, and the media spend a lot of time looking at it.
And what he was very pleased with was the fact that there had been a balanced discussion at the advisory committee, among the advisory committee members, that there had not been essentially a media circus around it. That's what

♀page 55

he meant by that.
Q. Can you tell the jury, can you read to the jury the remainder of the memo, because I don't think they heard that previously?
A. It says, "eventually, the various suggestions that this" --

Q. I'm going to ask you to start in the paragraph above, okay?
A. Sorry. At the beginning?
Q. Just read -- I've read the first paragraph. Read the second and third, please.
A. Okay.
"We must position Wyeth-Ayerst as the authoritative" --
Q. I'm going to ask you --
A. Go back further?
Q. Start "while this meeting..." so the jury can hear the entire memo in context.
A. "While this meeting was clearly a success for us, we must also accept the fact that Premarin, its assets and liabilities, will remain a topic of FDA and press interest for the foreseeable future. It's time now, as Bob Essner said at the follow-up meeting in Washington, to turn from a reactive to a proactive mode. We must position Wyeth-Ayerst as
♀page 56
the authoritative information source on hormone replacement therapy, HRT. This means that we must more and more be the providers of new credible medical and scientific information concerning HRT.
Eventually the various questions that this advisory committee could not answer conclusively will be answered, and it is our responsibility and very much to our benefit for Wyeth-Ayerst to provide the studies, information, and insights to ensure that the answers will be accurate and balanced."
Q. Were the various questions that the advisory committee could not answer conclusively, did that have to do with the role of hormone therapy in breast cancer?
A. Yes.
Q. And what, if anything, after that advisory committee and after Mr. Hassan sent this memo, what, if anything, did Wyeth do to provide the studies, information, and insights to ensure that the answers will be accurate and balanced?
A. Well, we continued, as we had, to investigate the relationship between hormone therapy and breast cancer. And we began, immediately after this, with a discussion with Dr. Colditz from Harvard, the
♀page 57
Nurses' Health study, for him to do what was effectively the very first meta-analysis on hormone therapy and breast cancer.
Q. Meta-analysis meaning what?
A. What they do is, they take a series of epidemiologic studies, the observational studies which may not have enough years of exposure or years of exposure or enough women involved, and they combine them.
So by combining all of the studies and analyzing them together, the hope is that you get more information than you can get from one individual. And that's -- that was the first time this had ever been done for hormone therapy.
Q. In addition to retaining Dr. Colditz to do

that, were you also contributing money to his ongoing efforts with the Nurses' Health Study?
A. Yes, we were.
Q. Was there ever a time when the Nurses' Health study asked Wyeth for support or money that Wyeth didn't provide it?
A. No.
Q. Were you also planning or carrying out the HERS study at the time?
A. Yes, we were.
♀page 58

Q. And soon after 1990, when this memo was written, did Wyeth support the WHI?
A. Yes.
Q. Did Wyeth do any long-term, five years or more, randomized clinical trials, where the primary endpoint of the study was to look at breast cancer?
A. No. That's unethical.
Q. Tell the jury why that would be unethical.
A. Because you can't study a drug in people to show harm. The whole purpose of studies has to be -- there has to be the belief that the patient will benefit or the person will benefit from that.
It is unethical to give a person a drug and try to show that the drug does them harm. Separate from the ethics of it, who in their right mind would enroll in a study? Doesn't make sense.
Q. You would have to file an IND and get the FDA to sign-off to do such a study?
A. Yes, you have to get FDA sign-off. We, as a company, have to believe the study will show benefit and the sites that are actually going to conduct the study, the physicians' offices, the research centers, they also have to sign-off to believe that the study will provide benefit to those patients.
Q. Let me take it out of the context of the
♀page 59

Prempro or Premarin or hormone therapy and breast cancer and just see if I understand what you're saying.
If you make a drug and you want to know, does this cause heart attacks, would you set up a randomized clinical trial and invite people to come to the study and say, we're going to give you this drug for five years, because we want to see how many heart attacks happen? Can you do that?
A. No, absolutely not.
Q. What does a clinical trial have to study?
A. The trial has to, first and foremost, have a benefit. And then, as part of that study, you look for safety issues. So you look at the side effects. That's required in all studies.
Q. So if the jury heard at some point that the only time Wyeth was willing to sign on to a randomized clinical trial was if it was looking for a benefit of its drug, would that be accurate?
A. That's correct. That's exactly how studies are done. Randomized control clinical trials must have a benefit as a primary endpoint.
Q. Tell the jury how much money Wyeth spends on research company wide.

A. Two to 3 billion dollars a year.

♀page 60

Q. How much money does the women's healthcare part of Wyeth specifically spend on research and development efforts on a yearly basis?
A. Around 200 million.
Q. If Wyeth didn't make money from selling products, would it be able to have that budget to do research and development?
A. No. If we didn't make money, we wouldn't be able to develop any new medicines. We'd lay off people. We're in business.
Q. The jury heard a term at some point, "ROI," a Return on Investment, and said, I think, talked about documents where when Wyeth was deciding whether to be involved in a study, looking at what the Return on Investment, or ROI, I believe.
Explain to the jury, I know you're a scientist, but you're also a businessman, what is Return on Investment and why is that something Wyeth would even look at when thinking about doing studies?
A. Well, Return on Investment is essentially the intersection between business and science. We have to do that as part of being good business people. So we look at what's the study going to cost us and what's the study going to bring in in revenue. It

♀page 61

does not mean that that is driving the decision backer.
As I said, it's the intersection between business and science. We have to look fundamentally at, does the study make good sense; are the experiments going to show what we think they're going to show; and is there an important medical need? Then we look for consensus in the company. As part of that consensus, we're looking for the business side to say, This makes sense from a financial perspective.
Ultimately, there may be a decision to conduct the study or not to conduct the study regardless of whether the business thinks it's a good idea or not. But I can't think of an example where we would do a study where we didn't think that the science and the medicine made sense.
MS. HANDLER: I'm changing topics.
Judge, I'm happy to continue.
THE COURT: We'll take a recess at this time.

\- - -

(Whereupon, the jury was excused from the courtroom at 2:46 p.m.)

\- - -

♀page 62

(Whereupon, a brief recess was taken at this time.)

\- - -

(Whereupon, the jury entered the courtroom at 3:10 p.m.)

\- - -

THE COURT: Ms. Handler, you may continue.

MS. HANDLER: Thank you, Your Honor.

BY MS. HANDLER:

Q. Dr. Dey, we were talking a minute ago about the ethics of randomized clinical trials and that the need -- you need to do a clinical trial when you're going to invite people in to take a drug in order to determine if there's a benefit rather than a risk; is that correct?

A. Yes.

Q. While looking at the benefit, you also track to see if there are risks, right?

A. Yes.

Q. I want to clarify something. The WHI, is that a benefit study?

A. Yes.

Q. The benefit that was being looked at was what?

A. It was the long-term prevention of

♀page 63

cardiovascular disease in women.

Q. And that started when?

A. 1993.

Q. So I'm going to ask you some questions about WHI, but before I get to that, I just want to clarify something.

Before the WHI, hormone therapy had a benefit of treating vasomotor symptoms; is that right?

A. That's correct.

Q. Couldn't the company have done a long-term randomized trial looking at vaso -- saying, We're going to look at vasomotor symptoms and then also follow breast cancer?

A. Well, we could have, but that's not the -- the short answer to your question is no. The problem with that is, vasomotor symptoms, No. 1, are short-term. Number 2, the other indication is vaginal atrophy or osteoporosis would not offset the long-term risk of breast cancer. So these were relatively short-term indications, but it was symptomatic. I mean, the women were prescribed the drug based on their symptoms.

Q. Would you know very soon in the trial whether it worked for the symptoms?

♀page 64

A. That's right.

Q. So there'd be no reason to continue it long-term?

A. That's right.

Q. Let's talk about the WHI.

Was Wyeth aware that the government was considering doing a WHI study before the study actually was underway?

A. Yes, years before.

Q. And were you involved at any time in discussing at Wyeth possible financial contributions to that study?

A. Yes.

Q. When you learned that NIH was planning to conduct the study, what was your reaction, if any?

A. I was excited. I thought it was a great scientific endeavor.
Q. Can you turn to Tab 17? That is Plaintiff's Exhibit 1229.
Is that a memo from you to Mr. Hassan, the president of the company?
A. Yes.
Q. It's dated April 9, 1991; is that right?
A. That's correct.
Q. What was your position at the time?

♀page 65

A. I was in research. I was the section head for pharmaceutical development at Wyeth.
Q. What was it you were trying to -- what was it you were telling Mr. Hassan in this memo?
A. Mr. Hassan and I had a previous conversation about a study that had been conducted for the indication of osteoporosis prevention; that's bone loss, prevention of bone loss. And so this memo was saying essentially that I think that, consistent with his desire that we do research of that value to the medical community, in this case to women, that I said, we should consider funding in part or all of the WHI, if NIH didn't.
Q. Can you read to the jury the highlighted sections of that memo so they can get the sense of what you were saying?
A. Yes. "You mentioned some time ago your desire for Wyeth-Ayerst to conduct pivotal research that would be as impressive and definitive as Dr. Lindsay's osteoporosis study. I believe this primary prevention trial," referring to the WHI, "could be such a study. Further, I would recommend that if this study is not funded by the National Heart, Lung, Blood Institute," which is part of NIH, "that Wyeth-Ayerst seriously consider underwriting a

♀page 66

major portion, if not all of the costs."
Q. What do you go on to tell him in the next highlighted section?
A. "There is no question this is a long-term commitment/investment, but from what" --
Q. I think it's I.
A. -- "from what I understand the potential market is much greater than the osteoporosis market."
Q. What was Dr. Lindsay's osteoporosis study that you're talking about?
A. It was a several year study looking at the effect of estrogens in preventing bone loss in women and, thus, preventing fractures and spinal deformity and so on.
Q. So were you at that point, as a researcher in the company, suggesting to the president in the company that Wyeth consider funding this prevention trial, this cardio prevention trial, if the government wasn't going to?
A. Yes.
Q. How much did the WHI end up costing the government; do you know?
A. Between 800 million and a billion dollars.

