# EXHIBIT 49

page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

\- - -

AUDREY SINGLETON and : JANUARY TERM, 2005
CHARLES SINGLETON, w/h, :
Plaintiffs, :
:
VS. :
:
:
WYETH, et al., :
Defendants. : NO. 02885

\- - -

JURY TRIAL
DAY TWO
P.M. SESSION

\- - -

FRIDAY, JANUARY 22, 2010
COURTROOM 246, CITY HALL
PHILADELPHIA, PENNSYLVANIA

\- - -

BEFORE: THE HONORABLE MARK I. BERNSTEIN, J.
AND A JURY

\- - -

Reported By:
Cynthia Touni, Registered Merit Reporter,
Official Court Reporter
(215) 683-8014

\- - -

page 2

APPEARANCES:
LITTLEPAGE BOOTH
BY:
ZOE LITTLEPAGE, ESQUIRE
2043 A WEST MAIN STREET
HOUSTON, TX 77098
AND
WILLIAMS CUKER BEREZOFSKY
BY:
SAMUEL ABLOESER, ESQUIRE
ESTHER BEREZOFSKY, ESQUIRE
1515 MARKET STREET, SUITE 1300
PHILADELPHIA, PA 19102
COUNSEL FOR THE PLAINTIFFS
NELSON MULLINS
BY:
DAVID E. DUKES, ESQUIRE
1320 MAIN STREET, 17TH FLOOR
COLUMBIA, SC 29201

a lawsuit and you had called the lawyer that was on
that lawsuit.
A. That's correct.
Q. That's not me, sir.
A. No, it is not.
THE COURT: Can we go back to
questions?
BY MS. LITTLEPAGE:
Q. Was that me, sir?
A. No.
Q. When you spoke to that lawyer from Nevada, you
said that you had agreed to be a consultant to the
page 79

B. HENDRICKS - REDIRECT
lawyer in Nevada.
THE COURT: That's a statement.
BY MS. LITTLEPAGE:
Q. Did you --
THE COURT: Start over. Start over.
BY MS. LITTLEPAGE:
Q. When you spoke to the lawyer in Nevada, did
you agree to be a consultant and to consult with
that lawyer?
A. I did.
Q. What did that mean? What did you and the
lawyer do?
A. I gave that lawyer basic information about
what a pharmaceutical rep is. Really no different
than what we provided the jury today. He was not
familiar with any aspect of what a pharmaceutical
rep does, what the companies do.
Q. Were you asked to explain certain Wyeth
documents to the lawyer?
A. Yes.
Q. Similar -- were they similar documents to the
documents that you've talked to the jury about,
marketing pieces and those sorts of things?
A. Yes.
page 80

B. HENDRICKS - REDIRECT
Q. You were asked some questions about signing a
certification.
First of all, can you explain to the
jury what happened when you were brought a
certification to sign by Wyeth, what were you told
by your manager this certification was for and what
were you supposed to do?
A. We were required to sign that document stating
that we were not participating in any of the
activities that were outlined there on condition of
our continued employment. I perceived that to be a
pretty serious threat. You don't sign it; you don't

have a job.

But in the meantime, we were still being asked by Wyeth to do many of the things that we were being told in this document not to do and, you know, to this day, I regret not standing my ground and saying either I'm going to stop doing this type of promotion, either off-label promotion, or I'm not going to sign the document. And if we have to take care of this with human resources or whomever, let's do it.

But I will be honest about this, I was dishonest in signing that because I wanted to keep





my job.

Q. And did Wyeth require you to sign a document that would indicate that you were not promoting their products for heart and mind benefit, the off-label benefits?

A. Exactly.

Q. And were you, in fact, trained to promote Wyeth's product for heart and mind benefit?

A. Exactly.

Q. Were you provided some of the documentation that we've looked at today by Wyeth to use in your discussions with doctors that dealt with heart and mind benefit?

A. Yes, we were.

Q. Those were documents given to you; you didn't create them on your computer and print them out?

A. That's correct.

MS. LITTLEPAGE: Nothing further, thank you.

THE COURT: Anything further?

MS. HUBBARD: No, Your Honor.

THE COURT: Thank you. You may step down.

(WITNESS EXCUSED.)





THE COURT: Charles, we're going to take a brief recess and come back for another witness.

(Jury out at 3:38 p.m.)

THE COURT: Who is our next witness?

MS. LITTLEPAGE: Dr. Austin.

THE COURT: We're going to try to get through his qualifications and then we'll deal with any motions concerning his qualifications. We'll take a brief recess.

(RECESS TAKEN.)

(Jury in at 3:51 p.m.)

THE COURT: Who is your next witness?
MR. BOOTH: Dr. Don Austin.
DONALD AUSTIN, after having been first duly sworn, was examined and testified as follows:
THE COURT CRIER: State your full name for the record and spell your last name, please.
THE WITNESS: Donald Austin, A-U-S-T-I-N.
MR. BOOTH: With the Court's permission, can we remove the book that was

page 83

D. AUSTIN - DIRECT (QUALIFICATIONS)

there from the last witness?
THE COURT: Sure.

