# EXHIBIT 62

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GEORGIA TORKIE-TORK, )
)
Plaintiff, )
)
v. ) CIVIL ACTION
)
WYETH, ) 1:04-cv-945
)
Defendant. )
)

REPORTER'S TRANSCRIPT
JURY TRIAL
VOLUME 5 - AFTERNOON SESSION
(No Morning Session)
Monday, November 22, 2010

---

BEFORE: THE HONORABLE T.S. ELLIS, III
Presiding

APPEARANCES: LITTLEPAGE BOOTH
BY: ZOE LITTLEPAGE, ESQ.
RAYMOND BOOTH, ESQ.
2043A W. Main St.
Houston, TX 77098

KOPSTEIN & PERILMAN
BY: PHILIP KULJURGIS, ESQ.
8633 Cross Chase Ct.
Fairfax Station, VA 22039
For the Plaintiff

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria Division



APPEARANCES (Continued):

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
BY: BETH WILKINSON, ESQ.
BRIAN STEKLOFF, ESQ.
2001 K Street, NW
Washington, DC 20006-1047

WILLIAMS & CONNOLLY, LLP
BY: RYAN SCARBOROUGH, ESQ.
725 12th St NW
Washington, DC 20005

epidemiological studies were reviewed to try to determine the risk of breast cancer.
Q. And when you say the collaborative group, was that actually the name of study, the collaborative study?
A. Yes.
Q. And if you look at the study, what was the finding of the study of the risk of breast cancer in women taking E+P?
A. That the longer the woman is on E+P, the higher the risk of breast cancer.
Q. Was there any --
THE COURT: Just a moment. Go back if you would. What is right before that?
THE WITNESS: About what?
THE COURT: I'm sorry, the quote.
ATTORNEY LITTLEPAGE: "Whether HRT affects mortality from breast cancer is not known."
AM Session / Parisian dir cont-cross
page 51

THE COURT: All right.
BY ATTORNEY LITTLEPAGE:
Q. Was there any information in the collaborative group study about women who were thinner or of normal build?
A. Yes.
Q. What did the collaborative group find on that issue?
A. That women of thinner build, the risk of breast cancer went down.
Q. If a woman was thinner, her risk went down as she entered menopause or throughout her life?
A. As she entered menopause. So it was making a group of women -- this is not in terms of estrogen but just women in general. When a woman went into menopause and she was thinner, she was at lower risk for breast cancer.
Q. And then if that woman who was at lower risk took E+P, what happened to her risk?
A. Her risk increased.
Q. And was there actually a chart in this collaborative group study that talks about years from menopause and whether a woman who was thinner's risk goes up or down the older she gets past menopause?
THE COURT: It's leading. It's all leading.
BY ATTORNEY LITTLEPAGE:
Q. Can you tell the jury what the table that dealt with this issue indicated?
AM Session / Parisian dir cont-cross
page 52

A. Her risk went down in terms of her time of menopause and her body weight. The lower her body weight, the lower her risk over time.
Q. And is this finding from the Collaborative Group that repeated in studies from 1997 on?
A. Yes.
Q. And what is important about this finding in your

opinion in terms of E+P and breast cancer for a thin or a normal built woman?
A. Yes. Those women, in terms of the different studies, the thinner women tended to be the women also put on estrogen-plus-progestin, E+P, and thereafter the women that would have the lower BMD.
So you are identifying a group of women who were at low risk of breast cancer, but if you increase the amount of estrogen and progestin, then you are now placing them at increased risk of breast cancer.
Q. Is there a connection between a thinner or normal built woman and the development of osteoporosis?
A. Yes. And if you look at the population who develops -- who are at risk for osteoporosis, they tend to be thinner women.
And so you have this population that is getting E+P for very -- for long duration, which would be the treatment -- the prevention of osteoporosis. So you are



actually taking women at low risk and raising them to high risk of breast cancer.
Q. Would it be appropriate, in your opinion, for a drug company to warn doctors about a subgroup of women like this that were at a particular increased risk?
A. Yes. Plus, they are required to do that in terms of updating their labeling.
Q. If you turn to tab 24, Plaintiff's Exhibit 811-R, can you tell the jury whether you have seen documents where Wyeth deals with this issue of thinner women and the risk of breast cancer?
A. What exhibit?
Q. Tab 24, Plaintiff's Exhibit 811-R.
THE COURT: What was this, this particular tab before you?
And take this one down.
I just want to know what tab it was.
ATTORNEY LITTLEPAGE: It was tab 21.
THE COURT: All right. Go on.
THE WITNESS: There is a comment there by Wyeth.
ATTORNEY LITTLEPAGE: And Judge, we move to admit Plaintiff's Exhibit 811-R.
ATTORNEY WILKINSON: We object, your Honor.
Can I discuss it with Ms. Littlepage?



