# EXHIBIT 64

page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION
- - -

MARY and THOMAS DANIEL : JUNE TERM, 2004
Plaintiffs, :
:
vs. :
:
WYETH PHARMACEUTICALS, :
et al., :
Defendants. : NO. 2368

- - -
JURY TRIAL
DAY 5
(DR. CHERYL BLUME)
- - -
WEDNESDAY, JANUARY 10, 2007 - PM SESSION
- - -
Courtroom 643, City Hall
Philadelphia, Pennsylvania
- - -
BEFORE: HONORABLE MYRNA P. FIELD, J.,
And a Jury
- - -
TRANSCRIBED BY: DEBRA B. FLAMER, R.P.R.
Official Court Reporter
215.683.8056

♀page 2

APPEARANCES:

LITTLEPAGE BOOTH
BY: ZOE LITTLEPAGE, ESQUIRE
RAINEY BOOTH, ESQUIRE
APRIL COWGILL, ESQUIRE
1012 W. Alabama Street
Houston, Texas 77006
713.529.8000/713.529.8044/Mobile: 850.572.8592
and
WILLIAMS CUKER BEREZOFSKY
BY: SAMUEL ABLOESER, ESQUIRE
ESTHER BEREZOFSKY, ESQUIRE
One Penn Center at Suburban Station
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA 19103-1819
215.557.0099/215.557
SAbloeser@wcblegal.com
Attorneys for Plaintiffs

ARNOLD & PORTER, LLP
BY: PETER T. GROSSI, ESQUIRE
DAPHNE O'CONNOR, ESQUIRE
KERI L. ARNOLD, ESQUIRE
555 Twelfth Street, NW
Washington, D.C. 20004-1206
202.942.5670/202.942.5999
Peter_Grossi@aporter.com
and
WILLIAMS & CONNOLLY, LLP
BY: HEIDI K. HUBBARD, ESQUIRE
725 Twelfth Street, NW
Washington, D.C. 20005

202.434.5451/202.434.5029
Attorneys for Defendant

♀page 3

I N D E X

PLAINTIFF'S EVIDENCE

DR. CHERYL BLUME

Direct by Ms. Littlepage------------------Page 4
Cross by Ms. Hubbard----------------------Page 63

♀page 4

Dr. Cheryl Blume - Continued Direct

\- - -

AFTERNOON SESSION

\- - -

THE COURT: Would you want a read- back on your last question, or are you okay?

MS. LITTLEPAGE: I'm okay, Judge. May I proceed?

THE COURT: Sure.

\- - -

CONTINUED DIRECT EXAMINATION

\- - -

BY MS. LITTLEPAGE:

Q. Dr. Blume, when we left for lunch we were talking about different ways that drug companies can look and assess some of the breast cancer risks and I want to talk about another different kind. We talked about databases, questionnaires, patient populations.

The last one I want to talk to you about is large clinical trials such as the WHI. Is it one of the options for a drug company to do, in addition to all the other things, a large clinical trial? What is a large clinical trial and what information would it give in this situation?

♀page 5

Dr. Cheryl Blume - Continued Direct

A. A controlled clinical trial is a trial that is designed before data collection begins. A study plan is developed. Generally there may be a couple different groups of patients in the study. Some patients may receive the drug that you're interested in studying. Others may receive, you've probably heard placebo or the sugar pill. Others may receive another drug. And you compare over time their responses to these various drugs.

In a controlled trial, controls, different things. For example, when you enter patients into a controlled trial, you control age across the treatment groups. So you don't have all the old ladies in one group and all the young women in another. You control the age.

You may control previous diseases they have. So you try to make your treatment groups as equal as possible. And then it's -- we call it blinded. Patients don't know what they're getting. They don't know if they are on placebos. The don't know if they are on a drug. A plan is followed for some period of time, and it depends on the drug, it might be a short study, it might be years of study. And they are seen by doctors who all follow the same

Dr. Cheryl Blume - Continued Direct
plan in watching them and observing them over a period of time. And all of this is controlled on the front end. And at the end of the study, scientists are able to make some observations: How did the patients who received the drug do for, say blood pressure trial. Did there blood pressure go down? Did it go down more than the patients who received the sugar pill? Did they have any bad side effects? Were the side effects different in the trial given the drugs versus the patients who got the sugar pill? It is controlled. Everything about it is controlled including the data analysis at the end.
Q. Was the WHI trial, the one the government did, set up the way you just described, in controlled different groups?
A. Yes.
Q. Can you tell the jury what information -- first of all, was the WHI trial supposed to last 15 years?
A. Yes.
Q. And, did it stop early?
A. Yes, it was stopped early.
Q. Can you explain to the jury what happened that



Dr. Cheryl Blume - Continued Direct
caused this study to be stopped early and what does that tell us about the breast cancer risk of these drugs?
A. When we talk about controlled trials, we set them up and we may want them to run a year or two years, depending on what we want to study. But most protocols know that we might not be able to do the study the whole time. Something may come up. And it is part of the control of the study, we have what we call stopping rules because those are the rules we will stop a study. And it's based on safety data. We might not know what the patients are getting. We don't know what they're getting. But we know if we see ahead of time in the plan, if we see so many deaths or we see so many incidents of cancer or so many broken legs, whatever the end point is, then we will stop the study and not let it go the whole time because the study -- it's not safe to continue the study anymore.
And that's what happened in this study we're discussing called WHI. Before they did the big study, before they did it, they had stopping rules set up and one of the stopping rules were if they observed breast cancer. And what happened was



Dr. Cheryl Blume - Continued Direct
over a period of time, the reports of the breast cancers accumulated and it reached the point that it got to one of the stopping rules and the study was stopped and patients were discontinued from the study and the data -- then the data were unblinded; in other words, we knew who received placebo versus

sugar pill versus those who got the drug.
Q. Was the WHI stopped earlier than the projected 15 years?
A. Yes. The stopping rules -- the safety stopping rules came into effect, it was stopped.
Q. And was it stopped after the average use of patients in the study was 4.4 years?
A. Yeah, a little over four years.
MS. O'CONNOR: Objection. Counsel is still leading.
THE COURT: Sustained.
BY MS. LITTLEPAGE:
Q. How long was the average use of the patients before the study was stopped?
A. It was less than five years.
Q. And what stopped the study? What bad event happened that stopped the study early?
A. When you're doing these types of studies, as I

♀page 9

Dr. Cheryl Blume - Continued Direct

mentioned, there's doctors at all the different centers that are -- they are feeding data back to the center who's collecting the date. So there might be 20 different study centers, but as they see patients, they send the data back to a central place. There are scientists at that central place; statisticians, data review experts, and what happens is they're watching the data as it comes in and with WHI, as they were observing the breast -- they were doing breast exams, they were looking for breast cancer, among a lot of things, the results came in that they had death to stopping rules, significant increase, more than they anticipated of breast cancer, so the study was stopped.
Q. Does that mean that there is no further data gained from the study because it was stopped? In other words, when the study stops, that's the end of the data you can get from the study?
A. Well, the patients are -- patients generally go through a close-out visit; the study is going to be stopped, they take them out of the study and the do final checks and then all the data in the study are examined that have been collected up until that point in stopping, so they look -- they keep looking

♀page 10

Dr. Cheryl Blume - Continued Direct

at other things. And sometimes in studies they don't drop all of the groups out, they might only drop the groups that are having the problems or keep they might keep some other groups in.
So sometimes data collection occurs in the groups that aren't having the problems.
Q. Now, we talked this morning about a document that was dated 1983 where Dr. Perdue goes to the workshop. Do you recall that document?
A. Yes.
Q. And, at this workshop, there is a discussion that there is a need for a large, long-term study. Would that be this type of study?
A. Well, yes, yes.
Q. And, from 1983 on -- first of all, in 1983 did

you see any documents indicating that Wyeth started a large clinical trial in 1983?
That was a terrible question. Let me ask a better question.
A. No, I did not see documents that Wyeth started any trials.
Q. From your review of the red flags or the safety signals, do you think it would have been appropriate that Wyeth would and could and should

♀page 11

Dr. Cheryl Blume - Continued Direct

have started a large clinical trial along with the other types of studies that you talked about this morning to get better information about the breast cancer risk?
A. I think the breast cancer risk was appreciated years ago, years ago. We saw data that Wyeth appreciated it in the 70's and certainly in the 80's. I don't think studies, ways to gather data, there's no one right way. I always use the tool box analogy. You can look at data and generate data a million different ways. And in the case of estrogen progestin therapy, there was a lot of different ways to look at it, a lot of different ways the efforts could have been made to look at breast cancer, and we talk about a lot of them. I'm of the opinion, given the breast cancer, that Wyeth could have, should have looked at them in a variety of ways. Some of the easier studies, the database studies, looking at the insurance databases, and I'm of the opinion they had the ability, had the wherewithal to be able to do a big study as well, a controlled study, but all of them were at some point able to -- they could have done any of them at some point in time and all of this would have likely given the

♀page 12

Dr. Cheryl Blume - Continued Direct

information that we have seen when others have done those types of studies.
Q. And the jury has seen this, this graphic from Wyeth, and I want to go through with you -- assume with me that the jury has heard there are several steps that Wyeth believes they would have to do before they could do a WHI-like study. And let me ask you about a couple of them. First of all, Wyeth has said that they couldn't do a study until after 1984 because the established effective dose of Premarin hadn't been figured out. Let me ask you this: Could Wyeth have done a study to establish what was the right dose for Premarin long before 1984?
A. Well, that dose was proven in 1994 and -- of course -- I mean the product had been used in combination for the 20 years prior to that so Wyeth was aware of what dose regimens were being used in combination.
Q. Is it something a drug company would typically do, is do a study to establish what is the effective dose of the drug they're selling?
A. Yes, and it's acquired for FDA approval purposes.

Dr. Cheryl Blume - Continued Direct
Q. But because Premarin was grandfathered from 1942 to 1984, 1984 was the first time Wyeth did that type of study and got that kind of data, right, on the dose issue?
It wasn't a very artful question. Let me ask a better question.
Could Wyeth, between 1942 and 1984 at any time have established the effective dose of their drug?
A. Yes.
Q. No reason that could not have been done ten years earlier?
A. Right. They could have done it at any time.
Q. So that step, the step that they say had to be done in order to do WHI could have been done earlier.
A. Yes. The IND could have been submitted long before 1983.
Q. Now, the Prempro pivotal trials, what is a pivotal trial?
A. Generally they're controlled trials, planned ahead. Pivotal generally refers to an FDA issue and a pivotal trial is a trial which FDA is using to either support an approval or to support not



Dr. Cheryl Blume - Continued Direct
approving you, but it's one of the main trials, critical trials.
Q. Human study?
A. Yes, human clinical trials.
Q. Although it appears here on the steps towards WHI, was this study done by Wyeth to get Prempro approved, that that's the purpose of the study, to get approval of their drug?
A. For the combination, yes, of course.
Q. So, just to be clear, Wyeth didn't do this study in order to be a lead-in to WHI, they did this study to get their drug approved.
A. No, the study wasn't designed for -- no, the study wasn't designed for breast cancer purposes, it was designed to look at endometrial -- the healthiness of the cells, endometrial cells when women were either getting estrogen alone or estrogen plus progestin.
Q. And it was -- I think I wrote the chart on this one already with Dr. Dey. It was a one-year study, right?
A. Correct.
Q. And I think a little over 1300 women ended up completing the study.



Dr. Cheryl Blume - Continued Direct
A. Yes. And that would not be enough for a controlled breast cancer trial.
Q. Any reason why Wyeth couldn't have done, started and completed this one-year trial in 1983 so that by 1984 it was done as opposed to taking nine years to do it?

A. No. There is none.
Q. This one could have been done earlier?
A. Oh, yes.
Q. So this step towards WHI could have been done earlier?
A. Yes.
Q. Pepi studies; can you tell the jury, first of all is Pepi a breast cancer study or a benefit study?
A. No, it was a benefit study looking at lipids, cardiovascular benefit study.
Q. And, could Pepi, could this study have been done earlier and whatever results that were needed could have been gathered earlier by Wyeth?
A. Yes, of course.
Q. And, the last step, the FDA, it's true -- is it true that the FDA would have to agree for a study like WHI to occur?

♀page 16

Dr. Cheryl Blume - Continued Direct

A. Are you asking prior to approval?
Q. Yes.
A. Yes, because it would have required to a review of the plan. Patients were going to be exposed to an unapproved drug and a placebo therapy, sugar pill therapy, so the FDA would have to review it prior to approval.
Q. We looked at a time line earlier where in 1983, Wyeth got permission to study the drug in humans.
A. Yes. That was when the IND, first IND was in.
Q. So, could the FDA have given permission in 1983 for a WHI-like study when they gave Wyeth permission to study this -- these drugs in women?
A. Well there certainly was a situation, a forum set up at that point that Wyeth could have submitted -- developed a protocol at that point in time and submitted it to the IND that would begin the dialogue back and forth between Wyeth and the FDA regarding the study design.
Q. Is there any one of these steps that Wyeth says is necessary before this large study can be done; any one of these steps that couldn't have been done years earlier?

