REC'D H.S.P. JAN 12 1976

# TRANSCRIPT OF PROCEEDINGS

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

FOOD AND DRUG ADMINISTRATION

OBSTETRICS AND GYNECOLOGY

ADVISORY COMMITTEE

**Date:** December 16, 1975

**Place:** Rockville, Maryland

Pages: 43 - 212

SECOND DAY

**BOWERS REPORTING COMPANY**
**7309 Arlington Boulevard**
**Falls Church, Virginia 22042**
**Phone: 703-573-5900**

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

FOOD AND DRUG ADMINISTRATION

OBSTETRICS AND GYNECOLOGY

ADVISORY COMMITTEE

9:00 A.M.,
Tuesday,
December 16, 1975

Conference Room G
Parklawn Office Bldg.
Rockville, Maryland

SECOND DAY

# CONTENTS

| | Page |
|---|---|
| William Finkle, Ph.D. Kaiser Permanente Medical Center Los Angeles, California | 45 |
| Donald Smith, M.D. University of Washington Seattle, Washington | 59 |
| Ross Prentice, Ph.D. Fred Hutchinson Cancer Research Center Seattle, Washington | 63 |
| Donald Austin, M.D. State Department of Health Berkeley, California | 71 |
| Thomas Mack, M.D. Director of Cancer Surveillance University of Southern California Los Angeles, California | 89 |
| Steven Silverberg, M.D. University of Colorado Medical School Denver, Colorado | 105 |
| John Annegers, M.D. The Mayo Clinic | 114 |
| Bernard Greenberg University of North Carolina | 117 |
| Dr. Sidney Wolff | 137 |
| Daniel Cramer, M.D. Boston Hospital for Women | 145 |
| Douglas Shanklin, M.D. University of Chicago | 155 |
| Sheldon Sommers, M.D. Lennox Hill Hospital, New York | 166 |
| Gilbert Gordon, M.D. University of California, San Francisco | 172 |
| Charles Hammond, M.D. Duke University | 188 |
| David H. Kushner, M.D. Georgetown University | 204 |

P R O C E E D I N G S

DR. KING: Let us come to order. This open hearing concerns the effect of estrogen on the endometrium. The number of people who have been asked to speak, and who have asked to speak is quite large. In order to move along, it is planned that the presentations will be given by 12:30, completed by 12:30.

At the end of each presentation, in usual accordance with the behavior of the committee, I will query the committee if there are any questions or comments the committee would like to made. I will then ask if there are any questions from members of the audience before we move on to the next presentation.

The first presentation this morning will be given by Dr. William Finkle, Kaiser Permanente Medical Center, Los Angeles California; title Increasing Risk of Endometrial Carcinoma Among Users of Conjugated Estrogen. Dr. Finkle.

DR. FINKLE: First of all, on behalf of Dr. Ziel, I would like to thank the committee for inviting our presentation. The underlying question of the study, is there an increased risk of endometrial cancer among users of conjugated estrogen? The main result is that we estimate a 7.6 fold increase in risk of developing endometrial cancer among users of conjugated estrogen, particularly Premarin. The implication of this in the southern California health plan population is that the estimated chance of developing endometrial cancer for women at risk who

do not use Premarin is on the order of one in 2,000. By contrast, the approximate risk for women who do use conjugated estrogens is on the order of one in 250.

Since this is per year, the increase in risk is quite substantial.

The other result of the study is that the increase in risk actually increases with duration of exposure. While the data are somewhat small on this point, they are statistically significant, and we estimate that for exposures less than five years the relative risk is 5.6, and for exposures greater than seven years, the increase in relative risk is 13.9.

The last result is that the implication of the risk ratio and the exposure data is a statistic called the etiologic fraction, interpreted as the proportion of cases due to the use of conjugated estrogen. Our estimate is that the etiologic fraction is 50 percent, that is, 50 percent of the cases, according to this estimate, are due to the use of conjugated estrogen.

I would like to proceed now to the method and go through the methods rather quickly since the time is quite short.

The overall methodology is described as a case control study. The cases are patients that were taken from the Kaiser tumor registry, and there were 94 such patients during the period July 1970 through December 1974.

The verification that the cases involved are indeed cancer patients was predicated on the existence of a pathologic

diagnosis of adenocarcinoma or adenoacanthoma in all cases. These slides are available as a permanent record and could be reviewed a second time.

The only remark to be made on the existence of the cases is that the pathologists tend to downgrade, that is, patho-logists tend to not classify a woman as having cancer if the case is borderline. According to the Chief of Pathology, the majority are frank adenocarcinoma.

The control subjects were chosen in the following way. The membership of the Kaiser Permanente Health Plan is compute-rized. Consequently, we could draw a random sample of members who had the same age, same sex, same area of residence, and the same duration of health plan membership as the cases. This was done choosing two cases for each patient.

The record review was done in such a way that the case and the two patients were passed to a record reviewer who did not know which was a case and which was a control. The re-cord reviewer gathered information on exposure to Premarin, exposure to other drugs, and characteristics of the patients, without knowing whether the chart in question was a case or a control.

The result, as we said, is a 7.6 fold risk ratio, that is, increase in relative risk. The chi square statistic was 49, meaning the probability of this event occurring by chance is on the order of less than one in 100,000,000.

The etiologic faction is 50 percent with a lower bound of 41 percent.

The technical points, which might be of interest to the committee, from the epidemiologic point of view was that we chose a period one year prior to the diagnosis and obliterated all information after that date. The reason for that was to avoid the potential of a more probing clinical history taking prior to the diagnosis. That is, we did not want the pre-monitoring symptoms to be the cause of the more probing clinical history taking, and therefore higher likelihood of identifying exposure to Premarin.

The variables for which we controlled were those variables listed in the MacMahon survey risk factors for endometrial cancer. Among the important ones were age, parity, excessive weight, age at menopause. None of these variables were significant, and consequently, we do not believe there is any bias due to the confounding of these other variables.

The other technical point before going on to the comments is we also did the same study and asked is there any increased risk due to the use of valium for endometrial cancer. Since there is no theory whatsoever that suggests that there should be, we expected that the answer would be no, and this is really an overall check on the validity of the method.

We did this for valium thyroid medication reserpine and got point estimates in contrast to 7.6 of .7, .5 and .9,

all of which are essentially insignificant. In fact, they are all less than 1.0.

The only other overall check on validity was we asked are the indications for Premarin the same in the patients and in the controls. The answer to that was for those patients where indications were given, 71 percent of the controls indicated hot flashes as the reason, whereas 72 percent of the patients indicated hot flashes as the reason. In other words, the reasons were essentially the same.

The only comment I would like to make before turning the floor over to questions is why it is that this risk of this magnitude might have been undetected until now? We know that Premarin and estrogens generally have been available for at least 30 years. This risk is substantially greater than the risk identified in other epidemiologic studies in other contexts.

The explanation that I would offer is that even though the second National Cancer Survey of 1947 and the third National Cancer Survey of 1969-71 give almost the same incidence of endometrial cancer, approximately 21 per 100,000, the prevalence of hysterectomy has increased enormously during that period. From incidental sources, we surmise that the prevalence of hysterectomy was on the order of 10 or 15 percent in the early 1950's. But, as we know from the 1968 data provided by the New England Journal of Medicine, an article by Bunker, that the prevalence of hysterectomy for women at age 60 in 1968

was 31 percent.

So, the phenomenon that I think has occurred is that the increase in endometrial cancer during that period between 1947 and 1970 was not due to an increase in the numerator but to a falling of the denominator, that is, the number of women at risk fell substantially and consequently masked the actual increase in endometrial cancer for women at risk, that is, those with an intact uterus.

As for the period after 1971, the Kaiser registry actually reports a significant increase in the order of ten percent per year, uncorrected for hysterectomy. So, even without taking hysterectomy into account, the increase in the Kaiser registry which is not significant to determine that there has been a nationwide increase is on the order of five or ten percent per year during the period 72-74.

As to the matter of hysterectomy in the study itself, the control patients who had had hysterectomy were excluded from the membership in the study. We did a hypothetical experiment, and said what if they were included? Had they been included, the risk ratio would have fallen from 7.6 to 4.9. In other words, there is a significant number of women who are given Premarin after a hysterectomy.

Therefore, the aggregate figure, if we had used all controls without taking into account hysterectomy, would have been approximately 5. We estimate 7.6.

I would like to open the floor for questions since the time is short and there are other speakers.

DR. KING: Thank you very much. Are there any questions or comments from the Advisory Committee?

DR. FINKEL: I have a question. One of our consultants, who reviewed your paper, raised the question as to whether women who are on estrogen are more likely to have diagnostic procedures, and therefore would have an in situ malignancy picked up earlier than non-estrogen users. I wonder if you could respond to that.

DR. FINKLE: There are a couple of things to be said about that. First of all, it is a very fair question. The data we have is the data on drug exposure. We tried to ask the question, are the people getting Premarin because they are in the clinic more often, and is Premarin merely a correlate of exposure to medical care. For example, we might expect that women who are in the system five times as much as women who are not would simply get five times as much Premarin, and be diagnosed more often, and we might get a superficial correlation with a particular drug.

Our two pieces of data on that are that the controls were members of the health plan as least as long as the patients who actually had the disease, and consequently had at least as much opportunity for exposure.

As for actual exposures, we know that the controls actually had slightly more valium, slightly more thyroid, and

slightly more reserpine than the patients. So, these are two indirect measures of opportunity for exposure to the medical care system.

We do not have data on whether there were actual procedures, and to what extent they were more frequent in the patients than in controls.

DR. ORTIZ: Is there any correlation to the dosage of the Premarin at all?

DR. FINKLE: The overwhelming majority, on the order of 80 or 85 percent, had the dosage 1.25 micrograms cyclically. Consequently, there is very little variety in the dosage, and as a practical matter we cannot report on anything except saying that these data are really about 1.25 taken cyclically.

DR. ORTIZ: How about the use of progesterins? Were there any progesterins used?

DR. FINKLE: No, this is a study in estrogen, not mixtures of estrogen and progesterone. In other words, the exposure information is exposure to estrogen, in particular, exposure to conjugated estrogen. But, we did not record mixtures of anything else actually, including progesterone.

DR. CONNELL: Did you look at any other factors other than hot flashes, which might have led these women to use estrogen? Secondly, did you look at the cyclicity, where they stopped every one month, every three months, every six months? Did you look at either of these factors?

DR. TURKSOY: Did you look at the past history to see if there is any dysfunctioning in this group?

DR. FINKLE: Yes, in fact in all patients we examined whether there was radiation therapy to the uterus or any other surgical procedure involving the uterus. If there was anything to indicate less than an intact uterus, the control subjects were eliminated from the study.

DR. TURKSOY: No, my question is specific for dysfunctional uterine bleeding, increased hemorrhage, or menorrhagia with this group?

DR. FINKLE: No, there is no data on that. We have merely exposure information, plus the confounding variables that are listed in the MacMahon survey of risk factors.

DR. SEGAL: I wonder if any effort was made to determine whether the control cases,at the time that they were selected might have had an undiagnosed carcinoma in situ.

DR. FINKLE: No, the control cases were intended to be comparable individuals from the same population with equal opportunity to be exposed to medical care at Kaiser Permanente. There was no physical examination of the controlled subjects, nor was there a physical examination of the patients. The data is from medical records and the pathology reports. So, we have estimates of exposure and estimates of frequency of use, but that is all.

DR. TYRER: Since Kaiser has a tendency to do things

that are rather systematized, I wonder if you looked at the way the prescriptions were written. In other words, were the d rections on there to take it continuously, or did the directions say to take it three weeks on and three weeks off?

DR. FINKLE: As I said, the overwhelming majority were 1.25 taken cyclically, where cyclically is very slightly varied between three weeks on and one week off, and 25 days on and five days off.

DR. KING: Are there any further question from the committee? Are there any questions from any one in the audience? Please identify yourself, and speak into the microphone.

DR. SHANKLIN: I am Dr. Shanklin, University of Chicago, Chief Pathologist, Chicago Lying-In Hospital. This is somewhat of an unfair question to you, because I know that you are not a physician, but I am very much disturbed by your remark that the pathological slides were not reviewed prior to the analysis of your case material.

The diagnostic criteria for carcinoma of the endometrium are not chiseled in stone, and I wondering what criteria were used to distinguish cancer or cancer in situ from precursor lesions.

DR. FINKLE: This is an important point, and it has been raised among our pathologists. We did not review the slides prior to the study. All we can say on this matter is that these slides are available, that the head of pathology who has discussed

this point in some detail and has reviewed it personally has authorized me to say that the slides are available for outside investigators,should it be appropriate.

More to the point, I think the sociology of how the slides are actually labeled with each potential carcinoma being identified as a potential carcinoma and then being reviewed by the complete panel of pathologists from the southern California region on a weekly basis prior to the actual labeling of a case as being adenocarcinoma. The result of this procedure is a fairly conservative labeling, and this again is a quotation from the head of pathology, and I cannot go beyond that to say that I have examined the slides, because it would not make a great deal of difference what I thought.

DR. SHANKLIN: You said that a majority of them were true cancers. That could be 48 out of the 94.

DR. FINKLE: Yes, it could. On the other hand, the phrase,the majority are frank adenocarcinomas, would lead me to bet that the number of frank carcinomas in your opinion would exceed 48. I do not have data on that.

DR. GREENBERG: In your paper you indicated that you had 94 patients with the disease, but that these were taken from the Cancer Tumor Registry, and you said that this represented a vast majority of the cases diagnosed at Kaiser Permanente Medical Center. How many cases were there really diagnosed, and was there any selectivity in terms of reporting? That is,

did the physician tend to report to the Tumor Registry any patient who had been prescribed estrogen? Was there any selective bias in these 94?

DR. FINKLE: There are two questions. One is does the 94 represent 100 percent of the cases during the period July 70 through December 74? The answer is no, it represents slightly less than 100 percent. It represents the first 94 cases, and there was a budgetary restriction, but we felt that this was sufficient to identify the risk, if it was there.

The second and more interesting question is was there any selection bias? And the answer to that is no. There was no evidence of exposure to Premarin when the case was included in the study.

DR. GREENBERG: You are missing my point. I am asking if there was a tendency for the case to be reported to the Tumor Registry if the patient had been prescribed estrogen, not that you had picked out 94 from the Registry? I presume you took all those on the Registry. Was there a bias in reporting it to the registry if the physician knew the patient had estrogen?

DR. FINKLE: I am not sure how to answer that question, because we believe that the Registry is a complete collection of all adenocarcinomas diagnosed in the region, and we have no reason to disbelieve that. Therefore,since there is not relationship between the frequency of diagnosis and the exposure to Premarin, I do not see that as a problem for selection.

MS. GREENBERGER: My name is Marsha Greenberger. I am an attorney with the Women's Rights Poject of the Center for Law and Social Policy. Dr. Finkle, I would like to ask you about the genesis of your study. Could you explain what led you to conduct the study to begin with?

DR. FINKLE: The genesis of the study was an observation by Dr. Ziel, the primary author, that the majority, in his opinion of endometrial cancers in his practice were taking Premarin. He urged that a study be done to determine if this was a general risk factor or if it was a superficial observation.

MS. GREENBERGER: Was he acting at the prodding of any governmental agency or state agencies or manufacturers of the drug or anything of that sort, or was this his own idea based on his own practice and his own observations?

DR. FINKLE: Yes, that is correct. There was no external encouragement to do this study addressed to Dr. Ziel. It was his own initiative.

MS. GREENBERGER: I would also like to ask whether you know of any studies, similar and more recent studies, similar to the one you have just done, which deal with benefits of Premarin as well as the risks of Premarin?

DR. FINKLE: Well, I am not an expert on the benefits of Premarin. It should be emphasized that this study has nothing to say on the benefits of Premarin. It is new material which may point out previously unappreciated danger of Premarin.

There is a review in the Journal of the National Cancer Institute by Wynder and Schneiderman, which lists seven studies on the effect of estrogen on breast and gynecologic cancer, but the conclusions of that paper are that more work needs to be done, and I really do not want to summarize the literature on what has been done.

MS. GREENBERGER: Also, do you know, aside from the papers that are being presented here dealing with the risk of endometrial cancer finding an increased risk with women who have uteruses in place, whether there are other studies focusing on other possible risks of Premarin.

DR. KING: This is deviating from the material that Dr. Finkle presented. If we could move on to the next presentation. Thank you. Thank you very much, Dr. Finkle.

The next presentation, entitled the Association of Estrogen and Endometrial Carcinoma, is presented by Dr. Donald Smith, University of Washington, Seattle, Washington.

DR. SMITH: Ladies and gentlemen, I would like to just address some comments toward the clinical aspects of our investigation and towards some of the question that have already been raised from the floor towards Dr. Finkle. Dr. Ross Prentice, our primary biostatistician, will discuss the statistical methodology following this presentation.

Some comments directed towards the work that we did as far as the selection of the patients from the Mason Clinic

and University Hospital Group in Seattle. We used the patient source list from the Washington-Alaska Tumor Registries for both institutions and for the selection of controls. The only patients that were left out of the study were patients where the data base or the chart provided insufficient data. For example, if no mention was made of estrogen use or non-use, of course, a patient had to be deleted.

The control groups were selected from the same registry involving cervical, vulvar and ovarian malignancies. The controls were selected on the basis of a year of diagnosis or nearest year of diagnosis to the comparing case, and as far as the age as to the nearest year within four years.

We selected for estrogen use rather arbitrarily, six months of use. This posed some problems. For example, cases that presented with symptomatology, for example, bleeding, sometimes estrogen had been given for that very symptom, and the diagnosis made very shortly thereafter. These patients were included therefore in the no estrogen group, although they may have received three or four cycles of estrogen. There were probably less than five in the total series that fell into this group.

We have some additional data to present because of the many questions that have come up concerning the use of Premarin as opposed to other estrogens. The reason we did not direct potential answers to these questions before is the fact

that we were using clinic and hospital charts to obtain our data. Very often they were incomplete as to the type of preparation, the dosage, perhaps the length of duration, or the cyclicity.

The most common problem we would find in the evaluation is that someone was on estrogen for many years, and from that we were certainly unable to direct any valid data as to the relative risk,for example,with usage of time.

We did go back and look, and we have for our cases in controls approximately 53 percent of the cases on Premarin. Stilbestrol was used 24 percent of the time, and other preparations or parenteral medication were used 23 percent of the time. This compares with the control group where Premarin was used 43 percent of the time, stilbestrol 21 percent and others 36 percent.

Using an odds ratio, just to roughly calculate relative risk, there is no difference between Premarin and, for example, Stilbestrol: 5.23 to 4.91. But,again, this is from less than an entire group that we have reported, and there were significant numbers of unknown preparations within that group.

We have gone on further to look at the pathology. The pathology was being reviewed by Dr. Bauermeister at the Mason Clinic, and we have some preliminary data on the staging of the disease, the histologic rating and the degree of myometrial invasion. There do seem to be differences in these categories.

If we break down the group of patients from the

Virginia Mason Hospital Group, we had approximately 247. There were 20 percent of the higher grades or upper stages of malignancy within the group that developed the disease without estrogen, 20 percent of these had either stage 2, 3 or 4 lesions, as opposed to only 4.5 percent for the group that developed the disease while taking estrogens.

In partial answer to Dr. Shanklin's question, we had 23 cases in the entire group of the 250 that were stage zero's. The rest were all stage one or above.

Looking at the histologic rating, or the relative degree of D-differentiation of the tumor, again the more undifferentiated grades, Grade III and IV, 55 percent were in this category, in the group that developed a disease without estrogen, and only 15 percent in the histologic Grades III and IV of the group taking estrogen.

As far as the degree of myometrial invasion, myometrial invasion occurred in 44 percent of the cases that developed the disease without estrogen and only 17 percent in the group on estrogen.

Deep myometrial invasion greater than one half the depth of the myometrium occurred in 18 percent of those without estrogen, and only in one case or one percent of the cases taking estrogen.

So, there does seem to be a difference in the biologic behavior of the tumor in the two groups of the cases of those

taking estrogen as opposed to those not. This does not seem to be explained on age alone. In fact, the older patients do not seem to be the ones who have more myometrial invasion in either group. You might think that perhaps with time this might occur.

A question came up as to whether or not the patients taking estrogen might be diagnosed a little earlier, or perhaps be subjected to more active diagnostic techniques. We were discussing that, in fact, just last night, and I wonder if the opposite just might not be the case. I think that the amount of bleeding that we see in patients taking estrogen is significant and oftentimes difficult to assess, and one wonders whether or not everyone should be D & C'ed, or who should have a D & C and at what time, as opposed to someone who might come in bleeding not on estrogen. I think the vast majority of people might tend to act somewhat earlier in that case, as opposed to the ones taking estrogen.

Before I would like to field questions, I would like to have Ross Prentice come up and discuss some of the analytic techniques used in the study, and then perhaps we could review any of the things that were not clear earlier.

DR. PRENTICE: Thanks, Don. Don has reviewed the basic design and conduct of the case control study in Seattle and also some ongoing study of differences between endometrial cancer cases on estrogen, as compared to those not on estrogen. I would like to return for just a short time to the basic case

control comparison, and discuss some refinements of the analysis.

To reiterate, the study was set up as a one to one matching of the cases controlled. There were 317 endometrial cancer cases which were one to one match to controls with other gynecologic malignancies, primarily cervical or ovarian cancer control.

In 152 of the 317 endometrial cancer patients, that is 48 percent, were on estrogen by the criteria that Don mentioned, as opposed to only 54,or 17 percent, of the 317 controls. This suggests completely unadjusted relative risk associated with estrogen exposure of 4.5.

Now, clearly there is a substantial variation in the probability of using estrogen with several other factors. For instance, the use of estrogen has been going up rather dramatically with chronological time, and that was the main motivation for the matching that was done in the study, namely on year and age of diagnosis.

This leads to conventional matched pair analysis. Of the 317 pairs, it turned out 128 were discordant with respect to estrogen exposure. That means that one, but not both of the members of a pair, was on estrogen. And, if there is no association between estrogen and endometrial cancer, at least no difference in that respect between case and control, one expects those 128 discordant pairs will be roughly equally divided between a case being on estrogen and a control being on estrogen.

