# EXHIBIT 78

January 12, 1976

MEMORANDUM OF CONFERENCE

Between: Ayerst Laboratories

Mr. Charles Hagen, General Counsel
Mr. M. Silverstein, Counsel
Dr. J. B. Jewell, Executive Vice Pres. Medical Affairs
Dr. G. J. Carallito, Executive Vice Pres. for Scientific Affairs
Dr. Henry Perdue, FDA. Liaison

and

Food and Drug Administration

Mr. Tom Cavanaugh, Division of Drug Advertisement
J. Richard Crout, M.D., Director of Bureau of Drugs
Ms. Ann Davidson, General Counsel's Office
Mr. William Drury, Division of Drug Advertisement
Marion J. Finkel, M.D., Associate Director for New Drug Evaluation
Mr. Ray Hamilton, Office of Compliance
Carl M. Leventhal, M.D., Deputy Director, Bureau of Drugs 13B-45
Edwin M. Ortiz, M.D., Director, Division of Metabolism and Endocrine Drug Products
Mr. Wayne Pines, Office of Public Information
Bernard St. Raymond, M.D., Division of Metabolism and Endocrine Drug Products
Peter Rheinstein, M.D., Director, Division of Drug Advertisement

Subject: Premarin - Letter Issued By Ayerst December 31, 1975. Mailed December 31, 1975.

Dr. Crout opened the meeting by stating the views of the Food and Drug Administration on the Ayerst letter sent to physicians dated "December, 1975". The Food and Drug Administration considers the above mentioned letter to be misrepresentation of scientific data presented in the New England of Medicine and at an open meeting of the Obstetrics and Gynecology Advisory Committee to the Food and Drug Administration on December 16, 1975. This has insensed the FDA at all levels including the Commissioner of Food and Drugs. The letter is, however, viewed by our staff in the Division of Drug Adversting and by our General Council's office as borderline from the standpoint of violation of the Laws and

and Regulations, because technically it did mention the Association of estrogen with endometrial cancer and included a package insert. The misrepresentation in the letter relates to misrepresenting the information presented before our Advisory Committee and not misrepresentation of the drug's labeling. The Food and Drug Administration will issue a Drug Information Bulletin to state objectively and impartially the new scientific findings of endometrial cancer in association with the use of estrogen postmenopausally. Dr. Crout stated that since Ayerst is the leading manufacturer of estrogens prescribed for postmenopausal use, he would expect a sound medical and scientific response to this new information, to both the medical profession and FDA. However, a letter which misrepresents the scientific findings as published in the literature and presented at the OB/GYN Advisory Committee is the only visible response from the Ayerst. This, in his opinion denotes a passive attitute in part of Ayerst. There has been no move from Ayerst toward proposed labeling change in light of the new findings linking estrogens with higher risk of endometrial cancer nor has there been a proposal from Ayerst of studies to deal with the questions raised regarding the studies presented at the OB/GYN Advisory Committee or even to refute or confirm the studies currently available.

The representatives of the sponsor stated that the letter was mainly prompted as a reaction to a fairly large amount of lay publicity associated with the findings linking estrogens to endometrial cancer and was not intended as an evaluation of the scientific data available to date on the relationship of estrogen administration for postmenopausally and endometrial cancer. They stated that their efforts have been hampered somewhat by not having available to them, prior to writing of th eletter the actual text of the recommendations of the Advisory Committee on the relationship of estrogens and endometrial cancer. They acknowledged receipt of our unofficial draft of the evaluation of recommendations of the Advisory Committee following a conversation with the Director of the Metabolism and Endocrine Division on January 9, 1976. Dr. Crout again emphasized that Ayerst did not respond with a proposed labeling change even though, as confirmed by the representatives of Ayerst at this meeting, Ayerst was aware that a labeling change was in order following the appearance of the publication in the medical literature. Representatives from Ayerst stated that a labeling change will be proposed by Ayerst after receipt of the official recommendations of the Advisory Committee and the manuscript from Dr. Thomas Mack. Counsel from Ayerst stated. much to the surprise of FDA staff, that the contents of the letter was the best that Ayerst thought they could legally state at this time, and stated their reluctance, because of legal implications, to be more explicit regarding warnings and risks associated with use of Premarin.

Dr. Crout succintly summarized what he views as the Ayerst position and FDA position in the matter as follows:

Ayerst Position:

1. The letter was issued in response to publicity which necessitated response.

2. The letter is not misleading and represents Ayerst's best summary of this situation that Ayerst thought they could make because of legal constraints.

3. Ayerst felt they had been delayed in sending a good letter or in proposing labeling by being denied access of Executive Committee Session of our OB/GYN Advisory Committee meeting of December 16, 1975.

4. According to Mr. Hagen, General Counsel, American Home Products, the letter is a preliminary communication.

5. The letter is not purported to be accurate scientific summary of scientific facts, but it is a response to articles on lay press. (This statement was made according to Mr. Hagen.)

At this point, Dr. Perdue from Ayerst Laboratories defended the Ayerst recommendations to physicians regarding the cyclic administration and early diagnosis of abnormalities in bleeding. It had been pointed out previously that awareness of diagnostic techniques improves chances of early diagnosis, but does not reduce the inherent risk associated with the use of estrogens.

Dr. Crout stated FDA position as follows:

1. Ayerst has the right and the obligation to send a letter to physicians specifically dealing with this new information relating to estrogens and endometrial cancer.

2. The above mentioned letter is warped in tone and is intended to obfuscate the issues rather than to highlight new information related to risk. This letter is borderline in terms of violating the Food, Drug and Cosmetic Act.

3. The FDA is not seeking a corrective letter from the Ayerst Laboratories since the FDA does not trust Ayerst's ability to write a reliable letter of that nature and does not wish to go through the exercise of creating a legalistic corrective letter with which the name of the FDA is associated, when the real thing is needed is an accurate statement to the medical profession.

4. The FDA will therefore issue a Drug Information Bulletin stating objectively the findings linking estrogens in endometrial cancer.

5. Any drug firm, Ayerst in this case, should know its drug, be aware of positive developments regarding its use and be responsible. The FDA is not impressed with the passive mode diplayed by Ayerst Laboratories in this case. An NDA labeling supplement with proposed new labeling and proposed research plans is in order from Ayerst.

6. We specifically reject Mr. Hagen's contention that the letter was "the best they could do" under corrent law and regulations. We also reject the view that Ayerst's actions are dependent on our Advisory Committee's recommendations. No withholding of information from Ayerst took place. They were at the Advisory Committee meeting, where told that the press release the next day contained the essential recommendations, and the official minutes have still not come to us.

7. The FDA will move ahead in developing new labeling with or without a proposal from Ayerst.

8. We are currently preparing the Drug Bulletin article and congressional testimony on estrogens. These will take into account what we know of Ayerst's performance to date, which is that the letter is their sole evidence of action.

Representatives from Ayerst then stated that they would have liked a meeting prior to the issuance of the letter. Such a meeting, however, was never requested.

The meeting closed with Ayerst representatives indicating they would take our views under advisement.

cc:
HFA-228
HFD-130
HFD-130/EOrtiz/1/14/76/tm/1/16/76

J. Richard Crout, M.D.

Edwin M. Ortiz, M.D.