# EXHIBIT 92

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JUDY ROMERO, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | 1:03-cv-001367 |
| vs. | § | |
| | § | |
| WYETH, LLC, | § | |
| | § | |
| Defendant. | § | |

— — —

TUESDAY, APRIL 26, 2011

— — —

Videotaped oral deposition of EBERHARD C. LOTZE, M.D., held in the offices of Woman's Hospital of Texas, 7600 Fannin, Houston, Texas, at 3:37 p.m., on the above date, before Michael E. Miller, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public.

— — —

GOLKOW TECHNOLOGIES, INC.
877.370.3377 | fax 917.591.5672
deps@golkow.com

A P P E A R A N C E S:

AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC
BY: DANIEL J. THORNBURGH, ESQUIRE
dthornburgh@awkolaw.com
17 East Main Street
Suite 200
Pensacola, Florida 32501
(850) 916-7450
Counsel for Plaintiffs

SNELL & WILMER, LLP
BY: BRYON J. BENEVENTO, ESQUIRE
bbenevento@swlaw.com
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
(801) 257-1900
Counsel for Defendant Wyeth, Inc., et al.

VIDEOGRAPHER:

RACHEL STODDER,
Golkow Technologies, Inc.

— — —



INDEX


| | |
|---|---|
| APPEARANCES | 2 |
| PROCEEDINGS | 5 |
| EXAMINATION OF EBERHARD C. LOTZE, M.D.: | |
| BY MR. BENEVENTO | 6 |
| BY MR. THORNBURGH | 108 |
| BY MR. BENEVENTO | 240 |
| CERTIFICATE | 263 |
| ACKNOWLEDGMENT OF DEPONENT | 264 |
| ERRATA | 265 |
| LAWYER'S NOTES | 266 |


— — —



DEPOSITION EXHIBITS
EBERHARD C. LOTZE, M.D.
Tuesday, April 26, 2011


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Lotze-1 | Curriculum Vitae | 9 |
| Lotze-2 | Medical Records, JRomero-O&GA-Houston-000190 - JRomero-O&GA-Houston-000232 [not consecutive] | 6 |
| Lotze-3 | 1998 Label for Premphase | 136 |
| Lotze-4 | "Menopause Isn't Gone In a Flash" W-ADSBRO-01096 - W-ADSBRO-01100 | 162 |
| Lotze-5 | "Menopausal Symptoms are Just the Tip of the Iceberg" PAYNC201-001154 | 166 |
| Lotze-6 | "Two Benefits vs. A Risk of Estrogen Replacement Therapy" CORRA302-000066 | 169 |
| Lotze-7 | Call Notes re: Dr. Lotze | 178 |
| Lotze-8 | 2007 Label for Prempro/Premphase | 207 |
| Lotze-9 | Chart of Dr. Lotze's Quarterly Prempro Prescriptions, w/Backup Data | 218 |
| Lotze-10 | 2000 Label for Prempro | 234 |


— — —



PROCEEDINGS
(April 26, 2011 at 3:37 p.m.)

THE VIDEOGRAPHER: Stand by, please. We are now on the record. My name is Rachel Stodder. I'm the videographer for Golkow Technologies.

Today's date is April 26th, 2011, and the time is 3:37 p.m. This video deposition is being held in Houston, Texas in the matter of Judy Romero vs. Wyeth, et al., for the United States District Court for the Eastern District of Texas, Beaumont Division.

The deponent is Dr. Lotze, M.D.

Will counsel please introduce yourselves for the record.

MR. BENEVENTO: My name is Bryon Benevento, and I represent the defendants.

MR. THORNBURGH: My name is Daniel Thornburgh. I represent the plaintiff, Judy Romero.

THE VIDEOGRAPHER: The court

Page 6

reporter is Mike Miller, and will now swear in the witness.

EBERHARD C. LOTZE, M.D., having been duly sworn, testified as follows:

EXAMINATION

BY MR. BENEVENTO:

Q. Good afternoon, Dr. Lotze. I appreciate you taking time to meet with us today in Houston. As I indicated a minute ago, my name is Bryon Benevento, and I represent the defendants in this matter.

As you probably know, we're here to talk about the care and treatment that you provided to Judy Romero. I've been informed that you no longer have medical records for her, so I've provided a courtesy copy to you and marked those as Deposition Exhibit 2.

(Whereupon, Deposition Exhibit Lotze-2, Medical Records, JRomero-O&GA-Houston-000190 - JRomero-O&GA-Houston-000232 [not consecutive], was marked for

Page 7

identification.)

BY MR. BENEVENTO:

Q. Before I get started, I'd like to just cover a couple preliminaries, if that's okay with you?

A. Sure.

Q. You realize that we're here to take your deposition, but we're not -- my client is not claiming that you did anything wrong.

A. I understand.

Q. This isn't a case where Wyeth is claiming that your medical care for Ms. Romero was substandard or improper. Do you understand that?

A. I understand that.

Q. We're here to talk about the care that Ms. Romero received because there's been a lawsuit filed by her against my clients for the development and sale of a hormone therapy drug. Do you understand that?

A. Yes.

Q. Okay. You do not have an

Page 8

attorney present; is that correct?

A. That's correct.

Q. Okay. Have you had an opportunity to meet with any of the lawyers in this case, Mr. Dan Thornburgh --

A. No.

Q. -- or any of his associates?

A. The first time I've seen you fellas.

Q. Probably something that you don't look forward to; but, again, I appreciate you being here.

Have you done anything to prepare for your deposition today?

A. I went to the OB/GYN Associates office, when you first notified me -- I don't know how long ago that was, three or four months -- and I looked at her record at that time.

Q. Okay.

A. But I don't recall the facts of the case at this point.

Q. Do you have a recollection of Judy Romero?

Page 9

A. No.

Q. So your testimony, as it pertains to her care and treatment, is going to be based upon the review of the medical records and your standard practice and protocols for care of a patient like her?

A. That's correct.

(Whereupon, Deposition Exhibit Lotze-1, Curriculum Vitae, was marked for identification.)

BY MR. BENEVENTO:

Q. Okay. You've been kind enough to provide me with a CV, and I've marked that as Deposition Exhibit 1. I just want to go through a couple of things to make sure I understand them correctly.

A. Okay.

Q. You graduated from medical school at Baylor College in 1965?

A. That's correct.

Q. And then you did your internship at Harbor General Hospital in Los Angeles?

A. Yes.

Page 10

Q. Was that affiliated with a military institution?
A. No. That's the UCLA program.
Q. Okay. And then it looks like you did your residency in obstetrics and gynecology at Baylor-affiliated hospitals here in Houston?
A. Correct.
Q. Then it looks like you spent a few years within the United States Navy Medical Corps?
A. Two years.
Q. Lieutenant commander?
A. Uh-huh.
Q. Were you performing medical services --
A. Yes. I was delivering babies and then practicing gynecology, obstetrics and gynecology.
Q. And then it looks like you were -- you've been in -- you were in private practice for about 35 years here in Houston?
A. That's correct.
Q. And then since 2007, you've

Page 11

been with the Woman's Hospital of Texas as its chief medical officer?
A. That's correct.
Q. Looks like you hold a clinical associate professor position with Baylor College?
A. Actually, since I -- when I -- I should have removed that. Since I closed my practice, I resigned that position.
Q. Okay. Are you teaching at any facilities?
A. No. I teach younger surgeons here. I mentor them in surgery, but that's the extent of it.
Q. Okay. So you actually assist newer physicians in general -- is it general surgery or --
A. No, in gynecologic -- precisely, endoscopic surgery.
Q. Endoscopic?
A. Yes.
Q. Thank you.
And it looks like you're board certified with the American College of

Page 12

Obstetrics and Gynecology; is that correct?
A. That's correct.
Q. Okay. And you're also with the American College of Physician Executives?
A. Well, that's an association.
Q. Okay. Any other American College associations that you have?
A. I'm a fellow of the American College of Surgeons and a fellow of the American College of Obstetricians and Gynecologists.
Q. And I think you said before, as you brought in the CV, there's a couple of -- many pages, actually, missing of various presentations and articles that you've authored?
A. Presentations, mostly surgical in nature, because that was my focus in my practice since 1980.
Q. Have you ever published on any topics relating to hormone therapy?
A. No.
Q. Have you published any -- on any topics relating to the manufacture,

Page 13

testing or marketing of pharmaceuticals?
A. No.
Q. Have you participated in any clinical trials for pharmaceuticals?
A. You know, many years ago, I believe, I was involved in an FDA-supervised study on a vaginal fungicide; and that was enough. I swore off that I would ever participate again.
Q. Do you remember what you were asked to do?
A. Fill out countless forms.
Q. Were you on the intake side of the study, meaning as the --
A. Yeah, we just collected clinical data on patients, yes.
Q. Okay. Prior to them taking the particular medication or after or both?
A. Well, we recruited the patient and gave them the medication, and then observed them afterwards.
Q. Okay. Was there any papers that were written afterwards or --
A. No. No. I did not participate

in this.
Q. Okay. Was this something in order to obtain FDA approval for this particular fungicide?
A. I imagine it was, yes.
Q. Do you know whether it was actually approved by the FDA?
A. All I know is the generic name, buta -- butoconazole, something like that. It was way back, many years ago.
Q. Have you ever worked with the FDA --
A. No.
Q. -- outside of that consulting capacity?
A. No.
Q. I'd like to focus, if I can, on your care during the 30 years -- 35 years that you were in private practice as an OB/GYN, okay?
A. Uh-huh.
Q. I take it during that period of time, you specialized in the care of -- and treatment of women?



A. That's correct.
Q. And during -- and in that capacity, many of those women were menopausal?
A. Well, it's interesting. In that early practice, there were very few menopausal women; and as you got older, your patients got older, so they aged along with you and they became menopausal, yes.
Q. At the time that you retired from private practice, could you give me a rough estimate of the number of women that were menopausal as opposed to not?
A. Oh, that's a difficult question, Mr. Benevento -- how do you pronounce your name?
Q. Benevento. "Good wind."
A. Benevento.
-- in that my practice evolved into a surgical practice, and specifically endoscopic surgery, which we pretty much pioneered here in Houston, so that I had a huge referral practice for laparoscopic hysterectomy, pelvic floor repair and so on



and so forth.
And, of course, I did have an office practice as well for patients, postmenopausal and premenopausal.
So to give you a percentage as to the numbers, I would say it would, perhaps, be in 10, 15%, maybe 20, at the most.
Q. I asked you that; you are a member of the American College of Obstetrics and Gynecology. Do you attend their meetings regularly?
A. No. I attend meetings now in the capacity of an industry, in that we have a product we're selling, our informed consent business on the Internet, online. But attending the meetings, no.
Q. During the '70s and '80s, when you were in private practice, did you attend the meetings of the American College of Obstetrics and Gynecology?
A. Some, but not all. There were many other organizations I belonged to that were more focused in my areas of interest.



Q. Which were what?
A. The American Fertility Society; the American Association of Gynecological Laparoscopists, or AAGL; the Society of Gynecologic Surgeons. Those, primarily.
Q. Were you a member of the North American Menopause Society?
A. I was for a very short period of -- no, I was -- well, I don't know. I subscribed to their journal for a while.
Q. Do you remember the name of the journal?
A. "Menopause"? I don't recall exactly.
Q. Okay. During that period of time, the '70s, '80s and early '90s, can you tell me the kinds of medical journals that you would routinely review in order to assist you with the care that you were providing to your patients?
A. Well, almost exclusively the -- called Fertility and Sterility. That was the journal of the American Fertility Society; the Green Journal, which was the publication

by the American College; and the Gray Journal, American Journal of Obstetrics and Gynecology.
And then there were a number of other -- what people would call throwaway journals: Reproductive Medicine was one of them; Female Patient; Contemporary Obstetrics and Gynecology; and then later on, the journal published by the AGL, Minimally Invasive Gynecologic Surgery.
Q. Did you read the New England Journal of Medicine on a regular basis?
A. No.
Q. Or JAMA?
A. No.
Q. I take it you would fulfill your continuing medical education requirements on a periodic basis?
A. Oh, yes.
Q. Do you recall whether you attended any of those kinds of courses that focused or specialized on the issue of hormone therapy?
A. No, not specifically, other



than it might have been a lecture and a general program, like attending the Sterility -- the American Fertility Society meeting or the occasional ACOG meeting.
Q. Could you tell the ladies and gentlemen of the jury what the symptoms that you consider to be menopausal?
A. Well, the most common symptom that everybody's heard of are hot flushes, night sweats, vaginal dryness, pain during intercourse. I mean, those are the -- and absence of menstrual flow, of course, associated with that. Those are the presenting symptoms in the usual fashion.
Q. How about vaginal atrophy?
A. Well, that goes with dryness, yes.
Q. Okay. Loss of libido?
A. Loss of libido is a symptom, although that's not necessarily just present during the menopause. And vaginal dryness is a finding, not a symptom -- I mean, vaginal atrophy is a finding, not a symptom. Dryness would be the symptom.



Certainly, emotional lability would be a symptom that sometimes would present as a presenting complaint in early menopause. Irregular menses, perhaps, would be associated with that as well, yeah.
Q. Is there a standard definition that you would use in order to determine whether a woman was menopausal?
A. I usually -- to confirm the menopausal state with a hormone test during an FSH study. And if that was -- showed an elevation of FSH levels and she had symptoms of night sweats and emotional lability, hot flushes, I think that would be pretty well stated that the patient was in menopause.
Q. I've heard some physicians indicate that they use a general rule of thumb that when the woman has stopped having her period for a year, that she would be characterized --
A. That's the old standard definition, yes. But if you tell a woman she has to have hot flushes and night sweats for a year before you make a diagnosis, you'll



lose a patient very quickly.
You have to excuse my voice. I had surgery on my neck here not too long ago. As you probably know, I had to cancel my deposition. And it leaves me still hoarse, so...
Q. You sound fine to me, and I do appreciate you accommodating us in rescheduling your deposition.
A. Sure. Sure.
Q. If there's any time that you need a break --
A. I'm fine.
Q. -- you know, this is not a marathon or endurance.
A. I understand.
Q. And if I ask you questions, which I'm sure I will, that you don't understand or don't make sense to you, just let me know --
A. Sure.
Q. -- and I'll try to do my best to rephrase them.
A. Sure.

Page 22

Q. So far, you've been doing great, so I appreciate that.
Based upon your knowledge, experience and training, do menopause-related symptoms affect a woman's quality of life?
A. Oh, absolutely. That's usually the reason for seeking help.
Q. Can they -- can those symptoms sometimes be life-altering or life-disturbing?
A. Very frequently. It changes the whole dynamic in a marriage or in the social relationship that person has, yes.
Q. And based upon your knowledge and experience and training, is hormone therapy a sound treatment for menopause-related symptoms, such as hot flashes and night sweats?
A. That's the accepted treatment, yes.
Q. And based upon your knowledge, experience and training, is hormone therapy effective for the prevention of osteoporosis?
A. For many years, that's the only

Page 23

thing we had; and it is very effective, yes.
Q. Have you ever heard it suggested to a woman with menopausal symptoms, such as hot flashes or night sweats, that they're at a reduced risk of contracting or developing breast cancer?
MR. THORNBURGH: Objection.
THE WITNESS: Would you -- would you say that question again?
MR. BENEVENTO: Sure.
BY MR. BENEVENTO:
Q. Have you ever heard anyone suggest to a woman that is experiencing menopausal symptoms, such as hot flashes or night sweats, that they are at a reduced risk of contracting or developing breast cancer?
MR. THORNBURGH: Same objection.
A. No. Breast cancer is always a risk.
BY MR. BENEVENTO:
Q. Have you ever told a woman that she has a lower risk of breast cancer because she's menopausal?

Page 24

MR. THORNBURGH: Objection.
A. Not that I recall.
BY MR. BENEVENTO:
Q. Have you ever heard any doctor at any clinic or at a medical conference or anywhere within your colleagues tell a woman with menopausal symptoms that they're at a lower risk of breast cancer?
MR. THORNBURGH: Objection.
A. No.
BY MR. BENEVENTO:
Q. Have you ever told a patient who has been diagnosed with breast cancer while taking hormone therapy that stopping her hormone therapy is enough to make her breast cancer go away?
MR. THORNBURGH: Objection.
A. No.
BY MR. BENEVENTO:
Q. You would agree with me that during the natural lifespan of a woman, they have a lifetime exposure of hormones, including estrogen?
MR. THORNBURGH: Objection.

Page 25

A. Well, during their reproductive years, yes; and to a lesser degree afterwards.
BY MR. BENEVENTO:
Q. Have you prescribed many different combinations of estrogen and progestins to your patients?
A. During my clinical practice years, I would think yes.
Q. Okay. Is one of those particular therapies entitled "Premphase"?
A. Premphase, I prescribed, yes.
Q. Can you tell the ladies and gentlemen of the jury what you understand that drug to be?
A. Premphase is a combination of conjugated equine estrogens and a -- I believe it was medroxyprogesterone, but it's been a long time.
Q. I just shorten it up as "MPA."
A. MPA, okay.
Q. Do you know why it is taken?
A. Well, assuming -- if I put a patient on Premphase, I would have to assume

Page 26

that she had a uterus in place. And estrogen, if given by itself, which is really what she needs to treat her menopausal symptoms, be they hot flushes or night sweats, what have you, would also lead to hyperstimulation to the lining of the uterus, putting her at risk -- at greater risk for uterine cancer.
So you combine it with medroxyprogesterone, or MPA, and that counteracts the estrogenic effect on the endometrium and thereby helps protect her, to some degree.
That would be given for -- Premphase would be given to somebody, then, in the menopause who had a uterus in place.
Q. Okay. So if I understand what you said, you would prescribe the estrogen portion in order to assist in the menopause symptoms, the vasomotor problems --
A. Right. Right.
Q. -- that she was complaining of, whether that be night sweats or hot flashes, vaginal atrophy, et cetera?

Page 27

A. Correct.
Q. And you would prescribe the progestin side of that drug in order to protect her uterus?
A. That's correct.
Q. Okay. What are the various options available to a physician, as you were for 35 years, for the treatment of menopause-related symptoms?
A. Well, certainly in the beginning of my practice, I had very few menopausal patients; but at that time, the hormonal treatment of menopause was not firmly established.
There was some physicians that were using a drug called stilbestrol that -- diethylstilbestrol, which is also known as DES, but this came -- fell out of vogue because it was a very, very potent medication.
And a more purified form of estrogen, estradiol, became available, and during the years, became fairly common that we would prescribe that in low dosage,

Page 28

progressively lower, as we realized that lower is better to patients who had vasomotor symptoms, hot flushes and night sweats.
And, of course, again, we knew, also -- or at least -- believe me, I started practicing medicine which I would now consider almost the Dark Ages, because we've learned so much since then as to physiology and what's necessary to maintain homeostasis in a healthy body.
We added the progestin, of course, to protect the endometrium. And sometimes it was two different prescriptions, and later on, pharmaceutical companies combined the two so that we made it very simple. We just had one drug.
Q. Now, in your answer, you indicated that you would attempt to use low dosages and then as you became more experienced, you said lower is better.
Can you give me a time frame of: Would that have been in the '70s, in the '80s?
A. '70s, into the '80s, and

Page 29

further on, yeah.
Q. So by --
A. It was a gradual process. It was sort of tied into, almost, the use of oral contraceptives as well, because the very early days of oral contraceptives, there were incredibly strong formulations; and then later on, we realized that we could go much, much lower dosages.
But let me also say that there are nonhormonal ways of treating hot flushes. There's various herbal preparations, or just stick it out and deal it with and it will go away; and in many cases, it did, and women put up with it.
Q. Okay. Getting back to the issues that I was talking about just a second ago --
A. Hormones.
Q. -- by the mid '90s, was it fairly recognized within your practice and how you administered prescription medications that you would use the lowest dosage possible to address the symptoms?

MR. THORNBURGH: Objection.
A. Absolutely.
BY MR. BENEVENTO:
Q. Okay. And you would use the lowest dosage possible for the shortest period of time to address the symptoms?
MR. THORNBURGH: Objection.
A. That's correct.
BY MR. BENEVENTO:
Q. Okay. And that's something that you, as I understand your testimony, had become familiar with over 20, 25 years of prior practice?
A. Yes.
Q. You mentioned oral contraceptives. In the '80s and '90s, were they hormone-based as well?
A. Yes.
Q. Did they have a risk of breast cancer?
MR. THORNBURGH: Objection.
A. Not that we understood, no. At least they were not associated with increased risk, or we would not caution our patients



that, "You have a higher risk of breast cancer by taking these."
BY MR. BENEVENTO:
Q. I'm sorry?
A. We did not caution our patients that their risk was increased.
Q. Did that ever change?
A. You know, my practice evolved so differently that my clientele was not young, other than wanting to get pregnant, so they were not taking birth control pills.
I actually had a big infertility practice. Or they were, you know, their late thirties, forties and were really trying to get rid of the problem, so we had a surgical practice.
Q. So your particular practice was geared toward helping people either get pregnant or addressing issues of complications of pregnancy?
MR. THORNBURGH: Objection.
A. The late effects of -- well, female problems involving fibroids, had nothing to do with pregnancy, or pelvic organ



prolapse, which may or may not be related to pregnancy.
BY MR. BENEVENTO:
Q. Are there pros and cons of various treatments that you would recommend to treat menopausal-related symptoms?
A. Pros and cons? Can you be more specific?
Q. Sure.
Is there certain types of treatments that -- for menopause that have pros, meaning that they're quick, efficient, easy, and cons may be that they don't work for certain people or certain people have allergies to them or things like that? Anything that you can think of as you were providing care and treatment for menopausal women?
MR. THORNBURGH: Objection, form.
A. Well, I would imagine that some people recommended injections, hormone injections, for quick relief. I never used hormone injections. But certainly hormone



replacement therapy, estrogen, per se, in patients who were diagnosed of being in menopause.
Again, I would not treat somebody without having made that diagnosis, based on either a long-term absence of menses and physical findings or in the presence of hot flushes and night sweats with an elevated FSH, follicle stimulating hormone, which would signify that, yes, this patient is either perimenopausal or into menopause, that I would initiate estrogen replacement therapy.
Now, if the patient had her ovaries but no uterus, then estrogen by itself was perfectly acceptable. But if she had a uterus, as I mentioned before, then we would combine it with a progestin.
BY MR. BENEVENTO:
Q. Would you agree that it's important to have as many safe options as possible for your patients who are suffering from menopause-related conditions?
A. Of course.

