# EXHIBIT 93

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JUDY ROMERO | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | 1:03-cv-1367 |
| vs. | § | |
| | § | |
| WYETH, INC., et al., | § | |
| | § | |
| Defendant. | § | |

---

| | | |
|---|---|---|
| JEAN LEA, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO: |
| | § | 1:03-cv-1339 |
| VS. | § | |
| | § | |
| WYETH, INC., et al., | § | |
| | § | |
| Defendants. | § | |

__ __ __

THURSDAY, AUGUST 4, 2011

__ __ __

Videotaped oral deposition of DONALD C. WILLIAMS, II, held in the offices of the Doyle, Restrepo, Harvin & Robbins, LLP, 600 Travis Street, Suite 4700, Houston, Texas, at 9:41 a.m., on the above date, before

__ __ __

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Michael E. Miller, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public.

A P P E A R A N C E S:

AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC
BY: NATHAN C. BESS, ESQUIRE
nbess@awkolaw.com
(via teleconference)
17 East Main Street
Suite 200
Pensacola, Florida 32501
(850) 916-7450
Counsel for Plaintiffs

WINSTON & STRAWN, LLP
BY: NATHAN E. HOFFMAN, ESQUIRE
nhoffman@winston.com
35 West Wacker Drive
Chicago, Illinois 60601-9703
(312) 558-5600
Counsel for Defendant Wyeth, Inc., et al.

DOYLE, RESTREPO, HARVIN & ROBBINS, LLP
BY: J.B. (TREY) HENDERSON, III, ESQUIRE
thenderson@drhrlaw.com
JPMorgan Chase Tower
600 Travis Street, Suite 4700
Houston, Texas 77002
(713) 228-5100
Counsel for The Witness

VIDEOGRAPHER:
DOUG OVERSTREET,
Golkow Technologies, Inc.

———



INDEX


| | |
|---|---|
| APPEARANCES | 2 |
| PROCEEDINGS | 6 |
| EXAMINATION OF DONALD C. WILLIAMS, II: | |
| BY MR. BESS | 7 |
| BY MR. HOFFMAN | 181 |
| BY MR. BESS | 207 |
| BY MR. HOFFMAN | 219 |
| CERTIFICATE | 222 |
| ACKNOWLEDGMENT OF DEPONENT | 223 |
| ERRATA | 224 |
| LAWYER'S NOTES | 225 |


———



DEPOSITION EXHIBITS
DONALD C. WILLIAMS, II
Thursday, August 4, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Williams-1 | Notice of Deposition | 9 |
| Williams-2 | Call Notes, re: Dr. Kirby | 67 |
| Williams-3 | Call Notes, re: Dr. Lal | 77 |
| Williams-4A | "Menopause Isn't Gone in a Flash" Document, W-ADSBRO-01096 - W-ADSBRO-01100 | 96 |
| Williams-4B | "Consider the Body of Evidence" Document, W-HUSAK01-00001017 - W-HUSAK01-00001018 | 102 |
| Williams-5 | "For Four Decades" Document, CHOOM022-000928 - CHOOM022-000938 | 106 |
| Williams-6 | Two Benefits vs. A Risk of ERT, CORRA302-00066 | 110 |
| Williams-7 | "Menopausal Symptoms Are Just The Tip Of The Iceberg" Document, PAYNC201-001154 | 115 |
| Williams-8 | 9/98 Therapeutic Options for Menopausal Health Monograph, W-HUSAK01-00000888 - W-HUSAK01-00000943 | 121 |



DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Williams-9 | 7/18/00 Wyeth-Ayerst Letter to AHP, CORRA001-000125 - CORRA001-000126 | 138 |
| Williams-10 | 7/13/07 Letter re: Mary Cardone | 144 |
| Williams-11 | IMS Data, re: Dr. Kirby | 162 |
| Williams-12 | Graph of IMS Date, re: Dr. Kirby | 163 |
| Williams-13 | Graph of IMS Date, re: Dr. Kirby | 164 |
| Williams-14 | IMS Data, re: Dr. Lal | 166 |
| Williams-15 | Graph of Dr. Lal's Prempro Prescriptions - Monthly | 166 |
| Williams-16 | Graph of Dr. Lal's Prempro Prescriptions - Quarterly | 167 |
| Williams-17 | Premarin: Sales Issues & Competitive Information, YAVUE007-000244 - YAVUE007-000396 | 172 |
| Williams-18 | 1998 PDR Entry for Prempro, W-LABELS-005338 - W-LABELS-005344 | 203 |

———

PROCEEDINGS
(August 4, 2011 at 9:41 a.m.)
THE VIDEOGRAPHER: Stand by. Okay. We're on the record August 4th, 2011. It's 9:41 a.m., beginning of Tape 1.
My name is Doug Overstreet. I'm the videographer.
This video deposition is being held in Houston, Texas in the matters of Judy Romero vs. Wyeth, Incorporated, et al., Cause No. 1:03-cv-1367, and Jean Lea vs. Wyeth, Incorporated, et al., Cause No. 1:03-cv-1339.
Will the attorneys please identify themselves for the record.
MR. HENDERSON: Trey Henderson here for Clark Williams.
MR. HOFFMAN: Nathan Hoffman on behalf of defendants.
MR. BESS: Nathan Bess for the plaintiffs, Jean Lea and Judy Romero.
THE VIDEOGRAPHER: The court



reporter is Mike Miller. He will now swear in the witness.
DONALD C. WILLIAMS, II,
having been duly sworn, testified as follows:
EXAMINATION
BY MR. BESS:
Q. Mr. Williams, good morning. My name is Nathan Bess. I represent two plaintiffs in the hormone replacement therapy litigation.
Let me ask you: Could you please state your name for the record.
A. Donald Clark Williams, II.
Q. Mr. Williams, let me ask you: Have you ever testified before?
A. No, I have not.
Q. All right. Have you ever given a deposition previously?
A. No, I have not.
Q. Have you ever been a party to a lawsuit before?
A. No, I have not.
Q. Okay. Mr. Williams, I'm sure that Mr. Henderson has gone over some of the



ground rules and some of the things to expect today, but just to reiterate some of those: Please remember today to give us verbal responses.
I am appearing by phone today. The disadvantage of that is, I can't see your responses. Additionally, the court reporter needs verbal responses for the record.
Mr. Williams, in the course of today, it's human nature for you to anticipate some of my questions and for you to begin to answer before I've completed my question.
The problem with that is, that makes it difficult for the court reporter to make an accurate and clear record of our discussion today. So, if you would, please wait for me to complete my question before you answer.
Additionally, I do realize that it's sometimes difficult to understand my questions by virtue of the speakerphone. If at any time you don't understand my question, please don't hesitate to ask me to repeat it;



or if the question is confusing in any way, I'm more than happy to rephrase my question.
Additionally, if at any time today you need a break, please let me know or let your lawyer know, and we'll be happy to accommodate you.
Do you understand those parameters?
A. Yes, I do.
Q. Okay. Mr. Williams, what's your home address?
A. My home address is 5422-B Petty Street, Houston, Texas, 77007.
Q. Is there any likelihood of you changing addresses or moving from that address in the next year?
A. No.
MR. BESS: Okay. Mr. Williams, I'd like to mark Exhibit 1, the notice of your deposition.
(Whereupon, Deposition Exhibit Williams-1, Notice of Deposition, was marked for identification.)
BY MR. BESS:

Page 10

Q. And, Mr. Williams, let me also add that I do have copies of the exhibits I'm going to be showing you today with the court reporter. We need to remember not to talk while the court reporter is getting those out; otherwise, he's not able to take down what we're saying.
Mr. Williams, your deposition today is being noticed in two separate lawsuits, one for Judy Romero and one for Jean Lea. They're both plaintiffs in the hormone therapy litigation lawsuit against Wyeth.
So in the course of today, I'm going to be asking about your detailing activities with both Dr. Kirby and Dr. Lal. So some of your testimony is going to overlap. I'm going to have to go between your visits with both of those doctors.
If at any time you need to distinguish your activities with one doctor versus the other physician, please let me know. Is that clear?
A. Yes.

Page 11

Q. Thank you, sir.
Mr. Williams, have you brought any documents with you today to this deposition?
A. No.
Q. All right. Do you have a -- did you produce a resume or curriculum vitae today?
A. Yes.
MR. BESS: Okay.
Mr. Henderson, is there any chance you could -- is that a document you could e-mail to me at one of the next breaks? I don't need it quickly, but I would just like to have a look at it.
MR. HENDERSON: Okay. I'll see if I can do that.
MR. BESS: All right. Appreciate it.
BY MR. BESS:
Q. Mr. Williams, without going through every single element of your CV, could you give me sort of a summary of your

Page 12

education?
A. Went to high school in Houston, Texas at Memorial High School; went to the University of Texas, 1989 to 1993; got a degree in political science.
Q. Did you do any graduate work at UT or any other university?
A. No, I did not.
Q. Following your graduation in 1993, what was your first job?
A. I was a bartender.
Q. And what was your next job after that?
A. I worked for Executone in sales.
Q. And after that?
A. Global Services Office Products.
Q. Was that also a sales position?
A. Yes.
Q. What about after that?
A. I worked for Wyeth.
Q. And on what date did you begin working for Wyeth?

Page 13

MR. HENDERSON: Just to the best of your recollection.
A. 1998. I don't remember which month. I don't have my -- I don't have it in front of me.
BY MR. BESS:
Q. And what was your position when you first began working for Wyeth?
A. Territory sales representative.
Q. Were you ever promoted while working for Wyeth?
A. Yes.
Q. And what was your promotion?
A. Area account manager.
Q. And what year was that, was that promotion?
A. 2001.
Q. Were you ever promoted subsequent to that?
A. No.
Q. And how long did you continue working for Wyeth?
A. Until October 2002. Actually, September 2002.

Page 14

Q. And what was your reason for leaving Wyeth?
A. Better job.
Q. And in what terms do you mean "better job"? In terms of salary?
A. I was looking for a job working in a hospital in medical devices.
Q. And what was your next job after leaving Wyeth?
A. LEXION Medical.
Q. And what type of organization is that?
A. It's a medical device company.
Q. And what type of medical devices do they --
A. It's a laparoscopic device.
Q. And are they a manufacturer or a reseller of those devices?
A. Manufacturer.
Q. And what's your position with LEXION?
A. Sales representative.
Q. And were you ever promoted while working for LEXION?

Page 15

A. No.
Q. Are you still working for LEXION?
A. No, I'm not.
Q. Okay. When did you leave LEXION Medical?
A. Roughly, March 2003.
Q. What was your reason for leaving LEXION Medical?
A. Opportunity in capital medical sales.
Q. And what was your next position after that?
A. With Datascope Patient Monitors, monitoring company.
Q. And is that also a manufacturer of medical supplies?
A. Yes.
Q. And what was your position at Datascope?
A. Sales representative.
Q. And I assume you detailed patient-monitoring devices, or let me just ask you: What products did you detail?

Page 16

A. It's sales of patient-monitoring equipment. It's an equipment position.
Q. How long did you work at Datastrobe?
A. It's Datascope.
Q. Oh, I beg your pardon.
A. Until December 2009.
Q. And what was your reason for leaving?
A. Better opportunity.
Q. Were you promoted while working for Datascope?
A. Yes.
Q. And what was your promotion to?
A. It was more of an addition to regional sales trainer.
Q. Okay. All right. So after you left Datascope in late 2009, where did you go to? Where was your next employment position?
A. ZOLL Medical.
Q. And are you currently employed there?
A. Yes.

Page 17

Q. And what's your position?
A. Sales representative.
Q. And what types of products do you detail?
A. Resuscitation equipment.
Q. Sedentation equipment?
A. Resuscitation.
Q. Oh. Thank you.
Mr. Williams, let me ask you: The custodial file for your time while working for Wyeth has not been provided to us. Do you have any explanation for that, why your records would be missing from Wyeth's file?
MR. HOFFMAN: Let me just object to the form of the question. Go ahead.
A. I do not have any files for my time at Wyeth.
BY MR. BESS:
Q. Okay. And you have nothing -- no materials were generated by Wyeth in your files at home?
A. No.

Page 18

Q. Did you have a storage locker while you were employed by Wyeth?
A. Yes.
Q. And what types of materials did you keep in that storage locker?
A. Samples, product samples; and all Wyeth materials.
Q. Did you surrender that locker after leaving Wyeth in 2003?
A. Yes.
Q. And who did you give the key to?
A. John Kreutzer.
Q. Did you also have a laptop furnished to you by Wyeth?
A. Yes.
Q. And what types of information did you record with that laptop?
A. Can you repeat the question?
Q. Yes, sir.
Generally, what did you use that laptop for, the one that was furnished to you by Wyeth?
A. Work.

Page 19

Q. What types of information did you record with that laptop?
A. Any and all files detailing -- regarding Wyeth.
Q. All right. Did you use a program called Leapfrog on your laptop?
A. Yes.
Q. And what was that program used for?
A. I remember the name, but I don't specifically recall.
Q. Okay. Did you record call notes on your laptop?
A. Yes.
Q. Did you typically make call notes for all the physicians that you detailed while you were a sales representative for Wyeth?
A. I don't understand what you mean by "call notes."
Q. Did you typically make annotations or notes following visits after detailing physicians while you were a sales representative at Wyeth?

Page 20

A. Yes.
MR. HOFFMAN: Let me just object to the form. I'm not sure the question is clear.
THE WITNESS: Can you repeat the question?
MR. BESS: Sure. And I would ask any objections are limited to form and foundation, all others are preserved until the time of trial. If we can stipulate to that, please.
MR. HOFFMAN: I will not stipulate to that, but --
MR. HENDERSON: I'm not either. They're going to be pursuant to the Federal Rules.
MR. BESS: Well, here's what we don't need: Speaking objections to coach the witness through today's deposition.
MR. HENDERSON: I'm not aware of any speaking objections.
MR. HOFFMAN: Nathan, just so you know, I mean, it's just unclear.

Page 21

When you talk about "call notes," there's various fields in call notes. There's substantive call notes, and then there's just basic information.
So that's why your question is unclear, and I don't want the record to be unclear.
MR. BESS: All right. We'll get to that later.
Mr. Williams, let me rephrase my question.
BY MR. BESS:
Q. Did you typically make notes of some type after visiting or detailing physicians in your territory?
A. Yes.
Q. And what type of information would you notate after those visits?
A. Items to be followed up on.
Q. Did you ever summarize conversations that you had with physicians that you detailed?
A. Yes.
Q. And was it typically your

Page 22

practice to make notations of conversations with physicians that you detailed for everyone that you visited?
A. No.
Q. So the laptop that was provided to you by Wyeth, did you give that laptop back to Wyeth after you left in 2003 -- or 2002, rather?
A. Yes.
MR. BESS: And just for the record, should a custodial file for Mr. Williams become available in the future or be discovered at some point, I reserve the right to reopen this deposition.
MR. HENDERSON: I object to that.
BY MR. BESS:
Q. Mr. Williams, tell me, please: What did you do to prepare for today's deposition?
A. Met with my attorney.
Q. Okay. And who is that?
A. Trey Henderson.

Page 23

Q. Okay. And how long did you meet with Mr. Henderson in preparing for today?
A. A total of two hours.
Q. Okay. When was that?
A. This morning and one day last week.
Q. All right. And had you met Mr. Henderson prior to those meetings?
A. Yes.
Q. What was the first time you met Mr. Henderson?
MR. HENDERSON: Objection. You're starting to really get into some area that's borderline privileged, and I'm not sure of the relevance of it.
BY MR. BESS:
Q. Mr. Williams, I'm not asking you about any communications between yourself and Mr. Henderson. I'm just trying to get an idea of your preparation for today.
A. We met for an hour last week and an hour this morning.

Page 24

Q. And have you ever met Mr. Hoffman prior to today?
A. No.
Q. And was Mr. Hoffman present at your meeting with Mr. Henderson this morning?
A. No.
Q. Do you have any idea -- do you have an idea whether there's a joint defense agreement between Mr. Henderson and Mr. Hoffman?
A. No.
Q. Is Wyeth paying the fees for Mr. Henderson's representation of you?
A. I do not know.
Q. Are you paying for your lawyer?
MR. HENDERSON: Objection. That's privileged.
Don't answer it.
BY MR. BESS:
Q. Mr. Williams, you don't know whether or not Wyeth is paying for Mr. Henderson's time today?
MR. HENDERSON: Objection, asked and answered.

Page 25

You can respond.
A. I don't know.
BY MR. BESS:
Q. Mr. Williams, what did -- what materials did you review in preparing for today's deposition?
A. Items from previous depositions.
Q. All right. And what types of items?
A. What looked like physician lists and old Wyeth materials.
Q. Okay. And how old were these materials you looked at, in general?
A. I -- please rephrase the question or reask the question.
Q. Sure.
Were these internal documents produced by -- excuse me, generated by Wyeth?
A. Not all of them.
Q. Okay. Can you describe, please, what you looked at?
A. Physician lists, some stuff -- some stuff that looked like it was from

Page 26

Wyeth, but others that definitely weren't.
Q. Okay. Did you review the package insert for Premarin or Prempro, Premphase?
A. No, I did not.
Q. Okay. Did you review any marketing materials generated by Wyeth?
MR. HENDERSON: What kind of materials? I'm sorry.
MR. BESS: Any marketing materials.
A. I'm unclear if it was marketing or not.
BY MR. BESS:
Q. Okay. Did you review any promotional materials generated by Wyeth?
A. I couldn't determine if it was directly from Wyeth.
Q. But did you review any promotional materials at all?
A. Yes.
Q. Okay. Did you review any advertisements for hormone therapy drugs?
A. What do you mean by

Page 27

"advertisements"?
Q. Did you -- well, Mr. Williams, what I mean by "advertisements," any print advertisements that appeared in magazines or other publications --
A. No.
Q. -- relating -- okay.
A. No, I did not.
Q. Okay. What type of advertisements did you see?
A. I'm unclear on your use of "advertisements."
Q. Well, what do you understand by the word "advertisements"?
A. I did not see anything that was printed for newspaper or magazine.
Q. Okay. Did you review any television advertisements?
A. No.
Q. Did you review any websites or any other Internet publications?
A. No.
Q. Did you review any training materials for sales representatives of Wyeth?

