# EXHIBIT 100

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

IN RE: PREMPRO PRODUCTS LIABILITY MDL No. 1507
No. 4:03CV01507

* * * * * * * * * *

DONNA SCROGGIN,
Plaintiff, Individual Case
v. No. 4:04CV01169 WRW
WYETH and its divisions; PHARMACIA & UPJOHN COMPANY LLC; WYETH PHARMACEUTICALS, INC.; and ESI LEDERLE,
Defendants.

Tuesday, February 12, 2008 - Little Rock, Arkansas - 8:20 a.m.

TRANSCRIPT OF TRIAL - VOLUME 7
BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

On Behalf of the Plaintiff:
MR. ERIK BRETT WALKER
Hissey, Kientz & Herron, P.L.L.C.
16800 Imperial Valley Drive
Suite 130
Houston, Texas 77070

MR. JAMES A. MORRIS, JR.
MR. STEVE M. FARIES
Brent Coon & Associates
11614 Bee Caves Road, Suite 220
Austin, Texas 78738

[CONTINUED]



APPEARANCES CONTINUED:

On Behalf of the Wyeth Defendants:
MR. F. LANE HEARD, III
MR. STEPHEN L. URBANCZYK
MR. RICHMOND MOORE
MR. MATTHEW V. JOHNSON
Williams & Connolly
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

MS. LYN PEEPLES PRUITT

said, in April of 2006. That was before she had been asked to testify or render any opinions against Wyeth. The first Wyeth report, Your Honor, is July 2nd, 2007. This is the first report that she renders against Wyeth. She was deposed 20 days after that, on July 20th, and she was asked: Are you contending that the labels, the PDR, the product information was inadequate based on the information that did, in fact, exist in the medical community?

Answer: Well, we have got a long time period here. In terms of Premarin, I haven't discussed the Premarin labeling.

THE COURT: Oops. What do you say about that?

MR. URBANCZYK: I don't remember discussing it in my report.

MR. MORRIS: He is taking a snippet out of the testimony. We don't know in what context she said that.

THE COURT: I'm going to sustain the objection. Exception noted.

MR. MORRIS: Well, will Your Honor allow me to go through her report a little more thoroughly? I didn't know that I was going --

THE COURT: You can do that at the next break, and if you can find anything, I will let you make another short run at it.



Let's bring the witness in, and the jury, and get going.

MR. MORRIS: They have been provided her report, Your Honor. I will tell you that, and they have had an opportunity to review it. And so if it's in here, I hope the Court can keep in consideration --

THE COURT: I told you I will let you make another run at it.

MR. MORRIS: -- the time-wasting effect of this.

THE COURT: I done told you and told you. I have had the same problem with court reporters and newspaper reporters. They continuously quote me correctly and in context, much to my embarrassment.

Everyone, please rise while the jury enters.

(Jury enters the courtroom.)

THE COURT: We need a witness.

I'm going to remind you again to speak more slowly.

THE WITNESS: Yes, sir. I am trying.

THE COURT: Thank you. Be seated.

MR. MORRIS: Thank you, Your Honor.

BY MR. MORRIS

Q There we go. Dr. Parisian, before we took a break, we had mentioned a label, and I want to show you the 1995 Prempro label. This is the same one that counsel showed the jury earlier. And in a patient portion of the package, there is the following warning on cancer of the breast. Now, from an FDA --



this is an FDA-approved label, correct?

A Yes. It's an FDA-approved product. The FDA didn't write

the label.
Q Who wrote the label once again?
A Again, it would have been negotiated between the manufacturer and the FDA.
Q All right. And does this provide a clear warning to women that this product may cause cancer of the breast?
A Clear? No.
Q In fact, what about this warning is not an indication that this product is definitely associated with breast cancer?
A Well, the way it's written. This is intended for the woman, and so patient labeling is supposed to be written at the sixth-grade level, which is fairly simple to understand. And it's kind of confusing as to what is occurring here.
Q And when it begins by stating in the first sentence, "Most studies have not shown a higher risk of breast cancer in women who have ever used estrogens," would that be something that a patient could rely upon?
A No. Because it's saying there isn't any risk of cancer.
Q All right. Could a patient rely upon that and say, Okay, so most studies have not shown a higher risk of breast cancer in women; therefore, I don't need to worry?
A Well, and also --
MR. URBANCZYK: Objection. Leading.
page 1304

THE COURT: Overruled.
THE WITNESS: It implies that there have been studies actually done to look at this.
BY MR. MORRIS
Q And as of 1990, had there been any adequate, well-controlled studies that looked at the right issues on this issue of E plus P in breast cancer?
A No.
Q Had the manufacturers conducted any studies?
A No.
Q Now, getting back to our historical time line here, I want to get back to 1990 with you. Have you seen this Wyeth internal correspondence?
A Yes.
Q This is Exhibit No. 1265. This has also been admitted, and what is being referenced in this memo?
A A presentation about breast cancer study results.
Q And it says: Situation analysis. What was the situation?
A Dr. Colditz was going to present a study about Premarin and showing an increased risk of breast cancer, 30 percent in current users.
Q And who is Dr. Graham Colditz?
A He is an expert in epidemiology and breast cancer.
Q And has he been studying women and women's health issues for a number of years?
page 1305

A Yes.

