# EXHIBIT 101

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

\- - -

| | |
|---|---|
| AUDREY SINGLETON and CHARLES SINGLETON, w/h, Plaintiffs, | : JANUARY TERM, 2005 |
| vs. | : |
| WYETH, et al., Defendants. | : NO. 02885 |

\- - -

JURY TRIAL

DAY FIVE

P.M. SESSION

\- - -

WEDNESDAY, JANUARY 27, 2010
COURTROOM 246, CITY HALL
PHILADELPHIA, PENNSYLVANIA

\- - -

BEFORE: THE HONORABLE MARK I. BERNSTEIN, J.
AND A JURY

\- - -

Reported By:
Cynthia Touni, Registered Merit Reporter,
Official Court Reporter
(215) 683-8014

\- - -

S. PARISIAN - DIRECT

A. Yes, ma'am.

Q. Dr. Bush reported that data from Katherine Fletcher at the National Cancer Institute, in a retrospective study conducted in the 1970's, saw an increased risk of breast cancer on women on HRT any dose, as compared to ERT.

A. Right.

Q. Why is that a significant piece of information when you look at the warnings that are on the 1997 Prempro label?

A. Well, the first part of the warning is only for estrogen. This is talking about E plus P. So a physician is not initially being warned that E plus P at any dose increases a woman's risk of breast cancer.

Q. Do you believe that the label should have said that at any dose E plus P could increase the risk of breast cancer?

A. Yes; particularly when you're talking about Prempro, which is an E plus P product.

Q. If we turn now to the second sentence of the warning. The majority of studies, however, have not shown an association in women who have ever used estrogen replacement therapy.

S. PARISIAN - DIRECT

Can you tell the jury what, in your opinion, is significant about that sentence?

A. In terms of the way this is written it would imply to a physician that it's all right. That the majority of the studies have shown there is no association with estrogen replacement therapy with breast cancer. So you begin with a warning that says there could be and then you end with a warning that says, don't worry, the studies have not shown that.

Q. Would it be reasonable for a doctor to believe that these sentences negated each other?

A. Yes.

Q. In your opinion, do they negate each other?

A. Yes.

Q. If we go to the next sentence, the effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen progestin therapy has been reported. Other studies have not shown this relationship.

Can you tell the jury the significance of this sentence?

A. Well, in terms of the very first sentence that

is saying that the risk of the progestin is unknown. Then you have at the very end, the last sentence, saying other studies.

So, again, you've negated the warning. You're saying, well, it's not known if progestin increases the risk of breast cancer, which is in agreement with what we just saw from the 1970's. Then you throw in a hooker at the end saying that there has been no relationship.

So it's writing a warning that actually is a nonwarning that means we don't know.

Q. If we look at the next sentence of the label it says, in a one-year clinical trial of Prempro, Premphase and Premarin alone, five new cases of breast cancer were detected among 1377 women who received combination treatments, while no new cases were detected among 347 women who received Premarin alone. The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population.

Can you explain to the jury the significance of that sentence?

A. Well, I would go up even to the sentence before where it says five new cases of breast cancer

S. PARISIAN - DIRECT

were detected. FDA had requested the word developed, because the word detected implies that is, oh, we're doing a study and we detected five cancers in women; whereas, developed is a much more important word because it means those women in the study taking the drug developed cancer.

So in terms of the very first wording, the FDA and Wyeth from the documents I've seen went back over the word developed versus detected. They ended up with detected.

Q. Let me ask you this a question about that: When the FDA wanted to describe -- the FDA wanted to describe this study, the FDA's language, five new cases of breast cancer developed, what would be different with that statement than what was actually in the label?

A. The use of the word developed. All the women enrolled in the study had negative mammography. They didn't have breast cancer identified before they were enrolled. So the word developed means that they developed it while taking the drug combination in the studies. It's more significant to a physician than just they were detected. You could have had women who were enrolled and, oh, you

detected in the enrolled population.

So it actually shows that the drug developed in a short study five new cases of breast cancer all of which were negative when they went into the study.

Q. Did Wyeth negotiate with the FDA to use Wyeth's language instead of what the FDA wanted?

A. From the documents I reviewed, yes. The word that was finally negotiated was detected rather than developed.

Q. Then the last sentence, the overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population.

What's the significance of that sentence?

A. That doesn't really reflect in terms of studies internally at Wyeth what the clinical incidence was of the background population.