Q. To your knowledge, did Mr. Hassan and others
♀page 67

at Wyeth seriously consider your proposal?
A. Yes.
Q. What was the upshot of that?
A. Well, we had conversations about it, but the upshot was that the National Institutes of Health decided to fund it and so we never crossed that bridge.
Q. You read from the memo where you say "there is no question this is a long-term commitment investment, but from what I understand the potential market is greater than the osteoporosis market"; is that right?
A. Yes.
Q. What are you referring to there?
A. I was interested in the -- as a scientist, I was in research; this is what I did for a living. And my desire was to move forward. I thought this was a great study. It would answer some important questions on cardiovascular disease which had been in the literature for a number of years, if not decades. So I really wanted us to fund the study.
I mean, you know, I would have been happy if we had done it all by ourselves, but the reality is, we're a company -- we're a for-profit company, and I recognize there's a potential issue.
♀page 68

It's back to this ROI question, what is the Return on Investment? All of these are risks, and I think that's what the company had to weigh in that decision.
Q. Were you telling Mr. Hassan that Wyeth should support the WHI only because it would -- if it worked, it would result in selling more Prempro, making Premarin, or hormone therapy making more money?
A. No. I thought there was an important medical clinical issue that needed to be answered. I, frankly -- I was trying to be sensitive that this was a business, but I was a researcher, and I was interested in doing it -- doing the science.
Q. NIH decided to run the study; is that right?
A. Yes.
Q. Did Wyeth, in fact, support the study?
A. Yes, we did.
Q. And tell the jury how Wyeth supported the study.
A. Well, I've used this analogy before. Wyeth was what I would like to refer to as part of a three-legged stool. We were one of the legs on a three-legged stool.
We provided the drug, about a hundred
♀page 69

million tablets. We provided access to our data on the drug, which was -- had been submitted to the FDA, but represented years -- decades of research. And we provided additional funding and assistance to the NIH in recruitment and patient education aids, teaching women how to do self-breast exams.

Q. Let's talk about each of those.
You said first that you provided the drug. And the drug in particular was what that was used in the WHI?
A. It was the current Prempro. It was not yet approved. It was a single tablet product, and we provided that in matching placebo, which was a tablet that looks exactly the same, but is a sugar pill.
Q. And there was an E only, estrogen only, arm of the WHI?
A. That's correct.
Q. Did Wyeth provide Premarin for that arm?
A. Yes, Premarin, as well.
Q. And did Wyeth provide a placebo pill that looked just like the Premarin pill?
A. Yes, we did.
Q. You said that you provide the Prempro, but Prempro wasn't yet on the market.

♀page 70

Were you making a combination one tablet estrogen, CEE/progestin, MPA tablet at the time the WHI started?
A. Not for commercial purposes. We were developing it as a research tool for the clinic, but it was not yet approved.
Q. So was it a big -- and then you also made the placebo that looked like the Prempro?
A. That's correct.
Q. And was that a big deal, that you have to have your folks in your manufacturing plant turn on machines and start cranking out the pills?
A. Well, I wish it were that easy. For a batch of Premarin, it took us about nine months. That was about 2 million tablets. For a batch of Prempro, it took us a year for each -- it was about 2 million tablets. We needed to provide between active drug and placebo about a hundred million tablets. So the commitment was for multiple years, on the neighborhood of five to six.
Then there was a commitment to do the stability, to make sure that the tablets didn't degrade over times, they continued to dissolve at the rate they were supposed to.
We had to provide all of that in the

♀page 71

times the NIH needed the drug. They didn't need it all at once. They needed it as they enrolled patients. It all had to be blinded. So the investigators didn't know what was in the box. They were assigned a patient number and tablets.
Q. And can you turn to Tab 18 in your first binder, that is DX195, and tell the jury what that is.
A. This is a letter to Dr. William Harlan at the NIH saying that we are doing the final preparation of the plan meeting with Dr. Healy, who was the director of NIH, and a commitment of the -- or a confirmation of the quantities of the products that NIH needed each of the active drugs, Premarin and Prempro, and then the two placebos.

Q. Just to be clear, could NIH have gone out on the marketplace and bought the placebo that looked like the Premarin?
A. No.
Q. Could they have gone out into the marketplace and brought a combination CEE/MPA product?
A. No; there was none available.
Q. And so you were getting your manufacturing up and running in order -- you did get your manufacturing up and running in order to produce the
♀page 72

Prempro that was needed for the study and do the stability tests on that drug?
A. Yes.
Q. And if it turned out that your NDA for Prempro, what was filed in '92, was never approved by the FDA, would that have all been a waste in terms of what the company was doing?
A. Yes.
Q. How long did each batch -- I think you may have told me. Nine months to make a batch of Premarin and a year to make a batch of Prempro; is that right?
A. Yes, that's about right.
Q. How many batches did you have to make in order to fulfill the commitment?
A. Looking at this, there were 31,500,000 Prempro tablets, so at 2 million tablets a batch, that was probably what, 16 batches, roughly. So nine times 16; long time.
Q. What did it cost Wyeth simply to make the pills?
A. About 2.7 to 3 million dollars.
Q. You also said that you provided funding and assistance with regard to recruitment and patient educational aids.
♀page 73

Explain that further. What do you mean by recruitment, and what did Wyeth do?
A. Well, one of the things that we do well is help conduct clinical trials. And the NIH was having difficulty recruiting patients for the study. This was the largest -- is and was the largest study ever conducted by this country in women. So this was a huge undertaking. NIH had never done such a large study. We had never done such a large study. No one had.
And so the issue that they were trying to deal with was, how do we recruit 20,000 women to a study that is not a six-month study or one year, but is, in fact, supposed to be eight and a half years long? And they were having difficulty recruiting those people.
Q. By "recruiting," you mean just getting the word out so that women would agree to sign up and stay in the study?
A. Yes, yes. And, of course, this is all -- people aren't paid to participate in these clinical trials. There are certain aspects, their medical coverage is covered, but, again, the patient doesn't know whether they're getting active drug or placebo.

So they're doing it out of personal interest and

♀page 74

contribution to science and medicine.
Q. NIH was having trouble getting women to sign on. What did they ask of Wyeth, and what did Wyeth do?
A. They asked for assistance in recruiting those patients, getting the word out, getting messages out in the communities, helping with advertising brochures, and so we gave them both our -- some intellectual knowledge, as well as financial support.
Q. And you also said that you provided training cards for women about breast exams. What did that involve?
A. As part of our routine, this is the kind of thing that we do routinely with physicians, provide teaching aids, information aids, to patients about our drugs or about the diseases that our drugs treat. And so we had -- we made some self-breast exam cards for the NIH to distribute to the research centers that were enrolling these women so the women would know how to do self-breast exams, since obviously, the breast cancer was an issue.
Q. You said we provided data; I think you talked about the IND for Prempro; is that right?
A. Yes.

♀page 75

Q. And why did the NIH -- did the NIH need to have the IND for Prempro in order to move forward with the WHI?
A. Yes.
Q. Why couldn't they do the study that they wanted to do?
A. Two reasons. One is that NIH can't do a study without FDA's review. And NIH needs to review this, as well, because they have their own ethics requirements. So the information that was in our application that was down at FDA, or soon to be down at FDA, was confidential. It was ours.

Without that, the NIH had no way to review the data to show that this drug was, in fact, safe and effective for the other indications that we were developing it for, vasomotor symptoms, osteoporosis, and vaginal atrophy. They needed that in order to review it.

The FDA can't give it -- even though they're all part of the same government we pay taxes for, they can't give that information, because it's proprietary. We have to give to them -- we have to sign a letter saying, You may use our information.

As part of that, that represented decades of research on Premarin and all the

♀page 76

information that was new -- new data that had not yet been reviewed, even by the FDA, on Prempro, which represented millions of dollars -- frankly, it's priceless.
Q. Did the NIH, during the course of the time that it was conducting the WHI, ever ask Wyeth for

any kind of support that Wyeth refused to give?
A. No.
Q. Did FDA, at any time during the course of the WHI, did they ever ask Wyeth to contribute anything, to assist in the ongoing conduct of the WHI when -- and Wyeth said, No, we won't do it?
A. No.
Q. Could you turn to Tab 19 in your notebook. This is Plaintiff's Exhibit 1117.
Do you see that?
A. Yes.
Q. Are you familiar with that document?
A. Yes.
Q. And just to orient the jury, this is an internal memo dated October 5, 1992, and it has -- and it's talking about the WHI Steering Committee that has not yet been officially formed. And I think the jury's heard some testimony in questioning, I think, of Dr. Pickar, about whether
♀page 77

it would be advantageous to Wyeth to get a seat at the Steering Committee and to have something to do with the agenda of that Steering Committee.
You're copied on this memo; is that right?
A. Yes, I am.
Q. Was Wyeth looking to sit on the Steering Committee of the WHI?
A. No.
Q. Did Wyeth ever look to control the WHI or control the agenda of any committees of the WHI?
A. No. We'd actually, as part of the contract, we had agreed to step out of any sort of involvement in the decision-making process.
Q. And why was that?
A. Because that's the way we want to do it. It's the way NIH operates. It's hands off.
Q. What is this memo talking about when people inside Wyeth are talking about, in fact, the Steering Committee hasn't been officially formed, and I think it talks about having a representative -- Wyeth-Ayerst Laboratories will be invited to send a representative to the Steering Committee and to appropriate subcommittees? What is that talking about?
♀page 78

A. The NIH, this involved 40 research centers around the country. NIH had a Steering Committee to coordinate the activities of all the research centers to make sure that they were all doing that, they knew any updates that occurred. They knew how to get the drug. They had their own information, drug safety monitoring board, that fed information from the study sites back to NIH.
This Steering Committee was made up of the researchers, as well as NIH participants in the study center in Seattle, the Fred Hutchinson Cancer Center.
What we were requesting, and NIH was actually asking for, was for people to be available when they had these annual meetings to be in

attendance. They had their meeting. We sat in the back to be sure that when issues came up on the agenda, we could answer them.

So if -- if they didn't get the drug in time, when was the next shipment of drug? If we could see the agenda beforehand, which sometimes happened, we could then anticipate the questions and have answers for them when they came up during the meeting. So if, you know, Vanderbilt didn't get drug June 13th, why was it? When were they going to

♀page 79

get it? We could say, They didn't get it June 13th, but we can get it to them June 18th. That was the reason. It was an operational reason that we were there.

Q. You talked about the WHI being a three-legged stool, and I think you've now talked about how Wyeth's contribution of the pills and the support and the giving the IND so that FDA would give permission to NIH to go forward with it is one leg of the stool.

What are the other two legs?

A. Well, NIH, obviously, because it's their study, it's government funded, they coordinate it. They set up the investigators, the study sites, they decide how the study is going to be run. They wrote the protocol.

The FDA is the third leg of the stool. NIH cannot do studies in humans without FDA approval. That's the law. So the NIH has to get FDA's approval. If FDA didn't approve this study, NIH couldn't have conducted it.