- - -

DIRECT EXAMINATION
(QUALIFICATIONS)

- - -

BY MR. BOOTH:
Q. Good afternoon.
A. Good after.
Q. With the Court's permission, would you state your full name for the jury, please.
A. Donald Austin, A-U-S-T-I-N.
Q. Doctor, you can see we have no microphones and it can be difficult to hear, so I'll ask you to keep your voice up.
A. We have no microphone?
Q. We have no microphones. We're going without.
Can you tell the jury your professional address?
A. Professional address is the Oregon Health and Science University. It's a university that includes a medical school, a nursing school, a dental school and a graduate school in Portland, Oregon.
Q. What is your occupation?

page 84

D. AUSTIN - DIRECT (QUALIFICATIONS)

A. I'm a professor in the department of public health and preventative medicine. I am primarily a chronic disease epidemiologist.
Q. Can you explain to the jury what it means to be a chronic disease epidemiologist, please.
A. Yes. Chronic diseases are those diseases which once you get, you tend to have for a long time as opposed to something like strep throat or measles. And it includes such things as heart diseases, cancer, stroke, et cetera.
And the epidemiologist is a person who studies how the disease is distributed in the

population and why it's distributed that way.
Q. Doctor, let me go through your qualifications to begin with.
Can you tell us, first of all, start with your educational background starting after college?
A. After college I went actually five years to medical school, because I took an extra year fulfilling most of the requirements for a master degree in microbiology. And then went into -- did my internship, went into the U.S. public health service where I spent three years in the public





health service, came back out and took another year to get another master's degree in preventative medicine or epidemiology, which was the first of a three years required to become board eligible in preventative medicine.
Q. Let me stop you there.
Tell us what it means -- tell us what the field of preventive medicine is.
A. Preventive medicine focuses primarily on the causes of disease, what the risk factors for those diseases are and what we can do about it with the primary interest of preventing these kinds of diseases in the population.
Q. Any further educational experiences after that?
A. Well, I finished my residency program in preventative medicine and then became Board certified in preventative medicine following that.
Q. Anything beyond that?
A. Experience.
Q. Now, are you -- so are you a licensed medical doctor?
A. I am.
Q. Are you Board certified in anything other than





preventative medicine?
A. No.
Q. Any other degrees that you hold at this time other than the masters degree that you also told us about?
A. Two masters and a doctor's degree. That's it.
Q. Once you got your degrees, you got out of school, can you begin by telling us about your employment history at that point.
A. Following my employment or following my getting the MPH, master in public health degree at UC Berkeley, I became employed by the State Health

Department in California where I stayed for about 20 years. And for most of those years I was the chief of the California Cancer Registry. I was the person responsible for collecting and analyzing data on cancer for the State of California.

Q. Tell the jury, please, what is the California Cancer Registry. What does it do? What did you do there?

A. Well, basically a registry is list of a roster of people who develop cancer and the information that's normally collected in a cancer registry includes information about the cancer, what its type

page 87

D. AUSTIN - DIRECT (QUALIFICATIONS)

is, information about the person, where they live, what their age, what their race, what their sex and where they were treated. And this is kept in a large, now computerized, file and it's used in the State of California, and in most places, is used for determining what risks are to portions of the population. It's used to investigate cancer clusters. It's used to conduct studies.

Q. Do you have a particular example you could give us of how you, yourself, worked to use that data in your job there?

A. Well, there were several examples. One example is we looked at the risks of malignant melanoma among the employees of the Lawrence Livermore National Laboratory. This is the high-tech atomic research facility that's operated by the University of California for the Department of Energy. And it's basically an atomic bomb and hydrogen bomb research facility.

And we looked to see whether or not those employees had a higher rate of certain types of cancer and they did. And we went on to report that.

We looked to see whether or not

page 88

D. AUSTIN - DIRECT (QUALIFICATIONS)

residence of a county in California in which there were a large number of petro chemical plants had a higher risk of lung cancer because of air pollution and we also looked at unusual outbreaks of cancer, one of which was an elevated rate of the uterine cancer that occurred during that time.

Q. We'll come back to talk about that.

So after -- tell me again how long did you work at the cancer registry or the tumor registry?

A. About 20 years. It could have been 19, it have could have been 21.

Q. Where did you go after that to work?
A. Following that, I accepted a position with the U.S. Public Health Service again and an assignment from CDC in Atlanta to the State of Oregon and I was assigned to the state government in Oregon to help them start chronic disease programs.
Q. What is the CDC?
A. That's the Centers for Disease Control in Atlanta. It's U.S. public health service, mostly a control disease control agency.
Q. What specifically were you doing for the CDC?
A. Well, I helped them design and initiate a





breast and cervical cancer program. It was primarily a screening program to design and initiate a tobacco control program, to design and initiate a diabetes control program and a cancer registry for the State of Oregon.
Q. When did you leave that job?
A. Pardon?
Q. How long did you stay at that job?
A. I stayed in that job four years.
Q. What did you do after that?
A. Then I accepted a position as a professor in the Department of Public Health and Preventative Medicine at the university, the medical school.
Q. Is that where you currently work today?
A. That's right. I retired as an active -- as a current faculty member and I'm now an emeritus faculty member, but I still teach. I supervise graduate students and I participate in certain research projects there and at the Veterans Administration Hospital, which is about a block away.
Q. Now, in looking back at your career, could you tell the jury, has your career had primary focus in terms of epidemiology?





A. Most of the focus has been on cancer epidemiology.
Q. In terms of cancer epidemiology, have you had focus in terms of preventative -- the preventative medicine degree that you told us about?
A. Well, I mentioned the breast and cervical cancer program which is primarily a control program, but one of the things that epidemiologists do is try to find out what is causing particularly changes in the rates of cancer. So we can make decisions about how to utilize those changes either to prevent additional cases or to stop the excess, if there is