Maybe we can resolve it.
THE COURT: Yes.
Don't display it yet.
(Counsel conferring.)
ATTORNEY WILKINSON: We agree. We will let it

bench conference is that I have admitted documents that include articles. They will go to the jury. And I plan to send all of it to the jury unless there is a specific agreement about a specific document.

ATTORNEY WILKINSON: Understood.

THE COURT: But it seems to me that if all you are going to do, both sides; if are you going to pick and chose and you are going to pick and choose out of articles, I am prepared to let the jury have the whole thing and let them decide.

ATTORNEY LITTLEPAGE: Yes, sir.

ATTORNEY WILKINSON: Thank you, your Honor.

(End of sidebar conference, open court as follows:)

THE COURT: You will have the articles. You are not required to read anything if you don't want to. But I am going to ensure that you have it the articles that are discussed.

All right. You may proceed.

ATTORNEY LITTLEPAGE: We were on Plaintiffs's Exhibit 811-R, tab 24.

BY ATTORNEY LITTLEPAGE:

Q. Are you with me, Dr. Parisian?

A. Yes.



Q. And can you tell me, does -- did you review documents, including 811-R, that indicate that there was -- indicated an understanding from Wyeth about this issue?

A. Yes.

Q. And what was Wyeth's understanding?

A. That there was an increased risk found in women of lean and normal body build of breast cancer. If there were sub-population at increased risk.

Q. And has a number of studies looked at this issue; rather, thinner or lean or normal built women are at an increased risk of breast cancer from taking E+P?

A. Yes.

Q. Can you give the jury some idea of how many studies?

A. I can think about maybe seven or eight.

Q. And do those studies find an increased risk for thinner or leaner women?

A. Yes. And It's relative risk, that they were lower to begin with, and it would raise this group.

THE COURT: What do you mean by "relative risk"?

THE WITNESS: Relative risk would be compared to Never users of hormone therapy, so that would be your normal population. If you look at the Collaborative study, the relative risk there is never users. So in terms of this group of women, since they are lower to begin with, it's a

approved for, the warnings, the precautions, the information that a physician needs to know about prescribing a drug.
Q. And who creates the label?
A. The manufacturer.
Q. And does the FDA have a role in supervising or approving the label?
A. All labels that are out in the -- used in the United States must be approved by the FDA.
Q. Does the FDA write the label for the drug company?
A. No.
Q. If a label is approved and a study comes out like the ones we've just talked about, Dr. Colditz or Dr. Cummings or the collaborative group, is there a mechanism for the drug company to add that information into the label?
A. Yes. The manufacturer can voluntarily add any of that information at any time using a process called a change is being effected supplement to improve and strengthen their warnings or to remove information that's not correct.
Q. And I want to talk a little bit about the Prempro label.
When was the Prempro label first approved?
A. The first approval was in 1994.
Q. And did the language of the Prempro label change in any substantial way as to breast cancer from 1994 all the way through to June of 2002?



A. No.
Q. So let's look at -- Plaintiff's Exhibit 6493 is the 1998 label.
A. Yes.
Q. And would it be fair to say that the 1998 label language stayed the same until June of 2002?
A. Yes.
Q. And is there, first of all, a "Warnings" section?
A. Yes.
Q. Why is there a "Warnings" section?
A. A "Warnings" section is to highlight information that's important to the physician making a risk-versus-benefit determination whether to prescribe the drug. So it's the information that a physician needs to have to consider about whether to use this drug or not for a patient.
Q. And is the Prempro label printed in the Physician's Desk Reference or the PDR?
A. Yes. The approved version is supposed to be in the PDR.
Q. And is the Prempro label attached to the back of a "Dear Doctor" letter if it is sent to doctors by the drug company?

A. It can be.
Q. Is this the breast cancer warning for Prempro from


1998 to 2002?
A. Yes.
Q. I want to go through sentence by sentence.
The first sentence indicates that:

Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2), in those women on estrogen replacement therapy taking higher doses or in those taking lower doses for a prolonged period of time, especially in excess of ten years.