♀page 17

Dr. Cheryl Blume - Continued Direct

A. Well, I think -- no, I think the controlled clinical trial could have been done earlier, should have been done earlier and the other trials that we discussed this morning could all have been done earlier.
Q. Now, Dr. Blume, have you reviewed testimony from Wyeth executives where Wyeth executives were asked did you do a breast cancer study to understand the issues of breast cancer with these drugs?
A. Yes, I reviewed several.
Q. Did you review the testimony of not one or two, but several corporate executives of Wyeth being asked that sort of big question?
A. Yes.
Q. I want to ask you about the first one,

Dr. Marc Deitch. Did you review his testimony?
A. I did.
Q. And let's hear what he said on this issue:
(Whereupon videotape deposition is played as follows:.)
"Q. Doctor, would you just tell me your full name, please.
A. Marc Deitch. I'm retired.
Q. When did you retire?
♀page 18

Dr. Cheryl Blume - Continued Direct
A. June of 1999.
Q. Do you recall a single study done by Wyeth between 1976 and 1999 that looked to address the issue of the relationship between estrogen replacement therapy or combination replacement therapy in breast cancer?
A. Nothing that I can recall right now; no, I can't.
Q. You haven't seen a single study, single study done by Wyeth that would answer the question of the connection between hormone replacement therapy and breast cancer?
Objection.
A. Again, I don't recall.
Q. Now, before 1994 do you recall a single study done by Wyeth that would definitively answer the question whether combination therapy enhanced the risk of breast cancer above estrogen alone?
A. I have no specific recollection of any study I can put my finger on. I do know there was a large body of data
♀page 19

Dr. Cheryl Blume - Continued Direct
available throughout this entire time, but I don't know which studies were which and which were either sponsored by or supported by Wyeth during that timeframe or even beyond that."
(End of portion played.)
BY MS. LITTLEPAGE:
Q. Is this one of the pieces of deposition testimony you reviewed?
A. It is.
Q. Let's see if we can -- Wyeth corporate executives were asked in this litigation whether Wyeth had ever done any studies to understand the breast cancer issues with E plus P. You saw that testimony?
A. I did.
Q. And the jury has just seen the testimony of Dr. Marc Deitch, and what did he confirm?
A. That he could not find any studies also.
Q. Did you also review the testimony of Dr. Harold Marder, the senior vice-president of Global Medical Affairs?
A. I did.
Q. And what were the conclusions of his

♀page 20

Dr. Cheryl Blume - Continued Direct
testimony?
A. The same.
Q. Which is?
A. That Wyeth did not support any studies designed to assess breast cancer.
Q. Dr. James Pickar, the assistant vice-president of Women's Health, was he asked those questions?
A. Yes.
Q. And what was his answer?
A. The same.
Q. Dr. Pamela Cobb, director of Global Medical Affairs, did he review her testimony?
A. I did.
Q. Dr. Gerald Fisher, senior vice-president of drug safety, did you review his testimony?
A. I did.
Q. Dr. Joseph Sung, vice-president of regulatory action, did you review his testimony?
A. Yes.
Q. And in the testimony that you reviewed, can you tell the jury, did Wyeth ever do a breast cancer study that looked to understand this issue of breast cancer and E plus P?
A. No.
♀page 21

Dr. Cheryl Blume - Continued Direct
MS. HUBBARD: Your Honor, I object to this. These depositions that she reviewed, they were not asked that specific question and there are phrases being taken out of context without the jury being able to hear what these witnesses were actually asked and what they testified to.
Your Honor, I posed an objection because the witness has been asked about a question that various Wyeth employees purportedly testified to where the jury has not been able to hear what they were really asked and their complete testimony, and so it's mischaracterizing the underlying evidence that the witness is claiming ...
THE COURT: Why don't we take them up as we call them one-by-one.
MS. LITTLEPAGE: Okay.
BY MS. LITTLEPAGE:
Q. Now, did you see any evidence in the documents, we talked about the testimony, any evidence in the Wyeth documents that Wyeth ever did any of these kinds of breast cancer studies; questionnaire studies, database studies, to try and
♀page 22

Dr. Cheryl Blume - Continued Direct
understand the breast cancer risk of these drugs?
A. No. I didn't see the effort -- that any effort was expended with any of them.
Q. And, having worked in the pharmaceutical industry, can you give me your expert opinion on the appropriateness of that being Wyeth's reaction to

this issue?
A. Yes. Given the gravity of the event, I mean, it's breast cancer, and the magnitude of the exposure of the women, I think it was a mistake not to study breast cancer beginning in the 1970s when they were first put on notice, in my opinion, using any one or all of the tool boxes, study designs that they could have done; I believe it was a mistake. I believe they should have done it.
Q. Let me turn to a different issue.
Dr. Blume, have you reviewed documents and published literature that deal with the issue of thin or lean, I think is how the medical literature refer to them, women, and breast cancer risks and these two drugs?
A. Yes. As I mentioned earlier, I think this morning, when you look at these large database studies, the Kaisers, or whatever, in addition to

♀page 23

Dr. Cheryl Blume - Continued Direct

looking for incidences of breast cancer, you can also find out all kinds of statistics about the women who took the drugs; other drugs they took, their age. We talked about this morning. And usually captured in those databases are the women's height, their weight, their body mass index, all those types of things. Oh, yes, it was examined.
Q. We're going to talk in detail about some of the documents, but overall what was found out about the risk for thin or lean women if they took these two drugs on the issue of breast cancer?
A. What's very interesting that lean women, women with lower body mass index have a significantly higher increase in breast cancer when associated with taking estrogen plus progestin.
Q. Let me hand you first what's been marked as Plaintiff's Exhibit 345, and at the same time I'll hand you Plaintiff's Exhibit 346.
MS. HUBBARD: Your Honor, I think you that you have ruled these could not be used without laying a foundation first.
THE COURT: 345.
MS. LITTLEPAGE: They both relate to Dr. Cummings' study. That was the study

♀page 24

Dr. Cheryl Blume - Continued Direct

where Dr. Blume was just talking about on thin or lean women and their higher risk of breast cancer.
MS. HUBBARD: Your Honor took this up this morning.
THE COURT: We've already done this. I'm sorry, you will have to have someone else.
MS. LITTLEPAGE: Judge, you overruled the objection this morning. Wyeth is re-urging objections that have already been overruled.
THE COURT: It seems to me the ruling this morning was if she could link them, she could get them in. But I don't see it

on here right now. I don't see it. And I don't remember reading it. I may have read it this morning.
MS. LITTLEPAGE: Judge, you ruled on one document, that the objection was sustained on the two documents in your Honor's hands, the objection was not sustained, it was overruled, and you asked me to do a foundational question which I



believe I have done, that ...
THE COURT: Okay. Let me read it. Unless you want to come up here and point out what you're trying to pull out of 345; frankly, I don't see it.
MS. LITTLEPAGE: Judge, may we have a bench conference.
THE COURT: I think so.
(Sidebar discussion on the record as follows:)
THE COURT: What are we talking about? Slim, lean ladies? Where? Where? Because I don't see it.
MR. GROSSI: That is exactly my question. This is a study involving bone density. It is not involving body mass index. It doesn't say anything about thin women. It is not about thin women.
MS. LITTLEPAGE: Don't ...
THE COURT: You can laugh all you want, but I don't see it.
MS. LITTLEPAGE: Judge, what he says is "Our findings suggest the risk of breast cancer associated with hormone replacement



therapy, they have been substantially underestimated since osteoporosis is the primary indication for its use.
THE COURT: I don't know if you can say just because she's skinny, she has osteoporosis. I don't know if that is true or false.
MR. GROSSI: Exactly. It has nothing to do with it.
MS. LITTLEPAGE: I'm not making that ling, Judge. There's two different studies; the Cummings study and the collaborative group. Both groups reinforce the exact same thing, which is thin or lean women have a greater risk of breast cancer.
THE COURT: Where does that stay this?
MR. GROSSI: It's not in this document and it's not in this study. If you have another study, use the other study.
MS. LITTLEPAGE: Don't tell the judge what is not the study when you know that the published study says that ...
THE COURT: Friends, there is no point in fighting about it because I don't see

♀page 27

Dr. Cheryl Blume - Continued Direct
anywhere and I do not know that just because you have osteoporosis you would necessarily -- I really don't know.
MS. LITTLEPAGE: That's the highest risk for osteoporosis in lean or thin women. I will lay the foundation the Cummings abstract and the final paper, along with the collaborative group, establishes what the expert has just told the jury. She's reviewed both of them. She's reviewed this, the final paper and the collaborative group. The final paper of this and the collaborative are published medical articles. Based on that she has given an opinion to the jury that both of those studies show an increased risk of breast cancer for thin or lean women on hormone replacement therapy.
THE COURT: Not on these papers they don't.
MR. JOHNSON: Your Honor, she's not a medical doctor.
THE COURT: From my tiny bit of osteoporosis experience, my grandmother who

♀page 28

Dr. Cheryl Blume - Continued Direct
who was a huge women, fell and broke her hip in a nursing home in her late 70's. Nobody would have ever called her slim. So she obviously was at risk for osteoporosis, we probably didn't know that it.
MR. GROSSI: Indeed that is what the article talks about, that the heavier the person -- not the heavier the person but the different bone densities have an effect on falling and fracturing.
THE COURT: Well this was many years ago but I do remember she was a very heavyset woman.
MS. LITTLEPAGE: Judge, the collaborative group does body mass weight.
THE COURT: But they didn't do it here.
MR. GROSSI: It's a different study.
MS. LITTLEPAGE: That's my whole point, is that she's not basing her opinion on one study, she's basing her opinion on two separate ...
THE COURT: None of which uses thin or lean.
MS. LITTLEPAGE: The collaborative

♀page 29

Dr. Cheryl Blume - Continued Direct
group does weight or body mass index. So women who are less than 25 are thin and women who are greater than the 25 when they have a body mass index which is a fat ...
THE COURT: Doesn't it have anything to do with your height too?

MS. LITTLEPAGE: Yes. Body mass index has to do with whether you are considered a lean frame or a heavyset frame. And, Judge, this is important because this women believes that in the warnings for this drug should have been information that thin or lean women who were at an increased risk, and that is information that would have been very important to my client because she's a thin or lean women. And her opinion is based on multiple studies, it's based on Wyeth documents. It's important the jury see this.

MR. ABLOESER: May I make a point here, your Honor? Samuel Abloeser. For all intents and purposes, what we are all arguing is what our interpretation of these studies are. Our interpretation, your

♀page 30

Dr. Cheryl Blume - Continued Direct

Honor, doesn't mean anything, it is what the expert's interpretation of these studies are and what she concludes. She is an expert witness. She is entitled to give her opinion based on documents that she would customarily review in the course of her work.

THE COURT: Tell me where she pulled that off this.

MR. ABLOESER: That's just been explained to you is that -- they are entitled on cross-examination -- everything that defense counsel is pointing out to you is fodder for cross-examination. What is important, your Honor, is that this expert has taken from these documents. It's not what you -- with all due respect, Your Honor, it's not what you glean from it, it's not with Mr. Grossi gleans from it ...

THE COURT: It's not here.

MR. ABLOESER: It is.

THE COURT: You have to make a link in your mind.

MR. ABLOESER: But the expert just has,

♀page 31

Dr. Cheryl Blume - Continued Direct

your Honor. That's the whole point, is that the expert is making the link.

THE COURT: Did you read the sentence here about "Adjusting for obesity, family history, including current users, therapy has had little effect on our results."

MR. ABLOESER: That is fodder for cross-examination.

MS. LITTLEPAGE: I will lay a better foundation. I will establish that her opinion is based on the Cummings abstract and final paper as well as the collaborative paper which actually does weight, actually does body mass index, which is the way scientifically you look at

thin versus overweight women, is body mass index. I will make that foundation for her opinion; that she looked at both of those studies and -- but as a basis of her opinion, that that information should have been in the label.
MR. GROSSI: Your Honor, if I can say, we're back here to talk about one piece of paper and your Honor has pointed out not

♀page 32

Dr. Cheryl Blume - Continued Direct

only does this piece of paper not indicate that body mass index has an effect, the sentence that your Honor just pointed out indicates just the opposite. That by adjusting it has no effect at all. And there you have the fact. May I finish? If Ms. Littlepage has another article, we should get that other article, we should all look at it and consider whether that one was appropriate. And also renew the objection made to the fact that this witness is not a medical doctor, she is not a person who well-versed in osteoporosis, in body mass index ...
THE COURT: You have her up there as a receptor ...
MR. GROSSI: This has nothing to do with receptor.
MS. LITTLEPAGE: She's a labeling expert. She has to establish that before she can say something should have been in the label, she has to establish it would have been scientifically valid. It's not appropriate for her to get on the stand and

♀page 33

Dr. Cheryl Blume - Continued Direct

say I think it should have been in the label. She had to show there is science to support it.
THE COURT: Fine, but I don't see it here.
MS. LITTLEPAGE: That is the problem, that you're looking at a document that is one in a series of documents. I won't even use this one. What is important to me is document 3 -- is I will lay the better foundation for her opinion, and that document 345 indicates that Wyeth understands that Dr. Cummings is going to present his data, and as opposed to coming forward and saying we're going to do a press release on his data, we're going to tell the world about his data, they employ the dismissive strategy, and that's their strategy.
MR. JOHNSON: Your Honor, this is plowed ground. You ruled on this this morning. You said the only way the document could come in is if she could lay a foundation. It's not from Wyeth, it's

♀page 34

Dr. Cheryl Blume - Continued Direct
from Burson-Marstellar.
THE COURT: Here he goes in the benefits and risks and he's not talking about skinny people.
MR. GROSSI: Exactly. Right.
MS. LITTLEPAGE: Because it's a Wyeth document.
THE COURT: He talks about osteoporosis. He talks about vasomotor, breast cancer, uterine cancer. He doesn't talk about skinny.
MR. GROSSI: Talk about highways and byways, they've been trying to go down this entire path in order to make Wyeth look dismissive in everything, and yet neither of the documents they intend to offer even relates to thin women, which is what they say they want to do.
MR. JOHNSON: Your Honor, let me go back to one other point we made this morning, is they have conceded that the 2005 label is the quote, unquote, right label. The right label says nothing about thin women.

♀page 35

Dr. Cheryl Blume - Continued Direct
MS. LITTLEPAGE: Please don't tell me what my liability theories are.
MR. JOHNSON: Have you conceded that or not? You said it several times.
MS. LITTLEPAGE: I'm not going ...
THE COURT: There's no reference here to thin, lean women and I'm not making osteoporosis on my behalf because I don't know enough.
MS. LITTLEPAGE: May I ask her about the studies she's looked at, the fact that she believes that there is science to support it and that she believes it should have been in the label. And then we've already ruled, your Honor, you've already ruled on the on the core data sheet, and the core data sheet, which is a Wyeth document, says thin or lean women are an increased risk. So that's where I am getting to. I end up with the Wyeth document that says what I'm saying.
MR. GROSSI: Why don't they just go there? They don't need all that.
THE COURT: Go ahead.

♀page 36

Dr. Cheryl Blume - Continued Direct
MS. LITTLEPAGE: You don't get to tell me how to try the case.
THE COURT: But I'll tell you one thing, you better try it a little faster.
(End of sidebar discussion.)
BY MS. LITTLEPAGE:

Q. Dr. Blume, we were talking about thin and lean women and the higher risks of breast cancer. Did you review medical studies or medical articles that dealt with this issue?
A. Yes.
Q. And one of them was by a group that I will call the Dr. Cummings group that we just started talking about, and did you also review the published medical article by the collaborative group that dealt with this issue?
A. I did.
Q. So do these two articles give information about the risk of breast cancer for women who are thin or leaner?
MS. HUBBARD: Objection. Leading.
THE COURT: Pardon?
MS. HUBBARD: Objection. Leading.
THE COURT: Rephrase your question.