Well, it turned out that of the 128 discordant pairs, in 113 of those the case was on estrogen, and in only 15 the control was on estrogen. That leads to a relative risk estimate of 7.5, which has been adjusted for year and age of diagnosis. This is rather similar to the California study. In fact, one can look at how that relative risk appears to vary with year of diagnosis. For those diagnosed before or during 1967, one gets a relative risk estimate of 5.8 as compared to 8.4 for those diagnosed more recently, after 1967. This presumably reflects duration of use, although we did not have good data on that.

The next question that arises is what other factors are related to estrogen use and possibly were not used in the matching? If such a factor also discriminates between case and controls, then is classically called a confounding factor and may give rise to bias.

As an illustration, a referral pattern was considered in the study. I will restrict attention to the main group of patients for a minute, which was Virginia Mason data, 243 of the 317 pairs, and these patients were either clinic patients or were referred in, and the clinic patients had somewhat higher use of estrogen. 53 percent of the clinic patients were on estrogen as compared to only 26 percent of the referral patients.

Now, it turned out that a somewhat larger fraction of cases were clinic patients and controls. 48 percent of cases were clinic patients, as compared to 36 percent of controls.

[illegible]

So, the danger is that some of the higher use of estrogen in the cases may be due to this influence of referral pattern rather than estrogen per say.

Then, there were several other factors there were simultaneously taken into account. I have mentioned referral pattern, year of diagnosis, age of diagnosis; among the others considered were hypertension and obesity.

So, the data were reanalyzed taking these factors into account and a decrease in estrogen use was noted with referral pattern, increased use with year, decreased use with age, and decreased use with obesity. That was defined as 30 percent above the upper end point for normal weight.

After simultaneous adjustment for these potential confounding factors, the relative risk estimate was 8.72 with associated confidence intervals from 5.2 to 14.6, a 95 percent confidence interval. So, even after taking these factors into account, the association is rather strong.

As a final refinement, one could note that the use of estrogen might not only depend on these other factors, but the dependence might differ between cases and controls. When this happens,the relative risk itself will depend on the factor. This is what is sometimes referred to as effect modification.

So, again, with the Virginia Mason data these same factors were considered as potential confounding and effect modifying factors, and it was found that the risk associated

with estrogen was increasing with year of diagnosis, and a somewhat decreased risk was associated with hypertension. There is also a suggestion of a decreased risk with obesity, but it is not clear at this time.

Unfortunately, some of these finer associations require rather substantial data sets to study in any detail, and at the moment we really are just able to show an apparent decreased risk with hypertension, but not a very precise estimate of the amount of that decrease.

Similarly, we could examine whether the relative risk estimate depends on the type of control. As I mentioned, there were three types of control, cervical, ovarian and vulvar cancer. There was a rather small number of vulvar cancer controls. In fact, again with the Virginia Mason data, this difference is not significant at the ten percent level, though there is a mild suggestion of a lower relative risk in comparison with the vulvar, comparing the endometrial cancer cases with the vulvar controls. It suggests possible further study of an association between estrogen use and vulvar cancer.

Most of my comments have been directed to the Virginia Mason data. The University of Washington data was a considerably smaller sample size: 74 cases and controls. A somewhat less frequent use of estrogen gave generally the same results for the basic relative risk but did not permit a study of some of the finer points of confounding and effect modification.

DR. KING: Are there any questions by any members of the committee?

DR. SEGAL: Was any consideration given to studying cigarette smoking as a confounding or effect modifying factor?

DR. PRENTICE: No, that was not considered.

DR. SEGAL: Are the data available to be able to do that?

DR. SMITH: I do not think our data would supply that information.

DR. KING: Are there any other questions from any member of the committee?

Please step to the microphone and identify yourself.

DR. KUSHNER: I am David H. Kushner, and I would like to ask Dr. Smith concerning his statement about the later diagnosis of women with endometrial carcinoma on estrogen than women who are not taking estrogen. I cannot understand or accept that, because it takes less time and is simpler to do an endometrial curetage in your office by vacuum than it is to do a colposcopy and a Pap smear. Now, if they are important, when a woman comes in bleeding, particularly a woman who has not menstruated for six months, she should immediately have an endometrial curetage done in the office. If you cannot do it, then of course she will have to have a D & C in the hospital.

DR.SMITH: I did not mean to imply that the people on estrogen were being diagnosed later. Just in answering to

the question, were they perhaps being diagnosed earlier, it is not certain that they are. Oftentimes, we would go right ahead and do a D & C on a patient who comes in without bleeding for some time, without being on estrogen, the chances of bleeding from a significant pathology is somewhat greater than someone who is taking estrogen who has often several episodes of bleeding from a sort of benign lesion.

But, I certainly agree with you. I do not mean to say that it is picked up any later or earlier.

MS. HARE: I am Doris Hare, and I am President of the American Foundation for Maternal and Child Health. As you all know, I am sure that there are 30 or 40,000,000 women who have been given diethylstlibestrol as a lactation suppressant. Has any attempt been made to evaluate the possible relationship between earlier administration of DES and later cancer?

DR. KING: We are talking about endometrial cancer, if you would like to refer back to what has already been said about the distribution of the cases.

DR. SMITH: We have no data concerning that, and I am not aware of any ongoing studies at the present time, although there certainly may be.

DR. SHANKLIN: I am very pleased to learn that now that your paper has been published, you are reviewing the slides. I wonder if these will be made available for review for some group to be chosen to make criteria fairly firm?

DR. SMITH: I am sure they certainly would be. Dr. Bauermeister I think would be more than happy to share that data with anyone.

DR. CRAMER: Did your rework of the data show that the patients on estrogen had endometrial lesions diagnosed earlier, or they had earlier grade lesions, stage zero and stage one? Is that correct?

DR. SMITH: The group on estrogen did have. I just cannot recall now. I do not think there was a significantly higher stage zero lesions in the estrogen treated group. There may be. Again, just looking at that very briefly recently, but not a great difference in the stage zero. There were large numbers. The vast majority of both groups were stage one, although there were 20 percent of the more advanced grades in the group not on estrogen, and only 4 1/2 percent in the group on estrogen.

MS. GREENBERGER: Dr. Smith, I would like to ask you the same question I asked Dr. Finkle. Could you explain the genesis of your study? What led you to undertake the study to begin with, and whether there were any outside requests from governmental officials or from manufacturers, et cetera?

DR. SMITH: There were no outside requests from anyone to initiate the study.

MS. GREENBERGER: Thank you.

DR. GORDAN: I would like to ask the same question

that was asked originally of Dr. Finkle, and I believe it was the thrust of Dr. Sheldon's subsequent question. You have now shown that in the estrogen treated women you are seeing earlier endometrial carcinoma. Is it possible that the increased number that you have detected in women taking estrogen is simply due to the fact that when you give women estrogen they bleed, but when women bleed and are under good medical care they have D & C's and therefore you are more apt to find them?

In other words, what I am asking you is are the two groups comparable? Are you comparing a group that has had frequent D & C's with a group in whom early carcinoma of the endometrium might not have been detected?

DR. SMITH: That is possible. We were unable to make any good determination of just how early either group might have received diagnostic procedures, and we do not have information in that regard.

DR. KING: Thank you very much, Dr. Smith and Dr. Prentice. The next presentation will be given by Dr. Donald Austin entitled Aspects of Rising Rate of Endometrial Cancer in the San Francisco Bay Area, Dr. Austin, State Department of Health, Berkely, California.

DR. AUSTIN: Thank you. I would like to present some data to you briefly, but first I would like to review the source of the data and some of its limitations.

California Tumor Registry collected the data.

California Tumor Registry is a unit within the State Department of Health. It began its operations in 1947. In 1960 it began the Alameda County Cancer Registry, which is a population based registry in one county in California. The county had a population of approximately 1,000,000. In 1969, the California Tumor Registry began the California portion of the third National Cancer Survey, which was in five counties, including Alameda County in the San Francisco Bay area, and since 1972 has continued an incidence determination system under the National Cancer Institute SEER Program, which stands for Surveillance, Epidemiology and End Results within the San Francisco, Oakland, standard metropolitan statistical area. This has a population of 3,000,000.

May I have the first slide, please?

The San Francisco-Oakland SMSA, as I mentioned has five counties. Within these five counties there are approximately 75 hospitals. Most of the larger hospitals, approximately 25 hospitals, have their own hospital tumor registries and report to the California Tumor Registry. The majority of the smaller hospitals, approximately 50, do not have their own registries, and the California Tumor Registry's field staff goes out and collects the cases from those hospitals.

This is the SMSA in the bay area. Alameda County is this county right here, approximately 1,000,000. The entire area is approximately 3,000,000. The information gathered on

each case includes pathologic characteristics of the tumor, such as site and type and extent of disease. These are collected by tumor abstractors, tumor registry abstractors, or by the Central Registry field staff. They are not reported by physicians. Also gathered on each case are methods of treatment and methods of diagnosis, and also the demographic characteristics of the patients, such as age, race, sex, et cetera.

The address is also recorded, so that geographic location of cancer can be mapped, and studies conducted using smaller geographic locations and counties.

No information on drug usage or past exposure to potential carcinogens is routinely gathered.

Slide off, please.

When the Alameda County Cancer Registry began, this was the first experience that the California Tumor Registry had in attempting a complete case ascertainment among the residents of a geographical area. How complete the information was in the earliest of those years is not completely known, but it can be estimated.

One way of estimating this that we have done is to look at the increase in all sites of cancer from 1960 to 1970 in Alameda County, and comparing the increase in those sites of cases that are routinely treated by radiotherapy as compared to those cases which are not. The reason we use that comparison is the fact that in the mid-60's we began doing a surveillance

of radiotherapy units within Alameda County and surrounding counties. Now, this is theoretically redundant since all cases treated in a radiotherapy unit would have to have a diagnosis prior to be referred to a radiotherapy unit.

However, we found that those cases routinely treated with radiotherapy had an increase in computed incidence several percent higher than those who were not routinely treated with radiotherapy. This would seem to indicate that perhaps up to three percent of an increase that we may see is due to an increase in case findings.

Now that is regarding Alameda County. We have 15 years of data for Alameda County, which will be presented. In addition, for all five counties we have data dating from 1969 through 1973, and some preliminary data for 1974. We believe that the data gathered since 1969 is very complete with the possible exception of 1971, which may be as much as three percent low.

We have a method of estimating the completeness of reporting based upon an estimate of those cases which have been lost, and that estimate is between one and one and a half percent, which means that our estimate of the completeness of reporting since 1969, with the possible exception of 1971, is on the basis of 98 to 99 percent.

This data, 1969 through 1973 data, we feel is extremely reliable and this will be presented first. I also want to point

out that the 1974 data are preliminary, i.e., the total count is not in for all counties. The significance of this is if the number is high, you can believe it. If the number is low, it may be because the total count is not in.

One county in particular, San Mateo County, is we know to some degree underreported at the time that this data were collected.

May I have the next slide, please?

This shows the incidence rates of invasive uterine carcinoma for the entire SMSA. I would like you to not two things. One is that the increase is in white females, and (2), the increase is in each of the five counties. It is also a rather significant increase.

The standard error of the SMSA rates for white females is on the order of 1.3 to 1.7. As you know, plus or minus two standard errors incorporates approximately 95 percent. Two standard errors would be approximately 3.0. So, the difference between the 1969 and the 1973 rates are approximately 5 1/2 standard errors.

SPEAKER: Dr. Austin, in the back of the room, we cannot read that slide. So, if you would be kind enough to summarize the essential meaning so that a layman can understand it, we would be grateful.

DR. AUSTIN: All right. I apologize. The number in 1969, the age adjusted incidence rates for white females, for

1969, 26.3; for 1970, 29.9; for 1971, 32.9; for 1972, 36.4; for 1973, 42.2; and the preliminary data for 1974, 42.6.

In addition to demonstrating a significant increase, this also shows that it is not limited to only one area within the SMSA. However it is limited to white females.

Next slide, please.

This is a graphic representation showing a steady rise in invasive carcinoma for white females, and as seen down at the bottom, the red line down at the bottom, there is also an increase in the in situ diagnosis made in that time.

Next slide, please.

This demonstrates that the rise is in each county. I should point out that this one county that goes up the highest is Marin County. This is the county with the highest median income in the State of California, the highest per capita income in the State.

Next slide, please.

This may be difficult to see.

DR. KING: To save you the difficulty of giving the exact figures, these tables can be made available by the Food and Drug Administration for any interested individual in the audience.

DR. AUSTIN: Thank you. This slide was put on there to demonstrate one thing. You can see from the age specific rate -- this is in basic white females -- that there is no

demonstrable change under the age of 50, that if the increase were due to increased case findings, or changes in diagnostic practice, we would not expect to see an increase limited to one age group and one race.

All the increase is from age 50 on.

Next slide, please.

These are in situ carcinomas. Again, although the numbers are much smaller, and there is an increase of variability, we again see that the increase is limited to white women over 50, and a proportional increase is somewhat larger.

Now, it is sometimes easier to see age specific changes by looking at proportional changes.

May I have the next slide, please?

This is all computed on the basis of 1969 rates, the percent of change, or the ratio of subsequent years to 1969. Again, you can see for invasive carcinoma of the uterine corpus that there is no change under age 50, that there is approximately a 50 to 100 percent increase in age groups over 50.

Next slide, please.

With in situ carcinoma, there is a more marked rise, although the number again is smaller and there is more variability. Here you may notice that over age 50 there is up to a 460 percent increase noted in one of the age groups over 50.

Now, there may be some significance to the fact that for invasive carcinoma the rise seems to be in the earlier

post-menopausal years as compared to the 80-85 age group, and in the in situ, the rise is even greater than for invasive carcinoma, because this is what one would expect if a wave of new carcinoma was moving through this age group.

That is, if that is in fact what this does signify, then we might expect to see a continued increase in invasive carcinoma so long as the in situ carcinoma continues to rise at a faster rate.

Next slide, please.

Since the increase was primarily in the over 50 age group, we then looked at two 25 year age groups: under 25 to 49, and 50 to 74, and this represents the two broad 25 year age groups. Again, you can see that for each county the marked contrast between the two age groups and the steady rise in the post-menopausal age group.

Next slide, please.

This is a graphic representation of the same data. The age group with the largest rise. Again the line up here is Marin County with the highest socio-economic status in the state. This red line which goes down here is San Mateo County, which we know is underrepresented in 1974.

Next slide, please.

Now, looking at that age group, 50-74, this is a graphic representation for the entire SMSA. We note that there is approximately an 80 percent rise from 100 to 180 in invasive

carcinoma, but it is proportionally greater for the in situ carcinoma, approximately a 200 percent rise from 10 to 30 per 100,000.

Now, it is important to see whether this could possibly have been due to changes in pathologic diagnoses made. This might be true if -- Well, if it is true in only one cell type, this may suggest an etiology to us. And, if it is true in all categories, that may suggest some artifactual cause for the increase.

May I have the next slide, please?

We did look at diagnostic categories. This is a percent representation, and this shows that in each diagnostic category that we had, which have been lumped together for simplicity, that there was approximately the same percent in each diagnostic category with the exception of sarcoma, which decreases slightly. The reason for that can be seen in the next slide.

Next slide, please.

This is that the numeric rise is exclusively among the endometrial cell, malignant adenoma, adenosquamous and epithelial not otherwise specified. The numeric count for the sarcoma remained stable over the five year period.

This suggests that whatever the cause is, it is due to an agent which has the primary effect on the endometrium. Now, it has long been known that corpus carcinoma, corpus cancer, is highest in the upper socio-economic strata and lowest in

the lower strata. Only our 72 and 73 data were available in such a fashion as to permit an analysis of socio-economic status.

We did this using census tracts, by taking the 50 to 74 population for the entire SMSA and then ranking the census tracts by median family income. In case there were a tie, by median education for the census tracts. Then, dividing the population into quartiles and computing the incidence rates for each quartile, which is shown on the next slide.

Next slide, please.

This is a rather marked gradient. I have not seen a gradient this big for uterine cancer before, ranging from 43.6 in the highest economic quartile to 22.2 in the lowest economic quartile.

I would like now to present some additional data to you from Alameda County. When the Alameda County data were examined approximately five years ago, they looked like this.

May I have the next slide, please?

This is a slide made about five years ago showing that for black females, uterine cancer rate shows a slight decrease over a ten year period.

The next slide, please.

And for white females, uterine cancer showed a slight increase. Now, this is a log scale which diminishes the effect of an increase. It looks smaller on a slide. Again, this is all ages.

However, if we look at it for a longer time period now, and look at the 50-74 age group, which is broken out; look at it for a longer time span and put it on an arithmetic scale, we get a quite different impression.

The next slide, please.

The red line is for white females, 50 to 74, and shows a rather impressive increase. The black line on the bottom is black females, which does in fact show a real decrease. Now, we feel as much as three percent of the rise in the early 60's may be artifactual. However, you may notice that the major increase is from 1965 on, and increased case findings cannot be too significant in the face of a decreased trend in black females.

Now, those members of the committee have a hand-out sheet, which again shows -- this is the long page -- it shows that it is again in the 50 plus age group in white females that the increase has been noted. Over that 15 year period, there has been no demonstrable increase in black, and no demonstrable increase in the under 50 age group.

Now, the Alameda County Cancer Registry also allow an evaluation as to the effect of possible sources of bias. One possible source of bias would be a change in diagnostic practice or coding practice, such that carcinomas once counted as carcinoma of the cervix now are diagnoses as carcinoma of the uterine corpus. If that were the case, then the total of carcinoma of the cervix plus uterine corpus would not change. Now we looked

at that.

May I have the next slide, please?

This shows that the total for the two does show approximately a 50 percent increase from 40.9 to 58.0 over a 13 year period. Corpus does in fact decrease, and cervix here does decrease, although we believe that the computed incidence of cervix has in fact decreased. Part of this is due to the increased use of the Pap smear and diagnosis of cases in the in situ stage, which of course is not entered into the computed incidence rates.

May I have the next slide, please.

This slide compared the increase in all sites, all other sites, with the increase in uterine corpus cancer. We see that there is an increase of almost 50 percent -- I beg your pardon. This shows approximately,over a 15 year period, a one percent rise per year for all sites, and approximately a 15 percent per year increase in uterine corpus sites, which is an average. That is an increase of 230 percent,as compared to 15 percent for all other sites.

Another potential source of artifact exists in a diagnosis by stage. Some might argue that the diagnosis of uterine cancer is technically difficult, and there may be an increasing tendency among pathologists to call questionable diagnoses carcinoma.

Now, while it is difficult to imagine how this could

happen simultaneously in five counties representing 75 hospitals, that for only whites over 50 years of age, we should examine that possibility, and we can using Alameda County Registry for 1960 to 1969.

This argument, incidentally, could only hold true for localized cases. It could not hold true for regional spread or remote spread.

May I have the next slide, please?

This is a three year moving average to eliminate the effect of annual variability, but you can see that there has been no large increase in localized cases. It remains approximately the same percent. There has been a slight decrease in regional cases, and a slight increase in remote cases.

Now, how does this rise in uterine cancer compare to other known cancer trends? One of the most dramatic increases in history of cancer epidemiology in the United States was that seen in lung cancer in males.

May I have the next slide,please?

This is the age-adjusted lung cancer death rates for a long period of time in California, 1920 to 1965, and you can see that the rate approximately doubled from 1930 to 1940, and approximately doubled again from 1940 to 1950, and again from 1950 to 1965. Now, that was death rate, not incidence rate. But, with lung cancer in that time period, the two were approximately equivalent.

Now, the Alameda County Registry was able to observe white male incidence rates over 1960 to 1969 for lung cancer.

The next slide, please.

This is bronchus and lung, over the time period of observation and on a logarithmic scale,it does not look too impressive, but it is still a significant increase. Now,you might compare that to the next slide.

May I have the slide off, please?

Our conclusions are that the increase is in fact real, and that it is due to the relatively recent introduction of some carcinogen or carcinogens into the white affluent postmenopausal females, and that this is probably the most significant increase that the California Tumor Registry has had been able to document. I am available for questions. Thank you.

DR. KING: Are there any questions by any of the members of the committee?

Are there any questions by anyone in the audience?

DR. KUSHNER: I am David H. Kushner, Senior Consultant of Columbia Hospital for Women and Clinical Professor at Georgetown University Medical School.

I am not acquainted with San Francisco, except as a visitor, but I have practiced in Washington all my life, and I agree with you that there are many more cases of adenocarcinoma of the uterus in the white population than in the black population. But, how can you compare that, or how can you not

look for another etiological factor, due to the fact that in Washington, D.C., where we have a very large black population, and a marked increase in the use of estrogen by these black women who are active in the professional, business and cultural activities, and many more black women are taking estrogen now than they took five or eight years ago, and still we have not had an increase? How can you explain that, please?

DR. AUSTIN: Thank you. I think that I should emphasize again that we have no information on the uses of estrogen or any other drug within that population. We are only reporting an increase in the incidence of uterine carcinoma.

MR. MINTZ: I am a reporter for the Washington Post. My name is Martin Mintz. Could you tell us how much the study cost?

DR. AUSTIN: Well, this is not a study in the sense of a funded study. This is a continuing monitoring procedure, which is partially funded by the National Cancer Institute and partially funded by the State of California.

MR. MINTZ: You can give us no dollar figures?

DR. AUSTIN: We have a contract with the National Cancer Institute for slightly less than a million dollars a year to monitor all sites of cancer in the five county area.

MR. MINTZ: Would it be out of order to ask a similar question regarding the first two studies that were reported this morning?

DR. KING: You certainly are free to ask the people who reported that at your leisure after this session.

MR. MINTZ: After this session? I have a reason for asking, which I think is of interest.

DR. KING: Please ask. Are the speakers here?

MR. MINTZ: Dr. Finkle?

DR. FINKLE: $1,900.

MR. MINTZ: And could the author of the other study?

DR. SMITH: I am not sure we could make a very accurate estimate, because of the time factor, but I would say the actual dollar amount is probably less than $1,000.

MR. MINTZ: Less than $1,000. I would like to ask if there is a representative of Ayerst Laboratories here who might tell us why they did not undertake these studies? Is there anyone here from Ayerst Laboratories? Are they not interested in this subject?