Q. Do you agree that at the present time, there is no strong evidence that there's a difference in the safety profile between different hormone preparations?
MR. THORNBURGH: Objection.
A. Depending on dosage. If the dosage is similar or equal, then I would think that is probably correct.
BY MR. BENEVENTO:
Q. When you first started prescribing hormone therapy to your patients, did you weigh the potential risks against the potential benefits in making the decision to prescribe the therapy?
MR. THORNBURGH: Objection.
A. We generally discussed that with patients. The risk, as we understood it, was certainly well documented.
The patient could develop a uterine cancer, stimulating the endometrium; would be at a slightly higher risk of a venous thromboembolus or blot clots or phlebitis.



In the early days, we did not associate any other risk from a cardiovascular standpoint.
BY MR. BENEVENTO:
Q. By the mid '90s, had you concluded that there was a small risk of having hormone therapy for breast cancer?
MR. THORNBURGH: Objection.
A. I was not aware of that.
BY MR. BENEVENTO:
Q. Okay. When you would prescribe a particular product like Premphase or Prempro hormone therapy, would you get the Physicians' Desk Reference to read the warnings and contraindications?
A. Yes. We did discuss that, yes.
Q. And in those warnings, do you recall a discussion about potential risk of breast cancer?
A. May have been, Mr. Benevento. It's been a long time since I held discussions such as these. But I would imagine that in the mid '90s, if I prescribed it, that I probably might have been --



probably would have been included in that, based on her family history.
If there was a negative family history, I would probably minimize it, saying, "Well, right now, we're going to treat you for your symptoms. You're going to be fine, and we'll just worry about whatever comes later."
Q. Okay. So if I understand your practice, it would be -- when you spoke to a patient, if she had a family history of breast cancer, you would talk to her about that risk for hormone therapy?
MR. THORNBURGH: Objection.
A. I would mention it, that we need to follow her very carefully. Certainly, I would insist on regular screening mammography and regular patient/physician exams. In other words, if she didn't come in, I wouldn't prescribe the medication.
BY MR. BENEVENTO:
Q. As part of your discussion with the patient, would you actually pull out the



PDR and show that to her and walk her through the warnings and contraindications?
A. Not usually at that time, no.
Q. Okay. Did that ever change in your practice?
A. No, although it might now. Back during my busy clinical years, we were generally overloaded with patients. We saw as many patients as we could schedule during the day and take care of in a thorough fashion, discuss their issues and take care of them.
But taking out a PDR and going over that, no.
Q. Okay. And if I understand what you testified to, though, you would look at the PDR from time to time in order to keep yourself informed?
A. Oh, yes, of course. We got drug detail people who came, and we reviewed risks and complications or indications, what have you, yes.
Q. Okay. And would you learn of additional medical complications from a drug

from seminars, conferences, colleagues, medical journals, those kinds of sources of information?
A. Generally, yes.
Q. Do you recall when you first started to prescribe Prempro, which is the drug that has both the estrogen and the progestin in the single tablet?
A. No, I sure don't.
Q. And I take it in your current position, you do not write prescriptions for --
A. No.
Q. -- hormone therapy?
A. No.
Q. And you're currently the chief medical officer for Woman's Hospital?
A. That's correct.
Q. All right. When you retired from private practice a few years ago, were you still writing prescriptions for Prempro?
A. I would suspect so, yes, although I'm sure there were fewer than it used to be.



Q. And then were you still writing prescriptions for Premarin or -- that's how I pronounce it --
A. Premarin, yes.
Q. Premarin?
A. Yes.
Q. How about Premphase?
A. I'm sure there were a few patients on Premphase. I cannot give you an answer to that.
Q. But it's fair to say that --
A. Alternative medications available, patches, and patients had their own ideas as to how they wanted to be treated.
Q. Okay. But it's fair to say that when you retired from private practice in 2006, you were still prescribing, for some patients, hormone therapy?
A. Oh, yes.
Q. And I think you've answered this question, but I just want to make sure: You don't recall Judy Romero at all?
A. I don't put a face to the name,



no. But usually when I review a chart, I would sort of get a feel for who that patient was, yes.
Q. Okay. And so it would be impossible for you to recall any statements that you may have made to her about her care and treatment?
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. If it's not in your medical records, you don't have a recollection?
MR. THORNBURGH: Objection.
A. No, no. I would not recall.
MR. BENEVENTO: I'm sorry, what's the basis for that objection?
MR. THORNBURGH: It's vague and ambiguous.
MR. BENEVENTO: Did you understand my question?
THE WITNESS: Yeah. Do I recall any specific conversations that I had with her. No.
BY MR. BENEVENTO:
Q. Right. And if there is --



MR. THORNBURGH: That wasn't the question, so it was vague and ambiguous.
BY MR. BENEVENTO:
Q. Would it be helpful to you if I showed you a label for Premphase or Prempro that predated Ms. Romero's cancer during the period of time that you were prescribing those drugs for her?
A. Sure. Uh-huh.
Q. And the reason I ask that is, again, I'm not trying to be argumentative or anything. I just wanted to know if you are aware of certain risks that were identified in the label, and if so, whether you would have -- it would have been your practice to communicate some of those risks to the patient?
A. It was always my practice to discuss what I considered to be a risk; certainly recalling risks particularly for thromboemboli, for sure. I'm sure, back in those days, we probably discussed breast cancer because everybody talked about it.

Cardiovascular disease, stroke, there was a higher risk of stroke. We understood that.
Later, people said, "Well, there might be a higher incidence of Alzheimer's." I'm not sure we ever discussed that. Heart attacks, I don't think that data came out until WHI.
Q. Okay. And WHI, the Women's Health Initiative, would have been 2002?
A. Right.
Q. Okay. Ms. Romero was diagnosed with breast cancer in 2001 --
A. Uh-huh.
Q. -- and stopped -- and was instructed to stop taking hormone therapy at that time, I believe, February-March of 2001?
A. Okay.
Q. So that would have been before WHI came out?
A. Yes. And I was taking care of her at that time, I take it?
Q. Yes, sir. Well, I shouldn't say that so quickly. Your group was.



A. Okay.
Q. And so what I'm trying to understand, if I've got your testimony correctly, you would have gone over with a patient such as Ms. Romero the risk of stroke and blood clots?
A. Blood clots for sure.
Q. And potentially, breast cancer?
A. Uh-huh.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Is that yes?
A. Yes.
Q. Okay. Those can all be fatal, correct?
A. Yeah. Absolutely.
Q. And we know that she continued to take the drugs, the hormone therapy, up until February of 2001. So would it be safe to assume that she accepted the risk of those particular potential side-effects --
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. -- or --



MR. THORNBURGH: Objection.
A. I would suspect that she felt the benefit of the hormone therapy outweighed the risk for her at that time.
BY MR. BENEVENTO:
Q. And you've already said this, but I just want to make sure I understand: Medicine and science evolve over time, correct?
A. Sure.
Q. And what we know today is not necessarily what we knew 20 years ago?
A. For sure.
Q. And that's true in -- with prescription medications as well, correct?
A. I would imagine.
Q. Did you have a practice of reanalyzing or reassessing a patient's need for hormone therapy on a periodic basis?
A. Not initially. I think after WHI, we discussed this, of course, in much greater detail, as far as, "Are you still having hot flushes?"
"No."



"Can you come off the hormones? How do you feel?"
And if we did, inevitably the patient said, "I want to be back on them," and that their sense of well-being was much better while they were taking hormones.
So although a lot of patients stopped hormone therapy after that on their own, and then came in complaining of hormone-deficiency symptoms like vaginal dryness, dyspareunia and night sweats, what have you, we would treat some of those symptomatically with other preparations.
Q. Okay. And it would be fair to say that you would not have instructed Ms. Romero not to worry about any risks such as stroke or pulmonary embolism or breast cancer?
A. Oh, no. No. We shared that information, but we didn't ever say, "Don't worry about it." I'd say, "Look, you know, these are the risks. This is the benefit. You have to make the decision."
And inevitably, quality of life

issues always were the determining factor that, "No, I want to be rid of hot flushes, vaginal dryness. I want to feel better."
Q. Okay. If I can turn your attention to Exhibit 2, which is the medical records that I've marked collectively, some of these predate your treatment of her and some of them, obviously, are during the period of time that your group did treat her, but they all came from your particular office.
A. Okay.
Q. If I can help --
THE WITNESS: Can you take this off for me? My hands are weak.
MR. THORNBURGH: Yeah.
THE WITNESS: Thank you.
BY MR. BENEVENTO:
Q. It looks like Ms. Romero was a patient of Dr. Lal, L-A-L, in the mid '90s?
A. Okay. Sam Lal?
Q. Right.
A. Yes.
Q. Do you know -- this particular



doctor is in Beaumont. Do you know Dr. Lal in Beaumont, Texas?
A. No. No. I don't know that doctor. Or Lal, L-A-L.
Q. L-A-L?
A. No. Lal, I don't know that person, no.
Q. All right. The first note that I have, sir, that is from your office is about 20 pages in, and it's got a little number down at the bottom of 27.
A. Okay. I found it. 26?
Q. 26 is above. And then if you look down below, 00027.
A. Okay. Yes. Right. Uh-huh.
Q. All right. And it appears that the date is February 10, 1998, correct?
A. Correct.
MR. THORNBURGH: I'm sorry, let me, if you don't mind, just find this page.
MR. BENEVENTO: Catch up to me? Sure.
MR. THORNBURGH: Yeah. What's



the Bates number?
MR. BENEVENTO: It's 27.
MR. THORNBURGH: 27. Is there --
MR. BENEVENTO: No, I put them in chronological order again.
There you go. With me?
MR. THORNBURGH: Yeah.
MR. BENEVENTO: Thank you.
BY MR. BENEVENTO:
Q. It looks like she presented with the chief complaint of lower abdominal discomfort?
A. Uh-huh.
Q. Do you see that?
A. Yes. Uh-huh.
Q. Do you know why she came to Houston to see you, as opposed to continuing to see her physician gynecologist in Beaumont?
A. I would suspect she was referred by a friend or an associate.
Q. Yeah, I had a note that indicated that her daughter was going -- was



seeking treatment through your group.
A. Okay.
Q. Do you recall Ms. Romero's daughter?
A. Huh-uh. No.
Q. The notation, as I'm going through there, says -- if you could read it, "Saw gynecologist, Beaumont, Dr. Lal."
A. Okay.
Q. And then I can't read the next entry.
A. "LMP, last menstrual period, one week, dash, normal flow."
Q. Okay. So she was still having her cycle?
A. No. She was on hormone replacement therapy; underneath that, "Premphase" --
Q. Okay.
A. -- "feels well."
Q. So on Premphase, they would still bleed?
A. Yes, that was cyclic.
Q. Okay. And would that be true

throughout their use of Premphase?
A. Yes.
Q. Would that mean that the only estrogen in the woman's body was from the hormone therapy?
MR. THORNBURGH: Objection.
A. Not necessarily.
BY MR. BENEVENTO:
Q. Okay. How would you be able to try to quantify what percentage of estrogen that a woman had was from endogenous sources as opposed to the therapy?
A. Well, in this particular case, you could not, unless you asked her to stop her hormone therapy and then did some hormonal studies to see where she was.
Q. Would you do an FSH test while someone was on Premphase?
A. No.
Q. So you would actually ask them to go off of Premphase?
A. Yes.
Q. For how long?
A. Well, usually -- again, it's



been a long time. I would suspect that I'd ask them be off for at least eight weeks before I'd -- but that may be too long. But that -- something like that would have been my answer -- my question for them.
Q. And if they were off of Premphase or hormone therapy for that period of time and they started to bleed again, would that tell you that they were still having some form of a cycle?
A. Yes.
Q. And that they were still producing some endogenous estrogen?
A. Correct.
Q. This notation indicated that she had already been on hormone therapy before she saw you. Do you know why she was taking it? Did she tell you?
A. No.
Q. Do your notes indicate the reason for her taking the hormone therapy, whether it was for menopausal symptoms or osteoporosis or something else?
A. No, not at that time. She had



a D&C at some time before. Perhaps it was to help her, regulate her during a premenopausal state. In other words, it wasn't unusual that if a patient was having irregular menses and ovulating irregularly, which is not uncommon at that particular state of life, that we would put a patient on hormones to help her during that stage. So I suspect that's what it was.
Q. Okay. If you turn three pages, the bottom number is number 28. These, again, are handwritten notes from your office?
A. Correct.
Q. Are they your -- is that your writing?
A. Yes. Yes.
Q. Okay. Under "Rx," which I assume is "prescriptions"?
A. Right.
Q. Can you read those for me, please?
A. It says, "Continue with Premphase, and may need a laparoscopy," to



determine or discover the source of her pain.
Q. Okay. And that's the lower abdominal pain that she was complaining off?
A. Right, that she came complaining about, yes.
Q. Okay. At this particular time, had you diagnosed her as suffering from menopausal symptoms?
A. I simply continued her care as it had been instituted by another gynecologist, and I was primarily involved in trying to determine the source of her pain.
Q. Okay. The lower abdominal pain?
A. Right.
Q. Did she have any questions for you as it pertained to the hormone therapy?
A. Not unless I wrote them down. I don't believe I did.
Q. And do you recall whether she was having any complaints or expressing any complaints to you about her hormone therapy?
A. No, she did not.
Q. When you indicated that you

were going to continue her on Premphase, would you have gone through the counseling with her that we talked about earlier, of, "Here's some of the risks, here's some of the benefits, here's some of the complications"?
A. No, not at that point.
Q. Is that because you would have assumed that she had already received --
A. Yes.
Q. -- that information from her prior gynecologist?
A. Yes.
Q. And I apologize if I've already asked you this, but as you would see a patient periodically over the years, let's say four or five years, would you ever refresh them in the counseling as it pertains to risks and benefits of hormone therapy?
A. Probably, most likely, yes, because patients would raise the issue, and we would have a discussion, yes.
Q. What kind of issues would they raise?
A. Well, the risk of cancer, risk



of ill effects from the hormones, prolonged treatment with the hormone.
Q. All right. If I can have you turn to page 26. It's about five more in.
A. Wait a minute. 26?
Q. Yes.
Again, the reason why they're not --
A. Going back or --
Q. Yes, they are. They're in chronological order. And unfortunately, when they were produced to our office, they weren't in chronological order --
A. Oh, I see. Okay.
Q. -- so I'm trying to just make it's easier for --
A. I gotcha. I gotcha.
Q. The top appears to be a -- it says "Progress Note," but looks to me like almost a --
A. It was a phone call.
Q. -- telephone note.
A. It was a telephone call, yes.
Q. Could you read that for me,



please?
A. Okay. It has a phone number. "Complains of" --
Q. Is that "heart irregularities"?
A. -- "heart irregularities, not sleeping well, hot flushes. Complains of heart pounding. Feels hormones not strong enough. She felt that this was -- this was before going on Premphase."
At that time, I said, "Okay. Let's do an FSH and an estrogen level." So she apparently was on Premphase when she was having those complaints, so I would do -- occasionally, I guess, I would do an FSH while the patient was on hormone. And I said it was okay to get those done in Beaumont.
Q. Okay. So she had been under your care for a few months by this time, correct?
A. 6/98, and she came to see me in?
Q. February of '98.
A. Okay. So four months.
Well, okay. So this was my



second contact with her. I wouldn't say that she'd been under my care. This was my second contact, by phone.
Q. Okay.
A. So she's just maintained her previous therapy.
Q. All right. But she was expressing to your office that the Premphase wasn't working for her?
A. That's the comment that she made, yes.
Q. Was that something that was unexpected?
A. Unusual.
Q. And then you indicated that you wanted to do an FSH test?
A. Right.
Q. And could you tell the ladies and gentlemen of the jury what an FSH test is and why you would do it?
A. Sure. FSH is a hormone produced by the pituitary gland. It's an abbreviation for follicle stimulating hormone, and it directly relates to the

amount of estrogen that's in the body. In other words, the higher the estrogen, the lower the FSH; the higher the FSH, generally the lower the estrogen.
And that is pretty much a routine study we use -- or we used, back then, in the diagnosis of menopause.
Q. Was that the only basis for determining whether a woman was menopausal or not?
A. No. Physical findings also contributed.
Q. And if I understand correctly, the FSH is actually an enzyme that's produced by the pituitary gland?
A. It's a hormone, not an enzyme, yes.
Q. Okay. A hormone produced by the pituitary gland --
A. That's correct.
Q. -- to send a signal to the ovaries to produce more estrogen?
A. That's correct, yes. It's sort of a push/pull mechanism. The FSH stimulates



the ovary to produce more estrogen. The estrogen is produced by the ovary, which cuts down on the FSH again.
Q. Is the ovary the only organ that would create estrogen in the body?
A. No. There are other ways of forming estrogen. I don't recall whether this patient was obese. Let's see what her weight was.
Q. Yeah, I don't think she was.
A. No, 124. Generally, obese patients convert adrenal androgens in their periphery, in their subcutaneous fatty tissues, into estrogen as well. So she wouldn't have any.
Q. And men can have estrogen in their body, can they not?
A. Absolutely. Absolutely, yeah.
Q. And how do the men -- how does, in a man's body, it create estrogen?
A. The same way.
Q. From the fats?
A. Yeah.
Q. Does someone have to be obese



in order to create estrogen in their body?
A. No. You could have a tumor, sure. And all men make some estrogen, okay, but most men predominate testosterone.
Q. So you indicated that it would be okay for her to have the FSH test and the hormone -- I'm sorry, and the estrogen level check conducted in Beaumont --
A. Uh-huh.
Q. -- where she lived?
A. Correct.
Q. All right. And then if I'm correct, there's -- on the same page, there's a note of June 23, 1998?
A. Right.
Q. And that has some handwritten note of the actual measurements of the FSH test?
A. Correct. That's my note.
Q. Okay.
A. And discussed her FSH, 45, which is slightly elevated, but her estrogen estradiol level is 152, which is fine. And she states that she was actually feeling



improved, so her symptomatology was really due to other factors not related to her hormones, most likely.
Q. Okay. Did you know whether the FSH test that was conducted, she was still taking Premphase at the time?
A. Yes, she was.
Q. She was.
So she didn't go off the Premphase for the --
A. No, she did not.
Q. Do those levels indicate that she is menopausal?
A. Probably.
Q. How so?
A. Well, 45 FSH is elevated.
Q. If you can turn to page --
A. She also complained of some irregular heartbeats, so I referred her to an internal medicine doctor. That's what that means.
Q. Okay. If you go three pages in, to 128 on the bottom, it's actually the clinical laboratory report from St. Elizabeth

Hospital in Beaumont.
A. Okay. All right.
Q. And that's the estradiol level; is that correct?
A. Yes.
Q. And the results of 152 indicate that she's in the late follicular phase?
A. Well, but she's on hormone replacement, so that does not necessarily indicate that.
Q. Why would anyone do this test when someone's on hormone therapy, then?
A. Well, she's complaining of hot flushes, and we're trying to determine: Does she truly have an absence of estrogen, or does she have enough?
Now, it can reasonably be argued that these hormone tests really don't contribute much, that they're of little value in that.
But the game patients play, and it probably has a significant psychological effect as well, is if you say, "Well, look, your hormone levels are fine," that they



respond to that just from a placebo effect as well.
So 152 was perfectly fine with me.
Q. So you're saying that the hormone therapy that she was taking was giving her enough estrogen in her body to address --
A. Yes.
Q. -- should be enough to address whatever menopausal symptoms she was complaining of?
A. Yeah. Uh-huh. Yes.
Q. And you did not increase the dosage of the Premphase?
A. No, sir.
Q. If you go to the next page, number 24, it appears to be dated February 2, 1999?
A. Yes.
Q. Okay. And under "Medications," it's got "Premphase," and what's that? Is that "to be determined"?
A. That -- no, "Premphase daily."



And then underneath that, I think that's Monistat, perhaps. No. Something. I can't read that writing. That was my nurse's writing. Something stat, 20 milligrams 1 b.i.d.
Q. She's complaining of vaginal discharge, over on the far left, so --
A. Yeah. Right. Let me see what her laboratory...
(Witness reviews document.)
A. It doesn't show much of anything.
BY MR. BENEVENTO:
Q. It appears, at least, by this examination of February of '99, she is not presenting with additional complaints of hot flashes and menopausal-related symptoms?
MR. THORNBURGH: Objection.
A. No. She had a vaginitis and otherwise, no other complaint, vaginal discharge --
BY MR. BENEVENTO:
Q. Well, she showed up to you --
A. -- recurrent pelvic pain,



chronic.
Q. If she showed up to your office and complained of hot sweats and hot flash -- night sweats and hot flashes and other kinds of menopausal symptoms that you've identified earlier in your deposition, would it have been your practice to note them under the "Complaints" section?
A. Yes.
Q. So is it a fair assumption, from reading your medical records, that she was not complaining of menopausal-related symptoms as of February of '99?
A. Correct.
Q. The next one I'd like to draw your attention to is about seven or eight more pages in. It's another annual examination. This one's February 22 of 2000. It has a little number 22 at the bottom.
MR. THORNBURGH: 22 is the Bates number?
MR. BENEVENTO: Yeah, 000022. It's dated 2/22 of 2000.
A. Okay.