Page 28

A. Yes.
Q. And were any of those training materials that refreshed your recollection about your training at Wyeth?
A. Yes.
Q. Did you -- in preparation for today, did you review any leave-behind pieces or any journal articles?
A. No.
Q. Can you recall for me, please, what type of training materials did you review?
A. What seemed to be an old -- I can't even remember if it was Premarin or Prempro training packet.
Q. Did you review any Slim Jims or other detailing materials?
A. Yes.
Q. And in reviewing those training -- excuse me, those detailing pieces, did that refresh your recollection about using those during your time as a sales representative?
A. Other than remembering the

Page 29

pieces -- I remember the pieces, but not the message.
Q. All right. Fair enough.
Have you discussed your deposition today with anyone else besides your attorney?
A. Yes.
Q. And who would that be?
A. My fiancee, my dad.
Q. And what did you discuss with your fiancee and your father?
A. That I was being deposed.
Q. Did you have any discussions with either your fiancee or your father about your work at Wyeth or the substance of your testimony today?
A. No.
MR. BESS: And, Mr. Henderson, I'd like to ask that, due to the lack of any custodial file being produced for Mr. Williams, if you could provide me with copies of any training materials or sales aides that Mr. Williams reviewed in preparation

for his deposition today.
MR. HENDERSON: You have them. It's what you produced to me.
MR. BESS: All right. Thank you.
BY MR. BESS:
Q. Mr. Williams, going back to the time when you first began working for Wyeth, let me ask you: Could you please describe the application and interview process for Wyeth when you began, prior to when you started working there in 1998?
A. I answered an ad in the Houston Chronicle and submitted my resume; was interviewed, I believe, three times, on three different occasions, actually.
Q. And who were you interviewed by?
A. John Kreutzer, Rusty Jackson, and I cannot remember the names of the area sales directors.
Q. Okay. And what's John Kreutzer's position at Wyeth?
A. At the time, he was sales



manager.
Q. Was he later promoted to a different position?
A. Yes.
Q. What was that?
A. He was manager of the area account managers.
Q. And what was Rusty Jackson's position at Wyeth?
A. He was a regional manager.
Q. And, if you could, could you describe for me, just in terms of definitions, "territory," "area" and "region," as you understood them while you were a sales representative at Wyeth?
A. Territory sales manager is a sales representative, the regional manager is the manager who manages those sales representatives, and an area account manager works more with institutions -- with institutions.
Q. Okay. So is it fair to say you have so many territories in one region, which coincides partially with an area? Is that



fair to say? If I'm wrong, please correct me.
A. There are multiple territory managers and the regional managers that manage them, and then a separate -- and they're calling on physicians in the field. The area account managers call on teaching institutions.
Q. Mr. Williams, what products did you detail while you worked for Wyeth as a sales representative?
A. Birth control pills were Alesse, Triphasil, Lo/Ovral; Premarin, Prempro, Premphase; Fosamax and Crinone.
Q. What type of birth control did you detail?
A. Alesse, Triphasil, Lo/Ovral. Those were the three: Alesse, Triphasil, Lo/Ovral.
Q. Which of the drugs that you detailed -- let me ask you -- let me strike that.
Do you understand the difference between a first-line drug and a



second-line drug, first-line therapy versus secondary therapy?
A. No, I do not.
Q. Did you have a salary increase after moving from Global Services to Wyeth in late 1998?
A. Yes.
Q. Mr. Williams, I'm not going to ask you today about how much money you made or what your salary was at Wyeth. But let ask you: Your compensation while you were a sales representative at Wyeth, was that based on salary and bonuses based on your performance at Wyeth as a sales representative?
A. Yes.
Q. And the bonuses that you received, what were those based on?
MR. HOFFMAN: Objection, foundation.
MR. BESS: Well, let me rephrase that question, then.
BY MR. BESS:
Q. Mr. Williams, did your bonuses

Page 34

change from year to year or quarter to quarter?
A. Can you please clarify the question?
Q. Sure.
How often did you receive bonuses while you worked as a sales representative at Wyeth?
A. I don't recall if it was monthly or quarterly.
Q. Okay. And those bonuses that you received either monthly or quarterly, did those vary from month to month or quarter to quarter?
A. Yes.
Q. And why did they vary from month to month or quarter to quarter?
MR. HOFFMAN: Objection, foundation.
Go ahead.
THE WITNESS: Can you please repeat the question?
MR. BESS: Sure.
BY MR. BESS:

Page 35

Q. What was that variation in the size of the bonus that you received either month to month or quarter to quarter? What was that variation based on?
MR. HOFFMAN: Same objection.
A. Sales -- sales results.
BY MR. BESS:
Q. So it's fair to say the greater -- the greater the sales volume of the products that you were detailing, the larger bonus that you would receive? Is that fair?
MR. HOFFMAN: Object to form.
A. No.
BY MR. BESS:
Q. Why is that?
A. I don't recall how the bonuses were graded out.
Q. Well, was part of the calculus in determining the size of your bonuses based on sales volume?
A. Yes.
Q. Mr. Williams, if we could, what type of training did you receive when you

Page 36

first began working for Wyeth?
A. To my recollection, the first day was training in -- it was outside of Philadelphia, and I believe my first stage of training lasted multiple weeks.
Q. You said outside Philadelphia. What type of facility were you trained in? Was it a...
A. It was corporate headquarters.
Q. Corporate headquarters.
Do you recall how many other sales representatives were trained at the same time as you?
A. No.
Q. And did you receive training materials from -- for use in your training during this two-week period?
A. Yes.
Q. And what types of materials were those? Could you describe those for me, please?
A. I don't recall specifics.
Q. The new sales representatives that were your colleagues there during the

Page 37

training, did they receive the same material that you did?
A. Yes.
Q. And I don't want to say "classmates," but your other colleagues that were being trained contemporaneously with you, did everyone receive the same training; in other words, the same sort of regimented substance that you were being trained on?
MR. HOFFMAN: Object to form.
THE WITNESS: Can you repeat the question, please?
MR. BESS: I apologize. It was a poorly worded question.
BY MR. BESS:
Q. The structure of your training sessions that you went through while you first started working for Wyeth, was that the same for everyone that was being trained at the same time you were?
A. Yes.
Q. The sales training materials that you received from the home office, were you required to read those and study those as

Page 38

part of your training?
A. Yes.
Q. Is it fair to say that all sales representatives that were trained at the same time as you were trained the same way with the same materials?
MR. HOFFMAN: Objection, form and foundation.
THE WITNESS: Can you repeat the question?
MR. BESS: Yes, sir.
BY MR. BESS:
Q. I'm just asking generally: During your training with Wyeth in 1998, when you first were hired as a sales representative, is it fair to say that everyone that was being trained with you in that initial training session at the Wyeth home office, that everyone was trained the same way with the same training materials?
A. Yes.
Q. Mr. Williams, do you recall the number of your territory that you detailed while you worked for Wyeth?

Page 39

A. No.
Q. Who was your supervisor while you worked for Wyeth?
A. John Kreutzer.
Q. So you interviewed with John Kreutzer, and he remained your district manager while you worked as a sales representative?
A. I did have a different sales manager for a short period of time.
Q. Yes, sir. And who was that?
A. Wes Sonnier.
Q. Did Rusty Jackson remain your regional manager?
A. Rusty was never my regional manager.
Q. Okay. So he was just involved in the interviewing process?
A. Yes.
Q. Okay. Who was your regional manager?
A. John Kreutzer.
Q. John Kreutzer. Okay.
And was anyone else

Page 40

specifically assigned to supervise your work while you worked as a sales representative?
A. No.
Q. Did you have a specific medical science liaison assigned to your area or that you were assigned to work with?
A. I don't recall.
Q. Okay. Well, let me ask you first: Do you recall what a medical science liaison is, or MSL?
A. No.
Q. Let me ask you: Did you ever -- did you know the other sales representatives in your territory?
A. Yes.
Q. And did you work with them from time to time?
A. Yes.
Q. How would you describe the relationship you had with other sales representatives? Was it a competitive relationship, or was it more of a cooperative team effort?
A. Cooperative.

Page 41

Q. Okay. And in what ways did you cooperate or collaborate with your fellow sales representatives in your territory?
A. During regional meetings.
Q. Okay.
A. And help, help train.
Q. And at regional meetings, what types of -- what types of things would be discussed, or what types of information would be shared at those regional meetings?
A. I don't really recall.
Q. Let me ask you: Have you ever met Ann Peebles or Ann Peebles Green?
A. Yes.
Q. And who is she?
A. Friend from high school.
Q. And did she also work as a sales representative for Wyeth?
A. Yes.
Q. Did you ever work with Ms. Green while you were a sales representative for Wyeth?
A. In what context?
Q. As a sales representative.

Page 42

A. Yes.
Q. Okay. Did you ever detail doctors or physicians together?
A. No.
Q. Was Ms. Peebles -- now she's Ms. Green. I don't know how to refer to her I guess I'll say "Ms. Green."
Did you have a chance to meet her at regional meetings between sales representatives?
A. Yes.
Q. And did Ms. Green also detail the Premarin family of products?
A. Yes.
Q. Okay. Did you ever know a woman named Diep Vu?
A. Yes.
Q. And who is Ms. Vu? Well, let me rephrase that.
In what capacity did you know Ms. Vu?
A. She was on my sales team.
Q. Was Ms. Green also on your sales team?

Page 43

A. No.
Q. Did Ms. Green detail Territory 73?
A. I have no idea.
Q. Did Ms. Vu detail Territory 83?
A. I have no idea.
Q. Okay. How often did you come into contact with Ms. Vu?
A. Only at the meetings.
Q. Okay. Did you have e-mail contact with Ms. Vu?
A. Yes.
Q. What was the name of your sales team?
A. I don't recall.
Q. I may have already asked this: Ms. Green, was she on the same sales team or a different one?
A. She was on a different one.
Q. Did you ever know Jeries Rajabi?
A. Yes.
Q. And who was that?
A. Jeries worked for Ayerst in

Page 44

Beaumont, and then was the manager of the other team -- was promoted to the manager of the other team.
Q. And was Ms. Green on Jeries Rajabi's sales team?
A. Yes.
Q. Was that team called Jeries' Angels?
A. I don't recall.
Q. Was it common for different sales teams to have informal team names?
A. I don't remember.
Q. Okay. Did you ever know a sales representative named Chris Blevins?
A. I recall the name.
Q. Okay. Did you ever work with Mr. Blevins?
A. I don't believe so. I believe he was the rep before me.
Q. You never had any personal contact with Mr. Blevins?
A. I don't think so.
Q. Okay. Do you have any reason to believe that your training as a Wyeth

Page 45

sales representative was substantively different from that from Ms. Green or Mr. Blevins or Ms. Vu?
MR. HOFFMAN: Object to form. Also, doesn't specify a time period.
But go ahead.
MR. HENDERSON: Objection, vague, ambiguous.
A. They were not in my sales training.
BY MR. BESS:
Q. In talking just about the Premarin family of products -- well, let me rephrase that.
Did you, Ms. Green, Ms. Vu and Mr. Blevins all detail the Premarin family of products?
A. Yes.
Q. And would it be your understanding that all four of you detailed those products in the same way?
MR. HOFFMAN: Object to form.
A. I don't know how they detailed.
BY MR. BESS:

Page 46

Q. Well, any instructions that you received from Wyeth regarding the manner in which you marketed the Premarin family of products, is there any reason for you to believe that the other sales representatives didn't follow those instructions?
MR. HOFFMAN: Objection, form, foundation.
A. I don't know how they promoted the products.
BY MR. BESS:
Q. Is there a reason for you to believe that they would have received different instructions on how to promote the Premarin family of products?
MR. HOFFMAN: Same objections, asked and answered.
A. Like I said, I don't know what information they were told.
BY MR. BESS:
Q. Mr. Williams, have you reviewed any transcripts of the testimony of any other sales representatives prior to your deposition today?

Page 47

A. No.
Q. Okay. Mr. Williams, let's talk a little bit about your activities as a sales representative.
MR. HENDERSON: I tell you what, Nate, we've been on almost an hour. Is this a good time, transition time, to take a break?
MR. BESS: It is.
MR. HENDERSON: Okay.
MR. BESS: If you guys want to take a break, let's go ahead and take a break. How long do you need, Trey?
MR. HENDERSON: I was just going to say five minutes, ten minutes.
MR. BESS: That's fine.
THE VIDEOGRAPHER: Off the record at 10:36, end of Tape 1.
(Recess taken, 10:36 a.m. to 10:47 a.m.)
THE VIDEOGRAPHER: On the record at 10:47, beginning of Tape 2.
BY MR. BESS:

Page 48

Q. All right, gentlemen. We're back on the record.
Mr. Williams, let me ask you: Going back to your promotion from territory sales representative to area sales manager, did that result in a salary increase?
A. It was actually area account manager, not an area --
Q. Okay. I beg your pardon.
A. Yes.
Q. Okay. On what basis did you receive the promotion? What were some of the factors that accounted for that?
MR. HOFFMAN: Objection, foundation.
A. Based off my level of knowledge and results.
BY MR. BESS:
Q. And what do you mean by "results"?
A. My sales performance.
Q. And your sales performance, was that related to the volume of prescriptions written by physicians in your territory?

Page 49

A. Sales performance, to my recollection, varied on a number of factors other than volume.
Q. Okay. Did they have to do with trends in prescriptions written by physicians that you detailed?
MR. HENDERSON: Objection, vague.
THE WITNESS: Can you repeat the question?
MR. BESS: Sure.
BY MR. BESS:
Q. Did you receive periodic reports on the numbers of prescriptions that physicians were writing that you were assigned to?
A. Yes.
Q. And why was that information important to you?
MR. HOFFMAN: Objection, form.
A. That --
MR. BESS: Let me rephrase that question.
BY MR. BESS:

Q. Why did you monitor that type of information periodically?
A. The information gave us a rough idea of what the prescriber was writing.
Q. Okay. And, in general, was it your goal to educate physicians so that they wrote more prescriptions of products in the Premarin family?
MR. HOFFMAN: Objection, form.
MR. HENDERSON: Objection, vague, ambiguous.
THE WITNESS: I don't understand the question.
MR. BESS: Well, we can start from the beginning.
BY MR. BESS:
Q. What was your primary goal as a territory sales representative for Wyeth?
A. To provide information to the physicians.
Q. Okay. In order to accomplish what?
A. In order to educate our physicians on the various Wyeth products.



Q. Okay. And was it your hope that, based on the information that you provided to physicians that you detailed, that they would write prescriptions for the products that you were detailing, including the Premarin family of products?
A. Yes.
Q. And were trends in the number of prescriptions -- let me rephrase that.
Were trends in the numbers of new prescriptions for the physicians you detailed a factor in how your bonuses were calculated?
A. Yes.
Q. Were sales representatives in your territory ranked according to the number of new prescriptions that were written for the doctors that they detailed?
A. I don't recall the variables that went into the rankings.
Q. Okay. But were sales representatives ranked against each other in your territory?
A. Yes.



Q. And do you have an understanding about why sales representatives in your territory were ranked?
A. Can you please repeat the question?
Q. Yes, sir.
Do you understand the reason why Wyeth thought it was important to rank the sales representatives in your territory?
A. Yes.
Q. And what is that?
A. To evaluate sales performance.
Q. And do you have an understanding of what that ranking was based on?
A. No.
Q. Okay. How often were sales representatives in your territory ranked?
A. I don't recall.
Q. Mr. Williams, let's turn to some of the specifics about the Premarin family of products that you detailed while you were a sales representative for Wyeth.
Let me ask you, Mr. Williams:



What was your understanding of the risk of endometrial cancer associated with estrogen and progestin in 1998?
MR. HOFFMAN: Objection, compound.
MR. HENDERSON: Objection, vague, ambiguous.
THE WITNESS: Can you repeat the question, please?
MR. BESS: Yes, sir.
BY MR. BESS:
Q. While you were a representative for Wyeth in 1998-1999, did you have an understanding of any risk of endometrial cancer associated with the administration of estrogen and progestin?
A. Yes.
Q. Okay. And what was your understanding of that relationship?
A. That women that still had an intact uterus required progestin --
Q. Okay.
A. -- to accompany the estrogen.
Q. Was it your understanding at

Page 54

the time that without administration of a progestin with the estrogen, that the estrogen alone could cause endometrial cancer?
MR. HOFFMAN: Objection, form, foundation.
A. Yes.
BY MR. BESS:
Q. And this understanding of the relationship between estrogen and uterine cancer, is that based on training that you received from Wyeth?
A. Yes.
Q. And based on that training, was that why you would subsequently recommend administration of an estrogen with a progestin for women?
MR. HOFFMAN: Objection, form.
THE WITNESS: Can you please clarify?
MR. BESS: Yes, sir.
BY MR. BESS:
Q. Based on the training that you received from Wyeth, would that be the reason

Page 55

why that you would -- let me start over.
Your recommendation to prescribe a progestin along with an estrogen, was that based on training that you received from Wyeth?
MR. HOFFMAN: Objection, form.
MR. HENDERSON: Objection, vague, ambiguous.
MR. HOFFMAN: I don't think he testified he recommended anything. But go ahead.
MR. HENDERSON: Assumes facts not in evidence.
MR. BESS: Well, let's start over, then.
BY MR. BESS:
Q. Mr. Williams, did you prescribe Premarin?
A. I didn't prescribe anything.
Q. That was -- excuse me.
Did you detail Premarin?
A. Yes.
Q. Did you also promote Provera?
A. No.