A. No. So they're technical changes, but not the conclusion change.
Q. All right. Now, we noted that that all started in 1990, correct?
A. Yes.
Q. I'm sorry. 2000?
A. 2000.
Q. I apologize. 2000. I want to show you a document out of the files of Wyeth, and this is Plaintiff's Exhibit 550, "Prospectives in ERT/HRT Advisory Board." And it begins "Day One, Friday, June 9th, 2000"?
A. Correct.
Q. Do you see that?
A. Yes.
Q. And we go back into the section on breast cancer, who is that by?
A. Stampfer.
MR. URBANCZYK: Your Honor, may we approach on this, please?
(Bench conference reported as follows:)
MR. URBANCZYK: Your Honor ruled that Mr. Morris could read certain portions of this document relating, I think, a couple of days ago to marketing. And Your Honor allowed him to read other portions of the document. But we have not -- this



particular statement, Your Honor, is hearsay. This is not -- this is hearsay. This is a statement by an expert at a conference that has been recorded by Wyeth. It is not -- cannot be introduced for the truth of the fact asserted. Dr. Stampfer is not here.
MR. MORRIS: This is a business record of Wyeth's that contradicts -- this is using -- being used for rebuttal to contradict what they were doing with Dr. Eden at the same exact time they had information -- Meir Stampfer. That 24 goes to the notice, it goes to the duty to test, the duty to warn.
MR. WALKER: In other words, it's not being offered for the truth of the matter asserted.
THE COURT: Why doesn't it go to notice?
MR. URBANCZYK: Well, Your Honor, they've already introduced the articles in 1998 by Dr. Colditz that says it causes breast cancer. We're on notice of that allegation.
MR. MORRIS: This rebuts the conduct they are doing, the ghostwriting.
MR. URBANCZYK: This is not a learned treatise. This is a statement made at a conference being used for the truth --
THE COURT: I believe, if nothing else, it's repetitive, so I'm going to rule it out. Save your exception, note your objection.
(Proceedings continuing in open court as follows:)
BY MR. MORRIS:



Q. All right. Earlier we talked about the Premarin warning

label?
A. Yes.
Q. And have you reviewed the Premarin label in the past?
A. Yes.
Q. Have you offered opinions regarding the Premarin label in the past?
A. Yes.
Q. Regarding cancer of the breast in this particular warning, it says, "The majority of studies have shown no association with the usual doses used for estrogen replacement therapy and breast cancer. Some studies have suggested a possible increased incidence of breast cancer in those women taking estrogens for prolonged periods of time and especially if higher doses are used."
Is there anything there that in 1992 would have informed the physician regarding the relationship between estrogens and progestins, MPA?
A. No.
Q. Is there any sufficient breast cancer warning conveyed by that regarding the dangers of estrogens plus progestins in 1992?
A. No.
Q. All right. I'd like to turn with you and talk with you a little bit as I'm making the segue to talk to you about Upjohn.



And this will go much quicker. With regard to Wyeth, let me ask you a couple questions. Throughout the years, based on the documents that you've reviewed, what we just went through in terms of the documents from John Eden, with regard to the documents from the '70s, the '80s, the '90s where they dismiss, distract, from a regulatory standpoint at the FDA, was Wyeth behaving as a reasonable company should under the regulations?
A. No. There was information to suggest that there was a risk and they weren't pursuing it to find out if there was a risk and then to take the appropriate actions, either do a study or to warn people. Instead, what we've seen is that they would have programs set up to negate research and studies that actually were done and to try to distract and dismiss the information so that physicians would be led to think that the information wasn't valid.
Q. And is the John Eden set of documents that we just went through and the one that was published in the American Journal of Obstetrics and Gynecology -- was that an example of their efforts to keep the water muddy with regard to this risk?
A. Yes. I mean, it's all through all of the Wyeth documents. When endometrial cancer had erupted, they lost most of their -- they lost half of their sales. So certainly there was no desire to have cancer of the breast also emerge. So there was a concerted effort through all of the documents to downplay the breast cancer risks.



Q. Would it have been perfectly appropriate, if Wyeth had