The background population means the women who aren't taking hormones, what their cancer risk is at the same age. And this really isn't supported by, if you use a database like the SEER database, which Dr. Austin talked about, isn't really supported. There was a higher risk in women

S. PARISIAN - DIRECT

taking E plus P than the background rate. So it's not accurate.

Q. Would this would it be reasonable for a doctor reading this to see that there was no increased risk of breast cancer in this study?

A. Well, that's what that final sentence is telling a doctor, that the occurrence of cancer is just like if the woman hadn't taken the drug. It's not more than what's occurring in the normal population.

Q. Is that sentence accurate or inaccurate based on the documents you've seen?

A. It's inaccurate based on documents I've seen.

Q. If you turn to tab 44 -- no 43, Plaintiff's Exhibit 830.

Is that one of the documents you've reviewed on this issue?

A. Yes, ma'am.

Q. If you turn to page 17 of this document.

MS. LITTLEPAGE: Judge, may we publish --

BY MS. LITTLEPAGE:

Q. Let me ask you, is Plaintiff's 830 a document prepared by two doctors from Wyeth?

S. PARISIAN - DIRECT

A. Yes, ma'am.

Q. Dr. Pinizzotto and Dr. Cui?

A. Correct. And they're both involved in the global safety surveillance and epidemiology division. That would be the division that does pharmacovigilance. That is the group that looks for safety signals.

Q. Did this group, on page 17, review the trial, the pivotal one-year trial, that's a part of this sentence, that's the study discussed in this sentence of the label?

A. Yes.

Q. On page 18 did they assess a statistical analysis of this last sentence?

A. Yes.

MS. LITTLEPAGE: Judge, may we publish Plaintiff's 830?

THE COURT: Yes.

BY MS. LITTLEPAGE:

Q. Can you tell the jury what these -- what that data showed when Wyeth looked at the actual background rate compared to its study, what did it show?

A. Okay. This discussion is they're looking at

the SEER database that's the database I believe Dr. Austin talked about. It's the cancer database. And it's a publicly available database. And they looked at their own population. They calculated the occurrence of breast cancer in the CE/MPA, that would be the E plus P group, and they calculated it was 4.1 per 100 patient years and they compared it to what the background rate is for the normal population which is .29 per 100 patient years.

So in terms of their population where they had done a study for the Prempro looking for occurrence of breast cancer, it was .41 versus the background rate of the population which is .29. So there's a difference between 41 -- I guess it would be 41 per 10,000 patient years versus 29 per 10,000 years, if you take out the decimal.

So there's a significance difference in that the risk is higher than the background rate that was calculated so that statement in the label is incorrect.

Q. So is the background rate and the rate from the study equal? Are they the same?

A. No.

Q. Is one higher than the other?

S. PARISIAN - DIRECT

A. Yes. 41 is higher than 29. This was only after a one-year study.

Q. If we look at the next sentence of the 1997 Prempro label, it talks about in the three-year clinical post menopausal estrogen progestin intervention PEPI trial of 875 women to assess differences among placebo unopposed Premarin and three different combination hormone therapy regimens.

Let me stop there and ask you have you reviewed documentation about the PEPI trial?

A. Yes.

Q. What differences was the PEPI trial assessing?

A. It was looking at cardiovascular issues. It wasn't looking at breast cancer. It's not a breast cancer study.

Q. PEPI was a heart study?

A. Yes.

Q. Did the label tell doctors that the study was a heart study and not a breast cancer study?

A. No.

Q. And then the label says that there was one new case of breast cancer detected in the placebo, one in the Premarin only group, none in the continuous

Premarin plus continuous medroxyprogesterone acetate group, two in the continuous Premarin and cyclic medroxyprogesterone acetate group.

Can you tell the jury what's the significance of this information in the label, in your opinion?

A. It would be confusing to a physician because this study wasn't designed to look at breast cancer. There's statements there about breast cancer, but it's really not telling them if there's a risk of breast cancer which is what the warning is supposed to be doing.

So, yes, there was a study, but it's misleading in that it was not a study that was looking at breast cancer.

Q. Would it be reasonable for a physician reading this to be reassured that there was no increased risk with using E plus P based on the data from the PEPI study?