Q. And all the time -- I know that you had already filed your IND, which was -- I mean was it your -- yeah, your IND for Prempro?

A. Yes.

♀page 80

Q. So Wyeth was waiting to hear whether the FDA was going to say, yes, you may go ahead and approve Prempro; is that right?

A. That's correct.

Q. And so in the early years of the WHI, when Wyeth was providing this support through product and money and other support, did you know whether Prempro was ever going to be approved?

A. No. It was an unapproved drug. That was the reason the -- the word "IND" exists, Investigational New Drug.

Q. Why was Wyeth willing to do all this, support a study of its drug they didn't know at the time was going to sell?

A. We thought this was really important, not for our business, but for the medical community and for women.

Q. I want to talk a little bit about the results of the WHI and how Wyeth responded to the results.

The initial results of the WHI were publicized, the jury's heard, in July of 2002; is that right?

A. Yes.

Q. But was there a time some years earlier when

Wyeth received information from NIH about some
♀page 81

preliminary results of the WHI?
A. Yes.
Q. And when was that and how did that occur?
A. It was -- there were two -- two points in time where we had received information from the National Institutes of Health, and it was through a letter that the NIH sent to the participants, the women that were participating in this study.
They -- from time to time -- well, they had committed to provide the women with updates. And from time to time, they sent out updates, what's going on with the study, how are things going on, or enrollment is complete. It was as much to keep the women engaged and not feel like they were doing this for naught.
In April of 2000, the NIH sent out one of these update letters, and this was an update letter cautioning women about an observation that they had seen in the early data from WHI, and that was an increased risk of cardiovascular disease.
Q. And Wyeth was advised of this?
A. Yes.
Q. What did Wyeth do when it learned in April -- after it learned in April 2000 that NIH was telling the women in the WHI about a potential increase in
♀page 82

cardiovascular risk, that's heart risk, right?
A. Yes, yes.
Q. What did Wyeth do?
A. Strokes, heart attacks, so on. We revised our label and sent that down to the FDA for approval based on this preliminary data that was -- there were really no numbers in the letter. It was just a notice that they had seen these increased cardiovascular events in the women taking the drug.
Q. And this is now in 2000. So we're several years later from what you were talking about when Wyeth agreed to support the WHI?
A. Yes.
Q. And Wyeth's drug had been -- Prempro had been approved in December of 1994 and was on the market as of '95, right?
A. That's correct.
Q. You now have this product on the market for a five-year period when you learn about this?
A. That's correct.
Q. So you said that you -- you submit revised labeling changes to the FDA for the Prempro label?
A. Yes.
Q. And what was it that you wanted to be saying? What were you proposing to say in the Prempro label?
♀page 83

A. Well, we wanted to put in this information about the WHI study. As I said, this was the largest study ever conducted, it was unlike any other, and we thought it was important to provide in the label a statement of exactly what was in those letters to the women.

Q. What did FDA say in response to your proposed label change?
A. The FDA said, No, we don't think there's enough here. This is preliminary data. We need to let the study play out.
Q. Did a time come later, after 2000, when you again got -- when Wyeth again learned of some additional dates, not final, but data from the WHI?
A. Another letter was sent out in June of 2001, so a year after the first letter, with more information along the same line, that they were saying increased heart attacks, strokes, adverse events.
Q. And what did Wyeth do, if anything, when it learned about this additional information that had come to their attention?
A. We did essentially the same thing we did the first time. We revised our label and sent that down to the FDA.
♀page 84

Q. And did you actually publish the revised labels this time?
A. Yes.
Q. Did FDA have any response to the fact that Wyeth did that?
A. Yes. After we actually revised our label and sent it out, the FDA came back and said, We don't agree. We want you to take the information out -- about the WHI out of your label, because, again, they said it's preliminary. We haven't seen the data. This is just in a letter to participants.
Q. When did Wyeth first find out that the NIH was actually going to halt the Prempro arm of the WHI?
A. Early July 2002.
Q. And tell the jury how you learned -- how Wyeth learned about it and what Wyeth did.
A. We received a call from Jacques Rossouw. Dr. Rossouw is a cardiologist, was study director for WHI. He didn't tell us what; he just asked us to come down to NIH to talk to him about the study.
So a group of us went down. I think there were three physicians and myself went down, met with Dr. Rossouw, and he told us he was going to halt the study and that we were allowed to look at the data, but we were not allowed to make copies of
♀page 85

it or take it back. They were halting the study because of adverse events in the population, cardiovascular events.
Q. What was Wyeth's immediate response when you learned that NIH was going to stop the study?
A. Actually, I misspoke. It was stopped for breast cancer concerns, but -- what our response was from that was, we went back to Wyeth. We notified our executive management. We then notified the FDA.
Q. Why did you notify the FDA?
A. Well, because -- well, NIH wasn't going to. They said, This is not -- you know, it's not what we need to do. We said we do, and we told -- we told NIH that we were going to notify not only FDA, but all the other regulatory agencies around the world

with that -- where we were on the market.
Q. And what was Wyeth's next priority after notifying the FDA and the other regulatory agencies around the world?
A. Well, we notified medical -- medical societies, medical organizations. We made them sign confidentiality, because we were under confidentiality from NIH, but we felt that they needed to know in order that they could be prepared for when NIH actually released the data.

♀page 86

Again, NIH hadn't told the public about this or the participants. They were going to notify them. We wanted the medical societies to be prepared to answer questions from their members. So physicians, medical groups, needed to be able to have a resource they could go to say, Here's what you do.
Q. Did Wyeth inform physicians about the results of the WHI?
A. After they were made public.
Q. So they were made public July 9th, 2002; is that right?
A. Yes, July 9th.
Q. What did Wyeth do?
A. We had 550,000 Dear Doctor letters overnighted to physicians so that they would receive them at the same time that NIH was making this release.
Q. Was this all before the actual article about the WHI result was published?
A. Yes. The article wasn't published for eight days, I guess, after the NIH made the public release.
Q. Did Wyeth do anything further when the article about the WHI results was actually published?
A. Yes. We -- we worked with the journal,

♀page 87

Journal of American Medical Association, to obtain 25,000 copies of the article. And we sent those to the sales representatives so that they would hand deliver them to the doctors so that the doctors would have the article and be able to read it and understand what the study actually showed.
Q. Did Wyeth take any steps to revise its label at that point?
A. Yes, we did.
Q. Tell the jury what you did.
A. Well, within two days after actually having the journal article, we sent to the FDA a revised copy of our label, which then took what was in the journal article, incorporated that in the label, and sent that on down to FDA.
Q. And is that submission to the FDA about changing the label, is that at Tab 20 of your first volume, DX279?
A. Yes, this is a revised labeling.
Q. Did the FDA approve the label after you sent it July 19, 2002?
A. No, they did not.
Q. What did they do?
A. They -- we had a very good relationship in

discussions with the agency over this. They said

♀page 88

they needed more time to review it, because the significance of the study and the volume of information. We agreed with them that we would go forward with the label with their understanding, but it was not to be considered the final label, that there would be other revisions after the agency had the additional time to review it.

Q. Did the agency take some time to review it?
A. Yes.
Q. Did Wyeth submit a proposed label change again?
A. Yes. We submitted a proposed label change to them again in August, and that was -- then we submitted it and published it at the same time. At the same time we published it, we sent out another 550,000 Dear Doctor letters with the revised labeling on it.
Q. Let's talk about that for a minute. You were at Tab 20.
If you go to A, which is attached, that's a Defense Exhibit 282.
Is that your -- is that Wyeth's submission dated August 23, 2002, for the label change that was submitted after the FDA had considered the data from the WHI?

♀page 89

A. Yes. This was -- reflected some early discussions and further review of the data from Wyeth and comments back from the FDA.
Q. Tab B, Defense Exhibit 283, what is that?
A. This is the August 28th letter to healthcare professionals, which included the information on the revised label.
Q. In August of 2002, were there any additional materials that Wyeth provided to physicians and patients through the sales force in order to get the word out about the WHI results?
A. Yes.
Q. Is that at Tab B of -- 20B of your notebook, DX283?
A. C or D?
Q. B -- I'm sorry, C.
A. Yes.
Q. What is -- that is Exhibit 596. What is that?
A. We call that a tear sheet, patient tear sheet.
Q. Why did Wyeth send this patient tear sheet out?
A. Because between the time that the FDA or NIH had released the data on July 9th and the time our sales force -- and I actually went out to the field, as well, and went to the doctors' offices and

♀page 90

listened to their comments, it was clear that patients were coming in, they were confused.
There were a lot of questions, and physicians were looking for something that would allow them to conveniently share the information with the patient so they could explain it to the

patient in their office. The patient didn't have to try to write a bunch of stuff down or take a bunch of notes. They could tear off this piece of paper, which is why it's called a tear sheet, take it home, look at it, review it, and decide, together with your spouse or significant other, what they wanted to do going forward.
Q. Now, I know you talked about the WHI stopping earlier because of the breast cancer result.
What did you understand the risk of breast cancer was that was shown in the WHI when they first announced the results?
A. 1.26.
Q. How did that compare to what Wyeth had been telling women in the labeling for the product, Prempro, prior to WHI?
A. It was essentially the same. Our label said 1.3 to 2.0.
Q. Did it get a lot of publicity, there was a
♀page 91

study that had been stopped because of breast cancer?
A. Oh, absolutely. This was the largest study ever conducted in women in the United States, so stopping the study was big news.
Q. Did a time come when the FDA formally approved a new Prempro label that incorporated information about the WHI?
A. Yes.
Q. When was that?
A. In January of 2003.
Q. You had submitted some label change in July and again in August, and they didn't approve it until January of '03?
A. That's correct.
Q. What did you do at that point?
A. We took the revised labels, wrote another Dear Doctor letter, sent out another 550,000 copies of the revised label that had now been approved by the FDA, so the physicians and patients had the current label.
Q. So we can finish up with these exhibits. Tab D, 20D, that is Defense Exhibit 284, what is that?
A. This is a letter from the FDA to Wyeth responding to our revisions to our label.
♀page 92

Q. That's the approval?
A. Yes.
Q. And what is Tab E, Defense Exhibit 3118?
A. This is the Dear Healthcare Provider, Dear Doctor letter, that was sent out January 6th of 2003 with the revised label.
Q. In terms of internationally at Wyeth, in terms of medical evaluation, clinical evaluation of what WHI meant in the overall context of science, is there a particular person at Wyeth who was principally responsible for that?
A. Yes.
Q. Who was that?
A. Dr. Ginger Constantine.
Q. The fall of 2002, before the labeling was

finalized, was a conference held at NIH that discussed the results of WHI?
A. Yes.
Q. Did Wyeth send anyone to that conference?
A. Yes. Wyeth was invited to send somebody to speak.
Q. Did somebody from Wyeth go to speak and address NIH?
A. Yes. That was Dr. Constantine.
Q. Has the company been involved in ongoing

♀page 93

discussions with NIH since then about the WHI results?
A. Yes.
Q. Has the company had ongoing discussions with the FDA about the WHI results?
A. Yes, on a somewhat routine basis.
Q. In all of the post-WHI activity inside the company or in your dialogues with NIH or with FDA, are you aware of any suggestion that Prempro should be taken off the market because of the WHI results?
A. No.
Q. What's your understanding as to why that's never come up, why that suggestion hadn't been made?
A. Because the benefits for the current indications of vasomotor symptoms and vaginal atrophy and osteoporosis, those benefits still outweigh the risks.
Q. Does the drug continue to be prescribed and continue to be taken by women in this country?
A. Yes. The drug continues to be viewed as safe and effective for its intended uses.
MS. HANDLER: Thank you.
Cross-examine.
MS. LITTLEPAGE: Judge, there's one issue I need to discuss with the Court at

♀page 94

sidebar.
Can I do it before we start?
THE COURT: Sure.