Can you tell the jury what is significant, if anything, about that sentence in the forming of your opinion?
A. That sentence comes from the FDA's guidance for noncontraceptive estrogen products. So it's a statement that has been around -- it was in the Premarin label, and it's now in this label. It's reflecting estrogen replacement therapy.
Q. And --
THE COURT: And indeed it says that, doesn't it?
THE WITNESS: Yes, sir.
THE COURT: All right.
BY ATTORNEY LITTLEPAGE:
Q. And does the warning start with a sentence that says,


"All warnings below pertain to the use of the combination product based on experience with estrogens and/or progestins"?
A. Yes.
Q. Have you reviewed documents or sworn testimony of Wyeth employees about why estrogen information was put into the E+P label?
THE COURT: All right. That's not something an expert is called on to testify to. If you have that testimony, you may admit it and argue it.
ATTORNEY LITTLEPAGE: Yes, sir.
THE COURT: But it's not pertinent through an expert giving opinions.
ATTORNEY LITTLEPAGE: Yes, sir.
BY ATTORNEY LITTLEPAGE:
Q. By 1995 -- 1998 when I want you to assume Ms. Torkie-Tork started taking Prempro, was there information in the documents you've reviewed that for E+P, there was an increased risk at all doses or just high doses?
A. There was -- in terms of the documents reviewed, the medical literature, at all doses, there was an increased

risk of E+P. So that is not being discussed here.
THE COURT: Come to the bench, please.
(Sidebar conference held as follows:)
THE COURT: Dr. Parisian, put it back on,


please.
THE WITNESS: Yes, sir.
THE COURT: They're talking there about breast cancers in women on estrogen, right?
THE WITNESS: Yes, sir.
THE COURT: Isn't farther down -- isn't there a statement about E+P?
THE WITNESS: There is some statement about progestins, yes, sir. She asked me specifically about this sentence.
THE COURT: Yes, but is there a statement in here about E+P?
The answer is "Yes."
THE WITNESS: Yes.
THE COURT: All right. Now, what was the last question asked, Mr. Rodriquez, of this witness, by Ms. Littlepage?
(Record read as requested.)
THE COURT: That's your question?
ATTORNEY LITTLEPAGE: Yes, sir.
THE COURT: We'll put aside it was leading.
ATTORNEY LITTLEPAGE: Okay.
THE COURT: That's all right.
And then what was the answer, Mr. Rodriquez?
Never mind. It's taking too much time.


As I recall, Dr. Parisian, you're not saying that that sentence that says "some studies" is inaccurate?
THE WITNESS: No, sir.
THE COURT: You're not saying it shouldn't have been in there?
THE WITNESS: No sir.
THE COURT: All right. So let's get to it. She has an opinion on whether the label is accurate or not. Let's get to the heart of it.
ATTORNEY LITTLEPAGE: Yes, sir.
(End of sidebar conference, open court as follows:)
BY ATTORNEY LITTLEPAGE:
Q. Do you believe, Dr. Parisian, whether this label should have included information about E+P and dose issues?
A. Yes.
Q. And do you have an opinion whether it was appropriate or inappropriate for a drug company to continue to talk about this information in the first sentence in light of

what they knew about E+P?
A. I do have an opinion.
Q. What's that opinion?
A. That it is not appropriate because it begins out by talking about based on experience with estrogens and/or progesterones. And so it doesn't begin by discussing the



new information about E+P. It begins talking about old information on E.
THE COURT: So is it your opinion that maybe it would be all right at the end or somewhere, but not at the beginning?
THE WITNESS: The estrogen section?
THE COURT: Yes.
THE WITNESS: It would be appropriate further down, not to start.
THE COURT: All right. But you think doctors aren't capable of understanding it where it is?
THE WITNESS: No, sir. In terms of the design of the labeling, if you have new information, you want to put it first because the doctor is going to focus on the very first sentence.
As he moves down the paragraph, he's going to look at the other information. But the most important new information should go first.
THE COURT: All right.
Next question.
BY ATTORNEY LITTLEPAGE:
Q. In your opinion, Dr. Parisian, should Wyeth have provided any information to doctors about E+P and dose?
A. Yes.
Q. Did Wyeth provide any information to doctors in this



label in 1998 about E+P and whether it can cause breast cancer at any dose?
A. No, they did not.
Q. And does this document indicate a length of time before the estrogen studies showed a breast cancer risk?
A. In excess of ten years, yes, ma'am.
Q. By 1998, did Wyeth know whether for E+P that length of time was necessary for the increase in breast cancer risk?
A. Yes.
Q. And what did it know?
A. It knew that it was far less than ten years.
THE COURT: And what study showed that?
THE WITNESS: You can begin with the Bergkvist study, which was six years, the E+P. So in terms of the studies --
THE COURT: I just asked you to name the study.
Bergkvist.

THE WITNESS: There's a Collaborative Study, in terms of Colditz's studies with the nurses.