♀page 37

Dr. Cheryl Blume - Continued Direct
THE WITNESS: Yes, I reviewed both articles.
BY MS. LITTLEPAGE:
Q. What information did these two studies give you on this issue?
A. Both studies indicated that the risk in women who are taking estrogen or progestin for breast cancer is not the same across all women. The risk of the breast cancer is higher in those women who are lean with a lower body mass index.
Q. Let me hand you what's been marked as Plaintiff's Exhibit 811.
MS. HUBBARD: Your Honor, we have an objection to this exhibit because it post-dates the plaintiff's use of the product. It's after she stopped using the product.
MS. LITTLEPAGE: Judge, the reference I'm using from it is reference to a study from 1997.
THE COURT: All right, confine yourself to it, please.
BY MS. LITTLEPAGE:
Q. Dr. Blume, let me ask you a couple questions about this document. Can you pull up 811. Is this

♀page 38

Dr. Cheryl Blume - Continued Direct
a Wyeth document?
A. It is.
Q. An internal Wyeth document?
A. It is.
Q. Coming from the file cabinets of Wyeth?
A. Yes.
Q. What is a core SPC?
A. A core data sheet such as this is a collection -- it's the company's collection, summarization of the critical, the overall information about a drug product, including its uses, safety concerns, adverse reactions.
Q. And if you turn to page 6 of this document, does this internal Wyeth document show whether Wyeth, the company Wyeth, understood the issue

you've just been talking to the jury about?
A. Yes, they have summarized it.
Q. What does Wyeth understand in this internal document about this issue of thin or lean women and a higher risk of breast cancer?
A. Well, they discuss several studies, but the conclusion statement is that they -- the increase in the risk, the potential for increased risk group, the breast cancer was found more in the women with

♀page 39

Dr. Cheryl Blume - Continued Direct

lean rather than the women with high body mass index.
Q. And if you go to the next page, page 7, do they actually go through and discuss a study, and they footnote it as footnote 15.
A. Yes.
Q. And, can you tell the jury what they say this study found?
A. Well, they footnoted several studies but the one that they are referring to is the one by Scher and JAMMA, and they quote from -- or summarize from that that the relationship between BMI, body mass index, and the risk of breast cancer, was based mainly on that study. And they found in that study that women with the -- the thinner women, the ones with the lower body mass index, in other words, under 24, equal to or under 24, had significant increased risk, greater risk for breast cancer when using estrogens, while there was no relationship in the women with the higher indexes, body mass indexes in the hormone use.
Q. And why is that important for the jury to understand that this information is contained in the internal documents, the private documents of Wyeth?

♀page 40

Dr. Cheryl Blume - Continued Direct

A. Well, there is -- any time that we do studies and see an event or see an association, we try and look -- after we realize there is an association with an adverse event, honestly the next step is that is there equal risk across all users for that or can we spotlight certain groups that may be at higher risk or those at lower risk. And companies will include that in labelling and in discussion materials. And this was important because the women who were in this study who were thinner, the lean ones, had the higher risk. And it was -- obviously it was understood, it was in their internal documents.
Q. Does the Wyeth document then go on and talk about a meta analysis of 51 epidemiological studies?
A. Right; and I think you referenced that earlier in the collaborative study. The collaborative study is quoted.
Q. Could you go down, April, and confirm that Footnote 18 is in fact this collaborative group that we talked about.
So does this document indicate that Wyeth was aware of the collaborative group article?
A. Yeah, the collaborative study looked across

♀page 41

Dr. Cheryl Blume - Continued Direct
over 51 studies. It was a big review and 50,000 women were examined. And when they looked across all of those studies, one of the things that they concluded regarding breast cancer, again, it was more common or more likely to occur in the thin, slender build women.
Q. Wyeth writes that, "This meta analysis, the collaborative group, has found that the relative risk of breast cancer was related to body mass index. Furthermore, the magnitude of the reduction, the relative risk, was related to body mass index and the difference between post-menopausal and pre-menopausal women being substantially greater for women of low body mass index than those of higher body mass index."
Let me ask you a question about that.
Did Wyeth ever, ever tell in their label, their doctor letter, press release, ever tell doctors and patients that thin or lean women had a higher risk of breast cancer?
A. This is an internal document so I tracked through, I tracked the labeling over time and I couldn't find that it was ever included.
Q. In your experience having been inside the drug
♀page 42

Dr. Cheryl Blume - Continued Direct
industry, is this the kind of important information that a doctor whose going to prescribe a drug to a thin or a lean woman should get from a drug company?
A. Drug companies will use their package inserts or other materials to look at different patient characteristics. It is not uncommon to see in an insert where they talk about risks being greater with different body weight, different races, different national origins. So they use the insert to spotlight data from whatever toolbox study they used that suggests weight. It may not be equal across all. There may be a greater risk in this group or a lesser risk in this group. So yes, it is examined.
Q. When you talk about a drug company having a duty to accurately describe risks, would this be what we're talking about where a thin or a lean woman is entitled to know that her risk of breast cancer is greater if she takes these two drugs than if she was an overweight woman?
THE COURT: Objection.
MS. HUBBARD: Yes. Objection. Leading.
THE COURT: Rephrase it. Strike the
♀page 43

Dr. Cheryl Blume - Continued Direct
answer. Rephrase it.

BY MS. LITTLEPAGE:
Q. Tell me why it's important when we talk about the duties of the company to accurately describe risks, that this information be told to doctors and

patients.
A. The package insert that you see with a product, as well as the information sheet that's provided to the patient is supposed to summarize the issues needed to make the correct decision on whether that drug is appropriate for that patient. Not across all patients, but for that particular patient. So as much information as you can tell the woman or tell her doctor that there is a risk, there is not a risk, and if there is a risk, it may be more in this particular patient, and then that patient has the right to say okay, I'm willing to accept that extra risk because I want the benefit of this drug. Or, I'm not willing to accept these risks and I'll just find some other way of dealing with it without having the benefit of the drug. So that's whey you try to put this in both patient information as well as in the prescriber's

♀page 44

Dr. Cheryl Blume - Continued Direct

information, the physician's insert information.
Q. And this information never was in the package insert.
A. I never found it.
Q. In your expert opinion, should Wyeth have told doctors and patients this information?
A. I think that, yes, and I think that any time there's -- I mean, this is a big sub group. This is lean versus not lean. Any time there's major sub groups; race, gender, body size, other drugs they might be taking, if you know that the risk is not equal across all groups, then I believe the patient has the right to know and I believe her prescriber has a right to know that for that communication between the two of them.
Q. Let me change topics and talk to you about what the actual label for Prempro said.
Physicians' Desk Reference. Can you tell the jury what this book is and how it's used?
A. Yes. Physicians' Desk Reference is published annually and it comes out, sort of like new cars, it comes out in September or October of the year before for the following year. So 2007 came out in the fall of 2006. And it -- and companies pay to have

♀page 45

Dr. Cheryl Blume - Continued Direct

their products included in this PDR. It includes the current prescribing information for whatever products those companies want to put in the PDR.
Q. Okay. And if a doctor is going to give a drug, he can open up the PDR and he can read Wyeth's information about the drug in this book?
A. Yes, of course, yes.
Q. Let's look and see what Wyeth said about breast cancer in its warnings in 1999, and I'll tell you that's the year Mrs. Daniel started the drug, okay?
Would you agree or tell us that on the one, two, third page of this package insert, was there information about breast cancer in the warnings?

A. Yes. My screen is not working.
Q. I'm actually going to pop out sentence-by-sentence. Can you read that?
A. Yes.
Q. Let's go through the first sentence and ...
MS. HUBBARD: I apologize, there is a typo in your graphic. I'm sure you meant 1.322.0, not 20.
MS. LITTLEPAGE: Ignore my -- it's a

♀page 46

Dr. Cheryl Blume - Continued Direct

2.0.
Let's read the first sentence. Can you help the jury understand what is important or relevant about the first sentence?
THE WITNESS: Sure.
BY MS. LITTLEPAGE:
Q. "Some studies have reported a moderately increased risk of breast cancer, relative risk of 1.3 to 2.0 on those women on estrogen replacement therapy taking higher doses, or those taking lower doses for prolonged periods of time, especially in excess of ten years."
What is important or relevant about that sentence for the jury to consider?
A. Okay, this occurs, if you ever looked at your prescribed -- ever looked in a PDR and looked at an insert, it's divided into different sections. This particular section is from the warnings section. And the first sentence is saying that there have been some studies that have reported a moderately increased risk of cancer in women who are on estrogen replacement therapy. Now this is a Prempro insert.
Q. Let me stop you there.

♀page 47

Dr. Cheryl Blume - Continued Direct

For a women who is reading this drug, who is taking both pills, does this sentence provide any information about both pills --
A. No.
Q. -- as opposed to just one?
A. Exactly. It's exactly what I was going to say. This sentence is directed to the studies that looked at estrogen alone.
Q. And what does it tell a woman about the single estrogen pill, although she's taking both, what does it tell her about this?
A. It's saying in some of the studies there has been a moderately increased risk in those women taking estrogen when they were taking higher doses, the bigger doses of it, or in those women who took lower doses but for prolonged periods of time, especially if they took estrogen alone for more than ten years.
Q. Does this sentence provide any information to a woman who took two pills, regular dose, for 16 months?
A. No.
MS. HUBBARD: I'm going to object. I think we're reading from the doctor's label

♀page 48

Dr. Cheryl Blume - Continued Direct
and the questions keep talking about ...
THE COURT: I think you really have to ask that of another witness, not this witness.
MS. LITTLEPAGE: I didn't understand the Court. This is our labeling expert.
THE COURT: I understand, but she can't tell you what somebody else would read into it when they read it.
MS. LITTLEPAGE: Got it.
BY MS. LITTLEPAGE:
Q. The next sentence says, "The majority of studies, however, have not shown an association in women who've ever used estrogen represent therapy."
What is important or relevant about that sentence to this jury?
A. Well, again, we're not dealing with estrogen plus progestin, we're looking only at estrogen, but what a sentence does is it summarizes, it's a conclusion sentence for what came before it and said most of the studies didn't show an issue, did not show a problem with breast cancer.
Q. And what is your expert opinion about doing that, giving information and then providing a
♀page 49

Dr. Cheryl Blume - Continued Direct
summary statement like this?
A. Well, the problem -- my particular problem with that is -- that section of the insert is when one studies how to write inserts and how inserts are read in focus panels, or whatever, is that is a sentence they take away. "The majority of the studies show no problem." That is a conclusion sentence and that is the take-home message that is taken away. And that's what they remember; and unfortunately, that doesn't reflect the real data.
Q. The next sentence, "The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen progestin therapy has been reported. Other studies have not shown this relationship."
What's the importance about those two sentences?
A. Well what the insert is saying here is we don't know. We don't really know what happens with breast cancer risks when you put the E and the P together. There have been some studies that have shown an increased risk and other haven't shown this. So the take-away message is we don't know.
♀page 50

Dr. Cheryl Blume - Continued Direct
It's unknown.
Q. And again, does the first sentence provide information and the second sentence take it away, minimize it?
A. Well, the first one.
MS. HUBBARD: Objection. Leading

again.
BY MS. LITTLEPAGE:
Q. Let me ask a better question.
What is the relationship between the first and the second sentence in your expert opinion?
A. Well the first sentence is complex, it's commonly used in writing inserts. It is saying we don't know and the studies go both ways. And at the end of the day, other studies haven't supported the relationship. So the take-away message is we don't know.
Q. The risk of the two drugs together?
A. Right, the two drugs together for breast cancer, that insert is saying we just don't know, definitive data aren't available.
Q. The next sentence says that "In a one-year clinical trial of Prempro, Premphase and Premarin

♀page 51

Dr. Cheryl Blume - Continued Direct
alone, five new cases of breast cancer were detected among 1377 women who had received combination treatments, while no new cases were detected among 347 women who received Premarin alone."
Let me stop and ask you about that. Is that referring to the Prempro pivotal trial that we talked about earlier?
A. Yes. That was the trial they did to get the approval in 1994 of the combination.
Q. I put 1300 women, but what the label actually tells us is 1377 women --
A. Correct.
Q. -- in that study.
A. Correct.
Q. The next sentence says, "The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population."
What's important for this jury to consider about these two sentences in the label?
A. This is the describing -- now remember, and I think I mentioned this earlier -- this study was designed to look at the effect of progestin on the uterus when those women were taking either estrogen alone or estrogen plus progestin to prove that the

♀page 52

Dr. Cheryl Blume - Continued Direct
when you added progestin you didn't have the endometrial cancer. That was how this study was designed. While they were doing the study they looked at a variety of other things, of course as you do in any clinical study, and in the group of women who are only getting the estrogen, there was no new cases in that study of cancer. In the group of women who were looking at estrogen plus -- who were receiving, sorry, estrogen plus progestin, there were five new cases of breast cancer during that study. So all of them were in the group who got the combination therapy. So that's telling you what happened during the study. That study was not design to look at breast cancer. One can't do a breast cancer study looking at 1300 women.

The last is sentence is saying that even though there were five new cases, that frequency doesn't exceed what you would expect in the general population.

Q. And in your expert opinion, what -- is this appropriate. I mean, tell me what is important about putting these two sentences together in a label.

A. Again, the take-away message, the remembered

♀page 53

Dr. Cheryl Blume - Continued Direct

message is there isn't an issue with the breast cancer. Because those five cases, even though all five were in the group of E plus P, that isn't what you would have expected in an overall population, any more than you would have expected in an overall population. It was a little concerning they were all the E plus P group and none of them were in the estrogen group, but that's the take-away message. It dilutes it. In my opinion that sentence dilutes away the fact that five new cases occurred with E plus P.

Q. Now, can a drug company at any time make these warnings stronger, increase the strength of the warnings?

A. There is a variety of ways that one can change their labeling, their approved labeling.

Q. Describe to the jury the way a drug company can on their own, without FDA making them do it, strengthen or increase their warnings.

A. Our rule book, if you will, our play book in the pharmaceutical company is called the Code of Federal Regulations. So that's the rule book we have to follow. One of the options -- one of the sections of course in the rule back is labeling.

♀page 54

Dr. Cheryl Blume - Continued Direct

What can you do with your label? When you get a product approved, it's generally based on small numbers of populations. I mean this is a thousand women. There's -- studies done before a drug is approved are not big studies, traditionally. Once your product gets out into the real world, a lot of people are taking your product. And these people may be sick or they may be taking other drugs, so you get a whole new world of information about your drug once it gets in the real world. Because when we do studies prior to approval, generally the patients in those studies are fairly healthy, with the exception of whatever you are studying, but when you go out in the real world, they have taken other drugs, they have renal -- kidney -- bad kidneys, bad livers, whatever, so you're watching very closely. If you spot new safety information -- and we talked about that this morning, our pharmacovigilance -- if we spot something new, what do we do? How do we get the information out to the doctors, out to their patients. And there is a couple of different things you can do. One of which is the FDA says, FDA recognizes that things take awhile when you send it to the government to get -- when you send things to

Dr. Cheryl Blume - Continued Direct

the FDA, it takes awhile to have it reviewed by them, so FDA says look, if you find new safety issues, new hazards with a drug, new concerns, you can change the label on your own. If it's safety. Now I can't change my label I'm only approved for hypertension, now I'm going to say hypertension and arthritis. I can't add any new uses without getting approval first. But I can say I've seen some things out in the field, I'm a little bit worried since the approval, I am going to add this warning. You can put in the marketplace. You can give it to doctors, give it to patients, whatever, before FDA reviews it, because it's a safety concern.

Q. We talked earlier about "Dear Doctor" letters. Can a drug company give a "Dear Doctor" letter and give information that way to physicians?

A. Yes. The old paper "Dear Doctor" letters could be sent when there is new safety information. Today we're electronic and companies can put information if there is new safety concerns, they can put it on the Web, put it on their Web site. You see companies that have sections of their Web site directed for patients.

Q. What about advertisements? Can drug companies



Dr. Cheryl Blume - Continued Direct

buy like a full-page ad in a newspaper and say Dear Public, something has come up with our drug, we think you need to do something about it?