DR. KING: Thank you very much. Next questioner, please.

DR. SILVERBERG: It appears in your study that you are equating the age of 50 with the menopause. Is that true? It seems to me, we did a study in 1972, and noticed that one of the things about certain histologic types of endometrial carcinoma is that they seem to occur in women who are older than 50 but still premenopausal, in other words, women who are having late menopause, which again appears to be a feature of our society in recent years.

Now, are you equating age 50 with menopause, or do you actually know that the women whom you are talking about are indeed post menopausal.

DR. AUSTIN: No, I equated it only in a conversational way, not in any real scientific way. The fact that we documented an increase in the 50 plus age group.

DR. SILVERBERG: So, many of these women could actually be premenopausal?

DR. AUSTIN: That is possible.

DR. GREENBERG: In presenting your figures, you spent a lot of time giving us details on how you got the data for the numerator. I am a little bit more concerned about the denominator, the population at risk. In order to have the data that you showed by year, you had to have very good estimates of the population by county, by age, by race and by sex. Now, if you underestimated the population because of in-migration, and we all know the bay area is a pretty popular place, your rates are going to be highly inflated if you are using too small a population base.

So, my first question is do you have any assurance your figures on population at risk are correct?

The second one, if I may while I have the microphone, is I am very much concerned that during the last three or four years, with the growth of HMO's and the making available of various medical and health services to groups that ordinarily

did not have them, have we as a result detected more endometrial carcinoma as a result of greater availability of diagnostic services?

DR. AUSTIN: Let me answer your second question first. I believe that we have seen an increase in invasive carcinoma in all three of the general extent of disease categories, and I do not believe that if we were, for example, considering only the remote stages, if we see an increase in that, that these are cancers which would not otherwise have come to light.

Now, regarding your first question, the population estimates for inter-census years are made by the Department of Finance in California, which are age specific and sex and race specific. There is always the chance that they have made a faulty estimate of the population after 1970. However, the population estimates between 1960 and 1970 for Alameda County I think are rather accurate, since we have two census years to measure from. That also showed the increase.

DR. PRENTICE: This is really a comment instead of a question. Dr. Noel Weiss, who is an epidemiologist in our group in Seattle, has recently looked at the endometrial cancer rates in 1974 for the six county area of about 2,000,000 population around Seattle, and noted about twice as many endometrial cancers as one would have expected on the basis of the third National Cancer Survey.

DR. KING: Thank you very much. Thank you very much,

Dr. Austin. The next presentation will be by Dr. Thomas Mack, the subject Conjugated Estrogen and Endometrial Carcinomas in a Retirement Community. Dr. Mack is Director of Cancer Surveillance at the University of Southern California, Los Angeles. Dr. Mack.

DR. MACK: Mr. Chairman, I have a fair amount of information to present, do you prefer about 20 minutes? If so, I will sort of gloss over the details, and leave it for questions.

DR. KING: I appreciate it. No more than 20 minutes. Ideally, 15 minutes.

DR. MACK: Our studies were conducted in a large retirement community in southern California, which had several advantages for purposes of epidemiological research. One is that it is a retirement community and people have a mean age of about 70 years of age. The second is that it is a closed community and a single health facility is available to the residents of the community, which means that it is relatively easy to ascertain the health status of people as they populate in units.

Since 1971, we have been gathering information on all incident cases of cancer in this particular community, which numbers now about 18,000 people. We have in the course of time gathered information up to middle November of 1975 on 65 cases of endometrial cancer, of which one represented a case which was metastatic from another site, and one other was in a lady who had recently moved in and was not on the population list, the registry list of the community.

For each of these cases of endometrial cancer, we selected four controls, very carefully matched on date of moving into the community and within individual year of age. Then, we abstracted each health facility chart of the 63 cases and four controls for each case, looking for any mention of estrogen use or any mention of a number of other drugs used, and for a variety of individual and medical and other conditions.

In addition to abstracting each available chart, we requested permission from the individuals for an interview and attempted to interview each of the individual patients and controls, getting information on the same conditions and drug use patterns.

Finally, we got access to the pharmacy records of the local pharmacy, which was a preponderant source of prescriptions, although not the exclusive source of prescriptions to the community. We evaluated all estrogen prescriptions written and filled at that pharmacy in the ten years prior to the study, 1964 on through 1965.

We put together all these sources of information, classified the individual drugs, and that is basically the information I am going to present.

Actually, I have some slides, and it might well be worthwhile to put them up. I was not going to, but I think I will.

My apologies for not giving them to you before.

All right, here is the summarized information and most important. We actually analyzed the study, first of all, as though it was a separate study based on the individual source of information. If one looked at the relative risk for previous past conjugated estrogen use, and I might add all use, all mention of use, and all other drug use and conditions mentioned within the six months prior to the diagnosis in the case were excluded. This represents only prior to six months before diagnosis in the case.

If only the abstracts were used as the source of information, from the 63 cases and 252 controls, the risk ratio was estimated to be 4.1, with a 95 percent confidence limit of 2.2 to 7.7. If only the interview was used, the risk ratio was estimated to be 2.8. If only pharmacy records were used, the risk ratio was estimated to be 2.6. And, if all were pooled, which we believe to be the best estimate of relative risk, it turns out to be 5.6, with confidence limits between 2.8 and 11.3.

We also looked at estrogens other than conjugated estrogens, and to our surprise found that they added somewhat to the relative risk. In fact, within people who also use conjugated estrogens, the relative risk was 2.5; and in people who did not use conjugated estrogens, the relative risk was 11.6.

Among these non-conjugated estrogens that people had taken, the most predominant ones were diethylstilbestrol and ethinyl estradiol. I should point out, however, that the

unknown parenteral injections that people are given were placed in this group, and it is certainly conceivable that esterone had been used as well.

If then we turn to examining all the additional material, using not conjugated estrogens alone but any estrogens, and I might say that I do not know of any individual category in which there is a difference between the two. The relative risks were up for all age groups, and as did the Seattle group, we found a somewhat lower relative risk within obese people alone, and within nulliparous people alone. I might also add that the single condition, as I will point out in a moment, that we found to be of interest was a past history of gall bladder disease. We also examined gall bladder disease in this context and found that it also was markedly reduced. That is to say, the relative risks of estrogens within people with fast gall bladder disease was lower.

People having any of the four conditions had a relative risk of 6.4, and people having none of those risk factors for endometrial cancer, in fact all of the cases had used estrogen, giving an infinite relative risk, but with small numbers.

Next slide, please.

For purposes of looking at the methodology, we examined a number of other drugs, and this list of drugs, the source of the information, again the cases and controls analyzed, the frequency of use in the controls, I might add that if you did not

notice, the frequency use of estrogen was in the ballpark of 50 percent, 40 percent for conjugated estrogen and 50 percent for any estrogens.

To make a long story short, we found no other significant risk ratios among all of the other drugs analyzed, including those which might be used or might be associated with frequent visits to physicians in general.

As we had found in prior studies, rauwolfia and barbiturates were the best markers of high social and economic class in the sense of access to physicians. Parenthetically, analyzing use of any non-estrogen drug, the initial risk ratio was 3.9.

Next slide, please.

3.9, which dropped to 1.6 among the users, and was present in very small numbers among the non-users. Again, this simply reiterates what I just said, namely that endometrial cancer is a disease that people with relatively high access to physicians have. If we postulate that estrogens are causal, then this explains it entirely.

As I noted before, gall bladder cancer was the only other risk factor which came out of our study. All of those which had been previously recognized, in fact, did not show up.

Next slide, please.

DR. ORTIZ: Dr. Mack, did you mean to say gall bladder cancer or disease?

DR. MACK: Disease. Did I say cancer? Pardon me.

Now, we in fact did look at the dose and the duration of estrogen routes. These data come from the same series, so individual cells represent small frequencies. But, there is a trend, so I think it is useful information.

This is duration going down here, 1 to 11 months of use; 12 to 59; 60 to 96; and 96 plus. This is mean dose. That means mean pill size over the course of a person's experience with drugs across this margin.

First, let's look at the margins. If one looks at the margins of duration, one finds what seems to be a duration risk effect. That is to say there is an increase in risk with increase in duration of use.

If one looks at this margin by dose, similarly 5.5, 4.5, 9.4. There seems to be a dose response.

If one looks within the body of the table, however, the duration disappears and the dose remains, so that for all of the three long duration use patterns there is in fact a consistent dose response.

We did have pharmacy records which did give the doctors instructions on the prescriptions. That means that the actual amount of information that was useful was relatively small compared to that added to the abstract and to the interview. But, we made an attempt to use it.

The principal features of interest here are the pattern of drug use. This means continuous usage. This means usage

with the two or three day drug free break, and this means a drug free break of four or more days per month. In actual fact, in this particular community, this is usually a weekly interval and this is a monthly interval.

Within the lower drug group particularly, there seemed to be a decrease in the four day interval group, but, of course, this is very small numbers, and I wouldn't place too much faith on it, but it is consistent with the clinicians view that the cells need rest from time to time.

We also attempted to look at the effect of being off the drug for awhile, and in this population as in most, there are not very many women who actually stopped a significant period of years ago. But, for what it is worth, within both of the two dose categories there was somewhat of a decrease if you had been off the drug for two years or more. My actual conclusion is that I am sorry that there was not a greater decrease because there seems to be still some effect of the drug two years after having taken it last.

Next slide, please.

We also looked very carefully at the described pathology of the cases. We did not have the slides reread, but we did examine what we had, and we divided them into the following categories, in situ, localized without myometrial invasion, and myometrial invasion two each of the three thirds of the myometrium, and then direct extension or metastasis.

Again, to make a long story short, the risk ratios for the non-invasive categories are all large, including superficial invasion. But, the risk ratios for the advanced disease is quite substantial.

I might also say that we have no examined this by grade, and looking at grade III lesions only, the risk ratio was 4.0, the risk ratio for others being much higher than that. We also have looked at the ten deaths among the 63 cases, and the risk ratio was 7.0, as opposed to about the same in the survivors.

We have also looked at the pattern of the presenting illness, that is to say the length of time before diagnosis that the woman complained of symptoms. In relation to this particular kind of information, and it is clear as has been suggested before here, those persons having less than one month of symptoms prior to diagnosis had a much higher risk for estrogen, suggesting that the physician was monitoring the lady to whom he was giving estrogens and picking up disease earlier.

It should also be pointed out that the frequency distribution of non-invasive to invasive disease, and in fact also grades I and II to grade III was very representative of most series. In the histology, I believe, it was about 29 percent for grade III.

Next slide, please.

Is that all? I do have two more tables that are not

on slides. The first one attempts to look at the duration of estrogen use versus the pathologic picture of cancer. With the possibility in mind that, since there is a much higher relative risk for non-invasive cancer, there are actually three alternative explanations for that.

One is that tumors are being picked up much quicker in people who are on Premarin. The second explanation is that, as has been suggested also, there is a good deal of pathologic misclassification, and endometrial hyperplasia has accounted for a large part of the mild disease.

The third explanation is that we are in the beginning of the first wave of a very large tide of disease. If that were the case, large numbers of people who have gone on the drug more recently might be showing up with mild diseases at this point in anticipation of people with more severe disease later on.

I am happy to report that there was not too much correlation between the seriousness of the disease and the duration of use, indicating that the last of the three alternatives is less likely, and currently we favor the explanation that clinicians are simply picking up cancer earlier than those people who are on Premarin.

We have made a couple of calculations which might be worthwhile. This community represents about 30,000 person years of women being surveyed for cancer. If one goes through the

calculations, that means about 200 incident cases per 100,000 women years. Now, that is an increase of twofold over the third National Cancer Survey rates for 65 to 74 year old women, peak age specific rates. So, it represents at least a twofold increase.

Now, in matching these cases with controls, we have of course excluded those people who have had hysterectomies, which gave us an estimate of actually what the prevalence of hysterectomy was in the community, and it averaged about 36 percent, being about a 30 percent in 70 plus year olds, and about 45 percent in under 60 year olds.

If one adjusts for that frequency of hysterectomy, the actual rate goes up to 300 per 100,000. One can then by a little mathematical manipulation get some estimate of what the baseline rate in the community would have been without estrogen, if estrogen is causal, and calculate what the actual burden of cancer being added by estrogen is, and if one goes through those calculations, one comes up with a figure of almost 500 per 100,000 per year in women placed on estrogen.

Just to make that figure sink home, that is a larger figure than the baseline risks to the same women of breast, lung, ovary, colon added together.

Similarly, one can go through a little of an iffy calculation to try to estimate whether or not we are in for more disease over the next few years. We obtained some secular trend estrogen use information, which might be better than that usually

available from the people who gather such information for the drug industry, and have tried to come up with a latent period assumption, which would be compatible with information from doctors from San Francisco and the Seattle people, in terms of the actual guesstimate as to what the increase has been.

They estimated that about 1.5 is the factor involved between 1969 and 1973. I am summarizing a whole bunch of different figures, 1.2 to 1.8. But, if you use 1.5, and you take this estrogen use information, which is actually the number of new prescriptions per year sampled from pharmacies in the United States, one finds that you have to come up with something like a four or five year latent period to get the 1.5 to correspond, taking all of the appropriate things into consideration. If that is true, then this year we should be in for a slight decrease actually in the amount of cancer, because the trend is not a smooth one. It has its ups and downs. But, after this year and this year, there should be another upswing. So, if we were to stop estrogens right now, and if they are causal, it may well be that we would still be seeing an increase in carcinoma until 1980.

I think that should be taken with a very large bundle of salt, because it is based on a lot of assumptions. But still the best guess that I could make from the information available is this.

I am ready for questions.

DR. KING: Any questions by any member of the committee? Dr. Segal?

DR. SEGAL: Dr. Mack, I just wanted to clarify one point. You indicated la:e in your presentations that you believe that the higher risk ratio for early stages of the disease is probably due to the fact that clinicians are picking up cancer earlier on patients that are on estrogen. Did I understand you correctly?

But, I assume that you say that, but at the same time feel that there is some evidence for a causal relationship in addition to this phenomena. Is that correct?

DR. MACK: Yes, I think that is very clear. In fact, you will notice that the risk ratio for invasive disease was in the ball park of 4 to 5. And, I might say that even in people picked up late, the risk ratios are high. I think one would have to put all of the cases together to come up with the appropriate figure anyway.

DR. SEGAL: Well, in all of these presentations we have been struck by the problem of the ascertainment bias, and I would like to get your view on that.

DR. MACK: You will have to define ascertainment bias for me.

DR. SEGAL: It is more likely that there would be a diagnosis of endometrial cancer made on infants who are using estrogen because they are bleeding, they contain more, they are

being biopsied more..

DR. MACK: I do not believe they would be more readily picked up. I believe that they were picked up more early. In other words, it is my view that it is only a matter of time in our particular measuring that we do. It is conceivable that they will be picked up a considerable amount earlier, because they are in contact with their physicians on a regular basis, but given a steady state, that is given things progressing as they usually are, there should be delayed ones coming in at the same time among those early ones.

Now, in relation to the actual carcinogenic event, it is late, but over time they should be coming in. So, I really do not think that offers an explanation for the doubt.

I might just make another comment or two about completeness of the case count, because questions have been raised about that in connection with the other studies.

We actually collected cases not only from the medical facilities and from the adjacent hospitals of any size, but we also collected all Orange and Los Angeles County death certificates, and we have an ongoing surveillance program in Los Angeles County that picks up all cases from all hopitals in Los Angeles County. So, I think that there is very little possibility that anybody would have escaped our net.

DR. KING: Any other questions by the committee? Any questions by anyone in the audience?

DR. MACK: Shall I answer it before you get to the microphone?

MS. GREENBERGER: Yes.

DR. MACK: Okay, our study was initiated because of the reports about anecdotes about cancer in people taking diethylstilbestrol, who had gonadal disgenesis, by our feeling.

Let me make another comment. I am glad you came up. We also have an estimate for current incidence in the Los Angeles County area. That estimate is about 1 1/2 times the third National Cancer Survey estimate for risk for 70 year old white women.

I might just note, though, that our rates among blacks in Los Angeles are almost twice those of the third National Cancer Survey estimates among blacks. Now, it is not completely fair to compare them, because those included a lot of southern blacks. But, in general patterns of disease in western blacks are closer to southern blacks than are northern blacks. So, I think it is an indication that there is an increase in endometrial cancer among blacks.

In short, there was no governmental request. It was strictly scientific suggestion.

MS. GREENBERGER: Thank you.

DR. MACK: A couple of thousand dollars.

MR. MINTZ: Thank you.

(Laughter.)

I have another question, but thank you anyway. I would like to ask you to give me your opinion of something that I would like to read to you, and I would like to identify the source first.

The source is a booklet called the Female Climacteric, a discussion by Robert W. Kissinger, M.D., Assistant Professor of Ob-Gyn at Harvard. It is put out by Ayerst Laboratories, and the 1973 version contains in the back the complete text of the package circular which makes reference to the possibility of vaginal carcinoma occurring in the offspring of women who got DES.

The tape, which I have here in my pocket of this, does not of course contain the package labeling. Dr. Kissinger says at the end, in response to this question, and I reach my question immediately after I read this, do your patients have fear of cancer in connection with this therapy?

Dr. Kissinger: "Well, I do not have many patients with such fears. When they do, I assure them that there is no scientific evidence that estrogen causes cancer of the breast or endometrium or any other organ in the human female. I point out that all of the studies that have been done are based on animal investigation, using very large dosages of estrogen in cancer susceptible animals. I add that these data cannot be transfered to the human female, and that numerous observations of patients treated with estrogen for prolonged periods of time

show a lower incidence of both mammary and endometrial cancer than one might expect on the basis of chance alone.

My question is, first, would you evaluate this advice and information in the light of current knowledge, and would you tell me if you know of any solid evidence to show a lower incidence of endometrial cancer than one might expect on the basis of chance alone? Thank you.

DR. MACK: That is a rather large order. When was the date of that advice?

DR. KING: 1973.

DR. MACK: I think his statement that most of the evidence was animal evidence was certainly true. I think the presence of studies which showed, if anything, a lower incidence of carcinoma in populations having been on estrogens was an accurate observation, but in studies which were not very carefully done and did not advertise themselves as being carefully done with respect to endometrial cancer, specifically because of the problem of past hysterectomy. I think his statement has to be taken with a grain of salt, that here is a physician in one specialty evaluating information from another specialty, and I think probably he would concur with that.

DR. KING: Thank you very much. At this point in time, we will have a ten minute break and reconvene at 11:00 o'clock.

(Brief recess.)

DR. KING: Let us come to order. The next presentation will be given by Dr. Steven Silverberg, entitled Endometrial Carcinoma in Young Women Taking Oral Contraceptive Agents. Dr. Silverberg is from the University of Colorado Medical School, Denver, Colorado.

DR. SILVERBERG: (This presentation is based on the first 21 cases recorded in the Registry for Endometrial Carcinoma in Young Women Taking Oral Contraceptive Agents. The first slide shows the histologic classification of the 21 tumors. The prominent secretory pattern in many of these cases) is probably related to the progestational content of the oral contraceptive agents being taken.

The next slide, please.

This shows the examination of the hysterectomy specimen in those cases in which we had hysterectomies. And, you will notice again that in the great majority of cases, either there was no residual tumor, as seen in six cases here, or tumor limited to the endometrium, as seen in another 11 cases.

Myometrial invasion was present in only one case and extension beyond the uterus was present only in one case. So, again as would befit the histologic types, these seem to be, if you will early carcinomas or carcinomas that have not displayed a great deal of invasiveness.

Again, this is what we expect or what has been reported in the literature in patients under 40 years of age. I might

mention parenthetically that literature review shows that this age group comprises about 2.5 percent of all endometrial cancer patients. So, it is a very small age group, and certainly one in which one does not expect a very high incidence of endometrial carcinoma, and it is one in which the majority of the tumors in the literature, and in the series which we have reviewed ourselves of patients not on oral contraceptives but under 40 years of age, in which these tumors have been predominantly well differentiated, predominantly non-invasive or only focally invasive tumors.

The next slide, please.

As one would expect, these patients do have a very good prognosis and thus far, although our follow-up period is very short, we have only one patient out of the 27 that we have now reviewed who has died of endometrial cancer, since the great majority of the other cases are non-invasive tumors and well differentiated. We do not expect to see many more deaths.

One of the things that we felt as we did this study was that in some of these patients, the relationship between the oral contraceptive agents and the development of carcinoma was very tenuous indeed. Because of this, we decided to eliminate from the major group patients with poor history, which means those patients who were taking oral contraceptives for less than one year before the diagnosis of endometrial carcinoma.

Number 2, patients who received oral contraceptive

therapy for bleeding, by this I mean rather than the oral contra-ceptives being instituted purely for contraceptive purposes. They were instituted in these patients, because the patients came in with a history of abnormal bleeding. In other words, she may have already nad carcinoma at the time when she was first seen by the physician who started the oral contraceptive agents.

Finally, some of these patients had polycystic ovaries, and it is well known that in the under 40 age group, polycystic ovarian disease is a significant precursor of endometrial cancer. As a matter of fact, in the literature, approximately 50 percent of all endometrial cancers occurring in women under 40 years of age have occurred on a background of polycystic ovarian disease.

These three indications, thus, allowed us to set up a separate group. The other patients on the lower line on this table represent patients who have none of these above findings. This again represents the earlier series, and I can update this to the current number of patients. If you will read the first line across as now reading 2, 6 and 1. In other words, out of these patients on the upper line, two of the nine patients that we have were predominantly or exclusively taking sequential agents, six were taking combined agents, and in one there was a history of four different oral contraceptive agents adminis-tered over a two year period, and neither the patient nor anyone else we could contact remembered exactly what they were, except

for the fact that they were some sort of oral contraceptive.

On the other hand, in the patients who did not have any of these findings that we have mentioned, the results are very different, and we now have 17 patients in this category. 15 of them have taken predominantly or exclusively sequential agents, and only 2 have taken combined agents.

This figure is almost exactly the opposite -- it is about somewhere between 85 and 90 percent of these patients on sequentials -- and in the population of the United States as a whole over 90 percent of people are on combined agents. So, if this were entirely a chance association, one would expect that these figures would read exactly the opposite. The two would be here, and the 15 in the more updated series would be in the other column.