BY MR. BENEVENTO:
Q. That's what I was able to pull out as the next annual examination of Ms. Romero by your office.
A. '99 -- oh, 2000, yeah. Okay. That's the 00. Okay. Almost exactly a year. Okay.
Q. And then under the complaints, there's a notation, looks like "none"?
A. "None."
Q. And medications, still Premphase?
A. Yes.
Q. So is it, again, fair to assume that the hormone therapy is addressing her menopausal symptoms?
A. Yes.
Now, I've got a question for you.
Q. Sure.
A. When did Prempro first --
Q. That's where I'm heading to next.
A. Okay.



Q. It's the next document.
A. Okay.
Q. The next annual exam of 2/27/01, which, again, is about four pages back, and it's Bates-numbered 20 on the very bottom, 000020.
A. Okay.
Q. That appears on the next annual examination; is that correct?
MR. THORNBURGH: If you don't mind.
MR. BENEVENTO: Sure.
A. Yes, that's correct.
MR. THORNBURGH: What's the date? That might be easier.
MR. BENEVENTO: It's February 27, 2001; entitled "Annual Examination of Judy Romero"; Bates number 00020. If it helps, it's --
THE WITNESS: I think it's further in.
MR. THORNBURGH: Is it -- oh, I'm sorry. I was going to wrong way. No, that's not it either. Is that



before or after that last?
MR. BENEVENTO: It's after.
THE WITNESS: It's about this much.
MR. BENEVENTO: It's about five pages later.
MR. THORNBURGH: Got it. Thank you.
MR. BENEVENTO: Sure.
BY MR. BENEVENTO:
Q. So, Doctor, the next notation I wanted to drawing your attention to, to me, appears to be the next annual examination of Ms. Romero --
A. Correct.
Q. -- of July -- I'm sorry, of February 27, '01, correct?
A. Uh-huh. Yes.
Q. All right. And under "Complaints," it appears that she has a couple there. Could you read them for me, please?
A. Well, actually, complaints were that she needs a heel scan, which was an



osteoporosis assessment, bone density assessment, and which we did in the office.
She had no bleeding, because I had changed her to Prempro before last -- a year ago. And she had an appendectomy in July, so that apparently explained her recurrent pain she had.
Q. Why would you have changed her from Premphase to Prempro if she wasn't having any problems?
A. Well, because most women like to stop having periods, and I'm sure that she initiated that, "Is there anything we can do to stop the periods?" And this is why I asked you a just a moment ago when did Prempro first appear.
Q. Okay. So you -- and I believe you were absolutely correct, sir, that you -- she was on Prempro for about --
A. A year.
Q. -- yeah. About ten months --
A. Yeah.
Q. -- as of July 27, '01?
A. Right. Uh-huh.

Q. And this is the same period where you noted an abnormal mammogram, correct?
A. Okay.
Q. And before I get to that abnormal mammogram, can you just -- under "Treatment," can you help me with what that says?
A. I said, first of all, "Diagnosis, rule out breast cancer, refer to general surgery."
Q. Okay. Where is that at?
A. Are we on the same page here?
Q. I apologize. I'm still on number 20, "Annual Examination of" --
A. Yeah, 2/27/01?
Q. 2/27/01, yes.
A. Okay.
Q. "Refer to general" --
A. "Surgery."
Q. -- "surgery"?
A. Right at the bottom.
Q. Okay. And what was that for?
A. Well, I was suspicious that she



had a breast cancer.
Q. And how did you reach that conclusion?
A. I did not feel anything, but apparently her mammogram was abnormal.
Q. Okay. So that's what I was trying to figure out. You had the mammogram result --
A. Apparently I did, yes.
Q. -- at the time --
A. Otherwise, I would not have made that comment here.
Q. Right. That's what I was trying to figure out, is whether you actually felt something and sent her --
A. No, I did not. "NPD" was my shorthand for no palpable disease.
Q. All right. So you would have had the mammogram result at the time of the annual examination, so she would have gone in for the mammogram a day or so --
A. She may have -- well, she may have had it done that same day, and the radiologist called me. I don't know. I'd



have to check and see what the date is on that.
Q. The next page appears to be the assessment for the bone loss?
A. Right.
Q. And there's some notations on the next page after that --
A. Right.
Q. -- which is Bates number 111 --
A. Yeah.
Q. -- where she is diagnosed with osteoporosis?
A. Osteoporosis. Femoral neck, yes.
Q. Even though she was on Prempro?
A. Was she a smoker? I don't recall.
Q. She was not.
A. Okay.
Q. At least the records indicate she denies smoking.
A. Yeah. Yeah. Okay. Well, it doesn't mean that you wouldn't get it. It certainly helped protect some people, but



some people still got osteoporosis.
Q. Well, kind of what I'm trying to figure out here, Doctor, is that if she was having some problems a year or two earlier with hot flashes again and wanting to check the estrogen levels and she's developing osteoporosis, all on hormone therapy, would it be safe to say that, perhaps, the dosage of the hormone therapy was on the lower end of what she needed?
A. Well, I would suspect that her bone density was already, a year before or two years before, in the lower end. And it was my aim at all times to maintain my patients on the lower dosages, so I would have not increased it for that.
I would have added some other medication to protect her bones, rather than increase hormone therapy.
Q. Okay. The prescription for the osteoporosis was to have her on -- is it Fosamax?
A. Yes.
Q. Now, are there any

complications from Fosamax?
MR. THORNBURGH: Objection.
A. I have no idea.
BY MR. BENEVENTO:
Q. Do you know whether you counseled her on the PDR, the Physicians' Desk Reference, for any warnings or contraindications for Fosamax?
MR. THORNBURGH: Objection.
A. I'm sure did. I'm sure it related to: Don't take it while you're lying down, drink plenty of fluids, and I'm sure we were not aware of any pathological fractures of the femur at that time.
BY MR. BENEVENTO:
Q. If I could go in, it's probably about eight or nine pages, it's the actual mammogram.
A. All right.
Q. It's got Bates number -- it's actually an addendum to the mammogram. It has a Bates number 130.
A. Okay.
Q. It's dated February 27, 2001,



so that was the date of the examination, also of your annual --
A. So she had it the same day. She came from Beaumont to have all her studies done.
Q. All right. And under the view, it says, "Addendum to mammogram dated 2/27/01." And it's -- under "Impression," it says, "Suspicious on the left breast, negative on the right breast; Recommendation: Surgical consultation for left breast."
And you agreed with that, correct?
A. Yeah. What usually happened, the patient would get her mammogram, then she'd come up and have my exam. And most likely, they called me and said, "Hey, we need to see her back for some more views," and she went back for additional mammography.
Q. And you were the physician that referred her to the surgeon, correct?
A. Yes, that's correct.
Q. All right. And you referred her to Dr. Karl Tomm?



A. Yes.
Q. All right. And that's about four more pages later. It's dated March 14, 2001, with the Bates number 108. It's his letter to you; is that correct?
A. Yes.
Q. Okay. And he's indicating that he performed a bilateral biopsy; the right breast findings were benign, correct?
A. Yes.
Q. And the left breast showed a high-grade ductal carcinoma in situ?
A. Exactly, yes.
Q. Okay. And then it says, "She has been told to stop her estrogen replacement therapy"?
A. Yeah.
Q. Did you agree with that assessment?
A. Yes.
Q. All right. Do you know why it was recommended that she stop her estrogen therapy?
MR. THORNBURGH: Objection.



A. Well, that was pretty much standard of care, that if a patient was diagnosed with breast cancer, that we'd stop all hormone therapy.
BY MR. BENEVENTO:
Q. Why is that?
A. Well, it was considered that possibly that might have been a related event at that time.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. That estrogen can cause breast cancer?
A. No, I won't say it causes breast cancer, but it might promote the growth of a cancer that's there.
Q. Okay. So that was something that was known in 2001 --
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. -- before WHI?
A. Well, I can't tell you whether that's true or not, but we did know, back then, that doubling time of cancers was

Page 78

probably seven to eight years, so that the cancer may well have existed in Ms. Romero before she ever started on hormone therapy.
Q. Right. We don't know when --
A. We don't know, no.
Q. We don't know when Ms. Romero's cancer would have developed?
A. No, we have no idea. Again, we don't know, and I'm not sure that we knew at this time whether estrogen is truly a fuel for breast cancer, because there's many patients that had breast cancer who go back on estrogen and do quite well.
Q. And we know from the WHI study of 2002 that the type of cancer she was diagnosed with, which is the ductal carcinoma in situ, was -- they did not find an association with hormone therapy; is that correct?
MR. THORNBURGH: Objection.
A. It's my recollection of WHI was that it was usually more for advanced cancers that were.
BY MR. BENEVENTO:

Page 79

Q. Invasive?
A. Yes.
Q. And DCIS is not invasive, correct?
A. "In situ" means it's localized to the lining. It's not invasive at this point.
MR. THORNBURGH: Objection.
MR. BENEVENTO: I'm sorry, what's the basis for your objection to these?
MR. THORNBURGH: He's here to testify about his care, as an obstetrician and gynecologist, of Ms. Romero, not to talk about or express opinions about breast cancer.
THE WITNESS: Thank you. Okay.
MR. THORNBURGH: He's not a breast cancer -- not an oncologist. So I think it's improper for you to talk about causes of breast cancer.
MR. BENEVENTO: Sure. So you're objecting on foundation?
MR. THORNBURGH: I'm objecting

Page 80

on foundation and that he's not been called as an expert on breast cancer.
MR. BENEVENTO: Okay. Well, I appreciate the latter part.
BY MR. BENEVENTO:
Q. But did you continue to treat Ms. Romero?
A. After she was diagnosed?
Q. Yes, sir.
A. I don't recall. I have to check on the records.
Q. Well, the records seem to go on to the present.
A. Looks like I saw her in 2002 here, so that's a year later.
Q. So when a patient has breast cancer, do you say, "Oops, sorry, stop the presses. I can't care and treat for you anymore"?
A. No, she's still a woman, she has gynecological issues, and as such, I would have continued to see her, and obviously I did.
Q. Right. And as part of your

Page 81

care and treatment of her after she contracts -- or is diagnosed with breast cancer, you don't prescribe care and treatment that would be counterproductive to her health, including breast cancer, correct?
A. I would assume.
Q. So you're generally familiar with things like WHI 2002 --
A. Yes.
Q. -- right?
And you indicated earlier that that's something that you had read; is that correct?
A. Yes.
Q. And you read that so that you could be familiar with the results of that study and how you can care and treat for your patients?
A. True, but WHI happened after we made the diagnosis of cancer in Judy.
Q. Correct, and I fully appreciate and agree with you.
A. Okay.
Q. My question was a little

different, and that is: When you read WHI, did you note that there was not a correlation between hormone therapy and noninvasive breast cancer?

MR. THORNBURGH: Objection.

A. I became aware of that later. I may not have been that focused at that time.

BY MR. BENEVENTO:

Q. Okay. And we can know from your care and treatment of Ms. Romero, she did not have invasive breast cancer, correct?

A. Not as far as I know.

Q. All right. If you turn, please, sir, to -- it's, again, about eight or nine pages in --

A. From 2/27/01?

Q. It's got a Bates number of 19 on the bottom. It's dated April 30, 2001, and it's a series of notations that are actually almost eight months.

A. I have 18 here, 19. 19 is 00019.

Q. Yeah. 00019, and it starts



with the phone note of April 30, 2001.

A. Here it is. Okay. All right.

Q. Can you help me with the notation on the top, please?

A. Judy Romero phone number, she was on some over-the-counter preparation, and that's my nurse's writing. I can't read it.

Q. Okay.

A. "Promensil," perhaps, over -- "times four weeks. Not helping with her hot flushes. What else now?"

Q. So apparently she was calling your office a few months after being taken off of hormone therapy --

A. Right. Yeah.

Q. -- and having been told that she has DCIS in the left breast?

A. Uh-huh.

Q. And she was complaining that she was experiencing hot flashes again?

A. Right.

Q. Do you recall what you did to help her with that?

A. I started her on Effexor.



Q. And what is Effexor?

A. It's a medication we use to -- I forgot the exact pharmacological designation of this. Five years out of practice does a lot for remembering the pharmaceuticals.

But it was usually treated for patients who had depression, and it helped modify hot flushes significantly, particularly this drug Effexor.

Q. Okay.

A. But she was also apparently taking tamoxifen.

Q. And that was prescribed to her by her oncologist?

A. Oncologist. And that is a major problem for hot flushes as well.

Q. Okay. That's an estrogen blocker?

A. Yes.

Q. All right. And she's also on radiation therapy for the left breast?

A. Right.

Q. That's a notation that you made



right below, correct?

A. Right.

Q. 5/2/01?

A. Right.

Q. All right. It looks like, however, that there was a recommendation to take Bellamine?

A. Well, Bellergal Spacetabs first, which was a medication that was quite efficient, quite effective in helping people with hot flushes. It was a -- gosh. Again, I can't remember the exact classification of the pharmaceuticals that are involved here; but it obviously helped her, because we refill it for her later on.

Q. That's what I was about to ask you.

A. Yeah.

Q. Is it safe to assume that the notation at the bottom of Bates number 19 of November 14, where it's refilled, tells us that she was getting some relief?

A. Right, because the Effexor, she didn't want to take that. She stopped that.

Page 86

That was noted in the above notation as well.
Q. Do you know why she stopped taking Effexor?
A. No.
Q. The next page, again I just had a question. It's looks like there was a sample collected on May 3, 2001, where there was some positive notations made?
A. Yeah, she had a positive hemoccult, meaning blood within her stool, so she was referred to a colon and rectal surgeon.
Q. Okay. And you were -- were you aware that she actually had a -- some of her colon removed a few years later?
MR. THORNBURGH: Objection.
A. No, I was not.
MR. BENEVENTO: What's the objection on that one?
MR. THORNBURGH: Lack of foundation.
BY MR. BENEVENTO:
Q. I'm asking you: Are you aware?
A. No.

Page 87

Q. Thank you.
MR. BENEVENTO: I'm not sure how else I can create the knowledge or lack thereof without asking a question, Counselor.
MR. THORNBURGH: Well, if you think that is part of the facts, then show him the records that show that.
MR. BENEVENTO: Sure.
MR. THORNBURGH: Don't --
MR. BENEVENTO: Okay.
BY MR. BENEVENTO:
Q. If you can turn to --
MR. BENEVENTO: I didn't know this was going to be hotly disputed, but apparently it is.
MR. THORNBURGH: I don't think it's a big issue, and I don't really care. I mean, I can object, and you can either show him or not. I don't care. But I can still object.
MR. BENEVENTO: Yeah, as long as you have a basis, sir.
MR. THORNBURGH: I do have a

Page 88

basis.
MR. BENEVENTO: Okay. And your basis is lack of foundation?
MR. THORNBURGH: Definitely. Yes.
MR. BENEVENTO: Okay.
BY MR. BENEVENTO:
Q. Well, if you can turn to your medical records...
A. 159 seems to have an endoscopy report on it.
Q. Thank you.
And what does that tell you?
A. Well, let's see here. Patient apparently had a history of polyps, colon polyps. She had some small internal hemorrhoids, had a sessile polyp adjacent to the area where the appendix was.
And so I would not say that this was part of her colon removed. That was a polypectomy, removal of a polyp.
Q. Okay. And do you know whether she had any further colon care?
A. No, I'm not aware of that.

Page 89

Q. All right. I believe the time period that she had that surgery, and I'll represent to you that she did have the surgery, you were retired in private practice --
A. Okay. All right.
Q. -- and were now here.
MR. THORNBURGH: I'll object.
MR. BENEVENTO: That it's not part of the record, so you're calling me a liar?
MR. THORNBURGH: I'm not calling you a liar.
MR. BENEVENTO: Okay.
MR. THORNBURGH: I'm just objecting -- I don't see it as part of the record, so, I mean, you can make representations. I'm going to object to the representations that you're making.
MR. BENEVENTO: Okay. On the basis that they're false?
MR. THORNBURGH: On the basis that you lack foundation right now. I

haven't seen it and --
MR. BENEVENTO: Okay.
BY MR. BENEVENTO:
Q. Can you turn to number 159?
MR. THORNBURGH: That's where we just were.
BY MR. BENEVENTO:
Q. Okay. If you turn to the next page, it indicates that the polyps were not malignant; is that correct?
A. That's what it says, yes, sir.
Q. Do you -- and do you know whether she had any further colonoscopies?
A. No, I'm not aware of any further care for her.
Q. If she was having continued -- if she was having continued colon problems, is that something you would have referred her to a gastroenterologist?
A. Probably a colon and rectal surgeon.
Q. Do you know whether she expressed any further complaints to you during your care and treatment of her as it



relates to complications from breast cancer?
A. Well, apparently she had a bone density done, and the date on this is March 2004, and her osteoporosis was getting worse, so I left a message for her to consider some other drug therapy, rather than Fosamax.
Q. Okay. And my question was poorly asked. Let me try again, Doctor.
In the care and treatment of Ms. Romero, after she had the biopsy and radiation therapy in 2001 --
A. Uh-huh.
Q. -- do you know of any further complications that she had pertaining to her breast cancer?
A. I'm not aware of any, no, sir.
Q. The next annual exam that I see is dated March 26, 2003. It's got a number 15 at the bottom. It would be approximately 20 pages after your annual examination of March 12, 2002.
A. Did I see her?
Q. Well, let me go to the next



one. The next annual examination of March 12, 2002, it's got a Bates number on the bottom of -- that's 00017. It follows the report of June '01, dealing with the Scott McKenney assessment.
MR. THORNBURGH: Is that before or after the '03?
MR. BENEVENTO: I believe it's before. You're talking about the colon document that he was talking about?
MR. THORNBURGH: Yeah. Right.
MR. BENEVENTO: I believe it's before.
BY MR. BENEVENTO:
Q. If it helps, here's my page, Doctor. I just wanted to note that it's the next examination.
A. Okay. Let's see. That's -- what's the date, again, on that?
Q. March of -- March 12, '02.
A. March 12. Okay. Hang on. Okay. Found it. All right.
Q. Are you still treating



Ms. Romero?
A. That's my handwriting, yes.
Q. Okay. And under the complaints, it says, "Getting up at night to urinate, no bleeding"?
A. Right.
Q. And the medication she's on is tamoxifen, and we talked about that. That's the hormone blocker?
A. Right.
Q. Celebrex?
A. Yes.
Q. What's the Celebrex for?
A. I did not prescribe it. It was prescribed by another physician, so I cannot answer that.
Q. Okay. Do you know what it's generally prescribed for, or does it have multiple uses?
A. It's usually prescribed for rheumatoid arthritis.
Q. Okay. And then we've got the Bellamine, which was for the hot flashes?
A. Hot flushes, uh-huh.

Page 94

Q. And then the Fosamax, which was for the bone density?
A. Right.
Q. Anything of note or unusual in this annual examination?
A. No. Her pelvic exam was very normal. Again, I had a habit of following patients who were taking tamoxifen because it had a different effect on the lining of the uterus. It could stimulate that. So I recommend that she have a pelvic ultrasound in September, just to assess her endometrial lining.
Q. Okay. And then about 20 more pages into Exhibit 2 is your next annual examination of March 26, '03. It's got a Bates number on the bottom of 00015.
A. Okay. Got it.
Q. Is she still under your care?
A. Yes.
Q. All right. And it says under "Complaints: No complaints, feels better"?
A. Feels better with Bellamine, yeah.

Page 95

Q. Okay. And the Fosamax for the bones?
A. Right.
Q. Okay. The next page is a mammogram result; is that correct?
A. Yes.
Q. And it indicates that -- it's negative, correct?
A. Right.
Q. But it indicates that she has dense breasts; is that correct?
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Well, can you explain to me what -- the third line under "Mammogram," where it says, "The fibroglandular parenchyma is dense"?
A. Well, that's the radiologist's interpretation. I'm not an expert in radiology and breast exams, so I can't comment on that, sir.
Q. Okay. Do you know whether she had dense breasts before she took hormone therapy?

Page 96

A. I have no idea.
Q. Okay. And at this particular point in her life cycle, it's March 26, 2003. She would have been off hormone therapy for two years?
A. That's correct.
Q. Okay. Would you expect that if -- the breasts to revert back to their pre-hormone therapy condition?
MR. THORNBURGH: Objection.
A. Well, apparently hormone therapy increases breast density, and that can remain, as I recall, for quite some time; but it generally does revert back to normal.
Now, this patient had radio therapy, and that might have influenced that. I don't know.
BY MR. BENEVENTO:
Q. Okay. How long does it generally take for the hormone therapy to work itself through the system so that it no longer would result in dense breasts for a woman?
A. I don't have an answer for you.

Page 97

I don't know.
Q. So if we looked at mammogram results that are current today and it still shows dense breasts, would it be a fair assessment to assume that she has dense breasts naturally?
MR. THORNBURGH: Objection.
A. I have no idea, sir. I look at the report that tells me no cancer, and I let the radiologist worry about the denseness.
BY MR. BENEVENTO:
Q. I understand that. I'm just asking you from your experience --
A. Yeah. Yeah.
Q. -- as a doctor in private practice for 35 years, whether someone that's been off of hormone therapy for a number of years and the mammograms are still showing dense breast tissue, that one could safely conclude that she has naturally dense breasts?
MR. THORNBURGH: Objection to form.
A. I don't have an answer for you,

sir. I do not know what the --
MR. THORNBURGH: Take the deposition of the radiologist.
A. I don't know what the answer would be for that, whether -- how long dense breast persists or whether a woman naturally have dense breasts. Certainly as a woman goes through menopause, they become less dense, but, again, every woman is different and every -- so I don't have an answer for you.
BY MR. BENEVENTO:
Q. Okay. Fair enough. That's all I wanted to know, whether you know or not.
A. I do not.
Q. Okay. There's a notation in the -- in your file, and it's far down in the records. It's number 56. It just indicates that this patient was being considered for T-O-F-O-R-T-E-O research?
A. Forteo?
Q. Yeah.
Do you know what that was about?