Page 56

Q. You did not?
A. Not as a stand-alone.
Q. Okay. What's the active ingredient in Premarin?
A. Conjugated equine estrogens.
Q. Did you also promote Prempro?
A. Yes.
Q. What are the active ingredients in Prempro?
A. Conjugated equine estrogens and medroxyprogesterone acetate.
Q. Did you ever promote the use of Premarin by itself?
A. Yes.
Q. Did you ever promote the use of Premarin in women that had an intact uterus?
A. No.
Q. Why is that?
A. Because of the risk associated.
Q. What risk?
A. The risk of endometrial cancer.
Q. In detailing physicians, for patients with an intact uterus, would you recommend another drug to be

Page 57

coadministrated -- coadministered, excuse me, with Premarin?
A. Yes.
Q. And what would that be?
A. Progestin.
Q. Okay. And what form of progestin would you recommend?
A. The medroxyprogesterone acetate.
Q. Did you generally detail the generic and not a branded form of MPA?
A. I detailed a branded form, yes.
Q. And what was that branded form?
A. It was Prempro.
Q. Did you ever detail Prempro by itself?
A. Yes.
Q. Okay. Did you ever recommended the use of Premarin with women -- for any women besides those without an intact uterus?
A. Can you please repeat the question?
Q. Sure. Let's make it simple.
What type of patients were

suitable candidates for the administration of Premarin by itself, stand-alone Premarin?
A. Premarin was prescribed for women with a fully -- or hysterectomized.
Q. Okay. Then is it fair to say for any other patients, you would recommend the administration of Prempro in lieu of Premarin?
MR. HENDERSON: Objection, vague, ambiguous.
MR. BESS: Mr. Williams?
A. We -- the information provided to the physicians regarding Prempro was that it was for use with patients that still had an intact uterus.
BY MR. BESS:
Q. Did you have any understanding that the active ingredients in Premarin and the estrogen that was contained in Premarin was any different from that found in Prempro?
A. The estrogens are the same.
Q. Were there any other reasons why you promoted Premarin to physicians, other than use for -- in patients who had not



had a hysterectomy?
MR. HOFFMAN: Objection, form.
MR. HENDERSON: Vague, overbroad.
A. I don't recall.
BY MR. BESS:
Q. Okay. Do you have any understanding of, prior to the introduction of Prempro, of Premarin being prescribed with another drug called Provera?
A. Can you repeat the question, please?
Q. Sure.
Prior to the introduction of Prempro, do you have any understanding of a drug called Provera being recommended along with Premarin?
A. That was before I started at Wyeth. I -- I don't remember.
Q. Right. But --
A. I don't remember what the recommendations were.
Q. Okay. Did you also detail a drug called Premphase?



A. Yes, I did.
Q. Okay. And what is Premphase?
A. It's still Premarin. I don't remember the -- I don't remember the specifics, how it was cycled through.
Q. Is it your understanding that the active ingredient in Premphase is the same as the active ingredient in Prempro and Premarin?
MR. HOFFMAN: Objection, form.
MR. HENDERSON: Yeah, we couldn't hear that one. Could you please restate it?
MR. BESS: Sure.
BY MR. BESS:
Q. Is it your understanding that the active ingredient in Premphase is the same as in Premarin?
A. One more time. We were adjusting the speaker.
Q. Sure. Three's the charm.
Do you have an understanding of whether or not there's a difference in the active ingredient in Premphase and Premarin?



MR. HOFFMAN: Object to "active ingredient." I don't know if we have the definition of that.
But go ahead.
MR. HENDERSON: Same objection.
A. I'm still confused by the question. I don't recall all the differences.
BY MR. BESS:
Q. Okay. Was it your understanding that conjugated equine estrogen was also a component of Premphase?
A. Yes.
Q. Okay. And was it also your understanding that Premphase was also prescribed as hormone replacement therapy?
A. Yes.
Q. Okay. Did you ever speak to doctors about a convenience factor as part of detailing Prempro; in other words, an ease of use, it being one pill instead of two?
A. I recall that Prempro was one pill. That's how I always sold it.
Q. Okay. Did you ever talk to

Page 62

doctors about an advantage in terms of fewer copays for patients, being that Prempro was one pill instead of two pills?
A. I don't recall.
Q. Okay. Mr. Williams, let's go back to your company laptop from Wyeth. We talked about Leapfrog.
Did you also use a program called Salesworks?
A. The name sounds familiar, but I don't remember what it's for.
Q. Okay. Were you generally attentive about making notes after doctors' --
A. No.
Q. -- detail visits? Okay.
Why would you make notes for some doctors and not for others?
A. My notes were more about follow-up visits and action items for follow-up visits.
Q. Okay. Let me ask you this: Were -- we talked about the ranking of sales representatives.

Page 63

Were doctors also ranked in territories?
MR. HOFFMAN: Objection, vague.
A. Were they ranked?
BY MR. BESS:
Q. Yeah. And to clarify: Did you ever periodically receive a report ranking doctors by the numbers of new prescriptions written for the Premarin family of products?
A. Yes.
Q. Okay. And how often were those rankings updated, do you recall?
A. No, I do not.
Q. Were you assigned to detail specific doctors in your territory?
A. Yes.
Q. And were you -- did you visit each doctor the same number of times in any given month?
A. I don't recall.
Q. Would you visit some doctors more frequently than others?
A. Yes.
Q. And did you prioritize certain

Page 64

physicians in your territory over other physicians?
A. Yes.
Q. All right. That prioritization, what was that based on?
A. Sometimes, I'd go see doctors because they were connected to a parking garage. Other times, I'd see doctors because they were in a group of five physicians in one office.
Q. Okay. So were your visits to physicians mostly based on convenience? Is that what you're saying?
A. Sometimes.
Q. Okay. Did you ever visit prescribing physicians more often that wrote a greater number of new prescriptions for the Premarin family of products?
A. Yes.
Q. And was that, in part, influenced by the reports that you received on the number of prescriptions that doctors were writing?
A. Yes.

Page 65

Q. Mr. Williams, we've been using the term "detailed," and I'm not sure we've actually gone back and defined that.
What do you understand by the term of art "detailed"?
A. I believe that "detail" is providing the doctor with information regarding the products.
Q. And as part of the detailing, does that involve -- is that discussions you had with physicians, any materials you leave with physicians, anything you show to doctors? Is that an accurate description?
MR. HENDERSON: Objection, vague, ambiguous.
A. A "detail" would be the discussions that we have with doctors.
BY MR. BESS:
Q. And during those discussions, would you also -- to the extent you needed them, would you also use any promotional materials or any sales aides that you had available to you from Wyeth?
A. Yes.

Page 66

Q. Going back to the visits that you had with doctors, the notations that you would make from time to time about follow-up visits, did you ever refer to those as "call notes"?
MR. HOFFMAN: Objection, form, vague.
A. No.
BY MR. BESS:
Q. What would you describe those as? Did you have a term for them?
A. Follow-up items.
Q. Okay. Did you sometimes make data entries about whether or not you left samples with physicians?
A. Yes.
Q. And was that a part of what you routinely did as a sales representative, was to give samples to physicians that asked for them?
A. Yes.
Q. Okay. And you kept samples in your storage locker, I think you mentioned earlier; is that correct?

Page 67

A. That's correct.
Q. Mr. Williams, we're here today because of the lawsuits by Ms. Lea and Ms. Romero. As I mentioned earlier today, we're going to have to sort of go back and forth between their prescribing physicians.
Did you ever detail a doctor named Dr. Kirby?
A. Yes.
Q. Okay. And what time -- during what time period did you detail Dr. Kirby?
A. When I started in 1998, and that ended in August of 2001.
MR. BESS: Okay. Mr. Williams, I'd like to mark as Exhibit 2 what I'll represent to you are the call notes for Dr. Kirby.
(Whereupon, Deposition Exhibit Williams-2, Call Notes, re: Dr. Kirby, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, have you ever seen --
MR. BESS: I beg your pardon?

Page 68

I had some interference on the phone. I thought somebody was speaking.
BY MR. BESS:
Q. Mr. Williams, let me ask you: Have you ever seen this document before, or a document similar to this one?
A. Yes.
Q. And where would you have seen this before?
A. I saw it this morning.
Q. Okay. And, Mr. Williams, on the first page underneath the heading "Physician Address," what name is listed there, where it says "First Name" and "Full Name."
A. James Kirby.
Q. Okay. Thank you.
And, again, Dr. Kirby is one of the doctors that you detailed, correct?
A. Yes.
Q. Mr. Williams, on the second page in the third column, the name William Blevins, I believe Mr. Blevins is also known as Chris Blevins; is that right?

Page 69

A. That's correct.
Q. Is that the sales rep that detailed Dr. Kirby prior to your work as a sales representative for Wyeth?
A. Yes.
Q. Thank you.
In the lower right-hand corner of Exhibit 2, there's an entry -- we don't have page numbers, but I'll try to refer to the date. I think that's probably the easiest way to navigate these documents.
On October 10th of 1997, there's an entry that reads, "Debbie mentioned something about Dr. Kirby liking the patch because of the 'delivery system.' Schedule appointment with Kirby and use the patch test."
Did I read that correctly?
A. Yes.
Q. Okay. And then if we flip to page 3 -- and that's the only entry I see on that page.
And, Mr. Williams, if we turn to page 3, looking at April 6th of 1998,

Page 70

there's an entry that says, "Donald Williams, II." Is that you?
A. Yes.
Q. Okay. And does that coincide with your recollection of the time that you began working as a sales representative for Wyeth?
A. Yes.
Q. And, I guess, also the same time that you began detailing Dr. Kirby; is that correct?
A. Yes.
Q. All right. The entry for December 3rd, 1998, there's a name, David Stallcup?
A. Yes.
Q. Who is that?
A. David Stallcup was the Ayerst representative.
Q. Okay. And, if you could, could you describe the relationship between Wyeth and Ayerst?
MR. HENDERSON: Objection, vague, ambiguous.

Page 71

A. Wyeth called on OB/GYNs, and Ayerst called on pretty much everybody.
BY MR. BESS:
Q. Okay. And did those two companies later merge?
A. Yes.
Q. And Wyeth later merged with Pfizer; is that correct?
MR. HOFFMAN: Objection. Just so the record is clear: The companies were already merged at this time, and they had long since been merged. I just don't want the facts --
MR. BESS: And, Trey, you're right -- or whoever. Maybe that's Nathan. I beg your pardon. I did misspeak.
MR. HENDERSON: That's Nathan.
MR. BESS: Let's start over.
BY MR. BESS:
Q. Mr. Williams, at that time, was it your understanding that Wyeth and Ayerst were the same company?
A. Yes.

Page 72

Q. Okay. And is it your understanding that Wyeth later merged with Pfizer?
MR. HOFFMAN: Objection, foundation.
A. I -- I heard that Pfizer bought Wyeth.
BY MR. BESS:
Q. Yes, sir. Thank you.
Mr. Williams, turning to the entry for August 29th, 2001, your name is listed again; is that correct?
A. Yes.
Q. And that appears to me to be the last time that you visited Dr. Kirby. Does that sound correct, according to your memory?
A. Can you please clarify to me the source of these dates?
Q. Yes, sir. This document was provided to me by Wyeth and Pfizer, and my understanding is that they come from the Leapfrog database of call notes for the sales representatives.

Page 73

MR. HOFFMAN: Nathan, just for the record, I don't believe we provided you with the document. I think we gave you the underlying database; is that right?
MR. BESS: That's correct.
A. That's the last time that it's noted that I called on Dr. Kirby.
BY MR. BESS:
Q. Okay. Your last visit with Dr. Kirby, did that coincide with your promotion to area district manager in 2001?
A. Area account manager, yes.
Q. Area account manager. I beg your pardon. That's twice I've messed that up. I'm not doing that on purpose, sir. All right.
After your promotion to area account manager, did you detail fewer physicians or what -- is there an explanation for why you --
(Clarification requested by the reporter.)
BY MR. BESS:

Q. Was there an explanation about why you were no longer detailing Dr. Kirby after August of 2001?
A. I -- after August 2001, when I became an area account manager, I no longer had Beaumont as part of my sales territory.
Q. Okay. And how else did your duties change after August of 2001?
A. I called predominantly on residents.
Q. Okay. And by "residents," do you mean physicians in the residency --
A. In residency programs, yes. Sorry.
Q. And looking at an entry for September of 2001 with the name Leigh-An Chiasson -- am I pronouncing that correct?
A. It's pronounced, yeah, Chiasson.
Q. Chiasson?
Was she the sales representative for Wyeth that assumed responsibility for the Beaumont territory after you left?



A. Yes.
Q. Okay. And, Mr. Williams, if you will turn with me to the entry for September 17th of 2002, I understand this is after your tenure at Wyeth.
In the following four pages, to the end of this document, these call notes, do you see multiple entries for different visits throughout that time, from the end of 2002 up until September of 2004?
A. Yes.
Q. And let me ask you this: Previously throughout this document, is it fair to say that there are no entries for any of the visits that you had with Dr. Kirby?
A. Yes.
Q. Okay. Can you explain why there are no comments for any of the visits that you had with Dr. Kirby and that subsequent sales representatives seemed to make comments regularly?
MR. HENDERSON: Objection, vague, ambiguous, compound.
A. I don't know why they entered



those notes into the system.
BY MR. BESS:
Q. Why didn't you ever make any comments about visits you had with Dr. Kirby?
A. I don't recall.
Q. Did you make entries for other physicians that you detailed?
A. No, not to my recollection.
Q. Are you testifying that you never made any comments, never made any entries in Leapfrog on your laptop for any of the physicians that you detailed?
MR. HOFFMAN: Objection.
A. I don't recall.
BY MR. BESS:
Q. Were you ever instructed by Wyeth to regularly make comments in Leapfrog after detailing visits you had with physicians?
A. I don't recall if that was -- if we were told to do that.
MR. BESS: Let's mark as Exhibit 3, Document 3, Mike.
(Whereupon, Deposition Exhibit



Williams-3, Call Notes, re: Dr. Lal, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, these are the Leapfrog entries for Dr. Radha Lal. Do you recall detailing Dr. Lal?
A. Yes.
Q. If you'd turn with me to the second page again, next to the name William Blevins, and recalling the same questions I asked with comments about Dr. Kirby --
MR. HOFFMAN: Nathan? Nathan, I'm sorry, let me just interpose something real quick.
MR. BESS: Sure.
MR. HOFFMAN: I believe -- it looks to me like this is the database for Leapfrog, as well as Salesworks. It looks like for both of these exhibits, that those have been merged.
And I think you only said Leapfrog, but I just wanted to clarify that for the record. It looks like you have Leapfrog and Salesworks,

Page 78

because it goes up through like 2004.
Anyway, that's my understanding, but I think you only said Leapfrog.
MR. BESS: Okay. Anyway, going back to my question, Mr. Williams.
BY MR. BESS:
Q. Chris Blevins, is he also known as William Blevins?
A. Yes.
Q. And, again, he was the sales representative that, for lack of a better term, predated you in that territory?
A. Yes.
Q. Patrick Tyrrell, does that name sound familiar?
A. I'm not familiar with that name.
Q. Okay. And, Mr. Williams, beginning on May 19th, is that your name listed in that entry?
A. Yes.
Q. And then it would appear to me that the last entry featuring your name is in

Page 79

August of 2001, August 22nd, 2001. Does that seem to be correct?
A. Yes.
Q. And, again, there are no comments listed for any of your entries here on this document, are there?
A. Was that a question?
Q. Yes, sir.
Does that appear to be correct, that there are no comments in any of the meeting entries that you have on this document?
A. There are no comments.
Q. Okay. Let me ask you this, Mr. Williams: Does it seem peculiar to you that there's no custodial file for your time at Wyeth, there are no comments made during that time? Do you have any explanation for that?
MR. HOFFMAN: Object to the form of the question.
A. No.
BY MR. BESS:
Q. Is there any reason you can

Page 80

think of why records made after your time at Wyeth would not be maintained or would have been lost or destroyed?
MR. HOFFMAN: Objection. I don't think that's been the representation made, just so the record is clear.
But go ahead.
THE WITNESS: Can you repeat the question, please?
MR. BESS: Yes, sir.
BY MR. BESS:
Q. Can you think of any reason for you to believe that your records would have been lost, destroyed or misplaced for your time as a sales representative at Wyeth?
MR. HOFFMAN: Object to the form of the question.
A. I don't know what would have happened with any of the -- any additional information.
BY MR. BESS:
Q. All right. Mr. Williams, have you ever heard of database information called

Page 81

IMS data?
A. Can you repeat that, please?
Q. Sure.
Have you ever heard the term "IMS data"?
A. Sounds familiar, but I couldn't tell you what it is.
Q. Okay. Do you recall that, during your time as a sales representative for Wyeth, that prescribing information was collected from pharmacies in your territory?
A. Yes.
Q. Were you trained by Wyeth on how to examine and use that data?
A. Yes.
Q. Did you have that data available to you on your company laptop from Wyeth?
A. Yes.
Q. Were you -- did you have tools available to you on your laptop to analyze some of that data on your own prior to visiting with physicians?
MR. HOFFMAN: Objection, vague.

Page 82

A. To my recollection, we had the lists.
BY MR. BESS:
Q. Okay. According to that IMS data, were you able to identify what drugs were being prescribed by certain physicians?
MR. HOFFMAN: Object. Object to form.
A. Yes.
BY MR. BESS:
Q. Were you able to look at total number of prescribed drugs for each physician versus the number of new prescriptions prescribed by each physician?
MR. HOFFMAN: Nathan, I'm sorry. Just so the record is clear: IMS only identifies the prescriptions that are filled, not the prescriptions that are written, and you keep referring to it as the number of prescriptions written, which IMS does not purport to track. It's only the filled prescriptions from the pharmacies.

Page 83

I just want that to be clear.
MR. BESS: Fair enough.
And taking that correction into account, Mr. Williams, what's your answer to that question?
A. I don't really remember how all the information was broken up and listed.
BY MR. BESS:
Q. Okay. In any case, were you able to reference that information prior to detailing doctors in your territory, before each visit?
A. That information was available, yes.
Q. And did you rely on this data, in part, to understand the prescribing habits of your physicians?
A. Yes.
Q. And let me ask you this: Your regional manager, John Kreutzer, would he have relied on the same IMS data in discussing sales trends in your area -- or in your district, rather?
MR. HOFFMAN: Objection.