A. Yes. Particularly when he was told in the paragraph before that there's no difference from the background rate.

Q. If you turn to tab 44, Plaintiff's Exhibit 20941, is this a Wyeth document?

A. Yes.
Q. Dealing with the PEPI study?
A. Yes.
MS. LITTLEPAGE: Judge, may we publish from 20941?
THE COURT: Yes.
BY MS. LITTLEPAGE:
Q. Does this document indicate it's an internal Wyeth e-mail?
A. Yes.
Q. It indicates PEPI was not designed to evaluate the risk or incidence of breast cancer. The study was not powered to answer this question.
A. Correct.
Q. Did Wyeth ever tell doctors out there in this country that the study they put in their label was not designed to evaluate the risks or incidence of breast cancer?
A. Not that I've seen. PEPI was actually the forerunner of the WHI. They were doing a smaller example with PEPI to kind of iron out how to do the WHI study.
Q. Do you have an opinion, Dr. Parisian, whether the 1997 label was adequate and accurate based on

S. PARISIAN - DIRECT

the stuff we've just been through, all those sentences we've just talked about?

A. I do. It was not adequate and it is not accurate in terms of a physician trying to read this label to determine if E plus P increases the risk of breast cancer. It doesn't reflect what Dr. Allen would ask for in 2000 and not yet about the risk of breast cancer.

Q. And I want to hand you the 2003 printed PDR and I've put tabs on the Prempro place so you can find it.

A. Thank you. It's tiny.

Q. Can you confirm to the jury that the language that we've just gone through from the 1997 label, the warnings of breast cancer, are the same in the 2003 PDR? Does the same language appear in the 2003 PDR?

MS. HUBBARD: Your Honor, if we could have a brief sidebar on this.

THE COURT: Yes. Let me see you at sidebar.

(DISCUSSION HELD AT SIDEBAR AS FOLLOWS:)

THE COURT: This is the 2003 PDR the

doctor received and it's the same.

MS. HUBBARD: The initial one. Not the supplement. I can't tell what she handed her. Was it the initial 2003 PDR?

MS. LITTLEPAGE: Yes.

THE COURT: So it's the same.

MS. HUBBARD: That one was the same.

THE COURT: Can we agree that it's the same so she doesn't have to spend 20 minutes reading it and then you'll do whatever you need to do?

MS. HUBBARD: Sure.

THE COURT: Okay. Is that why you wanted to go to sidebar? I was just trying to ask.

MS. HUBBARD: The other problem is because it was an update to the 2003 PDR, I didn't know what she had been handed.

THE COURT: That's fine. That's fine.

(END OF SIDEBAR DISCUSSION.)

THE COURT: Have you had time to review it?

THE WITNESS: Yes, sir.

THE COURT: Is it the same?

THE WITNESS: Yes, sir.

BY MS. LITTLEPAGE:

Q. Now, did Wyeth -- did the FDA at any time ask Wyeth to put stronger breast cancer warnings in its label?

A. Yes. In 2000.

Q. What happened? That's the 90 days that Dr. Allen -- that you talked about?

A. Right. Nothing happened.

Q. Was the stronger language that Dr. Allen wanted in the 2003 PDR?

A. No.

Q. It's the exact same language as the 1997.

A. Correct.

Q. Now, in 2002 when WHI came out, was that the first -- in 2002 did first WHI article come out?

A. Yes, July.

Q. Were there more WHI articles that came out after 2002?

A. Yes.

Q. Why would that happen? Why would there be more WHI articles?

A. Some of it was actually gathering data from the WHI studies. There were studies that were

S. PARISIAN - DIRECT

continuing and then also other people picked up some of the information in there and conducted other studies.

Q. And we've talked about the Million Women Study.

Did that come out after 2002?

A. Yes, it did. It came out in 2003. That was a study that was begun in the United Kingdom.

Q. Were there any other study of particular importance to you that came out after 2002 that you think you want to talk about?

A. The RAPP study. I believe WHIMS, the cognitive study, to look at dementia.

Q. That would be the study to show there wasn't a brain benefit?

A. Correct.

Q. From the WHI?

A. Correct.

Q. Okay.

A. There was a retrospective database study, the JICK study going back and not using the WHI database, but an insurance claims database to look at was there an increased risk of the breast cancer.

Q. I want to ask you now, Dr. Parisian, based on

S. PARISIAN - DIRECT

the information from the WHI and the articles that have come out since then that you perceive are significant, I want to go through each of our categories and ask you what would, starting first with risks, what would be an appropriate warning for Wyeth -- could all these articles -- could all of these studies have been done 10 to 15 years earlier?