\- - -

(Whereupon, a discussion was held at sidebar as follows:)

\- - -

MS. LITTLEPAGE: Judge, this was a motion in limine that we had filed concerning good acts of the company. And in that motion in limine, we had said that if Wyeth came in and said things, like I believe Dr. Dey has clearly done, We are the best, best company in the industry; we always put science first; we always do right by women, that we believed that it would open the door for us to discuss the fact that this is the same company who paid 21 billion dollars in diet drug claims. They have been sued over Duract and Cordarone, and fen-phen.
You cannot wrap yourself as the best company in the industry and not allow me to deal with that issue on cross-examination for the bias of showing that this man showing that

this is a company that has routinely, routinely

♀page 95

produced drugs that have been either removed from the market or black boxed once studies are done and have injured thousands of people.
It is completely unfair what happened this afternoon. We raised a motion in limine. Court told Wyeth, Be careful what they did. Wyeth filed a response and said, The most they would do is say they were a pharmaceutical company that had research facilities, and then today Dr. Dey comes in and says what I consider to be unbelievable statements that I, on behalf of Connie Barton, I feel very strongly I am entitled to cross-examine him about.
MS. HANDLER: I think Dr. Dey, Your Honor, was giving his view of the company. He's explaining what the company does, explaining how they view science, the fact that there may have been other drugs that have been withdrawn or that there have been lawsuits about other drugs is not a relevant issue. It's very prejudicial, and it would not be appropriate. I do not think we opened the door in any way to that.
THE COURT: Excuse me?
MS. HANDLER: The Court said, just as

♀page 96

Ms. Barton was able to talk about her background, we talked about the background of the company, what it was, how it views itself. This is not opening the door to the particular type of inflammatory things that Ms. Littlepage is suggesting that she would want to cross-examine on.
MS. LITTLEPAGE: I can't think of anything more prejudicial than a man who comes in and says, We are the best drug company in the industry --
THE COURT: Very well may be the best.
MS. LITTLEPAGE: I'm willing -- I believe they're not the best.
THE COURT: I very well may limit you, but I'm going to give you an opportunity to question in this area. Be careful, however.
I very well may not let you get involved in the dollar amount, things of that nature, but you very well may show they have had other problems with other drugs. Be careful.
MS. HANDLER: Your Honor, I know you don't want to give advisory opinions. I want to let the Court know that if they talk about

♀page 97

other drugs and fines or --
THE COURT: I'm not going to get into that.
MS. HANDLER: If I can finish what I want to say. Fines or withdraw from the market or make it sound like they're a bad company

because of what's happened with other drugs or lawsuits or people getting hurt from other drugs, I will move for a mistrial. I just want to know -- I will not do it -- stand up and say it --

THE COURT: Don't threaten me.

MS. HANDLER: I want to know the procedure, because I would like to come to sidebar to do it.

THE COURT: He opened the door, and I'm going to allow the plaintiff, in a limited extent, to pursue it with other -- in these other areas in a very cautious manner without getting into fines, without getting into whatever disciplinary actions may or may not have been taken. But he indicated it's the safest company.

Ask him what he meant by that. Does that mean they haven't had any problems with

♀page 98

other types of pharmaceutical products? I'll allow you to explore that on even balance. Don't come here and tell me what you're going to do. You can ask for a mistrial any time you like.

MS. HANDLER: Okay.

THE COURT: I just want you to understand you have your rights.

MS. HANDLER: I understand.

THE COURT: And I'll rule.

MS. HANDLER: I understand. I didn't want to do it in front of the jury if Your Honor doesn't want it being said in front of the jury.

THE COURT: I heard his testimony. I will allow proper cross-examination.

If you think it's not proper, you object, and you can see me at sidebar, and I'll rule.

MS. HANDLER: That's all I wanted to know.

- - -

(The following occurred in open court in the presence of the jury:)

- - -

♀page 99

CROSS-EXAMINATION

- - -

BY MS. LITTLEPAGE:

Q. Good afternoon, Dr. Dey.

How are you?

A. Good.

How are you, Ms. Littlepage?

Q. I'm good.

You told us that you live in Philadelphia.

Which part do you live?

A. West of here, about -- as a crow flies, about five miles.

Q. Can you give us your home address?

A. 47 Righters Mill Road, Narberth, Pennsylvania.

Q. And you currently still work for the defendant, Wyeth?
A. As of today, I think we're Pfizer.
Q. Do you currently still work for whoever you all are today?
A. I currently work for Wyeth/Pfizer, yes.
Q. And we heard from your deposition that you were responsible for marketing and sales with dotted line responsibility to research and development?
A. I don't think we heard that today.
♀page 100

Q. We didn't. We heard it weeks ago, actually.
A. Okay.
Q. Is that true?
A. Yes.
Q. And then you told us today that you were also responsible for financial issues from a senior management point of view?
A. As it related to women's healthcare, yes, I was involved in decisions involving business, yes.
Q. And can we agree, sir, that you were senior management on the Prempro project?
A. I was senior management for women's healthcare, yes.
Q. And Prempro and Wyeth's Premarin was in the women's healthcare division?
A. Yes, that's correct.
Q. And we've heard the words "Premarin family of products."
That means it's both the Premarin, and the Prempro, and the Premphase, your hormone therapy product?
A. Yes, and Premarin vaginal cream and Premarin IV.
Q. So if something went wrong with Prempro, it happened on your watch, right, sir?
♀page 101

A. Well, certainly I was responsible for the business from 2001 through 2007, 8, so, yes.
Q. And you're here to say, Everything didn't go wrong; ya'll did everything right?
A. I think we aspired to do everything right.
Q. Sir, your compensation -- part of your compensation package each year is stock options?
MS. HANDLER: Objection; relevance.
THE COURT: Sustained.
BY MS. LITTLEPAGE:
Q. Sir, do you have a financial interest in whether Prempro and Premarin have substantial sales each year?
MS. HANDLER: Objection; relevance.
THE COURT: Overruled.
THE WITNESS: Not specifically.
BY MS. LITTLEPAGE:
Q. Indirectly?
A. As the corporation goes, but not specifically the brand or women's healthcare, frankly, for that matter.
Q. So if -- well, let's be clear what we're talking about.
The Premarin family of products,

whether it's Premarin or E plus P, was your No. 1

♀page 102

product, right, sir?
A. The Premarin family of products was the No. 1 product family in women's healthcare.
Q. And it was a blockbuster product, right, sir?
A. It sold well, yes.
Q. I've seen documents where it's called the cornerstone product of the women's healthcare division?
A. Yes, that would be right.
Q. And so anything that impacts the sales of Wyeth's Premarin family of products substantially impacts your division, the women' healthcare?
A. Oh, it did, yes, but it didn't necessarily roll up in terms of financial remuneration back to me.
Q. Let me hand you some books.
Dr. Dey, if you turn to Tab 3.
A. Yes.
Q. That's a handwritten document by you, sir?
A. Yes, it is.
Q. Plaintiff's Exhibit 5858?
A. 0858.
Q. 0858?
A. Yes.
Q. And, Dr. Dey, in this handwritten document, do

♀page 103

you write, "Premarin has been a major contributor to this corporation since its approval in 1942"?
A. That's correct.
Q. And that's true?
A. That's true.
Q. And then you write, it was the principle product for the company and people wondered about the viability of the company when estrogen therapy was reported to increase the risk of endometrial hyperplasia and cancer, right, sir?
A. It was not the company, as we know it, Wyeth. It was Ayerst Laboratory, which was a small division of what was American Home Products. Wyeth now is much bigger that.
Q. That's a good question. Let me make sure the jury understands.
If we see documents that say Wyeth, Wyeth-Ayerst, Ayerst, Ayerst Laboratories, American Home Products, it's all the same company?
A. All part of the same company. But Ayerst Laboratories at this time was a division, small division of American Home Products.
Q. And then you go on in your handwriting to say, people wondered about the viability of the company -- I read that part.