All right. Next question.

BY ATTORNEY LITTLEPAGE:

Q. Did Wyeth ever --

THE COURT REPORTER: Excuse me.

(Off the record.)

(Witness stood aside.)



(Court recessed.)

(Court called to order at 3:40 p.m.)

THE COURT: You may bring the jury in, please.

(Jury in at 3:41 p.m.)

THE COURT: You may be seated.

And we may bring in the witness, please.

I regret having to take the recess, but it was necessary.

You may resume the stand, please. You'll recall you're still under oath.

(Witness resumed stand.)

All right. Ms. Littlepage, you may complete your examination.

ATTORNEY LITTLEPAGE: Yes, sir.

BY ATTORNEY LITTLEPAGE:

Q. Dr. Parisian, we were talking about length of use, and my question is, did Wyeth provide information to doctors from 1998 to June of 2002 on E+P as to whether the breast cancer risk was seen in less than ten years?

A. No, sir -- no, ma'am.

Q. And if we go to the next sentence, the next sentence of the Prempro warning reads, "The majority of studies, however, have not shown an association in women who have ever used estrogen-replacement therapy."

Did Wyeth ever provide an assessment to the



doctors as to what the E+P studies showed?

A. Not in terms of an association, no, ma'am.

Q. And if we turn to the next sentence, is this the part of the label that talks about E+P?

A. Yes.

Q. And does it say, "The effect of added progestins on the risk of breast cancer is unknown. Although a moderately increased risk in those taking combination estrogen-progestin therapy has been reported, other studies have not shown this relationship"?

A. Yes.

Q. Do you have an opinion whether Wyeth had information at this time about E+P that would have been important to tell doctors in the Prempro label?

A. Yes.

Q. And what sort of information is that?
A. That there had been an association in the literature of E+P and increased breast cancer risk, particularly in certain subgroups, women who were lean and also women who had low bone mineral density, so that is a specific subgroup of patients that had shown an increased risk.
Q. And if we turn to the next sentence, does Wyeth indicate in the Prempro label some information about the one-year clinical trial of Prempro, Premphase and Premarin?
A. Yes.



Q. Is that the Pivotal Trial that we had talked about?
A. Yes.
Q. And what did Wyeth tell doctors about the Pivotal Trial?
A. That the incidence of breast cancer in that population does not exceed that which would be expected for the background population.
Q. If you turn to tab 37 in your book, Plaintiff's Exhibit 285 --
ATTORNEY LITTLEPAGE: We move to admit Plaintiff's Exhibit 285.
ATTORNEY WILKINSON: No objection.
THE COURT: Admitted.
BY ATTORNEY LITTLEPAGE:
Q. Dr. Parisian, does that document discuss some of the findings of the one-year clinical trial that is referenced in the Prempro label?
A. Yes.
Q. And was there in fact some breast cancers that showed up in the Pivotal Trial?
A. Yes, referred to as a cluster.
Q. And what was the finding on at least one of those breast cancers as to whether after just a year the investigator found that the cancer was related to the use of the drug?



A. That the carcinoma was possibly drug-related in terms of the causal association.
Q. And this person would have been on E+P for a year?
A. For a year.
Q. Did Wyeth ever provide information from 1998 to 2002 to doctors that at least in this clinical trial there was one breast cancer after just a year that was possibly related to the drug?
A. Not that it was possibly related. There is a statement that breast cancer was detected in this clinical study.
Q. And have you seen documents as to whether "was detected" was an appropriate way to describe the Pivotal

Trial results?
A. Well, the document I have seen was the FDA had requested that the word "developed" be put in the label, and it was changed by Wyeth to "detected."
Q. And had the -- the FDA had asked that the label read "five new cases of breast cancer were developed"?
A. Yes.
Q. And if the FDA wanted that information how come it's not in the final label?
A. Because the responsibility for the label rests with the manufacturer, and it's a negotiation process. The company wanted the word "detected."