A. Yes, I have seen that. In the last couple of years I have seen full-page ads in you USA Today and The Times; yes, I have seen that.

Q. Now, the jury heard that in July of 2002, the WHI study was stopped and the results were published.

A. Yes.

Q. Now, after the results were published, did Wyeth go back and meet with the FDA and change the Prempro label to discuss more information about breast cancer?

A. Yes. The label was changed after WHI was published.

Q. Let me hand you what was discussed yesterday by the defendants. It's Defendant's Exhibit 84. And this, Dr. Blume, was discussed yesterday as the 2006 label for Prempro. Let me ask you a couple of questions about it.

Can you highlight the word invasive breast cancer that's right there.

What is this big black box that



Dr. Cheryl Blume - Continued Direct

appears right below the name of the drug?

A. Black box. It's called a black box warning.

Q. What is a black box warning?

A. When you want to highlight information in your insert and make sure people see it, one of the mechanisms that you're allowed to do in your label

is to what it is called black box warning, is you can put whatever information you want someone to make sure they see it right at the front. The reading of an insert tends to get diluted the longer the insert. So you want it right on the front end. And you bold it and it's supposed to catch the eye.
Q. So instead of having to turn to page 3 in the book, it would appear right underneath the name of the drug?
A. Right, if you want it, right, correct.
Q. What is the importance or significance of the fact that after, after the government study, this drug got a black box warning talking about the breast cancer risk?
A. Well, it's a fairly lengthy black box warning, but what it's saying in the first real paragraph is that the black box is discussing WHIs in the first sentence of the first real paragraph and it notes

♀page 58

Dr. Cheryl Blume - Continued Direct

there were several events that were observed in the prematurely discontinued study, and one of them was an increase, a significant increase in invasive metastatic breast cancer.
Q. Now, the jury was told yesterday that the warnings for breast cancer were reduced after WHI. Is that true?
A. No, they were put in a black box.
Q. Is a black box warning a stronger warning than this drug had on breast cancer before?
A. Yeah. It's in a black box warning.
Q. If you turn to page 24 of the document there is more information about breast cancer, and let's talk about what it says.
On the second sentence of this it says, "The most important randomized clinical trial providing information about this issue is the WHI."
Do you agree with that statement, that WHI is the most important clinical trial to give us information?
A. Well, it's certainly the most important controlled randomized clinical trial, yes.
Q. It goes down a little bit and it says right here "In these studies, the risk of breast cancer

♀page 59

Dr. Cheryl Blume - Continued Direct

was greater and became apparent earlier with estrogen plus progestin combination therapy as compared to estrogen alone therapy."
Do you see that?
A. Yes.
Q. What is the importance of that appearing for the first time in the label after WHI that this jury should consider?
A. Well, we looked at the earlier label, I think it was the one preceding this where it said -- it gave some data regarding estrogen therapy alone. This now, with WHI, the data were available from estrogen plus progestin, and the point of it is here is that when you look at the patients who were getting the combination, the risk was higher and it

became apparent earlier in the women who were getting the combo therapy. So this finally makes it into the insert.

Q. You go down here to there is a part here that says "In the WHI trial, invasive breast cancers were larger diagnosed as a more advanced stage than the estrogen plus progestin group compared with the placebo group."

Is that new information that wasn't in

♀page 60

Dr. Cheryl Blume - Continued Direct

the label before WHI?

A. Yeah. What it's saying; again, this label was able to take opportunity to discuss several things from WHI, and as I said earlier, you're looking to see yes or no, is there increased risk or is there not increased risk and once there is an increased risk, you want to learn all kind of things about it; what kind of women are at more increased risk and how does the risk present itself and what this label is taking care to say is that the risk was higher in the women getting the combo, they appeared -- their cancers appeared earlier and the ones who had the metastatic disease, the tumors were larger and they -- when they saw them, they were at a more advanced stage.

Q. So does this warning -- and let me be clear, this is after the WHI study was published -- does this warning provide more detailed information to the doctor about breast cancer and these drugs?

A. Yeah, well, I certainly think so.

Q. And you talked about the language of the older label. Does this after WHI label have more definitive language, clearer language?

A. It's, as the FDA would say, it's more tersely

♀page 61

Dr. Cheryl Blume - Continued Direct

cogent. It's very to-the-point and there doesn't seem to have the escape sentences, the sentence at the end which dilutes the meaning of what came ahead of it. But, this is the first time we had a label inclusion that actually provides hard data for E plus P, so they were able to finally put this risk information, get it in there.

Q. That is a good question. Did the fact that Wyeth didn't study these two drugs, the fact that they didn't do the types of studies we talked about, did that impact the label before the WHI study?

A. Well, the fact that there wasn't a controlled study prevented information such as this from getting in, but the fact that other studies weren't done or other studies weren't included -- I mean, those other studies could have been discussed in the label while waiting for data from a controlled clinical trial.

Q. If Wyeth had done the studies at the time periods you told the jury this morning, 70's, the 80's, even the early 90's, is it your expert opinion that the warnings on these drugs would have been different before 1999 when Mrs. Daniel started taking these drugs?

♀page 62

Dr. Cheryl Blume - Continued Direct

A. Well, yes, from both perspectives. Yes, if they had done a study such as this earlier, this type of information would have been in the insert earlier. And if they had chosen to include in the insert information from some of the other types of studies that were done or could have been done, then the information could have been in their earlier as well.

THE COURT: Have you many more questions for her? I'm just looking for a jury break, that's all.

MS. LITTLEPAGE: I'm on my last conclusory statement.

THE COURT: Fine. Then that is a good place to stop.

BY MS. LITTLEPAGE:

Q. Have you reached some conclusions, Dr. Blume, within reasonable degree of scientific certainty, as to whether Wyeth acted, in your opinion, as a reasonable and prudent drug company in connection with E plus P drugs?

A. Yes.

Q. And what are those opinions?

A. I think Wyeth did not. I think Wyeth failed

♀page 63

Dr. Cheryl Blume - Cross

to do the studies, any of the studies that could have provided additional information regarding the risk of breast cancer in the women taking their combination product. And by failing to do those studies, or by failing to include information in the label that others had reported from such studies, that prescribers and their patients were denied for years the information that finally became available recently.

MS. LITTLEPAGE: I pass the witness.

THE COURT: Okay. We'll have a jury break at this point.

Once again, you can't talk about your testimony.

\- - -

(Whereupon the Court took a brief recess.)

\- - -

(Whereupon the jurors enter the courtroom.)

\- - -

CROSS-EXAMINATION

\- - -

BY MS. HUBBARD:

♀page 64

Dr. Cheryl Blume - Cross

Q. Good afternoon, Dr. Blume.

A. Good afternoon.

Q. I'd like to start with a few basics. You're not a medical doctor, are you?

A. No. My Ph.D. is in pharmacology.

Q. And you're not an OB-GYN, are you?

A. No, I'm not a physician.
Q. And so you don't treat patients for problems associated with menopause, do you?
A. No. I'm not a physician.
Q. And you're not licensed to practice medicine in any state?
A. No. I'm not a physician.
Q. And you don't treat patients at all, right?
A. Because I'm not a physician.
Q. And just to make sure we're clear, and that would mean, then, for the jury's information that you don't prescribe medications.
A. That's correct.
Q. You do not engage in the process known as differential diagnosis, do you?
A. No. I'm not a physician.
Q. And you've never done any of these things that we just went through, have you?

♀page 65

Dr. Cheryl Blume - Cross

A. No, because I've never been a physician.
Q. And to be specific, you're not an oncologist, are you?
A. No.
Q. An oncologist would be a doctor who specializes in the treatment of cancer, and that would not be you; is that correct?
A. No; that is correct.
Q. And you're not, then, an expert in the biology or the pathology or the anatomy of the breasts, are you?
A. No.
Q. And, you do not have expertise in determining the cause of breast cancer, do you?
A. No. I'm not an oncologist.
Q. Let me go through a few more basics with you.
You're familiar with an entity called the Center for Drug Evaluation and Research or CEDAR at the FDA, aren't you?
A. Yes.
Q. And that's the division at the FDA that reviews application for the approval of new drugs, right?
A. Yes.

♀page 66

Dr. Cheryl Blume - Cross

Q. And so you have never worked for the Center for Drug Evaluation and Research at the FDA, have you?
A. I have always represented industry.
Q. So you have not?
A. I have not worked for the FDA.
Q. And so you have never worked as an FDA medical officer reviewing drug applications, correct?
A. No. I have always represented industry in interacting with the FDA's medical officers.
Q. So with respect to FDA, being an FDA medical officer; that's no.
And, you have never worked as an FDA officer reviewing the labeling for new drugs, have you?

A. No. I've never worked for the FDA.
Q. Okay. So we'll put here with respect to FDA labeling officer; no.
And with respect to -- we've already asked about reviewing new drugs, so just to summarize, as you've told the jury, you have never worked for any division of the FDA.
A. I have never worked for the FDA.
Q. In addition, you've never served on an FDA

♀page 67

Dr. Cheryl Blume - Cross

advisory committee that was reviewing a new drug for approval, correct?
A. Well because I was always representing industry, so I could not have served on those advisory committees.
Q. So you did not.
A. I could not.
Q. Now, you and I have met before, correct?
A. Yes.
Q. And we met and I had the opportunity to ask you some questions about your opinions in this case, right?
A. Yes.
Q. That was last April.
When I had an opportunity to speak with you last April, you had never spoken with the plaintiff in this case, Ms. Daniel, right?
A. Correct.
Q. And is that still the case?
A. I was introduced to her about two hours ago for the first time.
Q. So the first time you ever met her was today?
A. Yes.
Q. And you have never read her deposition in this

♀page 68

Dr. Cheryl Blume - Cross

case, have you?
A. No.
Q. And you have never met Mrs. Daniel's prescribing doctor, Dr. Haggard, have you?
A. No.
Q. And you have never read his deposition in this case, have you?
A. No.
Q. So, I assume that you're not expressing any opinion about Dr. Haggard specifically or his particular decision to prescribe Prempro to Mrs. Daniel, right?
A. I have not been asked to review that, no.
Q. So you're not expressing an opinion on that today?
A. No, not on any specific patient, no.
Q. And you have no knowledge about what the basis was for Dr. Haggard's decision to prescribe Prempro to Mrs. Daniel, do you?
A. I never even heard of Dr. Haggard.
Q. Never heard of him, you've never spoken to him, you never read his deposition so you don't have any opinion about his reasons and what he was thinking when he decided to prescribe Prempro to

♀page 69

Dr. Cheryl Blume - Cross

Mrs. Daniel, do you?
A. I don't have an opinion of any specific patient or their doctor.
Q. Now, I understand -- I believe when we met before that you have some knowledge, but you do not hold yourself out to be an expert in biostatistics, do you?
A. I am not. My Ph.D. is not in biostatistics. I mean, I used it for 30 years in my career but I am not a biostatistician by training.
Q. And you're not an epidemiologist by training either, are you?
A. Well obviously epidemiology is part of my job, but I am not an epidemiologist by training.
Q. And you don't do epidemiology survey work, do you?
A. As needed, for post-marketing safety detection and signals we do epidemiological type reviews, but I am not an epidemiologist.
Q. Do you do epidemiology survey work? That was my question.
A. Yes, for our clients we will arrange to have epidemiology surveys developed.
Q. But you are not qualified to do an

♀page 70

Dr. Cheryl Blume - Cross

epidemiological study, are you?
A. No, I am not trained as an epidemiologist.
Q. So with respect to my question, you are not qualified to do an epidemiological study, are you?
A. No, I'm not trained as an epidemiologist. We access epidemiologists as needed to conduct post-marketing safety detection.
Q. You are aware from your work in this case that clinical studies have been conducted on hormone therapy, right?
A. Yes.
Q. And some of those clinical studies are of estrogen alone, right? And some of those clinical studies are estrogen and progestin in combination, right?
A. Well I'm familiar with the combination study that was done for the 1994 approval and for the lower dose products, but I'm not familiar with any others conducted by Wyeth.
Q. You are aware, as well, that various observational studies and other kinds of studies have been done of hormone therapy, right?
A. Yes. Several people have looked at observational studies of estrogen and estrogen plus

♀page 71

Dr. Cheryl Blume - Cross

progestin.
Q. Okay. And in fact, in this litigation you, yourself, provided a list of about 2800 articles including many, many articles on hormone therapy, right?
A. Our internal library has 3300 library articles

with estrogen or estrogen plus progestin, correct.
Q. You're now up to 3300?
A. Correct.
Q. They went all the way back, those articles that you all collected, they went all the way back into the 70's, didn't they?
A. Even earlier.
Q. So even earlier than the 1970s there were articles out there written by researchers and scientists and doctors about hormone therapy, right?
A. Well, hormone therapy as well as animal data, correct.
Q. Both. We've got research articles about hormone therapy going all the way back into the 70's and maybe even earlier.
A. Yes.
Q. Why don't we take a quick look at that big list of studies that you provided us. Now we don't

♀page 72

Dr. Cheryl Blume - Cross

have the 3300 but when you and I met about ten months ago, we had about 2800. This is Defense Exhibit 10141.
Dr. Blume, you have that there in front of you. Do you recognize this as a very long list that you and your office put together of a lot of studies that have been done and articles written about hormone therapy? Do you agree with that?
A. Yes, of course.
Q. And it looks here, as you said, going all the way back into the 1970's and maybe even earlier.
And so just to make sure that we've got complete agreement on this point, is it fair to say there are many, many clinical publications about hormone therapy?
A. Of course.
Q. Okay. Of course. And with the exception of some things that might be pre-prints, all of these are available out there in the public domain, aren't they?
A. I don't know that. I think some of these you might need to belong to services that access the articles.
Q. But most of them are?