The next slide, please.

The next slide is not going to be readable in the back, but just reviews for those who are not familiar, the mechanisms of sequential and combined oral contraception agents. In the combined regimen, essentially, a pill consisting of both estrogen and progesterone is given throughout the cycle.

In these cycles, as they are followed histologically by people who have studied this, usually there is very little gland development. In other words, a very shortened proliferative phase, similarly a foreshortened secretory phase and a rather extensive, a rather prolonged regressive phase at the

end of each cyce.

With sequential agents, on the other hand, the first 14 pills are composed of estrogen alone, and only after this is a series of pills given, which contain both estrogen and progesterone. Again, in people who have analyzed series of patients taking sequential agents, the glands develop in a normal or even a hyperplastic proliferative phase under this regimen, whereas the secretory phase is generally foreshortened.

Thus, on a theoretical basis, the difference between the sequentials and the combineds is essentially that in sequential agents unopposed estrogen is administered for the first half of the cycle, whereas with combined agents estrogen and progesterone are administered throughout.

The conclusions that we can make are really somewhat limited, but certainly we know that there appears to be in women who are taking oral contraceptives and who develop endometrial cancer, there appears to be a markedly increased incidence of sequential therapy in this population.

Conclusions are essentially one of two, either sequential agents are causing or somehow contributing to the development of endometrial carcinoma, or the opposite conclusion is that combined agents may be protecting against the development of endometrial carcinoma. Thus, what we are seeing may be the incidence that we would expect in any women not taking oral contraceptive agents, showing up, however, only in those who

are taking sequentials.

To answer which of these is the correct interpretation we need population studies, as I mentioned. We need to compare larger numbers of patients on oral contraceptives with larger numbers of patients who are not taking oral contraceptives.

Thus far, we have made some beginning at the latter part of this project. We have looked at a series, a small series of patients in this age group not receiving oral contraceptives. We have also analyzed these data from the literature, and we suspect that there may be, indeed, some real differences.

For example, the incidence of nulliparity in patients not taking oral contraceptives is as you would imagine quite high, about 50 percent. In patients on sequential agents, in which we have this history available, the incidence of nullipa-rity thus far is two of the eleven patients that we have this data on. And in patients predominantly on combined regimen, the incidence of nulliparity was five of eight.

So, although these figures are certainly too small to be significant, certainly it seems to be the sequentials that may be somewhat different.

Similarly, in the incidence of polycystic ovaries, 50 percent in the literature, four of nine of our patients who are on combined agents, and only one of 12 of those on sequential agents had polycystic ovaries demonstrated and reviewed histo-logically at the time of hysterectomy.

Thus, we believe that there may be some differences in the populations between patients on sequential regimen, patients with endometrial cancer on combined regimen, and young patients with endometrial cancer on no oral contraceptives whatsoever.

We think that certainly larger numbers of cases need to be reviewed, and certainly a population based study to determine exactly what the incidence of oral contraceptive usage is in these young patients developing endometrial cancer needs to be undertaken. Thank you.

DR. KING: Does the committee have any questions that they would like to direct to Dr. Silverberg? Are there any questions from anyone in the audience?

MS. GREENBERGER: Dr. Silverberg, I know you have answered one of the questions I have been asking everyone who responded, but I have another one that I would like to ask you.

In your presentation you listed a variety of questions that should be answered, some of which you are hoping to address yourself. I am wondering whether you know if any other group who are physicians or scientists or researchers, et cetera, around the country are beginning to study these questions and whether manufacturers of the contraceptives in question have approached you or others to develop such studies.

DR. SILVERBERG: The answer to both of those questions I think is yes. I think several other physicians have become

interested in this problem in very recent years. There was a publication the month before ours appeared by Dr. Lyon in Minneapolis. There is also a group in Houston that is investigating this problem.

The answer to the second part of the question is also yes, and we have found that several of the drug manufacturers have been concerned, have contacted us, and have volunteered to help us if we want to expand this study in certain ways.

MS. GREENBERGER: Thank you.

DR. GRIGGS: In your paper, you had mentioned that seven of the patients in your group of 21 had discontinued the drug from periods of eight months to six years prior to having been reported. Do you have any idea of what the bleeding patterns were of these patients after discontinuing the oral contraceptives?

DR. SILVERBERG: Not off hand, no.

MR. NEAL: My name is David Neal and I represent my deceased daughter, Janet. I just wonder, Doctor, if you have given any consideration to the young women who are on these pills while you are continuing your studies. To go a step beyond that, whether you have any consideration to discontinuing the general use of these lethal drugs to the general population while your studies are continuing.

DR. SILVERBERG: Certainly, I am not in a position to continue or discontinue the use of these drugs in the general

population, nor in any women since I am not a clinician. I am a pathologist. Certainly, thus far, I do not think that the evidence is adequate to make the statement that these are lethal drugs, however.

DR. KING: Thank you very much, Dr. Silverberg. Before we go on to the next speaker, Dr. Segal, do you have a question.

DR. SEGAL: I wonder whether you have either asked the previous speakers or have analyzed their papers to determine whether in the case control studies that they have done there was any evidence of the women with carcinoma of the endometrium in the younger age groups having some correlation with oral contraceptives.

DR. SILVERBERG: No, I have not yet asked, and certainly in the papers that I have read, this information did not appear.

MS. LEE: My name is Fran Lee. I am a consumer editor and a medical researcher, and I am here to speak on behalf of estrogen. I never thought I would be up at this end of the mike.

DR. KING: Do you have a question?

MS. LEE: My question is are you going to throw out the baby with the water? Do you know what it is to be menopausal? Do you know what it is to be on the point of a breakdown? I am here to speak on behalf of thousands of women who have been saved and are back in the stream of life as a result of estrogen.

DR. KING: Thank you very much for your comment.

MS. LEE: I would like to continue later. I cancelled a plane flight so that I could come here to see that silliness does not come about.

DR. KING: Very good. The questions that will be directed to the speakers will pertain to the presentations that they have made. Thank you. Thank you, Dr. Silverberg.

Before we go on to the next speaker, I would like to make certain of making this announcement. The folders that many of you have found inside the door on the desk have been prepared by the speakers who have served as consultants for the Ayerst Company, and that material is not being distributed by the Food and Drug Administration.

The next speaker is Dr. John Annegers of the Mayo Clinic to speak on the incidence of endometrial carcinoma in Olmstead County in Minnesota, 1935-1975.

DR. ANNEGERS: We became aware of this question about the middle of the summer and began an initial study to determine the incidence rates of endometrial cancer among the resident population of Olmstead County, Minnesota.

The medical record resources of the Rochester Project of the Mayo Clinic were utilized to identify the cases of endometrial cancer which have occurred in the resident population of Olmstead County during the four decades from 1935 to 1974. A total of 176 cases met the residency and diagnostic criteria

The age adjusted incidence rate for the entire period was 15.5, which is slightly lower than the Connecticut rates for the same period of time. This is age adjusted to the U.S. 1950 population.

The age specific rates follow the expected trend of rising rapidly around 50 years of age and remaining stable at about 60 per 100,000 in subsequent age groups. It must be strongly emphasized that the rate is based on the total female population and not those at risks for developing endometrial cancer. The incidence rate among the population at risk could be determined only if the age specific prevalence rates of intact uteri were known.

For example, if a third of the population had had a hysterectomy, the actual incidence rate would be 50 percent higher than the quoted, while if half of the population were not at risk, the rate would be doubled.

We are now considering an incidence study of hysterectomies among Olmstead County residents during the past 40 or more years.

The number of cases for the successive decades in the period of the study were 22, 43, 56 and 55. The age adjusted rates for the corresponding decades were 11.7, 18.3, 17.9 and 13.9 respectively, if the total population is used as a denominator. Thus, we do not show any trend as far as the pattern of the incidence of endometrial cancer in Olmstead County, Minnesota.

At this time, we do not know the pattern of estrogen usage, and particularly Premarin usage for menopause among this population. Until the proper studies are carried out, we are not in a position to comment on the possible association between Premarin and endometrial cancer in this population.

There may have also been changes in the impact of other risk factors on the Olmstead County incidence rates. The association between estrogen usage and endometrial cancer could be examined through a case control study of the 176 cases. We are also contemplating a study in which a cohort of women with menopausal symptoms diagnosed from 1945 through 1974 will be identified.

Data on the usage of estrogens, as well as other suspected risk factors will be collected. The cohort will then be followed to determine if estrogen therapy is associated with elevated incidence of endometrial cancer. The study would also assist in answering other questions regarding estrogen treatment such as the occurrence of other malignancies, ischemic heart disease and fractures in the treated and untreated groups. Thank you.

DR. KING: Does the committee have any questions that they would like to direct to Dr. Annegers? Are there any questions from any one in the audience directed toward Dr. Annegers? Thank you very much, Dr. Annegers.

The next presentation will be given by Dr. Bernard

Greenberg, University of North Carolina, speaking to the discussion of retrospective studies on endometrial carcinoma.

DR. GREENBERG: Mr. Chairman, members of the Advisory Committee, and general audience, I was interested in the material presented this morning, because all of the results purporting to link estrogens with endometrial carcinoma were based upon retrospective studies, and what I would like to do is to point out some of the difficulties involved in retrospective studies, and also indicate why one must be extremely cautious in jumping to any conclusions with regard to the possible cause and effect relationship.

If we are interested in establishing a cause and effect relationship between some factor and disease, ordinarily, when we can, we do a controlled clinical trial.

May I have the first transparency, please?

In a controlled clinical trial we start out with N individuals, and a plus b of them are assigned to the particular factor under study, and c plus d of these individuals are assigned at random to be a group not under factor F.

Now, both of these groups are studied prospectively in time to observe what proportion of a plus b developed cases of the disease, and let us say that is a, so that the attack rate, as shown in the last column, would be a over a plus b. That would be rate number 1.

Similarly, those who were not put on factor F, c plus

d of them, c of them will develop cases of the disease, and they will have an attack rate $R_2$, which is c/c plus d.

Now, if one wanted to measure the true relative risks, and I say true relative risk in comparison to the relative risk as estimated from retrospective studies, it is simply the ratio of $R_1/R_2$, which are the figures shown as indicated.

If one wants to get a little more statistical, he can put confidence limits around this true relative risk, and I have indicated two references that can be found to be used to put confidence limits around this true relative risk.

Next transparancy.

Now, sometimes, we cannot do a controlled clinical trial, because the factor we are talking about may be a very harmful agent such as irradiation. It may be a factor which is one such as rubella during pregnancy. You cannot ethically and morally expose a group of subjects to the agent. So, you cannot do a controlled clinical trial.

Similarly, sometimes a disease is such, such as cancer, when you also cannot do a controlled clinical trial, because it may take 20 or 30 years before the disease will develop. Therefore, in order to overcome this limit, as far as controlled clinical trials are concerned, we usually turn to one or two or three other methods of trying to ascertain the relationship between some Factor F and its possible relationship to a disease.

One of these, of course, is to do in vitro and animal

studies. The problem there is, of course, trying to translate this to humans, if you establish a dose relationship even among primates, whether this applies to man is unknown. Another kind of study, which is sometimes used is an accidental exposure, such as in irradiation or air pollution. We try to take advantage of accidental exposures.

A third technique is to do a retrospective study such as the kind we have had reported this morning. Now, a retrospective study is very different philosophically from the controlled clinical trial. First of all, we take a sample of cases of the disease. We have a plus c cases of the disease who are selected, and among that group we try to find out what proportion of them have had a history of factor F, and that turns out to be a. So, we divide a over a plus c, and we get that proportion, and in the Ziel and Finkle study in Los Angeles that was 57 percent.

We then take a comparison group of persons, and these are not controls mind you. A control should only be used when you are dealing with a clinical trial. This is a comparison group of persons, b plus d of them. They may be well persons. They may be hospitalized persons. They may be persons ill with some disease other than the disease in question.

We take b plus d of them, and find out how many of them have this factor F, b, and we divide b by b plus d, and we get this ratio down here.

Based upon these two proportions then, we calculate

a relative risk, and that is what has been presented to us this morning, a relative risk, not the true relative risk, an estimate of it, and there are several ways of doing it. One is by Jerome Cornfield, and it is simply to take ad/bc. Another one is by Olli Miettinen, which is the one used incidentally in the Los Angeles study, because there they actually matched the comparison group to the cases observed by two or three characteristics.

Now, the retrospective study is fine as a device when you cannot do a controlled clinical trial, but it is exceedingly important that we understand the assumptions that go into the retrospective study, and what its philosophy is based upon.

May I have the next transparency?

At the top of this are simply different ways of calculating the relative risk. I have shown the Cornfield method. It gives you 7.40. The Miettinen method gives 7.59 or 7.6, as reported by the authors. And, if one wants to put confidence limits around that relative risk, there are at least a half a dozen different methods in the statistical literature that can be used to do so.

Now, the problem with the retrospective study is that too often persons fail to realize that in designing these relative risk methods there were four assumptions made by the authors, and I have listed these four assumptions because these assumptions are not always, and in fact are rarely fulfilled.

The first assumption is that the sample of observed

cases is assumed to be representative of all cases of the disease. Second, the sample of comparison individuals is assumed to be representative of all possible non-cases. The third, that factor F may not be a true causal factor, but only highly associated with another factor G, which may be the true cause of the disease. The assumption implied here is that the two groups differ only in factor F. Fourth, the rate occurrence of the disease is assumed to be small in magnitude.

Let me take these four assumptions and show you whether they are fulfilled or not in the two studies that we had reported this morning.

May I have the lights, please.

The first one I will dispose of was that last assumption, assumption number 4, in which it was said that the rate of disease is very small. This is really not much of a problem, because in this particular disease we are talking about endometrial carcinoma. The rate is about 20 per 100,000 for all ages, and even if you are talking about women over 50 the rate is only 60 per 100,000, that is, it is .0006, a number less than one in a thousand.

Now, the first problem that comes about is with assumption number 1. That was the assumption that the sample of cases was representative of all cases of the disease. No one would argue that the endometrial carcinoma cases in the Los Angeles and Seattle areas are representative of all cases of that disease

in the United States or the world. This would not be too important if there was no special selection in the cases used in the study reported. The word that was used by Dr. Segal this morning was ascertainment.

Now, in the study by Ziel and Finkle, and I will quote, the authors reported the vast majority of cases are reported to the Cancer Registry. Now, when I asked Dr. Finkle this morning whether that was true or not, he said, no. He said they took all of the cases reported in the Cancer Registry.

Well, there is obviously a discrepancy between what he told me to that question and what is in the article.

Secondly, the diagnosis of endometrial carcinoma was accepted at face value from the Cancer Registry, whether the person was reported to have had an adenocarcinoma or adenoacanthoma. There is no data provided on who did the diagnosis, what pathologist confirmed it, where, how and when. The data from the Cancer Registry were accepted at face value.

This again makes me wonder how true the 94 cases really were.

The second assumption that I had listed on the board, on the transparency, was that the comparison cases are representative of all persons who do not have the disease, the disease in this case being endometrial carcinoma. Here a very difficult philosophical question arises. How does one choose a comparison group? In the case of a disease such as endometrial carcinoma,

should the comparison group consist of well persons, hospitalized persons with non-cancerous diseases, hospitalized patients with breast cancer, ovarian tumors, vulvar carcinoma or cervical cancer who are hospitalized at the same time as the endometrial carcinoma patients?

Now, many studies have shown that the choice of the comparison group will determine almost as a function, almost exactly the magnitude of the relative risk. For example, in the Los Angeles study, they ended up with 7.6. In the Smith study, they had three different kinds of tumor, cervical cancer, vulvar cancer and ovarian cancer, and they used two different hospitals. Their relative risk in one hospital ranged from 1.5 to 7.8, and in the other hospital it ranged from .6, that is less than 1.0, up to 3.4. So, the two studies obviously do not end up with anything near the same relative risk, because they are choosing a different group of comparison cases.

In fact, the Seattle group show that the relative risk will also vary according to the year of diagnosis, the age of diagnosis, the socio-economic status and many other factors.

Therefore, because there is this doubt as to what is an appropriate comparison group, most epidemiologists recommend the use of several comparison groups.

There are other problems with respect to the representativeness of this comparison group. For example, the comparison group was probably selected, if I understand the study, in 1975;

when the medical records clerk requested the files of the patient and the two compeers, the two comparison individuals. This means that the compeers were still alive in 1975. Yet many of the patients in the patient group may have already died because the diagnosis was made as early as 1970.

Hence, the comparison groups should, by the method of ascertainment, automatically be a healthier group of women. Also, we do not know how many individuals were selected and rejected because they did not have an intact uterus. In other words, how did they go about selecting this comparison group?

The article should report the numbers that were rejected as comparisons. For example, they pointed out 1/3 of the women do not have an intact uterus. I would like to see if that is what they found out when they checked the records. Did they really reject 1/3 of the women because they did not have an intact uterus.

The comparison group was selected by matching for age, residential zone by the Zip Code, and duration of membership in the Kaiser Permanente Health Plan. Other studies have shown age at menopause, parity to be important predisposing factors, and perhaps these are more important than the ones that they used to match. Also, race, socio-economic status and all the other predisposing factors we know about it need to be considered.

The choice of the comparison group also can affect

rate of false negatives. If in the method selected, for example, a group with a high proportion of women not on estrogen may have a high rate of false negatives at the time of the reference date that they chose, because such women are obtaining less frequent observations by their physicians for various female abnormalities.

This uncertainty about the ideal comparison group leads epidemiologists, as I pointed out, to recommend that many ways of selecting comparison groups be used in order to rule out any potential bias.

Now, the third assumption was the one that the two groups differed only in factor F, that there was no underlying factor which was correlated with both of these. Now, this is undoubtedly the most serious problem facing us, and it can cause more problems in inference than anything else.

Simply because a factor is more highly associated with diseased patients than with noncases of the disease does not establish a causal relationship. The factor involved, say intake of conjugated estrogen, may be associated with another factor which is the true or more direct cause of the disease in question.

We sometimes try to eliminate some of these associated variables by matching the comparison group for age, sex, race, socio-economic status, place of residence, time of diagnosis, weight, parity, hypertension, or any other factor known to be predisposing.

But, even when we do so, there is always the remaining uncertainty that some underlying condition that causes the disease influences to some extent the use of this particular factor F. For instance, let us take the lung cancer and cigarette smoking case. Do high strung persons tend to develop lung cancer more frequently, and do they also smoke more cigarettes? They smoke more cigarettes to relieve their anxiety, and maybe this is what is causing their lung cancer rather than the cigarette smoking. I throw that out just as food for thought.

Now, the study in Los Angeles matched the comparison group by age, area of residence and duration of membership in the health plan. They investigated the confounding effect of nulliparous women versus parous women, and found a confounding effect of four percent. They also found a confounding effect of weight or obesity, and they also found a confounding effect for age at menopause.

However, from my point of view, looking at these three independently and separately is fine, except that it doesn't go far enough. They examined the confounding effects of parity, obesity and age of menopause separately and individually. Unfortunately, this is not how these factors operate in life.

The interaction or synergism of these factors may be much more important, and matching for them may have been a better way of controlling them, then by measuring this confounding factor.

Finally, the major confounding factor the authors may be overlooking is the reason why the women may be taking the estrogen in the first place. Were the women on estrogen a group of persons who were already in trouble with an inadequate amount of female hormones or other menstrual problems, and placed on therapy for that reason.

If so, was their original diagnosis the fact that caused the endometrial carcinoma rather than the estrogens themselves. We do not know the answer to this.

Now, the authors tend to try to answer this question by looking at the increased rate of endometrial carcinoma in the Seattle and Los Angeles areas, and I am not going to go into the details of how I disagree with their analysis. There will be another speaker, Dr. Cramer, who will devote himself to that aspect.

Now, because of these problems that we have with these three assumptions in retrospective studies, epidemiologists recommend two approaches to try and rule out a miscellaneous or extraneous factor. One of them is to replicate the studies in different centers with differing comparison groups. The second is to attempt to strengthen the hypothesis by looking for dosage response curves, dosage response relationships, or time response relationships.

Now, what do I mean by a dosage response relationship? Well, for instance, persons who smoke two packs of cigarettes a

day have a higher relative risk than those who smoke only one pack a day, and the latter in turn have a higher relative risk than those who smoke only a half a pack a day. That would be an example of a dosage response relationship.

Now, the Los Angeles office looked for a dosage response relationship and claimed that persons on estrogen for seven or more years have a higher relative risk. Unfortunately, the method they used to ascertain duration of therapy, as explained in the footnote in their table 2, is open to serious question and bias. Let me give you some of the reasons why.

First of all, the authors instructed the abstracters to measure the difference in time between the first recorded prescription for estrogen and the time of the latest prescription up to one year before onset of the disease. In that case, the duration that they are reporting in their paper is systematically underestimated by one year, because they stopped at the reference date, yet the case occurred one year later. Therefore, if the prescription went up to the last date, they obviously were at least one year under in terms of the duration of therapy.

Secondly, this method of calculating duration of therapy assumes the women stopped taking the estrogens on the date of the latest prescription. Now, the women may have continued to take the estrogens for years after the latest prescription, especially if the prescription was renewable.

Thirdly, no attempt was made in this study in Los

85

Angeles to ascertain the validity of these data by interviewing the women, or the comparison women, to find out if they took the drug. We know that there is not complete compliance, and they are simply taking at face value what was written in the chart that estrogens were prescribed. They have no basis for knowing whether the women actually took the drug.

Finally, no attempt was made to ascertain the dosage schedule, whether the patient was on the drug continuously, or whether a progestin was prescribed periodically.

Now, there are some statistical aspects of the study. I will not go into that, in order to save time.

Let me summarize my conclusions based upon what I feel are defects in these retrospective studies. I feel it would be premature to impose any ban -- and this may help the woman who couldn't get her say in at the end a few minutes ago -- it would be premature to impose any ban or restriction on the use of estrogen therapy at this time. Obviously, the millions of women using this drug derive considerable medical benefit from it in the way of controlling weight, decreasing the thinning out of bone tissue, slowing down the processes of aging, perhaps prevention of heart attacks, and a general feeling of well being.