A. I believe it was an injectable or intravenous agent to build bone. It was very expensive --
Q. Okay.
A. -- as I recall.
Q. And if I understand her records correctly, she was not eligible for that because she had radiation therapy?
A. Probably, yes.
Q. Okay. And then there's another mammogram; but I do believe this one was actually done after you retired, April 26th, 2007?
A. Yes, I had closed my practice in December -- in June of 2006.
Q. Do you know who took over her care from your group?
A. Well, let's see. She actually is seen here for her first exam in April of 2006 by Dr. John Irwin, so she apparently heard I was retiring and made a change.
Q. Was he with your group, or --
A. Yes.
Q. Okay. I also had an



individual -- just bear with me for a moment -- Teresa Robinson?
A. She's not in my group. She's a practitioner here at Woman's Hospital, yes.
Q. Do you know what her specialty is?
A. OB/GYN.
Q. Okay. At the time that you last saw Ms. Romero, did you have an assessment of her long-term prognosis for recurrence of breast cancer?
MR. THORNBURGH: Objection.
A. No. I'm sure I made a comment that everything looked fine, she was normal and healthy. And having had an in situ cancer, I would have expected that her prognosis was fairly good.
BY MR. BENEVENTO:
Q. And she hasn't contacted you since your retirement to discuss anything with you?
A. No. No.
Q. Okay. During the time that she was under your care, did she ever ask you



your opinion as to what caused her breast cancer?
A. Not that I recall.
Q. Had she asked you, would you have been able to answer her question?
A. No. I probably would have said "luck of the draw."
Q. When the WHI results came out in 2002, did it have any impact on your practice?
A. I think it impacted every gynecologist's office. We were flooded with phone calls. We had patients throwing their hormone pills away, coming in terribly -- complaining of hot flushes and all the other symptoms related to that; and, of course, with the stress, "What do I do now?"
And we used some local estrogens for their vaginal dryness, and we said, "Well, we can use other agents, like we did in this particular woman, to help combat the hot flushes. And some patients said, "Well, everything considered, I think I'll go backed on hormones."

So that was a very, very busy time for us, yes.
Q. So it ran the gamut?
A. Yeah.
Q. Some stopped taking hormone medication without consulting with you, correct?
A. Right. Oh, yes.
Q. Some consulted with you?
A. Right.
Q. And some continued with hormone therapy?
A. Yes.
MR. BENEVENTO: We have a few minutes left on the video. They need to change it, so why don't we take a quick break, and I'll look at my notes and see if I have anything else.
THE WITNESS: Yeah, I need a break. Okay.
THE VIDEOGRAPHER: Okay. We're off the record at 5:03 p.m. This concludes Tape 1.
(Recess taken, 5:03 p.m. to



5:11 p.m.)
THE VIDEOGRAPHER: Stand by, please. We're back on the record, 5:11 p.m. This is the beginning of Tape 2.
MR. BENEVENTO: Thank you.
BY MR. BENEVENTO:
Q. Doctor, when we took our break to change the tape, we were on the public reaction or your patient reaction to the WHI study results of 2002; and you indicated, if I'm correct, that some stopped taking it, some called and asked you questions, and then some continued to take the medication, correct?
A. They all called, it seemed like, yeah. Okay.
Q. And how did you advise a patient that would call and say, "Doctor, I just saw, you know, the news, and there's apparently a study out there that talks about hormone therapy. What do you think I ought to do?" What did you advise them?
A. Well, my first advice was,



"Well, let's wait and see what this is all about. Let's get a little bit better idea what the study really found and what's the data that's being presented," because we were all dumbfounded by -- we were blindsided by it.
And some doctors immediately stopped all hormone therapy. They told their patients, "Don't take it anymore."
Other doctors says, "Well, let's be a little bit more evenhanded here. Let's -- we can treat you. Let's follow you carefully. You're healthy. You've been on this a number of years; nothing's happened. Your mammogram is negative. Your exam is negative. You're feeling fine."
And other patients said, "I don't want any of it. I want to stop."
So I generally advised caution, but suddenly stopping everything, a more rational approach to evaluate the patient's specific situation in response to that.
Q. And did that continue through 2007?



A. It eased off; but certainly a lot of patients resumed hormone therapy. Many did not. And I think we all became more cautious in prescribing it.
Q. Would it be fair to say that we don't know what Ms. Romero would have done had she been asked to take hormone therapy after WHI result of 2002?
MR. THORNBURGH: Objection.
A. You mean if she had not had a cancer or --
BY MR. BENEVENTO:
Q. Yeah, let's assume for the sake of the argument that she continued under your care through 2002 -- July 2002 without breast cancer. Do we know what she would have done?
A. I think she definitely would have asked us, myself and other people, about the safety of it, and we would have been very circumspect and cautious in answering that, saying, "Well, at this point, you have no family history. You're negative. Your exam's negative. You've been on it for four years or however long," and, in general, we

said, "You're still having hot flushes. Stay on it while we're treating your hot flushes."
But whether she would have continued or not, I can't speak for her.
Q. Right. We don't know, correct?
A. Yeah.
Q. But it wasn't your approach to say, "Stop the presses" --
A. No.
Q. -- "no one gets hormone therapy ever again"?
A. No. No. No.
Q. That would have been an overreaction?
A. And many doctors did answer that way.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. There's some marketing materials that my client puts out from time to time about various drugs, including hormone therapy. Did you ever review any marketing materials by Wyeth pertaining to Premphase or Prempro?



A. I'm sure I did, but I don't recall the specific nature of any of them.
Q. Did you ever share any of those marketing materials with any patients?
A. If they were made specifically for patients, I would. But if they were not made, if they were directed to the physicians and the professionals, no.
Q. Okay. So if there were actual pamphlets for the patient that a drug representative would have, you would put them in your lobby?
A. I would pass them out, yes.
Q. Would you pass them out to the patients specifically, or would they just be there for the patient to gather?
A. No, it would be passed out specifically to patients who were taking that particular hormone replacement therapy.
Q. Okay. And do you know whether you passed out any information to Ms. Romero about Premphase or Prempro?
A. No, I do not.
Q. All right. There's some notes



that have been disclosed during the course of the litigation that various sales representatives from Wyeth visited your office from time to time to talk about hormone therapy.
Did any of those conversations with those sales representatives induce you or make you prescribe hormone therapy?
A. No.
Q. Were you influenced or induced by them to prescribe hormone therapy?
A. Never.
MR. BENEVENTO: Okay. Thank you for your time.
THE WITNESS: Sure.
EXAMINATION
BY MR. THORNBURGH:
Q. Doctor, I'll try to be as quick as I can, though I do have an outline that I need to go through with you.
A. Okay.
Q. So I apologize, but I thank you for your time.
A. You're welcome.



Now, before we start, I will tell you, as I've told the other counsel, that I will send a bill for my time.
Q. Okay. Okay.
A. Okay.
Q. All right. Doctor, when you were treating patients, did you have a busy practice?
A. Yes.
Q. And full waiting rooms, full of patients, or --
A. Well, my -- I really never liked waiting in a doctor's waiting area to be seen, and I tried to keep my practice so that my patients never waited more than 15 minutes.
So the answer to your question: I had a busy schedule, but it was not overbooked.
Q. Okay. And I think I asked the question probably poorly, but you were treating patients; that was your primary practice. You weren't doing research or teaching or other things like that?

Page 110

A. No. No. Teaching only inasmuch as we have residents here that we train, okay?
Q. Okay. They would train at your office?
A. No, only in surgery.
Q. Okay. And was that the case in 1998?
A. Yes.
Q. Doctor, is it accurate to say that the role of a doctor is to understand the drugs that you prescribe and provide accurate advice and information to patients?
A. It certainly is part of the role of the physician, yes.
Q. And the other part would be to visit with the parents and --
A. Visit, assess, diagnose, yes.
Q. Okay. And the goal of understanding the drugs that you're prescribing and to provide accurate advice and information to the patients so the patient can make informed decisions about a therapy?

Page 111

A. Generally, yes.
Q. And are you the type of doctor who discusses drugs with patients? I think you testified to that earlier, that you -- it was your general practice to discuss therapies with your patients?
A. I would discuss the highlights of therapy, both risk and benefits. But certainly you wouldn't have the time nor the patience nor the knowledge, nor would the patient tolerate an in-depth review of the entire PDR.
Q. Right. Right. So relevant risks that you determined were necessary to convey with the patient?
A. That's correct.
Q. And, also, you discussed benefits with patients?
A. Sure.
Q. And you did that in your practice with hormone therapy?
A. Yes.
Q. And would you leave the ultimate decision as to whether to take a

Page 112

drug or not to the patient?
A. Always.
Q. Doctor, earlier in your deposition you testified about a number of publications that you would receive from time to time, and I think you indicated ACOG is one of those?
A. Right.
Q. Okay. And in forming your risk-benefit assessment of drugs, would you rely on a number of different sources for information about the benefits and risks or safety of a drug?
A. I think that's part of our continuing education. We attend lectures. We read. We -- certainly the drug detail people played no small role in keeping us educated as to what's current and what's new. Absolutely, yes.
Q. Okay. Would it be fair to say that you would rely on medical school and residency training in determining the risks and benefits of drugs, including hormone therapy?

Page 113

A. Well, it certainly played a role; but I can tell you that during the years, and after having graduated from medical school in 1965, that is 46 years now, that pretty much -- or very little of what was true then is true now.
Q. All right. What about at the time that you were prescribing hormone therapy, would you, as part of your sources of information -- would you rely on information received from colleagues, perhaps?
A. Sure. There's always a free flow of information between physicians. Absolutely.
Q. Okay. And the -- I think you testified to this earlier, but the Physicians' Desk Reference as well?
A. Well, we would definitely consult that. I mean, it speaks for itself. I don't think there's a physician who wouldn't have a PDR in his office.
Q. Okay. And published medical articles from medical journals?

A. Absolutely.
Q. "Dear Doctor" letters sent from pharmaceutical companies?
A. As long as they were not just totally promotional, but had some valid scientific information, yes.
Q. Did you find that some "Dear Doctor" letters were mostly promotional?
A. Some were.
Q. Do you remember any specifically from Wyeth about hormone replacement therapy?
A. No.
Q. And you testified earlier, I believe, but CME lectures or presentation would be a source of information that you would rely on?
A. Yes.
Q. Medical conventions and booths at conventions?
A. Absolutely.
Q. Printed information received from sales reps or directly from drug companies?



A. Certainly, we reviewed that. Doesn't mean that -- I mean, we have independent minds. We would assess and either accept or discard.
Q. Right. I think what I mean by -- you would look at sort of the totality of the information out there to form your opinions about the safety and benefits of drugs?
A. Sure.
Q. And this would include sales reps, answers that you would receive, for instance, from sales reps about questions you may have?
A. If I felt that the question was appropriate and the answer was appropriate, sure.
Q. And bulletins, position statements and patient education information provided by medical associations, such as ACOG --
A. Absolutely.
Q. -- and NAMS?
A. Yes.



Q. Textbooks or reference materials?
A. They're usually outdated.
Q. What about Novak's on Gynecology, did you ever rely on that for information about drug safety?
A. It wouldn't be appropriate now. Back in the days when I studied, when I had my residency in 1966 through '69, it was very appropriate; but I wouldn't rely on that ten years later.
Q. Okay. Anytime after '66 or '69?
A. No, I generally read journals, and I don't think I ever went back to textbooks.
Q. What about articles in newspapers or ads on television?
A. No.
Q. Doctor, you trust that drug companies provide accurate information about the risks and benefits of a drug?
A. I think they're obligated to provide us accurate information about risks



and benefits; but they also have a promotional side to them, obviously.
Q. Right. But I guess what I mean to say is that you hope that they are providing you with accurate information about the safety and benefits of drugs?
A. Well, at the same time, you have to balance that, that we are not stooges that get spoon-fed by the drug companies, that we have an open mind and we can interpret and digest and make -- come to proper conclusions.
Q. Right. And I guess that goes back to looking at the total information out there --
A. Correct.
Q. -- from all these other sources that you can draw upon in forming opinions about drug safety and benefits of a drug?
A. Correct.
Q. Do you trust that drug companies won't hide bad data?
A. I mean, we've all read news about things like that, sure.

Page 118

Q. Do you hope that drug companies do not exaggerate benefits?
A. As I said before, you know, having an inquisitive mind and a discerning mind, you have to balance the risks and benefits. You don't depend on the drug company or anybody else to make that decision for you.
Q. Right. But you hope that drug companies wouldn't minimize or downplay risks of their drug?
A. No, I don't think they do. I think your own experience will play a big role in how you counsel patients and how you interpret the data.
Q. Right. Would you find it -- would it be inappropriate, in your opinion, for a drug company to not give you accurate information?
A. I would agree with that.
Q. And that would mean that it would be difficult or impossible for you to convey accurate information to the patient that you're treating?

Page 119

MR. BENEVENTO: Objection, lacks foundation.
A. If I relied totally on the drug company, that would be true, but I don't think I would ever do that.
BY MR. THORNBURGH:
Q. Right. You would rely on the other sources of information to draw upon?
A. Yes. Correct.
Q. Doctor, we talked about the PDR a bit. Can you tell the ladies and gentlemen of the jury what the Physicians' Desk Reference is?
A. It's a compendium that I would expect includes all the current pharmacopeia that's available in the United States, drugs that we use on a daily basis for every known condition.
It contains the description of the drug, the chemical makeup, the indications, the risks, the benefits, ad nauseam, the dosages, so -- and it gets bigger every year.
Q. And the PDR, the labels

Page 120

contained in the PDR, that's one source of information that you would draw upon to determine the risks and benefits of a drug?
A. Well, certainly if it's a drug that you are not familiar with, you would go to the PDR and look it up. If it's a drug that you use on a daily basis, I don't think you'd be as likely to go to the PDR.
Q. And prescribing hormone replacement therapy, the PDR would have been one source of information that you would have determined -- or that you would have looked at regarding the indications of the drug and the risks associated with the drug?
A. I don't think so, necessarily. I think we probably look as much in the drug product insert, labeling insert, as well as the information and knowledge that you've gained from lectures and general assessment of drug classes as to what their risks and benefits are.
Q. Do you recall whether or not you looked at the PDR in 1998, when you treated Ms. Romero with hormone therapy?

Page 121

A. No, I can't recall that.
Q. Could that have been one of the sources that you would have looked at?
A. Well, let's recall that my first visit with Ms. Romero, she was already on hormone replacement therapy, so it's not likely that I would have looked it up and said, "Let's see what's Premphase."
I was familiar with Premphase, and she was doing fine on it, so I said, "Well, let's just continue on it." So it's not likely that I would have looked up the PDR.
Q. Right. So you may have -- prior to 1998, you may have -- and just for hormone therapy in general, the PDR may have been something that you would have gained information from at some point in time prior to?
A. That would not have been my first source of information about becoming knowledgeable about hormone replacement therapy.
Q. Okay. The first source of

information would have been from one of these other sources?
A. Lectures, meetings, local CME programs that we have. I mean, physicians, believe me, even at this stage, we go to meetings and we attend continuing medical education classes. I maintain my license to this date.
Q. Right. I assume, and correct me if I'm wrong, that maybe at one point you would have looked at the PDR for Premphase, if you recall?
A. Specifically for dosages, perhaps; for some obscure side-effect, perhaps; but not primarily.
Q. Okay. And speaking of dosages, you understand that Premphase, at the time that you prescribed it, had one dose. It was Premarin, the estrogen, at 0.625 --
A. 0.625 and --
Q. -- and the medroxyprogesterone, the MPA, at 5 milligrams?
A. Yeah.
Q. There wasn't a lower dose than



that at the time?
A. No.
Q. So we know that you're familiar with the drugs known as postmenopausal hormone therapy. How long have you known about these types of drugs?
A. Well, you know, HRT came into vogue, I would say, probably late '70s and '80s; and Premarin was certainly one of the earliest ones that was available.
Estradiol tablets, specifically, became available, and then different formalizations. Patches didn't come along until the late '80s and the '90s, I believe. Maybe mid '80s. It's hard to be sure.
But it was -- you know, if you want to pinpoint it, there was a progressive continuum of learning about hormone replacement therapy during my professional career.
Q. Beginning in the '70s?
A. Possibly. Probably, yeah.
Q. And have you been



prescribing -- or prior to leaving the practice, had you -- how long had you prescribed E+P? And that's what I refer to --
A. Estrogen and progestin?
Q. Yeah.
A. At least 20 years, maybe more. But remember I said that in 1980, I focused my practice more and more into surgical practice, and that was really the -- I operated two to three days a week, so there was very little time in the office.
But I did see my ongoing practice, old patients, for new patient exams -- I mean yearly exams, yes, for 20, 25 years at the most.
Q. And we spoke about menopause earlier in your deposition, and some of the vasomotor symptoms that women experience. Is that because natural hormones start to deplete, or a woman becomes deficient of natural hormones at a certain age?
A. Correct.
Q. And that age would be around 45



to 55 age range?
A. The average age is 45 to 50, yeah. 55 sometimes.
Q. And the symptoms include vaginal dryness and atrophy, which you discussed earlier, and hot flashes, night sweats. And some of these problems cause difficulty in women having sexual intercourse, but also difficulty sleeping as well?
A. Yes.
Q. When -- in 1998, when Ms. Romero came for treatment, were you -- was it your understanding, Doctor, or did you believe that there was a heart benefit associated with hormone replacement therapy use? This is before the WHI.
A. Right.
No, we all thought, and we all counseled our patients, "This probably helps the heart." Yes, this is true.
Q. And in counseling Ms. Romero, that would have been a benefit that you would have thought would have benefitted

Ms. Romero?
MR. BENEVENTO: Objection, speculation, lacks foundation, misstates his testimony.
A. Well, I don't recall ever counseling her specifically on that. I might have. We did know at that time that estrogen was beneficial for high-density lipoproteins, and progestin was not. And her cholesterol, as I recall, was elevated. She also, at times, had an elevated blood pressure.
So we felt -- some people felt that hormone replacement therapy possibly had an adverse effect on blood pressure, but it generally was helpful to the heart. And there were both types of blood pressures recorded in her notes, both normal and elevated. So it's hard to say.
BY MR. THORNBURGH:
Q. And was it your understanding that there was an osteoporosis benefit with hormone replacement therapy?
A. Everybody. Everybody knew that, yes.



Q. Did you understand that this benefit only existed or persisted while a woman took hormone drugs?
A. Yes.
Q. And as long as she got off the drugs, this benefit would go away?
A. The benefit went away, yes.
Q. Now, in talking about the cardiac benefit, I'm a little unclear about your testimony, but I believe, and correct me if I'm wrong, but the cardiac benefit would have been a benefit that you would have considered as part of your entire risk-benefit assessment for hormone replacement therapy?
A. Yes, at that --
MR. BENEVENTO: Object to the form, lacks foundation, calls for speculation, misstates his testimony as it relates to Ms. Romero.
A. At that time, yes.
BY MR. THORNBURGH:
Q. Did you, Doctor, believe that there was a mental or Alzheimer's prevention



benefit of HRT prior to the WHI?
A. That was part of the thought processes as well, yes.
Q. And did you consider this benefit as part of your entire risk-benefit assessment associated with hormone replacement therapy?
A. We generally used that in our counsel, yes.
Q. Doctor, do you agree that not all women suffer with menopausal symptoms, even though they may be menopausal?
A. Yes.
Q. And do you agree that only a minority of women suffer from significant menopausal symptoms?
A. I wouldn't quite state it that way.
Q. How would you state it?
A. I'd say quite a number of women have menopausal symptoms for which they seek help and relief.
Q. Right. Some, though, are more severe than others?



A. Yes.
Q. But you would agree that not all women have the same hormone levels after menopause?
A. If they're truly in menopause, they all have low hormone levels.
Q. And some women have very low hormone levels, and thus they have more menopause symptoms, or perhaps more significant menopause symptoms?
A. That's hard to state. You know, there's a spectrum of severity and lack of severity across all women, and I don't think you can categorize like that.
Q. Right. Would you consider, or would you agree that there is some correlation between vasomotor symptoms and hormone levels?
A. FSH levels and vasomotor symptoms, yes.
Q. And hormone -- so the jury is clear, "hormone-deficient" means what?
A. Lack of estrogen, generally.
Q. Lack of natural hormones,

estrogen?
A. Lack of estrogen, yeah.
Q. And the purpose of E+P therapies is to increase the estrogen in the woman's body to decrease the vasomotor symptoms that a woman experiences during menopause?
A. If they're in menopause and they request treatment for that, yes.
Q. Are you aware that Wyeth used the term -- that term, "hormone deficiency" or "hormone-deficient," in their marketing material, including in their PDR label?
MR. BENEVENTO: Objection, lacks foundation, calls for speculation.
A. Okay.
BY MR. THORNBURGH:
Q. Would you disagree with that statement?
MR. BENEVENTO: Objection, lacks foundation.
A. It did not influence me in my decisions.