Page 84

Objection, foundation.
A. John had access to that information, and we did discuss it.
BY MR. BESS:
Q. And would that have been one tool available to John in aiding or directing the sales representatives in his region?
MR. HOFFMAN: Same objection.
A. Yes.
BY MR. BESS:
Q. Mr. Williams, would it have been your understanding that the same IMS data that we've been talking about is what would have been used as one factor in calculating the bonuses that you received periodically?
A. Yes.
Q. Mr. Williams, let's go back to sort of the detailing process that we've been talking about. So is it fair to say or fair to sort of generally categorize your job as visiting doctors and describing the products that you were detailing? Is that correct?
A. Visit -- yeah, visiting the

Page 85

doctors and giving them the information on our products.
Q. And during these discussions about the portfolio of products from Wyeth that you were asked to detail, would you discuss the risks and benefits of these drugs with physicians?
A. Yes.
Q. Would you answer any questions the doctors had about the products in your portfolio?
A. Yes.
Q. If doctors had questions about the products that you were detailing that you couldn't answer, what would you do?
A. That I couldn't answer? Get clarification from -- you know, from management.
Q. Okay. Would you ever refer a physician to other sales representatives or to a medical science liaison or anything like that? Did you have other resources available to you?
A. I don't recall specifically,

Page 86

but I know that we had clinical -- a clinical line that they could call in to.
Q. Okay. Did you have information that you were authorized to leave behind with physicians regarding the products that you were detailing?
A. Yes.
Q. Okay. And what types of materials were those, that you were authorized to leave behind with doctors?
A. One thing I remember was published studies, as long as they weren't altered or highlighted.
Q. Yes, sir.
A. And any materials that were approved for leave-behinds.
Q. Okay. And who were those materials approved by?
MR. HOFFMAN: Objection, lack of foundation.
A. I don't know directly, but they came from the company.
BY MR. BESS:
Q. Okay. Those all came from

Page 87

Wyeth?
A. The approved materials that we ordered, that we directly ordered, we were told what we could use.
Q. Okay. And these materials that you were told that you could use, did you sort of stockpile those in your storage locker?
A. Approved materials, yes.
Q. Did you ever provide doctors with promotional materials, brochures, pamphlets, anything of that type, to pass on to patients?
A. Yes.
Q. Have you ever heard the term "Slim Jim"?
A. Yes.
Q. I don't mean the snack food.
And what do you understand by that term?
A. To my knowledge, they're pamphlets distributed to patients.
Q. Did you ever receive tear-off sheets, pads of brochures to tear off and

Page 88

hand to patients?
A. Yes.
Q. And did you ever use those or distribute those to doctors, as a sales representative for Wyeth?
A. I can't remember if we distributed and left them or just discussed them.
Q. Okay. Let me ask you this, Mr. Williams: Was it part of your work as a sales representative to sort of go out of your way to get time with doctors?
MR. HOFFMAN: Objection.
MR. HENDERSON: Objection, vague, ambiguous.
MR. HOFFMAN: Same objection.
MR. BESS: Let me start over.
Let me ask you this, Mr. Williams.
BY MR. BESS:
Q. Was it difficult at times to get time with physicians to discuss the products you were detailing?
A. Yes.
Q. Okay. And what would you do to

Page 89

sort of overcome that obstacle, as far as getting time with doctors?
A. Certain opportunities, such as a lunch-and-learn or CME opportunity.
Q. Okay. And could you describe for us, please, what is a lunch-and-learn?
A. It's essentially having lunch brought in for the staff, and the doctor will come in and eat, and you get a little bit of time to discuss products with him.
Q. Did you ever take doctors out to lunch?
A. No.
Q. Did you ever take doctors out to dinner?
A. Doctors were invited to CME programs, but I never took a doctor directly to dinner.
Q. Okay. Did you ever take doctors to baseball games?
A. There was a CME program that involved a baseball game prior to the regulations that said you can't do that anymore.

Q. Right.
Did you ever -- did you ever drop off candy or cookies or anything like that for physicians' offices, for the staff?
A. Yes.
MR. HENDERSON: Objection, vague, ambiguous.
MR. BESS: What's ambiguous about candy and cookies?
MR. HENDERSON: Because you ended it "or with anything like that," which is undefined.
BY MR. BESS:
Q. Did you ever drop off candy or cookies at Dr. Kirby's office while you were a sales representative at Wyeth?
A. I don't recall his office specifically.
Q. What about Dr. Lal's office?
A. No.
Q. Okay. Did you ever bake a cake and leave it with a doctor that you detailed?
A. No.
Q. I didn't think you would. I



know that's not your style, Mr. Williams.
MR. HENDERSON: I tell you what, Nate, coming up --
MR. BESS: Yes, sir.
MR. HENDERSON: We've been on an hour, and we're coming up on lunch. Is this a good --
MR. BESS: Yeah, we'll --
MR. HENDERSON: Is this a good time to break, and what are your thoughts on lunch?
MR. BESS: Want to take 30 minutes? Does that give you enough time?
MR. HENDERSON: Probably going to need 45.
MR. BESS: 45? That's fine with me.
MR. HOFFMAN: Nathan, can I ask you real quick: What is -- what is your best estimate of the time remaining?
MR. BESS: I don't anticipate going very long today, most



importantly because we don't have a custodial file. Obviously, that chops off a lot of time.
MR. HOFFMAN: Okay. Just because I see about 20 documents sitting over there waiting to be marked, and I just -- the reason I'm asking is because I have a plane later in the day; and if I need to change it, I have no problem doing that. If you'd just give me some estimate, I'd appreciate it.
MR. BESS: Sure. Are we still on the record, by the way?
THE REPORTER: Yes.
MR. HENDERSON: Let's go off the record.
MR. BESS: Let's go off the record and we can discuss lunch and go on a break.
THE VIDEOGRAPHER: Off the record at 11:44, end of Tape 2.
(Recess taken, 11:44 a.m. to 12:31 p.m.)



THE VIDEOGRAPHER: Stand by. We're on the record, 12:31, beginning of Tape 3.
BY MR. BESS:
Q. All right. Thank you, Mr. Williams. We're back after our brief lunch break.
Let me ask you: How did you typically dress for detail visits with doctors while you were a sales rep for Wyeth?
A. I wore suits.
Q. And what about your work today for ZOLL Medical, what do you typically wear when you're detailing facilities or other customers?
A. I wear a suit.
Q. Going back to what we were talking about before the break, did you ever leave any other types of materials behind with doctors besides printed literature? In other words, did you ever leave mirrors or pens or any other things with the Wyeth or Pfizer logo?
A. Yes, pens.

Q. Anything besides pens?
A. Product samples.
Q. Okay. Did you ever leave behind any posters or -- that were intended to be hung in patient waiting rooms or anywhere else in the doctor's office?
A. I don't recall the posters.
Q. Okay. What about any brochures or pamphlets intended for patients?
A. Yes.
Q. Okay. And did some of these materials relate to the Premarin family of products?
A. Yes.
Q. Did some of these materials relate to menopause and the symptoms of menopause?
A. Yes.
Q. Did you have a certain budget every month for lunch-and-learns or for other activities related to detailing doctors?
A. Yes, we did.
Q. And can you estimate at this time what that -- on average, that budget



was?
A. I have no recollection of how much.
Q. Okay. Mr. Williams, have you ever heard of something called Delta-8,9? Does that sound familiar to you?
A. It sounds familiar. I don't remember what it is.
Q. Okay. Did you ever have any detail pieces, or did you ever use any detail pieces related to Delta-8,9?
A. I don't remember any.
Q. And do you have any recollection about that being related to a unique property of Premarin relating to brain function?
MR. HOFFMAN: Objection, form, foundation.
A. I remember the term "Delta-8,9." I don't remember what it was about.
BY MR. BESS:
Q. Okay. Going back to some of the marketing materials you used, let me mark



Exhibit 4 at this time.
(Whereupon, Deposition Exhibit Williams-4A, "Menopause Isn't Gone in a Flash" Document, W-ADSBRO-01096 - W-ADSBRO-01100, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, let me ask you: Does this document look familiar to you?
A. Yes, it does.
Q. Okay. And how do you recognize this document, in what context?
A. I remember the -- on page 5 of 5, the picture of the Patient Action Center.
Q. Okay. And, Mr. Williams, there on page 5 of 5, the "Patient Action Center for Menopausal Women," it reads at the bottom, "A series of brochures designed to help you and your patient initiate a discussion about the consequences of menopause and its associated estrogen loss."
Did I read that correctly, Mr. Williams?
A. Yes.



Q. Okay. And do you recall -- what were some of the benefits that you recall detailing for the Premarin family of products during discussions with physicians that you detailed?
MR. HENDERSON: Objection, vague and ambiguous.
A. Looking at the series of categories to the right, underneath where it says "Brochures cover," I remember there were individual brochures based on each of those topics.
BY MR. BESS:
Q. Okay. And, if you would, please, Mr. Williams, could you read those bullet points under "Brochures cover"?
MR. HOFFMAN: I'm sorry. Nathan, was your question regarding the brochures, or was your question regarding branded materials with Premarin on it? I think your original question --
MR. BESS: The initial question about the risks of -- excuse me, of

the benefits was directed specifically
at the Premarin family of products.
MR. HOFFMAN: Okay. And now
you're asking him about some unbranded
brochures.
MR. BESS: I'm just asking him
to read those bullet points into the
record.
A. The brochures cover menopause and sexuality, osteoporosis, cardiovascular disease, Alzheimer's disease, assessing your health at menopause, colon cancer, vision, treatment symptoms -- options, I'm sorry, treatment options.
BY MR. BESS:
Q. Thank you.
The text beneath that reads, "Each brochure contains basic information on the conditions, the prevalence among menopausal women, risk factors and suggestions for prevention. Readers are encouraged to talk to their doctors or other healthcare providers for more information and the latest data on these conditions.



"These brochures provide patients with the opportunity to initiate a dialogue on their health as they grow older, and the brochures can help enhance your counseling efforts with menopausal women."
Did I read that correctly?
A. Yes.
Q. Mr. Williams, do you recognize the illustration on the first page of this document?
A. Yes, I do.
Q. Okay. And in what context do you recall this illustration?
A. I just remember the picture. I don't remember what the -- what the messages were.
Q. Okay. And is it fair to say that basically, this is a patient education piece? Well, let me ask you. Let me rephrase the question --
A. I can't remember if this was designed for patients. I mean, I guess -- I can't remember how it was designed or how we used it. I only remember using this specific



piece.
Q. Okay. Do you recall using this or having -- do you recall this being used in your district?
A. I remember seeing this, but I don't remember it being used in the district. I don't remember using this myself.
Q. Okay. Next to the silhouette of the woman on the first page of this document, it reads, "Alzheimer's Disease," "Vision Problems," "Tooth Loss," "Heart Disease," "Colon Cancer," "Urogenital Problems" and "Osteoporosis."
Did I read that correctly?
A. Yes.
Q. And are these --
A. In addition to some reference notes.
Q. Okay. Yes, sir.
And what do these terms relate to?
MR. HOFFMAN: Objection.
Object to lack of foundation. The
witness already said he doesn't



remember using the piece, he doesn't
remember the messages for the piece,
so I don't know how he can testify
about it.
But having said that, go ahead.
MR. HENDERSON: I'll join in
the objection, vague and ambiguous.
MR. BESS: Please continue,
Mr. Williams.
A. I remember these ads, the specific brochures that we had to -- you know, that we put into the Patient Action Centers.
BY MR. BESS:
Q. Okay. And would those be the brochures listed on the fifth page in that illustration?
A. Yes.
Q. And do those brochures fall into the categories listed in the bullet points to the right of that illustration?
A. Generally, yes. "Urogenital problems" would be menopause/sexuality.
MR. BESS: All right. Let's

Page 102

mark at this time, Exhibit 4B and,
Mike, that's Document 17.
(Whereupon, Deposition Exhibit Williams-4B, "Consider the Body of Evidence" Document, W-HUSAK01-00001017 - W-HUSAK01-00001018, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, do you recognize this document?
A. With the exception of a few changes, it's generally the same one you just gave me.
Q. Okay. And we've already -- for example, the illustration on page 1 lists "Brain," "Eyes," "Vasomotor," "Heart," "Colon," Urogenital Tract" and "Bone," each with sort of a small paragraph following each.
Is that fair to characterize this document?
A. Yes.
Q. Okay. And the date at the

Page 103

bottom of this document is 1999, copyrighted by Wyeth-Ayerst Laboratories; is that correct?
A. That's correct.
Q. Okay. And would the categories of information listed on the front of this document -- are those consistent with areas of patient education, as you remember them during that time?
MR. HOFFMAN: Objection, lack of foundation.
MR. HENDERSON: Objection, vague, ambiguous.
A. I don't -- I don't recall it.
BY MR. BESS:
Q. Okay. At the bottom, the paragraph in bold, it reads, "If you are starting to experience uncomfortable menopausal symptoms, such as hot flashes, remember that they are signs of the estrogen loss that can ultimately affect your long-term health.
"Speak to your doctor or other healthcare provider. The more you learn, the

Page 104

better you may be able to protect your health in the years to come."
Did I read that correctly?
A. Yes.
Q. Okay. And, again, is estrogen one of the components of Premphase, Premarin and Prempro?
A. Conjugated equine estrogen is.
Q. And those are products that you detailed during your time as a sales representative for Wyeth; is that correct?
A. Yes.
Q. Any of the patient education brochures that either resemble those or were mentioned in Document 4A -- Exhibit 4A, rather, would you stockpile copies of those in your storage locker?
MR. HOFFMAN: Object to the form.
Are you referring to the Patient Action Center now, Nathan, or something else?
MR. BESS: I am.
THE WITNESS: Will you please

Page 105

repeat that question?
MR. BESS: Yes, sir.
BY MR. BESS:
Q. The brochures listed in the Patient Action Center, would you keep an adequate supply of those or stockpile those in your storage locker?
A. Yes.
Q. And would you -- during your detailing visits with physicians, would you check to make sure those were well stocked in their offices?
A. Yes.
Q. And upon detailing either Dr. Kirby or Dr. Lal, would you also check to make sure that any patient materials in those offices were well stocked?
MR. HOFFMAN: Objection.
A. I don't remember which materials those two physicians had. Some physicians don't allow you to put any materials in their offices.
BY MR. BESS:
Q. Okay. But for those physicians

Page 106

that would allow you to do that, is that something you would check on, as a practice?
A. Generally, yes, but not always.
MR. BESS: Let's mark Document 5 as Exhibit 5, please.
(Whereupon, Deposition Exhibit Williams-5, "For Four Decades" Document, CHOOM022-000928 - CHOOM022-000938, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, do you recognize this document?
A. I recognize the front page.
Q. Okay.
A. Page 1.
Q. And would this have been a marketing campaign that was used during your time as a sales representative for Wyeth?
A. I remember the first page. I don't remember any of the pictures within it. Yeah, like I say, I recognize the front page. I don't recognize this as an entire brochure.
Q. Sure.

Page 107

Is it possible it was used throughout your region?
MR. HOFFMAN: I'm sorry, I -- can you repeat that, Nate? I didn't get the question.
MR. BESS: Sure.
BY MR. BESS:
Q. Is it possible this was used throughout your region while you were a sales representative for Wyeth?
MR. HOFFMAN: Object, it's vague and lacks foundation.
MR. HENDERSON: Objection, calls for speculation.
A. I'm not -- I'm not sure what everyone else used in their discussions.
BY MR. BESS:
Q. Mr. Williams, if you'd turn to page 4 of 11?
A. Okay.
Q. And do you see the illustration at the bottom half of the page?
A. Yes.
Q. And it has categories of

Page 108

"brain," "skin tissue," "circulatory system," "breast," "nervous system," "digestive system," "bladder and urination" and "bone."
Did I read that correctly?
A. Yes.
Q. And above that, it reads, "Scientific research demonstrates that estrogen not only affects your reproductive system, but also affects," and it's above those categories.
Did I read that correctly?
A. Yes.
Q. And, Mr. Williams, if you will, turn to page 7. At the top is a heading that reads, "Menopause Often Results in Increased Cholesterol Levels."
Mr. Williams, do you ever -- do you recall having discussions with physicians regarding LDL and HDL cholesterol levels and their relationship to cardiovascular health?
MR. HOFFMAN: Objection --
A. Yes.
MR. HOFFMAN: Objection, vague. Go ahead.

Page 109

BY MR. BESS:
Q. And, Mr. Williams, if you'd please turn to page 8, the top heading that reads, "As Women Age, Their Risk of Heart Disease Increases."
Mr. Williams, do you recall, during your detailing activities for the Premarin family of products, discussing cardiovascular health with physicians?
MR. HOFFMAN: Objection, vague.
MR. HENDERSON: Objection, vague, ambiguous.
A. As it related to cholesterol levels, I do. Otherwise, I can't remember --
BY MR. BESS:
Q. Okay.
A. -- anything else.
Q. And at the bottom, it reads, "Heart disease includes: High blood pressure, clogged arteries, heart failure and heart attacks."
Did I read that correctly?
A. Yes.
MR. BESS: I'd like to mark at

this time Document 6 as Exhibit 6,
please.
(Whereupon, Deposition Exhibit Williams-6, Two Benefits vs. A Risk of ERT, CORRA302-00066, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, do you recognize this document?
A. No, I do not.
Q. Okay. At the top of the document, it reads, "Two Benefits vs. A Risk of Estrogen Replacement Therapy." It goes on to read, "As this chart shows, women who take estrogen following menopause have basically no more risk of developing breast cancer than women who do not take estrogen."
It goes on to read, "In addition, estrogen users are less likely than nonusers to die from complications of bone fractures due to osteoporosis. Estrogen users are also much less likely to die from heart disease, including heart attacks and strokes."



Did I read that correctly, Mr. Williams?
A. Yes. Yes, you read it.
Q. And at the bottom of this document, do you see the graph that's depicted there?
A. Yes.
Q. And at the bottom, it says, minus 18, "Lives Lost to Breast Cancer," and then plus 563, "Lives Saved By Avoiding Osteoporotic Fractures," and at the far right, there's a graph that reads, "5,250 Lives Saved By Avoiding Heart Disease."
Did I read that correctly -- or describe that correctly, rather?
A. You described it correctly.
Q. All right. Thank you.
Was heart disease a benefit that you discussed with physicians in your territory that you detailed?
A. No.
Q. Was osteoporosis a benefit that you described -- that you discussed with physicians in your territory?



MR. HOFFMAN: Objection. Are you -- are you saying related to this exhibit, or just generally?
MR. BESS: Just generally.
A. As it relates to prevention, yes.
BY MR. BESS:
Q. Okay. Did you ever have doctors ask you about a purported heart benefit from hormone replacement therapy?
MR. HOFFMAN: Objection, vague.
MR. HENDERSON: Objection, vague, ambiguous.
A. I can't recall direct questions.
BY MR. BESS:
Q. If a physician had asked you about a cardiac benefit or cardioprotective benefit from taking Prempro --
MR. HENDERSON: Objection, vague.
BY MR. BESS:
Q. -- what would your response have been?