A. Yes. Particularly the JICK study. It was just a database study. So that study could have been done at any time.

Q. And we've talked about the Million Women's and Wyeth's access to that sort of information?

A. Correct.

Q. Then the WHI we talked about whether Wyeth could have done that earlier?

A. Right.

Q. If Wyeth had done all these studies earlier, in your opinion, would the warnings have been different on this drug from 1997 through 2003?

A. Yes.

Q. In your opinion, starting with risks, what should an adequate warning -- that's a bad question.

If Wyeth had done the studies 10 to 15 years earlier, in your opinion, what would an

S. PARISIAN - DIRECT

appropriate and adequate label have been on this drug 10 or 15 years earlier?

A. Well, it definitely would have begun with the risk of breast cancer with E plus P that the -- it doesn't matter what dose, but the longer you take E plus P, the increased risk.

In terms of the Million Women's Study where the data showed at 2.6 years you had an increased risk. So in terms of the length of time, the physician would know that the longer you keep the woman on the drug, it has an increased risk. And so that would be something to consider.

The other thing --

Q. Hold on. Let me ask you a couple of questions.

The increased risk after 2.6 years is from the --

A. Million Women Study.

Q. Would the label also say that the risk keeps going up for --

A. Every year. There actually was also the CALLE study that showed that there was an increased risk around two years. So there's been subsequent studies that have gone with that. And every year

that the woman stays on it, so she would consider are my menopausal symptoms so bad that I need to have this drug and be concerned about the risk of the breast cancer. So she would decide how long she wants to be on it.

Also, the other thing that we hadn't talked about is the dose. That the FDA had required a dosing study to be done, which had never been done before, and in terms of low dose. So we would be now making a label for low dose. So low dose, the increased risk in time increases over use, definitely an increased risk with E plus P.

Q. Meaning that the E plus P risk is different than the E alone?

A. Yes.

Q. In your opinion, would an adequate label tell a doctor that E plus P can cause breast cancer?

A. Yes. There's the Lee study that actually showed that it causes breast cancer. And if you look even now at the patient insert, it says one of the side effects of Prempro is breast cancer.

Q. Would there be information, in your opinion, about the type, the size or the staging of the cancer when it was found?

S. PARISIAN - DIRECT

A. Most of the breast cancer that is being identified is invasive cancer.

Q. What's important about it being invasive versus something else?

A. Invasive cancer would be cancer that spread to the lymph nodes. It's harder to treat. It can be more dangerous.

In that same issue if you're going to talk about invasive breast cancer, you would also talk about the breast changes. When you put a woman on E plus P, her breasts are going to be more dense. We haven't talked about that, but in terms of mammography that dense breasts are more difficult use mammography on to identify cancer.

One of the good things about getting old is that your breasts become less dense and so mammography is better for older women because they don't have the estrogen progestin effect. You give them estrogen and the breasts are more difficult to do mammography on. So in terms of the invasive cancer, you have an issue with dense breasts.

You would also say you're not going to get a benefit of the cardiovascular benefit.

Q. Hold on. The breasts become more dense with

the E plus P?
A. E plus P.
Q. Because otherwise it would be becoming less dense because of their age?
A. Right.
Q. Then you said?
A. There is no cardiovascular benefit. There is no benefit for dementia. And in terms of osteoporosis, bone, that actually the FDA recommends Vitamin D, exercise, calcium are the number one things for if you're going to treat osteoporosis. There are other drugs approved for osteoporosis if a woman can't take any of these and is in that bona fide risk for osteoporosis, then you can consider this product.
Q. Okay. So that the woman should consider Vitamin D. You said something in the middle?
A. Calcium.
Q. And exercise or other drugs first?
A. Correct.
Q. Then as a second line treatment, use this drug?
MS. HUBBARD: Your Honor, I object to counsel just restating the witness'

testimony.

THE COURT: No, I don't have a problem with counsel restating, but I do have a problem with counsel leading.

MS. LITTLEPAGE: Sorry.

BY MS. LITTLEPAGE:

Q. Would hormone therapy in an adequate label be first line or second line treatment for osteoporosis?

A. It would be definitely second line. If indeed all these -- and also it would have to be a woman at bona fide risk of osteoporosis.

THE COURT: Does the PDR sometimes use these other medications first?