♀page 104

"At the time Premarin was the leading estrogen therapy on the market selling 300 million dollars," right, sir?
A. Yes. And it still is the leading estrogen product on the market.
Q. In fact, y'all are still the leaders of the

market?
A. That's correct.
Q. The whole family?
A. That's correct.
Q. Ya'll are the leaders of the market for Premarin and E plus P products, right, sir?
A. That's correct.
Q. By a long shot?
A. I don't know by a long shot, but we're still leaders.
Q. In the -- 70, 80 percent of the market is still yours?
A. I don't know. I remember I moved on to scientific affairs over the last couple of years. I haven't tracked the exact sales.
Q. Then you write that the sales for Premarin -- and here's where you write -- fell more than 50 percent to about 130 million, and you're talking about when it was found that the E alone was causing
♀page 105

endometrial cancer, right, sir?
A. Yes.
Q. And you say, as the role of progestin in modulating the effect of the unopposed estrogen on the endometrium was better elucidated, Prempro, the combined, was launched, right, sir?
A. Well, it was launched in 1995 after the FDA approved it as safe and effective, yes.
Q. And then you write, the Premarin family --
MS. HANDLER: Objection to the next sentence, Your Honor, relevance, 403, also.
THE COURT: What's the first word in the next sentence?
MS. LITTLEPAGE: The Premarin family.
MS. HANDLER: Goes to the next phase of the case, if there is one, Your Honor.
THE COURT: Sustained.
BY MS. LITTLEPAGE:
Q. When you add the E and the P together, did the company then start selling Prempro, right, sir?
A. After the FDA approved it, yes, sir.
Q. And I think your document says that it's the Premarin family that's the No. 1 product for Wyeth; do you see that?
A. Not specifically, no, but I -- I believe at
♀page 106

some point in time it was the No. 1 product for the company, yes.
Q. What is this handwritten document for, sir?
A. I'd have to read the whole thing. My guess is it was a note to the sales force or voicemail or something of that. I don't specifically recall.
Q. Okay.
If we turn to Tab 1, I want to talk -- you said ya'll were the leaders in the industry, right, sir?
A. Yes.
Q. Tab 1 is PX398. Do you see that, sir?
A. Yes, I do.
Q. And Tab 1 indicates -- if you turn to the second page of Tab 1, do you see that you received

this, you're one of the people on the distribution list?
A. Yes, I do.
Q. This document dated 1998, one of the take-home messages is that 93 percent of all new HRT starts were prescribed a Premarin family product for that month you're talking about, November of 1997, right, sir?
A. I think we were probably the only product on the market at the time. I think there wasn't a
♀page 107

whole lot of choice. So the fact we were 93 percent when you --
Q. That's my point. Thank you for getting there. Ya'll were the first people to get them together and get a single tablet?
A. First people to do the studies necessary to show that they were safe and effective, yes.
Q. And because of that, you really captured the menopause market, because you were the only one that the woman could go to pharmacy, pay one prescription price, and get E and P?
A. That's what we were hoping, is that we would be the first.
Q. And it worked?
A. We were the first, yes.
Q. And so at least at this point, 93 percent of all women starting hormone therapy are getting your product?
A. That's right.
Q. And then it goes on to say that ya'll know, because you've done a survey, that on average, women using HRT are taking the drug for 12.45 years. Do you see that?
A. Down -- are you talking about the highlighted section down below?
♀page 108

Q. I am, sir.
A. Yes. And it's a little hard to understand that since the product was just approved, but...
Q. Well, that's also my point, because before you approved the product in 1995, three years before, ya'll were actually selling E and P but in two separate tablets?
A. Yes, we were, along with -- I think there were probably 17 other products out there, as well.
Q. You had competitors?
A. Yes.
Q. Still have competitors today?
A. Right.
Q. Ya'll are still the leaders?
A. Yes.
Q. So we know that in February of 1998, ya'll knew that women taking E plus P were taking it for 12.5 years, on average, right, sir?
A. That's what this memo says, yes.
Q. So no question, Wyeth knew that women who took your products were going to stay on these drugs not a month, not six months, not one year, not two years, but, on average, 12.5 years, right, sir?
A. That's what this memo says, yes.

Q. And then that -- you've also had a survey done

♀page 109

to understand why doctors prescribe HRT. Do you see that?
A. Yeah. I'm not sure we had the survey done. I'm trying to catch up with you a little bit and read this memo for the first time.
Q. Somebody's done a survey that's in your memo, right, sir?
A. Yes, market measures.
Q. Market measures has done a survey to look and see why are people taking E plus P, and they found that why physicians prescribe HRT is for symptoms, right, sir?
A. Yes.
Q. For osteoporosis, right, sir?
A. Yes.
Q. And for heart benefit?
A. Cardiovascular benefits, that's correct.
Q. Now, ya'll knew in 1998 that the FDA had said that ya'll were not supposed to promote E plus P for heart benefit, right, sir?
A. No, I don't. I don't recall specifically.
Q. Okay.
Let's turn to Tab 2. Do you see Tab 2, sir?
A. Yes.

♀page 110

Q. Wyeth memo?
A. Yes.
Q. You are CC'd on it?
A. Yes, I am.
Q. Dated 1992?
A. Yes.
Q. So that's six years before?
A. Six years before?
Q. 1998.
A. Yes.
Q. Okay.
And in this memo, one of your physicians has been speaking to people from the FDA about labeling to do with heart effects?
A. Are you referring to Dr. Steve Sasson?
Q. I am.
A. He's research. He's a Ph.D. He's in regulatory affairs.
Q. A researcher has been speaking to FDA about heart effects, right, sir?
MS. HANDLER: Your Honor, I have an objection.
THE COURT: Let me see counsel.
\- - -
(Whereupon, a discussion was held

♀page 111

at sidebar as follows:)
\- - -
THE COURT: I didn't presuppose your objection, but I've been giving the other matter thought, and I don't believe it's relevant to any of the issues to go into any of

the other drugs that they have -- that they very well may have had problems with.
I'm going to sustain the objection if you do go that route.
What's the basis of your objection?
MS. HANDLER: I'm going to object to the document, because it's dealing with Premarin 1992 before Prempro was on the market. Discussing with the FDA about the drug, Premarin --
THE COURT: Hasn't that been discussed?
MS. LITTLEPAGE: The exact document has already been discussed.
THE COURT: I'll allow it.
MS. HANDLER: Making a record.
- - -
(The following occurred in open court in the presence of the jury:)

♀page 112

- - -
THE COURT: That objection was overruled.
BY MS. LITTLEPAGE:
Q. Now, in this memo that you are CC'd, Dr. Sasson, your researcher, has met with people at the FDA. Do you see that?
A. Yes.
Q. And the FDA person, Dr. Corfman, has said that the FDA is going to put cardiac information into the precautions section, right, sir?
A. Yes. This specifically was about labeling regarding cardiovascular benefits.
Q. And what Dr. Corfman from the FDA says is, the only reason FDA is presently not willing to allow this information to appear in the other sections, e.g. Additional Health Benefits, is to prevent Wyeth from promoting Premarin for what FDA considers to be a "yet to be proven" benefit, right, sir?
A. Yes. It was widely being prescribed by physicians off label. And the FDA was concerned that this would acknowledge and further support that.
Q. So certainly from 1992, ya'll knew you were not supposed to promote for cardiac, right, sir?

♀page 113

A. I'm not sure that I agree with that, because all I can tell you is what's here in this memo, and it's saying that they want to put as we had filed as a labeling supplement to the agency into the precaution section.
Q. To prevent Wyeth from promoting?
A. Right. But it doesn't mean it can't be in the label and we couldn't respond to questions about it.
Q. Would you agree with me you were not to promote -- FDA was preventing you from promoting; would you agree with that?
A. That's what this says, yes.
Q. Now, you told the jury that Wyeth is a company committed to science?
A. That's correct.

Q. And just so we're clear, when ya'll create these labels that you give to doctors, they're based on science, right, sir?
A. Yes.
Q. Studies are done, yes?
A. Yes.
Q. Study information is given to the doctors?
A. That's correct.
Q. No studies are done, no information to give to the doctors, right?
♀page 114

A. Yes.
Q. So just so we're clear, ya'll started selling Premarin in 1942, right, sir?
A. That's correct.
Q. In 1975, two independent researchers found your drug was causing cancer below the waist, right, sir?
A. It was increasing endometrial hyperplasia and endometrial cancer, yes, not just our drug, but all estrogens.
Q. Ya'll were the leader of the market then?
A. But all products that were estrogen. And it was also concern of the oral contraceptive involved, as well.
Q. It wasn't Wyeth science that found that connection, right, sir?
A. I'm sure we contributed to some of the science that was involved in that, yes.
Q. Sir, you know it was two separate groups in Los Angeles and Washington who found this, presented it at an FDA advisory committee, right, sir?
A. Yes.
Q. That wasn't Wyeth, right, sir?
A. But we had done studies along that same line.
Q. And had you found it before them or you did
♀page 115

studies after?
A. No. We had engaged in a study in 1975 with Dr. Hammond to look at that and actually a much larger study than the two that were discussed at the advisory committee.
Q. At the advisory committee before you started the study with Dr. Hammond and got results from Dr. Hammond's study, two independent people said your drug is causing endometrial cancer in women?
A. That was a relatively new finding and we were following up on that. We're actually a little bit ahead of curve. Before the advisory committee meeting, we had set up a contract with Dr. Hammond to involve his patients in what became a 25-year retrospective study looking at endometrial cancer and breast cancer.
Q. Just so we're clear, ya'll had started selling this drug in 1942, right, sir, and you sold it every single day ,every single month of every single year until 1975 when other people discovered it was causing cancer?
A. No, not entirely. We had done studies -- I mentioned them earlier -- Burch and Byrd in '71 and '74 were published that also looked at endometrial

cancer, as well.

♀page 116

Q. You agree with me, you sold your product this entire time?
A. Yes.
Q. And would you agree with me that once these independent researchers found the connection and the world learned the truth, your sales fell, right, sir, we just talked about that?
A. I think physicians were looking -- yes, physicians were looking for what to do in women who had a uterus, how to deal with the issue of increased endometrial hyperplasia associated with estrogen use, yes, not just our product, all estrogens.
Q. My question was, your sales fell, right, sir?
A. Yes.
Q. Now, after 1975, people started using your product E with a P to protect the woman from endometrial cancer from E?
A. Physicians were -- I would hate to use the term -- physicians were experimenting with ways to deal with the endometrial hyperplasia that they were seeing.
Q. They were experimenting on ways to deal with the cancer that your drug was causing, wasn't it?
A. I think they were trying to figure out a way

♀page 117

to offset the hyperplasias that they were seeing.
Q. And then ya'll actually brought a P to market so that you could have women that can have your E and your P every day?
A. There were Ps on the market. There were a lot of them actually on the market before that. That's what physicians were using. They were prescribing off label, as they're allowed to, to try to deal with what they were seeing in their practice.
Q. My question, ya'll brought a P to market?
A. When are you referring to?
Q. 1992, when you got Cycrin approved.
A. Yes. That was already on the market as Provera, and it had been -- the brand was Provera. It had been on the market. All we did was develop a generic, yes, we had Cycrin on the market.
Q. From 1975, you pretty much knew you weren't going to sell any P -- any E unless someone was taking a P and they had a uterus, because it would be dangerous, right, sir?
A. I think that's an overstatement of what -- what we knew was that there was an increased risk of endometrial hyperplasia associated in estrogen alone in women that had a uterus. Some physicians even today continue to prescribe estrogens alone in women

♀page 118

with a uterus.
So the majority of our business in women with a uterus, I would hope that physicians would use a progestin. It's the right thing to do, I would think.
Q. I would hope so, too.