THE COURT: I take it if the FDA thought that it was crucial it doesn't have to approve the label.
THE WITNESS: It does not have to approve the label.
THE COURT: Next question.
BY ATTORNEY LITTLEPAGE:
Q. And is there a final sentence where Wyeth indicates there was a three-year clinical trial call the PEPI trial?
A. Yes.
Q. What information about the PEPI trial does Wyeth provide to the doctors in the Prempro label?
A. They are discussing breast cancer in the PEPI trial.
Q. And was there any breast cancer seen in the E+P Prempro arm of the PEPI trial?
A. Yes.
Q. And what was the finding? One -- I'm sorry, let's see if I can find you -- one new case was detected in the placebo group, one in the Premarin only, none in the continuous Premarin plus continuous MPA, and two in the Premarin plus cyclic MPA group.
A. Yes.
Q. Which of those groups is Prempro?
A. Prempro would be the continuous. It would be continuous Premarin and MPA.
Q. And Wyeth reports that there was no breast cancer in


that study after number N 174?
A. Correct, in the PEPI study.
Q. What does N 174 mean in this context?
A. Out of 174 patients.
Q. Have you seen documentation as to whether the PEPI trial was designed or powered to look for breast cancer?
A. It was not designed to look for breast cancer.
Q. And is that indicated in Wyeth's documents, that it was not powered or designed --
A. In its own intern al documents, not in the label.
Q. If we turn to tab 38, is that one of the documents you

reviewed, Plaintiff's Exhibit 20941?
A. Yes.
ATTORNEY LITTLEPAGE: Judge, we move to admit Plaintiff's Exhibit 20941.
ATTORNEY WILKINSON: No objection.
THE COURT: Admitted.
BY ATTORNEY LITTLEPAGE:
Q. And does this internal document indicate that the PEPI study was not designed to evaluate --
THE COURT: You are leading, but in the hope of getting it over with, go ahead.
ATTORNEY LITTLEPAGE: Okay.
THE COURT: But you understand the proper -- what does it reflect.



ATTORNEY LITTLEPAGE: What does this reflect.
THE COURT: You have gone ahead and read it. It's in evidence, so go ahead and do it because it's all right.
BY ATTORNEY LITTLEPAGE:
Q. Does this document indicate that the PEPI study was not designed to evaluate the risk or incidence of breast cancer? The study was not powered to answer this question?
A. Yes, and that's the correct statement from the review of the PEPI document.
Q. Did Wyeth ever tell doctors that the PEPI study that it talked about in the label wasn't powered or designed to look at breast cancer?
A. No, not in the label.
Q. In your opinion, from 1998 to June of 2002, what would an adequate warning have said to relate to doctors about the breast cancer risk and E+P based solely on the science and the knowledge known by Wyeth in that time frame?
A. Based on the information I've reviewed, the label, adequate label would have informed the physician that there was a increased risk of breast cancer identified in -- in the studies, various clinical studies, E+P; that the dose wasn't the determinant as to the risk; and that there were certain subpopulations of patients, particularly thin women, lean women and women with lower BMD, that were at increased



risk of having breast cancer.
Q. Now, in the year 2000 was there some more studies that came out dealing with E+P and breast cancer?
A. Yes.
Q. Turn to tab 39 and tab 40. Can you tell us if those were the two studies that came out?
A. Yes.
Q. And can you tell us just the lead author of those two studies?

A. One would be referred to as the Ross study, R-o-s-s.
The other would be the Scherrer, S-c-h-e-r-r-e-r.
ATTORNEY LITTLEPAGE: And the Scherrer study, ML 63, we would like to publish. Is there any --
ATTORNEY WILKINSON: No objection.
THE COURT: All right. It's admitted. You may do so.
BY ATTORNEY LITTLEPAGE:
Q. And, can you tell the jury what date this was published and where?
A. It was published in JAMA, I believe, yes, American Medical Association, in 2000.
Q. And, were there findings in the Scherrer study about thin or lean women and whether they were at a particularly increased risk of breast cancer from E+P?
A. Yes.


Q. And what did the study indicate?
A. It talked -- there was an association that there was an increased risk in that group of women. Heavier women did not see the same increased risk.
Q. And was there a finding of the Scherrer study that E+P had a different risk than E alone?
A. Yes.
Q. And was it higher or lower?
A. It was higher.
Q. In response to the publication of the Scherrer study, did Wyeth issue a "Dear Doctor" letter?
A. I don't recall a "Dear Doctor" letter -- yes, they did. They did.
Q. If you turn to tab 32, Plaintiff's Exhibit 5775, is that the "Dear Doctor" letter issued in response to the Scherrer study?
A. Yes.
ATTORNEY LITTLEPAGE: Judge, may we admit into evidence Plaintiff's Exhibit 5775?
ATTORNEY WILKINSON: No objection.
THE COURT: Admitted.
BY ATTORNEY LITTLEPAGE:
Q. And in this "Dear Doctor" letter does Wyeth reference the two studies we just talked about, the Ross study and the Scherrer study?


A. Yes.
Q. And does it indicate that these two studies and two other studies, the risk data reported in these and other studies over the preceding 25 years are conflicting and inconclusive?
A. Yes.
Q. And does it indicate that more studies and especially