♀page 73

Dr. Cheryl Blume - Cross

A. I wouldn't know the percentage, but I believe some of these are accessed only by members.
Q. But most of these are out there in the public domain and for example if the FDA wanted access to them, the FDA could get access, right?
A. I would think so.
Q. Sure. And, if other researchers wanted access to them, other researchers could get access, right?
A. Yes.
Q. And, of all of these clinical studies and other studies on this list that your office compiled of estrogen -- let's just start with all of them on hormone therapy, whether estrogen alone or estrogen and progestin in combination -- there aren't any on

this list that you, yourself, authored, are there?
A. I don't know. I gave you a list of my estrogen progestin publications.
Q. No, I'm talking about these.
A. Oh, I don't know. I didn't compile this list, my office did. Whether they put my graduate research on there, I don't know.
Q. So the work you've done is back when you were doing graduate research, and that was based on work

♀page 74

Dr. Cheryl Blume - Cross

in a lab, right?
A. Well, yes.
Q. Okay. What I mean by that is -- let's talk about it for a minute. We would define studies done in people as -- we call them clinical?
A. Yes.
Q. So I just wanted to sort of separate those out. There are studies done in labs, studies done in animals, studies done in people, right?
A. Well, clinical studies go back to the laboratory for analysis.
Q. Sure. But I'm talking about let's try to separate out the studies where people are actually given a drug to take as opposed to for example work that might be done in a Petrie dish or in animals. Do you understand the distinction?
A. Yeah, I think so.
Q. Okay. And you, yourself have not participated in any studies done in humans with respect to hormone therapy, right?
A. Well, as I told you when you visited our office, my graduate research included looking for estrogen, actions on estrogen receptors and progestin receptors in a variety of tissues,

♀page 75

Dr. Cheryl Blume - Cross

including human tissues that were accessed from surgery suites, as breast cancer surgery was going on, prostate surgery was going on. So our efforts to look at estrogen and progestin receptors did include animal models that are believed to be predictive of human, as well as tissues taken during surgeries.
Q. I'm asking you a much more general question. You talked today about general studies can be done in people where for example some people would be given a particular drug that was being studied and those people would be monitored, maybe other people would not be given that drug. I'm talking about those kind of studies, people who are living and they're actually being studied of the effects of drug on them, I'm asking you about those kinds of studies, not tissue studies or animal studies. My question is probably not clear, but I meant it to be fairly simple.
Have you participated in any studies in people with respect to hormone therapy, not tissue, but people?
A. I believe that -- and I would have to check this but I believe I designed the studies at Mylan,

Dr. Cheryl Blume - Cross
helped design the studies at Mylan the pharmacokinetic studies for the patch products.
Q. The estrogen patch products?
A. The combination products. I would have to go back and check that.
Q. What is the name of that check?
A. Estrogen plus progesterone transdermal products.
Q. What is the name of it? What do they call it?
A. I have no idea what trade them the partners have given it.
Q. And other than that -- let me ask you a different question.
Have you authored any articles about the studies of hormone therapy in people, not tissue, not the lab, but in people?
A. No.
Q. And with respect to the clinical trials of hormone therapy, let's start with estrogen alone, with respect to the clinical trials of estrogen alone, you have not participated in any of those trials yourself, have you?
A. No.
Q. And you have not been involved with any of the



Dr. Cheryl Blume - Cross
clinical studies of estrogen and progestin in combination, have you?
A. No, I did not participate in the clinical trial that we discussed earlier today.
Q. Now, Dr. Blume, I understand from the records you've given us that you began working on this matter at the request of plaintiff's attorneys in approximately June of 2005, right?
A. We had our first meet in June of 2005. I think that we received information somewhat prior to the meeting.
Q. So somewhat prior to June of 2005 you had begun work on this matter and I believe that when you and I met last April, that you had billed around $150,000 to your work on this case. Does that sound right?
A. I do it in terms of percent. I know in 2005 this case represented about 1.6 percent of our income and in 2006 it was about 6 percent of our income, but I don't have the exact numbers.
Q. And if your invoices reflected that it was about $150,000, you wouldn't have any reason to dispute that, this would have been as of last April.
A. I tend to think of percentages of our total.



Dr. Cheryl Blume - Cross
Q. Since last April when you and I met, you spent approximately $150,000, you've done more work on this case, right?
A. Yes.
Q. So it's fair to say that now the amount you've billed on this litigation is certainly over

$150,000?
A. Probably.
Q. And that's work that you've done consulting with these plaintiffs' layers.
A. Well, it's for all estrogen progestin.
Q. Since you lacked this -- let's back up for a minute on your employment history here.
You were at Mylan, I want to talk to you about that, but you were at Mylan for about 20 years, correct?
A. '77 to '95.
Q. And then from '95 to '98, you were at a company called Somerset, right?
A. Yes.
Q. And from the time you left Somerset until the present, you've had your own consulting business, right?
A. That's correct.

♀page 79

Dr. Cheryl Blume - Cross
Q. And what is the name of it again, Pharmaceutical ...
A. Pharmaceutical Development Group.
Q. And, so during the past eight years since you've had your own business, you have agreed to offer opinions against a number of pharmaceutical companies, not just Wyeth, right?
A. Well, there have been multiple cases with Wyeth.
Q. A number of different companies, was my question.
A. There have been some on behalf of other companies.
Q. For example, you've offered opinions against Schering-Plough concerning asthma inhalers, right?
A. On those inhalers that did not have the drug in it, yes, and the children who died from asthma.
Q. So against Schering-Plough, and you offered opinions against Glaxo SmithKline about its antidepressant, antianxiety medication, Paxil, right?
A. Yes, with respect to the failure to -- the overdose.
Q. So against Glaxo SmithKline.

♀page 80

Dr. Cheryl Blume - Cross
And you've offered opinions against Hoffman LaRoche, including about its acne drug Accutane, right?
A. Well, for Accutane, correct.
Q. So against Hoffman LaRoche.
And you offered opinions against Bayer concerning its blood supplies, right?
A. Of the contaminated blood supplies they sent to South America, yes.
Q. So opinions against Bayer.
Oh, and let's see, you've offered opinions against Senicore about its drug Remicade, which among other things is used to treat Krone's disease, so against Senicore, right?
A. Yes.

Q. Okay. I'm not spelling that right.
And it's fair to say there are a number of other pharmaceutical companies you've offered opinions against in the past eight years since you've got into your own consulting business, right?
A. I'm not sure what other ones there are. There have been cases against companies.
Q. Against other companies we don't have listed

♀page 81



here?
A. I can't think of any sitting here. And then there have been cases on behalf of companies.
Q. We'll put "Others," question mark.
And, let's see, you've also offered opinions against McNeil, I forget that one, concerning children's Motrin, right?
A. Failure to put fatal skin reactions on the warnings, yes, okay.
Q. And this company called Pharmaceutical Development Group is your company, isn't it?
A. Yes.
Q. And you're the president and the sole shareholder?
A. Yes.
Q. And although your company does, as you pointed other out this morning, you do other types of work, you also have done quite a bit of litigation work, haven't you?
A. Well, 70 to 80 percent of our work is with drug companies in securing FDA approvals or helping them develop their post-approval mechanisms for safety detection.
Q. My question was actually about litigation.

♀page 82



A. Well, 70 to 80 percent is with drug companies and the balance of it is with pharmaceutical-related litigation.
Q. Including offering opinions against a whole lot of pharmaceutical companies, right?
A. Yes, we've offered for and in support of.
Q. And just let's focus on the past three years, the past three years. Went through the records, worked to figure this out. Is it fair to say that in the past three years your company has made over two million dollars on litigation work, hasn't it? I'm not talking about other work, 70 or 80 percent, I'm talking about just litigation work, past three years, over two million dollars?
A. I don't know.
Q. You don't know?
A. I don't know.
Q. Kind of in the right ballpark, isn't it?
A. I don't know. It seems really high. I don't know. Our litigation is combined together as well. So we do quite a bit of work with companies for patent litigation and in contractual litigation. That may represent the number of all litigation.
Q. Now, I want to talk to you a little bit about

♀page 83

Dr. Cheryl Blume - Cross

some things I think we can agree on based on when we talked last April.
You agree that all prescription medications have risks, don't you?
A. Of course.
Q. Of course. In fact, that is a no-brainer. Given the work that you've done for the past 30 years, we can accept all prescription medications have risks; yes?
A. Yes.
Q. And, Ms. Littlepage asked you a little bit about your work at Mylan where you spent quite a bit of time, and during the years you worked there you believe, don't you, that Mylan's regulatory practices, because you worked in regulatory affairs, were the practices of a reasonable pharmaceutical company?
A. I would hope so.
Q. You would hope so, because that was your area, right?
A. Well in the beginning, then I moved to product development.
Q. So Mylan with respect to regulatory, reasonable. And you said you moved to product

♀page 84

Dr. Cheryl Blume - Cross

development, so would you say when you are at Mylan, Mylan's practices with respect to product development were the practices of a reasonable pharmaceutical company.
A. I think so.
Q. So product development also reasonable. That was your company. You felt like they were doing what a reasonable company would do when you were there?
A. Trying to, yes.
Q. Okay. And the same, I take it, would be true of the other company where you worked, Somerset, right?
A. Hopefully.
Q. So, with respect to regulatory practices, you felt that Somerset's practices while you were there were reasonable, right?
A. Yes.
Q. And the same with their product development practices, you characterize them as reasonable too?
A. I think so.
Q. Okay, that's good.
And you would agree, of course, that the prescription drugs sold by Mylan while you were

♀page 85

Dr. Cheryl Blume - Cross

there had some risks?
A. Well all prescription and OTC drugs have some risk.
Q. And did Mylan sell OTC drugs?
A. When I was there, no.
Q. Okay. So my question was just with respect to

while you were there, would you agree that the drugs sold by Mylan had risks?
A. All drugs have risk.
Q. So that's a yes?
A. Yes, because all drugs have risks.
Q. Sure. And the same with Somerset. You'd agree that the drugs sold by Somerset when you were there had risks?
A. All drugs have some risks.
Q. When you were at Mylan, you had personal involvement with a drug called Maxzide, didn't you?
A. When I was where?
Q. At Mylan?
A. Yes.
Q. In fact, you had a fair amount of involvement with the development of Maxzide, didn't you?
A. Yes.
Q. That's a diuretic and anti-hypertensive drug?

♀page 86

Dr. Cheryl Blume - Cross

Do I have that right?
A. Yes.
Q. And you personally were primarily responsible for getting the new drug application for Mylan through the FDA approval process, weren't you?
A. Yes, I worked with them.
Q. And you were involved personally with getting the labeling approved for Maxzide.
A. At the point we were doing the labeling we were with one of your subsidiaries. One of Wyeth's subsidiaries actually marketed that product with us and both that subsidiary and Mylan participated in the labeling instructions.
Q. So you were involved with the FDA on the whole approval process, including the approval process with respect to the labeling?
A. Yes.
Q. And because at FDA, when the FDA approves a new drug it also has to approve the launch labeling for that drug, right, and that has to happen before any drug in this country can first be sold, the FDA has to approve the labeling, correct?
A. Yes.
Q. With respect to Maxzide, the drug you worked

♀page 87

Dr. Cheryl Blume - Cross

on for Mylan, it had some serious risks, not just risks but serious risk, right?
A. To what are you referring?
Q. Yeah, let me ask you a little bit about it. I'm not a doctor, so, I'll do my best here, but, Maxzide was, as I understand it ...
MS. LITTLEPAGE: Objection. Relevance.
THE COURT: I'm trying to figure out why it is important. It's not a breast cancer drug, right?
MS. HUBBARD: It's not a breast cancer drug but it goes to her applying different standards to her company than she's now applying to Wyeth, things she was responsible for ...

THE COURT: Well let's go there directly.

BY MS. HUBBARD:

Q. So, Maxzide was a potassium-conserving diuretic combination, right?

A. Well not completely. You're part right. You have part of it right. One of the components was potassium-conserving. The other component was potassium-wasting.

♀page 88

Dr. Cheryl Blume - Cross

Q. One of the risks of Maxzide -- I think I'm going to say this right -- hypercolemia?

A. Well, the two agents are put together because one loses potassium, one saves potassium, and the goal is to have normal potassium.

Q. Can we just put up slide 2, and why don't we just show Dr. Blume Defense Exhibit ...

MS. LITTLEPAGE: Why are we putting stuff up I don't have a copy of?

MS. HUBBARD: Exhibit 3899.

MS. LITTLEPAGE: Judge, we had a motion in limine on this. I don't see why we are discussing a drug that has nothing to do with this case. And now we're in details on the labeling.

THE COURT: Well she's trying to make a case and she's applying two different standards. So I'll let her apply the standards but we don't have to go into a whole description of Maxzide. But it really has nothing to do with the case.

BY MS. HUBBARD:

Q. So let's go right to the labeling. I want to talk about this drug and one other drug before we

♀page 89

Dr. Cheryl Blume - Cross

move off Mylan and Somerset.

I'm showing you Defense Exhibit 2899, and you recognize this as the 1995 label for Maxzide?

A. Well this, of course, is the Wyeth label for Maxzide and Maxzide 25.

Q. And that's the drug that you had.

A. In the Wyeth subsidiary, your client's subsidiary, it was a U.S. marketing agent in the United States.

Q. And you felt when Mylan -- with respect to Mylan's involvement, Mylan was a responsible pharmaceutical company, reasonable pharmaceutical company, right?

A. I think so.

Q. So Mylan participated in including a warning of the serious risk in the warnings section of the Maxzide label, right?

A. It is a black box, yes.

Q. And right there it is in the warnings section. Do I have that right?

A. Uh-huh, of course, right there.

Q. One other, just really quickly.

You also had personal involvement with

♀page 90

Dr. Cheryl Blume - Cross
a drug at Somerset called Eldepryl, didn't you?
A. Yes.
Q. And that drug also had some serious risks, didn't it?
A. Yes.
Q. Including a risk when Eldepryl interacts with foods containing Teramine found in cheese?
A. Teramine.
Q. Teramine, thank you.
And also a risk when Eldepryl interacts with certain antidepressants, right?
A. There are many drug interactions with those.
Q. And those can be serious risks.
A. All drug interactions can be serious.
Q. In fact, they can both be fatal, right?
A. Some drug interactions can be fatal, that's correct.
Q. But with respect to the extent of those interactions with Eldepryl, they were not fully seen until after Eldepryl started being sold, right?
A. Yes. We submitted a supplement for a new labeling after it was launched, correct. Our clinical trials were not permitted to include patients who were taking those drugs. So it was not
♀page 91

Dr. Cheryl Blume - Cross
until the product made it into commercial distribution that we saw those events.
Q. And -- but you felt like Somerset and the work it did on Eldepryl before it started being sold, before it was approved for sale, you thought they did a good job of testing that drug, right?
A. Yes. Much of that was done by the prior company; but yes, I think so.
Q. And the same with Mylan and Maxzide, you felt they did a good job before that drug started being sold of testing it, right?
A. Yes.
Q. With respect to Eldepryl, the drug where some of the extent of the reactions were picked up after it started being sold, you're not critical of Somerset or its predecessor company for not picking those things up before it went on the market, are you?
A. I believe we're prohibited by FDA from studying that prior to approval.
Q. So you're not critical?
A. I'm not critical because it would have been impossible to have studied it before.
Q. And that's because the FDA plays a very big
♀page 92

Dr. Cheryl Blume - Cross
role here in saying what can and cannot be studied and how before a drug gets approved, right?
A. Well in that particular case they did not want us looking at drug interaction.
Q. And they play a very big role of what you can study and how before a drug gets approved, don't

they?
A. Well in that particular case, they did not want that interaction study.
Q. And they play a very big role before a drug gets approved in deciding what you can study and how, don't they?
A. Well, I'm not sure how to answer a very big role but you have to submit your protocol to the IND as I discussed earlier, and then there is an action between FDA and the company and the conduct of the studies prior to approval, yes.
Q. And with respect to Eldepryl, we're talking about the drug where some things were learned after it started being marketed, then that required a change in the label after it went on the market, didn't it?
A. There have been several changes in the label.
Q. Several changes, but with respect to these

♀page 93

Dr. Cheryl Blume - Cross

interactions that were discovered after it went on the market, that required a change in the label, didn't it?
A. Yes.
Q. In fact, you had to say in the label that in fact some of those situations had been reported; whereas before the label said they had not been reported in the clinical trials.
A. Well, that's a good point. I'm glad you brought that out. What we did with that is that was an example of the changes being affected that I mentioned earlier. Once we had two reactions in the field on the drug interaction, we submitted to the agency a change was being affected to get it into the label.
Q. Right; and so you changed the label, it said something different than what it said at the time it was approved, right?
A. Well, what it said was we had reports in two patients and we were changing the label.
Q. Right, okay.
So you would agree, then, that after approval, after a drug is approved and it starts being prescribed by doctors we often learn more

♀page 94

Dr. Cheryl Blume - Cross

about the differences, the frequency, the severity of particular events?
A. Of course. That's why one does pharmacovigilance.
Q. Of course. And in fact, some risk are not even discovered at all until after a drug has started to be sold, right?
A. Yes.
Q. That's because, I believe I heard you say, and I tried to listen carefully, that a lot of the studies for a lot of drugs before they go on the market are actually pretty small, aren't they?
A. Yes, they can be small.
Q. And so sometimes risks are seen after approval this weren't seen in those pre-approval clinical

trials, right?
A. Yes.
Q. And so safety, safety in the FDA regulatory context does not mean an absence of risk, does it?
A. No, safety means that the benefit exceeds the risk.
Q. And that particular judgment, as to whether the benefit exceeds the risk, is a judgment that the FDA makes at the time of drug approval, correct?