We must avoid repeating what happened in New York State in the early 1950's, when antigen inocculations were suspected of having a provoking effect on poliomyelitis. Suspension of inocculations during the three or four summer months

when poliomyelitis was at a peak was attempted one year in New York State and the rise in cases of diphtheria and whooping cough were a greater loss than the few cases of poliomyelitis that were prevented.

As the Los Angeles authors themselves point out, the risk ratios for valium, reserpine and thyroid drugs were less than unity. That would mean a protective effect from estrogen against the diseases for which those three drugs are prescribed.

What I think is needed now are more epidemiological studies designed more validly than the previous two, using other groups of cases as well as other comparison individuals. I would especially like to see a comparison group of breast cancers.

Furthermore, one must examine the question of dosage schedule, duration of therapy, and the conjoint use of progestins. It may very well be that the use of estrogens should be recommended in conjunction with the periodic use of a progestin added to counteract any proliferation of the endometrium.

Similarly, we should learn more about restrictions on duration of therapy, dosage, age of patient when the dosage may be most dangerous, and other factors in the patient that may be contraindications for such therapy.

Any rash action at this point will cause more harm than the possible gain, especially where the annual incidence of endometrial carcinoma is only 20 per 100,000 on an age-adusted basis.

Even among women 50 years of age and older the annual incidence rate is only 60 cases per 100,000. If estrogens were to prevent as little as ten percent of cardiovascular problems among women 50 years of age and older, the overwhelming magnitude of cardiovascular disease makes the benefits far outweigh any possible disadvantages with respect to endometrial carcinoma -- a disadvantage which as far as I am concerned is far from proved at this time. Thank you.

DR. KING: Any questions from the committee?

DR. SEGAL: A very interesting and illuminating analysis of the methodological problems. You ended by drawing attention to the risk/benefit issue, and forgive me if I am blunt with this, but it seems to me that since you have raised this question, I have to ask you whether you are satisfied with the statistical design of all those studies on the estrogens that you are referring to, showing the benefits that you referred to?

DR. GREENBERG: Shelly, I do not know all of the studies you are referring to. I do know that in the current issue of the Archives of Medicine, and I think it is in this month's issue, there is an article showing the beneficial effect of estrogens on osteoporosis.

I am sure that there are similar studies, and perhaps some of the speakers who will follow me will talk about some of these benefits on controlling weight, and controlling hypertension

and many of the other presumed benefits, and we heard a lovely testimony from the lady in the back who did not get her two cents in, and there are millions of women who obviously get some medical benefit from it, or else they would not be taking this drug.

DR. SEGAL: Well, really, just on that one study you referred to, since you have seen that one, was that designed well, that one on osteoporosis? Can we say now that we are satisfied that it is established with sufficient valid data that estrogens are beneficial for osteoporosis?

DR. GREENBERG: Shelly, on that one I am going to have to plead that I am not completely familiar with the article. I simply read the summary of it. So, I cannot answer your question.

DR. KING: Any other questions from the committee? Are there any questions from anyone in the audience?

Just one minute. Dr. Ortiz?

DR. ORTIZ: Those benefits that Dr. Segal pointed out are not in the approved labelling for the drug.

DR. STADEL: I am Bruce Stadel from NIH. When you were discussing confounding, you said that one possible unanalyzed confounding variable was that women who take estrogens might have an underlying hypoestrogenic state, which would predispose them to take estrogens and conceivably predispose them to develop endometrial carcinoma.

It seems to me that the concept of a hypoestrogenic

state predisposing to endometrial carcinoma runs counter to all of the existing investigations of endometrial carcinoma.

DR. GREENBERG: There are many reasons why the estrogens are prescribed. That might be one of them. That is, a low level of endogenous estrogen, but other questions are vaginal bleeding and other reasons why estrogens are prescribed, and it may be any of these other factors that may be causing the endometrial carcinoma.

DR. STADEL: But, am I correct in understanding that you do not feel that a hypoestrogenic state could confound in this sense?

DR. GREENBERG: I do not know.

DR. STADEL: Thank you.

DR. PRENTICE: I agree with the criticism of the weaknesses of retrospective studies, as you mentioned, and most of these have been known for a very long time. The general suggestions that Dr. Greenberg made were toward multi-center trials and multi-comparison groups, and I think it is comforting that that has already happened to some extent, that similar risks were identified both in Seattle and in California, and that in the Seattle study in particular the relative risk did not significantly depend on the type of control.

DR. GREENBERG: Did not depend significantly what?

DR. PRENTICE: Did not significantly depend on the type of control that was selected.

DR. GREENBERG: In which study? The Los Angeles?

DR. PRENTICE: This is the Seattle.

DR. GREENBERG: But, it certainly did in the Seattle study.

DR. PRENTICE: No, this is the Seattle study that I am talking about.

DR. GREENBERG: The relative risk did not depend on the type of control?

DR. PRENTICE: Did not significantly depend on the type of control. There was a suggestion of a lower risk for the vulvar cancer controls which were --

DR. GREENBERG: Well, let me read to you from the article.

DR. PRENTICE: Well, you do not need to. I wrote that part. I remember it.

DR. GREENBERG: Well, look at page 1165, the relative risk for cervical cancer in Virginia Clinic is 7.8, for vulvar cancer 1.5, for ovarian cancer 3.9.

DR. PRENTICE: And what I am saying is those are not statistically significant in difference. Basically, there are very few vulvar cancer controls.

DR.GREENBERG: Okay, how about the difference between the University of Washington and Virginia Clinic, 3.4 versus 7.8; 0.6 versus 1.5; and 2.8 versus 3.9.

DR. PRENTICE: That difference was also not significant.

DR. GREENBERG: The point estimates are sure far off, though.

DR. PRENTICE: That is right, and when you have a very small number of control patients, the standard deviation is rather large.

DR. KING: Thank you. Next question.

DR. MACK: Dr. Greenberg, I have to ask you, you have not had the opportunity of reading this paper, but you saw a paper which we have written recently using a very similar study design, and I wonder if you would comment on the quality of the study design in our paper.

DR. GREENBERG: I am sorry. I did not hear the reference. To which study?

DR. MACK: We studied reserpine in breast cancer some months ago in a paper which you had access to and spent a lot of time looking at. So, I think you are familiar with our general study design, and I wonder if you have similar comments about our study.

DR. GREENBERG: I have not seen this study. I do know though that there are studies supposedly relating reserpine to breast cancer, and now those just the opposite.

DR. MACK: No, I am sorry. I was not trying to bring that into the meeting. I spoke at a similar FDA committee meeting, at which Dr. Greenberg also spoke, and this time we were on the same side. I wonder if my study design characteristics

have changed a lot in the last year.

DR. KING: Thank you very much. Next question, please.

DR. FINKLE: This is directed to the Chair. It looks like we do not really have enough time to get into a debate on this matter. Does the Chair invite written answers to the remarks?

DR. KING: Yes, it certainly is appropriate.

MS. LEE: Doctor, do animals go through menopause, and do they ever go through what women do? Do they have an estrogen problem? Therefore, would that not make the test unreliable if not used only on humans?

DR. GREENBERG: Well, we have some obstetricians here who probably know more about this than I do, and can answer the question. Certainly, the biggest problem with animal studies is in order to study a carcinogenic effect, you have to multiply the dosage by sometimes as much as 100 times what it would be in humans in order to study the dosage response relationship and to develop the response within a reasonable period of time.

The question that then comes up is how applicable is that to humans?

MS. LEE: Well, am I right? Is there someone here who can answer my question? Isn't it true that only women in living things go through lack of estrogen, that there is no menopause in animals?

DR. KING: That is correct.

The next speaker is Dr. Sidney Wolff of the Health Research Group. Dr. Wolff.

DR. WOLFF: Thank you, my remarks will be very brief, and I have copies of them for the members of the panel, so that they do not need to scurry around writing any numbers that they might be interested in.

Although estrogens as a class have been as well studied as any compounds for their carcinogenic properties with positive animal evidence of carcinogenicity going back to the 1930's, their use as human drugs has proliferated rapidly during the last ten years.

I would like to add with respect to Dr. Greenberg's question, yes, some animal evidence of carcinogenicity in estrogens and other compounds are achieved with high doses, but as Dr. Greenberg probably knows, there are a number of experiments in animals where a very low dose has caused carcinogenic effects.

The recent human evidence of the cancer causing properties of estrogens, however, has understandably served to reopen the discussion of the use of estrogen therapy for menopausal women. Whereas it is unfortunate that the animal evidence of cancer was not enough to prevent the massive inappropriate use of such drugs that now exist, at least now a reassessment of such use with a modification of prescribing will hopefully occur.

In the face of the older animal evidence and these two

new human studies, the two published ones and the additional one mentioned by Dr. Mack, I would hope that time not be spent on whether or not conjugated estrogens are carcinogens. Rather a careful review of present prescribing practices of these drugs will occur with a strong position developed against their indiscriminate use.

During the most recent year for which data are available, this is mid-1974 through mid-1975, there were 7.7 million prescriptions written for women for Premarin, the Ayerst brand name for its conjugated estrogen preparation. This does not include Premarin combinations, and is only for tablets and capsules. It does not include injections.

The recent survey in the State of Washington, and the survey was authored by Dr. Stadel, who just made a comment a few minutes ago, I will refer to this several times because it has some very interesting information as to how, and why, and to what extent these drugs are prescribed.

The recent survey in the State of Washington is applicable as far as the fraction of menopausal estrogen use represented by Premarin. The total prescriptions per year in the United States for these drugs is about 22,000,000. A further finding in the Washington survey, and this is a study that was published in the American Journal of Epidemiology in the last several months, volume 102, page 209; a further finding in the Washington survey was that about 60 percent of women using these

drugs use them for more than three months, the median length of use being ten years. I will repeat that. The median length of use being ten years. This means essentially that half of the people who are using these drugs in the survey in the area of Washington State were using them for more than ten years.

Since the average prescription, this is based on how many pills it is, is for about two months, it can be estimated that three to four million American women take these estrogen preparations, and that at least two to three million of these take the drug for longer than three months. This is a very conservative estimate, and it is much lower than the estimate that might likely be derived if one took the data, again from this Washington study, because in this study they found that 51 percent of all post-menopausal women were using these drugs for more than three months. This would result in a figure even higher than two to three million.

An examination of the diagnoses for which the 7.7 million prescriptions for Premarin are written, these are based on data from IMS in Philadelphia, which is a company which audits doctors'prescribing practices in order to provide data for a number of people, most of whom are the drug industry, who use the data to alter their promotion of the drugs.

But, I will review some of the data in this most recent survey of the use of Premarin. Special conditions without sickness, in other words conditions where there is no medical diagnos

made, 1,000,000 prescriptions. Diseases of bones and organs of movement, 253,000; whereas a study will be presented by Dr. Hammond alleging that these drugs are good for preventing osteoporosis. I think that with the exception of this study and perhaps the one that Dr. Greenberg referred, unless that is the same one, I think the review of most of the studies raise serious questions as to whether it works for that.

Symptoms of senility, and these are largely ill-defined conditions, 598,000 prescriptions. Mental disorders, 246,000 prescriptions.

In addition to the 2.1 million prescriptions, the sum of the numbers I just gave, written for the above diagnoses, which are at best questionably effective uses for the drug, I suspect that most of the 5.6 million additional prescriptions for Premarin may well be for benefits which are minor in comparison to the risk of cancer.

Conservatively, then, I would estimate that more than 3/4 of the prescriptions for these drugs are not warranted, either by virtue of lack of efficacy or by offering benefits trivial in comparison to the risk of cancer. Almost three years ago, the Medical Letter said the following about these drugs, and I quote from the Medical Letter early in 1973, volume 15, page 5. "The Medical Letter advises against the routine prescribing", and routine would be consistent with half of the women getting them for over ten years, the routine prescribing of

estrogens during and after the menopause because there is no adequate evidence that such treatment is beneficial, and because exogenous estrogen may promote or aggravate cancer of the genital tract or of the breast in some women.

Short term treatment with estrogens may be helpful in relieving symptoms associated with vaso-motor complaints or atrophic vaginitis. Most Medical Letter consultants doubt that estrogen administration has a beneficial effect on post-menopausal osteoporosis.

Since the median time for using these drugs in the Washington study was ten years, it appears that contrary to the Medical Letter recommendations most physicians are "keeping her on Premarin" to slightly rephrase a favorite Ayerst promotional gambit.

If 2,000,000 women are using these drugs on a long term basis, then the increased risk of uterine cancer is anywhere from four to eight times more than the risk in the general population. Actually, some of the data this morning show that it may be higher than that.

Premarin and the other similar estrogens may be causing an excess of 8,000 to 16,000 cancers in these women. I would think that it is probably much higher than that.

For the uses that there is no evidence that they meet the standards of substantial evidence of efficacy, or where a contraindication exists, the drugs obviously should not ever

be prescribed and the label should reflect these prohibitions. For the bulk of the other prescriptions, where relatively minor benefits are traded for the risk of cancer, women need to be informed in writing, written informed consent, about this and other risks, such as the increased risk of gall bladder disease in association with using these drugs.

The risk of getting cancer of the uterus as a result of using these pills is as great or greater than the operative mortality for many surgical procedures, where written informed consent is required.

Ayerst and other drug companies have exploited physicians, and secondarily millions of American women, by creating a state of mind where the doctro and his or her patient thinks they are lacking something and therefore are inadequate or abnormal if they do not use these drugs. Not prescribing these drugs, to put it another way, is viewed as the abnormal condition.

Although these anti-women advertising campaigns have yielded millions of dollars for drug companies, and I have included in my statement an estimate that at the manufacturing level -- this is the revenues to the companies themselves -- this represents about $80,000,000 in sales per year. This is all the companies, not just Ayerst.

Although they have yielded millions of dollars of profit for the drug companies, we now know that they are also

yielding thousands of cases of cancer of the uterus in women. In my view, it is unlikely that this massive overprescribing will continue if women are fully informed about the risk they are taking. Doctors who continue prescribing for non or contra-indicated reasons, or who fail to obtain written informed consent should be liable for malpractice.

We have here in the case of these drugs yet another example of the major role chemicals have in causing various kinds of cancers. Because of the hustling by the drug industry, there seems to be only two prerequisites for getting a prescription of Premarin, or any of these other drugs, being a woman and reaching menopause.

If HEW and the medical profession are really committed to preventing rather than causing cancer, strong action, as described above is needed. Thank you.

Again, there is a lot more information in the study that I referred to in the American Journal of Epidemiology, and I will make copies available to you.

DR. KING: Does the committee have any questions that they would like to direct to Dr. Wolff? Are there any questions from anyone in the audience?

MS. LEE: Dr. Wolff, would you be kind enough to tell the audience how many prescriptions went for chloramphenicol? I want to do a comparison.

DR. WOLFF: I do not have those numbers at my fingertips

Confidential Pursuant to Confidentiality Order

now. The FDA has them.

DR. KING: Please direct your question --

MS. LEE: All right, I will direct it. Could you tell me, Dr. Wolff, when you last had your last flash and your last menopausal depression?

DR. WOLFF: I think you know the answer to that question.

MS. LEE: Can you tell me why you are this irresponsible?

DR. STADEL: Dr. Wolff, since I wrote that paper, it is acceptable to you, I would like to make a very brief comment.

DR. WOLFF: Sure.

DR. STADEL: When I did that survey study, I found that the prevalence of a reported history of relatively severe hot flashes amongst women in that population appeared somewhat higher. I think substantially higher than it has appeared in other studies in the literature. I do not know what that means. I only quantified it in terms of women reported having had severe and persistent difficulty with hot flashes, and I think it was some 27 percent.

DR. WOLFF: 26 percent.

DR. STADEL: 26 percent. The usual figure cited, hither and yon, in the literature is around 10 to 15 percent. I do not know if that means that the population in that area of the country is different, either for some consitutional or

environmental reason, or something, but I was concerned about the possibility that the classic menopausal syndrome may be more common in that area of the country than elsewhere, and that this might account in part, although I did not feel in total, for the high rate of estrogen prescription. Thank you.

DR. KING: The next speaker is Dr. Daniel Cramer, Boston Hospital for Women, speaking on the trends in the incidence of endometrial carcinoma, 1935-1970.

DR. CRAMER: Thank you, Mr. Chairman, members of the committee, ladies and gentlemen.

Reports of increased risk for endometrial cancer due to exogenous estrogens make pertinent a critical examinination of trends in the morbidity and mortality of this malignancy, since the drugs have been in use since the early 1930's. But the rates for endometrial carcinoma are not easily interpreted for several reasons including differing diagnostic criteria, the frequency of hysterectomy and inaccuracies in tumor nomenclature. This report will first discuss these factors and then present the available data on trends in the incidence of endometrial cancer. It is based upon a study done about three years ago; and though updated information is available from individual regions, it remains the most current information we have on national trends for this disease. The data is derived from the Second and Third National Cancer Surveys which were multiregion in scope, comprising about 10 percent of the U.S. population

in 1947 and 1969-1971. This study also utilized the Connecticut Registry to obtain a continuous picture of the endometrial incidence since 1935. For simplicity, I will restrict the report to the rates in white females, since endometrial carcinoma remains relatively rare among blacks.

In interpreting cancer rates, the terms cancer of the corpus and cancer of the endometrium may be considered synonymous. Incidence refers to the number of cases originating in a specified period of time -- usually one year, while prevalence of course refers to the total number of individuals with disease at any one time. Crude rates refer to the number of cases per 100,000 population, while age specific rates delineate the incidence in a particular age group. Age adjusted rates are calculated from age specific rates and correct for shifts in the proportion of age groups over time.

I would like to begin with a point crucial to the understanding of endometrial cancer rates: criteria for the diagnosis of the disease. In the past, most malignancies were diagnosed by obvious clinical signs and symptoms associated with advanced disease. Recently we have seen the attempt to identify pre-cursor lesions on the pathological level and detect them by screening asymptomatic patients. These efforts may influence incidence rates for endometrial carcinoma in the following ways. First, there will necessarily be some overlap among the endometrial hyperplasias, carcinoma in situ and the

early invasive lesions. Thus many morphologic but not biologic cancers that would have regressed without treatment and would have remained undiagnosed will now be included in the category of endometrial carcinoma.

Second, when screening procedures are introduced in an unscreened population, individuals with prevalent pre-clinical disease are detected. If these are counted as incident cases, then an artifactual rise can be seen in the disease rates. This is demonstrated by some data from Louisville on the incidence of cervical cancer when the Pap smear program was first begun there.

May I have the first slide, please?

This is the top line. As can be seen, the incidence for cervical cancer increased markedly the first few years of the program before eventually reflecting a decline in the di-sease.

Our examination of the Connecticut data showed an increasing rate of carcinoma in situ's of the endometrium, and perhaps the start of a trend.

Next slide, please.

As you can see, the age-adjusted rate climbed from 0.4 to 1.2 over a period 1950-1969.

Slide off.

These factors could inflate current estimates of endo-metrial cancer and must be considered in evaluating unpublished

reports of soaring endometrial carcinoma rates. A careful survey of the pathologic criteria and method of diagnosis should be conducted to validate this information.

A second important factor is the role of hysterectomy. Cancer of the endometrium and cervix are unique diseases in that a large percentage of women have been excluded from the population at risk because of hysterectomy done for benign disease. By correcting for this, a more realistic picture of the incidence of endometrial cancer would be obtained; but this is impossible without specific data on the rates of hysterectomy by age, race, region and indication for the procedure. The best we can say is that the frequency of hysterectomy has increased over the past several decades; and it is estimated that as many as 30 percent of women have had this operation by age 65. This circumstance could obscure a true increase in the incidence of endometrial cancer; and this would be particularly so if the operation were performed primarily on those women most likely to develop endometrial cancer.

Let me digress a moment to explore this point a bit further. As I have said, the precise effect of hysterectomy performed for benign disease on the rates for uterine cancers cannot be determined due to a lack of data. But the next slide may help to clarify its theoretical effect.

Next slide, please.

The numbers used here are for illustrative purposes

only, and do not represent any actual data. Let us assume that uterine disease is arising at a stable rate with an annual incidence of 20 cases per thousand in 1970. Restricting our attention to the left of this slide, we now introduce hysterectomy under two different circumstances.

In case A, ten hysterectomies are done at random and have no effect on the 20 women destined to develop the disease. Thus, in 1970, again 20 cases per thousand is observed, or 20 per 990, if they could be corrected for the hysterectomies done.

Now, in the second situation, case B, very selective hysterectomy is performed, and in fact all ten hysterectomies done were on women destined to develop uterine disease. Now, the rate in 1971 is halved, 10 per thousand, or 10 per 990 if corrected for the hysterectomies.

Let us now examine the same two cases under the circumstances that a carcinogen is introduced into the population. Refer to the right side of the figure. In case A, the ten new cases due to the carcinogen are added to the 20 who were to develop the disease anyway. Again, the ten hysterectomies affected the denominator, and in 1971, 30 cases per thousand, or 30 per 990 corrected, is observed. An increase in incidence is not masked by the hysterectomies. But, in case B, the ten very selective hysterctomies have neutralized the effect of the ten new cases caused by the carcinogen, and the rate observed in 1971 is the same as the previous year, 20 cases per thousand.

Obviously, the dynamics of the situation in case B are totally missed by observing the incidence rates alone and the hysterectomies have completely obscured a change. This is why the question of selectivity of the hysterectomy for the particular disease is so crucial.

For many sources, it appears that hysterectomy is performed mainly on the multiparous patient, and it is rather the nulliparous patient who develops endometrial cancer. Thus, I would suggest that the effect of hysterectomy is closer to case A than to case B, though undoubtedly the real lies somewhere in between.

In summary, hysterectomy might not be expected to affect the trend in incidence rates for endometrial cancer as much as it might for cervical cancer which is associated with high parity. For this reason, it is hard to imagine that a 100 percent increase in the incidence of endometrial carcinoma predicted by some as a consequence of widespread estrogen usage could be obscured by this factor alone. But certainly a higher rate for the risk of endometrial cancer would be obtained if precise data on hysterectomy permitted correction of our incidence figures.