BY MR. THORNBURGH:
Q. And, Doctor, I just want to make clear, you're not giving causation opinions today, correct, on whether or not --
A. No.
Q. -- E+P caused Ms. Romero's breast cancer?
A. No.
Q. And you're not an oncologist?
A. No.
Q. And you don't treat breast cancer?
A. No.
Q. Doctor, earlier in your -- early on in your testimony, your deposition, you testified, it seems to me, and you can correct me if I'm wrong, that you didn't warn women necessarily about the risk of breast cancer because you didn't consider it a risk at the time --
MR. BENEVENTO: Objection, lacks foundation, misstates his testimony.
BY MR. THORNBURGH:



Q. -- before the WHI?
A. No, that's not entirely true. I said if there was no family history of breast cancer, first- or second-degree relatives, then I said your risk is general population; and as long as you've had your regular mammograms and we follow you carefully, if you do have a breast cancer, we'll pick it up earlier.
Q. Right. So it was your belief in 1998, or before the WHI, that the risk associated with hormone replacement therapy in women that didn't have a family history was consistent with the background rate of the general population?
A. No, I think it was probably slightly higher because all the product literature told us that as well; but it was a balance between patients, benefit and risk, and believe me, as long as a patient feels good and nothing's going wrong, they will take the benefit.
Q. Right. Doctor, I want to go over the 1998 Premphase label with you, and



this is the label that was in existence at the time that you first treated Ms. Romero.
A. Okay. You mean I continued her treatment.
Q. As you continued her treatment.
A. Okay.
Q. And I appreciate that, that she came in, she was referred to you from Dr. Radha Lal?
A. No, she was referred by a friend.
Q. A friend of hers?
A. By -- yeah, a friend of the patient.
Q. Okay. Did she bring with you -- and I see that there are some materials in here from 1996, before your treatment, when she was -- when Ms. Romero was being treated by Dr. Radha Lal, L-A-L.
Would this have been documentation or the medical chart that Ms. Romero would have brought with her during her first visit with you?
A. That, I cannot -- I cannot say

Page 134

for sure. She might have. I generally would have requested records later. It would be rare for a patient to bring me the records with her.
I would suspect that my records -- and, again, I didn't collect these records here -- would have been by themselves, like this (indicating).
Q. Okay.
A. I don't think that I had these, but I cannot be sure on that.
Q. So these -- you're not entirely --
A. If the patient came referred by the physician, I would expect the physician to send copies of records, okay? But if a patient was referred by a friend because she has pain and the other doctor is not making the diagnosis, wouldn't have a reason to bring the records, so I don't know whether they were with her or not.
Q. Right. And I'm not certain where -- and maybe I'm missing something in the records. Is there something in the

Page 135

records that makes you believe that she was referred from a friend?
A. Yeah. It says, "Referred By: Jolene Nelson," right here.
Q. Okay. And you don't know who Jolene Nelson is?
A. She was probably a patient of mine.
Q. Okay.
A. I had a big patient population in Beaumont.
Q. Uh-huh. And so they'd drive all the way up, two or so hours --
A. Yeah.
Q. -- is it about two hours, to come see you?
A. Uh-huh.
Q. And that's my understanding; my patient -- or my client, Judy Romero appreciated the treatment that you provided.
A. Okay. To put it in perspective a little more, my nurse lived in Beaumont. She drove from there every day, back and forth.

Page 136

Q. Okay. Wow. Wow.
A. That's a two-hour drive.
Q. So if you would have received these records from the client, would these -- would you have consulted with these records before seeing her for the first time or shortly after that?
A. Sure. If the patient were referred by another physician, I would have reviewed the records. I would have followed up with that physician with a letter.
Q. Okay. Okay. So we're just not sure where these additional records came from.
MR. THORNBURGH: If we can mark this as Exhibit 3.
(Whereupon, Deposition Exhibit Lotze-3, 1998 Label for Premphase, was marked for identification.)
BY MR. THORNBURGH:
Q. And do you recognize what I've handed you?
MR. THORNBURGH: Do you have a copy over there that you're referring

Page 137

to, or do you need another copy?
MR. BENEVENTO: I have the 2000 edition.
MR. THORNBURGH: Okay. I have '98, if you'd like to look at it.
MR. BENEVENTO: That would be great. I'm not sure they changed, but I'll be happy to look at yours.
MR. THORNBURGH: Yeah, I think they're pretty much the same, but we'll just look at the '98.
A. Well, what you've handed me is a top page of the Physician's Desk Reference labeled "Edition 52, 1998."
BY MR. THORNBURGH:
Q. And, Doctor, if you will, turn with me to the third page in that set of papers I handed you, the 1998 Physician's Desk Reference.
A. This one?
Q. Yeah. Actually, if you don't mind, if you'd just turn to the first page after the cover sheet --
A. Okay.

Q. -- just so we're clear that we're talking about Premphase here, correct?
A. Right. Okay.
Q. Okay. And if you go to the "Description" section real quick on the same page, the second page, it's actually page number 3116 of the 1998 PDR, and there's a subsection called "Description." It's on the same first page after the cover letter --
A. Yeah. All right.
Q. -- or after the cover sheet.
And so this first paragraph here, is it accurate -- am I interpreting this page accurate -- or this section accurate, that Premphase contained Premarin tablet containing 0.625 milligrams of conjugated estrogen and a 5-milligram -- 5 milligrams of medroxyprogesterone acetate, correct?
A. Right. The second half, yeah.
Q. It doesn't say that there's any lower dose --
A. No.
Q. -- with the Premphase family?



Okay.
Now, if you turn to the next page, the right-hand column of the page under "Warnings"?
A. Okay.
Q. Okay. And there's a section there under "Warnings" called "Introduction of Malignant Neoplasms, Breast Cancer."
Do you see that?
A. Uh-huh.
Q. And tell me -- just -- I'm going to read it to you, and tell me if I've read it correctly.
A. Okay.
Q. The first sentence says, "Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of 10 years."
A. Okay.
Q. Now, this section is simply



talking about estrogen therapy only, correct?
MR. BENEVENTO: Objection, misstates the document.
BY MR. THORNBURGH:
Q. This -- the sentence that I just read, Doctor, is only referring to estrogen therapy only; is that correct?
MR. BENEVENTO: Again, same objection, misstates the document. It says all warnings pertain to a combination product.
BY MR. THORNBURGH:
Q. Doctor, the first sentence -- the first sentence says, "Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy taking higher doses, or in taking lower doses for prolonged periods of time, especially in excess of 10 years."
Did I read that wrong?
MR. BENEVENTO: Yes, you did. You're taking -- objection to form.
MR. THORNBURGH: Excuse me.



MR. BENEVENTO: Objection to form.
MR. THORNBURGH: You will have an opportunity, Bryon -- Bryon, you can object --
MR. BENEVENTO: Excuse me. Excuse me. You're cutting me off. Object to the form --
(Simultaneous discussion interrupted by the reporter.)
MR. THORNBURGH: You will have an opportunity to come back and ask questions about this document.
MR. BENEVENTO: I have an objection.
MR. THORNBURGH: You can object.
MR. BENEVENTO: I'm trying to. You were not letting me.
MR. THORNBURGH: Objection is noted --
MR. BENEVENTO: No, you're not.
MR. THORNBURGH: And I will go on to the next question, okay?

Page 142

MR. BENEVENTO: No. I have an opportunity to object, sir, whether you --
MR. THORNBURGH: You want to give a speaking objection.
MR. BENEVENTO: No, sir. I want to say that your question misstates the document, lacks foundation, misleading.
MR. THORNBURGH: Okay --
MR. BENEVENTO: Those are all objections to form, and I have a right to make them.
MR. THORNBURGH: The label is misleading. You're right.
MR. BENEVENTO: No. The way you're reading it is misleading. That's my objection.
MR. THORNBURGH: Doctor, I'm sorry about that. Sometimes it's an adversarial process --
THE WITNESS: I understand.
MR. THORNBURGH: -- and we argue.

Page 143

BY MR. THORNBURGH:
Q. But am I interpreting -- or am I reading this sentence incorrectly, that some studies -- "Some studies have reported a moderately increased risk of breast cancer (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy taking higher doses, or in those taking lower doses for prolonged periods of time, especially in excess of ten years"?
A. You're reading that sentence correctly; but if you take it in context of the entire warnings, it says it's part of the combination product. So -- and it says, "Based on experience with estrogen and/or progestins," so --
Q. Right. And I'm going to go through the rest of this warning right here.
A. Okay. All right.
Q. I just want to -- just the first sentence there --
A. Okay. You've read this as it's stated here, but you left out the heading.
Q. Okay. And I -- no intention

Page 144

there. I mean --
A. Okay.
MR. BENEVENTO: That's been my objection.
BY MR. THORNBURGH:
Q. Okay. "Based on experience with estrogen and progestins." "Introduction of malignant neoplasms, breast cancer." The first sentence is talking only about estrogen replacement therapy, correct?
A. Okay.
MR. BENEVENTO: Object to the form, lacks foundation, misstates the document.
BY MR. THORNBURGH:
Q. Does it appear to you that the first sentence is only talking about, in that sentence, about estrogen replacement therapy?
A. No. To me, it appears that it is in the context of the combination product, that estrogen replacement therapy. Now, you can read it any way you want, but it's under this heading, so I don't want to get involved in an argument here.

Page 145

You read the sentence that you picked out correctly, but you left out the heading.
Q. Okay. So -- but is there -- in that first sentence, does it say anything about E+P therapy?
A. It doesn't say anything in that sentence, but it says, "Based on experience with" --
Q. Yeah, and I'm going to go -- I'm going to go --
MR. BENEVENTO: Objection. Let him finish his answer. You're cutting him off and you're being argumentative.
MR. THORNBURGH: I apologize. I apologize. I'm not trying to be argumentative or cut you off.
THE WITNESS: Okay. Okay. All right.
BY MR. THORNBURGH:
Q. But I am going to go down to the lower portion of this warning --
A. Okay. Okay.

Page 146

Q. -- and I think that will bring it into context --
A. Okay.
Q. -- about the estrogen and progesterone combination.
A. Okay.
MR. BENEVENTO: Objection, move to strike the colloquy, not a proper question.
BY MR. THORNBURGH:
Q. Doctor, the next sentence says -- so let's just focus on this first sentence here, okay?
A. Okay.
Q. It's talking about -- just the sentence alone is talking about estrogen therapy and the slight increased risk of breast cancer when taken in higher doses, or in taking lower doses for prolonged periods of time, especially in excess of ten years?
A. Okay.
MR. BENEVENTO: Objection, not a question, statement asked and answered.

Page 147

BY MR. THORNBURGH:
Q. It says that the risk associated with estrogen is -- and breast cancer is for long-term use in high doses. Am I interpreting that wrong?
MR. BENEVENTO: Objection, misstates the document.
A. You've read the sentence. I mean, I can read it too, if you'd like for me to read it. But it says lower doses for a prolonged period of time or higher doses for a shorter period of time.
But I want to tell you that findings contradict this because patients who are on estrogen only with history of breast cancer, there are many, many studies that show they live -- do fine and don't have breast cancer. So it's -- the whole thing is very confusing.
BY MR. THORNBURGH:
Q. Right. And -- but this sentence appears to suggest that there's a -- maybe a slight increased risk for a prolonged period of duration of use and for higher

Page 148

doses?
A. I mean, anybody can bring anything, and certainly drug companies will put anything down to help protect themselves, but they wrote down here higher doses for -- you know, taking high doses or taking low doses for a prolonged period of time. I can't argue with that.
Q. Right. Right. And, Doctor, you -- your prescription was -- you prescribed the regular low dose that was available of Premphase, correct?
A. Right.
Q. There wasn't a lower dose than what you prescribed?
A. No, this was the only dose we had.
Q. And that was -- you prescribed the recommended dose of E+P at the time?
A. Right.
Q. And you didn't prescribe it for a prolonged period of time and didn't prescribe it for longer than ten years --
A. No.

Page 149

Q. -- in this patient, correct?
A. No.
Q. This sentence doesn't warn of a risk of regular dose Premphase for less than ten years?
MR. BENEVENTO: Object to the form, misstates the document, asked and answered.
A. No, it says low dose for ten year, in excess of ten years.
BY MR. THORNBURGH:
Q. Right. Doctor, we'll move to the next sentence. It says, "The majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy."
A. Right.
Q. So saying the majority of studies haven't shown an increased risk?
A. Right.
Q. That's reassuring?
A. Right.
Q. "The effect of added progestins on the risk of breast cancer is unknown,

Page 150

although a moderately increased risk in those taking combined estrogen-progestin therapy has been reported."
A. Right.
Q. So it's saying it's unknown, but there has been some increased risk reported?
MR. BENEVENTO: Objection, the document speaks for itself. Are you going to ask him how he understands this, or are you just going to have him acknowledge that you've read the document?
BY MR. THORNBURGH:
Q. Doctor, this sentence says that the risk is unknown and that studies go both ways; isn't that correct?
A. That's what it says.
Q. Other studies have not shown this relationship?
A. Right.
Q. That's reassuring to you, Doctor?
A. Yes.

Page 151

Q. The next sentence says, "In a one-year clinical trial of Prempro, Premphase and Premarin alone, five new cases of breast cancer were detected among 1,377 women who received the combination treatments, while no new cases were detected among 347 women who received Premarin alone.
"The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population."
A. Okay.
Q. Does this sentence reassure you, Doctor, that even in Wyeth's study, the risk of breast cancer was no greater than that in the background rate?
MR. BENEVENTO: Objection, lacks foundation. He already said he didn't read the thing.
A. Sure.
MR. BENEVENTO: So you're asking him now if it reassured him when? He already said he didn't read it. This lacks foundation, misstates

Page 152

his testimony.
THE WITNESS: I might have read it at one time, but I didn't read it all the time.
MR. THORNBURGH: This is consistent with how he testified to.
BY MR. THORNBURGH:
Q. And this is consistent with what your understanding of the risks were at the time that you prescribed --
A. Right.
Q. -- Premphase?
A. I agree.
Q. Doctor, the next sentence says, "In the three-year clinical Postmenopausal Estrogen-Progestin Intervention trial (the PEPI trial) of 875 women to assess differences among placebo, unopposed Premarin and three different combination hormone therapy regimens, one new case of breast cancer was detected in the placebo group, one in the Premarin-alone group, none in the continuous Premarin plus -- continuous medroxyprogesterone acetate group, and two in

Page 153

the continuous Premarin plus cyclic medroxyprogesterone acetate group."
Doctor, this sentence indicates that there was another study done and that there was no greater risk of breast cancer for E+P users. Is that your understanding?
A. That's what I read.
MR. BENEVENTO: Objection, the document speaks for itself, misstates the document.
BY MR. THORNBURGH:
Q. Doctor, when you read this statement, or when you read it now and when you read it in the past, did you believe from this sentence that the PEPI study actually looked at breast cancer issues with the drugs?
A. I don't think it's -- it's reassuring right here. It says it didn't occur -- or it occurred in a regular -- or in a manner or in a frequency that was no higher than normal background incidence. So I'm not here to tell you what the PEPI trial did or did not do, other than that. I mean...

Page 154

Q. So this -- I'm sorry if you weren't done.
A. I mean, it assessed differences between hormone therapy regimens. I'm sure they also assessed heart disease and what have you.
Q. Okay. Does it indicate to you that they actually looked at the breast cancer issue in this study?
A. Looks like they did.
Q. Would it surprise you if we have evidence that they didn't?
MR. BENEVENTO: Objection, misleading, lacks foundation, calls for speculation.
A. Well --
BY MR. THORNBURGH:
Q. Would it be inappropriate?
A. That's -- I mean, that's something I'm not aware of, so I can't really comment on it.
Q. Doctor, this label provided you with -- really provided you, in 1998, with very little actual information about the drug

Page 155

you were prescribing; isn't that correct? I mean, it only talked about a risk with estrogen alone.
MR. BENEVENTO: Objection, misstates his testimony, misstates the document.
BY MR. THORNBURGH:
Q. I mean, the label did -- it was reassuring that the majority of studies showed no association?
A. That's reassuring, yes.
Q. Doctor, there's no black-box warning on this 1998 label warning women about the increased risk of invasive breast cancer; is that true?
A. I don't see one.
Q. Would be important to you, if there was a black-box warning?
A. Yes.
Q. And if there was a black-box warning, would you share that with your patients, about the risk of breast cancer?
A. Sure, absolutely.
Q. There's no warning that the

Page 156

risk of developing breast cancer can occur even just after a year or two with E+P use --
MR. BENEVENTO: Object to the form, misstates the document, misleading.
BY MR. THORNBURGH:
Q. -- is that correct, Doctor?
A. It doesn't appear in this particular paragraph, no.
Q. There's no warning in this label, 1998, of Premphase, that the risk of breast cancer increases each year that the patient stays on these drugs?
MR. BENEVENTO: Objection, the document speaks for itself, misstates his testimony, misleading.
BY MR. THORNBURGH:
Q. You didn't see that warning in at least the portion of the label that we read?
A. No.
Q. There's no -- and you testified earlier that Ms. Romero was thin, lean?
A. Correct.

Page 157

Q. Based on her weight during her time of treatment?
A. BMI was probably 23, 25. I don't know.
Q. You didn't see any warning in this label that breast cancers in women who used -- strike that.
You didn't see any warning in this label that there's increased risk of developing breast cancer if the woman is thin or lean build and uses hormone replacement therapy?
A. No.
Q. No warning in breast -- that breast cancer in women who use E+P are larger and at more advanced stage when found than cancer in women who did not use E+P; is that correct, Doctor?
MR. BENEVENTO: Objection, the document speaks for itself.
(Clarification requested by the reporter.)
A. Not in this paragraph.
BY MR. THORNBURGH:

Page 158

Q. No warning that E+P can cause breast cancer? No definitive warning in this label, or in that section that I read, at least, that E+P can cause breast cancer?
A. There's no such sentence, no.
Q. No warning that risks of taking E+P outweigh its benefits?
MR. BENEVENTO: Objection, the documents speak for themselves, misstates his testimony, misleading.
A. No, I don't see that.
BY MR. THORNBURGH:
Q. That information would have been important to you when prescribing Premphase to your patients, including Ms. Romero?
A. Certainly would be, but I don't think that that information was available for us for general hormone replacement therapy at that time.
Q. Right. And that's the -- and that's why we're here today, Doctor.
A. Okay.
MR. BENEVENTO: Objection.

Page 159

BY MR. THORNBURGH:
Q. We're here today, Doctor, because that information was not contained in this label.
A. Okay.
MR. BENEVENTO: Object to the statement, improper colloquy, move to strike.
BY MR. THORNBURGH:
Q. If you had that information, would you have passed it on to your patient?
A. I'm sure I would have mentioned and discussed it with her.
Q. You testified earlier that you received the ACOG journals, right, you call them the Gray and Green Journals?
A. Correct.
Q. Do you recall with any specificity reading any particular article about hormone replacement therapy?
A. No.
Q. Is it your understanding that you would have seen some articles during your beginning of your practice with --

Page 160

A. Obstetrical.
Q. -- obstetrics and gynecology, that you would have seen -- in 1998, that you would have seen some of these -- some articles about hormone replacement therapy?
A. I'm sure we read some, sure.
Q. Would you read through those journals and at least glance at articles that applied to issues important to you or issues relating to drugs that you regularly prescribed?
A. Sure.
Q. Would you review reprints of articles that were left behind by sales representatives?
A. Perhaps, but not necessarily.
Q. What about skim it, at least?
A. Skim it, perhaps, read the conclusion or the summary.
Q. Do you recall seeing advertisements about hormone replacement therapy in medical journals?
A. Yes.
Q. Were you exposed to marketing

Page 161

materials and patient education materials by the drug sales representatives?
A. Sure. Every drug rep had marketing and patient materials.
Q. Do you recall the names of the sales representatives that called on you for hormone replacement therapy?
A. No. There were a number of them. I'm sure if you gave me the Wyeth name, I could tell you if it was him or not, or her, whoever it was. Used to be hes. Now they're all shes.
Q. Doctor, you testified previously that the heart benefit was one of the benefits that you recalled as -- that you recall associated with hormone replacement therapy before WHI came out.
A. Right.
Q. And, also, Alzheimer's or mental disease?
A. Right.
Q. Have you ever --
MR. THORNBURGH: I'm going to hand you what we'll mark as Exhibit 4.

Page 162

(Whereupon, Deposition Exhibit Lotze-4, "Menopause Isn't Gone In a Flash," W-ADSBRO-01096 - W-ADSBRO-01100, was marked for identification.)
BY MR. THORNBURGH:
Q. Are you familiar with this piece of literature?
A. I don't recall it. I might have seen it in the past, but I don't specifically recall it.
Q. This talks about -- if you can, read the title of this document on top of the first page.
MR. BENEVENTO: Object to the use in his deposition. He said he doesn't recall it. He didn't author it, and you haven't established that he did use it in his practice, so lacks foundation.
MR. THORNBURGH: Well, we're going to go through it and --
MR. BENEVENTO: Well, you're not allow to read stuff until you

Page 163

establish that foundation, so I'm objecting.
MR. THORNBURGH: You can object.
MR. BENEVENTO: I did.
MR. THORNBURGH: Well, we're going to look at the whole document. There's several pages here. So once we get through it, it may refresh his memory, okay?
MR. BENEVENTO: No, it's not okay. But it's your deposition that you're using, so I'm objecting --
BY MR. THORNBURGH:
Q. Doctor, we're looking -- if you don't recall -- do you recall this specifically?
A. No.
Q. Okay. Would it refresh your memory, perhaps, if we looked through this document?
A. We can. It may or may not. I don't know.
Q. Okay. This document is called

Page 164

"Menopause Isn't Gone in a Flash." We call this the body -- this is known, at least to us, as the body of evidence. Have you heard about the body of evidence from sales reps? Do you recall that?
A. No.
Q. This first page talks about Alzheimer's disease, vision problems, tooth loss, heart disease, colon cancer, urogenital problems and osteoporosis.
A. Okay.
Q. Is it consistent with your understanding of what you knew prior to WHI that hormone replacement therapy would benefit women by creating heart protection, helping their teeth, vision problems, memory, colon cancer, osteoporosis?
A. Well, it was a general litany that we believed back then; and, I mean, this was prevalent in that day and age, yes.
Q. And these first two pages sort of -- it appears to me, at least, that it guides a doctor on how to use this promotional piece with patients.