MR. HENDERSON: Objection, vague, ambiguous, calls for speculation.
MR. HOFFMAN: Object to the hypothetical.
THE WITNESS: Can you repeat the question?
MR. BESS: Yes, sir.
BY MR. BESS:
Q. In 1998 or 1999, if, during one of your detail visits with a physician, you had been asked about a potential cardioprotective benefit of taking Prempro, what would your response have been to that doctor at that time?
MR. HENDERSON: Same objection.
MR. HOFFMAN: Same objections.
A. I can't remember. I mean, it would have been limited to the lipid changes.
BY MR. BESS:
Q. And is it your understanding as a sales representative that there's a cardiac benefit to lowering HDL cholesterol and raising HDL cholesterol [sic]?

MR. HOFFMAN: Objection. I think you said it twice, Nathan. You might want to restate your question.
MR. BESS: If I misspoke, I apologize. Let me try that again.
BY MR. BESS:
Q. Based on your understanding as a sales representative, do you understand there to be a cardioprotective benefit from lowering LDL cholesterol and raising HDL cholesterol?
A. I can't speak to what I remember from back then, you know, how I felt back then about it.
Q. Okay. And is this document consistent with your understanding in 1998 and 1999 that women who take estrogen following menopause are at basically no more risk of developing breast cancer than women who did not take estrogen?
MR. HOFFMAN: Objection. I think the witness already testified he doesn't recognize the document. I don't know how you can lay a



foundation for him to relate that to his practices.
MR. HENDERSON: Objection, vague, ambiguous.
A. This is not a document that we would have used.
BY MR. BESS:
Q. Yeah, but what about just the statement that -- at the top of the document?
A. I can't really recall how I addressed concerns or questions about that at the time.
MR. BESS: Let's move on to Document 7, which I'll mark as Exhibit 7, please.
(Whereupon, Deposition Exhibit Williams-7, "Menopausal Symptoms Are Just The Tip Of The Iceberg" Document, PAYNC201-001154, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, do you recognize this document in front of you?
A. Yes, I do.



Q. Okay. And would you please read the heading at the top of this?
A. The document says, "Menopausal Symptoms are Just the Tip of the Iceberg."
Q. All right. And in what context do you recall this document, Mr. Williams?
A. I recall it being used as -- or being -- helping to describe a woman that comes in with surface symptoms, such as hot flashes and night sweats, may also be at risk for osteoporosis and other estrogen-related events.
Q. Yes, sir.
And, if you would for me, please, would you read the text above the line there to the right of the illustration?
A. The text above the lines states, "Insomnia," "Hot Flashes," "Mood Disturbances," "Vaginal Atrophy," "Night Sweats."
Q. And, sir, if you would, please, read the text beneath that line.
A. Beneath the line, it reads, "Osteoporosis," "Alzheimer's Disease,"



"Macular Degeneration," "Cardiovascular Disease," "Colon Cancer," "Vaginal Infections," "Stress Incontinence," "Skin Atrophy," "Dementia," "Tooth Loss" and "Mortality."
Q. And to the left of that, what is that an illustration of? I know it's not that easy to read on this brochure.
A. It's an illustration of an iceberg.
Q. And did you use this piece in your region?
A. I don't recall using this piece. I remember seeing this piece, but I don't recall specifically using this piece.
Q. Okay. And is that you don't recall whether or not you used it in your region?
A. I'm saying for myself, I can't recall if I specifically used this piece myself.
Q. Okay. Fair enough.
Mr. Williams, were you aware that Wyeth sponsored continuing medical

Page 118

education programs for doctors from time to time?
A. Yes.
Q. And did that practice occur in your territory?
A. Yes, it did.
Q. Were you ever involved in the planning or organization of the CME program?
A. Yes, I was.
Q. Have you ever heard the term Visitor Speakers Bureau -- "Visiting Speakers Bureau"? Excuse me.
A. Yes.
Q. Is that similar to a CME program, or if not, could you explain the difference?
A. The difference would be if a physician actually gets continuing medical education credits, you know, for attending these speaker programs. I can't remember the designation between speaker programs and CMEs and the specifics about the regulations involved with each.
Q. Okay. The times in which you

Page 119

were involved in the organization or planning of these programs, did you have a -- sort of a set budget that was available to you from Wyeth?
A. Yes, I did.
Q. Okay. And did that budget depend on the scope of the program and sort of the nature of what was being planned?
MR. HOFFMAN: Objection. I'm sorry, are you talking about VSB now, or CME?
MR. BESS: CME programs.
A. I -- like -- I can't remember the budgets, and, as I said, I can't remember the paperwork differences between the regular visitor speaker programs and the CME programs.
BY MR. BESS:
Q. Okay. Would that process sort of generally be similar to VSB, as for CME --
MR. HOFFMAN: Objection, vague.
BY MR. BESS:
Q. -- as far as the approval project for any budget or other things that

Page 120

are necessary to organize these programs?
MR. HOFFMAN: Objection, vague, lacks foundation.
A. I remember CMEs involved a lot more money because they have to go to paying the CME speaker program for the registration paperwork.
BY MR. BESS:
Q. Okay. Were any educational materials to be used in any CMEs provided to you by Wyeth?
A. Can you repeat the question?
Q. Yes, sir.
Did Wyeth ever provide you with educational materials to be used in any CME programs?
A. Yes.
Q. And did you sometimes use those materials during CME programs and discussions with the doctors that came to those programs?
MR. HOFFMAN: Objection, lacks foundation.
Now you're talking about CME, Nathan?

Page 121

MR. BESS: I am.
A. I can't recall our interactions with physicians with CME programs or materials.
BY MR. BESS:
Q. And sort of in the same vein, do you recall if those materials were ever approved to leave behind with the doctors that attended any CME programs?
A. I can't recall what doctors received from the CME programs. I don't believe they received -- I can't recall what they received.
MR. BESS: Okay. Let me mark Document 8 as Exhibit 8, please.
(Whereupon, Deposition Exhibit Williams-8, 9/98 Therapeutic Options for Menopausal Health Monograph, W-HUSAK01-00000888 - W-HUSAK01-00000943, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, do you recognize this document?

Page 122

A. Yes.
Q. And how is it that you recognize this?
A. I was shown it this morning and remember the basic idea that came from this CME program.
Q. Okay. And having reviewed this document this morning, does it refresh your recollection of having reviewed this document in the late '90s?
A. Not really, other than just taking a quick glimpse at it, I remember that there was a dupe CME program in the late '90s; but I don't remember anything more than that.
Q. All right. Was the topics that were covered during the CME program -- would those topics be consistent with your understanding of the risks and benefits of the Premarin family of products, as you understood them in 1998 or 1999?
MR. HOFFMAN: Objection.
MR. HENDERSON: Objection, vague, ambiguous.

Page 123

A. I haven't spent the time to look over 56 pages today to recollect. I don't know what it would refresh from back then.
BY MR. BESS:
Q. And is it possible that this document or a document similar to this would have been used in some of the CME programs that happened in your region while you were a sales representative for Wyeth?
A. I can't -- I can't recall if CME programs involved handouts or were speaker programs or what materials were used in each of them.
Q. Thank you.
Mr. Williams, so you also detailed Fosamax, in addition to hormone replacement therapy; is that accurate?
A. Yes.
Q. Were you ever given instructions by Wyeth regarding promotion of Fosamax versus any of the Premarin family of products?
A. Can you repeat the question?

Page 124

Q. Yes, sir.
Did you ever receive instructions from Wyeth directing you to promote one product over the other? And by those, I mean Fosamax and Prempro.
MR. HOFFMAN: Objection, vague.
A. I don't recall being told to promote one over the other.
BY MR. BESS:
Q. Do you have any -- excuse me. Let me rephrase that.
Did you have any understanding in 1998 or 1999 about the extent or the degree of the benefit of prevention of osteopenia or osteoporosis of Fosamax compared with Prempro?
A. To my recollection, I kind of remember that Fosamax had an indication for treatment as well, whereas the Premarin family of products had a prevention indication.
Q. In the portfolio of products that you were responsible for while working for Wyeth, were certain products weighted

Page 125

more heavily than others, or were you directed to place more emphasis on filling certain products over others?
MR. HENDERSON: Objection, vague, ambiguous, compound.
A. I remember spending most of my time focused on selling birth control pills.
BY MR. BESS:
Q. We spoke earlier about your understanding of a favorable lipid profile for the Premarin family of products. Is that understanding based on materials or information that you obtained from Wyeth?
A. From the studies that had been published, is where I got that information.
Q. And were you directed to those studies by Wyeth?
A. Yes.
Q. Did the topic of either favorable lipid profile -- did that come up in your training sessions at the Wyeth home office?
A. I'm not specifically clear on when those discussions happened, if it was at

Page 126

initial training, follow-up training.
Q. Did you ever have -- let me strike that.
During your training at the Wyeth home office, did you ever have any training on the subject of a heart benefit associated with the Premarin family of products?
MR. HOFFMAN: Objection, vague.
A. I can't recall the initial trainings back in '98 or whenever it was --
BY MR. BESS:
Q. Okay.
A. -- what the specifics were.
Q. In 1998 or 1999, if other sales representatives for Wyeth were discussing a heart benefit associated with the Premarin family of products, is there any reason that you would not also be receiving the same instructions for detailing physicians on that benefit?
MR. HOFFMAN: Objection.
MR. HENDERSON: Objection, vague, ambiguous, assumes facts not in

Page 127

evidence.
MR. HOFFMAN: Calls for speculation.
A. I'm not sure what they were told.
BY MR. BESS:
Q. Would it have been proper for you, in 1998 or 1999, to discuss a possible or potential heart benefit associated with Premarin or Prempro?
MR. HOFFMAN: Objection, calls for speculation.
A. I don't recall specifically discussing a heart benefit, as such.
BY MR. BESS:
Q. Okay. Did you have an understanding, or were you ever told by Wyeth, that hormone replacement therapy provided any mental protection or had any quality of preventing Alzheimer's in patients?
A. I remember that there was information regarding research into Alzheimer's disease, but I can't remember the

Page 128

specifics on what those studies said and what those studies showed.
Q. Any studies on prevention of Alzheimer's or any other mental issues, would you have been directed to those by Wyeth?
MR. HOFFMAN: Objection, calls for speculation.
A. I can't recall any of the specifics on the -- on the studies, which studies.
BY MR. BESS:
Q. Any studies that you were directed to, would that have been through training or other materials provided to you by Wyeth?
MR. HOFFMAN: Calls for speculation.
MR. HENDERSON: Vague and ambiguous.
A. For information regarding something like that, we would have received information from -- that's the only place we could have gotten it from, from the articles, from the studies.

Page 129

BY MR. BESS:
Q. Okay. And do you recall ever discussing with Dr. Kirby or Dr. Lal any mental benefits associated with hormone replacement therapy?
A. No, I do not.
Q. Do you recall discussions with any other physicians regarding mental benefits associated with hormone replacement therapy?
A. I remember discussing the topic, but I don't remember specifics on whether -- what was discussed about it, no.
Q. Mr. Williams, what do you recall as far as discussions with physicians on the risk of breast cancer associated with hormone replacement therapy in 1998 or 1999?
A. At that time, I don't remember what -- what the discussions were.
Q. Would any discussions that you had with physicians during that time period -- would those have reflected the package insert and product labeling in effect at that time?

A. Yes.
Q. As far as a risk of breast cancer and any significant association to estrogen and progestin, would you agree that as much as you would have told any physician is what was present in the package labeling at that time?
MR. HENDERSON: Objection, vague, ambiguous, calls for speculation.
MR. HOFFMAN: Same.
A. The first thing we lead with is the package insert. That's the information that we -- that we gave to the physicians, was the package insert stuff.
BY MR. BESS:
Q. At any time during discussions with physicians, such as Dr. Kirby or Dr. Lal, would you have led any physician to believe that there was any greater risk of breast cancer than what is indicated in the package labeling?
MR. HENDERSON: Objection, vague, ambiguous, calls for



speculation.
MR. HOFFMAN: Same.
A. I don't recall how that was set. We went off the package inserts with all of our information we used.
BY MR. BESS:
Q. And do you recall ever telling Dr. Kirby or Dr. Lal about any significant risk of breast cancer in 1998 or 1999?
MR. HOFFMAN: Objection, vague.
A. I don't remember specific discussions with those physicians.
BY MR. BESS:
Q. Did you ever have discussions with any doctor about any significant risk of breast cancer in 1998 or 1999 or 2000?
MR. HENDERSON: Objection, vague, ambiguous.
MR. HOFFMAN: Same.
A. I -- I don't remember how those discussions, or if we had those discussions, what they were about.
BY MR. BESS:
Q. Mr. Williams, was it your



understanding in 1998 or 1999, based on your training from Wyeth, that Prempro, Premphase and Premarin were safe for long-term use?
MR. HOFFMAN: Objection, vague.
A. I can't remember. I remember that it was -- that it was discussed for short-term relief of vasomotor symptoms. I can't remember what long-term benefits were discussed at that time, during those years.
BY MR. BESS:
Q. What was your understanding of short-term use?
A. That was up to the physician to decide.
Q. Okay. Was it your understanding that the Premarin family of products were safe and effective to use for years and years?
MR. HOFFMAN: Objection, vague.
MR. HENDERSON: Objection, vague, ambiguous.
A. I remember it was discussed as long as symptoms appear for vasomotor, vaginal atrophy, that that was -- I don't



remember any long-term discussions, what were -- what were set as long-term expectations.
BY MR. BESS:
Q. Okay. So did you ever receive any training, for example, that Prempro was safe to use for more than a decade?
MR. HENDERSON: Objection, vague, ambiguous, assumes facts not into evidence.
A. I don't recall the specific discussions or that message.
BY MR. BESS:
Q. So is it fair to say you never received any training from Wyeth that hormone replacement therapy should only be used during a certain term of years or certain amount of time?
MR. HOFFMAN: Objection, vague and lacks foundation.
A. In the time that I was there -- will you repeat the question?
BY MR. BESS:
Q. Yes, sir.

So is it fair to say that you never received any specific training or instructions from Wyeth that Prempro or Premarin were safe to use for a specific period of time and not longer and not shorter?
MR. HOFFMAN: Same objection.
MR. HENDERSON: Same objections.
A. I don't remember specific -- I don't remember specific time frames being discussed.
BY MR. BESS:
Q. You do? I beg your pardon?
A. I do not remember specific time frames being discussed.
Q. Okay. Thank you.
MR. HENDERSON: Nate, we've been on an hour. Is this a good time for a break?
MR. BESS: Let me ask one last question and we'll take a short break.
BY MR. BESS:
Q. So is it fair to say that you



were never trained by Wyeth, one way or the other, to instruct doctors to tell women to stop taking Prempro or Premarin after a specific amount of time? Is that right?
MR. HENDERSON: Objection, vague, ambiguous, asked and answered.
MR. HOFFMAN: Yeah, same objections. I think he testified he doesn't recall.
But go ahead.
A. I don't remember the time frames, specifically being told to tell a doctor what lengths were.
MR. BESS: All right. Now is a good time to take a break. We can go off the record.
MR. HENDERSON: Okay.
THE VIDEOGRAPHER: Off the record at 1:20, end of Tape 3.
(Recess taken, 1:20 p.m. to 1:33 p.m.)
THE VIDEOGRAPHER: Stand by. We're on the record at 1:33, beginning of Tape 4.



BY MR. BESS:
Q. All right. Mr. Williams, let me ask you one thing: Was Mr. Hoffman present during lunch or during any of the breaks today?
A. I'm sorry, are you talking to me? Say again.
Q. During either lunch or -- during the lunch break or any of the shorter breaks that we've had today, was Mr. Hoffman present? Did you have any discussions with him?
A. No, I did not.
Q. Okay. Mr. Williams, were you ever instructed by Wyeth to downplay the risk of breast cancer associated with hormone replacement therapy?
MR. HENDERSON: Objection, vague, ambiguous.
MR. HOFFMAN: Same.
A. No. No, I was not.
BY MR. BESS:
Q. Okay. And were you ever trained by Wyeth to exaggerate either a



reported heart or mental benefit associated with hormone replacement therapy?
MR. HENDERSON: Objection, vague, ambiguous.
MR. HOFFMAN: Same.
A. No, I was not.
BY MR. BESS:
Q. All right. And, Mr. Williams, would you agree that it would be wrong or improper for a drug manufacturer to instruct its sales representatives to either overplay the benefits or downplay the risks of the drugs that it manufactures?
MR. HOFFMAN: Objection, assumes facts not in evidence, calls for speculation.
MR. HENDERSON: Same.
A. I don't know of a company doing that.
BY MR. BESS:
Q. Would you be upset if Wyeth engaged in practices similar to that?
MR. HOFFMAN: Same objections.
MR. HENDERSON: Same

Page 138

objections.
A. I don't -- I don't...
BY MR. BESS:
Q. And realizing that, Mr. Williams, you've been a sales representative for healthcare-related companies since 1998, is that something that's important to you, that the companies you work for operate with integrity and honesty in educating doctors?
MR. HENDERSON: Objection, vague, ambiguous, compound.
A. Yes.
MR. BESS: All right. I'd like to take Document 9, mark that as Exhibit 9, please.
(Whereupon, Deposition Exhibit Williams-9, 7/18/00 Wyeth-Ayerst Letter to AHP, CORRA001-000125 - CORRA001-000126, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, do you see the top of Exhibit 9, the letterhead? What

Page 139

company's logo is there, please?
A. Wyeth-Ayerst Laboratories.
Q. Yes, sir.
And if you'll turn with me to the second page, who is the signatory on this document?
A. Charles Payne.
Q. And what is his title listed as?
A. Wyeth-Ayerst territory manager.
Q. Okay. And below that, "23CWA," do you know what that designation stands for?
A. No, I don't.
Q. Is it possible that it's the territory he was assigned to?
MR. HOFFMAN: Calls for speculation.
A. Yes, it looks like a territory number, but I -- I don't know mine.
BY MR. BESS:
Q. And, Mr. Williams, I'm not going to read this entire letter to you, but I would like to draw your attention to a couple paragraphs.