THE WITNESS: Yes. And it can also -- it also can have if something is not effective and it's commonly thought that it is, and so physicians can be told that it's not.

THE COURT: Okay.

BY MS. LITTLEPAGE:

Q. For osteoporosis.

What about for vaginal issues related to menopause?

S. PARISIAN - DIRECT

A. For vaginal, if you're worried about vaginal atrophy, there are topical estrogen, even topical Premarin products that you can use instead of taking a daily pill all the time.

Q. What is a topical product?

A. It would be like a cream, an ointment, a suppository, something that you would put up into the vagina to treat atrophy.

Q. And an adequate label, would it say to first use those topicals?

A. Right. So this, again, would be second line. If a woman who has major issues with vaginal atrophy, then she can use this product.

But, again, she would have warnings to determine if her vaginal atrophy is bad enough if she wants to take an oral product everyday. A woman can decide that she did for a certain amount of time.

The other, hot flashes. Hot flashes. In terms of hot flashes, you could have no treatment and just suffer through them or you can take black cohosh which is an herb that some people take or you can take this product for a short period of time.

Q. What type of woman in an adequate label would

be recommended this product for hot flashes for?

A. A woman that's symptomatic of being estrogen deficient who would need estrogen and typically those women are symptomatic; they would have these and they would have worse symptoms than the majority of women, but they could be shown. And I think Miss Singleton actually had been shown by testing to be estrogen deficient.

MS. HUBBARD: I object. Move to strike the last point.

THE COURT: Because of the report?

MS. HUBBARD: Yes.

THE COURT: Objection overruled. It's incidental.

BY MS. LITTLEPAGE:

Q. In an adequate label would the adequate label recommend the use of E plus P with any woman with hot flashes or just women who had a certain level or type of hot flashing?

A. They would recommend it as a first line for women who meet a certain symptom type, not just any woman for hot flashes.

Q. The last thing you told us before was about dose and duration.

S. PARISIAN - DIRECT

A. Correct.

Q. Tell me how that would come together in the adequate labeling, in your opinion?

A. Well, when I'm writing an adequate label here or what would be in one, I am also taking into consideration that there is a low dose estrogen Prempro product which is lower dose than what was originally offered to Miss Singleton. And so in terms of the dose, the physician and the patient would be considering low dose, short duration for this, for these types of treatment of symptoms, which have not been an alternative for Mrs. Singleton at that time.

Q. In your opinion, Dr. Parisian, if Wyeth had done the studies that they could have done 10 to 15 years later, could their label have included all of the information you've just gone through with us as to an adequate label?

A. Oh, yes. I mean it did not have to wait until after the WHI. The most this information could have been gotten back when we went through that study from 1983, 1990. It could have been available by 1990.

Q. Did the Wyeth label that's printed in the PDR

S. PARISIAN - DIRECT

from 1997 on include the information that you've just said is needed for an adequate label?

A. No.

Q. We talked about a black box warning.

In your adequate label, would you have put breast cancer information in a black box?

A. I would have put it number one because I think in terms of a woman, it should be right up there for her doctor to know. And I also would have put in the black box that the WHI was stopped because of crossing this line for breast cancer and that's still not in the label.

Q. That the WHI was stopped because of breast cancer?

A. Right. Because it had reached, and I think that's important for a physician, the safety line had been crossed. The product was no longer considered safe to continue in this clinical trial because of the breast cancer risk. That's still not clear in the label.

Q. Now, you told us about low dose would be one of the things that you recommended, low dose, short duration.

Is there now today a low dose Prempro

S. PARISIAN - DIRECT

option?
A. Yes.
Q. When we say low dose, is it a lower dose of the E or the P or both?
A. Both. And that was one of the conditions of the Prempro approval. We said there were two. One was to look for breast cancer. The other was for Wyeth to investigate a low dose product. And the FDA requested that the company look at that.
Q. When Wyeth brought the low dose product to market, did Wyeth in the documents you've reviewed believe that the low dose was, in fact, a new drug different from the Prempro that Mrs. Singleton took?
A. From what I had seen in the documents, the company had requested to name it a different name, Premia, to distinguish from it Prempro.
Q. Did the FDA allow the company to call it a new name?
A. No.
Q. Is it referred to in the marketing materials as low dose Prempro, this new product?
A. Yes.
Q. Now, Dr. Parisian, do you have an opinion whether the Prempro that Audrey Singleton took from