In 1994, you got the two of them put together in one pill called Prempro, right, sir?
A. Actually, it was '95. Prempro as a two-tablet combination was approved in '94; '95 was approved as single tablet.
Q. Is that right then?
A. Yes.
Q. The jury has seen this, the information that goes to the doctor, these labels that you tell the doctor all about your drug based on science stayed the same in 1996, '97, '98, '99, 2000, 2001, as to breast cancer, right, sir?
A. I don't recall that. I'd be happy to look at the labels and comment on it.
Q. If we've heard testimony the warning stays the exact same, would you have any reason to dispute that?
A. No. But I don't have the label in front of me to look at. I'd be happy to look at it, though.

♀page 119

Q. Then in 2002, science comes along, the WHI, right, sir?
A. The results of the WHI were announced in 2002. There had been a lot of science going on between 1995, 1997, and 2002.
Q. All that science that was going on didn't get in your label until after WHI, right, sir?
MS. HANDLER: Objection; argumentative.
THE COURT: I didn't hear you.
MS. HANDLER: I said, Objection; argumentative.
THE COURT: Sustained as to form.
BY MS. LITTLEPAGE:
Q. Did any of that science get into your label so doctors could know about all that science until after the WHI?
A. If the FDA and Wyeth viewed that the information that was coming out between 1995 and 2002 merited a label change, it would have gone in there. But what that meant was that the science that was going on between 1995 and 2002 was already consistent with what was in the label already. And that's why if there aren't any label changes, nothing was changed in the label, because the

♀page 120

science hadn't changed.
Q. So we're clear, the WHI was a government study paid for by taxpayers, right, sir?
A. It was paid for by the government, yes, in major part.
Q. And then after the government study, not the Wyeth study, but the government study came out, your label changed, you sent out 500,000 Dear Doctor letters, people learned the truth, and your sales fell?
MS. HANDLER: Objection.
THE COURT: Sustained, as to form.
THE WITNESS: Would you repeat.
BY MS. LITTLEPAGE:
Q. Let's go through one by one.

You send out 500,000 Dear Doctor letters, right, sir?
A. In 2002, July 9th, we sent out 500,000. We sent out another 500,000 after the first labeling change, and another 500,000 after the second labeling change.
Q. You changed your label and you put a big black box, right, sir?
A. Actually, the FDA did.
Q. It now says, risk of invasive breast cancer,

♀page 121

right, sir?
A. Yeah, the black box was not a breast cancer black box. The black box was on cardiovascular disease and the cardiovascular use, and it warned physicians not to prescribe this drug for prevention of cardiovascular disease. That was the reason the black box came into being.
Q. In the black box warning, it now has a warning of invasive breast cancer, right, sir?
A. Yes.
Q. It now says, do not use your product to prevent heart disease and dementia?
A. Actually in the other order. Cardiovascular is the first thing that's mentioned in the black box. That's why the block box was there.
It pulled forward information that was already in the label into the black box about breast cancer. The word "invasive" actually came from Wyeth, and it was a quote out of the WHI study.
Q. That's my question.
It now says, don't use for heart disease and dementia in the black box?
A. Yes.
Q. Says, only use at the lowest effective dose for the shortest duration, right, sir?

♀page 122

A. Yes. That information was already in the label, as well.
Q. Says, excess risk increases with duration of use, right, sir?
A. I'm not sure. I don't recall that specific statement, but...
Q. And there are indications changed in now your second line treatment for vaginal atrophy and second line treatment for osteoporosis?
A. Oral tablets are second line, I think, for vaginal atrophy. I'm not sure. I would have to see the label specifically to verify those statements.
Q. After this science, government science, your sales fell, right, sir?
A. Prescriptions dropped off dramatically, yes.
Q. Now, you told this jury that ya'll funded lots of breast cancer studies?
A. We supported lots of breast cancer studies, yes.
Q. And you said Hulka?
A. Yes.
Q. Estrogen only, right?
A. Barbara Hulka, yes, that's correct.
Q. You said Horowitz, right, sir?

A. Yes, this was --

♀page 123

Q. Estrogen only?
A. This was in relationship, does Wyeth have a policy against studying breast cancer? And those were both studies that involved breast cancer. Hulka and Horowitz were estrogen alone, that's correct.
Q. Then you turned to the jury and you said, The FDA told us it was the most highly researched product, right, sir?
A. That's here from DDMAC; yes, FDA to Wyeth.
Q. Estrogen only, right, sir?
A. It was with regard to Prempro, but yes, it would have been only Premarin.
Q. Now, you're not here to say the FDA said that Prempro was the most highly studied drug, right?
A. It's part of the Premarin family. Remember Premarin makes up half of Prempro, so...
Q. You're certainly not here to say that the FDA didn't repeatedly meet with ya'll and tell you over and over and over and over and over and over and over again --
MS. HANDLER: Objection.
THE COURT: Objection is sustained.
BY MS. LITTLEPAGE:
Q. You're not here to tell us that the FDA didn't

♀page 124

meet you ya'll repeatedly and say, safety data is needed, and there's a potential breast cancer risk that needs to be answered?
A. I'm not sure what your question is. We routinely meet with the FDA to discuss labeling changes, supplements to our label. I'm -- I don't understand your question.
Q. Okay. Let's see if we can do this one.
When you went to get Prempro approved in the two tablet form in 1994, right, sir, you got a conditional approval from the FDA?
A. Not a conditional approval; it was approval.
Q. On the condition that Wyeth do a comprehensive investigation of the breast cancer risk with E plus P, right, sir?
A. There was a Phase IV commitment as part of the approval to do an investigation into the breast cancer risk of estrogen plus progestin versus estrogen alone.
Q. And the words the FDA used was "comprehensive investigation," right, sir?
A. Yes. Well, I don't know. I'd have to look at the memo to see. I don't recall the exact words that they used.
Q. You told us that ya'll funded breast cancer

♀page 125

studies because you funded Dr. Colditz. Do you remember you said that?
A. Well, he was one of the studies that we supported, yes.
Q. Let's make sure we understand what you did with Dr. Colditz.

Ya'll approached Dr. Colditz and asked him whether he would do a study to show that P reduced breast cancer risk, right, sir?
A. I'm not sure what the specific request was. We asked him to do a study looking at breast cancer with his population, which was the Nurses' Health study, to look at the relationship between estrogen plus progestin in breast cancer.
Q. And do you know, sir, that what the hypothesis, Dr. Colditz was asked to look for, was whether adding the P would actually reduce the risk of breast cancer for women?
A. A couple comments. One is no, I don't know specifically whether that is what he asked. But two points, one, in 1983, Dr. Gambrell did a study looking at estrogen and progestin in breast cancer. This was not a Wyeth funded study, and he showed a 70 percent reduction in breast cancer as a result of putting progestin with estrogen. So if Dr. Colditz

♀page 126

or the letter suggests that they were looking for the relationship of progestin to reduce the breast cancer, that was probably -- the basis of that was the data through Dr. Gambrell, that was an enormous study, 37,000 women years in Gambrell's study. But the other question is, how is the study asked because the null hypothesis is always twisted the other way around.
Not specifically unless I saw the letter you're referring to that I can agree with you, that's what we were doing.
Q. Go back to Colditz. I want to talk about Gambrell. You just talked about Gambrell, right?
You know that there were 9 E plus P breast cancer users in that study; did you know that, nine?
A. No, I don't know, and I'm not sure that's correct.
Q. Let's talk about Dr. Colditz.
You said you hired him to do a breast cancer study.
Do you know that he found that E plus P did not reduce the breast cancer risk, but that it increased the breast cancer risk and that more studies were clearly needed? Did you know that?

♀page 127

A. I'd be happy to review the specific wording that he used. I think what he said was he couldn't rule out a risk of E plus P, but he couldn't find what exactly was relative to E alone.
Q. Wyeth never hired him again, right?
A. No, that's not true. We continued to fund the Nurses' Health study, which he was, I think, the lead investigator from 1992 through 2002.
Q. Have you seen Dr. Colditz' deposition on that issue where he says after he told you he did not --
MS. HANDLER: Objection; hearsay.
THE COURT: She asked if he saw the deposition.
MS. HANDLER: She's about to quote from it.

THE COURT: Objection sustained, as to form.
You may ask him if he saw the deposition.
BY MS. LITTLEPAGE:
Q. Have you seen Dr. Colditz' deposition?
A. No, I have not.
Q. Before you came into this jury to tell them ya'll funded Dr. Colditz, you didn't look to see what Dr. Colditz said on this issue?

♀page 128

A. I'm not sure Dr. Colditz' issue or issue here is relevant to what I do on a daily basis.
Q. Then you said ya'll did the HERS study, right?
A. Yes, we funded the HERS trial.
Q. You were listing off breast cancers studies. You listed a bunch of E studies, you listed Dr. Colditz' study, and then you said HERS, right?
A. That's correct, HERS trial.
Q. This was a heart study?
A. Yes.
Q. Again, prime -- again, primary benefit was cardiovascular disease.
Turn to Tab 15 in your book. Do you see that, sir, Plaintiff's Exhibit 475?
A. Yes, I do.
Q. It's Dr. James Pickar, pubplan, confidential draft about the HERS study; do you see that?
A. Yes, I do.
Q. Can you turn to page 3? Can you read for the jury the sentence that's highlighted in this Dr. James Pickar publication plan.doc.
A. Yes, it says, "however, HERS was not designed to determine the impact of HRT on cancer incidence." And this included breast and gynecologic cancers. But HERS was also cited by the National Cancer

♀page 129

Institute, the FDA, and NIH as a breast cancer study.
Q. And HRT is E plus P, right, sir?
A. That's correct.
Q. Had you seen this document before you came in to tell this jury ya'll funded the HERS study and it was a breast cancer study?
MS. HANDLER: Objection; misstates the statement.
THE WITNESS: Objection sustained.
BY MS. LITTLEPAGE:
Q. Have you seen this document before you came in to tell this jury about HERS?
A. I don't recall.
Q. Now then, you told the jury that it was unethical to do breast cancer studies?
A. I said it is unethical to do a study where the sole purpose of the study is to demonstrate harm.
Q. But, clearly, it's absolutely and completely appropriate to do a study that would look at heart and brain benefit in the context of breast cancer risk, right, sir?
A. Yes. I believe if I understand what you're saying, yes.