♀page 95

Dr. Cheryl Blume - Cross

A. At the time of approval, the FDA has said for that benefit, for that use, knowing what we know now, that benefit of that use exceeds what we know then about the risks.
Q. And that's a judgment that the FDA makes at the time of approval?
A. Well it's the approval criteria.
Q. Right.
So let's talk a little bit more about the FDA, and I recognize you haven't worked for the FDA but you testified you have a lot of experience interacting with them so I want to see just some of the basic things that we can agree on about the FDA.
First of all, can we agree that the FDA is committed to protecting the public health?
A. My answer has come off the screen. Are we not referring to this insert?
Q. No, I'm asking you a question.
A. Well ...
Q. Can we agree that the FDA is committed to protecting the public health?
A. I think so, yes.
Q. Yes. And to that end, can we gee that the FDA hires qualified people?

♀page 96

Dr. Cheryl Blume - Cross

A. I think so; most of them.
Q. Okay. And can we agree that it hires -- of those qualified people it hires, it includes doctors and scientists?
A. Yes.
Q. So let's put the FDA right up here. Hires qualified people. And you agree on that?
A. For most of their people I think that's true.
Q. I'll give you the chance if you have specific qualifications about certain people, you will have the chance.
Can we also agree that prior to approval of a prescription drug, the FDA evaluates the safety and efficacy of that drug?
A. The FDA evaluates the data that are provided in the new drug application.
Q. Can we agree that prior to approval, the FDA evaluates the safety and efficacy of the drug?
A. Yes; as evidenced by the data in the new drug application.
Q. And in fact, can we agree the FDA is heavily involved in evaluating pre-approval submissions for new drugs?
A. I don't know what you mean by that.

♀page 97

Dr. Cheryl Blume - Cross
Q. Well actually, I want to ask you about your deposition. I'm going to refer you to deposition in this case.
THE COURT: I think this is the first deposition that has come up so maybe we should explain it.
One of the trial techniques that you may use when preparing for trial is to call a party or a witness in and ask them questions. And it's done with two lawyers and a stenographer but with no judge. And if they get into arguments over what is and is not to be answered, what they normally do is just put it down on a piece of paper and if they are going to use that section of the deposition when they get to court, then they present it to the judge for a ruling before it is used. And you can use it in many ways. Right now she's going to use it to bring to the witness' recollection, although she may very well have independent memory of it, things she said during a deposition. And I think it's appropriate to put the date of the
♀page 98

Dr. Cheryl Blume - Cross
deposition in, please.
When was it taken?
MS. HUBBARD: It was taken on April 7th, 2006.
THE COURT: So it's roughly about 8 months old.
MS. HUBBARD: Yes.
THE COURT: And it has a number?
MS. HUBBARD: It hasn't been independently marked as an exhibit. We certainly could do that.
THE COURT: I think you have to mark it so we can keep track of it. It may not come in but we should keep track of it.
MS. HUBBARD: Yes, for tracking purposes we will mark it.
BY MS. HUBBARD:
Q. Dr. Blum, you will recognize this as your deposition of last April when I had asked you some questions?
A. Yes. I do not see attached to this the errata sheet.
Q. We will get that and make sure you have an opportunity to look at it.
♀page 99

Dr. Cheryl Blume - Cross
Let me refer you to page 83. Tell me when you're there.
MS. LITTLEPAGE: Judge, I think it is improper to put this deposition up unless we are going to impeach on a particular question. There is no question pending.

THE COURT: That's true.
BY MS. HUBBARD:
Q. Let's do it that way. Let me refer you to lines 3 to 7 on that?
THE COURT: Are you on page 83 or on your page 326?
MS. HUBBARD: I'm on page 83. Oh, it has variety of numbers. I'm on page 83 of the deposition, which would be -- it looks like page 22.
THE COURT: As you can see, friends, there's four pages on a page here. That is where the confusion is.
BY MS. HUBBARD:
Q. Dr. Blume, are you on the same page 83 that I am on?
A. Yes.
Q. Lines 3 through 7 reads:

♀page 100

Dr. Cheryl Blume - Cross

"Question: Can we agree on sort of the basic points that the FDA evaluates the safety and efficacy of pharmaceutical products?
"Answer: Prior to approval, yes."
Were you asked that question and did you give that answer?
A. I believe so. I don't have the errata sheet, so I don't know if I made any corrections or not. But it appears that I said yes.
Q. And let me refer you over, while you've got that in front of you, to page 91.
MS. LITTLEPAGE: Judge, this is improper impeachment. She has to ask the question first.
MS. HUBBARD: I did ask the question and I had a hard time -- she had a hard time with it.
BY MS. HUBBARD:
Q. Would you agree with me that the FDA is heavily involved in evaluating pre-approval submissions for new trials?
A. Well my comment was I didn't know what you meant by the word "heavily."
Q. I asked you that same question at your

♀page 101

Dr. Cheryl Blume - Cross

deposition which is why I was going there because you told me yes at that time and so I'm not sure if we're not having a meeting of the minds.
A. Well, I'm sorry.
Q. Page 91?
A. Yes, I answered again, yes, I agree, yes.
THE COURT: So what did you impeach her with?
BY MS. HUBBARD:
Q. So we agree on that. And do we agree that how that process works, how the process works of the FDA being involved in pre-approval works on new drugs is that a company can submit an investigational new drug application, yes?
A. Yes. We talked about that this morning.

Q. We did. And I think you told Ms. Littlepage this morning that typically the FDA doesn't do studies itself, but it's heavily involved in the oversight of the testing done by companies, right?
A. FDA generally doesn't go to any of the testing centers until the time that the FDA has decided the NDA will be approved. And at that point, perhaps years later, the FDA may investigate two or three centers that participated in the pivotal NDA

♀page 102

Dr. Cheryl Blume - Cross

trials.
Q. I want to focus on the investigational new drug process. You are familiar with that. You talked about it with counsel this morning. The investigational new drug application can include a clinical study plan that the company is saying to the FDA, we want to do this study, right?
A. Yes.
Q. And the FDA then has an opportunity to comment on that clinical study plan, correct?
A. It can.
Q. And the FDA has the opportunity to ask the company not to do a particular study plan, they can say we don't like that study plan, right?
A. They can ask for changes.
Q. They can ask for changes. And so the goal of this investigational new drug process is sort of a collaborative approach of the company and the FDA to determine appropriate studies, right?
A. Well, the goals of the IND include more than the clinical program, but clinical protocols are submitted by the company and FDA can either say yes, no, or make these changes.
Q. Okay. And under this mechanism, the FDA can

♀page 103

Dr. Cheryl Blume - Cross

also stop a study if it has concerns, right?
A. Yes.
Q. So just to summarize our points of agreement here, we can gee that the FDA does review investigational new drug applications for pre-approval studies?
A. Yes, INDs are reviewed but not approved.
Q. Now, continuing on, the FDA can consider materials about a new drug, if we're talking about a new drug approval process, the FDA can consider materials about the new drug that are in addition to what the company submits to the FDA, right?
A. To what are you referring?
Q. Well, let me see if I can clarify it a little bit.
In addition to reviewing a company's submission about its new drug, the FDA can hold advisory committee meetings about that drug or class of drugs, right? In fact you referred to that this morning, advisory committee meetings?
A. Of course the FDA can have advisory meetings, but generally advisory committees are at the NDA stage, not the NID stage.
Q. I'm sorry, I was moving forward in the process

♀page 104

Dr. Cheryl Blume - Cross

a little bit. With respect to the new drug approval process ...

A. We moved to new drug approval?

Q. We're just going through the process here. The FDA can convene advisory committees, right?

A. They can?

Q. Yes, they can. They have that power. You talked about that this morning.

Would you agree that at meetings of advisory committees -- first of all, let's just make sure we're all on the same page. Advisory committees consist of people that the FDA appoint as sort of independent experts, right?

A. Yes.

Q. And at these advisory committee meetings of these independent experts, they may hear from representatives of the company, right?

A. Yes, if an NDA is under discussion.

Q. Yes. And but they may also hear from other experts who are not associated with the company, right?

A. If the FDA so-chooses.

Q. And then, moving along in the process, you mentioned, and let's go to that now, the new drug

♀page 105

Dr. Cheryl Blume - Cross

application or NDA. And once the IND studies are done, if the company thinks the data is favorable, the company can submit a new drug application to the FDA, can't it? Once the IND studies are done, and if the company thinks that the data from those studies were favorable, it can go ahead and submit a new drug application, right?

A. Well, you're almost right on that one. What happens is if the company thinks they are ready to submit an NDA, they submit a filing proposal to FDA. Your client's was denied a couple of times when they were doing the Prempro NDA because FDA did not believe there was enough in the NDA to file it. If the FDA agrees that there's enough to file it, then the NDA makes you file and then the FDA begins reviewing it to see if it's worthy of approval.

Q. So the company can submit it and then at some point the FDA can agree to file it, yes?

A. Yes.

Q. And at that point the FDA starts reviewing it?

A. Yes.

Q. And at that point -- or as the FDA is reviewing it, the FDA does not have to approve any new drug application, does it?

♀page 106

Dr. Cheryl Blume - Cross

A. It certainly does not.

Q. It does not. And in fact, it has the power to deny.

A. It has the power to issue a non-approval letter.

Q. A non-approval letter which would sort of be

in our common parlance, denying the application.
A. Well, it can either be denied outright or it can be denied at that moment pending additional data.
Q. And I think I listened carefully and I thought I heard your say earlier today that a drug cannot be on the market until it's been shown to the FDA to be safe, right?
(Brief pause by the Court.)
BY MS. HUBBARD:
Q. Would you leak my to repeat the question?
A. Please.
Q. I thought I heard you say today that a drug cannot be put on the market until the FDA has made the determination using the regulatory definition of safe that you gave us earlier, it cannot be put on the market until the FDA has determined it's safe, right?





A. That's partly true. For most drugs that is the case. There are a bold category of -- there is a whole group of drug products that are marketed today for which that has not yet been done. These are drugs that were either old or which, for whatever reason FDA exempted the approval process.
Q. Let's focus on the drugs in the past 20 years.
A. Well, it's really not that easy. There are still drugs even in the last 10 years that have been categorically exempted by FDA that they're not going to review them at this time, they may market without approval.
Q. So setting aside the exempt category drugs, can we agree, as you said this morning, all the other drugs cannot be sold in this country until the FDA has made the determination of safe as you defined it just a few minutes ago?
A. Today it it's safe about effective.
Q. Safe and effective. And that is kind of the point of the NDA review process, is to enable the FDA to make that determination, correct?
A. That's the part of the clinical data. That -- you're right on the clinical data. The other -- there's many parts of the new drug application. The





new drug application also contains thousands and thousands of pages about how you plan on the engineering and the manufacturing of the drug product and FDA must agree to all of those issues, how you are going to protect the environment. So the clinical portion deals with safety and effectiveness, but certainly there are many other sections that go into an NDA.
Q. And the review of the safety and effectiveness is part an parcel of the NDA review?
A. That's one part of it, yes.
Q. And we agree have that the FDA, basic point, reviews there drug applications?
A. Yes.
Q. And then as part of that review, when the FDA

decides to decline to approve a new drug, part and parcel of that is a review of the labeling called the launch labeling that is going to go along with the new drug, correct?
A. Yes.
Q. So, this should be reviews NDA -- I have terrible handwriting -- and this should be reviews, slash, approves, because I want to talk to you about that, labeling.

♀page 109

Dr. Cheryl Blume - Cross

And would you agree that the launch labeling has to be approved by the FDA as part and parcel of the new drug approval?
A. Yes.
Q. So you would then agree that the FDA is typically very heavily involved in review of the label before a new drug is approved, yes?
A. FDA -- yes, FDA reviews the launch label, approves it.
Q. And sometimes they will even participate in rewriting parts of the launch label, won't they?
A. My experience has generally been that the company does most of the writing and the FDA does most of the rejecting and the company goes back and does the rewriting.
Q. So the FDA can be pretty active in rejecting language the company proposes and telling them what else to say, right?
A. Or to suggest that they rewrite sections.
Q. So we will agree that they review the labeling that's going to go along with the new drug and can we also agree that before the drug can be sold, the FDA has to approve that labeling?
A. Well, the approval letter that you are sent

♀page 110

Dr. Cheryl Blume - Cross

with your NDA will generally append to the approval letter what the launch label will be.
Q. So that is a yes, they basically have to say yes, we approve the drug if you use this label?
A. When I said it that way, the launch label is generally attached to it as part of the approval letter.
Q. It's part of the approval, got it.