Two other considerations we briefly mention include demographic and socioeconomic trends. We have already mentioned the association of endometrial cancer and low parity and can only speculate what effect the declining birth rate in this country

has or will have on endometrial cancer rates. There is also a rough correlation of the degree of socioeconomic development and the levels of uterine cancer. The greatest rates for cervical cancer and lowest rates for endometrial cancer are found in the more poorly developed regions whereas the opposite situation -- low cervical and high endometrial are found in affluent societies. This factor could account for regional differences in endometrial cancer rates in this country.

Before presenting the rates for endometrial carcinoma, a final important consideration is the lack of detail in medical records and death certification that prevent the epidemiologist from determining the exact origin of the uterine tumors. These cases are coded "uterus" without specification as to cervical or endometrial origin. Several investigators have done retrospective studies on these cases in predominantly white populations and reached similar conclusions concerning their assignment. A 1950 survey of cancer incidence in Iowa showed that 72 percent of the cases originally coded to "uterus" were in fact corpus in origin. And in a survey of cases from the Connecticut Registry, 90 percent of cancers coded "uterus" were in reality from the corpus. In this study the number of cases of "uterus unspecified" was reduced by assigning them on the basis of histology, that is, the epidermoid carcinomas to the cervix and the adenocarcinomas to the endometrium. The remaining cases without histology listed were assigned to the endometrium

on the basis of the studies mentioned. Thus incidence rates from the 1930's through the 50's for endometrial carcinoma in white females are underestimated and must be corrected by apportioning the uterus unspecified cases.

We now present data on the trends in the incidence of endometrial carcinoma keeping in mind the factors discussed; in particular the uterus unspecified cases were apportioned as described and carcinoma in situ of the endometrium was excluded.

Next slide, please.

The National Survey age adjusted rates for white females were 21.1 cases per 100,000 in 1947 and 20.4 cases per 100,000 in 1970. That is the top red line. The rates for white females in Connecticut, the green line, suggest some fluctuations in the incidence of endometrial cancer since 1935, but there is no evidence of an overall increase in incidence.

The trend in the age specific rates for white females in the National Surveys are presented in the next slide.

Next slide, please.

The solid line is the Third National Survey and the dotted line is the Second National Survey. The curves for the two time periods are virtually identical except for some discrepancy in the oldest age groups. For comparable time periods the age specific rates for white females in Connecticut are shown in the next slide.

Next slide, please.

Again, the curves are noticeably similar except for the variance in the oldest age groups. Both sets of curves indicate no change in the incidence of endometrial cancer in white females over this period, confirming the age adjusted incidence data. Both sets of curves indicate a steep rise of the disease in the menopausal years with a peak incidence in the late 60's and some decline thereafter.

It should be emphasized, however, that endometrial carcinoma has become the most common invasive malignancy of the female gential tract in white females due to the declining incidence of invasive cervical cancer as is seen in the next slide.

Next slide, please.

So, cervical cancer predominates in the early years before age 40. Ovary and endometrial rise very sharply in the menopausal years, and thereafter endometrial predominates.

Slide off, please.

To complete this picture I have tabulated the mortality statistics for uterine cancers from the annual publications of the Bureau of Vital Statistics. The reported crude rates in white females for the mortality of uterine cancers over the period 1950-1971 are shown.

Next slide, please.

Overall there has been a marked decrease in the crude mortality rate for total uterine cancer from 20 cases per 100,000 in 195 to 10 cases per 100,000 in 1971. This reflects a decrease

in the rates for cervical cancer and in deaths recorded as uterus, site not specified. Now whether these uterus unspecified cases belong with endometrial cancer, as was found to be the case with the incident cases coded uterus unspecified, it is not clear. If so, then the rate of cancer of the corpus would actually have declined. As it is, the very small increase in cancer of the corpus from 1.4 cases per 100,000 in 1950 to 2.0 cases per 100,000 in 1971 probably indicates only greater accuracy in death certification. Preliminary figures from 1973 and 1974 confirm the downward trend in uterus site not specified and cancer of the corpus combined.

In summary, then, this study of the national trends of endometrial cancer over the period 1947-1970 did not show any significant change in the morbidity and mortality of this disease. We have pointed out, however, several factors which could obscure the actual situation including diagnostic criteria, role of hysterectomy, and inaccuracy in recording site of origin. This study cannot be considered a refutation of studies linking endometrial carcinoma and exogenous estrogen, but neither does it lend any support to the hypothesis. Thank you.

DR. KING: Does the committee have any questions that they would like to ask Dr. Cramer? Are there any questions from anyone in the audience.

MS. LEE: I would like to ask the doctor, in the study of the women's uteruses was the ejaculation of the husband

in natural intercourse looked into, because it has been said that cervical cancer is caused by some of the men. In every case mentioned here, do you have proof of the amount of intercourse, the amount of liquid, and the examination of the husband's semen?

DR. CRAMER: That would be very interesting data.

DR. KING: The next presentation is given by Dr. Douglas Shanklin, University of Chicago, speaking on the patho- logical observations on a series of over 400 uteri.

DR. SHANKLIN: Dr. King, Dr. Gregoire,, members of the panel, ladies and gentlemen. I would like to identify myself first. I am Pathologist-in-Chief of the Chicago Lying-In Hospital, Professor of Obstetrics and Pathology at the University of Chicago, and Emeritus Editor-in-Chief of the Journal of Reproductive Medicine. I am also signalled by being one of the two papers cited by Dr. Smith and his group as showing an increase incidence in a report I published of endometrial cancer, which was published in Consultant Magazine, and has not been published elsewhere in the literature.

In the packet provided you, and I have extra copies for anyone who wants them, there is a xerox reprint copy of that paper, which gives the specific data, not only from Chicago Lying-In Hospital, but also some data from the University Hospitals of Cleveland. I should call your attention specifically to the immediate previous presentation that there has also been

recorded an interesting apparent increase in the frequency of adenocarcinoma of the endocervix, which further confounds the problem of assignment of unspecified tumors of the uterus to the proper category.

This study which I am about to present you I cannot cost account, because it was based upon my salary when I was a full time member of the faculty. The source of the study was my own interest in diagnostic precision, enhanced perhaps in part by the fact that I had a great aunt who had metastatic endometrial carcinoma and a menopausal mother who was on estrogens. She has been on them for 20 years, and is in good health, thank you.

I also paid my own way to Washington.

Now, in 1971 the National Institutes of Health convoked a meeting in Hot Springs, Arkansas, which was on the subject of menopause and is published in this brochure, which the committee may want to make reference to later, called Menopause and Aging, and the material therein on carcinogenesis was an extremely abbreviated version. I have provided you in my handout a xerox copy of that page, and also of the draft report. What I want to show you is basically the same data which was published or brought together for that conference, following additional review of the cases and the criteria for histologic diagnosis.

The histologic diagnosis of endometrial carcinoma is

not, as I mentioned earlier, chiseled in stone, and there may be differences of opinion among expert pathologists, in particular the assignment of precursor lesions to an appropriate diagnostic category, the persistence and recurrence rates of which are not completely understood.

The study in question was a 33 month study in which the endometrial diagnosis or first impression was used as the index for the analysis. During this period roughly 9,000 surgical admissions were registered, and we had 436 endometrial hyperplasias or worse recorded, or about five percent. 25 of this group were variants of secretory hyperplasias, which I have excluded because their relationship to hyperplastic responses in the proliferative phase is unclear.

To gain a perspective of the endocrinopathies which are associated with endometrial carcinoma in the literature, in this same series of 436 patients there were two patients who had mesenchymomas or theca-granulosal cell tumors of the ovary and two with Stein-Leventhal syndrome, but none of the four had endometrial cancer.

The printed material also gives you the general diagnostic characterization and the typical dose schedules of those patients who did receive estrogens, and I will not repeat that data.

If we could have the first slide, please, to move this along.

I think it is useful to recall that we are talking not only about a tumor of low incidence, but we are talking about a tumor for cancers of the female reproductive tract with a reasonably good prognosis, particularly when caught in the earlier stages. As a matter of fact, the relatively good prognosis makes it very difficult to assess the propriety of using radiation therapy as opposed to surgery, and there is a continuing debate in the gynecologic literature on this point.

Next slide, please.

Is Dr. Silverberg still here? Would you diagnose this for us, please, sir?

I recognize that it is an isolated field and you are not looking at it under your microscope.

DR. SILVERBERG: You took the words right out of my mouth. On that field, I certainly would not call it cancer, but I would want to see the rest of it.

DR. SHANKLIN: Very fine. You agree with me. I put this on to illustrate the problems of borderline lesions, because it is after all a single photograph taken out of context of what should be available in an adequate biopsy. There are still some mesodermal trabeculae with vascular and other stromal tissue between the various elements, despite the rather angry looking epithelial proliferation, this is at worst a form of atypical adenomatous hyperplasia. I follow the Hertig definition of carcinoma in situ, which I feel is a distinct entity and easily

recognized, and this does not fulfill that criterion.

The next slide, however, will show you just for comparison an overt carcinoma with a moderate amount of storage material in the cells.

Next slide, please.

Here is a gross photograph of an open uterus containing a rather elegant, somewhat diffuse, carcinoma. This represents the curet tract of the curettage performed immediately before hysterctomy and illustrates that curettage may not be representative. A well performed curettage may take out 40 or 50 percent of the endometrial lining.

Next slide, please.

This is an outline of pathogenetic sequence, which I will then illustrate with some numerical data. We have the distribution of endometrial glands here. There seems to be an aggregation. The aggregations become more complicated and somewhere along in here there is a conversion of cells to either tumor in situ, or potential tumor in situ with further coalescence of that response, and ultimately coalescence with tumor extension into the mucosa and ultimately into the myometrium.

It is not known exactly where in this sequence the irreversible changes occur. The evidence that I have available to me suggests that this tumor can be multi-focal within the uterine cavity.

Next slide, please.

Now, we established diagnositic criteria which we felt were concordant with those published in the literature up through 1967, and began this study in January 1968, and assigned the patients to these various diagnositic categories, and the bottom line -- the table is in your handout -- gives you a rough comparison of the frequency in this particular hospital population of the various conditions.

Now, this is after elimination of the patients with secretory hyperplasias. This table breaks it out further according to age groupings by five year brackets, and we did this to see if there is any kind of age related sequencing, and the lines are in the dominant mode of occurrence of the various diagnoses, and you see the general drift in that direction.

This was the data behind the statement in Consultants that we felt that the problem probably has its onset at about age 30 rather than at the time of menopause. and to consider the problem only as one of menopause is probably starting much too late in understanding etiology and pathogenesis.

I call your attention to the fact that the peak distribution of diagnoses and the ectasia cystic hyperplasia group is a menopausal bracket, even though we are now seeing patients going through menopause as late as 57 and 58 years.

Next slide, please.

We then went to the use data available to us, and we found a very interesting relationship again confirming things

which have been published in the literature and our previous experience that the ectasia cystic hyperplasia group averages around 50 percent positive use of estrogens, and this is not dose related, and it is not compound related, nor is it time related. It is simply positive history of use at any time.

We left the secretory hyperplasias in here because they and the focal hyperplasias have a background frequency just a little bit lower than published in the accounts of the New England Journal, but we found a much lower frequency of use in all of the adenomatous hyperplasias and the cancers than we did in these two, which seem to be unmistakably related to the use of estrogens. As a matter of fact, there is a so-called estrogen effect cell, which can be seen in many of these endometria.

Next slide, please.

Now, there is one table in your handout which is not represented by slides. We found in our initial survey 12 patients who had endometrial carcinoma and who had used some type of estrogen. In reviewing these cases, we felt that we had overcalled one of them, and the reasons for that are detailed for the committee in the printed presentation. That was a patient who also had carcinoma of the cervix and had been treated with radiation and had had a little bit of use of estrogens in the vaginal tract to help her with atrophic changes, and hysterectomy was performed soon thereafter.

This left 11 patients, aging 46 to 73 years, who were anywhere from zero to 24 years post menopausal, who had used estrogen anywhere from a few months up to 19 years, and who showed an interesting mix of diethylstilbestrol, which was very popular in Chicago and conjugated estrogens. Only one of the 11, the type of estrogen utilized, could not be specifically identified.

I think it is useful to recall that when you are talking about carcinogenesis of any tissue, that the carcinogen does not have to be present at the time the tumor is diagnosed or treated. The carcinogen could have come by years before or months before and have performed whatever it does, the transformations to the enzyme systems.

It is kind of interesting that the patient who is 73 and who had been 24 years postmenopausal and 19 years on estrogen, which was diethylstilbestrol, this had been discontinued five full years prior to her diagnosis.

These data do not refute the notion or the suggestion that estrogenic substances might be related in the pathogenesis of endometrial carcinoma, but they do challenge that supposition rather strongly. Thank you.

DR. KING: Does the committee have any questions that they would like to address to Dr. Shanklin?

DR. SEGAL: Dr. Shanklin, your review of the pathogenesis is very helpful to us. One issue I am not quite clear on

is whether we should conclude from your statements that you are questioning not only the exogenous estrogen relationship with pathogenesis of endometrial carcinoma, but the general concept of a relationship between the development of the disease and endogenous estrogen production.

DR.SHANKLIN: Yes, sir. I am still questioning it, yes.

DR. KING: Does this committee have any other questions? Is there anyone in the audience who has any questions for Dr. Shanklin?

DR. ABELES: My name is Dr. Abeles, Westport, Connecticut. Dr. Shanklin, do you have any evidence that the estrogen effect cell that you mentioned is or is not a precarcinomatous phenomenon?

DR. SHANKLIN: I have no evidence. I have observational impressions, because one finds these in gland units which somehow when they get a little more than one per 10 or 15 cells suggest the localized diagnosis of atypical hyperplasia. The estrogen effect cell, to be more precise, is a somewhat larger cell with clear cytoplasm containing a fair bit cytoplasmic RNA, and they look very much like the cells you see in the atypical hyperplasias and carcinoma in situ's, and it is quite possible, but I cannot say that it is, a precursor element.

DR. ABELES: May I ask you a second question, then, sir? Is it not true that it is the general consensus of opinion

that estrogens administered to an already existent carcinoma might have an exaggerating or growth promoting effect?

DR. SHANKLIN: I do not think that is a consensus. It is being looked into through the matter of identifying estrogen receptor sites in tumors, and in uterine tissue in specific, and I would really not want to comment upon that until more evidence comes from various laboratories, including the University of Chicago, where estrogen receptors are being identified. There may be some in which the use of estrogen in an existing tumor may modify it. There is some reason to think that it might be productive of some of the so-called adenoacanthomas, but I cannot say that is a causal relationship or even a high suspicion at this time.

DR. ABELES: The reason I am asking, sir, if I might clarify, is it might be possible that in the epidemiological study submitted here that a lot of the cases, who were users of conjugated estrogen, might have been taking them without their or their physician's knowledge that there might have been an incipient cancer present. In which case the estrogen would be regarded not as a carcinogen, but as I term it a carcino-supportive and in which case it might also explain some of the epidemiological time base phenomena.

For example, referring to Dr. Cramer, if I might illuminate that a little, he is quoting the period 1949 through 1970. If you look at the usage of estrogen on the time base way, the

use of estrogen did not really take off until 1962 or 62, subsequent to the publication of a book called Feminine Forever, which was funded by a well known foundation called the Wilson Foundation, which created a huge demand on the consumer s de.

If we allow a certain lag time in the causation, if there is an association that this is a carcino-supportive, there might be a lag time, and this has been reflected somewhat in some of the figures we have seen here. The figures quoted by Dr. Cramer might not be pertinent to the actual incidence subsequent to 1970, which might be going on from 1970-1975 at a greater rate. In other words, there is a lag period, and we have not seen those yet in Dr. Cramer's figures.

DR. SHANKLIN: Yes sir, that is a fair point. The future is always speculative for all sides of this. I would like to point out to the committee, in the published material I have handed them, that the duration of history of use of the various estrogens in the majority of those 11 patients is much shorter than what we presently understand to be the probable induction time of cancers of the endometrium, and probably represents such spurious associations.

MS. LEE: Doctor, would you be kind enough to tell me, would you recommend shock treatment, tranquilizers, divorce, breakdowns instead of estrogen, or would you include the judicious use of it in putting the older woman back in the stream of life.

DR. SHANKLIN: As a pathologist, none of the above.

MS. LEE: Thank you. When did you have your last flash?

DR. SHANKLIN: Just a minute ago.

(laughter.)

DR. KING: The next speaker is Dr. Sheldon Sommers, speaking on pathologic considerations regarding retrospective studies on endometrial carcinoma. Dr. Sommers is of Lennox Hill Hospital, New York.

DR. SOMMERS: Perhaps I should also identify myself. I am a pathologist and Clinical Professor of Pathology at Columbia University and the University of Southern California. I find on counting up that I have written 44 articles on endometrium including carcinoma or on estrogens or their sources, and that does not include the book with Dr. Parsons. This is to indicate my continuing interest in the etiology and pathogenesis of endometrial carcinoma.

After 39 years of study and investigation in this field, I do not know the cause of endometrial carcinoma. But, perhaps the readers of the media do. I think it is a rather complicated etiology, which involves a genetic instability of endometrial nuclear protein and estrogenic growth stimulus, a viral genome to transform the cells, and a pituitary adrenal stimulation for the outgrowth of cancer. Among exogenous factors occasionally contributing are ionizing radiation, estrogen adminsitration, intrauterine foreign bodies and immunosuppressive therapy. In some cases estrogen is mainly a permissive factor,

and by that I mean like having a functioning anterior pituitary or functioning adrenal cortex.

Now, the point about estrogen administration is that the hormone is dropped into a body pool of unknown size, composition and turnover rate. There are studies in press indicating increased plasma levels of estrogen in women with endometrial carcinoma. So, it is unclear to me what added estrogens would do to an already hyperestrogenic state.

Now, let us briefly consider estrogenic hormones as carcinogens. Technically, and this is important, estrogens are not carcinogens, because there is no evidence published that I know of that they are cell transformers. I am astounded to hear people quote my own work back to me, and say estrogens are carcinogenic.

Now, there are many growth stimulants like estrogen, and these include such things as vitamins, insulin and gastrin, and to me estrogen is a growth stimulant.

Experimentally, Dr.Meissner and I produced endometrial carcinomas, and in the animals that developed endometrial carcinomas there was a special host reaction that involved the pituitary and the adrenal gland, and if they did not develop this special host reaction, no carcinoma was found, but only endometrial hyperplasia.

So, I think from human genetic studies, from our own human studies of autopsy cases and from the animal studies, that

endogenous host peculiarities are the key determinant of who gets endometrial carcinoma in perhaps 99 percent of the cases. The vast literature on this goes back 50 years, and is already well known.

In interest of brevity, I will not cover points made in discussion by other speakers, but I would like to point out in reference to the articles by Dr. Smith, et al, and Dr. Ziel and Finkle, that in my opinion statistical epidemiology is a new and desperate science in the throes of its adolescence, but at least it has developed some ground rules, and one of the ground rules, and number one in my book is that the populations being compared must be a random subset of the whole population. The reason for this is that the only mathematics available to compare the populations is that based on random subsets of major populations.

So, I am not a clinician. I asked Dr. Hugh Barber, who is our head Ob-Gyn, who takes estrogens? He said it tends to be women of higher economic groups who are likely to be overweight, not physically active, and who seek out doctors who prescribe hormones. If refused hormones by one physician, they find another to give estrogens. The obese women of higher income levels have long been recognized as predisposed to endometrial hyperplasia and carcinoma before there were any active estrogens available to administer.

Now, who in clinical practice regards such women as

a random sample of the entire female population? Therefore, I believe that, not being random, any statistical difference found is fallacious.

In neither report were the pathologic diagnoses confirmed by review of microscopic slides, and this is a necessary control procedure. If this is not done, Dr. Barber and I estimated about a ten percent error of cases sent in from outside called carcinoma which on review turn out to be only hyperplasia.

From Dr. Silverberg's article I see that there were 12 percent cases sent in to him that on review turned out to be hyperplasia and not carcinoma. This error may be acceptable to epidemiologists, but it is not to gynecologists and pathologists.

Also, I think a panel of pathologists should review the slides, because one ought to subdivide invasive endometrial carcinoma from carcinoma in situ; distinguish diffuse from focal, and both of these from endometrial carcinoma arising in a polyp. If you regard all endometrial cancer as a nosologic entity, you are being over simplistic.

What about the controls in the Smith and Ziel paper? Smith's paper used women with cancer of the cervix ovary and vulva. Are such women a random subset of the female population? Well, certainly not. Women with cervical carcinoma are practically the antithesis in respect to economic status, reproductive history and other features of women with endometrial carcinoma. Women with cancer of the ovary and vulva likewise traditionally

come from medically neglected groups. Among them are other various special attributes.

With such an inequality and selectivity in the composition of both the experimental and control groups, I am not surprised there were statistical differences found.

Now, to quote Feinstein, "if measurements have large biases and fluctuating errors or many different variables.... the power of elaborate analyses to overcome these deficiencies is feeble."

Now, I do hope that we will not be faced with a ban on estrogens, because in my opinion to prevent a putative one percent -- and that is my estimate -- of endometrial carcinoma, we then have to live comfortably at home with a population of postmenopausal women, which I would not view as a very good idea.

DR. KING: Does the committee have any questions they would like to direct to Dr. Sommers? Is there anyone in the audience who has any comment or question they would like to direct to Dr. Sommers?

DR. STADEL: Looking over your statement regarding symptoms such as uncertain tempered crying spells and difficult interpersonal relations, there is a recent New Zealand report of a controlled clinical trial of estrogens versus tricyclic antidepressants, which showed no apparent beneficial effect of estrogens in the management of depressive symptoms unless they were clearly accompanied by the more classical symptoms of

estrogen deficiency syndrome involving vaso-motor instability. Are you aware of any evidence of similar controlled nature which purports that estrogens are of value in dealing with emotional difficulties that women may confront during menopause, if those difficulties are not accompanied by the more classical signs of estrogen deficiency?

DR. SOMMERS: No, I am not aware of any controlled studies of that sort, but let me tell you that personal experience is important in this field, too.

DR. KING: Thank you very much. At this point, we will take a break, and we will reconvene in 55 minutes.

(Thereupon, at 12:50 o'clock p.m., a recess was taken until 1:45 o'clock p.m., the same day.)

AFTERNOON SESSION 1:55 P.M.