Page 165

MR. BENEVENTO: Same objections. Move to strike.
BY MR. THORNBURGH:
Q. So if you turn to page 3 of 5 of this document, it's the actual -- this is the way that the document actually would have appeared with "Menopause Isn't Gone in a Flash."
Does this refresh your memory about having this document?
A. No.
MR. BENEVENTO: Move to strike, lacks foundation, misstates the record.
A. I don't recall studying this document or passing it out to patients. Maybe I glanced at it once. I don't know. But I don't recall having it in my practice.
BY MR. THORNBURGH:
Q. Okay. If you turn to the next page, 4 of 5; and this talks about the brain, eyes, vasomotor, heart, colon, bone and urogenital tract.
And it was your understanding

Page 166

before WHI in 1998 that HRT had a benefit with at least some of these symptoms?
A. Yes, that's what we preached, yes.
Q. Do you remember advertisements about hormone replacement therapy where Lauren Hutton was the spokesperson?
A. Advertising where? On TV or what?
Q. In Woman's Day magazines or other magazines?
A. No, I never read those things.
Q. Doctor, what about this piece?
MR. THORNBURGH: We'll mark this as Exhibit 5.
(Whereupon, Deposition Exhibit Lotze-5, "Menopausal Symptoms are Just the Tip of the Iceberg," PAYNC201-001154, was marked for identification.)
BY MR. THORNBURGH:
Q. And the top of it says, "Menopause Symptoms are Just the Tip of the Iceberg," correct?

Page 167

A. That's what it says, but I don't remember ever seeing this.
MR. BENEVENTO: Based upon that testimony, move to strike, lacks foundation.
BY MR. THORNBURGH:
Q. Doctor, this talks about insomnia, hot flushes, mood disturbances, vaginal atrophy and night sweats?
A. Uh-huh.
Q. Those are symptoms that you would consider associated with menopause?
A. True.
Q. And underneath that line, it says, "Osteoporosis, Alzheimer's disease, macular degeneration, cardiovascular disease, colon cancer, vaginal infections, stress incontinence, skin atrophy, dementia, tooth loss, mortality."
Does it say that?
A. Yes, you read it.
Q. And it was your -- it was consistent with your understanding, prior to 1998, that hormone replacement therapy at

Page 168

least helped with some of those problems?
A. I would think you're right on that, yes.
Q. Including cardiovascular benefit?
A. Yes.
Q. Doctor, was it your understanding that estrogen replacement therapy actually saved lives?
A. I don't think we ever took it to that point. I think we told our patients that it would help protect their health.
Q. Including from heart disease?
A. Yeah, but I don't think I told a patient, "It's going to save your life."
Q. Okay. But it would -- but I guess the inference would be if it protects the heart, then it may protect the life?
A. Well, that's the lawyer talk. I don't think I ever took it to that point.
Q. What about --
A. I generally told my patients, Counselor, that our understanding of hormone replacement therapy at this point is it helps

Page 169

support and protect you, your health, heart, mind, bones, pelvic floor. I mean, this is what was generally considered the mantra used for hormone replacement therapy.
Q. Does -- have you ever seen what we're going to mark as Exhibit 6 before?
(Whereupon, Deposition Exhibit Lotze-6, "Two Benefits vs. A Risk of Estrogen Replacement Therapy," CORRA302-000066, was marked for identification.)
A. I know Dan Mishell. Dan Mishell was my chief when I was an intern.
BY MR. THORNBURGH:
Q. He was your -- I'm sorry?
A. He was my chief when I was an intern.
MR. BENEVENTO: Can I have a copy before we ask questions about it so I can determine whether I have objections?
MR. THORNBURGH: Bryon. Bryon. Bryon, I'm sorry, I didn't -- I was just moving along. I wasn't trying to

Page 170

leave you in the dark.
BY MR. THORNBURGH:
Q. So, I'm sorry, you testified that you know Daniel Minshell?
A. Mishell.
Q. Mishell?
A. I trained under him, yeah.
Q. You trained under him?
A. Yeah, but that was before this.
Q. Okay. And this looks like it's dated -- or at least the Mishell --
A. Mishell.
Q. I'm sorry.
A. Mishell.
Q. Mishell, 1986?
A. Okay.
MR. BENEVENTO: Object to the form.
BY MR. THORNBURGH:
Q. Do you have any reason to believe that -- this says, "Daniel Mishell, Jr., M.D., for OBG Management, Henderson, et al., AMJ Obstetrics" -- I'm sorry.

Page 171

MR. BENEVENTO: Obstetrics.
BY MR. THORNBURGH:
Q. -- "Obstetrics & Gynecology, 1986?
A. Uh-huh.
Q. Was he involved in any research, do you know of, in 1986 to determine whether or not hormone replacement therapy saved lives?
A. I have no idea. I do not recall seeing this.
Q. And this chart shows -- to the right, it shows, "5,250 lives saved by avoiding heart disease"?
MR. BENEVENTO: Objection, move to strike, lacks foundation, calls for speculation. Already indicated he hasn't read it and doesn't rely on it.
(Clarification requested by the reporter.)
A. I never saw this.
BY MR. THORNBURGH:
Q. Would this be -- the heart protection would be consistent with the

Page 172

information you had --
A. Right.
Q. -- about HRT --
A. True.
Q. -- and preventing heart disease?
A. Yeah, and osteoporosis.
Q. And osteoporosis.
And Dr. Mishell was your -- was the doctor --
A. Mishell.
Q. -- you trained under?
A. He was my chief when I was an intern in 1965.
Q. In 1965?
A. Right.
Q. And what -- how long were -- did you train under him?
A. One year.
Q. One year. 1965 to 1966?
A. And he terrified us as interns.
Q. And what was the subject matter?
A. He was chief of gynecology, and

Page 173

I was an intern at Harbor General.
Q. Doctor, you received "Dear Doctor" letters? You received "Dear Doctor" letters when you were practicing, up until 2007?
A. "Dear Doctor" letters?
Q. "Dear Healthcare" letters or healthcare letters that are sent from the manufacturing company to physicians?
A. I'm sure I did.
Q. Did you ever read "Dear Healthcare" or --
A. Not unless it had a drug recall or a black-box warning or anything like that, no.
Q. Okay. So if it said something like, "Important new risk information," or "Label change" --
A. Right. Yeah, if it was important, I would, yes.
Q. Doctor, you testified that there were some sales representatives that would come to you and would detail you on pharmaceutical products that they were

Page 174

selling --
A. Sure.
Q. -- on behalf of manufacturing companies?
A. Sure.
Q. And sales reps were a source of information?
A. Yes.
Q. You would hope that they would provide truthful and accurate information to you?
MR. BENEVENTO: Objection, asked and answered.
A. Well, if we had any question concerning the information they gave us, we asked them to back it up with the proper background information that we could then make our own decisions and judgments.
BY MR. THORNBURGH:
Q. Okay. Does the names Diep Vu, Diep Vu, ring a bell?
A. Yeah, I remember Diep, sure. She's a little short Vietnamese person.
Q. And Brandon Resendez?

Page 175

A. Yeah. Yep, tall black-haired fella, sure.
Q. James Ty?
A. I don't remember him.
Q. Did you know that these sales reps were keeping track of conversations that they had with you about -- conversations that they had with you about drugs they were trying to sell to you?
A. You mean they wrote their conversations down?
Q. Yeah. Were you aware of that?
A. No. Good for them. Okay.
Q. Can you tell me sort of what your relationship was with sales representatives, generally or specifically, with relation to these sales representatives, if you recall?
A. Well, we depended on sales reps to give us drug samples, which we would then pass on to patients. That's really the biggest use we had for them.
Q. So they would pass on samples to you, and you would provide those samples

Page 176

to --
A. Patients.
Q. -- the patients?
A. Sure.
Q. And I guess the purpose of that is to get new start patients --
A. Right. Right.
Q. -- started on new therapies?
A. Right.
Q. Or at least therapies manufactured by a different company, perhaps?
A. Sure. Uh-huh.
Q. Can you go through a normal sales rep visit? They'd come in. Would they come in unannounced, or would it be by appointment only?
A. Well, both. Both, depending on how you ran your practice. Again, I generally had very little time for them, and I didn't spend much time with them.
They would catch me in the hallway and say, "Okay, Doc, point for the day: Lowest dose, combination therapy, whatever," and then stock our drawers that we

Page 177

kept our samples in and, "Any questions?"
"No."
"Adios."
Q. Would sales reps ever talk to patients?
A. No.
Q. They may come into maybe some sort of contact, but not --
A. No contact with patients. I never allowed that. They had lunches for the nurses, gave them -- particularly the urinary problem issues with incontinence or treating urinary tract infections, as to what current treatment regimens were and standards of care were. And the hormone people, I imagine they did too.
Q. So they would meet with the nurses and give -- and give nurses therapies?
A. No.
Q. I'm sorry.
A. They were given information regarding -- because remember, now, nurses answered phones and passed information on to patients as well.

Page 178

Q. Right. Right. Okay.
MR. THORNBURGH: And let me just -- let's mark this, I'm sorry, as Exhibit 7.
(Whereupon, Deposition Exhibit Lotze-7, Call Notes re: Dr. Lotze, was marked for identification.)
A. These are all the visits.
BY MR. THORNBURGH:
Q. Those are the recorded visits, and I wanted to go over a few of those with you. Really, there's really not much recorded. You can see that there's -- it looks like maybe Diep Vu --
Diep Vu, am I pronouncing her name right?
A. Yeah. Yeah, we called her that.
Q. Okay. Looks like she started to call on you in 1997, but there are no notes.
A. Yeah.
Q. I don't know if she took notes or --

Page 179

A. Look, don't think that she saw me every time she dropped into the office, okay?
Q. Right. Right.
A. And not only me, but she dropped in at OGA --
Q. Right.
A. -- so I bet you you'll find the same record for all the doctors at OGA.
Q. I bet you I would. I've seen -- I've looked at lots of these --
A. Yeah.
Q. -- and it's very consistent, lots of --
A. Yeah. Yeah.
Q. -- they're seeing lots of different doctors for different reasons.
But you think she started detailing you on HRT in '97, about?
A. I guess so. Whatever she puts down --
Q. Okay. And --
A. -- date-wise. I don't see the date here. Is that -- no.

Page 180

Q. So it looks like the first recorded conversation that I have here is dated May 7th, 2002.
MR. BENEVENTO: You're not suggesting that it was tape-recorded, are you?
THE WITNESS: No.
MR. THORNBURGH: No. No. It's -- I'm sorry.
THE WITNESS: No, if they tape-recorded it, it was not with our consent.
MR. THORNBURGH: Recorded it in writing --
THE WITNESS: So they wrote the note after they made the call. I wasn't aware of that.
MR. THORNBURGH: I'm not suggesting that, and I meant to say keeping a record of the conversation.
THE WITNESS: Yeah.
MR. BENEVENTO: Well, that's a different characterization, if you're --

Page 181

MR. THORNBURGH: No, keeping the record is -- you know, they recorded the conversation in writing in some sort of database.
THE WITNESS: Okay.
BY MR. THORNBURGH:
Q. Okay.
A. Obviously, yeah.
Q. So -- and the first conversation that's -- that is written down is May 7th, 2002; is that accurate?
A. I don't see where you see the date. Oh, I see. Okay. Yeah.
Q. The far left.
A. I got it. Yeah. Okay.
Q. And that's Diep Vu, and I'll call her Ms. Vu, if that's okay?
A. Yeah. Right. Yeah.
Q. And she -- is it your recollection that she worked for Wyeth?
A. Yes.
Q. And it says that you were surprised that Premarin is 60 years old?
A. Right.

Page 182

Q. "Discussed proven record of safety and efficacy and compliance."
Did I read that correctly?
A. Okay.
Q. You teased her, it looks like, about natural -- and I'm not sure what that means.
A. Natural hormones, probably, yeah.
Q. Is that bioequivalent?
A. I guess so.
Q. "But then told me that he didn't need to sell him on Prempro or Premarin" because you're already writing the drug prescriptions?
A. Yeah. Okay.
Q. So is this consistent with your understanding of the types of conversations that you would have with sales reps? They'd come in --
A. I mean, yeah, there's some chitchat, a lot of chatter like that, yeah.
Q. And they'd come in for -- specifically with Premphase and Prempro,

Page 183

they'd come in and talk to you about the proven track record of safety?
A. I'm sure they did.
Q. Okay.
A. I'm also sure I told them I didn't have time for them.
Q. Right. And that's why these notes are probably really short. I think as you see, as we go through those, sometimes you're rushing them out the door so you can go actually treat patients, rather than --
A. Uh-huh.
Q. -- have conversations with the sales reps.
But just to back up a little bit, so the first note is 5/7/2002, and this is just about two months prior to WHI; is that correct?
A. Okay. Right.
Q. WHI was published July 17th, 2002. Is that about accurate?
A. Somewhere in there. Black day.
Q. What do you call it?
A. The black day, because our

Page 184

office was topsy-turvy.
Q. Because of the --
A. Phone calls.
Q. The phone calls?
A. Yeah.
Q. Okay. So -- and the next conversation that is written down in the -- on this document is May 22nd, 2002; and can you read that note?
MR. BENEVENTO: Object, lacks foundation, calls for speculation. These aren't his notes. He has no recollection of the statements.
BY MR. THORNBURGH:
Q. These are -- we'll talk about whether or not this is consistent with your memory of the types of conversations you had with the sales reps.
A. I don't think I ever used the term "gold standard." I think this is fabricated by her.
Q. No, this is -- I think this is Ms. Vu who's talking to you?
A. Right.

Page 185

Q. Who's, I think, explaining -- and you wouldn't have used the word "gold standard," right?
A. Huh-uh. No.
Q. So, "Discussed Premarin/Prempro being the gold standard/60 years of proven record of safety and efficacy. He" -- you "agreed and would let patients know, except those equestrians."
A. I have no idea what she's talking about.
Q. You would go to Prempro 5 or Premphase, and it says, "How does dosage flexibility add value to patients?"
MR. BENEVENTO: Objection, move to strike.
A. That's her comment. That has nothing to do with something I would ask or do --
BY MR. THORNBURGH:
Q. Were there some concerns with women about the -- maybe the treatment of the horses?
A. No.

Page 186

MR. BENEVENTO: Objection, lacks foundation, calls for speculation.
A. Estrogen was obtained from horse urine.
BY MR. THORNBURGH:
Q. Right.
A. So, yeah. Right. Obviously, how did they collect it? There was some bad publicity about that for a period of time.
Q. Right. I think there were -- PETA was all over them about the treatment of horses?
A. Yeah. Yeah.
Q. Do you recall that?
A. I remember something going on about maltreatment of horses, right.
Q. The next conversation is May -- I'm sorry, June 4th, 2002, and this is a little bit over -- this is about five to six weeks prior to WHI.
A. Uh-huh.
Q. It says that you introduced Ms. Vu to a beautiful menopausal patient on

Page 187

Premarin?
A. Well, it may have been a patient that's walking out and I said, "Here's a patient that's on that," yeah. Sure.
Q. Right. There may be some -- not some real -- they're not --
A. Oh, no. No. No.
Q. You're not allowing them to talk with the patients, but there may be some contact in the hallways?
A. Right. Right.
Q. And she writes, "Looks 56. She's actually over 65."
And it says that Ms. Vu "talked about how Premarin/Provera keeps patients healthy and maintains her quality of life. We discussed Premarin and gold standard and made Prempro another gold standard."
A. Those are her words.
Q. Right. Those are --
MR. BENEVENTO: Well, Doctor, just so you know, I'm objecting to this. She's not here, there's no

Page 188

foundation for this document, and he's asking you to assume things. Please don't assume anything. If you know, answer. If you don't --
THE WITNESS: Right.
MR. BENEVENTO: All he's doing is trying to get you to vouch for something on a piece of paper.
BY MR. THORNBURGH:
Q. Is this consistent with the type of conversation that you would have with these sales representatives in 2002 before WHI?
A. I would do anything to get the sales rep out of my hair --
Q. Right.
A. -- so I could see my patients, okay? And I said, "Okay, I'm using it. I'm fine with it. Leave my samples. You know I'm writing plenty of prescriptions, so adios."
Q. Right.
A. That was the extent of my conversation with this woman. Interesting.

Page 189

Q. And, you know, I mean, we got this information from Wyeth. This isn't information I --
A. Okay. All right.
MR. THORNBURGH: You're not suggesting I pulled this out of thin air. I mean, this is --
THE WITNESS: No, of course not.
MR. BENEVENTO: I'm not suggesting anything. I think this is inappropriate questions of a witness, asking him to vouch for statements that he didn't make --
MR. THORNBURGH: I'm not --
MR. BENEVENTO: Yes, you are.
MR. THORNBURGH: I'm not saying that he made any of these statements. These are statements that were written by --
THE WITNESS: No. No. I'm amazed.
MR. THORNBURGH: And I think that -- I mean, when she's talking

Page 190

about gold standards, I interpret it to mean that that's the words that she's using when she talks to you about the pharmaceuticals' safety profile.
THE WITNESS: That's -- right. I did not use that term, ever.
BY MR. THORNBURGH:
Q. Next one, 6/18/2002, approximately -- almost exactly one month before WHI?
A. Right.
Q. "Last time he introduced to me this beautiful patient on Premarin. I reminded him Premarin keeps her quality of life not like any other estrogen because of Delta 8, 9."
Do you know what Delta 8, 9 is? "Rapid" --
MR. BENEVENTO: That's a no, correct?
A. No.
BY MR. THORNBURGH:
Q. "Rapid symptom relief and

Page 191

significant bone turnover."
Is that information that -- is that consistent with the type of information you recall sales reps sharing with you during these sales rep visits?
A. They would utter thing like that, perhaps, yeah. Right. But I generally did not have the time to see them. I said, "Look, leave me alone."
Q. Right. And this next part of that -- last part of that sentence indicates that you were more concerned about treating your patients.
A. Right. Right.
Q. You rushed to see your patients. You weren't stopping to have a conversation with her. She was basically meeting you in the hallway, and you were trying to visit your patients?
MR. BENEVENTO: Objection, to strike.
A. Uh-huh.
BY MR. THORNBURGH:
Q. Is that an accurate statement

Page 192

of what you recall, consistent with what you remember?
A. Yes. Yes.
Q. July 2nd, 2002, approximately two weeks prior to WHI, she writes, "Purpose benefit check. Rapid symptom relief with Prempro and Premarin. He's committed to start patients. Went over new patient counseling materials."
Do you know what new patient counseling materials she's referring to?
A. I would imagine she was referring to new patient hormone starts.
Q. Can you -- what is -- is there material that they were provided -- that you were provided for new patients?
A. I don't recall. I don't recall.
Q. It says, "Emphasize number one success in patient compliance is counseling."
A. That's -- probably have to agree with that.
Q. And it says that you told Nurse Sonja --

Page 193

Is that someone that worked with you, a nurse?
A. Yeah.
Q. -- to give new starts?
A. Okay. Yeah.
Q. The next -- the very next entry is 7/17/2002 by Ms. Vu again, and this is the same day as the WHI was published; is that correct?
A. I guess, uh-huh.
Q. And can you read that entry?
A. She wrote that I think -- or I thought that MPA is the culprit responsible for heart disease in WHI. After ten years, switch my patients to Evista for existing Prempro patients. I guess I switched my patients back then. That patients -- wait a minute. That doesn't make sense.
"After ten years, switch patients to Evista. For existing Prempro patients, he switched them to FemHRT" -- oh, I see. Okay -- "or Activella. Discussed patient -- discussed age selection, 1.25."
Q. I think this was before you had

Page 194

a chance to look at WHI, because it was published that day in the --
MR. BENEVENTO: Objection, move to strike --
A. Yeah.
MR. BENEVENTO: -- misstates his testimony, lacks foundation.
BY MR. THORNBURGH:
Q. Is it consistent with your recollection that --
A. No, I don't --
Q. -- after this meeting, you may have determined -- you may have decided that you were going to go look at the WHI?
A. Oh, of course I would.
Q. Okay. And it says, "Shared with him about L. Spiroff's comment."
A. Leon Spiroff was a very visible professor. I think he was in Seattle, somewhere, chairman of the department and --
Q. Do you remember what that comment was?
A. I'm sure he must have been positive, in favor of hormone replacement,

Page 195

and negating the WHI.
Q. Okay.
A. But I don't recall the comment, no.
Q. All right. And the next statement -- so they came with a -- they may have -- maybe -- is it your understanding that they came with a countercomment to WHI by Mister -- or Dr. Spiroff on the same day that the WHI was published?
A. I'm sure he commented on it, but I -- I remember Spiroff being -- writing an editorial or something, but don't ask me what he wrote. I don't recall. It's been too long ago.
Q. After WHI, your prescribing habits or practice with patients changed pretty dramatically, didn't it?
A. They did.
Q. And women determined that they didn't want to remain on hormone replacement therapy anymore?
MR. BENEVENTO: Objection, asked and answered, misstates his

Page 196

testimony.
BY MR. THORNBURGH:
Q. Is that correct? Or they would --
A. No.
Q. -- take themselves off of the therapy?
A. Well, some did. But some wanted advice from me, and I wanted my patients off MPA.
Q. Right.
A. And I probably switched them -- switched them to estradiol and either a medrol progesterone compound. That's probably what I did.
Q. Uh-huh.
A. Or Activella, which is a combination of norethindrone and estradiol.
Q. So you would remove your patients that were taking Premphase, which contained medroxyprogesterone acetate, a synthetic progesterone --
A. Very few patients on Premphase.
Q. By this time?

Page 197

A. Very few.
Q. Okay. So on Prempro, which also contained medroxyprogesterone acetate --
A. Uh-huh.
Q. -- you would stop prescribing Prempro to those patients?
A. Yes.
Q. Okay. And it's true, isn't it, that another thing that you would do is, for patients that demanded to stay on Prempro, if -- you know, for whatever reason, that you would make them sign a consent?
A. I don't think I ever made them sign a consent. I think some doctors did. But if they demanded to stay on it, I might have made a note in their chart.
Q. Okay. We'll go through this, but it looks to me like that you were concerned about -- for instance, let's turn to -- here we go -- 9/26/2002.
It says, "As before, refused to start Prempro because of studies. For those who had symptoms on Prempro and wanted to stay on, he would get them to sign consent

Page 198

forms (from insurance). So far has not initiated."

So at least at this point, you're discussing the possibility of -- for good reason, I think -- I think to protect yourself from liability, to have doctor -- patients sign consent forms if they wanted to remain on Prempro?

MR. BENEVENTO: Object to the form, lacks foundation, compound, vague, misstates his testimony.