Page 140

Mr. Williams, the second paragraph reads, "This letter deals with a potentially more serious problem for Wyeth-Ayerst and American Home Products if appropriate action is not taken immediately.
"As a Wyeth female healthcare representative, I have been instructed with written presentations from company management to promote to physicians out-of-labeling indications such as, but not limited to, Alzheimer's disease, the reduction of cardiovascular disease and vanity issues with Premarin and Prempro.
"Since many recent studies have shown increased incidences of breast cancer, heart attack, and little effect on Alzheimer's disease, and many physicians may have been influenced by representatives, when detailing out of labeling, to prescribe Premarin or Prempro, the liability for Wyeth-Ayerst could make the Redux lawsuits pale in comparison, should upcoming studies show continued problems, or should patients be prescribed these products for these

Page 141

out-of-labeling indications and experience any medical problems."
And, Mr. Williams, if you'll turn with me to the second-to-the-last paragraph on the second page.
MR. HOFFMAN: I'm sorry, was there any question there, Nathan, for the witness?
MR. BESS: Oh, there will be.
MR. HOFFMAN: Let me object --
BY MR. BESS:
Q. Did I read that correctly, Mr. Williams?
MR. HOFFMAN: Let me object and move to strike the reading into the record of a document that you have no foundation to use with this witness. So I'll object, and I'll move to strike it.
MR. HENDERSON: Same.
MR. BESS: All right. So noted.
BY MR. BESS:
Q. On the second page,

Page 142

Mr. Williams, second-to-last paragraph, reads, "American Home Products and Wyeth-Ayerst have enough problems without another potential disaster occurring through out-of-labeling promotion.

"We're not selling used cars. We're selling pharmaceuticals that affect the lives of every woman that takes them. The desire for increased sales has overruled our company's ethical responsibilities to promote our products safely."

Did I read that correctly, Mr. Williams?

MR. HOFFMAN: Objection, move to strike.

A. You read it correctly.

BY MR. BESS:

Q. Mr. Williams, I believe you said you've not seen this document before?

A. I've not seen this document.

Q. Okay. If the allegations in this letter are true, are those -- are those things that you wish you'd been notified of or you'd been made aware of?

Page 143

MR. HENDERSON: Objection, calls for speculation.

MR. HOFFMAN: Same.

MR. HENDERSON: Vague, ambiguous.

A. I don't know these allegations. I don't know Chris.

BY MR. BESS:

Q. Do you agree with this Wyeth sales representative that out-of-label -- or off-label promotion potentially endangers the lives of patients who use drugs manufactured by Wyeth?

MR. HENDERSON: Objection, assumes facts not in evidence.

MR. HOFFMAN: Also calls for speculation.

A. Yeah, I don't know, you know, what he's trying to say here. I don't -- that's not how I promoted the products.

MR. BESS: Please take Document 10 and mark that as Exhibit 10, please.

(Whereupon, Deposition Exhibit

Page 144

Williams-10, 7/13/07 Letter re: Mary Cardone, was marked for identification.)

BY MR. BESS:

Q. Mr. Williams, have you seen this letter before, or this document?

A. Yes, I have.

Q. Okay. Where have you seen this document before?

A. I saw it this morning.

Q. Okay. And, Mr. Williams, if you could, if you could just read the text of -- the main text of this letter, please.

MR. HOFFMAN: I'll object. But go ahead.

A. "We write to advise you that we learned from Mary Cardone's personal counsel on Wednesday, July 11th, 2007, and confirmed on Thursday, July 12th, 2007, that, if called, she is likely to testify that she promoted the Premarin family of products for potential benefits for which the products were not indicated, in apparent contradiction to her deposition testimony."

Page 145

MR. HOFFMAN: I'll move to strike. There's no foundation to use this document with this witness.

MR. BESS: Okay.

MR. HENDERSON: I'm going to object -- I'm going to object because there's no question.

MR. BESS: Okay. I'll give you a question.

BY MR. BESS:

Q. Mr. Williams, let me ask you: Either when you were shown this letter this morning in preparing for today's deposition or in reading it just now, does it appear that to you that this letter indicates an incidence of off-label promotion by a sales representative for Wyeth?

MR. HENDERSON: Objection, vague, ambiguous, calls for speculation.

MR. HOFFMAN: Lacks foundation.

A. I'm not sure what this sales representative said or did.

BY MR. BESS:

Page 146

Q. Okay. In reading this letter this morning or during your deposition today, again, would you condemn any sales representative who engaged in off-label promotion of any of the Premarin family of products?
MR. HOFFMAN: Objection, assumes facts not in evidence, calls for speculation. This is a fact witness, not an opinion witness or an expert.
MR. HENDERSON: Vague and ambiguous.
A. As I said, I don't know what Mary said or did.
BY MR. BESS:
Q. Do you know Mary Cardone?
A. No, I do not.
Q. Sitting here today, as a professional in the healthcare industry since 1998, do you agree it's improper for sales representatives to promote off-label indications of the products they're responsible for?

Page 147

MR. HENDERSON: Objection, vague, ambiguous, calls for speculation.
MR. HOFFMAN: Same objection. Also assumes facts not in evidence and calls for opinion testimony.
A. I don't know what -- what these people said or promoted.
BY MR. BESS:
Q. All right. But taking these documents on their face, indicating they're aware of off-label promotion, would you agree that that's improper conduct for a sales representative in the healthcare industry?
MR. HENDERSON: Same objection.
MR. HOFFMAN: Same objections, asked and answered.
A. I don't know what these people said that was considered off-label.
BY MR. BESS:
Q. All right. If we reference back to Exhibit 9, the first page, "out-of-labeling indications, such as, but not limited to, Alzheimer's disease, the

Page 148

reduction of cardiovascular disease and vanity issues," assuming the content of this letter to be true, would you agree that promotion of those benefits as off-label indications would be improper?
MR. HENDERSON: Same objections.
MR. HOFFMAN: Same objections.
THE WITNESS: Will you repeat the question, please?
MR. BESS: Yes, sir.
BY MR. BESS:
Q. If you'll refer back to the off-label indications indicated in Exhibit 9, which are listed as "Alzheimer's disease, the reduction of cardiovascular disease and vanity issues," would you agree that off-label promotion of those indications would be improper for a sales representative?
MR. HOFFMAN: Same objections.
MR. HENDERSON: Same objections.
A. Yes.
BY MR. BESS:

Page 149

Q. Thank you.
Mr. Williams, have you ever heard of a newsletter or publication published by Wyeth called Seasons magazine?
A. Yes.
Q. And what is that publication? What is it that you recall about that?
A. I remember the magazine, but I don't remember the context.
Q. Okay. Do you recall whether or not that was a free publication that was offered to women?
A. No, I don't recall -- no, I don't. I don't recall.
Q. Did you ever provide copies of Seasons to any of the physicians that you detailed?
A. I don't remember having copies of Seasons.
Q. Okay. Did you ever encourage the physicians in your territory or -- I'll stop with that.
Did you ever encourage any physicians in your territory to sign up their

patients for anything called Seasons magazine?
A. I don't remember how we discussed Seasons magazines, or if that's something that sales reps even discussed.
Q. All right. Do you ever recall visiting pharmacies and asking them to sign up customers for anything called Seasons magazine?
A. No.
Q. Okay. Mr. Williams, we talked earlier about the VSB program, the Visiting Speakers Bureau program.
Were you ever involved in recruiting doctors to speak for VSB programs?
A. Yes.
Q. What would you tell the doctor about their role in speaking at a VSB program?
A. Could you clarify a little bit?
Q. Sure.
As far as the responsibilities for a doctor who would be a potential speaker for a VSB program, what types of discussions



would you have with doctors about that?
MR. HOFFMAN: Vague, ambiguous.
A. That they would be giving slide presentations of unbranded material.
BY MR. BESS:
Q. Okay. And did physicians that you would recruit for VSB programs -- would they typically receive an honorarium for that work?
A. Yes.
Q. Do you recall generally what amount those honorariums were?
A. No, I don't.
Q. Did you provide training for doctors who were slated to be speakers at VSB programs?
A. Yes.
Q. And what form was that training in?
A. Can you repeat the question?
Q. Sure.
What type of training would that be, any training that you provided to doctors that were going to be VSB speakers?



A. A doctor that was going to be a VSB speaker was usually -- usually attended a separate class that discussed how VSBs work, and that was outside of my real realm of working with them on the VSBs.
Q. Would those classes take place in your territory, or would they be somewhere else?
A. I don't recall.
Q. Was there a centralized location where potential VSB speakers were trained?
A. No.
Q. Were there -- typically, were groups of potential VSB speakers trained at one time, or were they all trained individually?
A. I don't recall.
Q. Were doctors ever asked to travel somewhere to be trained as a VSB speaker?
A. Yes.
Q. All right. Did doctors receive slides from Wyeth for use in their



presentations at VSB programs?
A. Yes.
Q. And did you ever encourage doctors to attend these VSB programs, besides the ones that were recruited to be speakers; in other words, just participants?
A. Yes.
Q. And what form were these VSB programs typically in?
A. Can you repeat the question, please?
Q. Sure.
What type of meetings were -- let me strike that.
Could you describe for us, please, sort of what form these VSB programs took? Were they physical meetings between doctors and the speakers? Were they teleconferences? Were they -- did they take some other form?
A. They were either teleconferences or dinner programs.
Q. And were participants who came to these VSB programs provided the dinner?

Page 154

A. Yes.
Q. And did you encourage patients -- excuse me. Strike that.
Did you ever encourage doctors in your territory that you were detailing to participate or attend these VSB presentations?
A. Yes.
Q. And how long would they typically last?
A. One hour.
Q. And do you recall what types of subjects were addressed by these VSB presentations?
A. It would depend on either a birth control pill VSB or hormone replacement, estrogen replacement therapy VSBs --
Q. Okay.
A. -- or speaker programs.
Q. All right. What about specifically hormone replacement therapy VSB programs, what types of subjects would be addressed during those programs?

Page 155

A. I can't recall.
Q. Was cardiovascular health ever a topic of a VSB program where hormone replacement therapy was ever a subject?
A. I can't recall if it was discussed specifically.
Q. Okay. Do you recall if it ever came up as part of general VSB programs?
A. I don't remember.
Q. Okay. Mr. Williams, did you ever attend conferences or medical conventions?
A. Yes.
Q. And what types?
A. Various local OB/GYN chapters, as well as the large ACOG convention.
Q. Okay. Did you ever maintain a booth or other type of company presence at these conventions?
A. Yes.
Q. And did you ever have any promotional materials available for distribution at your booth at these conventions?

Page 156

A. Yes.
Q. Okay. And what types of materials?
A. I don't recall specifically.
Q. Did you hand out any of these materials to doctors?
A. Yes.
Q. If the physicians had any questions about -- well, let me start over. Scratch that.
Did you ever distribute any promotional materials related to the Premarin family of products?
A. Yes.
Q. If physicians had any questions about those products in the Premarin family, would you address those questions at the conference -- or the convention, rather?
A. Yes.
Q. Mr. Williams, do you recall a program where Wyeth would purchase textbooks or other types of reference materials for doctors in your territory?
A. Yes.

Page 157

Q. And how did that program work?
A. I don't remember specifics.
Q. Did that program have a name or title, that you can recall?
A. I don't remember.
Q. Do you recall whether or not Dr. Kirby or Dr. Lal participated in any VSB programs?
A. Dr. Kirby, yes. Dr. Lal, I don't remember.
Q. Okay. Earlier we talked about CME presentations. Do you recall if Dr. Kirby or Dr. Lal participated in those?
A. No, I do not.
Q. Do you recall whether or not Dr. Kirby or Dr. Lal participated in the textbook program that we just talked about?
A. I don't remember.
Q. Mr. Williams, you worked with Wyeth, I believe you said, until September of 2002.
Let me ask you: Do you recall the publication of the Women's Health Initiative in July of 2002?

A. Yes, I do.
Q. How did you find out about that study or the publication of the study results from the Women's Health Initiative?
A. Information from -- we were -- I don't remember how it was disseminated to us, but from Wyeth.
Q. Did doctors have a lot of questions about hormone replacement therapy following the publication of the study results from the Women's Health Initiative in July of 2002?
MR. HOFFMAN: Objection. I'm sorry, Nate, can you be more specific? I think he was an area account manager at that time.
BY MR. BESS:
Q. Well, Mr. Williams, as an area account manager, you still detailed physicians; am I right?
A. I -- yes.
Q. So during that time in detailing physicians in your territory, even though I know it had changed, again, in 2001,



did you have questions from physicians in your territory about the risk-benefit profile of the Premarin family of products?
A. Yes.
Q. Is it your recollection or your understanding that the WHI indicated a greater risk of breast cancer associated with hormone replacement therapy?
MR. HOFFMAN: Objection, form, lacks foundation.
A. I can't remember specific results from WHI.
BY MR. BESS:
Q. Did you have any questions from physicians in -- after the -- in late-mid 2002 about the risk of breast cancer from hormone replacement therapy?
A. Yes.
Q. Were you ever asked about a cardiovascular risk associated with hormone replacement therapy after publication of the WHI study results?
A. Yes.
Q. Mr. Williams, did sales of the



Premarin family of products drop after publication of the results from the Women's Heath Initiative?
MR. HOFFMAN: Objection, lacks foundation.
A. I was not directly involved with sales that generated scrips at that time.
BY MR. BESS:
Q. Okay. Did you still monitor prescribing trends at that time for the physicians in your territory?
A. No.
Q. And was that after you became an area account manager?
A. Yes.
Q. As an area account manager, did you monitor sales volumes in your region -- or in your area, rather?
A. No.
Q. What about sales revenue in your area?
A. I don't recall.
Q. Were you aware of any drop in



sales in the entire region, not just your territory?
MR. HOFFMAN: Objection, lacks foundation.
A. My territory didn't generate scrips. That wasn't what I was focused on.
BY MR. BESS:
Q. Okay. From that time to time -- excuse me. Strike that.
At that time, did you periodically continue to meet with other sales representatives that worked for Wyeth?
A. Yes.
Q. And from talking with other sales reps that detailed the Premarin family of products, did that topic never come up, that sales had dropped in the territories following publication of the WHI study results?
MR. HOFFMAN: Objection, lacks foundation, calls for hearsay testimony.
A. I left a few months after WHI came out, and sales had not been impacted in

any way at that time.
BY MR. BESS:
Q. Okay. After you became an area account manager in 2001, did you continue to handle, as part of your portfolio, the Premarin family of products?
A. Yes.
MR. BESS: I'd like to take Documents 12 and 13 and mark those at this time as Exhibits 12 and 13.
THE REPORTER: So we're skipping Exhibit 11, Nates?
MR. BESS: Oh, I beg your pardon. Let's take -- let's start over.
Can we take Document 11 and mark that as Exhibit 11, please?
(Whereupon, Deposition Exhibit Williams-11, IMS Data, re: Dr. Kirby, was marked for identification.)
BY MR. BESS:
Q. Mr. Williams, earlier we talked about the IMS data that was available to you and that you used as a sales representative



for Wyeth. Do you remember our discussion?
A. Yes.
Q. And what you have in front of you, I'll represent to you, is that very same IMS data for Dr. Kirby. Does that look familiar to you?
A. I don't recognize this form of information.
Q. Did you have an interface or front end to review and analyze this data?
MR. HOFFMAN: Objection, vague.
A. I've never seen this type of data presented this way before.
BY MR. BESS:
Q. Okay. Well, I'll represent to you that's the raw -- raw form of the IMS data. And at this time, let me take exhibits -- Documents 12 and 13 and mark those as Exhibits 12 and 13, please.
(Whereupon, Deposition Exhibit Williams-12, Graph of IMS Date, re: Dr. Kirby, was marked for identification.)
(Whereupon, Deposition Exhibit



Williams-13, Graph of IMS Date, re: Dr. Kirby, was marked for identification.)
BY MR. BESS:
Q. All right. Mr. Williams, before you, you have marked as Exhibit 12 and Exhibit 13 are actually Exhibit 6 and Exhibit 7 from Dr. Kirby's deposition.
And I know you haven't seen this before, but I'll represent to you that this is a graph of the IMS data for Dr. Kirby, Exhibit 12 reflecting new prescriptions and Exhibit 13 reflecting total prescriptions written -- or, excuse me, prescribed by Dr. Kirby -- or, excuse me, that's -- or filled after prescribed by Dr. Kirby.
And, Mr. Williams, at the bottom, the X Axis, between October 2001 and January of 2003, how would you describe the change in the total volume of either new or total prescriptions for Premarin by Dr. Kirby?
MR. HOFFMAN: Objection.



There's no foundation to use the document with the witness.
MR. HENDERSON: Vague, ambiguous, assumes facts not into evidence.
A. To be correct, you're asking me about the time that I was not there?
BY MR. BESS:
Q. This would have been, yes, sir, shortly after you left.
A. These numbers show a reduction.
Q. All right. Would you describe that as a steep decline --
(Clarification requested by the reporter.)
BY MR. BESS:
Q. Mr. Williams, would you describe that as a sharp decline in both the total numbers of total and new prescriptions?
MR. HOFFMAN: Same objections.
A. There is a -- there is a definite decline.
BY MR. BESS:
Q. All right. Thank you.

MR. BESS: And, if I could, please, could I mark Document 14 as Exhibit 14.

(Whereupon, Deposition Exhibit Williams-14, IMS Data, re: Dr. Lal, was marked for identification.)

BY MR. BESS:

Q. Mr. Williams, I'll represent this is the raw form for the IMS data for Dr. Lal. And, again, let me ask you: Does this data look familiar? Have you ever seen it in this form before?

A. Is this what was presented that I saw this morning? Otherwise, this is a -- this is not how we used information when I was with Wyeth, or how we received information.

MR. BESS: And could I please take Documents 15 and 16 and mark those as Exhibit 15 and Exhibit 16, please.

(Whereupon, Deposition Exhibit Williams-15, Graph of Dr. Lal's Prempro Prescriptions - Monthly, was



marked for identification.)

(Whereupon, Deposition Exhibit Williams-16, Graph of Dr. Lal's Prempro Prescriptions - Quarterly, was marked for identification.)

BY MR. BESS:

Q. And, again, Mr. Williams, sort of following -- as you can expect, following on the bootheels of my earlier questions, I'll represent to you that these are graphs of the IMS data for Prempro for Dr. Lal between January of 2001 and June of 2003.

And, sir, if you would for me, could you please describe the change in monthly or quarterly prescription volume before and after July of 2002?

MR. HOFFMAN: I'll object, lacks foundation. I object to the characterization by this witness of evidence he cannot testify as to the accuracy of.

MR. HENDERSON: I'm going to object to as vague and ambiguous and assumes facts not in evidence.