Q. That's what happened, because the government
♀page 130

spent taxpayers' dollars looking at your drug and whether it gave a benefit or a risk, right, sir?
A. I think that's misstating. I think there are a number of studies that looked at that kind of risk-benefit equation. The HERS trial was one that looked at very similar and a different population than WHI.
Q. The government spent taxpayers' dollars studying your drug in terms of these benefits and this risk, right, sir?
A. Multiple risks, not just breast cancer. Breast cancer was one of the risks that they were looking at.
Q. I think you said it cost 800 million dollars?
A. I think it's between 800 million and a billion. I think that's what NIH has published as their costs.
Q. And you know, sir, the cost for the E plus P arm is 127 million dollars, right, sir?
A. No, I don't know that.
Q. What was the cost for the E plus P arm, not the whole study with all the arms and the vitamin and the diet and the observations, what was just the E plus P arm cost?
A. I don't know.
♀page 131

Q. You looked up only the 800 million dollar number before you came to testify?
A. I think it's the only number that the NIH has published. I don't know. That's what I read from NIH, is the 800 million dollar number.
Q. I think you told us today, Wyeth spends 2 billion dollars a year on research?
A. Two to three, yes.
Q. Two to three billion, per year?
A. Yes.
Q. And I think you told us that ya'll were one of the three-legged stools of the WHI, right?
A. I think we were one of the three -- one of the three legs to the stool.
Q. One of the legs of the three-legged stool?
A. That's correct.
Q. And the leg that ya'll were was a 2.7 million dollar investment of giving drug?
A. No. It's more than that, and I mentioned that before. 2.7 million was the cost of the tablets. It was additional money that was spent on supporting patient enrollment, and then there was the IND, which, frankly, is priceless.
Q. And you said you made a hundred million pills?
A. Yes, a hundred million tablets, right.
♀page 132

Q. Which I think it works out to you costing .0027 cents per pill?
A. That would be our cost.
Q. And Prempro sold for about 85 cents per pill on the market?
A. I don't know what the current price is, but

that's probably about right.
Q. Now, you said that ya'll did these annual meetings so that Wyeth could learn new stuff, right?
A. I wouldn't call it stuff. I think we -- Wyeth was trying to understand the science and keep up with the science and keep on the cutting edge.
Q. Much better. Cutting edge science is why you had these annual meetings?
A. Yes.
Q. Wyeth could bring everybody from around the world and ya'll could know what was cutting edge science, right, sir?
A. We could participate with our ideas, listen to them, yes.
Q. And learn them, learn about what the cutting edge science, was, right?
A. We did participate in those discussions, yes.
Q. And if it was important, you would have told the doctors in Peoria, Illinois about it, right?

♀page 133

A. Excuse me. I'm having a little bit of hard time jumping from the annual meeting to cutting edge science to it. What are you referring to, it?
Q. You told me labels were built on science?
A. That's correct.
Q. If Wyeth goes to one of these fancy annual meetings and ya'll learn something is really important, you could have told doctors in Peoria, Illinois --
MS. HANDLER: Objection to form.
BY MS. LITTLEPAGE:
Q. -- by putting it in your label, right, sir?
THE COURT: Objection sustained, as to form.
BY MS. LITTLEPAGE:
Q. If you went to the meeting and you learned something new, you could have told doctors about it, right, sir?
A. We would have reported anything new related to the product to the FDA. A lot of this, this was yet unpublished. When it was published, we would have shared it with FDA in written form. That would have then gone in if it were important, and the FDA decided it was important, along with us, would have gone in the label, that's correct.

♀page 134

Q. And the label never changed, giving doctors anywhere new information in 1997, 1998, 1999, 2000, 2001, right, sir?
A. No, I don't agree with that. The label changed, I'm sure, for various areas. If you're referring specifically to breast cancer --
Q. I am.
A. -- then it would have -- what would have gone in the label in 1995 would have been reevaluated and reviewed to decide whether or not there was, in fact, anything new that required the label to change.
If the label adequately reflected the science, then it wouldn't have changed, and nothing new on the breast cancer front was sufficient -- of

sufficient magnitude or outside the current label to warrant further labeling revision.
Q. The label never changed, right, sir?
MS. HANDLER: Objection; asked and answered.
THE COURT: Objection sustained.
BY MS. LITTLEPAGE:
Q. Did you ever tell doctors new breast cancer information at any point from 1997 to 2002 in your label?

♀page 135

A. We sent out Dear Doctor letters telling them of new information that was coming out on breast cancer in 1991, '95, so it was -- yeah, '90, '91, '95 on breast cancer information. If it didn't go into the label, it didn't go into the label for a reason, and that was because it wasn't significantly different than what was already in there.
Q. Let me ask you about the Charles Payne letter.
Do you remember that you were asked some questions about Charles Payne?
A. Yes.
Q. Charles Payne was one of your sales reps down in Alabama, right, sir?
A. Yes, down South. I'm not sure of the exact state.
Q. Which means he was one of the people that went and visited doctors and talked about your product?
A. Yes, that's correct.
Q. Jury's got to see two of them on this screen, the two that called on Dr. Swingler in Illinois.
A. Okay.
Q. Let me ask you something: When ya'll are hiring these sales reps, is good looks one of the criteria, to be pretty and blond so the doctors will give you time?

♀page 136

A. No.
Q. Have you seen the documents where ya'll called the sales reps the Ken and Barbies?
A. No.
Q. Let's talk about Charles Payne.
Charles Payne wrote ya'll a letter in 2000, right?
A. Yes.
Q. Tab 9 in the book?
A. That's correct.
Q. Charles Payne wrote to home office, right, sir?
A. He wrote to the Office of Compliance, which I think was up at American -- at the headquarters in Madison.
Q. And he wrote, "As a Wyeth female healthcare representative, I have been instructed with written presentations from company management to promote to physicians out of labeling indications, such as, but not limited to, Alzheimer's disease, the reduction of cardiovascular disease, and vanity issues with Premarin and Prempro." Do you see that?
A. Yes. He did exactly what he was asked to do in terms of reporting this.

Q. And then he says, "since many recent studies
♀page 137

have shown increased incidences of breast cancer, heart attack, and little effect on Alzheimer's disease, many physicians may have been influenced by representatives." Do you see that?
A. Yes, I do.
Q. And then when you turn the page, he says, "this is a potentially life-threatening situation," right, sir?
A. Sorry. Where are we?
Q. Second page.
A. Oh, the highlighted portion, yes, it says, "this is a potentially life-threatening situation," yes.
Q. He says, "we are not selling used cars. We are selling pharmaceuticals that effect the lives of every woman that takes them. The desire for increased sales has overruled our company's ethical responsibility to promote our products safely," right, sir?
A. I see that, yes.
Q. Now, you came to talk to the jury about this issue, about Charles Payne in Alabama?
A. Alabama and Georgia from what I see here.
Q. You know, sir, that Charles Payne had decided to leave your company after writing this letter and
♀page 138

got a release --
MS. HANDLER: Objection, Your Honor. May I be heard?
BY MS. LITTLEPAGE:
Q. -- got a release from Wyeth?
THE COURT: On that question?
MS. HANDLER: What she's going into.
THE COURT: All right. See you at sidebar.
\- - -
(Whereupon, a discussion was held at sidebar as follows:)
\- - -
THE COURT: What's the nature of your objection?
MS. HANDLER: The nature of the objection is, she's talking about a release from Wyeth. There's a lawsuit between Mr. Payne and the company. There was a settlement agreement and a release, and I assume you're going into what's been highlighted here.
I don't know what -- I don't think it's relevant. I think that this is a settlement agreement. People settle cases for any other --
♀page 139

THE COURT: That's not coming into evidence.
MS. LITTLEPAGE: Can I tell you?
THE COURT: You can make a record.
MS. LITTLEPAGE: I don't want that to come in.

Dr. Dey came in today and said, Wyeth did everything right concerning Charles Payne and --

THE COURT: Show he left the company.

MS. LITTLEPAGE: When he left the company, Wyeth made him sign a document that said he couldn't even tell the truth about what he had disclosed about Wyeth. That's what the document said, he cannot tell the truth about Wyeth. And I don't think he has to come in and say, We are the best company in the industry and we did everything right --

THE COURT: Let me see what you're referring to.

(Pause.)

MS. HANDLER: I ask the Court to continue beyond the highlighting to the next sentence.

THE COURT: Well, what he agreed to

♀page 140

do -- I mean, there was a settlement between them. As part of the settlement, this is what he agreed to do.

MS. LITTLEPAGE: Wyeth has taken the position that everything they did was totally appropriate. Therefore, their position should be telling a man he cannot tell the truth is totally inappropriate, and I'm allowed to at least investigate that.

MR. McDAVID: That's not what he said.

MS. LITTLEPAGE: Truth is not a defense. He cannot even tell the truth about what happened about his employment with Wyeth.

THE COURT: However, he may testify truthfully if placed under subpoena of court to testify about Wyeth-Ayerst.

MS. LITTLEPAGE: He comes in and tells the jury, we did everything right when the man reported it and he was told he cannot speak unless under a court order of what happened when he was at Wyeth, and that's not fair. They put it up. They came in to have this man say they did everything right.

This man can't even tell the truth to anybody on the street. He has to have a court

♀page 141

order before he can speak about what they say they had totally handled totally appropriately.

THE COURT: Look, I'm not an advocate.

It appears to me all of this was entered into as a result of a settlement agreement with the man. It wasn't because -- Wyeth entered into a settlement agreement. Part of this settlement was as set forth in this letter.

MS. LITTLEPAGE: I agree.

THE COURT: It's a settlement of a lawsuit.

MS. LITTLEPAGE: They asked for this provision.

THE COURT: Who wouldn't?

MS. LITTLEPAGE: Not the company that comes into court and says, We did everything right.

THE COURT: They did everything right. They paid this man a sum of money. If he went to court, he may not have gotten it. That's beside the point. I think that's very bright.

And I think you can find a way to question him about this document without going into the terms of the settlement which could

♀page 142

indicate what you're trying to do, but I don't think you have to go into litigation. I won't allow that, nor will I allow you to go into the terms.

There wasn't an objection; you just wanted to see me at sidebar?

MS. HANDLER: There was an objection to the use of this document. I didn't want to --

THE COURT: She can use it in a limited fashion. She may not go into the fact that there was a lawsuit between them to show that he left the company, and I'll give her some leeway without going into the terms of the settlement agreement.

MS. HANDLER: I understand that.

What she, obviously, wants to elicit is that Wyeth told this guy he couldn't tell the truth, so that's what's part of the settlement agreement. So whether she introduced the settlement agreement or not is not the point.

My objection is that this is irrelevant.

THE COURT: He can read this. She can

♀page 143

question him. She can question him how he left, that there might have been some serious disagreement between the two and he left and he's no longer employed. I think the inferences will be clear, circumstantial evidence, as part of this investigation.

What I'm concerned about is to allow in the terms of the settlement, which may very well be that Wyeth agreed to pay a sum of money and got something in return, that's all. It doesn't mean that was -- that was because of any impropriety by Wyeth. It was just terms of an agreement that both of them worked out amongst themselves.