And then, would you agree that in your experience -- I should have asked you this earlier, but if they don't like something that the company is proposing to say on the label that is going to go along with the new drug, they don't keep that a secret, do they, they can be pretty vocal.
A. Well, there's communications between the FDA and the company. It's not a public communication.
Q. They don't -- they're not shy about telling the company what they don't like about the label, are they?
A. Well, if you're -- the best way is if they tell you at the beginning what they don't like and you can make the changes at one time. Sometimes you will have a launch label and then they come back and ask for a change on something they didn't ask for in

♀page 111

Dr. Cheryl Blume - Cross
the beginning. So both ways.
Q. But at some point they speak up, if they don't like it, they speak up.
A. At the beginning, yes. After that, the company has much more authority over the label.
Q. We're just talking at the time of the new drug application approval process. And then sort of the last step in the process, we had reviews NDA but we should also have approves NDA. So you agree that before the drug can be sold the FDA has to approve that new drug application?
A. Yes, for those drugs that require approved NDA, that is true.
Q. Now, I think I heard you say earlier today that you weren't sure whether the FDA had authority over drugs going back into the 1940's. Did I understand you correctly?
A. Well, they have different authorities over those products than the ones today. Prior to 1938 the FDA didn't have any authority. And then between 1938 and 1962, FDA only had authority as it relates to safety. It wasn't until the '62 law, 1962 law, that FDA also had the authority on drug effectiveness.
♀page 112

Dr. Cheryl Blume - Cross
Q. So some period of time the FDA had authority over safety and then it also had authority over effectiveness starting in 1962?
A. And at one point they had no authority at all.
Q. But that was prior to the 1940s, you are saying.
A. You are partly right because there are still some drugs today which the FDA does not have explicit approval mechanism.
Q. Let's put those aside because Prempro is not one of them, is it?
A. No.
Q. Prempro was subject to this process that we've been talking about, wasn't it?
A. It was approved in '94.
Q. So this process was in effect in 1994?
A. Yes.
Q. So let's talk specifically now about the FDA involvement with Prempro. I understand you haven't worked at the FDA but I also understand in connection with your work on this case, you tried to familiarize yourself with the documents and the information that pertained to the approval of Prempro, didn't you?
♀page 113

Dr. Cheryl Blume - Cross
A. Yes.
Q. And so you would be aware, for example, that Dr. Solomon Sobel was one of the people at the FDA who was involved the FDA's approval of Prempro, right?
A. Yes.

Q. And, Dr. Sobel was the director of the Division of Metabolic and Endocrine Products, and that the division that was reviewing Prempro, right?
A. Yes.
Q. And you don't have any reason to doubt Dr. Sobel's competence, do you?
A. I've worked with him several times.
Q. Do you have any reason to doubt his competence?
A. No.
Q. You're also aware that Dr. Linda Golden at the FDA was the FDA's medical officer who conducted the medical review of Prempro, right?
A. Yes.
Q. And I believe you told me at your deposition you don't know Dr. Golden, do you?
A. I don't recall ever working with her.
Q. So you don't have any reason to question her

♀page 114

Dr. Cheryl Blume - Cross

competence either, do you?
A. I don't recall working with or knowing her.
Q. Let me just show you a slide. If we could put up number 4. I just want to show you briefly in kind of summary fashion some of the other people who worked at the FDA on the review of Prempro.
You see up there at the top Dr. Janet Woodcock. You don't have any reason to question her competence either, do you?
A. No.
Q. Okay. And how about Dr. Carl Peck? Do you have any reason to question his competence?
A. I think he's one of your consultants in this. No.
Q. You don't have any reason to question his competence?
A. No.
Q. How about Dr. Bruce Stazel, the medical officer there. Do you have any reason to question his competence?
A. No.
Q. You're aware that many of the people here have worked at the FDA or did work at the FDA for many years, right?

♀page 115

Dr. Cheryl Blume - Cross

A. I have no idea how long they worked at the FDA. I know Solomon Sobel has been there for a long time.
Q. So you, I assume, are not trying to tell the jury that to the extent these people were involved with the approval of Prempro, that they were somehow unqualified to do their job.
A. No, I never said that.
Q. You never said that?
A. I never said that at all.
Q. And we could agree, since we've agreed the FDA generally hires qualified people, you seemed to have maybe some hesitation in the general statement, but you don't have any reason to say that these people were unqualified, do you?

A. No, I don't have any reason to say that and my hesitation earlier was I don't know all of the people at the FDA, so obviously I can't make a statement that every one FDA hires is extremely competent because I haven't worked with all of them.
Q. Sure. Of course not. But with respect to these people, you're not here telling the people they were unqualified to do their job?
A. Yeah. Some of them I don't know.

♀page 116

Dr. Cheryl Blume - Cross
Q. But otherwise, you're not taking an issue with the qualifications of the people who worked on the Prempro new drug application, are you?
A. No, I worked with FDA every day. I am not taking any issues with their qualifications.
Q. All right, good. So let's talk then about the next step in the process, the IND. I believe that you already talked earlier today that there was an investigational new drug application in connection with Prempro. Right?
A. There had to be in order to initiate trials.
Q. Absolutely. And so you would agree that the FDA reviewed that, right?
A. Yes. I saw correspondence, yes.
Q. And that IND, that investigational new drug application, Wyeth asked, I heard you say this morning, in that application Wyeth asked the FDA to review a plan to start studying estrogen and progestin in combination, right?
A. Yes.
Q. And that was -- that application was submitted back in 1983, wasn't it?
A. Initially, yeah, it was submitted in '83 but the study wasn't started then.

♀page 117

Dr. Cheryl Blume - Cross
Q. But the request by Wyeth to start studying for the FDA's input on its study of these two things was back in 1983, right?
A. That's my understanding.
Q. And that was approximately ten years before that big WHI study you talked about was started, right?
A. Approximately, yes.
Q. And you would agree with me, wouldn't you, that that investigational new drug application by Wyeth included hundreds of studies that had been done up to that point in time by various scientists up to that point in time?
A. I know there were several animal studies submitted. I don't know if there were hundreds of clinical studies. I don't know.
Q. And at that point in time, there was no approved combination of estrogen and progestin on the market, right?
A. No.
Q. And that actually -- the approval of the combination did not happen until Prempro was approved at the end of 1994, right?
A. Prempack, in 1994.

Dr. Cheryl Blume - Cross

Q. So Wyeth submitted its application to start studying estrogen and progestin in combination back in 1983 and approximately ten years, a little bit more than ten years later, the combination was approved, right.
A. You're not suggesting that that trial took ten years to finish, are you?
Q. I'm certainly not. I just want to get the timeframe down.
A. 1983 they submitted and IND. They received approval end of 18994.
Q. And did you try in your work, I assume you did, in your work on this case, to familiarize yourself with the IND?
A. I did.
Q. And did you try to familiarize yourself with what happened with the original study that Wyeth was proposing to do in the IND?
A. Yes.
Q. And so you know, don't you, Dr. Blume, that that study, the Prempack study was started but they had enrollment problems, didn't they?
A. They couldn't get the study done.
Q. They had enrollment problems. Your



Dr. Cheryl Blume - Cross

understanding as well from looking at the documents?
A. Yes.
Q. And that means they weren't able to get enough people enrolled in the study to go forward with it, right?
A. Yes. They could not complete the study.
Q. So you're aware that Wyeth then went back to the FDA and said because we weren't able to get enough people to participate in the Prempack study, we're going to do a Prempro pivotal trial, and they submitted a proposal for what we heard about today, the Prempro pivotal trial, right.
A. I think there were a few steps in between there where they attempted to not do a study and asked FDA if they could just submit literature instead.
Q. I'm just focusing you on the IND process and the Prempro pivotal trial?
A. In between the first study and the actual study ...
Q. My question is just you're aware they went back to the FDA and asked the FDA for approval on the Prempro pivotal trial or for the FDA input on how they were going to conduct the Prempro pivotal



Dr. Cheryl Blume - Cross

trial, right?
A. Yes.
Q. Yes. And you tried to familiarize yourself with the Prempro pivotal trial, haven't you?
A. Yes.
Q. And so you know that it's what is called a

randomized controlled trial, right?
A. Yes.
Q. And you also know that it studied over I think you told Ms. Littlepage this morning over about 1300 participants, right?
A. 1377.
Q. And you also know that the Prempro pivotal trial involved giving mammograms to the patients in the trial, didn't it?
A. Yes.
Q. And you also know that the Prempro pivotal trial started in the approximately 1989?
A. Yes.
Q. And it was completed, of course had to be before Prempro was approved, wasn't it?
A. Yes.
Q. And then -- well let me back up for a second. You would agree that the FDA did review the protocol

♀page 121



for that trial?
A. Yes.
Q. And so we can agree that the FDA in general reviewed the proposals that Wyeth made to study the combination in connection with this IND step of the process?
A. Yes.
Q. And you know from your work in this case that the Prempro pivotal trial went forward and it did in fact study estrogen and progestin in combination, didn't it?
A. Yes.
Q. And it did in fact give mammograms to the patients in the study, didn't it?
A. Yes.
Q. And in fact, it did involve, as it was proposed to involve, over 1300 patients, didn't it?
A. Yes.
Q. And it was in fact successfully completed in 1992?
A. Yes.
Q. And you were in your work at Mylan involved in some preclinical studies on drugs like Maxzide that you had personal involvement with, right?

♀page 122



A. Yes.
Q. When you are at Mylan, you were involved in some what are called dose response studies for Maxzide, weren't you?
A. Yes.
Q. And those studies were to determine the appropriate dose of Maxzide before Maxzide was approved by the FDA, right?
A. Yes.
Q. And those studies, although they were intended to determine the appropriate dose, that was their intention, they also monitored for side effects, didn't they?
A. Yes.
Q. And in general, when it comes to studies, you

would agree -- we'll come back to this in just a minute -- you would agree with me that studies in general are intended to look for benefits and monitor for risks. Is that a fair description?
A. Studies are designed to detect both an effect as well as attempt to detect and quantify risk.
Q. So you wouldn't just go out and do a study solely to try to detect a risk, you need to have a benefit purpose or an efficacy purpose as well to do

♀page 123

Dr. Cheryl Blume - Cross

with that study, correct?
A. Not necessarily. It depends on what the goal of the study is.
Q. So could you imagine a situation in which you personally would participate in a study where the goal of the study was to see if you could invoke a risk or an adverse event in the patient in the study; that that was the sole goal? Would you personally participate in a study where that was the sole goal?
A. Well I think the way to say it is that studies are done were the sole goal is to monitor the safety of a product; and yes, I have participated in studies where the goal of the study was to monitor for any new safety issues.
Q. And the studies that you would personally be willing to participate in would not have to look for any benefit?
A. Well, back to the one that Wyeth marketed with my company, we included studies where after-dose response study, patients were put on the study, our product and other products, to assess long-term safety. It was called a long-term safety study and the only goal was to assess for any safety effects.

♀page 124

Dr. Cheryl Blume - Cross

Q. So let's talk about the dose response studies for just a minute longer on Maxzide. Those were intended to look at what, to try to decide what the appropriate dose was, correct?
A. They those studies were designed to determine the appropriate dose of the triamterene components.
Q. Because Maxzide was a combination drug, wasn't it?
A. Yes.
Q. And so the studies were looking for the appropriate dose of one of the components?
A. Yes. The other component was fixed.
Q. And the studies were also monitoring for any risks because they were looking for the appropriate dose, right?
A. Well in the dose response study, yes.
Q. And you would agree with me that those studies by Maxzide on dose response studies before Maxzide was approved, involved fewer than a thousand patients, right?
A. Probably.
Q. Now, let's go back to this for a minute. You talked about hiring qualified people at IND. Prempro over here. Let's talk about with respect to

♀page 125

Dr. Cheryl Blume - Cross
Prempro, advisory committees for a minute. Talk about hormone therapy. I think you referred this morning to the fact that there were advisory committees convened by the FDA to look at combination hormone therapy or hormone therapy.
A. Yes.
Q. We can agree the FDA convened advisory committees, including independent experts to look at hormone therapy and advise the FDA on hormone therapy. We agree on that?
A. We agree with specific safety concerns, yes.
Q. And those advisory committees included, just to be clear, they included doctors and scientists who were not employed by Wyeth, right, the advisory committees?
A. Probably.
Q. Even so, you are also aware that those advisory committees that looked at hormone therapy looked at specifically this breast cancer question, right?
A. Yes.
Q. So that was something that the FDA had the advice and input on from independent advisory committees, this breast cancer issue we're
♀page 126

Dr. Cheryl Blume - Cross
discussing here?
A. Well, breast cancer you have to go back to look at the individuals. Those committees were convened to look at the specific safety concerns and breast cancer was mentioned and the need to do a study was mentioned. But those advisory committees were not convened to assess the approvability of Prempro.
Q. Well actually I didn't ask you that. My question may have been unclear. I was just asking you agree with me that the advisory committee answered questions and advised the FDA on the question of whether there was a breast cancer risk associated with hormone therapy?
A. I recall that breast cancer was discussed in those meetings. I don't know if they were specifically convened to discuss breast cancer. It seems to me there were other issues pending with the drug.
Q. And we can certainly look at those minutes in a little bit.
You're also aware, aren't you, that the advisory committee, one of the advisory committee's recommended to the FDA that the FDA
♀page 127

Dr. Cheryl Blume - Cross
start considering whether to approve new drug applications for combination hormone therapy?
A. You'll have to show that to me, I don't recall that. We'll look at that in a few minutes.
MS. HUBBARD: So let's see, we've gotten as far -- your Honor, I probably

have another hour or hour-and-a-half. I can keep going to 5. I know we've got a deposition issue for tomorrow that we needed to discuss with your Honor.

MS. LITTLEPAGE: If we could go as long as possible tonight.

THE COURT: She's going to have to come back tomorrow under any scenario. There is no way I can relieve her. I can't get in an hour of her time tonight.

Where is it convenient to stop? Where can you bring the topic to an end.

MS. HUBBARD: Why don't we complete this chart.

BY MS. HUBBARD:

Q. Going back to Prempro ...

THE WITNESS: Excuse me, I can't see the chart.





THE COURT: Well now that you can see it, does it help you any?

BY MS. HUBBARD:

Q. Okay. So we were talking about Prempro, and in your work on the case, you learned that after the Prempro pivotal trial was completed, Wyeth submitted its new drug application for Prempro to the FDA, you learned that that was submitted, right?

A. Yes.

Q. And you also learned that the FDA reviewed it, right?

A. Yes.

Q. So we can agree that the Prempro NDA was reviewed by the FDA.

A. Yes.

Q. And we can also agree, can't we, that the labeling that would accompany Prempro was reviewed by the FDA?

A. Yes.

Q. That's part and parcel of the process, isn't it?

A. Yes.

Q. And we can agree that ultimately after the FDA reviewed it and made any changes it wanted, that the





FDA approved the labeling, the launch labeling for Prempro, right?

A. Yes.

Q. And then we can also agree, and just so we're clear when we're talking about labeling we're talking about what was going to be going to the doctors in connection with the drug, right?

A. Yes.

Q. And we're also talking about what is known as the patient package insert was also reviewed and approved by the FDA, right?

A. Yes, the FDA required all estrogen products to have patient package inserts.

Q. I'm just going complete the chart now and then we'll touch base on a few of these things, clean up

a few of these things on chart tomorrow but just to complete the last step in the process, we can agree that with respect to Prempro, after the FDA reviewed the entire new drug application, the FDA made the decision, based on all the information it had available to it, to approve Prempro to be marketed in the United States?
A. Yes, in 1994 Prempack was approved.
Q. When you're saying Prempack, you're saying

♀page 130

Dr. Cheryl Blume - Cross

that because it was still in two pills and then it was put into one pill thereafter, right?
A. Right.
Q. But when we talk about Prempro and Prempack, can we agree we're generally talking about basically the same thing, two pills or one pill?
A. Well, it's two separate approvals, but yes.
Q. And the FDA went ahead and approved this and as we discussed, FDA didn't have to do that, did they? The FDA doesn't have to do anything but it didn't have to approve Prempro, did it?
A. No, the FDA doesn't have to approve an NDA.
Q. The FDA could have said we want you to do something else, we're sending it back. The FDA could have said that, right?
A. Yes.
Q. Absolutely.