DR. KING: Let us call the meeting to order. The next presentation will be given by Dr. Gilbert Gordan of the University of California in San Francisco speaking on the subject of estrogen replacement therapy in the post menopause.

DR. GORDAN: Thank you, Dr. King, Dr. Gregoire, Dr. Ortiz, members of the panel and guests. Actually I am going to address myself to two subjects. The first one has to do with very recent information, almost all of it within the last three years, since which time we have been able to measure bone mass, and it has been quite clearly shown that loss of ovarian function, either from surgical oophorectomy or from the spontaneous menopause is followed by loss of bone mass.

The studies have been carried out by two individuals who have shown actually prevention of this loss of bone mass by the administration of relatively small doses of estrogen, prophylactic doses.

The second point to which I will address myself is one on which we have less data, the series are smaller, the methods of evaluation are more difficult. My point here will be that even after women have lost a large enough amount of bone to undergo fractures of the vertebrae, wrists and hips, it is possible to stop the progression of this disease, this time not by small prophylactic doses, but by full hormone replacement therapy.

Now, if you look at literature from other sources,

the archeologists and the anthropologists have reported for some years that even in prehistoric times bones of women show decreasing bone mass with age, whereas the bones of men do not.

Clinically the first report was in 1832 when the German surgeon Bruns noticed that before the age of 50, hip fractures are fundamentally a disease of men, but that after age 60, they were two and a half times more frequent in women.

Modern data are even more drastic. Our present information is that after the age of 60 women sustain eight to ten times more hip fractures than men. With all this information, it seems rather surprising that it was not until 1940 that the concept of post-menopausal osteoporosis was introduced by Fuller Albright.

Now, Albright emphasized the central role of estrogens in bone physiology, and of estrogen deficit in the bone breakdown we call postmenopausal osteoporosis. He postulated that during the reproductive years, estrogens prevent bone breakdown, store up calcium in the maternal bones for the needs of the fetal skeleton, and when estrogens are lost at the menopause that the bones break down.

Actually, recent evidence supports him very much across the board. For example, the serum calcium level is maintained primarily by what is called osteocytic osteolysis, which in shorter terms just means that the bone cells release calcium from the bone and put it into the blood.

It is now clear that from the menarche to the menopause the serum calcium levels of women are .2 to .3 of a milligram lower than that of men. After the menopause serum calcium levels rise, serum phosphate levels rise, as was first shown very well by Dr. Greenberg, and if one gives estrogen, the calcium and the phosphate levels come back down to more useful levels.

Now, in very recent years we have data using four different methods of measuring bone mass. One of these is photon absorptiometry, in which an I-125 source is placed underneath the forearm, and the amount of penetration of the photons through the bone is determined by a gauge or scintillation camera above. One can quantitate this in a number of ways. Obviously the more bone you have, the fewer photons will get through. So, you can record it in grams of hydroxyapatite or milligrams of calcium, if you wish. That is the most widely used technique.

The Meemas, we have heard some reference to a paper in the Archives of Internal Evidence, this is by Eric and Sylvia Meema from the West Toronto Hospital in Toronto, Canada. These people have reported in the last ten years a number of studies in which they have shown that simply applying a calipre to the cortex gives exactly the same information as you get from photon absorptiometry. Actually, they have used both techniques in many of their studies.

A third technique has been perfected, and it does give satisfactory data. This is to incorporate a step wedge, either

of aluminum or of calcium phosphate into the film at the time the bones are x-rayed, and by this technique, one can measure photographic density, and can get a very good approximation of bone mass.

The most recent technique has been reported only from one place, actually by Dahlin from the Karalinska in Stockhom, and this you use two x-ray beams that are columnated. The advantage of this is that you can actually measure trabecular bone, and this is of very great importance, because with this technique Dahlin has shown that oophorectomized women lose trabecular bone in the exact spots where they subsequently sustain fractures, namely the vertabrae, the hips and the wrist.

Now, I would like to point out to you in the first slide the sexual dimorphism in bone mass. There are both sexual and ethnic factors of importance.

May I have the first slide, please.

This happens to be done from Germany, but I could show you another similar one from Germany using five bones, or one from Stockholm or some from Canada. There are a number of spots and they all show very similar. I think this is one of the easiest ones to see, in spite of being in German. Manner of course are men, and frauen are women. Here we have the number of patients, and here the number of those showing significantly decreased bone mass. As you can see, after 50 increasing numbers of women have significantly decreased bone mass, while with men

it is less common until you get up to the 80 or 90 year age group.

Next slide,please.

Now, I should mention in passing that in addition to the sexual dimorphism is a polymorphism. Bone mass parallels skin pigmentation. It is greatest in blacks, next in brown, then in yellow, least in whites. We all lose bone with aging, men and women alike; all races lose bone. But, starting with a superior amount of bone blacks rarely lose enough bone to get x-ray evidence of osteoporosis, and this probably explains the great rarity of fractures of the hip in the negro of any age.

Now, this is a study done by Sylvia and Eric Meema, whom I mentioned to you. I want to point out two things here. Here is the amount of bone mass, and we need not worry about the units, because as you can see, up to age 55 in menstruating women it is constant.

Now, here we have patients demonstrated by their age past the menopause, not by their chronologic age. The significant point here is not only the fall off, but also that the young castrates are in this group, whereas who are still menstruating in their 50's are in this group. And, this and many other studies that I could mention strongly indicate that the loss of bone that occurs with age is not simply a matter of senile decay, it is a matter of loss of ovarian function.

Next slide, please.

Now, this is a similar study that was done by Aitken, again using two different techniques, photon absorptiometry and step wedges. He studied women who had undergone hysterectomy in the vicinity of Glascow, Scotland. When he called these women back, he found those whose ovaries had been spared had not lost bone mass, whereas those who had lost their ovaries at surgery had decreased bone mass. Then, he did a very nice study using two techniques, double blind technique, two dose level, well controlled, I believe, and administered either a placebo or mestranol. This happens to be the low dose of mestranol, 20 micrograms per day, and what he showed was that there was a significant prevention of loss of bone in women who were given mestranol, whereas those who were given nothing or an inactive placebo actually loss more bone.

Now, this is overlap obviously, but on a statistical basis I think you can say that prophylaxis with 20 micrograms in most cases prevents the bone loss.

Next slide, please.

This is a slide that orthopedists all know. If there are any orthopedists here, I apologize for showing it again. The epidemiology of fractures of the forearm has been known for about 200 years, and there is one city in Sweden, Malno, where the population is very stable and where the incidence of fractures of the forearm has been constant for the last 200 years.

These are data from 1966, so they are reasonably current.

Here you see that in youngsters, boys and girls alike, when they are out ice skating or skating or whatever they are doing, and they fall, and they break their wrist, the incidence of the fractures is equal in the two sexes. After the puberty they apparently find something different to do, and they do not break their wrist. Now, the interesting feature is what happens after age 50. In men, the incidence of Colles fracture arises very very little, whereas in women it shoots right up. Again, this is more evidence of the fragility of the skeleton of the post-menopausal woman.

Next slide, please.

More significant, more important are the data on hip fractures, and the reason why these are more important is that hip fractures kill. What we have talked about now with loss of height from vertebral fractures, back pain, invalidism from vertebral fractures, trenchant problems from a Colles fracture, but now we are talking about hip fractures. The incidence of hip fractures in women doubles every five years after age 60, so that within the ninth decade, between 80 and 89, it is actually up to 40 percent.

This is of great importance, because it is a major cause of morbidity and contributes considerably to mortality in women. Most of the serious morbidity from falls, most of the deaths from falls, are not due, as one might have thought, from

skull fractures, but from hip fractures.

Now, this is a fairly recent study from Finland, and here they have taken the trouble of showing previous studies. The data from Sweden show pretty much what you would expect, that in women there is a very great rise in fracture rates for hip fractures, whereas in men a very small one. And, here the data from Hong Kong, here, by contrast, was much less -- a more pigmented population, therefore a lower incidence.

Next slide, please.

Now, I would like to talk a little bit about the mechanism of action of estrogens, androgens and the so-called anabolic agents upon bone kinetics. Here I use the term bone accretion meaning the rate at which the mineral goes into the bone, which is a rough index of the rate of bone formation.

What we will see here is if one takes post-menopausal women, who have already lost 30 or 40 percent of their skeletal mass, and one now gives estrogens and androgens, as has been known now for 35 years, they go into positive calcium and phosphate balance. Now, if they go into positive calcium balance, one might suspect that this is an osteoblastic effect. However, it is not. The bone accretion rate actually falls. As you go into positive calcium balance, and you are actually laying down less bone, there is only one possible mechanism, that is that the action of these agents is to decrease the rate of bone breakdown.

This has been shown by a number of different techniques. This is one of them. I have mentioned to you what happens to the blood calcium and phosphate, which reflect this.

Next slide, please.

Now, there is a direct measurement by Jenny Jc nson of the Mayo Clinic. Here is a normal area of resorptive surface that one sees in iliac crest biopsies, shown here in the dotted portion. Now, in women who have post-menopausal osteoporosis, the amount of resorptive surface is very much greater. This study, they were put on 2 1/2 milligrams of Premarin, and as you can see the amount of resorptive surface was significantly decreased.

Now, my own interest in this goes back to about 1947 when I had the good fortune to work with Fuller Albright. In those days, estrogens and androgens were just becoming available. I devised a test which is widely used --some of you here have made money out of it; I have not -- called the Leveder Anidé (?) test, by which one can actually measure the anabolic activity of various steroid compounds.

The hope at that particular time was that since estrogens produce hyperplasia of the endometrium and they produce bleeding, we might be able to avoid all those things by giving a compound which have all the anabolic effects of testosterone but none of the nasty androgenic effects. So, we thought that if we got good anabolic compounds, these were going to be the

answer to a maiden's prayer.

From 1948 to 1955, I accumulated 220 women with far advanced post-menopausal osteoporosis. We put them on a study in which 120 of them started with estrogen, 100 of them started either with androgen or the low voltage androgens, which we call anabolic compounds. As I look back, I was incredibly naive. What happened here I think is worth pointing out.

Next slide, please.

First of all, I survived long enough to tell you what happened in 25 years. We have here about 1,500 years of estrogen therapy with full dose of Premarin. There were five fractures in this 1,500 for a fracture rate of three per thousand patient years. The normal fracture rate in post-menopausal women is seven per hundred per year. So, this is quite low.

Now, estrogens make women bleed. So, a lot of these women saw a gynocologist. I might say for the benefit of the gynecologists, this study was set up with the late Herbert Trout. For those of you who do not know, Trout and Papanicolaou, Papanicolaou was guinea pig type of scientist, but Trout was a women scientist. Trout and Papanicolaou originated what is now called the Pap test. Well Herbert Trout helped set this study up, did all the smears for me very graciously, and the nice point about this was that if any woman bled at any other time in withdrawal of estrogen, she got competent gynecologic examination.

Now, the not so nice thing is that in 24 cases they

either had the estrogen reduced to half of the replacement dose, or it was stopped, and in these fractures recurred. Seven of these nine women were put back on full replacement dosage, and were not fractured subsequently. But, the incidence here, nine fractures out of 24, is obviously very very great.

The other point is that, as you can see, I started out as an anabolic advocate, and now I have to say mea culpa. They would only tolerate 200 patient years of treatment. But, in that 200 patient years, we had eight fractures. These figures are obviously significantly different.

So, the androgens and the anabolics are far less effective, and of course as we all now know, they are far less well tolerated because of their androgenicity.

Now, I did not bring here the slide on the incidence of cancer, but you might like to know that in 25 patient years, with women of this age, this number of years at risk, we should have seen 20 cancers, and of course breast and cervix would have been high up in that list. We saw no breast and no cervix. We saw a total of eight cancers in all. These were of various organs. There was a lyomyosarcoma of the stomach. There was a myeloma carcinoma of the pancreas, carcinoma of the sigmoid. There were three endometrial carcinomas.

Now, I have mentioned to you that we were obsessive and compulsive about anybody who bled. In spite of that, the number of carcinomas that we turned up is not terribly great.

Obviously, endometrial carcinoma is not a common cause of death. It is a rare cause of death. There are 3,300 cases of deaths from endometrial carcinoma in the United States this year. That is the estimated number. The estimated incidence for this year in the United States is 27,000 cases. The peak of the incidence is between the ages 60 and 64, and as Dr. Cramer showed you this morning, in the Second National Cancer Survey, at that peak incidence, the figure is 79.8 per 100,000 patient years, and the Third its 90.3. The figure there of 90 per 100,000 patient years I think can be taken. That means .9 per 1,000 patient years. I had 2,000 patient years. I should have seen about 1.6. I saw three. This is not statistically different. And, of course, nobody died of these. These are not invasive tumors. These are detected because they bled, because they had D&C's, and the tissue was so read.

May I have the lights, please.

Now, at this point, I think I should say that I would much rather prevent osteoporosis than to treat it. It is true that if we give full replacement doses of estrogen, we can for the most part prevent further fractures, but it seems to me that giving estrogens to women who have already lost 1/3 or more of their bone is like locking the stable door after the horse is gone.

In addition full replacement doses are bound to produce endometrial hyperplasia, bleeding, D&C's, which I do not take

as a light matter. I have got one of my poor women who has had six of them already, but I am still compulsive about it. If she bleeds again, she will have a seventh, because we do not dare take a chance on missing an endometrial carcinoma.

Well, for all of these practical purposes, I think it is probably better to use prophylaxis than it is to wait until women have already undergone fractures, and shrunk and got into serious trouble. Current evidence is that a very small dose, 20 micrograms of mestranol, will prevent the bone loss. I would believe that prevention of the bone loss by small prophylactic doses will reduce the number of fractures of the vertebrae, the wrists and the hips, and probably reduce the mortality due to hip fractures, which I would guess are greater than the 3,300 endometrial cancer deaths that we have per year in the United States. Now, if I can answer questions, I would be pleased to do so.

DR. KING: Does the committee have any questions that they would like to direct to Dr. Gordan.

DR. ORTIZ: Dr. Gordan, will you please give us the Aitken reference for 1975?

DR. GORDAN: Well, if you wish, I will give you the 800 references I have compiled for the book that is in press on this subject. But, Aitken happens to have three current references. There is one in the British Medical Journal for May of 1973. There is one for September of 1973. And there is one in

Medicon International for January 1974. He also will have all of his data summarized in the Israel Journal of Medical Sciences for April 1976.

DR. ORTIZ: I thought there was a reference for 1975.

DR. GORDAN: This is actually more recent data, which will appear in his 1976 publication.

DR. SEGAL: I wonder if you could tell us if there is any evidence on the effect of progestins on bone kinetics, and in that longitudinal study which is very interesting that you showed, could you tell us about the patient survival rate over the 25 year period, and for those that did not have a full survival rate, what the causes of death were?

DR. GORDAN: The first question, if you did not hear it in the back of the room, was what do progestational compounds do to bone? Very few data on this. The Silverberg's claim that in the rat, which is a lousy animal to study mammalian skeletal metabolism, that progesterone nullifies the effect of estrogen upon the bone. Dick Landau, who has probably done more metabolic balance studies with progesterone than anybody I know, in a personal communication tells me that progesterone does nothing to external balances of calcium and phosphate. That is about the total literature on progesterone.

Second, on survival data, I think you should realize that the average age of these women, when I entered them on the study between 1948 and 1955,was 62. I have intimate information

on the cause of death. In other words, they died in our hospital, were autopsied, or they died in a surrounding area, where we are reasonably certain of the death. And, in these 134, the incidence of death from cancer is significantly less; the deaths from heart and stroke are just about what we should have expected for women of this age, namely 50 percent for heart, and 17.4 percent for stroke. I cannot tell you the total survival, and there is a catch in this. Nobody entered into the study unless we ad at least one year's study. This would automatically give y u biased numbers. For example, this shows up in the study Birch Burton Bayh, who have 9,000 years of estrogen treatment in hysterectomized women, and what they showed was an increased survival. But, they required that the patients be in the study five years before they accepted them, and this would automatically give you some increase. I cannot give you survival numbers.

DR. KING: Are there any other questions by the committee. Are the any questions by anyone in the audience.

DR. ABELES: Sir, you mentioned that menopausal black women rarely had fractures of the bone?

DR. GORDAN: Yes.

DR. ABELES: Can I ask you a question? Do black women lose estrogen after menopause?

DR. GORDAN: I do not know the incidence of estrogen therapy in either white or black women. I do know that hip fractures are the rarest thing in the world in blacks of either

sex, and that in my bone and stone clinic, where all of the osteoporotic women were accumulated over these years, that we had no case of a black woman.

There are good studies. There is one by Muldauer, one by Bowlet; I will give you references if you wish them. The evidence is that osteoporosis is extremely rare in black women.

DR. ABELES: Well, then the suggestion might be, sir, that barring differential of menopausal balance in black women post menopausally, that black women have some other factor which is preventing them from undergoing the same kind of osteoporotic phenomena as in whites. I would suggest then that perhaps their low socioeconomic status generally in the country that perhaps exercise had something to do with this phenomenon.

DR. GORDAN: I do not really know what it is. I have always called it an ethnic or genetic influence. It seemed that in all economic classes and in all geographic areas, in the Bantu it is the rarest thing in the world to see osteoporosis. They have long periods of lactation. They have long periods of calcium deficiency. They have a high incidence of lactase deficiency. They still do not get it. The point is that they have a lot more bone when they start with. Even if they are losing it at the same rate that you and I are, they will not lose it down to the point where it will get weak enough to fracture. It is an ethnic advantage.

DR. KING: Any other questions? Thank you. The next

presentation is by Dr. Charles Hammond from Duke University, entitled Estrogen Replacement Therapy in the Menopause.

DR. HAMMOND: Thank you, Dr. King, members of the panel. First, perhaps I should preface my comments by saying that I am a practicing obstetrician and gynecologist and endocrinologist and an academic practice, in that I have fellows who teach and do research but also see patients.

Today I have been asked to present current concepts of the climacteric or menopause as a reprise, if you will, to the discussion of a proposed linkage between adenocarcinoma of the endometrium and estrogen replacement therapy. In essence, what I would like to do is try to present more data on the benefit side of the benefit-hazard equation that we really must consider for any pharmacologic agent that we administer as physicians.

The data that follow are presented in that light -- not to provide a pro or a con on the topic under discussion -- but rather to provide a background of the physioligic changes of menopause and to review possible roles for therapeutic estrogen administration.

First, I would like to define the terms that I will use. Climacteric refers to the gradual decline of ovarian function and therefore encompasses a wide span of years, during which time menopause occurs. Menopause itself is a physiologic cessation of menses, a point of reference in the climacteric,

and both are due to a gradual senescence of the ovary and, in turn, declining estrogen production.

Let us next review the biology of the normal climacteric. After 30 years of ovulatory menstrual function, accompanied by full biologic estrogen maintenance of dependent tissues, and occurring somewhere around 40 years of age, the frequency of ovulation begins to decrease. This initiates a period of waning ovarian function or the climacteric, which may last as long as ten or 20 years, and will carry the woman through the intervals of decreased fertility, menopause and the manifestations of progressive tissue atrophy and aging, which occur. The major factor in this evolving picture is diminution of estrogen production associated with this interval of life. With our present longevity, a caucasian woman in the United States can anticipate 25 or more years of life in the state of decreased estrogen production, while the black female currently expects 16 or more years of similar existence.

Although estrogen does not wane in a straight line function, its progressive diminution over time leads to a sequential loss of estrogenic dependent functions: ovulation, menstrual function, vaginal and vulvar tissue strength, and finally general atrophy of all estrogen-dependent tissues. This estrogen loss is due to the continued attrition of residual follicular units which begins in the fifth decade of life, a process which certainly occurs but remains poorly understood.

Since fewer follicles are available, less and less estrogen production is possible. It must be remembered that these oldest follicle units have remained in the ovary unstimulated by gonadotropin since birth. When they are finally stimulated, the degree of differentiation each is likely to experience is limited, and thus each follicular growth period will be increasingly blunted and less estrogen produced. Eventually, these older follicles are exhausted; estrogne production is now at a low level of efficiency resulting almost entirely from indirect non-ovarian sources, the peripheral conversion of ovarian stromal and adrenal precursors to active estrogen in non-endocrine tissues.

Finally, the gonadal resource of estrogen becomes defunct. The ovary has become an atrophic mass of fibrous tissue, and estrogenicity, now at marginally sustaining levels,is basically the product of inadvertent dietary level, and non-ovarian activity. As the peripheral tissues age, in the seventh through the ninth decades, even these low levels wane still further. In past years, when a woman's longevity was only little longer than her ovarian functional duration, problems due to hypoestrogenism were of relatively little consequence. Now, however, as the woman's life is increasingly prolonged, she lives many years in a hormonally deficient state.

Let us now examine some of the current data regarding levels of estrogen and androgen in pre- and postmenopausal women.

May I have the first slide, please.

This slide illustrates the serum concentrations of estrogen in women and were taken primarily from Judd, but confirmed by others. From these data, we can see several items. First, in premenopausal women, estrogen levels fluctuate in relation to menstruation and involution of the ovarian follicle and corpus luteum.

Second, with oophorectomy in the premenopausal patient, there is a marked reduction of both estradiol and estrone, the two most potent estrogens present in women.

Third, in the postmenopausal women, there is a marked reduction of circulating estradiol and estrone to levels comparable to values in oophorectomized premenopausal subjects.

Fourth, with ovarian ablation or removal, there is no discernable fall of estrogen levels in the postmenopausal women.

Fifth, in postmenopausal women with endometrial cancer, estradiol and estrone levels are similar to concentrations seen in age and weight matched controls.

Finally, in postmenopausal women with endometrial cancer, both estradiol and estrone levels correlate directly with the patient's weight but not her age.

Next slide, please.

This slide illustrates the metabolic clearance rate of estrogens in pre- and postmenopausal women. It can be seen

that there is a reduction of the metabolic clearance rate of both estrogens in menopausal women.

Next slide, please.

This slide shows the production rate of estrogen, again in pre- and postmenopausal women. One notes that there is a major fluctuation in the production rate of estradiol and estrone in the premenopausal women, giving the range that is listed. Of major importance today is the marked diminution of production of both estrogens after the menopause occurs.

Next slide, please.