A. You know, I don't recall the exact way things happened. I think our insurance company asked that we have -- have patients sign, but I think that quickly fell by the wayside.

BY MR. THORNBURGH:

Q. Okay. And maybe if we go through this, it will refresh your recollection.

It also says that -- maybe she -- did she bring to you -- Ms. Diep bring to you some sort of Medi Affair form? Do you recall what that was?

Page 199

A. No.

Q. It says, "Will not sign Medi Affair form for his legal concern."

A. I have no idea.

Q. "However, he may get patients to sign consent form and let them have Prempro."

A. Okay.

Q. This is after -- if you go to the sentence before that, "Discussed rapid symptom relief from Prempro because of Premarin and asked him to let patients continue if they persist."

So she's still promoting Prempro to you, right?

A. Uh-huh. Uh-huh.

Q. Even after WHI?

A. Oh, yeah.

MR. BENEVENTO: Same objections.

A. But I preferred Prometrium, which was a natural progesterone.

BY MR. THORNBURGH:

Q. So Prometrium has natural

Page 200

progesterone?

A. Uh-huh.

Q. It's a bioequivalent?

A. Yeah.

Q. And you consider that to be a safer alternative than Prempro?

MR. BENEVENTO: Objection, lacks foundation.

A. No, I don't think we had any evidence that it was not safe.

BY MR. THORNBURGH:

Q. And then back in October 2002, Ms. Vu again, and you still will not start patient on Prempro?

MR. BENEVENTO: Same objections.

BY MR. THORNBURGH:

Q. Is that consistent with your recollection?

A. Uh-huh. Right.

Q. And October 22nd, 2002, it says -- and this is what I was referring to earlier. It says that you make patients who stay on Prempro sign consent forms.

Page 201

MR. BENEVENTO: Same objections.

A. Well, perhaps, I did. I don't recall that.

BY MR. THORNBURGH:

Q. Okay. And it -- granted, that was 2002. Here we are, 2011, eight, nine years ago.

A. Remember, my practice was not heavy in hormone replacement, so if there was an occasional patient, then I did, perhaps. If they put it down, perhaps, I did. I don't know.

Q. Do you have any reason to believe that you didn't have consent forms for patients that wanted to remain on Prempro?

A. I don't recall the consent form. You know, if anything, I would write it on the patient's chart, "Patient insists staying on Prempro, advised my misgivings about it."

Q. It says, "Very few patients" -- so let me read these two sentences. "He

makes patients who stay on Prempro sign a consent form. Very few patients, therefore, stay on."
MR. BENEVENTO: Objection, lacks foundation, same objections.
BY MR. THORNBURGH:
Q. Is that consistent with your memory -- it's consistent with your memory that very few patients stayed on Prempro after WHI?
MR. BENEVENTO: Objection, misstates his testimony, lacks foundation, calls for speculation.
A. A lot of patients stopped it, yes.
BY MR. THORNBURGH:
Q. November 5th, 2002, it says, "Will not start patients on Prempro, but Premarin and PVC."
A. Premarin and vaginal cream.
Q. Vaginal cream. Okay.
And is the vaginal cream a safer alternative for treating vaginal dryness and atrophy?



MR. BENEVENTO: Same objection, lacks foundation.
A. It's effective.
BY MR. THORNBURGH:
Q. "Had little success with patients consent form"?
MR. BENEVENTO: Same objection.
A. I guess so. I don't know. I don't recall.
MR. THORNBURGH: Okay. Doctor, we've got to change tape, so we'll go off the record.
THE VIDEOGRAPHER: We're going off the record, 6:41 p.m.
(Recess taken, 6:41 p.m. to 6:50 p.m.)
THE VIDEOGRAPHER: Stand by, please. We're back on the record, 6:50 p.m.
MR. BENEVENTO: I just want to put on the record what I said off the record. I indicated to plaintiff's counsel that this is unfair to me and the doctor. We're going now beyond



7:00 o'clock.
We're talking about notes and information that clearly postdates any care or treatment of Ms. Romero, since she was off HT in February of 2001; and so I believe, in fairness to the doctor, that the plaintiff's counsel should be paying for his time.
MR. THORNBURGH: And this is not Bryon's first rodeo. He's sat in depositions -- at least I believe he's sat in depositions where treating, prescribing physicians were deposed, and it has been consistently the party that notices the deposition pays for the time.
If Bryon wants to change what the protocol's been, then he has the right to object to it and we'll take it up with the judge.
MR. BENEVENTO: I just did. And I don't consider depositions rodeos, and this has never happened before in the depositions that I've



been in.
MR. THORNBURGH: Okay. Well, this is relevant to the prescribing practice of Dr. Lotze after the WHI.
THE WITNESS: But she had breast cancer before WHI.
MR. BENEVENTO: Yes, right, a year before any of this.
BY MR. THORNBURGH:
Q. But had the WHI came out -- come out in 1998, your prescribing practice would have changed?
MR. BENEVENTO: Objection, speculation, lacks foundation, misstates --
BY MR. THORNBURGH:
Q. Would it have changed -- if the WHI -- if the same -- if the same -- I think you called it -- what did you call it before, the black day or black?
A. Our black day with the phones, yeah.
Q. Black day, with the phone calls coming in, patients were concerned about the

Page 206

WHI, and your prescribing practice changed after the WHI; is that correct?
A. Okay. But you can make that short.
Q. Is it true that your prescribing practice changed after the WHI?
And I'll move on -- I'll get away from the call notes.
A. Yes, I stopped prescribing Provera in combination.
Q. Prempro?
A. Prempro.
Q. You stopped prescribing Prempro?
A. Prempro and Premphase.
Q. Doctor, for the purpose of time and getting you out of here as quickly as possible, I'm going to try to skip some of my notes so that I can get you out of here as soon as possible.
A. Okay. Okay.
Q. I'm going to move quickly to the Physician's Desk Reference 2007.
MR. THORNBURGH: I've

Page 207

highlighted this document for ease of reference. I can give him an unhighlighted document, if you prefer.
MR. BENEVENTO: It's your deposition. I'm going to object.
MR. THORNBURGH: You're going to object to the highlights?
MR. BENEVENTO: Yeah.
MR. THORNBURGH: Okay. Then we'll go with unhighlighted sections of it.
THE REPORTER: Are you marking that?
MR. THORNBURGH: Yes. I'm sorry. We're going to mark that as Exhibit 8.
(Whereupon, Deposition Exhibit Lotze-8, 2007 Label for Prempro/Premphase, was marked for identification.)
BY MR. THORNBURGH:
Q. Doctor, this is a label after the WHI; is that correct?
A. 2007, that's the edition, 2007.

Page 208

Yep, Physician's Desk Reference.
Q. And the 2007 label contains a black box at the very top of the warning -- of the label; is that correct?
MR. BENEVENTO: Object, lacks foundation, calls for speculation.
BY MR. THORNBURGH:
Q. Doctor, what's a black box? What's your understanding of a black box?
A. My understanding of black box is a warning to physicians that considerable risk is associated with use of the product.
Q. Is it a stronger warning than the -- than precautions or "Warnings" sections -- subsections of the label?
A. Right. Right.
Q. Doctor, the black box, can you read the first sentence?
MR. BENEVENTO: Object to the documents speaks for itself, lacks foundation, couldn't be relevant to Ms. Romero's care, since she wasn't being prescribed this drug after 2001.
MR. THORNBURGH: Right. But we

Page 209

certainly wish that our patient, our plaintiff, my client, had available to her and/or to her physicians a warning that was as strong as the warning that existed in 2007.
MR. BENEVENTO: Move to strike the colloquy, argumentative, lacked professionalism.
BY MR. THORNBURGH:
Q. Doctor, am I reading this correctly: "Estrogen and progestins should not be used for the prevention of cardiovascular disease or dementia"?
A. That's what it states.
Q. And this is a different warning than you had in 1998, or through 2001, when you treated Ms. Romero; is that correct?
A. That's correct.
Q. And it says, "The WHI reported increased risk of myocardial infarction, stroke, invasive breast cancer, pulmonary emboli and deep vein thrombosis in postmenopausal women during 5.6 years of treatment with conjugated estrogen combined

Page 210

with medroxyprogesterone acetate."
Did I read that correctly?
A. Yes. Uh-huh.
Q. And that warning is a new warning that's contained in the black-box warning that was not contained in any label during your treatment period of 1998 to 2001 --
MR. BENEVENTO: Objection, document speaks for itself, misleading.
BY MR. THORNBURGH:
Q. -- is that correct?
A. Appears to be.
Q. And if you go down, midway through the black-box warning, it says, "The Women's Health Initiative memory study, a substudy of the WHI, reported an increased risk of developing probable dementia in postmenopausal women."
That warning was not in existence at the time that you treated Ms. Romero with hormone replacement therapy, correct?

Page 211

A. No.
MR. BENEVENTO: Same objections.
BY MR. THORNBURGH:
Q. And that's inconsistent with what your understanding was prior to the WHI?
A. Right.
Q. And the cardiac risk is different than what your understanding was prior to the WHI, correct?
A. Correct. However, the one thing you haven't asked me is, do I believe in the validity of the WHI.
Q. I haven't asked you that, Doctor.
A. No, you haven't.
Q. Do you not believe in the validity of the WHI, Doctor?
A. It was a very slanted study, and there's many criticisms that can be placed against it. So although all of this in the black box has to be taken seriously, I think there are many factors now that, with longer time periods, people are backtracking,

Page 212

saying, "Well, this wasn't really true."
Q. Okay. There have been a number of studies that have come out after the WHI which have confirmed the findings in the WHI; isn't that correct?
A. And the reverse. The...
Q. Okay. Are you familiar with the SEERs data?
A. I probably was, but you can refresh my memory.
Q. After the WHI and women got off of hormone replacement therapy, the incident rate in the United States of breast cancer decreased dramatically?
MR. BENEVENTO: Objection, misstates the document, misleading as well.
A. Well, yeah --
BY MR. THORNBURGH:
Q. Is that your understanding? Is that consistent with your understanding of the SEERs data?
MR. BENEVENTO: Same objection.
A. I'd have to study it. You

Page 213

know, you're bringing this up right now. Without my having had a chance to go back at it, I couldn't give you a valid and rational, informed comment on it.
But all those studies, you can prove anything you want to prove, depending on how you want to design your study.
BY MR. THORNBURGH:
Q. Are you familiar with the Corbett study?
A. No.
Q. That found an increased risk of breast cancer in women treated with hormone replacement therapy, including DCIS cancers?
MR. BENEVENTO: Object to the form, misstates the record, lacks foundation.
A. I'd have to read the study before I could comment on it.
BY MR. THORNBURGH:
Q. Are you familiar --
MR. BENEVENTO: You're criticizing me for 15 minutes in your objections that this isn't an expert,

we're only here to talk about
Ms. Romero. You sure are violating
your own rights.
MR. THORNBURGH: I'm asking if
he's read these.
THE WITNESS: I have not.
BY MR. THORNBURGH:
Q. Are you familiar with these
studies?
A. Huh-uh.
Q. Kerr Makowski study?
A. No. Never heard of it.
Q. That found that 17,500 new
breast cancers were associated with the
ingestion of hormone replacement therapy?
MR. BENEVENTO: Move to strike,
misstates the record, misleading,
lacks foundation, argumentative.
BY MR. THORNBURGH:
Q. Okay. Doctor, if you go to the
bottom of the black box, the last sentence,
it says, "Because of these risks, estrogens
with or without progestin should be
prescribed at the lowest effective dose and



for the shortest duration, consistent with
treatment goals and risks for the individual
woman."
A. No argument with that.
Q. And is it your understanding
that after the WHI, that hormone replacement
therapy should not be the first line of
treatment of women suffering from vaginal
atrophy? Is that correct?
A. No, I don't believe that.
Q. Do you believe Prempro should
be the first line of treatment?
A. No. But I think hormone
replacement is still appropriate for vaginal
atrophy. In fact, there's no other
medication that you can use to protect a
woman against vaginal atrophy.
Q. Maybe I said it wrong.
Vaginal dryness?
A. Same thing.
Q. There would be other remedies?
A. Well, perhaps, for dryness,
yes.
Q. And that no longer should



hormone replacement therapy -- and I should
restate this, maybe.
Estrogen-plus-progesterone
therapies.
A. Okay.
Q. Estrogen-plus-MPA therapies
should no longer be the first line of
treatment for postmenopausal women who have
osteoporosis?
A. No, I agree.
Q. And the label in 1998 through
2000 -- or any -- no label before 2002,
before WHI, said that -- had that same
warning --
MR. BENEVENTO: Objection,
lacks foundation.
BY MR. THORNBURGH:
Q. -- is that correct? Or is that
your understanding?
MR. BENEVENTO: Misstates
testimony.
A. I don't recall it.
BY MR. THORNBURGH:
Q. So you would agree that the --



that after the WHI, there was a more
definitive warning about the risk of breast
cancers and use of estrogen and
medroxyprogesterone acetate?
MR. BENEVENTO: Object to the
form, compound, vague.
A. Well, apparently, there is.
But did we know that before WHI? I certainly
wasn't aware of it at the time I treated
Ms. Romero.
BY MR. THORNBURGH:
Q. Right. And that would have
been information that you would have liked to
have had while you were treating Ms. Romero,
right?
A. Well, yeah.
Q. Had the WHI come out during
your treatment of Ms. Romero, you wouldn't
have prescribed Prempro any longer, or
Premphase; is that correct?
MR. BENEVENTO: Objection,
misstates his testimony, lacks
foundation, calls for speculation.
A. Judged by my conduct of my

practice afterwards, it speaks for itself.
BY MR. THORNBURGH:
Q. Doctor, were you aware that Wyeth kept track of every prescription that you prescribed for Prempro?
A. Yes, I know that.
Q. Doctor, I'm going to hand you what we'll mark as composite Exhibit 9.
(Whereupon, Deposition Exhibit Lotze-9, Chart of Dr. Lotze's Quarterly Prempro Prescriptions, w/Backup Data, was marked for identification.)
MR. BENEVENTO: Is that the IMS data?
MR. THORNBURGH: Yes.
MR. BENEVENTO: Object, lacks foundation, also object to the gathering of the information.
BY MR. THORNBURGH:
Q. Doctor, this information, I'm going to represent to you, was provided to us by the defendant, Wyeth, okay?
A. Yeah.



MR. BENEVENTO: But the representation you just made to him is inaccurate. It is not a compilation of his prescriptions. That is a misstatement of the document.
MR. THORNBURGH: Of hormone replacement therapy?
MR. BENEVENTO: Of IMS data, that is correct. That's a misstatement. It is not that.
MR. THORNBURGH: Okay. You want to get sworn in and testify?
MR. BENEVENTO: You just represented to him something, and I'm correcting you on that and lodging my objection. I think what you're doing is completely inappropriate, and you're misleading the witness.
BY MR. THORNBURGH:
Q. Doctor, I'm handing you what we've marked as Exhibit 9. Those are the -- the top two pages are --
MR. THORNBURGH: I'm sorry.
MR. BENEVENTO: Oh, yeah.



Sure.
BY MR. THORNBURGH:
Q. The top two pages are charts that track your prescription of Prempro after the WHI. The first one -- both of these show a dramatic decrease in your prescribing of Prempro after the WHI.
A. Okay.
MR. BENEVENTO: Object.
BY MR. THORNBURGH:
Q. That would be consistent with what you testified to earlier --
A. Right.
Q. -- that you stopped prescribing Prempro --
A. Right. Right.
Q. -- and Premphase after the WHI, right?
MR. BENEVENTO: Object to the use of these documents. These were not prepared by Wyeth and weren't produced by Wyeth, and you're misrepresenting that they are.
MR. THORNBURGH: The raw



data --
MR. BENEVENTO: You gave me two pages, Counselor, and you represented to this witness --
MR. THORNBURGH: I just --
MR. BENEVENTO: Just a second, sir, I'm not done.
You represented to this witness that these came from Wyeth and were tracking his prescription. That is a misstatement of the record. It is a lie.
MR. THORNBURGH: The raw data -- the raw data, which is this --
MR. BENEVENTO: I don't have it. Have you given it to me? Do you have it?
MR. THORNBURGH: I just gave you two documents. I didn't think that you'd actually want to --
MR. BENEVENTO: Is that this?
MR. THORNBURGH: I gave you two separate documents, and I didn't think that you'd want to actually go through

Page 222

that many records to confirm what I'm talking about.

You've already got this documentation, this evidence, this raw data in your possession. You've got it. It was provided to us -- this raw data was provided to us from your client, okay?

Based on this raw data, you're able to use that data to develop these charts to show how your prescribing of Prempro changed after the WHI.

THE WITNESS: Okay. All right.

BY MR. THORNBURGH: Which you testified to was consistent with your prescribing practice, correct?

THE WITNESS: Okay.

MR. BENEVENTO: And, again, sir, just so you know my objection, what he's saying, we do not believe is accurate. That is not a tracking of your prescriptions. It is a sample of data.

It is not a -- coming from your

Page 223

pen. It is coming from people who refill prescriptions, that there's other data that he's not giving you that shows that you actually did prescribe Prempro.

This is a misstatement, and he's trying to mislead you. I strenuously object to this.

MR. THORNBURGH: I'm not trying to mislead you, Doctor.

THE WITNESS: Well, all I can say is, you show me data, you compile it. I know that I reduced my -- or I changed my prescribing habit, and you compiled that. I have no further knowledge of that.

I didn't compile it. He says Wyeth didn't compile it. Then whether it's true or not, I can't --

BY MR. THORNBURGH:

Q. Wyeth did provide us with this data, okay?

A. Okay. So I have no comment.

MR. BENEVENTO: I'm objecting

Page 224

to the characterization of the data, not the -- not the fact that we produced it to him.

First of all, we did not produce these two charts to him, and the raw data that he keeps talking about, I'm objecting to the characterization he's giving it, because it's inaccurate.

MR. THORNBURGH: He's got a right to object, but --

MR. BENEVENTO: That's what I did.

MR. THORNBURGH: -- we'll take that up with the judge later on.

MR. BENEVENTO: I just don't want you to believe what he's saying is true. Only testify to what you know.

BY MR. THORNBURGH:

Q. Isn't it consistent that your prescribing of Prempro -- you testified to this earlier, that you stopped prescribing Prempro and Premphase after the WHI?

Page 225

MR. BENEVENTO: That's inconsistent --

(Simultaneous discussion interrupted by the reporter.)

MR. BENEVENTO: It misstates his testimony on direct as well.

A. I agree with the comments being made that I changed my prescribing habits. Whether these charts accurately reflect what I did, I cannot attest to nor comment on.

BY MR. THORNBURGH:

Q. Would it be fair to say that a lot of the accepted beliefs that you had about Prempro and Premphase and hormone therapy changed after the WHI?

A. Some of them changed, based on the fact that WHI was a flawed study in many ways. That's all I can say.

Q. Would it be fair to say that you -- after the WHI, you provided the new information about the associated risk of hormone replacement therapy and breast cancer to patients in a more definitive way?

A. Well, it's information we had

Page 226

then we did not have before.
Q. Right. Right. And that's the problem.
A. Okay.
Q. That's the problem, why we're here today, is because you weren't provided with that information.
MR. BENEVENTO: Move to strike, argumentative, colloquy.
BY MR. THORNBURGH:
Q. Would you have liked to have been provided -- is it fair to say that you would have liked to have been provided with that information in 1998?
MR. BENEVENTO: Same objection.
A. I think -- I think all obstetrician/gynecologists and endocrinologists who wrote prescriptions for hormone replacement therapy were in a similar state of knowledge, that none of us had knowledge that was not provided otherwise. So it was a universal understanding of the effects of hormones.
BY MR. THORNBURGH:

Page 227

Q. Right. But this new information was important to you after the WHI?
A. Well, sure.
Q. And you -- after the WHI, you shared that information, the information gained from the WHI, to your patients and allowed them to make decisions about how to use E+P?
A. That's true, but I fail to see how that relates to my treatment of Ms. Romero.
Q. Well, if the WHI came out earlier --
A. But it didn't.
Q. Right. That's the problem.
A. Yeah.
Q. You know, we wish -- we wish Wyeth would have come forth earlier with this information --
MR. BENEVENTO: Move to strike, argumentative, improper, lacks foundation, misstating, misleading.
BY MR. THORNBURGH:

Page 228

Q. We wish Wyeth conducted studies --
MR. BENEVENTO: Also, same thing, misleading. Wyeth did conduct studies. This is highly inappropriate.
BY MR. THORNBURGH:
Q. -- to determine the breast cancer risk in patients taking E+P.
MR. BENEVENTO: Same objections, move to strike.
BY MR. THORNBURGH:
Q. You would agree that there -- after the WHI, it was determined that there was no longer -- that E+P is no longer heart-protective, no longer considered heart-protective --
A. Yeah.
Q. -- which was inconsistent with what you knew prior to WHI?
A. I agree.
Q. And it no longer gives a -- provides a brain protection either?
A. Agree.

Page 229

Q. Inconsistent with what was your understanding, the medical community's understanding, of E+P prior to the WHI?
MR. BENEVENTO: Objection, lacks foundation.
A. True.
BY MR. THORNBURGH:
Q. No longer the first line for treating osteoporosis?
A. No.
Q. And no longer the first line for vaginal dryness?
A. Not E+P, no.
Q. Doctor, you testified previously that one of the sources of information about hormone replacement therapy or drugs in general would come from conversations with colleagues?
A. Correct.
Q. Would some of that information, some of the information about whether or not to use hormone replacement therapy or the safety or benefits of hormone replacement therapy, come from your discussions with

Dr. Leroy Leeds?
A. Leroy Leeds was a colleague and a partner in my practice. I'm sure that we had discussions.
Q. And would you rely on some of the information that Dr. Leroy Leeds would provide to you during those discussions about the safety benefit of hormone replacement therapy?
A. No.
Q. Efficacy benefits?
A. No. If we had discussions, we each drew our own conclusions.
Q. Right. But that would be one of the sources where you would get information from?
A. Of course. There's free interchange of ideas and information that always occurs between physicians.
Q. And there are alternative therapies for treating osteoporosis, correct?
A. There are.
Q. And Fosamax is one of those?
A. Sure.