A. Looking at these charts, there is a decline.

BY MR. BESS:

Q. Okay. Is it fair to say a decline in sales volume would have resulted in potentially smaller bonuses for Wyeth sales representatives who were still active with the company at that time? Is that fair to say?

MR. HOFFMAN: Objection.

MR. HENDERSON: Objection, calls for speculation.

MR. HOFFMAN: Lacks foundation.

A. I don't know how field sales reps were compensated at that time.

BY MR. BESS:

Q. Okay. Fair enough.

Do you recall a change in the product labeling for Prempro and Premarin in August of 2002?

A. Yes, I do.

Q. And what do you recall about the change in the warnings at that time, or the change in the label?



A. I remember a black box was added. I don't remember what the description within the black box stated.

Q. Do you recall whether or not that black box -- do you recall whether or not that discussed increased incidence of invasive breast cancer?

A. I don't remember what was stated in there, other than that it was risks.

Q. Okay. And do you recall a black-box warning regarding breast cancer prior to publication of the study results of the Women's Heath Initiative?

A. I don't believe that there was one.

Q. All right. Mr. Williams, let me ask you: Do you understand that we're sitting here today because we're talking about two cases involving women who claim they developed breast cancer from taking combination hormone therapy?

A. Yes.

Q. Mr. Williams, let me ask you

this: Do you agree that combination hormone therapy, such as that in Prempro, can cause breast cancer in some women?

MR. HOFFMAN: Objection, calls for expert testimony.

MR. HENDERSON: Calls for speculation, vague and ambiguous.

A. I don't know what the data says.

BY MR. BESS:

Q. At any time prior to July or August of 2002, would you have ever told any patient that they were at an increased risk of developing breast cancer?

MR. HOFFMAN: Objection. I'm sorry, did you say "patient," Nathan?

MR. BESS: Yes, sir.

MR. HENDERSON: Objection, vague, ambiguous, calls for speculation.

MR. HOFFMAN: Same.

A. I don't recall having interactions with patients.

BY MR. BESS:



Q. At any time prior to July or August of 2002, would you have told any physician in your territory that you were responsible for or that you detailed that by virtue of taking Prempro, they're placing their patients at an increased risk of -- a significant risk of development of breast cancer?

MR. HENDERSON: Same objections.

MR. HOFFMAN: Objection, vague.

A. I don't recall the content regarding breast cancer that I had with the physicians.

BY MR. BESS:

Q. Did you ever receive instructions from Wyeth, after publication of the Women's Health Initiative, on how to deal with questions from physicians regarding significant risk of breast cancer?

MR. HOFFMAN: Object to the form and to the term "significant."

MR. HENDERSON: Vague, ambiguous.



A. I remember we received instructions and information on the results from the study, and I left the company a month and a half after.

MR. BESS: Mr. Williams, right now at this point, I'd like to take Document 19 and mark that as Exhibit 19.

THE REPORTER: So skipping 18?

MR. BESS: We're skipping 18.

MR. HOFFMAN: I'm sorry, did we have 17? I don't think we had 17 either.

THE REPORTER: We marked 17, Document 17, as Exhibit 4B earlier in the day.

(Comments off the record.)

MR. BESS: To keep them in order, we can mark this as Exhibit 17. That's fine.

(Whereupon, Deposition Exhibit Williams-17, Premarin: Sales Issues & Competitive Information, YAVUE007-000244 - YAVUE007-000396, was



marked for identification.)

BY MR. BESS:

Q. All right. Mr. Williams, do you recognize this document?

A. Yes.

Q. And how do you recognize this?

A. I was shown it this morning.

Q. Okay. When you were shown it this morning, did it refresh your recollection of having viewed this document previously, or was that the first instance?

A. That's the first time I remember seeing it.

Q. Okay. Mr. Williams, if you would, turn with me to -- do you see the Bates-stamp number? Or that's what we refer to as the Bates-stamp number. It says YAVUE007-00244. Sir, if you'll turn with me, please, to page 287.

A. Okay.

Q. All right. Mr. Williams, it reads, "I don't prescribe Premarin often because of the increased risk of breast cancer," in quotation marks.

Page 174

It goes on to read, "Analysis." It reads, "The first point to remember is that cancer of any type is a very emotional issue. The word 'cancer' creates anxiety in both the patient and the physician.

"For the patient, cancer is associated with the fear of dying. For the physician, it has become a medical-legal issue. Doctors are concerned about being sued by their patients. So they don't prescribe Premarin; or, at best, they prescribe it in short-term."

It goes on to read, "In many cases, the physician has not had time to read through the current literature. The increased risk of breast cancer, which the physician and the patient perceive, is not supported by recent literature reviews.

"In overcoming this resistance, you must make every effort to assure the physician that, for patients who need estrogen, the benefits of prescribing Premarin outweigh the risks, by utilizing one or more of the following: The Premarin

Page 175

package circular statement on breast cancer, the Premarin patient counseling kit, 'A Clinician's Guide to Menopause,' or DuPont article (PRM:335)."

Did I read that correctly, Mr. Williams?

A. Yes.

Q. Is this language consistent with your instructions from Wyeth to respond to physicians who were concerned with a potential association between breast cancer and administration of estrogen?

MR. HOFFMAN: Objection, vague, lacks foundation.

MR. HENDERSON: Scope.

A. I don't remember how -- and I said I haven't seen this document, and I don't recall what was specifically discussed regarding breast cancer after the Women's Heath Initiative.

BY MR. BESS:

Q. Did you ever receive materials from Wyeth specifically directing you on how to respond to questions by doctors concerned

Page 176

about a potential association between estrogen and breast cancer?

A. Yes.

Q. And what form did those instructions come in? What type of materials did you receive on that topic?

A. Will you repeat the question?

Q. Yes, sir.

I think you said -- and correct me if I'm wrong. I believe you said that you received instructions from Wyeth on how to respond to questions from physicians who were concerned about a possible association between breast cancer and estrogen therapy.

Do you recall what form those instructions might have come in?

A. No, I don't.

Q. Okay. And do you recall specifically what those instructions might have been or how those might have read?

A. No, I don't.

Q. Okay. On page 288, there's a heading that reads, "Suggested Response." It reads, "Doctor, I can appreciate your concern

Page 177

because the word 'cancer' scares all of us. With that in mind, I want to share with you some of the latest information on the risk of breast cancer and the use of estrogens.

"First, the Premarin package circular states, 'Some studies have suggested a possible increased incidence of breast cancer in those women on estrogen therapy taking higher doses for prolonged periods of time. The majority of studies, however, have not shown an association with the usual doses used for estrogen therapy.'"

Did I read that correctly, Mr. Williams?

A. Yes.

Q. Is that language consistent with your response to physicians who had a question about a potential association between breast cancer and estrogen during the time you were a sales representative for Wyeth?

MR. HENDERSON: Objection, vague, ambiguous, assumes facts not into evidence.

MR. HOFFMAN: Same objection.
A. I don't remember what was specifically told to us and instructed of us to discuss these type of issues.
BY MR. BESS:
Q. Well, let me just ask you this: At any time during your tenure as a Wyeth sales representative, prior to your departure in September of 2002, did you ever specifically tell any doctor that you detailed that there was a significant association between administration of estrogen plus progestin and breast cancer?
MR. HOFFMAN: Objection, vague. Object to the term "significant."
MR. HENDERSON: Ambiguous.
A. I don't recall specific meetings, what was discussed.
BY MR. BESS:
Q. Okay. Just one last thing: You currently work for ZOLL Medical -- ZOLL Medical? Excuse me.
A. Yes, I do.
Q. What types of resuscitation



equipment do you detail for ZOLL?
A. I'm in equipment sales, selling defibrillators and CPR equipment, code improvements for hospitals.
Q. Okay. And does that include, also, AEDs for schools and other large facilities?
A. I only deal with AEDs at hospitals. There are different sales groups that deal with alternative markets.
Q. Okay. Would you agree with me that a medical device, such as a defibrillator, can be extremely hazardous or dangerous to an individual's health if not used in strict compliance with the instructions for its use?
MR. HENDERSON: Objection, calls for opinion testimony and beyond the scope of this particular case, vague, ambiguous.
MR. HOFFMAN: Same.
A. Yes.
BY MR. BESS:
Q. And in that same vein, do you



think it's important for sales representatives to market the products that they're detailing in strict accordance with either product labeling or other instructions or indications for its proper use?
MR. HENDERSON: Same objections.
MR. HOFFMAN: Same.
A. Yes.
BY MR. BESS:
Q. And the same importance that we just talked about, do you think that also applies to pharmaceutical products, such as the Premarin family of products that you detailed as a sales representative for Wyeth?
MR. HENDERSON: Same objections.
MR. HOFFMAN: Same.
A. The products should be discussed within the labeling.
MR. BESS: Mr. Williams, thank you very much.
I'll pass the witness.
MR. HOFFMAN: I'm going to have



a few questions, Nathan, but I tell you what, can we take a really quick break, a restroom break, and let me organize my notes, and then hopefully I can do it very quickly?
MR. BESS: Sure. That's fine. Let's go off the record.
THE VIDEOGRAPHER: Off the record at 2:26.
(Recess taken, 2:26 p.m. to 2:36 p.m.)
THE VIDEOGRAPHER: Stand by. We're on the record, 2:36.
EXAMINATION
BY MR. HOFFMAN:
Q. Mr. Williams, thanks for coming here today. Appreciate it.
We have not met previously or discussed any of your testimony, have we?
A. No, we've not.
Q. Based upon what you told us during your testimony, I believe it's fair to say that you have not been employed now by Wyeth for about nine years; is that right?

A. That's correct.
Q. And if I understand your testimony correctly, in August of 2001 is when you changed over to the area account manager position; is that right?
A. The end of August 2001.
Q. And at that time, you would not have been calling on OB/GYNs for Premarin, Prempro or Premphase; is that correct?
A. After that time, I wasn't calling on them in that specific territory.
Q. Okay. So it's been now about ten years since you called on either Dr. Lal or Dr. Kirby, the doctors involved in this case; is that right?
A. That's correct.
MR. BESS: Object to form.
BY MR. HOFFMAN:
Q. Okay. Now, do you have any memory of any of your conversations with Dr. Lal?
MR. BESS: Object to form.
A. No, I do not.
BY MR. HOFFMAN:



Q. And do you have any memory of any of your conversations with Dr. Kirby?
MR. BESS: Object to form.
A. No, I do not.
BY MR. HOFFMAN:
Q. Do you have any memory of any of the materials that you may have provided to Dr. Lal?
A. Not specific to Dr. Lal, no.
Q. Okay. Do you have any memory of any of the materials that you may have provided to Dr. Kirby?
MR. BESS: Object to form.
A. No, I do not.
BY MR. HOFFMAN:
Q. And I think you mentioned previously that some doctors allowed you to leave certain materials with them and other doctors did not; is that right?
A. That's correct.
Q. Do you recall whether Dr. Lal allowed you to leave materials?
A. I don't recall Dr. Lal's policy.



Q. Okay. What about for Dr. Kirby, do you recall whether Dr. Kirby allowed you to leave materials with him?
A. Yes, he did.
Q. Okay. And do you recall what types of materials Dr. Kirby allowed you to leave?
A. No, just the fact that he allowed me to leave materials.
Q. Okay. Do you believe that you have any personal knowledge about Dr. Lal that could be helpful to either party in this case?
MR. BESS: Objection to form.
A. I don't remember much about Dr. Lal.
BY MR. HOFFMAN:
Q. Okay. Do you believe you have any personal knowledge about Dr. Kirby that could be helpful to either party in this case?
MR. BESS: Objection.
A. No, I do not.
BY MR. HOFFMAN:



Q. Now, you were trained back in 1998; is that right?
A. Yes.
Q. And you would have been trained by Wyeth on the Premarin, Prempro and Premphase labels at that time?
A. Yes.
Q. And was it your understanding that you could discuss any of the contents of the FDA-approved labeling with doctors?
A. Yes.
Q. And you also would have been trained on the rules that you were to follow when visiting with doctors and having discussions with them; is that right?
MR. BESS: Object to form.
A. Yes.
BY MR. HOFFMAN:
Q. And you would have been trained on providing fair balance to doctors?
MR. BESS: Object to form.
A. I don't recall specifics on it.
BY MR. HOFFMAN:
Q. Okay. When I say "fair

Page 186

balance," do you understand that means that if you're going to talk about the benefits of your product, then you also would talk about the risks and side-effects?
MR. BESS: Object to predicate, object to form, foundation.
A. I remember receiving training on both the benefits and the risks.
BY MR. HOFFMAN:
Q. Okay. And do you also recall receiving training on what you described earlier as staying on label?
A. Yes.
MR. BESS: Object to form.
BY MR. HOFFMAN:
Q. And I believe you testified earlier, also, that you would have only used the company-approved materials in your discussions with doctors; is that right?
A. Would you repeat the question?
Q. I believe you testified earlier that you would only have used the -- when I say "company-approved," the materials that were approved by Wyeth for you to discuss

Page 187

with physicians; is that right?
A. There was the company-approved materials, and...
Q. When I say that, I'm including the medical literature, the medical literature that you would be able to discuss with physicians.
A. The stuff from Wyeth.
Q. Okay. All right. Let me ask you about some of the specific exhibits that you were shown earlier.
Do you still have Exhibit 4A in front of you?
MR. HOFFMAN: I'm sorry, I have your copy.
MR. HENDERSON: That's all right.
A. Yes, I do.
BY MR. HOFFMAN:
Q. Now, I think -- I think I understood you earlier to say that you did not remember using this particular piece with physicians; is that right?
MR. BESS: Object to form.

Page 188

A. I remember using the -- on page 5 of 5.
BY MR. HOFFMAN:
Q. Okay. All right. Well, let's separate that out, then.
So on page 5 of 5, there's something referred to as the Patient Action Center; is that right?
A. That's correct.
Q. And you recall providing those brochures to doctors; is that right?
A. Yes, I do.
Q. Okay. But the piece that's entitled "Menopause Isn't Gone in a Flash," which starts on the first page of Exhibit 4A, do I understand you correctly that you don't recall using that particular piece with physicians?
MR. BESS: Object to form.
A. I remember seeing the piece. I don't remember using it with physicians.
BY MR. HOFFMAN:
Q. Okay. And you would not be able to testify that you used this particular

Page 189

piece with Dr. Lal in this case, would you?
MR. BESS: Objection.
A. I don't believe I used it with Dr. Lal.
BY MR. HOFFMAN:
Q. Okay. What about Dr. Kirby, do you believe you used it with Dr. Kirby?
A. I don't believe I used it with Dr. Kirby.
Q. Now, there -- if you turn to the -- page 4 of 5, down at the bottom of the piece that's entitled "Menopause and Its Associated Estrogen Loss, Consider the Entire Body of Evidence," you see there's a Wyeth logo down there at the bottom. Do you see that?
A. Yes, I do.
Q. And there's a copyright, there's a printed date, and then there's a series of numbers all the way over on the bottom right-hand corner. Do you see those?
A. Uh-huh.
Q. And I believe you testified earlier that when you had company-approved

Page 190

materials, you could order them from the company, and then they would be provided to you; is that right?
A. That's correct.
Q. And any company-approved materials would have an order number on them so you could order them from the company; is that correct?
A. Correct.
Q. Okay. But just because a company-approved material was available, that doesn't mean you would have ordered it or used it with particular physicians; is that right?
MR. BESS: Object to form.
A. That's correct.
BY MR. HOFFMAN:
Q. And you would use your own judgment as far as what you wanted to order and what you wanted to use in your discussion with doctors; is that correct?
A. That's correct.
MR. BESS: Objection.
BY MR. HOFFMAN:

Page 191

Q. Let's go to the next one, which is Exhibit 4B.
A. Okay.
Q. And I believe you also testified earlier that you do not recall using this particular piece with physicians?
MR. BESS: Object to form.
A. That's correct.
BY MR. HOFFMAN:
Q. So you would not be able to testify that you used this piece, the "Consider the Entire Body of Evidence" piece, with Dr. Lal in this case; is that right?
MR. BESS: Object to form.
A. This is actually the same piece as we just went over. It's the same order number.
BY MR. HOFFMAN:
Q. Right. Well, just to be clear: Exhibit 4A, it appears to be a compilation of a couple of different pieces and then a reference, actually, to a third piece.
So just setting that aside for the moment and just dealing with Exhibit 4B,

Page 192

my question is: Do you believe you'd be able to testify that you used Exhibit 4B with Dr. Lal in this case?
MR. BESS: Object to form.
A. I don't recall using this with Dr. Lal.
BY MR. HOFFMAN:
Q. What about with Dr. Kirby?
MR. BESS: Same objection.
A. I don't recall using it with Dr. Kirby either.
BY MR. HOFFMAN:
Q. All right. Let's go to Exhibit 5, please. If you turn to the last page, please, Mr. Williams, down at the bottom of the last page, you see a printed date of February 1997?
A. Yes, I do.
Q. Okay. And that would have been at least a year before you started with the company?
A. That's correct.
Q. Okay. And would you be able to testify that you used this piece, Exhibit 5,

Page 193

with Dr. Lal?
MR. BESS: Objection.
A. I don't believe I used this piece.
BY MR. HOFFMAN:
Q. What about with Dr. Kirby?
A. I don't believe I used this piece with him either.
Q. Okay. If you turn to Exhibit 6, please, I believe you testified earlier that you do not recognize Exhibit 6?
A. That's correct.
MR. BESS: Form.
BY MR. HOFFMAN:
Q. And if you don't recognize it, then I assume you would not be able to testify using it with Dr. Lal?
A. I don't remember using it with Dr. Lal.
Q. What about Dr. Kirby?
A. Dr. Kirby either.
Q. Okay. Next exhibit, please, Exhibit 7. Now, Exhibit 7, if you take a look at Exhibit 7, do you see any Wyeth logo

Page 194

on this piece anywhere?
A. No, I do not.
Q. Do you see a copyright date anywhere?
A. No, I don't.
Q. Do you see an order number anywhere, where you could order it from Wyeth?
A. No, I don't.
Q. Okay. And I think you said you may have seen this piece before, but you do not recall using it with any physicians; is that right?
A. That's correct.
Q. And if it was not a company-approved piece, you would not have used it in your promotional efforts; is that right?
MR. BESS: Object to form.
A. I did not use this piece.
BY MR. HOFFMAN:
Q. And you're not aware of anyone else using this piece with physicians either, are you?