MS. HANDLER: The problem is, if she gives it to the witness to read, the witness doesn't know he's not supposed to say what this document is.

THE COURT: He can read it to himself and wait for a question.

MS. HANDLER: Understood.

\- - -

(The following occurred in open court in the presence of the jury:)

- - -
♀page 144

THE COURT: I don't remember the nature of the question.
I'll ask you to ask another question instead.
MS. LITTLEPAGE: Yes.
BY MS. LITTLEPAGE:
Q. Mr. Payne, after he made this report, left Wyeth, stopped working for Wyeth?
A. I believe.
Q. And when he left, Wyeth and Mr. Payne agreed that Mr. Payne would never speak about --
MS. HANDLER: Objection, objection, Your Honor.
THE COURT: Objection sustained as to form.
BY MS. LITTLEPAGE:
Q. -- what had happened at Wyeth?
THE COURT: As to form.
BY MS. LITTLEPAGE:
Q. Do you know, sir, Mr. Payne and Wyeth made an agreement --
MS. HANDLER: Objection.
THE COURT: Not going to go into the agreement.
The objection is sustained.
♀page 145

BY MS. LITTLEPAGE:
Q. Would you agree with me, sir, that Wyeth and Mr. Payne made a decision that Mr. Payne would never speak about what he had talked about, what he had learned in his employment with Wyeth?
A. I don't know that. You know, maybe this happened before I was involved in women's healthcare. Maybe if I had been here, I would have been able to convince Mr. Payne to stay. He looks like a model employee, the kind of person we'd want.
Q. You said that, because you said ya'll did right because you demoted and took corrective action and reprimanded people in Alabama?
A. Reprimanded, yes. We reprimanded a number of people; one person left the company and two were demoted.
Q. If you turn to Tab 10, I want to talk to you one more thing on this issue.
Do you see Tab 10? It's Plaintiff's Exhibit 891R.
Sir, the jury has already heard that sales reps that call on doctors write call notes. Do you know what that is?
A. Yes, I do.
Q. The jury has heard that when the sales rep
♀page 146

talks to the doctor, she goes in her car and she writes down what she told the doctor and what the doctor and her spoke about into the call notes; you know that, sir?
A. I know that there are call notes. Reps write in there anything they want to write in there.

Q. Then they upload them back to Wyeth headquarters, right, sir?
A. I'm not sure of the process.
Q. And Plaintiff's Exhibit 891R, sir, is some call notes from Illinois, the State of Illinois; do you see that?
A. Yes, the city, yes, Freeport, McHenry.
MS. HANDLER: Your Honor, I have an objection to the use of this document since it doesn't involve these reps for the prescribing doctor.
THE COURT: I'm sorry. I didn't hear. Doesn't involve what?
MS. HANDLER: The prescribing doctor at issue in this case.
THE COURT: Okay. Overruled.
BY MS. LITTLEPAGE:
Q. And the first call note is from June of 1999, and the sales rep is Kathleen Monteleone, and she

♀page 147

writes in her call note about her discussion with the doctor "Premarin and use of it for treatment of heart disease." Do you see that, sir?
A. It says "Premarin and use of it for treatment of heart disease, HERS study," and this was a Dr. Lawrence, Lawrence Luy.
Q. So you told us that ya'll had reprimanded and demoted people in Alabama because they had encouraged sales reps to talk about heart and brain benefit, right, sir?
A. Whatever the basis was that the investigation showed up from the Office of Compliance, that's what they were reprimanded and dismissed for.
Q. Do you know if you ever reprimanded and dismissed Kathleen Monteleone from Freeport, Illinois for telling doctors about using your product for treatment of heart disease?
A. No, I don't.
Q. Next one is Tracy Wolniewicz. Do you see that?
A. Yes, I do.
Q. That sales rep was calling on a doctor in McHenry, Illinois. Do you see that?
A. Yes, McHenry, Illinois, yes.
Q. And this call note says, the doctor, "he seems

♀page 148

to understand Prems contribution to cardio protection." Do you see that?
A. Yes, I do see that, referring to, he looks like he's referring to PEPI paper.
Q. Did you ya'll demote and reprimand Ms. Wolniewicz?
A. You can't tell from these whether, in fact, the rep actually introduced this subject or whether the physician had a question about it and she responded. That's the problem with using the call notes, you have no context. They're notes to themselves, so to interpret this as her promoting the product, I think would be a stretch based on what I read here.
Q. Let's turn to the next page.

Do you see Tracy Wolniewicz again? Now she's talking to a doctor in Barrington, Illinois. Yes, sir?
A. Yes, I do. Barrington.
Q. This time she writes, "also mentioned Premarin family and best for osteo and cardio," right, sir?
A. That's what the -- that's what's here, yes.
Q. The next page is now a rep called Tracy Day calling on a doctor in Libertyville, Illinois. Do you see that?

♀page 149

A. Yes.
Q. This sales rep writes "used detail piece that showed number of lives saved (heart disease) with estrogen versus breast cancer loss." Do you see that?
A. Yes. I don't know whether that was an approved piece or whether that was not. If it was an approved piece, that would have been appropriate for the time, because it would have been CVD approved, so that would have been within label.
Again, the context of this, I don't know whether the physician brought it up and they're responding to it, which was permitted under the rules, or whether this was something that the sales rep brought up.
If the sales rep brought it up, then it's inappropriate. It's off the label. It's an indication they're promoting it.
Q. Tracy Day from Glenview, Illinois, this time she writes, "distinguished Premarin from 17B estradiol by talking about components, cardiovascular and Alzheimer's." Do you see that?
A. Yes, I do.
Q. Do you know if Ms. Day has ever been reprimanded, demoted, or corrective action has been

♀page 150

taken in the State of Illinois?
A. No, I do not.
Q. Let's turn to the next page.
Tracy Day, Libertyville, Illinois, "tried to present info on cardiovascular disease and Alzheimer's disease. Doctor said he didn't want to hear it, and I shouldn't try to oversell my product." Do you see that one, sir?
A. Good doctor, yes, I do.
Q. Was Tracy Day ever demoted, reprimanded, or corrective action taken?
A. I don't know.
Q. Next one is Rebecca Wolfe. She's calling on a doctor in Olympia Fields, Illinois. Do you see that?
A. Yes, I do.
Q. She's talking about Prempro and cardiovascular benefit. Do you see that?
A. Yes, I do.
Q. Turn the page to the next one, Nadine Rauch, another Wyeth sales representative, calling on a doctor in Joliet, Illinois?
A. Yes, I do.
Q. "Detailed on Premarin as first line still

because of cardiovascular effects," right, sir?

♀page 151

A. That's what I read, yes.
Q. Next one is another sales rep, Mike Jawor, from Orland Park, Illinois. Do you see that?
A. Yes, I do.
Q. He writes "discussed cardiovascular protection"?
A. Again, no context, but I see it written, yes.
Q. The next one is actually the sales rep that the jury has got to meet by deposition, Pamela Highfill, the one that called on Connie Barton's doctor. Do you see that?
A. Pamela Highfill.
Q. From Peoria, Illinois?
A. Yes.
Q. And it says, "explained the areas prem benefits, bone, heart, vasomotor, brain...new science. Next time." Right, sir?
A. Yes. And she also talks about the breast cancer tear sheet being a hit.
Q. Next one, is Ellen Catanese from Evanston, Illinois. Do you see that?
A. Yes, I do.
Q. She says, "Premarin protects the heart"?
A. Well, that's hard to tell whether that came from the physician -- again, whether it came from

♀page 152

her, the rep, or whether it came from the physician. The physician may have said "Premarin protects the heart." Again, these are notes. I have no way to interpret these as anything more than what's on a piece of paper. They're notes to themselves.
Q. So let's see. Maybe this doctor, Dr. Wehrmann, said, "Premarin protects the heart"; that's what you're saying?
A. That's right.
Q. Then the very next one, she's seeing Dr. Johnson, and her note says, "Premarin protects the heart over all others." Maybe Dr. Johnson raised that, too?
A. Then it says, is something about used something for second line defense. I don't know what this means.
Q. Well, let's look at the second one, Dr. Baquero. Look, she writes, "Premarin protects the heart." Maybe Dr. Baquero said that, too, right?
A. I see what you're saying. I mean, it's on -- it's on four or five of these.
Q. It's not on four or five. She writes the same thing, "Premarin protects the heart," when she calls on doctors in Evanston, Illinois one, two, three, four, five, six, seven, eight, nine, ten, 11, 12,

♀page 153

13, 14 different doctors.
A. Right. Well, if she was promoting this off label, she should have been terminated.
Q. Then when you turn the page, 15, 16, 17, 18, 19, 20, 21 different times, right, sir?
A. I haven't counted them, but yes.

Q. Did ya'll take corrective actions, reprimand, or demote Ms. Catanese?
A. I'm not sure we knew about this. If we had, we would have.
Q. Well, the call notes come to Wyeth headquarters; ya'll just didn't look?
A. No. The call notes were never intended to be an audit tool of the field. They were notes that were designed, in fact, to be used by the representatives to keep track of their information.
Q. But you could have looked?
A. I suspect so, but that's not what they were set up to do. If we wanted to do that, they would have been set up differently.
Q. Next one is James Lyons from Chicago, Illinois, who writes, "Premarin family for heart protection," right, sir?
A. That's what it says.
Q. Next sales rep is Colleen Everett, "reminder

♀page 154

to use of Prempro to prevent bone loss, as well as to prevent CVD, cardiovascular disease, and hot flushes," right, sir?
A. That's correct.
Q. Do you know if ya'll ever reprimanded, demoted, took corrective action in the State of Illinois for the off-label promotion of your sales reps?
MS. HANDLER: Objection to form.
THE COURT: The objection is overruled.
He may answer.
THE WITNESS: I don't know whether there was any corrective action.
THE COURT: I think we will end on that note.
Members of the Jury, thank you for your kind consideration for your appearing here when I asked. And let's do it for one more week. Hopefully we're getting there.
See you Monday at 9 o'clock. Have a great weekend.
\- - -
(Whereupon, the jury was excused from the courtroom at 4:57 p.m.)

♀page 155

\- - -
(Whereupon, the proceedings were adjourned at 4:57 p.m.)
\- - -

♀page 156

C E R T I F I C A T I O N

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above case, and that this copy is a correct transcript of the same.

Danielle O'Connor, RPR, CRR
Official Court Reporter

\- - - - - - - - - - -

(THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING REPORTER.)

♀