MS. HUBBARD: All right, I think this is an appropriate stopping point for tonight.

THE COURT: We'll excuse the jury at this point. Have a pleasant evening.

(Whereupon the jurors exit the courtroom.)

♀page 131

Colloquy

THE COURT: This is a legal argument so I ask that only lawyers stay and the parties leave.

MS. O'CONNOR: This is the deposition of the plaintiff's epidemiologist who they want to play the videotape tomorrow.

THE COURT: How many hours of it?

MS. O'CONNOR: The plaintiff's portion is about an hour and the cross we have is about an hour-and-a-half.

MR. BOOTH: You timed it?

MS. O'CONNOR: Yes, we did.

THE COURT: Somewhere in the intermission I expect someone to stand up and tell a few jokes so they wake up.

MR. BOOTH: Our direct is probably less than an hour.

THE COURT: But they are planted into the chairs. They never move.

MR. BOOTH: No, well, the cross is dramatically longer than our direct.

MS. O'CONNOR: The cross is really not that much longer.

THE COURT: I'll play anything you want

♀page 132

Colloquy

to play BUT I think it gets you nowhere. It is the biggest waste of time in the world. I'd put on dead-head live witnesses before depositions of boring doctors, straight out. They are just going to put the jury to sleep.

MR. GROSSI: Your Honor, I apologize, I was back there. My understanding is that it's something like 59 minutes of what they designated and about 120 minutes of what we designated.

THE COURT: Is there anything specific you are arguing?

MS. O'CONNOR: A couple of objections. If you grant them, it will be a little shorter. So the first one is where the first purple tab is on page 64. And this the question is asking Dr. Colditz, says let me ask you, Doctor, do you know whether IARCH, the International Agency for Research on Cancer can identify E plus P therapy as a carcinogen in terms of human breast cancer. And the answer is yes, when he says the IARCH has classified

♀page 133

Colloquy

combination E plus P as a level one carcinogen for breast cancer and our objection is it is a hearsay objection. Under Pennsylvania law there is no exception for learned treatises. He is just parroting back what IARCH says without laying a proper foundation.

THE COURT: Is he a member of IARCH? Does he go to the meetings?

MS. O'CONNOR: Not that I'm aware of.

MR. BOOTH: Mr. Grossi and I had a discussion about learned treatise.

MR. GROSSI: About IARCH?

MR. BOOTH: Yes, IARCH is a published, an authoritative learned treatise. Dr. Colditz testified he believes it is authoritative. And you said we were going to be allowed -- you said unless it's some Iranian journal from East Ethiopia we are going to be able to use authoritative stuff to bolster witness testimony. If we're not going to do that then our deal's off.

MR. GROSSI: I don't have a problem with using treatise. My problem would be

♀page 134

Colloquy

it is cumulative entirely. Dr. Dey was asked about that yesterday. He didn't deny that IARCH listed us. It is just cumulative.

MR. BOOTH: Then we don't have a deal.

THE COURT: If they want to put them to

sleep, they can.
MS. O'CONNOR: How did we resolve that? One.
THE COURT: It stays in. I'm all together with you on 802. That is the next step, 802.
MS. O'CONNOR: The objection is just designated here.
MR. BOOTH: Oh, sorry, yes. The objection comes up. The only thing is that if we're playing the videotape and sometimes the objection comes in over an answer to the question we have to have, I don't know if that's what this is.
MS. O'CONNOR: We checked them all.
THE COURT: They are generally not a problem.
MS. LITTLEPAGE: I believe there

♀page 135

Colloquy

are ...
MR. BOOTH: She said she checked it and it is not a problem.
THE COURT: 802 is gone.
MR. BOOTH: Yes, thank you.
MS. O'CONNOR: On page 804, this section on 804 goes to cardiac and heart disease.
MR. BOOTH: That's out. The cardiac part has to come out. I will make a note of that. We agree with that. But it is down to the risk part. See where it says down to line 5 of 805. Now we're talking about the risk, that is not cardiac that is breast. See what I mean?
MS. O'CONNOR: Yes. On that section -- so your Honor beginning at 805,11, the question and what was Wyeth's reaction.
THE COURT: They didn't want to hear it. They didn't want to hear it. I don't have a problem with it. That's his opinion. Should have asked him why they didn't want to hear it.
MS. O'CONNOR: It's speculation. We

♀page 136

Colloquy

ask that be stricken.
THE COURT: I don't see any problem. The follow-up question just wasn't asked. He said I didn't want to hear it. I think it comes in. Somebody should have asked him what the evidence was.
MS. O'CONNOR: Okay. And then on page 810.
THE COURT: All right.
MS. O'CONNOR: Again, this is cardiac testimony.
MR. BOOTH: If it's cardiac...
THE COURT: The one at the top talks about breast cancer, first of all.
MS. O'CONNOR: That part you just ruled

came in, but starting on page 810 where they're talking about the nurse's health study and the benefit that was studied there, that all relates to the cardiac benefit.

MR. BOOTH: Down to line, beginning line 22, I agree. All of that is talking about the same women from the same study so that should come out because it implies the

♀page 137

Colloquy

benefit issue. But beginning line 22, now we're talking strictly about breast cancer and that would not have any cardiac application.

THE COURT: He didn't see any evidence they were doing any studies.

MS. O'CONNOR: As long as the cardiac part comes out.

MR. BOOTH: Yes.

MS. O'CONNOR: The next part, on 821, the question here, tell the jury why you agree to provide your opinions on the issues of breast cancer in this litigation. And then Dr. Colditz talks about the evidence that he synthesized, but in the middle of that paragraph he says, "The impression that the manufacturers have not taken the issue as seriously as they could and so women haven't heard the message as clearly as they deserve." That portion of it we ask be stricken because Dr. Colditz is not an expert on regulatory stuff he's an epidemiologist. He has no basis to testify. He hasn't reviewed Wyeth's

♀page 138

Colloquy

internal documents. He has no basis to talk about whether the manufacturers were taking the issues seriously and what they did to get the message out. He has not reviewed the label or any of the internal documents.

MR. GROSSI: And there is nothing in his report that goes to that. His report was we thought we were getting an epidemiologist who was going to talk about studies, but here we have him sort of branching over into making an opinion, it's personal opinion, but I don't think an expert comes in and gives a personal opinion that hasn't been disclosed in the expert report.

THE COURT: I think you've made the same point many times already, that Wyeth should have done a lot of things in your opinion that they didn't do.

MR. BOOTH: May I be heard?

THE COURT: Sure.

MR. BOOTH: Mr. Grossi stood up in opening statement saying Dr. Colditz was a

♀page 139

Colloquy

high-paid witness. Called him an argumentative witness. They attacked him and will attack him on the way he did his studies and his motivations for being involved. This question deals with his motivation for being willing to be involved in this litigation. That's all he's doing. He's explaining why he got involved. This is his passion, it's his life work. He's already been attacked in opening. He should have the right to say why he was willing to get involved in the litigation. And that's all this does. That's his position on why he got involved.

MR. GROSSI: Then that should have been disclosed in the expert report. In the expert report he said I'm doing this because I'm being made nine hundred dollars an hour. I don't mean to belittle that. My only point is we got no notice in the expert report that this gentleman had any opinions about Wyeth's conduct.

Dr. Blume, on the other hand, she put it out there and as you say the jury heard

♀page 140

Colloquy

it all day long from Dr. Blume. I don't think we need another witness who is giving rank opinion, which no one can cross-examine because it's a personal opinion, not based on anything that you can cross-examine on, and it wasn't even disclosed until the time of his trial deposition. This is not a discovery.

THE COURT: It's a point you made a lot of times already and you are probably going to make it a lot more times.

MR. BOOTH: But it's his right to not be accused of being mercenary. He didn't say in his report I'm doing this for money. He didn't say because that is not appropriate. When he's attacked as to what his motivation is he should have the right to say why he's doing this because they attack him as being mercenary and that seems unfair for him not to be allowed to defend himself, and that's what he does here.

MR. GROSSI: Your Honor, I mentioned how much he was paid. I won't mention it

♀page 141

Colloquy

again.

THE COURT: I have no problem with how much he was paid. If he's good, he's worth every cent of it.

MR. BOOTH: How much has to come out?

MS. O'CONNOR: The first part where

he's talking the synthesis of date, which is what he does ...

THE COURT: The next paragraph, 20 to 24, and see if that -- I think maybe the fairest thing to do is the impression that the manufacturers have not taken the issue as seriously as they could, and stop there. That gives everybody a little bit of what they want.

MS. O'CONNOR: So women haven't heard.

THE COURT: The rest of it is gone.

So you have a chance to say to the -- about the manufacturers.

MR. BOOTH: That's fair.

THE COURT: So tomorrow is Dr. Colditz.

MR. GROSSI: Basically with the running time, my guess is since I think Ms. Hubbard has about an hour-and-a-half or

♀page 142

Colloquy

so -- and then redirect.

THE COURT: So that is probably the whole day; Colditz in the afternoon and Dr. Blume in the morning.

MR. GROSSI: I know what you are saying kabout videotapes. I think they come in better at 2:30 -- off the record.

(Discussion off the record.)

MS. O'CONNOR: Your Honor, there was one more objection. It was part of their option on completeness. I'll hand it up to you. It's not in the portion that you have. It's a section where Dr. Colditz is asked about a conversation he had with Dr. Deitch. Dr. Colditz did a meta analysis of some data and he gave a presentation on it and said he got a phone call from Dr. Deitch about it. Dr. Deitch is an employee at Wyeth. Most of it is fine. The only part we're objecting to is beginning at line 107, 18.

THE COURT: Talking about stock prices?

MS. O'CONNOR: Exactly. Well, I think it's the question after that. 107, line

♀page 143

Colloquy

18.

THE COURT: Line 18 talks about a forewarning of your presentation. Then he talks about the stock prices, which I think is irrelevant to this case.

MR. GROSSI: And speculation too, Your Honor.

THE COURT: The fact that the prices dropped is not speculation. I think the whole thing can come out. What is it doing for you. Where is it taking you?

MR. BOOTH: What happens is Dr. Colditz does work for this company over a period of time. Dr. Colditz makes a presentation. This goes to the issue of whether the

company, Wyeth is looking at the breast cancer issue or being passive and resistant. Dr. Colditz gets home from making a presentation about breast cancer and the Wyeth employee, Dr. Deitch calls on the phone and says I can't believe you did this, you have dropped our stock price, you didn't give us forewarning. So Wyeth's response on asking Dr. Colditz, and he said

♀page 144

Colloquy

well what Dr. Deitch was really worried about was the no forewarning. Well no forewarning has nothing to do with the stock price. The point is the company calls this man who is a scientist giving information about breast cancer to the world and fusses at him because their stock price is falling. That's the conduct this company did with Dr. Colditz. They are fussing with him about stock prices. He's presenting evidence about breast cancer, they fussing about stock price.

MR. GROSSI: Apparently this was so repulsive for Dr. Colditz that for the next three years he continued to take grants from Wyeth to do the studies we're are talking about today. This is very strange material and coming in without any warning, I think is improper.

MR. BOOTH: This is factual contact with this company on the critical issue with the critical witness at the critical time. And this company's reaction, information about breast cancer, was to

♀page 145

Colloquy

fuss at the man who presented it and tell him that he had caused a drop in their stock price.

MR. GROSSI: I agree with counsel, it is a factual statement. He should have been designated as a fact witness and his deposition taken at that time.

THE COURT: I am torn but I do think we're be better off with it out. You are showing the prescriptions up and the prescriptions down, I'm allowing you to do that. So if you have a one-day drop then they're going to come in with a Wall Street Journal ...

MR. BOOTH: It is a different time period. This is back at the critical time period that we're talking about where Wyeth's reaction was to fuss at the scientist who did the study rather than to engage the issue and try to figure out whether or not there was really a breast cancer risk. They fussed at him for presenting that there was a breast cancer risk.

♀page 146

Colloquy

THE COURT: That's the whole case, is that they never bothered to look at the breast cancer, they just wanted to merchandise.

MR. BOOTH: And this is evidence of that from a witness involved.

THE COURT: But you don't know, the whole market could have crashed that day.

MR. BOOTH: And they can bring that up through their witnesses. But our witness is certainly entitled to give this jury a flavor of his involvement with this company on the critical issue of breast cancer and their reaction -- if this was a different issue, this was a different drug or a different type of problem or a different industry -- this is this company, the issue of breast cancer and their reaction to this man when he announced these drugs are raising the risk of breast cancer and they called to fuss at him because it dropped their stock price.

MR. GROSSI: Here's the problem with that. In this Court -- I'm not sure Mr.

♀page 147

Colloquy

Booth is familiar with our procedures here, but in Pennsylvania, fact witnesses must be designated and that is a deposition and that deposition takes place before a trial deposition or a trial testimony and so we are put on notice of what he's -- a fact witness is going to say. In Pennsylvania and in this Court, an expert report must contain all of the material of the expert before his trial deposition or his trial preservation. And they are now using this they have denominated this as trial preservation. We went up there only two weeks before the trial in any event and we found out about this for the first time when they put it on at the very end of their examination. Then we had to do what would could to cross-examine on the fly. We had no notice of this. Now it has been canned and because it's been canned, the only way I can imagine we can get rid of it is to exclude it. He isn't going to be here. They're not going to bring him to be subject to cross-examination that we would

♀page 148

Colloquy

administer to this if he did come.

THE COURT: I'm going to exclude it. I think it is a highway and byway that doesn't get you very far on the adventure that you want to get to.

Your case is that they never did what

they should have done, and there's plenty of evidence that they needed to do it.

MR. BOOTH: I agree. The only thing I would say is it is also our case that they made that decision. In other words, they have a man who tells them news they don't like and they fuss at him because it hurt their stock price and that is information that we've claimed is what they did, but now if this evidence comes out, the jury doesn't have any basis to believe what we've told them so this is actual support for what we've told this jury about the way this company conducted.

THE COURT: You showed them the charts where the prescriptions go up and the prescriptions go down and that is hard evidence.

♀page 149

Colloquy

MR. BOOTH: That's after-the-fact. This is earlier.

THE COURT: That is evidence in the case. And you guys had nothing to do with it.

MR. GROSSI: Dr. Colditz has been in this litigation I think at least a year and this is the first time that anybody has ever brought up this alleged transaction.

MR. BOOTH: Well, he was talked to about his factual involvement with Wyeth all through the last trial, the Reeves trial.

MS. O'CONNOR: And this never came up.

THE COURT: Well, I wasn't there. I didn't do it. I've decided.

\- - -

(Hearing adjourned.)

\- - -

♀page 150

Colloquy

C E R T I F I C A T I O N

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above cause, and that this is a correct transcript of the same.

____________________________
DEBRA B. FLAMER, R.P.R.
Official Court Reporter

____________________________
DATE

♀