This slide then summarizes the sources of estrogen that we can identify in the pre- and postmenopausal women. Before menopause the majority of estrone is from direct ovarian secretion or from extraglandular conversion of an adrogen precursor, androstenedione. The remainder is from extraglandular conversion of testosterone and estradiol. For estradiol, the majority is from direct ovarian secretion with a limited amount from conversion in the periphery occuring from testosterone, androstenedione and estrone.

In the postmenopausal woman, most if not all estrone is produced from peripheral conversion of androstenedione produced primarily in ovarian stroma, while estradiol is produced by the peripheral conversion of estrone, testosterone and androstenedione. After menopause occurs, direct ovarian secretion of either estrone or estradiol is minimal.

Next slide, please.

Much has been said about the role of androgens, the concentration and androgens in serum, the conversion of androgens to estrogen in the postmenopausal woman. This slide shows such serum androgen concentraions. From these data, we can again draw several conclusions. In the premenopausal women there is a small but significant rise of both testosterone and androstenedione occurring at midcycle. With oophorectomy there is a fall of both androgens. In postmenopausal women androstenedione levels, but testosterone levels are distinctly higher than the quantity seen in castrated premenopausal women. Finally, with oophorectomy, there is a marked fall of testosterone and a direct decrease in the androstenedione of older women.

To these androgen data we must also add that the clearance rate of androstenedione is altered by body size, while the clearance rate of testosterone is altered by several factors, which include body weight, estrogen therapy, the presence of other androgens and the status of oophorectomy. Menopause has an effect on the metabolic clearance rate of testosterone, but not androstenedione.

If one then calcualtes the production rate of these tow androgens we note a marked diminution on testosterone, and to a lesser extent, androstenedione of postmenopausal women.

From all of these data, it appears that in the postmenopausal women androstenedione may be produced by direct

adrenal secretion and direct ovarian secretion in ratios of about 85 percent to 15 percent. The major production of testosterone is from peripheral conversion of this androstenedione. I think this is a pertinent point, particularly in light of Sitery(?) and others data, which allude to the conversion of androstenedione to estrogen occurring in the periphery and being higher percentile wise in patients with endometrial malignancies.

May I have the lights on, please.

What then does all of these hormonal studies mean? First, there is clearly a major decline of estrogens which occurs as the ovary fails. Second, while androgen production may continue at a fairly long interval after the decline of estrogen production, and that some of these androgens may be converted to estrogen in peripheral tissues, the relative concentrations of biologically active estrogen never again approaches the normal premenopausal levels.

It appears that there are three categorical features at work in all climacteric women to a greater or lesser degree, and I would underscore the terms greater or lesser degree. The symptomatic reaction is the sum of the impact of these three components on that individual person. First, the amount of estrogen depletion and the rate at which estrogen is withdrawn. Second, the collective,inherited and acquired propensities to succumb or withstand the impositions of the overall aging process. And, finally, the psychological impact of aging and the individual

reaction to the emotional implications of "change of life."

The degree of symptomatology experienced by women as they proceed through the early estrogen decline of the climacteric appears to depend upon the speed of that decline. If occasioned by surgical or radiational castration, the resulting abrupt estrogen loss is acute and severely symptomatic. The worst expressions of vasomotor flushes, sweats, globus hystericus, palpitations are experienced in these circumstances. Accompanying emotional reactions, depressions, anxiety, irritability also appear to be most virulent and likely in these conditions. Estrogen replacement therapy rapidly cures the majority of these symptoms.

If estrogen loss is slow, vasomotor reactions may be minimal, but abnormal and even prolonged uterine bleeding becomes a worrisome factor, reassurance may require operative investigation. The large middle group of patients, however, undergo depletion of estrogen at an intermediate rate, so that menopause is accompanied by mild periodic flushes, though it is estimated that such flushes in some degree, and on occasion of debilitating severity, occur in about half of postmenopausal women.

The effects of the late climacteric, extremely low estrogen production levels, are dependent upon many factors, including the general resistance of target, the aging tissues, the overall health, the quality of the diet, and the level of activity of the individual. As mentioned, also important is the

amount of estrogen produced by peripheral nonendocrine sources.

There are a variety of physical or somatic changes, which have been attributed to the postmenopausal status and the decline of estrogen. These are listed in the brochure that has been handed out. I will not tire the panel by repeating what they are obviously are aware of,which is the type and severity of these changes of atrophic dependent tissues which may occur.

Suffice it to say that the questions of osteoporosis I think have been addressed by Dr. Gordan. I think, personally, they are pertinent. I think clearly 25 percent fracture rates are significant. That is what we anticipate now in the post-menopausal woman in America.

The question of cardiovascular benefits of estrogen therapy remain unanswered. The increase in plasma lipids, the rise in the frequency, type and severity of cardiovascular problems in the postmenopausal woman are well known.

Certainly the problems of the severe vasomotor symptoms, the atrophic vaginitis and functional penetrative dyspareunia, the decrease in libido, some emotional changes, while clearly not due in all patients to a loss of estrogen, may well reflect that problem.

To summarize, what do we then know as facts about the climacteric? First with lengthening of life, normal women now live more than a third of their life with dramatically reduced estrogen levels, regardless of the source or cause of

that. Second, that approximately 25 percent of American women will consult a physician for symptoms which relate to menopause. Third, that approximately ten to 15 percent of women will have menopausal symptoms that are obviously caused by reduced estrogen levels, and would be most successfully treated by estrogen replacement therapy. Finally, postmenopausal women have higher rates of cardiovascular disease and osteoporosis clearly than do premenopausal women, and this process seems to be much more closely linked to the onset of the age of menopause than most other factors.

This presentation was really not designed to enter the specific discussion regarding the prophylactic benefits of ERT, nor to presuppose that every climacteric woman has symptoms which clearly warrant estrogen therapy. Simply, it is to draw your attention to the altered physiologic state created in women by prolonged longevity, a goal modern medicine has been most successful in achieving. Clearly, many of the problems of this hypoestrogenic state can be improved by therapeutic estrogen replacement, and frankly only improved by estrogen therapy.

Despite the roles of education, other psychotropic pharmacologic agents and considerable tender loving care on the part of the family and physician, there may be clearly a difference in the women with and without normal estrogen levels. No one can hope to stay young forever. Hormones certainly will not prevent the aging process. There should be no misconceptions

154

here. But, some of the difficulties of aging, however, can be softened with estrogen therapy, and several potentially disabling problems can be avoided.

Finally, I would like to close by drawing your attention to the recent proposed linkage between reserpine and breast carcinoma, a story which was initiated in much the same fashion as the topic today, only to be rapidly fading as a viable hypothesis.

Today, we have heard a variety of opinions. It would be my hope and opinion that we use this opportunity to focus our attention upon the problem, to join to establish meaningful prospective studies out of which we can hopefully draw better rational conclusions. Thank you.

DR. KING: Does the committee have any questions they would like to direct to the speaker?

DR. CORFMAN: Dr. Hammond, can you very briefly give the committee some estimate? Can you quantify the number of patients who have benefitted by this type of therapy?

DR. HAMMOND: As far as those patients who have, I would think the term deficiency state, clearly remedial to the replacement effects of estrogen, I would say in the range of 10 to 15 percent of postmenopausal women. Now, that is an estimate. There would be those whose opinion that I would regard highly who would say 20 or 30 or 40 percent. There would be others who would say five or ten. I draw that figure basically

out of data, for example, if there is a 25 percent fracture rate in the postmenopausal years in women, spread out obviously over a course of time; there are the problems in the dyspereunia, which may be significant, the severe debilitating vasomotor symptom which may or may not be alleviated by other methods, may or not be coped with, and I am presenting if we can treat in other ways other than estrogen, we could lower these figures in the range of probably ten to 15 percent, and that is a pure ballpark estimate.

DR. CORFMAN: So, you say perhaps 10 to 15 percent of all women of this age group benefit by therapy?

DR. HAMMOND: Correct.

DR. CORFMAN: Do you have quantified what percentage of women who are actually treated are benefitted by the treatment?

DR. HAMMOND: Again, I can only go on the basis of (a) reported data that I see and comments that I hear, but more importantly, perhaps, in my own practice. I personally do not treat all women with replacement estrogen, even if there is not a specific contraindication. In my practice, the patients that I have put on there I would say it has been a highly successful regimen. I would guess in excess of 75 percent. Again, I treat those patients who are symptomatic, or in whom I really thing is a clear indication to adminster therapy.

DR. CORFMAN: Do you know of any studies where Premarin

or some other estrogen has been crossed over with a placebo?

DR. HAMMOND: Yes, and there are certainly a myriad of mixed data in regard to particularly the psychomotor, psychogenic type problems, in regard to the extent of benefit that has been present. Up until the last two or three years, this was also true, I think, at least in regard to osteoporosis. I no longer feel as I felt then. I think there is a beneficial effect in regard to osteoporosis.

But, I think if you move into the areas of atrophic vagintis of severe and debilitating vasomotor symptoms, some of these changes clearly the placebo will not react for the same efficacy.

DR. SEGAL: My question is along the same line as the last. I would like to get your experience and knowledge in relation to the known studies on all of these issues. I think we have heard today from Dr. Gordan that there are good quantifiable measures of the relationship between estrogen loss and blood loss. For what other of the various conditions for which estrogen is prescribed in the menopause would you say that there are studies of that characteristic and quality establishing the benefit?

DR. HAMMOND: I would think clearly the atrophic vaginitis type problems, in which one can quantify by quantification index; you can quantify by coital frequency or a variety of other objective as well as subjective findings. This can clearly be

a cause of dysfunction in the marital unit in patients in the postmenopausal years.

I think those two would be major as far as objective quantification. I think the number and severity of vasomotor flashes are a third area that can, at least to some extent, be quantified, if not subjectively by the patient counting, almost objectively in some ladies in whom the rosy glow is very evident to everybody who is around her. So, frequency and severity of vasomotor symptoms, and again, there is the whole spectrum from essentially very little symptomatology of that type to debilitating. So, that is a second area.

We could get into some quantification of pelvic support, problems of the support of the bladder, urinary prolapse, intervessicle pressures. There is a debate present there at the moment. I personally am of the opinion that with declining estrogen levels that the pelvic support tissues likewise, with a higher percentile of time, will show some changes. That is harder to quantify. I heard two articles on it in the past two weeks, and it is still a debatable topic. I personally feel that that, in some women, is a significant change, though parity, type of delivery, and a variety of other factors enter into it. I think those are the main ones.

DR. SEGAL: I want to take advantage of your expertise and knowledge, while we have you here, to ask these questions. That is why I am pursuing this. What I would like to do is to

apply the same criteria of severity, judging the risk studies and the effectiveness studies, because ultimately, as you have pointed out, we have to take into account the benefit-hazard ratio. You have answered me in terms of the kinds of studies that could be done on a quantitative basis, but what I would like to know, in your experience, in your knowledge of the literature, which of these have actually been objectively documented as being beneficial?

DR. HAMMOND: Well, again, I think the atrophic vaginitis has. I think the vasomotor symptoms has, and I think rapidly now, with data such as Dr. Gordan has presented, the osteoporosis has. I think the question of cardiovascular problems much more difficult and much more complex, and would be much more difficult to set up those prospective studies that will be meaningful and well controlled over a long enough period of time to interpret familial pattern difference, dietary difference, cigarretter smoking difference, et cetera.

We currently have a prospective study -- well, it is not prospective either; that is an unfair term, but we have an institution which has traditionally used conjugated estrogen over the years. I might add frequently and usually with progestin added. And, we now have a population in excess of 400 or 500 patients who have been on this agent for a variety of symptoms at the time it was started, but been on it now an excess of ten years. We are in the midst of examining these data for

attact rates of endometrial malignancy, of cardiovascular changes with matched paired controls on different levels. I think these studies can be done and will be helpful. I think the retrospective study remains the best immediate method of at least getting a glimpse of where we stand, but I clearly feel that randomized prospective studies are going to be the answer, and that is going to probably take five or ten years to be meaningful in numerics. That is an opinion.

Now, beyond those areas I am not sure that I can think of others off the my hat. We could study clotting parameters. Then we could talk about attack rates of thromboembolic disease. These could be done, yes, and have some objectivity to them. Does that answer the question?

DR. KING: Are there any questions from anyone in the audience.

MS. LEE: Doctor, do you know why they give estrogens to men for heart attacks?

DR. HAMMOND: Well, the thought had been that the administration of estrogen to males who had had coronary artery disease, angina and coronary infarction was that one might add the protective effect that you ladies seem to enjoy in the premenopausal years to them. Unfortunately, the Farmington studies did not support that, and the study was actually stopped because the attack rate of second coronaries was higher than in non-treated control groups. I do not think it is that simple.

DR. KING: Thank you very much. The next presentation by Dr. David H. Kushner, Georgetown University, speaking to the subject of clinical experience of thirty years administration of estrogen.

DR. KUSHNER: Now, I know how the comic felt when he was asked to go on the stage following Bob Hope. I will necessarily be repetitious, and I will be summarily brief. I am David H. Kushner, Senior Consultant in Obstetrics and Gynecology at the Columbia Hospital for Women, and Clinical Professor of Obstetrics and Gynecology at the Georgetown University Medical School.

I have prescribed conjugated estrogens to selected patients since 1945. I have treated over 1,500 patients with conjugated estrogen for various periods of time since 1958. At present I am prescribing conjugated estrogen hormones for approximately 400 patients in the menopause or postmenopausal groups.

I have been interested in the relationship of cancer to estrogen for many years. Within my practice I determined how many patients developed breast cancer between January 1962 and December 31, 1969, and published the results of my investigation.

There were 17 cases of breast cancer; 900 had received various doses of conjugated estrogen at irregular intervals during that time. Of those, 11 developed cancer of the breast but had not received estrogen therapy. These were all proven by tissue

1

MANN
ETRICS
6/75

examination by a pathologist. Six patients who had received estrogen during the same period of time developed breast cancer. Again, these were proven by tissue examination.

I felt there was no convincing relationship.

Now, with respect to the use of conjugated estrogen and its relationship to cancer of the endometrium. Columbia Hospital for Women is staffed exclusively by certified specialists in obstetrics and gynecology. Most of these physicians use conjugated estrogen to a large extent in their practice.

I made the following determination, based on Columbia Hospital for Women, patient admissions. In the five-year period from 1958 to '62, there were a total of 16,000 non-obstetrical admissions. During that time there were 64 cases of adenocarcinoma of the uterus, giving a .4 of 1 percent incidence. In the five-year period from '63 to '67, there was a total of 21,000 non-obstetrical admissions, with 103 cases of adenocarcinoma of the uterus, resulting in an incidence of .5 of 1 percent.

In the five-year increment from '68 to '72, there were 42,700 non-obstetrical admissions, with 134 cases of adenocarcinoma of the uterus, an incidence again of .3 of 1 percent. In 1973 which is not included in the last five-year increment, there were 9,000 non-obstetrical admissions, with 30 cases of adenocarcinoma of the uterus, and in 1974 there were over 10,000 admissions with 31 cases of adenocarcinoma, and in 1975 from

January through the end of this October, there were 8,3( 0 admissions, with 30 cases of adenocarcinoma diagnosed.

This gives a grand total of 107,511 non-obstetrical patients admitted to Columbia Hospital for Women in the years from 1958 through 1975, giving an overall incidence of .37 of 1 percent.

In reviewing my own practice, I have diagnosed 15 patients since 1959 with adenocarcinoma of the uterus, and they were all operated upon. There has been no change in the incidence of adenocarcinoma in my patients, despite the increase in the number of patients for whom I have prescribed conjugated estrogen during the same period of time. In these 15 cancer patients, all of whom have been registered with the Tumor Registry of Columbia Hospital, I discovered that 7 patients had no estrogen, 4 had received conjugated estrogen, and 4 were direct referrals by a doctor who is no longer in practice and I am sorry to say I don't have any relationship there at all.

No information as to their exposure was recorded on the hospital records.

A great majority of gynecologists administer estrogens during the menopause and the post-menopause. Not every patient needs estrogens. This is a potent hormone and has proven successful in controlling and preventing physical and mental disturbances of the female patient in the menopause. You hav-

3

heard that all day. Estrogen should be prescribed only when indicated and for a limited period not exceeding six months without a repeat examination. Patients should have a complete physical examination, including a breast and pelvic examination at every six month interval. Cytology should be included in the examination at least once yearly.

Complete information should be given to all patients, particularly stressing the importance of regular physical check-ups and potential risks and dangers of taking the medication just as with oral contraceptives. Uterine bleeding should be thoroughly investigated with the use of office endometrial aspiration and curettage, and/or hospitalization for dilatation and curettage when necessary.

There is no doubt that estrogens have had a beneficial effect on many thousands of women. Their physical and mental well-being must be balanced against the possible dangers in the use of this hormone. There are many patients who would be unable to function if they were to have estrogen therapy discontinued. They would be unable to remain productive in their life. Many may well complain that their marital life and sexual activity is impaired or abolished without receiving estrogen.

The adventitious administration of estrogen should be condemned in summary. Adenocarcinoma of the endrometrium occurs most frequently in the menopause and post-menopause. The incidence of the cancer will increase as the longevity of women continues

to increase.

More women are involved in cultural, professional, and business activities each year. Many of these women require administration of estrogen to maintain proficiency and productivity in their lifestyle. The occurrence of irregular or post-menopausal bleeding requires thorough investigation regardless of the use of estrogen therapy.

DR. KING: Thank you very much, Dr. Kushner. Are there any questions from the Committee? Are there any questions from anyone in the audience?

Yes. Please identify yourself.

DR. ABELES: Dr. Abeles, Westport, Connecticut. Sir, you mentioned that in the proper administration of estrogens the patients should be limited to six months of therapy and then undergo a full physical examination before getting any more. And then you say that each year they should have cytology examinations. You don't detail what kind of cytology examinations. Is this merely aspiration or curettage or biopsy or what?

DR. KUSHNER: Well, to clarify, when the patient first is put on estrogen, she doesn't go six months. She only goes two months. Then she is on a six month interval. Now, she has a cytology, sometimes twice a year, but at least once a year. I will do aspiration, vacuum aspiration, on patients that are not having bleeding that have been on estrogen for

period of time, the same as I would do blood chemistries for the calciums or the triglycerides or the enzymes or you name it, LDH. Yes, sir.

DR. ABELES: So do you know what percentage then, or could I refer to some of the authors of the paper earlier today, in which some evidence was shown that the median time of prescription for the estrogens in question was ten years, how many of these examinations had been done on the average? Were they done on average? Who were the prescribers in most cases? Were these practicing gynecologists or general practitioners?

DR. KUSHNER: I am a practicing gynecologist, and I have been for over 40 years. I started at ten. Now, I have followed these patients myself. Many of these patients are grandmothers of babies I have delivered. I have followed them myself for 10 and 15 years and 20 years, and I have done the examination myself. Does that answer your question?

DR. ABELES: Yes, it does, but not in relation to your practice, Dr. Kushner. I am not questioning that. What I am asking is that with the background that you have given us on the proper practice of prescribing estrogens, how does this relate to the epidemiology which has caused this meeting in the first place? There is very little in those studies to show us what proper practice was done on these patients.

DR. KUSHNER: Well, I believe that anybody who writes a PRN prescription for Premarin should not be sued for malpractice

6

He ought to be whipped. Nobody ought to be sued for malpractice. I don't take that, when somebody says somebody is -- but I also believe that it is a mistake for any doctor, if a patient comes in with a backache and says, "Oh, you need Premarin." Or she says, "My husband is not happy with our sex life any more," "Oh, you take the Premarin." That is ridiculous. Is that what you were driving at?

DR. KING: Do you have a question, sir?

DR. NESTOR: Yes. Dr. Nestor of FDA. Dr. Kushner, you gave us the statistics from 1958 on. What was the change in the racial distribution from that period, in view of what we have heard about the difference in incidence in the races?

DR. KUSHNER: Racial?

DR. NESTOR: Yes.

DR. KUSHNER: Well, when I was a resident at Columbia Hospital many years ago, a black woman or doctor couldn't come within 100 feet of the front or back door. That's been before '58. I would say, to answer your question, that we now have about a 50-50 population, both on our staff and our patient census, and has been that way for at least five years, and almost for seven or eight years, and maybe -- and has gradually increased markedly from '58, which was practically 1 or 2 percent or 3 percent, up to now which is well over 50 percent.

Does that answer it? No, not exactly?

DR. NESTOR: I think that makes my point that we [illegible]

heard there is a difference in incidence in the races, and therefore your statistics really don't have much validity over that period of time.

DR. KUSHNER: These were just for comparison. I must say though, if you want to get back to the statistics of the black woman, I heard it mentioned here several times today, and I don't buy it, because I have a lot of black patients and they are in the same economic status as the white patients, and many of them are getting estrogen -- not as many as the white patients to be exact -- but many of them are.

But to say that in Washington, D. C. that a woman doesn't get osteoarthritis or hot flushes because she is in a low economic bracket doesn't hold water. If she is in a low economic bracket, she has difficulty getting a doctor to prescribe for her, maybe, except under Medicaid, which is still perfectly all right.

DR. SHANKLIN: Shanklin, Chicago. I would like to comment in that connection, Doctor, that your incidence figures on in-patients is almost identical to that from the University of Chicago, and over a longer period of time. Our hospital is in the midst of one of the largest black ghettos in America, and we see substantial numbers of endometrial cancer in black patients. I would just like to reinforce that.

DR. KING: The next question.

DR. STADEL: Dr. Stadel from NIH. I would like to

8

make a very brief comment regarding the issue of the prescribing and followup that was alluded to by the speaker three speakers ago. In the survey that I performed in Washington, the review of the medical records that was involved in the study indicated that the estrogens were prescribed by physicians of very divers backgrounds and although I did not tabulate and analyze the typ of followup, there was considerable range of both the duration of prescription and evidence of examination or other objective followup of people on prescriptions.

DR. KUSHNER: Yes, sir. I appreciate that, and I think it should not be.

DR. KING: Thank you, Dr. Kushner. I would like to take this opportunity to thank everybody for their attention to the presentations. This completes the presentations for today.

Thank you all.

(Thereupon, at 3:03 o'clock p.m., the meeting was concluded.)