Q. And that's -- after Ms. Romero was discontinued from hormone replacement therapy, she was prescribed Fosamax; is that correct?
MR. BENEVENTO: Misstates the record. She was prescribed it during HT. This is highly irregular, sir.
A. I wonder what that has to do with her --
BY MR. THORNBURGH:
Q. It's an alternative treatment to osteoporosis?
A. Well, we treated her for hot flushes.
Q. Right. But for her osteoporosis?
A. That was coincidental.
Q. Was the Fosamax there to treat her hot flashes or her osteoporosis?
A. Osteoporosis.
Q. All right. How long did you treat Ms. Lee -- Ms. Romero? I'm sorry.
A. Well, let's see. She was first seen in, I believe, in 19- --



MR. BENEVENTO: February '98, sir.
A. -- '98, February '98, and I think she changed, knowing I was going to close my practice. In April of 2006, she saw somebody else. So I was her gynecologist, I guess, for about six years.
BY MR. THORNBURGH:
Q. And during that -- during her treatment for breast cancer, do you recall any side-effects she had from radiation therapy?
A. No, I don't. That's not part of my treatment protocol.
Q. You would defer to the oncologist who treated her for --
A. Absolutely.
Q. Do you recall her developing leukopenia?
A. No.
Q. Do you know what leukopenia is?
A. Yes.
Q. And what is leukopenia?
A. Leukopenia is low white counts.



Q. And what are the -- what are the side-effects of having leukopenia? What are some of the complications one can experience?
A. Well, now, I don't see how that has any relationship to my deposition about hormone treatment here.
Q. Right. Well, I'm just going through the client's condition, some of the conditions she had as a result of developing breast cancer and undergoing radiation.
A. Well, I would not treat her for leukopenia. I would refer her to a hematologist, and I would let him worry or her worry about that.
Q. Okay. And is it -- the reason that Ms. Romero was removed from E+P therapy in 2001, is that because E+P therapy was contraindicated for women who have breast cancer?
A. Well, we all felt that if you have a breast cancer, hormones were -- we've always felt that, from the very beginning, that you do not use hormone therapy in

patients who have cancer.
Q. And that's because it can promote the growth of the cancer?
MR. BENEVENTO: Objection, lacks foundation.
A. We have no basis to consider that. We felt that it was appropriate not to put them on hormones.
BY MR. THORNBURGH:
Q. Doctor, is it your understanding that when you prescribed Prempro to Ms. Romero, that it contained the same -- a similar label in 2000 as the Premphase label in 1998?
A. I'd have to check and look at the labels before I can answer that.
Q. I'll mark the 2000 --
MR. THORNBURGH: I don't know where to mark this.
(Whereupon, Deposition Exhibit Lotze-10, 2000 Label for Prempro, was marked for identification.)
BY MR. THORNBURGH:
Q. When you -- you testified



that -- well, let me ask you this.
When you changed, switched the patient, Ms. Romero, from Premphase to Prempro, would you have provided her with the -- a risk-benefit discussion of Prempro?
A. I switched her on the basis of her not wanting to have more menstrual flow.
And as such, since she was taking a similar preparation as she was taking before, I doubt seriously that I would have gone over the risk-benefit evaluation, other than to advise her that she would no longer have menstrual periods; which she, indeed, did not have.
Q. And is it true, if you look at the 2000 label for Prempro, that -- and I apologize, it's hard to read --
A. I don't see where it says 2000, by the way.
Q. I'll represent to you that this is the 2000 label --
A. All right.
Q. -- that was provided to us during discovery from -- I believe from



Wyeth.
If you look at the front page of the label, it's Prempro and Premphase, if you look at it. You see the highlighted section --
A. That's crossed out here, yeah.
Q. Right. If you look at that closely, somebody must have highlighted it in a wrong color highlighter, but it's -- I'll represent to you that this is a Prempro and Premphase label.
A. Okay.
Q. And we discussed the 1998 label; and I'll represent to you, as well, that that was a Prempro and Premphase label.
A. Okay.
Q. Okay. So the warnings that were given for Prempro in 1998 would have been the same warnings as those given for Prempro, correct?
A. Okay.
Q. And the same warnings as those contained in the 2000 label?
A. Looks like it has "Premphase"



up here and "Prempro" down here (indicating).
Q. And I'll represent to you that the same breast cancer section that we discussed in the 1998 label is the identical warning that's contained in the 2000 label.
A. Uh-huh.
Q. And it was your testimony that the 1990 -- strike that. I'm trying to get us out of here as soon as possible.
I just want to -- just to go over this real quick, okay, and it's going to be my last line of questioning.
If you had the information that you had from the WHI study, you would have shared that with Ms. Romero, correct?
A. I would have been obligated to, uh-huh.
Q. And consistent with your statement earlier, after the Prempro -- after the WHI study, you no longer prescribed estrogen-plus-medroxyprogesterone therapies. And that would have been the same for Ms. Romero in 1998, had the information been available to you from the WHI in 1998,

Page 238

correct?
MR. BENEVENTO: Objection, calls for speculation.
A. I left out -- I simply did not prescribe medroxyprogesterone. I prescribed estrogen and progesterone.
BY MR. THORNBURGH:
Q. Right. But it would have been a different formulary?
A. That's correct.
Q. It wouldn't have been Prempro. It would have been natural progesterone?
A. That would have been my preference.
Q. It would have been a bioequivalent?
A. That would have been my preference.
Q. And is that because you believed that the bioequivalent hormones were safer than the MPA, medroxyprogesterone acetate?
MR. BENEVENTO: Objection, lacks foundation.

Page 239

A. We had no adverse data that it would not be safer.
BY MR. THORNBURGH:
Q. Okay. And if you -- and when you provided the information about the WHI, you would let your patient decide whether or not to continue with hormone replacement therapy?
A. They pretty much made up their mind already before they came in.
Q. Is it your -- is it based on your experience with treating menopausal women on hormone replacement therapy after WHI -- did the majority of these women get off of Prempro?
A. Immediately after WHI came out, yes, many women stopped. However, as time passed, the effect of WHI subsided and women would elect to go back on hormone replacement therapy -- and I'm not talking Prempro. I'm talking about hormone replacement therapy -- for a short period of time to treat their hot flushes and vaginal dryness, yes.
Q. So even for hormone replacement

Page 240

therapy in general, you would have prescribed low dose for short periods of time after the WHI?
A. I always did, yes.
MR. THORNBURGH: Okay. That's all I have, Doctor. Thank you for your time.
MR. BENEVENTO: Doctor, I've got some follow-up. I apologize.
THE WITNESS: Okay.
MR. BENEVENTO: I didn't intend to do this, but there were some things that were said in the last two hours by counsel that I need to get some clarification on.
THE WITNESS: Sure. All right.

EXAMINATION

BY MR. BENEVENTO:
Q. If your prescription records, the actual prescription records, demonstrate that you were writing prescriptions for Premphase in 2004, would you have a reason to disagree with that?
A. No.

Page 241

Q. If your prescription records demonstrated that you were writing prescriptions in 2004 for Prempro, would you have a reason to disagree with that?
A. No, I'm sure I did write some.
Q. Okay. And I believe you said to me earlier in direct that if the woman wanted to stay on it, she could stay on it, correct?
A. Correct.
Q. Okay. And so it wasn't a decision made by you, as counsel seems to suggest, that you were going to eliminate Prempro and eliminate Premphase. You allowed the patient to choose?
A. I allowed the patient to choose. I simply did not start new patients on that.
Q. Okay. Now, counsel asked you a lot about if you would have only known the information today that you would have known. Isn't it true for every single patient that you treat today, you would have liked to have known -- I'm sorry.

Page 242

Isn't it true for every patient you treated yesterday, you would have liked to have known the information today?
A. Of course. That holds true for every aspect of our lives.
Q. And science and medicine evolves over time, correct?
A. Correct.
Q. And what we thought we knew before is not necessarily true today?
A. I've already stated that.
Q. Counsel asked you a series of questions about the issue of cardiovascular disease, heart disease and HT. Do you remember that?
A. Yes.
Q. Okay. When Ms. Romero presented herself to you in February of 1998, she was already on Premphase, correct?
A. That's correct.
Q. Okay. And did she come to you and say, "Doctor, I'm concerned about my heart condition. I'm concerned about dementia. What should I do?"

Page 243

A. No, she came to me complaining of lower abdominal pain.
Q. Right. And it was your understanding that she was taking Premphase as a result of menopausal symptoms like hot flashes and night sweats, correct?
A. That's correct.
Q. Not because of cardiovascular disease issues, correct?
A. That's correct.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. Correct?
A. Correct.
Q. Okay. And when you reviewed her medical records, did you see anything in there from either you or any other physician that indicated she was being prescribed hormone therapy for cardiovascular benefits?
A. No.
Q. Did you see anything in the medical records that suggested that Ms. Romero was receiving hormone therapy for dementia?

Page 244

A. No.
Q. And it's true that you continued through 2007 to prescribe hormone therapy for vascular -- for vasomotor symptoms of menopausal women, correct?
A. True, up until June of 2006.
Q. What happened in June of 2006?
A. I retired.
Q. Right.
A. I closed my practice.
Q. I apologize. I said 2007. Thank you.
A. Okay.
Q. So as it relates to Ms. Romero, all of the things that counsel was talking about on tooth loss and osteoporosis and heart disease and dementia, that didn't have a thing to do with prescribing hormone therapy for Ms. Romero, did it?
A. No, it did not.
Q. Okay. Then counsel spent 40 minutes or so on phone records of sales -- or phone -- of sales representatives' notes?
A. Right.

Page 245

Q. Have you ever seen them before today?
A. Never have.
Q. Okay. Have you ever spoken to any of the sales representatives to make sure that what they wrote down was accurate?
A. No.
Q. Okay. As you were going through some of those notes, you noted that there were certain things that they said or noted down that was not accurate, correct?
A. Certainly not what I had said or indicated, yes.
Q. Right. Okay.
And a more basic question: The notes start in 2002. Was any of the information that Ms. Vu or any of the other sales representatives that counsel talked to you about -- did that have anything to do with your care and treatment of Ms. Romero?
MR. THORNBURGH: Objection.
A. No.
BY MR. BENEVENTO:
Q. Okay. So if someone said, you

Page 246

know, Premarin or Prempro is the gold standard, has been for 60 years, to you in 2002, would that have done anything for your care and treatment of Ms. Romero prior to her breast cancer in February of 2001?
MR. THORNBURGH: Objection.
A. No.
BY MR. BENEVENTO:
Q. No, correct?
A. No.
Q. Did any of the things that the sales representatives wrote down influence you in your care of any patients?
A. No. I think that record reflects that I pretty much held my own opinion about how I treated my patients.
Q. And did it influence you in any way in your care of Ms. Romero?
A. No.
Q. Label, Prempro label, and Premarin label -- or Premphase label.
A. Okay.
Q. I don't want to be argumentative with you, but I do want to

Page 247

understand what you said in your direct testimony to me.
A. Okay.
Q. It was my understanding that you indicated that you did not go to the Physicians' Desk Reference and read through all of those things in 1998 when you continued the prescription for Premphase for Ms. Romero, correct?
MR. THORNBURGH: Objection.
A. That's correct. What I did was I reviewed the product labeling in the beginning --
BY MR. BENEVENTO:
Q. Right.
A. -- to get an idea of what we were -- I was prescribing. But I did not routinely go back to the PDR and review it unless there was something weird the patient complained of and I had to figure out, "Well, where could this be from?"
Q. Right. And Premphase has been on the market well before 1998, correct?
A. Right. Right.

Page 248

Q. And you testified that your biggest decisions on how to handle these kinds of medications were based upon what you learned in seminars?
A. Right.
Q. What you heard from other colleagues, and more importantly, on your own experience with the drug?
A. Exactly.
Q. Okay. Now, counsel asked you to take a look at the particular warning in -- or the particular Physician's Desk Reference of 1998.
And if you look at the first line that he kept talking to you about, is it your understanding that the "Induction of Malignant Neoplasms, Breast Cancer," dealt with the combination product, Prempro and Premphase?
MR. THORNBURGH: Objection.
A. No.
BY MR. BENEVENTO:
Q. It says, "All warnings below pertain to the use of this combination

Page 249

product."
A. Correct.
Q. So as all this was being read, you understood that to be combination product --
A. Yes.
Q. -- not just estrogen, right?
A. Combination.
Q. Thank you.
Now, the first line says there's a relatively small risk of breast cancer, 1.3 to 2.0?
A. Right.
Q. What was WHI's findings for invasive breast cancer?
MR. THORNBURGH: Objection.
A. Well, it was increased.
BY MR. BENEVENTO:
Q. 1.24, wasn't it?
MR. THORNBURGH: Objection.
A. 1.24, exactly.
BY MR. BENEVENTO:
Q. And that's right in between -- or, actually, it's --

A. Well, actually, it straddles the -- the confidence interval was from 1, I believe, to 1.56 or 1.6 or something like that. So it really was clinically not significant.
Q. Clinically not significant?
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. WHI?
A. Yeah.
Q. Okay. Yet, as -- in this particular 1998 label, it does indicate that some studies have reported a moderately increased risk of breast cancer, correct?
MR. THORNBURGH: Objection.
A. And other studies did not.
BY MR. BENEVENTO:
Q. Right. Exactly.
And it said that the added effect of progestins to the risk of breast cancer is unknown, right?
A. Uh-huh.
Q. Right?
Unknown isn't a -- is not



something that's reassuring, is it?
A. Well, it states what it says. Unknown, we don't know.
Q. I appreciate that. And you said that several times, but counsel then tried to ask you some questions and said, "This reassures you, doesn't it? This reassures you, doesn't it"? And I'm just trying to figure out what you meant.
If the risk of cancer is unknown, is that reassuring?
MR. THORNBURGH: Objection.
MR. BENEVENTO: What's the objection?
MR. THORNBURGH: You're taking what I -- what we talked about earlier out of context.
MR. BENEVENTO: Okay. Fine.
A. No, that particular insert would be reassuring because it doesn't -- it told me that other studies didn't show any increases. This was within a relatively reasonable confidence interval. So, yeah, I mean --



BY MR. BENEVENTO:
Q. I mean --
A. -- the unknown certainly always scares people. Why shouldn't we be scared?
Q. Sure.
A. But the risk is unknown for medroxyprogesterone and progestin. Well, the risk is protecting the endometrium, so, that, we know was important for us.
Q. But it's talking about unknown as it relates to breast cancer.
A. Yeah. Okay.
Q. It says, "The effects of added progestin on the risk of breast cancer is unknown," and I'm trying to figure out why that statement is reassuring to you.
MR. THORNBURGH: Objection, asked and answered.
A. Well, you can quibble and say, "Well, it's unknown. There may be none."
BY MR. BENEVENTO:
Q. Correct. And does the label say that? Does the label say there's no risk of breast cancer if you take E+P?



A. No, that's the lawyer talk of taking things apart, yeah.
Q. Well, I understand that. But as you read this and see that there is disclosures of breast cancer, can you say to a patient, "Don't worry about it. You are not going to get breast cancer"?
MR. THORNBURGH: Objection.
A. No, of course. You could never say that.
BY MR. BENEVENTO:
Q. Okay. Is there anything in this label that would lead you to tell Ms. Romero, "Don't worry about breast cancer"?
MR. THORNBURGH: Objection.
A. No. We always worry about breast cancer, but we'll keep a close eye on you and we'll follow you up very carefully.
BY MR. BENEVENTO:
Q. Correct. And that's what you were talking about earlier --
A. Right.
Q. -- when you prescribed HT. You

said in direct, if I'm not mistaken --
A. Yeah.
Q. -- breast cancer was always an issue, you always talked about it, and you would follow up on it, right?
A. That's why they came in for exams.
Q. Right.
A. Breast exams, breast self-exam and mammograms.
Q. Did you -- is one of the reasons that you slowed down on your prescription of Prempro and Premphase the risk of litigation?
A. No.
Q. Okay.
A. I know that the pharmaceutical representative put that down. No, I was never worried about it. I was concerned about its effect on my patient.
Q. Okay. Effect on the patient mentally?
A. Cardiovascular, heart.
Q. Okay.



A. And at that point, now, the risk, the unknown on the breast.
Q. Okay. All right. So unknown risk of breast cancer and certain cardiovascular issues?
A. Right.
Q. Okay. So the statements in Exhibit 7 from the sales rep, you can say, as it relates to litigation risk, are not true?
A. No, I was not worried about litigation, other than somehow this issue with the patient signing the Prempro consent. I think there was a time where the insurance company said, "We need to have consent by the patient to be treated that way," and we sort of went along with it, but I did not continue with it.
If I had a patient who wanted to be on Prempro, I counseled her, she said that's what she wanted, I indicated on the patient's chart, and that was the end of that.
Q. And she chose to use it, and you prescribed it?



A. Yes.
Q. Okay. Now, counsel asked you about the SEERs data. Have you analyzed the SEERs data to determine when the decrease in breast cancer started?
A. No.
Q. To determine whether it was actually 18 months before HRT results were issued, or after?
A. No.
Q. Okay. Have you read any articles, sir, that talk about the fact that women's screening, mammograms and other forms of tests for breast cancer, have actually gone down after WHI --
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. -- after 2002?
A. I've heard of that. I've not read the studies.
Q. Right. And so you haven't done any analysis to determine whether, to the extent there's a lower amount of breast cancer today, it's a result of people just



not getting screened or people getting screened very well in the 1990s?
MR. THORNBURGH: Objection.
A. There's some unanswered questions there; but remember, my practice was not in that direction. My practice was a surgical practice --
BY MR. BENEVENTO:
Q. Surgical.
A. -- and that was my primary issue.
Q. Okay. And, again, I just want to make sure this is clear for the jury. Nothing that the sales representatives of Wyeth told you about Prempro or Premphase influenced your ability or decisions to prescribe to Ms. Romero?
A. No.
Q. And I believe you indicated that you're not a stooge, so you don't accept everything that the sales representative says is true; you actually verify it, based upon your own experience and research?
MR. THORNBURGH: Objection.

Page 258

A. Absolutely.
BY MR. BENEVENTO:
Q. You indicated that HRT became vogue in the late '70s and '80s, and that there is a progressive learning about HRT. What did you mean by the "progressive learning about HRT"?
A. Well, we used lower dosages, we became aware that we had to have a balance with progestin to protect the endometrium, which was not -- was not practiced in the beginning. So -- we learned its effect on lipids.
So, I mean, there was a lot of things we didn't know in the '70s which we became aware of in the '80s and the '90s.
Q. Dr. Mishell?
A. Uh-huh.
Q. Is he a reasonable guy?
A. I don't know if he's still alive.
MR. THORNBURGH: Objection.
BY MR. BENEVENTO:
Q. When you studied under him, did

Page 259

you respect him?
A. Oh, yes.
Q. And did you respect the way that he went about the practice of medicine?
A. I don't know about his practice of medicine. He was my chief and I was an intern, so that's the only observations I had. We lived in fear of him.
Q. Do you think that he would mislead you?
A. No.
Q. Do you think he would come up with phony information?
A. I have no reason to suspect that.
Q. Did the fact that sales representatives took your nurses to lunch influence your prescriptions of HT or how you used HT?
A. No. It led to good nursing morale in the office.
Q. Was Wyeth the only company that sent sales representatives?
A. No.

Page 260

Q. Did the Wyeth sales representatives appear to be different than other sales representatives in how they handled themselves and approached the product line?
A. No.
Q. Did you feel like you were getting undue pressure from Wyeth, as opposed to other pharmaceutical companies?
A. No, not at all.
Q. You indicated that WHI is a very slanted study. Those were your words, correct?
A. Uh-huh.
Q. Do you believe that it's -- that the media blew up the results of WHI more than they needed to be?
MR. THORNBURGH: Objection.
A. Oh, absolutely. It -- well, the way it was publicized from the very beginning was inappropriate. It should have been released to physicians first, so that people could be aware of what's coming.
But more -- more than that, the

Page 261

average age of patients started on hormones was 63. That was never my treatment protocol. If somebody came in at 63 and says, "I want to be hormones," I said, "Forget it."
We started for -- at the transition into the menopause with menopausal symptoms, and that's a very different picture from the standpoint of later outcomes.
BY MR. BENEVENTO:
Q. And counsel asked you questions about breast cancer. I just want to make sure.
You are not here to say that Ms. Romero's breast cancer had anything to do with the use of Premphase or Prempro, are you?
A. I have no information that would suggest that.
MR. BENEVENTO: Thank you. That's all I have. I appreciate your patience with me, by the way.
THE WITNESS: Now we go back to you?

Page 262

MR. THORNBURGH: Usually it's a ping-pong, Doctor, but I am going to not ask any more questions and get you out of here so you can go home.
THE WITNESS: Good. Thank you.
MR. THORNBURGH: I know you're wife's waiting for you. Thank you for your time today. I appreciate it.
THE WITNESS: Good luck to both of you.
THE VIDEOGRAPHER: Going off the record at 7:41 p.m.
(Proceedings adjourned at 7:41 p.m.)
— — — — — —

Page 263

CERTIFICATE

I, MICHAEL E. MILLER, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, EBERHARD C. LOTZE, M.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

______________________
MICHAEL E. MILLER,
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified LiveNote Reporter
Notary Public in and for the State of Texas
My Commission Expires: 7/9/2012
Dated: May 9, 2011

Page 264

ACKNOWLEDGMENT OF DEPONENT

I, EBERHARD C. LOTZE, M.D., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________________
EBERHARD C. LOTZE, M.D. DATE

Subscribed and sworn to before me this _______ day of _______________, 20 _____.
My commission expires: _______________

Notary Public

Page 265

— — — — — —
ERRATA
— — — — — —

PAGE LINE CHANGE
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________