Page 195

MR. BESS: Object to form.
A. I don't remember. I remember seeing the piece, but I don't remember anyone using it with a physician.
BY MR. HOFFMAN:
Q. Now, you were asked about Exhibit 8, which is some CME materials from Duke University Medical Center. Do you recall that?
A. Yes.
Q. And I believe you testified that you don't know if Dr. Lal or Dr. Kirby attended this event; is that correct?
A. I'm not sure if either of them attended this or participated in this.
Q. And would you know whether either of -- either Dr. Lal or Dr. Kirby ever even received this material from Duke University?
MR. BESS: Object to form.
A. I don't have that information.
BY MR. HOFFMAN:
Q. Okay. Thank you.
If you would turn to Exhibit 9,

Page 196

please. Exhibit 9, if you turn to the second page, please, you'll notice that in the second paragraph of this letter, it references a situation in Alabama and Georgia.
Do you see that in the third line of the second paragraph?
A. Yes, I do.
Q. And you never detailed Premarin, Prempro or Premphase in Alabama or Georgia, did you?
A. No, did not.
Q. And you don't know who Charles Payne is; is that right?
A. That's correct.
Q. And your district manager never was Bill Richards; is that right?
A. That's correct.
Q. Did you ever receive any regional training in Alabama?
A. No, I did not.
Q. Did you ever receive any regional training in Atlanta or the Georgia area?

Page 197

A. No, I did not.
Q. Okay. Let's look at Exhibit 10, please. Exhibit 10 references a Mary Cardone. Do you see that?
A. Yes, I do.
Q. And you don't know who she is; is that right?
A. No, I do not.
Q. Did you ever detail Premarin, Prempro or Premphase in the New Jersey area?
A. No, I did not.
Q. Did you ever attend any regional sales training in New Jersey?
A. No, I did not.
Q. Are you familiar with somebody by the name of Brett Hendricks?
A. No, I am not.
Q. Did you ever attend any regional training in Las Vegas, Nevada?
A. No.
Q. Did you ever attend any training at all in Nevada?
A. No.
Q. Was Mike Seppi ever your

Page 198

district manager?
A. No.
Q. And when you said earlier that you had recognized Exhibit 10, I believe you testified that the only reason you recognized this is because you were shown it this morning because plaintiffs' counsel had provided it to your lawyer; is that correct?
MR. BESS: Objection to form.
A. That's correct.
BY MR. HOFFMAN:
Q. Okay. Take a look quickly at Exhibit 11, Exhibit 12 and Exhibit 13.
It was represented to you by plaintiffs' counsel that these data are from IMS. Do you recall that?
A. Yes.
Q. Now, IMS is a third party; is that right? IMS is not Wyeth?
A. Correct.
Q. And do you recall that IMS only tracks some of the pharmacies where prescriptions are filled?
A. Yes, I do.

Page 199

MR. BESS: Object to form, foundation.
BY MR. HOFFMAN:
Q. And some of the major pharmacies are not included in the IMS database; is that right?
A. That's correct.
Q. Let me ask you about Walmart. Are you aware that Walmart is not included in IMS?
A. I don't remember specific.
MR. BESS: Foundation.
BY MR. HOFFMAN:
Q. Okay. But looking at Exhibit 11, Exhibit 12 and Exhibit 13, would you be able to testify as to the accuracy of any of the data presented in those exhibits?
A. I don't know the specific numbers of what was written.
Q. You wouldn't be able to verify the accuracy of any of that data?
A. No, I would not.
Q. And you could not testify about these exhibits in any way; is that right?

Page 200

MR. BESS: Objection, form.
A. No, I could not.
BY MR. HOFFMAN:
Q. Same questions for Exhibit 14, Exhibit 15 and Exhibit 16: Would you be able to verify or testify about the accuracy of the data that underlie any of those exhibits?
A. No, I cannot.
Q. Would you be able to testify about those exhibits in any way?
A. No.
Q. Now, there was some discussion during your prior testimony about the HDL and LDL levels, and just generally, lipids and cholesterol and discussions that you had with doctors on those topics. Do you recall that?
A. Yes.
Q. Do you recall that the lipids information and cholesterol information was contained in the Prempro FDA-approved labeling?
MR. BESS: Object to form.
A. I don't remember specifics of the lipid levels in the package labeling.

Page 201

BY MR. HOFFMAN:
Q. Do you recall generally that the lipid information was included in the FDA-approved labeling?
MR. BESS: Objection to form, foundation, leading, assumes facts not in evidence.
A. I haven't reviewed the package insert in many years. I can't remember what the specifics of the package insert were.
MR. HENDERSON: Okay. Let's mark the Prempro 1998 PDR as the next exhibit in order, please.
MR. BESS: Hold on. Any documents that you're using in your redirect are subject to the same practice and procedure order that I am.
I've not received copies of, or a notice that you're going to use any of the documents that you're using --
MR. HOFFMAN: I didn't know that I was going to use this, and I didn't know that it was something you

were not going to use.
Furthermore, it just refreshes the witness' recollection, which is, of course, an exception to the PPO that you're referring to.
Can we mark that as the next exhibit in order, please?
MR. BESS: All right. Nevertheless, I'm going to object to its use and in blatant disregard of the Court's order.
MR. HOFFMAN: I disagree with that. Nathan, you know that there are two exceptions to the Court order, right? One of the exceptions is refreshing the witness' recollection?
MR. BESS: That's not the way that I read the order. And it's rebuttal. I didn't ask the witness about the -- I haven't used the label all day.
MR. HOFFMAN: I mean, are you claiming some surprise by me using the Prempro label for 1998 with this



witness?
MR. BESS: I am. I've not seen it used in other sales representatives' depositions.
MR. HOFFMAN: Okay.
(Whereupon, Deposition Exhibit Williams-18, 1998 PDR Entry for Prempro, W-LABELS-005338 - W-LABELS-005344, was marked for identification.)
BY MR. HOFFMAN:
Q. Now, Mr. Williams, I asked you what you recalled about the label, and you told me that you didn't recall the specifics of it; is that right?
A. That's correct.
Q. And there's no way that you could, because this is a label from about 13 years ago; is that correct?
A. Yes.
Q. Now, just following up on the discussion earlier about cholesterol levels and lipids, if you would please turn to the Bates number 5341?



MR. BESS: This is the label for what year?
MR. HOFFMAN: 1998. 1998 Prempro.
BY MR. HOFFMAN:
Q. Are you there with me at 5341?
A. Yes, I am.
Q. Do you see in the left-hand column there's an entire section there called "Information Regarding Lipid Effects"?
A. Yes, I do.
Q. Okay. And, actually, up above there, do you see that big chart that says, "Mean Percent Change from Baseline Lipid Profile Values After One Year of Treatment"?
A. Yes, I do.
Q. And there's a listing of HDL and LDL, along with total cholesterol and triglycerides. Do you see that?
A. Yes, I do.
Q. So having looked at the 1998 Prempro label now, do you agree that the information that you were talking about earlier in your testimony regarding lipids



and cholesterol, and specifically HDL and LDL, was contained in the approved Prempro product labeling at that time?
MR. BESS: Object to form, foundation, leading, misstates the document.
A. The lipid information is contained here in the package insert.
BY MR. HOFFMAN:
Q. And if that information is in the package insert, then you would be allowed to discuss that information with physicians; is that correct?
MR. BESS: Objection, form, foundation.
A. Yes.
BY MR. HOFFMAN:
Q. Now, you were also asked about --
MR. BESS: Move to strike all testimony after admission of the last exhibit.
MR. HOFFMAN: And, of course, I disagree.

Page 206

BY MR. HOFFMAN:
Q. Now, you were also asked about ongoing research regarding heart -- or potential heart and potential brain benefits with hormone therapy. Do you recall that?
A. Yes.
Q. And I believe you testified generally that you recall that topic coming up, although you couldn't be specific, but generally, that physicians raised that topic with you; is that right?
A. Yes.
MR. BESS: Object to form.
BY MR. HOFFMAN:
Q. And do you recall generally that there were ongoing medical publications in the peer-reviewed journals regarding the potential benefits of heart and brain and hormone therapy?
MR. BESS: Object to form and foundation.
A. I remember that there were several publications that were coming out on a variety of topics regarding HRT and ERT.

Page 207

BY MR. HOFFMAN:
Q. And doctors were interested in those topics; is that right?
MR. BESS: Object to form.
A. Yes.
BY MR. HOFFMAN:
Q. But in any of your discussions with the physicians, do I understand correctly that you would have stayed on label in your discussions with them regarding your products, Premarin, Prempro and Premphase, at that time?
MR. BESS: Object to form.
A. Yes.
MR. HOFFMAN: Okay. Those are all the questions I have. Thank you.
MR. BESS: I have a couple follow-up questions.
EXAMINATION
BY MR. BESS:
Q. Mr. Williams, you were asked by counsel for Wyeth about some of the sales aids that you were shown today during your deposition.

Page 208

A. Yes.
Q. And I believe you stated earlier that you recognized the illustrations on -- that were similar on both of those; is that right?
A. Can you be specific?
Q. Yes, sir.
The silhouette of the woman on the front of Exhibit 4A and Exhibit 4B, does that ring a bell generally? Does that look familiar to you?
A. The silhouette looks familiar, yes.
Q. Okay. And in the course of your work as a sales representative for Wyeth, there were hundreds and hundreds of different sales aids and Slim Jims and leave-behind pieces and tear-off sheets and things of that manner that you had available for you to leave for the physician; is that correct?
MR. HOFFMAN: Objection, form.
A. Yes, that's correct.
BY MR. BESS:

Page 209

Q. And it's possible that there were -- there were many permutations of this illustration and of sort of patient education materials of this type; is that fair to say?
MR. HOFFMAN: Objection, calls for speculation.
A. There was multiple pieces that we had for discussions.
BY MR. BESS:
Q. Okay. And so is it possible that while, perhaps, not this specific version, a version similar to this was made available to either Dr. Lal or Dr. Kirby while you were detailing those physicians?
MR. HOFFMAN: Objection, calls for speculation, lacks foundation.
A. I don't remember which detail pieces and detail, you know, stuff I used with those two physicians.
BY MR. BESS:
Q. Okay. And is that because there's a large variety of materials you may or may not have left with those doctors? Without access to your custodial file or the

Page 210

documents, it's difficult to ascertain at this time; is that fair to say?
MR. HENDERSON: Objection, vague, ambiguous, speculation.
A. I had a ton of different pieces, you know, of these brochures available, and I picked and choosed which ones worked best for certain patient types.
BY MR. BESS:
Q. Is -- and regardless of that -- strike that.
Regardless of what materials went where, the message that -- or the information that's generally contained in these two exhibits, is that consistent with similar messaging that would have been in other patient education materials at the time that you were a sales representative for Wyeth?
MR. HOFFMAN: Objection, vague, calls for speculation, lacks foundation.
MR. HENDERSON: Same.
A. Like I can't remember using

Page 211

and -- using these pieces, and I can't remember how they would have applied to other pieces I did use.
BY MR. BESS:
Q. Okay. Do you recall brain, eyes, vasomotor, heart, colon, urogenital, bone, those aspects of a woman's health being themes common to other patient education materials?
MR. HOFFMAN: Same objections.
MR. HENDERSON: Same.
A. I remember them as they relate to that Patient Action Center.
BY MR. BESS:
Q. Okay. And is it also true as to Exhibit 5, that while you remember the advertising campaign, you don't remember specifically how that may have been employed in your territory while you were a sales representative? Is that accurate?
MR. HENDERSON: Objection, asked and answered.
A. I don't remember the advertising campaign. I just remember this

Page 212

front cover.
BY MR. BESS:
Q. Okay. Counsel for Wyeth asked you some questions about Exhibit 7. I'll represent to you, Mr. Williams, this was produced to me by Wyeth.
Do you have any reason to doubt the authenticity of this illustration -- or this document?
MR. HOFFMAN: I'll object to that; and it's misleading, Nathan. That's an incredibly misleading question.
You know as well as I do that this is not an approved piece; and telling the witness that it was given to you by us, and talking about the authenticity of it is a blatant misrepresentation, and I object to that.
MR. HENDERSON: I'm going to object --
MR. BESS: Do you have an alternative explanation why Wyeth has

Page 213

it in its files?
MR. HENDERSON: Hold on just a second.
I'm going to object to the extent it assumes facts not into evidence and to the extent it's misleading.
BY MR. BESS:
Q. Well, Mr. Williams, did you earlier testify that you recognized this illustration?
A. I've seen this before, yes.
Q. And did you see it in your capacity as a sales representative for Wyeth?
A. Yes, I did.
Q. All right. That's good enough for me. Thank you, Mr. Williams. Just a couple other follow-up questions.
You were asked about Exhibit 8, and I believe you testified you didn't know with absolute certainty whether or not Drs. Kirby and Lal attended this specific CME.
Let me ask you: The format of

Page 214

this document, Exhibit 8, this monograph, is that consistent with other similar materials that would have been available at other CME programs?

MR. HENDERSON: Objection, vague, ambiguous, calls for speculation.

MR. HOFFMAN: Same.

A. To my recollection, the sales reps couldn't be involved with CME programs, only visitor speaker programs.

BY MR. BESS:

Q. Okay. Did you never attend -- or, excuse me.

Were you ever involved with the organization or -- well, let me start over.

Were you ever involved with the organization of CME programs?

A. I made the physicians aware of the CME programs and CME credits were available, but they had to do all the signing-up on their own.

Q. Okay. And did you ever have the opportunity to review materials that were

Page 215

made available to physicians at CME programs organized by Wyeth?

A. Not to my recollection.

Q. Okay. And, to your knowledge, did physicians receive educational materials for CME programs organized by Wyeth?

A. I don't know what kind of handouts and stuff was disseminated at those meetings.

Q. Mr. Williams, there were some questions about the IMS data and the form and format. Do you have any reason to believe that that information was corrupted in any way before it was delivered to me by Wyeth?

MR. HOFFMAN: Objection, vague, lacks foundation.

A. I wouldn't know the contents of that data before or after.

BY MR. BESS:

Q. And do you have a reason to believe that my demonstrative aids here, the graphs that I made, in any way misinterpret or in a misleading fashion depict --

(Clarification requested by the

Page 216

reporter.)

BY MR. BESS:

Q. Insofar as the graphs, these visual aids that have been made of the underlying IMS data, do you have any reason to believe that those misstate the underlying IMS data?

MR. HOFFMAN: Objection, vague, lacks foundation.

A. I don't know. They came from the previous data, so...

BY MR. BESS:

Q. And as far as your recollection of prescribing habits following publication of the WHI, do those charts generally reflect general prescribing trends for physicians who were prescribing the Premarin family of products?

MR. HOFFMAN: Objection. The witness already testified that he didn't have access to that data after WHI.

MR. HENDERSON: Same objection.

A. I wasn't around long enough

Page 217

after WHI to see those kind of reports come in.

BY MR. BESS:

Q. Mr. Williams, did you not care about a significant development regarding a product that you detailed for three, four -- approximately four years?

MR. HENDERSON: Objection, vague, ambiguous.

A. Did I care?

BY MR. BESS:

Q. Yes, sir.

A. Yes, I cared.

Q. Okay. And regardless, you didn't follow up on how that news affected doctors in your area or in your old territory?

MR. HENDERSON: Objection, vague, ambiguous.

A. I no longer had contact with any physicians that I called on.

BY MR. BESS:

Q. Okay. And that never came up with discussions with other sales

Page 218

representatives or district managers or other members of the Prempro product family sales team?

MR. HOFFMAN: Objection, asked and answered. The witness previously testified.

MR. HENDERSON: Vague, ambiguous.

A. I didn't -- didn't really talk about sales numbers and what was happening with the products.

BY MR. BESS:

Q. Okay. Mr. Williams, I think you testified earlier this morning that you don't know whether or not Wyeth is contributing to financing your lawyer today; is that true?

A. I don't know.

Q. If that's true, do you believe that your attorney should have disclosed that to you prior to your deposition today?

MR. HENDERSON: Objection to the extent it calls for a legal conclusion, to the extent it violates

Page 219

privilege.

You don't need to answer that.

MR. BESS: You might want to get an ethics opinion on that.

All right. That's all that I have for today.

MR. HOFFMAN: I apologize, Mr. Williams. Just two follow-up questions.

EXAMINATION

BY MR. HOFFMAN:

Q. It's fair to say that in your time at Wyeth -- and I think you already said this -- you saw dozens, if not hundreds, of different detail pieces; is that right?

A. That's correct.

Q. And you saw all kinds of materials while you were with Wyeth, both during your training and when you were out in the field; is that right?

A. That's correct.

MR. BESS: Object to form.

BY MR. HOFFMAN:

Q. And just because you saw

Page 220

something and you recognized something, that doesn't mean that you used it; is that right?

MR. BESS: Object. Object to form, narrative, argumentative, object to foundation.

A. That's correct.

BY MR. HOFFMAN:

Q. And just because you saw something, that doesn't mean that it was used in your territory; is that right?

MR. BESS: Object to form.

A. That's correct.

BY MR. HOFFMAN:

Q. And just because you saw something, that doesn't mean that it was used with Dr. Lal or Dr. Kirby either, does it?

MR. BESS: Object to form.

A. That's correct.

MR. HOFFMAN: All right. That's all I have.

MR. HENDERSON: We're done?

MR. BESS: Done. Excuse me?

MR. HENDERSON: Are we done?

MR. BESS: We're done.

Page 221

MR. HENDERSON: Okay. Going off the record.

THE VIDEOGRAPHER: Okay. We're off the record at 3:10 p.m., end of deposition, end of Tape 4.

(Proceedings adjourned at 3:10 p.m.)

———————

CERTIFICATE

I, MICHAEL E. MILLER, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, DONALD C. WILLIAMS, II was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

______________________
MICHAEL E. MILLER,
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified LiveNote Reporter
Notary Public in and for the State of Texas
My Commission Expires: 7/9/2012
Dated: August 11, 2011



ACKNOWLEDGMENT OF DEPONENT

I, DONALD C. WILLIAMS, II, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________________
DONALD C. WILLIAMS, II DATE

Subscribed and sworn to before me this
_______ day of ______________, 20 _____.
My commission expires: _______________

Notary Public



ERRATA

PAGE LINE CHANGE
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________
____ ____ ____________________
REASON: ____________________



LAWYER'S NOTES

PAGE LINE
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________
____ ____ ____________________